**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **KEN and NAOMI SCHWIEKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:06-CV-838** |
| | ) | |
| **OLDCASTLE MATERIALS SOUTHEAST, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' EVIDENTIARY SUBMISSION IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs hereby file the following exhibits in support of the Motion for Partial Summary Judgment e-filed on the evening of September 6, 2007. These exhibits were too large to e-file on September 6, but per discussion with the Clerk's Office, the exhibits were split into smaller electronic sizes so that they are now capable of submission electronically.

The exhibits electronically filed herewith are:

P MPSJ Exh 3 Vol 8

P MPSJ Exh 3 Vol 9 part 1

P MPSJ Exh 3 Vol 9 part 2

P MPSJ Exh 3 Vol 9 part 3

P MPSJ Exh 3 Vol 10 part 1

P MPSJ Exh 3 Vol 10 part 2

P MPSJ Exh 3 Vol 10 part 3

P MPSJ Exh 3 Vol 10 part 4

P MPSJ Exh 3 Vol 11 part 1

P MPSJ Exh 3 Vol 12 part 1

P MPSJ Exh 3 Vol 12 part 2

P MPSJ Exh 3 Vol 12 part 3

P MPSJ Exh 4 Vol 14 part 1

P MPSJ Exh 4 Vol 14 part 2

P MPSJ Exh 4 Vol 14 part 3

P MPSJ Exh 4 Vol 14 part 4

P MPSJ Exh 4 Vol 14 part 5

P MPSJ Exh 4 Vol 14 part 6

P MPSJ Exh 4 Vol 15 part 1

P MPSJ Exh 4 Vol 15 part 2

P MPSJ Exh 4 Vol 15 part 3

P MPSJ Exh 4 Vol 15 part 4

P MPSJ Exh 4 Vol 15 part 5

P MPSJ Exh 4 Vol 15 part 6

P MPSJ Exh 4 Vol 15 part 7

Respectfully submitted this the 7th day of September, 2007.


                                            s/ C. E. Vercelli, Jr.
_____    **CHARLES E. VERCELLI, JR.** (VER003)
                                            One of the Attorneys for Plaintiffs


**OF COUNSEL:**
LAW OFFICES OF JAMES B. SPRAYBERRY        Charles E. Vercelli, Jr.
P.O. Drawer 2429                          VERCELLI & ASSOCIATES, P.C.
Auburn, AL 36831-2429                     1019 S. Perry Street
TEL:   (334) 821-7100                     Montgomery, AL 36104-5049
FAX:   (334) 821-7101                     TEL:   (334) 834-8805
jsprayberry-spraylaw@charter.net          FAX:   (334) 834-8807
                                          cvercelli@vercelli-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2007, I electronically filed the foregoing with the Clerk of the United States District Court for the Middle District of Alabama, using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Phillip E. Adams, Jr.
Rick Davidson
Matthew W. White
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

I also hereby certify that a copy of the foregoing will be served upon:

W. F. Horsley
SAMSON & DENSON, LLP
P. O. Box 2345
Opelika, AL 36803-2345

counsel for the landowners, by placing a copy of the same in the United States Mail, postage prepaid and properly addressed on the 7th day of September, 2007.

/s/ **C. E. Vercelli, Jr.**
Of Counsel

500-06\P MPSJ Evid Sub.1.wpd

3

Circuit Court No. CV02-85   Supreme Court No. 1040857

# APPEAL

## TO

# Supreme Court of Alabama

## FROM

MIKE & DONNA DAVIS ETAL--OLDCASTLE MATERIALS SOUTHEAST, INC & HANSON
AGGREGATES SOUTHEAST, INC.                                    *Appellant*

vs.

HANSON AGGREGATES SOUTHEAST, INC ETAL, & CITY OF OPELIKA, CITY OF
OPELIKA UTILITIES BOARD ETAL                                  *Appellee*

1    to our complaint in part on the grounds of

2    a statute of limitations.  They are arguing

3    that the statute of limitations bars your

4    complaint.

5              As you know, on a statute of

6    limitation's issue, if the character of the

7    nuisance has changed, the -- if the nuisance

8    has gotten much worse and much bigger, for

9    example, then the statute of limitations won't

10   bar the complaint.  Well, we have got to have

11   Opelika Materials' information regarding how

12   much aggregate they have put out, how much

13   water they have pumped, how much blasting

14   they did, in order to rebut the claim for --

15   for the statute of limitations.

16             THE COURT:  These are the people -- the

17   entity that operated the quarry --

18             MR. VERCELLI:  Yes.

19             THE COURT:  -- for Hanson?

20             MR. VERCELLI:  They are the ones who

21   basically opened it up in '96, '97.  And then

22   Hanson took it over in --

23             THE COURT:  And then they sold it to

24   Hanson?

25             MR. VERCELLI:  Sold it to Hanson.

1    THE COURT:  So they reopened it

2    in--what--'99?

3    MR. VERCELLI:  Well, it -- a continuous

4    operation essentially, but they made it

5    bigger.  It has gotten a whole lot bigger and

6    a whole lot worse since Hanson had it, we

7    contend.

8    THE COURT:  Well, why have y'all objected

9    to the subpoena?

10    MR. BYRAM:  Well, Judge, we -- we bought

11    the quarry more than two years before they

12    filed this lawsuit.  So anything about what

13    Opelika Materials was doing, you know, it is

14    at least two and a half years ago.

15    THE COURT:  I thought you said it was

16    Grill and Mooney.

17    MR. BYRAM:  Well --

18    MR. VERCELLI:  They are the owners.  Mr.

19    Grill and Mr. Nooney were the owners of

20    Opelika.  Opelika doesn't exist any more --

21    Opelika Materials doesn't exist.  We can't

22    get the records from the Opelika Materials,

23    so we need to get it from --

24    THE COURT:  When you say Mooney and Grill,

25    that's what you are talking about?

```
1              MR. VERCELLI:  Yes.  Actually Nooney with

2        an N.

3              THE COURT:  Nooney?

4              MR. VERCELLI:  Nooney with an N.  Yes.

5              MR. BYRAM:  The statute of limitations

6        was two years.  So anything before two years

7        before the lawsuit was filed, or February 12th,

8        2000, would just be irrelevant.  This case is

9        going to be complex enough without going and

10       getting into somebody else's files who operated

11       the quarry three or four years ago.

12             THE COURT:  What's the date of your

13       objection?

14             MR. BYRAM:  September the 23rd.

15             MR. VERCELLI:  They have got other

16       information, Your Honor.  For example,

17       pre-blast inspections.  We know from a number

18       of our clients that pre-blast inspections of

19       their homes and properties were performed at

20       the direction of Opelika Materials.  No one

21       to date has been able to give us copies of

22       whatever Opelika Materials did.  And -- for

23       example, that's one of the things we have just

24       got to have because we have claims on behalf

25       of these people for damages to their homes,
```

1    and these pre-blast inspections were conducted

2    in order to establish the base foundation of

3    the house before the blasting occurred.  We

4    also need the blasting records, personnel

5    records to show how many people were employed

6    there at the time.  We need information on

7    how many trucks are going to come in and out;

8    whether they were even pumping water out of

9    there.  We know they weren't pumping water

10    anywhere near the capacity they are pumping

11    now, if they were even pumping water.

12        THE COURT:  Are y'all going to pay them

13    to produce all this?

14        MR. VERCELLI:  Yes, Your Honor.  We will.

15    We haven't spoken with them, obviously, or

16    issued the subpoenas yet.  We intend to, if

17    Your Honor will allow us to issue the

18    subpoenas.

19        THE COURT:  I mean, how far back do you

20    expect to look for information?

21        MR. VERCELLI:  Well, they only go back to

22    '97, '96, I guess.

23        THE COURT:  Okay.

24        MR. VERCELLI:  It's not a real long time.

25        THE COURT:  All right.  I will grant it

1     then.

2          MR. VERCELLI:  Your Honor, do we just go

3     ahead and issue the subpoenas or do we --

4          THE COURT:  If you want to prepare an

5     order.

6          MR. VERCELLI:  Prepare an order.

7          THE COURT:  That would be fine.

8          MR. VERCELLI:  Prepare an order.

9          THE COURT:  Okay.  What's the next motion?

10         MR. BYRAM:  Judge, we had the motion to

11    compel production of some settlement

12    agreements.

13        THE COURT:  Settlement --

14        MR. BYRAM:  Yes, sir.   The -- we filed

15    that motion on August the -- August the 28th,

16    2002.  Two of the Plaintiffs in this case

17    sued the prior operator of the quarry and

18    entered into a settlement and made the same

19    kind of claims they make in this case.  They

20    settled with the prior operator of the quarry.

21    So we want to see the release and see what --

22    what the release is.  We also want to know how

23    much money they got.

24        MR. SPRAYBERRY:  We have no objection to

25    giving the release, Judge, but we would like

1    to redact the money out.  I think they are

2    entitled to see the release.

3        THE COURT:  Who are the --

4        MR. SPRAYBERRY:  One is a Haywood Jackson.

5    Mr. And Mrs. Haywood Jackson.  The claims are

6    similar but not the same.  They had -- actually

7    a rock shot through the roof.  It may have

8    been your case.

9        THE COURT:  The other one was Parker,

10   wasn't it?

11       MR. BYRAM:  Right.

12       MR. SPRAYBERRY:  The Parkers are not

13   Plaintiffs in this case, so we do not have

14   access to that.

15       THE COURT:  You are just asking for Mr.

16   Jackson?

17       MR. BYRAM:  They are.

18       MR. SPRAYBERRY:  Oh.  You are talking

19   about the other Parkers.

20       MR. BYRAM:  The Parker by the road sued,

21   didn't they?

22       MR. SPRAYBERRY:  Well, there is two sets

23   of Parkers.  Three sets.

24       MR. BYRAM:  There are three of them.

25       MR. SPRAYBERRY:  Three sets of Parkers.

1   There are three sets of Parkers.

2       THE COURT:  I am talking about Billy

3   Parker's son.

4       MR. SPRAYBERRY:  No.  They are not

5   parties.  There is another Parker, James and

6   Shirley, that live over on 169 that do have

7   another release.  That was for trespass where

8   Opelika Materials was actually driving across

9   their property.  We have no problem with that

10  one either, Judge.

11      THE COURT:  Okay.  Just --

12      MR. SPRAYBERRY:  Can we redact the money

13  out of it?

14      MR. BYRAM:  Judge, I think you ought to

15  consider that and -- when the issue comes up of

16  whether it's admissible or not, but as far as

17  discovery, I don't see any reason why we

18  shouldn't be able to know how much money they

19  got.

20      THE COURT:  Well, what kind of claims

21  does Mr. Jackson have now?

22      MR. SPRAYBERRY:  Now its for flooding of

23  his property, diverting water onto his

24  property, for dust, noise.  It's not for

25  shooting rocks through the ceiling like the

1        last time.

2              MR. BYRAM:  We don't have a problem wi

3        making --

4              THE COURT:  Well, didn't he make -- di

5        he make a claim for dust last time?

6              MR. SPRAYBERRY:  I don't -- not that I

7        aware of.  I mean, the main thrust of the c

8        was rocks coming through.

9              THE COURT:  Well, y'all have got the

10       complaints and all.

11             MR. BYRAM:  What he -- what he said wa

12       that it was unbearable to live next to a

13       quarry, and he settled the case and got the

14       money and bought a lakehouse at Lake Martin

15       and now he wants to get the same money agai

16       because he decided to stay by the quarry.

17             THE COURT:  Okay.  I will release the

18       information and grant -- and do a protectiv

19       order on it.

20             MR. BYRAM:  Okay.

21             THE COURT:  If you would do that and g

22       it to Mr. Byram.

23             MR. SPRAYBERRY:  Do you want us to dra

24       an order?

25             MR. BYRAM:  Sure.

```
 1          THE COURT:  Do a protective order

 2     MR. BYRAM:  Yes.

 3          THE COURT:  -- just saying that i

 4   for y'all's eyes only.

 5     MR. BYRAM:  We actually have a --

 6   general protective order in this case;

 7   can just stamp it under that, and that

 8   keep it from -- that's fine.

 9               Judge, the only other th

10   had was at our first hearing I think i

11   case or at one of the earlier hearings

12   filed a motion to file a motion under

13          THE COURT:  Yes.

14     MR. BYRAM:  And at the time we c

15   Monsanto case.

16          THE COURT:  Uh-huh (affirmative

17     MR. BYRAM:  And -- and you asked

18   was any other authority, and -- and s

19   got back to the office, we drafted th

20   to reconsider and filed that, and thi

21   Highland versus Eades case.

22          THE COURT:  Okay.  Well, I will

23   look at Highland v. Eades.  But I am

24   hesitant to let anybody file --

25     MR. BYRAM:  Well, Judge, our con
```

1          THE COURT:  -- confidential motions in

2      simple litigation.

3          MR. BYRAM:  Our concern, Judge, as we

4      expressed before, is concern over -- and we

5      also filed a motion -- joined with the motion

6      to reconsider is a motion for an in-camera

7      inspection, and we brought the stuff if you

8      want to look at it today.  But our concerns is

9      with the fair trial issues which are discussed

10     in the Highland versus Eades' case.  And some

11     of the information -- the -- the newspaper has

12     covered routine motions in this case and

13     routine hearings, and you have -- we have no

14     doubt that this would be --

15         THE COURT:  I don't see anybody.

16         MR. BYRAM:  -- in the newspapers, and the

17     only way we know to prevent that would be to

18     allow it under seal, which is what happened in

19     the Monsanto case.

20         THE COURT:  Well, I don't see anybody

21     from the newspaper here today.  Anybody from

22     the newspaper?

23         MR. BYRAM:  They seem to pick it up

24     whether they are here or not.

25         THE COURT:  You know, I will take a look

at it, but I am just real hesitant to allow

any motions to be filed under seal or Exhibits

that are attached to motions to be filed under

seal.  It just doesn't seem to be a real good

public policy for that.

MR. BYRAM:  Well, there is a strong public

policy for the Defendants to have a fair trial.

And that's the public policy that we are

relying on.

THE COURT:  Well, I guess the same thing

I told you last time:  We do capital murder

cases up here all the time.  I mean, you can

do individual voir dire.   And -- and then,

you know, basically the case law on -- on those

cases indicate that the -- then the -- any

type of motions about whether or not it was

a proper venue or not could be argued at that

time to see whether or not you can impanel the

jury, and I guess -- and that, of course, is

what I said last time, you know, borrowing --

borrowing criminal case law to apply to this

case on jury selection.

MR. BYRAM:  Well, Judge, I understand,

and -- and -- your feeling about it, but you

had asked me was there any other authority,

1          so --

2                  THE COURT:  Yes.  I will -- I will be more

3          than happy to read Highland.

4                  MR. BYRAM:  -- so here is another case and

5          it says there is a balancing test.

6                          (Brief pause and a brief

7                          off-the-record discussion was

8                          had.)

9                  THE COURT:  Then there was a motion to

10         dismiss, I guess Ms. Priest again, or the

11         Priest family?

12                 MR. DENSON:  Yes, sir.  The Young and the

13         Gilmer family.

14                 THE COURT:  I mean, Gilmer.

15                 MR. DENSON:  The Youngs own one tract and

16         the Gilmers own another tract.  And we raised

17         this point in the -- in regard to the first

18         complaint, the first amended complaint and now

19         the second amended complaint, and that is that

20         the -- the landowners -- and I would like to

21         get a response from the Plaintiffs' attorney

22         because we -- we went over this at the time we

23         filed our first motion to dismiss.

24                 THE COURT:  Right.  And I think that Mr.

25         Vercelli wrote a letter saying that --

1          MR. DENSON:  Right.

2          THE COURT:  -- clarifying that they

3     weren't asking for any type of monetary damages

4     at all but simply injunctive relief, and since

5     they were asking for injunctive relief, they

6     felt they needed to still remain as a named

7     party.

8          MR. DENSON:  Well, the -- it's our

9     contention, Judge, that in regard to the

10    second amended complaint, only count four

11    would apply to my Defendants because that is

12    the one count that is asking for injunction to

13    completely shut down the quarry.  Mr.

14    Vercelli's letter raised the point that he

15    thought he ought to have count five, which asks

16    for an injunction, but as an injunction

17    regarding the operation, in that they want to

18    enjoin the diversion of water.  That's still

19    the operation.  We are not operating the

20    quarry.  And I think the only proper count

21    against the Young and Gilmer Defendants would

22    be count four, to shut down the quarry.  We --

23    we have been through this -- because there has

24    been no ruling yet, we continue to have to go

25    through the discovery of each Plaintiff saying

1    that they are not claiming damages and that the

2    only thing they want against my Defendants is

3    to shut down the quarry.  We don't do any

4    operation, so we don't stand to be ruled by an

5    injunction with regard to how to divert water

6    or how to cause dust or noise or anything like

7    that, so --

8         THE COURT:  Well, do y'all still have

9    any -- under your lease do you have any rights

10   to the water?

11        MR. DENSON:  I don't think it addresses

12   that.

13        THE COURT:  Okay.

14        MR. VERCELLI:  They have -- they have

15   income rights, though, and that's some of the

16   difficulty.  I think if Your Honor were to

17   enjoin the quarry, they might then have a suit

18   against Hanson over there for not living up to

19   the terms of their lease, for example.  So I

20   think the royalty rights are sufficient to keep

21   them in.  We don't want to end up here at the

22   trial whenever it occurs and have -- and hear a

23   complaint that we can't get all the relief we

24   need for injunctive relief because we don't

25   have the Young -- the property owners here with

1419

 1    us.

 2         THE COURT:  Well, I will leave them in

 3    right now as to count four and five, and then

 4    -- then we can address them again at the

 5    pretrial.

 6         MR. DENSON:  One point I want to raise

 7    in regards to the Young Defendants, that --

 8    that piece of property is owned by four

 9    children, and they only attempted to serve one,

10    so we only have one of the four in court.

11         THE COURT:  Well, you may have to look at

12    your chain of title, Mr. Vercelli, and make

13    sure you have got all the right -- right

14    people.

15         MR. VERCELLI:  Maybe we can work it out

16    and -- maybe we can work it out; if not, we

17    will do something.

18         THE COURT:  All right.  Anything else?

19    Do y'all want me to bring y'all back in for

20    some other hearing before the pretrial?

21         MR. BYRAM:  It's probably a good idea,

22    Judge.

23         THE COURT:  All right.

24         MR. SPRAYBERRY:  Judge, we will be over

25    here in -- at the end of December or the first

1   of January.  I don't know when you were going

2   to set the pretrial.  But we have got --

3       THE COURT:  We have already set it

4   sometime.  Let's see.  Probably would have set

5   it February sometime, isn't it?

6       MR. SPRAYBERRY:  I think we have a hearing

7   in another case --

8       THE COURT:  February 18th.

9       MR. SPRAYBERRY:  -- with Mr. Byram and Mr.

10  Walker in --

11      MR. WALKER:   That's correct.

12      THE COURT:  Okay.  When is that?

13      MR. WALKER:  On the third or fourth, I

14  think, of January.  January?

15      MR. SPRAYBERRY:  January.

16      MR. VERCELLI:  Something like that.

17      MR. SPRAYBERRY:  So they will be here

18  that -- that --

19      THE COURT:  What day --

20      MR. SPRAYBERRY:  -- week.

21      THE COURT:  -- again is that, Mr. Walker?

22      MR. WALKER:  Your Honor, I think it's the

23  third or fourth.

24      THE COURT:  Okay.

25      MR. WALKER:  It's that first week we

121

1    return after the holidays.

2         THE COURT:  On the Marietta -- on the

3    Martin-Marietta?

4         MR. WALKER:  Yes, sir.

5         MR. SPRAYBERRY:  We will all be here.

6         THE COURT:  Well, I tell you what:  Why

7    don't I set this case -- I will look at the

8    calendar -- and just as far as some type of

9    status conference, for lack of a better term.

10   We can rule on any other pending motions at

11   that time.

12        MR. VERCELLI:  I think we are probably

13   going to get another discovery motion or two.

14   For example --

15        THE COURT:  Yes, sir.  Probably.

16        MR. VERCELLI:  -- to disclose the report.

17   The study.

18        THE COURT:  So we will -- we will just

19   count on that date.

20        MR. BYRAM:  Judge, the expert witness

21   deadlines that you have established, are they

22   to provide reports at that time or Rule 26

23   information or just names or what?

24        THE COURT:  If they -- if they have it,

25   but, you know, at least the names and addresses

1    and any -- at least preliminary reports and

2    everything else just so y'all can get going.

3    It's kind of hard to ask for a motion to

4    continue when this information hadn't been

5    exchanged, and -- so at least start getting

6    kind of a free-flow of information back and

7    forth on it.    Okay.

8        MR. DENSON:  Judge, do you want me to

9    prepare an order or are you going to do --

10    dismiss counts -- excepts counts five -- four

11    and five?  Are you going to dismiss one and two

12    and three?

13        THE COURT:  If you will prepare one, that

14    will be great.

15        MR. DENSON:  All right.

16        THE COURT:  Y'all know I have been a

17    little short-handed around here.

18        MR. DENSON:  All right, sir.

19        MR. BYRAM:  Judge, do you want us to

20    prepare --

21        THE COURT:  The -- the crew has been doing

22    a great job, though.

23        MR. BYRAM:  Would you like for us to

24    prepare an order on the motion to reconsider?

25        THE COURT:  No, sir.

1          MR. VERCELLI:  Thank you, Judge.

2                (Whereupon, the proceedings in

3                this case this date were

4                concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>REPORTER'S CERTIFICATE</u>

2

3        I do hereby certify that the above and

4    foregoing transcript of proceedings in the matter

5    aforementioned was taken down in machine shorthand,

6    and that the questions and answers thereto reduced

7    to writing under my personal supervision, and that

8    the foregoing represents a true and correct

9    transcript of the proceedings.

10        I further certify that I am neither of counsel

11    nor related to the parties to the action, nor am I

12    in any wise interested in the result of said cause.

13        DATED this the 4th day of December, 2002.

14

15

16

17

18    _____

19    JANET C. SMITH

20    OFFICIAL COURT REPORTER

21

22

23

24

25

1425

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
           Plaintiff,            *
                          *
v.                                     *          CASE NUMBER: CV-02-85
                          *
                          *
HANSON AGGREGATES SOUTHEAST,           *      
INC., et al.                           *
           Defendants.           *         JUL 10 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### OBJECTION TO HANSON'S FIRST MOTION IN LIMINE

Plaintiffs would show this Court that:

1) The homeowners are entitled to testify about worry and anguish. This would obviously encompass anything that caused them anguish, which would include, but not be limited to, noise, dust, sink holes forming, the possibility of pipeline explosion and illness and/or cancer due to the carcinogenic silica dust.

2) Hanson has asserted a number of defenses, many of which are frivolous. However, all of the Geologists, both Hansons and the plaintiffs, testified that prior to the Quarry there were very few sink holes. Since December , 2002, sink holes have been forming in an alarming number, and there are now approximately forty of them in a line from the dry spring to the Quarry. All of the Geologists have examined them, had G.P.S. coordinates provided and had the opportunity to photo and/or video some or all of them.

The Geologists all agree that having the information formation is important because it is related to the dewatering which in turn, lowers the water table and

causes a collapse and the sink holes to form. The defendants experts have interviewed Mr. Tankersly and Mr. Donnie Smith, have measured their wells and have examined the sink holes. They were available at all times for depositions.

3)Mrs. Shirlene Parker's , is videos of noise, of dust, which is at or very near the same time as the dismantling of the dust suppression system by Hanson. Hanson had intentionally dismantled their dust suppression system, even though they knew that they were generating carcinogenic silica dust, and even though they knew it was in violation of their ADEM air permit. Mrs. Parker has documented huge dust clouds on her video which was given to the defendants months ago.

4) As to the other witnesses who will testify about their medical conditions, the defendants have known about them since on or before February 13, 2003.

5) The defendants never requested to take their depositions and the defendants never requested to have them examined by Dr. Thrasher.

6) Even though Dr. Thrasher has examined several of the plaintiffs, with the agreement that his reports would be produced, the plaintiffs have yet to receive any such reports. In addition, the plaintiffs had recently learned that the Doctor has refused to give a deposition and he should thus be prohibited from testifying in this case. Attached is a letter of July 9 to the defense lawyers confirming his unavailability.

7) These witnesses videos are clearly admissible. Rule 401 has as a very liberal definition of relevant. It only calls for a logical relationship between their testimony and the issues in dispute. If there is any tendency, however slight, to shed light on the issues then this tendency makes the testimony admissible.

1427

8) These other witnesses are also clearly capable of giving opinions as lay people. They can testify as to whether people are drunk or sober, sane or insane, and sick or well. Witnesses are also allowed to testify as to when their illness began or ended.  Rule 701 of the Alabama Rules of Evidence generally follows the Alabama law of evidence which has existed for years in the State of Alabama. ( § 127 and §128 ; Gamble, McElroys Alabama Evidence).

9) Hanson also argues that they have not inspected the property of these other witnesses. That is incorrect as they have done repairs on the damage they caused on Mrs. Shirlene Parkers property and on Mr. Quintons property.

WHEREFORE, the plaintiffs move this Court for an Order that would:

A) Exclude Doctor Thrasher as an expert for Hanson;

B) Allow all of the plaintiffs witnesses to testify about the noise, dust, sink holes and premises;

OF COUNSEL:

CHARLES VERCELLI, JR.,  (VER004)
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

JAMES B. SPRAYBERRY (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

GUY GUNTER
*Council for City of Opelika/ Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the ___10___ day of March, 2003.

James A. Byram, Jr., Esq.
Dorman Walker, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears, Esq.
Attorney At Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
James B. Sprayberry

# JAMES B. SPRAYBERRY

ATTORNEY AT LAW
P.O. DRAWER 2429
AUBURN, ALABAMA 36831-2429
(334) 821-7100
FAX (334) 821-7101
July 9, 2003

James A. Byram, Jr., Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

   *Re:*   *Davis, et al. v. Hanson, et al.*
      *Hanson Medical Experts*

Dear Mr. Jim:

  Today I talked with Carol Alford about scheduling the last remaining medical reviews. I asked about deposition dates for Dr. Thrasher. Apparently he will be unavailable. If he is unavailable we would object to him as a witness. If you plan to use one of his partners as a witness we would, of course, want to take his deposition next week. Also, prior to agreeing to the medical exams, we requested that we receive copies of the Doctor's reports. As of today, we have not received any medical reports for our clients.

  Please give us a deposition date next week for your Doctor and provide us with copies of the written reports.

        Very truly yours,

        James B. Sprayberry

JBS/tgt

cc: Chip Vercelli, Esq.

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' EMERGENCY MOTION TO PRODUCE SALES AGREEMENT

Plaintiffs move this Honorable Court to order the immediate production of any and every sales agreement (by whatever name or designation), transfer agreement, assignment of lease, indemnification agreement, and every document appended thereto, with respect to the sale or transfer of the Lee County Quarry from Hanson Aggregates Southeast to any other person or company including, but not limited to Oldcastle Materials Southeast, Inc.  As grounds for this motion, Plaintiffs say:

1.     Plaintiffs have learned from reliable sources that within the past month the Defendant, Hanson Aggregates Southeast, Inc., has sold or may have sold or transferred all of its interest in and to the Lee County Quarry to a company brand new to Alabama, Oldcastle Materials Southeast, Inc., or some other corporation.

2.     Hanson has not disclosed this transfer to Plaintiffs.

3.     If true, this fact obviously has enormous ramifications on the prosecution of this action, including, especially, the Plaintiffs' claims for present and future damages and for equitable relief.

F I L E D

JUL 1 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

4.      Attached to this Motion are copies from the Alabama Secretary of State's website on

Corporations.  These show that Oldcastle Materials Southeast, Inc. qualified to do business

in Alabama only three weeks ago, which is consistent with what our sources tell us.

**Wherefore, for good cause shown**, Plaintiffs move this Honorable Court to order that

Hanson immediately produce an unredacted and complete copy of each and every document related

in any way to any transfer, sale, assignment of the Lee County Quarry to any other person or

business.

_____
**James B. Sprayberry (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Dorman Walker
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan

2

Corporation                          F/C 924-926
  Legal Name:  Oldcastle Materials Southeast, Inc.

State Of Inc:  Delaware

Qualified...:  06-18-2003

Date Of Inc.:  03-06-2002

Reg Agent...:  THE CORPORATION COMPANY
               2000 INTERSTATE PARK DR  STE 204
               MONTGOMERY, AL  36109

Prin Address:  100 CORPORATE PKWY  STE G2
               BIRMINGHAM, AL  35242

Nat Of Bus..:  * Not On Data Base

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,          *
          Plaintiff,          *
                              *
v.                            *          CASE NUMBER: CV-02-85
                              *
                              *
                              *
HANSON AGGREGATES SOUTHEAST,  *          
INC., et al.                  *          JUL 10 2003
          Defendants.         *
                                         IN OFFICE
                                     CORINNE T. HURST
                                      CIRCUIT CLERK

### PLAINTIFFS RESPONSE TO HANSON SECOND MOTION IN LIMINE

The plaintiffs would show this Court that:

1) Plaintiffs expert, Tom Aley, was duly licensed by the State of Alabama at the time that he was retained and injected the dye into the Little Uchee Creek and the dry Spring at Spring Villa.

2) Hanson Exhibit "B" is a letter from the State indicating that the temporary license may only be issued once. According to the Geology's Board Web Site this is totally incorrect. A copy of the applicable Geology's Boards regulation are attached from their work site. There is no limit on the number of times it may be issued.

