**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **KEN and NAOMI SCHWIEKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:06-CV-838** |
| | ) | |
| **OLDCASTLE MATERIALS SOUTHEAST, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' EVIDENTIARY SUBMISSION IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs hereby file the following exhibits in support of the Motion for Partial Summary Judgment e-filed on the evening of September 6, 2007. These exhibits were too large to e-file on September 6, but per discussion with the Clerk's Office, the exhibits were split into smaller electronic sizes so that they are now capable of submission electronically.

The exhibits electronically filed herewith are:

P MPSJ Exh 3 Vol 8

P MPSJ Exh 3 Vol 9 part 1

P MPSJ Exh 3 Vol 9 part 2

P MPSJ Exh 3 Vol 9 part 3

P MPSJ Exh 3 Vol 10 part 1

P MPSJ Exh 3 Vol 10 part 2

P MPSJ Exh 3 Vol 10 part 3

P MPSJ Exh 3 Vol 10 part 4

P MPSJ Exh 3 Vol 11 part 1

P MPSJ Exh 3 Vol 12 part 1

P MPSJ Exh 3 Vol 12 part 2

P MPSJ Exh 3 Vol 12 part 3

P MPSJ Exh 4 Vol 14 part 1

P MPSJ Exh 4 Vol 14 part 2

P MPSJ Exh 4 Vol 14 part 3

P MPSJ Exh 4 Vol 14 part 4

P MPSJ Exh 4 Vol 14 part 5

P MPSJ Exh 4 Vol 14 part 6

P MPSJ Exh 4 Vol 15 part 1

P MPSJ Exh 4 Vol 15 part 2

P MPSJ Exh 4 Vol 15 part 3

P MPSJ Exh 4 Vol 15 part 4

P MPSJ Exh 4 Vol 15 part 5

P MPSJ Exh 4 Vol 15 part 6

P MPSJ Exh 4 Vol 15 part 7

Respectfully submitted this the 7th day of September, 2007.

s/ C. E. Vercelli, Jr.

**CHARLES E. VERCELLI, JR.** (VER003)
One of the Attorneys for Plaintiffs

**OF COUNSEL:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
TEL:   (334) 821-7100
FAX:   (334) 821-7101
jsprayberry-spraylaw@charter.net

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
TEL:   (334) 834-8805
FAX:   (334) 834-8807
cvercelli@vercelli-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2007, I electronically filed the foregoing with the Clerk of the United States District Court for the Middle District of Alabama, using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Phillip E. Adams, Jr.
Rick Davidson
Matthew W. White
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

I also hereby certify that a copy of the foregoing will be served upon:

W. F. Horsley
SAMSON & DENSON, LLP
P. O. Box 2345
Opelika, AL 36803-2345

counsel for the landowners, by placing a copy of the same in the United States Mail, postage prepaid and properly addressed on the 7th day of September, 2007.

/s/  C. E. Vercelli, Jr._____
Of Counsel

500-06\P MPSJ Evid Sub.1.wpd

3

*Circuit Court, No.* CV02-85 *Supreme Court No.* 1040857

# APPEAL

TO

# Supreme Court of Alabama

FROM

MIKE & DONNA DAVIS ETAL—OLDCASTLE MATERIALS SOUTHEAST, INC & HANSON
AGGREGATES SOUTHEAST, INC.                                                 *Appellant*

vs.

HANSON AGGREGATES SOUTHEAST, INC ETAL, & CITY OF OPELIKA, CITY OF
OPELIKA UTILITIES BOARD ETAL                                                *Appellee*

2003

what Oldcastle knew, or what Oldcastle failed to know (unreasonably in Plaintiffs' judgment) about the operation prior to assuming the operation. It also effects the reasonableness of Hanson's current operation which includes pumping of massive amounts of water from the underground aquifers which therefore continues to cause sinkhole collapse throughout the region. For Oldcastle to object on the basis of relevance and that the information is not calculated to lead to the discovery of admissible evidence is therefore spurious. Oldcastle's objection that the information is overbroad and burdensome is, under *Ex parte Dorsey Trailers,* irrelevant. Moreover, Oldcastle has not shown how the documents are overbroad or how they are burdensome and oppressive to produce. Finally, Oldcastle did not produce any documents though it said that it would. Moreover, Oldcastle's response is that it would produce documents collected after July 13, 2003, whereas Plaintiff's request seeks information prior to that time if in the possession or custody or control of Oldcastle.

**30.** **Please produce all pumping records in your possession or subject to your control. This would include pumping or discharge records for the quarry from 1996 to the present, if available, together with all documents related to any calculations of storage capacity for water on the Gilmer property and the Young property. This would include all DMRs (Discharge Monitoring Reports) filed by Opelika Materials or Hanson or Oldcastle with ADEM, applications to ADEM, permits from ADEM and all documents to or from ADEM by Oldcastle, Hanson, Opelika Materials or their agents and/or engineers; warning letters, notices, violations, notice of potential violations or similar documents to or from ADEM. Note that this request includes, but is not limited to documents and information relating to how your internal pumping discharge records were calculated, including the actual calculations themselves.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to pumping and discharge by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in the Request that relate to its pumping of water from Opelika quarry after July 13, 2003.

**REASON TO COMPEL:**
In request number 30, Plaintiffs are seeking pumping record and other information that would allow Plaintiffs to calculate and understand and determine the manner in which Oldcastle calculates its pumping of water from the underground aquifers. Pumping from the underground aquifers has, as the Complaint alleges, caused the collapse of numerous

2003

sinkholes in the area, the collapse of roads in the area, the drying up of Spring Villa, and the drying up of Little Uchee Creek. This information is therefore clearly relevant, discoverable, and calculated to lead to the discovery of admissible evidence. What Oldcastle knew prior to its assumption of the quarry in 2003, is also relevant on the question whether Oldcastle's continued operation of the quarry constitutes a negligent and/or wanton operation and whether it should be subjected to punitive damages as alleged by the Plaintiffs. To object, therefore, that the information is not relevant, not calculated to lead to discoverable evidence, and burdensome and oppressive is therefore a spurious objection. Moreover, Oldcastle states that it would produce non-privileged and responsive documents, but produced none. Moreover, Oldcastle stated that it will produce the documents after July 13, but has produced none. Finally, Plaintiffs demand all such documents in its possession or subject to its control that relate to any pre-July 13, 2003, information in its possession or subject to its control, as well as a complete list of all allegedly privileged documents as noted elsewhere in this Motion to Compel.

32.   **Please produce all documents given to or received from Dr. Robert Cook or Mr. Patterson including, without limitation, (a) the 1999 Exploration and Evaluation of Aggregate Reserves, Opelika Project and (b) the 2000 Exploration and Evaluation of Aggregate Reserves, Opelika-Young Project.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

**REASON TO COMPEL:**
Request number 32 seeks any information received by Oldcastle from Dr. Robert Cook (one of Hanson's experts, and prominent geologist in the area), or Mr. Patterson, regarding 1999 exploration and evaluation of aggregate reserves and 2000 exploration and evaluation of aggregate reserves on the quarry site. This information was doubtless obtained by Oldcastle prior to its assumption of the quarry during its due diligence effort. To object, therefore, that the information is not relevant, not calculated to lead to discoverable evidence, and burdensome to produce is a spurious objection. The information is clearly relevant and will go to the issue, at least in part, whether Hanson should be punished for its continued operation of a known nuisance that causes substantial and serious damages to many members of the public as well as all of the Plaintiffs.

21

33. **Please produce all documents related to the dewatering or potential dewatering of the areas in and around the Lee County quarry. This would include, without limitation, the first notice to Oldcastle that the Lee County Quarry operation was dewatering or was alleged to be dewatering the surrounding area, the zone of influence of such dewatering, steps taken to identify the zone of influence, and steps taken to minimize or correct the alleged problems or damage.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for the production of expert opinions, and is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request that are related to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the Opelika quarry after July 13, 2003.

**REASON TO COMPEL:**
Plaintiffs' Complaint as amended against Oldcastle clearly claims that Oldcastle's operation by dewatering the ground is continuing to cause sinkhole collapse and continued dewatering of Spring Villa and Little Uchee Creek. Request 33 requests all documents relating to dewatering and potential dewatering of the areas around the quarry. Nothing could be more relevant and more discoverable, therefore. Oldcastle's objection is absurd. Oldcastle also indicates that it will produce all "non-privileged and responsive documents" for the time period after July 13, 2003. Plaintiffs are entitled to know what Oldcastle knew prior to July 13, and therefore, a full response is required. Moreover, to the extent that any documents are not produced under a claim of privilege, Oldcastle has an obligation under Alabama law to produce a detailed log regarding any such claims of privilege.

2011

34.  **Describe in detail whether Oldcastle believes that its continued pumping of water from the quarry pit will continue dewatering the properties around the Lee County quarry. If your contention is that there is no dewatering effect, please describe in detail all bases for such contentions.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
Interrogatory number 34 asks Oldcastle to answer a contention with respect to the very heart of this lawsuit. Plaintiffs have alleged that the continued pumping of water from the quarry pit will continue to dewater properties and thus to continue sinkhole collapse, to continue the dewatering of the Spring Villa spring, and to continue the dewatering and collapse of Little Uchee Creek. It is a proper contention interrogatory under Alabama Rule of Civil Procedure 33 and 34, and Oldcastle has no basis to object thereto. Oldcastle can always supplement its response in the event that its experts give it additional information. Plaintiffs are entitled to know now what Oldcastle knew at the time that it assumed the quarry and what it believed at the time that it assumed the quarry, which information will bear directly on the question whether it should be punished for knowingly continuing a substantial nuisance to the Plaintiffs.

35.  **Please produce all documents relating in any way to the size, scope, duration, or effect of a "cone of depression" or "zone of influence" of the dewatering caused by pumping water from the quarry pit to outfall 1.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that the terms "cone of depression," "zone of influence" and "outfall 1" are not defined, and the Request is therefore vague and ambiguous. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any "cone of depression" or "zone of influence" – however those terms may be defined – caused by pumping water from the quarry pit by Oldcastle after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to led to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does

not required Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
Request 35 seeks documents relating to the size of the "zone of influence or cone of depression" of the dewatering clause by pumping from the quarry. It has already been established in this Motion to Compel that this information goes to the very heart of Plaintiffs' claim. For Oldcastle to object is, therefore, spurious. Moreover, Plaintiffs incorporate by reference its reason to compel in response to request number 34.

36.    **Please produce all documents relating to the size and depth of the quarry, including the surface area of the quarry at any time on or before the date of acquisition of the quarry in July of 2003.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to the size and depth of the quarry as of July 13, 2003 and thereafter.

**REASON TO COMPEL:**
Plaintiffs allege that Oldcastle is continuing a nuisance. The size of the quarry has expanded considerably since Oldcastle began operation in July of 2003. Plaintiffs have asked for information relating to the size of the quarry. Oldcastle has indicated that it will produce non-privilege and responsive documents, but has produced none. Further, Oldcastle has an obligation to produce a log of any documents for which it claims are privileged.

38.    **Please produce all documents regarding any well inventory or spring inventory including related documents showing interviews with homeowners, depths of wells, location of wells and springs and whether the wells or springs were dry or had water.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

2013

**REASON TO COMPEL:**
Oldcastle has produced no documents. Moreover, Oldcastle has an obligation to produce a detailed log of any documents for which it claims are privileged.

39. **Please produce all documents reflecting Oldcastle's knowledge of the dewatering at Spring Villa and the Little Uchee Creek (whether or not you contend such dewatering was caused by or in part by Hanson and/or Oldcastle). This would include, but is not to be limited to, all correspondence, investigations, inspections and documents to or from government agencies regarding dewatering of Spring Villa and/or the Little Uchee Creek areas.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that any dewatering at Spring Villa and the Little Uchee Creek has occurred. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged dewatering at Spring Villa and the Little Uchee Creek caused or contributed to by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to t6he discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003, is causing any dewatering at Spring Villa and the Little Uchee Creek. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
As stated above, the dewatering of Spring Villa and Little Uchee Creek is one of Plaintiffs' largest claims in the case. To object that this information is not relevant is therefore absurd. To object that the information requested (all documents reflecting Oldcastle's knowledge of the dewatering) is absurd. There is no basis for privilege for these documents, and were there a basis, Oldcastle still has the obligation to produce a detailed log of any such documents for which it claims privilege. The information requested also seeks information and documents in Oldcastle's knowledge or subject to its control that pre-dates the date that it assumed the quarry on July 13, 2003, which information bears directly on the question whether it

25

negligently and wantonly continued the operation in a negligent and wanton manner and whether it should be punished by punitive damages imposed by the jury.

40.   **Please produce all documents regarding any sinkholes in and around the Lee County quarry, including, without limitation, all documents regarding Oldcastle's first knowledge of sinkholes, steps taken to identify the problem or potential problem, and any steps to be taken, already taken, or planned to be taken to minimize sinkhole formation in the future.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged formation of sinkholes caused or contributed to by Oldcastle's operations at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003 is causing any sinkholes in and around the Opelika quarry. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
Request number 40 asks Oldcastle to produce all documents regarding its first knowledge of sinkholes as well as steps taken to identify the problem or potential problem, etc. Very clearly, that information has nothing to do with the experts. Yet, Oldcastle objects that it does not have to give expert information at this time. The information requested is not information obtained or developed by experts. Plaintiffs have the right to know what Oldcastle knew and when regarding dewatering and sinkhole development in the area as well as problems related to sinkholes and efforts to be taken to minimize sinkhole formation in the future. Oldcastle's objection is again spurious.

41.   **Please produce all documents regarding any pre-blast inspections done for Oldcastle.**

OLDCASTLE'S RESPONSE:

2015

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

**REASON TO COMPEL:**
Oldcastle states that it will produce non-privileged and responsive documents relating to pre-blast inspections done for Oldcastle. No documents were produced, and even if any would have been produced, Oldcastle still has an obligation to produce a list of any allegedly privileged documents so the Plaintiffs can challenge the validity of any such claim.

42.    **Please produce all documents and information relating to Oldcastle's first notice that blasting had caused, or was causing, or was allegedly causing damage to any property owner in the area, including all steps taken to identify any problem or alleged problem and any steps taken to minimize or correct any such alleged problems or damage.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged damage caused by blasting by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning whether its blasting at the Opelika quarry after July 13, 2003, has caused, or was causing, or was allegedly causing damage to any property owner in the area, as well as any response Oldcastle made to such complaints.

**REASON TO COMPEL:**
Plaintiffs have clearly alleged in their Amended Complaint against Oldcastle that Oldcastle knew or should have known that the blasting from the quarry was causing damages to the homeowners in the area. The request seeks such information in the possession or subject to the control of Oldcastle, and further asks for information relating to all steps taken to identify any problems and any steps taken to minimize or correct any such alleged problems or damage. Oldcastle's objection that the information is not relevant, not calculated to lead to the discovery of admissible evidence, and overbroad is therefore, again, absurd. Oldcastle's gratuitous statement that it will produce information received after July 13, 2003, is also invalid because it has the obligation to give Plaintiffs all information responsive to this request which will bear on whether Oldcastle should be punished for its continued operation of the quarry knowing of the damages caused to the Plaintiffs by the operation of Hanson

2016

and, thus, by its continued operation of the quarry. Under *Ex parte Dorsey Trailers*, Oldcastle cannot make the determination whether the information requested will be useful to the Plaintiffs. Plaintiffs have the right to the information so long as it is calculated to lead to discoverable evidence, which it is.

**43.    Please produce all aerial photos of the quarry from 1996 to the present.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

**REASON TO COMPEL:**
Plaintiffs want all aerial photographs that Oldcastle has relating to the quarry. Oldcastle's statement that it will produce the non-privileged documents is ridiculous. These documents clearly cannot be privileged. Oldcastle has, further, produced no documents.

**44.    Please produce all documents regarding other regulatory filings or information not specifically requested above.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that the term "other regulatory filings or information" is not defined and the Request does not otherwise describe the document or documents requested with sufficient particularity to allow Oldcastle to determine which document or documents are being requested. The Request is therefore vague and ambiguous. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

**REASON TO COMPEL:**
In request number 44, Plaintiffs seek any other "regulatory filings or information not specifically requested above". It is clear from the context of this question that the Plaintiffs are seeking any other documents provided to any governmental agency. For Oldcastle to object that the request is vague and ambiguous is therefore not well taken. Moreover, very clearly, the information is relevant as the manner in which Oldcastle operates the quarry, and whether the quarry is operated within the limits of its permit, is relevant. Moreover, there may be other regulatory agencies other than ADEM and USEPA to which Oldcastle has reported, and if there is, the Plaintiffs are entitled to know about such information.

28

45. **Please produce all documents exchanged with Dyno Nobel or any other blasting company relating to the Opelika/Lee County quarry.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

**REASON TO COMPEL:**
Oldcastle states that it will produce non-privileged and responsive documents, but produced none. Moreover, if any documents are withheld on the claim of privilege (and none clearly could possibly attach), then Oldcastle has an obligation to give Plaintiffs a list of any such documents.

46. **Please produce all business licenses or permits of any type and description obtained or required by any governmental agency.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all business licenses and permits concerning its operations at the Opelika quarry that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

**REASON TO COMPEL:**
Oldcastle has stated it will produce the documents requested but has produced no such documents.

47. **Please produce all OSHA and/or MSHA inspections or other documents exchanged by and between Oldcastle and OSHA and/or MSHA.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the allegations set forth in the Fourth Amended and Restated Complaint do not pertain to worker health and

29

safety issues, the Request is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all OSHA and/or MSHA inspections and other documents exchanged by and between Oldcastle and OSHA and/or MSHA that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

**REASON TO COMPEL:**
At request number 47, Plaintiffs asked for all OSHA and MSHA inspections and other documents exchanged between Oldcastle and OSHA and/or MSHA. Oldcastle's response that it will produce any such documents exchanged between Oldcastle and OSHA and/or MSHA that "bear on the allegations set forth in the Fourth Amended and Restated Complaint" is an invalid response under *Ex parte Dorsey Trailers*. Oldcastle has the obligation to give all such documents to the Plaintiffs whether or not in Oldcastle's opinion it bears on any allegation of the Complaint. This is clearly discoverable evidence.

48.    **Please produce all personnel files on all of Oldcastle's Lee County quarry foremen and Plant Managers.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that producing the personnel files of its employees would violate the right of privacy of its employees as protected by the United States Constitution and the Constitution of the State of Alabama.

**REASON TO COMPEL:**
Plaintiffs seek information regarding personnel files on the quarry foremen and plant managers so that Plaintiffs may depose the same and otherwise obtain information relating to the manner in which Oldcastle has trained its supervisory personnel. Plaintiffs have alleged that the quarry is operated in a negligent and wanton manner. Failure to properly train its managers and supervisors (foremen and plant managers) would clearly bear on those allegations. Therefore, the information is relevant and discoverable as calculated to lead to discoverable evidence. Oldcastle's further objection that producing the information would violate the employee's rights of privacy is also unfounded because Oldcastle has not stated any alleged privilege or any particular constitutional provision protecting such information from discovery. Further, to the extent any information within those files is clearly privileged,

30

2019

that information can be redacted.  Moreover, any information withheld should be provided to the Plaintiffs in a log so that the Plaintiffs can contest the validity of any claims of privilege.

49.   **Please produce all documents relating to the hours worked by any and every Oldcastle employee of the Lee County Quarry from the moment Oldcastle assumed control of the quarry operation.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

**REASON TO COMPEL:**
Plaintiffs have alleged that the operation of the quarry is a nuisance.  The quarry is being operated longer hours than when Hanson had it.  The quarry is creating more problems for the homeowners in the area and is thus a bigger nuisance now than when Hanson had it.  Therefore, the hours that the employees work will clearly demonstrate Plaintiffs' claim that the quarry is becoming a worse nuisance than ever before.  Therefore, the information requested (all documents relating to the hours worked of any employee at the quarry) is clearly calculated to lead to discoverable evidence and is relevant to the issues in the case.  Oldcastle's objection to the contrary is erroneous.

**WHEREFORE,** for good cause shown, Plaintiffs move this Honorable Court to compel Oldcastle to produce the documents requested and, further, to award the Plaintiffs' attorneys costs for the necessity of filing a Motion to Compel.  Oldcastle's objections were, without exception, spurious and invalid under Alabama law.  To object is clearly a delaying tactic on Oldcastle's part designed to impede Plaintiffs' discovery in this case and to delay the litigation.  Plaintiffs therefore move for an award of attorneys' fees in this case situation based on Rule 26, Rule 33 and Rule 37.

**JAMES B. SPRAYBERRY(SPR008)**
One of the Attorneys for the Plaintiffs

31

2020

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

Jack Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 2 day of DEC , 2003.

OF COUNSEL

155-00\Plaintiff's Motion to Compel 12-2-03

32

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2021

MIKE DAVIS, et al.,                           )
                                              )
                    Plaintiffs,               )
                                              )
vs.                                           )      Civil Action No. CV-02-0085
                                              )
HANSON AGGREGATES SOUTHEAST,                  )
INC., et al.,                                 )
                                              )
                    Defendants.               )

## PLAINTIFFS' FIRST INTERROGATORIES AND
## REQUESTS FOR PRODUCTION TO DEFENDANT OLDCASTLE

Plaintiffs request Defendant Oldcastle Materials, Inc., to answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure, and to produce the following documents and things pursuant to Rule 34 of the Alabama Rules of Civil Procedure.

## I.  INSTRUCTIONS

(a)    In answering these Interrogatories and Requests, please furnish all information, however obtained, and including hearsay, that is or may be available to you and all information known by you or in your possession, in your agent's possession and/or in your attorney's possession, or appearing in your records.  When answering these Interrogatories and Requests, be advised that you have a good faith duty to conduct a reasonable investigation and to make a good faith attempt to answer each Interrogatory and to produce all documents and things requested.

(b)    If you cannot answer any of the following Interrogatories or Requests in full after exercising due diligence to secure the full information sought, so state and answer to the extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion, and detailing what you did in attempting to secure the unknown information.

(c)    If your answer is that the documents requested are not in your possession or custody, describe in detail the unsuccessful efforts you have made to locate or obtain possession of the records.  If your response is that the documents are not in your control, then identify who has control and the location of the records.  If a request for production seeks a specific document or an itemized category that is not in your possession, control,

2022

or custody, provide any documents you have that contain all or part of the information contained in the requested document or category, then identify the source of each of the documents you produce.

(d)    These Interrogatories and Requests for Production shall be deemed to be continuing until and during the course of trial. Information sought by these Interrogatories and Requests which you obtain or learn after you serve your answers and produce the documents must be disclosed to Plaintiffs by supplementary answers.

(e)    Plaintiffs demand that the documents requested be produced in the file folder or other container in which they are maintained or stored, and that the order or sequence of the documents, if more than one within a file is requested, be in the same order or sequence within such file as was maintained in the ordinary course of business just prior to the production thereof.

(f)    If you object to the production of any documents or a portion thereof based upon a claim that said documents are privileged or protected or otherwise undiscoverable, for each such document supply the following information: the portion that is not privileged, the author of the document, the person or persons to whom the document was addressed, the date of the document, and the subjects discussed in the document.

## II. DEFINITIONS

(a)    "Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred,

report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

(b)    "Your", "your", and "yours" shall mean each adverse party collectively and together. Thus, for each question, state the answer thereto for each party, if their answers differ.

(c)    "Identify":

i.    When used in reference to an individual, means to state his full name, if known, his present or last known position and business affiliation, and his residential address and telephone number.

ii.    When used in reference to a corporation, firm, or other entity, means to state its full name, form of organization (if known), and its present or last known address and telephone number.

iii.    When used in reference to a document, means to state the type of document, (e.g., letter, memorandum, telegram, chart, contract, prospectus, newspaper article, or the like), or some other means of identification, its author or authors, addressee or addressees, date or dates, subject or subjects, and its present location by address, and custodian or custodians. If such document was, but is no longer in your possession or subject to your control, state what disposition was made of it.

iv.    When used in reference to a telephone conversation, means, with respect to each party to the telephone conversation or listening thereto, to state: full name, business affiliation, business address, present or last known position, residential address, location of each party at the time the telephone conversation took place, which of the parties to the telephone conversation initiated the call, and when such telephone conversation took place.

v.    When used in reference to an oral conversation other than a telephone conversation, means, with respect to each party to the conversation or listening thereto, to state:  when such conversation took place, where such conversation took place, each parties' full name, present address and business affiliation, residential address, and telephone number.

## III.  INTERROGATORIES AND REQUESTS FOR PRODUCTION

1.    Please identify all persons who were involved in the negotiation for the purchase of the Opelika quarry from Hanson Aggregates Southeast, Inc.

2.    During a hearing before the Honorable Judge Walker, Oldcastle's attorney, Phillip Adams, stated in essence that Oldcastle intended to change the manner of operation of the quarry in Lee County.  Please describe in detail every fact supporting Mr. Adams' statements and describe in detail all expected, anticipated, planned, or potential changes to the manner or method of operation of the Oldcastle quarry in Lee County (as distinguished from the manner and method of operation of the Lee County quarry by Hanson Aggregates Southeast, Inc.).

3.    Please identify any expert witness whom you intend to call as an expert at the trial of this case, and for each such expert, please produce all documents, opinions, and other information in accordance with Alabama Rule of Civil Procedure 26(b).

4.    Please identify every person with knowledge of the manner of operation of the Hanson quarry after it was taken over by Oldcastle.

4

2025

5.    Please produce all discharge monitoring reports, and all documents of any type or description in the possession or custody or control of Oldcastle that relates in any manner to the pumping of water from the pit at the Lee County quarry.

6.    At any time on or after assuming control of the Lee County quarry, did Oldcastle change the pumps used to discharge water from the quarry pit into outfall number 1? If your answer is in the affirmative, describe all such changes in detail and produce all documents evidencing any such change.

7.    State the number of gallons of water discharged per day from the Oldcastle quarry pit for each day from the date Oldcastle assumed control of the quarry to the date that these interrogatories and requests for production are answered.

8.    Please produce the personnel files on every employee of Oldcastle at the Lee County quarry.

5

2026

9.    Please produce a "flow chart" or similar document evidencing the corporate structure of Oldcastle's Lee County quarry, from the Lee County quarry all the way up to the corporate owners and parent companies to the highest level, or describe in detail the "chain of command" and corporate structure of Oldcastle from the Lee County quarry upward to the highest corporate level and parent company ownership.

10.    Please produce a copy of the Joint Defense Agreement entered into between Oldcastle and Hanson as related in the Asset Purchase Agreement.

11.    Does any other written document exist that relates to any right of indemnity, contribution, refund, recission, cancellation, or other modification of the Asset Purchase Agreement or any other document in the event that the Lee County Circuit Court enjoins the operation of the Lee County quarry? In particular, Plaintiffs are asking precisely what will happen in the event the Lee County quarry is closed or otherwise substantially enjoined from operation by the Circuit Court of Lee County. Are there or will there be any ramifications whatsoever to Hanson, or will any remuneration or other consideration of any type or description pass between Oldcastle and Hanson in the event the Plaintiffs prevail in this litigation and the quarry is enjoined in part or in whole?

6

2027

12.    Please produce all documents in your possession or subject to your control that show or from which can be determined the amount of materials sold by Defendant Oldcastle to its customers since assuming operation of the Lee County quarry.

13.    Please produce copies of all Lee County mining and mineral tax returns with respect to the Lee County quarry.

14.    Please describe in detail all efforts or undertakings of any type or description considered "due diligence" with respect to the purchase of Hanson's Lee County quarry and operation.

15.    Please produce all documents related in any manner to Oldcastle's "due diligence" efforts and undertakings with respect to the purchase of the Hanson Lee County Quarry.  Without limiting the generality of the foregoing, please produce all documents related to:  what was considered and what was  investigated before Oldcastle purchased the quarry; why the quarry was purchased; who made the decision to purchase the quarry and what they based their decision upon; all written reports, internal memoranda, notes of any type or description, Minutes of Meetings of the Board of Directors, and any other

2028

written document dealing with the purchase of the Hanson Lee County Quarry; and all documents related to any steps taken to identify any problems or potential problems related to the quarry operation as well as steps taken or to be taken to minimize damage or alleged damages to surrounding landowners.

16.    Please produce all information known to Oldcastle in 2002 and/or 2003 in relation to the Opelika quarry. This would include, but is not limited to, the geology of the quarry and the surrounding area, the depth of the quarry at every year from 1996 to date, the number and location of sinkholes in 1999 and each year since 1999, the size of the cone of depression or zone of influence in 1999 and for each subsequent year, the written reports by Dr. Bob Cook or other consultants or in house geologist(s) at any time after 1999, and the underground water table levels from 1996 to date as well as the pumping amounts and damage (or potential damage) to surrounding properties.

17.    Please produce all environmental studies or assessments of any type or description performed by or for Hanson or by or for Oldcastle at any time (with respect to the Lee County Quarry).

8

2023

18.    Please produce all documents exchanged between Oldcastle or any officer, agent or employee thereof and ADEM or the U.S. EPA, including, without limitation, all air and/ or water applications and permits; all other applications and/ or permits issued to Hanson and/ or Oldcastle; all documents transferring any existing permits to Oldcastle; and any information relating to renewals, warnings, and/ or violations from ADEM or the U.S. EPA.

19.    Please produce copies of all complaints to Hanson or to Oldcastle, together with every document dealing in any manner with such complaint(s) and whatever corrective measures were taken or will be taken (including changes in the method of operation of the quarry) with respect to every such complaint.

20.    Please produce all documents in your possession or subject to your control that relate in any way to any pending lawsuit(s) against Hanson at the time of the acquisition of the Lee County Quarry by Oldcastle. This would include documents indicating Oldcastle's knowledge of the suit(s), documents on Oldcastle's responsibility for such suit(s) or indemnity by Hanson to Oldcastle for such suit(s), and any other documents relating to the resolution of any problems or complaints alleged by any of the Plaintiffs.

9

21.   Please produce all documents regarding Oldcastle's knowledge of any complaint by any person or governmental agency regarding dust or fugitive dust emissions. This would include dust from blasting, operations and/or equipment and traffic. Without limitation, this request includes all documents related to the quantity and composition of such dust or fugitive dust emissions, including silica content and/or silica notification to employees, including steps taken to identify the problem and minimize such problems.

22.   Please produce all documents regarding state or federal health/safety laws or regulations with respect to Silica contained within dust or any by-product of the Lee County quarry operation. Without limitation, this requests any MSDS used or issued by Oldcastle with respect to its Lee County quarry.

23.   Please produce all documents relating to the removal from operation or disabling of any of Hanson's (or now Oldcastle's) Dust Suppression System(s), whether for 24 hours or any longer period. This would also include reports, inspections, correspondence and/or documents relating to visible emission inspections, reports and/or repairs, including warnings or correspondence from or to ADEM.

24.     Please produce all documents related to when any and every piece of new equipment or machinery was or will be installed or became or will become operational at the Lee County quarry, including any equipment in the plant or production process (including vehicles of any type or description), and the dates when old crushers and/or conveyers were replaced or will be replaced by Oldcastle.

25.     Please produce all documents related to any "in house" inspections, including environmental inspections, dust suppression inspections, damage control and/or risk management inspections, and any other type of inspection at the Lee County Quarry.

26.     Please produce all documents related to any overburden piles on the south side of the quarry at the Lee County quarry (or anywhere else on the quarry property). This request includes, without limiting the generality of the foregoing request, all documents relating to the location, size and character of such overburden piles from 1996 to present including maintenance, reclamation from 1996 to the present, flooding and fugitive dust emissions, and any plans or intentions (firm or merely in discussion stages) relating to such overburden piles

27.    Please produce your copy of the Environmental memo from Nigel Wills and his recommendations, as well as all documents relating to it or to his recommendations in any manner.

28.    Please produce all documents relating to any and all steps taken (or to be taken) to implement any of the changes mentioned in Nigel Wells' environmental memo and/or to correct any known or alleged problems at the Lee County quarry.

29.    Please produce all documents relating to the location, installation and records regarding the any monitoring wells installed at any time near the quarry, and in particular in 2000 and 2001 on or around the Hanson property. This would include water levels, drill logs, water tables and any pumping records and the entire "study" performed by Hanson (possibly Bates #2938), as well as any study undertaken by or for Oldcastle.

30.    Please produce all pumping records in your possession or subject to your control. This would include pumping or discharge records for the quarry from 1996 to the present, if available, together with all documents related to any calculations of storage capacity for water on the Gilmer property and the Young property. This would include

12

2035

all DMRs (Discharge Monitoring Reports) filed by Opelika Materials or Hanson or Oldcastle with ADEM, applications to ADEM, permits from ADEM and all documents to or from ADEM by Oldcastle, Hanson, Opelika Materials or their agents and/or engineers; warning letters, notices, violations, notice of potential violations or similar documents to or from ADEM. Note that this request includes, but is not limited to documents and information relating to how your internal pumping discharge records were calculated, including the actual calculations themselves.

31.    Please produce all documents in your possession or subject to your control relating to any payments to Dr. Robert Cook for any reason since 1996.

32.    Please produce all documents given to or received from Dr. Robert Cook or Mr. Patterson including, without limitation, (a) the 1999 Exploration and Evaluation of Aggregate Reserves, Opelika Project and (b) the 2000 Exploration and Evaluation of Aggregate Reserves, Opelika-Young Project.

33.    Please produce all documents related to the dewatering or potential dewatering of the areas in and around the Lee County quarry. This would include,

without limitation, the first notice to Oldcastle that the Lee County Quarry operation was dewatering or was alleged to be dewatering the surrounding area, the zone of influence of such dewatering, steps taken to identify the zone of influence, and steps taken to minimize or correct the alleged problems or damage.

34.    Describe in detail whether Oldcastle believes that its continued pumping of water from the quarry pit will continue dewatering the properties around the Lee County quarry. If your contention is that there is no dewatering effect, please describe in detail all bases for such contentions.

35.    Please produce all documents relating in any way to the size, scope, duration, or effect of a "cone of depression" or "zone of influence" of the dewatering caused by pumping water from the quarry pit to outfall 1.

36.    Please produce all documents relating to the size and depth of the quarry, including the surface area of the quarry at any time on or before the date of acquisition of the quarry in July of 2003.

14

2035

37.    Please produce any and all mining plans of any type or description relating to the Lee County quarry.

38.    Please produce all documents regarding any well inventory or spring inventory including related documents showing interviews with homeowners, depths of wells, location of wells and springs and whether the wells or springs were dry or had water.

39.    Please produce all documents reflecting Oldcastle's knowledge of the dewatering at Spring Villa and the Little Uchee Creek (whether or not you contend such dewatering was caused by or in part by Hanson and/or Oldcastle).  This would include, but is not to be limited to, all correspondence, investigations, inspections and documents to or from government agencies regarding dewatering of Spring Villa and/or the Little Uchee Creek areas.

40.    Please produce all documents regarding any sinkholes in and around the Lee County quarry, including, without limitation, all documents regarding Oldcastle's first knowledge of sinkholes, steps taken to identify the problem or potential problem, and any

2036

steps to be taken, already taken, or planned to be taken to minimize sinkhole formation in the future.

41.    Please produce all documents regarding any pre-blast inspections done for Oldcastle.

42.    Please produce all documents and information relating to Oldcastle's first notice that blasting had caused, or was causing, or was allegedly causing damage to any property owner in the area, including all steps taken to identify any problem or alleged problem and any steps taken to minimize or correct any such alleged problems or damage.

43.    Please produce all aerial photos of the quarry from 1996 to the present.

44.    Please produce all documents regarding other regulatory filings or information not specifically requested above.

45.    Please produce all documents exchanged with Dyno Nobel or any other blasting company relating to the Opelika/Lee County quarry.

16

2087

46.     Please produce all business licenses or permits of any type and description obtained or required by any governmental agency.

47.     Please produce all OSHA and/or MSHA inspections or other documents exchanged by and between Oldcastle and OSHA and/or MSHA.

48.     Please produce all personnel files on all of Oldcastle's Lee County quarry foremen and Plant Managers.

49.     Please produce all documents relating to the hours worked by any and every Oldcastle employee of the Lee County Quarry from the moment Oldcastle assumed control of the quarry operation.

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

17

2088

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ___30th___ day of ___Sept___, 2003.

_C E Vercelli_

OF COUNSEL

155-00\Ps1stIRPD-Oldcastle,2.wpd

18

COPY

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

FILED

NOV 0 7 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OLDCASTLE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant Oldcastle Materials Southeast, Inc., ("Oldcastle") hereby responds to

Plaintiffs' First Interrogatories and Request for Production of Documents in accordance with the

requirements of Rules 33 and 34 of the Alabama Rules of Civil Procedure, and without admitting

the relevance or admissibility of any of the information contained herein, responds as follows:

### GENERAL OBJECTIONS

1.      Oldcastle has not concluded its investigation of the facts relating to this case,

formal discovery, or preparation for trial.  For that reason, Oldcastle's Responses to Plaintiffs'

First Interrogatories and Request for Production of Documents may be incomplete.  Also, there is

a possibility that, upon further investigation, certain details set forth in the responses may be

altered or amended.  These Responses to Plaintiffs' First Interrogatories and Request for

Production of Documents represent Oldcastle's reasonable efforts to provide the information

requested based upon documents in Oldcastle's possession, custody or control, and based upon

Oldcastle's current knowledge.  Oldcastle reserves the right to produce evidence of any

subsequently discovered fact or facts, to alter or amend its responses set forth herein, and

otherwise to assert factual and legal contentions as additional facts are ascertained, analyses are made, and legal research is completed. Oldcastle objects to each and every Interrogatory and Request for Production of Documents insofar as it may be construed as limiting or restricting Oldcastle's right to rely upon any document or information for any purpose whatsoever, including the use of responsive documents or information as evidence at any subsequent hearing, trial or proceeding.

2.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it purports to seek information protected by any privilege, including the attorney-client privilege, the work-product doctrine, the joint defense privilege, or any other privilege or protection provided by common law statute. In responding to the Interrogatories and Request for Production of Documents, Oldcastle will not provide any information that is protected from disclosure by any of the foregoing privileges. Inadvertent disclosure of such information is not intended to be a waiver of any privilege or any other ground for objecting to discovery. Furthermore, inadvertent disclosure of any such information shall not constitute a waiver of Oldcastle's right to object to the use of any such information during any subsequent proceeding.

3.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it purports to require Oldcastle to disclose confidential and proprietary business information or trade secrets.

4.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it seeks information not in Oldcastle's possession, custody or control on the grounds that it is unduly burdensome or oppressive.

5.    Oldcastle will make reasonable efforts to respond to each Interrogatory, to the extent that no objection is made, as Oldcastle understands and interprets the Interrogatory. If

2

Plaintiffs subsequently assert an interpretation of any Interrogatory which differs from that of Oldcastle, Oldcastle reserves the right to supplement its objections and responses.

6.     To the extent that any Interrogatory or Request for Production of Documents calls for information already in the possession of plaintiff or its counsel, Oldcastle objects on the grounds that the Interrogatory or Request for Production of Documents is unnecessary and unduly burdensome and constitutes annoyance, harassment, and oppression of Oldcastle.

7.     Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it seeks information not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

8.     Oldcastle's agreement to produce any non-privileged documents in its possession, custody or control responsive to a particular Request shall not be deemed an admission that it is in the possession of any document responsive to the Request.

9.     Oldcastle has filed a Motion to Dismiss the Fourth Amended Complaint or, alternatively, for More Definite Statement. In this Motion, Oldcastle shows that the Fourth Amended Complaint fails to state a cause of action against Oldcastle because, among other reasons, it does not include any allegations that Oldcastle has engaged in any actionable conduct since it acquired the Lee County quarry from Hanson on or about July 13, 2003. Oldcastle objects to each Interrogatory and Request for Production of Documents on the ground that Oldcastle is not required to respond to discovery until and unless plaintiffs plead one or more legally viable causes of action against Oldcastle entitling plaintiffs to relief if the facts alleged by plaintiffs are proven to be true.

These General Objections are incorporated into each response below as though fully set forth therein.

2042

## INTERROGATORIES AND REQUESTS FOR PRODUCTION

Interrogatory/Document Request Number 1.

Please identify all persons who were involved in the negotiation for the purchase of the

Opelika quarry from Hanson Aggregates Southeast, Inc.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further

objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome and

oppressive, and seeks information that is not relevant to the subject matter of this action and is

not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the

foregoing general and specific objections, Oldcastle responds as follows:

Frank Heisterkamp, Vice President of Development of Oldcastle Materials, was in charge

of the negotiations of the Asset Purchase Agreement between Oldcastle Materials Southeast, Inc.

and Hanson Aggregates Southeast, Inc., and is knowledgeable with respect thereto.

Interrogatory/Document Request Number 2.

During a hearing before the Honorable Judge Walker, Oldcastle's attorney, Phillip

Adams, stated in essence that Oldcastle intended to change the manner of operation of the quarry

in Lee County. Please describe in detail every fact supporting Mr. Adams' statements and

describe in detail all expected, anticipated, planned, or potential changes to the manner or

method of operation of the Oldcastle quarry in Lee County (as distinguished from the manner

and method of operation of the Lee County quarry by Hanson Aggregates Southeast, Inc.).

Response:

Oldcastle hereby incorporates the general objections set forth above. Without waiving

the foregoing general objections, Oldcastle responds as follows:

2043

Without prejudicing Oldcastle's right to implement additional measures in the future which it may deem appropriate as its investigation progresses, Oldcastle states that it is in the process of undertaking the following actions:

- Utilizing earthen material generated by the present and future overburden stripping operation to construct new dust, noise, and visual impact abatement berms along and within the southern and western property lines of the site (surrounding the quarry and all associated production areas on the site). These berms will be approximately 25 to 30 feet high and will be emplaced and vegetated so that, to the extent reasonably feasible, they will generally blend with the natural conditions surrounding them. Oldcastle believes that the abatement of dust, noise, and visual aesthetic impact will be substantial.

- Utilizing earthen material from stripping to construct a specially-designed, supplemental noise and dust abatement berm inside of, and roughly parallel to the southern property line berm to provide additional dust and noise protection to the abutting Davis property to the south. Again, Oldcastle believes that the reduction in dust and noise will be substantial.

- Relocating a new and reconfigured stone crushing processing plant from the present location of such operations on the surface of the site to the west and north of the quarry to a location lying wholly inside the quarry itself. Oldcastle believes that this reconfiguration and relocation, together with the improved technology and control equipment of the new plant, will eliminate any significant adverse effects from dust and noise associated with the crushing and processing

5

effects from dust and noise associated with the crushing and processing operations, and in conjunction with the berms described above will render these operations as clean and quiet as reasonably possible under the circumstances.

- Redesigning the quarry drilling patterns and blasting plans to minimize the rate of loading so that only the minimum amount of explosive is used to create the requisite volumes of broken rock during each blast. Oldcastle believes that this redesign will substantially reduce offsite impacts from ground and/or air vibration, will make the operations more cost efficient, and will permit the implementation of a vibration control program to ensure that all such vibrations are minimized to levels that Oldcastle believes should not generally be annoying or damaging to offsite property owners in the area.

- Designing a quarry-water management and aquifer recharge strategy that Oldcastle believes will return most, if not perhaps all, of the water pumped in connection with the quarry's operation to surface and subsurface drainages and aquifer(s).

Interrogatory/Document Request Number 3.

Please identify any expert witness whom you intend to call as an expert at the trial of this case, and for each such expert, please produce all documents, opinions, and other information in accordance with Alabama Rule of Civil Procedure 26(b).

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the ground that it is premature, as the Court's September 29, 2003

Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 4.

Please identify every person with knowledge of the manner of operation of the Hanson quarry after it was taken over by Oldcastle.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to the term "the Hanson quarry" to the extent that it implies that Oldcastle's purchase of the Opelika quarry from Hanson Aggregates Southeast and Oldcastle's subsequent operation thereof amounted to a mere continuation of the operations of Hanson Aggregates Southeast. Oldcastle further objects to this Interrogatory on the grounds that it is overbroad and vague and ambiguous. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows: Frank Heisterkamp, Morris Bishop, and Ted Reynolds have knowledge concerning the operation of the Opelika quarry by Oldcastle after July 13, 2003.

Interrogatory/Document Request Number 5.

Please produce all discharge monitoring reports, and all documents of any type or description in the possession or custody or control of Oldcastle that relates in any manner to the pumping of water from the pit at the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this document request on the grounds that it is overbroad, vague and ambiguous and

7

burdensome and oppressive in that it calls for the production of a large volume of cumulative documents. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all discharge monitoring reports of the Opelika quarry created after July 13, 2003 that are in its possession, custody or control.

Interrogatory/Document Request Number 6.

At any time on or after assuming control of the Lee County quarry, did Oldcastle change the pumps used to discharge water from the quarry pit into outfall number 1? If your answer is in the affirmative, describe all such changes in detail and produce all documents evidencing any such change.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

No.

Interrogatory/Document Request Number 7:

State the number of gallons of water discharged per day from the Oldcastle quarry pit for each day from the date Oldcastle assumed control of the quarry to the date that these interrogatories and requests for production are answered.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this document request on the grounds that it is overbroad, and unduly burdensome and oppressive in that it requires Oldcastle to summarize voluminous records. The information

2042

requested in this Interrogatory will be equally available to Plaintiffs from the discharge
monitoring reports which are being produced to Plaintiffs.

Interrogatory/Document Request Number 8.

Please produce the personnel files on every employee of Oldcastle at the Lee County
quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further
objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive,
and seeks information that is not relevant to the subject matter of this action and is not
reasonably calculated to lead to the discovery of admissible evidence.  Oldcastle further objects
to this Request on the ground that producing the personnel files of its employees would violate
the right of privacy of its employees as protected by the United States Constitution and the
Constitution of the State of Alabama.

Interrogatory/Document Request Number 9.

Please produce a "flow chart" or similar document evidencing the corporate structure of
Oldcastle's Lee County quarry, from the Lee County quarry all the way up to the corporate
owners and parent companies to the highest level, or describe in detail the "chain of command"
and corporate structure of Oldcastle from the Lee County quarry upward to the highest corporate
level and parent company ownership.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further
objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive,
and seeks information that is not relevant to the subject matter of this action and is not

reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Ted Reynolds is the Chief Operating Officer of Oldcastle Materials Southeast, Inc. and is the acting Plant Manager of the Opelika Quarry. Mr. Reynolds reports to Morris Bishop, President of Oldcastle Materials Southeast, Inc. Mr. Bishop reports to Mark Towe, President and Chief Operating Officer of Oldcastle Materials, Inc. Oldcastle Materials Southeast, Inc. is a wholly-owned subsidiary of Oldcastle Materials, Inc.

Interrogatory/Document Request Number 10.

Please produce a copy of the Joint Defense Agreement entered into between Oldcastle and Hanson as related in the Asset Purchase Agreement.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information. Finally, Oldcastle objects to this Request on the ground that it seeks information that is protected by the joint defense privilege.

Interrogatory/Document Request Number 11.

Does any other written document exist that relates to any right of indemnity, contribution, refund, rescission, cancellation, or other modification of the Asset Purchase Agreement or any other document in the event that the Lee County Circuit Court enjoins the operation of the Lee County quarry? In particular, Plaintiffs are asking precisely what will happen in the event the

10

Lee County quarry is closed or otherwise substantially enjoined from operation by the Circuit Court of lee County. Are there or will there by any ramifications whatsoever to Hanson, or will any remuneration or other consideration of any type of description pass between Oldcastle and Hanson in the event the Plaintiffs prevail in this litigation and the quarry is enjoined in part or in whole?

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is compound, overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory/Document Request Number 12.

Please produce all documents in your possession or subject to your control that show or from which can be determined the amount of materials sold by Defendant Oldcastle to its customers since assuming operation of the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not restricted to materials sold from the Opelika quarry, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information.

Interrogatory/Document Request Number 13.

Please produce copies of all Lee County mining and mineral tax returns with respect to the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information.

Interrogatory/Document Request Number 14.

Please describe in detail all efforts or undertakings of any type or description considered "due diligence" with respect to the purchase of Hanson's Lee County quarry and operation.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Interrogatory on the ground that it seeks confidential and proprietary business information. Oldcastle further objects to this Interrogatory to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 15.

Please produce all documents related in any manner to Oldcastle's "due diligence" efforts and undertakings with respect to the purchase of the Hanson Lee County Quarry. Without

12

limiting the generality of the foregoing, please produce all documents related to: what was considered and what was investigated before Oldcastle purchased the quarry; why the quarry was purchased; who made the decision to purchase the quarry and what they based their decision upon; all written reports, internal memoranda, notes of any type or description, Minutes of the Board of Directors, and any other written document dealing with the purchase of the Hanson Lee County Quarry; and all documents related to any steps taken to identify any problems or potential problems related to the quarry operation as well as steps taken or to be taken to minimize damage or alleged damages to surrounding landowners.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to the term "the Hanson Lee County Quarry" to the extent that it implies that Oldcastle's purchase of the Opelika quarry from Hanson Aggregates Southeast and Oldcastle's subsequent operation thereof amounted to a mere continuation of the operations of Hanson Aggregates Southeast. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 16.

Please produce all information known to Oldcastle in 2002 and/or 2003 in relation to the Opelika quarry. This would include, but is not limited to, the geology of the quarry and the

13

surrounding area, the depth of the quarry at every year from 1996 to date, the number and

location of sinkholes in 1999 and each year since 1999, the size of the cone of depression or zone

of influence in 1999 and for each subsequent year, the written reports by Dr. Bob Cook or other

consultants or in-house geologist(s) at any time after 1999, and the underground water table

levels from 1996 to date as well as the pumping amounts and damage (or potential damage) to

surrounding properties.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further

objects to this Interrogatory/Request on the grounds that inasmuch as the Interrogatory/Request

required Oldcastle to produce "all information known to Oldcastle in 2002 and/or 2003 in

relation to the Opelika quarry" and is not restricted to its operations at the quarry, it is overbroad,

vague and ambiguous, unduly burdensome and oppressive, and seeks information that is not

relevant to the subject matter of this action and is not reasonably calculated to lead to the

discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it

calls for the disclosure of documents or information protected by the attorney-client privilege or

the attorney work-product doctrine.

Interrogatory/Document Request Number 17.

Please produce all environmental studies or assessments of any type or description

performed by or for Hanson or by or for Oldcastle at any time (with respect to the Lee County

Quarry).

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further

objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive,

14

2050

Please produce copies of all complaints to Hanson or to Oldcastle, together with every document dealing in any manner with such complaint(s) and whatever corrective measures were taken or will be taken (including changes in the method of operation of the quarry) with respect to every such complaint.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the term "complaints" is not defined or limited in scope, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the grounds that insofar as the Request is not limited to complaints received by Oldcastle concerning its operation of the Opelika quarry, it is likewise overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning its operation of the Opelika quarry after July 13, 2003, as well as any response Oldcastle made to such complaints.

Interrogatory/Document Request Number 20.

Please produce all documents in your possession or subject to your control that relate in any way to pending lawsuit(s) against Hanson at the time of the acquisition of the Lee County Quarry by Oldcastle. This would include documents indicating Oldcastle's knowledge of the

16

suit(s), documents on Oldcastle's responsibility for such suit(s) or indemnity by Hanson to Oldcastle for such suit(s), and any other documents relating to the resolution of any problems or complaints alleged by any of the Plaintiffs.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 21.

Please produce all documents regarding Oldcastle's knowledge of any complaint by any person or governmental agency regarding dust or fugitive dust emissions. This would include dust from blasting, operations and/or equipment and traffic. Without limitation, this request includes all documents related to the quantity and composition of such dust or fugitive dust emissions, including silica content and/or silica notification to employees, including steps taken to identify the problem and minimize such problems.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not limited to complaints received by Oldcastle concerning its operation of the Opelika quarry, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

2055

Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning dust or fugitive dust emissions after July 13, 2003, as well as any response Oldcastle made to such complaints.

Interrogatory/Document Request Number 22.

Please produce all documents regarding state or federal health/safety laws or regulations with respect to Silica contained within dust or any by-product of the Lee County quarry operations. Without limitation, this requests any MSDS used or issued by Oldcastle with respect to its Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control concerning any silica contained within dust or any byproduct of the Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 23.

Please produce all documents relating to the removal from operation or disabling of any Hanson's (or now Oldcastle's) Dust Suppression System(s), whether for 24 hours or any longer

18

2055

period. This would also include reports, inspections, correspondence and/or documents relating to visible emission inspections, reports and/or repairs, including warnings or correspondence from or to ADEM.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not limited to the operation of any dust suppression system by Oldcastle during its operation of the Opelika quarry, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to any removal from operation of its dust suppression system for 24 hours or greater after July 13, 2003.

Interrogatory/Document Request Number 24.

Please produce all documents related to when any and every piece of new equipment or machinery was or will be installed or became or will become operational.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not restricted to equipment or machinery installed or planned to be installed by Oldcastle (as opposed to installed by Hanson), it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the

19

discovery of admissible evidence.  Oldcastle further objects to this Request on the grounds that

insofar as the Request is not restricted to equipment or machinery the operation of which would

bear on the allegations set forth in the Fourth Amended and Restated Complaint, it is overbroad,

unduly burdensome and oppressive, and seeks information that is not relevant to the subject

matter of this action and is not reasonably calculated to lead to the discovery of admissible

evidence.  Notwithstanding and without waiving the foregoing general and specific objections,

Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession,

custody or control relating to the installation or planned installation of any piece of new

equipment or machinery by Oldcastle at the Opelika quarry after July 13, 2003, to the extent

such piece of new equipment or machinery bears on the allegations set forth in the Fourth

Amended and Restated Complaint.

Interrogatory/Document Request Number 25.

Please produce all documents related to any "in house" inspections, including

environmental inspections, dust suppression inspections, damage control and/or risk

management inspections, and any other type of inspection at the Lee County Quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further

objects to this Request on the grounds that it is vague and ambiguous, overbroad, unduly

burdensome and oppressive, and seeks information that is not relevant to the subject matter of

this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents

or information protected by the attorney-client privilege or the attorney work-product doctrine.

Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control constituting reports of any inspection concerning the operations and conditions of the Opelika quarry after July 13, 2003, to the extent such inspection bears on the allegations set forth in the Fourth Amended and Restated Complaint.

Interrogatory/Document Request Number 26.

Please produce all documents related to any overburden piles on the south side of the quarry at the Lee County quarry (or anywhere else on the quarry property). This request includes, without limiting the generality of the foregoing request, all documents relating to the location, size and character of such overburden piles from 1996 to present including maintenance, reclamation from 1996 to the present, flooding and fugitive dust emissions, and any plans or intentions (firm or merely in discussion stages) relating to such overburden piles.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that insofar as the Request seeks documents from Oldcastle concerning the overburden piles from 1996 to present and is not restricted to Oldcastle's maintenance of the overburden piles after July 13, 2003, the Request seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to its maintenance of any overburden piles at the Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 27.

Please produce your copy of the Environmental memo from Nigel Wills and his recommendations, as well as all documents relating to it or to his recommendations in any manner.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it does not sufficiently identify the "Environmental memo from Nigel Wills" by date, recipient or otherwise with sufficient particularity so as to allow Oldcastle to determine which document or documents is being requested. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that Oldcastle ever received the document described in the Request. Oldcastle further objects to this Request on the grounds that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

The only such document is in Oldcastle's possession, custody or control is an April 28, 2000, memo from Nigel Wills to Tom Bugenhagen, which was marked as an exhibit to the deposition of Mr. Wills and provided to Oldcastle's counsel in the course of this litigation.

Interrogatory/Document Request Number 28.

22

2009

Please produce all documents relating to any and all steps taken (or to be taken) to implement any of the changes mentioned in Nigel Wells' environmental memo and/or to correct any known or alleged problems at the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it does not sufficiently identify "Nigel Wells' environmental memo" by date, recipient or otherwise with sufficient particularity so as to allow Oldcastle to determine which document is being referred to. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that Oldcastle ever received the document described in the Request. Oldcastle further objects to this Request on the ground that insofar as it requests documents "relating to any and all steps taken (or to be taken) . . . to correct any known or alleged problems at the Lee County quarry" it is vague and ambiguous and overbroad. Oldcastle further objects to this Request on the ground that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

See response to the previous Request. Oldcastle further states that, as set forth in its response to Interrogatory Number 2, Oldcastle is in the process of implementing a number of changes at the Opelika quarry. In planning and implementing these changes, Oldcastle has taken into account and/or will take into account a range of available information, which may or may not include, but in any event is not limited to, the April 28, 2000, memo from Nigel Wills to Tom Bugenhagen, which Oldcastle's counsel received in the course of this litigation.

Interrogatory/Document Request Number 29.

23

2061

Please produce all documents relating to the location, installation and records regarding any monitoring wells installed at any time near the quarry, and in particular in 2000 and 2001 on or around the Hanson property. This would include water levels, drill logs, water tables and any pumping records and the entire "study" performed by Hanson (possibly Bates # 2938), as well as any study undertaken by or for Oldcastle.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to any data collected after July 13, 2003, from any monitoring wells installed at or near the Opelika quarry.

Interrogatory/Document Request Number 30.

Please produce all pumping records in your possession or subject to your control. This would include pumping or discharge records for the quarry from 1996 to the present, if available, together with all documents related to any calculations of storage capacity for water on the Gilmer property and the Young property. This would include all DMRs (Discharge Monitoring Reports) filed by Opelika Materials or Hanson or Oldcastle with ADEM, applications to ADEM, permits from ADEM and all documents to or from ADEM by Oldcastle, Hanson, Opelika Materials or their agents and/or engineers; warning letters, notices, violations, notice of potential violations or similar documents to or from ADEM. Note that this request includes, but is not

2062

limited to documents and information relating to how your internal pumping discharge records were calculated, including the actual calculations themselves.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to pumping and discharge by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in the Request that relate to its pumping of water from Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 31.

Please produce all documents in your possession or subject to your control relating to any payments to Dr. Robert Cook for any reason since 1996.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle has made no payments to Dr. Robert Cook for any reason since 1996.

Interrogatory/Document Request Number 32.

2003

Please produce all documents given to or received from Dr. Robert Cook or Mr. Patterson including, without limitation, (a) the 1999 Exploration and Evaluation of Aggregate Reserves, Opelika Project and (b) the 2000 Exploration and Evaluation of Aggregate Reserves, Opelika-Young Project.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory/Document Request Number 33.

Please produce all documents related to the dewatering or potential dewatering of the areas in and around the Lee County quarry. This would include, without limitation, the first notice to Oldcastle that the Lee County Quarry operation was dewatering or was alleged to be dewatering the surrounding area, the zone of influence of such dewatering, steps taken to identify the zone of influence, and steps taken to minimize or correct the alleged problems or damage.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for the production of expert opinions, and is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks

2084

information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request that are related to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 34.

Describe in detail whether Oldcastle believes that its continued pumping of water from the quarry pit will continue dewatering the properties around the Lee County quarry. If your contention is that there is no dewatering effect, please describe in detail all bases for such contentions.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 35.

Please produce all documents relating in any way to the size, scope, duration, or effect of a "cone of depression" or "zone of influence" of the dewatering caused by pumping water from the quarry pit to outfall 1.

27

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that the terms "cone of depression," "zone of influence" and "outfall 1" are not defined, and the Request is therefore vague and ambiguous. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any "cone of depression" or "zone of influence" – however those terms may be defined –caused by pumping water from the quarry pit by Oldcastle after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 36.

Please produce all documents relating to the size and depth of the quarry, including the surface area of the quarry at any time on or before the date of acquisition of the quarry in July of 2003.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to the size and depth of the quarry as of July 13, 2003 and thereafter.

Interrogatory/Document Request Number 37.

Please produce any and all mining plans of any type or description relating to the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

There are no mining plans relating to the Opelika quarry in Oldcastle's possession, custody or control.

Interrogatory/Document Request Number 38.

Please produce all documents regarding any well inventory or spring inventory including related documents showing interviews with homeowners, depths of wells, location of wells and springs and whether the wells or springs were dry or had water.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 39.

Please produce all documents reflecting Oldcastle's knowledge of the dewatering at Spring Villa and the Little Uchee Creek (whether or not you contend such dewatering was caused by or in part by Hanson and/or Oldcastle). This would include, but is not to be limited to, all correspondence, investigations, inspections and documents to or from government agencies regarding dewatering of Spring Villa and/or the Little Uchee Creek areas.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that any dewatering at Spring Villa and the Little Uchee Creek has occurred. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged dewatering at Spring Villa and the Little Uchee Creek caused or contributed to by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003, is causing any dewatering at Spring Villa and the Little Uchee Creek. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

30

Interrogatory/Document Request Number 40.

Please produce all documents regarding any sinkholes in and around the Lee County quarry, including, without limitation, all documents regarding Oldcastle's first knowledge of sinkholes, steps taken to identify the problem or potential problem, and any steps to be taken, already taken, or planned to be taken to minimize sinkhole information in the future.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged formation of sinkholes caused or contributed to by Oldcastle's operations at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003 is causing any sinkholes in and around the Opelika quarry. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 41.

Please produce all documents regarding any pre-blast inspections done for Oldcastle.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 42.

Please produce all documents and information relating to Oldcastle's first notice that blasting had caused, or was causing, or was allegedly causing damage to any property owner in the area, including all steps taken to identify any problem or alleged problem and any steps taken to minimize or correct any such alleged problems or damage.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged damage caused by blasting by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning whether its blasting at the Opelika quarry after July 13, 2003, has caused, or was causing, or was allegedly causing damage to any property owner in the area, as well as any response Oldcastle made to such complaints.

Interrogatory/Document Request Number 43.

Please produce all aerial photos of the quarry from 1996 to the present.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 44.

Please produce all documents regarding other regulatory filings or information not specifically requested above.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further objects to this Request on the ground that the term "other regulatory filings or information" is not defined and the Request does not otherwise describe the document or documents requested with sufficient particularity to allow Oldcastle to determine which document or documents are being requested.  The Request is therefore vague and ambiguous.  Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory/Document Request Number 45.

Please produce all documents exchanged with Dyno Nobel or any other blasting company relating to the Opelika/Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 46.

Please produce all business licenses or permits of any type and description obtained or required by any governmental agency.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.  Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all business licenses and permits concerning its operations at the Opelika quarry that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

Interrogatory/Document Request Number 47.

Please produce all OSHA and/or MSHA inspections or other documents exchanged by and between Oldcastle and OSHA and/or MSHA.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further objects to this Request on the grounds that insofar as the allegations set forth in the Fourth Amended and Restated Complaint do not pertain to worker health and safety issues, the Request

34

is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all OSHA and/or MSHA inspections and other documents exchanged by and between Oldcastle and OSHA and/or MSHA that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

Interrogatory/Document Request Number 48.

Please produce all personnel files on all of Oldcastle's Lee County quarry foremen and Plant Managers.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that producing the personnel files of its employees would violate the right of privacy of its employees as protected by the United States Constitution and the Constitution of the State of Alabama.

Interrogatory/Document Request Number 49.

Please produce all documents relating to the hours worked by any and every Oldcastle employee of the Lee County Quarry from the moment Oldcastle assumed control of the quarry operation.

<u>Response:</u>

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

PHILLIP E. ADAMS, JR.  (ADA025)
Attorney for Defendant
P.O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

2074

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 6ᵗʰ day of November, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P.O. Box 409
Opelika, Alabama 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P.O. Box 2345
Opelika, Alabama 36803-2345

James A. Bryan, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

37

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
RAY VAUGHAN, Of COUNSEL
THERESE FORD, Of COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

November 12, 2003

Phillip E. Adams, Jr.                    **Via E-mail & Fax**
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

RE:  *Hanson Quarry*

Dear Phil:

I am e-mailing to you responses to interrogatories and requests for production on behalf of Opelika and Beauregard, and Bobby, Wanda, and Ambur Parker. These are representative of the answers of the remaining Plaintiffs, although each individual Plaintiff will have some few differences. Logistically, we are having all of these people come to Jim Sprayberry's office to sign their responses, but it may take a little while to get them all signed.

We have also called a few times and left messages for you regarding how to copy our documents for you. Our responses to your requests for production are basically the same documents we have already produced to Hanson, together with all deposition exhibits. This is a lot of documents. I left a message that I could have the Copy Center in Montgomery copy all of this information for you and deliver it to you, at your expense. If you would like to do that, let me know. If you want two copies, it would best to make them both now. I cannot let our originals out of our possession, though.

Also, I was disappointed in your answers to our interrogatories and requests. It appears Oldcastle is going to play games by not giving any information even though it is clearly discoverable. By subsequent letter, I will be asking for better responses prior to filing a motion to compel. We want to take the Plant Manager's deposition on November 20, as scheduled, even if we do not get good answers from Oldcastle. Right now, we want to take the corporate representatives' depositions on December 9-10, as scheduled, although we may have to postpone those if Oldcastle persists in refusing to give us discoverable information and documents. Please confirm that these depositions are scheduled and the place thereof.

Nov 12 03 10:52p    Charles E. Vercelli, Jr.    334-334-8807    p.3

Phillip E. Adams, Jr.
November 12, 2003
Page 2

Thank you.

Sincerely,

*Chuy Vercell*

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry (via E-mail & Fax)
       James A. Byram, Jr. (via E-mail & Fax)
       John V. Denson (via E-mail & Fax)
       Guy F. Gunter, III (via Fax only)
       H. Wayne Phears (via E-mail & Fax)
       Jack Weiss (via E-mail & Fax)
155-00\Adams2.1.wpd

NOV-13-2003 THU 05:38 PM ADA  UMBACH          FAX NO. 334 7  3238          P. 02/03

# ADAMS, UMBACH, DAVIDSON & WHITE, LLP

*Law Offices and Mediation Center*
205 South 9th Street
Opelika, Alabama 36801

Phillip E. Adams, Jr.
Arnold W. Umbach, Jr.
Patrick C. Davidson
Matthew W. White

Jacob A. Walker, Jr., Ret.

Email: padams@audwlaw.com
Direct Fax: (334) 749-3238

Mailing Address:
P.O. Box 2069
Opelika, AL 36803-2069

Tel. (334) 745-6466
Fax (334) 749-3238

November 13, 2003

VIA FACSIMILE

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry St.
Montgomery, AL 36104-5049

RE:   *Letter dated November 12, 2003 - Davis, et al. vs. Hanson Aggregates, et al.*

Dear Chip:

This will acknowledge receipt of your letter dated November 12, 2003. I had called Jimmy Sprayberry and talked with him on November 11, 2003, regarding my concerns for the depositions since Jack Weiss and I had not heard from you in several weeks to finally conclude our discussions regarding the deposition schedule.

I have also requested that Jimmy furnish to me all of the documents we have requested during the course of our discovery. I am concerned that if we rely on obtaining copies you furnished to some other party before we were brought into the lawsuit that something might be lost. I would like for you to respond to our discovery requests. We will, of course, be happy to pay for duplicate photocopies as is the custom in my experience. If you want to respond to our discovery request and have copies made in Montgomery and delivered to me that, of course, will be fine. I would like to have two copies and I would want to make sure that if the original documents are color that the copies produced are made in color.

I am somewhat puzzled by your statement regarding the answers we made to the interrogatories and request for production. It is my considered opinion that these responses are most legitimate given the fact that the complaint in this case does not state a claim against Oldcastle for which relief can be granted. We will be happy to

Case 2:06-cv-00828-MEF-TFM     Document 36-2     Filed 09/07/2007     Page 72 of 150

2075

Page Two
November 13, 2003

make better responses as soon as an amended complaint is filed which sets forth with
some specificity the act or acts committed by Oldcastle which justify the complaint you
filed in August of this year.

I am informed that the plant manager will not be available on November 20 as we had
earlier discussed. The reason he is not available is that it is my understanding that you
never responded to Jack Weiss' letter to conclude our negotiations so that his
deposition could be scheduled. We would like to have the court rule on our Motion to
Dismiss prior to any depositions being scheduled.

Please let me know when you have made the copies of the documents we have
requested in our discovery. I will be happy to pay you for these as soon as I am
notified.

I will also be happy to discuss with you and Jimmy our position in further detail if you
believe it would be beneficial.

Yours very truly,

PHILLIP E. ADAMS, JR.

rr
cc:     Attorneys of Record

LEXSEE 397 So. 2d 98

**Ex parte Dorsey Trailers, Inc., a Corporation (Re: Pearl Mincey, etc. v. Dorsey Trailers, Inc., a Corporation, et al.)**

No. 80-196

Supreme Court of Alabama

*397 So. 2d 98; 1981 Ala. LEXIS 3381*

April 9, 1981

**PRIOR HISTORY:**
[**1]

PETITION FOR WRIT OF MANDAMUS.

**DISPOSITION:**
    WRIT GRANTED CONDITIONALLY.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner corporation challenged a decision from the Circuit Court of Coffee County (Alabama), which denied its motions for a continuance and to compel an administratrix in an underlying wrongful death action to answer interrogatories. The corporation sought an original writ of mandamus against respondent circuit judge to compel the administratrix's answers and to continue the underlying action until the interrogatories were answered.

**OVERVIEW:** The administratrix filed a wrongful death action against the corporation. The corporation served the administratrix with interrogatories. The administratrix's answers were nonresponsive, evasive, incomplete, and inadequate. The corporation filed a second motion to compel. Without a hearing, the circuit judge denied the motion because he felt that the corporation knew most of the facts better than the administratrix and that the depositions on file answered most of the interrogatories. The corporation sought a writ of mandamus to require the circuit judge to compel the administratrix to properly answer and to continue the case. The court conditionally granted the writ. The court held that the circuit judge abused his discretion when he failed to grant the motion to compel, and he set the case for trial. The scope of discovery was broad under Ala. R. Civ. P. 26. The administratrix was required to answer or properly object to the interrogatories under Ala. R. Civ.

P. 33. The administratrix was not permitted to withhold answers because she thought they were not useful or beneficial, because her attorney had the information, or because the corporation already possessed the information.

**OUTCOME:** The court conditionally granted the writ of mandamus. If the circuit judge refused to grant the corporation's motion to compel answers and failed to order a continuance in the underlying action, then the writ would have issued upon the corporation's request.

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Civil Procedure > Discovery Methods > Interrogatories*
[HN1] Ala. R. Civ. P. 33(a) requires the reason for objection to interrogatories to be stated and that the attorney sign the objection being made by him.

*Civil Procedure > Disclosure & Discovery > Protective Orders*
*Civil Procedure > Remedies > Extraordinary Writs*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN2] Mandamus is a proper means of review to determine whether a trial judge abused his discretion in limiting a party's right to discovery. The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief. The writ will not issue where the right in question is doubtful. The Alabama Rules of Civil Procedure permit very broad discovery and the rules must be broadly and liberally construed. However, Ala. R. Civ. P. 26(c) recognizes that the right of discovery is not unlimited and gives the court broad power to control the use of the process and to prevent its abuse by any party. The rule does not allow

an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. For this reason, mandamus will issue to compel discovery only in those cases where a clear abuse of discretion is shown.

*Governments > Courts > Rule Application & Interpretation*
[HN3] Cases construing the Federal Rules of Civil Procedure are authority for construction of the Alabama Rules of Civil Procedure.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN4] The scope of discovery which may be had by interrogatories propounded pursuant to Ala. R. Civ. P. 33 is determined, as is the scope of other available forms of discovery, according to Ala. R. Civ. P. 26. Ala. R. Civ. P. 26(b)(1), in part, states that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. The rule makes it plain that discovery is not limited to matters competent as evidence at trial.

*Civil Procedure > Disclosure & Discovery > Relevance*
[HN5] "Relevancy," as used in the discovery rules, means relevant to the subject matter of the action and a reasonable possibility that the information sought will lead to other evidence that will be admissible.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Disclosure & Discovery > Discovery Methods > Interrogatories*
[HN6] It is not the prerogative of a party answering interrogatories to refuse to answer because of his opinion regarding the usefulness of the information sought or its relative benefit or harm to the parties involved. A defendant is entitled to the factual basis of the plaintiff's claim and all facts going to prove or disprove the defendant's defense.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN7] Under Ala. R. Civ. P. 33, a party must give full and complete answers to interrogatories served on him by another party. While a party may not have a duty to

search out new information, it is undisputed that a party has a duty to provide all information available to him. Information which is controlled by a party is available to him. If the answering party in good faith believes certain interrogatories ask for information beyond the permissible scope set out in Ala. R. Civ. P. 26, it is incumbent upon him to properly object under Ala. R. Civ. P. 33. Ala. R. Civ. P. 33(a), in part, states that each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
*Civil Procedure > Discovery Methods > Expert Witness Discovery*
[HN8] Objections to interrogatories must be specific and supported by a detailed explanation of why the interrogatories are improper. General objections may result in waiver of the objections. Available information which an answering party is under a duty to disclose also includes facts discovered and opinions held by his own expert witnesses.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
[HN9] A party has an obligation to reveal information held by his attorney.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN10] A party cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN11] Ala. R. Civ. P. 33(b), in part, states that an interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Discovery Methods > Interrogatories*
*Torts > Negligence > Negligence Generally*
[HN12] Interrogatories seeking opinions or contentions as to the acts or omissions constituting the basis of a claim of negligence are, by nature, questions of mixed

law and fact and are, therefore, proper. Interrogatories are an appropriate means for obtaining a specification of the facts upon which a claim of negligence is founded. Opinions and conclusions are inherent in any specification of the factual basis of a claim of negligence. The allegation of negligence itself is the statement of a conclusion, and because negligence may be pleaded broadly, a statement of the facts upon which the conclusion is based can hardly be forbidden as the expression of a conclusion.

*Civil Procedure > Disclosure & Discovery > Undue Burden*
*Civil Procedure > Discovery Methods > Oral Depositions*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN13] A party may not object to interrogatories merely on the ground that the questions contained therein were answered by deposition. The various methods of discovery are cumulative and complementary rather than alternative or exclusive. A party may both take depositions and propound written interrogatories, as long as he is not trying to circumvent a ruling by a trial court, or to harass or oppress the adverse party. The burden is on the adverse party to show that a hardship or injustice will be caused by the use of successive methods of discovery.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN14] Ala. R. Civ. P. 26(b)(1) permits a party to discover the identity and location of persons having knowledge of any discoverable matter, and the answering party is required under Ala. R. Civ. P. 26(e) to supplement his response to interrogatories seeking this information.

*Civil Procedure > Disclosure & Discovery > Relevance*
[HN15] A claim by an opposing party that much of the information sought by a party is in that party's possession has no bearing upon an otherwise appropriate discovery request.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Discovery Methods > Motions to Compel*
[HN16] The bounds of a circuit court's discretion to compel or deny discovery are broad.

**JUDGES:**

Embry, Justice. Torbert, C.J., Maddox, Faulkner, Jones, Almon, Shores, Beatty and Adams, JJ., concur.

**OPINIONBY:**

EMBRY

**OPINION:**

[*100] Dorsey Trailers, Inc., petitions this court for an original writ of mandamus requiring the Honorable Terry Butts, Judge of the Circuit Court of Coffee County, to compel Pearl Mincey, plaintiff below, to answer petitioner's interrogatories and to stay further proceedings in the action for damages below until plaintiff supplies such answers.

This action arose when Bruce Mincey, deceased, was killed by the explosion of a steel drum which he was cutting with a circular saw. Plaintiff, Pearl Mincey, as administratrix of the estate of Bruce Mincey, deceased, filed suit against petitioner for wrongful death on 6 June 1980, seeking two million dollars in damages for the death of Bruce Mincey. Plaintiff's action was brought under the theory of the Alabama Extended Manufacturer's Liability Doctrine and that of negligence and wanton misconduct.

The issue to be resolved is whether the trial judge abused his discretion in denying, without an opportunity for hearing, petitioner's motion [**2] for continuance and motion to compel answers to interrogatories.

On 6 August 1980, petitioner served written interrogatories upon the plaintiff. On 19 October 1980, petitioner, having received no response to its interrogatories, filed a [*101] motion to compel plaintiff to answer them, noting in its motion that the answers were necessary in order for petitioner to adequately defend the action. Without ruling on the motion to compel, the trial court, on motion of plaintiff, set the case for pretrial hearing on 17 November 1980.

At the pretrial conference, petitioner requested respondent trial judge to compel plaintiff to answer its interrogatories. As set out in his pretrial order of 8 December 1980, respondent judge gave the plaintiff an additional 30 days within which to answer petitioner's interrogatories and set the trial for 5 January 1981.

Petitioner received plaintiff's answers to its interrogatories on 15 December 1980. On the following day petitioner filed a second motion to compel plaintiff to answer interrogatories, claiming that plaintiff's answers were not in compliance with the Alabama Rules of Civil Procedure: being nonresponsive, evasive, incomplete and [**3] inadequate to allow petitioner to properly prepare its defense; and, as such, should be treated as a failure to answer under Rule 37(a)(3), ARCP. Contemporaneously, petitioner requested a hearing on its second motion to compel.

After attempting without success to contact

respondent judge in order to get a hearing on its second motion to compel, petitioner, on 17 December 1980, filed a motion for continuance of the case until such time as plaintiff properly responded to its discovery requests. Petitioner also requested a hearing of this motion.

Without providing petitioner an opportunity to be heard on its motions, respondent judge, on 23 December 1980, issued an order summarily denying both the motion for continuance and the motion to compel, and ordered the case tried at the January 1981 term of court (week of 5 January 1981). As a result of the denial of its motions, petitioner, on 29 December 1980, filed this petition for an original writ of mandamus, asking this court to require the trial judge to compel plaintiff to properly respond to petitioner's interrogatories, to further order the trial judge to continue this case from 5 January 1981 and to file an answer to the petition [**4] for mandamus. This court, on 30 December 1980, entered its order staying all proceedings in the action in the circuit court pending disposition of the petition for writ of mandamus in this court. Answer and brief of respondents were ordered filed as well as reply of petitioner thereto.

The interrogatories propounded to plaintiff by petitioner sought information concerning, *inter alia*, the facts and circumstances upon which plaintiff based her claims that petitioner was responsible for the death of Bruce Mincey, the locations and identities of all persons upon whom plaintiff relied in reaching her conclusions, and the identities of all persons expected to testify in the action, together with the substance of their expected testimony. Petitioner also inquired of plaintiff the location and identity of any expert witness expected to testify, the subject matter about which each expert was expected to testify, the substance of the facts and opinions of which each expert was expected to testify and a summary of the grounds of the opinion of each expert. In addition, petitioner requested the medical history of the decedent, including any physical or mental impairments, and his educational [**5] background and work history.

In answer to this petition, respondent trial judge, Honorable Terry Butts, asserts that he was familiar with the facts surrounding the case prior to the pretrial hearing on 17 November 1980. Based on this knowledge, he felt that most of the facts in the case were better known by petitioner than by plaintiff and that depositions on file appeared to answer most of the interrogatories. Respondent judge, therefore, opined that petitioner had all necessary and proper information and was merely trying to delay going to trial.

Respondent judge also maintains that the procedure in his court has always been that the party desiring

further answers to its interrogatories specify the ones which need to be answered or answered further. He notes that petitioner's second motion to compel failed to state which of the answers [*102] were considered evasive or incomplete and failed to take issue regarding those to which plaintiff had objected as improper.

Plaintiff's brief echoes respondent judge's contentions that the contents of oral depositions had already answered the questions posed by petitioner's interrogatories and that petitioner held the most knowledge [**6] of the pertinent facts, stating: "We cannot conceive of any facts that we could have that may be material that defendant does not already know." Plaintiff also argues that certain interrogatories call for facts and opinions unknown to plaintiff, but known and held by her attorney, and are improper attempts to discover the theories of her counsel. Furthermore, plaintiff states she did not answer certain interrogatories because she failed to see how the answers would be admissible or lead to admissible evidence, or how the information sought by these interrogatories would help petitioner or harm plaintiff. Finally, the interrogatories requesting names and addresses of all witnesses expected to testify are objected to as improper, and plaintiff maintains the trial court has never required such information to be supplied in response to a discovery request.

Replying to the arguments of respondent judge and plaintiff, petitioner contends it is entitled to the factual basis of plaintiff's claims and all facts going to prove or disprove petitioner's defenses. The discovery material, petitioner maintains, is not limited to admissible evidence, but extends to all matters which are relevant [**7] and reasonably calculated to lead to the discovery of admissible evidence. The fact that certain interrogatories are directed toward factual areas already covered by depositions is not a valid ground for objection, according to petitioner, which asserts that the various forms of discovery were meant to be cumulative and complementary, not mutually exclusive. Petitioner further argues that those interrogatories seeking contentions of plaintiff's attorney and names of all witnesses whom plaintiff expects to testify at trial are permissible.

Further, petitioner takes the position that those interrogatories considered improper by plaintiff were not properly objected to by her pursuant to [HN1] Rule 33(a), ARCP, which requires the reason for objection to be stated and that the attorney sign the objection being made by him. Petitioner argues that it is obvious from a reading of its interrogatories and plaintiff's answers thereto that the answers are evasive, incomplete, improperly objected to, and contrary to the letter and spirit of the Alabama Rules of Civil Procedure.

consequently the defective answers should have been treated as a failure to answer under Rule 37, ARCP. Combining these [**8] considerations with the fact that respondent trial judge denied petitioner's motions without a hearing based on his belief petitioner had all necessary information, petitioner asserts that the actions of respondent judge constituted a clear abuse of discretion.

*Ordinarily, we would not review rulings regarding discovery proceedings in the trial courts.* However, in this case there are basic questions to be answered, arising from the latest amendments to ARCP regarding discovery, that have not heretofore been addressed by this court.

[HN2] Mandamus is a proper means of review to determine whether a trial judge abused his discretion in limiting a party's right to discovery. *Assured Investors Life Insurance Co. v. National Union Associates, Inc., 362 So. 2d 228 (Ala. 1978).* The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief. The writ will not issue where the right in question is doubtful. *Lassiter v. Werneth, 275 Ala. 555, 156 So. 2d 647 (1963).*

As [**9] the court stated in *Campbell v. Regal Typewriter Co., Inc., 341 So. 2d 120 (Ala. 1976):*

The Alabama Rules of Civil Procedure permit very broad discovery and the rules must be broadly and liberally construed. *Cole v. Cole Tomato Sales, Inc., 293 Ala. 731, [*103] 310 So. 2d 210 (1975).* However, Rule 26(c) recognizes that the right of discovery is not unlimited and gives the court broad power to control the use of the process and to prevent its abuse by any party. The rule does not allow an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. ...

For this reason, mandamus will issue to compel discovery only in those cases where a clear abuse of discretion is shown. *Ex parte Alabama Power Co., 280 Ala. 586, 196 So. 2d 702 (1967).*

In order to determine whether such a clear abuse of discretion is present in this case, we must examine the interrogatories in light of the purpose and language of the rules of discovery in the Alabama Rules of Civil Procedure and the cases construing them. Looking to case law, we find an established rule that [HN3] cases construing the Federal Rules of Civil Procedure are authority [**10] for construction of the Alabama Rules of Civil Procedure. *Bracy v. Sippial Electric Co., Inc.,*

*379 So. 2d 582 (Ala. 1980); Alabama Power Co. v. White, 377 So. 2d 930 (Ala. 1979); State v. Horton, 373 So. 2d 1096 (Ala. 1979); Smith v. Wilcox County Board of Education, 365 So. 2d 659 (Ala. 1978); Assured Investors Life Insurance Co. v. National Union Associates, Inc., supra.*

"Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel." 23 Am. Jur. 2d, Depositions and Discovery, § 155 (1965). Stated otherwise, the rules seek to "make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter and Gamble* [**11] *Co., 356 U.S. 677, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958); Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947).*

It is the trial court's job to exercise its broad discretion in a manner that will implement this philosophy of full disclosure of relevant information and at the same time afford a party, or others, maximum protection against harmful side effects which would result from unnecessary disclosure. *Ex parte Guerdon Industries, Inc., 373 So. 2d 322 (Ala. 1979).*

[HN4] The scope of discovery which may be had by interrogatories propounded pursuant to Rule 33, ARCP, is determined, as is the scope of other available forms of discovery, according to Rule 26, ARCP.

Paragraph (b)(1) of Rule 26, in part, states:

*In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including ... the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible [**12] at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The rule makes it plain that discovery is not limited to matters competent as evidence at trial. [HN5] "Relevancy," as used in our discovery rules, means relevant to the subject matter of the action and a

reasonable possibility that the information sought will lead to other evidence that will be admissible. *Drewes v. Bank of Wadley, 350 So. 2d 402 (Ala. 1977);* 8 Wright and Miller, *Federal Practice and Procedure* § 2008 (1970).

Several of petitioner's interrogatories requested information on the physical, mental and medical history of the deceased, including such pertinent matters as visual impairment. Petitioner contends this information, [*104] in conjunction with questions about the deceased's educational background and work history, is relevant to the ability of the deceased to perceive and appreciate the danger of his task and to read and understand any warning labels which may have been on the drum. Plaintiff's response to these interrogatories was "not answered on advice of counsel," which response plaintiff's brief explains by saying: [**13]

These were not answered on advice of counsel because counsel fails to see how they have anything to do with the case or how they could lead to anything that might have anything to do with this case, and counsel for the plaintiff does not know the answer ... I do not see how any of the information sought by these or any other would help the plaintiff [defendant?] or harm the defendant [plaintiff?].

Given the purpose and broad scope of discovery, discussed *supra*, petitioner was clearly entitled to the information concerning the physical, mental and medical background of the deceased. [HN6] It is not the prerogative of a party answering interrogatories to refuse to answer because of his opinion regarding the usefulness of the information sought or its relative benefit or harm to the parties involved.

A defendant is entitled to the factual basis of the plaintiff's claim and all facts going to prove or disprove defendant's defense. 4 Moore's *Federal Practice*, para. 26.57. The contention that counsel for plaintiff does not know the facts surrounding the background of the deceased is hardly justification for failure of the plaintiff, mother of the deceased, to answer [**14] interrogatories addressed to her.

[HN7] Under Rule 33, a party must give full and complete answers to interrogatories served on him by another party. While a party may not have a duty to search out new information, it is undisputed that a party has a duty to provide all information available to him. *Hickman v. Taylor, supra;* 8 Wright & Miller, Federal Practice and Procedure, § 2172 (1970). Information which is *controlled* by a party is available to him. *Trane Co. v. Klutznick, 87 F.R.D. 473 (W.D. Wis. 1980).*

If the answering party in good faith believes certain interrogatories ask for information beyond the permissible scope set out in Rule 26, ARCP, it is incumbent upon him to properly object under Rule 33, ARCP.

Rule 33(a), in part, states:

Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them. ...

[HN8] Objections to interrogatories must be specific and supported by a detailed explanation of why the interrogatories [**15] are improper. *In re Folding Carton Antitrust Litigation, 83 F.R.D. 260 (N.D. Ill. 1979); United States v. 58.16 Acres of Land, 66 F.R.D. 570 (E.D. Ill. 1975),* 8 Wright & Miller, Federal Practice and Procedure § 2172 (1970). General objections may result in waiver of the objections. *In re Folding Carton Antitrust Litigation, supra; White v. Beloginis, 53 F.R.D. 480 (S.D.N.Y. 1971).*

Available information which an answering party is under a duty to disclose also includes facts discovered and opinions held by his own expert witnesses. In response to petitioner's interrogatory asking if any examination of the drum head had been made and, if so, what tests or analyses had been performed, plaintiff replied as follows:

"Mr. Payne has examined it and what kind of test, if any, he made, I don't know."

Having identified Mr. Payne in an earlier answer as an expert witness whom she expected to call at trial, plaintiff was under an obligation to ascertain from him whether he had conducted any tests or analyses of the drum, and, if so, sufficient facts about the tests or analyses to enable plaintiff to properly respond to the interrogatory.

[*105]   It is also [**16] well-established that [HN9] a party has an obligation to reveal information held by his attorney. *Naismith v. Professional Golfers Association, 85 F.R.D. 552 (N.D. Georgia 1979); Pilling v. General Motors Corp., 45 F.R.D. 366 (D. Utah 1968); Maryland ex rel. Peters v. Baltimore & O.R. Co., 7 F.R.D. 666 (E.D. Pa. 1947); Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947).* In answer to

petitioner's interrogatory seeking plaintiff's contentions regarding the nature of the drum's defect, the relation of petitioner's conduct to the defect, and the failure of petitioner to remedy the defect, plaintiff stated:

"My attorney will have to answer this."

Plaintiff argues that this interrogatory called for information held solely by her attorney, of which she had no knowledge. Plaintiff's reply to this interrogatory was improper. [HN10] A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney. *Miller v. Doctor's General Hospital, 76 F.R.D. 136 (N.D. Okla. 1977);* 8 Wright & Miller, Federal Practice and Procedure, § § 2171 & 2177 (1970).

Plaintiff argues that these contention-seeking [**17] interrogatories are also objectionable on the ground they attempt to uncover the legal theories and conclusions of her attorney. Plaintiff extends this argument to several other interrogatories which ask for plaintiff's opinions as to the acts and omissions constituting the bases of her claims, to which plaintiff responded: "Not answered on advice of counsel."

By amendment in 1970, [HN11] paragraph (b) of Rule 33, ARCP, in part, now states:

An interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact. . .

Many older cases denied a party the right to obtain the opinions and contentions of other parties through interrogatories. However, the overwhelming majority of recent decisions have adopted the view of the amended rule and allowed interrogatories seeking opinions and contentions of fact, or of mixed law and fact, while generally refusing to permit interrogatories asking for purely legal conclusions. 8 Wright & Miller, Federal Practice and Procedure § 2167 (1970). The Advisory Committee Note to Rule 33 of the Federal Rules of Civil [**18] Procedure is informative on this point:

... Efforts to draw sharp lines between facts and opinions have invariably been unsuccessful, and the clear trend of the cases is to permit 'factual' opinions. As to requests for opinions or contentions that call for the application of law to fact, they can be most useful in narrowing and sharpening the issues, which is a major

purpose of discovery. ... On the other hand, under the new language interrogatories may not extend to issues of 'pure law,' i.e., legal issues unrelated to the facts of the case. ...

In keeping with this line of thought, the modern trend has recognized that [HN12] interrogatories seeking opinions or contentions as to the acts or omissions constituting the basis of a claim of negligence are, by nature, questions of mixed law and fact and are, therefore, proper. 8 Wright and Miller, Federal Practice and Procedure § 2167 (1970). Expressing this view in *Hartsfield v. Gulf Oil Corp., 29 F.R.D. 163 (D.C. Pa. 1962),* the federal district court said:

It is now settled that interrogatories are an appropriate means for obtaining a specification of the facts upon which a claim of negligence is founded. [**19] ... The objection that the interrogatories require the statement of conclusions or opinions is unjustified in the present circumstances. Opinions and conclusions are inherent in any specification of the factual basis of a claim of negligence. The allegation of negligence itself is the statement of a conclusion, and since negligence may be pleaded broadly, a statement of the facts upon which the conclusion is based can hardly be forbidden as the expression of a conclusion.

[*106] Petitioner's interrogatories seeking the contentions of plaintiff concerning the acts and omissions constituting negligence on the part of petitioner should have been answered. As to other contention-seeking interrogatories, such discovery should generally be allowed if the answers would be useful in narrowing the issues or serve some other substantial purpose related to an essential element of a claim, unless a pure conclusion of law is called for. At any rate, the manner in which plaintiff objected was improper under Rule 33, ARCP, as discussed *supra,* and was hardly a sufficient statement of the specific ground for objection to allow petitioner a fair opportunity to rebut those reasons [**20] and to permit respondent trial judge to make a proper and informed decision on whether discovery should be compelled.

As discussed, *supra,* Rule 26, ARCP, also allows a party to discover the identity and location of persons having knowledge of any discoverable matter. Petitioner posed interrogatories seeking from plaintiff the names and addresses of any persons who observed or were around the location of the explosion, whether any statements had been taken by plaintiff from such persons, and the substance of the information held by such persons. Plaintiff simply responded that these matters

had been covered by deposition. Plaintiff gave the same reply to various interrogatories seeking the details of the educational background and work history of her decedent, the actions of the deceased at the time of the explosion, and the facts upon which plaintiff relied in contending that petitioner was negligent in the sale of the drum.

[HN13] A party may not object to interrogatories merely on the ground that the questions contained therein were answered by deposition. The various methods of discovery were intended to be cumulative and complementary rather than alternative or exclusive. [**21] A party may both take depositions and propound written interrogatories, as long as he is not trying to circumvent a ruling by the trial court, or to harass or oppress the adverse party. The burden is on the adverse party to show that a hardship or injustice will be caused by the use of successive methods of discovery. *Taylor v. Atchison, T. & S. F. Ry. Co., 33 F.R.D. 283 (W.D. Mo. 1962); Stonybrook Tenants Association, Inc. v. Alpert, 29 F.R.D. 165 (D.C.D. Conn. 1961); Bullard v. Universal Millwork Corp., 26 F.R.D. 144 (E.D. N.Y. 1960).*

In addition to requesting facts about persons with knowledge of the incident, petitioner asked plaintiff to give the names of all persons she intended to call as witnesses at trial, which she refused to do. If the circumstances justify it, a judge may properly require this information to be revealed. However, we will not hold that a discovering party has the right to demand from the adverse party a list of all witnesses to be called at trial. The majority of jurisdictions in this country do not require such discovery, although there is considerable authority for the opposing view. 8 Wright & Miller, Federal Practice & Procedure, [**22] § 2013. [HN14] Subparagraph (b)(1) of Rule 26, ARCP, permits a party to discover the identity and location of persons having knowledge of any discoverable matter and the answering party is required under Rule 26(e) to supplement his response to interrogatories seeking this information. Since these provisions effectively allow a party to discover the identity and location of any potential witnesses to be called by the opposition party, denial of the right to require disclosure of the specific persons which the adverse party intends to call as witnesses at trial will not subject the discovering party to surprise at trial. However, it will prevent substantial burdens being placed upon parties who have not completed their trial preparations or strategy.

The final point to be examined is plaintiff's response that "defendant has the answer to this already," to the interrogatory of petitioner seeking information about warning labels on the drum, and respondent trial judge's assertion that one reason he did not grant the motion to compel answers to interrogatories was because he felt most of the facts were better known by petitioner. This was not a proper reason [*107] for plaintiff's [**23] refusal to answer or for respondent judge's denial of the motion to compel answers. [HN15] A claim that much of the information sought by a defendant is in defendant's possession, if true, has no bearing upon an otherwise appropriate discovery request. *Dykes v. Morris, 85 F.R.D. 373 (D.C. Ill. 1980).*

All told, 37 of the 50 interrogatories propounded by petitioner received responses from plaintiff that the matter had already been covered by the complaint or by deposition, that the question was not answered on advice of counsel, or simply stating the word "answered." A reading of the remaining 13 answers reveals that several are nonresponsive, incomplete or evasive. In addition, plaintiff did not object, in the manner required by Rule 33, ARCP, to any interrogatory which she did not answer.

Such a disregard of the principles of law governing discovery should not have been overlooked by respondent judge and cannot be overlooked by this court. To permit this case to proceed to trial without requiring further answers from plaintiff to petitioner's interrogatories would contravene the purpose of the rules of discovery and might cause petitioner to suffer grave injustice. [HN16] The bounds [**24] of the trial court's discretion to compel or deny discovery are broad. However, in this case those bounds have been overstepped.

If, upon the basis of this decision, respondent trial judge fails to grant petitioner's motion to compel answers to interrogatories and fails to order a continuance of the action for damages until such time as plaintiff complies, a writ to effectuate those actions will issue upon request of petitioner.

WRIT GRANTED CONDITIONALLY.

Torbert, C.J., and Maddox, Faulkner, Jones, Almon, Shores, Beatty and Adams, JJ., concur.

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE & DONNA DAVIS; MIKE & ANN BROADWATER;          )
MITTIE BROADWATER; CITY OF OPELIKA, a Municipal     )
Corporation; THE UTILITIES BOARD OF THE CITY OF     )
OPELIKA, a public corporation; BEAUREGARD WATER     )
AUTHORITY, a public corporation; ANTHONY & CAROL    )
CLARK; CAROL CLARK, as Mother and Next Friend of    )
COURTNEY CLARK; ELAINE EDWARDS; MARY SUE            )
EILAND; MEDENA FRIZZEL; MEDENA FRIZZEL, as          )
Mother and Next Friend of KARLA FRIZZELL and        )
BRIANNA YOUGREN; RONNIE & DOROTHY GRIGGS;           )
MIKE & STACEY HAGENS;  HOWARD & LISA HARMON;        )
LISA HARMON, as Mother and Next Friend of JUDSON &  )
BRIA HARMON; HAYWARD & NORA JACKSON; MIKE &         )
SHELIA LaMACCHIA; SHELIA LaMACCHIA, as Mother       )
and Next Friend of RUSSELL LaMACCHIA; STANLEY &     )
JACKIE LEDBETTER; TERRY & CAROL LONG; TIM &         )
ADA MANNING; DAVID & JANETTE BAGGETT; JAMES         )
& SHIRLEY PARKER; RANDALL & WANDA PARKER;           )
WANDA PARKER, as Mother and Next Friend of AMBUR    )
& BRANDON PARKER; JEFF & MARIA RICHARDSON;          )
MARIA RICHARDSON, as Mother and Next Friend of      )
NATASHA RICHARDSON; DAVID & AMANDA                  )
SUMNER; AMANDA SUMNER, as Mother and Next Friend    )
of TODD SUMNER; LARRY & RITA SUMNER; MARTHA         )
TREADWAY; MARTHA TREADWAY, as Guardian and Next     )
Friend of JASMIN, MICHAEL, HAZEL & JOSEPH KING;     )
BILLY &  SHERRY WALLACE; SHERRY WALLACE, as         )
Mother and Next Friend of AARON WALLACE;            )
MICHELE WILKES; SHIRLEY WILSON; BETTY J.            )
PFINGSTON; BETTY J. PFINGSTON, as Guardian and      )
Next Friend of JESSICA PFINGSTON;  WONDA BRIGHT;    )
DONNIE SMITH; DAVID & TANYA TANKERSLEY;             )
and KEN & NAOMI SCHWIEKER,                          )
                                                    )
                  Plaintiffs,                       )
                                                    )   Civil Action No.
vs.                                                 )
                                                    )   CV-20 02-85
HANSON AGGREGATES SOUTHEAST, INC.; LOUISE           )
YOUNG O'BRIEN; VIRGINIA YOUNG PRIEST; VIRGINIA      )
HART YOUNG; CLAUDE JOHN YOUNG; CHARLES W.           )
GILMER, SR.; ALICE C. GILMER; CHARLES W. GILMER,    )
JR.; KAMMY GILMER; BARBARA GILMER SMITH; GARY       )
SMITH; MATTHEW RUTTLEDGE GILMER; LELIA              )
WILDER GILMER; GILMER PROPERTIES, LTD.; and         )
OLDCASTLE MATERIALS SOUTHEAST, INC.,                )
                                                    )
                  Defendants.                       )

FILED

DEC 1 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## FIFTH AMENDED AND RESTATED COMPLAINT

120. The Plaintiffs re-allege Paragraphs 1-119 inclusive.

121. The actions by Oldcastle have caused, are causing and will cause a nuisance. This nuisance has damaged, is damaging and will damage the Plaintiffs, their property and/or their homes.

122. Oldcastle has continued the nuisance by blasting, noise, dust, dewatering the creek and diverting springs and creeks.

123. The dewatering has caused, is causing and will cause sink holes, dry springs, diverted streams, road failures and soil subsidence.

124. The noise and dust are worse now with Oldcastle.

125. Many Plaintiffs have complained about the noise and dust. Oldcastle is generating tons of visible, fugitive dust that collects on Plaintiff's property and in their homes. It is so severe it has aggravated pre-existing medical problems such as asthma.

126. The blasting has caused and is causing damage to the majority of the homes. No repairs should be done while the blasting continues.

127. Oldcastle has cleared a large area and exposed the topsoil to washing and blowing.

128. Oldcastle has expanded and is expanding both the quarry pit and the huge pile of dirt along the southern property line. This has increased dust and flooding. Heavy equipment operates late into the night and on the weekend; sometimes for Forty-eight (48) hours straight. Most Plaintiffs can hear this loud, irritating noise in their homes with all doors and windows shut. Many Plaintiffs work nights or rotating shifts. This loud noise makes it impossible for them to sleep.

Oldcastle purchased and operated the quarry knowing that it was a nuisance and that it was causing and will continue to cause damage. The actions have been and are negligent, willfull and intentional. Despite numerous complaints, Oldcastle has continued to cause these damages.

**Wherefore** Plaintiffs demand judgement against Defendant Oldcastle:(1) enjoining all of the Defendants, including Defendant Oldcastle, from operating this or any quarry on the Youngs' and Gilmer's lands, and for such other legal or equitable relief to which they are entitled; (2) for all

2085

compensatory damages to which they are entitled based upon Defendant Oldcastle's continuation of the nuisance and continued negligent and wanton operation of the quarry; (3) for such punitive damages as the jury deems appropriate to punish and deter Defendant Oldcastle and others similarly situated; and (4) for costs of this action, attorneys' fees, interest and such other further relief as the jury finds reasonable.

JAMES B. SPRAYBERRY (SPR008)

OF COUNSEL:
For All Plaintiffs:
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

For Plaintiffs City of Opelika and Water Works Board of the City of Opelika Only:
Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

2090

James A. Byram, Jr.                 John V. Denson
Dorman Walker                       Samford, Denson, Horsley, Pettey & Bridges
Matt Parnell                        P.O. Box 2345
Balch & Bingham, LLP                Opelika, AL 36803-2345
P.O. Box 78
Montgomery, AL 36101


H. Wayne Phears                     Phillip E. Adams, Jr.
Phears & Moldovan                   Adams, Umbach, Davidson & White, LLP
Suite 375                           P. O. Box 2069
4725 Peachtree Corner Circle        Opelika, AL 36803-2069
Norcross, GA 30092-3000

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this
the _____ day of _____ Dec _____, 2003.

_____
OF COUNSEL


## **ALL PLAINTIFFS DEMAND TRIAL BY JURY IN LEE COUNTY, ALABAMA**


155-00\5th-Amend-Complaint1.wpd

*Faxed copies to Phil Adams*
*334-749-2800*
*and Jack Weiss*
*212-351-5224*

*Dec 9, 2003*

Nov 12 03 10:55p    Charles E. Vercelli, Jr.    334-834-8807         p.15
Case 3:06-cv-00838-MEF-TFM    Document 36-2    Filed 09/07/2007    Page 85 of 150

2091

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *    CASE NUMBER: CV-02-85 |
| | * |
| HANSON AGGREGATES SOUTHEAST, | * |
| INC., et al. | * |
| Defendants. | * |

### ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY RANDALL, WANDA, and AMBUR PARKER

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.    (a)    Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the

operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

As noted, the dust is a lot worse than it was, and our house is filling with dust, and the mountain of dirt is worse. Moreover, the noise pollution from the quarry is

worse than ever, and we hear the noise inside our home even louder than ever. The blasting is worse, and the blasts are shaking our home more than before. A very large area has been clear cut with more heavy equipment operating from very early in the morning until late in the evening. Oldcastle continues to flood our pasture because of the dirt, and our farm on Little Uchee Creek has little or no flow in the creek due to the dewatering.

(b)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference. Additionally, the clear cut area is much larger than before, more equipment is now operating, the noise is the same or worse under Oldcastle, and the dust is the same or worse under Oldcastle. The trees have been cleared within a few feet of the property lines on the east side and on part of the South side of the property. There is now only a small buffer strip, if any, of trees around part of the Young property. We and many of the Plaintiffs can sit or stand in our own backyards and watch the equipment operate, whereas before it was much less visible. During the month of October, on many mornings, the equipment was cranking up at 5:00 - 5:30 a.m and ran well past dark. For example, on October 20, 2003, Oldcastle's equipment ran until approximately 9:00 p.m.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to when Hanson began blasting, our home had no damage. Since Hanson began blasting on such a regular basis, we have had cracks, cracked foundations and other problems caused by the repetitive blasts. As long as the blasting continues, we cannot have our home repaired as, more likely than not, the damage would return in just a short while. Since Oldcastle is blasting just as much as before, and will continue to blast, anyone with a little bit of common sense can tell that Oldcastle's operation is going to continue causing damage to us.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by

Page 3 of 7

Nov 12 03 10:57p    Charles E. Vercelli, Jr.    334-834-8807    p.18
Case 3:06-cv-00838-MEF-TFM    Document 36-2    Filed 09/07/2007    Page 88 of 150

2004

reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)    We are bothered by the continued, and worse, dust in the air, by dust deposited onto our property and into our homes, by aggravation of our existing medical problems such as asthma, by repetitive shaking and rocking of our house from the blasting, by continuous daily noise from the equipment, and by continuous heavy truck traffic in the area. Most of this is daily, but the blasting is generally once a week or once every two (2) weeks. Some of the damage is not permanent such as noise and dust and will stop when the quarry is put out of business. Some of these problems, like the blasting damage, is not repairable at this time, if the blasting continues. If the blasting stops, then we can repair our house and we believe the continuing damage will stop. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Also, our breathing problems are just as bad as ever, and we understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)    Yes.

(b)    Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

Also, our health problems continue because of Oldcastle's continued operation of the quarry. These health problems are irreparable, as it is impossible to compensate us for our bad health and inability to breath in our own home.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)    Yes

(b)    Since July 13, 2003, the dust has been the same or worse than when Hanson ran the quarry. This is partly due to the fact that Oldcastle has cleared a very large area and has it exposed with no vegetation and in part because Oldcastle has raised the spoil pile by 25-50 feet or more–none of which is vegetated.

(c)    The increased dust since Oldcastle took over has made Wanda's and Ambur's asthma worse and is causing more problems at night. Wanda's and Ambers' medicine has changed to a stronger medicine and stronger dosages. Wanda and Ambur feel even worse than when Hanson was operating the quarry – not surprisingly since the dust is much, much worse. We cannot give you specific dates, as the problems are almost daily–worse on some days than others, but almost always there are some medical problems aggravated by the dust. Moreover, when the wind is blowing in our direction, we cannot even go outside. Finally, you can see the dust clouds coming from the Quarry and you can feel and breath the grit in the air.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.    (a)    Yes.

(b)    Please see our answers above, which apply here too. The dust and noise is almost daily. Except on Saturday and Sunday, the noise and dust are almost a daily nuisance beginning early in the morning and continuing until late at night. Even then, the dust stays on and lingers until Oldcastle starts operating again the next day. Sometimes on Sunday the dust is not so bad, unless the wind is blowing our way. The blasting is not as often but it rattles our home, and has caused cracks and our foundation problems get worse. If this isn't a nuisance–"anything that works hurt, inconvenience or damage to another" (to quote the law)–then nothing is.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)    Yes.

(b)    It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.

(c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 9 day of Dec _____, 2003.

*Randall Parker*
RANDALL PARKER, individually and as Father and Next Friend of Ambur Parker

*Wanda Parker*
WANDA PARKER, individually and as Father and Next Friend of Ambur Parker

STATE OF ALABAMA    *
COUNTY OF LEE        *

BEFORE ME, a Notary Public in and for said State and County, came RANDALL PARKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 9th day of December, 2003.

*Sophia S. Benson*
Notary Public

(SEAL)

My Commission Expires: 4-11-06

Nov 12 03 10:58a    Charles E. Vercelli, Jr.    334-834-8807    p.21
Case 3:06-cv-00838-MEF-TFM    Document 36-2    Filed 09/07/2007    Page 91 of 150

2097

STATE OF ALABAMA          *
COUNTY OF LEE             *

BEFORE ME, a Notary Public in and for said State and County, came WANDA PARKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, she executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this ___9th___ day of ___December___, 2003.

_____
Notary Public

(SEAL)

My Commission Expires: ___4-11-06___

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _November_, 2003.

_____
OF COUNSEL

155-00\Ans Oldcastle Int.randall parker.5.wpd

Page 7 of 7

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D
DEC 11 2003   2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al.,

   Plaintiff,

v.

            CASE NUMBER: CV-02-85

HANSON AGGREGATES SOUTHEAST,
INC., et al.

   Defendants.

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To: Clerk of the Lee County Circuit Court
   Lee County Justice Center
   2311 Gateway Drive, Room 104
   Opelika, Alabama 36801.

   Please take notice that the Answers to Oldcastles' First Set of Interrogatories By Randall, Wanda and Ambur Parker were served on December 10, 2003.

OF COUNSEL:

**CHARLES VERCELLI, JR.,** (VER004)
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

2059

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the _____ day of December, 2003.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**F I L E D**

DEC 11 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )     Civil Action No. CV-02-0085 |
| | ) |
| HANSON AGGREGATES SOUTHEAST, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

1.    Plaintiffs' Third Interrogatories and Requests for Production to Defendant Oldcastle.

_C E Vercelli_

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _____Dec_____, 2003.

_____
OF COUNSEL

155-00\Not-Serv-Disc 2.wpd

2

2102

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                           )
                                              )
                    Plaintiffs,               )
                                              )
vs.                                           )      Civil Action No. CV-02-0085
                                              )
HANSON AGGREGATES SOUTHEAST,                  )
INC., et al.,                                 )
                                              )
                    Defendants.               )

F I L E D

DEC 1 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### <u>NOTICE OF SERVING DISCOVERY</u>

Plaintiffs give notice of the filing of the following discovery in this case:

1.    Plaintiffs' Second Interrogatories and Requests for Production to Defendant

Oldcastle.

_C E Vucelly_

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2103

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                    John V. Denson
Matt Parnell                          Samford, Denson, Horsley, Pettey
Balch & Bingham, LLP                    & Bridges
P.O. Box 78                           P.O. Box 2345
Montgomery, AL 36101                  Opelika, AL 36803-2345

H. Wayne Phears                       Phillip E. Adams, Jr.
Phears & Moldovan                     Adams, Umbach, Davidson & White, LLP
Suite 375                             P. O. Box 2069
4725 Peachtree Corner Circle          Opelika, AL 36803-2069
Norcross, GA 30092-3000

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ⟨11th⟩ day of _⟨Dec⟩_, 2003.

_____
OF COUNSEL

155-00\Not-Serv-Disc.1.wpd

2

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2104

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Civil Action No. CV-02-0085 |
| | ) |
| HANSON AGGREGATES SOUTHEAST, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

FILED

DEC 1 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### PLAINTIFFS' MOTION TO SHORTEN TIME TO OBJECT and TO SCHEDULE HEARING ON MOTIONS

Plaintiffs move this Honorable Court to shorten the time in which Defendant Oldcastle may object to Plaintiffs' Second Interrogatories and Requests for Production, and to schedule a hearing date on or around January 5, 2004. As grounds for this Motion, Plaintiffs say:

1.      Plaintiffs filed an Amended Complaint against Oldcastle on August 1, 2003.

2.      At the same time, Plaintiffs issued a deposition notice for Oldcastle's Corporate Representative.

3.      Mr. Adams appeared for Oldcastle on August 15, 2003. At the same time Oldcastle filed a Motion to Continue and for an Alternate Trial Plan.

4.      Plaintiffs issued First Interrogatories and Requests for Production to Oldcastle on September 30, 2003.

5.      By agreement of the parties, the Plaintiffs willingly allowed Defendant Oldcastle to respond to Plaintiffs' First Interrogatories and Requests for Production and to produce the documents therewith on November 10, 2003.

6.    Defendant Oldcastle responded to Plaintiffs' First Interrogatories and Requests for Production on November 6, 2003, essentially objecting to everything and giving to Plaintiffs absolutely no useful information whatsoever. This clearly violated the spirit of Plaintiffs' cooperation, as Plaintiffs were led to believe that Oldcastle would actually produce some documents. None were produced and everything was objected to.

7.    On October 7, 2003, nearly two months after Oldcastle's attorney made an appearance and Moved to Continue the Trial (which was granted), Plaintiffs issued Deposition notices for Oldcastles' Corporate Representative (set for October 22, 2003) and Plant Manager (set for November 5, 2003).

8.    The parties' attorneys thereafter agreed to take the depositions of Oldcastle's Corporate Representatives on either December 3-4 or 9-10, 2003 (later confirmed to be the 9th-10th by Oldcastle), and the Plant Manager for November 20, 2003.    Oldcastle unilaterally cancelled these depositions.

9.    The Court has now allowed Defendant Oldcastle 30 days in which to answer Plaintiffs' Fifth Amended Complaint, which was served upon Defendant Oldcastle on the late afternoon of December 9, 2003. The Court also ordered that Defendant Oldcastle must produce its Corporate Representatives for depositions within 45 days of December 9, 2003. The Court also allowed Defendant Oldcastle 30 days to answer Plaintiffs' discovery requests.

10.    Plaintiffs filed Second Interrogatories and Requests for Production that are identical to, in every respect, the First Interrogatories and Requests for Production. These

2

were served upon Defendant Oldcastle on December 9, 2003, by fax, in the early evening and are being mailed to Defendant Oldcastle and all other attorneys of record on December 11, 2003. Therefore, Oldcastle will have had these interrogatories and requests in their possession for over 3 months when January 9, 2004, arrives.

11.    Oldcastle filed objections to every single one of Plaintiffs' First Interrogatories and Requests for Production. As explained in Plaintiffs' Motion to Compel responses, there is no legitimate basis for refusing the information requests. Because the Second Interrogatories are identical to the First, there is no doubt that Oldcastle will file objections to the Plaintiffs' Second Interrogatories and Requests, and will wait until January 9, 2004, to do so. Plaintiffs will then be forced to send a letter to Oldcastle to resolve the discovery dispute, wait for a response, and ultimately file another Motion to Compel. That process will take, at a minimum, 7 days. Therefore, if, as is substantially certain, Oldcastle refuses to respond fully, Plaintiffs' next Motion to Compel responses will not be heard by the Court until well after the 45 days in which Oldcastle has been ordered to produce their Corporate Representatives and Plant Manager for depositions.

12.    Given that (1) Defendant Oldcastle has had the First Interrogatories and Requests for Production (which are identical to the Second Interrogatories and Requests for Production), since September 30, 2003, about 2 ½ months already, (2) Defendant Oldcastle already knows exactly what the Plaintiffs are complaining about due to the fact that they had to conduct due diligence before purchasing the quarry, (3) Oldcastle alreadys knew all about the lawsuit before purchasing the quarry (it has a joint defense agreement

3

with Hanson), and (4) it would be entirely unfair and inequitable to the Plaintiffs to allow Defendant Oldcastle, by using the maximum time allowed by law to file objections, to thereafter defeat Plaintiffs' legitimate discovery attempts, the most fair and equitable thing for this Court to do is shorten the time in which Oldcastle may object and to set a date for a hearing on discovery disputes for a date sufficiently in advance of the corporate representative depositions that Plaintiffs will actually receive a meaningful amount of discovery from Oldcastle by the time those depositions are taken.

14.    It will not prejudice Defendant Oldcastle to file any objections within 15 days of today's date, as Oldcastle[1] has already had these same interrogatories and requests for over two months.

WHEREFORE, for good cause shown, Plaintiffs move this Honorable Court to enter an order requiring Defendant Oldcastle to file any objections to Plaintiffs' Second Interrogatories and Requests for Production within 15 days of today's date (by December 26) so that the Plaintiffs will have sufficient time to file a Second Motion to Compel, and so that the Court will be able to have a hearing before the date due for depositions of the Corporate Representatives.  Plaintiffs also move the Court to set a discovery dispute hearing on or around January 5, 2004.

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

---

[1]

Please note that the undersigned will be in a capital murder trial in Montgomery during the week of January 12-16.

4

2105

**OF COUNSEL:**

Charles E. Vercelli, Jr.                    Guy F. Gunter, III
VERCELLI & ASSOCIATES, P.C.                 MELTON, GUNTER & MELTON
1019 S. Perry Street                        P.O. Box 409
Montgomery, AL 36104-5049                   Opelika, AL 36803-0409
(334) 834-8805                              (334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                 John V. Denson
Matt Parnell                        Samford, Denson, Horsley, Pettey
Balch & Bingham, LLP                 & Bridges
P.O. Box 78                         P.O. Box 2345
Montgomery, AL 36101                Opelika, AL 36803-2345

H. Wayne Phears                     Phillip E. Adams, Jr.
Phears & Moldovan                   Adams, Umbach, Davidson & White, LLP
Suite 375                           P. O. Box 2069
4725 Peachtree Corner Circle        Opelika, AL 36803-2069
Norcross, GA 30092-3000

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by faxing a copy to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _11th_ day of December, 2003.

_C E Vercelli_
OF COUNSEL

155-00\Ps'Mot Shorten Time to Object.2.wpd

5

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. CV 02-085 |
| | * | |
| HANSON AGGREGATES | * | |
| SOUTHEAST, INC., et al, | * | |
| | * | |
| Defendants. | * | |

## ORDER

A Status Conference was held on December 9, 2003. Appearing for Plaintiffs were Attorneys, James Sprayberry, Chip Vercelli and Guy Gunter. Appearing for the Defendant, Hanson Aggregates Southeast, was Attorney James Byrum. Appearing for Defendant Old Castle, was Attorney Phillip E. Adams. Appearing for individual Defendants, was Attorney John Denson. At the conclusion of the conference the Court entered the following Orders:

1. The Plaintiffs are to file an Amended Complaint regarding allegations made against Old Castle within thirty (30) days from the date of this Order.

2. Defendant Old Castle is to answer any interrogatories and Motions to Produce within thirty (30) days from the date they receive the Amended Complaint.

3. Defendant Old Castle's Plant Manager and Corporate Representative's depositions are to be taken within forty-five days from the date of this Order. The depositions are to take place in the State of Alabama.

4. The Plaintiffs' experts' depositions are not to be taken until thirty (30) days after Old Castle complies with the "paper discovery" set forth in Paragraph Two above.

5. A Status Conference is set in this case on **MARCH 29, 2004, at 9:00 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

| | |
|---|---|
| Hon. Jimmy Sprayberry | Hon. Charles Vercelli, Jr. |
| Post Office Box 2429 | 1019 S. Perry Street |
| Auburn, AL 36831-2429 | Montgomery, AL 36104 |

2110

Hon. James Byram, Jr.
Hon. Dorman Walker
Hon. Matt Parnell
Post Office Box 78
Montgomery, AL 36101

Hon. Guy Gunter
Post Office Box 409
Opelika, AL 36803-0409

Hon. John V. Denson
Post Office Box 2345
Opelika, AL 36803-2345

Hon. Phillip E. Adams, Jr.
Post Office Box 2069
Opelika, AL 36803-2069

DONE this the 15th day of December, 2003.

_____
JACOB A. WALKER, III
Circuit Judge

**F I L E D**

DEC 1 7 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )        CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        Defendants.                    )


## ORDER GRANTING APPLICATION FOR ADMISSION TO PRACTICE UNDER RULE VII OF THE RULES GOVERNING ADMISSION TO THE ALABAMA STATE BAR


Upon consideration of the Verified Application for Admission to Practice filed herein by Jack M. Weiss, the Court is of the opinion and ascertains and finds that said Motion is due to be granted. It is, therefore,

ORDERED, ADJUDGED AND DECREED by the Court as follows:

1. That the Application of Jack M. Weiss for admission to practice under Rule VII in the above-styled case be and the same is hereby granted.

2. Jack M. Weiss shall comply with the provisions of The Alabama Rules of Professional Conduct and all other requirements as set forth in Rule VII of the Rules Governing Admission to the Alabama State Bar in the above-styled case.

DONE this the 14th day of December, 2003.

_____
CIRCUIT JUDGE

FILED

DEC 2 9 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,        §
           Plaintiff,       §
                     §
v.                     §    CASE NUMBER: CV-02-85
                     §
HANSON AGGREGATES SOUTHEAST, §
INC., et al.              §
          Defendants.    §

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

**FILED**

JAN 0 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

Please take notice that the following documents were served on January 2, 2004 to all attorneys of record in the above styled and numbered cause;

1. Plaintiffs' First Contention Interrogatories to Oldcastle
2. Plaintiffs' First Contention Interrogatories to Hanson
3. Plaintiffs' Second Request for Admissions to Oldcastle
4. Plaintiffs' Second Request for Admissions to Hanson

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2115

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 5th day of January, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

F I L E D
JAN 0 9 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**NOTICE OF SERVICE OF DISCOVERY DOCUMENTS**

TO: Circuit Clerk of Lee County:

Please take notice that on the 8th day of January, 2004,

_____ 1. A notice to take the deposition of __
_____ 2. Interrogatories
_____ 3. Request for Admissions
_____ 4. Request for Production
__X__ 5. Answers to Second Interrogatories
_____ 6. Response to Request for Admissions
__X__ 7. Response to Second Request for Production
_____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
        as follows:

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 8th day of January, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

JAN 1 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUPPLEMENTAL WITNESS DISCLOSURE

Plaintiffs supplement their prior Trial Witness List by disclosing the following person as a potential witness at the trial of this case:

68.    Steve Hearn, Lee County Highway Department.  Mr. Hearn was present on December 18, 2003, when the sinkhole on Spring Villa Road was being repaired and may be asked to testify regarding that sinkhole and the repair thereof.

_____
**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 9th day of _January_, 2004.

_____
OF COUNSEL

155-00\Ps\SuppWitnessDisc.1.wpd

2



IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

FILED
FEB 0 5 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, *et al.*,           §
                                §
          Plaintiffs,           §
                                §
vs.                             §          Civil Action No.: CV-2002-85
                                §
HANSON AGGREGATES               §
SOUTHEAST, INC., *et al.*,       §
                                §
          Defendants.           §

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

To:    Clerk
       Lee County Circuit Court
       Justice Center, Room 104
       2311 Gateway Drive
       Opelika, AL

       Please take notice that the following discovery documents have been served on behalf of

defendant Hanson Aggregates Southeast, Inc.:

       ( X )   Defendant Hanson's Response to Plaintiff's First Contention
               Interrogatories; and

       ( X )   Defendant Hanson's Response to Plaintiffs' Second Request for
               Admissions.

       Respectfully submitted this 4th day of February, 2004.

                                        _____
                                        One of the attorneys for Defendant
                                        Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
**BALCH & BINGHAM LLP**
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500

141181.1

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

### Certificate of Service

I hereby certify that on this 4th day of February, 2004, a copy of the foregoing has been served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
 & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
 & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2120

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. CV 02-085 |
| | * | |
| HANSON AGGREGATES | * | |
| SOUTHEAST, INC., et al, | * | |
| | * | |
| Defendants. | * | |

## **ORDER**

A Status Conference was held the above-styled case on February 4, 2004. Appearing for Plaintiffs were Attorneys, James Sprayberry. Appearing for the Defendant, Hanson Aggregates Southeast, was Attorney Paul Clark. Appearing for Defendant Old Castle, was Attorney Phillip E. Adams. Appearing for Defendants, Gilmer/Young was Attorney John Denson. The Court was updated on a variety of discovery issues. At the conclusion of the hearing it is the Court opinion that the parties should be ordered to mediate this matter. The parties are to select a mediator and evenly split the costs of said mediation. The parties are to notify the Court of the name of the mediator within the next forty-five (45) days. If the parties cannot agree on a mediator, the Court will appoint someone to mediate this case. Mediation is to be completed by July 1, 2004. The parties are reminded that the next Status Conference in this case is set for **MARCH 29, 2004, at 9:00 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Jimmy Sprayberry
Post Office Box 2429
Auburn, AL 36831-2429

Hon. Charles Vercelli, Jr.
1019 S. Perry Street
Montgomery, AL 36104

Hon. James Byram, Jr.
Hon. Dorman Walker
Hon. Matt Parnell
Post Office Box 78
Montgomery, AL 36101

Hon. John V. Denson
Post Office Box 2345
Opelika, AL 36803-2345

Hon. Phillip E. Adams, Jr.
Post Office Box 2069
Opelika, AL 36803-2069

Hon. Guy Gunter
Post Office Box 409
Opelika, AL 36803-0409

DONE this the 11ᵗʰ day of February, 2004.

JACOB A. WALKER, III
Circuit Judge

FILED

FEB 17 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2122

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                §
      Plaintiff,          §
                            §
v.                                 §    CASE NUMBER: CV-02-85
                            §
HANSON AGGREGATES SOUTHEAST,       §
INC., et al.                       §
      Defendants.          §

### NOTICE OF SERVICE DISCOVERY DOCUMENTS



FILED

MAR 11 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
      Lee County Justice Center
      2311 Gateway Drive, Room 104
      Opelika, Alabama 36801.

      Please take notice that the following documents were served on March 11, 2004 to all attorneys of record in the above styled and numbered cause;

    1.    Answers to Oldcastles' First Set of Interrogatories by Donnie Smith
    2.    Answers to Oldcastles' First Set of Interrogatories by Ronnie & Dorothy Griggs

                    James B. Sprayberry (SPR008)
                    *One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

2123

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 11th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

2124

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| HANSON AGGREGATES SOUTHEAST, | § |
| INC., et al. | § |
| Defendants. | § |

CASE NUMBER:

**FILED**
MAR 1 5 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:   Clerk of the Lee County Circuit Court
      Lee County Justice Center
      2311 Gateway Drive, Room 104
      Opelika, Alabama 36801.

Please take notice that the following documents were served on March 15, 2004 to all attorneys of record in the above styled and numbered cause;

1.   Answers to Oldcastles' First Set of Interrogatories by David and Tonya Tankersley

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 15th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

2126

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,      )
               )
    Plaintiffs,     )
               )
vs.               )    CASE NO. CV-02-85
               )
HANSON AGGREGATES    )
SOUTHEAST, INC., et al.,   )
               )
    Defendants.    )

**F I L E D**

MAR 1 7 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO: Circuit Clerk of Lee County:

Please take notice that on the 16th day of March, 2004,

    __X__ 1. A notice to take the deposition of:
              Randall and Wanda Parker
              Ronnie and Dorothy Griggs
              Anthony and Carol Clark
              Stan and Jackie Ledbetter
              Ken and Naomi Schwieker
              Mike and Ann Broadwater
              David and Amanda Sumner
              Donnie Smith
    _____ 2. Interrogatories
    _____ 3. Request for Admissions
    _____ 4. Request for Production
    _____ 5. Answers to Second Interrogatories
    _____ 6. Response to Request for Admissions
    _____ 7. Response to Second Request for Production
    _____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
            as follows:

was served on all parties to this cause by the Defendant Oldcastle Materials.

           ADAMS, UMBACH, DAVIDSON & WHITE, LLP

           BY: _____
           PHILLIP E. ADAMS, JR. (ADA025)
           Attorney for Defendant
           P. O. Box 2069
           Opelika, AL 36803-2069

2127

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 16th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

2125

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| **MIKE DAVIS; DONNA DAVIS; , et al** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NUMBER: CV-02-085** |
| | ) | |
| **HANSON AGGREGATES** | ) | |
| **SOUTHEAST, INC.; et al.** | ) | **FILED** |
| | ) | |
| **Defendants.** | ) | **MAR 1 8 2004** |

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF DISCOVERY DOCUMENTS

To:      Corinne T. Hurst, Clerk
         Lee County Justice Center
         2311 Gateway Drive
         Opelika, Alabama 36801

Please take notice that the following discovery documents have been filed on behalf of

Defendants, Virginia Young Priest; John Claude Young, c/o Virginia Young Priest, Louise Young

O'Brien; Virginia Hart Young and Gilmer Properties, Ltd, in the above-styled case:

(X)      Response to Plaintiffs' Third Request for Admissions.

DONE      this _18th_ day of _March_ , 2004.

Respectfully submitted,

**OF COUNSEL FOR DEFENDANTS:**
**VIRGINIA YOUNG PRIEST; JOHN CLAUDE**
**YOUNG, C/O VIRGINIA YOUNG PRIEST;**
**LOUISE YOUNG O'BRIEN; VIRGINIA HART**
**YOUNG; AND GILMER PROPERTIES, LTD.**
SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL  36803-2345
(334) 745-3504
FAX (334) 745-3506

JOHN V. DENSON
DEN007

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause, by mailing the same in U.S. Mail, postage prepaid, on this the _18th_ day of __March__, 2004, as follows:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA   30092-3000

Charles E. Vercelli, Jr.
Suite 214, Union Station
300-B Water Street
Montgomery, Alabama 36104

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

J.M. (Jack) Weiss
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON
  & WHITE, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

Guy F. Gunter, III
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-6244

John V. Denson

2180

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS; DONNA DAVIS; , et al    )
                                 )

Plaintiffs,                       )
                                 )

v.                               )     CIVIL ACTION NUMBER: CV-02-085
                               )

HANSON AGGREGATES         )
  SOUTHEAST, INC.; et al.       )
                               )

Defendants.                     )

## RESPONSE OF YOUNG AND GILMER DEFENDANTS
## TO PLAINTIFFS' THIRD REQUEST
## FOR ADMISSIONS

COMES NOW, the Defendants, Virginia Young Priest, Claude John Young, Louise

Young O'Brian, Virginia Hart Young, (hereinafter referred to **"Young"**) and  Gilmer Properties,

Ltd  (hereinafter referred to as **"Gilmer"**) and  in response to Plaintiffs' Third Request for

Admissions states as follows:

1.      The **Young** and **Gilmer** Defendants had insufficient information to admit that the

document, bate stamp numbers 2086-2191, is a complete and accurate copy of an official

government publication, and therefore, at this time denies said request.

2.      Denied.

3.      Denied.

4.      The **Young** and **Gilmer** Defendants have insufficient information to admit that

the report, bate stamp numbers 2192-2197, is an accurate copy of an official

government publication, and therefore, at this time denies said request.

1

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | § |
|         Plaintiff, | § |
| | § |
| v. | §    CASE NUMBER: CV-02-85 |
| | § |
| HANSON AGGREGATES SOUTHEAST, | § |
| INC., et al. | § |
|         Defendants. | § |

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

**F I L E D**

MAR 18 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

       Please take notice that the following documents were served on March 18, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by David and Amanda Sumner; and
2.    Answers to Oldcastles' First Set of Interrogatories by Mike and Ann Broadwater.

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 18th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

2133

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| HANSON AGGREGATES SOUTHEAST, | § |
| INC., et al. | § |
| Defendants. | § |

CASE NUMBER: CV-02-85

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

**F I L E D**

MAR 1 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

Please take notice that the following documents were served on March 17, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Stanley and Jackie Ledbetter.

_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2137

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 17th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

2135

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

**F I L E D**

MAR 18 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:   Clerk of the Lee County Circuit Court
      Lee County Justice Center
      2311 Gateway Drive, Room 104
      Opelika, Alabama 36801.

Please take notice that the following documents were served on March 17, 2004 to all attorneys of record in the above styled and numbered cause;

1.   Answers to Oldcastles' First Set of Interrogatories by Ken and Naomi Schwieker.

_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2133

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 17th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

FILED

MAR 1 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO: Circuit Clerk of Lee County:

Please take notice that on the 17th day of March, 2004,

_____ 1. A notice to take the deposition of:
_____ 2. Interrogatories
_____ 3. Request for Admissions
_____ 4. Request for Production
_____ 5. Answers to Second Interrogatories
__X__ 6. Response to Third Request for Admissions
_____ 7. Response to Second Request for Production
_____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
as follows:

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 17th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092


Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

MAR 19 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

1.  Plaintiffs' Third Request for Admissions to All Defendants (dated March 15, 2004); and

2.  Plaintiffs' Supplemental Response to Request for Production of Documents (dated March 15, 2004).

*C E Vercelli*

**CHARLES E. VERCELLI, JR.** (VER003)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _17_ day of ____March____, 2004.

_____
OF COUNSEL

155-00\Not-Serv-Disc.3.wpd

2

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

F I L E D

MAR 19 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**NOTICE OF SERVICE DISCOVERY DOCUMENTS**

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

Please take notice that the following documents were served on March 19, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Anthony and Carol Clark

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

2142

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 19th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801


James B. Sprayberry

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

FILED

MAR 26 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION OF DEFENDANT, OLDCASTLE MATERIALS SOUTHEAST, INC., FOR AN ORDER GRANTING ENTRY UPON LAND FOR THE PURPOSE OF DRILLING MONITORING WELLS

COMES NOW defendant Oldcastle Materials Southeast, Inc. ("Oldcastle"), a defendant

in the above-styled case, and pursuant to the provisions of Rule 36 of the Alabama Rules of Civil

Procedure, moves this Court for an order granting Oldcastle entry upon Plaintiffs' land for the

purpose of drilling approximately six groundwater monitoring wells. As grounds for said

Motion, Oldcastle shows the Court as Follows:

1.      A central allegation in Plaintiffs' complaint is that the pumping of water from the

pit of the Opelika quarry – formerly operated by defendant Hanson Aggregates Southeast, Inc.

("Hanson") and currently operated by Oldcastle – has had a deleterious impact on the water table

in the area of Spring Villa, has caused Little Uchee Creek and the spring at Spring Villa to run

dry, and caused the formation of sinkholes in the vicinity.

2.      The Opelika quarry is approximately 1.5 miles west of Spring Villa. Whether the

pumping at the quarry is having an effect on the water table in the vicinity of Spring Villa

depends on whether there is a hydrogeologic connection between the quarry and Spring Villa. It

is the intent of Oldcastle to (a) determine whether there is a hydrogeologic connection between

the quarry and Spring Villa such that the pumping at the quarry has caused the spring and Little Uchee Creek to run dry and sinkholes to form, and (2) if so, devise the most appropriate water recharge strategy to mitigate the effect of pumping on the water table at Spring Villa.

3.       The most accurate way to determine whether there is a hydrogeologic interconnection between the quarry and Spring Villa is to collect data concerning the structural geology and hydrology in the vicinity of the two locations and at various points in between. This data can only be collected by the drilling of rock cores and the installation of a series of monitoring wells. The drilling and monitoring of such wells would provide direct evidence concerning the lateral extent of the zone of influence of the pumping at the quarry, and help determine whether such pumping is having any influence on the water table at Spring Villa.

4.       In order to have as complete and accurate picture as possible concerning the lateral extent of the zone of influence of the pumping at the quarry, a sufficient number of monitoring wells must be installed at the appropriate locations, and meaningful data must be collected. Oldcastle intends to drill, install and collect data from approximately 6 rock cores and groundwater monitoring wells (at locations and depths to be determined) in the vicinity and to the west of Spring Villa (toward the quarry). Oldcastle plans to monitor the water level and the pressure in these wells at various rates of pumping at the quarry. The extent to which the water level and pressure in the monitoring wells is affected by the quarry pumping will assist in ascertaining whether there is indeed any connection between the quarry and Spring Villa.

5.       The wells that are currently in existence are both too few in number and not properly located to provide adequate data regarding the connectivity between the quarry and Spring Villa. Use of data from these monitoring wells to assess the extent of the hydrogeologic impact of pumping from the quarry is entirely speculative.

6.      Prior to the sale of the quarry to Oldcastle, Hanson installed six monitoring wells on the site. However, these wells were no further than several hundred feet from the quarry pit. While useful, data from these wells is not sufficiently informative of whether pumping from the quarry is having any effect on Spring Villa, which is located approximately 1.5 miles to the east of the quarry. Nor are these wells spaced such that one can determine the lateral extent of the zone of influence of the quarry pumping.

7.      The monitoring wells installed in the vicinity of Spring Villa by experts retained by the Plaintiffs are likewise insufficient to determine whether pumping at the quarry is having an effect on the water table at Spring Villa. Only one of these wells is being continuously monitored for data -- monitoring well 2, which is located in the immediate area of the spring. Only sparse data exists from monitoring well 1 (which is right next to monitoring well 2 and thus not very informative) and from monitoring well 5 (which is located about a couple hundred feet to the southwest of monitoring well 2). Significantly, there are no operating monitoring wells in the one and a half mile span between the quarry and the Spring.

8.      The installation and monitoring of the groundwater monitoring wells proposed by Oldcastle will provide the subsurface data necessary to permit the preparation of a complete picture of the geologic structure and hydrogeology between the quarry and Spring Villa. To the extent it is determined that there is a hydrogeologic connection between the two sites, the data collected will help determine the process, mechanism and volume capacity of that connection. This information would allow Oldcastle to design the most appropriate water recharge system to mitigate any impact its pumping has on the water table at Spring Villa.

9.      Rule 34(a) provides that upon request, a party may be permitted entry upon land in the possession or control of a party litigant "for the purpose of inspection and measuring,

surveying, photographing, testing, or sampling the property or any designated object or operation

thereon." Al. R. Civ. Proc. 34(a).  As set forth above, access to Plaintiffs' property for the

purpose of drilling approximately six groundwater monitoring wells is essential to Oldcastle's

defense of this case.  Granting such access will assist Oldcastle, as well as the Court, by

providing it with an empirical and non-speculative basis for determining whether pumping from

the Opelika quarry is in fact adversely impacting the water table in the vicinity of Spring Villa,

and, if so, developing the appropriate remedial measures.

WHEREFORE, Oldcastle respectfully requests that this Court enter an order granting

Oldcastle entry upon Plaintiffs' land for the purpose of drilling groundwater monitoring wells.

Respectfully submitted this the 26th day of March, 2004.

**PHILLIP E. ADAMS, JR.**  (ADA025)
Attorney for Defendant, Oldcastle Materials
Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel.  (334) 745-6466

70279448_1.DOC

4

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 26th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

2146

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

|  |  |  |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**F I L E D**

MAR 29 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO:  Circuit Clerk of Lee County:

Please take notice that on the 29th day of March, 2004,

_____ 1. A notice to take the deposition of:
_____ 2. Interrogatories
_____ 3. Request for Admissions
_____ 4. Request for Production
_____ 5. Answers to Second Interrogatories
_____ 6. Response to Third Request for Admissions
_____ 7. Response to Second Request for Production
_____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
        as follows:
___X___ 9. Other:  Oldcastle Privilege Log

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _Phillip E. Adams Jr._

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069

2149

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 29th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_Phillip E. Adams Jr._
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

MAR 3 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al.,      :

   Plaintiffs,      :

            :

v.            :  Civil Action No. CV-02-0085

            :

HANSON AGGREGATES SOUTHEAST, :

INC., et al.,        :

            :

   Defendants.      :

## VERIFIED APPLICATION OF BRIAN E. DAUGHDRILL
## FOR ADMISSION *PRO HAC VICE*

Comes now BRIAN E. DAUGHDRILL, applicant herein, and respectfully represents the following:

1.  Applicant resides at 3223 Northbrook Drive, Atlanta, Georgia 30341; 678-406-9269; 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.

2.  Applicant is an attorney and a member of the law firm of Phears & Moldovan, 4725 Peachtree Corners Circle, Suite 375, Norcross, Gwinnett County, Georgia 30092, 770-446-2116.

3.  Applicant has been retained personally by Hanson Aggregates Southeast, Inc. to provide legal representation in connection with the above-styled matter now pending before the above-named court in the State of Alabama.

4.  Since November of 2000, applicant has been, and presently is, a member in good standing of the Bar of the highest court of the State of Georgia, where applicant regularly practices law. (Certificate of Good Standing attached as Exhibit "A".)

1

5.    Applicant has been admitted to practice before the following courts:

a.    all state and federal courts of Georgia, admitted 2000, State Bar of

Georgia

No. 205760

Applicant is presently a member in good standing of the Bars of those courts

listed above.

6.    Applicant presently is not subject to any disbarment proceedings.

7.    Applicant presently is not subject to any suspension proceedings.

8.    Applicant never has been subject to any disbarment proceedings.

9.    Applicant never has been subject to any suspension proceedings.

10.    Applicant never has had any certificate or privilege to appear and practice before

any administrative body suspended or revoked.

11.    Applicant, either by resignation, withdrawal, or otherwise, never has terminated

or attempted to terminate applicant's office as an attorney in order to avoid administrative,

disciplinary, disbarment, or suspension proceedings.

12.    Applicant has not filed an application to appear as counsel under Rule VII during

the past three (3) years.  A member of applicant's firm, H. Wayne Phears,  has filed an

application to appear as counsel under Rule VII during the past three (3) years

13.    Local counsel of record associated with applicant in this matter is James A.

Byram, Jr., who has offices at Balch & Bingham, 2 Dexter Avenue, Montgomery, Montgomery

County, Alabama 36104, 334-834-6500.

14.    Exhibit "B" attached hereto lists accurately the name and address of each party in

2

this matter, and the name and address of each counsel of record who has appeared for each party.

15.    Applicant agrees to comply with the provisions of the Alabama Rules of

Professional Conduct, and applicant consents to the jurisdiction of the courts and the disciplinary

boards of the State of Alabama.

16.    Applicant respectfully requests to be admitted to practice in the above-named

court for this cause only.

DATED this _26th_ day of _March_ , 2004

PHEARS & MOLDOVAN

By: _____

Brian E. Daughdrill

PHEARS & MOLDOVAN
4725 Peachtree Corners Circle
Suite 375
Norcross, Georgia 30092
770-446-2116

3

STATE OF GEORGIA )

COUNTY OF GWINNETT )

I, Brian E. Daughdrill, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.

_____
Brian E. Daughdrill

Subscribed and sworn to before me this 30th day of March , 2004.

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rule VII of the Rules Governing Admission to the Alabama State Bar.

DATED this 30th day of March , 2004.

_____
James A. Bryam

NOTICE OF HEARING

This application for admission is set for hearing before the court or administrative agency appearing in the style hereof on the 20th day of April , 2004, at 9:00 a.m.

4

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the Alabama State Bar by mail addressed to: Alabama State Bar, Attn: PHV Admissions, P.O. Box 671, Montgomery, Alabama 36101, accompanied by payment of the $100 filing fee to the Alabama State Bar on this 30ᵗʰ day of March, 2004.

James A. Bryam, Jr.

# EXHIBIT "A"

# STATE BAR OF GEORGIA



2155

Mr. Brian E. Daughdrill
Phears & Moldovan
Suite 375
4725 Peachtree Corners Circle
Norcross, GA 30092

**CURRENT STATUS:**     Active Member

**DATE OF ADMISSION TO PRACTICE:**     11/02/2000

**Attorney Bar Number: 205760**

Today's Date:    March 24, 2004

Listed below are the disciplinary actions, if any, which have been taken against this member:

| Supreme Court Docket # | State Disciplinary Board Docket # | Disposition |
|---|---|---|
| NA | NA | |

The prerequisites for practicing law in the State of Georgia are as follows:

-Must be certified by the Office of Bar Admissions (either by exam or on motion)
-Sworn in to the Superior Court in Georgia
-Enrolled with the State Bar of Georgia which **is an arm of the Supreme Court of Georgia**

Under the privacy/confidentiality provision of the Bar Rule 4-221(d), any complaint against a member resolved prior to the filing and docketing of a disciplinary case in the Supreme Court is not a matter of public record, and may not be revealed without a waiver from the member. It is the policy of the State Bar of Georgia to answer any inquiry about a member by disclosing only those complaints that have been docketed in the Supreme Court. With respect to matters that are currently pending as active, undocketed cases, when an inquiry is received, the State Bar of Georgia shall not disclose the existence of those complaints. Such non-disclosure should not be construed to confirm the existence of confidential complaints since the vast majority of members in good standing are not the subject of such confidential complaints.

This member is currently in "good standing" as that term is defined by State Bar Rule 1-204. The member is current in license fees and is not suspended or disbarred as of the date of this letter.

This document hereby certifies that the above-mentioned individual is a registered member of the State Bar of Georgia and is currently in good standing.

### STATE BAR OF GEORGIA

*Brinda Lovvorn*

Brinda Lovvorn
Official Representative of State Bar of Georgia

HEADQUARTERS
104 Marietta Street ■ Suite 100
Atlanta, Georgia 30303 ■ (404) 527-8700
(800) 334-6865 ■ FAX (404) 527-8717

INTERNET ADDRESS
www.gabar.org

SOUTH GEORGIA
244 E. Second Street (Zip 31794) ■ P.O. Box 1390
Tifton, Georgia 31793-1390 ■ (229) 387-0446
(800) 330-0446 ■ FAX (229) 382-7435

# EXHIBIT "B"

2155

## PLAINTIFFS

**Wonda K. Bright**
245 Lee Rd. 166
Opelika, AL 36804

**Mike & Ann Broadwater**
610 Lee Rd. 166
Opelika, AL 36804

**Mittie Mae Broadwater**
574 Lee Rd. 166
Opelika, AL 36804

**Anthony & Carol Clark**
**Courtney Clark (a minor)**
1740 Lee Rd. 147
Opelika, AL 36804

**Michael & Donna Davis**
149 Lee Rd. 166
Opelika, AL 36804

**Edwards, Elaine, Alpha**
3274 Ala. Hwy. 169
3320 Ala. Hwy. 169
Opelika, AL 36804

**Mary Sue Eiland**
2853 Ala. Hwy. 169
Opelika, AL 36804

**Charolyn Medena Frizzell**
**Karla Frizzell (a minor)**
**Brianna Yougren (a minor)**
3173 Ala. Hwy. 169
Opelika, AL 36804

**Ronald & Dorothy Griggs**
3256 Ala. Hwy. 169
Opelika, AL 36804

**Mike & Stacy Hagans**
1668 Lee Road 147
Opelika, AL 36804

**PLAINTIFFS** (continued)

**Howard & Lisa Harmon**
**Judson Harmon (a minor)**
**Bria Harmon (a minor)**
145 Lee Road 707
Opelika, AL 36804

**Haward & Nora Jackson**
1141 Lee Road 166
Opelika, AL 36804

**Mike & Sheila LaMacchia**
**Russell LaMacchia (a minor)**
1355 Lee Road 147
Opelika, AL 36804

**Stanley & Jackie Ledbetter**
1330 Lee Road 166
Opelika, AL 36084

**Terry & Carol Long**
3379 Ala. Hwy. 169
Opelika, AL 36864

**Timothy & Adalene Manning**
3226 Ala. Hwy. 169
Opelika, AL 36804

**David & Cynthia Nash &**
**Jeanette Baggett**
1198 Lee Road 147
Opelika, AL 36804

**James & Shirley Parker**
3039 Ala. Hwy. 169
Opelika, AL 36804

**Randall & Wanda Parker**
**Ambur Parker (a minor)**
**Brandon Parker (a minor)**
1229 Lee Rd. 166
Opelika, AL 36804

**Pfingston, Betty**
**Jessica Pfingston (a minor)**
(no address provided by plaintiffs)

<u>PLAINTIFFS</u> (continued)

**Jeffrey & Maria Richardson**
**Natasha Richardson (a minor)**
265 Lee Rd. 705
Opelika, AL 36804

**David & Julie Sumner**
**Todd Sumner (a minor)**
164 Ala. Hwy. 148
Opelika, AL 36804

**Larry & Rita Sumner**
1100 Lee Rd. 147
Opelika, AL 36804

**Martha Ann Treadway**
**Jasmin King (a minor)**
**Hazel King (a minor)**
**Michael King (a minor)**
**Joseph King (a minor)**
3177 Ala. Hwy. 169
Opelika, AL 36804

**Billy Gene & Sherry Wallace**
**Aaron Wallace (a minor)**
1692 Lee Rd. 147
Opelika, AL 36804

**Michele "Mickie" Wilkes**
148 Lee Rd. 707
Opelika, AL 36804

**Shirley Wilson**
64 Lee Rd. 707
Opelika, AL 36804

**City of Opelika**
P. O. Box 390
Opelika, Alabama 36803

**The Utilities Board of the City of Opelika**
502 Geneva Street
Opelika, Alabama 36801

2159

**PLAINTIFFS** (continued)

**Beauregard Water Authority**
P. O. Box 271
Opelika, Alabama 36801

**DEFENDANTS:**

**Hanson Aggregates Southeast, Inc.**
100 Crescent Centre Parkway
Suite 1240
Tucker, Georgia  30084

**Virginia Young Priest**
414 Charing Loop
Auburn, Alabama 36830

**Claude John Young**
c/o North Ridge Nursing Home
Opelika, Alabama 36801

**Louise Young O'Brian**
416 Charing Loop
Auburn, Alabama 36830

**Virginia Hart Young**
HC3 Box 4-C
Port St. Joe, Florida  32456

**Charles W. Gilmer, Sr.**
575 Lee Road 166
Opelika, Alabama 36801

**Alice C. Gilmer**
575 Lee Road 166
Opelika, Alabama 36801

**Charles W. Gilmer, Jr.**
7800 Lee Road 175
Salem, Alabama 36874

2160

**DEFENDANTS** (continued)

**Kammy Gilmer**
7800 Lee Road 175
Salem, Alabama 36874

**Barbara Gilmer Smith**
1401 Lee Road 47
Opelika, Alabama 36804

**Gary Smith**
1401 Lee Road 47
Opelika, Alabama 36804

**Matthew Ruttledge Gilmer**
Lee Road 166
Opelika, Alabama 36804

**Lelia Wilder Gilmer**
Lee Road 166
Opelika, Alabama 36084

**ATTORNEYS**

**James B. Sprayberry**
P. O. Drawer 2429
Auburn, AL 36830

*(attorney for all individual plaintiffs and
plaintiffs City of Opelika, Utilities Board of the
City of Opelika, and Beauregard Water Authority)*

**Charles E. Vercelli, Jr.**
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, AL 36104-5049

*(attorney for all individual plaintiffs and
plaintiffs City of Opelika, Utilities Board of the
City of Opelika and Beauregard Water Authority)*

2161

**ATTORNEYS** (Continued)

**Guy F. Gunter, III**
Melton, Gunter & Melton
P.O. Box 409
Opelika, AL 36803-0409

*(Attorney for plaintiffs, City of Opelika and
Utilities Board of the City of Opelika)*

**John V. Denson**
**Josh J. Jackson**
Samford, Denson, Horsley,
 Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

*(attorneys for defendants Virginia Young Priest,
Claude John Young, Louise Young O'Brian,
Virginia Hart Young, Charles W. Gilmer, Sr.,
Alice C. Gilmer, Charles W. Gilmer, Jr.,
Kammy Gilmer, Barbara Gilmer Smith,
Gary Smith, Matthew Ruttledge Gilmer, and
Lelia Wilder Gilmer)*

**James A. Byram, Jr.**
**Paul A. Clark**
Balch & Bingham LLP
2 Dexter Avenue
Montgomery, Alabama 36104

**H. Wayne Phears**
**Brian E. Daughdrill**
Phears & Moldovan
Suite 375
Norcross, Georgia 30092

*(attorneys for defendant Hanson Aggregates
Southeast, Inc.)*



# ALABAMA STATE BAR

415 Dexter Avenue • Post Office Box 671 • Montgomery, Alabama 36101
Telephone: 334 / 269-1515 • Fax: 334 / 261-6310
www.alabar.org

## STATEMENT

The following information, in response to the application of petitioner, is furnished in compliance with Rule VII, Rules Governing Admission to the Alabama State Bar *(Pro HacVice)*:

**PETITIONER:**    Mr. Brian E. Daughdrill
Phears & Moldovan
4725 Peachtree Corners Cir. #375
Norcross, GA    30092-0000

**CURRENT APPLICATION:**

| | |
|---|---|
| Date Application Received: | March 31, 2004 |
| Case No.: | CV02-0085 |
| Style: | Mike Davis, et al. vs. Hanson Aggregates Southeast, Inc., et al. |
| Court/Agency: | Circuit Court of Lee County |
| Date of Hearing: | April 20, 2004 |

**LOCAL COUNSEL:**    Mr. James Asberry Byram Jr.
Balch & Bingham LLP
PO Box 78
Montgomery, AL    36101-0078

APPLICATIONS FOR RULE VII ADMISSION HAVE BEEN MADE BY ABOVE PETITIONER OR OTHER ATTORNEY MEMBERS OF PETITIONER'S FIRM IN THE PRECEDING 365 DAYS AS LISTED:

See Attached

_Philly Nainters_
PHV Admissions
March 31, 2004

FILED
APR 0 1 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK



## LAWYERS RENDER SERVICE

# Phears & Moldovan
## Dates reported: April 01,2001 - March 31,2004

| licant | Date App Received | Case | Court | | G/D/P/M |
|---|---|---|---|---|---|
| Phears, H. Wayne | | | | | |
| | 06/20/2003 | CV02-0085 | Circuit Court of Lee County | | G |

FILED

APR 0 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                §
      Plaintiff,                    §
                                  §
                                  §
v.                                         §    CASE NUMBER: CV-02-85
                                  §
HANSON AGGREGATES SOUTHEAST,     §
INC., et al.                          §
      Defendants.                   §

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

     Please take notice that the following documents were served on March 31, 2004 to all attorneys of record in the above styled and numbered cause;

       1.     Notice of Taking Deposition of Malcom C. LeBron.

                                          James B. Sprayberry (SPR008)
                                        *One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry              Charles E. Vercelli, Jr.
ATTORNEY AT LAW                  VERCELLI & ASSOCIATES, P.C.
P.O. Drawer 2429                 1019 S. Perry Street
Auburn, Alabama 36831-2429       Montgomery, Alabama 36104-5049
(334) 821-7100                   (334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 31st day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

# IN THE CIRCUIT COURT FOR
# LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
    Plaintiffs,            )
                                   )
vs.                                )    CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                  )
SOUTHEAST, INC. et al.,            )
                                   )
    Defendants.            )

**F I L E D**

APR 0 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## EXPERT WITNESS DISCLOSURE OF DEFENDANT,
## OLDCASTLE MATERIALS SOUTHEAST, INC.

Defendant Oldcastle Materials Southeast, Inc. ("Oldcastle"), by counsel, respectfully

submit this Disclosure of Expert Witnesses pursuant to Rule 26 of the Alabama Rules of Civil

Procedure.

## INTRODUCTORY STATEMENT AND RESERVATIONS

A.    This Expert Witnesses Disclosure ("Disclosure") sets forth the subject matter(s)

on which each expert is expected to testify in the trial of this matter.  Should Plaintiffs desire

further discovery of the findings and opinions to which these experts are expected to testify at

trial, Oldcastle will make all such witnesses available for deposition.

B.    To date, discovery is not completed in this case and Oldcastle's experts have not

completed their investigations.  Oldcastle reserves the right to supplement this Disclosure to

more fully set forth the substance of the experts' respective findings and opinions and a summary

of the grounds for each opinion.  Oldcastle also reserves the right to provide additional areas of

testimony, additional opinions, and additional grounds for opinions based on continuing

discovery in this matter.  Supplementation may take the form of amendments to this Disclosure,

a supplemental Disclosure, written report, deposition testimony or any other form sufficient to apprise Plaintiffs of the substance of and bases for the respective experts' opinions and/or additional areas of testimony, additional opinions, or additional grounds for opinions.

      C.    Oldcastle reserves the right to produce rebuttal opinion testimony upon completion of the depositions of Plaintiffs' expert witnesses and review of materials that were available to Plaintiffs' expert witnesses in formulating their opinions.

      D.    This Disclosure applies only to experts retained by Oldcastle in connection with this litigation. To the extent that other witnesses have developed opinions independent of this litigation, Oldcastle reserves the right to elicit these opinions at time of trial.

## EXPERT WITNESS DISCLOSURE

A.    Charles R. Faust, Ph.D.
    Geotrans, Inc.,
    46050 Manikin Plaza
    Sterling, VA 20166

      1.    Oldcastle expects to call Charles R. Faust, Ph.D., as an expert witness at trial.

      2.    The qualifications of Dr. Faust are summarized in the curriculum vitae attached as Exhibit A.

      3.    Dr. Faust is expected to testify concerning the hydrogeology in the area of the Opelika quarry and Spring Villa and whether there is hydrogeologic connection between the Opelika quarry and Spring Villa.

      4.    Oldcastle will supplement this designation with a written report setting forth the opinions of Dr. Faust and the bases for such opinions as soon as said report is available.

B.    Maria Zufall, Ph.D.
    Trinity Consultants
    6600 Peachtree Dunwoody Rd
    600 Embassy Row Suite 350
    Atlanta, GA 30328

1.     Oldcastle expects to call Maria Zufall, Ph.D., as an expert witness at trial.

2.     The qualifications of Dr. Zufall are summarized in the curriculum vitae attached as Exhibit B.

3.     Dr. Zufall is expected to testify concerning the atmospheric dispersion of fugitive dust emissions from the Opelika quarry.

4.     Oldcastle will supplement this designation with a written report setting forth the opinions of Dr. Zufall and the bases for such opinions as soon as said report is available.

C.     Kenneth Kaliski, P.E., Q.E.P.
Resource Systems Group, Inc.
331 Olcott Dr.
White River Junction, VT 05001

1.     Oldcastle expects to call Kenneth Kaliski, P.E., Q.E.P., as an expert witness at trial.

2.     The qualifications of Mr. Kaliski are summarized in the curriculum vitae attached as Exhibit C.

3.     Mr. Kaliski is expected to testify concerning the cumulative noise impacts from the operations of the crushing plant and related equipment at the Opelika quarry any mitigating impact on noise emanating from the Opelika quarry.

4.     Oldcastle will supplement this designation with a written report setting forth the opinions of Mr. Kaliski's and the bases for such opinions as soon as said report is available.

D.     McRoy Sauls
Sauls Seismic, Inc.
3710 4th Avenue South
Birmingham, AL 35222

1.     Oldcastle expects to call McRoy Sauls as an expert witness at trial.

3

2.     The qualifications of Mr. Sauls are summarized in the curriculum vitae attached as Exhibit D.

3.     Mr. Sauls is expected to testify concerning the extent to which blasting at the Opelika quarry is having any adverse impact on Plaintiffs' properties in the form of fugitive noise, vibrations and/or air concussions.

4.     Oldcastle will supplement this designation with a written report setting forth the opinions of Mr. Sauls and the bases for such opinions as soon as said report is available.

Respectfully submitted this the 1st day of April, 2004.

_____
**PHILLIP E. ADAMS, JR.** (ADA025)
Attorney for Defendant, Oldcastle Materials
Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

70279948_1.DOC

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 1st day of April, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

 **GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

## Education:

2171

Ph.D., Geology, The Pennsylvania State University, 1976
B.S., Geology, Department of Geosciences, The Pennsylvania State University, 1967

## Professional Experience:

GeoTrans, Inc., Sterling, Virginia, (1996-Present), *President and Principal Hydrogeologist*
GeoTrans, Inc., Sterling, Virginia (1979-1996), *Vice President and Principal Hydrogeologist*
U.S. Geological Survey, Water Resources Division, Northeastern Region, Reston, Virginia, (1971-1979), *Hydrologist/Geologist*
Department of Geosciences, The Pennsylvania State University, (1972-1974), *Graduate Research Assistant*

More than 25 years of experience in aquifer parameter estimation; well test design and analysis; numerical simulation; multi-phase flow; solute and heat transport; statistical applications to geology; flow in fractured media; hazardous and radioactive waste management; and geothermal reservoir analysis.

## Relevant Project Experience:

DNAPL Contaminated Site, Buffalo, New York – Principal Investigator for a PRP funded RI/FS at a former manufactured gas plant site. Delineated contamination in soils, groundwater, and surface water; designed and evaluated alternative remedial measures; and provided expert witness and negotiation support with the State of New York and non-participating PRPs.

Superfund Landfill, Missouri – Project Manager for groundwater modeling, hydrogeologic analysis, and expert testimony for remediation activities. Performed innovative and detailed assessment of the flow relationships between an aquifer and river using three-dimensional flow and transport models.

Love Canal, Niagara Falls, New York – Principal Investigator for modeling and analysis of DNAPL flow and transport at the Love Canal Superfund Site. Modeling supported analysis of remedial alternatives, including consideration of slurry and concrete barrier walls, clay and synthetic membrane landfill covers, and French drain leachate collection systems.

DNAPL Contaminated Site, West Virginia – Principal Investigator supporting a comprehensive remedial site investigation, contaminated soil removal action, baseline risk assessment, and preparation of a project closure strategy based on identified risk to human health and groundwater remediation technical impracticability.

Industrial Facility, southeastern Pennsylvania – Principal Investigator for design of a groundwater recovery system at a RCRA regulated facility. Supervised field studies (well installation, surface geophysics, aquifer testing, and sampling). Designed extraction system and wrote supporting documents for submittal to USEPA, the Pennsylvania DER, and the Delaware River Basin Commission. System is operating at design capacity.

Confidential Client, Delaware – Principal Investigator for a RCRA Facility Investigation (RFI) and Corrective Measures Study (CMS). The RFI activities included well installation, sampling, soil gas surveys, tracer tests, aquifer tests, and groundwater modeling. The CMS evaluated soil and groundwater remediation alternatives. A "no action" with monitoring alternative was recommended. The RFI and CMS reports were approved by USEPA, and the "no action" with monitoring plan was adopted by USEPA for the site.

DOE's Savannah River Site, South Carolina – Developed a three-dimensional groundwater flow and solute transport code called FTWORK. This code simulates groundwater flow through large, complex, multilayered, fully-saturated, porous hydrogeologic systems. Transport mechanisms include advection, dispersion, adsorption, and decay. We documented the model, and have extensively applied it at this site and elsewhere. The model is in the public domain and is used by other consultants and engineering companies.

---

*GeoTrans, Inc.*

 Page 1

## EXHIBIT A

**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
PRESIDENT, PRINCIPAL HYDROGEOLOGIST

Confidential Client – Developed SWANFLOW (Simultaneous Water And Non Aqueous Phase Flow), a finite-difference model that simulates the flow of water and an immiscible non-aqueous phase liquid (NAPL) in and below the vadose zone. This model was constructed for applications such as: hazardous waste migration analyses, groundwater restoration, and fuel spills and leaks. We documented the model for USEPA and support the model through a users group.

Whitmoyer Laboratories Site, Pennsylvania – Principal Investigator for a PRP funded Remedial Design/Remedial Action for the groundwater operable unit. The groundwater remedy will address arsenic contamination in a limestone and dolomite aquifer.

Superfund Site, Michigan – Principal Investigator for the design of a groundwater extraction system at a NPL site. The design of the system was based on the site Consent Order concept. A groundwater flow model was calibrated to site hydrogeological conditions and used to optimize the location, size and depths of drains and recharge trenches.

Two Superfund Site, southern New Jersey – Principal Investigator for groundwater investigations in the Pinelands area. Among other activities, numerical models for flow and solute transport were used to evaluate the potential for future contamination migration. The computer models were also used to evaluate groundwater pumping strategies.

NPL Site, Medley, Florida – Principal Investigator for stabilization of PCB and lead impacted soil and the analysis of the effectiveness of this remedy. Work included oversight of USEPA's RI/FS contractor on behalf of a PRP. A groundwater model was developed to establish monitoring action levels for the selected remedy (stabilization of PCB and lead contaminated soil). The model derived action levels were incorporated in the consent order for the site. The remedy was implemented and continued monitoring conducted by GeoTrans has shown the remedy to be effective.

Consolidated Edison, New York – Project Manager for modeling and analysis of the effects of a hypothetical nuclear reactor core melt-down. This included analysis of groundwater flow, heat transport, and radionuclide migration.

Confidential Client, Qatif Area, Saudi Arabia – Principal Investigator for groundwater and solute transport modeling to assess irrigation improvements. Groundwater modeling was used to define impacts including future water levels and consequent effects on well and spring production, pump settings, and migration of poor-quality groundwater.

Confidential Client, Jemez Mountains, New Mexico – Project Manager for computer modeling for impact assessment of the hydrologic impact of geothermal energy development, including estimates and prediction of geothermal reservoir history and effects on groundwater outflow to downstream users.

IBM Corporation, Manassas, Virginia – Conducted a groundwater contamination investigation and remedial program. The purpose of the study was to characterize the fracture flow system underlying the area and to assess the extent of groundwater and soil-water contamination by VOCs, primarily TCE. Performed groundwater modeling to assess the transport time and areal extent of contamination and to predict future temporal and spatial migration of the plume.

BCM, Inc., Lipari Landfill, New Jersey – Principal Investigator for conceptual design analysis of various remedial measures. Provided support to PRP for negotiation and litigation activities with the USEPA. Numerical groundwater models were applied to help interpret and predict the behavior of groundwater flow and convective contaminant transport. The results were incorporated into the engineering decisions regarding remedial measures.

Confidential Client, New Jersey – Principal Investigator for an owner-funded Remedial Investigation/Feasibility Study under a consent order and ECRA. Soil and groundwater contamination from volatile chemicals and mercury are the primary concerns at the site.

Confidential Client, Washington D.C. – Principal Investigator for groundwater/remedial action study at a former manufactured gas site. This project includes characterization of shallow and deep flow systems, design of a recovery well system, and localized soil sampling and analysis for PCB. The results of this investigation will be used to implement remediation and treatment of contaminated groundwater.

**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
PRESIDENT, PRINCIPAL HYDROGEOLOGIST

**Professional Certification:**

Certified Professional Geologist, VA
Certified Professional Geologist, PA

**Awards:**

Honor Societies and Awards:
ASCE 1985 Wesley W. Horner Award
P.D. Krynine Research Fund Award
Phi Kappa Phi
Fellow Geological Society of America
U.S. Navy Achievement Medal

**Publications:**

*Articles in Refereed Journals:*

1.  Faust, C.R., J.H. Guswa, J.W. Mercer, 1989. Simulation of three-dimensional flow of immiscible fluids within and below the unsaturated zone, *Water Resources Research*, 25(12): 2449-2464.

2.  Cohen, R.M., R.R. Rabold, C.R. Faust, J.O. Rumbaugh, and J. Bridge, 1987. Investigation and hydraulic containment of chemical migration at four landfills in Niagara Falls, New York, *Civil Engineering Practice*, 2(1):33-58.

3.  Mercer, J.W., C.R. Faust, R.M. Cohen, P.F. Andersen, and P.S. Huyakorn, 1985. Remedial action assessment for hazardous waste sites via numerical simulation, *Water Management and Research*, 3:377-387.

4.  Faust, C.R., 1985. Transport of immiscible fluids within and below the unsaturated zone: A numerical model, *Water Resources Research*, 21(4):487-596.

5.  Faust, C.R., J.W. Mercer, S.D. Thomas, and W.P. Balleau, 1984. Quantitative analysis of existing conditions and production strategies for the Baca geothermal system, New Mexico, *Water Resources Research*, 20(5):601-618.

6.  Andersen, P.F., C.R. Faust, and J.W. Mercer, 1984. Analysis of conceptual designs for remedial measures at Lipari Landfill, New Jersey, *Ground Water*, 22(2):176-190.

7.  Faust, C.R., and J. W. Mercer, 1984. Evaluation of slug tests in wells containing a finite-thickness skin, *Water Resources Research*, 20(4):504-506.

8.  Mercer, J.W., L.R. Silka, and C.R. Faust, 1983. Modeling groundwater flow at Love Canal, New York, *Journal of Environmental Engineering*, ASCE, 109(4):924-942.

9.  Huyakorn, P.S., B.H. Lester, and C.R. Faust, 1983. Finite-element techniques for modeling groundwater flow in fractured aquifers, *Water Resources Research*, 19(4):1019-1035.

10. Voight, B., and C.R. Faust, 1982. Frictional heat and strength loss in some rapid landslides, *Geotechnique*, 32(1):43-54.

11. Maddock, T., J.W. Mercer, and C.R. Faust, 1982. Management model for power production from a geothermal field: 1. Hot water reservoir and power plant model, *Water Resources Research*, 18(3):499-512.

**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

2174

12. Faust, C.R., L.R. Silka, and J.W. Mercer, 1981. Computer modeling and groundwater protection, Guest Editorial, *Ground Water*, 19(4):362-365.

13. Faust, C.R., and J.W. Mercer, 1980. Ground water modeling: Recent developments, *Ground Water*, 18(6):596-577.

14. Mercer, J.W., and C.R. Faust, 1980. Ground water modeling: Applications, *Ground Water*, 18(5):486-497.

15. Mercer, J.W., S.P. Larson, and C.R. Faust, 1980. Simulation of saltwater interface motion, *Ground Water*, 18(4):374-385.

16. Faust, C.R., and J.W. Mercer, 1980. Ground water modeling: Numerical models, *Ground Water*, 18(4):395-409.

17. Mercer, J.W., and C.R. Faust, 1980. Ground water modeling: Mathematical models, *Ground Water*, 18(3):212-227.

18. Mercer, J.W., and C.R. Faust, 1980. Ground water modeling: An overview, *Ground Water*, 18(2):108-115.

19. Mercer, J.W., and C.R. Faust, 1979. Geothermal reservoir simulation 3: Application of liquid and vapor dominated hydrothermal modeling techniques to Wairakei, New Zealand, *Water Resources Research*, 15(3):653-671.

20. Mercer, J.W., and C.R. Faust, 1979. A review of numerical simulation of hydrothermal systems, *Hydrological Sciences Bulletin*, 24(3):335-343.

21. Faust, C.R., and J.W. Mercer, 1979. Geothermal reservoir simulation 2: Numerical solution techniques for liquid and vapor dominated hydrothermal systems, *Water Resources Research*, 15(1):31-46.

22. Faust, C.R., and J.W. Mercer, 1979. Geothermal reservoir simulation 1: Mathematical models for liquid and vapor dominated hydrothermal systems, *Water Resources Research*, 15(1):23-30.

23. Yotsukura, N., A.P. Jackman, and C.R. Faust, 1973. Approximation of Heat Exchange at the Air Water Interface: *Water Resources Research*, 9(1):118-128.

*Conference or Symposium Proceedings:*

1. Faust, C.R., S.J. Wamback, and C.P. Spalding, 1990. Characteristics of the migration of immiscible fluids in glacial deposits and dolomite in Niagara Falls, New York, *Proceedings of IAH Conference Calgary '90* (April 1620, 1990), Calgary, Alberta, Canada.

2. Faust, C.R., R.R. Rabold, and J.W. Mercer, 1988. Modeling remedial actions at S-Area, Niagara Falls, NY, *Proceedings of the Seminar on Impact of Hazardous Waste Facilities on Water Utilities*, American Water Works Association Annual Conference, Orlando, FL.

3. Mercer, J.W., C.R. Faust, R.M. Cohen, P.F. Andersen, and P.S. Huyakorn, 1984. Remedial Action Assessment for Hazardous Waste Sites Via Numerical Simulation, Seventh Annual Madison Waste Conference on Municipal & Industrial Waste, University of Wisconsin, Madison, Wisconsin.

4. Huyakorn, O.S., D.E. Dougherty, and C.R. Faust, 1983. An improved finite-element model for simulating subsurface heat storage, International Conference on Subsurface Heat Storage in Theory and Practice (June 6-8), Stockholm, Sweden.

5. Hoyakorn, P.S., D.E. Dougherty, and C.R. Faust, 1982. Numerical simulation of thermal energy storage problems, *Proceedings of the 19th IMACS Congress on System Simulation and Scientific Computation* (August 8-13), Montreal, 2:296-298.

6.  Faust, C.R., 1982.  The Use of Modeling in Monitoring Network Design, *Proceedings of the Second National Symposium on Aquifer Restoration and Ground Water Monitoring*, National Water Well Association, pp. 156-162.

7.  Faust, C.R., and J.W. Mercer, 1982.  Preliminary analysis of groundwater development and brackish water upconing at Virginia Beach, Virginia, Special Publications: No. 1, *Georgia Southwestern College Studies of the Hydrogeology of the Southeastern United States*, B.F. Beck, (ed.), pp. 30-37.

8.  Faust, C.R., J.W. Mercer, and W.J. Miller, 1980.  The DOE code comparison study: Summary of results for problem 1, Presented at the Sixth Workshop on Geothermal Reservoir Engineering (December 17), Stanford, California.

9.  Mercer, J.W., and C.R. Faust, 1979.  Reservoir engineering and evaluation, Presented at the Geothermal Resources Council Symposium on Geothermal Energy and its Direct Uses in the Eastern United States, Roanoke, Virginia.

10.  Li, T.M.C., J.W. Mercer, C.R. Faust, and R.J. Greenfield, 1978.  Simulation of geothermal reservoirs including changes in porosity and permeability due to silica-water reactions, Presented at the Fourth Workshop on Geothermal Reservoir Engineering, Stanford University, Stanford, California.

11.  Huyakorn, P.S., G.F. Pinder, C.R. Faust, and J.W. Mercer, 1978.  Finite-element simulation of two-phase flows in porous media:  Computational Techniques for Interface Problems, American Society of Mechanical Engineers Applied Mechanics Division, 30:19-43.

12.  Mercer, J.W., and C.R. Faust, 1976.  The application of finite-element techniques to immiscible flow in porous media, *Proceedings, International Conference on Finite Elements in Water Resources* (July 1216), Princeton University, Pentech Press, pp. 121-157.

13.  Faust, C.R., and J.W. Mercer, 1976.  An analysis of finite-difference and finite-element techniques for geothermal reservoir simulation, *Proceedings of the Fourth SPE Symposium on Numerical Simulation of Reservoir Performance* (February 19-20), Los Angeles, California, pp. 337-354.

14.  Mercer, J.W., and C.R. Faust, 1975.  Simulation of water and vapor-dominated hydrothermal reservoirs, Paper SPE 5520 presented at 50th Annual Fall Meeting of the Society of Petroleum Engineers of AIME (September 28October 1), Dallas, Texas.

15.  Faust, C.R., and J.W. Mercer, 1975.  Mathematical modeling of geothermal systems, *Proceedings of the Second United Nations Symposium on the Development and Use of Geothermal Resources*, (May 20-29), San Francisco, California, 3:1633-1642.

16.  Mercer, J.W., C.R. Faust, and G.F. Pinder, 1974.  Geothermal reservoir simulation, *Proceedings of National Science Foundation Conference on Research for the Development of Geothermal Energy Resources* Pasadena, California, pp. 256-257.

*Technical Reports:*

1.  Cohen, R.M., A.H. Vincent, J.W. Mercer, C.R. Faust, and C.P. Spalding, 1993.  *Methods for Monitoring Pump-and-Treat Performance*, USEPA Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma, 114 pp.

2.  Faust, C.R., P.N. Sims, C.P. Spalding, and P.F. Andersen, 1989.  FTWORK: Groundwater flow and solute transport in three-dimensions, GeoTrans, Inc. WSRC-RP-89-1085 prepared for United States Department of Energy, Westinghouse, Savannah River Plant, Aiken, South Carolina.

**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

3.  Faust, C.R., and J.O. Rumbaugh, III, 1986. SWANFLOW: Simultaneous Water, Air, and Nonaqueous Phase Flow, Prepared by GeoTrans, Inc., Herndon, Virginia, for the United States Environmental Protection Agency, Washington, DC.

4.  Mercer, J.W., C.R. Faust, W.J. Miller, III, and F.J. Pearson, Jr., 1981. Review of simulation techniques for aquifer thermal energy storage, ATES, Pacific Northwest Laboratory Report, PNL3769, 183 pp.

5.  Mercer, J.W., S.P. Larson, and C.R. Faust, 1980. Finite-difference model to simulate the areal flow of saltwater and freshwater separated by an interface, U.S. Geological Survey Open File Report 80407, 88pp.

6.  Maddock, T., III, J.W. Mercer, C.R. Faust, and E.D. Attanasi, 1979. Management model for electrical power production from a hot-water geothermal reservoir, Reports on Natural Resources Systems No. 34, University of Arizona, Tucson, Arizona, 114 pp.

7.  Faust, C.R., and J.W. Mercer, 1977. Finite-difference model of two-dimensional single and two-phase heat transport in a porous medium: Version I, U.S. Geological Survey Open-File Report 77234.

8.  Wells, R.B., C.R. Faust, and J.W. Mercer, 1976. A cross-section plotting program (CSPP) for Gridded (Map) Data, U.S. Geological Survey Open File Report 76689.

*Abstracts for Papers not Listed:*

1.  Faust, C.R., and N. Shifrin, 1986. Use of risk assessment in determining groundwater remedies for the Hyde Park Landfill, in the Town of Niagara, New York: Hydrogeology and fate of chemicals (Abstract), 1986 AGU Fall Meeting/ASLO Winter Meeting, San Francisco, California.

2.  Faust, C.R., and B. Voight, 1979. Heat-induced fluid pressure enhancement mechanism in seismic faulting (Abstract), Annual Spring Meeting of the American Geophysical Union, Washington, DC.

3.  Faust, C.R., and J.W. Mercer, 1977. Mathematical models as an aid to understanding the geohydrology of hydrothermal systems (Abstract), Geological Society of America Annual Meeting, Seattle, Washington.

*Books and Book Chapters:*

1.  Mercer, J.W., C.R. Faust, W.J. Miller, and F.J. Pearson, Jr., 1982. Review of simulation techniques for aquifer thermal energy storage (ATES), in Advances in Hydroscience, Academic Press, New York, 13:11-29.

2.  Mercer, J.W., and C.R. Faust, 1981. Ground Water Modeling: National Water Well Association, Columbus, Ohio, 60 pp.

3.  Mercer, J.W., and C.R. Faust, 1980. The physics of fluid flow and heat transport in geothermal systems, in Sourcebook on the production of electricity from geothermal energy, Joseph Kestin (ed.), U.S. Department of Energy DOE/RA/40511, pp. 121-135.

*Miscellaneous:*

1.  Mercer, J.W., C.R. Faust, and L.R. Silka, 1984. Groundwater flow modeling study of the Love Canal area, New York, *Ground Water Contamination*, J.D. Bredehoeft and T.M. Usselman (eds.), National Research Council, pp. 109-119.

2.  Faust, C.R., 1976. Numerical simulation of fluid flow and energy transport in liquid and vapor-dominated hydrothermal systems, Ph.D. Thesis, The Pennsylvania State University, 163 pp.

# Maria J. Zufall, Ph.D.

6600 Peachtree Dunwoody Road

600 Embassy Row, Suite 350

Atlanta, Georgia 30328

Phone:  (770) 394-4001      Fax:  (770) 394-3610      E-mail:  mzufall@trinityconsultants.com

## EDUCATION

**Carnegie Mellon University,** Pittsburgh, PA
Ph.D., Department of Civil and Environmental Engineering, August 1998
Thesis Title: *Dry Deposition of Aerosols to Water Surfaces: Effects of Hygroscopic Growth and Wave Interactions*

**Carnegie Mellon University,** Pittsburgh, Pennsylvania
M.S., Department of Civil and Environmental Engineering, May 1995
Thesis Title: *Dry Deposition of Atmospheric Contaminants to Lake Michigan*

**Cornell University,** Ithaca, NY
B.S. with Distinction, Department of Civil and Environmental Engineering, May 1993

## EXPERIENCE

**Trinity Consultants,** Atlanta, Georgia
*Project Supervisor (2002 – present).*  Propose, manage, and implement air quality consulting projects at environmental consulting firm.  Projects include environmental regulatory evaluations for industrial facilities, air quality permitting, air dispersion modeling, and litigation support services.  Serve as instructor for courses on air quality permitting and dispersion modeling.

*Consultant(2000 – 2002).*  Provide consulting services to industrial clients to assure facilities are in compliance with air quality regulations.  Includes development of construction permit applications, facility audits, and air dispersion modeling.  Conduct detailed dispersion modeling analyses for near-field and far-field impacts.

**U. S. Environmental Protection Agency,** Research Triangle Park, North Carolina
*Environmental Scientist, Human Exposure Analysis Branch (1998 – 2000).*  Modeled human exposure to airborne particulate matter using indoor and outdoor air quality models and human activity patterns.  Conducted multimedia assessment of children's exposure to pesticides.

**Carnegie Mellon University,** Pittsburgh, Pennsylvania
*Research Assistant, Department of Civil and Environmental Engineering (1994 – 1998).*
Investigated dry deposition of atmospheric aerosols to water surfaces through mathematical modeling, wind tunnel experiments, and field studies.

*Course Instructor, Department of Civil and Environmental Engineering (1997).*
Designed curriculum, tests, and assignments and delivered lectures for a senior/graduate level course in air quality engineering.

# EXHIBIT B

SELECTED PUBLICATIONS AND PRESENTATIONS

Zufall, M. J., Bailey, R. B., Simonsen, S. L. 2001. Regulatory Applications of CALPUFF Modeling. Presented at 2001 Air and Waste Management Association Annual Conference, June 28, 2001.

Burke, J. M., Zufall, M. J. and Ozkaynak, H. 2001. "A Population Exposure Model for Particulate Matter: Case Study Results for $PM_{2.5}$ in Philadelphia, PA," *Journal of Exposure Analysis & Environmental Epidemiology* 11(6), 470-489.

Rea, A. W., Zufall, M. J., Williams, R. W., Sheldon, L., Howard-Reed C. 2001. "The influence of human activity patterns on personal PM exposure: A comparative analysis of filter-based and continuous particle measurements." *Journal of the Air and Waste Management Association*. 51:1271-1279.

Howard-Reed, C., Rea, A. W., Zufall, M. J., Burke, J. M., Williams, R. W., Suggs, J. C., Williams, L. S., Walsh, D. and Kwok, R. 2000. "Use of a continuous nephelometer to measure personal exposure to particles during the U.S. Environmental Protection Agency Baltimore and Fresno studies". *Journal of the Air and Waste Management Association*. 50:1125 – 1132..

Zufall, M.J., H. Ozkaynak, M. Brauer, W. Ott, and J. Spengler. 1999. "Particulate Matter Concentrations in Non-Residential Microenvironments: A Review" presented at the 1999 Joint Annual Meetings of the International Society of Exposure Analysis and the International Society for Environmental Epidemiology, September 5 to 8, 1999, Athens, Greece.

Zufall, M. J., Dai, W., Davidson, C. I., and Etyemezian, V. 1999. "Effects of waves on dry deposition rates of atmospheric aerosols to natural water surfaces: I. Mathematical Modeling." *Atmospheric Environment*, 33:4273-4281

Zufall, M. J., Dai, W., and Davidson, C. I. 1999. "Effects of waves on dry deposition rates of atmospheric aerosols to natural water surfaces: II. Wind Tunnel Studies."*Atmospheric Environment*, 33:4283-4290

Zufall, M. J., Davidson, C. I., Caffrey, P. F. and Ondov, J. M. 1998 "Airborne concentrations and dry deposition fluxes of particulate chemical species to southern Lake Michigan." *Environmental Science and Technology* 32: 1623-1628.

Zufall, M. J. and Davidson, C. I. 1998. "Dry deposition of particles." *In* R. M. Harrison and R. Van Grieken, eds. *Atmospheric Particles*. John Wiley and Sons. New York. pp. 426-473.

Zufall, M. J., Bergin, M. H., and Davidson, C. I. 1998. "Effects of hygroscopic growth on dry deposition of $(NH_4)_2SO_4$ to water surfaces -- a non-equilibrium approach." *Environmental Science and Technology*. 32: 584-590.

Zufall, M. J. and Davidson, C. I. 1997. "Dry deposition of particles to water surfaces." *In* J. Baker, ed. *Atmospheric Deposition of Contaminants to the Great Lakes and Coastal Waters*. Pergamon Press. New York. pp. 1-16.



**RSG** INC.
RESOURCE SYSTEMS GROUP, INC.

## KENNETH H. KALISKI P.E., Q.E.P., INCE BRD. CERT.
### DIRECTOR OF ENVIRONMENTAL SERVICES

### EDUCATION, LICENSES, AND CERTIFICATIONS

B.E. Engineering, Dartmouth College

B.A. Biological Sciences and Environmental Studies, Dartmouth College

Qualified Environmental Professional, Inst. of Professional Environmental Practice

Licensed Professional Engineer, Vermont and New Hampshire

Board Certified, Institute of Noise Control Engineering

### EXPERIENCE

Mr. Kaliski is the Director of Resource Systems Group's Environmental division. He has been with the firm since its founding in 1987. He manages projects and has served as an expert witness in the areas of community noise, air pollution, and traffic impacts. His projects include work in Vermont, New Hampshire, Massachusetts, Maine, New York, Connecticut, New Jersey, Alabama and Florida. In addition to developing the firm's air pollution and noise programs, he has authored much of the firm's traffic, air, and noise software, some of which is commercially available.

### RESPONSIBILITIES & RELEVANT PROJECTS (PARTIAL LIST)

*Noise Impact Evaluation of a Snowmaking System*—performed noise modeling of a proposed snowmaking system at the Viking Ski Touring Center in Londonderry, Vermont. Evaluated effectiveness of noise barriers in reducing noise levels.

*Sandbar Aggregate Quarry Noise Evaluation*—developed noise level estimates at nearby residences from a quarrying and crushing operation proposed for Milton, Vermont. Modeled the noise attenuation due to natural earth berms, hills, and man-made barriers. Proposed additional noise attenuation strategies to meet local and national guidelines.

*Hooksett Truck Depot Noise Impact Analysis*—evaluated existing and predicted future noise levels after expansion of a truck depot. Data collection included measuring background automobile speeds and noise levels on highway, and measuring idling and accelerating truck noise levels, and modeling impact of noise from depot at various times of day.

*Bennington, Vermont By-Pass Environmental Impact Study*—analyzed noise impacts of the proposed US 7 By-pass around Bennington, Vermont. Monitored existing noise levels and updated noise and traffic levels for use in noise modeling. Submitted report as part of a Federal Environmental Impact Statement.

*C&S Wholesale Grocer's Expansion Noise Impact Study*—forecasted noise levels at nearby residences and motels. Modeled each of 24 hours using various traffic counts, estimates of truck trip generation, FHWA's highway noise prediction computer model, and RSG's own model for idling truck noise attenuation. Modeled the effectiveness of barriers and terrain features in reducing noise levels. Prepared testimony for local and Act 250 hearings.

331 Olcott Drive, White River Junction, Vermont 05001
TEL 802.295.4999 • FAX 802.295.1006 • www.rsginc.com

EXHIBIT C

*Noise Impacts of a Landfill Gas Power Plant*—determined noise levels at neighboring residences from a landfill gas-fired electric power generator in Burlington, Vermont. Modeled noise attenuation due to atmospheric loss and topographic features using RSG's *NTerrain* noise modeling software package.

*Review of the White Rock Point Noise Impact Evaluation*—critiqued analysis of a drilling, blasting, and hauling operation in a residential neighborhood of South Burlington, Vermont. Performed modeling of point source construction noise, background airport noise, and traffic noise to assess projects compliance with local and national guidelines.

*Noise Forecasting for a Wind Turbine Demonstration Project*—conducted noise measurements and modeling for a proposed 12-tower wind turbine project by the Green Mountain Power Company in Searsburg, Vermont. Used the NTerrain model to quantify the effects of atmospheric loss, vegetation, wind, and terrain features on octave-band noise levels in the area.

*Noise Mitigation for Wood Kilns* – conducted an assessment of the noise generated by large wood drying kilns in Springfield, New Hampshire and made recommendations to reduce the impact of nighttime noise at neighboring properties.

## MEMBERSHIPS/AFFILIATIONS

Institute of Noise Control Engineering
Acoustical Society of America
Air and Waste Management Association
Institute of Professional Environmental Practice
Institute of Transportation Engineers
Tau Beta Pi Engineering Society

## PUBLICATIONS

Ray, R. R., Collier, R. D., and Kaliski, K. H., *Optimization of Stability and Performance of LMS Filters for Feedforward Active Noise Reduction in Communications Headsets*, ACTIVE 02, The 2002 International Symposium on Active Control of Sound and Vibration, July 2002.

Collier, R. D., and Kaliski, K. H., and Ray, R. R.,, *Experimental Techniques for Evaluation of Active Noise Reduction Communication Headsets with the Thayer Low Frequency Acoustic Test Cell*, Proceedings of the 2003 Institute of Noise Control Engineers NOISECON 2003.

Kaliski, K. H., Mills-Tettey, A., Seitaridou, E., Collier, R., *Low-Complexity Continuous Noise Monitoring System for Communities, Small Airports, and Remote Areas*, Proceedings of the 2001 Institute of Noise Control Engineers NOISECON 2001.

Marshal, N.L., Kaliski, K.H., Rimmer, L.L., Lawe, J.C., *Estimating Network Model Parameters from Mail Survey Data*, Proceedings of ASCE 4th International Conf. on Microcomputers in Transportation, Baltimore MD, July, 1992

Kaliski K, *Integrating Network Modeling and Air Pollution Modeling to Determine NO2 Contributions from Motor Vehicles*, Proceedings of the 3rd National Conference on Transportation Solutions for Small and Medium-Sized Areas, Transportation Research Board, October, 1991..


**SAULS**
**SEISMIC, INC.**

3710 4th Avenue South
Birmingham, AL 35222-2420
U.S.A.
www.saulsseismic.com
E-mail: sales@saulsseismic.com

Phone: 205-592-2466
Fax: 205-592-2477
Watts: 800-749-2477
 Ext. 110

# McROY SAULS

## RESUME

<u>PREVIOUS WORK EXPERIENCE:</u>

10/80 to PRESENT:

      President - Sauls Seismic, Inc.
      Birmingham, Alabama, USA

      President - NOMIS Seismographs
      Birmingham, Alabama, USA.

1/78 to 10/80:

      VME-Nitro Consult, Inc.
      Regional Manager - Alabama Office
      Jasper, Alabama

6/73 to 12/77:

      AETNA Life & Casualty Company
      Engineering Department
      Birmingham, Alabama

12/72 to 5/73:

      Assistant Golf Pro
      Indies Inn & Yacht Club
      Duck Key, Florida Keys

6/68 to 12/72:

      Clemson University
      B.S. - Engineering
      Clemson, South Carolina

**Birmingham,AL/Atlanta,GA/Chapmanville,WV/Charlotte,NC/Louisville,KY/Nashville,TN**
**Knoxville,TN/Columbus,OH**

EXHIBIT D

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                              )
                                                 )
        Plaintiffs,                       )      **COPY**
                                                 )
vs.                                              )      Civil Action No. CV-20 02-85
                                                 )
HANSON AGGREGATES SOUTHEAST,                     )
INC., et al.,                                    )
                                                 )
        Defendants.                       )

F I L E D

APR 0 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF TAKING DEPOSITION

TO:     James A. Byram, Jr.          John V. Denson
            BALCH & BINGHAM, LLP     SAMFORD, DENSON, HORSLEY,
            P.O. Box 78               PETTEY & BRIDGES
            Montgomery, AL 36101     P.O. Box 2345
                                     Opelika, AL 36803-2345

            H. Wayne Phears          Phillip E. Adams, Jr.
            PHEARS & MOLDOVAN      ADAMS, UMBACH, DAVIDSON
            Suite 375                  & WHITE, LLP
            4725 Peachtree Corner Circle P. O. Box 2069
            Norcross, GA 30092-3000    Opelika, AL 36803-2069

Please take notice that on April 16, 2004, at 9:00 a.m., at the offices of ADAMS, UMBACH,

DAVIDSON & WHITE, LLP, Opelika, Alabama, the Plaintiffs will take the deposition of **Malcom C.**

**LeBron, Rt. 2, Box 29, Rockford, Alabama 35136,** for the purposes of discovery and impeachment

at trial upon oral examination before a Court Reporter or some other officer authorized by law to

administer oaths.

To testify as to the following matters and produce for inspection the **ORIGINALS** of all

documents requested as follows:

     1.     Any and all Notices of Violations or environmental problems relating to the Lee
County quarry when operated by Hanson or Oldcastle.  This would include but not be limited to fuel

2185

spills, illegal discharges, dust problems or occasions when Hanson or Oldcastle violated or alleged to have violated their permits from ADEM.

2.    Copies of e-mails, memos or other documents to or from (a) Oldcastle Materials; (b) SRM; (c) Brian Fowler and/or North American Reserves; (d) Hanson; (including any employee of these companies).

3.    Any and all e-mails, correspondence or documents to or from any source relating to the Hanson/Oldcastle, Lee County quarry.

4.    Any and all e-mails, correspondence or documents to or from ADEM relating to the Hanson/Oldcastle, Lee County quarry.

5.    Any and all e-mails, correspondence, records, computations, notes or other documents relating to your letter in the Fall of 2003 to ADEM relating to an increase of pumping discharge to ten million gallons per day.

6.    Your entire file, including electronically stored data (including but not limited to e-mails), on this quarry.

The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witnesses.

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

2184

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 7th day of _____April_____, 2004.

_____
OF COUNSEL

\\Front door\C\My Document\WPDocs\JBS\CIVIL\Hanson\Pleadings\Deposition\Notice of Depo Lebron 3-29-04.wpd

2185

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| **MIKE DAVIS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-20 02-0085** |
| | ) | |
| **HANSON AGGREGATES SOUTHEAST,** | ) | F I L E D |
| **INC., et al.,** | ) | |
| | ) | APR 0 9 2004 |
| **Defendants.** | ) | |

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### PLAINTIFFS' MOTION FOR DEFENDANTS
### TO PAY COST OF SECOND MEDIATION

The Plaintiffs would show this court that:

1.    The first mediation in this case was held May 21, 2003. Mediation lasted over one-half (½) of a day and cost approximately $1,700.00, with the Plaintiffs paying one-half (½) of the cost.

2.    The rules of mediation require privacy and confidentiality. However, from the discovery documents and depositions taken since the last mediation, it is the Plaintiffs position that Hanson could not have mediated a successful settlement because it had ongoing negotiations and later a buy-sell agreement with Oldcastle. The buy-sell agreement was dated July 11, 2003 and was for the sell and/or swap six (6) or eight (8) quarries, including the Opelika quarry.

3.    The Lee County quarry sold on July 13, 2003, based on these negotiations which had begun in October or November, 2002. These negotiations included site visits by the Oldcastle management and contract geologist (Brian Fowler) in 2003. The site visit was to visually examine for safety, environmental concerns, and confirmation of estimated mineral reserves.

Page 1 of 3

2185

4.    Without disclosing the mediation discussions, it would have been (virtually) impossible to mediate a settlement due to the negotiations and pending sale/swap of the Opelika quarry.

5.    Since the Plaintiffs were never informed of the negotiations and/or pending sale, even though they had repeatedly asked, and did not learn of the transaction until approximately July 15, 2003.

6.    Accordingly, the Plaintiffs should not have to pay for a second mediation.  As the Plaintiffs entered the first mediation in good faith and without full knowledge of the circumstances surrounding Hansons inability to fully and fairly negotiate.

WHEREFORE, the Plaintiffs move this Court for an Order that would order the Defendants to pay the full cost of the second mediation.

Respectfully submitted,

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

2187

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ___ day of _____, 2004.

OF COUNSEL

\\Front door\C\My Documents\WPDocs\JBS\CIVIL\Hanson\Pleadings\Motions\Motion for Defendants to Pay Cost of 2nd Mediation.wpd

2185

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                                    )
                                                       )
        Plaintiffs,                                )
                                                       )
vs.                                                    )      **Civil Action No. CV-20 02-0085**
                                                       )
HANSON AGGREGATES SOUTHEAST,                           )
INC., et al.,                                          )
                                                       )
        Defendants.                                )

FILED

APR 0 9 2004

IN OFFICE
CORINNE T. HURST

## PLAINTIFFS' SECOND MOTION FOR ORDER COMPELLING PRODUCTION

    The Plaintiffs move the Court for an order requiring defendant, Oldcastle, to produce and

to permit plaintiffs to inspect and to copy each of documents in Plaintiffs' First and Second

Request for Production as well as Notice of Depositions that are not yet produced, as set out in a

letter of March 30, 2004 to Mr. Adams:

    Plaintiff did previously serve upon the defendant, Oldcastle, the following:

1.    Plaintiffs' First Interrogatories and Requests for Production to Defendant

    Oldcastle on the 30th day of September, 2003 (a copy of which has been

    previously filed).

2.    Plaintiffs' Motion to Compel Oldcastle to Respond to Plaintiffs' First

    Interrogatories and Requests for production filed with the Court on the 2nd day of

    December, 2003, which is incorporated and adopted herein by reference.

3.    Plaintiffs Second Interrogatories and Request for Production served 11th day of

    December, 2003.

4.   Notice of Deposition of Frank Heisterkamp (a copy of which is attached as Exhibit A).

5.   Notice of Deposition of Brian Fowler (a copy of which is attached as Exhibit B).

6.   Letter to Phil Adams dated March 30, 2004 (a copy of which is attached as Exhibit C), requesting documents.

7.   Notice of Deposition of Ted Reynolds (a copy of which is attached as Exhibit D).

8.   Selected pages of Heisterkamp deposition (copies of which are attached as Exhibit E) which discuss documents, privilege and related issues.

9.   Oldcastle Privilege Log (a copy of which is attached as Exhibit F).

10.  Selected pages of Fowler deposition (Copies of which are attached as Exhibit G).

11.  Selected pages of Reynolds deposition (Copies of which are attached as Exhibit H).

The parties have attempted to resolve the discovery disputes but are unable to do so. Some documents have been promised but have never been produced. The existence of other documents simply was not revealed until the deposition of Heisterkamp and Fowler and the production of the "Privilege Log" by Oldcastle. Documents and e-mails from early 2002 and earlier should be produced since Mr. Heisterkamp testified that the earliest contact was Fall, 2002. Other documents involve "due diligence" in relation to the purchase on July 13, 2003 and should be produced since it shows Oldcastle deliberate decision to close the deal even though it knew that this lawsuit made very serious allegations.

**WHEREFORE,** for good cause shown, Plaintiffs move this Honorable Court to compel

Oldcastle to produce the documents requested in the letter to Mr. Adams dated March 30, 2004

and, further, to award the Plaintiffs' attorneys costs for the necessity of filing a Motion to

Compel. Oldcastle's objections were invalid under Alabama law. To object is clearly a delaying

tactic on Oldcastle's part designed to impede Plaintiffs' discovery in this case and to delay the

litigation. Plaintiffs therefore move for an award of attorneys' fees in this case situation based

on Rule 26, Rule 33 and Rule 37.

Respectfully submitted,

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ___ day of ___ April ___, 2004.

_____
OF COUNSEL

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2192

MIKE DAVIS, et al.,                    )
                                       )
                Plaintiffs,            )
                                       )
vs.                                    )    Civil Action No. CV-20 02-85
                                       )
HANSON AGGREGATES SOUTHEAST,           )
INC., et al.,                          )
                                       )
                Defendants.            )

### RE-NOTICE OF TAKING DEPOSITION

TO:   James A. Byram, Jr.              John V. Denson
      Balch & Bingham, LLP             Samford, Denson, Horsley,
      P.O. Box 78                      Pettey & Bridges
      Montgomery, AL 36101             P.O. Box 2345
                                       Opelika, AL 36803-2345


      H. Wayne Phears                  Phillip E. Adams, Jr.
      Phears & Moldovan                Adams, Umbach, Davidson
      Suite 375                          & White, LLP
      4725 Peachtree Corner Circle     P. O. Box 2069
      Norcross, GA 30092-3000          Opelika, AL 36803-2069

Please take notice that on March 1 and March 2, 2004, commencing at 9:00 a.m. each

day, at the offices of Phillip E. Adams, Jr., Opelika, Alabama, the Plaintiffs will take the

depositions of the Corporate Representatives of Oldcastle Materials Southeast, Inc., for

the purposes of discovery and impeachment at trial upon oral examination before a Court

Reporter or some other officer authorized by law to administer oaths.

In accordance with Rule 30(b)(6), Defendant Oldcastle is requested to designate one

or more persons with knowledge to testify as to the following matters and to produce for

inspection the ORIGINALS of all documents requested on Exhibit A attached hereto:

2195

1.    The negotiation for the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

2.    The terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County quarry to or by Oldcastle Materials Southeast, Inc.

3.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

5.    All documents requested in Plaintiffs' First and Second Interrogatories and Requests for Production to Defendant Oldcastle.

6.    All documents regarding any changes to the manner of operation of the Lee County quarry whether such changes have been implemented or plan to be implemented in the future.

7.    All documents related in any way to any violations of Oldcastle's ADEM permits with respect to the Lee County quarry.

8.    All mining plans and any document related in any way to a mining plan.

9.    All documents related in any way to dust control activities or problems at the Lee County quarry.

10.    All documents related to discharging of water from the Oldcastle Lee County quarry.

11.    All documents related to sales of materials from the Lee County quarry.

12.    All documents evidencing the number of hours worked by Oldcastle Lee County quarry employees from the date of acquisition to the date of this deposition.

13.    All correspondence with ADEM with respect to the Lee County quarry.

14.    All internal memoranda, e-mails, or written documentation of any character relating to complaints by surrounding property owners, the investigation of such complaints, and the resolution, if any, of such complaints.

2194

15.   All ADEM applications and/or all ADEM permits for this Defendant.

16.   All ADEM reports, including but not limited to, monthly water quality reports.

17.   All hydrogeology and engineering reports and/or studies and related documents.

18.   All environmental reports or studies of any type or description prepared on this Defendant's behalf or on behalf of its predecessor and which this Defendant relies upon in any manner for any purpose.

19.   Any and all written or verbal complaints made by any entity against this Defendant as well as against Hanson. Complaints include, but are not limited to, complaints about noise, dust, blasting, water, trucks, and/or the operation of the quarry in general.

20.   Any and all pre-quarry and/or pre-purchase property inspections whether prepared on your behalf of on behalf of your predecessor, private property owners, or insurance companies. Please include in your response any and all photographs and any related documents.

21.   All sales tax reports and/or quarry mining tax reports filed in Lee County for the years 1999 through the present.

22.   All licenses, agreements, contracts, correspondence or other documents that relate to this Defendant's relationship with Dixie Pipeline or any other pipeline company in Lee County, Alabama.

23.   Any and all reports, studies, complaints, correspondence or other documents concerning or related to sinkholes in and around the Hanson Lee County Quarry. This would include, but not be limited to, the possibility of sinkholes forming, sinkholes that have formed, and/or the repair of sinkholes.

24.   The knowledge or information known to Oldcastle regarding the likelihood of sinkhole formation in or around its limestone quarries generally, as well as the formation of sinkholes in and around other Oldcastle quarries in karst terrain.

25.   Any and all studies, reports, complaints, correspondence or other documents relating to Spring Villa. This would include, but not be limited to, the dewatering of Spring Villa, the diversion of Spring Villa water into your quarry and/or the interbasin transfer of water from Spring Villa into your quarry or Chewacla Creek.

3

2195

26.    All documents relating to environmental problems, hazards, or concerns relating to the Opelika quarry.

27.    Any and all maps, drawings, plats, surveys, or other similar documents of the quarry or the leased property.

28.    Any and all blasting reports and blasting activities at the quarry since Oldcastle assumed control of the quarry.

29.    Any and all permits for blasting obtained by or on behalf of Oldcastle or any company performing blasting services for Oldcastle at its Lee County quarry.

30.    And and all "pre-blast" inspections of home and/or any knowledge gained by Oldcastle regarding any preexisting pre-blast inspections of homes relating in any way to damages allegedly caused by blasting at the quarry.

31.    Any and all information known to Oldcastle regarding the neighbors' complaints of blasting damage.

32.    Any and all information known to Oldcastle regarding noise, dust and medical complaints of people in the area surrounding the quarry.

33.    Any and all information known to Oldcastle regarding any adverse health effects to humans from breathing any dust or by-product of the quarry operation.

34.    Any Complaints and/or Notices of Violations (together with any sanctions or penalties imposed, if any) by any governmental regulatory body.

35.    The relocation of the plant equipment at the Lee County Quarry.

36.    The replacement of equipment (fixed or mobile) at the Lee County Quarry.

37.    All equipment and all equipment component parts (whether fixed or mobile) moved to or placed into service at the Lee County Quarry, including the place or places from which each piece of equipment was obtained or transferred.

38.    All information regarding the amount of dust generated by each piece of equipment (and/or component part thereof), whether fixed or mobile, at the Lee County Quarry.

2195

39.     Applications or correspondence to any regulatory agency relating to Oldcastle's intended, actual, or proposed relocation of the plant; the discharge area; or to increase the amount of water pumped from the quarry.

40.     Oldcastle's knowledge of and response, if any, to the June 26, 2003, and to the January 26, 2004, settlement letters from Plaintiffs' attorneys to Hanson's attorneys (including without limitation, whether Oldcastle received such documents and what it did after receiving such documents).

41.     All efforts undertaken by Oldcastle to ascertain the basis for, the truthfulness of, or the validity of the Plaintiffs' claims in the litigation, prior to assuming control of the quarry from Hanson.

42.     The knowledge or information known to Oldcastle regarding the likelihood of sinkhole formation in or around its limestone quarry in Lee County, Alabama.

The deponents are requested to bring with them and testify as to the documents and things requested on Exhibit "A" attached hereto.

The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witnesses.

_C E Vercelli_

_____
**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

5

2197

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 12TH day of February , 2004.

_C E Vincent_

OF COUNSEL

155-00\Re-Not-Depo--corp.rep-OC.4.wpd

6

2198

## EXHIBIT "A"

In the following requests, the term "document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, floppy disks, CD-ROMS, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed materials readable by humans or machines. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined)  contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

The deponents are  requested to bring with them to the deposition, and to give testimony as to the following documents and things:

1. All documents related to the negotiation of the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

2. All documents relating to the terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

3. All documents related to any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4. All documents related to any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

5. All documents responsive to Plaintiffs' First **AND SECOND** Interrogatories and Requests for Production to Oldcastle.

2199

6.      All documents regarding any changes to the manner of operation of the Lee County quarry whether such changes have been implemented or plan to be implemented in the future.

7.      All documents related in any way to any violations of any of Oldcastle's ADEM permits with respect to the Lee County quarry.

8.      All documents related to all mining plans and any document related in any way to a mining plan.

9.      All documents related in any way to dust control activities or problems at the Lee County quarry.

10.     All documents related to discharging of water from the Oldcastle Lee County quarry.

11.     All documents related to sales of materials from the Lee County quarry.

12.     All documents evidencing the number of hours worked by Oldcastle Lee County quarry employees from the date of acquisition to the date of this deposition notice.

13.     All correspondence with ADEM with respect to the Lee County quarry.

14.     All internal memoranda, e-mails, or written documentation of any character relating to complaints by surrounding property owners, the investigation of such complaints, and the resolution, if any, of such complaints.

15.     Please produce all ADEM applications and/or all ADEM permits for this Defendant.

16.     Please produce any and all ADEM reports, including but not limited to, monthly water quality reports

17.     Please produce any and all hydrogeology and engineering reports and/or studies and related documents.

18.     Please produce all environmental reports or studies of any type or description prepared on this Defendant's behalf or on behalf of its predecessor.

19.     All documents related to any and all written or verbal complaints made by any entity against this Defendant. Complaints include, but or not limited to, complaints about noise, dust, blasting, water, trucks, and/or the operation of the quarry in general.

20.    All documents related to any and all pre-quarry and/or pre-purchase property inspections whether prepared on your behalf of on behalf of your predecessor, private property owners, or insurance companies. Please include in your response any and all photographs and any related documents.

21.    All documents related to all sales tax reports and/or quarry mining tax reports filed in Lee County for the years 1999 through the present.

22.    All documents related to all licenses, agreements, contracts, correspondence or other documents that relate to this Defendant's relationship with Dixie Pipeline or any other pipeline company in Lee County, Alabama.

23.    All documents related to any and all reports, studies, complaints, correspondence or other documents concerning or related to sinkholes. This would include, but not be limited to, the possibility of sinkholes forming, sinkholes that have formed, and/or the repair of sinkholes.

24.    All documents related to any and all maps, drawings, plats, surveys, or other similar documents of the quarry or the leased property.

25.    All documents related to any and all studies, reports, complaints, correspondence or other documents relating to Spring Villa. This would include, but not be limited to, the dewatering of Spring Villa, the diversion of Spring Villa water into your quarry and/or the interbasin transfer of water from Spring Villa into your quarry or Chewacla Creek.

26.    All documents related to any actual or alleged environmental problems, hazards, or concerns relating to the Opelika quarry.

27.    All documents related to blasting reports and blasting activities at the quarry since Oldcastle assumed control of the quarry.

28.    All documents related to any and all permits for blasting obtained by or on behalf of Oldcastle or any company performing blasting services for Oldcastle at its Lee County quarry.

29.    All documents related to any "pre-blast" inspections of home and/or any knowledge gained by Oldcastle regarding any preexisting pre-blast inspections of homes relating in any way to damages allegedly caused by blasting at the quarry.

30.    All documents related to any and all information known to Oldcastle regarding the neighbors' complaints of blasting damage.

31.    All documents related to information known to Oldcastle regarding noise, dust and medical complaints of people in the area surrounding the quarry before Oldcastle purchased the quarry and since Oldcastle purchased the quarry.

32.    Any and all information known to Oldcastle regarding any adverse health effects to humans from breathing any dust or by-product of the quarry operation.

33.    All documents related to the receipt by Oldcastle of copies of (or summaries of) the two settlement letters (dated June 26, 2003 and January 26, 2004) from Plaintiffs' lawyers to Hanson's lawyers, which letters were FAXED to the office of Phillip Adams on the late afternoon of February 11, 2004.

34.    All documents related to the actions or other analysis of or consideration of the two settlement letters referenced in the immediately preceding paragraph.

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,     )
                )
     Plaintiffs,    )
                )
vs.              )     Civil Action No. CV-20 02-85
                )
HANSON AGGREGATES SOUTHEAST,  )
INC., et al.,           )
                )
     Defendants.    )

### NOTICE OF TAKING DEPOSITION

TO:   James A. Byram, Jr.        John V. Denson
      BALCH & BINGHAM, LLP    SAMFORD, DENSON, HORSLEY,
      P.O. Box 78            PETTEY & BRIDGES
      Montgomery, AL 36101     P.O. Box 2345
                              Opelika, AL 36803-2345

      H. Wayne Phears         Phillip E. Adams, Jr.
      PHEARS & MOLDOVAN      ADAMS, UMBACH, DAVIDSON
      Suite 375            & WHITE, LLP
      4725 Peachtree Corner Circle  P. O. Box 2069
      Norcross, GA 30092-3000   Opelika, AL 36803-2069

Please take notice that on Thursday, March 11, 2004 at 9:00 A.M., at the offices of

Phillip E. Adams, Jr., Opelika, Alabama, the Plaintiffs will take the deposition of the **one of**

**the remaining Corporate Representative of Oldcastle Materials Southeast, Inc. (Brian**

**Fowler)**, for the purposes of discovery and impeachment at trial upon oral examination

before a Court Reporter or some other officer authorized by law to administer oaths.

In accordance with Rule 30(b)(6), Defendant Oldcastle is requested to designate one

or more persons with knowledge to testify as to the following matters and to produce for

inspection the **ORIGINALS** of all documents (as defined below) requested as follows:

2203

1.   Any information in your possession or subject to your control relating to any other lawsuits against Oldcastle for blasting, dewatering, sinkholes, noise or dust since 1980 in any state in the United States.

2.   Knowledge of sinkholes or dewatering claims or problems at any other quarry owned and operated by Oldcastle.

3.   The entire file on the Lee County quarry.

4.   Any documents, correspondence or e-mails from or to Hanson or any of its Experts relating to the Lee County quarry.

5.   Any documents, correspondence or e-mails from or to Oldcastle or any of their Experts relating to the Lee County quarry.

6.   Any computer printouts, computer searches, site visits, calculations, photographs, investigatory or other documents relating to the Lee County quarry concerning:

(a)   mineable reserves and/or a mining plan;
(b)   depth of mining needed for this quarry or planned for this quarry;
(c)   pumping or dewatering and volumes or calculations related thereto;
(d)   changes in operation or methods of operation;
(e)   due diligence efforts and documents (whether before or after the sale);
(f)   the request to increase pumping to 10 mgd;
(g)   MSDS sheets on silica or other hazards at the Lee County quarry;
(h)   North American Reserve's list of "Red Flags" in its report of June 30, 2003;
(i)   all hydrogeology and/or engineering reports, studies or documents;
(j)   the dye traces on-going at the Lee County quarry;
(k)   sinkhole problems or formations at the Lee County quarry and the Spring Villa area;
(l)   Spring Villa, the spring at Spring Villa and/or dewatering of this spring; and
(m)   All information (oral or written) and all documents reviewed by you (and all generated by you) in connection with your assistance to Oldcastle in deciding to purchase this quarry (including documents received from any attorneys, from Hanson, or from any other source whatsoever).

Page 2 of 4

2204

7. The documents and things requested in the Re-Notice of Corporate Representative Deposition attached as Plaintiff's Exhibit 124 to the Heisterkamp deposition.

8. A current resume or CV.

The term "document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, floppy disks, CD-ROMS, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed materials readable by humans or machines. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witnesses.

*C E Vercelli*

Charles E. Vercelli, Jr. (VER003)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Page 3 of 4

2200

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 5th day of MARCH , 2004.

_____
OF COUNSEL

Notice of Deposition-Brian Fowler.3.wpd

2205

# JAMES B. SPRAYBERRY
ATTORNEY AT LAW
P.O. DRAWER 2429
AUBURN, ALABAMA 36831-2429
(334) 821-7100
FAX (334) 821-7101

March 30, 2004

Phillip E. Adams, Jr
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

Re:    *Davis, et al vs. Hanson/Oldcastle*

Dear Phil:

We have discussed and/or requested the documents that I have listed below. They fall within the request for production and deposition notices that we have filed. The items we would like are:

1.    The Oldcastle Code of Conduct referred to in the depositions;
2.    The Silica MSDS sheets and testing results from Oldcastle;
3.    Seismograph results/summaries for the Griggs and the Edwards property (I previously wrote and asked for those a short while ago);
4.    3 ½ inch binder from Skelly and Loy and related documents that Brian Fowler reviewed prior to the purchase;
5.    The Fowler "notes" that he wrote while on his site visit to Opelika;
6.    Fowler's billing for his project number 800-26;
7.    The amount of money to be paid by Hanson to Oldcastle if restrictions are put on the operation. This is set out in the Joint Defense Agreement (JDA);
8.    Documents from the "Privilege Log" of Oldcastle;
   Page 1 -    10/23/2003 e-mail from Fowler to Heisterkamp
   Page 2 -    None
   Page 3 -    10/9/2003 e-mail from Syr to Heisterkamp
             10/8/2003 e-mail from Fowler to Heisterkamp

1 - Atty. Corresp.
1 - Privilege Log
1 -

2207

Phil Adams, Esq.
March 30, 2004
Page 2

| | |
|---|---|
| Page 4 - | 9/28/2003 e-mail from Heisterkamp to Towe |
| | 9/21/2003 e-mail from Fowler to Heisterkamp |
| | 9/19/2003 e-mail from Heisterkamp to Fowler |
| | 9/17/2003 e-mail from Heisterkamp to Fowler |
| | 9/15/2003 e-mail from Brian Fowler to Bishop |
| | 9/10/2003 e-mail from Heisterkamp to Bishop |
| Page 5 - | 9/3/2003 two e-mails, Heisterkamp to Fowler, Fowler to Heisterkamp |
| Page 6 - | 7/12/2003 e-mail from Ward Nye to Heisterkamp |
| | 7/11/2003 e-mail from Heisterkamp to Bishop & Towe, re: Hanson Closing |
| | 7/11/2003 e-mail from Brian Fowler to Heisterkamp |
| | 7/10/2003 e-mail from Heisterkamp to Hill, re: Hanson deal, Ward Nye |
| | 7/10/2003 e-mail from Fowler to Kochian and Morris Bishop |
| Page 7 - | 7/15/2003 e-mail from John Gillan to Heisterkamp |
| | 7/15/2003 e-mail from Ward Nye to Heisterkamp |
| | 7/15/2003 e-mail from Heisterkamp to Gillan |
| Page 8 - | 7/14/2003 e-mail from Heisterkamp to Bishop, re: Joint Defense |
| | 7/14/2003 e-mail from Gillan to Heisterkamp, re: Joint Defense |
| | 10/16/2003 e-mail from Heisterkamp to Glenn Culpepper and Towe |
| Page 9 - | 7/11/2003 e-mail from Heisterkamp to Bishop and Towe |
| | 7/11/2003 e-mail from Tom Hill to Glenn Culpepper, Fw: Hanson deal - Ward Nye |
| | 7/11/2003 e-mail from Hill to Heisterkamp, re: Hanson deal - Ward Nye |
| | 7/10/2003 e-mail from Heisterkamp to Hill |
| Page 10 - | Undated spreadsheet by Heisterkamp, re: Hanson quarries 2002 (two of these are listed on page 10) |
| Page 11 - | Three undated spreadsheets by Heisterkamp, Hanson deal structure, Hanson quarries 2002 and asset swaps |
| Page 12 - | None |
| Page 13 - | Undated spreadsheet by Heisterkamp on Hanson quarries 2002 |
| Page 14 - | Undated spreadsheet by Heisterkamp shown as Hanson-GAT quarries |
| Page 15 - | All spreadsheets except the first one called "Dodge Forecast" |
| Page 16 - | Undated spreadsheet by Heisterkamp called Hanson-GAT Quarries |
| | 9/19/2003 Fowler to Heisterkamp fax, re: Opelika Dye Test Opinion |
| Page 17 - | Undated spreadsheet by Heisterkamp shown as Hanson Quarries 2002 |

2208

Phil Adams, Esq.
March 30, 2004
Page 3

Page 18 -   9/18/2002 Heisterkamp to Bishop fax
9/30/2002 Murphy to Heisterkamp letter
9/26/2002 Heisterkamp spreadsheet, Hanson Building Materials
reserve bank information
1/18/2002 Heisterkamp spreadsheet Opelika Summary Profit &
Loss

Page 19 -   The first five spreadsheets on that page dated 1/15/2002,
6/27/2001, 3/30/2000, 9/25/2002, 9/25/2002

Page 20 -   10/22/2002 Heisterkamp facsimile to Bishop, re: Hanson History

Please have those documents to us by April 9, 2004. If you decline to produce them, we
will have no choice but to file a Motion to Compel which we would rather not file since these
appear to be documents to which we are entitled.

Very truly yours,

James B. Sprayberry

JBS/ch

cc:   Chip Vercelli, Esq.
Guy Gunter, Esq.
Jim Byrum, Esq.
John V. Denson, Esq.
H. Wayne Phears, Esq.

*Circuit Court No.* <u>CV02-85</u> *Supreme Court No.* <u>1040857</u>

# APPEAL

TO

# Supreme Court of Alabama

FROM

<u>MIKE & DONNA DAVIS ETAL-OLDCASTLE MATERIALS SOUTHEAST,INC & HANSON</u>
AGGREGATES SOUTHEAST, INC.                                    *Appellant*

VS.

<u>HANSON AGGREGATES SOUTHEAST, INC ETAL. & CITY OF OPELIKA,CITY OF</u>
OPELIKA UTILITIES BOARD ETAL                                  *Appellee*

2209

### IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
            Plaintiffs,                )
                                       )
vs.                                    )        Civil Action No. CV-20 02-85
                                       )
HANSON AGGREGATES SOUTHEAST,           )
INC., et al.,                          )
                                       )
            Defendants.                )

### NOTICE OF TAKING DEPOSITION

TO:   James A. Byram, Jr.              John V. Denson
      Balch & Bingham, LLP             Samford, Denson, Horsley,
      P.O. Box 78                      Pettey & Bridges
      Montgomery, AL 36101             P.O. Box 2345
                                       Opelika, AL 36803-2345


      H. Wayne Phears                  Phillip E. Adams, Jr.
      Phears & Moldovan                Adams, Umbach, Davidson
      Suite 375                          & White, LLP
      4725 Peachtree Corner Circle     P. O. Box 2069
      Norcross, GA 30092-3000          Opelika, AL 36803-2069

Please take notice that on February 20, 2004, at 9:00 a.m. (CDT), at the offices of

Phillip Adams, Opelika, Alabama, the Plaintiffs will take the deposition of the **Plant**

**Manager of the Oldcastle Materials Southeast, Inc. quarry in Lee County**, for the purposes

of discovery and impeachment at trial upon oral examination before a Court Reporter or

some other officer authorized by law to administer oaths.

The deponent is requested to bring with him and testify as to the documents and

things requested on Exhibit "A" attached hereto. The deposition may be continued from

time to time until completed.  You are invited to attend and cross-examine the witness.

2210

*C E Vercelli*

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _February_ , 2003.

*C E Vercelli*

OF COUNSEL

2

155-00\N-Depo-Plant-Manager-OC.4.wpd

2.211

# EXHIBIT "A"

In the following requests, the term "document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, floppy disks, CD-ROMS, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed materials readable by humans or machines. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

1.      The negotiation of the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

2.      The terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

3.      Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4.      Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

212

5.   All documents responsive to Plaintiffs' First Interrogatories and Requests for Production to Oldcastle.

6.   All documents regarding any changes to the manner of operation of the Lee County quarry whether such changes have been implemented or plan to be implemented in the future.

7.   All documents related in any way to any violations of Oldcastle's ADEM permits with respect to the Lee County quarry.

8.   All mining plans and any document related in any way to a mining plan.

9.   All documents related in any way to dust control activities or problems at the Lee County quarry.

10.   All documents related to discharging of water from the Oldcastle Lee County quarry.

11.   All documents related to sales of materials from the Lee County quarry.

12.   All documents evidencing the number of hours worked by Oldcastle Lee County quarry employees from the date of acquisition to the date of this deposition notice.

13.   All correspondence with ADEM with respect to the Lee County quarry.

14.   All internal memoranda, e-mails, or written documentation of any character relating to complaints by surrounding property owners, the investigation of such complaints, and the resolution, if any, of such complaints.

15.   Please produce all ADEM applications and/or all ADEM permits for this Defendant.

16.     Please produce any and all ADEM reports, including but not limited to, monthly water quality reports

17.     Please produce any and all hydrogeology and engineering reports and/or studies and related documents.

18.     Please produce all environmental reports or studies of any type or description prepared on this Defendant's behalf or on behalf of its predecessor.

19.     Please produced any and all written or verbal complaints made by any entity against this Defendant. Complaints include, but or not limited to, complaints about noise, dust, blasting, water, trucks, and/or the operation of the quarry in general.

20.     Please produce any and all pre-quarry and/or pre-purchase property inspections whether prepared on your behalf of on behalf of your predecessor, private property owners, or insurance companies. Please include in your response any and all photographs and any related documents.

21      Please produce all sales tax reports and/or quarry mining tax reports filed in Lee County for the years 1999 through the present.

22.     Please produce all licenses, agreements, contracts, correspondence or other documents that relate to this Defendant's relationship with Dixie Pipeline or any other pipeline company in Lee County, Alabama.

23.     Please produce any and all reports, studies, complaints, correspondence or other documents concerning or related to sinkholes. This would include, but not be limited to, the possibility of sinkholes forming, sinkholes that have formed, and/or the repair of sinkholes.

24.    Please produce any and all maps, drawings, plats, surveys, or other similar documents of the quarry or the leased property.

25.    Please produce any and all studies, reports, complaints, correspondence or other documents relating to Spring Villa. This would include, but not be limited to, the dewatering of Spring Villa, the diversion of Spring Villa water into your quarry and/or the interbasin transfer of water from Spring Villa into your quarry or Chewacla Creek.

26.    Please produce all documents relating to environmental problems, hazards, or concerns relating to the Opelika quarry.

27.    Any and all blasting reports and blasting activities at the quarry since Oldcastle assumed control of the quarry.

28.    Any and all permits for blasting obtained by or on behalf of Oldcastle or any company performing blasting services for Oldcastle at its Lee County quarry.

29.    And and all "pre-blast" inspections of home and/or any knowledge gained by Oldcastle regarding any preexisting pre-blast inspections of homes relating in any way to damages allegedly caused by blasting at the quarry.

30.    Any and all information known to Oldcastle regarding the neighbors' complaints of blasting damage.

31.    Any and all information known to Oldcastle regarding noise, dust and medical complaints of people in the area surrounding the quarry.

32.    Any and all information known to Oldcastle regarding any adverse health effects to humans from breathing any dust or by-product of the quarry operation.

**EXHIBIT "E"**

2210

**Selected Pages from Heisterkamp Deposition**

<u>Page Number</u>                                                                                          <u>Heisterkamp</u>

94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Motion to Compel Discussed

121, 123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refusal to provide; "take up with Court"

126, 127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fowler opinion: dye test flawed

141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fowler opinion: quarry not causing holes or dewatering

147 - 149 . . . . . . . . . . . Refusal to give dollar amount in JDA based on instruction of Attorney

160 . . . . . . . . . . . . . . . . . . . . . . . . . . . . Written "Code of conduct" discussed but not produced

169 / 170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refuses to discuss due diligence
& what Gibson/Dunn, <u>prior to closing</u>, knew about lawsuit

185 . . . . . . . . . . . . . . . . . . . . . . . . . Knowledge of Gibson/Dunn, <u>prior to closing</u>, about lawsuit?

240 - 249 . . . . . . . . . . . . . . . . . . Discussion about failure to produce and defense assertion that
"Attorney Client" is only privilege Oldcastle asserts.

3/1/2004

Frank Heisterkamp

94

1   But I can tell you the reason that
2   I think it has been blacked out is
3   it had financial information
4   regarding quantities and prices
5   and profitability of the quarry.
6   And tell me why you think that's
7   relevant and I'll see if we can --
8   MR. VERCELLI: I don't know if it's
9   relevant or not, I can't see it.
10  That's the problem.
11  MR. ADAMS: Well, I mean, let's assume
12  that what I said is correct, and
13  if it is correct --
14  MR. VERCELLI: I don't know. I'll deal
15  with it later. We'll do a motion
16  to compel the production and we'll
17  just deal with it later.
18  Q. I'm going to show you Exhibit Number 23 --
19  MR. SPRAYBERRY: Bates 23?
20  Q. Bates 23 through 27, can you tell me what was
21  in that document that wasn't provided to us,
22  since it was also redacted, much of the
23  document there?

95

1   A. This is correspondence from Hanson to Morris
2   Bishop attaching a similar type summary sheet
3   to describe the documentation that was sent
4   from Hanson to Oldcastle as a result of our due
5   diligence request.
6   Q. Okay. What kind of information was sent
7   though; a summary of what?
8   A. If you look in the column "Category," it says,
9   "Permits." If you look at the Category
10  Description, you will see "ALA Air Permit
11  Number 2060026603." Five pages regarding the
12  Opelika site were sent from Mr. Butler to
13  Mr. Bishop on the transmittal date of the 12th
14  of May, 2003. That's all that this paper says.
15  Q. So where are the five pages that are referenced
16  here, like on that first line? Were they
17  produced?
18  A. Well, they are the permits for Opelika. And I
19  believe the permits for Opelika were produced
20  to you.
21  Q. By Oldcastle or by Hanson?
22  A. One or the other; I don't know.
23  MR. ADAMS: Aren't I looking at one

96

1   here? This is the application for
2   the permit.
3   A. And I'm not sure that we were asked for the
4   permits, to produce them. Did you ask us to
5   produce the permits?
6   Q. Yes. I will show you Exhibit 36, 37 -- well,
7   Bates 36, 37, this is another redacted sheet,
8   part of what they did produce references
9   internal safety inspection reports. Were those
10  produced to us; do you know?
11  A. I can't say for sure. I don't visualize the
12  document just by reading this and I can't know
13  for sure. I did not identify this.
14  Q. Right. Did Oldcastle have a lease with the
15  Youngs when it assumed operation of the quarry
16  on July 13th?
17  A. I hope we did.
18  Q. I'm sorry?
19  A. I hope we did.
20  Q. The reason I ask that is Mr. Denson had
21  indicated that they did not, so I'm curious --
22  MR. DENSON: I object to that. That's
23  not my allegation.

97

1   MR. VERCELLI: Well, we had asked for
2   the production of documents and
3   none were produced in response to
4   that. I thought you said they
5   didn't have one with the Youngs.
6   MR. DENSON: No, I've never said that.
7   I've never been asked to produce a
8   lease.
9   Q. Do you know the answer to the question of
10  whether or not the Youngs and Oldcastle had an
11  operational lease at the time that they assumed
12  the quarry in July?
13  A. To the best of my knowledge, we did. We
14  assumed both leases that Hanson had, both with
15  the Youngs and the Gilmers, at closing.
16  Q. Do you know whether there was a separate
17  document of assumption for those leases?
18  A. I don't know for sure. I would guess there
19  was, because that's how you assume leases.
20  Q. Did you-all produce to -- did Oldcastle produce
21  to us all of the closing documents except what
22  might have been redacted based on financial
23  information?

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048
5caea106-2811-4007-baae-d22f203862c6

---

118

1        know, there is more than --
2           MR. VERCELLI:  The federal one, yeah.
3           MR. ADAMS:  Well, yeah, but there are
4        many different plaintiffs involved
5        in the Opelika matter and I think
6        maybe that's --
7   Q.   Is that your understanding?
8   A.   Yes.
9   Q.   The lawsuits plural applied to --
10  A.   The situation -- the JDA was supposed to
11       address the situation we found regarding the
12       Opelika quarry.
13  Q.   So the JDA doesn't apply to any of the other
14       quarries other than Opelika?
15  A.   No.
16  Q.   All right.  Look at B, I presume that's 8B,
17       "Notwithstanding Section 8A, Oldcastle will be
18       solely responsible for all such costs of
19       defense with respect to," dah, dah, dah, "two,
20       any new claims that are added to the lawsuits."
21       How are y'all going to interpret new claims?
22       What constitutes a new claim?
23  A.   I don't know that I understand the question.

---

119

1   Q.   All right.  Well, it's referencing any new
2        claims that are added -- "Oldcastle will be
3        solely responsible for all costs of defense
4        with respect to, two, any new claims that are
5        added to the lawsuits."  What I'm wondering is,
6        what exactly does that mean?  What would you
7        consider a new claim?
8   A.   I would believe that to mean a claim other than
9        the Davis lawsuit.
10  Q.   All right.  For example, let's assume that new
11       sinkholes develop on one of the existing
12       plaintiffs' properties, as they have in the
13       last week, some more sinkholes have developed;
14       are those new claims or are those considered
15       not new climbs under this JDA?
16          MR. DAVIDSON:  Object to the form.
17  A.   I don't know that any sinkholes have developed
18       over the last week, as you said.
19  Q.   Well, I want you to assume that fact, okay?
20       Assume that new sinkholes have developed within
21       the last week or so on Donnie Smith's property,
22       some of which you-all and us were not aware of
23       until today, really.  Assuming that's true,

---

120

1        does that constitute a new claim added to the
2        lawsuit?
3           MR. DAVIDSON:  I think that's -- I
4        mean, we're going to argue with
5        each other about that, but he's
6        not going to give you a legal
7        answer about --
8           MR. ADAMS:  Chip, I can tell you what
9        our legal advice is going to be if
10       the hypothetical -- I don't think
11       this witness knows.  Our position
12       is, what caused it?  And our
13       position is going to be, it's not
14       our client's fault.
15          MR. VERCELLI:  Okay.
16  Q.   Let me ask a question like this; are you
17       certain that there's no interpretive document
18       somewhere, or a series of correspondence or
19       e-mails between either lawyers or parties, that
20       address some of the questions about how to
21       interpret this docuemnt?
22  A.   Yes.
23  Q.   There are such documents?

---

121

1   A.   No.  You asked me whether I'm sure that there
2        isn't.
3   Q.   Okay.
4   A.   And the answer is yes, so that means there
5        aren't.
6   Q.   Now, those e-mails that you referenced earlier
7        when you said there was a stack of e-mails or
8        words to that effect?
9   A.   Yeah.
10  Q.   What do those e-mails deal with?
11  A.   I sent all my e-mails that I had communicated
12       to and from Hanson in this entire acquisition
13       of the seven quarries that we talked about
14       earlier to our attorneys.  It was all of the
15       e-mails that I had generated during that time.
16  Q.   Okay.  And did any of those e-mails deal with
17       this Hanson lawsuit?
18  A.   I'm not entirely sure.  I would say a few
19       probably did.
20  Q.   What is the sum that's deleted in paragraph 9C?
21          MR. ADAMS:  We instruct you not to
22       answer that question.
23          MR. VERCELLI:  Okay.  And your basis

---

Ricky L. Tyler
(334) 262-3331

122

```
1          for that is?
2    MR. ADAMS: It's none of your business.
3    MR. VERCELLI: Okay. Do you have a
4          little more legally refined manner
5          of saying that?
6    MR. ADAMS: Well, I mean, what -- it's
7          not relevant. It's immaterial to
8          any of the issues in this case.
9          It has no probative value toward
10         anything. It's just completely
11         immaterial. It's not going to
12         lead you to any relevant
13         information.
14   MR. VERCELLI: Okay. What about the
15         fact that it affects the
16         credibility of the witness and the
17         parties, as it clearly does?
18   MR. ADAMS: Well, what difference would
19         it make if it was ten dollars or a
20         hundred million dollars?
21   MR. VERCELLI: I think it would make a
22         big difference on the credibility
23         of the witnesses.
```

123

```
1    MR. ADAMS: Why? Do you mean the lower
2          the better for you or the higher
3          the better for you?
4    MR. VERCELLI: I don't know, but I
5          would like to know one way or the
6          other.
7    MR. ADAMS: Well, we will just have to
8          take that up with the court.
9    MR. VERCELLI: Okay.
10         (Off-the-record discussion.)
11   Q.  Have you ever been sued before for any reason?
12   MR. WHITE: Are you talking about him
13         personally?
14   Q.  Personally?
15   A.  Me personally?
16   Q.  Yes.
17   A.  No.
18   Q.  Have you ever been involved in a lawsuit other
19         than in your official capacity as an attorney?
20   A.  No.
21   Q.  Okay. Have you ever been arrested for any
22         reason?
23   A.  No.
```

124

```
1    Q.  Do you personally belong to any type of an
2          organization or club in Lee County, Alabama?
3    A.  No.
4    Q.  Do you know whether Oldcastle, as a
5          corporation, belongs to any clubs or
6          organizations in Lee County?
7    A.  I don't know that.
8    Q.  Okay. Have you ever been treated for drug or
9          alcohol problems?
10   A.  No.
11   Q.  Before the lunch break we were talking about
12         the July 10th telephone conversation?
13   A.  Uh-huh. (Positive response.)
14   Q.  Tell me, please, the essence of the
15         conversation, as you recall it.
16   MR. WHITE: Let me object to the form.
17         Do you want to ask him what he
18         remembers of what was said?
19   MR. VERCELLI: Well, I want to start
20         out kind of generally, then I will
21         ask him everything he can remember
22         if necessary.
23   MR. WHITE: There might be -- go ahead,
```

125

```
1          I'm sorry.
2    A.  The essence of the conversation was that we had
3          just received a copy of the -- what we refer to
4          as the settlement letter, which is your letter
5          of -- I forgot the date, June 26th. And my
6          main purpose for the conference call was to
7          find out from Hanson, as much as I possibly
8          could, about the background of the lawsuit and
9          the serious allegations that were made in the
10         letter.
11   Q.  What did they tell you?
12   A.  I don't remember any specific details. What I
13         remember in general was that they told us about
14         the various plaintiffs and their claims and the
15         investigations that both plaintiffs and
16         defendants had conducted in connection with the
17         lawsuit.
18   Q.  Did they tell you the results of the
19         investigations?
20   A.  As far as I can remember now, they told us
21         about -- they told us about a dye test that had
22         occurred. I think that's probably all I
23         remember at this time.
```

32 (Pages 122 to 125)

**126**

1 Q. What did they tell you about the dye test?
2 A. At that phone call what was said about the dye
3   test was that the plaintiffs had conducted a
4   dye test that was basically flawed, yeah.
5 Q. How was it flawed? Did they tell you?
6 A. To the best of my recollection, they said that
7   the findings were inconclusive of the dye test
8   because of the way it was conducted and the
9   results were taken.
10 Q. "Were taken," I'm sorry, what do you mean by
11   that?
12 A. You know, I suggest you ask these details more
13   to Brian Fowler, who is our engineer in that
14   regard. My understanding at the time was that,
15   you know, different dye material was placed at
16   different locations, and one of it had shown up
17   after a certain time, and then time expired and
18   something else had shown up later. And I was
19   told, it was confirmed by our engineers, that
20   the way these tests were conducted and the
21   types of dye that were used were not conclusive
22   evidence of dewatering of the pit and causing
23   sinkholes, dewatering Little Uchee Creek, and

**127**

1   so forth.
2 Q. And what engineer told you that?
3 A. Brian Fowler.
4 Q. Mr. Fowler, does he work -- is he an Oldcastle
5   employee or is he the fellow with North
6   American or whatever they call that?
7 A. He's the principal of North American Reserves.
8   He's not an Oldcastle employee.
9 Q. Does Oldcastle have a geologist on staff?
10 A. There's no geologist that works out of our head
11   office in Washington, D.C.
12 Q. What about for Oldcastle Materials Southeast?
13 A. That I don't know. I don't know whether they
14   have a geologist on staff there.
15 Q. Okay. The way you've answered that to me is a
16   hedge; we don't have one in D.C., okay?
17     MR. WHITE: Object to the form and move
18       to strike?
19     MR. DAVIDSON: Whatever this is going
20       to be.
21 Q. That's fine. But I'm telling you that to
22   explain my next question, okay? My question
23   is, Oldcastle, whether it's Southeast or

**128**

1   Oldcastle, Inc., is a mining company that mines
2   rock. It's incredulous that Oldcastle wouldn't
3   have geologists employed by Oldcastle, to me,
4   okay? So I guess my question is, does
5   Oldcastle employ geologists?
6     MR. DAVIDSON: I move to strike all of
7       that. And if we can talk about
8       the question, I may have to object
9       to it, too. State your question,
10       Chip, so he can try to answer it.
11 Q. Does Oldcastle employ geologists?
12 A. Oldcastle Materials, Inc. is ultimately a
13   holding company for a variety of subsidiaries
14   operating in the mining business throughout the
15   United States. There's no geologist on staff
16   by Oldcastle Materials, Inc. in Washington,
17   D.C. What I'm not sure about is what the
18   situation is in the various subsidiaries in the
19   various regions and states where we have
20   operations and whether these individual
21   companies have any geologists on staff.
22 Q. Okay. Is the only geologist then that you, on
23   behalf of Oldcastle, consulted, prior to

**129**

1   purchasing this Opelika quarry, Mr. Fowler?
2 A. Yes.
3 Q. And how many trips to Alabama to the Opelika
4   quarry did Mr. Fowler make prior to the
5   purchase?
6 A. I don't know.
7 Q. Do you believe he made more than two?
8 A. I don't believe anything. I don't know.
9 Q. Did he ever give you a written report of any
10   type about the Lee County quarry?
11 A. Yes.
12 Q. Was that document or documents produced to us?
13 A. Isn't that what we discussed the last time?
14 Q. I don't know. If we did, remind me, I'm sorry.
15   By last time, do you mean in Mr. Reynolds'
16   deposition?
17 A. Yes.
18 Q. Give me your answer, if you can, please.
19 A. During Mr. Reynolds' deposition we talked about
20   it off the record, so I'm not sure what to do
21   now.
22 Q. Tell me what you understand about whether or
23   not Fowler gave you a written report or

3/1/2004                                                      Frank Heisterkamp

---

**138**

1    A.    It would be Ted Reynolds or Brian Fowler.
2    Q.    As a result of your conversations, what did you
3          determine to do to address the noise
4          complaints?
5    A.    Again, that was similar to the other two
6          issues. We felt that we ought to be able to
7          change the operations around so much that there
8          wouldn't be any harmful noise emissions into
9          the neighborhood.
10   Q.    And the big change there is that you're putting
11         the plant in the pit instead of on the surface?
12   A.    I guess that's part of it, yes.
13   Q.    What's the other part of it?
14   A.    The type of the plant could be another part; I
15         don't know. I'm not an expert enough to know.
16   Q.    Who would know the answers to that?
17   A.    Ted Reynolds and Brian Fowler. And I believe
18         Ted already spoke to that.
19   Q.    All right. Currently, or at least since July
20         13th, there was a plant -- we've been calling
21         it a plant, a rock crusher and related
22         conveyors and such, that have been situated
23         exactly where they were when Hanson had the

---

**139**

1          quarry, right?
2    A.    It's the Hanson plant, yes.
3    Q.    And that's still in operation, unless within
4          the last few days they've turned it off and
5          made the other one operational?
6    A.    Correct.
7    Q.    Then you've got a plant that's inside the pit
8          now that's a newer plant?
9    A.    Correct.
10   Q.    Erected on site?
11   A.    Yes.
12   Q.    Is there a third plant or a second, depending
13         on how you want to look at it, an agricultural
14         lime plant?
15   A.    No.
16   Q.    Is there proposed to be another plant there?
17   A.    At some stage we considered putting an ag lime
18         or agricultural lime plant in there, but that
19         plant has not been set up at the quarry.
20   Q.    Is it going to be set up?
21   A.    I believe that SRM Aggregates still has the
22         plan to set up an agricultural lime plant at
23         the quarry.

---

**140**

1    Q.    Where is that ag lime plant going to be placed?
2    A.    I don't know.
3    Q.    According to this document at page 1554, the
4          North American Reserve document, "An
5          agricultural lime plant is scheduled to be
6          erected at the overburden storage area in the
7          near future." Does that help? Does that
8          refresh your memory?
9    A.    No.
10   Q.    Do you know where the overburden storage area
11         is?
12   A.    I do not know where the overburden storage area
13         is that this report refers to.
14   Q.    Okay. Is there something other than this
15         report that will -- in writing that will
16         identify where they intend to put this ag lime
17         plant?
18   A.    Not to my knowledge. I guess you will have to
19         ask Morris Bishop or Ted Reynolds.
20   Q.    Okay. Ag lime, that's used in road preparation
21         and you spread it on fields in order to affect
22         the pH of the land and all of that, isn't it?
23   A.    It's -- as far as I know, and, again, I'm not

---

**141**

1          an expert there, it's a more powdery product
2          used in the agricultural industry.
3    Q.    Okay. As a result of your internal telephone
4          conversations, what did you determine to do to
5          address the issue of sinkhole formation, I
6          think is the way you said it?
7    A.    I had asked Brian Fowler to investigate the
8          allegations regarding sinkholes, dewatering of
9          Little Uchee Creek and Spring Villa. And I was
10         told by Mr. Fowler that, based on his findings
11         and investigations that he had conducted, he
12         did not believe that the operation of the
13         quarry would cause the formation of sinkholes
14         or dewater the creek and the spring.
15   Q.    What did he base that opinion on?
16   A.    You would have to ask him.
17   Q.    Did he share with you any particular
18         information that he based that opinion on?
19   A.    I believe he had, to the best of my knowledge,
20         various conversations with Hanson, their
21         technical staff and maybe their experts, but
22         I'm not sure about that.
23   Q.    Do you know whether he reviewed any written

---

36 (Pages 138 to 141)

3/1/2004                                                      Frank Heisterkamp

146

1      MR. WHITE: Didn't we talk about this
2          this morning?
3      MR. VERCELLI: Indirectly.
4  A.   I don't understand.
5  Q.   All right. Let me ask you this -- let me
6      rephrase my question. If the quarry is
7      enjoined and is determined to be shut down by
8      the judge as a result of this litigation, --
9  A.   Yes.
10 Q.   -- what is -- tell me, please, what happens
11     between Oldcastle and Hanson about that?
12     MR. DAVIDSON: To the extent that is in
13         what is protected and we haven't
14         produced, I don't think he --
15     MR. WHITE: We produced that in the --
16     MR. VERCELLI: Well, I know. It's also
17         a wordy type of document. I want
18         his understanding of what happens.
19     MR. WHITE: Well, his understanding of
20         what is going to happen is
21         irrelevant, because the document
22         is what controls that.
23     MR. DAVIDSON: This is what's going to

147

1          happen right here.
2      MR. VERCELLI: Okay.
3  A.   It's my understanding, and it's the agreement
4      between the parties, that Oldcastle takes the
5      risk of injunctive relief, as we refer to it,
6      of the quarry. So if we operate the quarry in
7      a way that causes sinkhole, causes harm, and is
8      ultimately led to be shut down, that's going to
9      be our problem.
10 Q.   Hanson doesn't have to pay anything or no
11     repercussion to Hanson whatsoever?
12 A.   There is a financial repercussion to them.
13 Q.   Okay. What is that financial repercussion?
14     MR. WHITE: Object to the form.
15     MR. DAVIDSON: We're not going to
16         disclose that.
17 A.   I was instructed by my attorney, Phil Adams,
18     earlier not to answer that.
19 Q.   Okay. That financial repercussion, does it
20     take the form of a payment of some amount of
21     money?
22 A.   Yes.
23 Q.   The amount of money invested by Hanson in the

148

1      quarry to change its operational -- I said
2      Hanson, didn't I?
3      MR. DAVIDSON: Yes.
4  Q.   Let me start over. The amount of money that
5      Oldcastle has spent on the quarry to change the
6      manner of its operation, do you know
7      approximately how much that is?
8  A.   Yes.
9  Q.   What is that?
10 A.   I believe that we have spent to date, to the
11     best of my knowledge, almost five million
12     dollars. We're planning to spend another two.
13 Q.   Of that amount, how much is on the plant in the
14     pit?
15 A.   Well, it's kind of all on the plant and the
16     pit, I don't understand the -- it's all in the
17     plant and the pit.
18     MR. WHITE: Did you say the plant in
19         the pit?
20     MR. VERCELLI: The plant in the pit,
21         I'm sorry.
22 A.   Oh.
23 Q.   How much of that money relates to the plant

149

1      being constructed in the pit?
2  A.   The cost for the plant, my best recollection,
3      is 1.2 million dollars, which would be
4      excluding any cost for setting it up, which is
5      significant.
6  Q.   Okay. The amount that Hanson is going to pay
7      to Oldcastle, is that amount sufficient to
8      reimburse Oldcastle for the amount that
9      Oldcastle is spending on the operational
10     changes to the quarry?
11     MR. WHITE: Object to the form.
12 A.   That's the same as before, I was instructed not
13     to answer that.
14 Q.   I understand. I have to ask so that I will
15     have the record so the judge can determine
16     whether to make you answer the question.
17 A.   Okay.
18 Q.   Now, the July 11th and July 12th conversations
19     that you've told me about, the internal
20     conversations were between you and Mr. Bishop
21     and Mr. Fowler?
22 A.   (Witness nods head in the affirmative.)
23 Q.   Any other parties?

38 (Pages 146 to 149)

158

1　A.　I have no other information than Mr. Reynolds,
2　　　no.
3　Q.　Now, you mentioned also that you will certainly
4　　　monitor pumping and water levels and everything
5　　　that's required in that regard; what did you
6　　　mean by "required in that regard"?
7　A.　I guess what I meant to say was that we will
8　　　monitor all emissions that can possibly be
9　　　created as a result from the operation of the
10　　quarry.
11　Q.　Okay.
12　A.　In particular the ones raised in the allegation
13　　　letter I referred to earlier, dust, noise,
14　　　vibration.
15　Q.　Okay. How are you monitoring for dust
16　　　emissions?
17　A.　Again, I refer to Mr. Reynolds' deposition.
18　Q.　Do you have any knowledge different than what
19　　　Mr. Reynolds testified about?
20　A.　No.
21　Q.　Would anyone with Oldcastle have any additional
22　　　or different knowledge than that which
23　　　Mr. Reynolds talked about?

159

1　A.　I doubt that, no.
2　Q.　He would be the best person in your opinion?
3　A.　Yes.
4　Q.　With respect to noise, would anybody have more
5　　　or better or different knowledge than
6　　　Mr. Reynolds? And I'm talking about
7　　　Oldcastle-related people.
8　A.　I wouldn't think so.
9　Q.　With respect to the discharge of water and the
10　　monitoring of discharge of water from the
11　　quarry pit, would anyone at Oldcastle have any
12　　better or different information than
13　　Mr. Reynolds testified about?
14　A.　I can't think of any, no.
15　Q.　Now, does Oldcastle Materials Southeast, Inc.,
16　　or Oldcastle Materials, Inc., have a
17　　department, a division, or a person whose job
18　　it is to ensure that Oldcastle complies with
19　　environmental rules and regulations?
20　A.　We all have to make sure that we comply with
21　　environmental rules and regulations. So I
22　　guess I don't know --
23　Q.　Well, do you have any particular person or any

160

1　　　particular department whose primary duties are
2　　　to ensure compliance with environmental rules
3　　　and regulations?
4　A.　You've asked me that with regard to Oldcastle
5　　　Materials Southeast and Oldcastle Materials,
6　　　Inc. With regard to Oldcastle Materials
7　　　Southeast, Inc., this responsibility, I
8　　　believe, falls within Ted Reynolds, I believe
9　　　Todd Wheeler, the professional engineer, and
10　　probably also Morris Bishop, the ultimately
11　　responsible President, to ensure that there's
12　　full compliance with all environmental rules
13　　and regulations.
14　　　　With regard to Oldcastle Materials, Inc.,
15　　there's no particular person who's charged with
16　　environmental compliance in our D.C. office.
17　　We all sign codes of conduct and have to -- and
18　　are constantly held to high standards on
19　　environmental compliance, but there is no
20　　individual person who is in charge of that.
21　Q.　Since you've been with Oldcastle, are you aware
22　　of whether Oldcastle has had any adverse
23　　verdicts in the United States against it

161

1　　　related to alleged sinkhole problems?
2　A.　I'm not aware of any.
3　Q.　Who would know the answer to that?
4　　　　MR. WHITE:　Are we talking about
5　　　　Oldcastle, Inc., Oldcastle
6　　　　Materials?
7　　　　MR. VERCELLI:　I'm talking really about
8　　　　any of the Oldcastles.
9　　　　MR. DAVIDSON:　There's only two --
10　　　　well, go ahead.
11　　　　MR. VERCELLI:　No, I'm talking about in
12　　　　the United States, so there is
13　　　　more than two.
14　　　　MR. DAVIDSON:　Well, there is a lot of
15　　　　subsidiaries, but it is not
16　　　　necessarily Oldcastles.
17　Q.　Just to make sure, I think we're communicating,
18　　but I'm talking about any of the Oldcastle
19　　companies in the U.S.
20　A.　I understand that.
21　　　　MR. WHITE:　You're asking who might
22　　　　know that information?
23　　　　MR. VERCELLI:　Yes.

41 (Pages 158 to 161)

|  | 166 |
|---|---|
| 1 | better knowledge? |
| 2 | A. Well, we are in the middle of investigating the |
| 3 | current status of the quarry and what is going |
| 4 | to be the best way in the future to operate the |
| 5 | quarry in an environmentally friendly way. So |
| 6 | after all of these reports are finalized, it |
| 7 | may be that somebody else has knowledge about |
| 8 | this. At the moment I would say Mr. Reynolds |
| 9 | is best informed about this. |
| 10 | (Off-the-record discussion.) |
| 11 | Q. Okay. I'm going to show you Oldcastle 751; |
| 12 | it's one of the documents y'all produced, y'all |
| 13 | being Oldcastle. This is dated July the 3rd. |
| 14 | The second page of that document references the |
| 15 | Davis lawsuit, okay? |
| 16 | MR. BYRAM: What is the document? |
| 17 | MR. VERCELLI: It is Oldcastle |
| 18 | production document 751 and 752. |
| 19 | MR. DAVIDSON: July 3rd letter to Jeff |
| 20 | Kochian at Gibson Dunn. |
| 21 | Q. It states on the very top with respect to the |
| 22 | Hanson lawsuits, "Tort action and companion |
| 23 | federal declaratory judgment action at Opelika |

|  | 167 |
|---|---|
| 1 | previously discussed in depth with Oldcastle |
| 2 | principals." And this is dated July the 3rd. |
| 3 | First of all, when was it discussed in depth |
| 4 | with Oldcastle principals on or before July the |
| 5 | 3rd? |
| 6 | A. I have no idea. |
| 7 | Q. Do you know which principals they're speaking |
| 8 | of? |
| 9 | A. Well, they must be speaking of either myself or |
| 10 | Tom Hill. |
| 11 | Q. Do you recall any such conversations on or |
| 12 | before July the 3rd? |
| 13 | A. As I said earlier, other than the conversation |
| 14 | at the end of May with Ward Nye when there was |
| 15 | a general reference to the lawsuit, there were |
| 16 | no other conversations about this. |
| 17 | Q. This letter is signed by a Mr. Gillan, Division |
| 18 | Counsel for Hanson Aggregates, and it's being |
| 19 | sent to Jeffrey Kochian? |
| 20 | A. Yes. |
| 21 | Q. Who is Oldcastle's lawyer at Gibson Dunn, |
| 22 | right? |
| 23 | A. He's a transaction lawyer at Gibson Dunn, yes. |

|  | 168 |
|---|---|
| 1 | Q. Okay. He references a discussion in depth. |
| 2 | The conversation you told me about in late May |
| 3 | with Mr. Nye you would not, and did not, |
| 4 | characterize as in-depth? |
| 5 | A. And I would not. |
| 6 | Q. Okay. So do you have any idea what |
| 7 | conversation these people are talking about in |
| 8 | this letter? |
| 9 | A. No. |
| 10 | Q. Who would know that; Mr. Kochian, I guess? |
| 11 | A. No. I guess the sender of the letter, which is |
| 12 | Mr. Gillan. |
| 13 | Q. Okay. Did your lawyers at Gibson Dunn have |
| 14 | other or additional conversations with Hanson |
| 15 | or Hanson lawyers regarding this Davis lawsuit |
| 16 | about which they reported to you prior to the |
| 17 | closing? |
| 18 | MR. WHITE: Objection. That's |
| 19 | attorney/client privilege, what |
| 20 | his lawyers may have told him |
| 21 | about this lawsuit. |
| 22 | MR. VERCELLI: I disagree for the |
| 23 | reason that this relates to the |

|  | 169 |
|---|---|
| 1 | due diligence efforts and the |
| 2 | purchase of the quarry. But to |
| 3 | the extent you may or may not be |
| 4 | right, I'm not asking for the |
| 5 | communication, I'm asking for the |
| 6 | fact of whether there was a |
| 7 | communication. |
| 8 | MR. WHITE: That's still protected. |
| 9 | A. I'm confused. I don't understand the question. |
| 10 | MR. WHITE: Whether or not they |
| 11 | communicated about it and to what |
| 12 | extent is protected by the |
| 13 | attorney/client privilege, and we |
| 14 | instruct him not to answer. |
| 15 | MR. VERCELLI: Okay. Are you saying |
| 16 | that you're not going to let him |
| 17 | answer whether or not the lawyers |
| 18 | reported to the principals at |
| 19 | Oldcastle relating to this lawsuit |
| 20 | prior to the closing of the |
| 21 | transaction? |
| 22 | MR. WHITE: That's exactly what -- any |
| 23 | communications that took place |

43 (Pages 166 to 169)

3/1/2004                                                                                    Frank Heisterkamp  2224

---

170

1      between Oldcastle and their
2      attorneys regarding this lawsuit
3      is privileged communications.
4      MR. VERCELLI: And you're not going to
5      let him answer questions about it?
6      MR. WHITE: Yes.
7      MR. DAVIDSON: And the fact of it, too.
8      I mean, the fact that there was a
9      communication.
10     MR. WHITE: That's right.
11     MR. VERCELLI: I just want to make sure
12     we're clear when we go to the
13     judge on that.
14     MR. DAVIDSON: Certainly.
15  Q.  Okay. This document, Oldcastle 752, the same
16     letter, references item 7B, "A substantially
17     identical summary of the Mike Davis matters
18     listed in the last audit letter." What summary
19     is this referring to, and what audit letter is
20     it referring to?
21  A.  I have no idea.
22  Q.  Have you seen any such audit letter or summary?
23  A.  No.

---

171

1   Q.  Okay.
2   A.  Can we take a break while you do that?
3   Q.  Sure.
4       (Recess.)
5   BY MR. VERCELLI:
6   Q.  Okay. Earlier you reported that -- in answer
7      to one of the questions earlier, we were
8      talking about Mr. Fowler, you said in essence
9      that Mr. Fowler's -- Mr. Fowler reported to you
10     that it was unlikely that all of these matters
11     were caused by the allegations -- let me start
12     over. That's just a bad question. I've got to
13     start that one all over.
14         As I understand it, Mr. Fowler reported to
15     you, and perhaps others at Oldcastle, that the
16     allegations of the Davis suit, as it relates to
17     the formation of sinkholes, drying up of the
18     Little Uchee, drying up of Spring Villa, were
19     not, in his opinion, correct?
20  A.  He didn't believe, based on his investigation
21     and findings, that the operation of the quarry
22     caused these allegations, sinkholes, Little
23     Uchee Creek and the spring.

---

172

1   Q.  Did he believe that any of them were caused by
2      the operation of the quarry? If not all of
3      them, were any of them caused by the operation
4      of the quarry in his opinion?
5   A.  As far as I remember, it was none of them.
6   Q.  Do you believe that the attorneys, Gibson Dunn,
7      that you had assisting you on the purchase of
8      the Opelika quarry had more or better
9      information relating to the allegations of the
10     Davis suit than you received?
11  A.  No.
12  Q.  We talked about the Skelly and Loy and the
13     aquaFUSION reports a little while ago; whose
14     responsibility was it to review or to analyze
15     those?
16  A.  Brian Fowler.
17  Q.  And Mr. Fowler was part of the team for this
18     acquisition, right?
19  A.  Absolutely.
20  Q.  Does Oldcastle, or any of the Oldcastle
21     companies that you're aware of, have a written
22     environmental policy of any type?
23  A.  I believe that our separate and individual

---

173

1      operations in the various regions that we
2      operate in have their own environmental
3      policies that they adhere to.
4   Q.  Do you know where we can get a copy of that
5      policy for Oldcastle Materials Southeast?
6   A.  I am not sure. I'm not exactly sure who
7      exactly would have that. I would ask
8      Mr. Bishop.
9   Q.  Okay.
10  A.  Or -- yeah, Mr. Bishop.
11  Q.  Does Oldcastle, or any subsidiary of Oldcastle
12     Materials, Inc., maintain a website?
13  A.  Yes, we have a website.
14  Q.  Okay. Who has the website? Does each company
15     have their own or is it one big website that's
16     intended to cover everybody?
17  A.  I'm not entirely sure. I'm not the expert on
18     the websites that we have. As far as I know,
19     there is an Oldcastle Materials website with
20     links to some of our individual subsidiaries.
21  Q.  What is that website address?
22  A.  My best guess is oldcastlematerials.com.
23  Q.  Does Oldcastle Materials, Inc., or any of the

---

44 (Pages 170 to 173)

**182**

1    made relative to the prior draft and this is
2    just a clean version of the second draft.
3    Q.   All right. That being 796. And is 796 the
4         final signed version? It does not have
5         signatures on it, but is that the final signed
6         version; do you know?
7    A.   I don't know.
8    Q.   Okay.
9    A.   I believe we produced a final signed version to
10        you.
11            MR. SPRAYBERRY: You were on a roll and
12               it should be right there.
13            MR. VERCELLI: 813.
14   A.   Here, is that what it says? 813 you're looking
15        for?
16   Q.   Yeah, but that's not a signed version.
17            MR. SPRAYBERRY: Well, it's in that
18               group, it's 813 through 835. It's
19               in there, I think.
20   Q.   All right. Let me get to that in just a
21        minute, but while we're on this one, let me ask
22        you a couple of questions. Version one lists
23        CRH Oldcastle Materials Group, Inc., who is

**183**

1    that?
2    A.   I have no idea. It's the wrong name.
3    Q.   Okay. None of the Oldcastle companies is
4         called CRH Oldcastle Materials Group, Inc.?
5    A.   There is no, no. I believe what they meant was
6         Oldcastle Materials, Inc. And they still got
7         it wrong, because the ultimate buyer was
8         Oldcastle Materials Southeast, Inc.
9    Q.   Right. Because it was wrong on the second
10        version as well, right?
11   A.   It could well be that there was another two
12        versions afterwards; I don't know.
13   Q.   Okay. I'm going to show you 817 and 818,
14        that's another version of the Asset Purchase
15        Agreement.
16            MR. SPRAYBERRY: What are we on, 817?
17   Q.   817 and 818. But that one is not signed
18        either. Do you know if that's the final
19        version?
20   A.   I don't know. Let me just have a quick look.
21   Q.   Sure. It's still got the wrong company?
22   A.   I hope it's wrong, because otherwise I was
23        wrong. I am not sure. All I can offer is that

**184**

1    I give you -- that I make sure I produce the
2    final signed version of it.
3        (Off-the-record discussion.)
4    Q.   All right. What I'm referring to now is
5         Oldcastle 1 and 2. On Oldcastle 2, that refers
6         to, number seven there, "copies of any water or
7         test well drilling logs;" did y'all, Oldcastle,
8         receive those prior to the purchase?
9    A.   Everything you see listed on List A in this
10        document, the recipient of that was Brian
11        Fowler.
12   Q.   Okay.
13   A.   So I guess Brian Fowler is the person who would
14        have received them, if he received them.
15   Q.   And you don't know whether he did or not?
16   A.   No.
17   Q.   Okay. And do you know whether he received
18        number eight or nine on here?
19   A.   I know nothing about List A.
20   Q.   Okay. 4, which is List C, these are requests
21        by the law firm, right?
22   A.   (Witness nods head in the affirmative.)
23   Q.   Do you know whether the law firm received these

**185**

1    documents requested, or, if so, when?
2    A.   I don't.
3    Q.   Who at that law firm would know?
4    A.   The transaction lawyer was Jeff Kochian, he
5         reports to Steve Shoemate, he would know.
6    Q.   Okay. Would the attorneys have reported the
7         information that they received -- no, let me
8         rephrase that. I'm going to presume that the
9         lawyers got at least some of the documents that
10        they requested on that list; that may be false,
11        but I want to presume they got at least some of
12        them. Did the lawyers summarize or report to
13        you or anyone else at Oldcastle that which they
14        did receive?
15            MR. WHITE: Object, instruct him not to
16               answer, attorney/client privilege.
17            MR. VERCELLI: Well, I'm not asking for
18               the actual communication, just the
19               fact of whether he reported it.
20            MR. WHITE: Instruct him not to answer.
21               I mean, you can do a motion to the
22               court. We're not going to answer
23               any questions about communications

47 (Pages 182 to 185)

3/1/2004

Frank Heisterkamp

238

1　A.　Why don't I do it when I give you the responses
2　　　so I'm probably more accurate than if I just do
3　　　it now?
4　Q.　Okay. And I will ask you to do the same thing
5　　　with respect to Oldcastle Materials Southeast,
6　　　Inc., could you do that?
7　A.　I can do that, but Oldcastle Materials
8　　　Southeast, Inc. doesn't have any other
9　　　subsidiaries. So I'm not quite sure what I
10　　am --
11　Q.　And I apologize, I wasn't clear. I'm not
12　　talking about subsidiaries of the corporation,
13　　I'm talking about the structure, the people,
14　　the flow chart of the personnel within
15　　Oldcastle Materials, Inc. In other words,
16　　you're the VP of Development?
17　A.　I understand. I will provide both.
18　Q.　You've got an Assistant VP of Development?
19　A.　I will provide both.
20　Q.　Someone is underneath him. And then there must
21　　be another VP of something else at Oldcastle
22　　Materials?
23　A.　Yes.

239

1　Q.　And what I want is all of the VPs and then
2　　everybody that reports to those VPs down to the
3　　individual quarry level?
4　A.　I'll do my best to provide those and I will
5　　show them to you.
6　　　MR. VERCELLI: Okay. We can have that
7　　　　understanding he will just do that
8　　　　when he reads and signs?
9　　　MR. WHITE: Yeah. I mean, are we
10　　　talking about -- I don't know how
11　　　far out you want.
12　　　MR. VERCELLI: To the individual -- to
13　　　the Plant Manager level of the
14　　　individual quarries.
15　　　MR. WHITE: For how many quarries are
16　　　we talking about.
17　　　MR. VERCELLI: Just Oldcastle Southeast
18　　　and Oldcastle Materials, Inc.
19　　　itself. I don't want that for --
20　　　I don't want it for all of these
21　　　other states and all of these
22　　　other subsidiaries.
23　　　MR. WHITE: That's fine.

240

1　A.　I can give you a chart that describes that for
2　　　Oldcastle Materials Southeast, Inc., and I can
3　　　give you a chart for Oldcastle Materials, Inc.
4　　　in their Washington-based operation.
5　Q.　That's what I would love. That will do
6　　　perfectly.
7　　　　MR. VERCELLI: And we just have an
8　　　　understanding that he will do that
9　　　　when he reads and signs, please?
10　　　MR. WHITE: That will be fine. Yeah,
11　　　he will do that.
12　Q.　Did Oldcastle obtain any aerial photographs of
13　　the quarry, other than this photograph marked
14　　1038 -- 1538, prior to acquisition?
15　A.　I don't believe we did.
16　Q.　How about since the acquisition, have you got
17　　any photographs, aerial photographs, of the
18　　quarry?
19　　　MR. WHITE: We've taken some in
20　　　anticipation of litigation.
21　A.　I believe we did at the request of our
22　　attorneys and we're using this in this case.
23　　　MR. VERCELLI: Okay. Now, those would

241

1　　　be discoverable, wouldn't they?
2　　　MR. WHITE: At the appropriate time. I
3　　　don't know that they're
4　　　discoverable at this time.
5　Q.　Prior to assuming the quarry, did Oldcastle
6　　exchange any information or obtain information
7　　from Dyno Nobel?
8　A.　I'm not aware of any.
9　Q.　Do you know who they are?
10　A.　It sounds like a blasting company to me, but
11　　I'm not aware of any.
12　　　MR. VERCELLI: I think we may be done.
13　　　If we can take a short break and
14　　　let Jim tell me what all I missed.
15　　　(Recess.)
16　　　MR. VERCELLI: We have no further
17　　　questions of the witness. Thank
18　　　you for answering our questions.
19　　　　I do want to mention this
20　　　though; at several points during
21　　　the deposition we inquired about
22　　　information known to the attorneys
23　　　for Oldcastle, namely Gibson Dunn.

61 (Pages 238 to 241)

242

| | |
|---|---|
| 1 | We were not allowed to ask the |
| 2 | questions, and answers were not |
| 3 | given to those questions, which, |
| 4 | of course, short-circuited or cut |
| 5 | us off from asking follow-up |
| 6 | questions relating to information |
| 7 | known to the Gibson Dunn attorneys |
| 8 | with respect to this litigation, |
| 9 | allegations of the litigation, |
| 10 | court documents, and then any |
| 11 | communications they might have |
| 12 | made with Oldcastle principals. |
| 13 | So I just want to make it |
| 14 | clear that, therefore, since we're |
| 15 | cut off from inquiring into that, |
| 16 | I think it would be most |
| 17 | inappropriate and unfair were |
| 18 | Oldcastle to try to use some of |
| 19 | that information at trial. So I |
| 20 | would expect Oldcastle is agreeing |
| 21 | not to try to use that information |
| 22 | at trial; is that true? |
| 23 | MR. ADAMS: I think what I would like |

243

| | |
|---|---|
| 1 | for you to do -- I believe I heard |
| 2 | you say that you were prevented |
| 3 | from asking the questions that you |
| 4 | thought were appropriate? |
| 5 | MR. VERCELLI: Uh-huh. |
| 6 | MR. ADAMS: I would like for you to go |
| 7 | ahead and ask those questions now, |
| 8 | pose those questions now, so we |
| 9 | can get those on the record, so |
| 10 | the court can determine whether or |
| 11 | not they are appropriate. |
| 12 | MR. VERCELLI: Okay. I think we did |
| 13 | that earlier, but I will be happy |
| 14 | to do that again. |
| 15 | MR. ADAMS: Well, then I misunderstood |
| 16 | what you said. I thought you said |
| 17 | you were prevented from asking the |
| 18 | questions. |
| 19 | MR. VERCELLI: We asked certain |
| 20 | questions to which he was |
| 21 | instructed not to answer, which, |
| 22 | of course, then we couldn't do |
| 23 | follow-up questions based on his |

244

| | |
|---|---|
| 1 | answers. |
| 2 | MR. ADAMS: So I take it that you did |
| 3 | ask all the questions that you |
| 4 | wanted to ask. |
| 5 | MR. VERCELLI: No. I asked questions |
| 6 | which led to objection, |
| 7 | attorney/client privileged, |
| 8 | instruct not to answer, which then |
| 9 | prevented me from being able to |
| 10 | make any follow-up questions based |
| 11 | on his answers. |
| 12 | MR. ADAMS: Well, you don't know what |
| 13 | your questions would have been |
| 14 | then since you don't know what the |
| 15 | answers would have been? |
| 16 | MR. VERCELLI: I would agree. |
| 17 | MR. ADAMS: Is that right? |
| 18 | MR. VERCELLI: I would agree. |
| 19 | MR. ADAMS: I just want to make it |
| 20 | clear that you haven't been |
| 21 | prevented from asking any |
| 22 | questions other than the follow-up |
| 23 | questions that you don't know what |

245

| | |
|---|---|
| 1 | they would be. |
| 2 | MR. VERCELLI: I tell you what let's |
| 3 | do, let's do this; let me ask the |
| 4 | witness some questions just to |
| 5 | make sure we've got it abundantly |
| 6 | clear. |
| 7 | BY MR. VERCELLI: |
| 8 | Q.   Prior to Oldcastle's assumption of the quarry, |
| 9 | the Gibson Dunn law firm was consulted in order |
| 10 | to assist you with the acquisition of this |
| 11 | quarry; is that right? |
| 12 | A.   Yes. |
| 13 | Q.   And one of the documents produced, namely |
| 14 | Oldcastle 1 through Oldcastle 6, includes |
| 15 | documents that were requested and were to be |
| 16 | provided to Mr. Shoemate at Gibson Dunn? |
| 17 | A.   Correct. |
| 18 | Q.   Now, one of my questions is, did Mr. Shoemate |
| 19 | or anybody at Gibson Dunn report to you in any |
| 20 | form about the documents that they received? |
| 21 | MR. WHITE: And that's where we object |
| 22 | and instruct him not to answer. |
| 23 | MR. ADAMS: What were the documents |

62 (Pages 242 to 245)

3/1/2004

Frank Heisterkamp

**246**

1    that --
2    MR. VERCELLI: They're listed on --
3    what's that page number there?
4    MR. ADAMS: Page four. You are asking
5    him about these documents that
6    were listed on page four?
7    MR. VERCELLI: Yes. Or any other
8    documents that they might have
9    received, but yes. And so my next
10    question will be, I wanted to go
11    down every one of those categories
12    and ask him about all of those
13    categories, whether Gibson Dunn
14    got them, what Gibson Dunn
15    reported to you about each of
16    these documents. Will you allow
17    him to answer those questions?
18    MR. ADAMS: I think you have framed the
19    issue properly, because we're not
20    going to allow you to go into
21    that.
22    MR. VERCELLI: And the other -- in
23    addition to what might also be on

**247**

1    the record, the other big category
2    is, what information Gibson Dunn
3    learned about this lawsuit, and
4    then what information Gibson Dunn
5    might have provided to Oldcastle
6    about what it learned about this
7    lawsuit.
8    MR. WHITE: We would have the same
9    objection.
10    MR. ADAMS: You're asking him what
11    Gibson Dunn learned?
12    MR. VERCELLI: Yes. And what Gibson
13    Dunn told Oldcastle management
14    about this lawsuit.
15    MR. ADAMS: All right. Well, I'm going
16    to instruct him not to answer what
17    Gibson Dunn told him. If he knows
18    what Gibson Dunn learned in some
19    other way, then I'll allow him to
20    answer that.
21    BY MR. VERCELLI:
22    Q.    Okay. Do you know what Gibson Dunn -- what
23    documents Gibson --

**248**

1    MR. WHITE: Well, let me say this; he
2    would have no way of knowing what
3    Gibson Dunn may have learned other
4    than by some communications from
5    Gibson Dunn.
6    MR. VERCELLI: That's exactly right.
7    MR. VERCELLI: Which you're not going
8    to let him talk about?
9    MR. WHITE: That's right.
10    MR. VERCELLI: So now I guess we're
11    back to, given that we are not
12    able to ask questions about
13    Oldcastle's knowledge learned from
14    Gibson Dunn, then it seems clear
15    to me, Oldcastle should not be
16    allowed to advance that
17    information at trial since we were
18    not allowed to discover it.
19    MR. ADAMS: Well, of course, I would
20    assume that you're going to take
21    this matter up with the judge
22    between now and the trial.
23    MR. VERCELLI: I don't know.

**249**

1    MR. ADAMS: And what we're planning on
2    doing, and I'm going to tell you
3    now, the only thing that we are
4    objecting to are communications
5    between Oldcastle and Oldcastle's
6    attorneys as being privileged,
7    okay?
8    MR. VERCELLI: Even though it relates
9    to their legal advice as part of
10    the acquisition of this quarry?
11    MR. ADAMS: Yes.
12    MR. VERCELLI: Okay. I think that's
13    clear as mud, but I think it's
14    clear enough on the record for the
15    judge to be able to assist us
16    should we desire.
17    MR. ADAMS: All right. Is there
18    anything else that you want to put
19    on the record?
20    MR. VERCELLI: No. We'll just schedule
21    some more depos when we get a
22    chance.
23    MR. ADAMS: All right. For your

63 (Pages 246 to 249)

*Davis v. Hansen*, Case No. CV 02-85
Privilege Log of Defendant, Oldcastle Materials Southeast, Inc.

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 10/28/2003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Attorney/Client; Joint Defense |
| 10/28/2003 | John Gillan | Frank Heisterkamp | Ward Nye; Tammy Butler; Wayne Phears | Email | Opelika | Attorney/Client; Joint Defense |
| 10/27/2003 | Frank Heisterkamp | Rowan Smith | Glenn Culpepper; Kara Morley | Email | Opelika Lawsuit | Attorney/Client; Work Product |
| 10/24/02003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Attorney/Client; Joint Defense |
| 10/24/2003 | John Gillan | Frank Heisterkamp | Wayne Phears; Ward Nye | Email | Opelika | Attorney/Client; Joint Defense |
| 10/24/2003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Joint Defense |
| 10/24/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client; Work Product |
| 10/24/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika | Attorney/Client |
| 10/23/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client; Work Product |
| 10/23/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika | Attorney/Client |
| 10/23/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams | | Email | Opelika | Attorney/Client; Work Product |
| 10/23/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams | | Email | Opelika | Attorney/Client; Work Product |
| 10/23/2003 | John Gillan | Frank Heisterkamp; John Gillan | | Email | Opelika | Joint Defense |
| 10/23/2003 | Brian Fowler | Frank Heisterkamp | | Email | Your Schedule? | Work Product |
| 10/22/2003 | Jeffrey Kochian | Deborah Fisher; Frank Heisterkamp; Olivia Cato | Brian Fowler | Email | Opelika | Attorney/Client; Work Product |
| 10/22/2003 | Deborah Fisher | Frank Heisterkamp; Jeffrey Kochian; Olivia Cato | Brian Fowler | Email | Opelika | Attorney/Client; Work Product |

2230

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 10/22/2003 | Jack Weiss | Frank Heisterkamp | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill; Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/20/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 10/20/2003 | Frank Heisterkamp | Jeffrey Kochian | Olivia Cato; Deborah Fisher; Brian Fowler | Email | Opelika | Attorney/Client; Work Product |
| 10/20/2003 | Jeffrey Kochian | Deborah Fisher; Frank Heisterkamp; Brian Fowler | Olivia Cato | Email | Opelika | Attorney/Client; Work Product |
| 10/20/2003 | Deborah Fisher | Frank Heisterkamp; Jeffrey Kochian; Brian Fowler | Olivia Cato | Email | Opelika | Attorney/Client; Work Product |
| 10/20/2003 | Frank Heisterkamp | Kara Morley | | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/20/2003 | Kara Morley | Frank Heisterkamp | | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/17/2003 | Jack Weiss | Frank Heisterkamp | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| | | Olivia Cato | Brian Fowler | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |

2

2231

| Date | Author | Recipient | Cc's | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|------|----------|-------------|----------------|
| 10/17/2003 | Olivia Cato | Frank Heisterkamp | Brian Fowler | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/17/2003 | Frank Heisterkamp | Brian Fowler | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Frank Heisterkamp | Glenn Culpepper; Mark Towe | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Frank Heisterkamp | Morris Bishop; Ted Reynolds | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles H. Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/14/2003 | Frank Heisterkamp | Morris Bishop; Ted Reynolds | | Email | FW: Opelika (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/14/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams | Email | Opelika (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/13/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/09/2003 | John Gillan | Gary Whitlock; Deborah Fisher; Frank Heisterkamp; Jeffrey Kochian | Leighton Yates; Ward Nye; Joseph Murphy | Email | FW: Opelika | Attorney/Client; Work Product |
| 10/09/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams | | Email | FW: Hanson/CRH Opelika | Attorney/Client; Work Product |
| 10/09/2003 | Craig Cyr | Frank Heisterkamp | | Email | Opelika Drawings | Work Product |
| 10/08/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika meeting – CONFIDENTIAL | Attorney/Client; Work Product |
| 10/07/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams; Brian Fowler | Charles Haake | Email | Davis v. Hanson et al (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |

3

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| 10/03/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/01/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 09/28/2003 | Frank Heisterkamp | Mark Towe | | Email | Opelika – For your information | Attorney/Client |
| 09/23/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 09/23/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika | Attorney/Client |
| 09/21/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika 2 | Work Product |
| 09/21/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika | Work Product |
| 09/19/2003 | Frank Heisterkamp | Brian Fowler | | Email | Opelika | Work Product |
| 09/17/2003 | Jeffrey Kochian | Frank Heisterkamp | Steven Shoemate; Jack Weiss | Email | Opelika Liability | Attorney/Client; Work Product |
| 09/17/2003 | Frank Heisterkamp | Jeffrey Kochian | Steven Shoemate; Jack Weiss | Email | Opelika Liability | Attorney/Client; Work Product |
| 09/17/2003 | Frank Heisterkamp | Brian Fowler | | Email | Elam | Work Product |
| 09/16/2003 | Jack Weiss | Phil Adams; Charles Haake | Frank Heisterkamp | Email | FW: Opelika quarry | Attorney/Client; Work Product |
| 09/15/2003 | Jeffrey Kochian | Frank Heisterkamp | Steven Shoemate | Email | Opelika Liability | Attorney/Client; Work Product |
| 09/15/2003 | Brian Fowler | Morris Bishop | Frank Heisterkamp | Email | Opelika | Work Product |
| 09/10/2003 | Frank Heisterkamp | Jack Weiss | | Email | Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/10/2003 | Frank Heisterkamp | Morris Bishop | | Email | FW: Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/09/2003 | Frank Heisterkamp | Jack Weiss | | Email | Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/09/2003 | Jack Weiss | Frank Heisterkamp | Charles Haake; Phil Adams | Email | FW: Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/04/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika – legal fees | Attorney/Client; Work Product |

4

| Date | Author | Recipient | CCs | Doc Type | Subject/Re | Privilege Type |
|---|---|---|---|---|---|---|
| 09/04/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams | Rowan Smith; Morris Bishop | Email | Opelika – legal fees | Attorney/Client; Work Product |
| 09/04/2003 | Rowan Smith | Frank Heisterkamp | | Email | Legal Fees – Opelika | Attorney/Client |
| 09/04/2003 | Frank Heisterkamp | Rowan Smith | | Email | Legal Fees – Opelika | Attorney/Client |
| 09/04/2003 | Frank Heisterkamp | Jack Weiss | | Email | Time line | Attorney/Client |
| 09/04/2003 | Jack Weiss | Frank Heisterkamp | Charles Haake | Email | FW: Opelika pretrial conf | Attorney/Client; Work Product |
| 09/03/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika/depo prep | Attorney/Client |
| 09/03/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika/depo prep | Attorney/Client |
| 09/03/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika/depo prep | Attorney/Client |
| 09/03/2003 | Frank Heisterkamp | Brian Fowler | | Email | Opelika | Work Product |
| 09/03/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika | Work Product |
| 09/02/2003 | Jack Weiss | Frank Heisterkamp | | Email | FW: hydrogeology issues | Attorney/Client; Work Product |
| 08/14/2003 | James Byram | Jack Weiss | | Email | Hydrogeology issues | Attorney/Client; Work Product; Joint Defense |
| 08/13/2003 | Jack Weiss | James Byram | Phil Adams | Email | Motion to continue | Attorney/Client; Work Product; Joint Defense |
| 08/13/2003 | James Byram | Phil Adams; Jack Weiss | | Email | FW: Motion to continue | Attorney/Client; Work Product; Joint Defense |
| 09/02/2003 | Jack Weiss | Frank Heisterkamp | | Email | Hydrogeology issues | Attorney/Client; Work Product |
| 09/01/2003 | Frank Heisterkamp | Jack Weiss | | Email | Hydrogeology issues | Attorney/Client; Work Product |
| 08/18/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 08/14/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams | Email | FW: hydrogeology issues | Attorney/Client |
| 08/14/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams | | Email | Opelika case (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 08/13/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika case | Attorney/Client; Work Product |

5

2234

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| 08/13/2003 | Tomohisa Aiko | Frank Heisterkamp | | Email | Opelika settlement letter | Attorney/Client |
| 08/13/2003 | Frank Heisterkamp | Tomohisa Aiko | | Email | Opelika settlement letter | Attorney/Client |
| 08/13/2003 | Tomohisa Aiko | Frank Heisterkamp | | Email | Opelika settlement letter | Attorney/Client |
| 07/12/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Opelika APA | Attorney/Client |
| 07/12/2003 | Ward Nye | Frank Heisterkamp | Joseph Murphy | Email | FW: #784406 v1 – Opelika Joint Defense Agreement | Joint Defense |
| 07/12/2003 | Jeffrey Kochian | Troy Clough; Steven Shoemate; Frank Heisterkamp | | Email | FW: #784406 v1 – Opelika Joint Defense Agreement | Attorney/Client; Joint Defense |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp; Steven Shoemate; Brian Fowler | | Email | Opelika | Attorney/Client; Work Product |
| 07/11/2003 | Frank Heisterkamp | Jeffrey Kochian | | Email | [No Subject] | Attorney/Client |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | [No Subject] | Attorney/Client; Work Product |
| 07/11/2003 | Frank Heisterkamp | Jeffrey Kochian | | Email | [No Subject] | Attorney/Client |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp; Brian Fowler | | Email | [No Subject] | Attorney/Client; Work Product |
| 07/11/2003 | Brian Fowler | Frank Heisterkamp | | Email | [No Subject] | Work Product |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | [No Subject] | Attorney/Client; Work Product |
| 07/11/2003 | Frank Heisterkamp | Jeffrey Kochian | | Email | [No Subject] | Attorney/Client |
| 07/11/2003 | Frank Heisterkamp | Morris Bishop | Mark Towe | Email | Hanson closing | Attorney/Client; Joint Defense |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp | Brian Fowler | Email | [No Subject] | Attorney/Client; Work Product |
| 07/10/2003 | Frank Heisterkamp | Tom Hill | | Email | Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| 07/10/2003 | Brian Fowler | Jeffrey Kochian | Morris Bishop; Frank Heisterkamp | Email | Hanson – Opelika | Attorney/Client; Work Product |
| 08/13/2003 | Frank Heisterkamp | Phil Adams; Jack Weiss; Brian Fowler; Morris Bishop | | Email | Time Line Opelika matter | Attorney/Client; Work Product |

2235

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 08/13/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Timeline | Attorney/Client; Work Product |
| 08/12/2003 | Frank Heisterkamp | Brian Fowler; Phil Adams; Jack Weiss; Morris Bishop | | Email | Hanson – Opelika law suit | Attorney/Client; Work Product |
| 08/11/2003 | Tomohisa Aiko | Frank Heisterkamp | Jack Weiss; Jeffrey Kochian | Email | Joint Defense Agreement | Attorney/Client; Work Product; Joint Defense |
| 08/10/2003 | Jack Weiss | Frank Heisterkamp | Steven Shoemate | Email | Jack Weiss | Attorney/Client; Work Product |
| 08/07/2003 | Tomohisa Aiko | Frank Heisterkamp | | Email | Opelika Asset Purchase Agreement | Attorney/Client; Work Product |
| 08/07/2003 | Frank Heisterkamp | Tomohisa Aiko | | Email | Opelika Asset Purchase Agreement | Attorney/Client; Work Product |
| 08/07/2003 | Tomohisa Aiko | Frank Heisterkamp | Jack Weiss | Email | Opelika Asset Purchase Agreement | Attorney/Client; Work Product |
| 08/07/2003 | Tomohisa Aiko | Frank Heisterkamp | Jack Weiss | Email | Opelika Schedules | Attorney/Client; Work Product |
| 08/07/2003 | Steven Shoemate | Frank Heisterkamp | | Email | Jack Weiss | Attorney/Client; Work Product |
| 08/07/2003 | Frank Heisterkamp | Steven Shoemate; Tomohisa Aiko | Jack Weiss | Email | Jack Weiss | Attorney/Client; Work Product |
| 08/01/2003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Attorney/Client; Work Product; Joint Defense |
| 08/01/2003 | John Gillan | Frank Heisterkamp | | Email | Opelika | Attorney/Client; Work Product; Joint Defense |
| 07/18/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 07/15/2003 | John Gillan | Frank Heisterkamp | | Email | Opelika | Joint Defense |
| 07/15/2003 | Ward Nye | Frank Heisterkamp | John Gillan | Email | Opelika | Joint Defense |
| 07/15/2003 | Frank Heisterkamp | John Gillan | Ward Nye; Joseph Murphy | Email | Opelika | Joint Defense |

7

2236

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 07/14/2003 | Frank Heisterkamp | Morris Bishop | Rowan Smith; Mark Towe | Email | Opelika | Joint Defense |
| 07/14/2003 | John Gillan | Frank Heisterkamp | Ward Nye; Joseph Murphy | Email | Opelika | Joint Defense |
| 10/27/2003 | Frank Heisterkamp | Rowan Smith | Glenn Culpepper; Kara Morley | Email | Opelika Lawsuit | Attorney/Client; Work Product |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill, Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Frank Heisterkamp | Glenn Culpepper; Mark Towe | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 07/11/2003 | Tom Hill | Glenn Culpepper | | Email | FW: Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill; Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |

8

2237

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 10/16/2003 | Frank Heisterkamp | Glenn Culpepper; Mark Towe | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 09/28/2003 | Frank Heisterkamp | Mark Towe | | Email | Opelika – For your information | Attorney/Client; Work Product |
| 07/14/2003 | Frank Heisterkamp | Morris Bishop | Rowan Smith; Mark Towe | Email | FW: Opelika | Attorney/Client; Work Product; Joint Defense |
| 07/11/2003 | Frank Heisterkamp | Morris Bishop | Mark Towe | Email | Hanson closing | Attorney/Client; Joint Defense |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill; Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 07/11/2003 | Tom Hill | Glenn Culpepper | | Email | FW: Hanson deal -- Ward Nye | Attorney/Client; Joint Defense |
| 07/11/2003 | Tom Hill | Frank Heisterkamp | | Email | Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| 07/10/2003 | Frank Heisterkamp | Tom Hill | | Email | Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Asset List | Proprietary/ Confidential Business Information |
| 08/15/2003 | Deborah Fisher | Tomohisa Aiko | Frank Heisterkamp; Brian Fowler | Letter | Hanson Quarries | Attorney/Client; Work Product |

2238

| Date | Author | Recipient | cc: | Doc. Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|-----------|-------------|----------------|
| 08/29/2003 | Deborah Fisher | Tomohisa Aiko; Brian Fowler; Frank Heisterkamp | | Facsimile | Opelika Quarry | Attorney/Client; Work Product |
| 07/10/2003 | Deborah Fisher | Frank Heisterkamp; Jeff Kochian; Brian Fowler | | Memorandum | New Information on Southeastern Quarries | Attorney/Client; Work Product |
| 07/10/2003 | Deborah Fisher | Glen Wilking; Gary Whitlock | | Memorandum | New Information on Southeastern Quarries | Attorney/Client; Work Product |
| | Frank Heisterkamp | | | Spreadsheet | Asset Swaps | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| 06/18/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Capital Expenditures Three Years 2003-2005 | Proprietary/ Confidential Business Information |
| 06/17/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Stripping Cost by Site ($000) | Proprietary/ Confidential Business Information |
| 06/17/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Capital Expenditures Five Years 2003-2005 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |

10

2230

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| | Frank Heisterkamp | | | Spreadsheet | Hanson Deal Structure (revised) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Asset Swaps | Proprietary/ Confidential Business Information |
| 06/07/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Stripping Cost by Site ($000) | Proprietary/ Confidential Business Information |
| 06/07/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Capital Expenditures Five Years 2003-2005 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Leases | Proprietary/ Confidential Business Information |
| 04/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Southeast Region – Backlog – April 2003 | Proprietary/ Confidential Business Information |
| 04/30/2003 | Frank Heisterkamp | | | Spreadsheet | Plant Finished Goods Inventory Report | Proprietary/ Confidential Business Information |

11

| Date | Author | Recipient | CCs | Doc Type | Subject/Re | Privilege Type |
|------|--------|-----------|-----|----------|------------|----------------|
| | Frank Heisterkamp | | | Spreadsheet | Summary Profit & Loss by Cost Element 2000 (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Sales Analysis of Aggregates – Month & YTD (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Sales Analysis of Aggregates – Month & YTD (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Sales Analysis of Aggregates – Month & YTD (Various Quarries) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Summary Profit & Loss by Cost Element (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/12/2003 | Frank Heisterkamp | Mark Towe | | Facsimile | Hanson Project Spreadsheets | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries – Consol 6 Asset | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries – Consol 5 Asset | Proprietary/ Confidential Business Information |

12

224

| Date | Author | Recipient | CCs | Doc Type | Subject/Re | Privilege Type |
|------|--------|-----------|-----|----------|------------|----------------|
| 05/02/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Stripping Cost by Site ($000) | Proprietary/ Confidential Business Information |
| 05/02/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project 2003 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries – Consol 6 Asset | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Swaps – Summary Comparison | Proprietary/ Confidential Business Information |
| 12/02/2003 | Joseph Murphy | Frank Heisterkamp | | Facsimile and Spreadsheets | Summary Profit & Loss by Cost Element (Various Quarries) | Proprietary/ Confidential Business Information |
| 12/03/2003 | Joseph Murphy | Frank Heisterkamp | | Facsimile | 12 month results; Summary Profit & Loss by Cost Element (Various Quarries) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 (Nov YTD) | Proprietary/ Confidential Business Information |
| 06/24/2003 | Craig Cyr | Frank Heisterkamp | | Email | Updated Hanson Lease Table | Proprietary/ Confidential Business Information |

13

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 07/01/2003 | Joseph Murphy | Frank Heisterkamp | | Facsimile | Spreadsheets Re: Hanson Aggregates Stock Status and Plant Finished Goods Inventory Reports | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarry Aggregate Valuation | Proprietary/ Confidential Business Information |
| 08/13/2003 | Frank Heisterkamp | | | Spreadsheet | SRM Aggregates Hanson Employee Unused Vacation as of 07/13/2003 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson – GAT Quarries | Proprietary/ Confidential Business Information |
| 03/29/2003 | Frank Heisterkamp | Tom Hill; Don Eshleman; Glenn Culpepper; Mark Towe; Michael Brady | | Memorandum | Hanson – Asset swaps | Proprietary/ Confidential Business Information |
| 04/04/2003 | Frank Heisterkamp | Joseph Murphy | | Letter | Business Valuation | Proprietary/ Confidential Business Information |
| 07/10/2003 | Frank Heisterkamp | | | Spreadsheet | Plant Finished Goods Inventory Report | Proprietary/ Confidential Business Information |
| 07/08/2003 | Deborah Fisher | Jeffrey Kochian; Jack Zouhary | Frank Heisterkamp; Glenn Perry | Email | Hanson like-kind exchange issue—leases | Attorney/Client |
| 07/08/2003 | Joseph Murphy | Frank Heisterkamp | | Email | FW:  Leased Vehicles | Proprietary/ Confidential Business Information |

14

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| | Frank Heisterkamp | | | Spreadsheet | FW Dodge Forecast | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Swaps – Summary Comparison | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Leases | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Alexander City Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| 06/03/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson – GAT | Proprietary/ Confidential Business Information |

15

| Date | Author | Recipient | CC's | Doc Type | Subject/Re | Privilege Type |
|------|--------|-----------|------|----------|------------|----------------|
| | Frank Heisterkamp | | | Spreadsheet | Hanson – GAT Quarries | Proprietary/ Confidential Business Information |
| 05/30/2003 | Frank Heisterkamp | | | Spreadsheet | Plant Finished Goods Inventory Report – Alexander City | Proprietary/ Confidential Business Information |
| 09/19/2003 | Brian Fowler | Frank Heisterkamp | | Facsimile | Opelika Dye Test Opinion | Work Product |
| 09/17/2003 | Charles Haake | Phil Adams; Frank Heisterkamp | Jack Weiss | Email | Opposition to Plaintiffs' Motion to Continue | Attorney/Client; Work Product |
| 09/11/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element (Dec YTD) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element (Apr YTD) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element 2000 | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |

16

| Date | Author | Recipient | CC# | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element 2000 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Capital Expenditures – Select Sites | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quaries for swap with OMG 2002 (Nov YTD) | Proprietary/ Confidential Business Information |
| 03/08/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Swaps – Summary Comparison | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson – Profit and Loss Models | Proprietary/ Confidential Business Information |

17

2245

| Date | Author | Recipient | CCs | Doc Type | Subject/Re | Privilege Type |
|------|--------|-----------|-----|----------|------------|----------------|
| 09/25/2002 | Frank Heisterkamp | Joseph Murphy | | Facsimile | Alabama – Confidentiality Agreement | Proprietary/ Confidential Business Information |
| 09/23/2002 | Joseph Murphy | Frank Heisterkamp | | Letter | Confidentiality Agreement | Proprietary/ Confidential Business Information |
| 09/18/2002 | Frank Heisterkamp | Morris Bishop | | Facsimile | Hanson – Asset Swap | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Handwritten Note | Hanson – Asset Swap | Proprietary/ Confidential Business Information |
| 09/30/2002 | Joseph Murphy | Frank Heisterkamp | DLG; CHN & GJW | Letter | Confidentiality Business Information | Proprietary/ Confidential Business Information |
| 09/26/2002 | Frank Heisterkamp | | | Spreadsheet | Hanson Building Materials America, Inc. Reserve Bank Information as of April 2002 (000 omitted) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Summary | Opelika Quarry – Lease Recording Summary | Proprietary/ Confidential Business Information |
| 01/18/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |

18

2247

| Date | Author | Recipient | Ccs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| 01/15/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates -- Month & YTD | Proprietary/ Confidential Business Information |
| 06/27/2001 | Frank Heisterkamp | | | Record Summary | Opelika Mineral Agreement and Lease | Proprietary/ Confidential Business Information |
| 03/30/2000 | Frank Heisterkamp | | | Record Summary | Opelika -- Agreement and Easement | Proprietary/ Confidential Business Information |
| 09/25/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element  (Aug YTD) | Proprietary/ Confidential Business Information |
| 09/25/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates -- Month & YTD | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Aggregates East -- Southeast Region Opelika Quarry | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson -- History (Alexander City & Opelika) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson -- History (Alexander City & Opelika) w.o. inventory adjustment | Proprietary/ Confidential Business Information |

19

2248

| Date | Author | Recipient | CC8 | Doc Type | Subject/Re... | Privilege Type |
|------|--------|-----------|-----|----------|---------------|----------------|
| 10/18/2002 | Joseph Murphy | Frank Heisterkamp | | Facsimile | Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| 10/24/2002 | Joseph Murphy | Frank Heisterkamp | | Email & Spreadsheets | Opelika & Alex City – Inventory | Proprietary/ Confidential Business Information |
| 10/22/2002 | Frank Heisterkamp | Morris Bishop | | Facsimile & Spreadsheets | Hanson – Hanson History | Proprietary/ Confidential Business Information |
| 10/24/2002 | Joseph Murphy | Frank Heisterkamp | | Facsimile & Spreadsheets | Fixed Asset Master List | Proprietary/ Confidential Business Information |

70278310_4.DOC

20

2249

# EXHIBIT "G"

## Selected Pages from Fowler Deposition

Page Number                                                                              Heisterkamp

102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . No opinion on dye test -not enough data-

103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . He told Oldcastle no way to know categorically

187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Does not know if all marble connected

206 / 208 . . . . . . . . . . . . . . . . . . No data, but does not believe spring water coming into quarry

230 . . . . . . . . . . . . . . . . . . . . . . . . . (No data) but believes spring dry for combination of reasons

250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . He "does not understand geology of spring area"

264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Aware of MSDS/silica sheet and testing

3  A.   There may be a copy of a letter there in the
4       stack. I don't recall.
5  Q.   You don't remember who it was from or to?
6  A.   No.
7  Q.   I don't remember seeing one. Let me show you
8       the documents I think we got today, Mr. Fowler,
9       if you could flip through it?
10  A.   I think I'm recalling now that I believe what I
11      saw was a deposition by a Doctor Ewers or
12      Evers, I forget the name now. I believe he was
13      an expert for Hanson.
14  Q.   Ewers?
15  A.   I think it's Ewers. I think that's the --
16      that's the document that I have seen.
17  Q.   A report by Doctor Ewers, maybe?
18  A.   Well, I believe -- I'm pretty sure it was
19      either a deposition or a report.
20  Q.   Okay. Did you look at any of the other reports
21      or summaries of --
22  A.   I've seen all of the expert opinion at this
23      point.
0102
1  Q.   Okay.
2  A.   But I don't believe there's a letter. I think
3      what I'm recalling is that --
4  Q.   And you found all of that out in what month?
5  A.   Well, it was -- I think I finally got the
6      materials in early August of 2003.
7  Q.   Have you been asked to form any opinions on
8      that dye trace or dye study?
9  A.   Oh, several times.
10  Q.   You have been?
11  A.   Yes, I have.
12  Q.   Okay. And by whom were you asked?
13  A.   Oldcastle, various people.
14  Q.   Have you done any calculations or research on
15      it?
16  A.   I have formulated no opinion.
17  Q.   And why didn't you formulate an opinion?
18  A.   Don't have enough information yet.
19  Q.   What are you lacking?
20  A.   Well, we need to understand the structural
21      geology of the bedrock; we need to understand

251

22 the actual flow net that exists in the bedrock;

23 I have to understand the chemistry of these

0103

1 dyes better than I do.  Basically you need to

2 go through the type of investigation you and I

3 talked about an hour or so, hour and a half

4 ago.

5 Q. Right.  The step-by-step from the geology down

6 to the samples?

7 A. Right.  Otherwise in my view, and as I've said

8 to Oldcastle, there's no way to know what the

9 dye test means categorically.

10 Q. Does it tell you anything about travel time?

11 A. A dye test by itself?

12 Q. Right.

13 A. It can, if you know all of those parameters I

14 was describing to you.

15 Q. Okay.  And since you were asked to formulate

16 opinions, have you looked at any other

17 documents or talked to anybody else?

18 A. No.  We're formulating this investigation that

19 we want to undertake and we've been waiting for

20 that to start.

21 Q. "We" being North American Reserve?

22 A. North American Reserve on behalf of Oldcastle.

23 Q. Okay.  And what are you going to do to -- you

0104

1 say you are formulating it, what are you going

2 to do?

3 A. Well, we basically are going to drill a series

4 of holes around the quarry and in a line from

5 the quarry towards the northeast out into the

6 Young parcel, out to the furthest reaches of

7 the Young parcel that we can get to on that

8 property.  And then essentially pump the quarry

9 at a variety of different rates and actually

10 monitor the drawdowns, not model them, but

11 monitor them, so that we know about the

12 hydrology.  Then the drilling that's done will

13 all be rock cores, so we'll get what appears,

14 from the literature and the other expert

15 opinion, to be the first third dimensional

16 picture of what the bedrock geology is under

2252

8    surface that you're talking about. From the
9    high point on the Young parcel it would
10    probably be close to 280, 290, something, you
11    know, on the order of 300 feet, underneath the
12    highest part of the Young parcel. On the
13    average it's probably 250.
14  Q.    All right. Back on your report, down at the
15    bottom at 2.2, it talks about "All but one of
16    these reserves consists of nearly flat-lying
17    varieties of marble, limestone and dolomitic
18    limestone." I guess the one exception is some
19    other quarry that's got some type of granite?
20  A.    Right. It's Alexander City.
21  Q.    Okay. Now, the marble out at the Lee County
22    quarry is not flat-lying, is it?
23  A.    Well, at the time, based on what we knew at the
0186
1    time from that Steltenpohl geologic map, and
2    the fact that we hadn't yet acquired all of
3    these other field trip reports that I mentioned
4    earlier this morning, because we didn't
5    understand that this whole activity was
6    underway, the map that he did — the first map
7    that he did, the one I was referring to, shows
8    the Chewacla Marble, as it's called on the map,
9    to be flat-lying. And when we looked in the
10    quarry, we saw the jointing and the fracturing,
11    but the layering, the bedding, the relic
12    bedding in the limestone is close to
13    horizontal. So we made that assumption that it
14    was a flat-lying limestone.
15  Q.    It's actually pinnacled, isn't it, and domed?
16  A.    Do you mean the surface of it?
17  Q.    Right.
18  A.    Yes. Right. But the limestone formation is
19    flat-lying underneath.
20  Q.    Okay. And when you looked at the GSA map, the
21    geology map, did you notice that there were
22    several locations of the Chewacla Marble?
23  A.    Yes.
0187
1  Q.    Did you see that there was one location up at
2    Spring Villa?

253

3  A.   Well, I didn't know Spring Villa was important
4      at the time, but I did notice that there was
5      marble there.
6  Q.   Okay.
7  A.   And also over at -- over towards Chewacla State
8      Park.
9  Q.   Right.  Do you know if those units of Chewacla
10     Marble are connected?
11 A.   We don't.
12 Q.   Okay.  How do you know you don't?
13 A.   Well, I don't know because I haven't studied
14     it.
15 Q.   You haven't looked.  Okay.
16 A.   I'm going on the basis of all the published
17     information in the expert reports in this case,
18     there's great disagreement over whether they're
19     connected or not.  And we would like to find
20     that out in our investigation, which is one of
21     our goals.
22 Q.   On the next page, 1554, it specifically talks
23     about the quarry and the expansion.  I think
0188
1      you did some calculations on your sheet,
2      somebody has taken your calculations, but did
3      you calculate up how much overburden would have
4      to be removed?
5  A.   I think that's on the sheets there.
6          MR. ADAMS:  I think Mr. Vercelli had
7              that.
8  Q.   That would be on 1801 maybe or 1802?
9  A.   I don't know if it's on there or not.  Yeah,
10     here it is.  It's on 1804 on the left side,
11     lower left side, at three million cubic yards.
12     The actual calculated number was 2.595 million
13     yards and we rounded it up to three million.
14 Q.   Cubic yards?
15 A.   Yes.
16 Q.   And that's where you're going to strip it off
17     the 16 acres?
18 A.   Well, that would be the total stripping left to
19     go all the way out to the end of the quarry
20     development.
21 Q.   Okay.  And when you're removing that

2254

```
 1      near?
 2  A.  Well, near enough for it to be a problem.  I
 3      mean, it was going to depend on the situation.
 4      I mean, the point is we always look.  Whether
 5      it's near or far, we're always looking for that
 6      kind of problem, potential problem.
 7  Q.  And how do you look near or far?
 8  A.  Well, you look around the site, aerial photos,
 9      maps, the state databases that tell you where
10      the parks are, where the protected wetland
11      areas are, wildlife habitats and that kind of
12      thing.
13  Q.  If you had known that Spring Villa was dry,
14      would that have raised a red flag with you?
15  A.  Well, just that fact alone I don't think would
16      have.
17  Q.  Okay.  Why not?
18  A.  Well, I mean what raised the spectra of it was
19      the implication that this quarry made it dry.
20      I mean, that takes it from a non-red flag to a
21      red flag.
22  Q.  All right.  Which is the last one down there,
23      environmental litigation?
0206
 1  A.  Right.
 2  Q.  I take it if you had known, when you did your
 3      site visit, that there was a pending lawsuit,
 4      it would have raised a red flag?
 5  A.  Yes.
 6  Q.  Okay.  And then I would assume that on July
 7      10th when you found out, it raised the red
 8      flag?
 9  A.  It did.  And it's still up.
10  Q.  And it's still up?
11  A.  Yes.
12  Q.  Okay.  So I guess would it be fair to say on
13      July 10th you had some reservations about the
14      purchase of this property?
15          MR. ADAMS:  Object to the form.
16  A.  Well, no.  Because we -- we believed -- well,
17      what we understood of the allegations that day,
18      we thought they were pretty serious, if true.
19      And we still think that's the case, and we're
```

2255

20    approaching -- this investigation we're going
21    to do, we're approaching it with that attitude.
22    But we don't believe, based on our experience
23    in dealing with these kinds of problems and the

0207

1    basic geological and hydrogeological situation
2    that exists out there, that these problems
3    can't be controlled in a way that will be
4    satisfactory. So we wouldn't have -- I don't
5    think we would have backed off of the
6    acquisition; I'm certain we wouldn't have
7    actually.
8  Q.  I thought I had asked you earlier about the
9    cone of depression and whether you could
10    calculate it and so forth, but you said you
11    didn't have enough data. But now you're
12    telling me at the time you had enough data to
13    determine that, in your opinion, Oldcastle
14    could control or limit the impact?
15        MR. ADAMS: Object to the form.
16  A.  Yeah. I think the -- we looked in the quarry
17    at the fractured limestone, and we looked at
18    the water situation that existed there, and
19    this is after we found out about the
20    litigation. There's basically no conduit or
21    system of conduits in the quarry walls which
22    would suggest that four or five or six million
23    gallons of water a day out of the water budget

0208

1    is coming straight over from Little Uchee Creek
2    drainage into the quarry. It goes to the
3    contributory cause business I was talking about
4    this morning.
5  Q.  Well, where is it coming from?
6  A.  Well, we don't know. As a matter of fact,
7    nobody does. Lots and lots of speculation, but
8    no scientific facts. Well, the investigation
9    we intend to do is going to determine that,
10    because that's where the rubber hits the road
11    in this whole thing. And if we find out --
12        MR. ADAMS: Hold it, Brian.
13  A.  Okay. We need to establish the degree to which
14    these different -- the allegations, contentions

2256

15     and speculations are true or not true.

16  Q.   Right.

17  A.   And the qualitative judgment on my part was

18     that the -- given the fact these are usually

19     contributory problems, once we identify the

20     contributors, because we have identified them

21     as specifically as we're proposing to do it,

22     that we can mitigate those impacts

23     satisfactorily.

0209

1  Q.   But right now you're telling us that nobody

2     knows where the water is coming from?

3  A.   That's right.

4  Q.   So if Hanson's people told you they knew where

5     it was coming from or what was causing it,

6     you're saying that --

7  A.   I don't believe them.

8  Q.   You don't believe them?

9  A.   No. And I don't believe your experts either.

10  Q.   And why don't you believe Hanson's experts?

11  A.   Because there is no scientific data used to

12     develop the opinions and speculations. They're

13     speculations, and we need to --

14  Q.   And what scientific data is missing, in your

15     opinion?

16  A.   The actual measurements and studies of the sort

17     I described to you this morning; on site,

18     hands-on, give me the numbers, let's find out

19     what's really going on type study.

20  Q.   Okay. Back on July 10th, if you didn't believe

21     Hanson's experts and you had no data of your

22     own, why was it Oldcastle thought they could

23     limit the impact?

0210

1       MR. ADAMS: Well, wait a minute.

2         That's not what he testified

3         about, Jimmy.

4       MR. VERCELLI: That's exactly what he

5         testified to.

6       MR. ADAMS: No, it isn't, Chip. And I

7         don't want to --

8       MR. VERCELLI: That's exactly how I

9         understood it.

2257

```
 8        there is just a whole range of things you can
 9        do in between lots and little.  I mean, it
10        depends on how much.
11   Q.   Low flow, you know, it's 300,000, 500,000
12        gallons a day?
13   A.   I mean, I think my trouble with the Little
14        Uchee Creek and Spring Villa right now is we
15        don't know anything about the structural
16        geology underneath Spring Villa or the Little
17        Uchee Creek.  The 2001 map from Georgia Survey,
18        the Steltenpohl map I mentioned this morning,
19        and then the third one that Doctor Cook did in
20        his deposition, all show different geology at
21        Spring Villa.  So there's three guys right
22        there and all disagree on what the bedrock is
23        at Spring Villa.  One of them is -- hopefully
0229
 1        one of them is right.  Maybe they're all wrong,
 2        we don't know.  We would like to drill some
 3        holes over there and find out what it is.
 4   Q.   I thought they all agreed that it was Chewacla
 5        Marble?
 6   A.   The maps are all different in the third
 7        dimension.  So we need to resolve that or at
 8        least I would need to resolve it before I could
 9        start making some conclusions.  But you've got
10        the karstic solubility of the limestone over
11        there may be the same as it may be at the quarry.
12   Q.   Right.  This is a karst area?
13   A.   Right.  And the rate of karstic development
14        solution activity underneath Spring Villa is
15        conceivably faster than it is at the quarry or
16        slower.  I mean, we just don't know which.
17        It's entirely possible that the problem at
18        Spring Villa and Little Uchee Creek is a
19        contributory problem.
20   Q.   Say that again.
21   A.   Well, there's karstic features forming -- there
22        were karstic features forming under Spring
23        Villa and under Little Uchee Creek a thousand
0230
 1        years ago and that's been progressing up until
 2        today.  So the fact that the spring went dry
```



2258

3    and the creek went dry may not necessarily be
4    just because the quarry is there.  It could be,
5    and probably is, a combination of these
6    different things.  And there's also been
7    construction at the spring in the past in the
8    1950s, drilling, blasting and deepening and
9    whatever.
10  Q.   '20s, 1920s.
11  A.   Well, whenever.  But, you know, the point is
12    that over a thousand year time frame for
13    karstic features to be forming, it's not
14    unlikely, I don't know that it is, but it's not
15    unlikely that there could have been some
16    changes wrought by that work, which added
17    together with today's conditions, you know,
18    created the situation that we have today.  And
19    in order for me to tell you how much water is
20    good and how much water is bad relative to the
21    quarry, I need to know the answers to those
22    questions before I could really give you a
23    solid answer.
0231
1  Q.   When you say that the karst features have been
2    forming out in the spring area for thousands of
3    years, what are you basing that on?
4  A.   Well, it's karstic limestone, nobody disagrees
5    about that.  And the karstic development began
6    as soon as the ocean --
7  Q.   Receded?
8  A.   -- receded, which is roughly in the Pliocene,
9    what, five million years ago.
10  Q.   It was before my time, I don't know.
11  A.   Me, too.
12  Q.   So we've done -- I was asking you about some of
13    this stuff.  If there is a cone of depression
14    in this karst area, are sinkholes more likely
15    to form?
16  A.   I'm not sure.  If the quarry is creating the
17    cone?
18  Q.   Well, you've already said they are, haven't
19    you?
20  A.   I'm just confused about your question.
21  Q.   I mean, there is a cone of depression out

2259

20  A.   Right.
21  Q.   Okay.
22  A.   That's always a possibility.  In fact, the
23       famous stories in Florida where the parking
0250
1        lots collapse, and it eats cars and people and
2        everything else, I mean, oftentimes those
3        sinkholes are there for a long, long time, and
4        it's that one day when the extra
5        tractor-trailer truck drives over it that, you
6        know, it collapses or whatever it is.
7   Q.   I was going to ask you about that, too.  If
8        these sinkholes are forming and are continuing
9        to form, like you say the potential is there
10       and they haven't collapsed yet, could it be a
11       safety factor if you're driving your pickup
12       truck or your tractor over your pasture?
13  A.   Well, sure.  And I think that there's a
14       pattern.  If you look at the sinkholes that are
15       involved here, you will see that most of them
16       are concentrated around Spring Villa and Little
17       Uchee Creek.  And there's a set of geological
18       circumstances there that we don't — I
19       certainly don't understand and the experts that
20       y'all have had seem to conflict over it.  We
21       need to find out why that pattern is the way it
22       is, because that's important.  I don't know
23       why, but that's an important factor here.
0251
1   Q.   How did you know that there was a pattern to
2        the sinkholes?  Did you look at the GPS grid we
3        had given?
4   A.   Yeah.  We got a set of GPS readings from
5        somebody, I'm not quite sure, and then we
6        plotted them up.
7   Q.   Okay.
8            MR. BYRAM:  Do I have that?
9            MR. SPRAYBERRY:  Probably not.  We
10           don't give everything.
11           MR. BYRAM:  Whatever that is, I want a
12           copy of it.
13           MR. SPRAYBERRY:  Yes, you should have
14           it.

2260

9    you write somebody a scheduling e-mail over the
10    weekend about calls next week or something, I
11    don't -- I do everything orally with Oldcastle.
12    I just don't have time and in the field there
13    are no computers around to e-mail.
14  Q.  Okay.  Number five, the same thing, e-mails and
15    so forth to Oldcastle, you don't have any of
16    those?
17  A.  No.
18  Q.  Number six is a laundry list of stuff of
19    computer printouts or documents; A is minable
20    reserves or the mining plan, you're working on
21    that, right?
22  A.  Well, I gave you our calculations earlier.
23  Q.  On the reserves, okay?
0263
1  A.  Right.  And the mining plan -- operational plan
2    is under development.
3  Q.  All right.  B is depth of mining, you've given
4    us that?
5  A.  Yes.
6  Q.  C is the pumping, the volumes, the
7    calculations you've given us your discharge
8    reports?
9  A.  Right.  What we had was what we had from
10    Hanson.  We haven't generated any of ours yet
11    because we haven't started the investigation.
12  Q.  Okay.  D, documents related to the changes in
13    operations or methods of operations; and you've
14    told us about some, but have there been any
15    memos or documents circulated beforehand saying
16    how you're going to change the operation?
17  A.  Not that I know of.  Or at least not that I
18    produced.
19  Q.  E is your due diligence efforts and documents,
20    which I think you've produced a large --
21  A.  Yes.
22  Q.  We've got all of that.  F was the request to
23    increase the pumping to ten million gallons a
0264
1    day by Mr. LeBron, do you have any documents on
2    that?
3  A.  No.  No.

2261

```
 4   Q.   G was the data sheet on silica or other hazards
 5        at the Lee County quarry, do you have any of
 6        that?
 7   A.   No, I don't.
 8   Q.   Okay.  Do you know anything about the
 9        requirements for the safety sheet on the
10        silica?
11   A.   I know what they are.
12   Q.   Okay.  Are they required at the limestone
13        quarries?
14   A.   Yeah, I believe they are -- well, it depends on
15        State law, but there are supposed to be MSDS
16        sheets available for anything that represents a
17        hazard to a truck driver or an employee.
18   Q.   Right.  And silica is one of the by-products
19        from the crushing and limestone operation,
20        isn't it?
21   A.   Well, generally not from the limestone, it's
22        probably from the overburden in this case, but
23        there is a possibility you would have there.
0265
 1   Q.   Okay.  Who would we get that from; do you know?
 2   A.   Well, I would imagine that Ted Reynolds would
 3        be the one.
 4   Q.   H, any other documents on your list of red
 5        flags; I think we've gone over that?
 6   A.   Yes.
 7   Q.   And I think you said on the government sites
 8        you looked at, y'all just look at them, make a
 9        small notation, and don't store it or print it
10        or anything?
11   A.   Right.  That's right.
12   Q.   All of the hydrology or engineering reports,
13        studies or documents?
14   A.   Well, everything that I've got that we had
15        beforehand, you have.  I don't have -- we
16        haven't generated any of our own yet.  And the
17        only other things I have are the expert reports
18        that the two sides, Hanson and you folks, have
19        produced, which were given to me after the
20        closing.
21   Q.   Do you have any documents on the dye traces or
22        the dye studies going on at the quarry?
```

2262

# EXHIBIT "H"

## Selected Pages from Reynolds Deposition

| Page Number | Heisterkamp |
|---|---|
| 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Has read Oldcastle Environment policy |
| 249 - 253 . . . . . . . . . . . . . . . . . . . . . . | Oldcastle can and does test employees for silica exposure |

2265

3  A.  There may be a copy of a letter there in the
4      stack.  I don't recall.
5  Q.  You don't remember who it was from or to?
6  A.  No.
7  Q.  I don't remember seeing one.  Let me show you
8      the documents I think we got today, Mr. Fowler,
9      if you could flip through it?
10 A.  I think I'm recalling now that I believe what I
11     saw was a deposition by a Doctor Ewers or
12     Evers, I forget the name now.  I believe he was
13     an expert for Hanson.
14 Q.  Ewers?
15 A.  I think it's Ewers.  I think that's the --
16     that's the document that I have seen.
17 Q.  A report by Doctor Ewers, maybe?
18 A.  Well, I believe -- I'm pretty sure it was
19     either a deposition or a report.
20 Q.  Okay.  Did you look at any of the other reports
21     or summaries of --
22 A.  I've seen all of the expert opinion at this
23     point.
0102
1  Q.  Okay.
2  A.  But I don't believe there's a letter.  I think
3      what I'm recalling is that --
4  Q.  And you found all of that out in what month?
5  A.  Well, it was -- I think I finally got the
6      materials in early August of 2003.
7  Q.  Have you been asked to form any opinions on
8      that dye trace or dye study?
9  A.  Oh, several times.
10 Q.  You have been?
11 A.  Yes, I have.
12 Q.  Okay.  And by whom were you asked?
13 A.  Oldcastle, various people.
14 Q.  Have you done any calculations or research on
15     it?
16 A.  I have formulated no opinion.
17 Q.  And why didn't you formulate an opinion?
18 A.  Don't have enough information yet.
19 Q.  What are you lacking?
20 A.  Well, we need to understand the structural
21     geology of the bedrock; we need to understand

264

```
22      the actual flow net that exists in the bedrock;
23      I have to understand the chemistry of these
0103
1       dyes better than I do.  Basically you need to
2       go through the type of investigation you and I
3       talked about an hour or so, hour and a half
4       ago.
5  Q.   Right.  The step-by-step from the geology down
6       to the samples?
7  A.   Right.  Otherwise in my view, and as I've said
8       to Oldcastle, there's no way to know what the
9       dye test means categorically.
10 Q.   Does it tell you anything about travel time?
11 A.   A dye test by itself?
12 Q.   Right.
13 A.   It can, if you know all of those parameters I
14      was describing to you.
15 Q.   Okay.  And since you were asked to formulate
16      opinions, have you looked at any other
17      documents or talked to anybody else?
18 A.   No.  We're formulating this investigation that
19      we want to undertake and we've been waiting for
20      that to start.
21 Q.   "We" being North American Reserve?
22 A.   North American Reserve on behalf of Oldcastle.
23 Q.   Okay.  And what are you going to do to -- you
0104
1       say you are formulating it, what are you going
2       to do?
3  A.   Well, we basically are going to drill a series
4       of holes around the quarry and in a line from
5       the quarry towards the northeast out into the
6       Young parcel, out to the furthest reaches of
7       the Young parcel that we can get to on that
8       property.  And then essentially pump the quarry
9       at a variety of different rates and actually
10      monitor the drawdowns, not model them, but
11      monitor them, so that we know about the
12      hydrology.  Then the drilling that's done will
13      all be rock cores, so we'll get what appears,
14      from the literature and the other expert
15      opinion, to be the first third dimensional
16      picture of what the bedrock geology is under
```

2260

8    surface that you're talking about. From the
9    high point on the Young parcel it would
10   probably be close to 280, 290, something, you
11   know, on the order of 300 feet, underneath the
12   highest part of the Young parcel. On the
13   average it's probably 250.
14 Q.  All right. Back on your report, down at the
15      bottom at 2.2, it talks about "All but one of
16      these reserves consists of nearly flat-lying
17      varieties of marble, limestone and dolomitic
18      limestone." I guess the one exception is some
19      other quarry that's got some type of granite?
20 A.   Right. It's Alexander City.
21 Q.   Okay. Now, the marble out at the Lee County
22      quarry is not flat-lying, is it?
23 A.   Well, at the time, based on what we knew at the
0186
1    time from that Steltenpohl geologic map, and
2    the fact that we hadn't yet acquired all of
3    these other field trip reports that I mentioned
4    earlier this morning, because we didn't
5    understand that this whole activity was
6    underway, the map that he did -- the first map
7    that he did, the one I was referring to, shows
8    the Chewacla Marble, as it's called on the map,
9    to be flat-lying. And when we looked in the
10   quarry, we saw the jointing and the fracturing,
11   but the layering, the bedding, the relic
12   bedding in the limestone is close to
13   horizontal. So we made that assumption that it
14   was a flat-lying limestone.
15 Q.  It's actually pinnacled, isn't it, and domed?
16 A.  Do you mean the surface of it?
17 Q.  Right.
18 A.  Yes. Right. But the limestone formation is
19      flat-lying underneath.
20 Q.  Okay. And when you looked at the GSA map, the
21      geology map, did you notice that there were
22      several locations of the Chewacla Marble?
23 A.  Yes.
0187
1 Q.   Did you see that there was one location up at
2      Spring Villa?

2266

3   A.   Well, I didn't know Spring Villa was important
4        at the time, but I did notice that there was
5        marble there.
6   Q.   Okay.
7   A.   And also over at -- over towards Chewacla State
8        Park.
9   Q.   Right.  Do you know if those units of Chewacla
10       Marble are connected?
11  A.   We don't.
12  Q.   Okay.  How do you know you don't?
13  A.   Well, I don't know because I haven't studied
14       it.
15  Q.   You haven't looked.  Okay.
16  A.   I'm going on the basis of all the published
17       information in the expert reports in this case,
18       there's great disagreement over whether they're
19       connected or not.  And we would like to find
20       that out in our investigation, which is one of
21       our goals.
22  Q.   On the next page, 1554, it specifically talks
23       about the quarry and the expansion.  I think
0188
1        you did some calculations on your sheet,
2        somebody has taken your calculations, but did
3        you calculate up how much overburden would have
4        to be removed?
5   A.   I think that's on the sheets there.
6            MR. ADAMS:  I think Mr. Vercelli had
7                that.
8   Q.   That would be on 1801 maybe or 1802?
9   A.   I don't know if it's on there or not.  Yeah,
10       here it is.  It's on 1804 on the left side,
11       lower left side, at three million cubic yards.
12       The actual calculated number was 2.595 million
13       yards and we rounded it up to three million.
14  Q.   Cubic yards?
15  A.   Yes.
16  Q.   And that's where you're going to strip it off
17       the 16 acres?
18  A.   Well, that would be the total stripping left to
19       go all the way out to the end of the quarry
20       development.
21  Q.   Okay.  And when you're removing that

2267

```
 1      near?
 2   A.   Well, near enough for it to be a problem.  I
 3        mean, it was going to depend on the situation.
 4        I mean, the point is we always look.  Whether
 5        it's near or far, we're always looking for that
 6        kind of problem, potential problem.
 7   Q.   And how do you look near or far?
 8   A.   Well, you look around the site, aerial photos,
 9        maps, the state databases that tell you where
10        the parks are, where the protected wetland
11        areas are, wildlife habitats and that kind of
12        thing.
13   Q.   If you had known that Spring Villa was dry,
14        would that have raised a red flag with you?
15   A.   Well, just that fact alone I don't think would
16        have.
17   Q.   Okay.  Why not?
18   A.   Well, I mean what raised the spectra of it was
19        the implication that this quarry made it dry.
20        I mean, that takes it from a non-red flag to a
21        red flag.
22   Q.   All right.  Which is the last one down there,
23        environmental litigation?
0206
 1   A.   Right.
 2   Q.   I take it if you had known, when you did your
 3        site visit, that there was a pending lawsuit,
 4        it would have raised a red flag?
 5   A.   Yes.
 6   Q.   Okay.  And then I would assume that on July
 7        10th when you found out, it raised the red
 8        flag?
 9   A.   It did.  And it's still up.
10   Q.   And it's still up?
11   A.   Yes.
12   Q.   Okay.  So I guess would it be fair to say on
13        July 10th you had some reservations about the
14        purchase of this property?
15           MR. ADAMS:  Object to the form.
16   A.   Well, no.  Because we -- we believed -- well,
17        what we understood of the allegations that day,
18        we thought they were pretty serious, if true.
19        And we still think that's the case, and we're
```

2268

```
20    approaching -- this investigation we're going
21    to do, we're approaching it with that attitude.
22    But we don't believe, based on our experience
23    in dealing with these kinds of problems and the
0207
1     basic geological and hydrogeological situation
2     that exists out there, that these problems
3     can't be controlled in a way that will be
4     satisfactory. So we wouldn't have -- I don't
5     think we would have backed off of the
6     acquisition; I'm certain we wouldn't have
7     actually.
8  Q.  I thought I had asked you earlier about the
9     cone of depression and whether you could
10    calculate it and so forth, but you said you
11    didn't have enough data. But now you're
12    telling me at the time you had enough data to
13    determine that, in your opinion, Oldcastle
14    could control or limit the impact?
15        MR. ADAMS: Object to the form.
16 A.  Yeah. I think the -- we looked in the quarry
17    at the fractured limestone, and we looked at
18    the water situation that existed there, and
19    this is after we found out about the
20    litigation. There's basically no conduit or
21    system of conduits in the quarry walls which
22    would suggest that four or five or six million
23    gallons of water a day out of the water budget
0208
1     is coming straight over from Little Uchee Creek
2     drainage into the quarry. It goes to the
3     contributory cause business I was talking about
4     this morning.
5  Q.  Well, where is it coming from?
6  A.  Well, we don't know. As a matter of fact,
7     nobody does. Lots and lots of speculation, but
8     no scientific facts. Well, the investigation
9     we intend to do is going to determine that,
10    because that's where the rubber hits the road
11    in this whole thing. And if we find out --
12        MR. ADAMS: Hold it, Brian.
13 A.  Okay. We need to establish the degree to which
14    these different -- the allegations, contentions
```

15    and speculations are true or not true.

16 Q.   Right.

17 A.    And the qualitative judgment on my part was

18       that the -- given the fact these are usually

19       contributory problems, once we identify the

20       contributors, because we have identified them

21       as specifically as we're proposing to do it,

22       that we can mitigate those impacts

23       satisfactorily.

0209

1 Q.    But right now you're telling us that nobody

2       knows where the water is coming from?

3 A.    That's right.

4 Q.    So if Hanson's people told you they knew where

5       it was coming from or what was causing it,

6       you're saying that --

7 A.    I don't believe them.

8 Q.    You don't believe them?

9 A.    No.  And I don't believe your experts either.

10 Q.   And why don't you believe Hanson's experts?

11 A.   Because there is no scientific data used to

12      develop the opinions and speculations.  They're

13      speculations, and we need to --

14 Q.   And what scientific data is missing, in your

15      opinion?

16 A.   The actual measurements and studies of the sort

17      I described to you this morning; on site,

18      hands-on, give me the numbers, let's find out

19      what's really going on type study.

20 Q.   Okay.  Back on July 10th, if you didn't believe

21      Hanson's experts and you had no data of your

22      own, why was it Oldcastle thought they could

23      limit the impact?

0210

1       MR. ADAMS:  Well, wait a minute.

2         That's not what he testified

3         about, Jimmy.

4       MR. VERCELLI:  That's exactly what he

5         testified to.

6       MR. ADAMS:  No, it isn't, Chip.  And I

7         don't want to --

8       MR. VERCELLI:  That's exactly how I

9         understood it.

2270

8      there is just a whole range of things you can
9      do in between lots and little.  I mean, it
10     depends on how much.
11  Q.   Low flow, you know, it's 300,000, 500,000
12     gallons a day?
13  A.    I mean, I think my trouble with the Little
14     Uchee Creek and Spring Villa right now is we
15     don't know anything about the structural
16     geology underneath Spring Villa or the Little
17     Uchee Creek.  The 2001 map from Georgia Survey,
18     the Steltenpohl map I mentioned this morning,
19     and then the third one that Doctor Cook did in
20     his deposition, all show different geology at
21     Spring Villa.  So there's three guys right
22     there and all disagree on what the bedrock is
23     at Spring Villa.  One of them is -- hopefully
0229
1      one of them is right.  Maybe they're all wrong,
2      we don't know.  We would like to drill some
3      holes over there and find out what it is.
4  Q.    I thought they all agreed that it was Chewacla
5     Marble?
6  A.    The maps are all different in the third
7     dimension.  So we need to resolve that or at
8     least I would need to resolve it before I could
9     start making some conclusions.  But you've got
10     the karstic solubility of the limestone over
11     there is the same as it may be at the quarry.
12  Q.   Right.  This is a karst area?
13  A.   Right.  And the rate of karstic development
14     solution activity underneath Spring Villa is
15     conceivably faster than it is at the quarry or
16     slower.  I mean, we just don't know which.
17     It's entirely possible that the problem at
18     Spring Villa and Little Uchee Creek is a
19     contributory problem.
20  Q.   Say that again.
21  A.   Well, there's karstic features forming -- there
22     were karstic features forming under Spring
23     Villa and under Little Uchee Creek a thousand
0230
1      years ago and that's been progressing up until
2      today.  So the fact that the spring went dry

271

3    and the creek went dry may not necessarily be
4    just because the quarry is there.  It could be,
5    and probably is, a combination of these
6    different things.  And there's also been
7    construction at the spring in the past in the
8    1950s, drilling, blasting and deepening and
9    whatever.
10  Q.    '20s, 1920s.
11  A.    Well, whenever.  But, you know, the point is
12        that over a thousand year time frame for
13        karstic features to be forming, it's not
14        unlikely, I don't know that it is, but it's not
15        unlikely that there could have been some
16        changes wrought by that work, which added
17        together with today's conditions, you know,
18        created the situation that we have today.  And
19        in order for me to tell you how much water is
20        good and how much water is bad relative to the
21        quarry, I need to know the answers to those
22        questions before I could really give you a
23        solid answer.
0231
1    Q.    When you say that the karst features have been
2        forming out in the spring area for thousands of
3        years, what are you basing that on?
4    A.    Well, it's karstic limestone, nobody disagrees
5        about that.  And the karstic development began
6        as soon as the ocean --
7    Q.    Receded?
8    A.    -- receded, which is roughly in the Pliocene,
9        what, five million years ago.
10  Q.    It was before my time, I don't know.
11  A.    Me, too.
12  Q.    So we've done -- I was asking you about some of
13        this stuff.  If there is a cone of depression
14        in this karst area, are sinkholes more likely
15        to form?
16  A.    I'm not sure.  If the quarry is creating the
17        cone?
18  Q.    Well, you've already said they are, haven't
19        you?
20  A.    I'm just confused about your question.
21  Q.    I mean, there is a cone of depression out

20  A.   Right.
21  Q.   Okay.
22  A.   That's always a possibility.  In fact, the
23       famous stories in Florida where the parking
0250
1        lots collapse, and it eats cars and people and
2        everything else, I mean, oftentimes those
3        sinkholes are there for a long, long time, and
4        it's that one day when the extra
5        tractor-trailer truck drives over it that, you
6        know, it collapses or whatever it is.
7   Q.    I was going to ask you about that, too.  If
8        these sinkholes are forming and are continuing
9        to form, like you say the potential is there
10       and they haven't collapsed yet, could it be a
11       safety factor if you're driving your pickup
12       truck or your tractor over your pasture?
13  A.   Well, sure.  And I think that there's a
14       pattern.  If you look at the sinkholes that are
15       involved here, you will see that most of them
16       are concentrated around Spring Villa and Little
17       Uchee Creek.  And there's a set of geological
18       circumstances there that we don't — I
19       certainly don't understand and the experts that
20       y'all have had seem to conflict over it.  We
21       need to find out why that pattern is the way it
22       is, because that's important.  I don't know
23       why, but that's an important factor here.
0251
1   Q.   How did you know that there was a pattern to
2        the sinkholes?  Did you look at the GPS grid we
3        had given?
4   A.   Yeah.  We got a set of GPS readings from
5        somebody, I'm not quite sure, and then we
6        plotted them up.
7   Q.   Okay.
8             MR. BYRAM:  Do I have that?
9             MR. SPRAYBERRY:  Probably not.  We
10            don't give everything.
11            MR. BYRAM:  Whatever that is, I want a
12            copy of it.
13            MR. SPRAYBERRY:  Yes, you should have
14            it.

227

```
 9       you write somebody a scheduling e-mail over the
10       weekend about calls next week or something, I
11       don't -- I do everything orally with Oldcastle.
12       I just don't have time and in the field there
13       are no computers around to e-mail.
14  Q.   Okay.  Number five, the same thing, e-mails and
15       so forth to Oldcastle, you don't have any of
16       those?
17  A.   No.
18  Q.   Number six is a laundry list of stuff of
19       computer printouts or documents; A is minable
20       reserves or the mining plan, you're working on
21       that, right?
22  A.   Well, I gave you our calculations earlier.
23  Q.   On the reserves, okay?
0263
 1  A.   Right.  And the mining plan -- operational plan
 2       is under development.
 3  Q.   All right.  B is depth of mining, you've given
 4       us that?
 5  A.   Yes.
 6  Q.   C is the pumping, the volumes, the
 7       calculations, you've given us your discharge
 8       reports?
 9  A.   Right.  What we had was what we had from
10       Hanson.  We haven't generated any of ours yet
11       because we haven't started the investigation.
12  Q.   Okay.  D, documents related to the changes in
13       operations or methods of operations; and you've
14       told us about some, but have there been any
15       memos or documents circulated beforehand saying
16       how you're going to change the operation?
17  A.   Not that I know of.  Or at least not that I
18       produced.
19  Q.   E is your due diligence efforts and documents,
20       which I think you've produced a large --
21  A.   Yes.
22  Q.   We've got all of that.  F was the request to
23       increase the pumping to ten million gallons a
0264
 1       day by Mr. LeBron, do you have any documents on
 2       that?
 3  A.   No.  No.
```

2274

4   Q.   G was the data sheet on silica or other hazards
5        at the Lee County quarry, do you have any of
6        that?
7   A.   No, I don't.
8   Q.   Okay.  Do you know anything about the
9        requirements for the safety sheet on the
10       silica?
11  A.   I know what they are.
12  Q.   Okay.  Are they required at the limestone
13       quarries?
14  A.   Yeah, I believe they are -- well, it depends on
15       State law, but there are supposed to be MSDS
16       sheets available for anything that represents a
17       hazard to a truck driver or an employee.
18  Q.   Right.  And silica is one of the by-products
19       from the crushing and limestone operation,
20       isn't it?
21  A.   Well, generally not from the limestone, it's
22       probably from the overburden in this case, but
23       there is a possibility you would have there.
0265
1   Q.   Okay.  Who would we get that from; do you know?
2   A.   Well, I would imagine that Ted Reynolds would
3        be the one.
4   Q.   H, any other documents on your list of red
5        flags; I think we've gone over that?
6   A.   Yes.
7   Q.   And I think you said on the government sites
8        you looked at, y'all just look at them, make a
9        small notation, and don't store it or print it
10       or anything?
11  A.   Right.  That's right.
12  Q.   All of the hydrology or engineering reports,
13       studies or documents?
14  A.   Well, everything that I've got that we had
15       beforehand, you have.  I don't have -- we
16       haven't generated any of our own yet.  And the
17       only other things I have are the expert reports
18       that the two sides, Hanson and you folks, have
19       produced, which were given to me after the
20       closing.
21  Q.   Do you have any documents on the dye traces or
22       the dye studies going on at the quarry?

2/20/2004

Ted Reynolds

**42**

1  Q.   Okay.  So if there is an environmental problem
2       out there, let's say that Oldcastle Materials'
3       quarry in Lee County violated its ADEM permit,
4       let's assume that happened -- that has happened
5       already, hasn't it?
6            MR. WHITE:  Object to form.
7  A.   I don't understand the question.
8  Q.   Oldcastle Materials' Lee County quarry has
9       already violated its ADEM permit, hasn't it?
10 A.   Which ADEM permit are you referring to?  Well,
11      I can't ask questions, I'm sorry.
12 Q.   You tell me which ones they violated.  They've
13      already violated their air permit, haven't
14      they?
15 A.   Not to my knowledge.
16 Q.   Oldcastle has been cited by ADEM for violating
17      the air permit, haven't they?
18 A.   Not to my knowledge.
19 Q.   Okay.  Oldcastle has been cited by ADEM for
20      violating its discharge permit, hasn't it?
21 A.   We're currently discussing that with ADEM right
22      now.
23 Q.   But they've cited you for violating the

**43**

1       discharge permit, haven't they?
2  A.   We received an NOV.
3  Q.   Notice of Violation?
4  A.   Yes.
5  Q.   And what did that relate to?
6  A.   They had five points on it that they felt were
7       noncompliance issues.
8  Q.   Do you have that document with you here today?
9  A.   No, I do not.
10 Q.   Is there some particular reason you didn't
11      bring that document with you?
12           MR. WHITE:  We've got that in the
13           documents that we're going to
14           produce to you.
15           MR. VERCELLI:  Okay.
16 Q.   Now, because Opelika violated its permit, is it
17      your fault that the quarry there violated the
18      permit or is it someone else's fault?
19           MR. ADAMS:  Object to the form.
20 A.   I'm listed as the responsible official.
21 Q.   What happened to you as a result of that
22      violation, if anything?
23 A.   I received a notice of violation.

**44**

1  Q.   From ADEM?
2  A.   Yes, sir.
3  Q.   What did the corporation do to you as a result
4       of that violation, if anything?
5  A.   Nothing at this time.
6  Q.   Do you expect the corporation to do anything to
7       you?
8  A.   No, sir.
9  Q.   Okay.  I didn't either.
10           MR. ADAMS:  I move to strike that as
11           being inappropriate.
12           MR. VERCELLI:  That's fine.
13 Q.   If there's a problem at the Opelika quarry and
14      you don't know the answer to it, who do you go
15      to other than Mr. Wheeler?  I'm talking about
16      environmental issues.
17 A.   Depending on what it might be, I mean, it's
18      speculation.  We would have to have a problem
19      that would come up that would require somebody
20      other's expertise than what we have.
21 Q.   Okay.  As far as you know, Mr. Wheeler is the
22      one who is ultimately responsible for
23      environmental issues for Oldcastle Materials

**45**

1       Southeast; is that right?
2  A.   No, I am listed as the responsible official.
3  Q.   At the plant, right?
4  A.   Yes.
5  Q.   I'm talking about at the Southeast, for all of
6       the plants?
7  A.   I'm probably listed as the responsible official
8       for those, too.
9  Q.   For all of the other plants?
10 A.   Yes.
11 Q.   Okay.  Tell me all of the training you've
12      received by Oldcastle relating to environmental
13      compliance issues for the State of Alabama.
14      What training have you actually received from
15      Oldcastle?
16 A.   We -- can we take a break?
17 Q.   I would rather you answer that question first,
18      but we can after the question is answered, if
19      you don't mind.
20 A.   I've read Oldcastle's environmental policies.
21 Q.   You have read Oldcastle's environmental
22      policies?
23 A.   Yes.

Ricky L. Tyler                                    Montgomery Reporting Service
(334) 262-3331                                            (877) 834-6048

8b6c5d17-17b1-4719-add5-a6cba011e668

246

1  A.  You have a 250 foot blasting limit from the
2      pipeline and we're storing the overburden on
3      that 250 foot area. So, no, it will never be
4      mined.
5  Q.  Okay. And it's your testimony that you could
6      have put all of that 600,000 yards in that
7      area?
8  A.  You could have. But the reason the 600,000
9      yards came up here was to build this enormous
10     berm to cut down on the noise that was alleged
11     to be coming from the property.
12  Q.  And the other reason it was put there, it was
13     also convenient to do that, wasn't it?
14  A.  Well, it's much more easier to -- it's a much
15     more shorter haul to haul to the new area than
16     it was to haul it all the way to the top of
17     that big berm. So, no, that's not correct.
18  Q.  Okay. Where are you going to put all of this
19     overburden as you enlarge the pit here?
20  A.  We will continue on this 250 foot blasting
21     limitation along the pipeline.
22  Q.  Both sides or just the north side?
23  A.  Just the north side.

247

1  Q.  Okay. We talked earlier about the
2     environmental assessment, did we resolve that
3     issue? We can go off the record.
4     (Off-the-record discussion.)
5  BY MR. VERCELLI:
6  Q.  The geologist who visited twice, what were the
7     reasons for his visits?
8  A.  Just to look at the quarry.
9  Q.  What was his purpose in looking at the quarry?
10  A.  So he would have firsthand knowledge of what it
11     looked like.
12  Q.  All right. Well, what was he going to do based
13     on that knowledge?
14  A.  I can't answer that.
15  Q.  Okay. Both visits were just so he would have
16     knowledge of the quarry and see the situation
17     there?
18  A.  To the best of my knowledge, yes.
19  Q.  Do you know when those visits were?
20  A.  I don't recall the dates at this time.
21  Q.  Were they months apart or days apart or what?
22  A.  I don't recall at this time.
23  Q.  Other than reporting to ADEM, does anybody else

248

1     have regulatory authority over the quarry,
2     other than MSHA and ADEM?
3  A.  Yes.
4  Q.  Who is that?
5  A.  It would be the Alabama Industrial Relations
6     Board, I believe.
7  Q.  Department of Industrial Relations?
8  A.  Yeah.
9  Q.  What do they require of you-all?
10  A.  They come in and do occasional site visits.
11  Q.  For what purpose?
12  A.  Looking at the pit for safety.
13  Q.  Okay. When you hire employees or other workers
14     for this Opelika quarry, what information do
15     you give them? I mean, we would have loved to
16     have had a personnel file, but we don't have
17     one, so we could have gone through a personnel
18     file. So, generally speaking, what information
19     do you give them?
20  A.  I don't understand what you're asking.
21  Q.  Okay. When you hire them, do you give them any
22     warnings about anything?
23  A.  I still don't understand what you're asking.

249

1  Q.  Do you have any MSDS's on site?
2  A.  Sure.
3  Q.  For what?
4  A.  Any chemicals used in the plant.
5  Q.  Okay. Anything other than chemicals used in
6     the plant?
7  A.  Not that I can recall at this time.
8  Q.  How about silica? Have you got an MSDS at the
9     plant for silica dust?
10  A.  I don't know. I don't recall at this time.
11  Q.  Whose job is it to ensure that appropriate
12     MSDS's are distributed to the employees?
13  A.  Our Safety Director.
14  Q.  Who is that?
15  A.  It would Dana Gortney.
16  Q.  Mr.?
17  A.  Ms.
18     MR. ADAMS: You said Gortney?
19  A.  Gortney, G-O-R-T-N-E-Y.
20  Q.  Is she related to the other Gortney?
21  A.  Yes.
22  Q.  Husband and wife?
23  A.  Brother and sister.

63 (Pages 246 to 249)

2/20/2004

Ted Reynolds

---

250

1  Q.  Brother and sister. So her office is at
2       Birmingham?
3  A.  Yes.
4  Q.  And it's not your job or someone at the local
5       quarry to make sure that the various quarry
6       employees are given the appropriate MSDS's?
7  A.  New hire employees are given training, safety
8       training, and which the MSDS is part of that
9       training.
10 Q.  Who gives that training?
11 A.  Dana Gortney or her -- whoever she appoints to
12      do that.
13 Q.  And is that on site training or do they go
14      somewhere else for it?
15 A.  It can be either.
16 Q.  How about for the employees at the Lee County
17      quarry, was it on site or did they have to go
18      off?
19 A.  They went off site. Part of them have went off
20      site; part of them have been done there.
21 Q.  Do the employees sign the MSDS's or acknowledge
22      receipt in some manner?
23 A.  I don't know about the MSDS in particular. I

---

251

1       know they sign off on their training
2       certificates and the MSDS is a part of that
3       training program.
4  Q.  Okay. Are you aware of the hazards of silica
5       dust?
6  A.  I have a basic knowledge.
7  Q.  Okay. What is your basic knowledge of the
8       hazards, if any, of silica dust?
9  A.  You know, you don't need to breathe too much of
10      it.
11 Q.  Why not?
12 A.  It can be harmful to you.
13 Q.  How can it be harmful to you?
14 A.  It can hurt your lungs or whatever.
15 Q.  And that's something that Oldcastle is aware of
16      and has an obligation under law to warn its
17      employees of, isn't it?
18      MR. ADAMS: Object to the form.
19 Q.  You can answer if you can.
20 A.  Yes.
21 Q.  Do you have a copy of the MSDS for silica
22      that's used at the Opelika quarry?
23 A.  I don't know --

---

252

1  Q.  Have you ever seen --
2  A.  -- at this time.
3  Q.  -- one down there?
4  A.  I do not recall seeing one at this time.
5  Q.  Is there a place at the plant, the Opelika
6       quarry, where notices and MSDS's are published
7       so that employees can go there to see them if
8       they choose to?
9  A.  Yes.
10 Q.  Where is that?
11 A.  It's in the employee room.
12 Q.  I'll make this statement in your presence, just
13      so you can get your heads-up on it; we would
14      like to get copies of all of the documents that
15      are available to the employees in the employee
16      room. And I would like that none of them be
17      destroyed pending the copying of all of those
18      documents. I'm sure your lawyers will send you
19      a letter at some point.
20      MR. ADAMS: If you will just write us
21      and let us know what you want.
22 Q.  What, if anything, does Oldcastle do to
23      determine whether its employees are exposed to

---

253

1       too much silica dust?
2  A.  The federal government does employee testing
3       and we have done -- or we have the ability to
4       do some testing ourselves.
5  Q.  Do you do the testing on the employees?
6  A.  We have not done it at Opelika.
7  Q.  Is there a particular reason you haven't done
8       it at Opelika?
9  A.  We haven't -- I don't know how to say it. We
10      just haven't got to it yet.
11 Q.  And silica dust is created how in a quarry like
12      this Lee County quarry?
13 A.  Through the crushing operation.
14 Q.  All right. Through blasting as well?
15 A.  I would think that would be minimal.
16 Q.  Okay. Why do you think it would be minimal?
17 A.  Because you don't blast every day.
18 Q.  Do you have any knowledge or does Oldcastle
19      attempt in any way to determine how much of the
20      dust from each blast is fugitive dust
21      emissions?
22 A.  No.
23 Q.  What does Oldcastle do to minimize the dust

---

64 (Pages 250 to 253)



**IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA**

FILED
APR 1 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, *et al.*,                §
                                      §
        Plaintiffs,                  §
                                      §
vs.                                   §        Civil Action No.:  CV-2002-85
                                      §
HANSON AGGREGATES                     §
SOUTHEAST, INC., *et al.*,            §
                                      §
        Defendants.                  §

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

To:    Clerk
       Lee County Circuit Court
       Justice Center, Room 104
       2311 Gateway Drive
       Opelika, AL


Please take notice that the following discovery documents have been served on behalf of

defendant Hanson Aggregates Southeast, Inc.:

( X )    Fourth Re-Notice of Deposition (Utilities Board of the City of Opelika);

( X )    Fourth Re-Notice of Deposition (City of Opelika);

( X )    Fourth Re-Notice of Deposition (Beauregard Water Authority); and

( X )    Notice of Deposition (Mayor Barbra Patton, Bo Brown, Jerry Teel, Dan
         Hilyer and Bill Harrelson)

Respectfully submitted this 9th day of April, 2004.

_Paul Clark_
_____
One of the attorneys for Defendant
Hanson Aggregates Southeast, Inc.


143632.1

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
**BALCH & BINGHAM LLP**
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116

## Certificate of Service

I hereby certify that on this 9th day of April, 2004, a copy of the foregoing has been served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
 & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
 & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

_Paul Clark_
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

**F I L E D**

**APR 1 3 2004**

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
Lee County Justice Center
2311 Gateway Drive, Room 104
Opelika, Alabama 36801.

Please take notice that the following documents were served on April 12, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Haward and Nora Jackson.

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2281

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 12th day of April, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY&
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | * |
|          Plaintiff, | * |
| v. | *     CASE NUMBER: CV-02-85 |
| | * |
| | * |
| HANSON AGGREGATES SOUTHEAST, | * |
| INC., et al. | * |
|       Defendants. | * |

F I L E D
APR 1 3 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION FOR LEAVE TO ADD PLAINTIFFS

The Plaintiffs would show this Court that:

1. The Plaintiffs move for leave to add Robert and Belinda Smith as Plaintiffs.

2. They have damage to their home as well as claims for dust and noise. Mrs. Smith and their fourteen (14) year old son have asthma, which is greatly aggravated by the dust. Mr. Smith has recently begun having nose bleeds.

3. They have no sinkholes open on their property.

4. Their claims will not delay the remainder of the case.

**WHEREFORE,** the Plaintiffs move this Court for leave to add additional Plaintiffs.

**OF COUNSEL:**

**CHARLES VERCELLI, JR.,** (VER004)
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

**GUY GUNTER**
*Council for City of Opelika/ Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

2286

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 13th day of _____April_____, 2004.

_____
OF COUNSEL

2284

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| **MIKE DAVIS, et al.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NUMBER: CV-02-85** |
| | § | |
| **HANSON AGGREGATES SOUTHEAST,** | § | |
| **INC., et al.** | § | |
| **Defendants.** | § | |

**F I L E D**

APR 1 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
Lee County Justice Center
2311 Gateway Drive, Room 104
Opelika, Alabama 36801.

Please take notice that the following documents were served on April ___14___, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Michele Wilkes.

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the _____ day of April, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY&
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

FILED

APR 1 5 2004

2286

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' MOTION TO COMPEL ALEY DEPOSITION

Plaintiffs move this Honorable Court to enter an order allowing Plaintiffs to depose their expert, Tom Aley. As grounds for this Motion, Plaintiffs say:

1. Tom Aley has been designated as Plaintiffs' expert.

2. Mr. Aley has given several reports in this case. Attached to this Motion to Compel are the most recent of Mr. Aley's reports, which detail his opinions regarding Oldcastle and the damages it is causing. These reports are Bates-stamped 2234-2268.

3. The Plaintiffs have repeatedly requested to depose Mr. Aley, for use at trial, mediation, or otherwise. Defendants have refused.

4. Tom Aley is a world-renowned expert who travels very frequently on business. He frequently travels out of the country for extended periods. His availability is difficult, therefore, and it is imperative to the Plaintiffs' case, that Mr. Aley's deposition be taken both for discovery and for use at trial, if necessary. The Plaintiffs want to depose Mr. Aley as if he were testifying live at trial.

5. The Plaintiffs wish to take Mr. Aley's deposition by videotape.

2287

6.    The Defendants have refused to take the deposition of Mr. Aley, and/or have refused to allow the Plaintiffs to depose Mr. Aley for use at trial.

7.    Alabama Rule of Civil Procedure 30 clearly sets forth that the Plaintiffs have the right to depose their expert. As their expert has produced all of his reports, and has previously been deposed by Defendant Hanson, it is appropriate and not unfair to the Defendants that the Plaintiffs be allowed to depose Mr. Aley as requested.

8.    Rule 32 also provides that the deposition of Mr. Aley may be taken and used for any purpose, including use at trial or any other hearing. Therefore, there is no basis for Defendants to refuse to cooperate in the deposition of Mr. Aley.

9.    Mr. Aley is available for deposition on May 18-19, and Plaintiffs have requested of the Defendants that they take the deposition at that time. Defendants have refused, even though Defendants' expert, Dr. Ewers, is available on those days.

10.    Plaintiffs hereby agree, and by prior stipulation with Defendant Hanson's attorneys, have agreed that each parties' experts may attend the depositions of the other experts. Accordingly, Plaintiffs agree that the Defendants' experts may attend the deposition of Mr. Aley (and Plaintiffs' other experts) provided that Mr. Aley or other Plaintiffs' experts may attend the depositions of the Defendants' experts.

**WHEREFORE**, for good cause shown, Plaintiffs move this Honorable Court to enter an order allowing the Plaintiffs to depose Mr. Aley on May 18-19, 2004, by videotape and by stenographic means.

2

2288

_CHARLES E. VERCELLI, JR._ **(VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

3

2289

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 14th day of ___April___, 2004.

_____
OF COUNSEL

155-00\PsMot to Compel Aley Depo.2.wpd

4

Summary of the professional opinions of Thomas J. Aley relative to the Hanson (now Oldcastle) Quarry, which is located near Opelika, Alabama. Opinions revised on March 29, 2004.

1. My opinions are based upon site visits on December 5 and 17, 2002;, April 28, 2003; and September 4, 2003. My opinions are further based upon my professional education and training; over 37 years of professional experience in karst hydrology and sinkhole collapse issues; technical literature and previous experience dealing with sinkhole formation and the impacts of quarry pumping on sinkhole formation; previous experience where quarry pumping has resulted in springs ceasing to flow; and various documents, reports, and maps related to the Hanson Quarry (now known as the Oldcastle Opelika Quarry) and to wells and hydrologic conditions in the Opelika area.

2. The Hanson (now Oldcastle) Quarry, located near Opelika, Alabama, is excavating geologic units which consist primarily of the Chewacla Marble. The Chewacla Marble of the region has natural solutional features which include (but are not limited to) pinnacled bedrock, solutional openings, and springs such as Spring Villa.

3. A productive aquifer exists in the Chewacla Marble and in adjacent and nearby rock units which notably include the Hollis Quartzite. This aquifer yields groundwater supplies to local wells and formerly yielded water to a spring known as Spring Villa.

4. It is common for quarries located in soluble rocks such as marble, limestone, and dolomite to adversely impact adjacent lands if the operation of the quarries appreciably lowers natural groundwater elevations. These impacts on adjacent lands commonly include, but may not be limited to: A) land subsidence and/or the sudden formation of sinkholes in surrounding areas, B) decreases in groundwater supplies available to water supply wells, C) decreases in the flow rates of surface streams, and D) decreases in the flow rates of springs.

5. A new sinkhole formed immediately adjacent to Lee County Highway 166 after pumping of the Hanson (now Oldcastle) Quarry lowered groundwater elevations in the area. When observed on December 17, 2002, this sinkhole was about 15 feet in diameter and about 15 feet deep. Weathered marble was exposed on the hanging wall of the sinkhole. On December 17, 2002, five pounds of rhodamine WT dye solution consisting of approximately 20% dye and 80% diluent was introduced into this sinkhole accompanied by approximately 73,000 gallons of water. For a period of 3 hours and 21 minutes the water was introduced into this sinkhole at a rate of about 350 gallons per minute, and all water rapidly disappeared into the subsurface through the bottom of the sinkhole. The dye was subsequently detected in water discharged from the Hanson (now Oldcastle) Quarry at the point where the quarry discharge passes beneath Lee County Highway 166. This groundwater trace demonstrated that the sinkhole is hydrologically connected with the Hanson (now Oldcastle) Quarry. The breakthrough curve of dye concentrations is consistent with subsurface flow through a fractured rock groundwater system.

Plaintiff
000000000002234

1

6. It is my conclusion that the collapse of the sinkhole immediately adjacent to Lee County Highway 166 was a direct result of quarry pumping. Pumping by the quarry appreciably lowered natural groundwater elevations in and around the quarry and reduced buoyant support given to the overlying landscape by water. Loss of buoyant support is a common mechanism responsible for sinkhole collapses associated with de-watering of soluble rock aquifers by quarries.

7. A report by Paul B. Krebs and Associates entitled "Hydrology for the Spring Villa, Alabama, Area" indicates that Hanson Aggregates Inc. re-activated the quarry in question during the summer of 1999. The U.S. Geological Survey Parkers Crossroads 7.5 minute topographic quadrangle of 1971 (photorevised 1983) indicates that, prior to the re-activation of the quarry the elevation on the quarry floor was about 585 feet above msl. There was a small and undoubtedly shallow pool of water on the floor as shown on the topographic map. It is reasonable to conclude that the elevation of this pool was at or near the natural elevation of the water table in the quarry area prior to the re-activating of the quarry.

8. A large spring known as Spring Villa is located in the valley of Little Uchee Creek about 8,000 feet northeast of the Hanson (now Oldcastle) Quarry. The spring is located in the Chewacla Marble. Prior to the pumping by the quarry Spring Villa provided a perennial discharge of groundwater. This conclusion is based on flow records, past use of the spring, and wetland vegetation located downstream of the spring. The spring no longer has a perennial discharge. The Krebs report plus verbal information from Alan Lee (Opelika Water Works) and James Sprayberry (an attorney) indicate that the spring has discharged water for only a few hours since it first stopped flowing during late spring, 2000. This altered flow pattern is attributable to the quarry pumping which has diverted water from the spring into the quarry and then, after pumping, into a different topographic basin from the one in which the water would normally have flowed.

9. The elevation of the floor of the pool at Spring Valley is approximately 573 feet msl. Prior to re-activation of the quarry, the water table elevation in the vicinity of the quarry was at about 585 feet. As a result, the elevation difference between the two points under natural conditions was about 12 feet over a lateral distance of about 8,000 feet with the groundwater gradient being from the quarry toward the spring. The most reasonable assumption regarding the direction for groundwater movement under natural conditions was from the vicinity of the quarry area toward Spring Villa.

It is my conclusion that re-activation of the quarry has lowered the present water table elevation in the immediate vicinity of the quarry to about 500 feet. This has reversed the direction of the groundwater gradient between the quarry and Spring Villa. It is my further conclusion that the pumping of the quarry after its re-activation has been responsible for the ending of flow from Spring Villa.

Plaintiff
000000000002235

10. Based upon my experience, and the pattern of groundwater elevations in the area, it is my conclusion that Spring Villa will seldom (if ever) discharge groundwater unless quarry pumping is curtailed and water level elevations in the region are allowed to recover to more natural conditions. If the pumping of the quarry is terminated, it is my conclusion that the spring will again have perennial flow within a few months to a few years.

11. It is my understanding that the Hanson (now Oldcastle) Quarry plans to ultimately increase the depth of the quarry by about another 125 feet. If this were to occur it will result in even more sinkhole collapses in the region, more decreases and losses of groundwater supplies for properties around the quarry, and adverse impacts from the quarry pumping on lands in a much larger quarry zone of influence.

12. On December 17, 2002 I introduced 10 pounds of a fluorescein dye mixture containing approximately 75% dye and 25% diluent into a dissolved out hole in the Chewacla Marble from which spring water at Spring Villa had formerly discharged to the surface. The dye was flushed into the groundwater system with water from a fire hydrant; the flow rate was between 300 and 325 gallons per minute. Based upon meter readings, a total of 119,000 gallons of water was introduced into the spring between 0735 hours and 1437 hours on December 17. All water rapidly disappeared into the groundwater system.

As of sampling and analysis completed through March 23, 2004, no dye from this dye introduction has been detected in the discharge water from the Hanson Quarry or in water at any other sampling stations.

13. On December 17, 2002 I introduced 15 pounds of an eosine dye mixture containing approximately 75% dye and 25% diluent into a sinkhole formed within about the previous week in the channel of Little Uchee Creek. The sinkhole is located about 800 feet northwest of Spring Villa. At the time of the dye introduction the sinkhole into which the dye was introduced was the furthest upstream of a series of 7 recently formed sinkholes in the channel of Little Uchee Creek in the stream reach upstream of the Lee County Highway which passes north of Spring Villa. Subsequent to the time of my dye introduction more sinkholes have formed in the area including another sinkhole on Little Uchee Creek upstream of the one into which I introduced the tracer dye. At the time of my dye introduction Little Uchee Creek was flowing into the dye introduction sinkhole at a rate of approximately 100 gallons per minute. At this time no flow in the creek passed this sinkhole and continued down the surface stream channel.

Eosine dye from the sinkhole introduction on Little Uchee Creek was first detected in water discharged from the Hanson (now Oldcastle) Quarry in activated carbon samplers in place for the period from June 5 to June 12, 2003. This indicates that the first arrival of dye from this dye introduction in water from the quarry occurred between 170 and 177 days after dye introduction. Eosine dye from this dye introduction has continued to be detected in activated carbon samplers in place at the point where quarry water

Plaintiff
00000000000002236

3

discharges across Road 166. The most recently collected samplers were in place at this location for the period from May 8 to May 23, 2004.

14. Based upon field observations, groundwater gradients, technical literature, and my past experience it is my conclusion that the Hanson (now Oldcastle) Quarry pumping has caused the formation of sinkholes in the channel of Little Uchee Creek and the subsequent loss of perennial flow in this stream from the point of the most upstream sinkhole downstream for an appreciable distance. The quarry pumping has also resulted in the decrease of flow rates in Little Uchee Creek for the entire stream segment downstream of the sinkholes in the stream channel and Spring Villa.

15. The pumping of water from the Hanson (now Oldcastle) Quarry has caused new sinkhole development along Lee County Highway 166 and in the channel of Little Uchee Creek. In addition, a number of other sinkholes resulting from quarry activities have occurred in the region and more examples of sinkhole collapses and land subsidence due to quarry pumping must be expected in the future in areas underlain by the Chewacla Marble.

16. Rhodamine WT dye from the dye introduction in a sinkhole along Road 166 was detectable in activated carbon samplers placed in water discharged from the quarry at the point where this water crosses Road 166. This dye was first detected in activated carbon samplers in place at this sampling station for the period from December 18 to 19, 2003 (Days 1 and 2 after the date of dye introduction). Rhodamine WT was detectable in activated carbon samplers placed at this sampling station through the period July 2 to August 28, 2003 (Days 197 through 254 after the date of dye introduction).

Approximately 98% of all rhodamine WT dye detected at the point where quarry discharge waters cross Road 166 was detected in samples collected on or before March 27, 2003. During this period no eosine dye was detected at this sampling station and the analytical graphs showed no evidence that any rhodamine WT dye was degrading to a fluorescent compound which would create fluorescence peaks which might be confused with well shaped emission fluorescence peaks characteristic of eosine dye. Any suggestion that the eosine dye detected at this sampling station during the period from the period June 5 to June 12, 2003 through March 8 to 23, 2004 might in some way represent a fluorescent compound resulting from the breakdown of rhodamine WT dye is not supported by factual data and is not reasonable.

17. I have prepared a report entitled: "Summary Report on Groundwater Tracing Results Associated with the Hanson (now Oldcastle) Quarry at Opelika, Alabama." The report is dated April, 2004. This report reflects my professional opinions.

F:\shared\tom\opelika3.doc
Revised 4/6/04

Plaintiff
00000000002237

4

2294

# Summary Report on Groundwater Tracing Results Associated with the Hanson (now Oldcastle) Quarry at Opelika, Alabama.

## April 2004.

Tom Aley, Alabama Professional Geologist #1089

## Dye Introductions

### Rhodamine WT Trace

A new sinkhole formed immediately adjacent to Lee County Highway 166 after pumping of the Hanson (now Oldcastle) Quarry lowered groundwater elevations in the area. When observed on December 17, 2002, this sinkhole was about 15 feet in diameter and about 15 feet deep. Weathered marble was exposed on the hanging wall of the sinkhole.

On December 17, 2002, five pounds of rhodamine WT dye solution consisting of approximately 20% dye and 80% diluent was introduced by Tom Aley into this sinkhole accompanied by approximately 73,000 gallons of water. For a period of 3 hours and 21 minutes the water was introduced into this sinkhole at a rate of about 350 gallons per minute, and all water rapidly disappeared into the subsurface through the bottom of the sinkhole.

### Eosine Trace

On December 17, 2002 Tom Aley introduced 15 pounds of an eosine dye mixture containing approximately 75% dye and 25% diluent into a sinkhole formed within about the previous week in the channel of Little Uchee Creek. The sinkhole is located about 800 feet northwest of Spring Villa. At the time of the dye introduction the sinkhole into which the dye was introduced was the furthest upstream of a series of 7 recently formed sinkholes in the channel of Little Uchee Creek in the stream reach upstream of the Lee County Highway which passes north of Spring Villa. Subsequent to the time of my dye introduction more sinkholes have formed in the area including another sinkhole on Little Uchee Creek upstream of the one into which I introduced the tracer dye. At the time of my dye introduction Little Uchee Creek was flowing into the dye introduction sinkhole at a rate of approximately 100 gallons per minute. At this time no flow in the creek passed this sinkhole and continued down the surface stream channel.

### Fluorescein Trace

On December 17, 2002 Tom Aley introduced 10 pounds of a fluorescein dye mixture containing approximately 75% dye and 25% diluent into a dissolved out hole in the Chewacla Marble from which spring water at Spring Villa had formerly discharged to the surface. The dye was flushed into the groundwater system with water from a fire

Plaintiff
00000000002238

hydrant; the flow rate was between 300 and 325 gallons per minute. Based upon meter readings, a total of 119,000 gallons of water was introduced into the spring between 0735 hours and 1437 hours on December 17. All water rapidly disappeared into the groundwater system.

## Dye Sampling Results

Sampling results from all activated carbon and water samples are included as Tables 5 and 6 at the back of this report.

## Tracer Dye Detections

### Rhodamine WT Trace

Dye from this trace was detected at the following sampling stations:

♦ Station 10. Test Well at 166. This station is very near the dye introduction point.
♦ Station 11. Quarry Discharge at 166.
♦ Station 12. Quarry Discharge at Parkers. This station is downstream of Station 11.
♦ Station 13. Creek at 146. This station is downstream of Stations 11 and 12.

Table 1 summarizes data from Station 11 (Quarry Discharge at 166) for rhodamine WT dye detections in elutants from activated carbon samplers.

Through September 24, 2003 the sum of mean rhodamine WT dye concentrations in activated carbon samplers was 6019.8 parts per billion. Mean values were used when two samplers were analyzed for dye concentrations. The activated carbon samplers were lost for the period from Day 77 to Day 84. For this period we used the daily mean of the previous and subsequent sample values; this was 5.0 ppb; for the seven day period it equaled 35.0 ppb. For the period from Day 98 to Day 168 there were no samples. For this 70 day period we used the mean daily value for the prior period and the subsequent period (0.85 ppb) for 70 days = 59.5 ppb. The sum of 6019.8 + 35.0 + 59.5 = 6114.3 ppb.

Plaintiff
000000000002239

2

2286

Plaintiff

00000000022246

Table 1. Rhodamine WT Dye Detections in Elutants from Activated Carbon Samplers, Quarry Discharge at Road 166.  Day Zero is 12/17/02, the date of dye introduction.

| From | Day # | To | Day # | Packet 1 conc. ppb | Packet 2 conc. ppb | Difference ppb | Mean ppb | RPD | Packet 1 WL nm | Packet 2 WL nm | Difference ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/5/02 | | 12/12 | 1 | ND | ND | | ND | | | | |
| 12/12 | 1 | 12/18 | 1 | ND | | | | | | | |
| 12/18 | 1 | 12/19 | 2 | 156 | 91.6 | 64.4 | 123.8 | 52.0 | 567.8 | 567.6 | .2 |
| 12/19 | 2 | 12/20 | 3 | 534 | 413 | 121 | 474 | 25.5 | 568.0 | 568.2 | .2 |
| 12/20 | 3 | 12/23 | 6 | 1990 | 2380 | 391 | 2185 | 17.9 | 568.0 | 568.0 | .0 |
| 12/23 | 6 | 12/26 | 9 | 811 | 742 | 69 | 777 | 8.9 | 568.0 | 567.9 | .1 |
| 12/26 | 9 | 12/30/02 | 13 | 764 | 612 | 152 | 688 | 22.1 | 567.9 | 568.3 | .4 |
| 12/30/02 | 13 | 1/2/03 | 16 | 408 | 607 | 199 | 508 | 39.2 | 567.4 | 567.8 | .4 |
| 1/2 | 16 | 1/9 | 23 | 570 | 475 | 95 | 523 | 18.2 | 567.7 | 567.4 | .3 |
| 1/9 | 23 | 1/16 | 30 | 266 | 216 | 50 | 241 | 20.7 | 567.6 | 567.4 | .2 |
| 1/16 | 30 | 1/23 | 37 | 144 | 142 | 2 | 143 | 1.4 | 567.7 | 567.7 | 0 |
| 1/23 | 37 | 1/30 | 44 | 95.5 | 81.7 | 13.8 | 88.6 | 15.6 | 567.8 | 567.7 | .1 |
| 1/30 | 44 | 2/6 | 51 | 64.7 | 33.9 | 30.8 | 49.3 | 62.5 | 567.6 | 567.6 | 0 |
| 2/6 | 51 | 2/13 | 58 | 35.6 | 26.1 | 9.5 | 30.9 | 30.7 | 567.9 | 567.7 | .2 |
| 2/13 | 58 | 2/20 | 65 | 46.9 | 44.1 | 2.8 | 45.5 | 6.2 | 567.7 | 567.9 | .2 |
| 2/20 | 65 | 2/26 | 71 | 40.3 | NS | -- | -- | | 567.9 | NS | -- |
| 2/26 | 71 | 3/6 | 79 | 51.1 | 52.7 | 1.6 | 51.9 | 3.1 | 568.1 | 568.1 | 0 |
| 3/6 | 79 | 3/13 | 86 | NS | | -- | -- | NS | NS | | |
| 3/13 | 86 | 3/19 | 92 | 23.1 | 17.9 | 5.2 | 20.5 | 25.4 | 568.0 | 568.3 | .3 |
| 3/19 | 92 | 3/27 | 100 | 6.81 | 8.68 | 1.87 | 7.75 | 24.1 | 568.9 | 568.3 | .6 |
| 3/27 | 100 | 6/5 | 170 | No Samples | | | | | | | |
| 6/5 | 170 | 6/12 | 177 | 3.88 | 5.38 | 1.50 | 4.63 | 32.4 | 568.4 | 566.8 | 1.6 |
| 6/12 | 177 | 7/2 | 197 | 7.35 | 11.2 | 3.8 | 9.3 | 40.9 | 567.6 | 566.8 | 0.8 |

(continued)

3

Plaintiff
0000000000002241

2297

Table 1 (continued). Rhodamine WT Dye Detections in Elutants from Activated Carbon Samplers, Quarry Discharge at Road 166. Day Zero is 12/17/02, the date of dye introduction.

| From | Day # | To | Day # | Packet 1 conc. ppb | Packet 2 conc. ppb | Difference ppb | Mean ppb | RPD | Packet 1 WL nm | Packet 2 WL nm | Difference ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (continued) | | | | | | | | | | | |
| 7/2 | 197 | 8/28 | 254 | 11.9 | 9.78 | 2.1 | 10.9 | 19.3 | 568.3 | 566.8 | 1.5 |
| 8/28 | 254 | 9/4 | 261 | ND | ND | | | | ND | ND | |
| 9/4 | 261 | 9/9 | 266 | ND | ND | | | | ND | ND | |
| 9/9 | 266 | 9/16 | 273 | ND | ND | | | | ND | ND | |
| 9/16 | 273 | 9/24 | 281 | ND | ND | | | | ND | ND | |
| 9/24 | 281 | 10/1 | 288 | ND | ND | | | | ND | ND | |
| 10/1 | 288 | 10/8 | 295 | ND | ND | | | | ND | ND | |
| 10/8 | 295 | 10/15 | 302 | ND | ND | | | | ND | ND | |
| 10/15 | 302 | 10/22 | 309 | ND | ND | | | | ND | ND | |
| 10/22 | 309 | 10/29 | 316 | ND | ND | | | | ND | ND | |
| 10/29 | 316 | 11/12 | 3.30 | Water Sample Only | | | | | | | |
| 11/12 | 330 | 12/17 | 365 | ND | ND | | | | ND | ND | |
| 12/17 | 365 | 1/6/04 | 385 | ND | ND | | | | ND | ND | |
| 1/6/04 | 385 | 3/8 | 447 | ND | ND | | | | ND | ND | |
| 3/8 | 447 | 3/23 | 462 | ND | ND | | | | ND | ND | |

4

2298

Approximately 98% of all rhodamine WT dye detected at the point where quarry discharge waters cross Road 166 was detected in samples collected on or before March 27, 2003. During this period no eosine dye was detected at this sampling station and the analytical graphs showed no evidence that any rhodamine WT dye was degrading to a fluorescent compound which would create fluorescence peaks which might be confused with well shaped emission fluorescence peaks characteristic of eosine dye.

Table 2 provides mean daily rhodamine WT concentrations from Station 11. The peak daily rhodamine WT dye concentration at this sampling station occurred during the period from Day 3 to Day 6 after dye introduction (December 20 to 23, 2002). The mean daily rhodamine WT concentration during this period was 728.3 ppb. Order of magnitude dye concentration declines from this peak concentration period were as follows:

- Mean daily rhodamine WT dye concentration at Station 11 declined to approximately 10% of the peak daily dye concentration during the period from Day 16 to 23 after dye introduction (January 2 to January 9, 2003).
- The mean daily dye concentration at this station declined to approximately 1% of the peak daily dye concentration during the period from Day 44 to 51 after dye introduction (January 30 to February 6, 2003).
- The mean daily dye concentration declined to 0.1% of the peak daily dye concentration during the period from Day 170 to 177 (June 5 to June 12, 2003).

In summary, approximately 98% of the detected rhodamine WT dye had discharged from the quarry on or before March 27, 2003. The first detection of eosine dye at Station 11 occurred at the same time that the mean daily rhodamine WT concentration had declined to 0.1% of the peak daily dye concentration. Any suggestion that the eosine dye detected at this sampling station during the period from June 5 to June 12, 2003 through March 8 to 23, 2004 might in some way represent a fluorescent compound resulting from the breakdown of rhodamine WT dye is not supported by factual data and is neither logical nor reasonable. In fact, the data clearly demonstrate that the breakdown of rhodamine WT could not have produced the fluorescence peaks in the range of eosine dye detected in all activated carbon samplers collected from Station 11 during the period from Day 170 to 177 through at least Day 447 through Day 462. Eosine dye will probably continue to be present beyond Day 462 in the discharge water from the quarry as monitored with activated carbon samplers at Station 11.

Plaintiff
000000000002242

**Table 2. Mean Daily Rhodamine WT Concentrations from Activated Carbon Samplers, Quarry Discharge at Road 166. Day 0 is 12/17/02.**

| Period from Day | To Day | Daily Mean Conc. ppb |
|---|---|---|
| 0 | 1 | 0 |
| 1 | 2 | 123.8 |
| 2 | 3 | 474.0 |
| 3 | 6 | 728.3 |
| 6 | 9 | 259.0 |
| 9 | 13 | 172.0 |
| 13 | 16 | 169.3 |
| 16 | 23 | 74.7 |
| 23 | 30 | 34.4 |
| 30 | 37 | 20.4 |
| 37 | 44 | 12.7 |
| 44 | 51 | 7.0 |
| 51 | 58 | 4.4 |
| 58 | 65 | 6.5 |
| 65 | 71 | 6.7 |
| 71 | 79 | 6.5 |
| 79 | 86 | 5.0 - NS - Est. mean of prior and subsequent periods |
| 86 | 92 | 3.4 |
| 92 | 100 | 1.0 |
| 100 | 170 | 0.9 - NS - Est. mean of prior and subsequent periods |
| 170 | 177 | 0.7 |
| 177 | 197 | 0.5 |
| 197 | 254 | 0.2 |
| 254 | 261 | ND |
| 261 | 266 | ND |
| 266 | 273 | ND |
| 273 | 281 | ND |
| 281 | 288 | ND |
| 288 | 295 | ND |
| 295 | 302 | ND |
| 302 | 309 | ND |
| 309 | 316 | ND |
| 316 | 330 | ND - Water Sample Only |
| 365 | 385 | ND |
| 385 | 447 | ND |
| 447 | 462 | ND |

Plaintiff
000000000002243

Relative Percent Difference (RPD) values are routinely calculated in professional quality hydrologic studies. The RPD value for a pair of samples is the difference between the two analysis results divided by the mean of the two values. RPD values were calculated for dye concentrations in pairs of activated carbon samplers which contained rhodamine WT dye. There were 19 pairs of activated carbon samplers used in the calculations. The mean RPD value for rhodamine WT concentration was 24.5%. The maximum RPD value for any pair of samples was 62.5%, and the minimum RPD value for any pair of samples was 1.4%. There were no cases where rhodamine WT was detected in only one of the pair of samplers. The mean wavelength difference in fluorescence peaks was 0.4 nm. These values demonstrate that the analytical results are of adequate quality to support calculations made above relative to the amount of detectable rhodamine WT discharged from the quarry during particular periods and the concentrations eluted from activated carbon samplers.

### Eosine Trace

Dye from this trace was detected at the following sampling stations:

- Station 11.  Quarry Discharge at 166.
- Station 12.  Quarry Discharge at Parkers.  This station is downstream of Station 11.

Table 3 summarizes data from Station 11 (Quarry Discharge at 166) for eosine dye detections in elutants from activated carbon samplers. Eosine dye was first detected at this sampling station in activated carbon samplers in place for the period June 5 to 12, 2003 (170 to 177 days after dye introduction). Eosine dye has been continuously detected in all activated carbon samplers collected from this sampling station through the most recent samplers which were in place from March 8 to 23, 2004 (447 to 462 days after dye introduction).

Table 4 presents mean daily eosine concentrations from activated carbon samplers in place at Station 11. The maximum mean daily concentration occurred in a sampler in place for the period from Day 261 to 266 (September 4 to 9, 2003).

Relative Percent Difference (RPD) values were calculated for activated carbon samplers which contained eosine dye. There were 16 pairs of activated carbon samplers used in the calculations. The mean RPD value for eosine concentrations was 30.0%. The maximum RPD value for any pair of samples was 87.0%, and the minimum RPD value for any pair of samples was 3.2%. There were no cases where eosine was detected in only one of a pair of samplers. The mean wavelength difference in fluorescence peaks in pairs of samplers was 0.2 nm.

Plaintiff
00000000002244

Plaintiff
00000000000002245

**Table 3.  Eosine Dye Detections in Elutants from Activated Carbon Samplers, Quarry Discharge at Road 166.  Day Zero is 12/17/02, the date of dye introduction.**

| From | Day # | To | Day # | Packet 1 conc. ppb | Packet 2 conc. ppb | Difference ppb | Mean ppb | RPD | Packet 1 WL nm | Packet 2 WL nm | Difference ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/5/03 | 170 | 6/12 | 177 | 3.23 | 5.62 | 2.39 | 4.43 | 54.0 | 539.1 | 539.2 | 0.1 |
| 6/12 | 177 | 7/2 | 197 | 9.09 | 16.2 | 7.1 | 12.7 | 55.9 | 539.1 | 539.2 | 0.1 |
| 7/2 | 197 | 8/28 | 254 | 8.24 | 7.80 | 0.44 | 8.02 | 5.5 | 539.4 | 539.7 | 0.3 |
| 8/28 | 254 | 9/4 | 261 | 5.13 | 5.48 | 0.35 | 5.31 | 6.6 | 538.8 | 539.0 | 0.2 |
| 9/4 | 261 | 9/9 | 266 | 12.4 | 7.93 | 4.5 | 10.2 | 44.1 | 539.3 | 539.1 | 0.2 |
| 9/9 | 266 | 9/16 | 273 | 11.0 | 4.27 | 6.7 | 7.7 | 87.0 | 538.9 | 539.1 | 0.2 |
| 9/16 | 273 | 9/24 | 281 | 7.05 | 6.83 | 0.22 | 6.94 | 3.2 | 539.2 | 539.1 | 0.1 |
| 9/24 | 281 | 10/1 | 288 | 5.43 | 8.45 | 3.02 | 6.94 | 43.5 | 539.5 | 539.1 | 0.4 |
| 10/1 | 288 | 10/8 | 295 | 8.57 | 11.6 | 3.0 | 10.1 | 29.7 | 539.1 | 539.0 | 0.1 |
| 10/8 | 295 | 10/15 | 302 | 4.32 | 5.27 | 0.95 | 4.80 | 19.8 | 539.0 | 539.1 | 0.1 |
| 10/15 | 302 | 10/22 | 309 | 3.12 | 1.63 | 1.49 | 2.38 | 62.6 | 539.6 | 539.5 | 0.1 |
| 10/22 | 309 | 10/29 | 316 | 6.99 | 8.10 | 1.11 | 7.55 | 14.7 | 539.0 | 539.1 | 0.1 |
| 10/29 | 316 | 11/12 | 330 | Water Sample Only | | - | | | | | |
| 11/12 | 330 | 12/17 | 365 | 9.51 | 11.1 | 1.6 | 10.3 | 15.5 | 539.6 | 539.2 | 0.4 |
| 12/17 | 365 | 1/6/04 | 385 | 9.85 | 10.7 | 0.8 | 10.3 | 7.8 | 539.3 | 539.5 | 0.2 |
| 1/6 | 385 | 3/8 | 447 | 13.7 | 16.8 | 3.1 | 15.3 | 20.3 | 539.1 | 539.3 | 0.2 |
| 3/8 | 447 | 3/23 | 462 | 12.8 | 11.6 | 1.2 | 12.2 | 9.8 | 539.2 | 539.3 | 0.1 |

2302

**Table 4. Mean Daily Eosine Concentrations from Activated Carbon Samplers, Quarry Discharge at Road 166. Day 0 is 12/17/02.**

| Period from Day | To Day | Daily Mean Conc. ppb |
|---|---|---|
| 170 | 177 | 0.63 |
| 177 | 197 | 0.64 |
| 197 | 254 | 0.14 |
| 254 | 261 | 0.76 |
| 261 | 266 | 2.04 |
| 266 | 273 | 1.10 |
| 273 | 281 | 0.87 |
| 281 | 288 | 0.99 |
| 288 | 295 | 1.44 |
| 295 | 302 | 0.69 |
| 302 | 309 | 0.34 |
| 309 | 316 | 1.08 |
| 316 | 330 | 0.69 - No Sample. Mean of prior and subsequent value. |
| 330 | 365 | 0.29 |
| 365 | 385 | 0.52 |
| 385 | 447 | 0.25 |
| 447 | 462 | 0.81 |

Plaintiff
000000000002246

2305

Dr. Ewers, in a letter of July 10, 2003 to Mr. Byram, suggested that my interpretation of an eosine dye detection in the June 5, 2003 sampling was premature and very possibly incorrect. Dr. Ewers asserted that the fluorescence peaks which I attributed to eosine dye (and which met our qualitative and quantitative criteria for positive eosine dye detections) were likely due to the breakdown of rhodamine WT dye. There are a number of reasons that Dr. Ewers' assertions are incorrect; the following identifies some of them:

♦ Rhodamine WT does not convert to eosine dye. Instead, some portions of a rhodamine WT dye mixture may degrade to a compound which has some fluorescence characteristics similar to eosine dye. Further degradation yields a compound with still different fluorescence characteristics.

♦ The fact that 98% of the detected rhodamine WT dye had discharged from the quarry on or before March 27, 2003 and that the first detection of eosine dye at Station 11 occurred at the same time that the mean daily rhodamine WT concentration had declined to 0.1% of the peak daily dye concentration. As a result, there was insufficient rhodamine WT available to convert to a compound which might have fluorescence characteristics similar to eosine dye.

♦ Dr. Ewers stated that my interpretation of a positive eosine detection in activated carbon samplers placed in waters derived from the quarry was premature. Dr. Ewers' opinion (one would expect) indicates that further positive detections of eosine dye would be able to confirm the conclusion which I had reached. As of March 23, 2004 we have collected and analyzed 32 activated carbon samplers which had been placed in the water pumped from the quarry and which contained detectable concentrations of eosine dye. The time period during which eosine dye has been detected in waters from the quarry has now exceeded 9 months. No sampler in place during any portion of this 9 month period was negative for the presence of eosine dye. I disagree with Dr. Ewers' statement that my interpretation was premature. However, the abundant data now available show that my interpretation (actually my conclusion) was in fact correct.

♦ Deterioration of rhodamine WT dye to a fluorescent compound which would be mistaken for eosine dye in activated carbon samplers (assuming an analytical approach of professional quality) is a highly unlikely event. When it occurs, the conversion takes on the order of years. It is reasonable to expect such a conversion to be especially slow in relatively clean groundwater (such as found in the Opelika area).

♦ We have conducted other analytical tests on elutant samples from charcoal packets placed in waters which have discharged from the quarry. These results have been compared with results from samples known to contain eosine dye. Results from these other analytical tests of samplers from the quarry discharge water have been consistent with the presence of eosine dye in the samplers. These tests have included: 1) dilution of elutant samples with water to determine the wavelength difference due to the modification of the liquid matrix, and 2) multiple analysis of samples with different wavelength separations between the excitation and emission slits.



Plaintiff
000000000002247

2304

♦ There are no data to reasonably suggest that the fluorescence peaks which we have identified as eosine dye are not in fact eosine dye derived from the dye which we introduced in Little Uchee Creek.

**Fluorescein Trace**

As of March 23, 2004 no fluorescein dye has been detected from the introduction at Spring Villa. Solution cavities exist at Spring Villa below the elevation at which the dye was introduced. The introduced dye and water could be detained in these cavities and be slowly "bleeding out" into adjacent rocks and/or alluvium. Of major importance is the fact that, unlike the eosine dye introduction upstream of Spring Villa on Little Uchee Creek, there is no continuing flow of water serving to flush the fluorescein dye into and through the regional aquifer. The magnitude of this difference in flushing water volume is indicated by the following values.

On December 17, 2002 a total of 119,000 gallons of water was introduced with the dye at Spring Villa. On the same date eosine dye was introduced at the sinkhole on Little Uchee Creek. The flow rate at the eosine dye introduction site was estimated at 100 gallons per minute; this equals 144,000 gallons per day. In a single day the eosine dye introduction had approximately 1.2 times more water to flush it into and through the aquifer than did the Spring Villa Trace.

Dr. Ewers also introduced fluorescein dye at Spring Villa. In a letter to Charles E. Vercelli, Jr. from James A. Byram, Jr. dated March 29, 2004, Mr. Byram reported that Dr. Ewers used in excess of 15,000 cubic feet of flush water; this equals 112,200 gallons. Since he reported that the volume was in excess of 15,000 cubic feet we will conclude, for calculation purposes, that Dr. Ewers introduced about 115,000 gallons of water in conjunction with his dye introduction at Spring Villa.

The amount of water I introduced at Spring Villa, plus the volume that Ewers introduced, equals about 234,000 gallons. We have now sampled for tracer dyes in the discharge waters from the quarry through March 23, 2004; this is 462 days after my dye introduction. 462 days multiplied by 144,000 gallons of water per day equals approximately 66.5 million gallons of water. This in turn equals 284 times more water introduced behind the eosine dye introduction than behind the fluorescein introductions made by Dr. Ewers and me. Other than trivial amounts of water yielded by precipitation into the spring basin there has been no other water introduced into Spring Villa.

Prior to the start of pumping by the quarry the mean flow of Spring Villa (based upon 16 measurements) was 3.78 cubic feet per second. The amount of water introduced into Spring Villa in conjunction with the Ozark Underground Laboratory (OUL) fluorescein dye introduction equaled the mean flow from this spring for a 70 minute period. The peak measured flow rate of Spring Villa was 11.01 cubic feet per second. At

11

Plaintiff
000000000002248

305

this flow rate the amount of water introduced into Spring Villa in conjunction with our dye introduction equaled the peak measured flow from this spring for a period of 24 minutes. Spring Villa, before its water sources was pirated by quarry pumping, was a major regional spring. Historic flow rates from the spring and the nature of solution cavities make it reasonable to expect the existence of bedrock cavities capable of detaining many times the volume of water introduced during the OUL and Ewers dye traces.

As of March 23, 2004, no fluorescein dye from either of the two dye introductions made at Spring Villa has been detected in quarry discharge waters. Detainment of dyed waters in the vicinity of Spring Villa with slow release into alluvium or the fractured rock aquifer adjacent to the limestone deposits is the likely explanation for the non-detection of fluorescein in quarry discharge waters. This is supported by the results from the results from the nearby eosine dye introduction.

It is also noteworthy that, based upon Mr. Byram's letter of March 29, 2004, Dr. Ewers has not detected fluorescein dye at any of his other sampling stations. Dr. Ewers, in a July 10, 2003 letter to James A. Byram, Jr., concluded that the most likely reason that fluorescein had not been detected from my introduction at Spring Villa was due to my failure to have sufficient properly located dye sampling stations. Dr. Ewers' data is providing useful evidence that his suggestion (that dye from Spring Villa would appear at locations other than in the quarry) was neither reasonable nor correct.

F:\shared\tom\opelika8.doc

Plaintiff
000000000002249

Ozark Underground Laboratory, Inc.

Opelika, AL

Groundwater Investigation
Charcoal Results

Table 5.   Results charcoal samplers analyzed for the presence of fluorescein, eosine, rhodamine WT (RWT) and sulforhodamine B (SRB) dyes.
Peak wavelengths are reported in nanometers (nm); dye concentrations are reported in parts per billion (ppb).

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Fluorescein Results Conc. ppb | Eosine Results Peak nm | Eosine Results Conc. ppb | RWT Results Peak nm | RWT Results Conc. ppb | SRB Results Peak nm | SRB Results Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3409 | 1 | East Branch Uchee Creek at Road 148 | | 12/6 1205 | 12/12 1106 | | ND | | ND | | ND | | ND |
| M3765 | 1 | East Branch Uchee Creek at Road 148 | | 12/12 1106 | 12/18 0918 | | ND | | ND | | ND | | ND |
| M3782 | 1 | East Branch Uchee Creek at Road 148 | | 12/18 0918 | 12/19 0855 | | ND | | ND | | ND | | ND |
| M3939 | 1 | East Branch Uchee Creek at Road 148 | | 12/19 0855 | 12/20 0827 | | ND | | ND | | ND | | ND |
| M3958 | 1 | East Branch Uchee Creek at Road 148 | | 12/20 0827 | 12/23 0916 | | ND | | ND | | ND | | ND |
| M4012 | 1 | East Branch Uchee Creek at Road 148 | | 12/23 0916 | 12/26 0918 | | ND | | ND | | ND | | ND |
| M4030 | 1 | East Branch Uchee Creek at Road 148 | | 12/26 0918 | 12/30 0844 | | ND | | ND | | ND | | ND |
| M4127 | 1 | East Branch Uchee Creek at Road 148 | | 12/30 0844 | 1/2 0824 | | ND | | ND | | ND | | ND |
| M4406 | 1 | East Branch Uchee Creek at Road 148 | | 1/2 0824 | 1/9 0851 | | ND | | ND | | ND | | ND |
| M4545 | 1 | East Branch Uchee Creek at Road 148 | | 1/9 0851 | 1/16 0834 | | ND | | ND | | ND | | ND |
| M4796 | 1 | East Branch Uchee Creek at Road 148 | | 1/16 0834 | 1/23 0751 | | ND | | ND | | ND | | ND |
| M4865 | 1 | East Branch Uchee Creek at Road 148 | | 1/23 0751 | 1/30 0805 | | ND | | ND | | ND | | ND |
| M4943 | 1 | East Branch Uchee Creek at Road 148 | | 1/30 0805 | 2/6 0800 | | ND | | ND | | ND | | ND |
| M5033 | 1 | East Branch Uchee Creek at Road 148 | | 2/6 0800 | 2/13 0809 | | ND | | ND | | ND | | ND |
| M5110 | 1 | East Branch Uchee Creek at Road 148 | | 2/13 0809 | 2/20 0748 | | ND | | ND | | ND | | ND |
| M5135 | 1 | East Branch Uchee Creek at Road 148 | | 2/20 0748 | 2/26 0731 | | ND | | ND | | ND | | ND |
| M5264 | 1 | East Branch Uchee Creek at Road 148 | | 2/26 0731 | 3/6 0906 | | ND | | ND | | ND | | ND |
| M5369 | 1 | East Branch Uchee Creek at Road 148 | | 3/6 0906 | 3/13 0755 | | ND | | ND | | ND | | ND |
| M5466 | 1 | East Branch Uchee Creek at Road 148 | | 3/13 0755 | 3/19 0757 | | ND | | ND | | ND | | ND |
| M5617 | 1 | East Branch Uchee Creek at Road 148 | | 3/19 0757 | 3/27 0732 | | ND | | ND | | ND | | ND |
| M7266 | 1 | East Branch Uchee Creek at Road 148 | | 3/27 0732 | 6/5 1203 | | ns | | ND | | ND | | ND |
| M72266 | 1 | East Branch Uchee Creek at Road 148 | | 6/5 1203 | 6/12 1505 | | wso | | ND | | ND | | ND |
| | 1 | East Branch Uchee Creek at Road 148 | | 6/12 1505 | 7/2 1300 | | ND | | ND | | ND | | ND |
| M3407 | 2 | Little Uchee at 148 | | 12/6 1147 | 12/12 1059 | | ND | | ND | | ND | | ND |
| M3408 | 3 | Spring Villa below Weir | | 12/6 1157 | 12/12 1050 | | ND | | ND | | ND | | ND |
| M3946 | 3 | Spring Villa below Weir | | 12/12 1050 | 12/20 0847 | | ND | | ND | | ND | | ND |
| M3962 | 3 | Spring Villa below Weir | | 12/20 0847 | 12/23 0936 | | ND | | ND | | ND | | ND |
| M4015 | 3 | Spring Villa below Weir | | 12/23 0936 | 12/26 0943 | | ND | | ND | | ND | | ND |
| M4033 | 3 | Spring Villa below Weir | | 12/26 0943 | 12/30 0904 | | ND | | ND | | ND | | ND |
| M4130 | 3 | Spring Villa below Weir | | 12/30 0904 | 1/2 0842 | | ND | | ND | | ND | | ND |
| M4409 | 3 | Spring Villa below Weir | | 1/2 0842 | 1/9 0907 | | ND | | ND | | ND | | ND |
| M4548 | 3 | Spring Villa below Weir | | 1/9 0907 | 1/16 0851 | | ND | | ND | | ND | | ND |
| M4799 | 3 | Spring Villa below Weir | | 1/16 0851 | 1/23 0805 | | ND | | ND | | ND | | ND |
| M4867 | 3 | Spring Villa below Weir | | 1/23 0805 | 1/30 0825 | | ND | | ND | | ND | | ND |
| M4946 | 3 | Spring Villa below Weir | | 1/30 0825 | 2/6 0812 | | ND | | ND | | ND | | ND |
| M5036 | 3 | Spring Villa below Weir | | 2/6 0812 | 2/13 0831 | | ND | | ND | | ND | | ND |
| M5112 | 3 | Spring Villa below Weir | | 2/13 0831 | 2/20 0759 | | ND | | ND | | ND | | ND |
| M5137 | 3 | Spring Villa below Weir | | 2/20 0759 | 2/26 0740 | | ND | | ND | | ND | | ND |
| M5266 | 3 | Spring Villa below Weir | | 2/26 0740 | 3/6 0915 | | ND | | ND | | ND | | ND |
| M5371 | 3 | Spring Villa below Weir | | 3/6 0915 | 3/13 0806 | | ND | | ND | | ND | | ND |
| M5468 | 3 | Spring Villa below Weir | | 3/13 0806 | 3/19 0808 | | ND | | ND | | ND | | ND |

2306

Plaintiff
00000000000002250

Ozark Underground Laboratory, Inc.                                    Opelika, AL

Groundwater Investigation
Charcoal Results

2007

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M5619 | 3 | Spring Villa below Weir | | 3/19 0808 | 3/27 0745 | ND | | ND | | ND | | ND | |
| M7269 | 3 | Spring Villa below Weir | | 3/27 0745 | 6/5 1150 | ns | | ND | | ND | | ND | |
| M7678 | 3 | Spring Villa below Weir | | 6/5 1150 | 6/12 1532 | ND | | ND | | ND | | ND | |
| M9208 | 3 | Spring Villa below Weir | | 6/12 1532 | 7/2 1236 | ND | | ND | | ND | | ND | |
| M9338 | 3 | Spring Villa below Weir | Ewers | NDT | 9/24 1023 | ND | | ND | | ND | | ND | |
| M9450 | 3 | Spring Villa below Weir | Ewers | 9/24 1023 | 10/1 0714 | ND d | | ND | | ND | | ND | |
| M9614 | 3 | Spring Villa below Weir | Ewers | 10/1 0714 | 10/8 1317 | ND | | ND | | ND | | ND | |
| M9728 | 3 | Spring Villa below Weir | Ewers | 10/8 1317 | 10/15 1332 | ND | | ND | | ND | | ND | |
| M9814 | 3 | Spring Villa below Weir | Ewers | 10/15 1332 | 10/22 1330 | ND | | ND | | ND | | ND | |
| N0115 | 3 | Spring Villa below Weir | Ewers | 10/22 1330 | 10/29 1031 | ND | | ND | | ND | | ND | |
| N0445 | 3 | Spring Villa below Weir | Ewers | 10/29 1031 | 11/12 1312 | ND | | ND | | ND | | ND | |
| N0619 | 3 | Spring Villa below Weir | Ewers | NDT | 11/26 1047 | ND | | ND | | ND | | ND | |
| N0990 | 3 | Spring Villa below Weir | Ewers | NDT | 12/17 1204 | ND | | ND | | ND | | ND | |
| N1738 | 3 | Spring Villa below Weir | Ewers | 12/17 1200 | 1/7 0646 | ND | | ND | | ND | | ND | |
| N1928 | 3 | Spring Villa below Weir | Ewers | 2/19 1320 | 3/8 1140 | ND | | ND | | ND | | ND | |
| N1928 | 3 | Spring Villa below Weir | Ewers | 3/8 1140 | 3/23 1345 | ND | | ND | | ND | | ND | |
| M3769 | 4 | Test Well #2 | | 12/17 1349 | 12/18 0944 | ND | | ND | | ND | | ND | |
| M3786 | 4 | Test Well #2 | | 12/18 0944 | 12/19 0912 | ND | | ND | | ND | | ND | |
| M3944 | 4 | Test Well #2 | | 12/19 0912 | 12/20 0848 | ND | | ND | | ND | | ND | |
| M3961 | 4 | Test Well #2 | | 12/20 0848 | 12/23 0934 | ND | | ND | | ND | | ND | |
| M4014 | 4 | Test Well #2 | | 12/23 0934 | 12/26 0940 | ND | | ND | | ND | | ND | |
| M4032 | 4 | Test Well #2 | | 12/26 0940 | 12/30 0913 | ND | | ND | | ND | | ND | |
| M4129 | 4 | Test Well #2 | | 12/30 0913 | 1/2 0846 | ND | | ND | | ND | | ND | |
| M4408 | 4 | Test Well #2 | | 1/2 0846 | 1/9 0909 | ND | | ND | | ND | | ND | |
| M4547 | 4 | Test Well #2 | | 1/9 0909 | 1/16 0853 | ND | | ND | | ND | | ND | |
| M4798 | 4 | Test Well #2 | | 1/16 0853 | 1/23 0810 | ND | | ND | | ND | | ND | |
| M4945 | 4 | Test Well #2 | | 1/23 0810 | 1/30 0824 | ns | | ND | | ND | | ND | |
| M5035 | 4 | Test Well #2 | | 1/30 0824 | 2/6 0814 | ND | | ND | | ND | | ND | |
| M5113 | 4 | Test Well #2 | | 2/6 0814 | 2/13 0832 | ND | | ND | | ND | | ND | |
| M5138 | 4 | Test Well #2 | | 2/13 0832 | 2/20 0802 | ND | | ND | | ND | | ND | |
| M5267 | 4 | Test Well #2 | | 2/20 0802 | 2/26 0745 | ND | | ND | | ND | | ND | |
| M5372 | 4 | Test Well #2 | | 2/26 0745 | 3/6 0918 | ND | | ND | | ND | | ND | |
| M5469 | 4 | Test Well #2 | | 3/6 0918 | 3/13 0806 | ND | | ND | | ND | | ND | |
| M5621 | 4 | Test Well #2 | | 3/13 0806 | 3/19 0810 | ND | | ND | | ND | | ND | |
| | 4 | Test Well #2 | | 3/19 0810 | 3/27 0747 | ND | | ND | | ND | | ND | |
| | 4 | Test Well #2 | | 3/27 0747 | 6/5 1145 | ns | | ND | | ND | | ND | |
| M7268 | 4 | Test Well #2 | | 6/5 1145 | 6/12 1530 | ND | | ND | | ND | | ND | |
| M7677 | 4 | Test Well #2 | | 6/12 1530 | 7/2 1234 | ND | | ND | | ND | | ND | |
| M3611 | 4 | Test Well #2 | Ewers | NDT | 8/27 1042 | ND | | ND | | ND | | ND | |
| M8847 | 4 | Test Well #2 | Ewers | 8/27 1042 | 9/3 0654 | ND | | ND | | ND | | ND | |
| M8923 | 4 | Test Well #2 | Ewers | 9/3 0654 | 9/10 0709 | ND | | ND | | ND | | ND | |
| M9127 | 4 | Test Well #2 | Ewers | 9/10 0709 | 9/16 0716 | ND | | ND | | ND | | ND | |
| M9202 | 4 | Test Well #2 | Ewers | 9/16 0716 | 9/24 1013 | ns | | ND | | ND | | ND | |

f:\docs\coal\opelika.xls
3/29/04

2

Plaintiff
0000000000002251

Ozark Underground Laboratory, Inc.

Optika, AL.

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M9448 | 4 | Test Well #2 | Ewers | 9/24 1013 | 10/1 0704 | nsf | | | ND | | ND | | ND |
| M9612 | 4 | Test Well #2 | Ewers | 10/1 0704 | 10/8 1309 | ND | | ND | | ND | | ND | |
| M9726 | 4 | Test Well #2 | Ewers | 10/8 1309 | 10/15 1327 | ND | | ND | | ND | | ND | |
| M9812 | 4 | Test Well #2 | Ewers | 10/15 1327 | 10/22 1323 | ND | | ND | | ND | | ND | |
| N0113 | 4 | Test Well #2 | Ewers | 10/22 1323 | 10/29 1024 | ND | | ND | | ND | | ND | |
| N0443 | 4 | Test Well #2 | Ewers | 10/29 1024 | 11/12 1307 | ND | | ND | | ND | | ND | |
| N0617 | 4 | Test Well #2 | Ewers | NDT | 11/26 1037 | ND | | ND | | ND | | ND | |
| N0988 | 4 | Test Well #2 | Ewers | NDT | 12/17 1156 | ND | | ND | | ND | | ND | |
| N1736 | 4 | Test Well #2 | Ewers | 2/19 1310 | 1/7 0640 | ND | | ND | | ND | | ND | |
| N1926 | 4 | Test Well #2 | Ewers | 3/8 1130 | 3/8 1130 | ND | | ND | | ND | | ND | |
| M3411 | 5 | Test Well Number 5 | Ewers | 12/10 1018 | 3/23 1335 | ND | | ND | | ND | | ND | |
| M3770 | 5 | Test Well Number 5 | | 12/12 1033 | 12/12 1033 | ND | | ND | | ND | | ND | |
| M3787 | 5 | Test Well Number 5 | | 12/18 1002 | 12/18 1002 | ND | | ND | | ND | | ND | |
| M3945 | 5 | Test Well Number 5 | | 12/19 0837 | 12/19 0837 | ND | | ND | | ND | | ND | |
| M3956 | 5 | Test Well Number 5 | | 12/20 0811 | 12/20 0811 | ND | | ND | | ND | | ND | |
| M4010 | 5 | Test Well Number 5 | | 12/23 0858 | 12/23 0858 | ND | | ND | | ND | | ND | |
| M4028 | 5 | Test Well Number 5 | | 12/26 0858 | 12/26 0858 | ND | | ND | | ND | | ND | |
| M4125 | 5 | Test Well Number 5 | | 12/30 0827 | 12/30 0827 | ND | | ND | | ND | | ND | |
| M4404 | 5 | Test Well Number 5 | | 1/2 0804 | 1/2 0804 | ND | | ND | | ND | | ND | |
| M4543 | 5 | Test Well Number 5 | | 1/9 0832 | 1/9 0832 | ND | | ND | | ND | | ND | |
| M4794 | 5 | Test Well Number 5 | | 1/16 0819 | 1/16 0819 | ND | | ND | | ND | | ND | |
| M4863 | 5 | Test Well Number 5 | | 1/23 0736 | 1/23 0736 | ND | | ND | | ND | | ND | |
| M4941 | 5 | Test Well Number 5 | | 1/30 0745 | 1/30 0745 | ND | | ND | | ND | | ND | |
| M5031 | 5 | Test Well Number 5 | | 2/6 0746 | 2/6 0746 | ND | | ND | | ND | | ND | |
| M5108 | 5 | Test Well Number 5 | | 2/13 0755 | 2/13 0755 | ND | | ND | | ND | | ND | |
| M5134 | 5 | Test Well Number 5 | | 2/20 0733 | 2/20 0733 | ND | | ND | | ND | | ND | |
| M5262 | 5 | Test Well Number 5 | | 2/26 0712 | 2/26 0712 | ND | | ND | | ND | | ND | |
| M5367 | 5 | Test Well Number 5 | | 3/6 0852 | 3/6 0852 | ND | | ND | | ND | | ND | |
| M5464 | 5 | Test Well Number 5 | | 3/13 0740 | 3/13 0740 | ND | | ND | | ND | | ND | |
| M5615 | 5 | Test Well Number 5 | | 3/19 0741 | 3/19 0741 | ND | | ND | | ND | | ND | |
| | 5 | Test Well Number 5 | | 3/27 0719 | 6/5 1209 | ns | | | | | | ND | |
| M7264 | 5 | Test Well Number 5 | | 6/5 1209 | 6/12 1445 | ND | | ND | | ND | | ND | |
| M7675 | 5 | Test Well Number 5 | | 6/12 1445 | 7/2 1212 | ND | | ND | | ND | | ND | |
| M3403 | 6 | Not assigned | | | | | | | | | | | |
| M3755 | 7 | Little Uchee Creek at 145 | | 12/6 1026 | 12/12 0830 | ND | | ND | | ND | | ND | |
| M3772 | 7 | Little Uchee Creek at 145 | | 12/12 0830 | 12/18 0711 | ND | | ND | | ND | | ND | |
| M3772D | 7 | Little Uchee Creek at 145 | | 12/18 0711 | 12/19 0725 | ND | | ND | | ND | | ND | |
| M3930 | 7 | Little Uchee Creek at 145 | | 12/19 0725 | 12/20 0657 | ND | | ND | | ND | | ND | |
| M3948 | 7 | Little Uchee Creek at 145 | | 12/20 0657 | 12/23 0741 | ND | | ND | | ND | | ND | |
| M4002 | 7 | Little Uchee Creek at 145 | | 12/23 0741 | 12/26 0733 | ND | | ND | | ND | | ND | |
| M4019 | 7 | Little Uchee Creek at 145 | | 12/26 0733 | 12/30 0705 | ND | | ND | | ND | | ND | |

3

Plaintiff
0000000000002252

f:\docs\coa\optika.xls
3/29/04

Underground Laboratory, Inc.    ● Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4116 | 7 | Little Uchee Creek at 145 | | 12/30 0705 | 1/2 0653 | ND | | ND | | ND | | ND | |
| M4395 | 7 | Little Uchee Creek at 145 | | 1/2 0653 | 1/9 0726 | ND | | ND | | ND | | ND | |
| M4534 | 7 | Little Uchee Creek at 145 | | 1/9 0726 | 1/16 0720 | ND | | ND | | ND | | ND | |
| M4786 | 7 | Little Uchee Creek at 145 | | 1/16 0720 | 1/23 0640 | ND | | ND | | ND | | ND | |
| M4854 | 7 | Little Uchee Creek at 145 | | 1/23 0640 | 1/30 0639 | ND | | ND | | ND | | ND | |
| M4932 | 7 | Little Uchee Creek at 145 | | 1/30 0639 | 2/6 0648 | ND | | ND | | ND | | ND | |
| | 7 | Little Uchee Creek at 145 | | 2/6 0648 | 2/13 0658 | wso | | | | | | ND | |
| M5099 | 7 | Little Uchee Creek at 145 | | 2/13 0658 | 2/20 0637 | ND | | ND | | ND | | ND | |
| M5127 | 7 | Little Uchee Creek at 145 | | 2/20 0637 | 2/26 0612 | ND | | ND | | ND | | ND | |
| M5253 | 7 | Little Uchee Creek at 145 | | 2/26 0612 | 3/6 0729 | ND | | ND | | ND | | ND | |
| M5361 | 7 | Little Uchee Creek at 145 | | 3/6 0729 | 3/13 0620 | ND | | ND | | ND | | ND | |
| M5455 | 7 | Little Uchee Creek at 145 | | 3/13 0620 | 3/19 0638 | ND | | ND | | ND | | ND | |
| M5608 | 7 | Little Uchee Creek at 145 | | 3/19 0638 | 3/27 0629 | ND | | ND | | ND | | ND | |
| | 7 | Little Uchee Creek at 145 | | 3/27 0629 | 6/5 1250 | ns | | | | | | ND | |
| M7255 | 7 | Little Uchee Creek at 145 | | 6/5 1250 | 6/12 1353 | ND | | ND | | ND | | ND | |
| | 7 | Little Uchee Creek at 145 | | 6/12 1353 | 7/2 1058 | wso | | | | | | ND | |
| M3402 | 8 | Gates Road at Section Corner | | 12/6 1012 | 12/12 0953 | ND | | ND | | ND | | ND | |
| M3763 | 8 | Gates Road at Section Corner | | 12/12 1000 | 12/18 0850 | ND | | ND | | ND | | ND | |
| M3779 | 8 | Gates Road at Section Corner | | 12/18 0850 | 12/19 0829 | ND | | ND | | ND | | ND | |
| M3937 | 8 | Gates Road at Section Corner | | 12/19 0829 | 12/20 0801 | ND | | ND | | ND | | ND | |
| M3955 | 8 | Gates Road at Section Corner | | 12/20 0801 | 12/23 0846 | ND | | ND | | ND | | ND | |
| M4009 | 8 | Gates Road at Section Corner | | 12/23 0846 | 12/26 0848 | ND | | ND | | ND | | ND | |
| M4027 | 8 | Gates Road at Section Corner | | 12/26 0848 | 12/30 0815 | ND | | ND | | ND | | ND | |
| M4124 | 8 | Gates Road at Section Corner | | 12/30 0815 | 1/2 0756 | ND | | ND | | ND | | ND | |
| M4403 | 8 | Gates Road at Section Corner | | 1/2 0756 | 1/9 0825 | ND | | ND | | ND | | ND | |
| M4542 | 8 | Gates Road at Section Corner | | 1/9 0825 | 1/16 0812 | ND | | ND | | ND | | ND | |
| M4793 | 8 | Gates Road at Section Corner | | 1/16 0812 | 1/23 0728 | ND | | ND | | ND | | ND | |
| M4862 | 8 | Gates Road at Section Corner | | 1/23 0728 | 1/30 0736 | ND | | ND | | ND | | ND | |
| M4939 | 8 | Gates Road at Section Corner | | 1/30 0736 | 2/6 0738 | ND | | ND | | ND | | ND | |
| M5030 | 8 | Gates Road at Section Corner | | 2/6 0738 | 2/13 0747 | ND | | ND | | ND | | ND | |
| M5107 | 8 | Gates Road at Section Corner | | 2/13 0747 | 2/20 0724 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 2/20 0724 | 2/26 0703 | wso | | | | | | ND | |
| M5261 | 8 | Gates Road at Section Corner | | 2/26 0703 | 3/6 0819 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 3/6 0819 | 3/13 0731 | wso | | | | | | ND | |
| M5463 | 8 | Gates Road at Section Corner | | 3/13 0731 | 3/19 0733 | ND | | ND | | ND | | ND | |
| M5614 | 8 | Gates Road at Section Corner | | 3/19 0733 | 3/27 0712 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 3/27 0712 | 6/5 1215 | ns | | | | | | ND | |
| M7263 | 8 | Gates Road at Section Corner | | 6/5 1215 | 6/12 1440 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 6/12 1440 | 7/2 1206 | wso | | | | | | ND | |
| M3401 | 9 | Gates Road at West Stream | | 12/6 0946 | 12/12 0945 | ND | | ND | | ND | | ND | |
| M3401D | 9 | Gates Road at West Stream | | 12/6 0946 | 12/12 0945 | ND | | ND | | ND | | ND | |
| M3762 | 9 | Gates Road at West Stream | | 12/12 0945 | 12/18 0839 | ND | | ND | | ND | | ND | |
| M3778 | 9 | Gates Road at West Stream | | 12/18 0839 | 12/19 0821 | ND | | ND | | ND | | ND | |

4

Plaintiff
0000000000002253

F:\docs\coa\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3936 | 9 | Gates Road at West Stream | | 12/19 0821 | 12/20 0754 | ND | | ND | | ND | | ND | |
| M3954 | 9 | Gates Road at West Stream | | 12/20 0754 | 12/23 0841 | ND | | ND | | ND | | ND | |
| M4008 | 9 | Gates Road at West Stream | | 12/23 0841 | 12/26 0841 | ND | | ND | | ND | | ND | |
| M4026 | 9 | Gates Road at West Stream | | 12/26 0841 | 12/30 0809 | ND | | ND | | ND | | ND | |
| M4123 | 9 | Gates Road at West Stream | | 12/30 0809 | 1/2 0750 | ND | | ND | | ND | | ND | |
| M4402 | 9 | Gates Road at West Stream | | 1/2 0750 | 1/9 0820 | ND | | ND | | ND | | ND | |
| M4541 | 9 | Gates Road at West Stream | | 1/9 0820 | 1/16 0807 | ND | | ND | | ND | | ND | |
| M4792 | 9 | Gates Road at West Stream | | 1/16 0807 | 1/23 0723 | ND | | ND | | ND | | ND | |
| M4861 | 9 | Gates Road at West Stream | | 1/23 0723 | 1/30 0731 | ND | | ND | | ND | | ND | |
| M4938 | 9 | Gates Road at West Stream | | 1/30 0731 | 2/6 0734 | ND | | ND | | ND | | ND | |
| M5029 | 9 | Gates Road at West Stream | | 2/6 0734 | 2/13 0742 | ND | | ND | | ND | | ND | |
| M5106 | 9 | Gates Road at West Stream | | 2/13 0742 | 2/20 0720 | ND | | ND | | ND | | ND | |
| M5133 | 9 | Gates Road at West Stream | | 2/20 0720 | 2/26 0659 | ND | | ND | | ND | | ND | |
| M5133D | 9 | Gates Road at West Stream | | 2/20 0720 | 2/26 0659 | ND | | ND | | ND | | ND | |
| M5259 | 9 | Gates Road at West Stream | | 2/26 0659 | 3/6 0815 | ND | | ND | | ND | | ND | |
| M5366 | 9 | Gates Road at West Stream | | 3/6 0815 | 3/13 0727 | ND | | ND | | ND | | ND | |
| M5462 | 9 | Gates Road at West Stream | | 3/13 0727 | 3/19 0729 | ND | | ND | | ND | | ND | |
| | 9 | Gates Road at West Stream | | 3/19 0729 | 3/27 0709 | wso | | | | | | ND | |
| | 9 | Gates Road at West Stream | | 3/27 0709 | 6/5 1219 | ns | | | | | | ND | |
| M7262 | 9 | Gates Road at West Stream | | 6/5 1219 | 6/12 1435 | wso | | ND | | ND | | ND | |
| | 9 | Gates Road at West Stream | | 6/12 1435 | 7/2 1200 | wso | | | | | | ND | |
| M3788 | 10 | Test Well at 166 | | 12/12 1018 | 12/17 1310 | ND | | ND | | 567.6 | 608 | ND | |
| M3761 | 10 | Test Well at 166 | | 12/17 1310 | 12/18 0828 | ND | | ND | | ND | | ND | |
| M3777 | 10 | Test Well at 166 | | 12/18 0828 | 12/19 0814 | ND | | ND | | ND | | ND | |
| M3935 | 10 | Test Well at 166 | | 12/19 0814 | 12/20 0748 | ND | | ND | | ND | | ND | |
| M3953 | 10 | Test Well at 166 | | 12/20 0748 | 12/23 0835 | ND | | ND | | ND | | ND | |
| M4007 | 10 | Test Well at 166 | | 12/23 0835 | 12/26 0834 | ND | | ND | | ND | | ND | |
| M4025 | 10 | Test Well at 166 | | 12/26 0834 | 12/30 0801 | ND | | ND | | ND | | ND | |
| M4122 | 10 | Test Well at 166 | | 12/30 0801 | 1/2 0743 | ND | | ND | | ND | | ND | |
| M4401 | 10 | Test Well at 166 | | 1/2 0743 | 1/9 0814 | ND | | ND | | ND | | ND | |
| M4539 | 10 | Test Well at 166 | | 1/9 0814 | 1/16 0801 | ND | | ND | | ND | | ND | |
| M4791 | 10 | Test Well at 166 | | 1/16 0801 | 1/23 0718 | ND | | ND | | ND | | ND | |
| M4859 | 10 | Test Well at 166 | | 1/23 0718 | 1/30 0725 | ND | | ND | | ND | | ND | |
| M4937 | 10 | Test Well at 166 | | 1/30 0725 | 2/6 0729 | ND | | ND | | ND | | ND | |
| M5028 | 10 | Test Well at 166 | | 2/6 0729 | 2/13 0736 | ND | | ND | | ND | | ND | |
| M5105 | 10 | Test Well at 166 | | 2/13 0736 | 2/20 0715 | ND | | ND | | ND | | ND | |
| M5132 | 10 | Test Well at 166 | | 2/20 0715 | 2/26 0651 | ND | | ND | | ND | | ND | |
| M5258 | 10 | Test Well at 166 | | 2/26 0651 | 3/6 0810 | ND | | ND | | ND | | ND | |
| M5365 | 10 | Test Well at 166 | | 3/6 0810 | 3/13 0721 | ND | | ND | | ND | | ND | |
| M5461 | 10 | Test Well at 166 | | 3/13 0721 | 3/19 0723 | ND | | ND | | ND | | ND | |
| M5613 | 10 | Test Well at 166 | | 3/19 0723 | 3/27 0703 | ND | | ND | | ND | | ND | |
| | 10 | Test Well at 166 | | 3/27 0703 | 6/5 1225 | ns | | | | | | ND | |
| M7261 | 10 | Test Well at 166 | | 6/5 1225 | 6/12 1428 | ND | | ND | | ND | | ND | |

5

f:\docs\coa\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.    Opelika, AL

Ground Water Investigation
Charcoal Results

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M7674 | 10 | Test Well at 166 | | 6/12 1428 | 7/2 1140 | ND | | ND | | ND | | ND | |
| M3399 | 11 | Quarry Discharge at 166 | | 12/5 0855 | 12/12 1004 | ND | | ND | | ND | | ND | |
| M3759 | 11 | Quarry Discharge at 166 | | 12/12 1004 | 12/18 0810 | ND | | ND | | ND | | ND | |
| M3759D | 11 | Quarry Discharge at 166 | | 12/12 1004 | 12/18 0810 | ND | | ND | | ND | | ND | |
| M3776 | 11 | Quarry Discharge at 166 | | 12/18 0810 | 12/19 0807 | ND | | ND | | 567.8 | 156 | ND | |
| M3776D | 11 | Quarry Discharge at 166 | | 12/18 0810 | 12/19 0807 | ND | | ND | | 567.6 | 91.6 | ND | |
| M3934 | 11 | Quarry Discharge at 166 | | 12/19 0807 | 12/20 0739 | ND | | ND | | 568.0 | 534 | ND | |
| M3934D | 11 | Quarry Discharge at 166 | | 12/19 0807 | 12/20 0739 | ND | | ND | | 568.2 | 413 | ND | |
| M3952 | 11 | Quarry Discharge at 166 | | 12/20 0739 | 12/23 0823 | ND | | ND | | 568.0 | 1,990 | ND | |
| M3952D | 11 | Quarry Discharge at 166 | | 12/20 0739 | 12/23 0823 | ND | | ND | | 568.0 | 2,380 | ND | |
| M4006 | 11 | Quarry Discharge at 166 | | 12/23 0823 | 12/26 0818 | ND | | ND | | 568.0 | 811 | ND | |
| M4006D | 11 | Quarry Discharge at 166 | | 12/23 0823 | 12/26 0818 | ND | | ND | | 567.9 | 742 | ND | |
| M4024 | 11 | Quarry Discharge at 166 | | 12/26 0818 | 12/30 0753 | ND | | ND | | 567.9 | 764 | ND | |
| M4024D | 11 | Quarry Discharge at 166 | | 12/26 0818 | 12/30 0753 | ND | | ND | | 568.3 | 612 | ND | |
| M4121 | 11 | Quarry Discharge at 166 | | 12/30 0753 | 1/2 0735 | ND | | ND | | 567.4 | 408 | ND | |
| M4121D | 11 | Quarry Discharge at 166 | | 12/30 0753 | 1/2 0735 | ND | | ND | | 567.8 | 607 | ND | |
| M4399 | 11 | Quarry Discharge at 166 | | 1/2 0735 | 1/9 0806 | ND | | ND | | 567.7 | 570 | ND | |
| M4399D | 11 | Quarry Discharge at 166 | | 1/2 0735 | 1/9 0806 | ND | | ND | | 567.4 | 475 | ND | |
| M4538 | 11 | Quarry Discharge at 166 | | 1/9 0806 | 1/16 0755 | ND | | ND | | 567.6 | 266 | ND | |
| M4538D | 11 | Quarry Discharge at 166 | | 1/9 0806 | 1/16 0755 | ND | | ND | | 567.4 | 216 | ND | |
| M4790 | 11 | Quarry Discharge at 166 | | 1/16 0755 | 1/23 0712 | ND | | ND | | 567.7 | 144 | ND | |
| M4790D | 11 | Quarry Discharge at 166 | | 1/16 0755 | 1/23 0712 | ND | | ND | | 567.7 | 142 | ND | |
| M4858 | 11 | Quarry Discharge at 166 | | 1/23 0712 | 1/30 0718 | ND | | ND | | 567.8 | 95.5 | ND | |
| M4858D | 11 | Quarry Discharge at 166 | | 1/23 0712 | 1/30 0718 | ND | | ND | | 567.7 | 81.7 | ND | |
| M4936 | 11 | Quarry Discharge at 166 | | 1/30 0718 | 2/6 0724 | ND | | ND | | 567.6 | 64.7 | ND | |
| M4936D | 11 | Quarry Discharge at 166 | | 1/30 0718 | 2/6 0724 | ND | | ND | | 567.6 | 33.9 | ND | |
| M5027 | 11 | Quarry Discharge at 166 | | 2/6 0724 | 2/13 0730 | ND | | ND | | 567.9 | 35.6 | ND | |
| M5027D | 11 | Quarry Discharge at 166 | | 2/6 0724 | 2/13 0730 | ND | | ND | | 567.7 | 26.1 | ND | |
| M5104 | 11 | Quarry Discharge at 166 | | 2/13 0730 | 2/20 0709 | ND | | ND | | 567.7 | 46.9 | ND | |
| M5104D | 11 | Quarry Discharge at 166 | | 2/13 0730 | 2/20 0709 | ND | | ND | | 567.9 | 44.1 | ND | |
| M5131 | 11 | Quarry Discharge at 166 | | 2/20 0709 | 2/26 0646 | ND | | ND | | 567.9 | 40.3 | ND | |
| M5257 | 11 | Quarry Discharge at 166 | | 2/26 0646 | 3/6 0804 | ND | | ND | | 568.1 | 51.1 | ND | |
| M5257D | 11 | Quarry Discharge at 166 | | 2/26 0646 | 3/6 0804 | ND | | ND | | 568.1 | 52.7 | ND | |
| | 11 | Quarry Discharge at 166 | | 3/6 0804 | 3/13 0709 | wso | | ns | | | | | |
| M5459 | 11 | Quarry Discharge at 166 | | 3/13 0709 | 3/19 0719 | ND | | ND | | 568.0 | 23.1 | ND | |
| M5459D | 11 | Quarry Discharge at 166 | | 3/13 0709 | 3/19 0719 | ND | | ND | | 568.3 | 17.9 | ND | |
| M5612 | 11 | Quarry Discharge at 166 | | 3/19 0719 | 3/27 0659 | ND | | ND | | 568.9 | 6.81 | ND | |
| M5612D | 11 | Quarry Discharge at 166 | | 3/19 0719 | 3/27 0659 | ND | | ND | | 568.3 | 8.68 | ND | |
| M7259 | 11 | Quarry Discharge at 166 | | 3/27 0659 | 6/5 1230 | ns | | 539.1 | 3.23 | 568.4 | 3.88 | ND | |
| M7259D | 11 | Quarry Discharge at 166 | | 6/5 1230 | 6/12 1425 | ND | | 539.2 | 5.62 | 566.8 | 5.38 | ND | |
| M7673 | 11 | Quarry Discharge at 166 | | 6/12 1425 | 7/2 1136 | ND | | 539.1 | 9.09 | 567.5 | 7.35 | ND | |
| M7673D | 11 | Quarry Discharge at 166 | | 6/12 1425 | 7/2 1136 | ND | | 539.2 | 16.2 | 566.8 | 11.2 | ND | |

6

Plaintiff
0000000000002255

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M8612 | 11 | Quarry Discharge at 166 | | 7/2 1136 | 8/28 0640 | ND | | 539.4 | 8.24 | 568.3 | 11.9 | ND | |
| M8612D | 11 | Quarry Discharge at 166 | | 7/2 1136 | 8/28 0640 | ND | | 539.7 | 7.80 | 566.8 | 9.78 | ND | |
| M8851 | 11 | Quarry Discharge at 166 | | 8/28 0640 | 9/4 0654 | ND | | 538.8 | 5.13 | ND | | ND | |
| M8851D | 11 | Quarry Discharge at 166 | | 8/28 0640 | 9/4 0654 | ND | | 539.0 | 5.48 | ND | | ND | |
| M8928 | 11 | Quarry Discharge at 166 | | 9/4 0654 | 9/9 0652 | ND | | 539.3 | 12.4 | ND | | ND | |
| M8928D | 11 | Quarry Discharge at 166 | | 9/4 0654 | 9/9 0652 | ND | | 539.1 | 7.93 | ND | | ND | |
| M9133 | 11 | Quarry Discharge at 166 | | 9/9 0652 | 9/16 0824 | ND | | 538.9 | 11.0 | ND | | ND | |
| M9133D | 11 | Quarry Discharge at 166 | | 9/9 0652 | 9/16 0824 | ND | | 539.1 | 4.27 | ND | | ND | |
| M9207 | 11 | Quarry Discharge at 166 | | 9/16 0824 | 9/24 1114 | ND | | 539.2 | 7.05 | ND | | ND | |
| M9207D | 11 | Quarry Discharge at 166 | | 9/16 0824 | 9/24 1114 | ND | | 539.1 | 6.83 | ND | | ND | |
| M9343 | 11 | Quarry Discharge at 166 | | 9/24 1114 | 10/1 0801 | ND | | 539.1 | 8.45 | ND | | ND | |
| M9343D | 11 | Quarry Discharge at 166 | | 9/24 1114 | 10/1 0801 | ND | | 539.1 | 5.43 | ND | | ND | |
| M9454 | 11 | Quarry Discharge at 166 | | 10/1 0801 | 10/8 1303 | ND | | 539.1 | 8.57 | ND | | ND | |
| M9454D | 11 | Quarry Discharge at 166 | | 10/1 0801 | 10/8 1303 | ND | | 539.0 | 11.6 | ND | | ND | |
| M9617 | 11 | Quarry Discharge at 166 | | 10/8 1303 | 10/15 1354 | ND | | 539.0 | 4.32 | ND | | ND | |
| M9617D | 11 | Quarry Discharge at 166 | | 10/8 1303 | 10/15 1354 | ND | | 539.1 | 5.27 | ND | | ND | |
| M9731 | 11 | Quarry Discharge at 166 | | 10/15 1354 | 10/22 1000 | ND | | 539.2 | 3.12 | ND | | ND | |
| M9731D | 11 | Quarry Discharge at 166 | | 10/15 1354 | 10/22 1000 | ND | | 539.6 | 1.63 | ND | | ND | |
| M9817 | 11 | Quarry Discharge at 166 | | 10/22 1000 | 10/29 0954 | ND | | 539.5 | 6.99 | ND | | ND | |
| M9817D | 11 | Quarry Discharge at 166 | | 10/22 1000 | 10/29 0954 | ND | | 539.1 | 8.10 | ND | | ND | |
| N0615 | 11 | Quarry Discharge at 166 | | 10/29 0954 | 11/12 1223 | wso | | 539.6 | 9.51 | ND | | ND | |
| N0615D | 11 | Quarry Discharge at 166 | | 11/12 1223 | 12/17 1120 | ND | | 539.2 | 11.1 | ND | | ND | |
| N0985 | 11 | Quarry Discharge at 166 | | 11/12 1223 | 12/17 1120 | ND | | 539.3 | 9.85 | ND | | ND | |
| N0985D | 11 | Quarry Discharge at 166 | | 12/17 1120 | 1/6 1404 | ND | | 539.5 | 10.7 | ND | | ND | |
| N1735 | 11 | Quarry Discharge at 166 | | 12/17 1120 | 1/6 1404 | ND | | 539.1 | 13.7 | ND | | ND | |
| N1735D | 11 | Quarry Discharge at 166 | | 1/6 1404 | 3/8 1119 | ND | | 539.2 | 16.8 | ND | | ND | |
| N1923 | 11 | Quarry Discharge at 166 | | 1/6 1404 | 3/8 1119 | ND | | 539.2 | 12.8 | ND | | ND | |
| N1923D | 11 | Quarry Discharge at 166 | | 3/8 1119 | 3/23 1408 | ND | | 539.3 | 11.6 | ND | | ND | |
| M3410 | 12 | Quarry Discharge at Parkers | | 12/10 1001 | 12/12 0921 | ND | | ND | | ND | | ND | |
| M3758 | 12 | Quarry Discharge at Parkers | | 12/12 0921 | 12/18 0759 | ND | | ND | | ND | | ND | |
| M3775 | 12 | Quarry Discharge at Parkers | | 12/18 0759 | 12/19 0758 | ND | | ND | | 567.9 | 46.6 | ND | |
| M3933 | 12 | Quarry Discharge at Parkers | | 12/19 0758 | 12/20 0732 | ND | | ND | | 568.0 | 338 | ND | |
| M3951 | 12 | Quarry Discharge at Parkers | | 12/20 0732 | 12/23 0815 | ND | | ND | | 568.2 | 1,020 | ND | |
| M4005 | 12 | Quarry Discharge at Parkers | | 12/20 0732 | 12/23 0815 | ND | | ND | | 568.0 | 304 | ND | |
| M4023 | 12 | Quarry Discharge at Parkers | | 12/26 0810 | 12/26 0810 | ND | | ND | | 567.9 | 385 | ND | |
| M4119 | 12 | Quarry Discharge at Parkers | | 12/30 0746 | 12/30 0746 | ND | | ND | | 567.9 | 171 | ND | |
| M4398 | 12 | Quarry Discharge at Parkers | | 1/2 0728 | 1/2 0728 | ND | | ND | | 567.9 | 179 | ND | |
| M4537 | 12 | Quarry Discharge at Parkers | | 1/9 0759 | 1/9 0759 | ND | | ND | | 567.6 | 98.4 | ND | |
| M4789 | 12 | Quarry Discharge at Parkers | | 1/16 0749 | 1/16 0749 | ND | | ND | | 567.5 | 59.7 | ND | |
| M4857 | 12 | Quarry Discharge at Parkers | | 1/23 0707 | 1/23 0707 | ND | | ND | | 567.7 | 46.5 | ND | |
| M4935 | 12 | Quarry Discharge at Parkers | | 1/30 0712 | 1/30 0712 | ND | | ND | | 567.5 | 28.1 | ND | |
| M5026 | 12 | Quarry Discharge at Parkers | | 2/6 0719 | 2/13 0725 | ND | | ND | | 568.1 | 10.7 | ND | |

f:\docs\xls\opelika.xls
3/29/04

Plaintiff
0000000000002256

Opelika, AL

Ozark Underground Laboratory, Inc.

Groundwater Investigation
Charcoal Results

2313

8

Plaintiff
00000000002257

| OUL Lab # | OUL Station # | Station Name | Samples by Envers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc ppb | Eosine Peak nm | Eosine Conc ppb | RWT Peak nm | RWT Conc ppb | SRB Peak nm | SRB Conc ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M5103 | 12 | Quarry Discharge at Parkers | | 2/13 0725 | 2/20 0705 | ND | | ND | | 567.8 | 16.3 | ND | |
| M5130 | 12 | Quarry Discharge at Parkers | | 2/20 0705 | 2/26 0640 | ND | | ND | | 567.7 | 7.65 | ND | |
| M5256 | 12 | Quarry Discharge at Parkers | | 2/26 0640 | 3/6 0759 | ND | | ND | | 567.8 | 9.24 | ND | |
| M5364 | 12 | Quarry Discharge at Parkers | | 3/6 0759 | 3/13 0702 | ND | | ND | | 568.1 | 12.4 | ND | |
| M5364D | 12 | Quarry Discharge at Parkers | | 3/6 0759 | 3/13 0702 | ND | | ND | | 568.1 | 14.3 | ND | |
| M5458 | 12 | Quarry Discharge at Parkers | | 3/13 0702 | 3/19 0711 | ND | | ND | | 568.6 | 10.1 | ND | |
| M5611 | 12 | Quarry Discharge at Parkers | | 3/19 0711 | 3/27 0655 | ns | | ND | | 568.5 | 7.06 | ND | |
| M7258 | 12 | Quarry Discharge at Parkers | | 3/27 0655 | 6/5 1235 | ns | | | | | | ND | |
| M7258 | 12 | Quarry Discharge at Parkers | | 6/5 1235 | 6/12 1418 | ND | | 538.6 | 4.82 | 566.6 | 7.71 | ND | |
| M7258D | 12 | Quarry Discharge at Parkers | | 6/5 1235 | 6/12 1418 | ND | | 537.6 | 2.78 | 568.4 | 4.15 | ND | |
| | 12 | Quarry Discharge at Parkers | | 6/12 1418 | 7/2 1126 | wso | | | | | | ND | |
| | 12 | Quarry Discharge at Parkers | | NDT | 8/28 | ns | | | | | | ND | |
| M8852 | 12 | Quarry Discharge at Parkers | | 9/4 0839 | 9/4 0839 | ND | | ND | | ND | | ND | |
| M8929 | 12 | Quarry Discharge at Parkers | | 9/4 0839 | 9/9 0647 | ND | | ND | | ND | | ND | |
| M8929D | 12 | Quarry Discharge at Parkers | | 9/9 0647 | 9/9 0647 | ND | | ND | | ND | | ND | |
| M9132 | 12 | Quarry Discharge at Parkers | | 9/9 0647 | 9/16 0819 | ND | | 539.4 | 3.87 | ND | | ND | |
| M9132D | 12 | Quarry Discharge at Parkers | | 9/16 0819 | 9/24 1109 | wso | | 539.1 | 4.01 | ND | | ND | |
| M9342 | 12 | Quarry Discharge at Parkers | | 9/24 1109 | 9/24 1109 | ND | | 539.6 | 1.89 | ND | | ND | |
| M9342D | 12 | Quarry Discharge at Parkers | | 9/24 1109 | 10/1 0756 | ND | | 539.1 | 1.95 | ND | | ND | |
| M9453 | 12 | Quarry Discharge at Parkers | | 10/1 0756 | 10/1 0756 | ND | | 539.1 | 3.21 | ND | | ND | |
| M9453D | 12 | Quarry Discharge at Parkers | | 10/1 0756 | 10/8 1358 | ND | | 539.1 | 3.26 | ND | | ND | |
| M9616 | 12 | Quarry Discharge at Parkers | | 10/8 1358 | 10/8 1358 | ND | | 538.3 | 1.67 | ND | | ND | |
| M9616D | 12 | Quarry Discharge at Parkers | | 10/8 1358 | 10/15 1348 | ND | | 538.3 | 2.56 | ND | | ND | |
| M9730 | 12 | Quarry Discharge at Parkers | | 10/15 1348 | 10/15 1348 | ND | | 538.1 | 1.14 | ND | | ND | |
| M9730D | 12 | Quarry Discharge at Parkers | | 10/15 1348 | 10/22 0953 | ND | | 538.5 | 1.14 | ND | | ND | |
| M9816 | 12 | Quarry Discharge at Parkers | | 10/22 0953 | 10/22 0953 | ND | | 538.3 | 1.14 | ND | | ND | |
| M9816D | 12 | Quarry Discharge at Parkers | | 10/22 0953 | 10/29 0951 | ND | | 538.2 | 1.38 | ND | | ND | |
| N0117 | 12 | Quarry Discharge at Parkers | | 10/29 0951 | 10/29 0951 | ND | | 538.4 | 2.97 | ND | | ND | |
| N0117D | 12 | Quarry Discharge at Parkers | | 10/29 0951 | 11/12 1216 | ND | | 539.3 | 4.42 | ND | | ND | |
| N0614 | 12 | Quarry Discharge at Parkers | | 11/12 1216 | 11/12 1216 | ND | | 539.1 | 4.27 | ND | | ND | |
| N0614D | 12 | Quarry Discharge at Parkers | | 11/12 1216 | 12/17 1113 | ND | | 539.1 | 4.62 | ND | | ND | |
| N0984 | 12 | Quarry Discharge at Parkers | | 12/17 1113 | 12/17 1113 | ND | | 539.0 | 5.90 | ND | | ND | |
| N0984D | 12 | Quarry Discharge at Parkers | | 12/17 1113 | 1/6 1400 | ND | | 539.3 | 3.40 | ND | | ND | |
| N1922 | 12 | Quarry Discharge at Parkers | | 1/6 1400 | 1/6 1400 | wso | | 539.0 | 3.76 | ND | | ND | |
| N1922D | 12 | Quarry Discharge at Parkers | | 3/8 1116 | 3/8 1116 | ND | | 539.1 | 6.60 | ND | | ND | |
| M3405 | 13 | Creek at 146 | | 12/6 1100 | 3/23 1400 | ND | | 539.3 | 7.53 | ND | | ND | |
| M3756 | 13 | Creek at 146 | | 12/12 0857 | 12/12 0857 | ND | | ND | | ND | | ND | |
| M3773 | 13 | Creek at 146 | | 12/18 0729 | 12/18 0729 | ND | | ND | | ND | | ND | |
| M3931 | 13 | Creek at 146 | | 12/19 0738 | 12/19 0738 | ND | | ND | | 568.8 | 5.72 | ND | |
| M3949 | 13 | Creek at 146 | | 12/20 0711 | 12/20 0711 | ND | | ND | | 567.9 | 60.0 | ND | |
| M4003 | 13 | Creek at 146 | | 12/23 0756 | 12/26 0747 | ND | | ND | | 568.0 | 13.8 | ND | |

2314

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4021 | 13 | Creek at 146 | | 12/26 0747 | 12/30 0724 | ND | | ND | | 568.2 | 10.9 | ND | |
| M4117 | 13 | Creek at 146 | | 12/30 0724 | 1/2 0706 | ND | | ND | | ND | | ND | |
| M4117D | 13 | Creek at 146 | | 12/30 0724 | 1/2 0706 | ND | | ND | | 567.2 | 25.8 | ND | |
| M4117V | 13 | Creek at 146 | | 12/30 0724 | 1/2 0706 | ND | | ND | | ND | | ND | |
| M4396 | 13 | Creek at 146 | | 1/2 0706 | 1/9 0740 | ND | | ND | | 567.7 | 40.1 | ND | |
| M4535 | 13 | Creek at 146 | | 1/9 0740 | 1/16 0732 | ND | | ND | | 567.8 | 31.1 | ND | |
| M4787 | 13 | Creek at 146 | | 1/16 0732 | 1/23 0652 | ND | | ND | | 567.7 | 22.9 | ND | |
| M4855 | 13 | Creek at 146 | | 1/23 0652 | 1/30 0653 | ND | | ND | | 568.2 | 5.71 | ND | |
| M4933 | 13 | Creek at 146 | | 1/30 0653 | 2/6 0702 | ND | | ND | | ND | | ND | |
| M5024 | 13 | Creek at 146 | | 2/6 0702 | 2/13 0710 | ND | | ND | | ND | | ND | |
| M5101 | 13 | Creek at 146 | | 2/13 0710 | 2/20 0648 | ND | | ND | | 567.4 | 4.10 | ND | |
| M5128 | 13 | Creek at 146 | | 2/20 0648 | 2/26 0625 | ND | | ND | | 567.0 | 4.04 | ND | |
| M5234 | 13 | Creek at 146 | | 2/26 0625 | 3/6 0739 | ND | | ND | | ND | | ND | |
| M5362 | 13 | Creek at 146 | | 3/6 0739 | 3/13 0646 | ND | | ND | | 567.5 | 5.18 | ND | |
| M5456 | 13 | Creek at 146 | | 3/13 0646 | 3/19 0651 | ND | | ND | | ND | | ND | |
| M5609 | 13 | Creek at 146 | | 3/19 0651 | 3/27 0639 | ND | | ND | | ND | | ND | |
| | 13 | Creek at 146 | | 3/27 0639 | 6/5 1242 | ns | | | | | | ND | |
| M7256 | 13 | Creek at 146 | | 6/5 1242 | 6/12 1406 | ND | | ND | | ND | | ND | |
| M7672 | 13 | Creek at 146 | | 6/12 1406 | 7/2 1110 | ND | | ND | | ND | | ND | |
| | 14 | Beauregard Well Number 4 | | | | Only water samples collected at this site | | | | | | | |
| M3406 | 15 | Chewacala Creek near Pipeline | | 12/6 1124 | 12/12 0913 | ND | | ND | | ND | | ND | |
| M3757 | 15 | Chewacala Creek near Pipeline | | 12/12 0913 | 12/18 0748 | ND | | ND | | ND | | ND | |
| M3774 | 15 | Chewacala Creek near Pipeline | | 12/18 0748 | 12/19 0751 | ND | | ND | | ND | | ND | |
| M3932 | 15 | Chewacala Creek near Pipeline | | 12/19 0751 | 12/20 0724 | ND | | ND | | ND | | ND | |
| M3950 | 15 | Chewacala Creek near Pipeline | | 12/20 0724 | 12/23 0807 | ND | | ND | | ND | | ND | |
| M4004 | 15 | Chewacala Creek near Pipeline | | 12/23 0807 | 12/26 0801 | ND | | ND | | ND | | ND | |
| M4022 | 15 | Chewacala Creek near Pipeline | | 12/26 0801 | 12/30 0736 | ND | | ND | | ND | | ND | |
| M4118 | 15 | Chewacala Creek near Pipeline | | 12/30 0736 | 1/2 0719 | ND | | ND | | ND | | ND | |
| M4397 | 15 | Chewacala Creek near Pipeline | | 1/2 0719 | 1/9 0752 | ND | | ND | | ND | | ND | |
| M4536 | 15 | Chewacala Creek near Pipeline | | 1/9 0752 | 1/16 0742 | ND | | ND | | ND | | ND | |
| M4788 | 15 | Chewacala Creek near Pipeline | | 1/16 0742 | 1/23 0702 | ND | | ND | | ND | | ND | |
| M4856 | 15 | Chewacala Creek near Pipeline | | 1/23 0702 | 1/30 0706 | ND | | ND | | ND | | ND | |
| M4934 | 15 | Chewacala Creek near Pipeline | | 1/30 0706 | 2/6 0713 | ND | | ND | | ND | | ND | |
| M5025 | 15 | Chewacala Creek near Pipeline | | 2/6 0713 | 2/13 0719 | ND | | ND | | ND | | ND | |
| M5102 | 15 | Chewacala Creek near Pipeline | | 2/13 0719 | 2/20 0658 | ND | | ND | | ND | | ND | |
| M5129 | 15 | Chewacala Creek near Pipeline | | 2/20 0658 | 2/26 0635 | ND | | ND | | ND | | ND | |
| M5255 | 15 | Chewacala Creek near Pipeline | | 2/26 0635 | 3/6 0752 | ND | | ND | | ND | | ND | |
| M5363 | 15 | Chewacala Creek near Pipeline | | 3/6 0752 | 3/13 0656 | ND | | ND | | ND | | ND | |
| M5457 | 15 | Chewacala Creek near Pipeline | | 3/13 0656 | 3/19 0702 | ND | | ND | | ND | | ND | |
| M5610 | 15 | Chewacala Creek near Pipeline | | 3/19 0702 | 3/27 0649 | ND | | ND | | ND | | ND | |
| | 15 | Chewacala Creek near Pipeline | | 3/27 0649 | 6/5 1240 | ns | | | | | | ND | |
| M7257 | 15 | Chewacala Creek near Pipeline | | 6/5 1240 | 6/12 1413 | ND | | ND | | ND | | ND | |
| | 15 | Chewacala Creek near Pipeline | | 6/12 1413 | 7/2 1119 | wso | | | | | | | |

Plaintiff
00000000000002258

f:\docs\coa\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**

**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3404 | 16 | Trib to Lee County Lake | | 12/6 1045 | 12/12 0842 | ND | | ND | | ND | | ND | |
| M3754 | 16 | Trib to Lee County Lake | | 12/12 0842 | 12/18 0653 | ND | | ND | | ND | | ND | |
| M3771 | 16 | Trib to Lee County Lake | | 12/18 0653 | 12/19 0715 | ND | | ND | | ND | | ND | |
| M3929 | 16 | Trib to Lee County Lake | | 12/19 0715 | 12/20 0646 | ND | | ND | | ND | | ND | |
| M3947 | 16 | Trib to Lee County Lake | | 12/20 0646 | 12/23 0731 | ND | | ND | | ND | | ND | |
| M4001 | 16 | Trib to Lee County Lake | | 12/23 0731 | 12/26 0722 | ND | | ND | | ND | | ND | |
| M4018 | 16 | Trib to Lee County Lake | | 12/26 0722 | 12/30 0653 | ND | | ND | | ND | | ND | |
| M4115 | 16 | Trib to Lee County Lake | | 12/30 0653 | 1/2 0643 | ND | | ND | | ND | | ND | |
| M4394 | 16 | Trib to Lee County Lake | | 1/2 0643 | 1/9 0711 | ND | | ND | | ND | | ND | |
| M4533 | 16 | Trib to Lee County Lake | | 1/9 0711 | 1/16 0707 | ND | | ND | | ND | | ND | |
| M4785 | 16 | Trib to Lee County Lake | | 1/16 0707 | 1/23 0630 | ND | | ND | | ND | | ND | |
| M4853 | 16 | Trib to Lee County Lake | | 1/23 0630 | 1/30 0629 | ND | | ND | | ND | | ND | |
| M4931 | 16 | Trib to Lee County Lake | | 1/30 0629 | 2/6 0638 | ND | | ND | | | | ND | |
| M5023 | 16 | Trib to Lee County Lake | | 2/6 0638 | 2/13 0648 | ND | | ND | | | | ND | |
| M5098 | 16 | Trib to Lee County Lake | | 2/13 0648 | 2/20 0629 | ND | | ND | | | | ND | |
| M5126 | 16 | Trib to Lee County Lake | | 2/20 0629 | 2/26 0604 | ND | | ND | | | | ND | |
| M5252 | 16 | Trib to Lee County Lake | | 2/26 0604 | 3/6 0718 | ND | | ND | | | | ND | |
| M5359 | 16 | Trib to Lee County Lake | | 3/6 0718 | 3/13 0620 | ND | | ND | | | | ND | |
| M5454 | 16 | Trib to Lee County Lake | | 3/13 0620 | 3/19 0629 | ND | | ND | | | | ND | |
| | 16 | Trib to Lee County Lake | | 3/19 0629 | 3/27 0621 | wso | | | | | | ND | |
| M7234 | 16 | Trib to Lee County Lake | | 6/5 1300 | 6/5 1300 | ns | | | | | | ND | |
| | 16 | Trib to Lee County Lake | | 6/5 1300 | 6/12 1345 | ND | | ND | | ND | | ND | |
| | 16 | Trib to Lee County Lake | | 6/12 1345 | 7/2 1052 | wso | | | | | | ND | |
| M3764 | 17 | Little Uchee Upstream from Sink | | 12/17 0819 | 12/18 0903 | ND | | ND | | ND | | ND | |
| M3781 | 17 | Little Uchee Upstream from Sink | | 12/18 0903 | 12/19 0843 | ND | | ND | | ND | | ND | |
| M3938 | 17 | Little Uchee Upstream from Sink | | 12/19 0843 | 12/20 0816 | ND | | ND | | ND | | ND | |
| M3957 | 17 | Little Uchee Upstream from Sink | | 12/20 0816 | 12/23 0904 | ND | | ND | | ND | | ND | |
| M4011 | 17 | Little Uchee Upstream from Sink | | 12/23 0904 | 12/26 0905 | ND | | ND | | ND | | ND | |
| M4029 | 17 | Little Uchee Upstream from Sink | | 12/26 0905 | 12/30 0832 | ND | | ND | | ND | | ND | |
| M4126 | 17 | Little Uchee Upstream from Sink | | 12/30 0832 | 1/2 0812 | ND | | ND | | ND | | ND | |
| M4405 | 17 | Little Uchee Upstream from Sink | | 1/2 0812 | 1/9 0840 | ND | | ND | | ND | | ND | |
| M4544 | 17 | Little Uchee Upstream from Sink | | 1/9 0840 | 1/16 0824 | ND | | ND | | ND | | ND | |
| M4795 | 17 | Little Uchee Upstream from Sink | | 1/16 0824 | 1/23 0741 | ND | | ND | | ND | | ND | |
| M4864 | 17 | Little Uchee Upstream from Sink | | 1/23 0741 | 1/30 0753 | ND | | ND | | ND | | ND | |
| M4942 | 17 | Little Uchee Upstream from Sink | | 1/30 0753 | 2/6 0751 | ND | | ND | | ND | | ND | |
| M5032 | 17 | Little Uchee Upstream from Sink | | 2/6 0751 | 2/13 0759 | ND | | ND | | ND | | ND | |
| M5109 | 17 | Little Uchee Upstream from Sink | | 2/13 0759 | 2/20 0738 | ND | | ND | | ND | | ND | |
| M5263 | 17 | Little Uchee Upstream from Sink | | 2/20 0738 | 2/26 0718 | wso | | | | | | ND | |
| M5368 | 17 | Little Uchee Upstream from Sink | | 2/26 0718 | 3/6 0900 | ND | | ND | | ND | | ND | |
| M5465 | 17 | Little Uchee Upstream from Sink | | 3/6 0900 | 3/13 0746 | ND | | ND | | ND | | ND | |
| M5616 | 17 | Little Uchee Upstream from Sink | | 3/13 0746 | 3/19 0747 | ND | | ND | | ND | | ND | |
| | 17 | Little Uchee Upstream from Sink | | 3/19 0747 | 3/27 0723 | ND | | ND | | ND | | ND | |
| | 17 | Little Uchee Upstream from Sink | | 3/27 0723 | 6/5 1130 | ns | | | | | | ND | |

Plaintiff
00000000002259

f:\docs\coa\opelika.xls
3/29/04

2316



Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M7265 | 17 | Little Uchee Upstream from Sink | | 6/5 1130 | 6/12 1502 | ND | | | | | | ND | |
| | 17 | Little Uchee Upstream from Sink | | 6/12 1502 | 7/2 1224 | wso | | | | | | ND | |
| M8613 | 17 | Little Uchee Upstream from Sink | Ewers | NDT | 8/27 1057 | ND | | ND | | | | ND | |
| M8849 | 17 | Little Uchee Upstream from Sink | Ewers | 8/27 1057 | 9/3 0710 | ND | | ND | | ND | | ND | |
| M8926 | 17 | Little Uchee Upstream from Sink | Ewers | 9/3 0710 | 9/10 0736 | ND | | ND | | ND | | ND | |
| M9130 | 17 | Little Uchee Upstream from Sink | Ewers | 9/10 0736 | 9/16 0748 | ND | | ND | | ND | | ND | |
| M9205 | 17 | Little Uchee Upstream from Sink | Ewers | 9/16 0748 | 9/24 1034 | ND | | ND | | ND | | ND | |
| M9339 | 17 | Little Uchee Upstream from Sink | Ewers | 9/24 1034 | 10/1 0727 | ND | | ND | | ND | | ND | |
| M9451 | 17 | Little Uchee Upstream from Sink | Ewers | 10/1 0727 | 10/8 1330 | ND | | ND | | ND | | ND | |
| M9611 | 17 | Little Uchee Upstream from Sink | Ewers | 10/8 1330 | 10/15 1316 | ND | | ND | | ND | | ND | |
| M9725 | 17 | Little Uchee Upstream from Sink | Ewers | 10/15 1316 | 10/22 1315 | ND | | ND | | ND | | ND | |
| M9811 | 17 | Little Uchee Upstream from Sink | Ewers | 10/22 1315 | 10/29 1017 | ND | | ND | | ND | | ND | |
| N0112 | 17 | Little Uchee Upstream from Sink | Ewers | 10/29 1017 | 11/12 1302 | ND | | ND | | | | ND | |
| N0987 | 17 | Little Uchee Upstream from Sink | Ewers | 11/12 1302 | 12/17 NT | ns | | | | | | ND | |
| | 17 | Little Uchee Upstream from Sink | | 12/17 NT | 1/7 0623 | ND | | ND | | ND | | ND | |
| N1925 | 17 | Little Uchee Upstream from Sink | Ewers | 1/7 0623 | 3/8 | ns | | | | | | ND | |
| M3766 | 18 | Test Well #1 at Spring | | NDT | 3/23 1317 | ND | | ND | | ND | | ND | |
| M3783 | 18 | Test Well #1 at Spring | | 12/17 1345 | 12/18 0939 | ND | | ND | | ND | | ND | |
| M3941 | 18 | Test Well #1 at Spring | | 12/18 0939 | 12/19 0909 | ND | | ND | | ND | | ND | |
| M3959 | 18 | Test Well #1 at Spring | | 12/19 0909 | 12/20 0840 | ND | | ND | | ND | | ND | |
| M4013 | 18 | Test Well #1 at Spring | | 12/20 0840 | 12/23 0930 | ND | | ND | | ND | | ND | |
| M4031 | 18 | Test Well #1 at Spring | | 12/23 0930 | 12/26 0935 | ND | | ND | | ND | | ND | |
| M4128 | 18 | Test Well #1 at Spring | | 12/26 0935 | 12/30 0902 | ND | | ND | | ND | | ND | |
| M4407 | 18 | Test Well #1 at Spring | | 12/30 0902 | 1/2 0840 | ND | | ND | | ND | | ND | |
| M4546 | 18 | Test Well #1 at Spring | | 1/2 0840 | 1/9 0905 | ND | | ND | | ND | | ND | |
| M4797 | 18 | Test Well #1 at Spring | | 1/9 0905 | 1/16 0849 | ND | | ND | | ND | | ND | |
| M4866 | 18 | Test Well #1 at Spring | | 1/16 0849 | 1/23 0801 | ND | | ND | | ND | | ND | |
| M4944 | 18 | Test Well #1 at Spring | | 1/23 0801 | 1/30 0823 | ND | | ND | | ND | | ND | |
| M5034 | 18 | Test Well #1 at Spring | | 1/30 0823 | 2/6 0810 | ND | | ND | | ND | | ND | |
| M5111 | 18 | Test Well #1 at Spring | | 2/6 0810 | 2/13 0830 | ND | | ND | | ND | | ND | |
| M5136 | 18 | Test Well #1 at Spring | | 2/13 0830 | 2/20 0756 | ND | | ND | | ND | | ND | |
| M5265 | 18 | Test Well #1 at Spring | | 2/20 0756 | 2/26 0738 | ND | | ND | | ND | | ND | |
| M5370 | 18 | Test Well #1 at Spring | | 2/26 0738 | 3/6 0913 | ND | | ND | | ND | | ND | |
| M5467 | 18 | Test Well #1 at Spring | | 3/6 0913 | 3/13 0803 | ND | | ND | | ND | | ND | |
| M5618 | 18 | Test Well #1 at Spring | | 3/13 0803 | 3/19 0805 | ND | | ND | | ND | | ND | |
| | 18 | Test Well #1 at Spring | | 3/19 0805 | 3/27 0739 | ND | | ND | | ND | | ND | |
| M7267 | 18 | Test Well #1 at Spring | | 3/27 0739 | 6/5 1140 | ND | | ND | | ND | | ND | |
| M7676 | 18 | Test Well #1 at Spring | | 6/5 1140 | 6/12 1528 | ND | | ND | | ND | | ND | |
| M8610 | 18 | Test Well #1 at Spring | | 6/12 1528 | 7/2 1232 | ns | | | | | | ND | |
| M8848 | 18 | Test Well #1 at Spring | Ewers | NDT | 8/27 1046 | ND | | ND | | ND | | ND | |
| M8924 | 18 | Test Well #1 at Spring | Ewers | 8/27 1046 | 9/3 0658 | ND | | ND | | ND | | ND | |
| M9128 | 18 | Test Well #1 at Spring | Ewers | 9/10 0725 | 9/16 0724 | ND | | ND | | ND | | ND | |

11

Plaintiff
0000000000002260

f:\docs\ooa\opelika.xls
3/29/04

2317

Opelika, AL

Ozark Underground Laboratory, Inc.

## Groundwater Investigation
## Charcoal Results

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M9203 | 18 | Test Well #1 at Spring | Ewers | 9/16 0724 | 9/24 1015 | ND | | ND | | ND | | ND | |
| M9336 | 18 | Test Well #1 at Spring | Ewers | 9/24 1015 | 10/1 0710 | ND | | ND | | ND | | ND | |
| M9449 | 18 | Test Well #1 at Spring | Ewers | 10/1 0710 | 10/8 1313 | ND | | ND | | ND | | ND | |
| M9613 | 18 | Test Well #1 at Spring | Ewers | 10/8 1313 | 10/15 1330 | ND | | ND | | ND | | ND | |
| M9727 | 18 | Test Well #1 at Spring | Ewers | 10/15 1330 | 10/22 1326 | ND | | ND | | ND | | ND | |
| M9813 | 18 | Test Well #1 at Spring | Ewers | 10/22 1326 | 10/29 1027 | ND | | ND | | ND | | ND | |
| N0114 | 18 | Test Well #1 at Spring | Ewers | 10/29 1027 | NDT | ND | | ND | | ND | | ND | |
| N0444 | 18 | Test Well #1 at Spring | Ewers | NDT | 11/12 1309 | ND | | ND | | ND | | ND | |
| N0618 | 18 | Test Well #1 at Spring | Ewers | NDT | 11/26 1040 | ND | | ND | | ND | | ND | |
| N0989 | 18 | Test Well #1 at Spring | Ewers | NDT | 12/17 1200 | ND | | ND | | ND | | ND | |
| N1737 | 18 | Test Well #1 at Spring | Ewers | 12/17 1156 | 1/7 0643 | ND | | ND | | ND | | ND | |
| N1927 | 18 | Test Well #1 at Spring | Ewers | 1/7 0643 | 2/19 1315 | ns | | ND | | ND | | ND | |
| M3767 | 19 | Test Well #1 at Spring | Ewers | 2/19 1315 | 3/8 1135 | ND | | ND | | ND | | ND | |
| M3784 | 19 | 1st Hole past Spring | Ewers | 3/8 1135 | 3/23 1340 | ND | | ND | | ND | | ND | |
| M3942 | 19 | 1st Hole past Spring | | 12/17 0730 | 12/18 0949 | ND | | ND | | ND | | ND | |
| M3963 | 19 | 1st Hole past Spring | | 12/18 0949 | 12/19 0917 | ND | | ND | | ND | | ND | |
| M4016 | 19 | 1st Hole past Spring | | 12/19 0917 | 12/20 0852 | ND | | ND | | ND | | ND | |
| M4034 | 19 | 1st Hole past Spring | | 12/20 0852 | 12/23 0939 | ND | | ND | | ND | | ND | |
| M4131 | 19 | 1st Hole past Spring | | 12/23 0939 | 12/26 0947 | ND | | ND | | ND | | ND | |
| M4410 | 19 | 1st Hole past Spring | | 12/26 0947 | 12/30 0908 | ND | | ND | | ND | | ND | |
| M4549 | 19 | 1st Hole past Spring | | 12/30 0908 | 1/2 0849 | ND | | ND | | ND | | ND | |
| M4801 | 19 | 1st Hole past Spring | | 1/2 0849 | 1/9 0912 | ND | | ND | | ND | | ND | |
| M4868 | 19 | 1st Hole past Spring | | 1/9 0912 | 1/16 0855 | ND | | ND | | ND | | ND | |
| M4947 | 19 | 1st Hole past Spring | | 1/16 0855 | 1/23 0816 | ND | | ND | | ND | | ND | |
| M5037 | 19 | 1st Hole past Spring | | 1/23 0816 | 1/30 0830 | ND | | ND | | ND | | ND | |
| M5114 | 19 | 1st Hole past Spring | | 1/30 0830 | 2/6 0816 | ND | | ND | | ND | | ND | |
| | 19 | 1st Hole past Spring | | 2/6 0816 | 2/13 0839 | ND | | ND | | ND | | ND | |
| | 19 | 1st Hole past Spring | | 2/13 0839 | 2/20 0810 | ND | | ND | | ND | | ND | |
| | 19 | 1st Hole past Spring | | 2/20 0810 | 2/26 0748 | ns | | ND | | ND | | ND | |
| M5373 | 19 | 1st Hole past Spring | | 2/26 0748 | 3/6 0921 | ns | | ND | | | | ND | |
| M5470 | 19 | 1st Hole past Spring | | 3/6 0921 | 3/13 0810 | ND | | ND | | | | ND | |
| M5622 | 19 | 1st Hole past Spring | | 3/13 0810 | 3/19 0812 | ND | | ND | | | | ND | |
| | 19 | 1st Hole past Spring | | 3/19 0812 | 3/27 0750 | ND | | ND | | | | ND | |
| M7270 | 19 | 1st Hole past Spring | | 3/27 0750 | 6/5 1157 | ns | | ND | | | | ND | |
| M7679 | 19 | 1st Hole past Spring | | 6/5 1157 | 6/12 1535 | ND | | ND | | | | ND | |
| M3768 | 20 | 2nd Hole past Spring | | 6/12 1535 | 7/2 1237 | ND | | ND | | | | ND | |
| M3785 | 20 | 2nd Hole past Spring | | 12/17 0730 | 12/18 0952 | ND | | ND | | ND | | ND | |
| M3943 | 20 | 2nd Hole past Spring | | 12/18 0952 | 12/19 0918 | ND | | ND | | ND | | ND | |
| M3964 | 20 | 2nd Hole past Spring | | 12/19 0918 | 12/20 0854 | ND | | ND | | ND | | ND | |
| M4017 | 20 | 2nd Hole past Spring | | 12/20 0854 | 12/23 0940 | ND | | ND | | ND | | ND | |
| M4035 | 20 | 2nd Hole past Spring | | 12/23 0940 | 12/26 0949 | ND | | ND | | ND | | ND | |
| M4132 | 20 | 2nd Hole past Spring | | 12/26 0949 | 12/30 0910 | ND | | ND | | ND | | ND | |
| M4411 | 20 | 2nd Hole past Spring | | 12/30 0910 | 1/2 0851 | ND | | ND | | ND | | ND | |
| | | | | 1/2 0851 | 1/9 0913 | ND | | ND | | ND | | ND | |

12

Plaintiff
0000000000002261

2318

Opelika, AL

Ozark Underground Laboratory, Inc.

Groundwater Investigation
Charcoal Results

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M45550 | 20 | 2nd Hole past Spring | | 1/9 0913 | 1/16 0856 | ND | | ND | | ND | | ND | |
| M44802 | 20 | 2nd Hole past Spring | | 1/16 0856 | 1/23 0817 | ND | | ND | | ND | | ND | |
| M44869 | 20 | 2nd Hole past Spring | | 1/23 0817 | 1/30 0831 | ND | | ND | | ND | | ND | |
| M5038 | 20 | 2nd Hole past Spring | | 1/30 0831 | 2/6 0817 | ns | | | | | | ND | |
| M5115 | 20 | 2nd Hole past Spring | | 2/6 0817 | 2/13 0842 | ND | | ND | | | | ND | |
| M5139 | 20 | 2nd Hole past Spring | | 2/13 0842 | 2/20 0812 | ND | | ND | | ND | | ND | |
| M5268 | 20 | 2nd Hole past Spring | | 2/20 0812 | 2/26 0750 | ND | | ND | | ND | | ND | |
| M5374 | 20 | 2nd Hole past Spring | | 2/26 0750 | 3/6 0922 | ND | | ND | | ND | | ND | |
| M5471 | 20 | 2nd Hole past Spring | | 3/6 0922 | 3/13 0812 | ND | | ND | | ND | | ND | |
| M5623 | 20 | 2nd Hole past Spring | | 3/13 0812 | 3/19 0814 | ND | | ND | | ND | | ND | |
| M7271 | 20 | 2nd Hole past Spring | | 3/19 0814 | 3/27 0752 | ND | | ND | | ND | | ND | |
| | 20 | 2nd Hole past Spring | | 6/5 1159 | 6/12 1536 | ns | | | | | | ND | |
| **M8614** | 21 | **Beauregard Well #1** | Ewers | NDT | 7/2 1238 | ns | | ND | | | | ND | |
| M8850 | 21 | Beauregard Well #1 | Ewers | 8/27 1300 | 8/27 1300 | ND | | ND | | ND | | ND | |
| M8927 | 21 | Beauregard Well #1 | Ewers | 9/3 0726 | 9/3 0726 | ND | | ND | | ND | | ND | |
| M9131 | 21 | Beauregard Well #1 | Ewers | 9/10 0754 | 9/10 0754 | ND | | ND | | ND | | ND | |
| M9206 | 21 | Beauregard Well #1 | Ewers | 9/16 0803 | 9/16 0803 | ND | | ND | | ND | | ND | |
| M9341 | 21 | Beauregard Well #1 | Ewers | 9/24 1050 | 9/24 1050 | ND | | ND | | ND | | ND | |
| M9452 | 21 | Beauregard Well #1 | Ewers | 10/1 0741 | 10/1 0741 | ND | | ND | | ND | | ND | |
| M9610 | 21 | Beauregard Well #1 | Ewers | 10/8 1344 | 10/8 1344 | ND | | ND | | ND | | ND | |
| M9724 | 21 | Beauregard Well #1 | Ewers | 10/15 1300 | 10/15 1300 | ND | | ND | | ND | | ND | |
| M9810 | 21 | Beauregard Well #1 | Ewers | 10/22 1300 | 10/22 1300 | ND | | ND | | ND | | ND | |
| N0111 | 21 | Beauregard Well #1 | Ewers | 10/29 1002 | 10/29 1002 | ND | | ND | | ND | | ND | |
| N0616 | 21 | Beauregard Well #1 | Ewers | NDT | 11/26 | ND | | ND | | | | ND | |
| N0986 | 21 | Beauregard Well #1 | Ewers | NDT | 12/17 1135 | ns | | | | | | ND | |
| N1924 | 21 | Beauregard Well #1 | Ewers | 12/17 1135 | 1/7 0611 | ND | | ND | | ND | | ND | |
| **M8925** | 22 | **Spring Villa at Suction Bay** | Ewers | 3/8 1059 | 3/8 1059 | ND | | ND | | ND | | ND | |
| M9129 | 22 | Spring Villa at Suction Bay | Ewers | 3/8 1059 | 3/23 1255 | ND | | ND | | ND | | ND | |
| M9134 | 22 | Spring Villa at Suction Bay | Ewers | 9/3 0701 | 9/10 0729 | ND | | ND | | ND | | ND | |
| M9204 | 22 | Spring Villa at Suction Bay | Ewers | 9/10 0729 | 9/16 0735 | ND | | ND | | ND | | ND | |
| M9337 | 22 | Spring Villa at Suction Bay | Ewers | NDT (1) | 9/16 0733 | ND | | ND | | ND | | ND | |
| M9615 | 22 | Spring Villa at Suction Bay | Ewers | 9/16 0733 | 9/24 1026 | ND | | ND | | ND | | ND | |
| M9729 | 22 | Spring Villa at Suction Bay | Ewers | 9/24 1026 | 10/1 0718 | ND d | | ND | | ND | | ND | |
| M9815 | 22 | Spring Villa at Suction Bay | Ewers | 10/1 0718 | 10/15 1337 | ND | | ND | | ND | | ND | |
| N0116 | 22 | Spring Villa at Suction Bay | Ewers | 10/22 1334 | 10/22 1334 | ND | | ND | | ND | | ND | |
| | 22 | Spring Villa at Suction Bay | Ewers | 10/29 1033 | 10/29 1033 | ND | | ND | | ND | | ND | |
| | 22 | Spring Villa at Suction Bay | Ewers | 11/12 1314 | 11/12 1314 | ND | | ND | | ND | | ND | |
| | 22 | Spring Villa at Suction Bay | Ewers | | 3/8 | ns | | | | | | | |

13

Plaintiff
0000000000002262

f:/docs/coa/opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

Opelika, AL

Groundwater Investigation
Water Results

**Table 6.** Results water samples analyzed for the presence of fluorescein, eosine, rhodamine WT (RWT) and sulforhodamine B (SRB) dyes. Peak wavelengths are reported in nanometers (nm); dye concentrations are reported in parts per billion (ppb).

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3805 | 1 | East Branch Uchee Creek at Road 148 | | 12/18 0918 | ND | | ND | | ND | | ND | |
| M3818 | 1 | East Branch Uchee Creek at Road 148 | | 12/19 0855 | ND | | ND | | ND | | ND | |
| M7690 | 1 | East Branch Uchee Creek at Road 148 | | 7/2 1300 | ND | | ND | | ND | | ND | |
| M3349 | 5 | Test Well Number 5 | | 12/10 1018 | ND | | ND | | ND | | ND | |
| M3807 | 5 | Test Well Number 5 | | 12/18 1002 | ND | | ND | | ND | | ND | |
| M3821 | 5 | Test Well Number 5 | | 12/19 0837 | ND | | ND | | ND | | ND | |
| M3368 | 7 | Little Uchee Creek at 145 | | 12/5 1115 | ND | | ND | | ND | | ND | |
| M3354 | 7 | Little Uchee Creek at 145 | | 12/6 1026 | ND | | ND | | ND | | ND | |
| M3359 | 7 | Little Uchee Creek at 145 | | 12/10 0915 | ND | | ND | | ND | | ND | |
| M3795 | 7 | Little Uchee Creek at 145 | | 12/18 0711 | ND | | ND | | ND | | ND | |
| M3809 | 7 | Little Uchee Creek at 145 | | 12/19 0725 | ND | | ND | | ND | | ND | |
| M5054 | 7 | Little Uchee Creek at 145 | | 2/13 0658 | ND | | ND | | ND | | ND | |
| M7682 | 7 | Little Uchee Creek at 145 | | 7/2 1058 | ND | | ND | | ND | | ND | |
| M3353 | 8 | Gates Road at Section Corner | | 12/6 1012 | ND | | ND | | ND | | ND | |
| M3363 | 8 | Gates Road at Section Corner | | 12/10 1113 | ND | | ND | | ND | | ND | |
| M3816 | 8 | Gates Road at Section Corner | | 12/18 0830 | ND | | ND | | ND | | ND | |
| M5205 | 8 | Gates Road at Section Corner | | 12/19 0829 | ND | | ND | | ND | | ND | |
| M5431 | 8 | Gates Road at Section Corner | | 2/26 0703 | ND | | ND | | ND | | ND | |
| M7688 | 8 | Gates Road at Section Corner | | 3/13 0731 | ND | | ND | | ND | | ND | |
| M3352 | 8 | Gates Road at Section Corner | | 7/2 1206 | ND | | ND | | ND | | ND | |
| M3362 | 9 | Gates Road at West Stream | | 12/6 0946 | ND | | ND | | ND | | ND | |
| M3802 | 9 | Gates Road at West Stream | | 12/10 1116 | ND | | ND | | ND | | ND | |
| M3815 | 9 | Gates Road at West Stream | | 12/18 0839 | ND | | ND | | ND | | ND | |
| M5635 | 9 | Gates Road at West Stream | | 12/19 0821 | ND | | ND | | ND | | ND | |
| M7687 | 9 | Gates Road at West Stream | | 3/27 0709 | ND | | ND | | ND | | ND | |
| M3367 | 11 | Quarry Discharge at 166 | | 7/2 1200 | ND | | ND | | ND | | ND | |
| M3366 | 11 | Quarry Discharge at 166 | | 12/5 0855 | ND | | ND | | ND | | ND | |
| M3792 | 11 | Quarry Discharge at 166 | | 12/10 1011 | ND | | ND | | ND | | ND | |
| M3793 | 11 | Quarry Discharge at 166 | | 12/17 1300 | ND | | ND | | ND | | ND | |
| M3801 | 11 | Quarry Discharge at 166 | | 12/17 1449 | ND | | ND | | ND | | ND | |
| M3814 | 11 | Quarry Discharge at 166 | | 12/18 0810 | ND | | ND | | ND | | ND | |
| M3995 | 11 | Quarry Discharge at 166 | | 12/19 0807 | ND | | ND | | 574.3 | 1.73 | ND | |
| M3999 | 11 | Quarry Discharge at 166 | | 12/20 0739 | ND | | ND | | 574.4 | 7.73 | ND | |
| M4110 | 11 | Quarry Discharge at 166 | | 12/23 0823 | ND | | ND | | 574.1 | 1.93 | ND | |
| M4114 | 11 | Quarry Discharge at 166 | | 12/26 0818 | ND | | ND | | 574.3 | 1.06 | ND | |
| M4166 | 11 | Quarry Discharge at 166 | | 12/30 0753 | ND | | ND | | 574.4 | 0.238 | ND | |
| | 11 | Quarry Discharge at 166 | | 1/2 0735 | ND | | ND | | 575.2 | 0.266 | ND | |

1

Plaintiff
0000000000002263

f:\docs\coalopelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Water Results**

2320

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4515 | 11 | Quarry Discharge at 166 | | 1/9 0806 | ND | | ND | | 574.2 | 0.182 | ND | |
| M4618 | 11 | Quarry Discharge at 166 | | 1/16 0755 | ND | | ND | | 574.4 | 0.070 | ND | |
| M4806 | 11 | Quarry Discharge at 166 | | 1/23 0712 | ND | | ND | | ND | | ND | |
| M4898 | 11 | Quarry Discharge at 166 | | 1/30 0718 | ND | | ND | | ND | | ND | |
| M4965 | 11 | Quarry Discharge at 166 | | 2/6 0724 | ND | | ND | | ND | | ND | |
| M5058 | 11 | Quarry Discharge at 166 | | 2/13 0730 | ND | | ND | | ND | | ND | |
| M5125 | 11 | Quarry Discharge at 166 | | 2/20 0709 | ND | | ND | | ND | | ND | |
| M5204 | 11 | Quarry Discharge at 166 | | 2/26 0646 | ND | | ND | | ND | | ND | |
| M5519 | 11 | Quarry Discharge at 166 | | 3/6 0804 | ND | | ND | | ND | | ND | |
| M5430 | 11 | Quarry Discharge at 166 | | 3/13 0709 | ND | | ND | | 579.2 | 0.091 | ND | |
| M5491 | 11 | Quarry Discharge at 166 | | 3/19 0719 | ND | | ND | | ND | | ND | |
| M5634 | 11 | Quarry Discharge at 166 | | 3/27 0659 | ND | | ND | | ND | | ND | |
| M7315 | 11 | Quarry Discharge at 166 | | 6/12 1425 | ND | | ND | | ND | | ND | |
| M7686 | 11 | Quarry Discharge at 166 | | 7/2 1136 | ND | | ND | | ND | | ND | |
| M8799 | 11 | Quarry Discharge at 166 | | 8/28 0640 | ND | | ND | | ND | | ND | |
| M8932 | 11 | Quarry Discharge at 166 | | 9/9 0652 | ND | | ND | | ND | | ND | |
| M9152 | 11 | Quarry Discharge at 166 | | 9/16 0824 | ND | | ND | | ND | | ND | |
| M9233 | 11 | Quarry Discharge at 166 | | 9/24 1114 | ND | | ND | | ND | | ND | |
| M9512 | 11 | Quarry Discharge at 166 | | 10/1 0801 | ND | | ND | | ND | | ND | |
| M9552 | 11 | Quarry Discharge at 166 | | 10/8 1303 | ND | | ND | | ND | | ND | |
| M9737 | 11 | Quarry Discharge at 166 | | 10/15 1354 | V | | | | | | | |
| M9976 | 11 | Quarry Discharge at 166 | | 10/22 1000 | ND | | ND | | ND | | ND | |
| N0151 | 11 | Quarry Discharge at 166 | | 10/29 0954 | ND | | ND | | ND | | ND | |
| N0625 | 11 | Quarry Discharge at 166 | | 11/12 1223 | ND | | ND | | ND | | ND | |
| N1017 | 11 | Quarry Discharge at 166 | | 12/17 1120 | ND | | ND | | ND | | ND | |
| N1741 | 11 | Quarry Discharge at 166 | | 1/6 1404 | ND | | ND | | ND | | ND | |
| N1930 | 11 | Quarry Discharge at 166 | | 3/8 1119 | ND | | ND | | ND | | ND | |
| M3357 | 12 | Quarry Discharge at Parkers | | 3/23 1408 | ND | | ND | | ND | | ND | |
| M3799 | 12 | **Quarry Discharge at Parkers** | | 12/10 1001 | **ND** | | **ND** | | **ND** | | **ND** | |
| M3813 | 12 | Quarry Discharge at Parkers | | 12/18 0759 | ND | | ND | | ND | | ND | |
| M3994 | 12 | Quarry Discharge at Parkers | | 12/19 0758 | ND | | ND | | ND | | ND | |
| M3998 | 12 | Quarry Discharge at Parkers | | 12/20 0732 | ND | | ND | | 574.4 | 0.925 | ND | |
| M4109 | 12 | Quarry Discharge at Parkers | | 12/23 0815 | ND | | ND | | 574.1 | 0.537 | ND | |
| M4113 | 12 | Quarry Discharge at Parkers | | 12/26 0810 | ND | | ND | | 574.2 | 1.61 | ND | |
| M4165 | 12 | Quarry Discharge at Parkers | | 12/30 0746 | ND | | ND | | 574.3 | 1.23 | ND | |
| M4514 | 12 | Quarry Discharge at Parkers | | 1/2 0728 | ND | | ND | | 574.5 | 0.277 | ND | |
| M4617 | 12 | Quarry Discharge at Parkers | | 1/9 0759 | ND | | ND | | 574.8 | 0.288 | ND | |
| M4805 | 12 | Quarry Discharge at Parkers | | 1/16 0749 | ND | | ND | | 576.4 | 0.175 | ND | |
| | 12 | Quarry Discharge at Parkers | | 1/23 0707 | ND | | ND | | 574.8 | 0.092 | ND | |

Plaintiff
00000000002264

f:\docs\coa\opelika.xls
3/29/04

2

Ozark Underground Laboratory, Inc.  
Opelika, AL

232 *(handwritten)*

## Groundwater Investigation
### Water Results

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4897 | 12 | Quarry Discharge at Parkers | | 1/30 0712 | ND | | ND | | ND | | ND | |
| M4964 | 12 | Quarry Discharge at Parkers | | 2/6 0719 | ND | | ND | | ND | | ND | |
| M5057 | 12 | Quarry Discharge at Parkers | | 2/13 0725 | ND | | ND | | ND | | ND | |
| M5124 | 12 | Quarry Discharge at Parkers | | 2/20 0705 | ND | | ND | | ND | | ND | |
| M5203 | 12 | Quarry Discharge at Parkers | | 2/26 0640 | ND | | ND | | ND | | ND | |
| M5318 | 12 | Quarry Discharge at Parkers | | 3/6 0759 | ND | | ND | | 575.2 | 0.059 | ND | |
| M5429 | 12 | Quarry Discharge at Parkers | | 3/13 0702 | ND | | ND | | ND | | ND | |
| M5490 | 12 | Quarry Discharge at Parkers | | 3/19 0711 | ND | | ND | | ND | | ND | |
| M5633 | 12 | Quarry Discharge at Parkers | | 3/27 0655 | ND | | ND | | ND | | ND | |
| M7314 | 12 | Quarry Discharge at Parkers | | 6/12 1418 | ND | | ND | | ND | | ND | |
| M7685 | 12 | Quarry Discharge at Parkers | | 7/2 1126 | ND | | ND | | ND | | ND | |
| M8954 | 12 | Quarry Discharge at Parkers | | 9/9 0647 | ND | | ND | | ND | | ND | |
| M9151 | 12 | Quarry Discharge at Parkers | | 9/16 0819 | ND | | ND | | ND | | ND | |
| M9232 | 12 | Quarry Discharge at Parkers | | 9/24 1109 | ND | | ND | | ND | | ND | |
| M9511 | 12 | Quarry Discharge at Parkers | | 10/1 0756 | ND | | ND | | ND | | ND | |
| M9551 | 12 | Quarry Discharge at Parkers | | 10/8 1358 | ND | | ND | | ND | | ND | |
| M9664 | 12 | Quarry Discharge at Parkers | | 10/15 1348 | ND | | ND | | ND | | ND | |
| M9736 | 12 | Quarry Discharge at Parkers | | 10/22 0953 | ND | | ND | | ND | | ND | |
| M9975 | 12 | Quarry Discharge at Parkers | | 10/29 0951 | ND | | ND | | ND | | ND | |
| N0150 | 12 | Quarry Discharge at Parkers | | 11/12 1216 | ND | | ND | | ND | | ND | |
| N0624 | 12 | Quarry Discharge at Parkers | | 12/17 1113 | ND | | ND | | ND | | ND | |
| N1016 | 12 | Quarry Discharge at Parkers | | 1/6 1400 | ND | | ND | | ND | | ND | |
| N1739 | 12 | Quarry Discharge at Parkers | | 3/8 1116 | ND | | ND | | ND | | ND | |
| N1929 | 12 | Quarry Discharge at Parkers | | 3/23 1400 | ND | | ND | | ND | | ND | |
| M3369 | 13 | Creek at 146 | | 12/5 1147 | ND | | ND | | ND | | ND | |
| M3355 | 13 | Creek at 146 | | 12/6 1100 | ND | | ND | | ND | | ND | |
| M3364 | 13 | Creek at 146 | | 12/10 0927 | ND | | ND | | ND | | ND | |
| M3796 | 13 | Creek at 146 | | 12/18 0729 | ND | | ND | | ND | | ND | |
| M3810 | 13 | Creek at 146 | | 12/19 0738 | ND | | ND | | ND | | ND | |
| M3992 | 13 | Creek at 146 | | 12/20 0711 | ND | | ND | | ND | | ND | |
| M3996 | 13 | Creek at 146 | | 12/23 0756 | ND | | ND | | 573.4 * | 0.259 | ND | |
| M4107 | 13 | Creek at 146 | | 12/26 0747 | ND | | ND | | 574.1 | 1.62 | ND | |
| M4111 | 13 | Creek at 146 | | 12/30 0724 | ND | | ND | | 574.2 | 0.717 | ND | |
| M4532 | 13 | Creek at 146 | | 1/2 0706 | ND | | ND | | 574.0 * | 0.242 | ND | |
| M4512 | 13 | Creek at 146 | | 1/9 0740 | ND | | ND | | 573.6 * | 0.211 | ND | |
| M4615 | 13 | Creek at 146 | | 1/16 0732 | ND | | ND | | 575.4 | 0.115 | ND | |
| M4803 | 13 | Creek at 146 | | 1/23 0652 | ND | | ND | | 574.2 | 0.103 | ND | |
| M4895 | 13 | Creek at 146 | | 1/30 0653 | ND | | ND | | 573.8 * | 0.053 | ND | |
| M4962 | 13 | Creek at 146 | | 2/6 0702 | ND | | ND | | ND | | ND | |

3

Plaintiff
0000000000002265

Ozark Underground Laboratory, Inc.

Opelika, AL

## Groundwater Investigation
## Water Results

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M5055 | 13 | Creek at 146 | | 2/13 0710 | ND | | ND | | ND | | ND | |
| M5122 | 13 | Creek at 146 | | 2/20 0648 | ND | | ND | | ND | | ND | |
| M5201 | 13 | Creek at 146 | | 2/26 0625 | ND | | ND | | ND | | ND | |
| M5316 | 13 | Creek at 146 | | 3/6 0739 | ND | | ND | | 575.8 | 0.061 | ND | |
| M5427 | 13 | Creek at 146 | | 3/13 0646 | ND | | ND | | ND | | ND | |
| M5631 | 13 | Creek at 146 | | 3/27 0639 | ND | | ND | | ND | | ND | |
| M3350 | 14 | Beauregard Well Number 4 | | 12/6 1115 | ND | | ND | | ND | | ND | |
| M3361 | 14 | Beauregard Well Number 4 | | 12/10 0935 | ND | | ND | | ND | | ND | |
| M3797 | 14 | Beauregard Well Number 4 | | 12/18 0740 | ND | | ND | | ND | | ND | |
| M3811 | 14 | Beauregard Well Number 4 | | 12/19 0746 | ND | | ND | | ND | | ND | |
| M3993 | 14 | Beauregard Well Number 4 | | 12/20 0718 | ND | | ND | | ND | | ND | |
| M3997 | 14 | Beauregard Well Number 4 | | 12/23 0801 | ND | | ND | | ND | | ND | |
| M4108 | 14 | Beauregard Well Number 4 | | 12/26 0755 | ND | | ND | | ND | | ND | |
| M4112 | 14 | Beauregard Well Number 4 | | 12/26 0755 | ND | | ND | | ND | | ND | |
| M4164 | 14 | Beauregard Well Number 4 | | 12/30 0731 | ND | | ND | | ND | | ND | |
| M4513 | 14 | Beauregard Well Number 4 | | 1/2 0713 | ND | | ND | | ND | | ND | |
| M4616 | 14 | Beauregard Well Number 4 | | 1/9 0747 | ND | | ND | | ND | | ND | |
| M4804 | 14 | Beauregard Well Number 4 | | 1/16 0737 | ND | | ND | | ND | | ND | |
| M4896 | 14 | Beauregard Well Number 4 | | 1/23 0657 | ND | | ND | | ND | | ND | |
| M4963 | 14 | Beauregard Well Number 4 | | 1/30 0700 | ND | | ND | | ND | | ND | |
| M5056 | 14 | Beauregard Well Number 4 | | 2/6 0708 | ND | | ND | | ND | | ND | |
| M5123 | 14 | Beauregard Well Number 4 | | 2/13 0715 | ND | | ND | | ND | | ND | |
| M5202 | 14 | Beauregard Well Number 4 | | 2/20 0654 | ND | | ND | | ND | | ND | |
| M5317 | 14 | Beauregard Well Number 4 | | 2/26 0630 | ND | | ND | | ND | | ND | |
| M5428 | 14 | Beauregard Well Number 4 | | 3/6 0745 | ND | | ND | | ND | | ND | |
| M5489 | 14 | Beauregard Well Number 4 | | 3/13 0651 | ND | | ND | | ND | | ND | |
| M5632 | 14 | Beauregard Well Number 4 | | 3/19 0656 | ND | | ND | | ND | | ND | |
| M7313 | 14 | Beauregard Well Number 4 | | 3/27 0644 | ND | | ND | | ND | | ND | |
| M7683 | 14 | Beauregard Well Number 4 | | 6/12 1408 | ND | | ND | | ND | | ND | |
| M3351 | 15 | Chewacala Creek near Pipeline | | 7/2 1114 | ND | | ND | | ND | | ND | |
| M3365 | 15 | Chewacala Creek near Pipeline | | 12/6 1124 | ND | | ND | | ND | | ND | |
| M3798 | 15 | Chewacala Creek near Pipeline | | 12/10 0956 | ND | | ND | | ND | | ND | |
| M3812 | 15 | Chewacala Creek near Pipeline | | 12/18 0748 | ND | | ND | | ND | | ND | |
| M7684 | 15 | Chewacala Creek near Pipeline | | 12/19 0751 | ND | | ND | | ND | | ND | |
| M3356 | 16 | Trib to Lee County Lake | | 7/2 1119 | ND | | ND | | ND | | ND | |
| M3358 | 16 | Trib to Lee County Lake | | 12/6 1045 | ND | | ND | | ND | | ND | |
| M3794 | 16 | Trib to Lee County Lake | | 12/10 0922 | ND | | ND | | ND | | ND | |
| M3808 | 16 | Trib to Lee County Lake | | 12/18 0653 | ND | | ND | | ND | | ND | |
| M5630 | 16 | Trib to Lee County Lake | | 12/19 0715 | ND | | ND | | ND | | ND | |
| | | | | 3/27 0621 | ND | | ND | | ND | | ND | |

4

Plaintiff
0000000000002266

Ozark Underground Laboratory, Inc.

Opelika, AL

Groundwater Investigation
Water Results

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M7681 | 16 | Trib to Lee County Lake | | 7/2 1052 | ND | | ND | | ND | | ND | |
| M3791 | 17 | Little Uchee Upstream from Sink | | 12/17 0819 | ND | | ND | | ND | | ND | |
| M3804 | 17 | Little Uchee Upstream from Sink | | 12/18 0903 | ND | | ND | | ND | | ND | |
| M3817 | 17 | Little Uchee Upstream from Sink | | 12/19 0843 | ND | | ND | | ND | | ND | |
| M5206 | 17 | Little Uchee Upstream from Sink | | 2/26 0718 | ND | | ND | | ND | | ND | |
| M7689 | 17 | Little Uchee Upstream from Sink | | 7/2 1224 | ND | | ND | | ND | | ND | |
| M3790 | 18 | Test Well #1 at Spring | | 12/17 1026 | ND | | ND | | ND | | ND | |
| M3789 | 18 | Test Well #1 at Spring | | 12/17 1345 | ND | | ND | | ND | | ND | |
| M3806 | 18 | Test Well #1 at Spring | | 12/18 0939 | ND | | ND | | ND | | ND | |
| M3819 | 18 | Test Well #1 at Spring | | 12/19 0909 | ND | | ND | | ND | | ND | |
| N1742 | 21 | Beauregard Well #1 | Ewers | 3/8 1059 | ND | | ND | | ND | | ND | |

Plaintiff
00000000002267

F:\docs\coal\opelika.xls
3/29/04

5

Ozark Underground Laboratory, Inc.

pelika, AL

**Groundwater Investigation**
Footnotes

## FOOTNOTES

ND = No dye detected

ns = no charcoal sample for this sampling period.

wso = only a water sample was collected during this sampling period.

d = these charcoal packets were dry upon arrival at the OUL.

nsf = the sample for this sampling period was not found.

v = water vial empty upon arrival at OUL.

(1) = old bug

Plaintiff
00000000002268

f:\docs\coal\opelika.xls
3/29/04

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                                    )
                                                       )
                    Plaintiffs,                        )
                                                       )
vs.                                                    )        Civil Action No. CV-20 02-0085
                                                       )
HANSON AGGREGATES SOUTHEAST,                           )
INC., et al.,                                          )
                                                       )
                    Defendants.                        )

### CIVIL SUBPOENA FOR PRODUCTION OF
### DOCUMENTS, ETC., UNDER RULE 34(b)(2)

TO:    Dixie Pipeline Company
       1117 Perimeter Center West, Suite West 301
       Atlanta, Georgia 30338

You are hereby commanded to do each of the following acts at the instance of the Plaintiffs within fifteen (15) days after service of this subpoena.

That you produce the following documents and permit the above-named Plaintiffs to inspect and copy each of the following documents (all with respect to the Lee County Quarry only):

1.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Oldcastle Materials Southeast, Inc. d/b/a SRM, from January 1, 2003, through the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

2.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Hanson Aggregates Southeast, Inc. between July 1, 2002, and the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

3.    Any documents (as defined on the attached sheet) regarding the affects on the Dixie Pipeline were a sinkhole to form under the Pipeline in Lee County, Alabama.

4. Any documents that evidence any problems with the pipeline in the stretch between the Lee County Terminal on Highway 51 and the Georgia State line.

5. All construction drawings, specifications, and contract specifications (as well as, as-built specifications) relating to the construction of the pipeline in the section of Lee County, Alabama from the Highway 51 Terminal to the Georgia state line.

6. Documents detailing the use of the gravel purchased from Hanson and/or Oldcastle (SRM) by Dixie Pipeline.

7. Any records related in any way to the walk-through inspections and/or reports related thereto (as noted at page 9 in the deposition of Ricky Chafin taken on December 10, 2002).

Such production and inspection is to take place at the place where the documents or things are regularly kept or at some other reasonable place designated by you.

You are further advised that other parties to the action in which this subpoena has been issued have the right to be present at that time of such production or inspection. You have the option to deliver or mail legible copies of documents or things to the party causing the issuance of this subpoena but you may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies. The Plaintiffs agree to pay all reasonable expenses incurred by you at the aforementioned time and place.

You have the right to object at any time prior to the date set forth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating, with respect to any item or category to which objection is made, you reasons for such objection.

Dated this the ___ day of _____, 2004.


_____
**CHARLES E. VERCELLI, JR.**
One of the Attorneys for Plaintiffs
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

CLERK


By: _____
DEPUTY CLERK

2327

Law Offices of James B. Sprayberry
P. O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P. O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

155-00\Subpoena-Dixie1.3.wpd

## DEFINITIONS

"Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

2325

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                          )
                                             )
           Plaintiffs,                      )
                                             )
vs.                                          )    Civil Action No. CV-20 02-85
                                             )
HANSON AGGREGATES SOUTHEAST,                 )
INC., et al.,                                )
                                             )
           Defendants.                      )

### PLAINTIFF'S OPPOSITION TO OLDCASTLE'S MOTION
### FOR DRILLING MONITORING WELLS

Plaintiffs would show this Court that:

1.    This Defendant has been extremely slow in producing most of it's discovery.  For example, their experts summaries were due at the end of January, 2004.  They are yet to be produced even though requested several times.  The Plaintiff's have pointed out on several occasions that our experts can not change or reformulate their opinions without data and documentation from Oldcastle.

In opposition to this motion copy of the deposition of Brian Fowler will be filed simultaneously with this motion.  Fowler was a designated corporate rep, even though a contract geologist.  At his deposition on March 11, 2004, Fowler testified under oath that:

    A.    He had no testing plan in this case (Pg.103 and 252 - 254) even though he has been involved since May, 2003;

    B.    He had no mine plan in this case (Pg. 54);

    C.    He and/or Oldcastle no longer monitored the daily discharge amounts as Hanson had done. (Pg. 108);

D.    He and/or Oldcastle no longer monitored their own monitoring wells on their leased property. (Pg. 105 - 107 ) This was done even though Oldcastle had the drill records and pump test records from Aqua Fusion;

E.    He intended to reduce (in order to test) the pumping discharge in order to avoid damage being caused at the higher rates. (Pg. 214, 223 - 224 );

F.    The pumping of monitoring wells is for new quarries (Pg. 46), if an existing quarry the company monitors the water levels under <u>actual</u> conditions.  He also had no idea where monitor wells would be placed (Pg. 144 - 146);

G.    He agreed that discharge pumping causes dewatering, which lowers the water table and causes a cone of depression (Pg. 218) and that the "cone" does make sinkholes more likely. (Pg. 231);

H.    He <u>cannot</u> think of a way to tell how far the water comes from (Pg. 255) and since July, 2003, he has done <u>nothing</u> to test. (Pg. 252 - 254);

I.    He even admitted that testing now <u>cannot</u> tell water patterns of 2003 or earlier. (Pg. 247); and

J.    He admitted that the dye from the sinkhole on Lee Road 166 showed a hydro connection to the quarry (Pg. 226).  Also, he admitted that the dye from the Little Uchee sinkhole showed <u>either</u> a direct connection to the quarry <u>or</u> it was a chemical breakdown. (Pg. 227).

2.    The Defendant had requested permission which the City (by Vercelli letter dated 3/26/2004), declined to grant at this time unless a written plan was submitted showing a hydraulic or hydro geology need.  A copy of the letter is attached.

3.    Oldcastle has now unilaterally canceled the scheduled deposition of Tom Aley (Plaintiff's Expert) which has been set for several weeks. His deposition was set April 7 and 8, 2004 and this canceled verbally, on Friday afternoon at about 2:30 P.M. He may not be available now for several weeks or months, and they have waived the chanse to depose Mr. Aley.

4.    Earlier the Defendant Hanson had unilaterally canceled the depositions of three or four of the Opelika City witnesses including the Mayor, Dan Hilyer, Alan Lee and Bo Brown. These had been set for April 1 and 2.

It appears that Oldcastle have made a corporate decision to stonewall and delay this case as much as possible. They were aware of the pending litigation in May, 2003 prior to their purchase of the quarry on July 13, 2003. Now ten months later, Oldcastle, <u>without a hydraulic plan</u>, has decided they want new monitoring wells. The Plaintiffs are filing simultaneously with this motion other letters to show the correspondence with the Plaintiffs attempting to obtain documents, to attempt to avoid delay on the scheduled depositions. They are:

A.    Vercelli letter of March 12, 2004, (experts and Aley deposition);

B.    Vercelli letter of March 12, 2004, (Ewers work);

C.    Vercellie e-mail of January 7, 2004, (Ewers work);

D.    Vercelli letter of March 19, 2004, (depositions and expert information);

E.    Vercelli letter of March 3, 2004, (experts and silica);

F.    Vercelli letter of March 26, 2004, (no water plan/wells); and

G.    Vercelli memo of March 8, 2004, (Aley deposition).

5.    These documents are needed and necessary, and overdue by many months. Oldcastle was served in August, 2003 with a request for documents. These should be produced within ten

(10) days.

WHEREFORE, the Plaintiffs move this Court for an order that; (a) Denies their motion for monitoring wells, (b) Orders them to immediately produce their expert's summaries and Rule 26 disclosures, (c) provide other requested documents such as, hazard warning sheets for silica, seismograph result for the Griggs/Edwards the three and a half (3 ½ ) inch Skelly and Loy notebook reviewed by Mr. Fowler prior to the purchase on July 13, 2003 and the list of other documents that were intentionally withheld by Oldcastle's New York lawyers.

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 29 day of MARCH, 2004.

OF COUNSEL

\\Front door\C\My Documents\WPDocs\JBS\Civil\HANSON\Pleadings\Oppositions\Plaintiff's Opposition to Defendant's Drilling Monitoring Wells.wpd

2333

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 12, 2004

Phillip E. Adams, Jr.                                    **Via E-mail & Mail**
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

RE:    ***Davis, et al v. Hanson/Oldcastle***

Dear Phil:

This follows our lengthy conversation during the deposition of Brian Fowler, one of your corporate representatives, yesterday, March 11. During the deposition, it was established clearly that some of Mr. Fowler's documents requested in the deposition notice and in the corporate representative deposition notice were not produced to us by the attorneys at Gibson, Dunn & Crutcher in New York. In addition, Oldcastle's responses to our 2nd Interrogatories did not identify what documents were being produced. All the document does is say that documents are produced, and then Oldcastle gave us a stack of documents. This has made it extremely difficult to determine what documents came from what source. Moreover, based on the review of the documents in the corporate representative's depositions, we believe but do not know for sure, that some of the documents were simply those which we had produced, produced back to us. As you know, if that is true, it is not appropriate under the Civil Discovery Rules.

In an effort to resolve this discovery dispute, we have asked that you promptly provide to us (in no more than two weeks) a detailed listing of exactly what documents were produced and from whom they were obtained. You are also to produce to us (as we had previously agreed) a detailed privilege log indicating what documents were withheld from us under a claim of privilege. We have no such information now, but it is clear that some documents were withheld from us.

If you are unable to respond in full to this request within two weeks, kindly let me know now so that we may file a motion to compel with the Court. I would rather not have to file such a motion.

✓ 1- Aley
1- Atty. Corresp.
1- Vercelli.

2334

Phillip E. Adams, Jr.
March 12, 2004
Page 2

Additionally, with respect to experts, we disclosed to you our experts many months ago. Their opinions have not changed because we have never been given information from you that would change any of their opinions.  Under the order of September 29, 2003, under "further comments", the Court stated: "The Plaintiffs shall have sixty (60) days from this Order to disclose any expert witnesses.  **The Defendant shall have sixty (60) days thereafter to disclose any expert witness or in the alternative shall have one-hundred twenty (120) days from this Order."** One-hundred twenty days from that Order was approximately January 26, 2004.  We have repeatedly requested information from your experts.  We have received none.  Your delay in disclosing your expert information to us is hindering our ability to prosecute our case.  We therefore ask that you provide your expert witness disclosures, which were due on January 26, not later than March 31, 2004.  We can then give that information to Mr. Aley in time for him to consider it before his deposition on April 7.  In that regard, let this confirm that we have tendered our expert, Tom Aley, for deposition at that time.

If these issues are not resolved satisfactorily, we expect to raise them with the Judge on March 29.  Thank you.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry (via e-mail and mail)
       James A. Byram, Jr. (via e-mail and mail)
       John V. Denson (via e-mail and mail)
       Guy F. Gunter, III (via e-mail and mail)
       H. Wayne Phears (via e-mail and mail)
       Jack Weiss (via e-mail and mail)
155-00\Adams7.1.wpd

2335

# VERCELLI & ASSOCIATES, P.C.

### *Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 12, 2004

James A. Byram, Jr.                                      **Via E-mail and Mail**
Balch & Bingham, LLP
P. O. Box 78
Montgomery, AL 36101-0078

     RE:   ***Davis, et al. v. Hanson Aggregates, et al.***

Dear Jim:

We need the following information with respect to Dr. Ewers' work:

1.    The types and concentration of dyes injected into each site;

2.    The quantity of dyes injected into each site;

3.    The amount of water that flushed the dyes into each of the injection points;

4.    Your dye test results since the date of injection; and

5.    We need to know the manufacturer or seller of the particular dyes injected.

Mr. Aley will need all of this information to factor the same into his opinions. As you know, we have tendered him for deposition on April 7, and we want to be sure that he will be able to have enough information to give his opinions at that time. If you cannot reply to this request within the next two weeks, please let us know, and please let us know why not.

Thank you.

                    Sincerely,

                    Charles E. Vercelli, Jr.

CEVjr/ma

James A. Byram, Jr.
March 12, 2004
Page 2

cc:     Tom Aley (via e-mail and mail)
        James B. Sprayberry (via e-mail and mail)
        John V. Denson (via e-mail and mail)
        Guy F. Gunter, III (via e-mail and mail)
        H. Wayne Phears (via e-mail and mail)
        Phillip E. Adams, Jr. (via e-mail and mail)
        J.M. (Jack) Weiss (via e-mail and mail)


P.S.    We have asked Mr. Aley to provide us with his test results.  We propose to give you Mr.
        Aley's test results at the same time we receive your test results.

155-00\Byram39.2.wpd

2337

## Cassie Holk

| | |
|---|---|
| **From:** | "Chip Vercelli" <cvercelli@vercelli-law.com> |
| **To:** | "Weiss, Jack M." <jmweiss@gibsondunn.com>; "Phears, Wayne" <wphears@pmlawfirm.com>; "Denson, John" <Denson@samfordlaw.com>; "Byram, Jim" <Jbyram@balch.com>; "Adams, Phil" <padams@audwlaw.com>; "Sprayberry, Jim - Cassie" <cholk@charterinternet.com> |
| **Sent:** | Friday, March 12, 2004 3:25 PM |
| **Attach:** | Byram39.2.wpd; Adams7.1.doc; Adams7.1.wpd; Byram39.2.doc |

Attached in Word and in WordPerfect formats are two letters -- one to Phil and one to Jim Byram.  Thank you.
CHIP

2338

**Cassie Holk**

| | |
|---|---|
| **From:** | "Chip Vercelli" <cvercelli@vercelli-law.com> |
| **To:** | "Weiss, Jack M." <jmweiss@gibsondunn.com>; "Phears, Wayne" <wphears@pmlawfirm.com>; "Denson, John" <Denson@samfordlaw.com>; "Byram, Jim" <Jbyram@balch.com>; "Adams, Phil" <padams@audwlaw.com>; "Sprayberry, Jim - Cassie" <cholk@CHARTERINTERNET.COM> |
| **Sent:** | Wednesday, January 07, 2004 3:01 PM |
| **Subject:** | Hanson |

Balch & Bingham, LLP

P. O. Box 78

Montgomery, AL 36101-0078

RE: *Davis, et al. v. Hanson Aggregates, et al.*

Dear Jim:

Without reviewing my notes carefully, I recall that when we agreed for Hanson's experts to inject dye, Hanson promised to send us the results of any dye sampling promptly. We have received no results. Can you please, therefore, immediately forward to us the results of all testing done to date? We would like this information at least in summary form at this time, followed later by the backup documentation.

If you recall our conversations and agreements differently, kindly let me know, and I will examine my notes more carefully. Otherwise, I hope that you will send us this information within a few days. Thank you.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma

cc: James B. Sprayberry (via e-mail only)

John V. Denson (via e-mail only)

Guy F. Gunter, III (via fax only)

H. Wayne Phears (via e-mail only)

Phillip E. Adams, Jr. (via e-mail only)

J.M. (Jack) Weiss (via e-mail only)

2339

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

## FAX MESSAGE

TO:

| | |
|---|---|
| James B. Sprayberry | 334-821-7101 |
| Guy F. Gunter, III | 334-745-6288 |
| John V. Denson | 334-745-3506 |
| James A. Byram, Jr. | 866-736-3863 |
| Phillip E. Adams, Jr. | 334-749-3238 |
| H. Wayne Phears | 770-263-6715 |
| J.M. "Jack" Weiss | 212-351-5224 |

FROM:          Chip Vercelli

DATE:          March 19, 2004

RE:            *Davis, et al. v. Hanson, et al.*

FAX NO.:       Listed above

NO. OF PAGES:  ___3___
(Including Cover Sheet)

MESSAGE:

***************************************************************************************
CONFIDENTIALITY NOTICE
   The information contained in this facsimile message is privileged and confidential information
intended for the use of the addressee listed above. If you are neither the intended recipient nor the employee
nor agent responsible for delivering this message to the intended recipient, you are hereby notified that any
disclosure, copying, distribution, or the taking of any action in reliance on the contents of this Facsimile
message is strictly prohibited. If you have received this document in error, please immediately notify us by
telephone to arrange for the return of the original documents to us.

***************************************************************************************

All atty fax 2.wpd

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

2340

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 19, 2004

James A. Byram, Jr.
Balch & Bingham, LLP
P. O. Box 78
Montgomery, AL 36101-0078

**Via E-mail and Fax**

RE:  *Davis, et al. v. Hanson Aggregates, et al.*

Dear Jim:

This letter follows our sinkhole tour with Hanson and Oldcastle experts. I videotaped all of the sinkholes until I left. I left when they were looking at the last sinkhole on the Spring Villa property farthest downstream on the old drainage. They then went to sinkholes on Highway 166, the Clark property, and near the Uniroyal Tire Plant. I did not videotape those, therefore.

During the videotaping, occasionally Mr. Wood wanted me to make note of something and make statements on the video. I told him that I would be happy to provide a copy of the videotape to you. I am happy to do so. However, during the tour, Mr. Wood had maps and a list of sinkholes that very clearly included sinkholes unknown to the Plaintiffs. We have never received a complete list of sinkholes from you, and it is very clear that your expert knew of additional sinkholes, for example, but not limited to, farther north and west of Little Uchee Creek than we knew about. By this time, we would have thought you would have had a duty to provide all such known sinkholes to us. We have always provided all known sinkholes to you, as soon as we learn about them.

I am happy to provide you a copy of the videotape. However, I will do so only with your agreement to provide to me your GPS coordinates on every sinkhole known to you and your experts. If you are willing to do this, I will be happy to provide these videotapes to you within a week and a half. I would provide them sooner, but I am going out of town for a week.

By copy of this letter to Phil Adams, I am making the same video available to him, but I of course will not send it to him until I have heard from you. If you can possibly respond today, that would be appreciated.

2341

Mr. James A. Byram, Jr.
March 19, 2004
Page 2

On another note, we understand that you want to change the depositions of the City representatives from April 1 and April 2 to April 14-16 or April 19-22.   The City representatives' depositions are already scheduled for the 1st and 2nd. Is it not possible for you to simply send someone else?  We do not desire to get into a position where you and/or Oldcastle can ask for another continuance because you or Oldcastle were unable to take depositions.  We do not want to delay depositions, therefore.  If you and Phil can assure us that you and Phil will not be asking for another continuance from the August trial setting, then I suppose we can agree to continue the depositions.  Otherwise, we would prefer to keep them on April 1 and 2.

With respect to the dates you have proposed (April 14-16 and April 19-22), be advised that I will be in a capital murder trial the week of April 19-22, and preparing for it the prior week.  Therefore, those days are not very convenient for me.  I would like to be at my own clients' depositions, so it is much more convenient for these depositions to be taken on April 1 and 2 as scheduled.  Please let me know your thoughts in this regard.  By copy of this letter to Mr. Adams, I am asking him to give us his thoughts as well.

I would appreciate hearing from you today if possible.  If not, please respond to Jim Sprayberry next week.  Thank you.

Sincerely?

*Chip Vucell*

Charles E. Vercelli, Jr.

CEVjr/ma
cc:     James B. Sprayberry (via e-mail and fax)
        John V. Denson (via e-mail and fax)
        Guy F. Gunter, III (via e-mail and fax)
        H. Wayne Phears (via e-mail and fax)
        Phillip E. Adams, Jr. (via e-mail and fax)
        J.M. (Jack) Weiss (via e-mail and fax)

P.S.    We presume you are gathering Dr. Ewers' test results.  When can we expect to exchange such results?

165-00\Byram41.3.wpd

2342

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, *Of Counsel*

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 3, 2004

Phillip E. Adams, Jr.                                    **Via Fax & Mail**
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

RE:    *Davis, et al v. Hanson/Oldcastle*

Dear Phil:

As we discussed at the deposition of Mr. Heisterkamp, we do want to take the deposition of Brian Fowler. You were going to check whether he could give a deposition during the latter part of this week or next week. Inasmuch as he is in essence the corporate representative, we would ask that he be produced in Alabama for the deposition. If you disagree with this reasoning, please let me know. We would like to take his deposition as soon as possible in order to conclude our questions of the corporate representatives.

Also note that I have provided copies of the photograph that you gave me (Bates number 1538) to Jim Byram and to John Denson for their files.

We also need a copy of the MSDS on silica and other items (any MSDS's used by Oldcastle).

I understand, based on your statement read to us at the end of the deposition of Mr. Heisterkamp, that your expert witnesses are: Geotran of Sterling, Virginia; Trinity Consultants (place unknown); Resource Systems Group (place unknown); Sauls Engineering (seismographic); and Austin Powder (blasting). If you have any additional or different experts, we obviously need to know of those people at this time. Please send us their addresses.

Additionally, we have not received responses to our third interrogatories and requests for production. Can you please file responses?

Phillip E. Adams, Jr.
March 3, 2004
Page 2

Finally, based on the Heisterkamp deposition, it is clear that we need a copy of the Oldcastle "code of conduct". Could you please provide this to us as soon as possible? If not, just let me know.

I look forward to hearing from you soon.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry
159-09\Adams6.1.wpd

# VERCELLI & ASSOCIATES, P.C.

### *Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 26, 2004

Phillip E. Adams, Jr.                                    **Via E-mail & Fax only**
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

RE:    ***Davis, et al v. Hanson/Oldcastle***

Dear Phil:

During Mr. Fowler's deposition, you told us, for the first time, that your experts had not yet completed–or even substantially begun– a water study plan for the area. You told us for the first time that your experts would like to drill new monitoring wells in or around the dry spring area at Spring Villa. You asked our permission to install such wells. We have discussed your request with Guy Gunter and with Mr. Tom Aley.

At this point we are not inclined to grant permission to allow any new wells on the City or Utility Board property. One reason we are not inclined to grant such permission is the fact that Oldcastle has abandoned the monitoring of their own monitoring wells. We believe they had six (6) monitoring wells on leased property. In addition, there are three monitoring wells already in place in the Spring Villa area. Two (2) are on the Utility board property and one (1) is on the Smith property. Data already exists on those three (3) wells through old reports and through Dr. Ewers' monitoring since September of 2003. Since Oldcastle and Hanson have a Joint Defense Agreement, it is clear that all that data is available to your experts. Consequently, we see no need, at this late date, to authorize additional wells to be drilled.

We might reconsider if a complete and detailed water study plan is provided that shows a hydrological need for new monitoring wells in the Spring Villa area. Oldcastle has had eight (8) months since the purchase to complete such a plan and provide it to us. If Oldcastle would like us to reconsider, please provide us with a detailed water study plan as soon as possible.

Phillip E. Adams, Jr.
March 26, 2004
Page 2

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:     James B. Sprayberry (via e-mail and fax)
        James A. Byram, Jr. (via e-mail and fax)
        John V. Denson (via e-mail and fax)
        Guy F. Gunter, III (via fax)
        H. Wayne Phears (via e-mail and fax)
        Jack Weiss (via e-mail and fax)
155-00\Adams8.1.wpd

2346

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

## FAX MESSAGE

**TO:**

| | |
|---|---|
| James B. Sprayberry | 334-821-7101 |
| Guy F. Gunter, III | 334-745-6288 |
| John V. Denson | 334-745-3506 |
| James A. Byram, Jr. | 866-736-3863 |
| Phillip E. Adams, Jr. | 334-749-3238 |
| H. Wayne Phears | 770-263-6715 |
| J.M. "Jack" Weiss | 212-351-5224 |

**FROM:**    Chip Vercelli

**DATE:**    March 8, 2004

**RE:**    *Davis, et al. v. Hanson, et al.*

**FAX NO.:**    Listed above

**NO. OF PAGES:**    ___2___
(Including Cover Sheet)

**MESSAGE:**

*********************************************************************************
CONFIDENTIALITY NOTICE
    The information contained in this facsimile message is privileged and confidential information intended for the use of the addressee listed above. If you are neither the intended recipient nor the employee nor agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this Facsimile message is strictly prohibited. If you have received this document in error, please immediately notify us by telephone to arrange for the return of the original documents to us.

*********************************************************************************

All atty fax.2.wpd

2347

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

## MEMORANDUM

**TO:**     James A. Byram, Jr. (via Fax only)
James B. Sprayberry (via Fax only)
John V. Denson (via Fax only)
Guy F. Gunter, III (via Fax only)
H. Wayne Phears (via Fax only)
Jack Weiss (via Fax only)
Phillip E. Adams, Jr. (via Fax only)

**FROM:**   Charles E. Vercelli, Jr.

**DATE:**   March 8, 2004

**RE:**     *Davis, et al. v. Hanson Aggregates, et al.*

Dear Gentlemen:

Jim Sprayberry and I would like to take the deposition of Tom Aley by videotape on any of the following days: March 30-April 2 or April 5-7. We will offer him for a discovery deposition to be followed by the videotape deposition for use at trial or elsewhere. Please advise which dates are convenient. Please note that we have recently forwarded Oldcastle's discovery responses and Mr. Reynolds' deposition to Mr. Aley. We will forward to him Mr. Fowler's deposition immediately upon receipt, and we will ask Mr. Aley to send to us any changes to his opinions based on this information. We expect to provide that to you at least one week before his deposition.

Please have your response available during Thursday's deposition as we would like to schedule Mr. Aley's deposition at that time. Thank you.

CEVjr/ma
155-011\All\tly memos.1.wpd

```
0001
1              IN THE CIRCUIT COURT FOR
2                LEE COUNTY, ALABAMA
3
4
5   MIKE DAVIS, et al.,
6          Plaintiffs,
7   Vs.                    CIVIL ACTION NO.
8                      CV-2002-85
9   HANSON AGGREGATES SOUTHEAST,
10  INC., et al.,
11          Defendants.
12
13
14
15          DEPOSITION OF BRIAN K. FOWLER, taken
16  pursuant to notice and stipulation on behalf of the
17  Plaintiffs, in the conference room of Adams, Umbach,
18  Davidson & White, 205 South 9th Street, Opelika,
19  Alabama, before Ricky L. Tyler, Certified Shorthand
20  Reporter and Notary Public in and for the State of
21  Alabama at Large, on Thursday, March 11th, 2004,
22  commencing at 9:50 A.M.
23
0002
1               APPEARANCES
2   FOR THE PLAINTIFFS:
3          CHARLES E. VERCELLI, JR., ESQ.
4          Vercelli & Associates
5          1019 South Perry Street
6          Montgomery, AL 36104-5049
7           and
8          JAMES B. SPRAYBERRY, ESQ.
9          Attorney at Law
10         P. O. Drawer 2429
11         Auburn, AL 36831-2429
12
13  FOR THE DEFENDANT, HANSON AGGREGATES SOUTHEAST:
14         JAMES A. BYRAM, JR., ESQ.
15         Balch & Bingham LLP
16         P. O. Box 78
17         Montgomery, AL 36101-0078
18  FOR OLDCASTLE MATERIALS SOUTHEAST:
```

2349

14    South Bethlehem, New York.
15  Q.    South Bethlehem?
16  A.    Yes.  And then we've done -- we've contributed
17       into some assessments for another daughter
18       called The Dolomite Group, D-O-L-O-M-I-T-E.
19       They're in the Rochester, New York area.
20  Q.    All right.  Do you remember which quarry that
21       was for?
22  A.    I don't honestly remember.
23  Q.    The Dolomite Group, do they work in limestone
0046
1       mainly?
2  A.    Yes.  All of these -- well, the quarry in
3       Vermont is in a -- like a schist, all of the
4       other ones are in limestones.
5  Q.    And when you do the cone of depression, what do
6       you have to locate for the regulatory agencies?
7  A.    Well, they want to -- well, in a new quarry
8       opening, generally you've gone out and drilled
9       a series of holes to try to determine exactly
10       where the rock is so you know how to plan the
11       quarry.  And the different states that require
12       this to be done will ask you to put observation
13       wells into the core holes so that you can
14       monitor the ground water after you've taken the
15       core out.  So they will ask us for all of that
16       data.  And in a new quarry setting, where there
17       is no pumping going on, we will often run a
18       pump test.
19  Q.    I was fixing to say, in a pre-quarry situation,
20       how can we determine what the pumping is going
21       to be if they're not in operation?  How do you
22       do that?
23  A.    Well, we will run a pump test.  And there are a
0047
1       variety of formulas, once again, that one can
2       use to scale a pump test so that you can -- you
3       estimate the cone of depression at the rate of
4       the pump test.  And then by using charts and
5       graphs, nomographs in particular, you can take
6       those results and estimate what the pumping
7       rate will be at higher volumes.
8  Q.    Of those cones of depression that you've worked

2300

```
18  Q.   And is that litigation or is that --
19  A.   It's -- what is it in?  It's in a -- I can't
20       think of the name of the process.  There's
21       litigation in place, but it's been kicked down
22       from litigation to --
23  Q.   Mediation or arbitration?
0053
1   A.   The court kicked it back to the environmental
2        regulatory board that serviced the appeal the
3        first time.  So it's in litigation, but the
4        part I'm in right now is not in court.
5   Q.   What town or county would that be in?
6   A.   See, the quarry is located in Cavendish,
7        Vermont, C-A-V-E-N-D-I-S-H.
8   Q.   Do you know what county?
9   A.   I think that's Windsor County, Vermont,
10       W-I-N-D-S-O-R.
11  Q.   Okay.  I think you said you had been involved
12       in a good bit of due diligence.  What about
13       mining plans, have you --
14  A.   Yes.
15  Q.   Do you do mining plans for companies?
16  A.   Yes, we do.
17  Q.   Do you do mining plans for Oldcastle or its
18       affiliated companies?
19  A.   Yes, we do.
20  Q.   Have you done any recently for them?
21  A.   Well, we're involved in one way or the other
22       with that most all the time for Oldcastle and
23       their companies.
0054
1   Q.   Are you involved in the one in Lee County,
2        Alabama?
3   A.   Yes.
4   Q.   And how are you involved in that one?
5   A.   I'm responsible for it.
6   Q.   All right.  What's the status of it?
7   A.   It's in progress at the moment.
8   Q.   Do we have anything in writing on it yet?
9   A.   No.
10  Q.   Tell us what you do when you're doing a mining
11       plan.  How do you go about that?
12  A.   Well, we're in the process of trying to
```

2351

13     determine a lot of those items we discussed
14     earlier; the bedrock structure, the locations
15     of the bedrock formations; we're taking a look
16     at what Hanson was doing operationally from the
17     point of view of blasting, orientation of
18     blasting faces, loading of blasting materials,
19     what kind of rock product they were generating
20     versus what kind we're going to try to
21     generate; what kind of hauling equipment we're
22     going to use in the quarry; what sort of
23     loading equipment we will be using in the
0055
1     quarry. It's a very dense matrix of questions
2     that need to get answered in order to put
3     together a mine plan.
4     Q.   Do you have an estimate on when that will be
5     finished?
6     A.   We're beginning or going to begin some
7     investigations, drilling and so on, here
8     hopefully in the next week or two. It will
9     probably take something on the order of a
10     month, month and a half; it depends a little
11     bit on the weather and then, of course, what we
12     find in the drilling.
13     Q.   Are you going to be drilling exploratory holes
14     to core it and see what's down there?
15     A.   Yes. And then we would take that data as I
16     sort of described to you earlier and that would
17     go into giving us the quantitative basis we
18     would need for the mine -- for the mine plan.
19     Q.   Have you reviewed -- I'm going to ask in a
20     minute what Hanson gave you, but have you seen
21     Hanson's old mining plans?
22     A.   No, we haven't.
23     Q.   Have you had -- I guess you've had experience
0056
1     in, when you do these due diligence and so
2     forth, looking for potential hazards or
3     liabilities that might be involved in a quarry?
4     A.   Yes.
5     Q.   And would that include both computer searches
6     and manual searches of records and site visits?
7     A.   Yes.

2352

```
 3  A.   There may be a copy of a letter there in the
 4       stack.  I don't recall.
 5  Q.   You don't remember who it was from or to?
 6  A.   No.
 7  Q.   I don't remember seeing one.  Let me show you
 8       the documents I think we got today, Mr. Fowler,
 9       if you could flip through it?
10  A.   I think I'm recalling now that I believe what I
11       saw was a deposition by a Doctor Ewers or
12       Evers, I forget the name now.  I believe he was
13       an expert for Hanson.
14  Q.   Ewers?
15  A.   I think it's Ewers.  I think that's the --
16       that's the document that I have seen.
17  Q.   A report by Doctor Ewers, maybe?
18  A.   Well, I believe -- I'm pretty sure it was
19       either a deposition or a report.
20  Q.   Okay.  Did you look at any of the other reports
21       or summaries of --
22  A.   I've seen all of the expert opinion at this
23       point.
0102
 1  Q.   Okay.
 2  A.   But I don't believe there's a letter.  I think
 3       what I'm recalling is that --
 4  Q.   And you found all of that out in what month?
 5  A.   Well, it was -- I think I finally got the
 6       materials in early August of 2003.
 7  Q.   Have you been asked to form any opinions on
 8       that dye trace or dye study?
 9  A.   Oh, several times.
10  Q.   You have been?
11  A.   Yes, I have.
12  Q.   Okay.  And by whom were you asked?
13  A.   Oldcastle, various people.
14  Q.   Have you done any calculations or research on
15       it?
16  A.   I have formulated no opinion.
17  Q.   And why didn't you formulate an opinion?
18  A.   Don't have enough information yet.
19  Q.   What are you lacking?
20  A.   Well, we need to understand the structural
21       geology of the bedrock; we need to understand
```

2353

22    the actual flow net that exists in the bedrock;
23    I have to understand the chemistry of these
0103
1     dyes better than I do.  Basically you need to
2     go through the type of investigation you and I
3     talked about an hour or so, hour and a half
4     ago.
5   Q.    Right.  The step-by-step from the geology down
6     to the samples?
7   A.    Right.  Otherwise in my view, and as I've said
8     to Oldcastle, there's no way to know what the
9     dye test means categorically.
10   Q.    Does it tell you anything about travel time?
11   A.    A dye test by itself?
12   Q.    Right.
13   A.    It can, if you know all of those parameters I
14     was describing to you.
15   Q.    Okay.  And since you were asked to formulate
16     opinions, have you looked at any other
17     documents or talked to anybody else?
18   A.    No.  We're formulating this investigation that
19     we want to undertake and we've been waiting for
20     that to start.
21   Q.    "We" being North American Reserve?
22   A.    North American Reserve on behalf of Oldcastle.
23   Q.    Okay.  And what are you going to do to -- you
0104
1     say you are formulating it, what are you going
2     to do?
3   A.    Well, we basically are going to drill a series
4     of holes around the quarry and in a line from
5     the quarry towards the northeast out into the
6     Young parcel, out to the furthest reaches of
7     the Young parcel that we can get to on that
8     property.  And then essentially pump the quarry
9     at a variety of different rates and actually
10     monitor the drawdowns, not model them, but
11     monitor them, so that we know about the
12     hydrology.  Then the drilling that's done will
13     all be rock cores, so we'll get what appears,
14     from the literature and the other expert
15     opinion, to be the first third dimensional
16     picture of what the bedrock geology is under

2384

17     this quarry and in the land areas between it

18     and the surrounding areas.

19  Q.   I know you got the Patterson reports, did you

20     look at the drill reports and the core studies

21     in those?

22  A.   Yes. Yes, we did. Yes, we did.

23  Q.   I noticed in there there was some voids and mud

0105

1     seams and so forth in the rock, did that tell

2     you anything about the geology in that area?

3  A.   Well, in the vicinity of the cores it shows

4     that there is mud seams and voids, which is

5     typical of limestone formations.

6  Q.   Right. And do those mud seams or voids carry

7     water, transmit water?

8  A.   I believe some of them were moist; I don't

9     remember any wet voids.

10  Q.   Okay. And did you review the pumping records

11     in the Buss report?

12  A.   There are no pumping records in the Buss

13     report.

14  Q.   I may be calling it the wrong thing.

15  A.   Not sounding controversial, but there just

16     aren't any and we can save some time. The Buss

17     report describes the installation of six

18     monitoring wells.

19  Q.   Right. And they pumped them?

20  A.   To develop them. There is no data there

21     relative to pumping of the quarry and

22     observations in the wells made later, which is

23     what we need.

0106

1  Q.   Okay. So you're saying that really has -- that

2     Buss report is of no value?

3  A.   In and of itself, right.

4  Q.   Okay. When I say he did a pump study, he

5     pumped the wells to see what the interrelation

6     between two of the wells were, one and three?

7  A.   Right. That's what is known as a development

8     study, to make sure that he's got

9     communication. He was installing the wells,

10     and that's an installation report, and what

11     he's doing is telling somebody like me that the

2885

12    wells were put in, that they communicated, so
13    we know the net -- the data that we're going to
14    get will be -- we will be able to relate each
15    well to the other one. And then he leaves the
16    site and let's me, or whoever he did the work
17    for, take care of the monitoring after that.
18  Q.   Right. And they were keeping up, I think, with
19    the daily pumping discharge?
20  A.   "They" being meaning?
21  Q.   Hanson.
22  A.   I believe that's true, yes.
23  Q.   And they were also monitoring the water levels
0107
1    in those monitoring wells daily or weekly?
2  A.   I don't remember, but those records are in the
3    stack you have here today.
4  Q.   Can you tell us why Oldcastle is not doing
5    that?
6  A.   We're trying to reinstall these observation
7    wells at points in the structural geology where
8    we will gain information that's directly
9    related to those calculations I described to
10    you before.
11  Q.   I guess my question was off. Can you tell me
12    why Oldcastle is not doing daily pumping
13    records of discharge, keeping up with a chart?
14  A.   Well, I suspect they know how much they're
15    pumping every day. Are you talking about
16    quarry pumping or hydrological study?
17  Q.   Quarry pumping, their discharge?
18  A.   Yeah, they know what that is.
19  Q.   Why aren't they logging it; do you know?
20  A.   On paper?
21  Q.   Right.
22  A.   I don't know. I don't know that.
23  Q.   Did you recommend to them they either do do it
0108
1    or not to do it?
2  A.   No. I haven't been asked one way or the other.
3  Q.   Well, wouldn't that help you to know what
4    they're pumping every day?
5  A.   Well, no. Because the pumping they're doing
6    now is designed to keep the water in the quarry

7      at one level so that they can mine rock above
8      that level or keep roadways dry and that kind
9      of thing. The pumping they're doing is not
10     varied enough or quantitative enough in the
11     sense of the exact numbers to tell us anything
12     about the hydrology.
13  Q.  Do you remember what Hanson was pumping on a
14     daily average?
15  A.  I don't offhand.
16  Q.  If I told you three million, I mean, does that
17     ring a bell with you?
18  A.  Well, it seems a little high, I think, but it's
19     in the right range.
20  Q.  Do you know what Oldcastle is pumping now?
21  A.  I don't right now.
22  Q.  Well, when you looked at the pre-acquisition,
23     and prior to the site visit, didn't you review
0109
1      the Hanson pumping records to see how much they
2      were pumping on a daily basis?
3  A.   I don't believe we got the actual pumping
4      records until later on in this process. We
5      reviewed the NPDES permits that they had given
6      us, which have the pumping -- the permitted
7      pumping rates in them.
8  Q.  And what were the permitted pumping rates; do
9      you remember?
10  A.   I believe -- I believe they were in that one
11     and a half to three million gallon a day range,
12     although I -- I could go back and review it
13     again, I don't honestly remember what they were
14     at the time.
15  Q.  Sure. Did you review any rainfall records?
16  A.  Pre -- in the due diligence?
17  Q.  Right.
18  A.  No.
19  Q.  And what about since then, has Oldcastle been
20     keeping up with the rainfall records?
21  A.  I don't believe Oldcastle is, no.
22  Q.  Why aren't they doing that?
23  A.  I don't know. I don't know.
0110
1  Q.  Prior to the site visit did you look at any

2357

```
 8        usually where you find those things, from the
 9        gas line company.  They will have requirements
10        you have to follow.
11   Q.   Did you talk to somebody to find that out?
12   A.   The Hanson people told us that Dixie Pipeline
13        knew what was going on and had provided them in
14        the past with approvals of their blasting
15        plans.
16   Q.   Did the people at Hanson tell you they had
17        seismographs out a lot of times when they
18        blasted?
19   A.   Yes.  In fact, they said they had them out all
20        the time.
21   Q.   Did they tell you why they had them out?
22   A.   The reason we were given was that it's a
23        standard corporate procedure to have the
0143
 1        seismographs out.
 2   Q.   They didn't tell you it was because of the
 3        claims of blasting damage and they had at least
 4        one of them in the yard of one of the
 5        plaintiffs?
 6   A.   My understanding was they always had
 7        seismographs out for every blast.  We weren't
 8        told there was any special reason in this case.
 9   Q.   Did you check the monitoring wells when you
10        were there?
11   A.   We went to the heads of the wells to see where
12        they were.
13   Q.   The locations?
14   A.   Right.  And we checked on the -- there was one
15        well in Doctor Buss's report that had a seal
16        problem.
17   Q.   Bentonite?
18   A.   Yeah.  And we went to look at that.
19   Q.   And they freed it up, I think?
20   A.   I think the well has been decommissioned
21        because the seal problem couldn't be solved.  I
22        think I learned that after the site visit, but
23        at the time we wanted to see, you know, what
0144
 1        that all meant.  And then we checked the other
 2        wells to see if the seals -- if there had been
```

2358

3      any sealing problems there, and everything
4      seemed to be okay in the wells themselves.
5  Q.   And those wells, I guess, penetrated the
6      groundwater table?
7  A.   I believe they all did, yes.
8  Q.   Are those wells still there on site?
9  A.   Oh, yes.
10 Q.   Are they just going to be abandoned?
11 A.   No. No. We're going to use three of them in
12      our study. One of them, I believe, has been
13      taken out by the stripping operation. It was
14      located where the stripping operation
15      ultimately went through, so that's been taken
16      out by the stripping.
17 Q.   Which three are you going to use, do you know?
18 A.   I don't know the numbers, but it would be the
19      three on the west side. I know there's two on
20      the west side and one in like the southwest
21      corner. I don't remember the numbers.
22 Q.   Right. Two on the west side or three on the
23      west side?
0145
1  A.   Well, I think there's two on the west side and
2      then the third one is down in the southwest
3      corner. And we're going to add three of our
4      own.
5  Q.   And where are you going to add yours?
6  A.   Well, we're going to do one up in back of the
7      shop and office area on the north side of the
8      site.
9  Q.   North side, okay.
10 A.   Right. To try to determine the northerly edge
11      of the marble and the adjacent rock formation.
12      And then another one over on -- effectively on
13      what's the tree line right now on the stripping
14      operation on the Young parcel, which would be
15      easterly.
16 Q.   East side?
17 A.   Yeah.
18        MR. ADAMS: Did you say marble just a
19        minute ago?
20 A.   Yes.
21 Q.   It's a dolomitic marble, isn't that what that

14          asking him that?
15   Q.   I'm just asking.  Have you looked at --
16   A.   I don't remember those records exactly.  I
17        remember reading about those kind of things.
18   Q.   I think I was asking you, when you're pumping
19        from the quarry, you can call it whatever you
20        want, but you're dewatering the area, aren't
21        you?
22             MR. WHITE:  Object to the form.
23             MR. ADAMS:  It's asked and answered.
0218
1    A.   Well, no, we're not.  I mean, we're pumping at
2         different rates, which are substantially lower
3         than the pumping rate that's going on in the
4         quarry.  Half million gallons a day --
5    Q.   No, I'm talking about now; pumping four and a
6         half million gallons a day?
7    A.   Well, whatever water is coming in the quarry,
8         we're taking it out.  From wherever it's coming
9         from, we're taking it out.
10   Q.   And when you're taking it out and discharging
11        it, whatever you call that, you're dewatering,
12        aren't you?
13   A.   Right, but I don't know what I'm dewatering.
14             MR. ADAMS:  Object to that, asked and
15                  answered.
16   Q.   And why are we dewatering?
17   A.   Why are we dewatering?
18   Q.   Is it to keep the quarry dry?
19   A.   Well, to keep the water level at a level
20        necessary to run the quarry.
21   Q.   Sure.  And when you pump and discharge, it
22        artificially lowers the water table?
23   A.   Yes.
0219
1    Q.   And when you artificially lower the water
2         table, I think we've already agreed, it causes
3         the cone of depression?
4    A.   It creates the cone, yes.
5    Q.   Right.  And we don't know the size of the cone
6         or the shape of the cone, right?
7    A.   That's right.
8    Q.   But when you're taking out -- I don't know what

2360

```
 9      four and a half million gallons a day would be,
10      but 130 million gallons a month or something?
11  A.   Whatever that is.
12  Q.   And I think you said you could do calculations
13      on a water budget?
14  A.   We can, yes.
15  Q.   Okay.  But you haven't done any of those yet?
16  A.   No.
17  Q.   Okay.  In fact, to do a water budget, you don't
18      need geology or any of the other data, do you?
19  A.   Oh, absolutely.
20  Q.   You do?
21  A.   I don't know how you can get a water budget
22      without it.
23  Q.   Is that on the density and the permeability
0220
 1      factors that go in the formula?
 2  A.   Right.
 3  Q.   And I think you mentioned the formulas, where
 4      are they located?  Are they in some general --
 5  A.   Yeah, any basic hydrology textbook would have
 6      the formulas.
 7  Q.   All right.  And what are they called?  I know
 8      they don't have a particular --
 9  A.   I don't know that there's a particular name.
10      They are sort of aquifer dynamics formulae.
11  Q.   Okay.  Aquifer dynamics?
12  A.   There will be a set of them for sand and gravel
13      and a set of them for fractured rock and so
14      forth.
15  Q.   What are the other factors that go into the
16      formula; do you know?
17  A.   The formula?
18  Q.   Right.
19  A.   Which one?
20  Q.   Whichever one you would use to figure up the
21      water budget?
22  A.   Oh, well, I don't know that there is a formula
23      for a water budget.  I thought you were talking
0221
 1      about aquifer dynamics and the way water flows
 2      through an aquifer.  A water budget is
 3      basically an estimate of how much water is
```

23        less than what was being pumped at those times.

0223

1         And the reason you do that is so in the course
2         of running the pump test you don't cause damage
3         to the outside envelope of the pumping that's
4         been going on. If the allegation is that two
5         million gallons a day is causing damage, it's
6         crazy to do a test at two million gallons a
7         day, because you may cause damage during the
8         test. So you go down to half a million or a
9         million or 750,000 where it's pretty clear no
10        damage has occurred in the past.
11   Q.   Well, isn't it also dangerous -- if you're
12        going to fluctuate the pumping and fluctuate
13        the water table level, that it can even be more
14        dangerous because it will cause -- particularly
15        in karst terrain it will cause sinkhole
16        collapse?
17   A.   Was that a question?
18   Q.   Right.
19   A.   No.
20   Q.   That's not a problem?
21   A.   No, because the collapse dynamics of the
22        sinkholes were triggered by some pumping rate
23        in the past, which is going to be, given the

0224

1         records, likely substantially higher than what
2         we would be pumping during the pump test. So
3         the water tables around the quarry should
4         actually be coming up during the time we're
5         running the test.
6    Q.   You're saying even the holes that are forming
7         recently in the last two weeks or so were
8         caused by pumping that was in the past?
9    A.   No, they may be being caused by the pumping
10        today, so you don't run the test at the pumping
11        that's going on today, because you might create
12        more sinkholes.
13   Q.   You reduce it down?
14   A.   That's exactly right. That's what I've been
15        saying. So you run the test at 500,000 or 250
16        or something like that so that you're below the
17        damage envelope that's been demonstrated to be

18    true.
19  Q.  Okay.  Do you know how much leased land is out
20      there, Mr. Fowler?
21  A.  I think it's all leased.
22  Q.  Oh, I'm sorry.  How many acres are leased?
23          MR. ADAMS:  All of it.
0225
1           MR. SPRAYBERRY:  A good answer to a bad
2              question.
3   A.  I'm sorry, I misunderstood your question.  No,
4      I don't know the total acreage.
5   Q.  Assume it's 600 acres, and we're pumping out
6      1.6 billion gallons a year, or whatever it
7      would be, according to my math, do you think
8      that 1.6 billion gallons is all coming from
9      that leased property?
10  A.  Probably not.
11  Q.  We just don't know where it's coming from?
12  A.  Right.
13  Q.  Is there any way we can tell how far it's
14      coming at this point?
15  A.  How far the water that comes into the quarry
16      travels?  Not right now, I don't think, that I
17      can think of a way.
18  Q.  I guess you saw in the depositions about the
19      dye traces and I think I had asked you earlier.
20      From the -- on 166, which is on the west side
21      of the quarry, there's a sinkhole --
22  A.  Right.
23  Q.  -- and the Rhodamine dye was put in there and
0226
1      it showed up about three days later in the
2      quarry discharge; does that tell you anything
3      about that sinkhole?
4   A.  Well, probably there is a connection between
5      the sinkhole, hydrologic connection between the
6      sinkhole and the water in the quarry.
7   Q.  Oky.  And what about the Eosine that was put in
8      Uchee Creek and showed up in the discharge,
9      does that tell you anything?
10          MR. ADAMS:  Object to the form.
11  A.  Well, no, because of this problem with the
12      breakdown products, which, you know, I need to

2363

13     investigate some more.
14  Q.   Well, I thought I asked that earlier and you
15     said Eosine does not break down; the
16     Fluorescein does, but Eosine doesn't?
17  A.   Right.  But the Eosine could have come from
18     whatever the other dye was that they put in
19     close to the quarry, as I understand it.
20  Q.   You're saying the Eosine could have come from
21     the Rhodamine dye?
22  A.   Right, as a breakdown product of the Rhodamine
23     dye or whatever it was.  I don't remember which
0227
1     dye is which here.  But Eosine is the one I
2     understand is the most stable of the three,
3     chemically stable.
4  Q.   Right.  And it's the one that's shown up from
5     Little Uchee Creek in the discharge?
6         MR. WHITE:  Object to the form.
7  A.   Is Eosine?
8  Q.   And does that tell you anything?
9  A.   Well, it could mean that there's a direct
10     connection between the spring and the quarry or
11     it could mean that it's breakdown product, and
12     we aim to try to resolve that.
13  Q.   One of the two?
14  A.   Right.  Which one it is, we don't know, but we
15     need to find out.
16  Q.   And it would have to travel about 7,000 feet,
17     that's an abnormally long distance, is it, for
18     water --
19  A.   That's a long way for a cone of depression.
20  Q.   Is it?
21  A.   Yeah.
22  Q.   What's the longest dye study you know of?
23  A.   Well, I don't know.  The longest one I know
0228
1     about is, I don't know, a few hundred feet, I
2     think, up until now.
3  Q.   Okay.  If the water from Little Uchee is going
4     into the quarry, what can we do about it?
5         MR. WHITE:  Object to the form.
6  A.   Well, I guess it would depend on how much water
7     is going in from Little Uchee Creek.  I mean,

3    and the creek went dry may not necessarily be

4    just because the quarry is there. It could be,

5    and probably is, a combination of these

6    different things. And there's also been

7    construction at the spring in the past in the

8    1950s, drilling, blasting and deepening and

9    whatever.

10 Q.   '20s, 1920s.

11 A.   Well, whenever. But, you know, the point is

12    that over a thousand year time frame for

13    karstic features to be forming, it's not

14    unlikely, I don't know that it is, but it's not

15    unlikely that there could have been some

16    changes wrought by that work, which added

17    together with today's conditions, you know,

18    created the situation that we have today. And

19    in order for me to tell you how much water is

20    good and how much water is bad relative to the

21    quarry, I need to know the answers to those

22    questions before I could really give you a

23    solid answer.

0231

1 Q.   When you say that the karst features have been

2    forming out in the spring area for thousands of

3    years, what are you basing that on?

4 A.   Well, it's karstic limestone, nobody disagrees

5    about that. And the karstic development began

6    as soon as the ocean --

7 Q.   Receded?

8 A.   -- receded, which is roughly in the Pliocene,

9    what, five million years ago.

10 Q.   It was before my time, I don't know.

11 A.   Me, too.

12 Q.   So we've done -- I was asking you about some of

13    this stuff. If there is a cone of depression

14    in this karst area, are sinkholes more likely

15    to form?

16 A.   I'm not sure. If the quarry is creating the

17    cone?

18 Q.   Well, you've already said they are, haven't

19    you?

20 A.   I'm just confused about your question.

21 Q.   I mean, there is a cone of depression out

2365

22    there?
23  A.   Because of the pumping, yes.
0232
1  Q.   Because of the pumping?
2  A.   Right.
3  Q.   And this is a karst area?
4  A.   Yes.
5  Q.   And because of that, isn't it true that it's
6       more likely that sinkholes will form?
7  A.   It increases the possibility, yes.
8  Q.   All right. And if there is a sinkhole that
9       forms in a stream, it can swallow that stream,
10      can't it?
11  A.   Oh, sure. Yeah.
12  Q.   I think you even made reference to the river
13      where the quarry was diverting some of the
14      water from the river 2,000 feet earlier in your
15      deposition?
16  A.   Oh, on one of the other quarries?
17  Q.   Yes.
18  A.   Yes.
19  Q.   Which quarry was that?
20  A.   That was the one in Pennyslvania.
21  Q.   What was the name of it?
22  A.   Well, it's called the Hummelstown quarry,
23      H-U-M-M-E-L-S-T-O-N -- S-T-O-W-N, I'm sorry.
0233
1  Q.   And I take it it did not swallow the entire
2       river, it was taking part of the water?
3  A.   Right. But had we not stopped the process, the
4       hole would have gotten progressively bigger and
5       eventually the river would have run into the
6       quarry.
7  Q.   So you had no choice in that situation but to
8       try to do something?
9           MR. ADAMS: Object to the form.
10  A.  Right.
11  Q.   And if there's a sinkhole out there in Little
12      Uchee Creek, you can just assume that it is
13      swallowing the entire creek --
14          MR. WHITE: Object to the form.
15          MR. ADAMS: Object to the form.
16  A.  Well, I don't know. I mean, I haven't walked

2366

6  A.   I gave them back to Ted, yeah.
7  Q.   Okay.  Well, we will need to get those from
8        Mr. Reynolds.
9  A.   The better place to get them is from Dixie
10       Pipeline.
11 Q.   What you're saying is there's steel on either
12       side of the pipeline itself?
13 A.   Right.  The pipeline is constructed so that
14       it's not tremendously flexible in a vertical or
15       a horizontal sense.
16 Q.   Is it in a steel cage or is it welded to the
17       pipe?
18 A.   I believe the superstructure in this case is
19       welded to the side of the pipe, although, you
20       know, don't hold me right to that, but I think
21       that's what it is.
22 Q.   So if a 20 foot hole opens underneath it,
23       you're not — you think it will hold up?
0247
1  A.   Right, it would bridge the hole.  You need to
2        fix the hole obviously and reenforce the pipe,
3        but you wouldn't have an immediate impact.
4  Q.   Okay.  I think Lee County also did some sonar
5        on Lee Road 166 and on Spring Villa Road, did
6        you see those reports?
7  A.   I don't believe I did, no.
8  Q.   Okay.  There was a big void up under Spring
9        Villa Road according to the sonar reports, and
10       they were going to grout it; I don't know if
11       they've grouted it or not?
12 A.   I don't think I have seen — I'm pretty sure I
13       haven't.  I don't recall it, anyway.
14 Q.   I think you said earlier that the water
15       underground, the groundwater, can flow one
16       direction and then over time it can change and
17       go to a different direction?
18 A.   Yeah, in karstic limestone.  Yeah.
19 Q.   Sure.  So if we do monitoring wells in 2004
20       will it tell us what the water pattern was in
21       2003 or 2002, or could it change over time?
22 A.   Yeah, we wouldn't probably be able to determine
23       the previous patterns, except, I mean, if we
0248

2367

```
 1      were lucky enough to hit a void of a certain
 2      sort that had a certain diameter and we were
 3      able to look at the weathering rinds on the
 4      side of the sinkhole -- of the void in order to
 5      get an idea of how long it has been since water
 6      did flow through the crack and so forth, that's
 7      one way to get at it.
 8  Q.  Right.
 9  A.  It's not tremendously precise, but you can tell
10      if you are lucky enough to hit one of them.
11  Q.  Other than the monitoring wells that you're
12      talking about, is there anything else we can
13      use or do to determine where the water is
14      coming from that's going into the quarry?
15  A.  Well, use the sinkholes actually.
16  Q.  Do what now?
17  A.  Use the sinkholes.
18  Q.  How would we use those?
19  A.  If they're directly related to water flow
20      involving the quarry, then by studying them and
21      how long it's been since water was in them and
22      how they collapsed, we'll get a pretty good
23      feel for where the cone of depression is or has
0249
 1      been and how the quarry pumping might be
 2      affecting it. In fact, in our investigation,
 3      one of the things we want to do is a
 4      hole-by-hole inspection and collapse mechanic
 5      analysis on each one.
 6  Q.  Why do you look to see when it had water in it?
 7  A.  Well, that will give us an idea of how long ago
 8      the water had been there. If a sinkhole forms
 9      tomorrow and you go into it and you find out
10      the weathering rinds on the side of it indicate
11      no water has been there for 150 years or
12      something like that, then the collapse
13      mechanics are the results of something else.
14      You see, the sinkhole can form and water go
15      some place else, but that sinkhole never sunk,
16      it never was old enough or it had enough water
17      in it to actually --
18  Q.  The potential was there, but it had not yet
19      collapsed?
```

15     MR. VERCELLI:  And over time we've
16        given all of the coordinates as
17        best we can on all of them over
18        time.
19     MR. BYRAM:  Yeah.  Well, it would be
20        nice to have one list.
21     MR. ADAMS:  Somebody gave them to me
22        very recently, within the last
23        month or so.
0252
1  A.   And maybe I got them from you then.
2     MR. ADAMS:  Yeah, you did.
3  Q.   Mr. Fowler, after — in July of last year when
4     you learned of the litigation, I know y'all are
5     working on this plan, what else have y'all done
6     to determine the validity or the invalidity of
7     the allegations in the lawsuit?
8  A.   Well, we haven't really done anything specific
9     in a scientifically quantitative sense.  What
10    we've been trying to do is make sure we
11    understood all of the positions.  As I said
12    earlier, I think it's important not to be
13    cynical about this, and say, this is baloney,
14    and this is okay.
15       I mean, we're not a party to the original
16    lawsuit, we're in this other one.  And my
17    attitude was that let's see if one of these
18    people is right.  Let's assume the best and go
19    forward and see if we can use their data, use
20    their line of logic, and their evidence, and so
21    on, and come up with a reasonable scientific
22    certainty that their conclusion is accurate.
23       And we've spent most of the most of the
0253
1    months between our receipt of the boxes of the
2    stuff and, you know, the first -- you know, you
3    read things first to get a feel for where
4    you're going and sifting and sorting and
5    whatever.  We've spent most of the time trying
6    to figure out where those opinions are.
7       We've come up with these conflicts that
8    I've described earlier and decided that what we
9    needed to do was conduct this investigation of

10      our own to try to get enough data to decide
11      which ones are right or wrong, or what is -- if
12      they're all wrong, what's right.
13          I guess we don't have a big stake in the
14      results of the investigation.  Because what we
15      intend to do is what we've already started to
16      do, and that is to begin to identify, you know,
17      dust, noise, blasting, down the list.  Those
18      are problems.  I've just taken --
19  Q.  One at a time?
20  A.  -- the complaint seriously, because, I mean,
21      people aren't complaining about them if they
22      weren't problems in the sense of their
23      lifestyle or their livelihood.  And in an
0254
1       environmental management sense, it doesn't
2       matter how bad the problem is, the problem
3       exists.  And as long as the problem exists,
4       even perceived to exist, we've got a problem.
5           And there are a variety of things we can
6       do to begin to mitigate those impacts, whatever
7       they may be.  Now, some people may never be
8       satisfied, you know, but we'll do the best we
9       can.  And that's the goal -- I mean, that's my
10      assignment from Oldcastle is to design an
11      investigation and the design of a mining plan
12      which has the maximum amount of abatement --
13      mitigation and abatement built into it for the
14      impacts that have been identified by the
15      complaints that you-all have transferred to us.
16  Q.  Have you made any recommendations to Oldcastle
17      that they've declined not to pursue?
18  A.  Oh, no.  Everything we've suggested they've
19      done.
20  Q.  Okay.  And that's the berms and the monitoring
21      wells to be put in; any other recommendations
22      you've made to them?
23  A.  Yeah.  We suggested that they, for the time
0255
1       being, cut back on the loading rate and the
2       blasting and redesign the blasting patterns.
3       Based on information that I don't personally
4       have, but Ted Reynolds had, about the size of

5    the blasting shots that they were detonating --
6    that Hanson was detonating and the orientation
7    of the quarry and so forth, we've backed all of
8    that down to somewhere around 50 percent of
9    what they were doing.  The plant production
10    rate has been cut down to -- I'm not quite sure
11    of these percentages, so don't hold me to them,
12    but something like 50 or 60 percent of what
13    they were doing.  And we've moved the hauling
14    patterns in the stripping area and the quarry
15    around so we've cut down back-up movements, for
16    example, which have all of the back-up alarms.
17    So no trucks are backing up any more, they're
18    all --
19  Q.    Going forward?
20  A.    Right, they're always going forward.  There is
21    a variety of things like that that we have done
22    in an attempt to make sure insofar as we can,
23    without having the numbers, that, you know,
0256
1    we're not creating whatever impact people
2    perceived that there was before.  Now,
3    obviously that isn't a hundred percent
4    successful, but that's what we've been doing.
5  Q.    Would you agree with me that the water table in
6    the Spring Villa area has dropped, for whatever
7    reason?
8  A.    It appears as though it has, yeah.
9  Q.    And dropped fairly significantly?
10  A.    It dropped more than 30 feet.
11  Q.    Right.  For whatever reason.  And I believe
12    Hanson's expert said that whatever caused that
13    water table to drop was also causing the
14    sinkholes?
15  A.    In the Spring Villa area?
16  Q.    Right.
17  A.    Yeah.
18  Q.    Would you agree with that?
19  A.    I agree with that.  We don't know what the
20    mechanism is, but --
21  Q.    When you're talking about the mechanism of the
22    sinkhole, are you talking about the size of it
23    and the shape of it and how it collapsed in; is

2371

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

F I L E D

APR 1 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**DEEFNDANT OLDCASTLE MATERIALS' RESPONSE TO
PLAINTIFFS' "MOTION FOR DEFENDANTS
TO PAY COST OF SECOND MEDIATION"**

COMES now Oldcastle Materials, Inc. and files herein its response and opposition to Plaintiffs' Motion seeking to compel this Defendant to pay a portion of the Plaintiffs' cost of mediation and shows unto the Court as follows:

1. The Plaintiffs in this case filed suit against this Defendant on August 1, 2003, less than thirty (30) days after this Defendant acquired the Opelika quarry from Hanson Materials and prior to this Defendant conducting any significant quarry operations on the property.

2. The Plaintiffs' Motion avers that the first mediation was held May 21, 2003, more than two months prior to the Defendant Oldcastle being made a party to this action and the mediation was held without Oldcastle's knowledge, consent or participation.

3. The Court has ordered all parties to mediation at this time and Oldcastle intends to enter into the mediation in good faith.

4. However, the attorney for Oldcastle has recently been advised by counsel for the Plaintiffs that he has spoken with the Court appointed mediator to discuss the method and means by which the

mediation might be conducted. Counsel for Oldcastle has reached the opinion after receiving and reviewing a memo from Plaintiffs' counsel dated April 12, 2004 that Plaintiffs may not be entering mediation in good faith with the idea of reaching a compromised settlement of claims in this matter (See Exhibit "A" attached hereto.)

WHEREFORE, the Defendant Oldcastle avers that this Court make and enter an order requiring that the cost of mediation be divided equally between the Plaintiffs and the Defendants herein.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant Oldcastle
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15th day of April, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

2375

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345


_____
Of Counsel

2374

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

### MEMORANDUM

**TO:**      James A. Byram, Jr.
James B. Sprayberry
John V. Denson
Guy F. Gunter, III
H. Wayne Phears
Jack Weiss
Phillip E. Adams, Jr.

**FROM:**    Charles E. Vercelli, Jr.

**DATE:**    April 14, 2004

**RE:**      *Davis, et al. v. Hanson Aggregates, et al.*

---

Dear Gentlemen:

I have spoken with retired Circuit Judge William Gordon about mediating this case. During the last hearing, the Defendants apparently agreed to a subsequent mediation by Judge Gordon. In discussing the matter with Judge Gordon, I made him aware of the purchase of the quarry by Oldcastle and Mr. Adams' involvement. In further discussing the matter with Judge Gordon, we felt it might be appropriate for Judge Gordon to communicate with each of the parties separately, rather than have a joint mediation session attended by all parties and their representatives. He and I felt that it may be more conducive to settlement discussions if he were able to speak freely with each party without the time constraint of a formal mediation. The formal mediation did not work last time. Jim Sprayberry and I do not believe that it is particularly necessary to have everybody in one conference room together only to be broken up into separate rooms at this point in the game. I invite your thoughts in this regard.

If either Defendant would rather not participate, please let us know. We are certainly willing to listen, but please do not waste your time and our time if your client has no intention of offering a meaningful settlement proposal. Our original letter to Hanson (June 26, 2003) sets forth the issues that must be addressed in any settlement dialogue.

CEVjr/ma
cc:   Judge William Gordon
155-001\All atty memo\K2sepd

# EXHIBIT A

2375

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC. et al., | ) |
| | ) |
| Defendants. | ) |

FILED

APR 15 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION FOR COURT TO ORDER PARTIES TO ATTEND MEDIATION

COMES NOW the Defendant, Oldcastle Materials and moves the Court to require the Plaintiffs and Defendants herein to have all Plaintiffs and representatives of corporate Plaintiffs and Defendants present at the mediation ordered by this Court and in support of this Motion says as follows:

1. Less than thirty (30) days after acquiring the Opelika quarry and before any significant operations had begun on the premises Plaintiffs filed suit against Oldcastle in this matter.

2. Defendant Oldcastle has never had an opportunity to participate in a mediation or other attempt to resolve the issues and claims being made by the Plaintiffs against the Defendant Oldcastle. Consistent with the Civil Court mediation Rules applicable in this state Oldcastle intends to bring a representative prepared to discuss during mediation the issues submitted and someone who possesses authority to authorize settlement during the mediation session. Oldcastle is informed that not all Plaintiffs may attend the mediation session.

2375

3. Oldcastle further avers that the claims being asserted by the parties are different and each Plaintiff should be present in order to hear and participate in the negotiations and the mediation process.

4. Oldcastle proposes that this Honorable Court require that the parties and their attorneys meet with the mediator to determine the appropriate method by which the mediation might be conducted, including the notion of conducting the mediation over several days by which all individual Plaintiffs could participate on one day and the representatives of the City of Opelika and Beauregard Water Authority participate on another day in order to allow all parties an opportunity to engage in the mediation process and to have an opportunity to settle each respective claim on their individual merits.

Respectfully submitted, this the 15th day of April, 2004.


ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant Oldcastle
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15th day of April, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

APR 1 6 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. CV-02-85 |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RESPONSE TO PLAINTIFFS' MOTION REGARDING THE COSTS OF SECOND MEDIATION

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") hereby requests the Court to deny Plaintiffs' "Motion for Defendants to Pay Cost of Second Mediation." In response to Plaintiff's Motion, Hanson avers as follows:

1.      Rule 2 of the *Alabama Civil Court Mediation Rules* states that "[i]n all instances except where the request for mediation is made by only one party, the court may allocate the costs of mediation, except attorney's fees, among the parties." The Comment to Rule 2, as amended, admonishes that "[i]t may be helpful for courts to consider the commitment to the mediation process that derives from each party having a financial stake in the process. Courts may find mediations are more successful if each party is required to pay a portion of the mediation costs."

2.      Rule 15 of the *Alabama Civil Court Mediation Rules* requires that "...expenses of the mediation, including necessary travel and expenses of the mediator...shall be borne equally by the parties unless the parties agree otherwise, or unless the court directs otherwise."

3.      In the instant case, the Court exercised its authority under *Ala.Civ.Ct.Med.R.* 2 and 15 to allocate the expenses of the second mediation in its Order dated February 12, 2004. In

143682.1

1

its Order, the Court specifically required the parties to "evenly split the costs of said mediation." The Court's Order is in harmony with the express language of Rules 2 and 15 and with the express purpose for the allocation of mediation expenses set forth in the Comment to Rule 2.

4.    Plaintiffs' request to alter the Court's previous allocation of expenses is wholly without merit.  Hanson entered into the first round of mediation "prepared to discuss during mediation sessions the issues submitted to mediation" and made "someone with authority to settle" "reasonably available" during the entire course of the initial mediation as required by Rule 6 of the mediation rules.  There is simply no basis for any contrary contention by plaintiffs' counsel.

WHEREFORE, premises considered, Hanson respectfully requests the Court to deny Plaintiffs' Motion for Defendants to Pay Cost of Second Mediation as the Court has previously ruled on this issue in a manner consistent with the express language and purpose of the *Alabama Civil Court Mediation Rules.*

Respectfully submitted this the 15th day of April 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

143682.1

2

2380

H. Wayne Phears, Esq.
Phears & Moldovan
4725 Peachtree Corner Circle
Suite 375
Norcross, Georgia  30092

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by

United States Mail, properly addressed and postage prepaid, on this the 15th day of April 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

Of Counsel

143682.1

3

FILED

APR 19 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2381

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                    )
        PLAINTIFFS,                 )
                                    )
vs.                                 )        CIVIL ACTION NO. CV-02-85
                                    )
HANSON AGGREGATES                   )
SOUTHEAST, INC., et al.,            )
                                    )
        DEFENDANTS.                 )

### DEFENDANT OLDCASTLE'S MOTION TO STRIKE EACH OF THE PLAINTIFF'S RESPONSES TO OLDCASTLES INTERROGATORIES AND MOTION TO COMPEL NEW RESPONSES AND MOTION FOR SANCTIONS

COMES NOW, the Defendant, Oldcastle Materials Southeast Inc., by and through counsel, and moves this Honorable Court to strike each of the individual Plaintiff's responses to Oldcastle's Interrogatories and to compel the Plaintiffs to file new responses which fully and completely respond to Oldcastle's discovery requests. As grounds for said motion, Defendant states as follows:

1.    On October 15, 2003, Oldcastle propounded Interrogatories and Request for Production directed to each of the Plaintiffs.  (See exhibit A).

2.    Sometime thereafter, Oldcastle began receiving Interrogatory Responses signed by the Plaintiffs.  However, upon reviewing the Interrogatory responses, it became apparent that each of the Plaintiff's interrogatory responses were virtually identical to each other, with the exception of only a few paragraphs scattered throughout the responses.  (Examples of Plaintiffs' Interrogatory responses are attached as exhibits B, C, D, E, F, & G).

3.    As the Court can see, one can literally lay the responses side by side, and see the identical nature of the responses. The responses are verbatim for each Plaintiff, with very few exceptions.

4.    An example of one of the Plaintiffs Interrogatory responses are those completed by Plaintiffs, Naomi and Ken Schweiker, which is attached as Exhibit "B". Oldcastle's Interrogatory #1 requests information concerning the Plaintiffs' experts, their opinions, qualifications, and bases for their opinions. The Schweiker's response is that "at the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Request for Production. . . . . Summaries of the opinions, qualifications, and bases for opinions for these experts have been previously produced in Plaintiffs' response to Hanson's Interrogatories and Request for Production of Documents which are incorporated here by reference. These expert's opinions are expected to be the same - as appropriate - with respect to Defendant, Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Request for Production of Documents, then Plaintiffs expect to provide such information to each of the above experts." The Schweiker's response to this interrogatory is <u>identical</u> to the responses of <u>all</u> the Plaintiff's.

5.    On March 16, 2001, counsel for Oldcastle wrote to counsel for Plaintiffs requesting that the Plaintiffs meaningfully respond to Oldcastle's

2383

discovery requests. (See exhibit H). Specifically, counsel stated, "we are entitled to specific responses regarding experts and expert opinions and we will expect to receive those prior to your clients' depositions." As of the date of the instant filing, counsel for Oldcastle has not received any supplemented discovery responses from any of the Plaintiffs.

6.   In addition, and perhaps more disturbing, is that each of the Plaintiffs' discovery responses contain information and alleged factual statements regarding the operation of the quarry, and its alleged effects, which the Plaintiffs themselves have no personal knowledge of, yet such statements are set forth in their Interrogatory responses as if the individual Plaintiffs do, in fact, have personal knowledge of the alleged facts.

7.   Take, for instance, the Interrogatory responses of Ken and Naomi Schwieker. In Interrogatory # 2(a) Oldcastle asks the Plaintiff to "set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in paragraph 111 of the complaint that Oldcastle 'is intending to and will continue the operations of the quarry the same or similar conditions' as Hanson operated the quarry." Ken and Naomi Schwieker responded in pertinent part as follows, " . . . *Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operations of their mobile equipment and their*

stationary equipment; *Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much or more noise and dust pollution . . . ."* (Emphasis added).[1] <u>At deposition</u>, however, Mr. Schwieker admitted that he did *not* have any personal knowledge as to *how much water Oldcastle is pumping from the quarry;* he admitted that he did *not* have any personal knowledge has to *how much dust is being generated at the quarry, and further stated that dust is not one of his complaints in this lawsuit;* he further admitted that he did *not* have any personal knowledge regarding *the generation of "loud and irritating noise from early in the morning and into the night" -- Specifically, he admitted that he had no knowledge of whether Oldcastle operated the quarry earlier in the morning that Hanson or later in the evening than Hanson;* Mr. Schwieker also admitted that he has *no knowledge* as to *how much rock Oldcastle may be crushing and whether it has caused as much or more noise and dust pollution.* (See excerpts of depo. of Ken Schweiker attached as exhibit I.)

8.    Again, in Interrogatory # 3(a), Oldcastle requests that the Plaintiffs set forth every fact, transaction, occurrence, communication, or event upon

---

[1] Again, all of the Plaintiffs responses to this interrogatory in this regard were identical.

which Plaintiffs base the contention in paragraph 113 of the complaint that
"Oldcastle continued operation of the quarry will be done in a negligent
and a wanton manner and causing damages and continued damages to
Plaintiffs."

9.    Ken and Naomi Schwieker in their response to said Interrogatory, state
that, ". . . Oldcastle continued and continues its operations unabated - and
in fact in a manner that is even worse than when Hanson operated the
quarry, *as the noise is worse, the dust is worse*, the problems with land
collapse is worse, and the spoil pile has been greatly increased in size."[2]
Again, at deposition, Mr. Schwieker admitted that *he has no knowledge of
noise or dust problems, and that dust and noise are not part of his
complaints in this lawsuit.*  Additionally, in his response to Interrogatory
# 3(a) the Schweiker's state that, "moreover, on October 5th & 6th, 2003,
there was a heavy mud and/or discharge in violation of ADEM
regulations that resulted in massive amounts of sediment being pumped
out of the holding ponds and into the drainage and onto the Bobby Parker
property, causing his irrigation system to pump red mud all over his
property (until the mud clogged his system and shut it down).[3]  Again, at
deposition, Mr. Schwieker admitted that he had no first hand knowledge

---

[2]Once again, all of the Plaintiffs responses to this interrogatory in this regard
were identical.

[3]Yet again, all of the Plaintiffs responses to this interrogatory in this regard were
identical.

of this incident and gained this information via his attorney. (See exhibit I).

10.    These are but a few examples of the kinds of interrogatory responses each of the Plaintiffs gave. These types of interrogatory responses are scattered throughout the responses by Ken and Naomi Schwieker, and throughout all of the Plaintiffs responses to Oldcastle's Interrogatories. Time after time at deposition, many of the Plaintiffs have disavowed their interrogatory responses, or distanced themselves therefrom.

11.    The Plaintiffs' Interrogatories responses, in their current state do not aid the Defendants in ascertaining which claims are being made by which parties, or what the Plaintiffs' expert will say as to any alleged damages allegedly caused by Oldcastle. This is precisely the reason the Interrogatories and Request for Production were propounded to the Plaintiffs in the first place.

12.    The Plaintiffs' responses to Oldcastle's Discovery Requests in their current condition, are utterly meaningless. They simply compile a series of bare allegations and unsubstantiated contentions drafted by the Plaintiffs' attorneys and signed off by the Plaintiffs themselves. Each of the Plaintiffs have admitted over and over that they do not have personal knowledge of the allegations set forth in their discovery responses.

WHEREFORE, counsel for Defendant, Oldcastle moves this Honorable Court to strike each of the Plaintiffs' discovery responses and order that each of the Plaintiffs

2387

again respond to Oldcastle's discovery requests, but this time in a more meaningful and forthright way, based upon each individual Plaintiff's personal knowledge. Additionally, Defendant also moves this Honorable Court to enter such appropriate attorneys fees, costs, and sanctions as it deems appropriate pursuant to Rule 37 due to the incomplete, evasive, inadequate and misleading nature of Plaintiffs' discovery responses.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
PHILLIP E. ADAMS, JR. (ADA025)

BY: _____
MATTHEW W. WHITE (WHI086)

BY: _____
PATRICK C. (RICK) DAVIDSON (DAV111)

Attorneys for Defendant Oldcastle Materials Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the above and foregoing upon:

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 South Perry Street
Montgomery, AL 36104

James B. Sprayberry, Esq.
P.O. Box 2429
Auburn, AL 36831-2429

Guy Gunter, Esq.
P.O. Box 409
Opelika, AL 36801

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

This the 19 day of April, 2004.

_____
Of Counsel for Defendant

2389

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )        CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC. et al.,                )
                                       )
        Defendants.                    )

## OLDCASTLE'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Defendant Oldcastle, Inc., requests that Plaintiffs answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure.

## INSTRUCTIONS AND DEFINITIONS

1.    "Complaint" means the Fourth Amended and Restated Complaint in this matter.

2.    "Oldcastle" means Oldcastle, Inc., the entity named in the complaint, including any present or former officers, directors, employees, representatives, agents or attorneys thereof.

3.    "Hanson" means Hanson Aggregates Southeast, Inc., the entity named in the complaint, including any present or former officers, directors, employees, representatives, agents or attorneys thereof.

4.    The "Quarry" means to the limestone and marble quarry located in Lee County, Alabama, referred to in the complaint.

5.    "Relating to" and "relate(s) to" mean constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to the given subject matter.

6.    "Document" shall include, without limitation, all written, typed, or otherwise preserved communication, including any letter, correspondence, note, book, pamphlet, article,

DEFENDANT'S EXHIBIT

A

bulletin, directive, review, publication, memorandum, diary, log, test, analysis, study, appraisal, projection, check, invoice, receipt, bill, purchase order, shipping order, contract, lease, agreement, work paper, calendar, envelope, paper, telephone message, tape, computer tape, computer disk, computer card, recording, videotape, film, microfilm, microfiche, drawing, account, ledger, statement, financial data, and all other writings or communication in Plaintiffs' actual or constructive possession, custody or control or of which Plaintiffs have knowledge of the existence, and whether prepared, published, or released by Plaintiffs or by any other person or entity. The term "documents" is intended to include all drafts of documents and all documents in Plaintiffs' actual or constructive possession, custody or control, and whether prepared, published or released by Plaintiffs or by any other person or entity. Without limiting the foregoing, the term "document" shall include any copy that differs in any respect from the original or other versions of the document, such as, but not limited to, copies containing notations, insertions, corrections, marginal notes, emendations or any other variations.

7.      "Person" means any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

8.      Whenever in these interrogatories there is a request to identify a communication, state:

    a.      the date and place of such communication;

    b.      the identity of each person who was present at or who participated in such communication;

    c.      the type of communication (e.g., letter, telegram, conference, telephone conversation, memoranda, etc.);

    d.      the substance of such communication; and

2391

    e.    the identity of each document reflecting, referring to, comprising, constituting, or summarizing such communication.

9.    Whenever in these interrogatories there is a request to identify a document, state:

    a.    the date;

    b.    the author and signatories;

    c.    the recipients and addresses;

    d.    the type of document (e.g., letter, memorandum, telegram, etc);

    e.    the substance of the document;

    f.    the identity and addresses of all other persons who received copies;

    g.    the custodian; and

    h.    the location.

10.    Whenever in these interrogatories there is a request to identify a person, state:

    a.    the full name;

    b.    residence address;

    c.    residence telephone number;

    d.    business address;

    e.    business telephone number; and

    f.    and relationship to Plaintiffs of that person.

## INTERROGATORIES

1.    Identify any and all experts Plaintiffs intend to offer testimony in the trial of this matter, and state the subject matter on which the expert is expected to testify, state the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each opinion.

2.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 111 of the Complaint that Oldcastle "is intending to and will continue the operations of the quarry under the same or similar conditions" as Hanson operated the quarry.

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

3.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 113 of the Complaint that "Oldcastle's continued operation [of the quarry] will be done in a negligent and wanton manner causing damages and continued damages to Plaintiffs."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

4.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 114 of the Complaint that "All damages and harms pleaded in this Complaint will continue if Defendant Oldcastle continues to operate the quarry."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

5.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 114 of the Complaint that

2393

"any blasting and discharging of water by Oldcastle will cause continuing damages to the Plaintiffs."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

6.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused any injury or damage to the Plaintiff's property.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

    (1)    the nature of each such item of injury or damage;

    (2)    the date such injury or damage occurred;

    (3)    whether such injury or damage is permanent; and

    (4)    every fact, transaction, occurrence, communication, or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (3) of this interrogatory.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

7.    (a)    State whether Plaintiffs contend that Oldcastle's continued operation of the quarry gives rise to a substantial threat of irreparable injury to Plaintiffs.

2394

(b)   If the answer to subparagraph (a) of this interrogatory is yes, set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs bases that contention.

(c)   Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (b) above.

8.   (a)   For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused, aggravated or otherwise contributed to any personal injury or bodily harm.

(b)   For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

    (1)   the nature of each item of such personal injury or bodily harm;

    (2)   the date such personal injury or bodily harm occurred; and

    (3)   every fact, transaction, occurrence, communication, or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (2) of this interrogatory.

(c)   Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

9.   (a)   For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, constitutes a nuisance, as that term is used in Section 6-5-120 of the Code of Alabama.

2395

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

10.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused any trespass upon the Plaintiff's property.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

11.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused such Plaintiff any special damage, as that term is used in Section 6-5-123 of the Code of Alabama.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)    the nature of such damage;

(2)    the amount of such damage; and

7

2396

(3)    each fact, transaction, occurrence, communication or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (2) of this interrogatory.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

12.    (a)    State whether Oldcastle's operation of the quarry after July 13, 2003, has diverted any stream, as that term is used in Section 33-7-4 of the Code of Alabama, from its natural channel.

(b)    If the answer to subparagraph (a) of this interrogatory is yes, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

_____
**PHILLIP E. ADAMS, JR.**

70262432_1.DOC

8

2397

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15TH day of October, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

2896

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *    CASE NUMBER: CV-02-85 |
| | * |
| HANSON AGGREGATES SOUTHEAST, | * |
| INC., et al. | * |
| Defendants. | * |

### ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY KEN AND NAOMI SCHWIEKER

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.    (a)    Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the some of the other plaintiffs have observed significant increases in sinkholes. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more



DEFENDANT'S EXHIBIT
B

rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

Several holes formed in the branch, which runs east from the west; this branch disappears into these sinkholes and is swallowed. These holes are spaced twenty (20) feet apart.

A new hole (20 feet long by 15 feet wide by 6 feet deep) formed March 1, 2004 (A.M.) or February 29, 2004 (P.M.) in sudden collapse. It is south of the branch and west of these other holes. It is approximately five (5) feet from the branch and will soon connect with the branch and cause a huge hole. Also a very large sinkhole formed near by branch on the night of March 13 or the morning of March 14. It is approximately twenty (20) feet east of the hole that formed approximately two (2) weeks ago. When it formed it was approximately 10 ft. x 15 ft. with an unknown depth.

Also the deep water well at our farm has gone substantially dry as of March 14. We used it frequently but in small quantities. We have used it for forty (40) years or more and never had a problem with lack of water. Now it produces little or no water.

Ken has also observed a sinkhole south of the Uniroyal Plant next to Highway 169. It has grown in size. Ken has also heard and felt, for the first time, blasts from the quarry.

We now fear for our safety constantly and our fear is ten (10) times greater that when Hanson operated the quarry. Our property is substantially devalued. These holes could cause a potentially tragic accident. We are reluctant to operate our tractor or bushhog now because of the danger of hidden sinkholes

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping

2400

records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

(b)     Please see our answer to 2(b) above, which is incorporated here by reference; also county workers. Spring Villa road is in terrible shape.

(c)     Please see our answers above, which are incorporated here by reference.

4.     (a)     Please see our answers above, which are incorporated here by reference.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)     Please see our answers above, which are incorporated here by reference.

5.     (a)     All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to the quarry we had no sinkholes and there was no problem with loss of surface water. Now holes are forming constantly, ponds are dry and streams diverted.

(b)     Please see our answers above, which are incorporated here by reference.

6.     (a)     We can't answer for everyone, except for what we have been told. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our farm house.

(b)     The sinkholes are getting worse and my property is not safe. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic,

dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Sinkholes are forming constantly with some forming as recently as February 29, 2004 or March 1, 2004. As long as the pumping continues, the problem will be permanent. My land is substantially devalued. Another hole formed March 13 (P.M.) Or March 14 (A.M.).

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.     (a)     Yes.

(b)     Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.     (a)     No

(b)     N/A

(c)     N/A

(d)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.     (a)     Yes.

(b)     The sinkholes have ruined my property and have made my property unsafe.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.     (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

2402

11.   (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.   (a)      Yes.

(b)      It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground.  I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.  Some holes have formed as recently as February 29, 2004 or March 1, 2004 and March 13/14, 2004.

(c)      Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 16th day of _____, 2004.

KEN SCHWIEKER

NAOMI SCHWIEKER

2403

STATE OF ALABAMA     *
                     *
COUNTY OF LEE         *

BEFORE ME, a Notary Public in and for said State and County, came KEN SCHWIEKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this ___ day of March, 2004.

_____
Notary Public

(SEAL)

My Commission Expires: MY COMMISSION EXPIRES DEC. 18, 2007 _____


STATE OF ALABAMA     *
                     *
COUNTY OF LEE         *

BEFORE ME, a Notary Public in and for said State and County, came NAOMI SCHWIEKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 17th day of March, 2004.

_____
Notary Public

(SEAL)

My Commission Expires: MY COMMISSION EXPIRES DEC. 18, 2007 _____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069


_____

James B. Sprayberry

2405

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,

        Plaintiff,

v.

HANSON AGGREGATES SOUTHEAST, INC., et al.

        Defendants.

*
*
*
*
*
*
*
*
*

**ORIGINAL**

**CASE NUMBER: CV-02-85**

### ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY DONNIE SMITH

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same--as appropriate--with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.    (a)    Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as

**DEFENDANT'S EXHIBIT**

C

2406

much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area. Three or more new holes have opened in February, 2004.

(b)     See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.     (a)     Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

(b)     Three or more new holes have opened and several are very large holes. Spring Villa road is in terrible shape.

(c)     Please see our answers above, which are incorporated here by reference.

4.     (a)     Please see our answers above, which are incorporated here by reference.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)     Please see our answers above, which are incorporated here by reference.

5.     (a)     All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to the quarry we had no sinkholes and there was no problem with loss of surface. Now holes are forming constantly.

(b)     Please see our answers above, which are incorporated here by reference.

6.     (a)     We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)     The sinkholes are getting worse and my property is not safe. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Sinkholes are forming constantly with some forming as recently as February 26, 2004. The sinkholes can be repaired but they re-appear bigger than before. As long as the pumping continues, the problem will be permanent. My land is substantially devalued. We understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.     (a)     Yes.

(b)     Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health,

our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

(c)  Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.  (a)  No

(b)  N/A

(c)  N/A

(d)  Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.  (a)  Yes.

(b)  The sinkholes have ruined my property and have made my property unsafe.

(c)  Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.  (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.  (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.  (a)  Yes.

(b)  It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems. Some holes have formed as recently as February 26, 2004.

(c)   Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 27 day of February, 2004.

DONNIE SMITH

STATE OF ALABAMA        *
                        *
COUNTY OF LEE           *

BEFORE ME, a Notary Public in and for said State and County, came DONNIE SMITH, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 27 day of Feb, 2004.

Notary Public

(SEAL)

My Commission Expires: 9/18/04

2410

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

3/11/2004

James B. Sprayberry