3) The Board's regulations cite the eligibility requirements as being § 34-41-4(h), Code of Alabama 1975. This is totally irrelevant and incorrect. § 34-41-4(h) covers reimbursement to Board Members of One hundred dollars ($100.00) per day.

4) The regulations of the Geology's Board have nothing to do with qualifications of an expert witness. They are clearly based on his education, training, and experience. Obviously Tom Aley is qualified since he has done between three

thousand and four thousand dye trace studies in America and throughout the world. This clearly qualifies him under rules 702, 703 and 705 of the Alabama Rules of Evidence. Attached is a letter of July 3 to the Hanson attorneys.

5) Mr. Aley's qualifications should be compared to Hanson's expert, Mr. Woods. Mr. Woods has done three (3) dye trace studies and is not certified by any organization as an Hydrologist.

6) In response to Hanson's paragraph # 8, the purchase price of the Quarry paid by Hanson Opelika Materials would clearly be admissible and does not indicate necessarily the wealth of Hanson. Hanson cites Rule 703 as a reason to exclude such testimony. Rule 703 of Alabama Rules of Evidence covers the opinions of experts. In addition it has come to the attention of the plaintiffs that Hanson has, sold, or is planing to sell, this Quarry. The amount of profit, or loss, if any they make on the transaction, would also be admissible.

Wherefore, plaintiffs move this Court for an order to:

(A) Allow Mr. Aley to testify as an experts

(B) Prevent Hanson from introducing or testifying about the two letters from the Alabama Geology Board. These letters's where not produced until the night of July 9, or the early morning of July 10, and the executive director apparently has never been listed as a Hanson witness.

1435

**OF COUNSEL:**

**CHARLES VERCELLI, JR., (VER004)**
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

**JAMES B. SPRAYBERRY (SPR008)**
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

**GUY GUNTER**
*Council for City of Opelika/ Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the ____ day of ~~March~~ July, 2003.

James A. Byram, Jr., Esq.
Dorman Walker, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears, Esq.
Attorney At Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

James B. Sprayberry

1438

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
THERESE FORD
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

July 3, 2003
**Via Fax & Mail**

James A. Byram, Jr.
Dorman Walker
Balch & Bingham, LLP
P. O. Box 78
Montgomery, AL 36101-0078

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

RE:  *Davis, et al. v. Hanson Aggregates, et al.*

Dear Gentlemen:

We spoke with Mr. Aley. You had asked for the charcoal packs. Be advised that the charcoal packs are not retained after testing. Rather, the pack is placed in solution, which extracts any dye, and the solution is retained. The charcoal, no longer containing dye, is discarded. Mr. Aley is willing to ship ½ of the solution directly via Federal Express to a qualified and reputable testing laboratory. To do this, we need to know the name and address of the laboratory, the person who will conduct the testing, the name of the person to receive the shipment, and the phone number. You will need to give us a Federal Express billing number to bill the shipment to.

We, of course, would like copies of your results as soon as you receive them. With these agreements, we will ask Mr. Aley to ship them to your laboratory. Note that Mr. Aley received additional charcoal packs today. Mr. Aley just (verbally) advised that he finished testing the most recently received samples (June 12-July 2, 2003). There are very nice and very clear peaks showing clearly that the new samples also confirm eosine in the discharge.

We received your supplemental witness list a few minutes ago. You have added another Hanson person. I asked that you send me a list of what the Hanson personnel would say, but you have not done so. Do we need to depose them all next week? Please respond so that depositions will not be necessary.

1437

Messrs. Byram & Phears
July 3, 2003
Page 2

    We also just realized that we inadvertently left Danny Moore off our witness list, although you have had his disclosure for several months. We do intend to call him at trial.

    Finally, we requested information on the well levels taken yesterday, but have not received them as promised. Please send these to us ASAP. Thank you.

                                                    Sincerely,

                                                    Charles E. Vercelli, Jr.

CEVjr/ma
Enclosure
cc:    James Sprayberry
       Guy Gunter
       John Denson
155-00\Byram-Phears1.1.wpd

ALABAMA BOARD OF LICENSURE FOR PROFESSIONAL GEOLOGISTS

ADMINISTRATIVE CODE

## CHAPTER 364-X-12 INTERIM PERMITS FOR COMITY

TABLE OF CONTENTS

364-X-12-.01 Requirements

364-X-12-.02 Issuance

364-X-12-.01 Requirements.

(1) The Board shall grant an interim permit for comity, not to exceed ninety (90) days in any calendar year, to practice as a professional geologist to persons who apply for such permit and who are eligible for comity under Section 34-41-4(h), Code of Ala. 1975. The application procedure for an interim permit is identical to that prescribed for continuing licensure as a professional geologist in this State. A person desiring an interim permit will file the prescribed application for license and request in writing within ten (10) days of entering the State for commencing the work for which the permit is sought that he/she be issued an interim permit. This request will state the reason for requesting such permit, the specific work to which it applies, and maximum time, both in-State and out-of-state, for completing the work.

(2) If the Executive Secretary of the Board finds the application and request to be in order, the request for an interim permit will be referred to a Member of the Board by mail, and upon his/her approval the interim permit and number will be issued through the Office of the Board.

**Author:** Thornton L. Neathery

**Statutory Authority:** Code of Ala. 1975, §§34-41-8.

**History: New Rule:** Filed May 10, 1996; effective June 14, 1996. **Amended:** Filed March 5, 2002; effective April 9, 2002.

364-X-12-.02 Issuance.

(1) An interim permit for comity will be effective for an aggregate of ninety (90) days in any one- (1) calendar year.

(2) While practicing under an interim permit in the State, the holder thereof will affix to all plans and documents for use and execution in this State, the seal or stamp required in the state in which he/she is licensed or registered, with the added notation: "Practicing in the State of Alabama under Interim

1439

Permit No....."

**Author:** Thornton L. Neathery

**Statutory Authority:** <u>Code of Ala. 1975</u>, §§34-41-8.

**History: New Rule:** Filed May 10, 1996; effective June 14, 1996.
**Amended:** Filed March 5, 2002; effective April 9, 2002.

d. Holds himself or herself out as one who performs or is able to perform any geological services or work recognized by the board as the public practice of geology.

This definition shall not be construed to regulate or interfere with the legitimate practice of any licensed professional, other than geologists.

(9) RESPONSIBLE CHARGE OF WORK. The independent control and direction by the use of initiative, skill, and independent judgment of geological work or the supervision of such work.

(10) SPECIALTY. A branch of geology which is recognized as a subdiscipline for purposes of certification after registration as a licensed professional geologist.

(11) SUBORDINATE. A person who assists a licensed professional geologist in the public practice of geology without assuming the responsible charge of work and who is under the direction and supervision of a licensed professional geologist.

(12) UNPROFESSIONAL CONDUCT. The practice of geology by a licensed professional geologist who willfully performs any act, causes omissions, or makes any assertions or representations which are fraudulent, deceitful, or misleading, or which in any manner whatsoever discredits or tends to discredit the profession of geology. (Acts 1995, No. 95-399, p. 820, § 3.)

§ 34-41-4.  Board created; membership generally.

(a) There is created the Alabama Board of Licensure for Professional Geologists which shall administer and enforce this chapter.

(b) The board shall consist of seven members appointed by the Governor from a list of nominees submitted by the board, or any entity designated by the board. Members of the board, except for the initial board, shall be licensed professional geologists. Whenever possible the membership of the board shall be inclusive and reflect the racial, gender, geographic, urban/rural, and economic diversity of the state.

(c) Each member of the board shall be a citizen of the United States, a resident of the State of Alabama for at least five years immediately preceding appointment, reside in the state during the term of office, and be at least 26 years of age.

(d) All members of the initial board shall be appointed by the Governor from a list of nominees who shall at the time of their appointment qualify for licensing under this chapter and become duly licensed during their term. Membership of the initial board shall include at least one representative member from each of the following professional subgroups of geologist: Faculty of the departments of geology at colleges and universities in the State of Alabama that grant degrees in the geological sciences; governmental agencies employing geologists; businesses, exclusive of those exempted herein; mining industry, petroleum industry, geotechnical and/or environmental engineering

(e) After the establishment of the initial board, all members of the board shall be licensed under this chapter. The term of office of each member of the board shall be three years. Notwithstanding the foregoing, of the first members appointed, two shall be appointed for a term of one year, two for terms of two years, and three for terms of three years. No member shall serve more than two consecutive three-year terms, without interruption in service of at least three years.

(f) Each term on the board shall expire on September 30 of the year in which the term expires. When the term of a member expires, the Governor shall appoint a new member or reappoint the current member for a full term under subsections (d) and (e). If a vacancy occurs, within 90 days of the vacancy the Governor shall appoint a replacement to fill the vacancy for the remainder of the unexpired term. Except for the members of the initial board, all appointments and reappointments to the board shall be made by the Governor from a list of nominees submitted by the board, or any entity designated by the board. In appointing members to the board, the Governor shall strive to achieve diversity in race, gender, geography, residence, and economic condition.

(g) The Governor may remove a member of the board only for neglect of duty, an unexcused failure to attend more than one of the regularly scheduled meetings held in a calendar year during the term in office of the member, malfeasance, violation of this chapter, or conviction of a felony or other crime of moral turpitude.

(h) Members of the board shall receive reimbursement for expenses incurred in the performance of duties of one hundred dollars ($100) per day plus mileage payable at the same rate as paid for state officers and employees for each day of actual attendance at a regular or special meeting of the board.

(i) The board may employ the necessary personnel for performance of its functions and fix their compensation. The board may appoint committees to aid in the performance of its functions. (Acts 1995, No. 95-399, p. 820, § 4; Acts 1997, No. 97-156, p. 208, § 3; Act 2001-251, p. 802, § 3.)

HISTORY

Amendment note:
The 1997 amendment, effective March 26, 1997, in subsection (h) inserted "of one hundred dollars ($100) per day plus mileage payable at the same rate as paid for state officers and employees for each day of actual attendance at a regular or special meeting of the board".

The 2001 amendment, effective April 19, 2001, in subsection (b), in the first sentence added "from a list of nominees submitted by the board, or any entity designated by the board" and rewrote the third sentence; in subsection (c) inserted "of the board" following "all members"; and in subsection (f) added

Code Commissioner's Notes

Acts 1997, No. 97-156, § 2, provides: "The existence and functioning of the Alabama Board of Licensure for Professional Geologists created and functioning pursuant to Section 34-41-1 to 34-41-34, inclusive, Code of Alabama 1975, is continued, and those code sections are expressly preserved."

Act 2001-251, § 2 provides: "The existence and functioning of the Alabama Board of Licensure for Professional Geologists, created and functioning pursuant to Sections 34-41-1 to 34-41-34, inclusive, Code of Alabama 1975, is continued, and those code sections are expressly preserved."

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )        CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        Defendants.                    )

**F I L E D**

JUL 10 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### HANSON'S AMENDED WITNESS LIST

Defendant Hanson Aggregates Southeast, Inc. ("Hanson"), hereby amends its witness list

for the first trial, as follows:

> 34.    Ron Gore (or other ADEM representative)
>        c/o Alabama Department
>        1400 Coliseum Boulevar
>        Montgomery, Alabama

*Originals to be filed*

son

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101-0078
334/834-6500
334/269-3115 (fax)

H. Wayne Phears, Esq.
Attorneys at Law
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

133405.1

## CERTIFICATE OF SERVICE

This is to certify that on the ____9____ day of July, 2003, a copy of the foregoing was served by first-class United States Mail, properly addressed and postage prepaid, upon the following:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

Of Counsel

133405.1

-2-

FILED
1446

JUL 18 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
      Plaintiffs,                      )
                                       )
vs.                                    )        CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
      Defendants.                      )

## OBJECTION TO MOTION FOR BIFURCATION OF THE DEFENDANTS

      Defendant Hanson Aggregates Southeast, Inc. ("Hanson") objects to Plaintiffs' Motion for Bifurcation of the Defendants as follows:

      1.    Plaintiffs assert in their motion for bifurcation that "the only defendant" in the legal phase of this trial is Hanson. (*See* Plaintiffs' Motion at ¶ 4.) Plaintiffs base this assertion on their failure to request monetary damages from the Young and Gilmer defendants. (*Id.*) The Plaintiffs conclude that, because they do not seek money damages from these two groups of defendants, there are no "legal issues" to be decided with respect to the interests of the Youngs and Gilmers in this action. (*Id.*)

      2.    The first trial will determine liability. The Young and Gilmer defendants are vitally interested in this issue. Obviously, if the verdict is for the defendants on liability, no injunctive relief would be proper.

      3.    Plaintiffs' conclusion, however, shows very little understanding of the principles that underlie the role of the jury and the historic right to a jury trial. It is axiomatic that the Court answers questions of law and, where a jury is

impaneled, the jury answers questions of fact and renders a verdict on the legal relief to be awarded. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). These roles are maintained within the context of trial which is bifurcated with respect to legal and equitable relief; the jury answers all questions of fact common to the legal and equitable relief sought and renders a verdict on the legal relief sought. *Ex parte Thorn*, 788 So 2d 140 (Ala. 2000)(citing *Dairy Queen*, 369 U.S. at 479). The only differences in a bifurcation of legal and equitable claims are that (1) evidence necessary to decide questions of equity, such as the comparative injury doctrine, is heard by the Court only; and (2) the Court renders the decision on the equitable relief sought. (*Id.*)

4.      In the instant case, there are a multitude of questions of fact which are common to both the legal and the equitable relief sought by the Plaintiffs. For example, the question of whether Hanson has operated the quarry negligently is a question of fact for the jury. It is also a question which is common to both the legal and equitable relief sought by the Plaintiffs because money damages may not be awarded (i.e. – legal relief cannot be granted) nor may the quarry be enjoined (i.e. – equitable relief cannot be entered) on the basis of negligence unless the jury finds in favor of the Plaintiffs on their negligence claim.

5.      The Young and Gilmer defendants are entitled to participate in that phase of the instant trial during which questions of fact common to both the equitable and legal relief sought by the Plaintiffs will be presented to the jury. These defendants are not precluded from participation in litigation before the jury

simply by the nature of the relief sought against them. The Plaintiffs' assertions to the contrary ignore the multitude of questions of fact, equally relevant to the Youngs and Gilmers as to Hanson itself, which must be decided by the jury before any relief, whether legal or equitable, may be entered against any of the defendants.

6.    Plaintiffs' assertion that the Young and Gilmer defendants have no interest in the legal portion of the initial trial ignores the monetary impact that any injunction on quarry operations will have on these defendants. The Young and Gilmer defendants are paid royalties based on the sales of quarried rock. Prohibiting production of such rock at the quarry will have a direct and tangible monetary effect on the Young and Gilmer defendants. Thus, despite Plaintiffs' erroneous assertion, these defendants have an identifiable interest in the outcome of the "legal phase" of the instant trial proceeding.

7.    Plaintiffs assertion that the Court has "essentially" found that the Young and Gilmer defendant should not be allowed to participate in the liability/ money damages portion of the trial is a fallacy unsupported by any ruling previously issued by the Court.

8.    Contrary to Plaintiffs' assertion, *Ala. R. Civ. P.* 21 is not a proper basis upon which to remove the Young and Gilmer Defendants from the liability/ money damages phase of the currently scheduled trial. Rule 21 provides for the severance of parties who have been misjoined to an action. Once severed, the original action becomes two separate actions with two separate civil action numbers. *See, e.g., Key v. Robert M. Duke Ins. Agency,* 340 So. 2d 781 (Ala.

1449

1976). Severance of this action into two separate actions would neither be a proper nor an efficient method for resolving the Plaintiffs claims against these defendants.

9.     The Court's order bifurcating the legal and equitable relief phases of the initial trial was not entered pursuant to *Ala. R. Civ. P.* 21 as asserted by the Plaintiffs, but was entered under the authority *Ala. R. Civ. P.* 42, which permits separate trials for any claim or issue to avoid prejudice, irrespective of the alignment of the parties involved.   Bifurcation of the initial trial does not, as Plaintiffs assert, require the severance of the Youngs and Gilmers from the instant action.

Respectfully submitted this the __9__ day of July, 2003.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Attorneys at Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia  30092
(770) 446-2116
(770) 263-6715 (fax)

1447

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the __9__ day of July, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUL 1 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) | |
| Defendants. | ) | |

## DESIGNATION OF DEPOSITION TESTIMONY

Hanson Aggregates Southeast, Inc. ("Hanson") designates the following deposition testimony to be used as testimony at the trial of this matter:

1.     The entire sworn statement of Ronald U. Harris, Executive Vice President of Paul B. Krebs and Associates.

2.     Deposition of Tony Williams, page 140, line 8 through page 158, line 8.

3.     Deposition of Richard Chafin, page 37, line 19 through page 38, line 8.

4.     Deposition of Warren Stiles, M.D., page 6, line 9 through page 16, line 7.

5.     Deposition of Katherine Nichols, M.D., page 6, line 8 through page 52, line 15.

6.     Hanson reserves the right not to use any of the above-designated deposition testimony.

Respectfully submitted this the 10th day of July, 2003.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

1449

OF COUNSEL:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 10th day of July, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

Of Counsel

- 2 -

FILED

JUL 18 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
    Plaintiffs,                    )
                                       )
vs.                                    )    CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
    Defendants.                    )

## RENEWED MOTION FOR SEPARATE TRIAL
## AND RENEWED MOTION TO CONTINUE

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") moves the Court,
pursuant to *Ala.R.Civ.P.* 42(b), to order a separate trial of the claims of the City of Opelika,
the Utilities Board of the City of Opelika, and the Beauregard Water Authority ("the
Municipal Defendants"). Additionally, Hanson requests the Court to continue the separated
trial of the Municipal Defendants. In support of this Motion, Hanson avers as follows:

1.    According to the Court's previously entered case management order, the
claims of six families (the "Individual Plaintiffs") and the claims of Municipal Plaintiffs are
to be litigated during the initial trial of the above-styled cause. The initial trial is scheduled
to begin on July 21, 2003.

2.    In an effort to provide support for the "de-watering" claims of the Municipal
Plaintiffs, Plaintiffs expert, Tom Aley, conducted a dye test to determine whether or not a
hydrogeologic connection exists between various surrounding water sources, including
Spring Villa, and the Hanson quarry pit. (*See* Deposition of Tom Aley, excerpts of which

132188.1

are attached as Exhibit "A.")  This test was begun in December of 2002.  (Ex. A at 71.) Plaintiffs conducted this test by releasing dye into the various water sources and placing receptors near the pipe from which Hason discharges the water it pumps from the quarry pit.   Monitoring stopped on March 27, 2003.  Tom Aley was deposed on April 29, 2003. On June 5, 2003, without Hanson's knowledge, new dye receptors were placed downstream o f t he q uarry d ischarge.  O n J une 24 2 003, P laintiffs r evealed t hat d ye allegedly released in Little Uchee Creek in December 2002 was allegedly found in receptors placed near the discharge pipe between June 5 -12, 2003.

3.     Plaintiffs's counsel contends that this "hit" is their most important evidence regarding the Spring Villa claim.  Plaintiffs will undoubtably focus much of their time at trial explaining the test results and arguing their significance to the jury.

4.     In order to assess and defend allegations stemming from the alleged results of this test, Hanson will need, at the very least, additional time to depose the individual who collected the receptors, Allen Lee (an employee of the City of Opelika), and to re-depose Tom Aley.

5.     Furthermore, it is essential that Hanson be allowed an opportunity to find and consult with an independent dye testing expert witness to evaluate the study conducted by Plaintiffs' expert and its alleged results.   It has not been necessary to retain a dye testing expert previously because there were no relevant positive results to evaluate.

6.     Even though Hanson is currently working to accomplish these ends, completing the evaluation of Plaintiffs' test before the start of the currently scheduled trial, if such is possible, will place an enormous burden on Hanson.

7.     The burden created by the analysis of this evidence would be greatly

reduced by the separation and subsequent continuance of the Municipal Plaintiffs' claims from the remaining claims of the Individual Plaintiffs. Further, proceeding with the trial of the Individual Plaintiffs claims only will be far less burdensome than a trial of both the Individual and Municipal Plaintiffs' claims.

8.      In addition, both the nature of the injuries asserted by of the Individual Plaintiffs and the evidence necessary to support their claims are <u>substantially different</u> from injuries asserted by and the evidence required to support the claims of the Municipal Plaintiffs. (*See* Hanson's first Motion to Sever or for Separate Trials, filed on December 20, 2003.) Separate trials of the Individual and Municipal Plaintiffs' claims would not require a substantial duplication of evidence or testimony because the nature of the claims are so vastly different. Further, a separate trial of these claims would increase the jury's ability to form a clear understanding of the issues to be decided regarding each of these claims.

WHEREFORE, PREMISES CONSIDERED, Hanson respectfully requests the Court to order separate trials of the claims of the Municipal Plaintiffs and the claims of the remaining Individual Plaintiffs, and to continue the trial of the Municipal Plaintiffs' claims from the current trial setting.

Respectfully submitted this the ___9th___ of July, 2003.

One of the Attorneys for Defendant Hanson
Aggregate Southeast, Inc.,

1455

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101
334/834-6500
334/269-3115 (fax)

H. Wayne Phears, Esq.
Attorneys at Law
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

### CERTIFICATE OF SERVICE

This is to certify that on the ___9th___ day of July, 2003, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

Of Counsel

Exhibit A

1

1          IN THE CIRCUIT COURT FOR

2              LEE COUNTY, ALABAMA

3

4

5     MIKE DAVIS, et al.,

6              Plaintiffs,

7     Vs.                          CIVIL ACTION NO.

8                                  CV-2002-85

9     HANSON AGGREGATES SOUTHEAST,

10    INC., et al.,

11             Defendants.

12

13

14

15          DEPOSITION OF THOMAS ALEY, taken pursuant

16    to notice and stipulation on behalf of the

17    Defendants, in the conference room of the Law Office

18    of James B. Sprayberry, 225 North Gay Street, Auburn,

19    Alabama, before Ricky L. Tyler, Certified Shorthand

20    Reporter and Notary Public in and for the State of

21    Alabama at Large, on Tuesday, April 29th, 2003,

22    commencing at 9:12 A.M.

23

**Page 70**

1  A.  There are -- I believe there are some. There's
2     been substantial work on that done in Tasmania,
3     Australia, by the -- I believe it's the
4     Tasmanian Forest Practices Board funded the
5     study. I have done some work of this type
6     associated with roads in Southeast Alaska.
7  Q.  Okay.
8  A.  Oh, excuse me, and I've done work for the
9     Maryland Highway and Transportation Department
10    on some sinkhole issues.
11  Q.  Okay.
12  A.  I think that's a reasonable coverage of it.
13  Q.  Do you ever recall seeing or hearing of a study
14    in Missouri, your home state, concerning the
15    sinkholes being caused by road construction or
16    utility construction?
17  A.  None occurs to me.
18  Q.  Okay.
19  A.  Could we take another stretch break?
20  Q.  Sure.
21     (Recess.)
22  BY MR. BYRAM:
23  Q.  Mr. Aley, I had asked you to sort of list what

**Page 71**

1     all you had done in this case and what all you
2     -- you know, the type of work, and then what
3     all was ongoing. Was there any sort of work,
4     testing, data collection, that you recommended,
5     but was not done in this case?
6  A.  No.
7  Q.  Okay. Was there any work, testing, data
8    collection that you considered and decided not
9    to do in this case?
10  A.  I think you always consider a number of things,
11    but I think to accurately answer your question,
12    no, there wasn't anything.
13  Q.  Okay. You came, according to your report, on
14    December the 5th, '02?
15  A.  I believe that's correct.
16  Q.  Okay.
17  A.  Yes, the 5th and 17th. And I was here
18    yesterday as well.
19  Q.  And the 17th was the day the dyes were
20    introduced?
21  A.  Correct.
22  Q.  Okay. Is that the right verb?
23  A.  That's the word I like.

**Page 72**

1  Q.  Okay. And then you were back yesterday when we
2    saw you?
3  A.  Yes.
4  Q.  Okay. And then you were here on the 5th. The
5    purpose of the 5th was to design the study, I
6    guess?
7  A.  Design the study and it's an opportunity to see
8    if I thought I could do the client any good
9    after looking at it on the ground.
10  Q.  Did the scope of the assignment change between
11    the 5th and the 17th?
12  A.  No.
13  Q.  Who contacted you about this job?
14  A.  Jim Sprayberry.
15  Q.  Do you currently have any other assignments,
16    whether -- well, I think that's the right way
17    to ask it, any other assignments in the State
18    of Alabama relating to quarries?
19  A.  We do dye analysis sampling for many clients.
20    And some of those issues do involve -- do
21    involve quarries. Typically if somebody is
22    doing a dye trace, because I have a lot of
23    experience in dealing with them, we have

**Page 73**

1     telephone discussions about how much dye should
2     we use and things like that. And I'm doing one
3     with Joiner and Associates, or we've had one.
4     Bob could fill you in more closely on that, I
5     think, than I.
6  Q.  Okay. That would be the only one in Alabama?
7  A.  I believe so.
8  Q.  Okay. Have you been consulted or approached
9    about some litigation in this county about
10    another quarry or proposed quarry?
11  A.  Do you mean something into the future?
12  Q.  Yes.
13  A.  I've heard just mention of it, but I have no
14    details on it and certainly have not been
15    retained.
16  Q.  Okay. Do you have any experience in
17    groundwater modeling to determine an area of
18    zone of influence for quarries?
19  A.  I've been involved with conceptual models, but
20    not predictive, not numerical models.
21  Q.  You mentioned several times about the Maryland,
22    I think, law or regulatory framework that
23    required some prequarry definition of the zone

19 (Pages 70 to 73)

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048
36d8fffd-1f5a-4357-b365-82b2450e6561

FILED

JUL 1 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                      )
                                         )
        Plaintiffs,                      )
                                         )
    vs.                                  )          CASE NO. CV-02-85
                                         )
HANSON AGGREGATES                        )
SOUTHEAST, INC., et al.,                 )
                                         )
        Defendants.                      )

## MOTION TO STRIKE OPELIKA'S NEW DAMAGE CLAIM

Hanson Aggregates Southeast, Inc. (Hanson") moves the Court to strike

Opelika's new damage claim first disclosed in Plaintiffs' Supplemental Response

to Defendants' Interrogatories, on the following grounds:

1.    The chief claim of the City of Opelika and the City of Opelika

Utilities Board (the "Opelika Plaintiffs") revolves around the alleged de-watering

of Spring Villa.  When the spring stopped flowing during the summer of 2000, the

attached spring-fed pool at Spring Villa Park was closed.  Among other things,

the Opelika Plaintiffs assert that they have lost revenue from the closing of the

pool, and assert that the citizens of Opelika have lost the recreational use of the

pool.

2.    Hanson served interrogatories and requests for production on the

Opelika Plaintiffs on December 31, 2002.  A copy of Hanson's Interrogatories

and Requests for Production is attached as Exhibit "A."   In relevant part,

Hanson's interrogatories requested Plaintiff to provide a detailed list of the

damages sought by these Plaintiffs against Hanson.  (Ex. A at Interrogatory 11.)

Hanson's requests for production asked Plaintiffs to provide a copy of all

documents and tangible evidence supporting the Plaintiffs claims for damages.

(Ex. A at Request for Production 4.)

3.    On February 28, 2003, the Opelika Plaintiffs responded to Hanson's initial discovery requests.    (*See* Answer to Defendant Hanson's Interrogatories and Requests for Production, attached as Exhibit "B.")    In response to Hanson's request for a detailed list of damages, the Opelika Plaintiffs provided as follows:

> 11.    We are more concerned about an injunction because we have a large number of families who depend on us for water and/or recreation.  The City has made a previous demand and a break down of their damages.  If the damage caused by Hanson is permanent, even though the nuisance is abatable, we believe that the damages would be based on the permanent devaluation of the Water Board and City of Opelika property.  The rental value would be $12,000 per month for the City and $3,000 per month for the Utility Board, not counting remediation.  The $15,000.00 per month would have begun, at a minimum, two (2) years prior to the filing of suit up to trial.

(Ex. B.)

In response to Hanson's request for all documents relating to their damages, the Opelika Plaintiffs responded as follows:

> 3.    You have our Krebs report.  We will be producing reports from the meteorologist, hydrologist and the other experts that directly relate to our claims and some or all of your defenses.

> 4.    See response to #3.  In addition, we have a video and photographs made of sinkholes, the dewatered Spring and the dewatered Little Uchee Creek.

(Ex. B.)

4.     The "previous demand" referenced by the Opelika Plaintiffs in their response to Interrogatory 11 was a settlement demand letter forwarded to the defendants on May 29, 2002.  In this letter, the Opelika Plaintiffs requested Hanson to replace the old Spring Villa pool with a new pool at an expense to Hanson of $700,000.00.

5.     Opelika's mayor, Barbara Patton, was deposed on April 18, 2003 regarding the Opelika Plaintiffs' claims against Hanson.  (*See* Deposition of Mayor Barbara Patton, excerpts attached as Exhibit "C.")  In her deposition, Mayor Patton affirmed the City's claim that Hanson provide the City of Opelika with a new pool at a cost of $700,000.  (Ex. C at pp. 69, 89, 99-101.)

6.     Bill Harrelson, the Director of Parks and Recreation for the City of Opelika, was deposed on May 6, 2003.  (*See* Deposition of Bill Harrelson, excerpts attached as Exhibit "D.")  Mr. Harrelson is responsible for maintaining Opelika's public pools, and was also responsible for the Spring Villa pool before it closed.  (Ex. D at pp. 10, 14-17.)  During his deposition, Mr. Harrelson testified that he did not know how much it would cost to build a new pool for the City of Opelika.  (Ex. D at p.103.)  He only knew what he'd heard from other people. (*Id.*)

7.     Plaintiffs' pretrial contentions, attached as Exhibit 1 to the parties' proposed pretrial order, failed to disclose their intentions to amend their previous damage claim regarding the replacement of Spring Villa pool.

8.     On June 27, 2003, less than 25 days before the scheduled start of the trial of the Opelika Plaintiffs' claims, Plaintiffs served their "Supplemental

Response to Defendant's Interrogatories." A copy of this supplemental response is attached as Exhibit "E." In this supplemental response, purportedly compiled by Bill Harrelson, Plaintiffs change their demand from $700,000.00 in constructions costs for a new pool, to $3,962,000.00 (1.5 million for construction costs, plus all costs for the maintenance of the pool for the next 30 years). (Ex. E.) This information was provided for the first time more than four months after Plaintiffs' responses to Hanson's interrogatories were due to be served. This last minute change represents an increase of more than 500% in Plaintiffs' demands regarding the "replacement" costs of Spring Villa pool.

9.     Plaintiffs' supplemental response is in reality an untimely amendment to their interrogatory responses and should be struck. *See, e.g.,* *City of Prichard v. Hawkins*, 255 Ala. 676, 53 So. 2d 378, 383-84 (1951).

10.     Plaintiffs should be judicially estopped from changing their damage calculation at this late date. *See Jinright v. Paulk*, 758 So. 2d 553, 555 (Ala. 2000)(The doctrine of judicial estoppel applies to preclude a party from assuming a position in a legal proceeding which is inconsistent with one previously asserted). The Opelika Plaintiffs, in the person of Mayor Patton, previously testified under oath that the amount of the Opelika Plaintiffs' claim regarding the construction of a new pool for the City was $700,000.00. Hanson has relied on this sworn testimony preparing its defense of the Opelika Plaintiffs' claims at the trial of this matter. These Plaintiffs should not be allowed to make assertions in their Supplemental Response which so drastically contradicts their previous sworn testimony.

11.    Because of Plaintiffs' undue delay in presenting this new damage calculation, Hanson will be prevented from conducting the proper discovery needed to defend this assertion, and to locate and name rebuttal witnesses.

Respectfully submitted this the _9th_ day of July, 2003.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Attorneys at Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the _4th_ day of July, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

Of Counsel

A

IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
                    Plaintiffs,        )
                                       )
vs.                                    )          Civil Action No. CV-2002-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
                    Defendants.        )

## DEFENDANT HANSON'S INTERROGATORIES
## AND REQUESTS FOR PRODUCTION

Pursuant to ALA. R. CIV. P. 33 and 34, Hanson Aggregates Southeast, Inc. (Hanson) requests plaintiffs City of Opelika, the Utilities Board of the City of Opelika, and the Beauregard Water Authority to answer the following interrogatories and to produce the documents herein requested within thirty days after service at the office of Balch & Bingham LLP, 2 Dexter Avenue, Montgomery, Alabama 36104, and to permit Hanson and its attorneys to inspect them and to copy such of them as they may desire.

### I.
### Definitions and Instructions

The following definitions and instructions are applicable to each interrogatory and request for production unless negated by the context:

1.     The terms "you" and "your" shall mean the plaintiffs City of Opelika, the Utilities Board of the City of Opelika, and the Beauregard Water Authority, individually and collectively, and any person acting or purporting to act on behalf of any of them.

2.     Undefined terms shall have the same meaning as utilized in your complaint.

3.     The term "any" means "each and every" as well as "anyone".

4.      The conjunction "and/or" shall be interpreted in every instance both conjunctively and disjunctively so as to include any information within the scope of any of the items to which the conjunction "and/or" applies.

5.      The term "relating", means constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, supporting, summarizing, mentioning, including, concerning, and/or referring to, directly or indirectly.

6.      The term "document" shall have the same meaning as in Rule 34, *A.R.C.P.*, and shall include, without limitation, all tangible items, and all written or graphic matters of every kind and description, whether handwritten, typed or otherwise produced, reproduced, whether draft or final, original or reproduction, in your actual or constructive possession, custody or control, regardless of where located and however denominated by you including, but not limited to: reports, statements, letters, correspondence, memoranda, notes, summaries, films, transcripts, contracts, agreements, licenses, memoranda or notes of telephone conversations or personal conversations, or interviews, microfilms, telegrams, books, articles, bulletins, circulars, pamphlets, notices, rules, regulations, directives, teletype messages, communications, minutes of meetings, interoffice or interoffice communications, working papers, desk calendars, appointment books, diaries, time sheets, logs, visual, audio or video tapes, recordings, drawings, graphs, charts, photographs, telephone records, data processing results, printouts and computations (both in existence and stored in memory), and other data compilations from which information can be obtained and translated, if necessary, and a reasonably usable form.

7.      The term "document" shall also include all copies of each document if the copies contain any omission or additional writing or other marking or are not identical to the original in any manner whatsoever.

8.      The obligation to produce the documents requested herein is of a continuing nature. If at any time after compliance with this request you should acquire possession, custody or control of any additional document within the scope of the request, except to the extent such documents are obtained by discovery on the public record of this case you are required promptly to furnish such documents to plaintiffs' attorneys.

9.      Where only a portion of a document relates to or refers to the subject indicated the entire document along with all attachments, appendices and/or exhibits must nevertheless be produced.

10.      "Identify" means, when used in reference to:

(a)      a natural <u>person</u>, to set forth such person's 1) full name, 2) present or last known business and residence address, 3) present or last known employer and position, and 4) employer and position at the time in question with respect to the particular interrogatory involved.

(b)      a person who is a <u>business organization</u> or other entity not a natural person, to set forth, 1) the full name of such organization, 2) the address of such organization, and 3) the form of such organization. (For example, corporation, partnership, joint venture, etc.)

(c)    a <u>document</u>, to designate the production number, if previously produced, or to describe the document in sufficient particularity to withstand valid objections to such description appearing in a subpoena duces tecum or request or motion for production of such document, including, but not limited to, the type of document (i.e., "letter"), date, authority and address; and to state the name, address, and business and every person who has such document in his or her possession, custody of control and the location of such document.

(d)    a <u>transaction</u>, to state separately (i) its date and the place where it occurred, (ii) its substance, (iii) the identity of each person participating in the transaction, and (iv) the identity of all notes, memoranda or other documents memorializing, referring to or relating to the subject matter of the statement.

11.    As to any document with respect to which you assert a claim of privilege from discovery, identify the documents with a reasonable particularity, <u>i.e.</u>, by date, title and form (e.g., letter, memorandum) the name of the preparer, originator, and/or transmitter of the document, the name of the recipient of the document, the subject matter of the document, the number of pages, whether there were any attachments or appendices to such document, and the basis or ground of your assertion of such privilege.

## II.
## Interrogatories

1.    Identify any person whom you expect to call as an expert witness at trial; state the subject the subject matter upon which the expert is expected to testify; state the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

**Response:**

2.    State every fact, application of law to fact, and contention supporting the allegation in your complaint that the defendants' operation of a limestone quarry constitutes a nuisance.

**Response:**

1405

3.      State every fact, application of law to fact, and contention supporting the allegations in your complaint that the actions of defendants in pumping water from the quarry pit have caused such a substantial de-watering of the area that the spring at Spring Villa has been caused to go dry as a direct result of the pumping of water from the ground from the quarry.

Response:

4.      State every fact, application of law to fact, and contention supporting the allegations in your complaint that there is a substantial likelihood that the operations of the defendants in pumping out water from the quarry, in and around the quarry, will cause sinkholes in, near, and even far away from the quarry, and that this result is absolutely certain to occur in many places.

Response:

5.      State every fact, application of law to fact, and contention supporting the allegation in your complaint that operations of the quarry in causing sinkholes to form now and in the future will in fact endanger the viability of the Dixie Pipeline, and that it is foreseeable that if the ground beneath the Dixie Pipeline were to give way, particularly at a welded joint, the Dixie Pipeline would then rupture, and that a rupture of the pipeline could very well cause an explosion of devastating proportions that could incinerate an area of hundreds of yards in diameter.

Response:

1466

6.      State every fact, application of law to fact, and contention supporting the allegations in your complaint that actions of the defendants through blasting caused shaking of the earth, and throwing of rock, dirt, and dust onto and about the lands of plaintiffs.

**Response:**

7.      State every fact, application of law to fact, and contention supporting the allegations in your complaint that defendants actions have been willful, wanton, and aggravated, and in the complaint that defendants' actions were rude, wanton outrageous, and reckless.

**Response:**

8.      State every fact, application of law to fact, and contention supporting the allegations in your complaint that defendants have continued their challenged actions with full knowledge of the damaged being forced upon the individual plaintiffs as well as the public at large, and that defendants have taken no steps to abate any nuisance.

**Response:**

9.      State every fact, application of law to fact, and contention supporting the allegations in your complaint that plaintiffs made known to defendants by oral and written means  the damages

caused to plaintiffs and the general public by defendants' actions, and that plaintiffs protested defendants' actions.

Response:

     10.    Identify any person with knowledge of discoverable facts relating to the allegations of your complaint or your answers to these interrogatories.

Response:

     11.    Identify by specific amount and category all monetary damages that you claim, and include in your response your calculations or other rationale for the amount that you claim.

Response:

     12.    To the extent not previously stated, state every fact, application of law to fact, and contention supporting your claim that defendants are liable to you and/or that you or your property have been damaged by defendant.

Response:

13.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 51 of the second amended and restated complaint.

Response:

14.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 52 of the second amended and restated complaint.

Response:

15.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 53 of the second amended and restated complaint.

Response:

16.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 54 of the second amended and restated complaint.

**Response:**

17.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 82 of the second amended and restated complaint.

**Response:**

18.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 97 of the second amended and restated complaint.

**Response:**

19.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 108 of the second amended and restated complaint.

**Response:**

126684.1                                    8

20.    Do you contend that the quarry is a public nuisance or a private nuisance, as defined by *Ala. Code* § 6-5-121, or both a public and a private nuisance?

**Response:**

21.    What specific aspects of the quarry operations do you contend constitute  a private nuisance?

**Response:**

22.    What specific aspects of the quarry operations do you contend constitute a public nuisance?

**Response:**

23.    If you claim that any specific aspect of the quarry operations constitutes a public nuisance, then for each plaintiff making this claim, identify the special damage required by *Ala. Code* § 6-5-123 to give a right of action.

**Response:**

24.     Do you contend that the quarry is a permanent nuisance or an abatable nuisance -- *see, e.g., Reichert v City of Mobile,* 776 So.2d 761, 764 (Ala. 2000) -- or both a permanent and an abatable nuisance?

Response:

25.     What specific aspects of the quarry do you contend constitute a permanent nuisance and when do you contend that such aspects of the quarry became a permanent nuisance?

Response:

26.     What specific aspects of the quarry operations do you contend constitute an abatable nuisance, when do you contend that such aspects of the quarry became an abatable nuisance and, for any such aspect of the quarry, how do you contend the alleged nuisance should be abated?

Response:

27.     How, specifically, do you contend that Hanson is operating the quarry negligently or improperly?

Response:

126684.1                                    10

28.    Do you contend that the damages plaintiffs allege can be avoided in the future if the quarry is operated non-negligently or properly?

**Response:**

29.    Do you contend that Hanson is liable for damage to any plaintiff caused by any act or omission relating to the quarry that occurred before Hanson acquired the quarry assets from Opelika Materials in June 1999?

**Response:**

30.    Assume that all blasting at the quarry is performed by an independent blasting contractor. Do you contend that Hanson is liable for damage to plaintiffs caused by blasting performed by the independent blasting contractor?

**Response:**

31.    If you contend that the quarry is an abatable nuisance, do you contend that plaintiffs are entitled to recover damages for the permanent devaluation of their property?

**Response:**

1473

32.    Do you contend that operations at the quarry by Opelika Materials were a nuisance when they began?   If not, when do you contend operations at the quarry became a nuisance?

**Response:**

33.    Do you contend that operations at the quarry by Hanson were a nuisance when they began in 1999?  If not, when do you contend operations at the quarry became a nuisance?

**Response:**

34.    Do you contend that your use of groundwater has been interfered with by the quarry? Explain.

**Response:**

35.    If you contend that the alleged effect of the quarry on Spring Villa is a public nuisance, identify your special damage "in which the public does not participate" as required by *A la. Code* § 6-5-123.

**Response:**

36.    Do you contend that the "comparative injury doctrine" -- *see Martin Bldg. Co. v Imperial Laundry Co*, 124 So. 82, 84 (Ala. 1929) -- does not apply to your claim for injunctive relief?

Response:

37.    Why do you contend that you are entitled to recover attorneys fees?

Response:

## III.
### Requests for Production

1.    Every document that is, or evidences, or materially relates to, any communication between (a) the plaintiffs or any agent of the plaintiffs and (b) Hanson, any agent or Hanson's, other defendant, or any agent of any other defendant.

2.    Every document that is, or evidences, or materially relates to, any communication between (a) the plaintiffs or any agent of the plaintiffs and (b) any other plaintiff, or agent for any other plaintiff, or any person or entity with whom deponent or deponent's agents have communicated concerning the facts or claims alleged by plaintiffs in this case.

3.    Every document or tangible item in the possession or control of plaintiffs or agents of the plaintiffs that materially relates to (a) the facts or claims asserted by plaintiffs, or (b) the defenses asserted by Hanson or any other defendant.

1475

4.    Every document or tangible item that evidences or materially relates to plaintiffs' allegations of damages or claims for damages.

5.    Every document that materially relates to the claims made by the plaintiffs against Hanson or any other defendant.

_____
One of the attorneys for defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Dorman Walker (WAL086)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500
(334) 269-3115 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on the 31st day of December, 2002, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

_____
Of Counsel

126684.1                                14

B

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
          Plaintiff,          *
                              *
v.                                     *       CASE NUMBER: CV-02-85
                              *
                              *
HANSON AGGREGATES SOUTHEAST,           *
INC., et al.                           *
          Defendants.          *

## CITY OF OPELIKA AND OPELIKA UTILITIES BOARD'S ANSWER TO DEFENDANT HANSON'S INTERROGATORIES AND REQUEST FOR PRODUCTION

1.     Please see list previously furnished.

2.     Hanson is dewatering the area around the quarry. This is causing a cone of depression, sinkholes and artificial lowering of the water table and related problems. Spring Villa and Little Uchee Creek have both gone dry and we believe that these problems will only get worse with time.

3.     See response to #2. Also, by lowering the water table Hanson has reversed the flow at the spring. Our hydrologist indicates that if the quarry is filled with the overburden that has been removed, the flow to the Spring would be restored.

4.     See responses to #2 and to #3. There has been a large sinkhole on Lee Road 166, which has re-opened. We understand there are others on the Gilmer and Young property. There are now numerous sinkholes in and around Spring Villa and Little Uchee Creek. Some have formed as recently as December, 2002. We believe they will increase in number and in location.

5.     Neither the City of Opelika nor the Utilities Board has information on the pipeline.

6.     We have not seen or felt a blast at our offices. Employees may have heard or felt them at Spring Villa Park.

7.     We wrote the state and Hanson because of our concerns for our water supply. Hanson has failed to supply us with information or to cooperate with us. With this knowledge, they have continued to blast, get bigger and dig deeper. They promised to provide their study to the City if the City would provide the Krebs Report to them. The City provided the Krebs Report, but Hanson breached its promised by failing to provide us with their study.

8.  See response to #7.  They have taken no steps that we are aware of to stop, prevent or correct the damage.

9.  See responses to #7 and #8.

10.  Mayor Patton, City of Opelika
Dan Hillyer, Opelika Water Board
Bill Harrelson, Opelika Parks & Recreation
Darren Brown (who has sinkholes)
Robert Smith (who has dry ponds)
Our Experts and other Water Board Employees who helped pump water down the large sinkhole on Lee Road 166 including Alan Lee and Woody Hicks, who prepared the Krebs reports

11.  We are more concerned about an injunction because we have a large number of families who depend on us for water and/or recreation.    The City has made a previous demand and a break down of their damages.  If the damage caused by Hanson is permanent, even though the nuisance is abatable, we believe that the damages would be based on the permanent devaluation of the Water Board and City of Opelika property. The rental value would be $12,000 per month for the City and $3,000 per month for the Utility Board, not counting remediation.  The $15,000.00 per month would have begun, at a minimum, two (2) years prior to filing suit up to trial.

12.  See previous answers.

13.  Hanson is dewatering a large area, which is partially in limestone.  We believe that it will get worse.  This is based on the geology in the area, the topography, water flow on the surface, the dewatering of the Spring Villa area, the depth of the quarry, the amount of quarry discharge and the huge amount of overburden removed.

14.  See response to #13.  We understand that the engineers, geologists and hydrologist believe it to be the same marble formation.  The records and local witnesses indicate the Spring has never gone dry until Hanson began to pump a large amount of discharge from the quarry.  Sinkholes have formed and re-appeared around the quarry. The last several years, we have not had a severe drought and the Spring has never gone dry in other droughts.

15.  See responses to #13 and #14.  We know the Spring is dry, Little Uchee is dry and the situation is getting worse.

16.  See responses to #13 and #14.  We believe the water problems could be corrected if the overburden was replaced into the quarry.  Any hole or depression would fill with water and the water table would return to its previous level.  However, it the quarry continues and/ or gets deeper the damage may be irreversible.

17.  See responses to #13, #14. #15 and #16.  We do have recreational losses.

We have been unable to fill the Spring Villa pool and we do not have the Spring as an emergency, back-up water source. Major environmental damage is being caused and will only get worse if the quarry continues. The Spring water could be filtered and used by consumers, it could be bottled or it could be sold as raw water to some other water system.

18.    See responses to #14, #15, #16 and #17.

19.    See responses to #13, #14, #15, #16, #17 and #18. We are unsure of the Parker's claim. The flow at the spring has been reversed and no longer surcharges.

20.    We believe it is both. As to us, we believe it is public.

21.    That would be up to the homeowners or citizens to determine.

22.    See responses to #2, #5, #13, #14, #15, #16, #17, #18, and #19.

23.    We are not required to have a special damage as we are a public water system with thousands of customers. However, we do have special damages due to the dewatering and sinkhole problem.

24.    We believe it abatable with no permanent damage known at this time; however, major repairs would be needed around Little Uchee and the Spring.

25.    See response to #24. We believe it abatable.

26.    The blasting, the pumping of water, the lowering of the water table and the creation of sinkholes.

27.    By continuing to get bigger and deeper thus causing more problems. This is being done after we complained, Opelika complained and numerous homeowner's complained.

28.    No, not as to us.

29.    If Hanson knew of problems and continued them, then they are responsible.

30.    Yes.

31.    If permanently damaged, yes. If the damages are abatable, no. Remediation and repair may be required from Hanson.

32.    Yes.

33.    Yes.

34.    We believe that Well #4 will be negatively impacted in the future much more than now. Beauregard has another well in Creek Nations that might be impacted. Currently, the quarry is dewatering a large area which does impact us, Little Uchee Creek and Spring Villa. Also, see above responses.

1479

We have been unable to fill the Spring Villa pool and we do not have the Spring as an emergency, back-up water source. Major environmental damage is being caused and will only get worse if the quarry continues.

18.    See responses to #14, #15, #16 and #17.

19.    See responses to #13, #14, #15, #16, #17 and #18. We are unsure of the Parker's claim. The flow at the spring has been reversed and no longer surcharges.

20.    We believe it is both. As to us, we believe it is public.

21.    That would be up to the homeowners or citizens to determine.

22.    See responses to #2, #5, #13, #14, #15, #16, #17, #18, and #19.

23.    We are not required to have a special damage as we are a public water system with thousands of customers. However, we do have special damages due to the dewatering and sinkhole problem.

24.    We believe it abatable with no permanent damage known at this time; however, major repairs would be needed around Little Uchee and the Spring.

25.    See response to #24. We believe it abatable.

26.    The blasting, the pumping of water, the lowering of the water table and the creation of sinkholes.

27.    By continuing to get bigger and deeper thus causing more problems. This is being done after we complained, Opelika complained and numerous homeowner's complained.

28.    No, not as to us.

29.    If Hanson knew of problems and continued them, then they are responsible.

30.    Yes.

31.    If permanently damaged, yes. If the damages are abatable, no. Remediation and repair may be required from Hanson.

32.    Yes.

33.    Yes.

34.    We believe that Well #4 will be negatively impacted in the future much more than now. Beauregard has another well in Creek Nations that might be impacted. Currently, the quarry is dewatering a large area which does impact us, Little Uchee Creek and Spring Villa. Also, see above responses.

35.    See response to #23.

36.    We do not believe it is mandatory. We do not believe it applies because we have thousands of people depending on us for water while Hanson mines for corporate profit.

37.    Under a public trust theory.


1.    Hanson should have copies of all previous communications, including the Krebs Report.

2.    This Plaintiff objects as we do not understand this question; however, we have not communicated, to our knowledge, with any of the home owners or with Beauregard Water Authority. We have communicated between ourselves, but is a work product generated because of this litigation and we object to any such production.

3.    You have our Krebs Report. We will be producing reports from the meteorologist, hydrologist and the other experts that directly relate to our claims and some or all of your defenses.

4.    See response to #3. In addition, we have a video and photographs made of the sinkholes, the dewatered Spring and the dewatered Little Uchee Creek.

5.    See response to #3.


CITY OF OPELIKA


By: _____

Its: ___MAYOR_____


OPELIKA UTILITIES BOARD


By: _____

Its: ___Chairman_____

**OF COUNSEL:**

**CHARLES VERCELLI, JR.,** (VER003)
*Co-Council for Property Owners*
300-B Water Street, Suite 214
Montgomery, AL 36104
(334)265-6529

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, via hand-delivery, on this the 28 day of February, 2003.

James A. Byram, Jr., Esq.
Dorman Walker, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Guy Gunter, Esq.
Melton, Gunter & Melton
P.O. Box 409
Opelika, Alabama 36801

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

James B. Sprayberry

1482

**STATE OF ALABAMA**       *
                          *
**COUNTY OF LEE**         *

I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that Barbara Patton, _____Mayor_____ of City of Opelika, whose names is signed to the foregoing instrument, and who is known to me, acknowledged before me on this date that being informed of the contents of said instrument executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this the 28 day of February, 2003.

(SEAL)

NOTARY PUBLIC

My Commission Expires:

9/18/04

**STATE OF ALABAMA**       *
                          *
**COUNTY OF LEE**         *

I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that Nemer Williams, _____Chairman_____ of Opelika Utilities Board, whose names is signed to the foregoing instrument, and who is known to me, acknowledged before me on this date that being informed of the contents of said instrument executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this the 28 day of February, 2003.

(SEAL)

NOTARY PUBLIC

My Commission Expires:

9/18/04

C

1

1                    IN THE CIRCUIT COURT FOR

2                      LEE COUNTY, ALABAMA

3

4

5    MIKE DAVIS,et al.,

6              Plaintiffs

7    Vs.                              CIVIL ACTION NO.

8                                     CV-2002-85

9    HANSON AGGREGATES SOUTHEAST,

10   INC., et al.,

11             Defendants.

12

13

14

15             DEPOSITION OF MAYOR BARBARA PATTON, taken

16   pursuant to notice and stipulation on behalf of the

17   Defendants, in the conference room of the City Hall

18   of Opelika, 204 7th Street South, Opelika, Alabama,

19   before Ricky L. Tyler, Certified Shorthand Reporter

20   and Notary Public in and for the State of Alabama at

21   Large, on Friday, April 18th, 2003, commencing at

22   9:05 A.M.

23

66

1  there should not be any quarrying on the Gilmer
2  and Young property?
3       MR. VERCELLI: Objection.
4  A.  The City's position is that, you know, we want
5      our spring back. Does the quarry contribute to
6      that, I think, is the question. And the only
7      way that I know that we're going to find out is
8      if we close it down, like I said, for a little
9      while to see if it will come back. If it won't
10     come back, you know, then do you continue to
11     quarry? I don't know. Do we continue to have
12     sinkholes out there, you know, if the quarrying
13     continues? So that's another question. It's a
14     safety issue, I feel, if the quarrying
15     continues.
16 Q.  What's the safety issue?
17 A.  The sinkholes and the fact that roads out there
18     are falling in in places.
19 Q.  Are those county roads?
20 A.  I think they are county roads, but it's still a
21     public safety issue no matter who -- our
22     citizens travel on those county roads, too.
23 Q.  The issue about where sinkholes might

67

1      reasonably be expected to occur, is that a
2      technical issue?
3       MR. VERCELLI: Objection.
4  A.  I don't know who knows that.
5  Q.  Okay. Would --
6  A.  Is that a question that people know where those
7      sinkholes are going to occur?
8  Q.  You've had experts testify about it in this
9      case. Questions about the probable size of
10     sinkholes, would that be a technical issue?
11 A.  It's not something I can answer.
12 Q.  Does the City want the Court to shut down the
13     quarry?
14 A.  Yes.
15 Q.  Short of shutting down the quarry, is there
16     anything -- if the Court decides not to shut
17     down the quarry, what would the City want?
18 A.  Well, I think we made a presentation to you of
19     what we thought was reasonable.
20 Q.  Okay.
21       MR. VERCELLI: Are you talking about
22         your settlement proposal?
23 A.  Uh-huh. (Positive response.)

68

1  Q.  Do you still think that's reasonable?
2  A.  I think that what we really want is for the
3      quarry to shut down is the main thing; then all
4      of those other things are not --.
5  Q.  And if the quarry shut down and the spring
6      didn't recover, would you or would you not have
7      objections to the quarry reopening?
8  A.  Well, we need to know whether that's
9      contributing to the spring.
10 Q.  Right. So what's the answer to my question?
11 A.  Say your question again.
12 Q.  If the quarry shut down or stopped pumping and
13     the spring did not recover, would you -- does
14     the City object in that event to the quarry
15     continuing operation?
16 A.  Well, that was my same response before about
17     those sinkholes, you know. I don't know what
18     else it causes out there.
19 Q.  Okay.
20 A.  I mean, if that's a big liability and the
21     quarry is causing those sinkholes, then I don't
22     think they ought to operate.
23 Q.  Okay. So the City's position is, I'm just

69

1      trying to get it straight, that if the quarry
2      is contributing to sinkholes or the spring,
3      that the quarry shouldn't be allowed to
4      operate; is that right?
5  A.  If the quarry is contributing to what?
6  Q.  Either the spring being dry, or the sinkholes
7      being out there in the Spring Villa area?
8  A.  And any other liability issues that might be
9      there, and I guess the sinkholes, and we talked
10     about the pipeline a long time ago, if that's a
11     problem, so, yeah.
12 Q.  The City is claiming damages in this case; is
13     that right?
14 A.  Yes.
15 Q.  What are the damages that the City is claiming?
16 Q.  Do you have that list with you?
17 Q.  The settlement letter?
18 A.  Uh-huh. (Positive response.)
19 Q.  Okay. They haven't changed since then?
20 A.  Huh-uh. (Negative response.)
21 Q.  Okay. You need to --
22 A.  No, it hasn't.
23 Q.  Has the Spring Villa area been in a drought

18 (Pages 66 to 69)

**86**

1    area, because I think he has the
2    right to be here in representing
3    the City on the Federal questions.
4    In the State action there is no
5    claim that the state -- I'm sorry,
6    that the City has for any wetland
7    deprivations or wetland drying up
8    and such related claims. So they
9    don't go to what is at issue in
10   this case. .
11   MR. BYRAM: Well, what I'm asking about
12        is the document that was produced
13        in this case by you to me relevant
14        to my request for production in
15        this case.
16   MR. VERCELLI: Okay. But your question
17        is, does the City have claims for
18        wetlands and all of these sort of
19        things, and that's not something
20        that I think we should get into
21        unless the City's Federal action
22        lawyer is here.
23   MR. BYRAM: Well, actually the

**87**

1        objection didn't come from the --
2        it came from Lee County.
3    MR. VERCELLI: I was thinking it was
4        the City's lawyer, wasn't it?
5    MR. SPRAYBERRY: The County's.
6    MR. VERCELLI: Well, the City lawyer is
7        not here and this deposition
8        wasn't noticed in the Federal
9        action, so I don't think it's
10       appropriate to be having the
11       deposition if it's going to affect
12       the Federal action. I have
13       already said, there is no claim in
14       the State Court action for
15       wetlands drying up.
16          Now, the fact that we
17       produced a document in response to
18       your request, you can certainly
19       ask her about the document, but
20       certainly not about contention
21       questions, I think.
22   BY MR. BYRAM:
23   Q.   Let me show you this memorandum here from Bill

**88**

1        Harrelson to Mayor Barbara Patton, subject
2        Spring Villa water; are you familiar with that
3        document?
4    A.   (Witness reading.)
5    Q.   The question was, are you familiar with that
6        document?
7    A.   Yes, I am.
8    Q.   Okay. It doesn't have a date on it; do you
9        know when it was written, approximately?
10   A.   I don't remember exactly.
11   Q.   Did you request the memo?
12   A.   Yes, I did. Well, I didn't request the memo.
13       I requested an answer to my question in here.
14   Q.   And what was the question?
15   A.   About pumping city water to the Spring Villa
16       pool.
17   Q.   Okay. Does Mr. Harrelson, in that memo,
18       express some concern about wetlands?
19   A.   He does.
20   Q.   Okay. Is that a concern of the City of
21       Opelika?
22   MR. VERCELLI: Objection. Jim, the
23        problem I've got is we don't have

**89**

1        the lawyer here in the Federal
2        action, and this really impacts
3        the Federal question as well.
4    MR. BYRAM: It might, but it impacts
5        this case, too.
6    MR. VERCELLI: I think we will just
7        have to defer and wait on that.
8    MR. BYRAM: Well, no, I'm not going to
9        defer and wait on it when it's an
10       issue in this case, Chip.
11   MR. VERCELLI: Wetlands are not an
12       issue in this case.
13   MR. BYRAM: Well, wrong. Guess what,
14       you're wrong.
15   MR. VERCELLI: We've already told you
16       that we're not making a claim for
17       wetland deprivations in the State
18       Court action.
19   Q.   Mayor Patton, when I asked you about damages in
20       this case, did you refer me to a letter?
21   A.   I did.
22   Q.   Okay. And does that letter ask for damages for
23       wetlands?

. 23 (Pages 86 to 89)

98

1    understand what the claim is and how the
2    damages are figured, so that if we disagree
3    with that, we will have an opportunity to tell
4    our side of the story. So I'm just trying to
5    understand what your testimony or theory is as
6    to damages. And you mentioned for the loss of
7    opportunity to construct a lake, and you
8    mentioned 300,000, and I think you said that
9    was based on what it would cost to build a
10   lake?
11   A.   No, not the construction of the lake, but, you
12   know, the water that was going to come into the
13   lake was from the spring. If there are other
14   things that we have to do as far as running
15   pipes out there to provide water to make a
16   lake, that might be where that figure was
17   derived. It won't be the total cost of
18   constructing the lake.
19   Q.   Okay. Is there anybody that's done any
20   detailed cost estimates to see what that would
21   be?
22   A.   Just did just some rough estimates.
23   Q.   Who would know most about that?

99

1    A.   I don't remember exactly where those came from.
2    I know we had some discussions with the
3    Utilities Board about -- with Mr. Hilyer about
4    that and with Mr. Harrelson.
5    Q.   Okay. And then there was a point made in this
6    letter about the cost to construct waterlines
7    to serve Spring Villa Estates; is that
8    something that Mr. Hilyer would know more
9    about?
10   A.   Yes.
11   Q.   And then you add a claim for the cost of a new
12   swimming pool; is that right?
13   A.   That's correct.
14   Q.   Now, are you claiming -- are you wanting to
15   shut down the quarry and also get the cost of a
16   new swimming pool?
17   A.   The main thing is to go ahead and close the
18   quarry down. If the spring comes back, you
19   know, the swimming pool, we will have the water
20   in the swimming pool.
21   Q.   So you're not asking for both?
22   A.   If the spring comes back.
23   Q.   You need to say "not asking for both"?

100

1    A.   If the spring comes back and the swimming pool
2    is still able to be used, then we're not asking
3    for both.
4    Q.   Now, the estimates in these documents I've been
5    provided for -- in the grant applications and
6    various things, for the cost of either
7    repairing or enlarging the pool, there seems to
8    be a huge difference between those numbers and
9    the number that we were provided of 700,000
10   dollars. Do you know why the big difference?
11   A.   I know that Mr. Harrelson based those figures
12   on a municipal pool that's -- what he thought
13   would be best out there if the spring water
14   went away, because the spring water was the
15   biggest attraction out there. And just to put
16   in a pool the same size as that -- that was
17   there now, would not be adequate to serve.
18   Q.   Okay. The 700,000 was for a much larger
19   pool --
20   A.   Yes.
21   Q.   -- than what's there now?
22   A.   Not much larger, but a larger pool.
23   Q.   60 percent larger?

101

1    A.   I don't know how much larger. You'll have to
2    ask him the dimensions.
3    Q.   Mr. --
4    A.   Harrelson.
5    Q.   -- Harrelson? Is Barge, Wagoner, Sumners and
6    Cannon a recreation planning consulting firm
7    that worked up a proposal for the Spring Villa
8    Park?
9    A.   We've had -- I don't know whether they --
10   Goodwyn, Mills and Cawood did one, and I don't
11   know if they did the workup on the pool that
12   you're talking about. They may have.
13   Q.   Any other damages that the City is claiming?
14   A.   I think just what we had in the settlement and
15   the fact that we wanted to -- the only damages
16   we're claiming are the lake and the pool -- the
17   pool and the fact that the spring is shut down.
18   Q.   Okay. Well, you told me about the cost of a
19   new swimming pool if the spring doesn't come
20   back; the money for the loss of the opportunity
21   to construct a lake, which you believe to be
22   based on the cost of piping water to the lake;
23   and then you mentioned, but said Mr. Hilyer

26 (Pages 98 to 101)

D

1

1          IN THE CIRCUIT COURT FOR

2              LEE COUNTY, ALABAMA

3

4

5   MIKE DAVIS, et al.,

6              Plaintiffs,

7   Vs.                        CIVIL ACTION NO.

8                              CV-2002-85

9   HANSON AGGREGATES SOUTHEAST,

10  INC., et al.,

11             Defendants.

12

13

14

15          DEPOSITION OF BILL HARRELSON, taken

16  pursuant to notice and stipulation on behalf of the

17  Defendants, in the conference room of the Law Office

18  of James B. Sprayberry, 225 North Gay Street, Auburn,

19  Alabama, before Ricky L. Tyler, Certified Shorthand

20  Reporter and Notary Public in and for the State of

21  Alabama at Large, on Tuesday, May 6th, 2003,

22  commencing at 10:35 A.M.

23

10

1  Q.  What school is the Recreational Parks
2      Administration major in at Clemson?
3  A.  Under the School of Forestry, I believe. At
4      that time it was; I'm not sure now. It is an
5      accredited Recreation curriculum. And there
6      are very few around; none in Alabama.
7  Q.  Okay. Did you come in as the -- what's your
8      title?
9  A.  I'm Director of Parks and Recreation.
10 Q.  Okay. How long have you been Director?
11 A.  Since May of 1981. I came to Opelika as the
12     Opelika Center Director. I don't know if you
13     want all of this information or not.
14 Q.  Yeah.
15 A.  And then I was promoted, and I can't tell you
16     what year, to Recreation Supervisor, which I
17     was over all recreation programs. And then I
18     was promoted to Supervisor of Parks and
19     Recreation. And then I was promoted to
20     Director when Mr. Calhoun retired.
21 Q.  What -- I'm trying to think of the best way to
22     ask this, but what all is encompassed by the
23     Parks and Recreation Department?

11

1  A.  Well, you know, that depends on the city. In
2      Opelika it's a very comprehensive job.
3  Q.  I mean in Opelika.
4  A.  I would think very similar to Auburn. In
5      Opelika we run two recreation centers; we run
6      the Spring Villa Park; of course, it's in the
7      county, although it's a city park; all sports
8      programs, a very comprehensive sports program;
9      all parks; West Ridge Park, which consists of
10     12 ball fields; anything to do with Parks and
11     Recreation. We -- public recreation is a big
12     department in Opelika. There is very little in
13     Opelika done by private organizations. So it
14     would vary from city to city. But I'm head of
15     Parks and Recreation in the city.
16 Q.  Okay. And a recreation center, is that a place
17     where you, like, play basketball and things
18     like that?
19 A.  Sure. We have two centers in Opelika.
20 Q.  And when you say sports, like Little League is
21     run by the City?
22 A.  Dixie Youth.
23 Q.  Dixie Youth?

12

1  A.  Yes.
2  Q.  You provide the facilities and they provide the
3      Dixie --
4  A.  Well, the only private organization in the
5      whole City of Opelika is the Dixie Youth
6      Association. Now, they actually run Minor
7      League and Dixie Youth League. It's our
8      facility. But we do all of the T-ball, we do
9      all of the girls' softball, then we pick the
10     boys back up at age 13 and take the older ones.
11     There is that Association, which it's a
12     close-knit Association with us.
13 Q.  What's your budget?
14 A.  I think last year it was a little over two
15     million. And you asked me something I really
16     can't sit here and answer. I would have to
17     look, but somewhere in that neighborhood. And,
18     of course, that depends on what your capital
19     outlay is and a lot of different things.
20 Q.  It varies from year-to-year?
21 A.  It varies year-to-year. The operation stays
22     basically the same and your capital outlay
23     would vary.

13

1  Q.  You indicated it was a major function of the
2      city government here, your annual budget would
3      put you where? If you were going to order the
4      departments of the City and the size of their
5      budget, where would Parks and Recreation be?
6  A.  I would think we would -- of course, the Police
7      and the Fire Department would be budgeted more
8      money because of the number of employees, and I
9      think Public Works would, but we probably would
10     be, I would say, fourth. And I'm not including
11     the Water Board, because that is actually run
12     separately by an autonomous board -- or maybe
13     not an autonomous board; I don't know exactly
14     what it's called. They are separate. They
15     generate their own money. So I'm not
16     considering them. And I'm not considering the
17     School Board, because they're separate.
18 Q.  Does the -- let me just ask you this way; does
19     your department have receipts? Do you bring in
20     money?
21 A.  Yes, to a certain extent. We're not in the
22     money-making business. We do have a portion of
23     our budget where there is revenue brought in.

5/6/2003                                                                                                          Bill Harrelson

**14**

1    It in no way offsets expenditures, nor is it
2    intended to, but we do bring in certain
3    receipts, and it is put in the budget as
4    receipts.
5  Q.  Do you have a judgment about what it is as a
6    percentage of the budget or however you would
7    characterize it?
8  A.  It's way less than ten percent. You know, if I
9    could go look at it, I could tell you exactly
10   what it is, because it's an amount in our
11   budget just like an expenditure, but it's very,
12   very small in the City of Opelika.
13 Q.  Okay.
14 A.  And that, again, would vary from city-to-city.
15 Q.  Okay. Now, at Spring Villa Park you've got --
16   of course, you had a swimming pool, you had a
17   picnic area, you had or have a camper area?
18 A.  Uh-huh. (Positive response.)
19 Q.  The thing across the road, what do you call
20   that?
21 A.  We call it the lodge; that's new. And we also
22   put a shelter over there, a real nice picnic
23   shelter.

**15**

1  Q.  And how long has that been built?
2  A.  We built on that for a long time. About the
3    time we closed the pool was the same time we
4    were in the process of building that. We were
5    given that old house that we now call the lodge
6    from the Industrial Development Board when they
7    started the Wal-Mart Distribution Center. We
8    were also given the caretaker's home. It's a
9    very nice home that our caretaker lives in out
10   there now. We were also given a double-wide
11   trailer that's down in the campgrounds. All of
12   that took place about the same time that the
13   pool closed. So, you know, as the pool was
14   closing, we were building those facilities.
15   And now the facilities are very nice.
16 Q.  What other activity do you have down there?
17   You had a pool, picnic, camper, you've got the
18   lodge and shelter area, anything else?
19 A.  That's about it. Spring Villa has a tremendous
20   number of church groups that go out there;
21   there's a tremendous number of family reunions
22   that go out there; scout troops; school groups;
23   all kind of groups, as well as just regular

**16**

1    traffic. We have everything from weddings to
2    funerals out there. We had a funeral in the
3    picnic shelter. The lady's last request was to
4    be cremated and have the funeral at Spring
5    Villa; that was just about two weeks ago. We
6    have a little bit of everything out there.
7  Q.  Okay. Let me ask you this; how many public
8    pools are there in Opelika?
9  A.  Now there's two. Spring Villa was the third.
10 Q.  Okay. And what are the other two referred to
11   as?
12 A.  The Opelika Pool and the Covington Center Pool.
13 Q.  How old is the Opelika Pool?
14 A.  It was built in 1962.
15     (Off-the-record discussion.)
16 Q.  All right. And the Covington Center Pool, when
17   was it built?
18 A.  The same time.
19 Q.  1962?
20 A.  Uh-huh. (Positive response.)
21 Q.  And are they the same size?
22 A.  No, the Covington Pool is somewhat smaller.
23 Q.  What size is it?

**17**

1  A.  And, here again, I don't -- I could quote you
2    gallons if I was in my office. The Opelika
3    Pool is over 300,000 gallons and the Covington
4    Pool is under 200,000 gallons. The difference
5    is, the Opelika Pool is a competitive -- has
6    the competitive swimming lanes and the
7    Covington Pool does not.
8  Q.  Is that the way you -- I don't know much about
9    pools, but is that the typical way you would --
10   in your business or job, you would refer to
11   them by gallons that they hold?
12 A.  Yeah. Generally that's the way it's referred
13   to.
14 Q.  So the Spring Villa pool was built in 1930?
15 A.  1933 is what I've been told.
16 Q.  1933?
17 A.  Supposedly built under CWA or WPA or one of
18   those Roosevelt programs.
19 Q.  And how many gallons was it?
20 A.  I would say it was -- and, here again, nobody
21   has ever measured it. I would say it's
22   somewhere around the same size as the Covington
23   pool, maybe a little larger. I would say

5 (Pages 14 to 17)

102

1    Q.    There is an interrogatory answer that says that
2          the -- it gives a number for the -- well, let
3          me look and see exactly what it says. It gives
4          a rental value for, I assume, the Spring Villa
5          Park or pool at 12,000 per month; do you know
6          anything about that number or how that was
7          computed?
8    A.    I have no idea.
9    Q.    Okay.
10   A.    I don't even know where it came from.
11   Q.    All right.
12   A.    All I know is receipts. Now, how you put a
13         value -- how you put a dollar value on
14         recreation, I don't know.
15   Q.    Have you ever had one of your parks appraised
16         for any reason?
17   A.    No. Well, that's not true. We had the old
18         tennis courts in Opelika appraised because we
19         gave it to the school system. And when you do
20         that, you have to have it appraised. And I
21         think that's the only park I ever remember
22         having appraised.
23   Q.    Okay. Have you ever been to any seminars or

103

1          anything, continuing education, where that was
2          discussed, evaluating public parks?
3    A.    No.
4    Q.    You do know what it would cost to build a pool?
5    A.    I do know what it would cost to build a pool.
6          I don't. I got it from the people who build
7          pools.
8    Q.    All right. I think you've told me about this,
9          but let me get a sticker on it.
10   A.    That was just drawn by a guy named Tim Gore who
11         was a student at Auburn and working for us and
12         he drew that.
13              (Defendant's Exhibit 272 marked
14              for identification.)
15   Q.    You're talking about Defendant's Exhibit 272?
16   A.    Uh-huh. (Positive response.)
17   Q.    So that was just something that was sketched
18         out by an Auburn student who was working for
19         you?
20   A.    Yes. He was a recreation student. As a matter
21         of fact, he worked for us for many, many years.
22         He now runs a company downtown. But this was
23         drawn from an architectual drawing. Now, where

104

1          the drawing is, I don't have any idea.
2          Mr. Calhoun got him -- this was a big color
3          picture is what it was. And Mr. Calhoun wanted
4          it so he could put it up down at the bank and
5          put it different places trying to generate some
6          interest in getting this lake built.
7    Q.    Let me ask you this; the way he's drawn it off
8          here, you've got the dashed line going from the
9          pump house toward the creek?
10   A.    Uh-huh. (Positive response.)
11   Q.    That's what -- that's the approximate location
12         of what we've called the spring branch?
13   A.    I guess; I don't know.
14   Q.    Okay. And then coming down --
15   A.    You see, that can't be right, because this is
16         what I'm calling the spring branch right here
17         (Indicating). I don't know what that is. This
18         is the spring house right here, and that branch
19         -- this is where we pump from, right here
20         behind this building; it doesn't show the box I
21         keep talking about. And this area right here
22         from time to time would be all the way out in
23         this white area, and then from time to time it

105

1          would be a creek.
2    Q.    Okay.
3    A.    Of course, Mr. Calhoun is talking about damming
4          it down here. I assume this is the dike right
5          here that you can still see out there.
6    Q.    What is that dashed line?
7    A.    I don't know. I have no idea what that is.
8    Q.    I guess maybe that's a trail.
9    A.    Well, it couldn't be, because that was
10         marshland, used to be; you couldn't walk
11         through there.
12              MR. SPRAYBERRY: Is that your water
13         line running to the pool?
14   A.    I'll tell you what it is. I'll tell you
15         exactly what it is. It is a trail. And
16         there's a bridge right here, and it was built
17         by a Boy Scout getting his Eagle Badge. That's
18         what that is. And you can walk right up in
19         here and stay on the high ground most of the
20         time, and you could get to the spring house,
21         and you could actually look at the spring.
22         Everybody out there wanted to go see the
23         spring. And this Boy Scout, his name was

27 (Pages 102 to 105)

E

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT'S INTERROGATORIES

The City of Opelika and the Opelika Utilities Board supplementally respond to Defendant Hanson's Interrogatories and Requests for Production as follows:

1.    In the past, Hanson has asked for an estimate of damages for the City of Opelika and/or the Opelika Utilities Board. The Plaintiffs disclose the following additional damages which have now been calculated by the Plaintiff City of Opelika: $3,962,000.00 as itemized on the attached report from Bill Harrelson. Note that this report includes only expenses to be incurred directly related to loss of the Spring Villa pool. The City and the Utilities Board also claim damages as previously alleged in responses to interrogatories and deposition responses.

_C E Vuculy_

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Dorman Walker
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

FAX and by

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _27th_ day of _June_, 2003.

_C E Vercelli_

OF COUNSEL

155-00\Ps\SuppResp-D'sInterr.2.wpd

2

1493

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,       )
                           )
      Plaintiffs,        )
                           )
vs.                       )       CASE NO. CV-02-85
                           )
HANSON AGGREGATES     )
SOUTHEAST, INC., et al.,   )
                           )
      Defendants.     )

F I L E D
JUL 1 ? 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### HANSON'S FIRST MOTION IN LIMINE

Hanson Aggregates Southeast, Inc. ("Hanson") moves the Court *in limine* to prohibit, exclude or limit evidence, comment, or argument to the jury by the Plaintiffs and their attorneys concerning the following:

1.    **Any claim or allegation regarding the following:**

    **(A)    the Dixie Pipeline;**

        (i)    Plaintiffs pretrial contentions contain several allegations relating to the Dixie Pipeline.  By including these allegations within their contentions, Plaintiffs expressly assert their intentions to argue these claims before the jury.

        (ii)    Plaintiffs claims regarding the Dixie Pipeline are due to be dismissed pursuant to Hanson's previously filed motion for summary judgment.

    **(B)    sinkholes or other alleged effects of de-watering on property which is**

**not owned or maintained by those six families designated by the Court to participate in the initial trial (the "Individual Plaintiffs") or by the City of Opelika, the Utilities Board of the City of Opelika, or the Beauregard Water Authority (the "Municipal Plaintiffs");**

(i)      Plaintiffs have indicated their intent to call several witnesses to testify as to alleged sinkholes or other alleged effects of de-watering on property which is not owned or maintained by any Individual or Municipal Plaintiff.  Specifically, Plaintiffs included the following non-party witnesses, who are anticipated to give such testimony, on their witness list:

1.    Mr. or Mrs. David Tankersley
2.    Donnie Smith
3.    Neal Hall
4.    Shirlene Parker

(ii)      The Court has already precluded the Tankersleys and Donnie Smith from joining this action as Plaintiffs.  Plaintiffs attempt to circumvent the Court's exclusion of these individuals as Plaintiffs by seeking to call them as witnesses at trial.

(iii)      The Court has also previously precluded the Plaintiffs from asserting damages allegedly sustained by Lee County as part of this suit.  (*See* Hearing Transcript of June 13, 2003, at pp. 22-23.)  Despite this ruling, Plaintiffs continue to express their intent to call Neal Hall, a Lee County employee, to give testimony regarding alleged damages to Lee County roads and right-of-ways.

**(C)      the effects of dust allegedly caused by the quarry on any person other**

133034.1                                -2-

than the Individual Plaintiffs or on property which is not owned or maintained

by either the Individual Plaintiffs or the Municipal Plaintiffs;

(i)    Plaintiffs have indicated their intent to call the following non-party

witnesses who are anticipated to give such testimony:

1.    Shirlene Parker
2.    Darlene Motley
3.    Dot Haynie
4.    Mike Delk
5.    Mr. Quiton

(ii)    Plaintiffs have failed to provide any medical records or other

information in support of the claims asserted by these individuals;

(iii)    Plaintiffs have failed to make these individuals available for

deposition;

(iv)    None of these individuals have submitted to a medical examination by

Hanson's independent medical expert, Dr. David Thrasher.

(D)    the effects of blasting at the quarry on property which is not owned or

maintained by either the Individual Plaintiffs or the Municipal Plaintiffs;

(i)    Plaintiffs have indicated their intent to call the following non-party

witnesses who are anticipated to give such testimony:

1.    Darlene Motley
2.    Mr. Quiton

(ii)    Plaintiffs have failed to make these individuals available for

deposition;

(iii)    The property of these individuals has not been inspected by Hanson

or its expert witnesses.

(E)     **Any claim or allegation of physical injury to any person other than the Individual Plaintiffs;**

    (i)     Plaintiffs have indicated their intent to call the following non-party witnesses who are anticipated to give such testimony:

        1.     Shirlene Parker
        2.     Darlene Motley
        3.     Dot Haynie
        4.     Mike Delk
        5.     Mr. Quiton

    (ii)    Plaintiffs have failed to provide any medical records or other information in support of the claims asserted by these individuals;

    (iii)    Plaintiffs have failed to make these individuals available for deposition;

    (iv)    None of these individuals have submitted to a medical examination by Hanson's independent medical expert, Dr. David Thrasher.

(F)     **Any claim or allegation regarding the noise allegedly caused by the quarry made by any person other than the Individual Plaintiffs;**

    (i)     Plaintiffs have indicated their intent to call the following non-party witnesses who are anticipated to give such testimony:

        1.     Shirlene Parker
        2.     Darlene Motley

    (ii)    Plaintiffs have failed to make these individuals available for deposition.

(G)     **Any claim or allegation regarding the effects of quarry activity on any**

-4-

1497

**person other than the Individual Plaintiffs or on property which is not owned**

**or maintained by either the Individual Plaintiffs or the Municipal Plaintiffs.**

2.      The Court has previously entered two case management orders the purpose of which was to fashion a plan by which this matter could proceed to trial in an orderly, efficient, and judicially economic manner. Allowing the Plaintiffs to present evidence or argument regarding any of the above claims would defeat the primary purpose of the Court's previously entered case management orders by requiring an additional and unnecessary expenditure of judicial time and resources to address claims which will not be submitted to the jury for consideration and a verdict.

3.      All testimony and evidence regarding each of the above claims is irrelevant under *Ala. R. Evid.* 401 for the purposes of the initial trial and should be excluded under *Ala. R. Evid.* 402.

4.      The probative value of any such testimony is substantially outweighed by the danger of unfair prejudice to the Defendants during the initial trial. Any relevancy of such testimony is far outweighed by its tendency to confuse and mislead the jury and would constitute a substantial waste of time and resources. Such evidence should be excluded under *Ala. R. Evid.* 403.

5.      Testimony or other evidence of claims regarding any of the above claims would constitute evidence of "other wrongs" specifically prohibited by *Ala. R. Evd.* 404(b).

6.      Sustaining objections to such irrelevant and prejudicial testimony, rather than enforcing a preclusion of such testimony, would not cure the effects of such improper testimony, but would reinforce its impact on the jurors.

1498

WHEREFORE, premises considered, Hanson moves the Court to order the Plaintiffs and their counsel to (1) refrain from making any mention of the items set forth above, whether directly or indirectly, in opening statement, during the questioning of witnesses, in closing argument, or otherwise, and (2) refrain from introducing any evidence or attempting to elicit testimony concerning the same.

Respectfully submitted this the _9_ of July, 2003.

_____

One of the Attorneys for Defendant Hanson Aggregate Southeast, Inc.,

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101
334/834-6500
334/269-3115 (fax)

H. Wayne Phears, Esq.
Attorneys at Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

1499

## CERTIFICATE OF SERVICE

This is to certify that on the ___9___ day of July, 2003, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama 36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

_____
Of Counsel

1509

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,      )
                                 )

      Plaintiffs,      )
                                 )

vs.                    )      CASE NO. CV-02-85
                                 )

HANSON AGGREGATES      )
SOUTHEAST, INC., et al.,      )
                                 )

      Defendants.      )

F I L E D

JUL 1 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### HANSON'S SECOND MOTION IN LIMINE

Hanson Aggregates Southeast, Inc. ("Hanson") moves the Court *in limine* to prohibit, exclude or limit evidence, comment, or argument to the jury by the Plaintiffs and their attorneys concerning the following:

7.     **Any and all testimony of Tom Aley.**

(A)     Under *Ala. Code* § 34-41-7 (1975), any person engaged in the public practice of geology must be licensed by the Alabama Board of Licensure for Professional Geologists. The express purpose of this licensing requirement is to "protect life, property, health, safety, public welfare, and the environment through the regulation of the practice of geology." *Ala. Code* § 34-41-2(a)(1) (1975). The express intent of the licensing requirement is "to ensure that only those persons who are registered and licensed pursuant to [Title 34, Chapter 41 of the Alabama Code] unless they are exempted from licensing, shall publicly practice, offer or attempt to publicly

practice geology or any specialty thereof.... Ala. Code § 34-41-2(b)

(1975).

(B)    Section 34-41-3 defines the "public practice of geology as:

> [t]he performance of geological service or work, including, but not limited to, consultation, geologic investigation, surveys, evaluations, planning, mapping or review of geological work....  A person publicly practices...geology if the person does any of the following:
>
> > a.  Offers to or provides geologic work or services to the public in any branch of the profession of geology.

Giving expert opinion testimony as part of a judicial proceeding regarding geologic issues clearly falls within § 34-41-3's definition of the public practice of geology.

(C)    Under *Ala. Code* § 34-41-18(b), "it is unlawful for any person to publicly practice ...geology, unless that person has been duly licensed."

(D)    The Plaintiffs have designated Tom Aley, a hydrologist, to testify as an expert witness at the trial of this case.  Mr. Aley is not a resident of the State of Alabama and does not hold a valid license from the Alabama Board of Licensure for Professional Geologists. (*See* Letter from Keith Warren of July 9, 2003, attached as Exhibit "A.")  Mr. Aley previously held a temporary license which is now expired.  Further, Mr. Aley's application for a second temporary license was denied by the Licensure Board.  (*See* Letter from Keith Warren of July 7, 2003, attached as Exhibit "B.")

(E)    To allow Mr. Aley to testify at the trial of this matter would be a direct violation of Title 34, Chapter 41 and would defeat the regulatory purpose behind its enactment.    Plaintiffs should be precluded from soliciting testimony from any geologist, including Mr. Aley, who is not in compliance with the regulatory laws of the State of Alabama.

8.    **Any and all evidence regarding (i) the purchase price of the Hanson Quarry from Opelika Materials, LLC; (ii) the gross receipts of and/or sales by the guarry; (iii); the lease amount and/or royalties paid to the Young and Gilmer families.**

(A)    Plaintiffs have expressed their intent to introduce unauthenticated documents from R.E. Grills, the parent company of Opelika Materials, which set forth the amount Hanson paid to Opelika Materials, LLC as part of the purchase of the quarry's operational assets in 1999.  The Plaintiffs may also intend to proffer evidence regarding other financial aspects of the quarry's operation, including, but not limited to, sales gross receipts, the lease amount, and royalties paid to the Young and Gilmer families.

(B)    All other evidence regarding the financial aspects of the quarry's operations should be excluded under *Ala. R. Evd.* 703 because such evidence is wholly irrelevant to Plaintiffs' claims against Hanson.

(C)    Such evidence should be excluded as it constitutes an impermissible and prejudicial showing of wealth. The Alabama Supreme Court has long held that references to a party's wealth are so poisonous that they constitute "ineradicable error." *E.g., Ex parte Shiland*, 653 So.

1503

2d 993, 995 (Ala. 1995).

(D)    Even if such evidence is relevant, its introduction should be prohibited because its relevancy will be substantially outweighed by its tendency to create confusion within the jury, a waste of the Court and the jury's time, and an undue delay in trial proceedings as Hanson will be required to rebut the Plaintiffs' arguments and assertions regarding this evidence.  *See Ala. R. Evd.* 403; *Taylor v. General Motors Corp.*, 707 So. 2d 198 (Ala. 1997)(finding that the trial court's discretionary authority allows for the exclusion of relevant evidence which it believes is of little probative value); *Murry v. Alabama Power Co.*, 413 So. 2d 1109 (Ala. 1982)(holding that it is proper to exclude evidence which will work more to divert the attention of the jury than to provide probative worth).

(E)    Sustaining objections to such evidence or testimony or offers of the same will not cure the effects of such prejudice, but will reinforce the impact of such prejudicial testimony or evidence on the jurors.  Further, references to a party's wealth are so egregious that the harm they cause cannot be overcome.

Respectfully submitted this the 9th of July, 2003.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

1506

**OF COUNSEL:**
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
334/834-6500
334/269-3115 (fax)

H. Wayne Phears, Esq.
Attorneys at Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on the 9th day of July, 2003, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama 36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUL 1 5 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>HANSON AGGREGATES SOUTHEAST, )<br>INC., et al., )<br><br>Defendants. ) | Civil Action No. CV-20 02-0085 |

## NOTICE OF INTENT TO SERVE SUBPOENA ON NON-PARTY

Take notice that upon the expiration of fifteen (15) days (or such other time as the

Court has allowed) from the date of service of this Notice, Plaintiffs will apply to the Clerk

of this Court for issuance of the attached subpoena directed to:

Alabama Board of Licensure for Professional Geologists
610 S. McDonough Street
Montgomery, AL 36104

to produce the documents or things at the time and place specified in the subpoena.

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

1565

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Dorman Walker
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
709 Avenue A
Opelika, AL 36803-2345

Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by hand delivery, or by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the __12th__ day of __July_____, 2002.

_____
OF COUNSEL

155-00\Not-Intent Geo Bd.2.wpd

1507

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                         )
                                            )
                Plaintiffs,                 )
                                            )
vs.                                         )          Civil Action No. CV-20 02-0085
                                            )
HANSON AGGREGATES SOUTHEAST,                )
INC., et al.,                               )
                                            )
                Defendants.                 )

### CIVIL SUBPOENA FOR PRODUCTION OF
### DOCUMENTS, ETC., UNDER RULE 34(b)(2)

TO:    Alabama Board of Licensure for Professional Geologists
       610 S. McDonough Street
       Montgomery, AL 36104

You are hereby commanded to do each of the following acts at the instance of the Plaintiffs within fifteen (15) days after service of this subpoena: You are commanded to produce the following documents (as defined on the attached page) and to permit the above-named Plaintiffs to inspect and copy each of the following documents:

1.     Any and all documents in your possession or subject to your control that relate to any application for licensure by Mr. Thomas J. Aley, of Aley Lane, Protem, Missouri.

2.     Any correspondence, e-mail, memoranda, record of telephone conversation, fax or other document of any type or description relating to any communication with the law firm of Balch & Bingham or any employee thereof including, without limitation, James Byram, Carol Alford, or Paul Clark, as it relates to Hanson Aggregates Southeast, Inc., the Lee County Quarry, or Thomas J. Aley.

3.     Any correspondence, e-mail, memoranda, record of telephone conversation, fax or other document of any type or description relating to any communication with the law firm of Phears & Moldovan of Atlanta or Norcross Georgia, including, without limitation, H. Wayne Phears, as it relates to Hanson Aggregates Southeast, Inc., the Lee County Quarry, or Thomas J. Aley.

4.     Any correspondence, e-mail, memoranda, record of telephone conversation, fax or other document of any type or description relating to any communication with any Hanson employee or agent as it relates to Hanson Aggregates Southeast, Inc., the Lee County Quarry, or Thomas J. Aley.

5.    Any correspondence, e-mail, memoranda, record of telephone conversation, fax, or other document of any type or description relating to any communication with Dr. Robert Cook as it relates to the licensure or application therefor by Thomas J. Aley.

6.    Attached to this subpoena are two letters from Keith E. Warren, Executive Secretary of the Alabama Board of Licensure for Professional Geologists. Produce every document in your possession or subject to your control that relates to how these letters came into the possession of Dr. Robert Cook, the law firm or firms of Balch & Bingham, James Byram, Paul Clark, Carol Alford, Wayne Phears, or Phears & Moldovan.

Such production and inspection is to take place at the place where the documents or things are regularly kept or at some other reasonable place designated by you.

You are further advised that other parties to the action in which this subpoena has been issued have the right to be present at that time of such production or inspection. You have the option to deliver or mail legible copies of documents or things to the party causing the issuance of this subpoena but you may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies. The Plaintiffs agree to pay all reasonable expenses incurred by you at the aforementioned time and place.

You have the right to object at any time prior to the date set forth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating, with respect to any item or category to which objection is made, you reasons for such objection.

Dated this the ____ day of _____, 2003.


_C. E. Vercelli_____                    CLERK
CHARLES E. VERCELLI, JR.
Attorney for Plaintiffs

VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049                        By: _____
(334) 834-8805                                        DEPUTY CLERK

1509

## DEFINITION

"Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

1510

# *Alabama Board of Licensure for Professional Geologists*



610 S. McDonough Street  Montgomery, Alabama 36104
Telephone: (334) 269-9990  Fax: (334) 263-6115

July 9, 2003

To Whom It May Concern:

According to our records, Mr. Thomas J. Aley is not an active licensed Professional Geologist by the Alabama Board of Licensure for Professional Geologists.  Mr. Aley held a Temporary License (TP#25) that expired on December 26, 2002.  If you have any other questions, you may contact me at the Board office, (334) 269-9990.

Sincerely,

Keith E. Warren
*Executive Secretary*

SEAL

A

**Alabama Board of Licensure for Professional Geologists**

610 S. McDonough Street, Montgomery, Alabama 36104
Telephone (334) 269-9990  Fax (334) 263-6115

1511



July 7, 2003

Thomas J. Aley
Ozark Underground Laboratory, Inc.
1572 Aley Lane
Protem, MO 65733

Dear Mr. Aley,

The Alabama Board of Licensure for Professional Geologists have received your application for a Temporary Permit as a Geologist. However, you were granted a Temporary Permit as a Geologist on September 26, 2002. According to the Rules and Regulations of the Board, a Temporary Permit is only valid for 90 days, and is a one-time issuance. Therefore, we are unable to grant your request for an additional Temporary Permit. Please find check #1978 in the amount of $25.00. If you wish to obtain a Professional Geologist License in the State of Alabama, please visit our website at www.algeobd.state.al.us or contact this office for an application.

If you have any questions, please do not hesitate to contact my assistant, Ms Arwen Freeman at 334.269.9990, ext. 10.

Sincerely,

Keith F. Warren
Executive Secretary

B

1512

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                        *
                                           *
              Plaintiff,                   *
                                           *
v.                                         *        CASE NUMBER: CV-02-85
                                           *
HANSEN AGGREGATES SOUTHEAST, et al.,       *
                                           *
              Defendant.                   *

### SUMMONS

NOTICE TO:        **VIRGINIA YOUNG PRIEST**
                  **FOR: CLAUDE JOHN YOUNG**
                  **1414 CHARING LOOP**
                  **AUBURN, AL 36830**

    The Complaint and Second Amended Complaint, which are attached to this Summons, is important and you must take immediate action to protect your rights. You or your attorney are required to file the original of your written Answer, either admitting or denying each allegation in the Complaint with the Clerk of this Court. A copy of your Answer must be mailed or hand delivered by you or your attorney to James B. Sprayberry, Attorney for the Plaintiff, whose address is Post Office Box 2429, Auburn, Alabama 36831-2429

    This Answer must be mailed or delivered within 30 days after this Summons and Complaint were delivered to you, or a Judgment by default may be entered against you for the money or other things demanded in the Complaint.

TO ANY SHERIFF OR ANY PERSON AUTHORIZED by the Alabama Rule of Civil Procedure:

[  ]    You are hereby commanded to serve this Summons and a copy of the Complaint in this action upon the Defendant.

[ xxx ]  Service by Certified Mail of this Summons is initiated upon the written request of the Plaintiff, pursuant to the Alabama Rules of Civil Procedure.

Date _7-14-03_____

By: _CAS_____                    _____
                                    CLERK

    Certified mail is hereby requested.

RETURN ON SERVICE:

[ ]     Return receipt of certified mail received in this office on _____.

[ ]     I certify that I personally delivered a copy of the Summons and Complaint to the Defendant in _____ County, Alabama on _____.

_____          _____
Date                                      Server's Signature

_____          _____
Address of Server                         Type of Process Server

A

# *Alabama Board of Licensure for Professional Geologists*



610 S. McDonough Street  Montgomery, Alabama 36104
Telephone: (334) 269-9990  Fax: (334) 263-6115

July 9, 2003

To Whom It May Concern:

According to our records, Mr. Thomas J. Aley is not an active licensed Professional
Geologist by the Alabama Board of Licensure for Professional Geologists.  Mr. Aley
held a Temporary License (TP#25) that expired on December 26, 2002.  If you have
any other questions, you may contact me at the Board office, (334) 269-9990.

Sincerely,

Keith E. Warren
*Executive Secretary*

SEAL

B

## *Alabama Board of Licensure for Professional Geologists*



*610 S. McDonough Street  Montgomery, Alabama 36104*
*Telephone: (334) 269-9990  Fax: (334) 263-6115*

July 7, 2003

Thomas J. Aley
Ozark Underground Laboratory, Inc.
1572 Aley Lane
Protem, MO  65733

Dear Mr. Aley,

The Alabama Board of Licensure for Professional Geologists have received your
application for a Temporary Permit as a Geologist.  However, you were granted a
Temporary Permit as a Geologist on September 26, 2002.  According to the
Rules and Regulations of the Board, a Temporary Permit is only valid for 90
days, and is a one-time issuance.  Therefore, we are unable to grant your
request for an additional Temporary Permit.  Please find check #1978 in the
amount of $25.00.  If you wish to obtain a Professional Geologist License in the
State of Alabama, please visit our website at www.algeobd.state.al.us or contact
this office for an application.

If you have any questions, please do not hesitate to contact my assistant, Ms.
Arwen Freeman at 334.269.9990, ext. 10.

Sincerely,

Keith E. Warren
*Executive Secretary*

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**F I L E D**

JUL 1 5 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )   Civil Action No. CV-20 02-0085 |
| | ) |
| HANSON AGGREGATES SOUTHEAST, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' TRIAL EXHIBIT LIST

1. ADEM Permits: any or all of ADEM's file materials on Hanson's Opelika quarry, including DMRs, correspondence of any type, permits and applications (air and water, all years), notices of violations and correspondence related thereto, air and water monitoring data of any type

2. Opelika Materials ADEM NPDES permits and applications

3. Opelika Materials/Hanson transfer document & cover letter to Lebron (Sept. 13, 1999)

4. Application to modify (App for modification Jan. 28, 2000)

5. Application to Reissue

6. Any and every Document used in any Deposition taken by Plaintiffs.

7. Any and every Document used in any Deposition taken by Defendant.

8. Any and every Bates-stamped document identified by number in any deposition.

9. GSA's Geologic Map of Alabama or a color photograph of a section thereof

10. GSA's Hydro maps

11. Aerial photographs (produced in B/W by Hanson) of the quarry, 1999, 2000, 2001, 2002.

12. Aerial photographs 1999 Spring Villa & quarry area (color)

13. Photographs:
    Any or every photograph produced by Plaintiffs to Defendant, whether in print form or on CD-Roms.
    Any or every photograph taken by any Plaintiff, Dr. Cooper, Tom Aley, or Woody Hicks.

1515

Water towers in Opelika
Manning photos of sinkholes
Richardson photos of sinkholes
Rita Sumner photos of sinkholes
Donnie Smith photos of sinkholes
Tankersly photos of sinkholes
Photographs of the initial Quarry Tour

14.    Maps:

Well inventory (Auburn Quad & Parker Quad merged)
Sinhkole locations (by Lee County Highway Department)
Sinkhole Summary & Topographic Map showing same
Tax maps with locations of Quarry, Defendant's and Plaintiff's properties
Aerial Map, Bates No. 2518
Geologic map by Wood (particularly one that Woods drew on )
Geologic map by Cook
PX-24 (Woods)
Geologic Map of Alabama by GSA
Water Map of Alabama by GSA
GSA Special Map 131
GSA Map 151
Tom Aley sampling locations
Young Prop - Drill hole legend (Plaintiff's Exh. 29)
Lee County Highway May
Topographic Maps of quarry and Spring Villa areas (Parker's Crossroads Quadrangle)
Well inventory Map- (Plaintiff's Ex. 25)
Beauraguard Water Authority maps showing area/potential contamination from Wellhead, protection report
BWA Color Map/lines & Wells

15.    Documents produced by Neal Hall and given to Defendants on June 6, 2003

16.    Videos: Any or every videotape produced to Defendant by Plaintiffs, including the videotapes by Mike Davis, Shirlene Parker, Mrs. Motley, Billy Wallace, and Chip Vercelli (with other witnesses for authentication and testimony)
            Aerial 2/20/01
            Davis home 12/14/00
            Davis tapes 1-4
            Jackson tape 5/20/01
            Motley 6/13/02
            Parker, Shirlene 1/23/01-1/30/01
            Little Uchee & Sinkholes, 12/10/02 & 1/3/03
            Highway 166 sinkholes videotapes 8/16/02

1517

GSA Living with Sinkholes videotape
Tankersly video on sinkholes
Smith video on sinkholes
Tacoma Narrows bridge collapse
Hanson's Blast videotape Bates no 04260

17.   Medical records on the following Plaintiffs:
      Clark, Carol
      Clark, Courtney
      Broadwater, Mike
      Sumner, Amanda
      Sumner, Todd
      Griggs, Dorothy
      Parker, Wanda
      Parker, Ambur

18.   Depositions (in whole or in part):
      Dr. Stiles
      Dr. Nichols
      Dr. Thrasher (when taken)
      Tony Williams (selected portions)
      David Turner (selected portions)
      Nigel Wells (selected portions; both depositions)
      Steve Edgerton (selected portions)

19.   Hanson's documents documenting Complaints from Plaintiffs and/or others

20.   Sherry Wallace's notes, dates, etc. as produced.

21.   Dot Griggs' notes, dates, etc. as produced by plaintiff's listing blast dates (Sherry Wallace
      and Dot Griggs)

22.   MSDS/Silica Data Sheet

23.   Wells, Nigel, Environmental Memo Spring 2000

24.   Skelly & Loy Report dated 6/21/99

25.   Skelly & Loy Report June 29, 1999 (redacted exhibit)

26.   Hanson documents:
      Blasting reports produced
      Summary of all Blasting reports that Hanson produced
      Pumping records

3

Well inventory documents
Blasts videotape

27.    Sauls documents produced in response to subpoena (blasting records)

28.    Krebs Report

29.    Aley, Tom Documents:
Resume
All exhibits to his deposition
All supplementally produced documents, including supplemental report, water budget, photographs, chain of custody documents, graphs and charts relating to testing and test results on charcoal packs, correspondence with Alan Lee
Water Budgets
Map of sample sites
Reports, charts, etc of dye analysis and spread sheets
Photos of dye injection
Certificate of Analysis, 7/7/03 for July 2, 2003 sample
Certificate of Analysis, 7/7/03 for June 13, 2003 sample
Analytical Graphs (on large poster board)
Chart of TSS Quarry Discharge (1997 to 2002)
Chart of Summary Quarry MW Data for MW 1-6
Monthly Precipitation by Calendar Year Chart, 1983 - 2002
Summary of Water Budget Calculations for Opelika, Alabama and other attachments (sent to Sprayberry & Vercelli with letter from Aley on 5/8/03, and previously produced to Defendants) [including Bar Graphs for 1984-2002 Water Year Predicted Yield; chart of precipitation and temperature information by Calendar Year)
Predicted Yields at Opelika, Alabama chart, Water Years 1984 to 2003 (through Feb 2003) (water budget and revised water budget)
Color photos of Dye Injection by Tom Aley
Groundwater Tracing Handbook, 2002
All Custody forms and charts (as produced 6/12/03 by letter from JBS to Jim Byram)
Excerpts from Maryland Code

30.    Getz's resume

31.    Getz's report

32.    Getz's weather records, including all rainfall data (and Lee County specific data) that has been produced, as updated through 7/3/03 (and further if available at trial)

33.    Getz's Palmer Drought Indices produced

1519

34. Robert Getz's documents, including his initial report and CV, rainfall data as updated through 7/3/03, and Palmer Drought Indices

35. "hansonplc.clm website documents on its Environmental Policy, 2001, Environmental Policy 2000, and its En and 2002 Environmental Reports, _____

36. "Hanson Aggregates East" by Butch Reeves, President Hanson Aggregates East; Overview, Strengths, Strategy Elements, 1998 Financial Results, Regional Overview, Becker Acquisition, Benchmarking

37. "A Sound and Dust Decision - A Hanson Aggregates Operation In California Addresses Community Concerns with Equipment Solutions", as previously published in Pit & Quarry, by Rodney E. Garrett

38. Dr. Cooper's resume

39. Dr. Cooper's photographs

40. Dr. Cooper's list of Plaintiffs' damages and notes relating thereto, including all exhibits to his deposition

41. Hicks' resume

42. Hick's update Memo with photographs

43. Alan Lee documents, including:
List of GPS sites
Chain of custody documentation on dye sampling
Field Notes

44. Dr. Saunders resume

45. Dr. Saunders initial report

46. Dr. Saunders/GSA Water Availability Map

47. GSA Well Records-Rock drilled at Forestry

48. Dan Hilyer documents, including
All deposition exhibits
Photographs of Water tanks
Deeds City to Utilities Board and to City of the park and spring properties

49. Deeds to all homeowners (6) homes

5

1520

50.  Ledbetter appraisal

51.  Randall Parker survey

52.  Randall Parker September 1, 1981, letter from GSA with attachments

53.  Sherry Wallace list/blasting with comments and dates

54.  Wallace photos of (1) dust cloud, (2) ripple/wave in pool from blast and cracks in ceiling

55.  Cook Documents:
     Plaintiff's Ex. 57- Geology of Hanson, April 15, 2003
     Plaintiff's Ex. 58 - Geology Map with his markings
     Plaintiff's Ex. 60- Lee County Map with his line's to Creek Nation's Subdv.
     Plaintiff's Ex. 61- Topo Map with his drawings for Spring recharge and Q recharge.
         (Recharge for Q includes Clark prop. & crosses 169).
     Dr. Cook's deposition from Berry v. Martin Marietta
     Patterson reports 1999 & 2000
     Skelly & Loy water flow document
     Skelly & Loy Phase I report

56.  Harrellson documents/Opelika Parks & Recreation
     Minutes from Recreation Board
     Estimates on pool, costs, etc. (memo to Mayor)
     Deeds for City and Utility Board
     Recent Pool Costs Estimates (produced within last 3 weeks) [$3.9 M]

57.  Decker Complaints  10-5-00 (Bates 1317)

58.  Hanson Letter 10-04-2000 (Bates 1318,1319 & 1320)

59.  Edwards Complaint Documents 07-18-01 (Bates 1313)

60.  Davis Complaint Documents 11-10-01 (Bates 1311)
     Davis Complaint Documents 09-25-01 (Bates 1312)
     Davis Complaint Documents 07-14 and 07-19-00 (Bates 1316)

61.  Clark Dates of Blasting notes

62.  State Fire Marshall letter 07-31-01 (Bates 1314)

63.  Blasting permit state laws

1521

64.    Guy Gunter letter 08-01-01 (Bates 1341) re: Bobby Parker

65.    All Hanson-produced Pumping records, including DMRs and worksheets, Bates nos 03681 – 03708

66.    Summary Chart of all Hanson-produced pumping records

67.    All DMRs filed with ADEM for Opelika Mat and Hanson (originally filed as well as corrected)

68.    Summary chart of all DMRs

69.    Hanson's Lee County Mineral and Mining Tax Returns

70.    Summary chart of Hanson's Lee County Mineral and Mining Tax Returns

71.    Letter to ADEM dated November 11, 1999

72.    Letter to ADEM dated September 29, 1999

73.    January 12, 2001 (non-compliance notification)

74.    March 18, 2002 (response to NOV of Feb. 26, 2002)

75.    May 17, 2002  (corrected to DMR's)

76.    January 12, 2001 (non-compliance notification)

77.    February 26, 2002 (NOV) (7 violations)

78.    Buy-Sell Agreement dated June 29, 1999 with exhibits recently produced (includes Bates 3709 thru 3760 from prior production) with Exhibits and Edgerton Deposition exhibits

79.    ADEM letter of July 29, 1999 (3879-3882)

80.    Hanson letter of Aug. 7, 1999 (3883)

81.    ADEM letter of Dec. 10, 1999 (with consent agreement)

82.    Lebron letter   Feb. 24, 2000  (to ADEM)

83.    Lebron letter   Aug. 13, 1999 (to ADEM)

84.    Grills letter Aug. 13, 1999     (to ADEM)

7

1522

85.     Lebron letter   Sept. 7, 1999 (to ADEM)

86.     Hanson letter Aug. 5, 1999  (to ADEM)

87.     ADEM warning letter on incorrect figures

88.     Blast permit state law

89.     Patterson Exploration documents:
        1999- Gilmer prop. with narrative
        2000- Young prop. with narrative
        Skelly & Loy cover letter (2938-2939)
        Skelly Loy Phase I (with 1981 geol. report) (2939a-2946)
        Skelly Water Flow Study (Bates 2801-2825)

90.     Wills Enviro. Memo April 28, 2000 (4261-4264)

91.     Hanson letters to Grills at time of pruchase

92.     Buy/Sell Agreement with Exhibits

93.     Zoning letter from City of Opelika

94.     All exhibits from Wood Deposition, including 19- elev. monitoring wells; 20- water levels
        of monitoring wells; 21 & 22 diagrams and drill logs; 23- Pumping from Jan-March 2003;
        26-GSA reports of wells; 27-chart for well survey info; 28- GSA data on wells & Springs
        Lee County; 30-Water availability map GSA

95.     All Exhibits from Rex Griffin Depo, including:
        Plaintiffs II - map with wells
        Unnumbered sheet with well info
        Graph of pump tests
        Graph of water levels in wells
        Data on test wells
        Drill log and water level info
        Rainfall records

96.     October 24, 2000 note Chandler (GSA)

97.     August 31, 1999 letter from Robin Baker

98.     November 9, 1999 letter Robin Baker

8

1523

99.    GSA data on Spring Villa discharge

100.   Alan Lee elevations for Wells at Spring and at Smiths

101.   Maps from Beaureguard Wellhead Protection Study

102.   BWA color map showing water lines and wells

103.   BWA Wellhead Protection Study

104.   BWA Memo on Leaks Close to Rock Quarry Sept – Jan 2003

105.   Well logs and data for Beaureguard

106.   Opelika Parks & Rec. memo with attachments

107.   GPS Co-Ord for 5 test Wells

108.   GSA Circular 68, Sinkhole Problem in and near Roberts Industrial S/D B'Ham, AL

109.   Topo map with sampling sites

110.   Rainfall records from Roger Getz

111.   Young Memo of Lease & Lease, January 17, 2000

112.   Gilmer Lease (June 30, 1999), with Maps 00090, 00091, 00092

113.   Tankersly well Coordinates per Woods revised well list.

114.   Young Property Clearing map (00101)

115.   Dyno Nobel Letter 12/15/99 to Hanson re: Summary of Observations, etc.

116.   Hanson's Mining Plans and Charts, Bates nos. 02510 – 02521

117.   Hanson's Policy on Blasting, Bates Nos. 02522 – 02534

118.   Georgia Minerals letter 6/30/99, Bates no 02543– 02552

119.   Georgia Minerals letter and 3-D graphs, Bates nos 02553 – 02569

120.   Continental Aerial Survey Report 4/00, Bates nos 02570 – 02594

121. Hanson 11/26/99 Edgerton memo and attachments, Bates nos 02595 – 02602

122. Reserves notes, Bates nos 02625 – 02627

123. Hanson's Stripping schematic, Bates nos 02634 – 02636

124. Ward memo 8/10/01 Bates no 02643 – 02644

125. Hanson Memo 3/19/99 Bates nos 02648 – 02652

126. Geologic Investigation 6/2/81, Bates nos. 0259 – 02674

127. Evaluation Report December 1985, Bates nos 02675 – 02576

128. Yokel Report on Geology of the Chewacla Marble, Bates nos 02826 – 02937

129. ADEM Water Quality Guidelines, Chapter 335-6-11

130. ADECA letter to Sprayberry 9/16/02

131. ADECA Regulations, Chapter 305-0-1 et seq.

132. Documents attached to Sprayberry's Fax to Byram on 7/9/03, including Opelika's grant request, Lake construction information, BWA June 8, 2000, letter to US Corps of Engineers, Memoranda, Wills' press release, etc.

133. Air pollution control equipment daily inspection reports, Bates nos 04267 – 04438

134. Historic Newspaper articles on Spring Villa (attached to Sprayberry's letter to Byram of March 5, 2003)

135. Minutes and other Historic information attached to Sprayberry letter of March 10, 2003 to Byram

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

1525

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Dorman Walker
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ____ day of _____, 2003.

_____
OF COUNSEL

155-00\P Trial Exhibit List.7.wpd

11

FILED

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA  JUL 1 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| Plaintiff, | * | |
| v. | * | CASE NUMBER: CV-02-85 |
| | * | |
| | * | |
| HANSON AGGREGATES SOUTHEAST, | * | |
| INC., et al. | * | |
| Defendants. | * | |

## MOTION FOR LEAVE TO AMEND COMPLAINT AND ADD A DEFENDANT

The Plaintiff's would show this Court that:

1.    In June, 2003, Old Castle Materials Southeast, Inc., ran an ad in the local <u>Opelika-Auburn News</u> for production workers in Opelika.  The jobs included equipment operator, plant operators, and general labor.

2.    When one checks the worldwide web for Old Castle Materials you arrive at the website for Old Castle Materials of Dublin Ireland.   Old Castle is the fourth (4th) largest rock and concrete company in the world and the website had maps showing its locations in North America.

3.    More than one plaintiff has heard that Hanson has transferred the Opelika Quarry to Old Castle effective July 12 at midnight.

4.    More than one plaintiff has heard that Old Castle had one or more employees required to have an introduction and orientation to the policies and procedures for Old Castle Materials.

5.    The plaintiffs have previously filed, as an attachment to their emergency motion for production of documents, a printout from the Alabama Secretary of State's office indicating that Old Castle Materials Southeast, Inc. qualified to do business in the State of Alabama on June 18, 2003.  The newly registered agent is some type of

1527

corporation service from Birmingham, Alabama.

6. Counsel for the plaintiffs have arranged to review ADEM's records to determine if Old Castle has filed for a transfer of the ADEM permits. The attorney's have also inquired of the Lee County Tax/Probate Office to determine if Old Castle had claimed the County license. No County license has been issued as of July 11, 2003.

7. Based on the information obtained, the plaintiff's believe that Old Castle Materials has bought, leased, acquired or otherwise had the Opelika Quarry transferred to it. Plaintiffs seek permanent injunctive relief prohibiting any operation of a limestone quarry on the lands of the Gilmers and Youngs. Accordingly, Old Castle Materials Southeast, Inc., is a necessary party to this litigation.

8. Time is of the essence in adding Old Castle as a Defendant, given that although Old Castle assumed control of the quarry with full knowledge of this litigation, Old Castle may try to continue the rescheduled trial date for this case.

**WHEREFORE,** the Plaintiffs move this Honorable Court for leave to Amend their Complaint to add Old Castle Materials Southeast, Inc., as a defendant to this litigation.

This the 10 day of July, 2003.


**OF COUNSEL:**

CHARLES VERCELLI, JR., (VER03)
*Co-Counsel for all Plaintiffs*
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8807

JAMES B. SPRAYBERRY (SPR008)
*Co-Counsel for All Plaintiffs*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

1525

GUY GUNTER
*Council for City of Opelika/ Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided to the following, by first class mail postage prepaid and properly addressed on this the ⎯⎯ day of July, 2003.

James A. Byram, Jr., Esq.
Paul Clark, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery,    Alabama    36101-0078

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears, Esq.
Attorney At Law
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
James B. Sprayberry

1520

F I L E D

JUL 1 8 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )  CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## HANSON'S REPLY TO PLAINTIFFS' MOTION IN
## OPPOSITION TO SUMMARY JUDGMENT

Hanson Aggregates, Southeast, Inc. ("Hanson") replies to Plaintiffs' Motion in

Opposition to Summary Judgment as follows:

1.    Plaintiffs' brief correctly asserts that the threshold issue in this case is whether

the nuisance allegedly created by quarry operations, if any, is public or private.

(Plaintiffs' Brief at p. 1.)  Plaintiffs, however, fail to provide any guidance as to the

answer to this question.  Rather, Plaintiffs' assume, without support, that any nuisance

created by the quarry is public with respect to the claims asserted by the City of

Opelika.  (Plaintiffs' Brief at p. 2.)  Plaintiffs completely fail to address the issue with

regard to the Individual Plaintiffs or the Beauregard Water Authority.

2.    Plaintiffs make the blanket assertion that "blasting is a nuisance, a ready

mix concrete plant is a nuisance and the interference with a homeowners use of ground

water...is a nuisance." (Plaintiffs' Brief at p. 1.)  However, the cases cited in support of

this assertion belie its accuracy.  In *Birmingham Reality v. Thomason*, 63 So. 65, 67

(Ala. 1912), the court found that the a claim for damages arising from the blasting

operations of the defendant, carried out over a considerable amount of time, without

due precautions being taken for the safety of persons or property within the zone of danger sounded in nuisance rather than trespass. The court did not find that all blasting was a nuisance as asserted by the Plaintiffs. Further, the *Thomason* case is distinguishable from the instant case in that Hanson has previously shown that all blasting at the quarry is conducted safely and in accordance with all applicable regulations.

In *Morgan County Concrete v. Tannor*, 374 So. 2d 1344, 1346 (Ala. 1979), the Alabama Supreme Court affirmed a jury verdict which found the defendant's concrete plant caused a private nuisance because the evidence presented proved that the noise and dust from the plant caused a "substantial and unreasonable interference" with the plaintiffs' use and enjoyment of their property. The *Tannor* Court did not, as Plaintiffs assert, find that all concrete plants constitute a nuisance. The *Tannor* case is distinguishable from the instant litigation in that the present Plaintiffs' have failed to provide sufficient evidence to show a "substantial and unreasonable" interference in the use and enjoyment of their properties.

Plaintiffs place substantial reliance on *Henderson v. Wade Sand and Gravel*, 388 So. 2d 900 (1980) in both their response and supporting brief. However, *Henderson* does support the conclusion, as the Plaintiffs contend, that any interference with a homeowners' use of groundwater is a nuisance. Rather, the *Henderson* Court found that groundwater interference claims are governed by the law of nuisance. Thus, the interference must be both "substantial and unreasonable" to qualify as a nuisance. *See Tannor*, 374 So. 2d at 1346. In this case, Plaintiffs have not shown that their use of

- 2 -

groundwater has been either substantially or unreasonably interfered with by quarry operations.

3.      While Plaintiffs correctly assert that *Ala. Code* § 6-5-122 (1975) allows a municipality to maintain an action to abate a nuisance which threatens the health or safety of a city, Plaintiffs fail to assert any basis for the applicability of this statute. The City of Opelika is only municipality which is a party to this suit; none of the other parties are municipalities and may not evoke the provisions of § 6-5-122. Plaintiffs, however, have failed to show that quarry operations threaten the "health or safety" of any citizen of the City of Opelika. None of the Individual Plaintiffs live within the City of Opelika. None of the representatives of the City of Opelika have testified that quarry operations threaten the either the health or safety of the City. Therefore, Plaintiffs have failed to establish that a public nuisance claim may be maintained against Hanson under § 6-5-122.

4.      Contrary to Plaintiffs' assertions, an amendment adding new parties to a nuisance claim should only be allowed where the defendant has been fully apprised of a claim arising from specified conduct and has prepared to defend the claim against him. *English v. State*, 585 So. 2d 910, 912 (Ala. 1991). Such an amendment was allowed in English only because the claims and the interests of the party sought to be added were identical in every respect to the claims previously asserted against the defendant. *Id.* Thus, the Plaintiffs should not be allowed to amend their Complaint at this stage of litigation to add any new parties who intend to assert any claim of which Hanson has not been fully apprised or which Hanson is not been preparing to defend.

5.    Plaintiffs assert that *Ala. Code* § 33-7-4 (1975) allows statutory damages on behalf of the City of Opelika and the Randall Parker family to be assessed against Hanson for the alleged diversion of Little Uchee Creek into a "swallow hole." (*See* Plaintiffs' Brief at p. 2.)  However, neither the City of Opelika or Randall Parker family assert that they have been harmed by any such diversion, assuming *arguendo* that a "swallow hole" qualifies as a "diversion" under § 33-7-4.  In fact, Randall Parker has testified that the use of his land along Little Uchee Creek has not been affected by quarry operations. (*See* Hanson's Summary Judgment Brief at pp. 14-15.)  Thus, even assuming Plaintiffs "swallow hole" argument is correct, neither the City not the Parkers are entitled to any damages under § 33-7-4 as neither have shown any evidence of injury resulting therefrom.

6.    Plaintiffs' assertion that claims for public nuisance have no statute of limitations is miserably incorrect.  Both cases asserted by Plaintiffs in support of this argument, *City of Birmingham v. Land*, 34 So. 613 (1903) and *Stouts Mountain Coal Co. v. Ballard*, 70 So. 172 (Ala. 1915), are completely inapposite to the statute of limitations issue.  In each case, the respective courts found that the right to maintain a nuisance cannot be acquired by prescription.  *See id*.  The question was whether the defendants acquired a property right in the maintenance of their conduct by virtue of its open and adverse continuation for a specified length of time.  This question is far different than the question of whether a plaintiff has allowed a cause of action to become so stale as to prevent its just and equitable litigation.  Plaintiffs simply cannot support their argument that claims for damages from a public nuisance are exempt from all statutes of limitation.

- 4 -

7.     No support is provided for Plaintiffs assertion that *both* injunctive and monetary relief may be awarded under a nuisance claim.    Rather, Plaintiffs bald statement is contrary to the prior decisions of the Alabama Supreme Court on this issue. *See Baldwin v. McClendon,* 288 So. 2d 761, 766 (Ala. 1974).

8.     Plaintiffs' argument regarding *Union Cemetery Co. v. Harrison*, 101 So. 517 (1924) is completely opposite to the decision actually rendered by the appellate court. The *Union Cemetery* Court found that a husband could <u>not</u> give his opinion as to the cause of his wife illness.  Further, the Court's evocation of the role of the jury in determining the cause of illness was not a preclusion of summary judgment, but was a prohibition of testimony on the "ultimate issue" (a rule still adhered to at the time of the Union Cemetery decision).  Thus, contrary to Plaintiffs' argument the Individual Plaintiffs are prohibited by the *Union Cemetery* decision from giving any testimony regarding the cause of another person's alleged illness or injury.

9.     In support of their argument for punitive damages, Plaintiffs cite *Abbot v. Braswell*, 265 So. 2d 871 (Ala. 1972) and *Gregath v. Bates*, 359 So. 2d 404 (Ala. 1978). The *Abbot* decision, decided under the scintilla rule, is distinguishable form the instant case in that the Plaintiffs have failed to provide any evidence that Hanson's actions have been malicious or attenuated with aggravation." *See id.*    Further, punitive damages are not even mentioned in the Supreme Court's decision in *Gregath v. Bates*. While the court does discuss mental suffering, the Court does not create any connection between the availability of mental anguish damages and punitive damages. As a result, Plaintiffs' fail to properly support their argument that the issue of punitive damages should be submitted to the jury.

- 5 -

10.    The Alabama Supreme Court's decision in *Holder v. Emwood*, 165 So. 235 (Ala. 1936) does not support the application of the law of trespass to the Plaintiffs' individual claims regarding damage allegedly caused by the overburden pile.  *See id.* *Holder* involved the improper burial of human remains and is inapplicable to claims of flooding caused by the overburden pile.

11.    Plaintiffs' assertion of negligence per se is insufficient to overcome Hanson's motion for summary judgment as Plaintiffs' have failed to plead negligence per se in any of their previously filed complaints.

12.    Plaintiffs randomly insert an argument based on *McCraney v. Leeds*, 194 So. 2d 151 (Ala. 1940), which dealt with an old Alabama Code section regarding the obstruction of a public street, into their response to Hanson's motion for summary judgment.  Plaintiffs, however, have not made any claims or presented any evidence that Hanson has obstructed any public road.  Even if those claims had been previously asserted and properly supported, Plaintiffs fail to provide a basis on which they can maintain a public nuisance claim for such obstruction in that there is no evidence that any Plaintiff, whether individual or municipal, has been specially injured.  *McCraney*, therefore, does not support Plaintiffs' motion to deny Hanson's motion for summary judgment.

13.    In regard to the claims of the Beauregard Water Authority, Plaintiffs' assert that the opinions of Tom Aley "clearly indicate that the Beauregard well has been or will be affected by the Hanson quarry."  (*See* Plaintiffs' Brief at p. 5.)  However, Plaintiffs fail to attach any such opinion to their response.  Under *Ala. R. Civ. P.* 56 all supporting evidence and affidavits must be attached to a party's response to an opposing motion

- 6 -

1555

for summary judgment. By failing to attach the supporting documentation regarding Aley's opinions, Plaintiffs' fail to satisfy the procedural requirements of Rule 56.

14. Plaintiff fail to cite any legal authority in support of their assertion of the "public trust" doctrine. Again, Plaintiffs' unsupported assertion is contrary to the applicable rule of law as discussed in Hanson's motion for summary judgment brief.

15. While costs may be recoverable under the Declaratory Judgment Act, *Ala. Code* § 6-6-231 (1975), that provision does not apply to attorney's fees. Moreover, Plaintiffs' have failed to request declaratory relief against Hanson. Thus, the Declaratory Judgment Act cannot be used to sustain the Plaintiffs' claim for the recovery of either costs or attorney's fees.

Respectfully submitted this the 17th day of July, 2003.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

1586

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 17th day of July, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

Of Counsel

1557

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                          *
                                             *
            Plaintiff,                       *
                                             *
vs.                                          *        CIVIL ACTION NO. CV 02-085
                                             *
HANSON AGGREGATES                            *
SOUTHEAST, INC., et al,                      *
                                             *
            Defendants.                      *

## ORDER

A hearing was held in this case on July 11, 2003. The Attorneys for all parties were present. The Defendants in this case made a Motion to Continue this case for a variety of reasons. In particular, two of the Defendants had only recently been served and had not had an opportunity to file an Answer. Furthermore, there are other issues that may or may not involve new potential parties. IT IS THEREFORE ORDERED, ADJUDGED and DECREED that the trial set for July 21, 2003, is CONTINUED to **OCTOBER 20, 2003, at 8:30 A.M. in Courtroom Three of the Lee County Justice Center. A PreTrial Conference is set in this case for September 22, 2003, at 9:00 A.M. in Courtroom Three.**

A Status Conference is set in this case for **August 1, 2003, at 1:30 P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Jimmy Sprayberry
Post Office Box 2429
Auburn, AL 36831-2429

Hon. Charles Vercelli, Jr.
1019 S. Perry Street
Montgomery, AL 36104

Hon. James Byram, Jr.
Hon. Dorman Walker
Hon. Matt Parnell
Post Office Box 78
Montgomery, AL 36101

Hon. John V. Denson
Post Office Box 2345
Opelika, AL 36803-2345

Hon. Guy Gunter
Post Office Box 409
Opelika, AL 36803-0409

DONE this the 16th day of July, 2003.

JACOB A. WALKER, III
Circuit Judge

FILED

JUL 2 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

1588

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS; DONNA DAVIS; , et al )
 )
Plaintiffs, )
 )
v. )  CIVIL ACTION NUMBER: CV-02-085
 )
HANSON AGGREGATES )
 SOUTHEAST, INC.; et al. )
 )
Defendants. )

F I L E D

JUL 2 4 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### ANSWER OF YOUNG DEFENDANTS

COME NOW, the Defendants, Louise Young O'Brien, (having been served on or about June 27, 2003), Virginia Hart Young (having been served on or about June 28, 2003) and Claude John Young, by and through his sister, Virginia Young Priest who has authority to act for her brother, Claude John Young through a Power of Attorney, (having been served on or about July 14, 2003) (heretofore "Young Defendants") and for answer to the Complaint as last amended state the following:

1. Said Young Defendants in response to paragraphs numbers 27, in the original Complaint and 48 in the Second Amended Complaint, state that these three Young Defendants along with Virginia Young Priest are owners of a one-fourth undivided interest in the "Young property" and that they are not members of any limited or general partnership. Said "Young Defendants" also deny that they leased the Young property to Opelika Materials, Inc., their only lease being to the Defendant Hanson Aggregates Southeast, Inc. Said Young Defendants furthermore admit they have a direct financial interest in the quarry due to receipt of rental payments and payments for cutting timber, but deny that they have ever received any royalty payments for aggregate mined from the premises from the time of the original lease up to the present time.

2.     For further answer to the Complaint, as last amended,  said Young Defendants adopt the Answer and Counterclaim heretofore filed by and on behalf  of Virginia Young Priest, a copy of which is attached hereto as Exhibit "A."

Respectfully submitted,

COUNSEL FOR DEFENDANTS
VIRGINIA YOUNG PRIEST, LOUISE YOUNG
O'BRIEN, CLAUDE JOHN YOUNG,
VIRGINIA HART YOUNG AND
GILMER PROPERTIES, LTD.
SAMFORD, DENSON, HORSLEY,
PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL  36803-2345
(334) 745-3504
FAX (334) 745-3506

BY: _____
       John V. Denson
       DEN007

1540

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing document upon all interested parties, including the attorneys listed below, in Open Court on this the _24_ day of _July,_ 2003.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

Mr. H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corners Circle
Norcross, Georgia  30092

Mr. Charles E. Vercelli, Jr.
1019 South Perry Street
Montgomery, Alabama 36104-5049

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Guy F. Gunter, III
Melton, Gunter & Melton
Post Office Box 409
Opelika, Alabama 36803-0409

John V. Denson

Exhibit A

RECYCLED PAPER
RECYCLABLE

1541

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS; DONNA DAVIS; , et al | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: CV-02-085 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC.; et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER AND COUNTERCLAIM OF
## YOUNG AND GILMER DEFENDANTS

COME NOW, the Defendants, Virginia Young Priest and Gilmer Properties, Ltd.

(hereinafter, "**Young and Gilmer Defendants**") and for Answer to the various amended and

restated complaints filed by the Plaintiffs herein, without waiving any Motion filed on behalf of the

**Gilmer and Young Defendants**, said **Defendants** hereby file their Answer and Counterclaim

and state as follows:

## FIRST DEFENSE

The **Young and Gilmer Defendants** plead the general issue denying each and every

material allegation in the Amended and Restated Complaints and state that the Plaintiffs are not

entitled to recover against these **Defendants.**

## SECOND DEFENSE

The Plaintiffs have failed to state a claim upon which relief can be granted.

1

**THIRD DEFENSE**

The Plaintiffs claim damages arising from the "operation" of the limestone quarry and it affirmatively appears from the allegations of the Complaints that the **Young and Gilmer Defendants** are not the operators of the quarry, but are merely the owners and "lessors" or "landlords" of the property on which the quarry is located. There is no agency relationship between the **Young and Gilmer Defendants** and the "tenant" or "leessee," Defendant Hanson Aggregates Southeast, Inc. (hereinafter "Defendant Hanson"). The law of Alabama has long been settled to the effect that where the relationship of the parties is that of "Lessor" and "Lessee" of the land, the owner or "Lessor" of the land is not responsible for damages caused to third parties by the "Lessee" unless said "Lessee" is alleged to be the agent, servant or employee of the owner/"Lessor" (See *Wood v. Shell Oil Company* 495 So.2d 1034 (Ala. 1986) and *Kendrick v. Alabama Power Company* 601 So.2d 912 (Ala. 1992).

In the respective Lease Agreements between the **Young** and **Gilmer Defendants** and Defendant Hanson, heretofore produced to the Plaintiffs, paragraph 19, states as follows:

> "No Agency. Tenant's [Defendant Hanson] employees, agents and contractors are not employees or agents of landlord [**Young** and **Gilmer Defendants**] and nothing contained herein shall be construed to create any agency or partnership relationship between the parties."

**FOURTH DEFENSE**

The Plaintiffs have failed to state a claim upon which relief can be granted relating to the Dixie Pipeline. No Plaintiff has demonstrated standing to assert an interest to the Dixie Pipeline.

**FIFTH DEFENSE**

2

1543

Venue should be transferred or changed as authorized by Alabama Code § § 6-3-21.1 and 6-3-20.

### SIXTH DEFENSE

The Plaintiffs' claims are barred by the two year statute of limitations, Alabama Code § 6-2-31(1), the one year statute of repose, Alabama Code § 6-5-127, and the six year statute of limitations for indirect trespass, Alabama Code § 6-2-34; alternatively, Plaintiffs' claims for relief are limited to the two year period before the filing of the Complaint to-wit February 12, 2000 to February 12, 2002.

### SEVENTH DEFENSE

Plaintiffs have not suffered actual substantial damages as a result of an alleged indirect trespass, and therefore cannot state a claim for indirect trespass.

### EIGHTH DEFENSE

The Plaintiffs have no standing to assert claims for or special damages resulting from:

a.    Defendant Hanson's allegedly causing the de-watering of the subsoil surrounding the quarry, causing the Spring Villa spring to go dry, allegedly putting the Dixie Pipeline at risk, and/or causing sink holes to form on property owned by persons who are not parties to this suit;

b.    Alleged pollution by dust from the quarry that does not have a substantial adverse impact on each Plaintiff's real property;

c.    For alleged diversion of Little Uchee Creek under Alabama Code § 33-7-4.

3

1544

## NINTH DEFENSE

The **Young and Gilmer Defendants** plead the comparative injury doctrine as an affirmative defense to the Plaintiffs' claims for injunctive relief.

## TENTH DEFENSE

The **Young and Gilmer Defendants** are not liable for any act or omission of any other party or nonparty, including but not limited to independent contractors and persons with whom it does business.

## ELEVENTH DEFENSE

The Plaintiffs' alleged damages are speculative, contingent, and not recoverable as a matter of law.

## TWELFTH DEFENSE

The Defendant Hanson has acted in accordance with the law and operated the quarry in a lawful manner.

## THIRTEENTH DEFENSE

Damages alleged by the Plaintiffs are too remote from any alleged conduct by the **Young and Gilmer Defendants** to support any recovery or relief to the Plaintiffs.

## FOURTEENTH DEFENSE

Any injuries suffered by the Plaintiffs were not proximately caused by the **Young and Gilmer Defendants.**

4

1545

### FIFTEENTH DEFENSE

The Plaintiffs' claims are barred by the equitable doctrine of estoppel, laches, and unclean hands.

### SIXTEENTH DEFENSE

The Plaintiffs have failed to mitigate their damages, if any.

### SEVENTEENTH DEFENSE

To the extent the Plaintiffs have suffered any injury, such injury was caused by and is the responsibility of other persons, entities, or acts of nature rather the **Young and Gilmer Defendants.**

### EIGHTEENTH DEFENSE

Because the acts and omissions of the Defendant Hanson have been lawful, the Plaintiffs are not entitled to equitable relief against the **Young and Gilmer Defendants.**

### NINETEENTH DEFENSE

The **Young and Gilmer Defendants** have not acted towards any Plaintiff with malice, insult, inhumanity, or contumely.

### TWENTIETH DEFENSE

The **Young and Gilmer Defendants** hereby adopt by specific reference any defense pleaded by the Hanson Defendant.

5

1546

### TWENTY-FIRST DEFENSE

The **Young and Gilmer Defendants** have not breached any duty owed to any of the Plaintiffs.

### TWENTY-SECOND DEFENSE

The **Young and Gilmer Defendants** hereby deny any liability for punitive damages and specifically adopt by specific reference the defenses stated by Hanson in their defenses numbered 24 through 30.

### COUNTERCLAIM FOR DECLARATORY AND EQUITABLE RELIEF

The **Young and Gilmer Defendants**, pursuant to Rule 13, A.R.Civ.P., adopt the Counterclaim filed on behalf of Defendant Hanson, and specifically adopt paragraph 13, of Hanson's Counterclaim requesting declaratory and equitable relief under the comparative injury doctrine concerning how the quarry operations can be changed or modified so as to avoid future damages. The **Young and Gilmer Defendants** further seek a declaration of how the alleged nuisance may be abated and under what conditions Defendant Hanson can continue its operations without further litigation and threats of litigation. See *Slocum v. Broadus*, 585 So.2d 1356 (Ala. 1991); *Daniels v. Chapuis*, 344 So.2d 500 (Ala. 1977); and *Martin Bldg. Co. v. Imperial Laundry Co.*, 124 So.2d 82 (Ala. 1929).

The **Young and Gilmer Defendants** further adopt by specific reference paragraphs 14 through 17, requesting declaratory and equitable relief as stated in the Hanson Counterclaim.

6

1547

Respectfully submitted,

**OF COUNSEL FOR DEFENDANTS:**
**VIRGINIA YOUNG PRIEST AND**
**GILMER PROPERTIES, LTD.**

SAMFORD, DENSON, HORSLEY,
 PETTEY & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345
(334) 745-3504
FAX (334) 745-3506

JOHN V. DENSON
DEN007

1548

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause, by mailing the same in U.S. Mail, postage prepaid, on this the _19th_ day of _March_, 2003, as follows:


James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

Charles E. Vercelli, Jr.
1019 South Perry Street
Montgomery, Alabama 36104

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Guy F. Gunter, III
Melton, Gunter & Melton
Post Office Box 409
Opelika, Alabama 36803-0409


John V. Denson

1549

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
        Plaintiffs,                )
                                   )
vs.                                )        CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                  )
SOUTHEAST, INC., et al.,           )
                                   )
        Defendants.                )

FILED

JUL 2 8 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## HANSON'S OBJECTION TO PLAINTIFFS'
## MOTION TO AMEND COMPLAINT AND ADD A DEFENDANT

Hanson Aggregates Southeast, Inc. ("Hanson") objects to Plaintiffs' Motion for Leave to Amend Complaint and Add a Defendant, as follows:

1.    Plaintiffs filed their motion for leave to amend the complaint on July 16, 2003. However, Plaintiffs did not attach a copy of their proposed amendment or otherwise disclose the nature of the claims they intend to assert within their amendment.

2.    A party's ability to amend a pleading is governed by Rule 15 of the *Alabama Rules of Civil Procedure*. Rule 15 is modeled on *Fed.R.Civ.P.* 15, which requires that the proposed amended pleading accompany the motion in most circumstances. 3 *Moore's Federal Practice* § 15.17 [1] (3rd ed. 2003). *See Moore v. Indiana*, 999 F.2d 1125, 1131 (7th Cir. 1993); *Clayton v. Whitehall School District*, 778 F. 2d 457 (8th Cir. 1985); Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 1485, p. 603 (1990 ed.). Without knowing the scope of the proposed amended pleading, it is impossible to tell how it may affect the already pending action and the interests of the parties thereto.

134181.1

1559

3.    Hanson respectfully requests a hearing before this Court regarding the merits of the Plaintiffs' motion to amend at the August 1, 2003 status conference.

Respectfully submitted this 25th day of July, 2003.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

1551

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 25th day of July, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

Of Counsel

1552

# IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

FILED

JUL 2 8 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### HANSON'S OBJECTION TO PLAINTIFFS'
### EMERGENCY MOTION TO PRODUCE SALES AGREEMENT

Hanson Aggregates Southeast, Inc. ("Hanson") hereby objects to Plaintiffs' Emergency

Motion to Produce Sales Agreement filed on July 10, 2003, as follows.

1.     Plaintiffs' "emergency" motion requests the Court to order the production of

certain documents relating to the transfer of the Opelika quarry from Hanson to Oldcastle

Materials Southeast, Inc.  At the time this motion was filed, the Plaintiffs had not yet requested

these documents from the Defendant under the provisions set forth in the *Alabama Rules of Civil*

*Procedure* regarding the production of documents during the course of discovery.  In light of this

failure, any motion requesting the Court to order such production is premature and should be

denied.

2.     Subsequent to the filing of Plaintiffs' "emergency" motion, Plaintiffs served their

Fourth Interrogatories and Requests for Production of Documents.  This request for production

of documents encompasses the very same documents as requested in Plaintiffs' "emergency"

motion.  As such, Plaintiffs' motion has been rendered moot, and Hanson should be allowed to

respond to Plaintiffs' fourth discovery requests within the time frame set forth in *Ala.R.Civ.P.*

34(b).

134180.1

1555

3.    Hanson requests Plaintiffs' "emergency" motion be set for hearing at the August

1, 2003, status conference.

Respectfully submitted this 25th day of July, 2003.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

1554

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this 25th day of July, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

_____
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED 1555

MIKE DAVIS, et al.,                  )
                                     )
            Plaintiffs,              )
                                     )
vs.                                  )    Civil Action No. CV-20 02-0085
                                     )
HANSON AGGREGATES SOUTHEAST,         )
INC., et al.,                        )
                                     )
            Defendants.              )

JUL 2 9 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## PLAINTIFF BAGGETT'S SUPPLEMENTAL
## RESPONSE TO DISCOVERY

Plaintiff Baggett supplements her prior discovery responses as follows:

1.    I was deposed on March 10, 2003.

2.    After reading my deposition recently, I felt that I may have left some things out when I got sidetracked during the deposition. I therefore want to describe my problems better.

3.    I have allergies real bad, and may not have mentioned those in the deposition. I take over-the-counter antihistamines for allergies and for sinusitis. This year has been the worst year ever for my allergies, and I am really suffering with this. I started to wheeze and cough a lot and I am afraid I might be developing asthma. I use an inhaler frequently at night when I am laying down. I feel like I am not getting enough air. I do not need to be home breathing this dust all of the time, but I am not working right now so I cannot do anything about it.

_Janette Baggett_
JANETTE BAGGETT

1555

STATE OF ALABAMA
COUNTY OF _Lee_

Personally appeared before me, the undersigned Notary Public in and for the State and County aforesaid, the within named **Janette Baggett**, who, after first being duly sworn, and having read and fully understanding the foregoing document, states under oath that the facts and matters stated therein are true to the best of her knowledge, information and belief.

SWORN TO AND SUBSCRIBED BEFORE me this 28 day of July, 2003.

Notary Public

[SEAL]

My Commission Expires: July 18, 2007

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2

1557

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                          H. Wayne Phears
Matt Parnell                                 Phears & Moldovan
Balch & Bingham, LLP                         Suite 375
P.O. Box 78                                  4725 Peachtree Corner Circle
Montgomery, AL 36101                         Norcross, GA 30092-3000

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

by placing a copy of the same in the United States mail, properly addressed and postage
prepaid, this the ___28___ day of _____July_____, 2003.

_____
OF COUNSEL

155-00\ BaggettSuppResp.1.wpd

3

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA **FILED** 1558

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | **JUL 2 9 2003** |
| Plaintiffs, | ) | IN OFFICE<br>CORINNE T. HURST<br>CIRCUIT CLERK |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| HANSON AGGREGATES SOUTHEAST,<br>INC., et al., | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION TO SHORTEN TIME

Plaintiffs move this Honorable Court to shorten the time to respond to Plaintiffs' Fourth Interrogatories and Requests for Production to Defendant Hanson and Third Interrogatories and Requests for Production to the Young and Gilmer Defendants. As grounds for this motion, Plaintiffs say:

1.   Plaintiffs learned, one week before the trial, that Hanson sold the quarry to Oldcastle Materials.

2.   To date, Hanson has not admitted the name of the person to whom the quarry was sold, despite Plaintiffs' request at the Hearing on July 11th, and despite the pendency of the Emergency Motion. Therefore, Plaintiffs do not positively know the identity of the new owner of the quarry.

3.   In an effort to discover the name of the new owner, the terms of its ownership, the agreements as to indemnity and defense costs, and the knowledge of the new owner of the existence of the lawsuit, among other things, Plaintiffs originally filed the Emergency Motion and have since filed Fourth Interrogatories and Requests for Production to Hanson and Third Interrogatories and Requests for Production to the Young and Gilmer Defendants.

4.   If the Court does not order the immediate responses to these discovery requests, and the Defendants are given 30 days to respond–and doubtless they will respond

with an objection in order to delay the October 20th trial setting– then it is likely the Plaintiffs will not discover this important evidence sufficiently far in advance of the trial to be able to conduct such additional discovery as is necessary to properly prepare their case against Hanson and Oldcastle.

5.    The documents requested are easily produced by the Defendants. The Youngs and Gilmers, if they have had any written negotiations with Oldcastle and/or Hanson regarding the sale/transfer of the quarry, have these documents in their immediate possession. Producing the documents and responding to the Interrogatories would be relatively quick and easy.

6.    The same is true for Hanson: the documents are easily within the possession and control of Hanson and whatever lawyers or corporate officials negotiated the sale/transfer for Hanson.

7.    To require the immediate production of the documents and responses to the Interrogatories would not, therefore, be burdensome or unreasonable.

**Wherefore,** Plaintiffs move this Honorable Court to enter an order requiring Hanson to fully respond to the Fourth Interrogatories and Requests for Production by 3:00 p.m. Monday, August 4th, and to enter an order requiring the Young and Gilmer defendants to fully respond to the Third Interrogatories and Requests for Production by 3:00 p.m. on Friday, August 8th.

_C E Vercelli_

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

2

1500

OF COUNSEL:
Charles E. Vercelli, Jr.                          Guy F. Gunter, III
VERCELLI & ASSOCIATES, P.C.                       MELTON, GUNTER & MELTON
1019 S. Perry Street                              P.O. Box 409
Montgomery, AL 36104-5049                         Opelika, AL 36803-0409
(334) 834-8805                                    (334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                               H. Wayne Phears
Matt Parnell                                      Phears & Moldovan
Balch & Bingham, LLP                              Suite 375
P.O. Box 78                                       4725 Peachtree Corner Circle
Montgomery, AL 36101                              Norcross, GA 30092-3000

John V. Denson
Samford, Denson, Horsley, Pettey &
      Bridges
P.O. Box 2345
Opelika, AL 36803-2345

by faxing a copy of the same ti each and by placing a copy of the same in the United States
mail, properly addressed and postage prepaid, this the ___29th___ day of
_____July_____, 2003.

_____
OF COUNSEL

135-00\P M-Shorten Time.1.wpd

3

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' FOURTH INTERROGATORIES AND REQUESTS FOR PRODUCTION TO ALL DEFENDANTS

Plaintiffs request Defendant Hanson to answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure, and to produce the following documents and things pursuant to Rule 34 of the Alabama Rules of Civil Procedure.

## I.  INSTRUCTIONS

Plaintiffs incorporate by reference the instructions stated in their First Interrogatories and Requests for Production to the Defendants.

## II. DEFINITIONS

Plaintiffs incorporate by reference the definitions stated in their First Interrogatories and Requests for Production to the Defendants.

## III.   INTERROGATORIES AND REQUESTS FOR PRODUCTION

1.     Describe in detail the reason that Hanson sold, swapped, or otherwise transferred the Lee County Quarry to Oldcastle (or whomever it was sold or transferred to).

2.    With respect to the sale, swap, or other transfer of the Lee County Quarry, describe

in detail every step Hanson took

(1) to ensure that the Plaintiffs' complaints about the spoil piles will be

resolved, and describe in detail when the Plaintiffs' complaints will be resolved;

(2) to ensure that the Plaintiffs' complaints about noise will be resolved or

alleviated in some manner;

(3) to ensure that the Plaintiffs' complaints about dust will be resolved or

alleviated in some manner;

(4) to ensure that the Plaintiffs' complaints about blasting will be resolved or

alleviated in some manner; and

(5) to ensure that the Plaintiffs' complaints about the quarry dewatering the

area and causing sinkholes to form will be resolved or alleviated in some manner.

3.    Produce every document in your possession or subject to your control that relates in any way to your answers to interrogatories 2(1) to 2(5).

4.    Produce every document in your possession or subject to your control regarding the sale, swap, or other transfer of the Lee County Quarry to Oldcastle (or to whomever the purchaser or transferee is).

5.    Do you contend that the dye trace conducted by Mr. Aley and/or the testing conducted by Mr. Aley was flawed in any way, was inaccurate in any way, or was conducted in any respect in an erroneous, negligent or unprofessional manner?  If your answer is in the affirmative, describe in great detail your contentions and the bases therefor.

6.    Do you contend that the manner in which Alan Lee placed dye collection charcoal packs, or retrieved them, or shipped them to Tom Aley/Ozark Underground Laboratories was done improperly or in such a manner as to be unreliable, improper, or negligent? If your answer is in the affirmative, describe in great detail your contentions and the bases therefor.

3

7.  Do you contend that the manner in which the charcoal packs were shipped to Mr. Aley is in some manner erroneous or that the manner of shipping affected adversely the proper analyses of those charcoal packs by Mr. Aley and/or his laboratory personnel? If your answer is in the affirmative, describe in detail your contentions and every fact known to you in support of your contentions.

8.  Describe in detail your efforts to test or otherwise determine the validity *vel non* of Mr. Aley's dye trace testing or results, and produce every document in your possession or subject to your control that relates in any way to your efforts in this regard.

9.  Since January 1, 2002, have you conducted any type of dye trace or dye testing, or sampling for any dye, on any portion of the quarry property, the quarry discharge, or elsewhere that relates to the operation of the Hanson Lee County Quarry? If your answer is in the affirmative, please describe such testing in great detail and produce a copy of all documents related to such testing and the results thereof.

1565

10.   Once Hanson became aware of the Dye Trace being conducted by Mr. Aley, did

Hanson, its attorneys, its agents, employees, consultants, or any other person known

to Hanson attempt in any way to alter or modify the results of that test, or to

interfere with the Dye Trace results?  If your answer is in the affirmative, describe

in detail such actions and identify the person most familiar with such actions.

11.   Describe in detail the manner in which Hanson and/or its attorneys obtained the

two letters attached to Defendant's Second Motion In Limine regarding Mr. Tom

Aley.

12.   Produce all documents including letters, e-mails, memoranda, notes of telephone

conversations or other documents relating to the manner in which Hanson and/or

its attorneys obtained the two letters attached to Defendant's Second Motion In

Limine regarding Mr. Tom Aley.

1566

13.   Produce all documents including, without limitation, contracts, correspondence, memoranda, e-mails,  to or from Oldcastle Materials Southeast, Inc., regarding any purchase or sale, "swap", transfer, or assignment of the Lee County Quarry.

14.   Produce all correspondence, e-mails, memoranda, records of telephone conversations, faxes or other documents of any type or description relating to any communication with the Alabama Board of Licensure for Professional Geologists, Keith Warren, or any employee or agent thereof, as it relates to Hanson Aggregates Southeast, Inc., the Lee County Quarry, or Thomas J. Aley.

15.   Defendant hired a consultant (believed to be Jerry Ingram) to conduct a telephone survey relating to alleged adverse pretrial publicity in Lee County.  The results of such survey were offered in part to Judge Walker in support of Defendant's motion to change or transfer venue. *See* May 2, 2002, Affidavit of Mr. Ingram.  Describe in detail the manner in which this survey was conducted, how the persons contacted were determined, each and every question asked, and the "script" or other document used in conducting the telephone surveys.

16.   Produce all documents in the possession or control of Jerry Ingram as it relates to this telephone survey, including, without limitation, any document purporting to

6

memorialize in any manner the responses of the persons contacted and the questions asked.

17. Produce all documents of any type or description (including without limitation any documents relating to assignment or renegotiation of any lease agreements) exchanged between any one or more of the named defendants (whether served or not).

18. Has Hanson or anyone else on its behalf (or on behalf of Oldcastle or any other company) installed or attempted to install any type of dust monitoring equipment (whether automated, semi-automated, or requiring human intervention) within the past 12 months? If your answer is in the affirmative, please produce all documents relating to the installation of such equipment (including without limitation all invoices and cost of installation documents) and all results obtained from such equipment.

19. In early 2003, there was an earthquake in Northeast Alabama. At the time, there were three seismographs permanently installed near the quarry. Please produce the seismograph readings from these seismographs at the time of the earthquake. If you contend these readings are not available, please explain the reason these readings are not available.

1508

_[signature]_

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

by faxing a copy of the same ti each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _22nd_ day of _July_, 2003.

_[signature]_

OF COUNSEL

155-00\Ps4thIRPD.4.wpd

8

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

1569

MIKE DAVIS, et al.,                )
                                   )
              Plaintiffs,          )
                                   )
vs.                                )    Civil Action No. CV-20 02-0085
                                   )
HANSON AGGREGATES SOUTHEAST,        )
INC., et al.,                      )
                                   )
              Defendants.          )

### PLAINTIFFS' THIRD INTERROGATORIES AND REQUESTS FOR PRODUCTION TO THE GILMER & YOUNG DEFENDANTS

Plaintiffs request the Gilmer Defendants to answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure, and to produce the following documents and things pursuant to Rule 34 of the Alabama Rules of Civil Procedure.

### I. INSTRUCTIONS

Plaintiffs incorporate by reference the instructions stated in their First and Second Interrogatories and Requests for Production to the Defendants.

### II. DEFINITIONS

Plaintiffs incorporate by reference the definitions stated in their First and Second Interrogatories and Requests for Production to the Defendants.

### III. INTERROGATORIES AND REQUESTS FOR PRODUCTION

1.    Please produce all documents in your possession or subject to your control that relate in any way to the sale, transfer, lease, assignment, or other negotiation regarding the Hanson Lee County Quarry to any company, including but not limited to Oldcastle Materials Southeast, Inc.

2.    When did you first learn of any pending sale or transfer of the quarry?

3.    Please describe in detail your knowledge of sale, transfer or assignment of the

Hanson Lee County Quarry to another person or entity.

4.    What is the correct name of the entity that purchased or otherwise obtained control

or ownership of the Hanson Lee County Quarry.

_C E Vercelli_

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

2

1571

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

John V. Denson
Samford, Denson, Horsley, Pettey &
    Bridges
P.O. Box 2345
Opelika, AL 36803-2345

by faxing a copy of the same ti each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _____ day of _____, 2003.

_____
OF COUNSEL

155-00\3rdIRPD-Gilmer-Young1.1.wpd

3

1572

FILED
JUL 3 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA**

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO HANSON'S OBJECTION TO MOTION TO AMEND COMPLAINT

Plaintiffs respond to Hanson's Objection to Plaintiffs' Motion to Amend Complaint and Add a Defendant as follows:

1. This Response should be read in conjunction with Plaintiffs' response to Hanson's objection to Plaintiffs' Emergency Motion to Produce Sales Agreement. As the Court knows, immediately upon learning that Hanson was selling the quarry less than one week before trial, Plaintiffs moved the Court to order the production of the sales agreement. Hanson objected, citing (without any supporting authority therefor) that "confidentiality" and "SEC rules" would not allow them to tell if the quarry was being sold the very next day. This, despite the fact that everyone in the community knew of the sale to Oldcastle.

2. Hanson now objects to the Emergency Motion because it was not a "proper" Interrogatory and Request for Production (which would give them another 30 days before they would have to produce it, which, they well know, would give the new Defendant only 30 days before trial once they were finally served). Thus, the objection can be seen for what it is: another of Hanson's delaying tactics.

3. Turning to the merits of the Objection, Plaintiffs filed a Rule 15(a) Motion to Amend the Complaint to allow them to add a Defendant – the new owner of the quarry to whom Hanson sold its nuisance.

4. Rule 15(a) provides, in pertinent part: "... Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause."

5. **Alabama** Rule 15(a) does not require, or appear to contemplate the filing of, the amended Complaint sought to be filed. Indeed, filing the Amended Complaint prior to the Court granting the Motion would appear contrary to the intent of the Rule.

6. Hanson's motion, therefore, should be denied: Plaintiffs have rightfully and for good cause shown moved the Court to allow them to amend the complaint for the sole purpose of adding a new Defendant, as Hanson sold the quarry to the new tortfeasor, Oldcastle, and Plaintiffs moved to join the new tortfeasor within days of learning of its existence and ownership.

7. Regardless, Plaintiffs attach hereto, as Exhibit A, the proposed Fourth Amended and Restated Complaint, which simply adds new paragraphs at the end of the Complaint asserting claims against the new owner of the quarry.

8. Additionally, Rule 25(c), "Substitution of Parties", clearly provides that Oldcastle can and should be joined immediately in the case:

> "(c) **Transfer of Interest.** In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in subdivision (a) of this rule."

Accordingly, it is very proper that the Court should immediately order that the new owner of the quarry be **joined** (not substituted) as an additional party, as the transfer of ownership does not in any way absolve Hanson of complete responsibility for all past and future damages to the Plaintiffs.

**Wherefore**, for good cause shown, Plaintiffs move this Honorable Court to deny Hanson's objection and to enter an order granting leave to amend the complaint against Oldcastle.

JAMES B. SPRAYBERRY (SPR008)
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2

1694

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                           H. Wayne Phears
Matt Parnell                                  Phears & Moldovan
Balch & Bingham, LLP                          Suite 375
P.O. Box 78                                   4725 Peachtree Corner Circle
Montgomery, AL 36101                          Norcross, GA 30092-3000

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

by faxing a copy of the same to each and by placing a copy of the same in the United States mail,
properly addressed and postage prepaid, this the 30 day of July, 2003.

OF COUNSEL

l55-00\Resp H Obj to M-Amend.2.wpd

3

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUL 3 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE TO HANSON'S OBJECTION TO PLAINTIFFS' EMERGENCY MOTION TO PRODUCE SALES AGREEMENT

1.  Hanson actually objects to giving the Sales Agreement to the Plaintiffs. It does so on two grounds: (1) that Plaintiffs did not file a Rule 33 or Rule 34 discovery request in the first place, and (2) since Plaintiffs have now filed Interrogatories and Requests, the Emergency Motion is moot and Hanson should have 30 more days to give up the documents.

2.  The response is, in all candor, nothing but a meritless delaying tactic.

3.  Plaintiffs learned through the local citizens, not through counsel for Hanson (who had a duty–*de facto* if not *de jure*– to advise the Court and Counsel for the Plaintiffs of the sale), only one week before the scheduled 2-week trial of the case.

4.  As the Court knows, to have tried the case without the new owner would have been a monstrous waste of (1) the Court's time and resources, and (2) Plaintiffs' time and resources. Moreover, and worse, the Court might not have had the power to enjoin the new owner.

5.  Apparently, Hanson was going to wait until the day of the trial to advise the Court and Plaintiffs of this minor fact.

6.  In any event, with one week before trial (9 calendar days), Plaintiffs could not realistically file a Rule 33/34 discovery request, which Hanson would not have to answer until 21 days after the trial began. Therefore, to assert that Plaintiffs should have filed a discovery request is absurd.

7.  Hanson's second ground for denial is that since the Plaintiffs now filed "proper" discovery requests (on July 22) seeking this same information, it should get 30 more days to respond.

8.  The case is set for trial on October 20th, 102 days after the filing of the emergency motion, and 90 days after service of the new Interrogatories and Requests for Production. If Hanson answers on time with no delay (it will likely object on the 30th day, requiring a motion to compel, a subsequent hearing, and more delay), then Plaintiffs will not be told who owns the

1576

quarry (proper names, etc.) or what the terms of the sale are until at best just 60 days before the trial.

9.    More importantly, if Hanson's objection is granted, Plaintiffs may not get any discovery from the new owner (including depositions of the new plant manager, the new Corporate Representatives, etc.) until literally days before the trial.

10.   Hanson has had, since July 10th, full knowledge that Plaintiffs want the properly discoverable, complete and unredacted sales or other transfer agreement(s). To delay at this point is unreasonable, unfair to the Plaintiffs, and would reward Hanson by essentially ensuring another continuance.

11.   Hanson's motion should be denied summarily and the Emergency Motion granted under the circumstances.

12.   If necessary, the Plaintiffs move this Honorable Court to treat the Emergency Motion as a motion to shorten time to respond to Plaintiffs' discovery request filed on July 22nd, and to order that Hanson produce the complete and unredacted sales agreement(s) by Monday, August 4th – which would be 25 days after filing the Emergency Motion.

13.   Finally, given that (1) Hanson has not otherwise objected to producing the sales agreement(s) despite having the Emergency Motion for over 19 days and (2) that Hanson requested a hearing on the Motion on August 1 without otherwise objecting to the production, the Court should hold the hearing and immediately order production of each and every document relevant to the sale of the quarry by Hanson to Oldcastle.

**Wherefore,** for good cause shown, Plaintiffs move the Court to (1) overrule Hanson's disingenuous objection, and (2) order Hanson to produce the complete and unredacted sales agreement(s) or other documents by whatever name not later than 3:00 p.m. on Monday August 4, to the offices of the undersigned.

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2

1577

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

John V. Denson
Samford, Denson, Horsley, Pettey &
     Bridges
P.O. Box 2345
Opelika, AL 36803-2345

by faxing a copy of the same to each and by  placing a copy of the same in the United States mail,
properly addressed and postage prepaid, this the ___30___ day of ____July_____, 2003.

OF COUNSEL

155-00\Resp H Obj to Emerg M Produce Sales Agr.2.wpd

3

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

JUL 3 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Civil Action No. CV-20 02-0085 |
| | ) |
| HANSON AGGREGATES SOUTHEAST, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

### PLAINTIFFS' MOTION TO RECONSIDER ORDER DENYING JOINDER OF ADDITIONAL PLAINTIFFS AND MOTION TO JOIN NEW PLAINTIFF

Plaintiffs move this Honorable Court to reconsider its Order of May 27, 2003, denying Plaintiffs' Motion to add as Plaintiffs in this litigation, Donnie Smith and Mr. and Mrs. David Tankersly, and further move this Honorable Court to Add Mr. Ken Schwiecker as a Plaintiff. As grounds for this Motion, Plaintiffs say:

1.  On May 16, 2003, Plaintiffs moved this Honorable Court for leave to add Donnie Smith and Mr. and Mrs. David Tankersly as Plaintiffs in this case.

2.  Donnie Smith owns property on which numerous sinkholes have formed. His property is located on Spring Villa Road, immediately adjacent to the power line right-of-way and the properties owned by the Utilities Board of the City of the Opelika.Mr. Smith's properties have suffered numerous sinkholes and other collapses caused by Hanson's dewatering of the area including his property.

3.  Hanson's experts and attorneys have several times traveled to Mr. Smith's properties to examine the sinkholes and they have had discussions with him prior to his request to be added as a Plaintiff. Mr. Smith does not complain of noise, dust, or damage due to blasting – only that the quarry has caused sinkholes on his land that makes his land unsafe, and that

1579

the sinkholes continue to appear, making it dangerous to walk or ride on substantial portions of his land. Therefore, aside from deposing Mr. Smith, little needs to be done by the Defendants to discover their case against Mr. Smith.

4.  Mr. and Mrs. David Tankersly live close to Mr. Smith, on Highway 148 (Spring Villa Road). Numerous sinkholes have developed on their property, which is somewhat west of the Smith and Spring Villa properties. Mr. Tankersly's well has also gone dry. As before, the Tankerslys do not complain of noise, dust, or blasting damage. They complain that Hanson's dewatering has caused sinkholes to form on their land, making it unsafe and jeopardizing their home (a sinkhole has formed near the corner of their home). Hanson's experts have already spoken with Mr. Tankersly, and Hanson's experts (and possibly its attorneys) have visited the Tankerslys' lands and photographed and otherwise recorded information about the sinkholes and the well water levels (dry except immediately after a heavy rain). Therefore, there is little left for Hanson to do except to depose the Tankerslys.

5.  Plaintiffs note that Mr. Smith and Mr. Tankersly have long been listed as witnesses on their trial witness list, so that Hanson has long known of these persons' complaints.

6.  Since the Court denied the motion initially, the case has been continued for three more months. In the interim, Hanson's experts have regularly examined these putative Plaintiffs' properties, have recorded readings from the Tankersly well, and have otherwise "discovered" these persons' claims.

7.  In the interests of judicial economy, it only makes sense to include the Smith and Tankersly claims in this same litigation now.

2

*1569*

8.    Plaintiffs do not intend to have Mr. Smith and Mr. and Mrs. Tankersly's claims litigated in the first trial of the case.  Rather, they are (and have long been) scheduled to be witnesses in the first trial, and will be witnesses regardless whether they are or are not parties to this litigation.  However, by adding them as parties now, neither they nor the Defendants will have to re-litigate the exact same issues with the exact same witnesses, the exact same testimony, and the exact same experts.  In short, if the Court does not allow the joinder of these parties and claims at this time, there will be another two or three week long trial at some point one or two years down the road, with all of the same parties as Defendants, with all the same facts as related to the geological evidence, and with all the same and witnesses.

9.    It is significant that the Defendants have already fully investigated the Smith and Tankersly lands and the sinkholes thereon.  Therefore, Defendants cannot claim an inability to prepare to defend their case.  This is especially true since neither parties' claims would actually be litigated in October.  Rather, as with the remaining 50-odd plaintiffs, their claims would either be settled after the October trial, or they would go to trial much later than October.

10.   Since Hanson and its experts have already spoken with these Plaintiffs they have already taken GPS coordinates on the sinkholes, they have already examined Mr. Tankersly's dry well (the only dry well in the county), and they have, therefore, already substantially developed whatever factual arguments are necessary to defend their case, there is no reason to delay adding these persons as parties.  In point of fact, by adding them as parties, the Defendants would have a better basis (bias and interest in the outcome) to impugn their trial testimony.

3

11.    In addition, another person, Mr. Ken Schwieker, has contacted the Plaintiffs' attorneys about joining this lawsuit. Mr. Schwieker owns land north of Donnie Smith and adjacent to Little Uchee Creek and the Utilities Board property on the north side of Spring Villa Road. Numerous (at least six major sinkholes) sinkholes have formed on Mr. Schwieker's property, and he feels that it is no longer safe to walk or ride horseback on large portions of his property.

12.    Although Mr. Schwieker would now be added as a plaintiff, his claims for damages would not be presented to the October jury. Rather, as with the other plaintiffs, the Tankerslys and Mr. Smith, his claim would wait until another portion of the trial of this case after October.

13.    Also as before, Mr. Schwieker does not claim damages for dust, noise or blasting–only the creation of sinkholes on his lands.

14.    Therefore, Hanson will not be prejudiced by adding Mr. Schwieker as a party, Hanson has plenty of time to depose him should it so desire (he will now be listed as an additional trial witness to authenticate and locate the sinkholes on his lands), and Hanson would not be prejudiced by this joinder at this time.

15.    Finally, it would make sense to allow this landowner to also join this case in order to avoid the necessity of having a second or third trial at some point in the future.

16.    The interests of judicial economy, as well as costs to the parties, strongly compels the conclusion that these parties should be allowed to join the current lawsuit, although they should not be added as "parties" whose claims will be adjudicated on October 20th.

4

1582

**WHEREFORE,** for good cause shown, Plaintiffs move this Honorable Court to reconsider

its Order denying the Motion to add Donnie Smith and Mr. and Mrs. Tankersly as parties Plaintiff

and to allow the same, and to enter an order joining Mr. Ken Schwieker as a plaintiff.


_____

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

5

1583

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                    John V. Denson
Dorman Walker                        Samford, Denson, Horsley, Pettey & Bridges
Matt Parnell                             P.O. Box 2345
Balch & Bingham, LLP              Opelika, AL 36803-2345
P.O. Box 78
Montgomery, AL 36101

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 30 day of July, 2003.

OF COUNSEL

155-00\Ps'Mot-OrderDenyJoinder.2.wpd

6

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

1584

| | | |
|---|---|---|
| **MIKE DAVIS, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-20 02-0085 |
| | ) | |
| **HANSON AGGREGATES SOUTHEAST,** | ) | |
| **INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' MOTION TO RETAIN EXHIBIT

Plaintiffs move this Honorable Court to retain a complete copy of the Skelly & Loy report that the Court examined in-camera, for use during the trial of the case.   In support of this Motion, Plaintiffs say:

1.    Plaintiffs filed a Motion to Compel production of several documents, one of which was the Skelly & Loy Phase I report.

2.    On June 13, 2003, the Court entered an Order requiring Hanson to produce parts of that report to the Plaintiffs.

3.    Plaintiffs maintain that the entire document is discoverable.

4.    The Court, at the time of reviewing the document, did not have the benefit of hearing the evidence at trial.

5.    Plaintiffs move the Court to have an unredacted copy of the report available for its review during the trial to determine whether additional portions of the report are, based upon the evidence adduced at trial, relevant, material and discoverable.

**Wherefore,** for good cause shown, Plaintiffs move this Honorable Court to retain a complete copy of the Skelly & Loy Phase I report during the trial so that the Court could, during the trial, determine if additional portions thereof should be produced to the Plaintiffs.

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

1585

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Dorman Walker
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by Faxing a copy of the same to each and by placing a copy of the same in the United States mail,
properly addressed and postage prepaid, this the 31 day of July, 2003.

OF COUNSEL

155-00\PsMot-RetainExh.2.wpd

FILED

JUL 31 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

AUG 0 1 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al.,                )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )        Case No.:   CV-02-85
                                   )
HANSON AGGREGATES,                 )
SOUTHEAST, INC., et al.,           )
                                   )
        Defendants.                )

## NOTICE OF TAKING DEPOSITION

TO:   **Jim Byram, Esq.**                    **John Denson, Esq.**
      **Dorman Walker, Esq.**                P.O. Box 2345
      P.O. Box 78                            Opelika, Alabama 36803-2345
      Montgomery, Alabama 36101-0078

      **H. Wayne Phears, Esq.**
      **Phears & Moldovan**
      Suite 375
      4725 Peachtree Corner Circle
      Norcross, Georgia 30092

Please take notice that at the time, date and place indicated below, Plaintiff shall take the testimony by deposition upon oral examination of **The Corporate Representative of Defendant Oldcastle Materials Southeast, Inc.** who is requested to give testimony and produce documents related to the following matters:

1.    The negotiation of the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County Quarry to Oldcastle Materials Southeast, Inc.

2.    The terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County Quarry to Oldcastle Materials Southeast, Inc.

3.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

Page 1 of 3

1587

4.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

Such deposition shall be taken for the purpose of discovery or for use as evidence in this action pursuant to the Alabama Rules of Civil Procedure.

**TIME:**    Said deposition shall be taken on Friday, September 5, 2003 commencing at 9:00 A.M. and from time to time thereafter as said deposition may be continued for completion.

**PLACE:**    Said deposition shall be taken in the office of James B. Sprayberry, 225 North Gay Street, Auburn, Alabama 36830.

**TAKEN BEFORE:**    Said deposition shall be taken before someone who is authorized to administer oaths by the laws of the State of Alabama.

Deponent is requested to bring to the deposition all documents related to the following:

1.    The negotiation of the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County Quarry to Oldcastle Materials Southeast, Inc.

2.    The terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County Quarry to Oldcastle Materials Southeast, Inc.

3.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

Charles E. Vercelli, Jr.
One of the Plaintiffs' Attorneys

1588

**OF COUNSEL:**

**CHARLES VERCELLI, JR.,** (VER004)
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

**GUY GUNTER**
*Council for City of Opelika/ Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the _1_ day of August , 2003.

James A. Byram, Jr., Esq.
Dorman Walker, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Rick Tyler
Montgomery Court Reporting
P.O. Box 1761
Montgomery, Alabama 36102

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

James Haygood, Esq.
Haygood, Cleveland & Pierce
P.O. Box 3310
Auburn, Alabama 36831-3310

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Charles E. Vercelli, Jr.

Page 3 of 3

## IN THE CIRCUIT COURT OF LEE COUNTY, ⎯LABAMA

1589

| | |
|---|---|
| MIKE & DONNA DAVIS; MIKE & ANN BROADWATER; MITTIE BROADWATER; CITY OF OPELIKA, a Municipal Corporation; THE UTILITIES BOARD OF THE CITY OF OPELIKA, a public corporation; BEAUREGARD WATER AUTHORITY, a public coporation; ANTHONY & CAROL CLARK; CAROL CLARK, as Mother and Next Friend of COURTNEY CLARK; ELAINE EDWARDS; MARY SUE EILAND; MEDENA FRIZZEL; MEDENA FRIZZEL, as Mother and Next Friend of KARLA FRIZZELL and BRIANNA YOUGREN; RONNIE & DOROTHY GRIGGS; MIKE & STACEY HAGENS; HOWARD & LISA HARMON LISA HARMON, as Mother and Next Friend of JUDSON & BRIA HARMON; HAYWARD & NORA JACKSON; MIKE & SHELIA LaMACCHIA; SHELIA LaMACCHIA, as Mother and Next Friend of RUSSELL LaMACCHIA;     STANLEY & JACKIE LEDBETTER; TERRY & CAROL LONG; TIM & ADA MANNING; DAVID & JANETTE BAGGETT; JAMES & SHIRLEY PARKER; RANDALL & WANDA PARKER; WANDA PARKER, as Mother and Next Friend of AMBUR & BRANDON PARKER; JEFF & MARIA RICHARDSON; MARIA RICHARDSON, as Mother and Next Friend of NATASHA RICHARDSON; DAVID & AMANDA SUMNER; AMANDA SUMNER, as Mother and Next Friend of TODD SUMNER; LARRY & RITA SUMNER; MARTHA TREADWAY; MARTHA TREADWAY, as Guardian and Next Friend of JASMIN, MICHAEL, HAZEL & JOSEPH KING; BILLY & SHERRY WALLACE; SHERRY WALLACE, as Mother and Next Friend of AARON WALLACE; MICHELE WILKES; SHIRLEY WILSON; BETTY J. PFINGSTON; BETTY J. PFINGSTON, as Guardian and Next Friend of JESSICA PFINGSTON; and WONDA BRIGHT, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| HANSON AGGREGATES SOUTHEAST, INC.; LOUISE YOUNG O'BRIEN; VIRGINIA YOUNG PRIEST; VIRGINIA HART YOUNG; CLAUDE JOHN YOUNG;CHARLES W. GILMER, SR.; ALICE C. GILMER; CHARLES W. GILMER, JR.; KAMMY GILMER; BARBARA GILMER SMITH; GARY SMITH; MATTHEW RUTTLEDGE GILMER; LELIA WILDER GILMER; GILMER PROPERTIES, LTD.; and OLDCASTLE MATERIALS SOUTHEAST, INC., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**Civil Action No.**

**CV-20 02-85**

F I L E D

AUG 0 1 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### THIRD AMENDED AND RESTATED COMPLAINT

1508

1.  Plaintiffs Mike and Donna Davis, who reside at 149 Lee Road 707, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Davises aver that as a result of Defendants' actions their home, property and families have sustained the following damages, among others: cracks have formed in the basement and in the fireplace; the tiles in the ceiling of the basement are falling out; their boat and boathouse are forever covered by a thick coat of dust; Donna Davis has developed allergy and sinus problems within the last two years, caused by the Defendants; they have incurred medical expenses and will continue to do so; and there are other known and unknown problems with their home and property.

2.  Plaintiffs Mike and Ann Broadwater, who reside at 610 Lee Road 166, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Broadwaters aver that as a result of Defendants' actions their home, property and families have sustained the following damages, among others: a cracked foundation; cracked ceilings; a cracked fireplace; unlevel floors; Plaintiff Mike Broadwater has had a lung transplant and the never ending dust, noise and shaking of the home have greatly aggravated his condition; and other known and unknown damages.

3.  Plaintiff Mittie Broadwater, who resides at 574 Lee Road 166, is over the age of nineteen years and is a resident of Lee County, Alabama. Ms. Broadwater avers that as a result of Defendants' actions her home and property have sustained the following damages, among others: the blocks under her mobile home have cracked and are falling apart; the front and back doors of her home are hanging up on the bottom of the doorway; the windows of her home are cracked; and there are other known and unknown problems with her home and property.

4.  Plaintiff City of Opelika is a municipal corporation organized under the laws of the state of Alabama, situated in Lee County, Alabama.

5.  Plaintiff The Utilities Board of the City of Opelika, is a public corporation that operates a public water supply and distribution system on behalf of the City of Opelika and surrounding areas of Lee County, Alabama.

6.  Plaintiff, the Beauregard Water Authority, is a public corporation that operates a public water supply and distribution system on behalf of the Beauregard community and surrounding areas of Lee County, Alabama.

2

7.   Plaintiffs Anthony and Carol Clark, who reside at 1740 Lee Road 147, are husband and
     wife, are over the age of nineteen years and are residents of Lee County, Alabama. The
     Clarks aver that as a result of the Defendants' actions their home, property and families have
     sustained the following damages, among others: cracked walls and ceilings; cracks in the
     foundation of the home; cracked windshields in their vehicles; sink holes have formed on
     their property; the allergies and asthma suffered by certain family members have been
     aggravated and their medical conditions will continue to deteriorate; they have incurred
     medical expenses and will continue to do so; and there are other known and unknown
     problems with their home and property.

8.   Plaintiff Courtney Clark is a minor citizen of Lee County, Alabama, who resides with his
     parents Anthony and Carol Clark.  Plaintiff Courtney Clark avers that as a result of the
     Defendants' actions, he has developed asthma, suffers from this disease daily, and will
     continue to suffer from this condition.  He may have other known and unknown damages.

9.   Plaintiff Elaine Edwards, who resides at 3274 Alabama Highway 169, is over the age of
     nineteen years and is a resident of Lee County, Alabama.  Ms. Edwards avers that as a result
     of the Defendants' actions, her homes and the home of her mother have sustained the
     following damages, among others: her home vibrates; cracks in the sidewalks; the concrete
     steps have pulled away from her concrete porch; her renal condition has been aggravated by
     the constant vibrations and dust; she has incurred medical expenses and will continue to do
     so; and there are other known and unknown problems with her homes and property.

10.  Plaintiff Mary Sue Eiland, who resides at 2853 Alabama Highway 169, is over the age of
     nineteen years and is a resident of Lee County, Alabama.  Ms. Eiland avers that as a result
     of the Defendants' actions her home and property have sustained the following damages,
     among others: cracked windshields; cracks in the concrete; walls cracked in every room of
     her home; tiles falling from the bathroom ceilings; and other known and unknown problems
     with her home and property.

11.  Plaintiff Medena Frizzel, who resides at 3173 Alabama Highway 169, is over the age of
     nineteen years and is a resident of Lee County, Alabama.  Plaintiff Medena Frizzell avers that
     as a result of the Defendants' actions her home, property, and family have sustained the
     following damages: cracked windshield on her vehicle; cracked windows in her home;
     cracked mirrors; ceiling leaks; cracked ceilings; trim falling off walls; pictures falling off

walls; her home is unlevel; the electricity and power blink off and on when blasting occurs; Plaintiff Medena Frizzell has suffered a recurrence of her childhood asthma within the last three years; she has incurred medical expenses; and other known and unknown problems with her home and property.

12.    Plaintiff Karla Frizzel is a minor resident citizen of Lee County, Alabama, who resides with her mother and next friend, Medina Frizzell. Plaintiff Karla Frizzel avers that as a result of the Defendants' actions she has developed an asthmatic condition and will continue to suffer from this condition.

13.    Plaintiff Brianna Yougren is a minor resident citizen of Lee County, Alabama, who resides with her mother and next friend, Medina Frizzell. Plaintiff Brianna Yougren avers that as a result of the Defendants' actions she has  has developed an asthmatic condition and will continue to suffer from this condition.

14.    Plaintiffs Ronnie and Dorothy Griggs, who reside  at 3256 Alabama Highway 169, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Griggs aver that as a result of the Defendants' actions, their home, property and families have sustained the following damages, among others: cracked foundation; cracked sidewalks; cracks in the bathroom tile; flower boxes are pulling away from the walls of the house; Plaintiff Dorothy Griggs has developed allergy and sinus problems due to the constant presence of quarry dust in her home and on her property; they have incurred medical expenses and will continue to do so; and there are other known and unknown problems with her homes and property.

15.    Plaintiffs Mike and Stacy Hagans, who reside at 1668 Lee Road 147, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Hagans aver that as a result of the Defendants' actions, their home, property and families have sustained the following damages: cracked windshields on their vehicles; sinkholes have formed on their property; their house is unlevel; cabinets are separating from the walls of their home; cracked windows; the allergies suffered by certain family members have been aggravated; Plaintiff Stacy Hagans suffers from inflamed and infected sinuses; the family has incurred medical expenses and will continue to do so; and other known and unknown problems with their home and property.

16.  Plaintiffs Howard and Lisa Harmon, who reside at 145 Lee Road 707, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Harmons aver that as a result of the Defendants' actions their home, property, and family have sustained the following damages, among others; their home vibrates during blasting activities; cracked bricks on the exterior of the home; cracks in fireplace; Plaintiff Howard Harmon has developed chronic sinusitis ; the family has incurred medical expenses and will continue to do so; and other known and unknown problems with their home and property.

17.  Plaintiff Judson Harmon is a minor resident citizen of Lee County who resides with his parents, and who brings this action by and through his mother and next friend, Lisa Harmon. Plaintiff Judson Harmon avers that as a result of the Defendants' actions he has developed allergic rhinitis and will continue to suffer from this condition.

18.  Plaintiff Bria Harmon is a minor resident citizen of Lee County who resides with her parents, and who brings this action by and through her mother and next friend, Lisa Harmon. Plaintiff Bria Harmon avers that as a result of the Defendants' actions she has developed chronic allergies and sinus problems and she will continue to suffer from this condition.

19.  Plaintiffs Hayward and Nora Jackson, who reside at 1141 Lee Road 166, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Jacksons aver that as result of the Defendants' actions, their home, property and family have been damaged as follows: mud and water constantly stands on their property inviting the presence of swarms of insects, frogs, snakes and other pests; Plaintiff Nora Jackson has developed chronic bronchitis, inflammatory lung disease, atypical pneumonia, and acute respiratory distress syndrome; the family has incurred medical expenses; and other known and unknown damages.

20.  Plaintiffs Mike and Shelia LaMacchia, who reside at 1355 Lee Road 147, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The LaMacchias aver that as a result of the Defendants' actions their home and property have sustained the following damages, among others: their backyard underground spring has gone dry; the foundation of their home is cracked; they have incurred medical expenses as of result of their child's illnesses; and other known and unknown problems with their home and property.

1594

21.    Plaintiff Russell LaMacchia, is a minor resident citizen of Lee County, Alabama, who resides with his parents, and who brings this action by and through his mother and next friend, Shelia LaMacchia. Plaintiff Russell LaMacchia avers that as a result of the Defendants' actions, he has developed otitis media and will continue to suffer from this condition.

22.    Plaintiffs Stanley and Jackie Ledbetter, who reside at 1330 Lee Road 166, and also own rental properties located across the street at 1333 Lee Road 166, Lots #2-9, 1377 Lee Road 166, 1332 Lee Road 166, 1334 Lee Road 166, 1336 Lee Road 166, and 1340 Lee Road 166, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Ledbetters aver that as a result of the Defendants' actions, their homes, properties and family have sustained the following damages, among others: cracked windows; foundation cracks; cracked ceilings; unlevel mobile homes; and other known and unknown problems with their home and properties.

23.    Plaintiffs Terry and Carol Long, who reside at 3379 Alabama Highway 169, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Longs aver that as a result of the Defendants' actions, their home and property have sustained the following damages, among others: cracks in cement sidewalks; cracks in cement around swimming pool; cracks around windows; cracks in trim work; recent cracks forming in three year old addition to home; and other known and unknown problems with their home and property.

24.    Plaintiffs Tim and Ada Manning, who reside at 3226 Alabama Highway 169, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Mannings aver that as a result of the Defendants' actions their home and property have sustained the following damages, among others: chipped paint on their vehicles as result of blasting debris landing in their yard; cracked windshields; a cracked foundation on their home; cracks in driveway and in cement area around their swimming pool; crack in swimming pool; and other known and unknown problems with their home and property.

25.    Plaintiffs David and Janette Baggett, who reside at 1198 Lee Road 147, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Baggetts aver that as a result of the Defendants' actions, their homes, property, and family have sustained the following damages, among others: leaks in their ceilings; cracks in

ceilings; cracks in walls; mobile homes are unlevel; Plaintiff Janette Baggett's depression and nervous condition has been greatly aggravated by the constant noise, blasting and shaking that occurs in her home; Plaintiff David Nash has developed allergy and sinus problems within the last two years; they have incurred medical expenses; and other known and unknown problems with their homes and property.

26.    Plaintiffs James and Shirley Parker, who reside at 3039 Alabama Highway 169, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. James and Shirley Parker aver that as a result of the Defendants' actions, their home, property and family have sustained the following damages, among others: cracked windows; a cracked foundation; cracks in the walls and ceilings of their home; due to the constant presence of quarry dust, Plaintiff Shirley Parker has developed asthma within the last two years; and other known and unknown damages.

27.    Plaintiff Randall and Wanda Parker, who reside at 1229 Lee Road 166, are over the age of nineteen years and are residents of Lee County, Alabama. Plaintiffs' Randall and Wanda Parker are riparian owners south of Spring Villa Park who own part of Little Uchee Creek. Randall and Wanda Parker aver that as a result of the Defendants' actions, their home and property have sustained the following damages, among others: cracked foundation; cracked chimney; cracked sheet rock; cabinets pulling away from the walls; light fixtures are loose and fall when blasting occurs; Plaintiff Wanda Parker developed asthma approximately 1 year ago; they have incurred medical expenses and will continue to do so; and other known and unknown damages. Furthermore the Randall and Wanda Parker aver that the past and future actions of the Defendants will irreparably harm their family's interests in and to Little Uchee Creek, as well as the interests of many other citizens of Lee County, Alabama, who use the creek as they do.

28.    Plaintiff Ambur Parker is a minor resident citizen of Lee County who resides with her parents James and Wanda Parker, and who brings this action by and through her mother and next friend, Wanda Parker. Plaintiff Ambur Parker avers that as a result of the Defendants' actions, she has developed asthma within the last year and will continue to suffer from this condition.

29.    Plaintiff Brandon Parker is a minor resident citizen of Lee County who resides with his parents James and Wanda Parker, and who brings this action by and through his mother and

next friend, Wanda Parker. Plaintiff Brandon Parker avers that as a result of the Defendants' actions, he has developed allergy and sinus problems that include nose bleeds and will continue to suffer from this condition.

30. Plaintiffs Maria and Jeff Richardson, who reside at 265 Lee Road 705, are over the age of nineteen years and are residents of Lee County, Alabama. The Richardsons aver that as a result of the Defendants' actions, their home, property and family have sustained the following damages, among others: cracked foundation; cracks in the ceiling; Plaintiff Jeff Richardson has developed allergic sinus problems; they have incurred medical expenses and will continue to do so; and other known and unknown damages.

31. Plaintiff Natasha Richardson is a minor resident citizen of Lee County who resides with his parents and who brings this action by and through her mother and next friend, Maria Richardson. Plaintiff Natasha Richardson avers that as a result of the Defendants' actions, she has developed asthma and will continue to suffer from this condition.

32. Plaintiffs David and Amanda Sumner, who reside at 164 Lee Road 148, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. David and Amanda Sumner aver that as a result of the Defendants' actions, their home, property and family have sustained the following damages, among others; cracked foundation; crack in the ceilings; crack in the concrete surrounding the swimming pool; they have incurred medical expenses and will continue to do so; and other known and unknown damages.

33. Plaintiff Todd Sumner, is a is a minor resident citizen of Lee County who resides with his parents, and who brings this action by and through his mother and next friend, Amanda Sumner. Plaintiff Todd Sumner avers that as a result of the Defendants' actions, he developed asthma at the age of three months and will continue to suffer from this condition.

34. Plaintiffs Larry and Rita Sumner, who reside at 1100 Lee Road 147, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. Plaintiffs Larry and Rita Sumner aver that as a result of the Defendants' actions, their home and property have sustained the following damages, among others: cracked windshields; house is unlevel; cracked roof; cracked ceilings; cracked walls; slit roof beams; and other known and unknown damages.

35. Plaintiff Martha Treadway, who resides at 3177 Alabama Highway 169, is over the age of nineteen years and is a resident of Lee County, Alabama. Ms. Treadway avers that as result

of the Defendants' actions, her home, property and family have sustained the following damages, among others: destroyed field lines; cracked ceilings; cabinets pulling away from the walls; she has developed chronic pulmonary disease, a serious problem with her lung, in the last three years; bricks falling off the frame of the house; she has incurred medical expenses and will continue to do so; and other known and unknown damages.

36.    Plaintiff Jasmine King, is a minor resident citizen of Lee County who resides with her grandmother and who brings this action by and through her grandmother and next friend, Martha Treadway. Plaintiff Jasmine King avers that as a result of the Defendants' actions, she has developed asthma and will continue to suffer from this condition.

37.    Plaintiff Michael King is a minor resident citizen of Lee County who resides with his grandmother, and who brings this action by and through his grandmother and next friend, Martha Treadway. Plaintiff Michael King avers that as a result of the Defendants' actions, he has developed asthma and will continue to suffer from this condition.

38.    Plaintiff Hazel King is a minor resident citizen of Lee County who resides with her grandmother, and who brings this action by and through her grandmother and next friend, Martha Treadway. Plaintiff Hazel King avers that as a result of the Defendants' actions, she has developed asthma and will continue to suffer from this condition.

39.    Plaintiff Joseph King is a minor resident citizen of Lee County who resides with his grandmother, and who brings this action by and through his grandmother and next friend, Martha Treadway. Plaintiff Joseph King avers that as a result of the Defendants' actions, he has developed asthma and will continue to suffer from this condition.

40.    Plaintiffs Billy and Sherry Wallace, who reside at 1692 Lee road 147, are husband and wife, are over the age of nineteen years and are residents of Lee County, Alabama. The Wallaces aver that as a result of the Defendants' actions, their home, property and family have sustained the following damages, among others: pictures are being knocked off walls and destroyed; cracked ceilings; windows knocked out of the home; cracked fireplace stones; cracked windows; their older child suffers from asthma but has been in remission since leaving the family home; Plaintiff Billy Wallace has developed a cavitary lung disease; the family has incurred medical expenses and will continue to do so; and other known and unknown damages.

1508

41.    Plaintiff Aaron Wallace is a minor resident citizen of Lee County who resides with is parents, and who brings this action by and through his mother and next friend, Sherry Wallace. Aaron Wallace avers that as a result of the Defendants' actions he has developed asthma, chronic allegeries, sinuitis; that he is forced to sleep under a cold air humidifer; and will continue to suffer from these conditions, and other known and unknown damages.

42.    Plaintiff Michele Wilkes, who resides at 148 Lee Road 707, is over the age of nineteen years and is a resident of Lee County, Alabama. Ms. Wilkes avers that as the result of Defendants' actions, her home and property have sustained the following damages, among others: a cracked foundation; bricks separating from a concrete porch; water leakage in her basement; concrete blocks in basement separating; concrete pad and step s pulling away from the house; she has developed sinus problems in the last three years; she has incurred medical expenses and will continue to do so; and other known and unknown damages.

43.    Plaintiff Shirley Wilson, who resides at 64 Lee Road 707, is over the age of nineteen years and is a resident of Lee County, Alabama. Ms. Wilson avers that as a result of the Defendants' actions, her home and property have sustained the following damages, among others: the well located on her property is filling in; cracked walls; cracked foundation; she has developed an allergy to dust that was worsened over the last year; and other known and unknown damages.

44.    Plaintiff Betty J. Pfingston, who resides in one of the mobile homes owned by Stanley Ledbetter off of Highway 166 in Lee County, and is over the age of nineteen years and is a resident of Lee County, Alabama. Ms. Pfingston avers that as a result of the Defendants' actions, the mobile home in which she lives has been damaged; she has to put up with the noise, vibration, dust, and other irritations caused by the quarry, to her great inconvenience and harm; and she has suffered other known and unknown damages.

45.    Plaintiff Jessica Pfingston is a minor resident citizen of Lee County who resides with her grandmother and who brings this action by and through her grandmother and next friend, Betty J. Pfingston. Jessica Pfingston avers that as a result of the Defendants' actions, she has developed asthma and will continue to suffer from this condition, and other known and unknown damages.

46.    Plaintiff Wonda Bright resides at 245 Lee Road 166, is over the age of nineteen years and is a resident of Lee County, Alabama. Ms. Bright avers that as a result of the Defendants'

actions, she has suffered the following damages: she cannot escape the noise, truck traffic noise, blasting noise and vibration, dust, and her home has suffered cracks on the concrete porches. Additionally, she has developed allergies and must now take allergy medication, and she has been unable to sell her house and move away from the nuisance.

47.     Defendant Hanson Aggregates Southeast, Inc. (hereinafter "Hanson") is a foreign corporation doing business in Lee County, Alabama. It owns and operates a limestone quarry, equipment terminal and an explosives holding area on the property belonging to the Young Defendants and the Gilmer Defendants.

48.     Defendants Louise Young O'Brien, Virginia Young Priest, Virginia Hart Young, and Claude John Young (hereinafter "the Young Defendants") are either members of a limited partnership or a general partnership. The Young Defendants leased their land in Lee County south of Highway 169 and East of Highway 166 to Opelika Materials, Inc., and ultimately to Defendant Hanson Aggregates Southeast, Inc. for use as its quarry site. This land is near all the named Plaintiffs. The Young Defendants have a direct financial interest in the Hanson Quarry as they are believed to receive royalty payments on the aggregate mined from the premises, so that their presence in the suit is required as necessary parties to any injunctive relief that might be obtained by the Plaintiffs. Plaintiffs do not seek money damages from the Young Defendants.

49.     Defendants Charles W. Gilmer, Sr., Alice C. Gilmer, Charles W. Gilmer, Jr., Kammy Gilmer, Barbara Gilmer Smith, Gary Smith, Matthew Ruttledge Gilmer, Lelia Wilder Gilmer, and Gilmer Properties, Ltd. (hereinafter "the Gilmer Defendants") are either members of a limited partnership or a general partnership. The Gilmer Defendants leased their land in Lee County south of Highway 169 and East of Highway 166 to Defendant Hanson Aggregates Southeast, Inc. for use as its quarry site. This land is near all the named Plaintiffs. The Gilmer Defendants have a direct financial interest in the Hanson Quarry as they are believed to receive royalty payments on the aggregate mined from the premises, so that their presence in the suit is required as necessary parties to any injunctive relief that might be obtained by the Plaintiffs. Plaintiffs do not seek money damages from the Gilmer Defendants.

## STATEMENT OF FACTS

50. The individual Plaintiffs all reside within a mile or so of the Defendants' properties, near Lee County Road 166 and Alabama Highway 169, and all own property that is in close proximity to the quarry owned and/or operated by Defendants Hanson.

51. The Beauregard Water Authority operates water wells in or near the same "chewacla marble" terrain. The Plaintiff believes the water table has been effected and that this adverse impact will increase in the future if the quarry continues to operate. They also believe the repetitive blasting has caused damage to its water lines and will continue to do so in the future.

52. The City of Opelika owns Spring Villa Park and swimming pool, and The Utilities Board owns and operates properties surrounding Spring Villa Park, including a natural spring that has flowed, non-stop, for generations. The spring ceased to flow in the spring of 2000, within a few years after the quarry began pumping millions of gallons of water per day out of the quarry pit. The quarry pit and the spring are in the same "chewacla marble" (aka limestone) terrain, which is highly fractured, and through which water migrates easily. Plaintiffs aver that the quarrying activities of the Defendants have in fact caused the spring to go dry.

53. The Spring Villa Park swimming pool was fed by the spring water, so that the swimming pool is now dry and has been since the spring of 2000. Therefore, both the City of Opelika and The Utilities Board have suffered various damages. Although the Utilities Board does not now rely upon the spring for a source of public drinking water, it may do so in the future, so that the Defendants' actions in drying the spring have and will cause damage to the City and to The Utilities Board. The City of Opelika has also now lost the opportunity to construct a recreational lake on and upon the Spring Villa Park property, for use by the public for recreational purposes. The land owned by the City and The Utilities Board have, therefore, been devalued by the actions of the quarry.

54. Were the Court to enjoin the quarry from pumping water from the aquifers in the area, and require it to allow the quarry pit to fill, it is probable that the "cone of depression" caused by pumping such large quantities of water from the quarry pit will gradually disappear, and it is probable that the spring would again flow.

55. The Defendants' operation of a limestone quarry constitutes a nuisance.

56. The actions of the Defendants have caused a de-watering of the subsoil in a large area surrounding the quarry.

57.    The Hanson quarry operation is immediately adjacent to the Dixie Pipeline, a very large transcontinental liquid propane gas pipeline. The Dixie Pipeline conveys thousands of gallons of propane gas, daily, under 1440 psi pressure, through the pipeline immediately adjacent to and within as little as 100 feet of the pit created by the Defendants' operations.

58.    There is a substantial likelihood that the operations of the Defendants in pumping out water from the ground in and around the quarry, will cause sinkholes in, near, and even far away from the quarry. This result is absolutely certain to occur in many places – although exactly which places and which particular spots of ground will be caused to sink cannot be predicted with certainty.

59.    An example of one such sinkhole is a 25 feet in diameter, 20 feet deep sinkhole that developed within the last two months, 34 feet east of the pavement of Highway 166, and only 233 feet north of the center of the Dixie Pipeline easement that crosses Highway 166.

60.    Sinkholes have also formed on the Plaintiffs' lands, including a large sinkhole in the driveway of the Clarks, which was filled with many dumptruck loads of dirt. This sinkhole, and others, formed only a few hundred feet south of the Dixie Pipeline easement and within a few hundred feet of the quarry pit.

61.    The operations of the quarry in causing sinkholes to form now and in the future will in fact endanger the viability of the Dixie Pipeline. It is entirely possible, and indeed foreseeable, that if the ground beneath the Dixie Pipeline were to give way, particularly at a welded joint, the Dixie Pipeline would then rupture. A rupture of the pipeline could very well cause an explosion of devastating proportions. An explosion from the Dixie Pipeline could literally incinerate an area hundreds of yards in diameter, including Plaintiffs' homes and/or passing motorists on Highway 166.

62.    Many of the Plaintiffs' homes are located within a few hundred yards of the Dixie Pipeline and the Defendants' quarry.

63.    In recent depositions of Hanson corporate representatives, it was also learned that Hanson has violated several of the terms and conditions of Dixie Pipelines' "blasting guidelines", which Dixie relied upon in granting Hanson permission to blast so close to the pipeline. These violations included using too many pounds of explosives too close to the pipeline and failing to notify Dixie Pipeline personnel of their intentions to blast so that Dixie could

reduce the operating pressure on the pipeline–a safety measure designed to protect the integrity of the pipeline and to avoid damage to the pipeline.

64. Hanson necessarily uses thousands of pounds of explosives each week in blasting at the quarry. The blasting obviously throws thousands of pounds of earth, including rock, dust, and fine particulate, into the air in and around the quarry.

65. The blasting causes shaking of the earth, shaking of the Plaintiffs' homes, and the throwing of rock, dirt and dust onto and about the lands of the Plaintiffs.

66. As part of its operations, Hanson necessarily contracts with trucking companies and tractor-trailer and dump-truck operators to remove their product from the quarry site and onto the roads and highways in Lee County, including Highways 169 and 166, among others. This causes from dozens to hundreds of trucks daily to enter and exit from the quarry. These trucks are loaded to weights substantially in excess of the design criteria for the roads and highways, and cause substantial amounts of dust and debris to be deposited on the public roads and upon the lands of many of the plaintiffs.

67. As part of its operations, Hanson necessarily moves large quantities of overburden to a "spoil pile" area that is immediately adjacent to several of the Plaintiffs' lands, including the Davises, the Harmons, Ms. Wilkes, and the Jacksons.

68. The quarrying activities from this pit inevitably cause substantial, objectionable, and unceasing noise during most hours of the day and many hours of the night, as the plant generally operates from 6:00 a.m. until 6:00 p.m. and often thereafter. This noise also occurs commonly on the weekends, sometimes including Sundays. This noise comes from rock crushers, explosions, loud machinery operating many hours during the day and night, whistles, backup bells on heavy equipment, large trucks traveling up and down the roads and highways, and other such noises.

69. The quarrying causes dust and other pollutants to accumulate on the Plaintiffs' property, including inside their homes, and in the air on their property and near their property, thereby causing damage to the Plaintiffs personally and to their real property.

70. Hanson has, for several years, had actual and constructive knowledge that sediment and erosion floods onto Plaintiff Jackson's lands and onto Plaintiff Randall Parker's lands. Despite requests to stop the erosion and flooding, Hanson has ignored the problem and has failed to take any corrective action whatsoever.

14

71. The quarrying causes such a constant noise and vibration to the Plaintiffs' property, including their homes, that they cannot peaceably enjoy their land.

72. Defendants' operations are so loud and annoying that at many times, it is impossible for some of the Plaintiffs to sleep – especially those who work at night and must sleep during the day, such as Mr. Davis.

<u>COUNT ONE</u>
<u>(Private and Public Nuisance)</u>

73. Plaintiffs reallege paragraphs 1 through 70 of the Complaint as if set out here in full.

74. Defendant Hanson's quarrying operations have caused and are causing a private and/or public nuisance to exist, as described above. The quarrying is harmful to the public and adversely affects people of ordinary sensibilities.

75. Hanson's operations create unreasonably loud noises, vibrations, dust, and pollution, and cause a tremendous increase in traffic from dangerously loaded heavy trucks. These and other damages alleged in this Complaint harm the public generally.

76. The Plaintiffs have suffered and continue to suffer hurt, inconvenience, and other damages that are different in kind and degree than the damages suffered by the general population of Lee County. Moreover, the Plaintiffs have suffered damages due to Defendants' conduct that would affect any ordinary, reasonable person, and such damages are not such as would be fanciful or as would affect only a person of fastidious taste. Plaintiffs have the right to file this claim under Alabama Code Sections 6-5-120, 6-5-123, 6-5-124, 6-5-125 and 6-5-127.

77. The damages caused to the individual Plaintiffs include, but are not limited to:

a. lack of quiet enjoyment of their property, which includes, at times, a complete inability to use or enjoy their property;

b. noise generated by machinery operating virtually twenty-four hours per day;

c.  pollution of the air by dust generated from blasting, diggings, movement of equipment and operation of heavy machinery and manufacturing plants;

d.  permanent devaluation of the Plaintiffs' land and homes by the above mentioned nuisance;

e.  noise, vibration, and damage to their homes and property caused by the Defendants' use of explosives and the blasting in the quarry;

f.  increase in pollution (air, noise, garbage) caused by the increase in traffic volume of heavy and dangerous trucks;

g.  broken windshields and damaged automobiles caused by the trucks going to and from the quarry at all hours;

h.  mental anguish and mental suffering of these Plaintiffs as they worry about the safety and value of their loved ones, their homes, and their lands; and

i.  Personal injury, including causing some plaintiffs to develop asthma and other breathing/pulmonary problems, and exacerbating other plaintiffs' existing asthmatic and other breathing/pulmonary problems.

78.  Hanson's actions have been repetitive, willful, wanton and aggravated. Hanson has ignored and violated the important "blasting guidelines" of the Dixie Pipeline (which are designed to ensure the integrity of the pipeline, and, therefore, the safety of the community), and Hanson has continued to blast even though inside the Opelika police jurisdiction and even though it was requested by Plaintiffs to refrain from blasting.

79.  Moreover, despite actual knowledge that the spoil pile is sloped very steeply, was never planted with any type of vegetation to arrest erosion and runoff, and that, therefore, large quantities of dirt and sediment migrate onto the Plaintiffs' properties, Hanson has taken

absolutely no steps to limit or stop the erosion and continuing trespasses. This conduct justifies the imposition of punitive damages.

80. Hanson has continued to process and manufacture rock and rock by-products. Moreover, the Defendants continued their operations with full knowledge of the damages being forced upon the individual Plaintiffs, as well as the public at large, and Defendants have not abated their nuisance despite demand to do so.

81. Defendants' actions constitute a private and public nuisance, and their actions are or can be abated, so that the nuisance created and maintained by the Defendants is abatable.

82. The damages suffered by the City of Opelika and The Utilities Board of the City of Opelika include loss of public property, recreational uses and benefits to the public generally, loss in value of public property, and loss of water to be used as a backup source of clean drinking water for citizens of Opelika and Lee County.

83. If Hanson is allowed to continue pumping water from the quarry pit, further dewatering of the area will occur, the cone of depression will enlarge, and eventually more private, and quite possibly public, water wells will go dry or be reduced in capacity.

**WHEREFORE,** Plaintiffs claim from Defendant Hanson compensatory and punitive damages, costs of this action, attorneys' fees, interest and such other further relief as the jury finds reasonable, and in addition, request this Honorable Court to enter injunctive relief preventing all of the Defendants from continuing to cause the damages stated above.

## COUNT TWO
### (Negligence and Wantonness)

84. Plaintiffs reallege paragraphs 1 through 81 of the Second Amended and Restated Complaint as if set out here in full.

17

85.   Defendant Hanson has a duty to operate the quarry in a manner that will not cause unreasonable injury to adjacent and/or nearby landowners.

86.   Defendant Hanson breached its duty by damaging the Plaintiffs as stated above.

87.   As described above, Plaintiffs suffered damages due to the negligent and wanton and willful manner in which Defendant Hanson operates the quarry.

88.   Defendant Hanson has actual knowledge that the manner in which it is operating its quarry was causing the very damages (both public and private) stated above in this Complaint. Despite such actual knowledge (made known to them by oral and written notice), the Defendant continues to cause the damages stated above. Moreover, the Plaintiffs from time to time protested the manner in which Defendant operates the quarry, yet Defendants refused to change or alter their practices, all to the continued detriment of the Plaintiffs.

89.   The manner in which Defendant Hanson ignored the Plaintiffs' complaints constitutes rude, wanton, outrageous, and/or reckless conduct for which Hanson should be punished by the imposition of punitive damages.

   **WHEREFORE,** Plaintiffs claim from Defendant Hanson compensatory and punitive damages, costs of this action, attorneys' fees, interest and such other further relief as the jury finds reasonable, and in addition, request this Honorable Court to enter injunctive relief preventing all of the Defendants from continuing to cause the damages stated above.

## COUNT THREE
### (Trespass)

90.   Plaintiffs reallege paragraphs 1 through 87 of the Second Amended and Restated Complaint as if set out here in full.

91.   The manner in which Defendant Hanson operates the quarry has caused noxious fumes, dust, particulate matter, and garbage to enter upon Plaintiffs' lands without their consent and