## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| KEN and NAOMI SCHWIEKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 3:06-CV-838 |
| | ) | |
| OLDCASTLE MATERIALS SOUTHEAST, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' EVIDENTIARY SUBMISSION IN
## SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs hereby file the following exhibits in support of the Motion for Partial Summary Judgment e-filed on the evening of September 6, 2007. These exhibits were too large to e-file on September 6, but per discussion with the Clerk's Office, the exhibits were split into smaller electronic sizes so that they are now capable of submission electronically.

The exhibits electronically filed herewith are:

P MPSJ Exh 3 Vol 8

P MPSJ Exh 3 Vol 9 part 1

P MPSJ Exh 3 Vol 9 part 2

P MPSJ Exh 3 Vol 9 part 3

P MPSJ Exh 3 Vol 10 part 1

P MPSJ Exh 3 Vol 10 part 2

P MPSJ Exh 3 Vol 10 part 3

P MPSJ Exh 3 Vol 10 part 4

P MPSJ Exh 3 Vol 11 part 1

P MPSJ Exh 3 Vol 12 part 1

P MPSJ Exh 3 Vol 12 part 2

P MPSJ Exh 3 Vol 12 part 3

P MPSJ Exh 4 Vol 14 part 1

P MPSJ Exh 4 Vol 14 part 2

P MPSJ Exh 4 Vol 14 part 3

P MPSJ Exh 4 Vol 14 part 4

P MPSJ Exh 4 Vol 14 part 5

P MPSJ Exh 4 Vol 14 part 6

P MPSJ Exh 4 Vol 15 part 1

P MPSJ Exh 4 Vol 15 part 2

P MPSJ Exh 4 Vol 15 part 3

P MPSJ Exh 4 Vol 15 part 4

P MPSJ Exh 4 Vol 15 part 5

P MPSJ Exh 4 Vol 15 part 6

P MPSJ Exh 4 Vol 15 part 7

Respectfully submitted this the 7th day of September, 2007.


s/ C. E. Vercelli, Jr.

**CHARLES E. VERCELLI, JR.** (VER003)
One of the Attorneys for Plaintiffs


**OF COUNSEL:**

LAW OFFICES OF JAMES B. SPRAYBERRY                Charles E. Vercelli, Jr.
P.O. Drawer 2429                                 VERCELLI & ASSOCIATES, P.C.
Auburn, AL 36831-2429                            1019 S. Perry Street
TEL:   (334) 821-7100                            Montgomery, AL 36104-5049
FAX:   (334) 821-7101                            TEL:   (334) 834-8805
jsprayberry-spraylaw@charter.net                 FAX:   (334) 834-8807
                                                 cvercelli@vercelli-law.com

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2007, I electronically filed the foregoing with the Clerk of the United States District Court for the Middle District of Alabama, using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Phillip E. Adams, Jr.
Rick Davidson
Matthew W. White
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

I also hereby certify that a copy of the foregoing will be served upon:

W. F. Horsley
SAMSON & DENSON, LLP
P. O. Box 2345
Opelika, AL 36803-2345

counsel for the landowners, by placing a copy of the same in the United States Mail, postage prepaid and properly addressed on the 7th day of September, 2007.

/s/  C. E. Vercelli, Jr._____
Of Counsel

500-06\P MPSJ Evid Sub.1.wpd

*Circuit Court, No.* CV02-85 *Supreme Court No.* 1040857

# APPEAL

TO

# Supreme Court of Alabama

FROM

MIKE & DONNA DAVIS ETAL—OLDCASTLE MATERIALS SOUTHEAST, INC & HANSON
AGGREGATES SOUTHEAST, INC.                                                *Appellant*

vs.

HANSON AGGREGATES SOUTHEAST, INC ETAL. & CITY OF OPELIKA, CITY OF
OPELIKA UTILITIES BOARD ETAL                                             *Appellee*

what Oldcastle knew, or what Oldcastle failed to know (unreasonably in Plaintiffs' judgment) about the operation prior to assuming the operation. It also effects the reasonableness of Hanson's current operation which includes pumping of massive amounts of water from the underground aquifers which therefore continues to cause sinkhole collapse throughout the region. For Oldcastle to object on the basis of relevance and that the information is not calculated to lead to the discovery of admissible evidence is therefore spurious. Oldcastle's objection that the information is overbroad and burdensome is, under *Ex parte Dorsey Trailers,* irrelevant. Moreover, Oldcastle has not shown how the documents are overbroad or how they are burdensome and oppressive to produce. Finally, Oldcastle did not produce any documents though it said that it would. Moreover, Oldcastle's response is that it would produce documents collected after July 13, 2003, whereas Plaintiff's request seeks information prior to that time if in the possession or custody or control of Oldcastle.

**30.**    **Please produce all pumping records in your possession or subject to your control. This would include pumping or discharge records for the quarry from 1996 to the present, if available, together with all documents related to any calculations of storage capacity for water on the Gilmer property and the Young property. This would include all DMRs (Discharge Monitoring Reports) filed by Opelika Materials or Hanson or Oldcastle with ADEM, applications to ADEM, permits from ADEM and all documents to or from ADEM by Oldcastle, Hanson, Opelika Materials or their agents and/or engineers; warning letters, notices, violations, notice of potential violations or similar documents to or from ADEM. Note that this request includes, but is not limited to documents and information relating to how your internal pumping discharge records were calculated, including the actual calculations themselves.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to pumping and discharge by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in the Request that relate to its pumping of water from Opelika quarry after July 13, 2003.

**REASON TO COMPEL:**
In request number 30, Plaintiffs are seeking pumping record and other information that would allow Plaintiffs to calculate and understand and determine the manner in which Oldcastle calculates its pumping of water from the underground aquifers. Pumping from the underground aquifers has, as the Complaint alleges, caused the collapse of numerous

20

sinkholes in the area, the collapse of roads in the area, the drying up of Spring Villa, and the drying up of Little Uchee Creek. This information is therefore clearly relevant, discoverable, and calculated to lead to the discovery of admissible evidence. What Oldcastle knew prior to its assumption of the quarry in 2003, is also relevant on the question whether Oldcastle's continued operation of the quarry constitutes a negligent and/or wanton operation and whether it should be subjected to punitive damages as alleged by the Plaintiffs. To object, therefore, that the information is not relevant, not calculated to lead to discoverable evidence, and burdensome and oppressive is therefore a spurious objection. Moreover, Oldcastle states that it would produce non-privileged and responsive documents, but produced none. Moreover, Oldcastle stated that it will produce the documents after July 13, but has produced none. Finally, Plaintiffs demand all such documents in its possession or subject to its control that relate to any pre-July 13, 2003, information in its possession or subject to its control, as well as a complete list of all allegedly privileged documents as noted elsewhere in this Motion to Compel.

32.  **Please produce all documents given to or received from Dr. Robert Cook or Mr. Patterson including, without limitation, (a) the 1999 Exploration and Evaluation of Aggregate Reserves, Opelika Project and (b) the 2000 Exploration and Evaluation of Aggregate Reserves, Opelika-Young Project.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

**REASON TO COMPEL:**
Request number 32 seeks any information received by Oldcastle from Dr. Robert Cook (one of Hanson's experts, and prominent geologist in the area), or Mr. Patterson, regarding 1999 exploration and evaluation of aggregate reserves and 2000 exploration and evaluation of aggregate reserves on the quarry site. This information was doubtless obtained by Oldcastle prior to its assumption of the quarry during its due diligence effort. To object, therefore, that the information is not relevant, not calculated to lead to discoverable evidence, and burdensome to produce is a spurious objection. The information is clearly relevant and will go to the issue, at least in part, whether Hanson should be punished for its continued operation of a known nuisance that causes substantial and serious damages to many members of the public as well as all of the Plaintiffs.

21

33.    **Please produce all documents related to the dewatering or potential dewatering of the areas in and around the Lee County quarry. This would include, without limitation, the first notice to Oldcastle that the Lee County Quarry operation was dewatering or was alleged to be dewatering the surrounding area, the zone of influence of such dewatering, steps taken to identify the zone of influence, and steps taken to minimize or correct the alleged problems or damage.**

OLDCASTLE'S RESPONSE:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for the production of expert opinions, and is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request that are related to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the Opelika quarry after July 13, 2003.

**REASON TO COMPEL:**

Plaintiffs' Complaint as amended against Oldcastle clearly claims that Oldcastle's operation by dewatering the ground is continuing to cause sinkhole collapse and continued dewatering of Spring Villa and Little Uchee Creek. Request 33 requests all documents relating to dewatering and potential dewatering of the areas around the quarry. Nothing could be more relevant and more discoverable, therefore. Oldcastle's objection is absurd. Oldcastle also indicates that it will produce all "non-privileged and responsive documents" for the time period after July 13, 2003. Plaintiffs are entitled to know what Oldcastle knew prior to July 13, and therefore, a full response is required. Moreover, to the extent that any documents are not produced under a claim of privilege, Oldcastle has an obligation under Alabama law to produce a detailed log regarding any such claims of privilege.

2011

**34.**  **Describe in detail whether Oldcastle believes that its continued pumping of water from the quarry pit will continue dewatering the properties around the Lee County quarry. If your contention is that there is no dewatering effect, please describe in detail all bases for such contentions.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
Interrogatory number 34 asks Oldcastle to answer a contention with respect to the very heart of this lawsuit. Plaintiffs have alleged that the continued pumping of water from the quarry pit will continue to dewater properties and thus to continue sinkhole collapse, to continue the dewatering of the Spring Villa spring, and to continue the dewatering and collapse of Little Uchee Creek. It is a proper contention interrogatory under Alabama Rule of Civil Procedure 33 and 34, and Oldcastle has no basis to object thereto. Oldcastle can always supplement its response in the event that its experts give it additional information. Plaintiffs are entitled to know now what Oldcastle knew at the time that it assumed the quarry and what it believed at the time that it assumed the quarry, which information will bear directly on the question whether it should be punished for knowingly continuing a substantial nuisance to the Plaintiffs.

**35.**  **Please produce all documents relating in any way to the size, scope, duration, or effect of a "cone of depression" or "zone of influence" of the dewatering caused by pumping water from the quarry pit to outfall 1.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that the terms "cone of depression," "zone of influence" and "outfall 1" are not defined, and the Request is therefore vague and ambiguous. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any "cone of depression" or "zone of influence" – however those terms may be defined – caused by pumping water from the quarry pit by Oldcastle after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to led to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does

23

not required Oldcastle to identify its expert witnesses until January 27, 2004.
Notwithstanding and without waiving the foregoing general and specific objections,
Oldcastle will identify its experts and produce expert discovery at a time and place
that is mutually agreeable to the parties.

**REASON TO COMPEL:**
Request 35 seeks documents relating to the size of the "zone of influence or cone of
depression" of the dewatering clause by pumping from the quarry. It has already been
established in this Motion to Compel that this information goes to the very heart of Plaintiffs'
claim. For Oldcastle to object is, therefore, spurious. Moreover, Plaintiffs incorporate by
reference its reason to compel in response to request number 34.

36.    **Please produce all documents relating to the size and depth of the quarry, including the
       surface area of the quarry at any time on or before the date of acquisition of the quarry
       in July of 2003.**

       OLDCASTLE'S RESPONSE:
       Oldcastle hereby incorporates the general objections set forth above. Notwithstanding
       and without waiving the foregoing general objections, Oldcastle responds as follows:

       Oldcastle will produce all non-privileged and responsive documents in its possession,
       custody or control relating to the size and depth of the quarry as of July 13, 2003 and
       thereafter.

       **REASON TO COMPEL:**
       Plaintiffs allege that Oldcastle is continuing a nuisance. The size of the quarry has expanded
       considerably since Oldcastle began operation in July of 2003. Plaintiffs have asked for
       information relating to the size of the quarry. Oldcastle has indicated that it will produce
       non-privilege and responsive documents, but has produced none. Further, Oldcastle has an
       obligation to produce a log of any documents for which it claims are privileged.

38.    **Please produce all documents regarding any well inventory or spring inventory
       including related documents showing interviews with homeowners, depths of wells,
       location of wells and springs and whether the wells or springs were dry or had water.**

       OLDCASTLE'S RESPONSE:
       Oldcastle hereby incorporates the general objections set forth above. Notwithstanding
       and without waiving the foregoing general objections, Oldcastle responds as follows:

       Oldcastle will produce all non-privileged and responsive documents in its possession,
       custody or control set forth in this Request.

**REASON TO COMPEL:**
Oldcastle has produced no documents. Moreover, Oldcastle has an obligation to produce a detailed log of any documents for which it claims are privileged.

39. **Please produce all documents reflecting Oldcastle's knowledge of the dewatering at Spring Villa and the Little Uchee Creek (whether or not you contend such dewatering was caused by or in part by Hanson and/or Oldcastle). This would include, but is not to be limited to, all correspondence, investigations, inspections and documents to or from government agencies regarding dewatering of Spring Villa and/or the Little Uchee Creek areas.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that any dewatering at Spring Villa and the Little Uchee Creek has occurred. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged dewatering at Spring Villa and the Little Uchee Creek caused or contributed to by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to t6he discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003, is causing any dewatering at Spring Villa and the Little Uchee Creek. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
As stated above, the dewatering of Spring Villa and Little Uchee Creek is one of Plaintiffs' largest claims in the case. To object that this information is not relevant is therefore absurd. To object that the information requested (all documents reflecting Oldcastle's knowledge of the dewatering) is absurd. There is no basis for privilege for these documents, and were there a basis, Oldcastle still has the obligation to produce a detailed log of any such documents for which it claims privilege. The information requested also seeks information and documents in Oldcastle's knowledge or subject to its control that pre-dates the date that it assumed the quarry on July 13, 2003, which information bears directly on the question whether it

2014

negligently and wantonly continued the operation in a negligent and wanton manner and whether it should be punished by punitive damages imposed by the jury.

**40.    Please produce all documents regarding any sinkholes in and around the Lee County quarry, including, without limitation, all documents regarding Oldcastle's first knowledge of sinkholes, steps taken to identify the problem or potential problem, and any steps to be taken, already taken, or planned to be taken to minimize sinkhole formation in the future.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged formation of sinkholes caused or contributed to by Oldcastle's operations at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003 is causing any sinkholes in and around the Opelika quarry. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

**REASON TO COMPEL:**
Request number 40 asks Oldcastle to produce all documents regarding its first knowledge of sinkholes as well as steps taken to identify the problem or potential problem, etc. Very clearly, that information has nothing to do with the experts. Yet, Oldcastle objects that it does not have to give expert information at this time. The information requested is not information obtained or developed by experts. Plaintiffs have the right to know what Oldcastle knew and when regarding dewatering and sinkhole development in the area as well as problems related to sinkholes and efforts to be taken to minimize sinkhole formation in the future. Oldcastle's objection is again spurious.

**41.    Please produce all documents regarding any pre-blast inspections done for Oldcastle.**

OLDCASTLE'S RESPONSE:

2015

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

**REASON TO COMPEL:**
Oldcastle states that it will produce non-privileged and responsive documents relating to pre-blast inspections done for Oldcastle. No documents were produced, and even if any would have been produced, Oldcastle still has an obligation to produce a list of any allegedly privileged documents so the Plaintiffs can challenge the validity of any such claim.

42. **Please produce all documents and information relating to Oldcastle's first notice that blasting had caused, or was causing, or was allegedly causing damage to any property owner in the area, including all steps taken to identify any problem or alleged problem and any steps taken to minimize or correct any such alleged problems or damage.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged damage caused by blasting by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning whether its blasting at the Opelika quarry after July 13, 2003, has caused, or was causing, or was allegedly causing damage to any property owner in the area, as well as any response Oldcastle made to such complaints.

**REASON TO COMPEL:**
Plaintiffs have clearly alleged in their Amended Complaint against Oldcastle that Oldcastle knew or should have known that the blasting from the quarry was causing damages to the homeowners in the area. The request seeks such information in the possession or subject to the control of Oldcastle, and further asks for information relating to all steps taken to identify any problems and any steps taken to minimize or correct any such alleged problems or damage. Oldcastle's objection that the information is not relevant, not calculated to lead to the discovery of admissible evidence, and overbroad is therefore, again, absurd. Oldcastle's gratuitous statement that it will produce information received after July 13, 2003, is also invalid because it has the obligation to give Plaintiffs all information responsive to this request which will bear on whether Oldcastle should be punished for its continued operation of the quarry knowing of the damages caused to the Plaintiffs by the operation of Hanson

27

and, thus, by its continued operation of the quarry. Under *Ex parte Dorsey Trailers*, Oldcastle cannot make the determination whether the information requested will be useful to the Plaintiffs. Plaintiffs have the right to the information so long as it is calculated to lead to discoverable evidence, which it is.

**43.  Please produce all aerial photos of the quarry from 1996 to the present.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

**REASON TO COMPEL:**
Plaintiffs want all aerial photographs that Oldcastle has relating to the quarry. Oldcastle's statement that it will produce the non-privileged documents is ridiculous. These documents clearly cannot be privileged. Oldcastle has, further, produced no documents.

**44.  Please produce all documents regarding other regulatory filings or information not specifically requested above.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that the term "other regulatory filings or information" is not defined and the Request does not otherwise describe the document or documents requested with sufficient particularity to allow Oldcastle to determine which document or documents are being requested. The Request is therefore vague and ambiguous. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

**REASON TO COMPEL:**
In request number 44, Plaintiffs seek any other "regulatory filings or information not specifically requested above". It is clear from the context of this question that the Plaintiffs are seeking any other documents provided to any governmental agency. For Oldcastle to object that the request is vague and ambiguous is therefore not well taken. Moreover, very clearly, the information is relevant as the manner in which Oldcastle operates the quarry, and whether the quarry is operated within the limits of its permit, is relevant. Moreover, there may be other regulatory agencies other than ADEM and USEPA to which Oldcastle has reported, and if there is, the Plaintiffs are entitled to know about such information.

45.    **Please produce all documents exchanged with Dyno Nobel or any other blasting company relating to the Opelika/Lee County quarry.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

**REASON TO COMPEL:**
Oldcastle states that it will produce non-privileged and responsive documents, but produced none. Moreover, if any documents are withheld on the claim of privilege (and none clearly could possibly attach), then Oldcastle has an obligation to give Plaintiffs a list of any such documents.

46.    **Please produce all business licenses or permits of any type and description obtained or required by any governmental agency.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all business licenses and permits concerning its operations at the Opelika quarry that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

**REASON TO COMPEL:**
Oldcastle has stated it will produce the documents requested but has produced no such documents.

47.    **Please produce all OSHA and/or MSHA inspections or other documents exchanged by and between Oldcastle and OSHA and/or MSHA.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the allegations set forth in the Fourth Amended and Restated Complaint do not pertain to worker health and

29

safety issues, the Request is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all OSHA and/or MSHA inspections and other documents exchanged by and between Oldcastle and OSHA and/or MSHA that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

**REASON TO COMPEL:**
At request number 47, Plaintiffs asked for all OSHA and MSHA inspections and other documents exchanged between Oldcastle and OSHA and/or MSHA. Oldcastle's response that it will produce any such documents exchanged between Oldcastle and OSHA and/or MSHA that "bear on the allegations set forth in the Fourth Amended and Restated Complaint" is an invalid response under *Ex parte Dorsey Trailers*. Oldcastle has the obligation to give all such documents to the Plaintiffs whether or not in Oldcastle's opinion it bears on any allegation of the Complaint. This is clearly discoverable evidence.

48. **Please produce all personnel files on all of Oldcastle's Lee County quarry foremen and Plant Managers.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that producing the personnel files of its employees would violate the right of privacy of its employees as protected by the United States Constitution and the Constitution of the State of Alabama.

**REASON TO COMPEL:**
Plaintiffs seek information regarding personnel files on the quarry foremen and plant managers so that Plaintiffs may depose the same and otherwise obtain information relating to the manner in which Oldcastle has trained its supervisory personnel. Plaintiffs have alleged that the quarry is operated in a negligent and wanton manner. Failure to properly train its managers and supervisors (foremen and plant managers) would clearly bear on those allegations. Therefore, the information is relevant and discoverable as calculated to lead to discoverable evidence. Oldcastle's further objection that producing the information would violate the employee's rights of privacy is also unfounded because Oldcastle has not stated any alleged privilege or any particular constitutional provision protecting such information from discovery. Further, to the extent any information within those files is clearly privileged,

30

that information can be redacted. Moreover, any information withheld should be provided to the Plaintiffs in a log so that the Plaintiffs can contest the validity of any claims of privilege.

49.    **Please produce all documents relating to the hours worked by any and every Oldcastle employee of the Lee County Quarry from the moment Oldcastle assumed control of the quarry operation.**

OLDCASTLE'S RESPONSE:
Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

**REASON TO COMPEL:**
Plaintiffs have alleged that the operation of the quarry is a nuisance. The quarry is being operated longer hours than when Hanson had it. The quarry is creating more problems for the homeowners in the area and is thus a bigger nuisance now than when Hanson had it. Therefore, the hours that the employees work will clearly demonstrate Plaintiffs' claim that the quarry is becoming a worse nuisance than ever before. Therefore, the information requested (all documents relating to the hours worked of any employee at the quarry) is clearly calculated to lead to discoverable evidence and is relevant to the issues in the case. Oldcastle's objection to the contrary is erroneous.

**WHEREFORE,** for good cause shown, Plaintiffs move this Honorable Court to compel Oldcastle to produce the documents requested and, further, to award the Plaintiffs' attorneys costs for the necessity of filing a Motion to Compel. Oldcastle's objections were, without exception, spurious and invalid under Alabama law. To object is clearly a delaying tactic on Oldcastle's part designed to impede Plaintiffs' discovery in this case and to delay the litigation. Plaintiffs therefore move for an award of attorneys' fees in this case situation based on Rule 26, Rule 33 and Rule 37.

**JAMES B. SPRAYBERRY(SPR008)**
One of the Attorneys for the Plaintiffs

31

2020

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

Jack Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 2 day of Dec , 2003.

OF COUNSEL

155-00\Plaintiff's Motion to Compel 12-2-03

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2021

MIKE DAVIS, et al.,                                )
                                                   )
                Plaintiffs,                        )
                                                   )
vs.                                                )        Civil Action No. CV-02-0085
                                                   )
HANSON AGGREGATES SOUTHEAST,                       )
INC., et al.,                                      )
                                                   )
                Defendants.                        )

### PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT OLDCASTLE

Plaintiffs request Defendant Oldcastle Materials, Inc., to answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure, and to produce the following documents and things pursuant to Rule 34 of the Alabama Rules of Civil Procedure.

## I.  INSTRUCTIONS

(a)    In answering these Interrogatories and Requests, please furnish all information, however obtained, and including hearsay, that is or may be available to you and all information known by you or in your possession, in your agent's possession and/or in your attorney's possession, or appearing in your records. When answering these Interrogatories and Requests, be advised that you have a good faith duty to conduct a reasonable investigation and to make a good faith attempt to answer each Interrogatory and to produce all documents and things requested.

(b)    If you cannot answer any of the following Interrogatories or Requests in full after exercising due diligence to secure the full information sought, so state and answer to the extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion, and detailing what you did in attempting to secure the unknown information.

(c)    If your answer is that the documents requested are not in your possession or custody, describe in detail the unsuccessful efforts you have made to locate or obtain possession of the records.  If your response is that the documents are not in your control, then identify who has control and the location of the records.  If a request for production seeks a specific document or an itemized category that is not in your possession, control,

2022

or custody, provide any documents you have that contain all or part of the information contained in the requested document or category, then identify the source of each of the documents you produce.

(d)    These Interrogatories and Requests for Production shall be deemed to be continuing until and during the course of trial. Information sought by these Interrogatories and Requests which you obtain or learn after you serve your answers and produce the documents must be disclosed to Plaintiffs by supplementary answers.

(e)    Plaintiffs demand that the documents requested be produced in the file folder or other container in which they are maintained or stored, and that the order or sequence of the documents, if more than one within a file is requested, be in the same order or sequence within such file as was maintained in the ordinary course of business just prior to the production thereof.

(f)    If you object to the production of any documents or a portion thereof based upon a claim that said documents are privileged or protected or otherwise undiscoverable, for each such document supply the following information: the portion that is not privileged, the author of the document, the person or persons to whom the document was addressed, the date of the document, and the subjects discussed in the document.

## II. DEFINITIONS

(a)    "Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred,

report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

(b)     "Your", "your", and "yours" shall mean each adverse party collectively and together. Thus, for each question, state the answer thereto for each party, if their answers differ.

(c)     "Identify":

i.     When used in reference to an individual, means to state his full name, if known, his present or last known position and business affiliation, and his residential address and telephone number.

ii.     When used in reference to a corporation, firm, or other entity, means to state its full name, form of organization (if known), and its present or last known address and telephone number.

iii.     When used in reference to a document, means to state the type of document, (e.g., letter, memorandum, telegram, chart, contract, prospectus, newspaper article, or the like), or some other means of identification, its author or authors, addressee or addressees, date or dates, subject or subjects, and its present location by address, and custodian or custodians. If such document was, but is no longer in your possession or subject to your control, state what disposition was made of it.

iv.     When used in reference to a telephone conversation, means, with respect to each party to the telephone conversation or listening thereto, to state: full name, business affiliation, business address, present or last known position, residential address, location of each party at the time the telephone conversation took place, which of the parties to the telephone conversation initiated the call, and when such telephone conversation took place.

v.     When used in reference to an oral conversation other than a telephone conversation, means, with respect to each party to the conversation or listening thereto, to state:  when such conversation took place, where such conversation took place, each parties' full name, present address and business affiliation, residential address, and telephone number.

3

2024

## III.  INTERROGATORIES AND REQUESTS FOR PRODUCTION

1.    Please identify all persons who were involved in the negotiation for the purchase of the Opelika quarry from Hanson Aggregates Southeast, Inc.

2.    During a hearing before the Honorable Judge Walker, Oldcastle's attorney, Phillip Adams, stated in essence that Oldcastle intended to change the manner of operation of the quarry in Lee County.  Please describe in detail every fact supporting Mr. Adams' statements and describe in detail all expected, anticipated, planned, or potential changes to the manner or method of operation of the Oldcastle quarry in Lee County (as distinguished from the manner and method of operation of the Lee County quarry by Hanson Aggregates Southeast, Inc.).

3.    Please identify any expert witness whom you intend to call as an expert at the trial of this case, and for each such expert, please produce all documents, opinions, and other information in accordance with Alabama Rule of Civil Procedure 26(b).

4.    Please identify every person with knowledge of the manner of operation of the Hanson quarry after it was taken over by Oldcastle.

4

2025

5.     Please produce all discharge monitoring reports, and all documents of any type or description in the possession or custody or control of Oldcastle that relates in any manner to the pumping of water from the pit at the Lee County quarry.

6.     At any time on or after assuming control of the Lee County quarry, did Oldcastle change the pumps used to discharge water from the quarry pit into outfall number 1? If your answer is in the affirmative, describe all such changes in detail and produce all documents evidencing any such change.

7.     State the number of gallons of water discharged per day from the Oldcastle quarry pit for each day from the date Oldcastle assumed control of the quarry to the date that these interrogatories and requests for production are answered.

8.     Please produce the personnel files on every employee of Oldcastle at the Lee County quarry.

2026

9.    Please produce a "flow chart" or similar document evidencing the corporate structure of Oldcastle's Lee County quarry, from the Lee County quarry all the way up to the corporate owners and parent companies to the highest level, or describe in detail the "chain of command" and corporate structure of Oldcastle from the Lee County quarry upward to the highest corporate level and parent company ownership.

10.    Please produce a copy of the Joint Defense Agreement entered into between Oldcastle and Hanson as related in the Asset Purchase Agreement.

11.    Does any other written document exist that relates to any right of indemnity, contribution, refund, recission, cancellation, or other modification of the Asset Purchase Agreement or any other document in the event that the Lee County Circuit Court enjoins the operation of the Lee County quarry? In particular, Plaintiffs are asking precisely what will happen in the event the Lee County quarry is closed or otherwise substantially enjoined from operation by the Circuit Court of Lee County. Are there or will there be any ramifications whatsoever to Hanson, or will any remuneration or other consideration of any type or description pass between Oldcastle and Hanson in the event the Plaintiffs prevail in this litigation and the quarry is enjoined in part or in whole?

2027

12.     Please produce all documents in your possession or subject to your control that show or from which can be determined the amount of materials sold by Defendant Oldcastle to its customers since assuming operation of the Lee County quarry.

13.     Please produce copies of all Lee County mining and mineral tax returns with respect to the Lee County quarry.

14.     Please describe in detail all efforts or undertakings of any type or description considered "due diligence" with respect to the purchase of Hanson's Lee County quarry and operation.

15.     Please produce all documents related in any manner to Oldcastle's "due diligence" efforts and undertakings with respect to the purchase of the Hanson Lee County Quarry.  Without limiting the generality of the foregoing, please produce all documents related to:  what was considered and what was  investigated before Oldcastle purchased the quarry; why the quarry was purchased; who made the decision to purchase the quarry and what they based their decision upon; all written reports, internal memoranda, notes of any type or description, Minutes of Meetings of the Board of Directors, and any other

2028

written document dealing with the purchase of the Hanson Lee County Quarry; and all documents related to any steps taken to identify any problems or potential problems related to the quarry operation as well as steps taken or to be taken to minimize damage or alleged damages to surrounding landowners.

16.     Please produce all information known to Oldcastle in 2002 and/or 2003 in relation to the Opelika quarry. This would include, but is not limited to, the geology of the quarry and the surrounding area, the depth of the quarry at every year from 1996 to date, the number and location of sinkholes in 1999 and each year since 1999, the size of the cone of depression or zone of influence in 1999 and for each subsequent year, the written reports by Dr. Bob Cook or other consultants or in house geologist(s) at any time after 1999, and the underground water table levels from 1996 to date as well as the pumping amounts and damage (or potential damage) to surrounding properties.

17.     Please produce all environmental studies or assessments of any type or description performed by or for Hanson or by or for Oldcastle at any time (with respect to the Lee County Quarry).

8

2020

18.    Please produce all documents exchanged between Oldcastle or any officer, agent or employee thereof and ADEM or the U.S. EPA, including, without limitation, all air and/ or water applications and permits; all other applications and/ or permits issued to Hanson and/ or Oldcastle; all documents transferring any existing permits to Oldcastle; and any information relating to renewals, warnings, and/ or violations from ADEM or the U.S. EPA.

19.    Please produce copies of all complaints to Hanson or to Oldcastle, together with every document dealing in any manner with such complaint(s) and whatever corrective measures were taken or will be taken (including changes in the method of operation of the quarry) with respect to every such complaint.

20.    Please produce all documents in your possession or subject to your control that relate in any way to any pending lawsuit(s) against Hanson at the time of the acquisition of the Lee County Quarry by Oldcastle.  This would include documents indicating Oldcastle's knowledge of the suit(s), documents on Oldcastle's responsibility for such suit(s) or indemnity by Hanson to Oldcastle for such suit(s), and any other documents relating to the resolution of any problems or complaints alleged by any of the Plaintiffs.

9

21.    Please produce all documents regarding Oldcastle's knowledge of any complaint by any person or governmental agency regarding dust or fugitive dust emissions. This would include dust from blasting, operations and/or equipment and traffic. Without limitation, this request includes all documents related to the quantity and composition of such dust or fugitive dust emissions, including silica content and/or silica notification to employees, including steps taken to identify the problem and minimize such problems.

22.    Please produce all documents regarding state or federal health/safety laws or regulations with respect to Silica contained within dust or any by-product of the Lee County quarry operation. Without limitation, this requests any MSDS used or issued by Oldcastle with respect to its Lee County quarry.

23.    Please produce all documents relating to the removal from operation or disabling of any of Hanson's (or now Oldcastle's) Dust Suppression System(s), whether for 24 hours or any longer period. This would also include reports, inspections, correspondence and/or documents relating to visible emission inspections, reports and/or repairs, including warnings or correspondence from or to ADEM.

24.    Please produce all documents related to when any and every piece of new equipment or machinery was or will be installed or became or will become operational at the Lee County quarry, including any equipment in the plant or production process (including vehicles of any type or description), and the dates when old crushers and/or conveyers were replaced or will be replaced by Oldcastle.

25.    Please produce all documents related to any "in house" inspections, including environmental inspections, dust suppression inspections, damage control and/or risk management inspections, and any other type of inspection at the Lee County Quarry.

26.    Please produce all documents related to any overburden piles on the south side of the quarry at the Lee County quarry (or anywhere else on the quarry property). This request includes, without limiting the generality of the foregoing request, all documents relating to the location, size and character of such overburden piles from 1996 to present including maintenance, reclamation from 1996 to the present, flooding and fugitive dust emissions, and any plans or intentions (firm or merely in discussion stages) relating to such overburden piles

2032

27.    Please produce your copy of the Environmental memo from Nigel Wills and his recommendations, as well as all documents relating to it or to his recommendations in any manner.

28.    Please produce all documents relating to any and all steps taken (or to be taken) to implement any of the changes mentioned in Nigel Wells' environmental memo and/or to correct any known or alleged problems at the Lee County quarry.

29.    Please produce all documents relating to the location, installation and records regarding the any monitoring wells installed at any time near the quarry, and in particular in 2000 and 2001 on or around the Hanson property. This would include water levels, drill logs, water tables and any pumping records and the entire "study" performed by Hanson (possibly Bates #2938), as well as any study undertaken by or for Oldcastle.

30.    Please produce all pumping records in your possession or subject to your control. This would include pumping or discharge records for the quarry from 1996 to the present, if available, together with all documents related to any calculations of storage capacity for water on the Gilmer property and the Young property. This would include

12

all DMRs (Discharge Monitoring Reports) filed by Opelika Materials or Hanson or Oldcastle with ADEM, applications to ADEM, permits from ADEM and all documents to or from ADEM by Oldcastle, Hanson, Opelika Materials or their agents and/or engineers; warning letters, notices, violations, notice of potential violations or similar documents to or from ADEM. Note that this request includes, but is not limited to documents and information relating to how your internal pumping discharge records were calculated, including the actual calculations themselves.

31.    Please produce all documents in your possession or subject to your control relating to any payments to Dr. Robert Cook for any reason since 1996.

32.    Please produce all documents given to or received from Dr. Robert Cook or Mr. Patterson including, without limitation, (a) the 1999 Exploration and Evaluation of Aggregate Reserves, Opelika Project and (b) the 2000 Exploration and Evaluation of Aggregate Reserves, Opelika-Young Project.

33.    Please produce all documents related to the dewatering or potential dewatering of the areas in and around the Lee County quarry. This would include,

13

without limitation, the first notice to Oldcastle that the Lee County Quarry operation was dewatering or was alleged to be dewatering the surrounding area, the zone of influence of such dewatering, steps taken to identify the zone of influence, and steps taken to minimize or correct the alleged problems or damage.

34.    Describe in detail whether Oldcastle believes that its continued pumping of water from the quarry pit will continue dewatering the properties around the Lee County quarry. If your contention is that there is no dewatering effect, please describe in detail all bases for such contentions.

35.    Please produce all documents relating in any way to the size, scope, duration, or effect of a "cone of depression" or "zone of influence" of the dewatering caused by pumping water from the quarry pit to outfall 1.

36.    Please produce all documents relating to the size and depth of the quarry, including the surface area of the quarry at any time on or before the date of acquisition of the quarry in July of 2003.

14

2035

37.     Please produce any and all mining plans of any type or description relating to the Lee County quarry.

38.     Please produce all documents regarding any well inventory or spring inventory including related documents showing interviews with homeowners, depths of wells, location of wells and springs and whether the wells or springs were dry or had water.

39.     Please produce all documents reflecting Oldcastle's knowledge of the dewatering at Spring Villa and the Little Uchee Creek (whether or not you contend such dewatering was caused by or in part by Hanson and/or Oldcastle). This would include, but is not to be limited to, all correspondence, investigations, inspections and documents to or from government agencies regarding dewatering of Spring Villa and/or the Little Uchee Creek areas.

40.     Please produce all documents regarding any sinkholes in and around the Lee County quarry, including, without limitation, all documents regarding Oldcastle's first knowledge of sinkholes, steps taken to identify the problem or potential problem, and any

steps to be taken, already taken, or planned to be taken to minimize sinkhole formation in the future.

41.    Please produce all documents regarding any pre-blast inspections done for Oldcastle.

42.    Please produce all documents and information relating to Oldcastle's first notice that blasting had caused, or was causing, or was allegedly causing damage to any property owner in the area, including all steps taken to identify any problem or alleged problem and any steps taken to minimize or correct any such alleged problems or damage.

43.    Please produce all aerial photos of the quarry from 1996 to the present.

44.    Please produce all documents regarding other regulatory filings or information not specifically requested above.

45.    Please produce all documents exchanged with Dyno Nobel or any other blasting company relating to the Opelika/Lee County quarry.

16

46.    Please produce all business licenses or permits of any type and description obtained or required by any governmental agency.

47.    Please produce all OSHA and/or MSHA inspections or other documents exchanged by and between Oldcastle and OSHA and/or MSHA.

48.    Please produce all personnel files on all of Oldcastle's Lee County quarry foremen and Plant Managers.

49.    Please produce all documents relating to the hours worked by any and every Oldcastle employee of the Lee County Quarry from the moment Oldcastle assumed control of the quarry operation.

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

17

2088

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _30th_ day of _Sept_____, 2003.

_C E Vercelli_

OF COUNSEL

155-00\Ps1stIRPD-Oldcastle,2.wpd

18

COPY

## IN THE CIRCUIT COURT FOR
## LEE COUNTY, ALABAMA

FILED

NOV 0 7 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )  CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC. et al., | ) |
| | ) |
| Defendants. | ) |

## OLDCASTLE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant Oldcastle Materials Southeast, Inc., ("Oldcastle") hereby responds to Plaintiffs' First Interrogatories and Request for Production of Documents in accordance with the requirements of Rules 33 and 34 of the Alabama Rules of Civil Procedure, and without admitting the relevance or admissibility of any of the information contained herein, responds as follows:

### GENERAL OBJECTIONS

1.      Oldcastle has not concluded its investigation of the facts relating to this case, formal discovery, or preparation for trial.  For that reason, Oldcastle's Responses to Plaintiffs' First Interrogatories and Request for Production of Documents may be incomplete.  Also, there is a possibility that, upon further investigation, certain details set forth in the responses may be altered or amended.  These Responses to Plaintiffs' First Interrogatories and Request for Production of Documents represent Oldcastle's reasonable efforts to provide the information requested based upon documents in Oldcastle's possession, custody or control, and based upon Oldcastle's current knowledge.  Oldcastle reserves the right to produce evidence of any subsequently discovered fact or facts, to alter or amend its responses set forth herein, and

otherwise to assert factual and legal contentions as additional facts are ascertained, analyses are made, and legal research is completed. Oldcastle objects to each and every Interrogatory and Request for Production of Documents insofar as it may be construed as limiting or restricting Oldcastle's right to rely upon any document or information for any purpose whatsoever, including the use of responsive documents or information as evidence at any subsequent hearing, trial or proceeding.

2.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it purports to seek information protected by any privilege, including the attorney-client privilege, the work-product doctrine, the joint defense privilege, or any other privilege or protection provided by common law statute. In responding to the Interrogatories and Request for Production of Documents, Oldcastle will not provide any information that is protected from disclosure by any of the foregoing privileges. Inadvertent disclosure of such information is not intended to be a waiver of any privilege or any other ground for objecting to discovery. Furthermore, inadvertent disclosure of any such information shall not constitute a waiver of Oldcastle's right to object to the use of any such information during any subsequent proceeding.

3.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it purports to require Oldcastle to disclose confidential and proprietary business information or trade secrets.

4.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it seeks information not in Oldcastle's possession, custody or control on the grounds that it is unduly burdensome or oppressive.

5.    Oldcastle will make reasonable efforts to respond to each Interrogatory, to the extent that no objection is made, as Oldcastle understands and interprets the Interrogatory. If

2

Plaintiffs subsequently assert an interpretation of any Interrogatory which differs from that of Oldcastle, Oldcastle reserves the right to supplement its objections and responses.

6.    To the extent that any Interrogatory or Request for Production of Documents calls for information already in the possession of plaintiff or its counsel, Oldcastle objects on the grounds that the Interrogatory or Request for Production of Documents is unnecessary and unduly burdensome and constitutes annoyance, harassment, and oppression of Oldcastle.

7.    Oldcastle objects to each Interrogatory and Request for Production of Documents to the extent it seeks information not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

8.    Oldcastle's agreement to produce any non-privileged documents in its possession, custody or control responsive to a particular Request shall not be deemed an admission that it is in the possession of any document responsive to the Request.

9.    Oldcastle has filed a Motion to Dismiss the Fourth Amended Complaint or, alternatively, for More Definite Statement. In this Motion, Oldcastle shows that the Fourth Amended Complaint fails to state a cause of action against Oldcastle because, among other reasons, it does not include any allegations that Oldcastle has engaged in any actionable conduct since it acquired the Lee County quarry from Hanson on or about July 13, 2003. Oldcastle objects to each Interrogatory and Request for Production of Documents on the ground that Oldcastle is not required to respond to discovery until and unless plaintiffs plead one or more legally viable causes of action against Oldcastle entitling plaintiffs to relief if the facts alleged by plaintiffs are proven to be true.

These General Objections are incorporated into each response below as though fully set forth therein.

2042

## INTERROGATORIES AND REQUESTS FOR PRODUCTION

Interrogatory/Document Request Number 1.

Please identify all persons who were involved in the negotiation for the purchase of the

Opelika quarry from Hanson Aggregates Southeast, Inc.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further

objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome and

oppressive, and seeks information that is not relevant to the subject matter of this action and is

not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving the

foregoing general and specific objections, Oldcastle responds as follows:

Frank Heisterkamp, Vice President of Development of Oldcastle Materials, was in charge

of the negotiations of the Asset Purchase Agreement between Oldcastle Materials Southeast, Inc.

and Hanson Aggregates Southeast, Inc., and is knowledgeable with respect thereto.

Interrogatory/Document Request Number 2.

During a hearing before the Honorable Judge Walker, Oldcastle's attorney, Phillip

Adams, stated in essence that Oldcastle intended to change the manner of operation of the quarry

in Lee County.  Please describe in detail every fact supporting Mr. Adams' statements and

describe in detail all expected, anticipated, planned, or potential changes to the manner or

method of operation of the Oldcastle quarry in Lee County (as distinguished from the manner

and method of operation of the Lee County quarry by Hanson Aggregates Southeast, Inc.).

Response:

Oldcastle hereby incorporates the general objections set forth above.  Without waiving

the foregoing general objections, Oldcastle responds as follows:

Without prejudicing Oldcastle's right to implement additional measures in the future which it may deem appropriate as its investigation progresses, Oldcastle states that it is in the process of undertaking the following actions:

- Utilizing earthen material generated by the present and future overburden stripping operation to construct new dust, noise, and visual impact abatement berms along and within the southern and western property lines of the site (surrounding the quarry and all associated production areas on the site). These berms will be approximately 25 to 30 feet high and will be emplaced and vegetated so that, to the extent reasonably feasible, they will generally blend with the natural conditions surrounding them. Oldcastle believes that the abatement of dust, noise, and visual aesthetic impact will be substantial.

- Utilizing earthen material from stripping to construct a specially-designed, supplemental noise and dust abatement berm inside of, and roughly parallel to the southern property line berm to provide additional dust and noise protection to the abutting Davis property to the south. Again, Oldcastle believes that the reduction in dust and noise will be substantial.

- Relocating a new and reconfigured stone crushing processing plant from the present location of such operations on the surface of the site to the west and north of the quarry to a location lying wholly inside the quarry itself. Oldcastle believes that this reconfiguration and relocation, together with the improved technology and control equipment of the new plant, will eliminate any significant adverse effects from dust and noise associated with the crushing and processing

effects from dust and noise associated with the crushing and processing operations, and in conjunction with the berms described above will render these operations as clean and quiet as reasonably possible under the circumstances.

- Redesigning the quarry drilling patterns and blasting plans to minimize the rate of loading so that only the minimum amount of explosive is used to create the requisite volumes of broken rock during each blast. Oldcastle believes that this redesign will substantially reduce offsite impacts from ground and/or air vibration, will make the operations more cost efficient, and will permit the implementation of a vibration control program to ensure that all such vibrations are minimized to levels that Oldcastle believes should not generally be annoying or damaging to offsite property owners in the area.

- Designing a quarry-water management and aquifer recharge strategy that Oldcastle believes will return most, if not perhaps all, of the water pumped in connection with the quarry's operation to surface and subsurface drainages and aquifer(s).

Interrogatory/Document Request Number 3.

Please identify any expert witness whom you intend to call as an expert at the trial of this case, and for each such expert, please produce all documents, opinions, and other information in accordance with Alabama Rule of Civil Procedure 26(b).

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the ground that it is premature, as the Court's September 29, 2003

6

Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 4.

Please identify every person with knowledge of the manner of operation of the Hanson quarry after it was taken over by Oldcastle.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to the term "the Hanson quarry" to the extent that it implies that Oldcastle's purchase of the Opelika quarry from Hanson Aggregates Southeast and Oldcastle's subsequent operation thereof amounted to a mere continuation of the operations of Hanson Aggregates Southeast. Oldcastle further objects to this Interrogatory on the grounds that it is overbroad and vague and ambiguous. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows: Frank Heisterkamp, Morris Bishop, and Ted Reynolds have knowledge concerning the operation of the Opelika quarry by Oldcastle after July 13, 2003.

Interrogatory/Document Request Number 5.

Please produce all discharge monitoring reports, and all documents of any type or description in the possession or custody or control of Oldcastle that relates in any manner to the pumping of water from the pit at the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this document request on the grounds that it is overbroad, vague and ambiguous and

7

burdensome and oppressive in that it calls for the production of a large volume of cumulative documents. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all discharge monitoring reports of the Opelika quarry created after July 13, 2003 that are in its possession, custody or control.

Interrogatory/Document Request Number 6.

At any time on or after assuming control of the Lee County quarry, did Oldcastle change the pumps used to discharge water from the quarry pit into outfall number 1? If your answer is in the affirmative, describe all such changes in detail and produce all documents evidencing any such change.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

No.

Interrogatory/Document Request Number 7:

State the number of gallons of water discharged per day from the Oldcastle quarry pit for each day from the date Oldcastle assumed control of the quarry to the date that these interrogatories and requests for production are answered.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this document request on the grounds that it is overbroad, and unduly burdensome and oppressive in that it requires Oldcastle to summarize voluminous records. The information

requested in this Interrogatory will be equally available to Plaintiffs from the discharge monitoring reports which are being produced to Plaintiffs.

Interrogatory/Document Request Number 8.

Please produce the personnel files on every employee of Oldcastle at the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that producing the personnel files of its employees would violate the right of privacy of its employees as protected by the United States Constitution and the Constitution of the State of Alabama.

Interrogatory/Document Request Number 9.

Please produce a "flow chart" or similar document evidencing the corporate structure of Oldcastle's Lee County quarry, from the Lee County quarry all the way up to the corporate owners and parent companies to the highest level, or describe in detail the "chain of command" and corporate structure of Oldcastle from the Lee County quarry upward to the highest corporate level and parent company ownership.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not

9

reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Ted Reynolds is the Chief Operating Officer of Oldcastle Materials Southeast, Inc. and is the acting Plant Manager of the Opelika Quarry. Mr. Reynolds reports to Morris Bishop, President of Oldcastle Materials Southeast, Inc. Mr. Bishop reports to Mark Towe, President and Chief Operating Officer of Oldcastle Materials, Inc. Oldcastle Materials Southeast, Inc. is a wholly-owned subsidiary of Oldcastle Materials, Inc.

Interrogatory/Document Request Number 10.

Please produce a copy of the Joint Defense Agreement entered into between Oldcastle and Hanson as related in the Asset Purchase Agreement.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information. Finally, Oldcastle objects to this Request on the ground that it seeks information that is protected by the joint defense privilege.

Interrogatory/Document Request Number 11.

Does any other written document exist that relates to any right of indemnity, contribution, refund, rescission, cancellation, or other modification of the Asset Purchase Agreement or any other document in the event that the Lee County Circuit Court enjoins the operation of the Lee County quarry? In particular, Plaintiffs are asking precisely what will happen in the event the

2045

Lee County quarry is closed or otherwise substantially enjoined from operation by the Circuit Court of lee County. Are there or will there by any ramifications whatsoever to Hanson, or will any remuneration or other consideration of any type of description pass between Oldcastle and Hanson in the event the Plaintiffs prevail in this litigation and the quarry is enjoined in part or in whole?

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is compound, overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory/Document Request Number 12.

Please produce all documents in your possession or subject to your control that show or from which can be determined the amount of materials sold by Defendant Oldcastle to its customers since assuming operation of the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not restricted to materials sold from the Opelika quarry, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information.

Interrogatory/Document Request Number 13.

Please produce copies of all Lee County mining and mineral tax returns with respect to the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information.

Interrogatory/Document Request Number 14.

Please describe in detail all efforts or undertakings of any type or description considered "due diligence" with respect to the purchase of Hanson's Lee County quarry and operation.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Interrogatory on the ground that it seeks confidential and proprietary business information. Oldcastle further objects to this Interrogatory to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 15.

Please produce all documents related in any manner to Oldcastle's "due diligence" efforts and undertakings with respect to the purchase of the Hanson Lee County Quarry. Without

limiting the generality of the foregoing, please produce all documents related to: what was considered and what was investigated before Oldcastle purchased the quarry; why the quarry was purchased; who made the decision to purchase the quarry and what they based their decision upon; all written reports, internal memoranda, notes of any type or description, Minutes of the Board of Directors, and any other written document dealing with the purchase of the Hanson Lee County Quarry; and all documents related to any steps taken to identify any problems or potential problems related to the quarry operation as well as steps taken or to be taken to minimize damage or alleged damages to surrounding landowners.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to the term "the Hanson Lee County Quarry" to the extent that it implies that Oldcastle's purchase of the Opelika quarry from Hanson Aggregates Southeast and Oldcastle's subsequent operation thereof amounted to a mere continuation of the operations of Hanson Aggregates Southeast. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 16.

Please produce all information known to Oldcastle in 2002 and/or 2003 in relation to the Opelika quarry. This would include, but is not limited to, the geology of the quarry and the

surrounding area, the depth of the quarry at every year from 1996 to date, the number and location of sinkholes in 1999 and each year since 1999, the size of the cone of depression or zone of influence in 1999 and for each subsequent year, the written reports by Dr. Bob Cook or other consultants or in-house geologist(s) at any time after 1999, and the underground water table levels from 1996 to date as well as the pumping amounts and damage (or potential damage) to surrounding properties.

Response:

      Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory/Request on the grounds that inasmuch as the Interrogatory/Request required Oldcastle to produce "all information known to Oldcastle in 2002 and/or 2003 in relation to the Opelika quarry" and is not restricted to its operations at the quarry, it is overbroad, vague and ambiguous, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 17.

      Please produce all environmental studies or assessments of any type or description performed by or for Hanson or by or for Oldcastle at any time (with respect to the Lee County Quarry).

Response:

      Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive,

2086

Please produce copies of all complaints to Hanson or to Oldcastle, together with every document dealing in any manner with such complaint(s) and whatever corrective measures were taken or will be taken (including changes in the method of operation of the quarry) with respect to every such complaint.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the term "complaints" is not defined or limited in scope, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the grounds that insofar as the Request is not limited to complaints received by Oldcastle concerning its operation of the Opelika quarry, it is likewise overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning its operation of the Opelika quarry after July 13, 2003, as well as any response Oldcastle made to such complaints.

Interrogatory/Document Request Number 20.

Please produce all documents in your possession or subject to your control that relate in any way to pending lawsuit(s) against Hanson at the time of the acquisition of the Lee County Quarry by Oldcastle. This would include documents indicating Oldcastle's knowledge of the

suit(s), documents on Oldcastle's responsibility for such suit(s) or indemnity by Hanson to Oldcastle for such suit(s), and any other documents relating to the resolution of any problems or complaints alleged by any of the Plaintiffs.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Interrogatory/Document Request Number 21.

Please produce all documents regarding Oldcastle's knowledge of any complaint by any person or governmental agency regarding dust or fugitive dust emissions. This would include dust from blasting, operations and/or equipment and traffic. Without limitation, this request includes all documents related to the quantity and composition of such dust or fugitive dust emissions, including silica content and/or silica notification to employees, including steps taken to identify the problem and minimize such problems.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not limited to complaints received by Oldcastle concerning its operation of the Opelika quarry, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

2055

Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning dust or fugitive dust emissions after July 13, 2003, as well as any response Oldcastle made to such complaints.

Interrogatory/Document Request Number 22.

Please produce all documents regarding state or federal health/safety laws or regulations with respect to Silica contained within dust or any by-product of the Lee County quarry operations. Without limitation, this requests any MSDS used or issued by Oldcastle with respect to its Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control concerning any silica contained within dust or any byproduct of the Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 23.

Please produce all documents relating to the removal from operation or disabling of any Hanson's (or now Oldcastle's) Dust Suppression System(s), whether for 24 hours or any longer

18

2058

period. This would also include reports, inspections, correspondence and/or documents relating to visible emission inspections, reports and/or repairs, including warnings or correspondence from or to ADEM.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not limited to the operation of any dust suppression system by Oldcastle during its operation of the Opelika quarry, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to any removal from operation of its dust suppression system for 24 hours or greater after July 13, 2003.

Interrogatory/Document Request Number 24.

Please produce all documents related to when any and every piece of new equipment or machinery was or will be installed or became or will become operational.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the Request is not restricted to equipment or machinery installed or planned to be installed by Oldcastle (as opposed to installed by Hanson), it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the

19

discovery of admissible evidence. Oldcastle further objects to this Request on the grounds that insofar as the Request is not restricted to equipment or machinery the operation of which would bear on the allegations set forth in the Fourth Amended and Restated Complaint, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to the installation or planned installation of any piece of new equipment or machinery by Oldcastle at the Opelika quarry after July 13, 2003, to the extent such piece of new equipment or machinery bears on the allegations set forth in the Fourth Amended and Restated Complaint.

<u>Interrogatory/Document Request Number 25.</u>

Please produce all documents related to any "in house" inspections, including environmental inspections, dust suppression inspections, damage control and/or risk management inspections, and any other type of inspection at the Lee County Quarry.

<u>Response:</u>

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is vague and ambiguous, overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request to the extent that it calls for the disclosure of documents or information protected by the attorney-client privilege or the attorney work-product doctrine.

Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control constituting reports of any inspection concerning the operations and conditions of the Opelika quarry after July 13, 2003, to the extent such inspection bears on the allegations set forth in the Fourth Amended and Restated Complaint.

Interrogatory/Document Request Number 26.

Please produce all documents related to any overburden piles on the south side of the quarry at the Lee County quarry (or anywhere else on the quarry property). This request includes, without limiting the generality of the foregoing request, all documents relating to the location, size and character of such overburden piles from 1996 to present including maintenance, reclamation from 1996 to the present, flooding and fugitive dust emissions, and any plans or intentions (firm or merely in discussion stages) relating to such overburden piles.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that insofar as the Request seeks documents from Oldcastle concerning the overburden piles from 1996 to present and is not restricted to Oldcastle's maintenance of the overburden piles after July 13, 2003, the Request seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

21

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to its maintenance of any overburden piles at the Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 27.

Please produce your copy of the Environmental memo from Nigel Wills and his recommendations, as well as all documents relating to it or to his recommendations in any manner.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it does not sufficiently identify the "Environmental memo from Nigel Wills" by date, recipient or otherwise with sufficient particularity so as to allow Oldcastle to determine which document or documents is being requested. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that Oldcastle ever received the document described in the Request. Oldcastle further objects to this Request on the grounds that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

The only such document is in Oldcastle's possession, custody or control is an April 28, 2000, memo from Nigel Wills to Tom Bugenhagen, which was marked as an exhibit to the deposition of Mr. Wills and provided to Oldcastle's counsel in the course of this litigation.

Interrogatory/Document Request Number 28.

2000

Please produce all documents relating to any and all steps taken (or to be taken) to implement any of the changes mentioned in Nigel Wells' environmental memo and/or to correct any known or alleged problems at the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it does not sufficiently identify "Nigel Wells' environmental memo" by date, recipient or otherwise with sufficient particularity so as to allow Oldcastle to determine which document is being referred to. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that Oldcastle ever received the document described in the Request. Oldcastle further objects to this Request on the ground that insofar as it requests documents "relating to any and all steps taken (or to be taken) . . . to correct any known or alleged problems at the Lee County quarry" it is vague and ambiguous and overbroad. Oldcastle further objects to this Request on the ground that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

See response to the previous Request. Oldcastle further states that, as set forth in its response to Interrogatory Number 2, Oldcastle is in the process of implementing a number of changes at the Opelika quarry. In planning and implementing these changes, Oldcastle has taken into account and/or will take into account a range of available information, which may or may not include, but in any event is not limited to, the April 28, 2000, memo from Nigel Wills to Tom Bugenhagen, which Oldcastle's counsel received in the course of this litigation.

Interrogatory/Document Request Number 29.

23

2061

Please produce all documents relating to the location, installation and records regarding any monitoring wells installed at any time near the quarry, and in particular in 2000 and 2001 on or around the Hanson property. This would include water levels, drill logs, water tables and any pumping records and the entire "study" performed by Hanson (possibly Bates # 2938), as well as any study undertaken by or for Oldcastle.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to any data collected after July 13, 2003, from any monitoring wells installed at or near the Opelika quarry.

Interrogatory/Document Request Number 30.

Please produce all pumping records in your possession or subject to your control. This would include pumping or discharge records for the quarry from 1996 to the present, if available, together with all documents related to any calculations of storage capacity for water on the Gilmer property and the Young property. This would include all DMRs (Discharge Monitoring Reports) filed by Opelika Materials or Hanson or Oldcastle with ADEM, applications to ADEM, permits from ADEM and all documents to or from ADEM by Oldcastle, Hanson, Opelika Materials or their agents and/or engineers; warning letters, notices, violations, notice of potential violations or similar documents to or from ADEM. Note that this request includes, but is not

24

2062

limited to documents and information relating to how your internal pumping discharge records were calculated, including the actual calculations themselves.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to pumping and discharge by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in the Request that relate to its pumping of water from Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 31.

Please produce all documents in your possession or subject to your control relating to any payments to Dr. Robert Cook for any reason since 1996.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle has made no payments to Dr. Robert Cook for any reason since 1996.

Interrogatory/Document Request Number 32.

2063

Please produce all documents given to or received from Dr. Robert Cook or Mr. Patterson including, without limitation, (a) the 1999 Exploration and Evaluation of Aggregate Reserves, Opelika Project and (b) the 2000 Exploration and Evaluation of Aggregate Reserves, Opelika-Young Project.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory/Document Request Number 33.

Please produce all documents related to the dewatering or potential dewatering of the areas in and around the Lee County quarry. This would include, without limitation, the first notice to Oldcastle that the Lee County Quarry operation was dewatering or was alleged to be dewatering the surrounding area, the zone of influence of such dewatering, steps taken to identify the zone of influence, and steps taken to minimize or correct the alleged problems or damage.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for the production of expert opinions, and is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks

information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request that are related to any dewatering or potential dewatering of the areas in and around the Opelika quarry caused by Oldcastle's operation of the Opelika quarry after July 13, 2003.

Interrogatory/Document Request Number 34.

Describe in detail whether Oldcastle believes that its continued pumping of water from the quarry pit will continue dewatering the properties around the Lee County quarry. If your contention is that there is no dewatering effect, please describe in detail all bases for such contentions.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Interrogatory on the grounds that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 35.

Please produce all documents relating in any way to the size, scope, duration, or effect of a "cone of depression" or "zone of influence" of the dewatering caused by pumping water from the quarry pit to outfall 1.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Oldcastle further objects to this Request on the ground that the terms "cone of depression," "zone of influence" and "outfall 1" are not defined, and the Request is therefore vague and ambiguous.  Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any "cone of depression" or "zone of influence" – however those terms may be defined – caused by pumping water from the quarry pit by Oldcastle after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.  Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004.  Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle will identify its experts and produce expert discovery at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 36.

Please produce all documents relating to the size and depth of the quarry, including the surface area of the quarry at any time on or before the date of acquisition of the quarry in July of 2003.

Response:

Oldcastle hereby incorporates the general objections set forth above.  Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control relating to the size and depth of the quarry as of July 13, 2003 and thereafter.

28

Interrogatory/Document Request Number 37.

Please produce any and all mining plans of any type or description relating to the Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it seeks confidential and proprietary business information. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

There are no mining plans relating to the Opelika quarry in Oldcastle's possession, custody or control.

Interrogatory/Document Request Number 38.

Please produce all documents regarding any well inventory or spring inventory including related documents showing interviews with homeowners, depths of wells, location of wells and springs and whether the wells or springs were dry or had water.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 39.

29

Please produce all documents reflecting Oldcastle's knowledge of the dewatering at Spring Villa and the Little Uchee Creek (whether or not you contend such dewatering was caused by or in part by Hanson and/or Oldcastle). This would include, but is not to be limited to, all correspondence, investigations, inspections and documents to or from government agencies regarding dewatering of Spring Villa and/or the Little Uchee Creek areas.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that it assumes facts not in evidence, namely that any dewatering at Spring Villa and the Little Uchee Creek has occurred. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged dewatering at Spring Villa and the Little Uchee Creek caused or contributed to by Oldcastle's operation of the quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003, is causing any dewatering at Spring Villa and the Little Uchee Creek. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 40.

Please produce all documents regarding any sinkholes in and around the Lee County quarry, including, without limitation, all documents regarding Oldcastle's first knowledge of sinkholes, steps taken to identify the problem or potential problem, and any steps to be taken, already taken, or planned to be taken to minimize sinkhole information in the future.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged formation of sinkholes caused or contributed to by Oldcastle's operations at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that it calls for an expert opinion, and it is therefore premature, as the Court's September 29, 2003 Scheduling Order does not require Oldcastle to identify its expert witnesses until January 27, 2004. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged documents in its possession, custody or control concerning its knowledge of whether or not its operations at the Opelika quarry after July 13, 2003 is causing any sinkholes in and around the Opelika quarry. Oldcastle further responds that it will identify its experts and produce expert discovery related to this Request at a time and place that is mutually agreeable to the parties.

Interrogatory/Document Request Number 41.

Please produce all documents regarding any pre-blast inspections done for Oldcastle.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 42.

Please produce all documents and information relating to Oldcastle's first notice that blasting had caused, or was causing, or was allegedly causing damage to any property owner in the area, including all steps taken to identify any problem or alleged problem and any steps taken to minimize or correct any such alleged problems or damage.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as it is not restricted to any alleged damage caused by blasting by Oldcastle at the Opelika quarry after July 13, 2003, it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all complaints it has received concerning whether its blasting at the Opelika quarry after July 13, 2003, has caused, or was causing, or was allegedly causing damage to any property owner in the area, as well as any response Oldcastle made to such complaints.

Interrogatory/Document Request Number 43.

2070

Please produce all aerial photos of the quarry from 1996 to the present.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 44.

Please produce all documents regarding other regulatory filings or information not specifically requested above.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the ground that the term "other regulatory filings or information" is not defined and the Request does not otherwise describe the document or documents requested with sufficient particularity to allow Oldcastle to determine which document or documents are being requested. The Request is therefore vague and ambiguous. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory/Document Request Number 45.

Please produce all documents exchanged with Dyno Nobel or any other blasting company relating to the Opelika/Lee County quarry.

Response:

Oldcastle hereby incorporates the general objections set forth above. Notwithstanding and without waiving the foregoing general objections, Oldcastle responds as follows:

Oldcastle will produce all non-privileged and responsive documents in its possession, custody or control set forth in this Request.

Interrogatory/Document Request Number 46.

Please produce all business licenses or permits of any type and description obtained or required by any governmental agency.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all business licenses and permits concerning its operations at the Opelika quarry that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

Interrogatory/Document Request Number 47.

Please produce all OSHA and/or MSHA inspections or other documents exchanged by and between Oldcastle and OSHA and/or MSHA.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that insofar as the allegations set forth in the Fourth Amended and Restated Complaint do not pertain to worker health and safety issues, the Request

is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, Oldcastle responds as follows:

Oldcastle will produce all OSHA and/or MSHA inspections and other documents exchanged by and between Oldcastle and OSHA and/or MSHA that bear on the allegations set forth in the Fourth Amended and Restated Complaint.

Interrogatory/Document Request Number 48.

Please produce all personnel files on all of Oldcastle's Lee County quarry foremen and Plant Managers.

Response:

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Oldcastle further objects to this Request on the ground that producing the personnel files of its employees would violate the right of privacy of its employees as protected by the United States Constitution and the Constitution of the State of Alabama.

Interrogatory/Document Request Number 49.

Please produce all documents relating to the hours worked by any and every Oldcastle employee of the Lee County Quarry from the moment Oldcastle assumed control of the quarry operation.

<u>Response:</u>

Oldcastle hereby incorporates the general objections set forth above. Oldcastle further objects to this Request on the grounds that it is overbroad, unduly burdensome and oppressive, and seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

PHILLIP E. ADAMS, JR.  (ADA025)
Attorney for Defendant
P.O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

2074

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 6th day of November, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P.O. Box 409
Opelika, Alabama  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P.O. Box 2345
Opelika, Alabama  36803-2345

James A. Bryan, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia  30092

_____
Of Counsel

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
RAY VAUGHAN, Of Counsel
THERESE FORD, Of Counsel

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

November 12, 2003

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

**Via E-mail & Fax**

RE:   *Hanson Quarry*

Dear Phil:

I am e-mailing to you responses to interrogatories and requests for production on behalf of Opelika and Beauregard, and Bobby, Wanda, and Ambur Parker. These are representative of the answers of the remaining Plaintiffs, although each individual Plaintiff will have some few differences. Logistically, we are having all of these people come to Jim Sprayberry's office to sign their responses, but it may take a little while to get them all signed.

We have also called a few times and left messages for you regarding how to copy our documents for you. Our responses to your requests for production are basically the same documents we have already produced to Hanson, together with all deposition exhibits. This is a lot of documents. I left a message that I could have the Copy Center in Montgomery copy all of this information for you and deliver it to you, at your expense. If you would like to do that, let me know. If you want two copies, it would best to make them both now. I cannot let our originals out of our possession, though.

Also, I was disappointed in your answers to our interrogatories and requests. It appears Oldcastle is going to play games by not giving any information even though it is clearly discoverable. By subsequent letter, I will be asking for better responses prior to filing a motion to compel. We want to take the Plant Manager's deposition on November 20, as scheduled, even if we do not get good answers from Oldcastle. Right now, we want to take the corporate representatives' depositions on December 9-10, as scheduled, although we may have to postpone those if Oldcastle persists in refusing to give us discoverable information and documents. Please confirm that these depositions are scheduled and the place thereof.

Case 3:06-cv-00838-MEF-TFM    Document 37-2    Filed 09/07/2007    Page 70 of 150

2076

Phillip E. Adams, Jr.
November 12, 2003
Page 2

     Thank you.

                             Sincerely,

                             Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry (via E-mail & Fax)
       James A. Byram, Jr. (via E-mail & Fax)
       John V. Denson (via E-mail & Fax)
       Guy F. Gunter, III (via Fax only)
       H. Wayne Phears (via E-mail & Fax)
       Jack Weiss (via E-mail & Fax)
155-00\Adams2.1.wpd

2077

## ADAMS, UMBACH, DAVIDSON & WHITE, LLP
### *Law Offices and Mediation Center*
205 South 9th Street
Opelika, Alabama 36801

Phillip E. Adams, Jr.
Arnold W. Umbach, Jr.
Patrick C. Davidson
Matthew W. White
‑‑‑‑‑‑‑‑‑‑‑
Jacob A. Walker, Jr., Ret.

Email: padams@audwlaw.com
Direct Fax: (334) 749-3238

Mailing Address:
P.O. Box 2069
Opelika, AL 36803-2069

Tel. (334) 745-6466
Fax (334) 749-3238

November 13, 2003

VIA FACSIMILE

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry St.
Montgomery, AL 36104-5049

RE:    *Letter dated November 12, 2003 - Davis, et al. vs. Hanson Aggregates, et al.*

Dear Chip:

This will acknowledge receipt of your letter dated November 12, 2003. I had called Jimmy Sprayberry and talked with him on November 11, 2003, regarding my concerns for the depositions since Jack Weiss and I had not heard from you in several weeks to finally conclude our discussions regarding the deposition schedule.

I have also requested that Jimmy furnish to me all of the documents we have requested during the course of our discovery. I am concerned that if we rely on obtaining copies you furnished to some other party before we were brought into the lawsuit that something might be lost. I would like for you to respond to our discovery requests. We will, of course, be happy to pay for duplicate photocopies as is the custom in my experience. If you want to respond to our discovery request and have copies made in Montgomery and delivered to me that, of course, will be fine. I would like to have two copies and I would want to make sure that if the original documents are color that the copies produced are made in color.

I am somewhat puzzled by your statement regarding the answers we made to the interrogatories and request for production. It is my considered opinion that these responses are most legitimate given the fact that the complaint in this case does not state a claim against Oldcastle for which relief can be granted. We will be happy to

Page Two
November 13, 2003


make better responses as soon as an amended complaint is filed which sets forth with
some specificity the act or acts committed by Oldcastle which justify the complaint you
filed in August of this year.

I am informed that the plant manager will not be available on November 20 as we had
earlier discussed. The reason he is not available is that it is my understanding that you
never responded to Jack Weiss' letter to conclude our negotiations so that his
deposition could be scheduled. We would like to have the court rule on our Motion to
Dismiss prior to any depositions being scheduled.

Please let me know when you have made the copies of the documents we have
requested in our discovery. I will be happy to pay you for these as soon as I am
notified.

I will also be happy to discuss with you and Jimmy our position in further detail if you
believe it would be beneficial.

Yours very truly,

PHILLIP E. ADAMS, JR.

rr
cc:    Attorneys of Record

LEXSEE 397 So. 2d 98

**Ex parte Dorsey Trailers, Inc., a Corporation (Re: Pearl Mincey, etc. v. Dorsey Trailers, Inc., a Corporation, et al.)**

No. 80-198

Supreme Court of Alabama

*397 So. 2d 98; 1981 Ala. LEXIS 3381*

April 9, 1981

**PRIOR HISTORY:**
[**1]

PETITION FOR WRIT OF MANDAMUS.

**DISPOSITION:**
    WRIT GRANTED CONDITIONALLY.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner corporation challenged a decision from the Circuit Court of Coffee County (Alabama), which denied its motions for a continuance and to compel an administratrix in an underlying wrongful death action to answer interrogatories. The corporation sought an original writ of mandamus against respondent circuit judge to compel the administratrix's answers and to continue the underlying action until the interrogatories were answered.

**OVERVIEW:** The administratrix filed a wrongful death action against the corporation. The corporation served the administratrix with interrogatories. The administratrix's answers were nonresponsive, evasive, incomplete, and inadequate. The corporation filed a second motion to compel. Without a hearing, the circuit judge denied the motion because he felt that the corporation knew most of the facts better than the administratrix and that the depositions on file answered most of the interrogatories. The corporation sought a writ of mandamus to require the circuit judge to compel the administratrix to properly answer and to continue the case. The court conditionally granted the writ. The court held that the circuit judge abused his discretion when he failed to grant the motion to compel, and he set the case for trial. The scope of discovery was broad under Ala. R. Civ. P. 26. The administratrix was required to answer or properly object to the interrogatories under Ala. R. Civ.

P. 33. The administratrix was not permitted to withhold answers because she thought they were not useful or beneficial, because her attorney had the information, or because the corporation already possessed the information.

**OUTCOME:** The court conditionally granted the writ of mandamus. If the circuit judge refused to grant the corporation's motion to compel answers and failed to order a continuance in the underlying action, then the writ would have issued upon the corporation's request.

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Civil Procedure > Discovery Methods > Interrogatories*
[HN1] Ala. R. Civ. P. 33(a) requires the reason for objection to interrogatories to be stated and that the attorney sign the objection being made by him.

*Civil Procedure > Disclosure & Discovery > Protective Orders*
*Civil Procedure > Remedies > Extraordinary Writs*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN2] Mandamus is a proper means of review to determine whether a trial judge abused his discretion in limiting a party's right to discovery. The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief. The writ will not issue where the right in question is doubtful. The Alabama Rules of Civil Procedure permit very broad discovery and the rules must be broadly and liberally construed. However, Ala. R. Civ. P. 26(c) recognizes that the right of discovery is not unlimited and gives the court broad power to control the use of the process and to prevent its abuse by any party. The rule does not allow

an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. For this reason, mandamus will issue to compel discovery only in those cases where a clear abuse of discretion is shown.

*Governments > Courts > Rule Application & Interpretation*
[HN3] Cases construing the Federal Rules of Civil Procedure are authority for construction of the Alabama Rules of Civil Procedure.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN4] The scope of discovery which may be had by interrogatories propounded pursuant to Ala. R. Civ. P. 33 is determined, as is the scope of other available forms of discovery, according to Ala. R. Civ. P. 26. Ala. R. Civ. P. 26(b)(1), in part, states that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. The rule makes it plain that discovery is not limited to matters competent as evidence at trial.

*Civil Procedure > Disclosure & Discovery > Relevance*
[HN5] "Relevancy," as used in the discovery rules, means relevant to the subject matter of the action and a reasonable possibility that the information sought will lead to other evidence that will be admissible.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN6] It is not the prerogative of a party answering interrogatories to refuse to answer because of his opinion regarding the usefulness of the information sought or its relative benefit or harm to the parties involved. A defendant is entitled to the factual basis of the plaintiff's claim and all facts going to prove or disprove the defendant's defense.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN7] Under Ala. R. Civ. P. 33, a party must give full and complete answers to interrogatories served on him by another party. While a party may not have a duty to

search out new information, it is undisputed that a party has a duty to provide all information available to him. Information which is controlled by a party is available to him. If the answering party in good faith believes certain interrogatories ask for information beyond the permissible scope set out in Ala. R. Civ. P. 26, it is incumbent upon him to properly object under Ala. R. Civ. P. 33. Ala. R. Civ. P. 33(a), in part, states that each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
*Civil Procedure > Discovery Methods > Expert Witness Discovery*
[HN8] Objections to interrogatories must be specific and supported by a detailed explanation of why the interrogatories are improper. General objections may result in waiver of the objections. Available information which an answering party is under a duty to disclose also includes facts discovered and opinions held by his own expert witnesses.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
[HN9] A party has an obligation to reveal information held by his attorney.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN10] A party cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN11] Ala. R. Civ. P. 33(b), in part, states that an interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Discovery Methods > Interrogatories*
*Torts > Negligence > Negligence Generally*
[HN12] Interrogatories seeking opinions or contentions as to the acts or omissions constituting the basis of a claim of negligence are, by nature, questions of mixed

law and fact and are, therefore, proper. Interrogatories are an appropriate means for obtaining a specification of the facts upon which a claim of negligence is founded. Opinions and conclusions are inherent in any specification of the factual basis of a claim of negligence. The allegation of negligence itself is the statement of a conclusion, and because negligence may be pleaded broadly, a statement of the facts upon which the conclusion is based can hardly be forbidden as the expression of a conclusion.

*Civil Procedure > Disclosure & Discovery > Undue Burden*
*Civil Procedure > Discovery Methods > Oral Depositions*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN13] A party may not object to interrogatories merely on the ground that the questions contained therein were answered by deposition. The various methods of discovery are cumulative and complementary rather than alternative or exclusive. A party may both take depositions and propound written interrogatories, as long as he is not trying to circumvent a ruling by a trial court, or to harass or oppress the adverse party. The burden is on the adverse party to show that a hardship or injustice will be caused by the use of successive methods of discovery.

*Civil Procedure > Disclosure & Discovery > Relevance*
*Civil Procedure > Discovery Methods > Interrogatories*
[HN14] Ala. R. Civ. P. 26(b)(1) permits a party to discover the identity and location of persons having knowledge of any discoverable matter, and the answering party is required under Ala. R. Civ. P. 26(e) to supplement his response to interrogatories seeking this information.

*Civil Procedure > Disclosure & Discovery > Relevance*
[HN15] A claim by an opposing party that much of the information sought by a party is in that party's possession has no bearing upon an otherwise appropriate discovery request.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Discovery Methods > Motions to Compel*
[HN16] The bounds of a circuit court's discretion to compel or deny discovery are broad.

**JUDGES:**
Embry, Justice. Torbert, C.J., Maddox, Faulkner, Jones, Almon, Shores, Beatty and Adams, JJ., concur.

**OPINIONBY:**

EMBRY

**OPINION:**

[*100] Dorsey Trailers, Inc., petitions this court for an original writ of mandamus requiring the Honorable Terry Butts, Judge of the Circuit Court of Coffee County, to compel Pearl Mincey, plaintiff below, to answer petitioner's interrogatories and to stay further proceedings in the action for damages below until plaintiff supplies such answers.

This action arose when Bruce Mincey, deceased, was killed by the explosion of a steel drum which he was cutting with a circular saw. Plaintiff, Pearl Mincey, as administratrix of the estate of Bruce Mincey, deceased, filed suit against petitioner for wrongful death on 6 June 1980, seeking two million dollars in damages for the death of Bruce Mincey. Plaintiff's action was brought under the theory of the Alabama Extended Manufacturer's Liability Doctrine and that of negligence and wanton misconduct.

The issue to be resolved is whether the trial judge abused his discretion in denying, without an opportunity for hearing, petitioner's motion [**2] for continuance and motion to compel answers to interrogatories.

On 6 August 1980, petitioner served written interrogatories upon the plaintiff. On 19 October 1980, petitioner, having received no response to its interrogatories, filed a [*101] motion to compel plaintiff to answer them, noting in its motion that the answers were necessary in order for petitioner to adequately defend the action. Without ruling on the motion to compel, the trial court, on motion of plaintiff, set the case for pretrial hearing on 17 November 1980.

At the pretrial conference, petitioner requested respondent trial judge to compel plaintiff to answer its interrogatories. As set out in his pretrial order of 8 December 1980, respondent judge gave the plaintiff an additional 30 days within which to answer petitioner's interrogatories and set the trial for 5 January 1981.

Petitioner received plaintiff's answers to its interrogatories on 15 December 1980. On the following day petitioner filed a second motion to compel plaintiff to answer interrogatories, claiming that plaintiff's answers were not in compliance with the Alabama Rules of Civil Procedure: being nonresponsive, evasive, incomplete and [**3] inadequate to allow petitioner to properly prepare its defense; and, as such, should be treated as a failure to answer under Rule 37(a)(3), ARCP. Contemporaneously, petitioner requested a hearing on its second motion to compel.

After attempting without success to contact

respondent judge in order to get a hearing on its second motion to compel, petitioner, on 17 December 1980, filed a motion for continuance of the case until such time as plaintiff properly responded to its discovery requests. Petitioner also requested a hearing of this motion.

Without providing petitioner an opportunity to be heard on its motions, respondent judge, on 23 December 1980, issued an order summarily denying both the motion for continuance and the motion to compel, and ordered the case tried at the January 1981 term of court (week of 5 January 1981). As a result of the denial of its motions, petitioner, on 29 December 1980, filed this petition for an original writ of mandamus, asking this court to require the trial judge to compel plaintiff to properly respond to petitioner's interrogatories, to further order the trial judge to continue this case from 5 January 1981 and to file an answer to the petition [**4] for mandamus. This court, on 30 December 1980, entered its order staying all proceedings in the action in the circuit court pending disposition of the petition for writ of mandamus in this court. Answer and brief of respondents were ordered filed as well as reply of petitioner thereto.

The interrogatories propounded to plaintiff by petitioner sought information concerning, *inter alia*, the facts and circumstances upon which plaintiff based her claims that petitioner was responsible for the death of Bruce Mincey, the locations and identities of all persons upon whom plaintiff relied in reaching her conclusions, and the identities of all persons expected to testify in the action, together with the substance of their expected testimony. Petitioner also inquired of plaintiff the location and identity of any expert witness expected to testify, the subject matter about which each expert was expected to testify, the substance of the facts and opinions of which each expert was expected to testify and a summary of the grounds of the opinion of each expert. In addition, petitioner requested the medical history of the decedent, including any physical or mental impairments, and his educational [**5] background and work history.

In answer to this petition, respondent trial judge, Honorable Terry Butts, asserts that he was familiar with the facts surrounding the case prior to the pretrial hearing on 17 November 1980. Based on this knowledge, he felt that most of the facts in the case were better known by petitioner than by plaintiff and that depositions on file appeared to answer most of the interrogatories. Respondent judge, therefore, opined that petitioner had all necessary and proper information and was merely trying to delay going to trial.

Respondent judge also maintains that the procedure in his court has always been that the party desiring further answers to its interrogatories specify the ones which need to be answered or answered further. He notes that petitioner's second motion to compel failed to state which of the answers [*102] were considered evasive or incomplete and failed to take issue regarding those to which plaintiff had objected as improper.

Plaintiff's brief echoes respondent judge's contentions that the contents of oral depositions had already answered the questions posed by petitioner's interrogatories and that petitioner held the most knowledge [**6] of the pertinent facts, stating: "We cannot conceive of any facts that we could have that may be material that defendant does not already know." Plaintiff also argues that certain interrogatories call for facts and opinions unknown to plaintiff, but known and held by her attorney, and are improper attempts to discover the theories of her counsel. Furthermore, plaintiff states she did not answer certain interrogatories because she failed to see how the answers would be admissible or lead to admissible evidence, or how the information sought by these interrogatories would help petitioner or harm plaintiff. Finally, the interrogatories requesting names and addresses of all witnesses expected to testify are objected to as improper, and plaintiff maintains the trial court has never required such information to be supplied in response to a discovery request.

Replying to the arguments of respondent judge and plaintiff, petitioner contends it is entitled to the factual basis of plaintiff's claims and all facts going to prove or disprove petitioner's defenses. The discovery material, petitioner maintains, is not limited to admissible evidence, but extends to all matters which are relevant [**7] and reasonably calculated to lead to the discovery of admissible evidence. The fact that certain interrogatories are directed toward factual areas already covered by depositions is not a valid ground for objection, according to petitioner, which asserts that the various forms of discovery were meant to be cumulative and complementary, not mutually exclusive. Petitioner further argues that those interrogatories seeking contentions of plaintiff's attorney and names of all witnesses whom plaintiff expects to testify at trial are permissible.

Further, petitioner takes the position that those interrogatories considered improper by plaintiff were not properly objected to by her pursuant to [HN1] Rule 33(a), ARCP, which requires the reason for objection to be stated and that the attorney sign the objection being made by him. Petitioner argues that it is obvious from a reading of its interrogatories and plaintiff's answers thereto that the answers are evasive, incomplete, improperly objected to, and contrary to the letter and spirit of the Alabama Rules of Civil Procedure.

consequently the defective answers should have been treated as a failure to answer under Rule 37, ARCP. Combining these [**8] considerations with the fact that respondent trial judge denied petitioner's motions without a hearing based on his belief petitioner had all necessary information, petitioner asserts that the actions of respondent judge constituted a clear abuse of discretion.

Ordinarily, we would not review rulings regarding discovery proceedings in the trial courts. However, in this case there are basic questions to be answered, arising from the latest amendments to ARCP regarding discovery, that have not heretofore been addressed by this court.

[HN2] Mandamus is a proper means of review to determine whether a trial judge abused his discretion in limiting a party's right to discovery. *Assured Investors Life Insurance Co. v. National Union Associates, Inc., 362 So. 2d 228 (Ala. 1978).* The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief. The writ will not issue where the right in question is doubtful. *Lassiter v. Werneth, 275 Ala. 555, 156 So. 2d 647 (1963).*

As [**9] the court stated in *Campbell v. Regal Typewriter Co., Inc., 341 So. 2d 120 (Ala. 1976):*

The Alabama Rules of Civil Procedure permit very broad discovery and the rules must be broadly and liberally construed. *Cole v. Cole Tomato Sales, Inc., 293 Ala. 731, [*103] 310 So. 2d 210 (1975).* However, Rule 26(c) recognizes that the right of discovery is not unlimited and gives the court broad power to control the use of the process and to prevent its abuse by any party. The rule does not allow an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. ...

For this reason, mandamus will issue to compel discovery only in those cases where a clear abuse of discretion is shown. *Ex parte Alabama Power Co., 280 Ala. 586, 196 So. 2d 702 (1967).*

In order to determine whether such a clear abuse of discretion is present in this case, we must examine the interrogatories in light of the purpose and language of the rules of discovery in the Alabama Rules of Civil Procedure and the cases construing them. Looking to case law, we find an established rule that [HN3] cases construing the Federal Rules of Civil Procedure are authority [**10] for construction of the Alabama Rules of Civil Procedure. *Bracy v. Sippial Electric Co., Inc.,*

*379 So. 2d 582 (Ala. 1980); Alabama Power Co. v. White, 377 So. 2d 930 (Ala. 1979); State v. Horton, 373 So. 2d 1096 (Ala. 1979); Smith v. Wilcox County Board of Education, 365 So. 2d 659 (Ala. 1978); Assured Investors Life Insurance Co. v. National Union Associates, Inc., supra.*

"Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel." 23 Am. Jur. 2d, Depositions and Discovery, § 155 (1965). Stated otherwise, the rules seek to "make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter and Gamble [**11] Co., 356 U.S. 677, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958); Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947).*

It is the trial court's job to exercise its broad discretion in a manner that will implement this philosophy of full disclosure of relevant information and at the same time afford a party, or others, maximum protection against harmful side effects which would result from unnecessary disclosure. *Ex parte Guerdon Industries, Inc., 373 So. 2d 322 (Ala. 1979).*

[HN4] The scope of discovery which may be had by interrogatories propounded pursuant to Rule 33, ARCP, is determined, as is the scope of other available forms of discovery, according to Rule 26, ARCP.

Paragraph (b)(1) of Rule 26, in part, states:

*In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including ... the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible [**12] at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The rule makes it plain that discovery is not limited to matters competent as evidence at trial. [HN5] "Relevancy," as used in our discovery rules, means relevant to the subject matter of the action and a

reasonable possibility that the information sought will lead to other evidence that will be admissible. *Drewes v. Bank of Wadley, 350 So. 2d 402 (Ala. 1977)*; 8 Wright and Miller, Federal Practice and Procedure § 2008 (1970).

Several of petitioner's interrogatories requested information on the physical, mental and medical history of the deceased, including such pertinent matters as visual impairment. Petitioner contends this information, [*104] in conjunction with questions about the deceased's educational background and work history, is relevant to the ability of the deceased to perceive and appreciate the danger of his task and to read and understand any warning labels which may have been on the drum. Plaintiff's response to these interrogatories was "not answered on advice of counsel," which response plaintiff's brief explains by saying: [**13]

These were not answered on advice of counsel because counsel fails to see how they have anything to do with the case or how they could lead to anything that might have anything to do with this case, and counsel for the plaintiff does not know the answer ... I do not see how any of the information sought by these or any other would help the plaintiff [defendant?] or harm the defendant [plaintiff?].

Given the purpose and broad scope of discovery, discussed *supra*, petitioner was clearly entitled to the information concerning the physical, mental and medical background of the deceased. [HN6] It is not the prerogative of a party answering interrogatories to refuse to answer because of his opinion regarding the usefulness of the information sought or its relative benefit or harm to the parties involved.

A defendant is entitled to the factual basis of the plaintiff's claim and all facts going to prove or disprove defendant's defense. 4 Moore's Federal Practice, para. 26.57. The contention that counsel for plaintiff does not know the facts surrounding the background of the deceased is hardly justification for failure of the plaintiff, mother of the deceased, to answer [**14] interrogatories addressed to her.

[HN7] Under Rule 33, a party must give full and complete answers to interrogatories served on him by another party. While a party may not have a duty to search out new information, it is undisputed that a party has a duty to provide all information available to him. *Hickman v. Taylor, supra*; 8 Wright & Miller, Federal Practice and Procedure, § 2172 (1970). Information which is *controlled* by a party is available to him. *Trane Co. v. Klutznick, 87 F.R.D. 473 (W.D. Wis. 1980)*.

If the answering party in good faith believes certain interrogatories ask for information beyond the permissible scope set out in Rule 26, ARCP, it is incumbent upon him to properly object under Rule 33, ARCP.

Rule 33(a), in part, states:

Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them. ...

[HN8] Objections to interrogatories must be specific and supported by a detailed explanation of why the interrogatories [**15] are improper. *In re Folding Carton Antitrust Litigation, 83 F.R.D. 260 (N.D. Ill. 1979); United States v. 58.16 Acres of Land, 66 F.R.D. 570 (E.D. Ill. 1975)*, 8 Wright & Miller, Federal Practice and Procedure § 2172 (1970). General objections may result in waiver of the objections. *In re Folding Carton Antitrust Litigation, supra; White v. Beloginis, 53 F.R.D. 480 (S.D.N.Y. 1971)*.

Available information which an answering party is under a duty to disclose also includes facts discovered and opinions held by his own expert witnesses. In response to petitioner's interrogatory asking if any examination of the drum head had been made and, if so, what tests or analyses had been performed, plaintiff replied as follows:

"Mr. Payne has examined it and what kind of test, if any, he made, I don't know."

Having identified Mr. Payne in an earlier answer as an expert witness whom she expected to call at trial, plaintiff was under an obligation to ascertain from him whether he had conducted any tests or analyses of the drum, and, if so, sufficient facts about the tests or analyses *to enable plaintiff to properly respond to the interrogatory*.

[*105] It is also [**16] well-established that [HN9] a party has an obligation to reveal information held by his attorney. *Naismith v. Professional Golfers Association, 85 F.R.D. 552 (N.D. Georgia 1979); Pilling v. General Motors Corp., 45 F.R.D. 366 (D. Utah 1968); Maryland ex rel. Peters v. Baltimore & O.R. Co., 7 F.R.D. 666 (E.D. Pa. 1947); Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947)*. In answer to

petitioner's interrogatory seeking plaintiff's contentions regarding the nature of the drum's defect, the relation of petitioner's conduct to the defect, and the failure of petitioner to remedy the defect, plaintiff stated:

"My attorney will have to answer this."

Plaintiff argues that this interrogatory called for information held solely by her attorney, of which she had no knowledge. Plaintiff's reply to this interrogatory was improper. [HN10] A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney. *Miller v. Doctor's General Hospital, 76 F.R.D. 136 (N.D. Okla. 1977);* 8 Wright & Miller, Federal Practice and Procedure, § § 2171 & 2177 (1970).

Plaintiff argues that these contention-seeking [**17] interrogatories are also objectionable on the ground they attempt to uncover the legal theories and conclusions of her attorney. Plaintiff extends this argument to several other interrogatories which ask for plaintiff's opinions as to the acts and omissions constituting the bases of her claims, to which plaintiff responded: "Not answered on advice of counsel."

By amendment in 1970, [HN11] paragraph (b) of Rule 33, ARCP, in part, now states:

An interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact. . .

Many older cases denied a party the right to obtain the opinions and contentions of other parties through interrogatories. However, the overwhelming majority of recent decisions have adopted the view of the amended rule and allowed interrogatories seeking opinions and contentions of fact, or of mixed law and fact, while generally refusing to permit interrogatories asking for purely legal conclusions. 8 Wright & Miller, Federal Practice and Procedure § 2167 (1970). The Advisory Committee Note to Rule 33 of the Federal Rules of Civil [**18] Procedure is informative on this point:

... Efforts to draw sharp lines between facts and opinions have invariably been unsuccessful, and the clear trend of the cases is to permit 'factual' opinions. As to requests for opinions or contentions that call for the application of law to fact, they can be most useful in narrowing and sharpening the issues, which is a major

purpose of discovery. ... On the other hand, under the new language interrogatories may not extend to issues of 'pure law,' i.e., legal issues unrelated to the facts of the case. ...

In keeping with this line of thought, the modern trend has recognized that [HN12] interrogatories seeking opinions or contentions as to the acts or omissions constituting the basis of a claim of negligence are, by nature, questions of mixed law and fact and are, therefore, proper. 8 Wright and Miller, Federal Practice and Procedure § 2167 (1970). Expressing this view in *Hartsfield v. Gulf Oil Corp., 29 F.R.D. 163 (D.C. Pa. 1962),* the federal district court said:

It is now settled that interrogatories are an appropriate means for obtaining a specification of the facts upon which a claim of negligence is founded. [**19] ... The objection that the interrogatories require the statement of conclusions or opinions is unjustified in the present circumstances. Opinions and conclusions are inherent in any specification of the factual basis of a claim of negligence. The allegation of negligence itself is the statement of a conclusion, and since negligence may be pleaded broadly, a statement of the facts upon which the conclusion is based can hardly be forbidden as the expression of a conclusion.

[*106] Petitioner's interrogatories seeking the contentions of plaintiff concerning the acts and omissions constituting negligence on the part of petitioner should have been answered. As to other contention-seeking interrogatories, such discovery should generally be allowed if the answers would be useful in narrowing the issues or serve some other substantial purpose related to an essential element of a claim, unless a pure conclusion of law is called for. At any rate, the manner in which plaintiff objected was improper under Rule 33, ARCP, as discussed *supra,* and was hardly a sufficient statement of the specific ground for objection to allow petitioner a fair opportunity to rebut those reasons [**20] and to permit respondent trial judge to make a proper and informed decision on whether discovery should be compelled.

As discussed, *supra,* Rule 26, ARCP, also allows a party to discover the identity and location of persons having knowledge of any discoverable matter. Petitioner posed interrogatories seeking from plaintiff the names and addresses of any persons who observed or were around the location of the explosion, whether any statements had been taken by plaintiff from such persons, and the substance of the information held by such persons. Plaintiff simply responded that these matters

had been covered by deposition. Plaintiff gave the same reply to various interrogatories seeking the details of the educational background and work history of her decedent, the actions of the deceased at the time of the explosion, and the facts upon which plaintiff relied in contending that petitioner was negligent in the sale of the drum.

[HN13] A party may not object to interrogatories merely on the ground that the questions contained therein were answered by deposition. The various methods of discovery were intended to be cumulative and complementary rather than alternative or exclusive. [**21] A party may both take depositions and propound written interrogatories, as long as he is not trying to circumvent a ruling by the trial court, or to harass or oppress the adverse party to show that a hardship or injustice will be caused by the use of successive methods of discovery. *Taylor v. Atchison, T. & S. F. Ry. Co.*, 33 F.R.D. 283 (W.D. Mo. 1962); *Stonybrook Tenants Association, Inc. v. Alpert*, 29 F.R.D. 165 (D.C.D. Conn. 1961); *Bullard v. Universal Millwork Corp.*, 26 F.R.D. 144 (E.D. N.Y. 1960).

In addition to requesting facts about persons with knowledge of the incident, petitioner asked plaintiff to give the names of all persons she intended to call as witnesses at trial, which she refused to do. If the circumstances justify it, a judge may properly require this information to be revealed. However, we will not hold that a discovering party has the right to demand from the adverse party a list of all witnesses to be called at trial. The majority of jurisdictions in this country do not require such discovery, although there is considerable authority for the opposing view. 8 Wright & Miller, Federal Practice & Procedure, [**22] § 2013. [HN14] Subparagraph (b)(1) of Rule 26, ARCP, permits a party to discover the identity and location of persons having knowledge of any discoverable matter and the answering party is required under Rule 26(c) to supplement his response to interrogatories seeking this information. Since these provisions effectively allow a party to discover the identity and location of any potential witnesses to be called by the opposition party, denial of the right to require disclosure of the specific persons which the adverse party intends to call as witnesses at trial will not subject the discovering party to surprise at trial. However, it will prevent substantial burdens being placed upon parties who have not completed their trial preparations or strategy.

The final point to be examined is plaintiff's response that "defendant has the answer to this already," to the interrogatory of petitioner seeking information about warning labels on the drum, and respondent trial judge's assertion that one reason he did not grant the motion to compel answers to interrogatories was because he felt most of the facts were better known by petitioner. This was not a proper reason [*107] for plaintiff's [**23] refusal to answer or for respondent judge's denial of the motion to compel answers. [HN15] A claim that much of the information sought by a defendant is in defendant's possession, if true, has no bearing upon an otherwise appropriate discovery request. *Dykes v. Morris*, 85 F.R.D. 373 (D.C. Ill. 1980).

All told, 37 of the 50 interrogatories propounded by petitioner received responses from plaintiff that the matter had already been covered by the complaint or by deposition, that the question was not answered on advice of counsel, or simply stating the word "answered." A reading of the remaining 13 answers reveals that several are nonresponsive, incomplete or evasive. In addition, plaintiff did not object, in the manner required by Rule 33, ARCP, to any interrogatory which she did not answer.

Such a disregard of the principles of law governing discovery should not have been overlooked by respondent judge and cannot be overlooked by this court. To permit this case to proceed to trial without requiring further answers from plaintiff to petitioner's interrogatories would contravene the purpose of the rules of discovery and might cause petitioner to suffer grave injustice. [HN16] The bounds [**24] of the trial court's discretion to compel or deny discovery are broad. However, in this case those bounds have been overstepped.

If, upon the basis of this decision, respondent trial judge fails to grant petitioner's motion to compel answers to interrogatories and fails to order a continuance of the action for damages until such time as plaintiff complies, a writ to effectuate those actions will issue upon request of petitioner.

WRIT GRANTED CONDITIONALLY.

Torbert, C.J., and Maddox, Faulkner, Jones, Almon, Shores, Beatty and Adams, JJ., concur.

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE & DONNA DAVIS; MIKE & ANN BROADWATER; )
MITTIE BROADWATER; CITY OF OPELIKA, a Municipal )
Corporation; THE UTILITIES BOARD OF THE CITY OF )
OPELIKA, a public corporation; BEAUREGARD WATER )
AUTHORITY, a public corporation; ANTHONY & CAROL )
CLARK; CAROL CLARK, as Mother and Next Friend of )
COURTNEY CLARK; ELAINE EDWARDS; MARY SUE )
EILAND; MEDENA FRIZZEL; MEDENA FRIZZEL, as )
Mother and Next Friend of KARLA FRIZZELL and )
BRIANNA YOUGREN; RONNIE & DOROTHY GRIGGS; )
MIKE & STACEY HAGENS; HOWARD & LISA HARMON; )
LISA HARMON, as Mother and Next Friend of JUDSON & )
BRIA HARMON; HAYWARD & NORA JACKSON; MIKE & )
SHELIA LaMACCHIA; SHELIA LaMACCHIA, as Mother )
and Next Friend of RUSSELL LaMACCHIA; STANLEY & )
JACKIE LEDBETTER; TERRY & CAROL LONG; TIM & )
ADA MANNING; DAVID & JANETTE BAGGETT; JAMES )
& SHIRLEY PARKER; RANDALL & WANDA PARKER; )
WANDA PARKER, as Mother and Next Friend of AMBUR )
& BRANDON PARKER; JEFF & MARIA RICHARDSON; )
MARIA RICHARDSON, as Mother and Next Friend of )
NATASHA RICHARDSON; DAVID & AMANDA )
SUMNER; AMANDA SUMNER, as Mother and Next Friend )
of TODD SUMNER; LARRY & RITA SUMNER; MARTHA )
TREADWAY; MARTHA TREADWAY, as Guardian and Next )
Friend of JASMIN, MICHAEL, HAZEL & JOSEPH KING; )
BILLY & SHERRY WALLACE; SHERRY WALLACE, as )
Mother and Next Friend of AARON WALLACE; )
MICHELE WILKES; SHIRLEY WILSON; BETTY J. )
PFINGSTON; BETTY J. PFINGSTON, as Guardian and )
Next Friend of JESSICA PFINGSTON; WONDA BRIGHT; )
DONNIE SMITH; DAVID & TANYA TANKERSLEY; )
and KEN & NAOMI SCHWIEKER, )
                                                 )
                    Plaintiffs,                  )
                                                 )   Civil Action No.
vs.                                              )
                                                 )   CV-20 02-85
HANSON AGGREGATES SOUTHEAST, INC.; LOUISE )
YOUNG O'BRIEN; VIRGINIA YOUNG PRIEST; VIRGINIA )
HART YOUNG; CLAUDE JOHN YOUNG; CHARLES W. )
GILMER, SR.; ALICE C. GILMER; CHARLES W. GILMER, )
JR.; KAMMY GILMER; BARBARA GILMER SMITH; GARY )
SMITH; MATTHEW RUTTLEDGE GILMER; LELIA )
WILDER GILMER; GILMER PROPERTIES, LTD.; and )
OLDCASTLE MATERIALS SOUTHEAST, INC., )
                                                 )
                    Defendants.                  )

**FIFTH AMENDED AND RESTATED COMPLAINT**

FILED

DEC 1 0 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

120.   The Plaintiffs re-allege Paragraphs 1-119 inclusive.

121.   The actions by Oldcastle have caused, are causing and will cause a nuisance. This nuisance has damaged, is damaging and will damage the Plaintiffs, their property and/or their homes.

122.   Oldcastle has continued the nuisance by blasting, noise, dust, dewatering the creek and diverting springs and creeks.

123.   The dewatering has caused, is causing and will cause sink holes, dry springs, diverted streams, road failures and soil subsidence.

124.   The noise and dust are worse now with Oldcastle.

125.   Many Plaintiffs have complained about the noise and dust. Oldcastle is generating tons of visible, fugitive dust that collects on Plaintiff's property and in their homes. It is so severe it has aggravated pre-existing medical problems such as asthma.

126.   The blasting has caused and is causing damage to the majority of the homes. No repairs should be done while the blasting continues.

127.   Oldcastle has cleared a large area and exposed the topsoil to washing and blowing.

128.   Oldcastle has expanded and is expanding both the quarry pit and the huge pile of dirt along the southern property line. This has increased dust and flooding. Heavy equipment operates late into the night and on the weekend; sometimes for Forty-eight (48) hours straight. Most Plaintiffs can hear this loud, irritating noise in their homes with all doors and windows shut. Many Plaintiffs work nights or rotating shifts. This loud noise makes it impossible for them to sleep.

Oldcastle purchased and operated the quarry knowing that it was a nuisance and that it was causing and will continue to cause damage. The actions have been and are negligent, willfull and intentional. Despite numerous complaints, Oldcastle has continued to cause these damages.

**Wherefore** Plaintiffs demand judgement against Defendant Oldcastle:(1) enjoining all of the Defendants, including Defendant Oldcastle, from operating this or any quarry on the Youngs' and Gilmer's lands, and for such other legal or equitable relief to which they are entitled; (2) for all

2085

compensatory damages to which they are entitled based upon Defendant Oldcastle's continuation of the nuisance and continued negligent and wanton operation of the quarry; (3) for such punitive damages as the jury deems appropriate to punish and deter Defendant Oldcastle and others similarly situated; and (4) for costs of this action, attorneys' fees, interest and such other further relief as the jury finds reasonable.

_____

**JAMES B. SPRAYBERRY** (SPR008)

**OF COUNSEL:**
**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

**For Plaintiffs City of Opelika and Water Works Board of the City of Opelika Only:**
Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

2080

James A. Byram, Jr.
Dorman Walker
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _____ 10th _____ day of _____ Dec _____, 2003.

_____
OF COUNSEL

## **ALL PLAINTIFFS DEMAND TRIAL BY JURY IN**
## **LEE COUNTY, ALABAMA**

155-00\5th-Amend-Complaint1.wpd

*Faxed copies to Phil Adams
334-749-2800
and Jack Weiss
212-351-5224*

*Dec 9, 2003*

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                            *
                                               *
           Plaintiff,                          *
                                               *
v.                                             *        CASE NUMBER: CV-02-85
                                               *
HANSON AGGREGATES SOUTHEAST,                   *
INC., et al.                                   *
           Defendants.                         *

### ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY RANDALL, WANDA, and AMBUR PARKER

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same—as appropriate—with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

      Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.    (a)    Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the

operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

As noted, the dust is a lot worse than it was, and our house is filling with dust, and the mountain of dirt is worse. Moreover, the noise pollution from the quarry is

worse than ever, and we hear the noise inside our home even louder than ever. The blasting is worse, and the blasts are shaking our home more than before. A very large area has been clear cut with more heavy equipment operating from very early in the morning until late in the evening. Oldcastle continues to flood our pasture because of the dirt, and our farm on Little Uchee Creek has little or no flow in the creek due to the dewatering.

(b)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference. Additionally, the clear cut area is much larger than before, more equipment is now operating, the noise is the same or worse under Oldcastle, and the dust is the same or worse under Oldcastle. The trees have been cleared within a few feet of the property lines on the east side and on part of the South side of the property. There is now only a small buffer strip, if any, of trees around part of the Young property. We and many of the Plaintiffs can sit or stand in our own backyards and watch the equipment operate, whereas before it was much less visible. During the month of October, on many mornings, the equipment was cranking up at 5:00 - 5:30 a.m and ran well past dark. For example, on October 20, 2003, Oldcastle's equipment ran until approximately 9:00 p.m.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to when Hanson began blasting, our home had no damage. Since Hanson began blasting on such a regular basis, we have had cracks, cracked foundations and other problems caused by the repetitive blasts. As long as the blasting continues, we cannot have our home repaired as, more likely than not, the damage would return in just a short while. Since Oldcastle is blasting just as much as before, and will continue to blast, anyone with a little bit of common sense can tell that Oldcastle's operation is going to continue causing damage to us.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by

reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)  We are bothered by the continued, and worse, dust in the air, by dust deposited onto our property and into our homes, by aggravation of our existing medical problems such as asthma, by repetitive shaking and rocking of our house from the blasting, by continuous daily noise from the equipment, and by continuous heavy truck traffic in the area. Most of this is daily, but the blasting is generally once a week or once every two (2) weeks. Some of the damage is not permanent such as noise and dust and will stop when the quarry is put out of business. Some of these problems, like the blasting damage, is not repairable at this time, if the blasting continues. If the blasting stops, then we can repair our house and we believe the continuing damage will stop. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Also, our breathing problems are just as bad as ever, and we understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

(c)  Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.  (a)  Yes.

(b)  Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

Also, our health problems continue because of Oldcastle's continued operation of the quarry. These health problems are irreparable, as it is impossible to compensate us for our bad health and inability to breath in our own home.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)    Yes

(b)    Since July 13, 2003, the dust has been the same or worse than when Hanson ran the quarry. This is partly due to the fact that Oldcastle has cleared a very large area and has it exposed with no vegetation and in part because Oldcastle has raised the spoil pile by 25-50 feet or more—none of which is vegetated.

(c)    The increased dust since Oldcastle took over has made Wanda's and Ambur's asthma worse and is causing more problems at night. Wanda's and Ambers' medicine has changed to a stronger medicine and stronger dosages. Wanda and Ambur feel even worse than when Hanson was operating the quarry — not surprisingly since the dust is much, much worse. We cannot give you specific dates, as the problems are almost daily—worse on some days than others, but almost always there are some medical problems aggravated by the dust. Moreover, when the wind is blowing in our direction, we cannot even go outside. Finally, you can see the dust clouds coming from the Quarry and you can feel and breath the grit in the air.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.    (a)    Yes.

(b)    Please see our answers above, which apply here too. The dust and noise is almost daily. Except on Saturday and Sunday, the noise and dust are almost a daily nuisance beginning early in the morning and continuing until late at night. Even then, the dust stays on and lingers until Oldcastle starts operating again the next day. Sometimes on Sunday the dust is not so bad, unless the wind is blowing our way. The blasting is not as often but it rattles our home, and has caused cracks and our foundation problems get worse. If this isn't a nuisance—"anything that works hurt, inconvenience or damage to another" (to quote the law)—then nothing is.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)    Yes.

(b)    It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.

(c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 9 day of Dec _____, 2003.

_Randall Parker_____
RANDALL PARKER, individually and as Father
and Next Friend of Ambur Parker

_Wanda Parker_____
WANDA PARKER, individually and as Father
and Next Friend of Ambur Parker

STATE OF ALABAMA    *
COUNTY OF LEE       *

BEFORE ME, a Notary Public in and for said State and County, came RANDALL PARKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 9th day of December, 2003.

_Sophia S. Benson_____
Notary Public

(SEAL)

My Commission Expires: 4-11-06 _____

Nov 12 03 10:58a    Charles E. Vercelli, Jr.    334-834-8807    p.21
Case 3:06-cv-00838-MEF-TFM    Document 37-2    Filed 09/07/2007    Page 91 of 150

2097

STATE OF ALABAMA        *
COUNTY OF LEE           *

BEFORE ME, a Notary Public in and for said State and County, came WANDA PARKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, she executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this _9th_ day of _December_, 2003.

_Sophia S. Benson_
Notary Public

(SEAL)

My Commission Expires: _4-11-06_

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _November_, 2003.

_C E Vercelli_
OF COUNSEL

155-00\Ans Oldcastle Int.randall parker.5.wpd

Page 7 of 7

FILED
DEC 11 2003 2098
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,
      Plaintiff,

v.

HANSON AGGREGATES SOUTHEAST,
INC., et al.
      Defendants.

CASE NUMBER: CV-02-85

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

     Please take notice that the Answers to Oldcastles' First Set of Interrogatories By Randall, Wanda and Ambur Parker were served on December 10, 2003.

OF COUNSEL:

CHARLES VERCELLI, JR., (VER004)
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

JAMES B. SPRAYBERRY (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the _____ day of December, 2003.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

DEC 1 1 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

1.    Plaintiffs' Third Interrogatories and Requests for Production to Defendant

Oldcastle.

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2101

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _____Dec____, 2003.

_____
OF COUNSEL

155-00\Not-Serv-Disc 2.wpd

2

2102

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                      )
                                          )
            Plaintiffs,                   )
                                          )
vs.                                       )     Civil Action No. CV-02-0085
                                          )
HANSON AGGREGATES SOUTHEAST,             )
INC., et al.,                             )
                                          )
            Defendants.                   )

FILED

DEC 1 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

1.   Plaintiffs' Second Interrogatories and Requests for Production to Defendant

Oldcastle.

_C E Vercelli_

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2103

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                     John V. Denson
Matt Parnell                            Samford, Denson, Horsley, Pettey
Balch & Bingham, LLP                      & Bridges
P.O. Box 78                             P.O. Box 2345
Montgomery, AL 36101                    Opelika, AL 36803-2345


H. Wayne Phears                         Phillip E. Adams, Jr.
Phears & Moldovan                       Adams, Umbach, Davidson & White, LLP
Suite 375                               P. O. Box 2069
4725 Peachtree Corner Circle            Opelika, AL 36803-2069
Norcross, GA 30092-3000


J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193


by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 11th day of _____Dec_____, 2003.


_____
OF COUNSEL

155-00\Not-Serv-Disc.1.wpd

2

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2104

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

F I L E D

DEC 1 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## PLAINTIFFS' MOTION TO SHORTEN TIME TO OBJECT and TO SCHEDULE HEARING ON MOTIONS

Plaintiffs move this Honorable Court to shorten the time in which Defendant Oldcastle may object to Plaintiffs' Second Interrogatories and Requests for Production, and to schedule a hearing date on or around January 5, 2004. As grounds for this Motion, Plaintiffs say:

1.    Plaintiffs filed an Amended Complaint against Oldcastle on August 1, 2003.

2.    At the same time, Plaintiffs issued a deposition notice for Oldcastle's Corporate Representative.

3.    Mr. Adams appeared for Oldcastle on August 15, 2003. At the same time Oldcastle filed a Motion to Continue and for an Alternate Trial Plan.

4.    Plaintiffs issued First Interrogatories and Requests for Production to Oldcastle on September 30, 2003.

5.    By agreement of the parties, the Plaintiffs willingly allowed Defendant Oldcastle to respond to Plaintiffs' First Interrogatories and Requests for Production and to produce the documents therewith on November 10, 2003.

6.     Defendant Oldcastle responded to Plaintiffs' First Interrogatories and Requests for Production on November 6, 2003, essentially objecting to everything and giving to Plaintiffs absolutely no useful information whatsoever. This clearly violated the spirit of Plaintiffs' cooperation, as Plaintiffs were led to believe that Oldcastle would actually produce some documents. None were produced and everything was objected to.

7.     On October 7, 2003, nearly two months after Oldcastle's attorney made an appearance and Moved to Continue the Trial (which was granted), Plaintiffs issued Deposition notices for Oldcastles' Corporate Representative (set for October 22, 2003) and Plant Manager (set for November 5, 2003).

8.     The parties' attorneys thereafter agreed to take the depositions of Oldcastle's Corporate Representatives on either December 3-4 or 9-10, 2003 (later confirmed to be the 9th-10th by Oldcastle), and the Plant Manager for November 20, 2003.   Oldcastle unilaterally cancelled these depositions.

9.     The Court has now allowed Defendant Oldcastle 30 days in which to answer Plaintiffs' Fifth Amended Complaint, which was served upon Defendant Oldcastle on the late afternoon of December 9, 2003. The Court also ordered that Defendant Oldcastle must produce its Corporate Representatives for depositions within 45 days of December 9, 2003. The Court also allowed Defendant Oldcastle 30 days to answer Plaintiffs' discovery requests.

10.     Plaintiffs filed Second Interrogatories and Requests for Production that are identical to, in every respect, the First Interrogatories and Requests for Production. These

2

were served upon Defendant Oldcastle on December 9, 2003, by fax, in the early evening and are being mailed to Defendant Oldcastle and all other attorneys of record on December 11, 2003.  Therefore, Oldcastle will have had these interrogatories and requests in their possession for over 3 months when January 9, 2004, arrives.

11.     Oldcastle filed objections to every single one of Plaintiffs' First Interrogatories and Requests for Production.  As explained in Plaintiffs' Motion to Compel responses, there is no legitimate basis for refusing the information requests.  Because the Second Interrogatories are identical to the First, there is no doubt that Oldcastle will file objections to the Plaintiffs' Second Interrogatories and Requests, and will wait until January 9, 2004, to do so.  Plaintiffs will then be forced to send a letter to Oldcastle to resolve the discovery dispute, wait for a response, and ultimately file another Motion to Compel.  That process will take, at a minimum, 7 days.  Therefore, if, as is substantially certain, Oldcastle refuses to respond fully, Plaintiffs' next Motion to Compel responses will not be heard by the Court until well after the 45 days in which Oldcastle has been ordered to produce their Corporate Representatives and Plant Manager for depositions.

12.     Given that (1) Defendant Oldcastle has had the First Interrogatories and Requests for Production (which are identical to the Second Interrogatories and Requests for Production), since September 30, 2003, about 2 ½ months already, (2) Defendant Oldcastle already knows exactly what the Plaintiffs are complaining about due to the fact that they had to conduct due diligence before purchasing the quarry, (3) Oldcastle already knew all about the lawsuit before purchasing the quarry (it has a joint defense agreement

3

2107

with Hanson), and (4) it would be entirely unfair and inequitable to the Plaintiffs to allow Defendant Oldcastle, by using the maximum time allowed by law to file objections, to thereafter defeat Plaintiffs' legitimate discovery attempts, the most fair and equitable thing for this Court to do is shorten the time in which Oldcastle may object and to set a date for a hearing on discovery disputes for a date sufficiently in advance of the corporate representative depositions that Plaintiffs will actually receive a meaningful amount of discovery from Oldcastle by the time those depositions are taken.

14.    It will not prejudice Defendant Oldcastle to file any objections within 15 days of today's date, as Oldcastle[1] has already had these same interrogatories and requests for over two months.

WHEREFORE, for good cause shown, Plaintiffs move this Honorable Court to enter an order requiring Defendant Oldcastle to file any objections to Plaintiffs' Second Interrogatories and Requests for Production within 15 days of today's date (by December 26) so that the Plaintiffs will have sufficient time to file a Second Motion to Compel, and so that the Court will be able to have a hearing before the date due for depositions of the Corporate Representatives.  Plaintiffs also move the Court to set a discovery dispute hearing on or around January 5, 2004.

**CHARLES E. VERCELLI, JR.** (VER003)
One of the Attorneys for the Plaintiffs

---

[1]

Please note that the undersigned will be in a capital murder trial in Montgomery during the week of January 12-16.

4

2105

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by faxing a copy to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _____ day of December, 2003.

_____
OF COUNSEL

155-00\Ps'Mot Shorten Time to Object.2.wpd

5

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. CV 02-085 |
| | * | |
| HANSON AGGREGATES | * | |
| SOUTHEAST, INC., et al, | * | |
| | * | |
| Defendants. | * | |

### ORDER

A Status Conference was held on December 9, 2003.  Appearing for Plaintiffs were Attorneys, James Sprayberry, Chip Vercelli and Guy Gunter.  Appearing for the Defendant, Hanson Aggregates Southeast, was Attorney James Byrum.  Appearing for Defendant Old Castle, was Attorney Phillip E. Adams.  Appearing for individual Defendants, was Attorney John Denson.  At the conclusion of the conference the Court entered the following Orders:

1.  The Plaintiffs are to file an Amended Complaint regarding allegations made against Old Castle within thirty (30) days from the date of this Order.

2.  Defendant Old Castle is to answer any interrogatories and Motions to Produce within thirty (30) days from the date they receive the Amended Complaint.

3.  Defendant Old Castle's Plant Manager and Corporate Representative's depositions are to be taken within forty-five days from the date of this Order. The depositions are to take place in the State of Alabama.

4.  The Plaintiffs' experts' depositions are not to be taken until thirty (30) days after Old Castle complies with the "paper discovery" set forth in Paragraph Two above.

5.  A Status Conference is set in this case on **MARCH 29, 2004, at 9:00 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Jimmy Sprayberry
Post Office Box 2429
Auburn, AL 36831-2429

Hon. Charles Vercelli, Jr.
1019 S. Perry Street
Montgomery, AL 36104

Hon. James Byram, Jr.
Hon. Dorman Walker
Hon. Matt Parnell
Post Office Box 78
Montgomery, AL 36101

Hon. Guy Gunter
Post Office Box 409
Opelika, AL 36803-0409

Hon. John V. Denson
Post Office Box 2345
Opelika, AL 36803-2345

Hon. Phillip E. Adams, Jr.
Post Office Box 2069
Opelika, AL 36803-2069

DONE this the 15th day of December, 2003.

_____
JACOB A. WALKER, III
Circuit Judge

**F I L E D**

DEC 1 7 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2111

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING APPLICATION FOR ADMISSION TO PRACTICE UNDER RULE VII OF THE RULES GOVERNING ADMISSION TO THE ALABAMA STATE BAR

Upon consideration of the Verified Application for Admission to Practice filed herein by Jack M. Weiss, the Court is of the opinion and ascertains and finds that said Motion is due to be granted. It is, therefore,

ORDERED, ADJUDGED AND DECREED by the Court as follows:

1. That the Application of Jack M. Weiss for admission to practice under Rule VII in the above-styled case be and the same is hereby granted.

2. Jack M. Weiss shall comply with the provisions of The Alabama Rules of Professional Conduct and all other requirements as set forth in Rule VII of the Rules Governing Admission to the Alabama State Bar in the above-styled case.

DONE this the _14th_ day of December, 2003.

_____
CIRCUIT JUDGE

FILED

DEC 2 9 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al., §
        Plaintiff, §
§
v. § CASE NUMBER: CV-02-85
§
HANSON AGGREGATES SOUTHEAST, §
INC., et al. §
        Defendants. §

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

FILED

JAN 0 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:   Clerk of the Lee County Circuit Court
      Lee County Justice Center
      2311 Gateway Drive, Room 104
      Opelika, Alabama 36801.

Please take notice that the following documents were served on January 2, 2004 to all attorneys of record in the above styled and numbered cause;

1. Plaintiffs' First Contention Interrogatories to Oldcastle
2. Plaintiffs' First Contention Interrogatories to Hanson
3. Plaintiffs' Second Request for Admissions to Oldcastle
4. Plaintiffs' Second Request for Admissions to Hanson

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2115

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 5th day of January, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000


James B. Sprayberry

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FILED**

JAN 0 9 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**NOTICE OF SERVICE OF DISCOVERY DOCUMENTS**

TO:  Circuit Clerk of Lee County:

Please take notice that on the 8th day of January, 2004,

_____ 1. A notice to take the deposition of __
_____ 2. Interrogatories
_____ 3. Request for Admissions
_____ 4. Request for Production
__X__ 5. Answers to Second Interrogatories
_____ 6. Response to Request for Admissions
__X__ 7. Response to Second Request for Production
_____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
     as follows:

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

## CERTIFICATE OF SERVICE

2115

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 8th day of January, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

**JAN 1 2 2004**

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. CV-02-0085 |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) |
| Defendants. | ) |

## PLAINTIFFS' SUPPLEMENTAL WITNESS DISCLOSURE

Plaintiffs supplement their prior Trial Witness List by disclosing the following person as a potential witness at the trial of this case:

68.     Steve Hearn, Lee County Highway Department. Mr. Hearn was present on December 18, 2003, when the sinkhole on Spring Villa Road was being repaired and may be asked to testify regarding that sinkhole and the repair thereof.

_____
**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ___9th___ day of ___January___, 2004.

_____
OF COUNSEL

155-00\Ps\SuppWitnessDisc.1.wpd

2

FILED
FEB.0·5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA**

MIKE DAVIS, *et al.*,                        §
                                             §
            Plaintiffs,                       §
                                             §
vs.                                          §        Civil Action No.:  CV-2002-85
                                             §
HANSON AGGREGATES                            §
SOUTHEAST, INC., *et al.*,                    §
                                             §
            Defendants.                       §

<u>**NOTICE OF SERVICE OF DISCOVERY DOCUMENTS**</u>

To:    Clerk
       Lee County Circuit Court
       Justice Center, Room 104
       2311 Gateway Drive
       Opelika, AL

       Please take notice that the following discovery documents have been served on behalf of

defendant Hanson Aggregates Southeast, Inc.:

       ( X )    Defendant Hanson's Response to Plaintiff's First Contention
                Interrogatories; and

       ( X )    Defendant Hanson's Response to Plaintiffs' Second Request for
                Admissions.

       Respectfully submitted this 4th day of February, 2004.

                                   _____
                                   One of the attorneys for Defendant
                                   Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500

141181.1

2119

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## Certificate of Service

I hereby certify that on this 4th day of February, 2004, a copy of the foregoing has been served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                         *
                                            *
            Plaintiff,                      *
                                            *
vs.                                         *        CIVIL ACTION NO. CV 02-085
                                            *
HANSON AGGREGATES                           *
SOUTHEAST, INC., et al,                     *
                                            *
            Defendants.                     *

## ORDER

A Status Conference was held the above-styled case on February 4, 2004. Appearing for Plaintiffs were Attorneys, James Sprayberry. Appearing for the Defendant, Hanson Aggregates Southeast, was Attorney Paul Clark. Appearing for Defendant Old Castle, was Attorney Phillip E. Adams. Appearing for Defendants, Gilmer/Young was Attorney John Denson. The Court was updated on a variety of discovery issues. At the conclusion of the hearing it is the Court opinion that the parties should be ordered to mediate this matter. The parties are to select a mediator and evenly split the costs of said mediation. The parties are to notify the Court of the name of the mediator within the next forty-five (45) days. If the parties cannot agree on a mediator, the Court will appoint someone to mediate this case. Mediation is to be completed by July 1, 2004. The parties are reminded that the next Status Conference in this case is set for **MARCH 29, 2004, at 9:00 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Jimmy Sprayberry
Post Office Box 2429
Auburn, AL 36831-2429

Hon. Charles Vercelli, Jr.
1019 S. Perry Street
Montgomery, AL 36104


Hon. James Byram, Jr.
Hon. Dorman Walker
Hon. Matt Parnell
Post Office Box 78
Montgomery, AL 36101

Hon. John V. Denson
Post Office Box 2345
Opelika, AL 36803-2345

Hon. Phillip E. Adams, Jr.
Post Office Box 2069
Opelika, AL 36803-2069

Hon. Guy Gunter
Post Office Box 409
Opelika, AL 36803-0409

DONE this the 11th day of February, 2004.

JACOB A. WALKER, III
Circuit Judge

**F I L E D**

FEB 17 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2122

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    §
      Plaintiff,                    §
                            §
v.                                     §    CASE NUMBER: CV-02-85
                            §
HANSON AGGREGATES SOUTHEAST,           §
INC., et al.                           §
      Defendants.                   §

### NOTICE OF SERVICE DISCOVERY DOCUMENTS



To:    Clerk of the Lee County Circuit Court
      Lee County Justice Center
      2311 Gateway Drive, Room 104
      Opelika, Alabama 36801.

FILED
MAR 1 1 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Please take notice that the following documents were served on March 11, 2004 to all attorneys of record in the above styled and numbered cause;

    1.    Answers to Oldcastles' First Set of Interrogatories by Donnie Smith
    2.    Answers to Oldcastles' First Set of Interrogatories by Ronnie & Dorothy
        Griggs

_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

2123

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 11th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

_____
James B. Sprayberry

2124

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-228 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

FILED

MAR 15 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

Please take notice that the following documents were served on March 15, 2004 to all attorneys of record in the above styled and numbered cause;

      1.    Answers to Oldcastles' First Set of Interrogatories by David and Tonya Tankersley

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 15th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

2126

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
    Plaintiffs,                     )
                                   )
vs.                                )     CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                  )
SOUTHEAST, INC., et al.,           )
                                   )
    Defendants.                     )

FILED

MAR 17 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO:  Circuit Clerk of Lee County:

Please take notice that on the 16th day of March, 2004,

   X   1.  A notice to take the deposition of:
             Randall and Wanda Parker
             Ronnie and Dorothy Griggs
             Anthony and Carol Clark
             Stan and Jackie Ledbetter
             Ken and Naomi Schwieker
             Mike and Ann Broadwater
             David and Amanda Sumner
             Donnie Smith
      2.  Interrogatories
      3.  Request for Admissions
      4.  Request for Production
      5.  Answers to Second Interrogatories
      6.  Response to Request for Admissions
      7.  Response to Second Request for Production
      8.  Notice of Intent to Serve a Subpoena on a Non-Party
         as follows:

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY:  _Phillip E Adams_____
      PHILLIP E. ADAMS, JR. (ADA025)
      Attorney for Defendant
      P. O. Box 2069
      Opelika, AL 36803-2069

2127

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 16th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

2123

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS; DONNA DAVIS; , et al | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: CV-02-085 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC.; et al. | ) | |
| | ) | |
| Defendants. | ) | |

FILED

MAR 18 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF DISCOVERY DOCUMENTS

To:       Corinne T. Hurst, Clerk
          Lee County Justice Center
          2311 Gateway Drive
          Opelika, Alabama 36801

Please take notice that the following discovery documents have been filed on behalf of

Defendants, Virginia Young Priest; John Claude Young, c/o Virginia Young Priest, Louise Young

O'Brien; Virginia Hart Young and Gilmer Properties, Ltd, in the above-styled case:

(X)     Response to Plaintiffs' Third Request for Admissions.

DONE       this 18th day of  March ,  2004.

Respectfully submitted,

**OF COUNSEL FOR DEFENDANTS:**
**VIRGINIA YOUNG PRIEST; JOHN CLAUDE**
**YOUNG, C/O VIRGINIA YOUNG PRIEST;**
**LOUISE YOUNG O'BRIEN; VIRGINIA HART**
**YOUNG; AND GILMER PROPERTIES, LTD.**
SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL 36803-2345
(334) 745-3504
FAX (334) 745-3506

JOHN V. DENSON
DEN007

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause, by mailing the same in U.S. Mail, postage prepaid, on this the _18th_ day of ___March___, 2004, as follows:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA  30092-3000

Charles E. Vercelli, Jr.
Suite 214, Union Station
300-B Water Street
Montgomery, Alabama 36104

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

J.M. (Jack) Weiss
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON
  & WHITE, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

Guy F. Gunter, III
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-6244

John V. Denson

2130

### IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS; DONNA DAVIS; , et al )
                                    )
Plaintiffs,                   )
                                    )
v.                                   )       CIVIL ACTION NUMBER: CV-02-085
                                    )
HANSON AGGREGATES     )
 SOUTHEAST, INC.; et al.    )
                                    )
Defendants.              )

### RESPONSE OF YOUNG AND GILMER DEFENDANTS
### TO PLAINTIFFS' THIRD REQUEST
### FOR ADMISSIONS

      COMES NOW, the Defendants, Virginia Young Priest, Claude John Young, Louise Young O'Brian, Virginia Hart Young, (hereinafter referred to **"Young"**) and Gilmer Properties, Ltd (hereinafter referred to as **"Gilmer"**) and in response to Plaintiffs' Third Request for Admissions states as follows:

      1.      The **Young** and **Gilmer** Defendants had insufficient information to admit that the document, bate stamp numbers 2086-2191, is a complete and accurate copy of an official government publication, and therefore, at this time denies said request.

      2.      Denied.

      3.      Denied.

      4.      The **Young** and **Gilmer** Defendants have insufficient information to admit that the report, bate stamp numbers 2192-2197, is an accurate copy of an official government publication, and therefore, at this time denies said request.

1

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | § |
|     Plaintiff, | § |
| | § |
| v. | §   CASE NUMBER: CV-02-85 |
| | § |
| HANSON AGGREGATES SOUTHEAST, | § |
| INC., et al. | § |
|     Defendants. | § |

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

F I L E D

MAR 18 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To: Clerk of the Lee County Circuit Court
   Lee County Justice Center
   2311 Gateway Drive, Room 104
   Opelika, Alabama 36801.

   Please take notice that the following documents were served on March 18, 2004 to all attorneys of record in the above styled and numbered cause;

   1. Answers to Oldcastles' First Set of Interrogatories by David and Amanda Sumner; and

   2. Answers to Oldcastles' First Set of Interrogatories by Mike and Ann Broadwater.

               James B. Sprayberry (SPR008)
               *One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

2152

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 18th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801


James B. Sprayberry

2133

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

F I L E D

MAR 1 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

Please take notice that the following documents were served on March 17, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Stanley and Jackie Ledbetter.

_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

James B. Sprayberry                         Charles E. Vercelli, Jr.
ATTORNEY AT LAW                             VERCELLI & ASSOCIATES, P.C.
P.O. Drawer 2429                            1019 S. Perry Street
Auburn, Alabama 36831-2429                  Montgomery, Alabama 36104-5049
(334) 821-7100                              (334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 17th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

2136

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                  §
          Plaintiff,              §
                    §
v.                                   §    CASE NUMBER: CV-02-85
                    §
HANSON AGGREGATES SOUTHEAST,         §
INC., et al.                         §
          Defendants.             §

**F I L E D**

MAR 18 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
        Lee County Justice Center
        2311 Gateway Drive, Room 104
        Opelika, Alabama 36801.

Please take notice that the following documents were served on March 17, 2004 to all attorneys of record in the above styled and numbered cause;

        1.    Answers to Oldcastles' First Set of Interrogatories by Ken and Naomi Schwieker.

                        James B. Sprayberry (SPR008)
                        *One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

2135

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 17th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

F I L E D

MAR 1 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )   CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO:  Circuit Clerk of Lee County:

Please take notice that on the 17th day of March, 2004,

_____ 1.  A notice to take the deposition of:
_____ 2.  Interrogatories
_____ 3.  Request for Admissions
_____ 4.  Request for Production
_____ 5.  Answers to Second Interrogatories
__X__ 6.  Response to Third Request for Admissions
_____ 7.  Response to Second Request for Production
_____ 8.  Notice of Intent to Serve a Subpoena on a Non-Party
         as follows:

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY:_____

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 17th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

MAR 19 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

1.    Plaintiffs' Third Request for Admissions to All Defendants (dated March 15, 2004); and

2.    Plaintiffs' Supplemental Response to Request for Production of Documents (dated March 15, 2004).

_____
**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _17th_ day of _____Mnrl_____, 2004.

_____
OF COUNSEL

155-00\Not-Serv-Disc.3.wpd

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

F I L E D

MAR 19 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

       Please take notice that the following documents were served on March 19, 2004 to all attorneys of record in the above styled and numbered cause;

        1.    Answers to Oldcastles' First Set of Interrogatories by Anthony and Carol Clark

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2142

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 19th day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

F I L E D

MAR 2 6 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA**

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION OF DEFENDANT, OLDCASTLE MATERIALS SOUTHEAST, INC., FOR AN ORDER GRANTING ENTRY UPON LAND FOR THE PURPOSE OF DRILLING MONITORING WELLS

COMES NOW defendant Oldcastle Materials Southeast, Inc. ("Oldcastle"), a defendant

in the above-styled case, and pursuant to the provisions of Rule 36 of the Alabama Rules of Civil

Procedure, moves this Court for an order granting Oldcastle entry upon Plaintiffs' land for the

purpose of drilling approximately six groundwater monitoring wells. As grounds for said

Motion, Oldcastle shows the Court as Follows:

1.    A central allegation in Plaintiffs' complaint is that the pumping of water from the

pit of the Opelika quarry – formerly operated by defendant Hanson Aggregates Southeast, Inc.

("Hanson") and currently operated by Oldcastle – has had a deleterious impact on the water table

in the area of Spring Villa, has caused Little Uchee Creek and the spring at Spring Villa to run

dry, and caused the formation of sinkholes in the vicinity.

2.    The Opelika quarry is approximately 1.5 miles west of Spring Villa. Whether the

pumping at the quarry is having an effect on the water table in the vicinity of Spring Villa

depends on whether there is a hydrogeologic connection between the quarry and Spring Villa. It

is the intent of Oldcastle to (a) determine whether there is a hydrogeologic connection between

2144

the quarry and Spring Villa such that the pumping at the quarry has caused the spring and Little Uchee Creek to run dry and sinkholes to form, and (2) if so, devise the most appropriate water recharge strategy to mitigate the effect of pumping on the water table at Spring Villa.

3.    The most accurate way to determine whether there is a hydrogeologic interconnection between the quarry and Spring Villa is to collect data concerning the structural geology and hydrology in the vicinity of the two locations and at various points in between. This data can only be collected by the drilling of rock cores and the installation of a series of monitoring wells. The drilling and monitoring of such wells would provide direct evidence concerning the lateral extent of the zone of influence of the pumping at the quarry, and help determine whether such pumping is having any influence on the water table at Spring Villa.

4.    In order to have as complete and accurate picture as possible concerning the lateral extent of the zone of influence of the pumping at the quarry, a sufficient number of monitoring wells must be installed at the appropriate locations, and meaningful data must be collected. Oldcastle intends to drill, install and collect data from approximately 6 rock cores and groundwater monitoring wells (at locations and depths to be determined) in the vicinity and to the west of Spring Villa (toward the quarry). Oldcastle plans to monitor the water level and the pressure in these wells at various rates of pumping at the quarry. The extent to which the water level and pressure in the monitoring wells is affected by the quarry pumping will assist in ascertaining whether there is indeed any connection between the quarry and Spring Villa.

5.    The wells that are currently in existence are both too few in number and not properly located to provide adequate data regarding the connectivity between the quarry and Spring Villa. Use of data from these monitoring wells to assess the extent of the hydrogeologic impact of pumping from the quarry is entirely speculative.

2

6.      Prior to the sale of the quarry to Oldcastle, Hanson installed six monitoring wells on the site. However, these wells were no further than several hundred feet from the quarry pit. While useful, data from these wells is not sufficiently informative of whether pumping from the quarry is having any effect on Spring Villa, which is located approximately 1.5 miles to the east of the quarry. Nor are these wells spaced such that one can determine the lateral extent of the zone of influence of the quarry pumping.

7.      The monitoring wells installed in the vicinity of Spring Villa by experts retained by the Plaintiffs are likewise insufficient to determine whether pumping at the quarry is having an effect on the water table at Spring Villa. Only one of these wells is being continuously monitored for data – monitoring well 2, which is located in the immediate area of the spring. Only sparse data exists from monitoring well 1 (which is right next to monitoring well 2 and thus not very informative) and from monitoring well 5 (which is located about a couple hundred feet to the southwest of monitoring well 2). Significantly, there are no operating monitoring wells in the one and a half mile span between the quarry and the Spring.

8.      The installation and monitoring of the groundwater monitoring wells proposed by Oldcastle will provide the subsurface data necessary to permit the preparation of a complete picture of the geologic structure and hydrogeology between the quarry and Spring Villa. To the extent it is determined that there is a hydrogeologic connection between the two sites, the data collected will help determine the process, mechanism and volume capacity of that connection. This information would allow Oldcastle to design the most appropriate water recharge system to mitigate any impact its pumping has on the water table at Spring Villa.

9.      Rule 34(a) provides that upon request, a party may be permitted entry upon land in the possession or control of a party litigant "for the purpose of inspection and measuring,

3

surveying, photographing, testing, or sampling the property or any designated object or operation thereon." Al. R. Civ. Proc. 34(a). As set forth above, access to Plaintiffs' property for the purpose of drilling approximately six groundwater monitoring wells is essential to Oldcastle's defense of this case. Granting such access will assist Oldcastle, as well as the Court, by providing it with an empirical and non-speculative basis for determining whether pumping from the Opelika quarry is in fact adversely impacting the water table in the vicinity of Spring Villa, and, if so, developing the appropriate remedial measures.

WHEREFORE, Oldcastle respectfully requests that this Court enter an order granting Oldcastle entry upon Plaintiffs' land for the purpose of drilling groundwater monitoring wells.

Respectfully submitted this the 26th day of March, 2004.

**PHILLIP E. ADAMS, JR.** (ADA025)
Attorney for Defendant, Oldcastle Materials
Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

70279448_1.DOC

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 26th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )    CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        Defendants.                    )

**FILED**
MAR 29 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO:  Circuit Clerk of Lee County:

Please take notice that on the 29th day of March, 2004,

_____ 1. A notice to take the deposition of:
_____ 2. Interrogatories
_____ 3. Request for Admissions
_____ 4. Request for Production
_____ 5. Answers to Second Interrogatories
_____ 6. Response to Third Request for Admissions
_____ 7. Response to Second Request for Production
_____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
         as follows:
__X__ 9. Other:   Oldcastle Privilege Log

was served on all parties to this cause by the Defendant Oldcastle Materials.

                      ADAMS, UMBACH, DAVIDSON & WHITE, LLP

                      BY: _____
                           PHILLIP E. ADAMS, JR. (ADA025)
                           Attorney for Defendant
                           P. O. Box 2069
                           Opelika, AL 36803-2069

2149

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 29th day of March, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

MAR 3 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al.,                          :

      Plaintiffs,                             :

                           :

v.                                           :    Civil Action No. CV-02-0085

                           :

HANSON AGGREGATES SOUTHEAST,                 :
INC., et al.,
                           :

      Defendants.                             :

### VERIFIED APPLICATION OF BRIAN E. DAUGHDRILL
### FOR ADMISSION *PRO HAC VICE*

Comes now BRIAN E. DAUGHDRILL, applicant herein, and respectfully represents the

following:

1.    Applicant resides at 3223 Northbrook Drive, Atlanta, Georgia 30341;

678-406-9269; 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.

2.    Applicant is an attorney and a member of the law firm of Phears & Moldovan,

4725 Peachtree Corners Circle, Suite 375, Norcross, Gwinnett County, Georgia 30092, 770-446-

2116.

3.    Applicant has been retained personally by Hanson Aggregates Southeast, Inc. to

provide legal representation in connection with the above-styled matter now pending before the

above-named court in the State of Alabama.

4.    Since November of 2000, applicant has been, and presently is, a member in good

standing of the Bar of the highest court of the State of Georgia, where applicant regularly

practices law. (Certificate of Good Standing attached as Exhibit "A".)

1

5.   Applicant has been admitted to practice before the following courts:

a.   all state and federal courts of Georgia, admitted 2000, State Bar of

Georgia

No. 205760

Applicant is presently a member in good standing of the Bars of those courts

listed above.

6.   Applicant presently is not subject to any disbarment proceedings.

7.   Applicant presently is not subject to any suspension proceedings.

8.   Applicant never has been subject to any disbarment proceedings.

9.   Applicant never has been subject to any suspension proceedings.

10.   Applicant never has had any certificate or privilege to appear and practice before

any administrative body suspended or revoked.

11.   Applicant, either by resignation, withdrawal, or otherwise, never has terminated

or attempted to terminate applicant's office as an attorney in order to avoid administrative,

disciplinary, disbarment, or suspension proceedings.

12.   Applicant has not filed an application to appear as counsel under Rule VII during

the past three (3) years.  A member of applicant's firm, H. Wayne Phears,  has filed an

application to appear as counsel under Rule VII during the past three (3) years

13.   Local counsel of record associated with applicant in this matter is James A.

Byram, Jr., who has offices at Balch & Bingham, 2 Dexter Avenue, Montgomery, Montgomery

County, Alabama 36104, 334-834-6500.

14.   Exhibit "B" attached hereto lists accurately the name and address of each party in

this matter, and the name and address of each counsel of record who has appeared for each party.

15.    Applicant agrees to comply with the provisions of the Alabama Rules of

Professional Conduct, and applicant consents to the jurisdiction of the courts and the disciplinary

boards of the State of Alabama.

16.    Applicant respectfully requests to be admitted to practice in the above-named

court for this cause only.

DATED this _26th_ day of _March_ , 2004

PHEARS & MOLDOVAN

By: _____

Brian E. Daughdrill

PHEARS & MOLDOVAN
4725 Peachtree Corners Circle
Suite 375
Norcross, Georgia 30092
770-446-2116

3

STATE OF GEORGIA )

COUNTY OF GWINNETT )

I, Brian E. Daughdrill, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.

_____
Brian E. Daughdrill

Subscribed and sworn to before me this 30th day of March, 2004.

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rule VII of the Rules Governing Admission to the Alabama State Bar.

DATED this 30th day of March, 2004.

_____
James A. Bryam

NOTICE OF HEARING

This application for admission is set for hearing before the court or administrative agency appearing in the style hereof on the 20th day of April, 2004, at 9:00 a.m.

4

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the Alabama State Bar by mail addressed to: Alabama State Bar, Attn: PHV Admissions, P.O. Box 671, Montgomery, Alabama 36101, accompanied by payment of the $100 filing fee to the Alabama State Bar on this 30th day of March, 2004.

James A. Bryam, Jr.

# EXHIBIT "A"

# STATE BAR OF GEORGIA



2155

Mr. Brian E. Daughdrill
**Phears & Moldovan**
**Suite 375**
**4725 Peachtree Corners Circle**
Norcross, GA 30092

**CURRENT STATUS:**    Active Member

**DATE OF ADMISSION TO PRACTICE:**    **11/02/2000**

**Attorney Bar Number: 205760**

Today's Date:    March 24, 2004

Listed below are the disciplinary actions, if any, which have been taken against this member:

| Supreme Court Docket # | State Disciplinary Board Docket # | Disposition |
|---|---|---|
| NA | NA | |

The prerequisites for practicing law in the State of Georgia are as follows:

     -Must be certified by the Office of Bar Admissions (either by exam or on motion)
     -Sworn in to the Superior Court in Georgia
     -Enrolled with the State Bar of Georgia which **is an arm of the Supreme Court of Georgia**

Under the privacy/confidentiality provision of the Bar Rule 4-221(d), any complaint against a member resolved prior to the filing and docketing of a disciplinary case in the Supreme Court is not a matter of public record, and may not be revealed without a waiver from the member. It is the policy of the State Bar of Georgia to answer any inquiry about a member by disclosing only those complaints that have been docketed in the Supreme Court. With respect to matters that are currently pending as active, undocketed cases, when an inquiry is received, the State Bar of Georgia shall not disclose the existence of those complaints. Such non-disclosure should not be construed to confirm the existence of confidential complaints since the vast majority of members in good standing are not the subject of such confidential complaints.

This member is currently in "good standing" as that term is defined by State Bar Rule 1-204. The member is current in license fees and is not suspended or disbarred as of the date of this letter.

This document hereby certifies that the above-mentioned individual is a registered member of the State Bar of Georgia and is currently in good standing.

### STATE BAR OF GEORGIA

*Brenda Lovvorn*

Brinda Lovvorn
Official Representative of State Bar of Georgia

HEADQUARTERS
104 Marietta Street ■ Suite 100
Atlanta, Georgia 30303 ■ (404) 527-8700
(800) 334-6865 ■ FAX (404) 527-8717

INTERNET ADDRESS
www.gabar.org

SOUTH GEORGIA
244 E. Second Street (Zip 31794) ■ P.O. Box 1390
Tifton, Georgia 31793-1390 ■ (229) 387-0446
(800) 330-0446 ■ FAX (229) 382-7435

# EXHIBIT "B"

2155

## PLAINTIFFS

**Wonda K. Bright**
245 Lee Rd. 166
Opelika, AL 36804

**Mike & Ann Broadwater**
610 Lee Rd. 166
Opelika, AL 36804

**Mittie Mae Broadwater**
574 Lee Rd. 166
Opelika, AL 36804

**Anthony & Carol Clark**
**Courtney Clark (a minor)**
1740 Lee Rd. 147
Opelika, AL 36804

**Michael & Donna Davis**
149 Lee Rd. 166
Opelika, AL 36804

**Edwards, Elaine, Alpha**
3274 Ala. Hwy. 169
3320 Ala. Hwy. 169
Opelika, AL 36804

**Mary Sue Eiland**
2853 Ala. Hwy. 169
Opelika, AL 36804

**Charolyn Medena Frizzell**
**Karla Frizzell (a minor)**
**Brianna Yougren (a minor)**
3173 Ala. Hwy. 169
Opelika, AL 36804

**Ronald & Dorothy Griggs**
3256 Ala. Hwy. 169
Opelika, AL 36804

**Mike & Stacy Hagans**
1668 Lee Road 147
Opelika, AL 36804

**PLAINTIFFS** (continued)

**Howard & Lisa Harmon**
**Judson Harmon (a minor)**
**Bria Harmon (a minor)**
145 Lee Road 707
Opelika, AL 36804

**Haward & Nora Jackson**
1141 Lee Road 166
Opelika, AL 36804

**Mike & Sheila LaMacchia**
**Russell LaMacchia (a minor)**
1355 Lee Road 147
Opelika, AL 36804

**Stanley & Jackie Ledbetter**
1330 Lee Road 166
Opelika, AL 36084

**Terry & Carol Long**
3379 Ala. Hwy. 169
Opelika, AL 36864

**Timothy & Adalene Manning**
3226 Ala. Hwy. 169
Opelika, AL 36804

**David & Cynthia Nash &**
**Jeanette Baggett**
1198 Lee Road 147
Opelika, AL 36804

**James & Shirley Parker**
3039 Ala. Hwy. 169
Opelika, AL 36804

**Randall & Wanda Parker**
**Ambur Parker (a minor)**
**Brandon Parker (a minor)**
1229 Lee Rd. 166
Opelika, AL 36804

**Pfingston, Betty**
**Jessica Pfingston (a minor)**
(no address provided by plaintiffs)

<u>PLAINTIFFS</u> (continued)

**Jeffrey & Maria Richardson**
**Natasha Richardson (a minor)**
265 Lee Rd. 705
Opelika, AL 36804

**David & Julie Sumner**
**Todd Sumner (a minor)**
164 Ala. Hwy. 148
Opelika, AL 36804

**Larry & Rita Sumner**
1100 Lee Rd. 147
Opelika, AL 36804

**Martha Ann Treadway**
**Jasmin King (a minor)**
**Hazel King (a minor)**
**Michael King (a minor)**
**Joseph King (a minor)**
3177 Ala. Hwy. 169
Opelika, AL 36804

**Billy Gene & Sherry Wallace**
**Aaron Wallace (a minor)**
1692 Lee Rd. 147
Opelika, AL 36804

**Michele "Mickie" Wilkes**
148 Lee Rd. 707
Opelika, AL 36804

**Shirley Wilson**
64 Lee Rd. 707
Opelika, AL 36804

**City of Opelika**
P. O. Box 390
Opelika, Alabama 36803

**The Utilities Board of the City of Opelika**
502 Geneva Street
Opelika, Alabama 36801

2155

**PLAINTIFFS** (continued)

**Beauregard Water Authority**
P. O. Box 271
Opelika, Alabama 36801

**DEFENDANTS:**

**Hanson Aggregates Southeast, Inc.**
100 Crescent Centre Parkway
Suite 1240
Tucker, Georgia 30084

**Virginia Young Priest**
414 Charing Loop
Auburn, Alabama 36830

**Claude John Young**
c/o North Ridge Nursing Home
Opelika, Alabama 36801

**Louise Young O'Brian**
416 Charing Loop
Auburn, Alabama 36830

**Virginia Hart Young**
HC3 Box 4-C
Port St. Joe, Florida 32456

**Charles W. Gilmer, Sr.**
575 Lee Road 166
Opelika, Alabama 36801

**Alice C. Gilmer**
575 Lee Road 166
Opelika, Alabama 36801

**Charles W. Gilmer, Jr.**
7800 Lee Road 175
Salem, Alabama 36874

2100

**DEFENDANTS** (continued)

**Kammy Gilmer**
7800 Lee Road 175
Salem, Alabama 36874

**Barbara Gilmer Smith**
1401 Lee Road 47
Opelika, Alabama 36804

**Gary Smith**
1401 Lee Road 47
Opelika, Alabama 36804

**Matthew Ruttledge Gilmer**
Lee Road 166
Opelika, Alabama 36804

**Lelia Wilder Gilmer**
Lee Road 166
Opelika, Alabama 36084

**ATTORNEYS**

**James B. Sprayberry**
P. O. Drawer 2429
Auburn, AL 36830

*(attorney for all individual plaintiffs and*
*plaintiffs City of Opelika, Utilities Board of the*
*City of Opelika, and Beauregard Water Authority)*

**Charles E. Vercelli, Jr.**
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, AL 36104-5049

*(attorney for all individual plaintiffs and*
*plaintiffs City of Opelika, Utilities Board of the*
*City of Opelika and Beauregard Water Authority)*

**ATTORNEYS** (Continued)

**Guy F. Gunter, III**
Melton, Gunter & Melton
P.O. Box 409
Opelika, AL 36803-0409

*(Attorney for plaintiffs, City of Opelika and
Utilities Board of the City of Opelika)*

**John V. Denson**
**Josh J. Jackson**
Samford, Denson, Horsley,
 Pettey & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

*(attorneys for defendants Virginia Young Priest,
Claude John Young, Louise Young O'Brian,
Virginia Hart Young, Charles W. Gilmer, Sr.,
Alice C. Gilmer, Charles W. Gilmer, Jr.,
Kammy Gilmer, Barbara Gilmer Smith,
Gary Smith, Matthew Ruttledge Gilmer, and
Lelia Wilder Gilmer)*

**James A. Byram, Jr.**
**Paul A. Clark**
Balch & Bingham LLP
2 Dexter Avenue
Montgomery, Alabama 36104

**H. Wayne Phears**
**Brian E. Daughdrill**
Phears & Moldovan
Suite 375
Norcross, Georgia 30092

*(attorneys for defendant Hanson Aggregates
Southeast, Inc.)*



# ALABAMA STATE BAR

415 Dexter Avenue • Post Office Box 671 • Montgomery, Alabama 36101
Telephone: 334 / 269-1515 • Fax: 334 / 261-6310
www.alabar.org

## STATEMENT

The following information, in response to the application of petitioner, is furnished in compliance with Rule VII, Rules Governing Admission to the Alabama State Bar *(Pro Hac Vice)*:

**PETITIONER:**    Mr. Brian E. Daughdrill
Phears & Moldovan
4725 Peachtree Corners Cir. #375
Norcross, GA    30092-0000

**CURRENT APPLICATION:**

|   |   |
|---|---|
| Date Application Received: | March 31, 2004 |
| Case No.: | CV02-0085 |
| Style: | Mike Davis, et al. vs. Hanson Aggregates Southeast, Inc., et al. |
| Court/Agency: | Circuit Court of Lee County |
| Date of Hearing: | April 20, 2004 |

**LOCAL COUNSEL:**    Mr. James Asberry Byram Jr.
Balch & Bingham LLP
PO Box 78
Montgomery, AL    36101-0078

APPLICATIONS FOR RULE VII ADMISSION HAVE BEEN MADE BY ABOVE PETITIONER OR OTHER ATTORNEY MEMBERS OF PETITIONER'S FIRM IN THE PRECEDING 365 DAYS AS LISTED:

See Attached

*Philly Naintas*
PHV Admissions
March 31, 2004

FILED
APR 0 1 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK



## LAWYERS RENDER SERVICE

# Phears & Moldovan
## Dates reported: April 01,2001 - March 31,2004

| Applicant | Date App Received | Case | Court | | G/D/P/M |
|---|---|---|---|---|---|
| Phears, H. Wayne | | | | | |
| | 06/20/2003 | CV02-0085 | Circuit Court of Lee County | | G |

FILED

APR 0 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:     Clerk of the Lee County Circuit Court
        Lee County Justice Center
        2311 Gateway Drive, Room 104
        Opelika, Alabama 36801.

    Please take notice that the following documents were served on March 31, 2004 to all attorneys of record in the above styled and numbered cause;

    1.     Notice of Taking Deposition of Malcom C. LeBron.


_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*


OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 31st day of March, 2004.

James A. Byram, Jr.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Guy Gunter
*Council for City of Opelika/Opelika Water*
*Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

# IN THE CIRCUIT COURT FOR
# LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,        )

     Plaintiffs,       )

vs.             )     CASE NO. CV-02-85

HANSON AGGREGATES   )
SOUTHEAST, INC. et al.,    )

     Defendants.      )

FILED

APR 0 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## EXPERT WITNESS DISCLOSURE OF DEFENDANT,
## OLDCASTLE MATERIALS SOUTHEAST, INC.

Defendant Oldcastle Materials Southeast, Inc. ("Oldcastle"), by counsel, respectfully submit this Disclosure of Expert Witnesses pursuant to Rule 26 of the Alabama Rules of Civil Procedure.

## INTRODUCTORY STATEMENT AND RESERVATIONS

A.     This Expert Witnesses Disclosure ("Disclosure") sets forth the subject matter(s) on which each expert is expected to testify in the trial of this matter. Should Plaintiffs desire further discovery of the findings and opinions to which these experts are expected to testify at trial, Oldcastle will make all such witnesses available for deposition.

B.     To date, discovery is not completed in this case and Oldcastle's experts have not completed their investigations. Oldcastle reserves the right to supplement this Disclosure to more fully set forth the substance of the experts' respective findings and opinions and a summary of the grounds for each opinion. Oldcastle also reserves the right to provide additional areas of testimony, additional opinions, and additional grounds for opinions based on continuing discovery in this matter. Supplementation may take the form of amendments to this Disclosure,

a supplemental Disclosure, written report, deposition testimony or any other form sufficient to apprise Plaintiffs of the substance of and bases for the respective experts' opinions and/or additional areas of testimony, additional opinions, or additional grounds for opinions.

C.      Oldcastle reserves the right to produce rebuttal opinion testimony upon completion of the depositions of Plaintiffs' expert witnesses and review of materials that were available to Plaintiffs' expert witnesses in formulating their opinions.

D.      This Disclosure applies only to experts retained by Oldcastle in connection with this litigation. To the extent that other witnesses have developed opinions independent of this litigation, Oldcastle reserves the right to elicit these opinions at time of trial.

## EXPERT WITNESS DISCLOSURE

A.      Charles R. Faust, Ph.D.
         Geotrans, Inc.,
         46050 Manikin Plaza
         Sterling, VA 20166

1.      Oldcastle expects to call Charles R. Faust, Ph.D., as an expert witness at trial.

2.      The qualifications of Dr. Faust are summarized in the curriculum vitae attached as Exhibit A.

3.      Dr. Faust is expected to testify concerning the hydrogeology in the area of the Opelika quarry and Spring Villa and whether there is hydrogeologic connection between the Opelika quarry and Spring Villa.

4.      Oldcastle will supplement this designation with a written report setting forth the opinions of Dr. Faust and the bases for such opinions as soon as said report is available.

B.      Maria Zufall, Ph.D.
         Trinity Consultants
         6600 Peachtree Dunwoody Rd
         600 Embassy Row Suite 350
         Atlanta, GA 30328

1.    Oldcastle expects to call Maria Zufall, Ph.D., as an expert witness at trial.

2.    The qualifications of Dr. Zufall are summarized in the curriculum vitae attached as Exhibit B.

3.    Dr. Zufall is expected to testify concerning the atmospheric dispersion of fugitive dust emissions from the Opelika quarry.

4.    Oldcastle will supplement this designation with a written report setting forth the opinions of Dr. Zufall and the bases for such opinions as soon as said report is available.

C.    Kenneth Kaliski, P.E., Q.E.P.
Resource Systems Group, Inc.
331 Olcott Dr.
White River Junction, VT 05001

1.    Oldcastle expects to call Kenneth Kaliski, P.E., Q.E.P., as an expert witness at trial.

2.    The qualifications of Mr. Kaliski are summarized in the curriculum vitae attached as Exhibit C.

3.    Mr. Kaliski is expected to testify concerning the cumulative noise impacts from the operations of the crushing plant and related equipment at the Opelika quarry any mitigating impact on noise emanating from the Opelika quarry.

4.    Oldcastle will supplement this designation with a written report setting forth the opinions of Mr. Kaliski's and the bases for such opinions as soon as said report is available.

D.    McRoy Sauls
Sauls Seismic, Inc.
3710 4th Avenue South
Birmingham, AL 35222

1.    Oldcastle expects to call McRoy Sauls as an expert witness at trial.

3

2.      The qualifications of Mr. Sauls are summarized in the curriculum vitae attached as Exhibit D.

3.      Mr. Sauls is expected to testify concerning the extent to which blasting at the Opelika quarry is having any adverse impact on Plaintiffs' properties in the form of fugitive noise, vibrations and/or air concussions.

4.      Oldcastle will supplement this designation with a written report setting forth the opinions of Mr. Sauls and the bases for such opinions as soon as said report is available.

Respectfully submitted this the 1ST day of April, 2004.

**PHILLIP E. ADAMS, JR.** (ADA025)
Attorney for Defendant, Oldcastle Materials
Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel.  (334) 745-6466

70279948_1.DOC

4

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 1st day of April, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel


**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

## Education:

Ph.D., Geology, The Pennsylvania State University, 1976
B.S., Geology, Department of Geosciences, The Pennsylvania State University, 1967

## Professional Experience:

GeoTrans, Inc., Sterling, Virginia, (1996-Present), *President and Principal Hydrogeologist*
GeoTrans, Inc., Sterling, Virginia (1979-1996), *Vice President and Principal Hydrogeologist*
U.S. Geological Survey, Water Resources Division, Northeastern Region, Reston, Virginia, (1971-1979), *Hydrologist/Geologist*
Department of Geosciences, The Pennsylvania State University, (1972-1974), *Graduate Research Assistant*

More than 25 years of experience in aquifer parameter estimation; well test design and analysis; numerical simulation; multi-phase flow; solute and heat transport; statistical applications to geology; flow in fractured media; hazardous and radioactive waste management; and geothermal reservoir analysis.

## Relevant Project Experience:

DNAPL Contaminated Site, Buffalo, New York – Principal Investigator for a PRP funded RI/FS at a former manufactured gas plant site. Delineated contamination in soils, groundwater, and surface water; designed and evaluated alternative remedial measures; and provided expert witness and negotiation support with the State of New York and non-participating PRPs.

Superfund Landfill, Missouri – Project Manager for groundwater modeling, hydrogeologic analysis, and expert testimony for remediation activities. Performed innovative and detailed assessment of the flow relationships between an aquifer and river using three-dimensional flow and transport models.

Love Canal, Niagara Falls, New York – Principal Investigator for modeling and analysis of DNAPL flow and transport at the Love Canal Superfund Site. Modeling supported analysis of remedial alternatives, including consideration of slurry and concrete barrier walls, clay and synthetic membrane landfill covers, and French drain leachate collection systems.

DNAPL Contaminated Site, West Virginia – Principal Investigator supporting a comprehensive remedial site investigation, contaminated soil removal action, baseline risk assessment, and preparation of a project closure strategy based on identified risk to human health and groundwater remediation technical impracticability.

Industrial Facility, southeastern Pennsylvania – Principal Investigator for design of a groundwater recovery system at a RCRA regulated facility. Supervised field studies (well installation, surface geophysics, aquifer testing, and sampling). Designed extraction system and wrote supporting documents for submittal to USEPA, the Pennsylvania DER, and the Delaware River Basin Commission. System is operating at design capacity.

Confidential Client, Delaware – Principal Investigator for a RCRA Facility Investigation (RFI) and Corrective Measures Study (CMS). The RFI activities included well installation, sampling, soil gas surveys, tracer tests, and groundwater modeling. The CMS evaluated soil and groundwater remediation alternatives. A "no action" with monitoring alternative was recommended. The RFI and CMS reports were approved by USEPA, and the "no action" with monitoring plan was adopted by USEPA for the site.

DOE's Savannah River Site, South Carolina – Developed a three-dimensional groundwater flow and solute transport code called FTWORK. This code simulates groundwater flow through large, complex, multilayered, fully-saturated, porous hydrogeologic systems. Transport mechanisms include advection, dispersion, adsorption, and decay. We documented the model, and have extensively applied it at this site and elsewhere. The model is in the public domain and is used by other consultants and engineering companies.

---

EXHIBIT A



**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

2172

Confidential Client – Developed SWANFLOW (Simultaneous Water And Non Aqueous Phase Flow), a finite-difference model that simulates the flow of water and an immiscible non-aqueous phase liquid (NAPL) in and below the vadose zone. This model was constructed for applications such as: hazardous waste migration analyses, groundwater restoration, and fuel spills and leaks. We documented the model for USEPA and support the model through a users group.

Whitmoyer Laboratories Site, Pennsylvania – Principal Investigator for a PRP funded Remedial Design/Remedial Action for the groundwater operable unit. The groundwater remedy will address arsenic contamination in a limestone and dolomite aquifer.

Superfund Site, Michigan – Principal Investigator for the design of a groundwater extraction system at a NPL site. The design of the system was based on the site Consent Order concept. A groundwater flow model was calibrated to site hydrogeological conditions and used to optimize the location, size and depths of drains and recharge trenches.

Two Superfund Site, southern New Jersey – Principal Investigator for groundwater investigations in the Pinelands area. Among other activities, numerical models for flow and solute transport were used to evaluate the potential for future contamination migration. The computer models were also used to evaluate groundwater pumping strategies.

NPL Site, Medley, Florida – Principal Investigator for stabilization of PCB and lead impacted soil and the analysis of the effectiveness of this remedy. Work included oversight of USEPA's RI/FS contractor on behalf of a PRP. A groundwater model was developed to establish monitoring action levels for the selected remedy (stabilization of PCB and lead contaminated soil). The model derived action levels were incorporated in the consent order for the site. The remedy was implemented and continued monitoring conducted by GeoTrans has shown the remedy to be effective.

Consolidated Edison, New York – Project Manager for modeling and analysis of the effects of a hypothetical nuclear reactor core melt-down. This included analysis of groundwater flow, heat transport, and radionuclide migration.

Confidential Client, Qatif Area, Saudi Arabia – Principal Investigator for groundwater and solute transport modeling to assess irrigation improvements. Groundwater modeling was used to define impacts including future water levels and consequent effects on well and spring production, pump settings, and migration of poor-quality groundwater.

Confidential Client, Jemez Mountains, New Mexico – Project Manager for computer modeling for impact assessment of the hydrologic impact of geothermal energy development, including estimates and prediction of geothermal reservoir history and effects on groundwater outflow to downstream users.

IBM Corporation, Manassas, Virginia – Conducted a groundwater contamination investigation and remedial program. The purpose of the study was to characterize the fracture flow system underlying the area and to assess the extent of groundwater and soil-water contamination by VOCs, primarily TCE. Performed groundwater modeling to assess the transport time and areal extent of contamination and to predict future temporal and spatial migration of the plume.

BCM, Inc., Lipari Landfill, New Jersey – Principal Investigator for conceptual design analysis of various remedial measures. Provided support to PRP for negotiation and litigation activities with the USEPA. Numerical groundwater models were applied to help interpret and predict the behavior of groundwater flow and convective contaminant transport. The results were incorporated into the engineering decisions regarding remedial measures.

Confidential Client, New Jersey – Principal Investigator for an owner-funded Remedial Investigation/Feasibility Study under a consent order and ECRA. Soil and groundwater contamination from volatile chemicals and mercury are the primary concerns at the site.

Confidential Client, Washington D.C. – Principal Investigator for groundwater/remedial action study at a former manufactured gas site. This project includes characterization of shallow and deep flow systems, design of a recovery well system, and localized soil sampling and analysis for PCB. The results of this investigation will be used to implement remediation and treatment of contaminated groundwater.

**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

## Professional Certification:

Certified Professional Geologist, VA
Certified Professional Geologist, PA

## Awards:

Honor Societies and Awards:
ASCE 1985 Wesley W. Horner Award
P.D. Krynine Research Fund Award
Phi Kappa Phi
Fellow Geological Society of America
U.S. Navy Achievement Medal

## Publications:

*Articles in Refereed Journals:*

1. Faust, C.R., J.H. Guswa, J.W. Mercer, 1989. Simulation of three-dimensional flow of immiscible fluids within and below the unsaturated zone, *Water Resources Research*, 25(12): 2449-2464.

2. Cohen, R.M., R.R. Rabold, C.R. Faust, J.O. Rumbaugh, and J. Bridge, 1987. Investigation and hydraulic containment of chemical migration at four landfills in Niagara Falls, New York, *Civil Engineering Practice*, 2(1):33-58.

3. Mercer, J.W., C.R. Faust, R.M. Cohen, P.F. Andersen, and P.S. Huyakorn, 1985. Remedial action assessment for hazardous waste sites via numerical simulation, *Water Management and Research*, 3:377-387.

4. Faust, C.R., 1985. Transport of immiscible fluids within and below the unsaturated zone: A numerical model, *Water Resources Research*, 21(4):487-596.

5. Faust, C.R., J.W. Mercer, S.D. Thomas, and W.P. Balleau, 1984. Quantitative analysis of existing conditions and production strategies for the Baca geothermal system, New Mexico, *Water Resources Research*, 20(5):601-618.

6. Andersen, P.F., C.R. Faust, and J.W. Mercer, 1984. Analysis of conceptual designs for remedial measures at Lipari Landfill, New Jersey, *Ground Water*, 22(2):176-190.

7. Faust, C.R., and J. W. Mercer, 1984. Evaluation of slug tests in wells containing a finite-thickness skin, *Water Resources Research*, 20(4):504-506.

8. Mercer, J.W., L.R. Silka, and C.R. Faust, 1983. Modeling groundwater flow at Love Canal, New York, *Journal of Environmental Engineering*, ASCE, 109(4):924-942.

9. Huyakorn, P.S., B.H. Lester, and C.R. Faust, 1983. Finite-element techniques for modeling groundwater flow in fractured aquifers, *Water Resources Research*, 19(4):1019-1035.

10. Voight, B., and C.R. Faust, 1982. Frictional heat and strength loss in some rapid landslides, *Geotechnique*, 32(1):43-54.

11. Maddock, T., J.W. Mercer, and C.R. Faust, 1982. Management model for power production from a geothermal field: 1. Hot water reservoir and power plant model, *Water Resources Research*, 18(3):499-512.

2174

12. Faust, C.R., L.R. Silka, and J.W. Mercer, 1981. Computer modeling and groundwater protection, Guest Editorial, *Ground Water*, 19(4):362-365.

13. Faust, C.R., and J.W. Mercer, 1980. Ground water modeling: Recent developments, *Ground Water*, 18(6):596-577.

14. Mercer, J.W., and C.R. Faust, 1980. Ground water modeling: Applications, *Ground Water*, 18(5):486-497.

15. Mercer, J.W., S.P. Larson, and C.R. Faust, 1980. Simulation of saltwater interface motion, *Ground Water*, 18(4):374-385.

16. Faust, C.R., and J.W. Mercer, 1980. Ground water modeling: Numerical models, *Ground Water*, 18(4):395-409.

17. Mercer, J.W., and C.R. Faust, 1980. Ground water modeling: Mathematical models, *Ground Water*, 18(3):212-227.

18. Mercer, J.W., and C.R. Faust, 1980. Ground water modeling: An overview, *Ground Water*, 18(2):108-115.

19. Mercer, J.W., and C.R. Faust, 1979. Geothermal reservoir simulation 3: Application of liquid and vapor dominated hydrothermal modeling techniques to Wairakei, New Zealand, *Water Resources Research*, 15(3):653-671.

20. Mercer, J.W., and C.R. Faust, 1979. A review of numerical simulation of hydrothermal systems, *Hydrological Sciences Bulletin*, 24(3):335-343.

21. Faust, C.R., and J.W. Mercer, 1979. Geothermal reservoir simulation 2: Numerical solution techniques for liquid and vapor dominated hydrothermal systems, *Water Resources Research*, 15(1):31-46.

22. Faust, C.R., and J.W. Mercer, 1979. Geothermal reservoir simulation 1: Mathematical models for liquid and vapor dominated hydrothermal systems, *Water Resources Research*, 15(1):23-30.

23. Yotsukura, N., A.P. Jackman, and C.R. Faust, 1973. Approximation of Heat Exchange at the Air Water Interface: *Water Resources Research*, 9(1):118-128.

*Conference or Symposium Proceedings:*

1. Faust, C.R., S.J. Wamback, and C.P. Spalding, 1990. Characteristics of the migration of immiscible fluids in glacial deposits and dolomite in Niagara Falls, New York, *Proceedings of IAH Conference Calgary '90* (April 1620, 1990), Calgary, Alberta, Canada.

2. Faust, C.R., R.R. Rabold, and J.W. Mercer, 1988. Modeling remedial actions at S-Area, Niagara Falls, NY, *Proceedings of the Seminar on Impact of Hazardous Waste Facilities on Water Utilities*, American Water Works Association Annual Conference, Orlando, FL.

3. Mercer, J.W., C.R. Faust, R.M. Cohen, P.F. Andersen, and P.S. Huyakorn, 1984. Remedial Action Assessment for Hazardous Waste Sites Via Numerical Simulation, Seventh Annual Madison Waste Conference on Municipal & Industrial Waste, University of Wisconsin, Madison, Wisconsin.

4. Huyakorn, O.S., D.E. Dougherty, and C.R. Faust, 1983. An improved finite-element model for simulating subsurface heat storage, International Conference on Subsurface Heat Storage in Theory and Practice (June 6-8), Stockholm, Sweden.

5. Hoyakorn, P.S., D.E. Dougherty, and C.R. Faust, 1982. Numerical simulation of thermal energy storage problems, *Proceedings of the 19th IMACS Congress on System Simulation and Scientific Computation* (August 8-13), Montreal, 2:296-298.

GeoTrans, Inc.

CHARLES R. FAUST, PH:D., P.G.
PRESIDENT, PRINCIPAL HYDROGEOLOGIST

6.  Faust, C.R., 1982. The Use of Modeling in Monitoring Network Design, *Proceedings of the Second National Symposium on Aquifer Restoration and Ground Water Monitoring*, National Water Well Association, pp. 156-162.

7.  Faust, C.R., and J.W. Mercer, 1982. Preliminary analysis of groundwater development and brackish water upconing at Virginia Beach, Virginia, Special Publications: No. 1, *Georgia Southwestern College Studies of the Hydrogeology of the Southeastern United States*, B.F. Beck, (ed.), pp. 30-37.

8.  Faust, C.R., J.W. Mercer, and W.J. Miller, 1980. The DOE code comparison study: Summary of results for problem 1, Presented at the Sixth Workshop on Geothermal Reservoir Engineering (December 17), Stanford, California.

9.  Mercer, J.W., and C.R. Faust, 1979. Reservoir engineering and evaluation, Presented at the Geothermal Resources Council Symposium on Geothermal Energy and its Direct Uses in the Eastern United States, Roanoke, Virginia.

10. Li, T.M.C., J.W. Mercer, C.R. Faust, and R.J. Greenfield, 1978. Simulation of geothermal reservoirs including changes in porosity and permeability due to silica-water reactions, Presented at the Fourth Workshop on Geothermal Reservoir Engineering, Stanford University, Stanford, California.

11. Huyakorn, P.S., G.F. Pinder, C.R. Faust, and J.W. Mercer, 1978. Finite-element simulation of two-phase flows in porous media: Computational Techniques for Interface Problems, American Society of Mechanical Engineers Applied Mechanics Division, 30:19-43.

12. Mercer, J.W., and C.R. Faust, 1976. The application of finite-element techniques to immiscible flow in porous media, *Proceedings, International Conference on Finite Elements in Water Resources* (July 1216), Princeton University, Pentech Press, pp. 121-157.

13. Faust, C.R., and J.W. Mercer, 1976. An analysis of finite-difference and finite-element techniques for geothermal reservoir simulation, *Proceedings of the Fourth SPE Symposium on Numerical Simulation of Reservoir Performance* (February 19-20), Los Angeles, California, pp. 337-354.

14. Mercer, J.W., and C.R. Faust, 1975. Simulation of water and vapor-dominated hydrothermal reservoirs, Paper SPE 5520 presented at 50th Annual Fall Meeting of the Society of Petroleum Engineers of AIME (September 28October 1), Dallas, Texas.

15. Faust, C.R., and J.W. Mercer, 1975. Mathematical modeling of geothermal systems, *Proceedings of the Second United Nations Symposium on the Development and Use of Geothermal Resources*, (May 20-29), San Francisco, California, 3:1633-1642.

16. Mercer, J.W., C.R. Faust, and G.F. Pinder, 1974. Geothermal reservoir simulation, *Proceedings of National Science Foundation Conference on Research for the Development of Geothermal Energy Resources* Pasadena, California, pp. 256-257.

*Technical Reports:*

1.  Cohen, R.M., A.H. Vincent, J.W. Mercer, C.R. Faust, and C.P. Spalding, 1993. *Methods for Monitoring Pump-and-Treat Performance*, USEPA Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma, 114 pp.

2.  Faust, C.R., P.N. Sims, C.P. Spalding, and P.F. Andersen, 1989. FTWORK: Groundwater flow and solute transport in three-dimensions, GeoTrans, Inc. WSRC-RP-89-1085 prepared for United States Department of Energy, Westinghouse, Savannah River Plant, Aiken, South Carolina.

**GeoTrans, Inc.**

CHARLES R. FAUST, PH.D., P.G.
*PRESIDENT, PRINCIPAL HYDROGEOLOGIST*

3. Faust, C.R., and J.O. Rumbaugh, III, 1986. SWANFLOW: Simultaneous Water, Air, and Nonaqueous Phase Flow, Prepared by GeoTrans, Inc., Herndon, Virginia, for the United States Environmental Protection Agency, Washington, DC.

4. Mercer, J.W., C.R. Faust, W.J. Miller, III, and F.J. Pearson, Jr., 1981. Review of simulation techniques for aquifer thermal energy storage, ATES, Pacific Northwest Laboratory Report, PNL3769, 183 pp.

5. Mercer, J.W., S.P. Larson, and C.R. Faust, 1980. Finite-difference model to simulate the areal flow of saltwater and freshwater separated by an interface, U.S. Geological Survey Open File Report 80407, 88pp.

6. Maddock, T., III, J.W. Mercer, C.R. Faust, and E.D. Attanasi, 1979. Management model for electrical power production from a hot-water geothermal reservoir, Reports on Natural Resources Systems No. 34, University of Arizona, Tucson, Arizona, 114 pp.

7. Faust, C.R., and J.W. Mercer, 1977. Finite-difference model of two-dimensional single and two-phase heat transport in a porous medium: Version I, U.S. Geological Survey Open-File Report 77234.

8. Wells, R.B., C.R. Faust, and J.W. Mercer, 1976. A cross-section plotting program (CSPP) for Gridded (Map) Data, U.S. Geological Survey Open File Report 76689.

*Abstracts for Papers not Listed:*

1. Faust, C.R., and N. Shifrin, 1986. Use of risk assessment in determining groundwater remedies for the Hyde Park Landfill, in the Town of Niagara, New York: Hydrogeology and fate of chemicals (Abstract), 1986 AGU Fall Meeting/ASLO Winter Meeting, San Francisco, California.

2. Faust, C.R., and B. Voight, 1979. Heat-induced fluid pressure enhancement mechanism in seismic faulting (Abstract), Annual Spring Meeting of the American Geophysical Union, Washington, DC.

3. Faust, C.R., and J.W. Mercer, 1977. Mathematical models as an aid to understanding the geohydrology of hydrothermal systems (Abstract), Geological Society of America Annual Meeting, Seattle, Washington.

*Books and Book Chapters:*

1. Mercer, J.W., C.R. Faust, W.J. Miller, and F.J. Pearson, Jr., 1982. Review of simulation techniques for aquifer thermal energy storage (ATES), in Advances in Hydroscience, Academic Press, New York, 13:11-29.

2. Mercer, J.W., and C.R. Faust, 1981. Ground Water Modeling: National Water Well Association, Columbus, Ohio, 60 pp.

3. Mercer, J.W., and C.R. Faust, 1980. The physics of fluid flow and heat transport in geothermal systems, in Sourcebook on the production of electricity from geothermal energy, Joseph Kestin (ed.), U.S. Department of Energy DOE/RA/40511, pp. 121-135.

*Miscellaneous:*

1. Mercer, J.W., C.R. Faust, and L.R. Silka, 1984. Groundwater flow modeling study of the Love Canal area, New York, *Ground Water Contamination*, J.D. Bredehoeft and T.M. Usselman (eds.), National Research Council, pp. 109-119.

2. Faust, C.R., 1976. Numerical simulation of fluid flow and energy transport in liquid and vapor-dominated hydrothermal systems, Ph.D. Thesis, The Pennsylvania State University, 163 pp.

# Maria J. Zufall, Ph.D.

6600 Peachtree Dunwoody Road

600 Embassy Row, Suite 350

Atlanta, Georgia 30328

Phone:  (770) 394-4001     Fax:  (770) 394-3610     E-mail:  mzufall@trinityconsultants.com

## EDUCATION

**Carnegie Mellon University,** Pittsburgh, PA

Ph.D., Department of Civil and Environmental Engineering, August 1998

Thesis Title: *Dry Deposition of Aerosols to Water Surfaces: Effects of Hygroscopic Growth and Wave Interactions*

**Carnegie Mellon University,** Pittsburgh, Pennsylvania

M.S., Department of Civil and Environmental Engineering, May 1995

Thesis Title: *Dry Deposition of Atmospheric Contaminants to Lake Michigan*

**Cornell University,** Ithaca, NY

B.S. with Distinction, Department of Civil and Environmental Engineering, May 1993

## EXPERIENCE

**Trinity Consultants,** Atlanta, Georgia

*Project Supervisor (2002 – present).*  Propose, manage, and implement air quality consulting projects at environmental consulting firm.  Projects include environmental regulatory evaluations for industrial facilities, air quality permitting, air dispersion modeling, and litigation support services.  Serve as instructor for courses on air quality permitting and dispersion modeling.

*Consultant(2000 – 2002).*  Provide consulting services to industrial clients to assure facilities are in compliance with air quality regulations.  Includes development of construction permit applications, facility audits, and air dispersion modeling.  Conduct detailed dispersion modeling analyses for near-field and far-field impacts.

**U. S. Environmental Protection Agency,** Research Triangle Park, North Carolina

*Environmental Scientist, Human Exposure Analysis Branch (1998 – 2000).*  Modeled human exposure to airborne particulate matter using indoor and outdoor air quality models and human activity patterns.  Conducted multimedia assessment of children's exposure to pesticides.

**Carnegie Mellon University,** Pittsburgh, Pennsylvania

*Research Assistant, Department of Civil and Environmental Engineering (1994 – 1998).*  Investigated dry deposition of atmospheric aerosols to water surfaces through mathematical modeling, wind tunnel experiments, and field studies.

*Course Instructor, Department of Civil and Environmental Engineering (1997).*  Designed curriculum, tests, and assignments and delivered lectures for a senior/graduate level course in air quality engineering.

# EXHIBIT B

SELECTED PUBLICATIONS AND PRESENTATIONS

Zufall, M. J., Bailey, R. B., Simonsen, S. L. 2001. Regulatory Applications of CALPUFF Modeling. Presented at 2001 Air and Waste Management Association Annual Conference, June 28, 2001.

Burke, J. M., Zufall, M. J. and Ozkaynak, H. 2001. "A Population Exposure Model for Particulate Matter: Case Study Results for $PM_{2.5}$ in Philadelphia, PA," *Journal of Exposure Analysis & Environmental Epidemiology* 11(6), 470-489.

Rea, A. W., Zufall, M. J., Williams, R. W., Sheldon, L., Howard-Reed C. 2001. "The influence of human activity patterns on personal PM exposure: A comparative analysis of filter-based and continuous particle measurements." *Journal of the Air and Waste Management Association.* 51:1271-1279.

Howard-Reed, C., Rea, A. W., Zufall, M. J., Burke, J. M., Williams, R. W., Suggs, J. C., Williams, L. S., Walsh, D. and Kwok, R. 2000. "Use of a continuous nephelometer to measure personal exposure to particles during the U.S. Environmental Protection Agency Baltimore and Fresno studies". *Journal of the Air and Waste Management Association.* 50:1125 – 1132..

Zufall, M.J., H. Ozkaynak, M. Brauer, W. Ott, and J. Spengler. 1999. "Particulate Matter Concentrations in Non-Residential Microenvironments: A Review" presented at the 1999 Joint Annual Meetings of the International Society of Exposure Analysis and the International Society for Environmental Epidemiology, September 5 to 8, 1999, Athens, Greece.

Zufall, M. J., Dai, W., Davidson, C. I., and Etyemezian, V. 1999. "Effects of waves on dry deposition rates of atmospheric aerosols to natural water surfaces: I. Mathematical Modeling." *Atmospheric Environment,* 33:4273-4281

Zufall, M. J., Dai, W., and Davidson, C. I. 1999. "Effects of waves on dry deposition rates of atmospheric aerosols to natural water surfaces: II. Wind Tunnel Studies."*Atmospheric Environment,* 33:4283-4290

Zufall, M. J., Davidson, C. I., Caffrey, P. F. and Ondov, J. M. 1998 "Airborne concentrations and dry deposition fluxes of particulate chemical species to southern Lake Michigan." *Environmental Science and Technology* 32: 1623-1628.

Zufall, M. J. and Davidson, C. I. 1998. "Dry deposition of particles." *In* R. M. Harrison and R. Van Grieken, eds. *Atmospheric Particles.* John Wiley and Sons. New York. pp. 426-473.

Zufall, M. J., Bergin, M. H., and Davidson, C. I. 1998. "Effects of hygroscopic growth on dry deposition of $(NH_4)_2SO_4$ to water surfaces -- a non-equilibrium approach." *Environmental Science and Technology.* 32: 584-590.

Zufall, M. J. and Davidson, C. I. 1997. "Dry deposition of particles to water surfaces." *In* J. Baker, ed. *Atmospheric Deposition of Contaminants to the Great Lakes and Coastal Waters.* Pergamon Press. New York. pp. 1-16.


**R S G** INC.
RESOURCE SYSTEMS GROUP, INC.

## KENNETH H. KALISKI P.E., Q.E.P., INCE BRD. CERT.
### DIRECTOR OF ENVIRONMENTAL SERVICES

### EDUCATION, LICENSES, AND CERTIFICATIONS

B.E. Engineering, Dartmouth College

B.A. Biological Sciences and Environmental Studies, Dartmouth College

Qualified Environmental Professional, Inst. of Professional Environmental Practice

Licensed Professional Engineer, Vermont and New Hampshire

Board Certified, Institute of Noise Control Engineering

### EXPERIENCE

Mr. Kaliski is the Director of Resource Systems Group's Environmental division. He has been with the firm since its founding in 1987. He manages projects and has served as an expert witness in the areas of community noise, air pollution, and traffic impacts. His projects include work in Vermont, New Hampshire, Massachusetts, Maine, New York, Connecticut, New Jersey, Alabama and Florida. In addition to developing the firm's air pollution and noise programs, he has authored much of the firm's traffic, air, and noise software, some of which is commercially available.

### RESPONSIBILITIES & RELEVANT PROJECTS (PARTIAL LIST)

*Noise Impact Evaluation of a Snowmaking System*—performed noise modeling of a proposed snowmaking system at the Viking Ski Touring Center in Londonderry, Vermont. Evaluated effectiveness of noise barriers in reducing noise levels.

*Sandbar Aggregate Quarry Noise Evaluation*—developed noise level estimates at nearby residences from a quarrying and crushing operation proposed for Milton, Vermont. Modeled the noise attenuation due to natural earth berms, hills, and man-made barriers. Proposed additional noise attenuation strategies to meet local and national guidelines.

*Hookset Truck Depot Noise Impact Analysis*—evaluated existing and predicted future noise levels after expansion of a truck depot. Data collection included measuring background automobile speeds and noise levels on highway, and measuring idling and accelerating truck noise levels, and modeling impact of noise from depot at various times of day.

*Bennington, Vermont By-Pass Environmental Impact Study*—analyzed noise impacts of the proposed US 7 By-pass around Bennington, Vermont. Monitored existing noise levels and updated noise and traffic levels for use in noise modeling. Submitted report as part of a Federal Environmental Impact Statement.

*C&S Wholesale Grocer's Expansion Noise Impact Study*—forecasted noise levels at nearby residences and motels. Modeled each of 24 hours using various traffic counts, estimates of truck trip generation, FHWA's highway noise prediction computer model, and RSG's own model for idling truck noise attenuation. Modeled the effectiveness of barriers and terrain features in reducing noise levels. Prepared testimony for local and Act 250 hearings.

331 Olcott Drive, White River Junction, Vermont 05001
TEL 802.295.4999 • FAX 802.295.1006 • www.rsginc.com

## EXHIBIT C

*Noise Impacts of a Landfill Gas Power Plant*—determined noise levels at neighboring residences from a landfill gas-fired electric power generator in Burlington, Vermont. Modeled noise attenuation due to atmospheric loss and topographic features using RSG's *NTerrain* noise modeling software package.

*Review of the White Rock Point Noise Impact Evaluation*—critiqued analysis of a drilling, blasting, and hauling operation in a residential neighborhood of South Burlington, Vermont. Performed modeling of point source construction noise, background airport noise, and traffic noise to assess projects compliance with local and national guidelines.

*Noise Forecasting for a Wind Turbine Demonstration Project*—conducted noise measurements and modeling for a proposed 12-tower wind turbine project by the Green Mountain Power Company in Searsburg, Vermont. Used the NTerrain model to quantify the effects of atmospheric loss, vegetation, wind, and terrain features on octave-band noise levels in the area.

*Noise Mitigation for Wood Kilns* – conducted an assessment of the noise generated by large wood drying kilns in Springfield, New Hampshire and made recommendations to reduce the impact of nighttime noise at neighboring properties.

## MEMBERSHIPS/AFFILIATIONS

Institute of Noise Control Engineering
Acoustical Society of America
Air and Waste Management Association
Institute of Professional Environmental Practice
Institute of Transportation Engineers
Tau Beta Pi Engineering Society

## PUBLICATIONS

Ray, R. R., Collier, R. D., and Kaliski, K. H., *Optimization of Stability and Performance of LMS Filters for Feedforward Active Noise Reduction in Communications Headsets*, ACTIVE 02, The 2002 International Symposium on Active Control of Sound and Vibration, July 2002.

Collier, R. D., and Kaliski, K. H., and Ray, R. R.,, *Experimental Techniques for Evaluation of Active Noise Reduction Communication Headsets with the Thayer Low Frequency Acoustic Test Cell*, Proceedings of the 2003 Institute of Noise Control Engineers NOISECON 2003.

Kaliski, K. H., Mills-Tettey, A., Seitaridou, E., Collier, R., *Low-Complexity Continuous Noise Monitoring System for Communities, Small Airports, and Remote Areas*, Proceedings of the 2001 Institute of Noise Control Engineers NOISECON 2001.

Marshal, N.L., Kaliski, K.H., Rimmer, L.L., Lawe, J.C., *Estimating Network Model Parameters from Mail Survey Data*, Proceedings of ASCE 4th International Conf. on Microcomputers in Transportation, Baltimore MD, July, 1992

Kaliski K, *Integrating Network Modeling and Air Pollution Modeling to Determine $NO_2$ Contributions from Motor Vehicles*, Proceedings of the 3rd National Conference on Transportation Solutions for Small and Medium-Sized Areas, Transportation Research Board, October, 1991..

# SAULS
## SEISMIC, INC.

3710 4th Avenue South
Birmingham, AL 35222-2420
U.S.A.
www.saulsseismic.com
E-mail: sales@saulsseismic.com

Phone: 205-592-2466
Fax: 205-592-2477
Watts: 800-749-2477
Ext. 110

## McROY SAULS

## RESUME

PREVIOUS WORK EXPERIENCE:

10/80 to PRESENT:

> President - Sauls Seismic, Inc.
> Birmingham, Alabama, USA
>
> President - NOMIS Seismographs
> Birmingham, Alabama, USA.

1/78 to 10/80:

> VME-Nitro Consult, Inc.
> Regional Manager - Alabama Office
> Jasper, Alabama

6/73 to 12/77:

> AETNA Life & Casualty Company
> Engineering Department
> Birmingham, Alabama

12/72 to 5/73:

> Assistant Golf Pro
> Indies Inn & Yacht Club
> Duck Key, Florida Keys

6/68 to 12/72:

> Clemson University
> B.S. - Engineering
> Clemson, South Carolina

**Birmingham,AL/Atlanta,GA/Chapmanville,WV/Charlotte,NC/Louisville,KY/Nashville,TN
Knoxville,TN/Columbus,OH**

EXHIBIT D

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                          )
                                             )
        Plaintiffs,                          )      **COPY**
                                             )
vs.                                          )      Civil Action No. CV-20 02-85
                                             )
HANSON AGGREGATES SOUTHEAST,                 )
INC., et al.,                                )
                                             )
        Defendants.                          )

FILED
APR 0 8 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF TAKING DEPOSITION

TO:    James A. Byram, Jr.        John V. Denson
        BALCH & BINGHAM, LLP    SAMFORD, DENSON, HORSLEY,
        P.O. Box 78              PETTEY & BRIDGES
        Montgomery, AL 36101     P.O. Box 2345
                                Opelika, AL 36803-2345

        H. Wayne Phears         Phillip E. Adams, Jr.
        PHEARS & MOLDOVAN     ADAMS, UMBACH, DAVIDSON
        Suite 375              & WHITE, LLP
        4725 Peachtree Corner Circle  P. O. Box 2069
        Norcross, GA 30092-3000    Opelika, AL 36803-2069

Please take notice that on April 16, 2004, at 9:00 a.m., at the offices of ADAMS, UMBACH,

DAVIDSON & WHITE, LLP, Opelika, Alabama, the Plaintiffs will take the deposition of **Malcom C.**

**LeBron, Rt. 2, Box 29, Rockford, Alabama 35136,** for the purposes of discovery and impeachment

at trial upon oral examination before a Court Reporter or some other officer authorized by law to

administer oaths.

To testify as to the following matters and produce for inspection the **ORIGINALS** of all

documents requested as follows:

      1.    Any and all Notices of Violations or environmental problems relating to the Lee
County quarry when operated by Hanson or Oldcastle. This would include but not be limited to fuel

2185

spills, illegal discharges, dust problems or occasions when Hanson or Oldcastle violated or alleged to have violated their permits from ADEM.

2.    Copies of e-mails, memos or other documents to or from (a) Oldcastle Materials; (b) SRM; (c) Brian Fowler and/or North American Reserves; (d) Hanson; (including any employee of these companies).

3.    Any and all e-mails, correspondence or documents to or from any source relating to the Hanson/Oldcastle, Lee County quarry.

4.    Any and all e-mails, correspondence or documents to or from ADEM relating to the Hanson/Oldcastle, Lee County quarry.

5.    Any and all e-mails, correspondence, records, computations, notes or other documents relating to your letter in the Fall of 2003 to ADEM relating to an increase of pumping discharge to ten million gallons per day.

6.    Your entire file, including electronically stored data (including but not limited to e-mails), on this quarry.

The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witnesses.


**JAMES B. SPRAYBERRY** (SPR008)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2184

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 7TH day of _____April_____, 2004.

_____
OF COUNSEL

\\Front door\C\My Document\WPDocs\JBS\CIVIL\Hanson\Pleadings\Deposition\Notice of Depo Lebron 3-29-04.wpd

2185

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| **MIKE DAVIS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-20 02-0085** |
| | ) | |
| **HANSON AGGREGATES SOUTHEAST,** | ) | **FILED** |
| **INC., et al.,** | ) | |
| | ) | APR 0 9 2004 |
| **Defendants.** | ) | |

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### PLAINTIFFS' MOTION FOR DEFENDANTS
### TO PAY COST OF SECOND MEDIATION

The Plaintiffs would show this court that:

1.    The first mediation in this case was held May 21, 2003.  Mediation lasted over one-half (½) of a day and cost approximately $1,700.00, with the Plaintiffs paying one-half (½) of the cost.

2.    The rules of mediation require privacy and confidentiality.  However, from the discovery documents and depositions taken since the last mediation, it is the Plaintiffs position that Hanson could not have mediated a successful settlement because it had ongoing negotiations and later a buy-sell agreement with Oldcastle.  The buy-sell agreement was dated July 11, 2003 and was for the sell and/or swap six (6) or eight (8) quarries, including the Opelika quarry.

3.    The Lee County quarry sold on July 13, 2003, based on these negotiations which had begun in October or November, 2002.  These negotiations included site visits by the Oldcastle management and contract geologist (Brian Fowler) in 2003.  The site visit was to visually examine for safety, environmental concerns, and confirmation of estimated mineral reserves.

4.   Without disclosing the mediation discussions, it would have been (virtually) impossible to mediate a settlement due to the negotiations and pending sale/swap of the Opelika quarry.

5.   Since the Plaintiffs were never informed of the negotiations and/or pending sale, even though they had repeatedly asked, and did not learn of the transaction until approximately July 15, 2003.

6.   Accordingly, the Plaintiffs should not have to pay for a second mediation.  As the Plaintiffs entered the first mediation in good faith and without full knowledge of the circumstances surrounding Hansons inability to fully and fairly negotiate.

WHEREFORE, the Plaintiffs move this Court for an Order that would order the Defendants to pay the full cost of the second mediation.

Respectfully submitted,


**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs


**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2187

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _____ day of ___April___, 2004.

OF COUNSEL

\\Front door\C\My Documents\WPDocs\JBS\CIVIL\Hanson\Pleadings\Motions\Motion for Defendants to Pay Cost of 2nd Mediation.wpd

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                     )
                                        )
            Plaintiffs,                 )
                                        )
vs.                                     )        Civil Action No. CV-20 02-0085
                                        )
HANSON AGGREGATES SOUTHEAST,            )
INC., et al.,                           )
                                        )
            Defendants.                 )

FILED

APR 0 9 2004

IN OFFICE
CORINNE T. HURST

## PLAINTIFFS' SECOND MOTION FOR ORDER COMPELLING PRODUCTION

The Plaintiffs move the Court for an order requiring defendant, Oldcastle, to produce and

to permit plaintiffs to inspect and to copy each of documents in Plaintiffs' First and Second

Request for Production as well as Notice of Depositions that are not yet produced, as set out in a

letter of March 30, 2004 to Mr. Adams:

Plaintiff did previously serve upon the defendant, Oldcastle, the following:

1.      Plaintiffs' First Interrogatories and Requests for Production to Defendant

        Oldcastle on the 30th day of September, 2003 (a copy of which has been

        previously filed).

2.      Plaintiffs' Motion to Compel Oldcastle to Respond to Plaintiffs' First

        Interrogatories and Requests for production filed with the Court on the 2nd day of

        December, 2003, which is incorporated and adopted herein by reference.

3.      Plaintiffs Second Interrogatories and Request for Production served 11th day of

        December, 2003.

4. Notice of Deposition of Frank Heisterkamp (a copy of which is attached as Exhibit A).

5. Notice of Deposition of Brian Fowler (a copy of which is attached as Exhibit B).

6. Letter to Phil Adams dated March 30, 2004 (a copy of which is attached as Exhibit C), requesting documents.

7. Notice of Deposition of Ted Reynolds (a copy of which is attached as Exhibit D).

8. Selected pages of Heisterkamp deposition (copies of which are attached as Exhibit E) which discuss documents, privilege and related issues.

9. Oldcastle Privilege Log (a copy of which is attached as Exhibit F).

10. Selected pages of Fowler deposition (Copies of which are attached as Exhibit G).

11. Selected pages of Reynolds deposition (Copies of which are attached as Exhibit H).

The parties have attempted to resolve the discovery disputes but are unable to do so. Some documents have been promised but have never been produced. The existence of other documents simply was not revealed until the deposition of Heisterkamp and Fowler and the production of the "Privilege Log" by Oldcastle. Documents and e-mails from early 2002 and earlier should be produced since Mr. Heisterkamp testified that the earliest contact was Fall, 2002. Other documents involve "due diligence" in relation to the purchase on July 13, 2003 and should be produced since it shows Oldcastle deliberate decision to close the deal even though it knew that this lawsuit made very serious allegations.

WHEREFORE, for good cause shown, Plaintiffs move this Honorable Court to compel

Oldcastle to produce the documents requested in the letter to Mr. Adams dated March 30, 2004

and, further, to award the Plaintiffs' attorneys costs for the necessity of filing a Motion to

Compel. Oldcastle's objections were invalid under Alabama law. To object is clearly a delaying

tactic on Oldcastle's part designed to impede Plaintiffs' discovery in this case and to delay the

litigation. Plaintiffs therefore move for an award of attorneys' fees in this case situation based

on Rule 26, Rule 33 and Rule 37.


Respectfully submitted,


_____

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs


**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the ___ day of ___ April ___, 2004.

OF COUNSEL

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Civil Action No. CV-20 02-85 |
| | ) |
| HANSON AGGREGATES SOUTHEAST, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

### RE-NOTICE OF TAKING DEPOSITION

TO:   James A. Byram, Jr.                    John V. Denson
      Balch & Bingham, LLP                   Samford, Denson, Horsley,
      P.O. Box 78                            Pettey & Bridges
      Montgomery, AL 36101                   P.O. Box 2345
                                             Opelika, AL 36803-2345


      H. Wayne Phears                        Phillip E. Adams, Jr.
      Phears & Moldovan                      Adams, Umbach, Davidson
      Suite 375                                & White, LLP
      4725 Peachtree Corner Circle           P. O. Box 2069
      Norcross, GA 30092-3000                Opelika, AL 36803-2069

Please take notice that on March 1 and March 2, 2004, commencing at 9:00 a.m. each

day, at the offices of Phillip E. Adams, Jr., Opelika, Alabama, the Plaintiffs will take the

depositions of the Corporate Representatives of Oldcastle Materials Southeast, Inc., for

the purposes of discovery and impeachment at trial upon oral examination before a Court

Reporter or some other officer authorized by law to administer oaths.

In accordance with Rule 30(b)(6), Defendant Oldcastle is requested to designate one

or more persons with knowledge to testify as to the following matters and to produce for

inspection the ORIGINALS of all documents requested on Exhibit A attached hereto:

2195

1.    The negotiation for the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

2.    The terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County quarry to or by Oldcastle Materials Southeast, Inc.

3.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4.    Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

5.    All documents requested in Plaintiffs' First and Second Interrogatories and Requests for Production to Defendant Oldcastle.

6.    All documents regarding any changes to the manner of operation of the Lee County quarry whether such changes have been implemented or plan to be implemented in the future.

7.    All documents related in any way to any violations of Oldcastle's ADEM permits with respect to the Lee County quarry.

8.    All mining plans and any document related in any way to a mining plan.

9.    All documents related in any way to dust control activities or problems at the Lee County quarry.

10.    All documents related to discharging of water from the Oldcastle Lee County quarry.

11.    All documents related to sales of materials from the Lee County quarry.

12.    All documents evidencing the number of hours worked by Oldcastle Lee County quarry employees from the date of acquisition to the date of this deposition.

13.    All correspondence with ADEM with respect to the Lee County quarry.

14.    All internal memoranda, e-mails, or written documentation of any character relating to complaints by surrounding property owners, the investigation of such complaints, and the resolution, if any, of such complaints.

2194

15. All ADEM applications and/or all ADEM permits for this Defendant.

16. All ADEM reports, including but not limited to, monthly water quality reports.

17. All hydrogeology and engineering reports and/or studies and related documents.

18. All environmental reports or studies of any type or description prepared on this Defendant's behalf or on behalf of its predecessor and which this Defendant relies upon in any manner for any purpose.

19. Any and all written or verbal complaints made by any entity against this Defendant as well as against Hanson. Complaints include, but are not limited to, complaints about noise, dust, blasting, water, trucks, and/or the operation of the quarry in general.

20. Any and all pre-quarry and/or pre-purchase property inspections whether prepared on your behalf of on behalf of your predecessor, private property owners, or insurance companies. Please include in your response any and all photographs and any related documents.

21. All sales tax reports and/or quarry mining tax reports filed in Lee County for the years 1999 through the present.

22. All licenses, agreements, contracts, correspondence or other documents that relate to this Defendant's relationship with Dixie Pipeline or any other pipeline company in Lee County, Alabama.

23. Any and all reports, studies, complaints, correspondence or other documents concerning or related to sinkholes in and around the Hanson Lee County Quarry. This would include, but not be limited to, the possibility of sinkholes forming, sinkholes that have formed, and/or the repair of sinkholes.

24. The knowledge or information known to Oldcastle regarding the likelihood of sinkhole formation in or around its limestone quarries generally, as well as the formation of sinkholes in and around other Oldcastle quarries in karst terrain.

25. Any and all studies, reports, complaints, correspondence or other documents relating to Spring Villa. This would include, but not be limited to, the dewatering of Spring Villa, the diversion of Spring Villa water into your quarry and/or the interbasin transfer of water from Spring Villa into your quarry or Chewacla Creek.

3

2195

26. All documents relating to environmental problems, hazards, or concerns relating to the Opelika quarry.

27. Any and all maps, drawings, plats, surveys, or other similar documents of the quarry or the leased property.

28. Any and all blasting reports and blasting activities at the quarry since Oldcastle assumed control of the quarry.

29. Any and all permits for blasting obtained by or on behalf of Oldcastle or any company performing blasting services for Oldcastle at its Lee County quarry.

30. And and all "pre-blast" inspections of home and/or any knowledge gained by Oldcastle regarding any preexisting pre-blast inspections of homes relating in any way to damages allegedly caused by blasting at the quarry.

31. Any and all information known to Oldcastle regarding the neighbors' complaints of blasting damage.

32. Any and all information known to Oldcastle regarding noise, dust and medical complaints of people in the area surrounding the quarry.

33. Any and all information known to Oldcastle regarding any adverse health effects to humans from breathing any dust or by-product of the quarry operation.

34. Any Complaints and/or Notices of Violations (together with any sanctions or penalties imposed, if any) by any governmental regulatory body.

35. The relocation of the plant equipment at the Lee County Quarry.

36. The replacement of equipment (fixed or mobile) at the Lee County Quarry.

37. All equipment and all equipment component parts (whether fixed or mobile) moved to or placed into service at the Lee County Quarry, including the place or places from which each piece of equipment was obtained or transferred.

38. All information regarding the amount of dust generated by each piece of equipment (and/or component part thereof), whether fixed or mobile, at the Lee County Quarry.

2195

39.    Applications or correspondence to any regulatory agency relating to Oldcastle's intended, actual, or proposed relocation of the plant; the discharge area; or to increase the amount of water pumped from the quarry.

40.    Oldcastle's knowledge of and response, if any, to the June 26, 2003, and to the January 26, 2004, settlement letters from Plaintiffs' attorneys to Hanson's attorneys (including without limitation, whether Oldcastle received such documents and what it did after receiving such documents).

41.    All efforts undertaken by Oldcastle to ascertain the basis for, the truthfulness of, or the validity of the Plaintiffs' claims in the litigation, prior to assuming control of the quarry from Hanson.

42.    The knowledge or information known to Oldcastle regarding the likelihood of sinkhole formation in or around its limestone quarry in Lee County, Alabama.

The deponents are requested to bring with them and testify as to the documents and things requested on Exhibit "A" attached hereto.

The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witnesses.

_C E Vercelli_

CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

2197

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _February_ , 2004.

_C E Vincent_

OF COUNSEL

155-00\Re-Not-Depo--corp.rep-OC.4.wpd

6

2198

## EXHIBIT "A"

In the following requests, the term "document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, floppy disks, CD-ROMS, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed materials readable by humans or machines. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined)  contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

The deponents are  requested to bring with them to the deposition, and to give testimony as to the following documents and things:

1.    All documents related to the negotiation of the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

2.    All documents relating to the terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

3.    All documents related to any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4.    All documents related to any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

5.    All documents responsive to Plaintiffs' First **AND SECOND** Interrogatories and Requests for Production to Oldcastle.

2199

6.    All documents regarding any changes to the manner of operation of the Lee County quarry whether such changes have been implemented or plan to be implemented in the future.

7.    All documents related in any way to any violations of any of Oldcastle's ADEM permits with respect to the Lee County quarry.

8.    All documents related to all mining plans and any document related in any way to a mining plan.

9.    All documents related in any way to dust control activities or problems at the Lee County quarry.

10.    All documents related to discharging of water from the Oldcastle Lee County quarry.

11.    All documents related to sales of materials from the Lee County quarry.

12.    All documents evidencing the number of hours worked by Oldcastle Lee County quarry employees from the date of acquisition to the date of this deposition notice.

13.    All correspondence with ADEM with respect to the Lee County quarry.

14.    All internal memoranda, e-mails, or written documentation of any character relating to complaints by surrounding property owners, the investigation of such complaints, and the resolution, if any, of such complaints.

15.    Please produce all ADEM applications and/or all ADEM permits for this Defendant.

16.    Please produce any and all ADEM reports, including but not limited to, monthly water quality reports

17.    Please produce any and all hydrogeology and engineering reports and/or studies and related documents.

18.    Please produce all environmental reports or studies of any type or description prepared on this Defendant's behalf or on behalf of its predecessor.

19.    All documents related to any and all written or verbal complaints made by any entity against this Defendant. Complaints include, but or not limited to, complaints about noise, dust, blasting, water, trucks, and/or the operation of the quarry in general.

20.    All documents related to any and all pre-quarry and/or pre-purchase property inspections whether prepared on your behalf of on behalf of your predecessor, private property owners, or insurance companies. Please include in your response any and all photographs and any related documents.

21.    All documents related to all sales tax reports and/or quarry mining tax reports filed in Lee County for the years 1999 through the present.

22.    All documents related to all licenses, agreements, contracts, correspondence or other documents that relate to this Defendant's relationship with Dixie Pipeline or any other pipeline company in Lee County, Alabama.

23.    All documents related to any and all reports, studies, complaints, correspondence or other documents concerning or related to sinkholes. This would include, but not be limited to, the possibility of sinkholes forming, sinkholes that have formed, and/or the repair of sinkholes.

24.    All documents related to any and all maps, drawings, plats, surveys, or other similar documents of the quarry or the leased property.

25.    All documents related to any and all studies, reports, complaints, correspondence or other documents relating to Spring Villa. This would include, but not be limited to, the dewatering of Spring Villa, the diversion of Spring Villa water into your quarry and/or the interbasin transfer of water from Spring Villa into your quarry or Chewacla Creek.

26.    All documents related to any actual or alleged environmental problems, hazards, or concerns relating to the Opelika quarry.

27.    All documents related to blasting reports and blasting activities at the quarry since Oldcastle assumed control of the quarry.

28.    All documents related to any and all permits for blasting obtained by or on behalf of Oldcastle or any company performing blasting services for Oldcastle at its Lee County quarry.

29.    All documents related to any "pre-blast" inspections of home and/or any knowledge gained by Oldcastle regarding any preexisting pre-blast inspections of homes relating in any way to damages allegedly caused by blasting at the quarry.

30.    All documents related to any and all information known to Oldcastle regarding the neighbors' complaints of blasting damage.

31.     All documents related to information known to Oldcastle regarding noise, dust and medical complaints of people in the area surrounding the quarry before Oldcastle purchased the quarry and since Oldcastle purchased the quarry.

32.     Any and all information known to Oldcastle regarding any adverse health effects to humans from breathing any dust or by-product of the quarry operation.

33.     All documents related to the receipt by Oldcastle of copies of (or summaries of) the two settlement letters (dated June 26, 2003 and January 26, 2004) from Plaintiffs' lawyers to Hanson's lawyers, which letters were FAXED to the office of Phillip Adams on the late afternoon of February 11, 2004.

34.     All documents related to the actions or other analysis of or consideration of the two settlement letters referenced in the immediately preceding paragraph.

2202

# IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
      Plaintiffs,            )
                                   )
vs.                                )    Civil Action No. CV-20 02-85
                                   )
HANSON AGGREGATES SOUTHEAST,        )
INC., et al.,                      )
                                   )
      Defendants.            )

## NOTICE OF TAKING DEPOSITION

TO:   James A. Byram, Jr.       John V. Denson
      BALCH & BINGHAM, LLP    SAMFORD, DENSON, HORSLEY,
      P.O. Box 78             PETTEY & BRIDGES
      Montgomery, AL 36101    P.O. Box 2345
                                 Opelika, AL 36803-2345

      H. Wayne Phears        Phillip E. Adams, Jr.
      PHEARS & MOLDOVAN    ADAMS, UMBACH, DAVIDSON
      Suite 375            & WHITE, LLP
      4725 Peachtree Corner Circle P. O. Box 2069
      Norcross, GA 30092-3000   Opelika, AL 36803-2069

Please take notice that on Thursday, March 11, 2004 at 9:00 A.M., at the offices of

Phillip E. Adams, Jr., Opelika, Alabama, the Plaintiffs will take the deposition of the **one of**

**the remaining Corporate Representative of Oldcastle Materials Southeast, Inc. (Brian**

**Fowler)**, for the purposes of discovery and impeachment at trial upon oral examination

before a Court Reporter or some other officer authorized by law to administer oaths.

In accordance with Rule 30(b)(6), Defendant Oldcastle is requested to designate one

or more persons with knowledge to testify as to the following matters and to produce for

inspection the **ORIGINALS** of all documents (as defined below) requested as follows:

2203

1. Any information in your possession or subject to your control relating to any other lawsuits against Oldcastle for blasting, dewatering, sinkholes, noise or dust since 1980 in any state in the United States.

2. Knowledge of sinkholes or dewatering claims or problems at any other quarry owned and operated by Oldcastle.

3. The entire file on the Lee County quarry.

4. Any documents, correspondence or e-mails from or to Hanson or any of its Experts relating to the Lee County quarry.

5. Any documents, correspondence or e-mails from or to Oldcastle or any of their Experts relating to the Lee County quarry.

6. Any computer printouts, computer searches, site visits, calculations, photographs, investigatory or other documents relating to the Lee County quarry concerning:

    (a) mineable reserves and/or a mining plan;
    (b) depth of mining needed for this quarry or planned for this quarry;
    (c) pumping or dewatering and volumes or calculations related thereto;
    (d) changes in operation or methods of operation;
    (e) due diligence efforts and documents (whether before or after the sale);
    (f) the request to increase pumping to 10 mgd;
    (g) MSDS sheets on silica or other hazards at the Lee County quarry;
    (h) North American Reserve's list of "Red Flags" in its report of June 30, 2003;
    (i) all hydrogeology and/or engineering reports, studies or documents;
    (j) the dye traces on-going at the Lee County quarry;
    (k) sinkhole problems or formations at the Lee County quarry and the Spring Villa area;
    (l) Spring Villa, the spring at Spring Villa and/or dewatering of this spring; and
    (m) All information (oral or written) and all documents reviewed by you (and all generated by you) in connection with your assistance to Oldcastle in deciding to purchase this quarry (including documents received from any attorneys, from Hanson, or from any other source whatsoever).

2204

7.  The documents and things requested in the Re-Notice of Corporate Representative Deposition attached as Plaintiff's Exhibit 124 to the Heisterkamp deposition.

8.  A current resume or CV.

The term "document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, floppy disks, CD-ROMS, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed materials readable by humans or machines.  To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined)  contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witnesses.

*C E Vercelli*

Charles E. Vercelli, Jr. (VER003)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2200

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
  & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 5ᵗʰ day of _MARCH_, 2004.

_C. E. Vincent_
OF COUNSEL

Notice of Deposition-Brian Fowler.3.wpd

2205

# JAMES B. SPRAYBERRY
### ATTORNEY AT LAW
P.O. DRAWER 2429
AUBURN, ALABAMA 36831-2429
(334) 821-7100
FAX (334) 821-7101

March 30, 2004

Phillip E. Adams, Jr
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

Re:    *Davis, et al vs. Hanson/Oldcastle*

Dear Phil:

We have discussed and/or requested the documents that I have listed below. They fall within the request for production and deposition notices that we have filed. The items we would like are:

1. The Oldcastle Code of Conduct referred to in the depositions;
2. The Silica MSDS sheets and testing results from Oldcastle;
3. Seismograph results/summaries for the Griggs and the Edwards property (I previously wrote and asked for those a short while ago);
4. 3 ½ inch binder from Skelly and Loy and related documents that Brian Fowler reviewed prior to the purchase;
5. The Fowler "notes" that he wrote while on his site visit to Opelika;
6. Fowler's billing for his project number 800-26;
7. The amount of money to be paid by Hanson to Oldcastle if restrictions are put on the operation. This is set out in the Joint Defense Agreement (JDA);
8. Documents from the "Privilege Log" of Oldcastle;
   Page 1 -    10/23/2003 e-mail from Fowler to Heisterkamp
   Page 2 -    None
   Page 3 -    10/9/2003 e-mail from Syr to Heisterkamp
               10/8/2003 e-mail from Fowler to Heisterkamp

1 - Atty. Corresp.
1 - Privilege Log
1 -

2207

Phil Adams, Esq.
March 30, 2004
Page 2

| | |
|---|---|
| Page 4 - | 9/28/2003 e-mail from Heisterkamp to Towe |
| | 9/21/2003 e-mail from Fowler to Heisterkamp |
| | 9/19/2003 e-mail from Heisterkamp to Fowler |
| | 9/17/2003 e-mail from Heisterkamp to Fowler |
| | 9/15/2003 e-mail from Brian Fowler to Bishop |
| | 9/10/2003 e-mail from Heisterkamp to Bishop |
| Page 5 - | 9/3/2003 two e-mails, Heisterkamp to Fowler, Fowler to Heisterkamp |
| Page 6 - | 7/12/2003 e-mail from Ward Nye to Heisterkamp |
| | 7/11/2003 e-mail from Heisterkamp to Bishop & Towe, re: Hanson Closing |
| | 7/11/2003 e-mail from Brian Fowler to Heisterkamp |
| | 7/10/2003 e-mail from Heisterkamp to Hill, re: Hanson deal, Ward Nye |
| | 7/10/2003 e-mail from Fowler to Kochian and Morris Bishop |
| Page 7 - | 7/15/2003 e-mail from John Gillan to Heisterkamp |
| | 7/15/2003 e-mail from Ward Nye to Heisterkamp |
| | 7/15/2003 e-mail from Heisterkamp to Gillan |
| Page 8 - | 7/14/2003 e-mail from Heisterkamp to Bishop, re: Joint Defense |
| | 7/14/2003 e-mail from Gillan to Heisterkamp, re: Joint Defense |
| | 10/16/2003 e-mail from Heisterkamp to Glenn Culpepper and Towe |
| Page 9 - | 7/11/2003 e-mail from Heisterkamp to Bishop and Towe |
| | 7/11/2003 e-mail from Tom Hill to Glenn Culpepper, Fw: Hanson deal - Ward Nye |
| | 7/11/2003 e-mail from Hill to Heisterkamp, re: Hanson deal - Ward Nye |
| | 7/10/2003 e-mail from Heisterkamp to Hill |
| Page 10 - | Undated spreadsheet by Heisterkamp, re: Hanson quarries 2002 (two of these are listed on page 10) |
| Page 11 - | Three undated spreadsheets by Heisterkamp, Hanson deal structure, Hanson quarries 2002 and asset swaps |
| Page 12 - | None |
| Page 13 - | Undated spreadsheet by Heisterkamp on Hanson quarries 2002 |
| Page 14 - | Undated spreadsheet by Heisterkamp shown as Hanson-GAT quarries |
| Page 15 - | All spreadsheets except the first one called "Dodge Forecast" |
| Page 16 - | Undated spreadsheet by Heisterkamp called Hanson-GAT Quarries |
| | 9/19/2003 Fowler to Heisterkamp fax, re: Opelika Dye Test Opinion |
| Page 17 - | Undated spreadsheet by Heisterkamp shown as Hanson Quarries 2002 |

2208

Phil Adams, Esq.
March 30, 2004
Page 3

Page 18 -    9/18/2002 Heisterkamp to Bishop fax
9/30/2002 Murphy to Heisterkamp letter
9/26/2002 Heisterkamp spreadsheet, Hanson Building Materials
reserve bank information
1/18/2002 Heisterkamp spreadsheet Opelika Summary Profit &
Loss

Page 19 -    The first five spreadsheets on that page dated 1/15/2002,
6/27/2001, 3/30/2000, 9/25/2002, 9/25/2002

Page 20 -    10/22/2002 Heisterkamp facsimile to Bishop, re: Hanson History

Please have those documents to us by April 9, 2004. If you decline to produce them, we
will have no choice but to file a Motion to Compel which we would rather not file since these
appear to be documents to which we are entitled.

Very truly yours,

James B. Sprayberry

JBS/ch

cc:    Chip Vercelli, Esq.
Guy Gunter, Esq.
Jim Byrum, Esq.
John V. Denson, Esq.
H. Wayne Phears, Esq.

*Circuit Court No.* CV02-85 *Supreme Court No.* 1040857

# APPEAL

TO

# Supreme Court of Alabama

FROM

MIKE & DONNA DAVIS ETAL-OLDCASTLE MATERIALS SOUTHEAST, INC & HANSON
AGGREGATES SOUTHEAST, INC.                                   *Appellant*

vs.

HANSON AGGREGATES SOUTHEAST, INC ETAL. & CITY OF OPELIKA, CITY OF
OPELIKA UTILITIES BOARD ETAL                                 *Appellee*

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                              )
          Plaintiffs,        )
                              )
vs.                                    )     Civil Action No. CV-20 02-85
                              )
HANSON AGGREGATES SOUTHEAST,           )
INC., et al.,                          )
                              )
         Defendants.        )

## NOTICE OF TAKING DEPOSITION

TO:   James A. Byram, Jr.         John V. Denson
       Balch & Bingham, LLP       Samford, Denson, Horsley,
       P.O. Box 78               Pettey & Bridges
       Montgomery, AL 36101      P.O. Box 2345
                                Opelika, AL 36803-2345

       H. Wayne Phears          Phillip E. Adams, Jr.
       Phears & Moldovan         Adams, Umbach, Davidson
       Suite 375                 & White, LLP
       4725 Peachtree Corner Circle  P. O. Box 2069
       Norcross, GA 30092-3000     Opelika, AL 36803-2069

Please take notice that on February 20, 2004, at 9:00 a.m. (CDT), at the offices of Phillip Adams, Opelika, Alabama, the Plaintiffs will take the deposition of the **Plant Manager of the Oldcastle Materials Southeast, Inc. quarry in Lee County**, for the purposes of discovery and impeachment at trial upon oral examination before a Court Reporter or some other officer authorized by law to administer oaths.

The deponent is requested to bring with him and testify as to the documents and things requested on Exhibit "A" attached hereto. The deposition may be continued from time to time until completed. You are invited to attend and cross-examine the witness.

2210

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

OF COUNSEL:

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _February_, 2003.

OF COUNSEL

155-00\N-Depo-Plant-Manager-OC.4.wpd

2.211

# EXHIBIT "A"

In the following requests, the term "document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, floppy disks, CD-ROMS, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed materials readable by humans or machines. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

1. The negotiation of the purchase or other transfer of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

2. The terms and conditions of any agreements or other documents of any type or description related to the purchase, transfer, or other assumption of the Hanson Aggregates Southeast, Inc., Lee County quarry to Oldcastle Materials Southeast, Inc.

3. Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Gilmer Defendants.

4. Any and all negotiations, discussions, or other agreements between Oldcastle Materials Southeast, Inc. and any representative of the Young Defendants.

212

5.    All documents responsive to Plaintiffs' First Interrogatories and Requests for Production to Oldcastle.

6.    All documents regarding any changes to the manner of operatión of the Lee County quarry whether such changes have been implemented or plan to be implemented in the future.

7.    All documents related in any way to any violations of Oldcastle's ADEM permits with respect to the Lee County quarry.

8.    All mining plans and any document related in any way to a mining plan.

9.    All documents related in any way to dust control activities or problems at the Lee County quarry.

10.    All documents related to discharging of water from the Oldcastle Lee County quarry.

11.    All documents related to sales of materials from the Lee County quarry.

12.    All documents evidencing the number of hours worked by Oldcastle Lee County quarry employees from the date of acquisition to the date of this deposition notice.

13.    All correspondence with ADEM with respect to the Lee County quarry.

14.    All internal memoranda, e-mails, or written documentation of any character relating to complaints by surrounding property owners, the investigation of such complaints, and the resolution, if any, of such complaints.

15.    Please produce all ADEM applications and/or all ADEM permits for this Defendant.

2213

16.    Please produce any and all ADEM reports, including but not limited to, monthly water quality reports

17.    Please produce any and all hydrogeology and engineering reports and/or studies and related documents.

18.    Please produce all environmental reports or studies of any type or description prepared on this Defendant's behalf or on behalf of its predecessor.

19.    Please produced any and all written or verbal complaints made by any entity against this Defendant. Complaints include, but or not limited to, complaints about noise, dust, blasting, water, trucks, and/or the operation of the quarry in general.

20.    Please produce any and all pre-quarry and/or pre-purchase property inspections whether prepared on your behalf of on behalf of your predecessor, private property owners, or insurance companies. Please include in your response any and all photographs and any related documents.

21.    Please produce all sales tax reports and/or quarry mining tax reports filed in Lee County for the years 1999 through the present.

22.    Please produce all licenses, agreements, contracts, correspondence or other documents that relate to this Defendant's relationship with Dixie Pipeline or any other pipeline company in Lee County, Alabama.

23.    Please produce any and all reports, studies, complaints, correspondence or other documents concerning or related to sinkholes. This would include, but not be limited to, the possibility of sinkholes forming, sinkholes that have formed, and/or the repair of sinkholes.

24.    Please produce any and all maps, drawings, plats, surveys, or other similar documents of the quarry or the leased property.

25.    Please produce any and all studies, reports, complaints, correspondence or other documents relating to Spring Villa. This would include, but not be limited to, the dewatering of Spring Villa, the diversion of Spring Villa water into your quarry and/or the interbasin transfer of water from Spring Villa into your quarry or Chewacla Creek.

26.    Please produce all documents relating to environmental problems, hazards, or concerns relating to the Opelika quarry.

27.    Any and all blasting reports and blasting activities at the quarry since Oldcastle assumed control of the quarry.

28.    Any and all permits for blasting obtained by or on behalf of Oldcastle or any company performing blasting services for Oldcastle at its Lee County quarry.

29.    And and all "pre-blast" inspections of home and/or any knowledge gained by Oldcastle regarding any preexisting pre-blast inspections of homes relating in any way to damages allegedly caused by blasting at the quarry.

30.    Any and all information known to Oldcastle regarding the neighbors' complaints of blasting damage.

31.    Any and all information known to Oldcastle regarding noise, dust and medical complaints of people in the area surrounding the quarry.

32.    Any and all information known to Oldcastle regarding any adverse health effects to humans from breathing any dust or by-product of the quarry operation.

6

**EXHIBIT "E"**

2210

## Selected Pages from Heisterkamp Deposition

Page Number                                                                Heisterkamp

94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Motion to Compel Discussed

121, 123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refusal to provide; "take up with Court"

126, 127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fowler opinion: dye test flawed

141 . . . . . . . . . . . . . . . . . . . . . . . . . . . Fowler opinion: quarry not causing holes or dewatering

147 - 149 . . . . . . . . . . . Refusal to give dollar amount in JDA based on instruction of Attorney

160 . . . . . . . . . . . . . . . . . . . . . . . . . . . Written "Code of conduct" discussed but not produced

169 / 170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refuses to discuss due diligence
& what Gibson/Dunn, prior to closing, knew about lawsuit

185 . . . . . . . . . . . . . . . . . . . . . . . . . Knowledge of Gibson/Dunn, prior to closing, about lawsuit?

240 - 249 . . . . . . . . . . . . . . . . . Discussion about failure to produce and defense assertion that
"Attorney Client" is only privilege Oldcastle asserts.

3/1/2004

Frank Heisterkamp

94

1    But I can tell you the reason that
2    I think it has been blacked out is
3    it had financial information
4    regarding quantities and prices
5    and profitability of the quarry.
6    And tell me why you think that's
7    relevant and I'll see if we can --
8    MR. VERCELLI: I don't know if it's
9    relevant or not, I can't see it.
10    That's the problem.
11    MR. ADAMS: Well, I mean, let's assume
12    that what I said is correct, and
13    if it is correct --
14    MR. VERCELLI: I don't know. I'll deal
15    with it later. We'll do a motion
16    to compel the production and we'll
17    just deal with it later.
18  Q.    I'm going to show you Exhibit Number 23 --
19    MR. SPRAYBERRY: Bates 23?
20  Q.    Bates 23 through 27, can you tell me what was
21    in that document that wasn't provided to us,
22    since it was also redacted, much of the
23    document there?

95

1  A.    This is correspondence from Hanson to Morris
2    Bishop attaching a similar type summary sheet
3    to describe the documentation that was sent
4    from Hanson to Oldcastle as a result of our due
5    diligence request.
6  Q.    Okay. What kind of information was sent
7    though; a summary of what?
8  A.    If you look in the column "Category," it says,
9    "Permits." If you look at the Category
10    Description, you will see "ALA Air Permit
11    Number 2060026603." Five pages regarding the
12    Opelika site were sent from Mr. Butler to
13    Mr. Bishop on the transmittal date of the 12th
14    of May, 2003. That's all that this paper says.
15  Q.    So where are the five pages that are referenced
16    here, like on that first line? Were they
17    produced?
18  A.    Well, they are the permits for Opelika. And I
19    believe the permits for Opelika were produced
20    to you.
21  Q.    By Oldcastle or by Hanson?
22  A.    One or the other; I don't know.
23    MR. ADAMS: Aren't I looking at one

96

1    here? This is the application for
2    the permit.
3  A.    And I'm not sure that we were asked for the
4    permits, to produce them. Did you ask us to
5    produce the permits?
6  Q.    Yes. I will show you Exhibit 36, 37 -- well,
7    Bates 36, 37, this is another redacted sheet,
8    part of what they did produce references
9    internal safety inspection reports. Were those
10    produced to us; do you know?
11  A.    I can't say for sure. I don't visualize the
12    document just by reading this and I can't know
13    for sure. I did not identify this.
14  Q.    Right. Did Oldcastle have a lease with the
15    Youngs when it assumed operation of the quarry
16    on July 13th?
17  A.    I hope we did.
18  Q.    I'm sorry?
19  A.    I hope we did.
20  Q.    The reason I ask that is Mr. Denson had
21    indicated that they did not, so I'm curious --
22    MR. DENSON: I object to that. That's
23    not my allegation.

97

1    MR. VERCELLI: Well, we had asked for
2    the production of documents and
3    none were produced in response to
4    that. I thought you said they
5    didn't have one with the Youngs.
6    MR. DENSON: No, I've never said that.
7    I've never been asked to produce a
8    lease.
9  Q.    Do you know the answer to the question of
10    whether or not the Youngs and Oldcastle had an
11    operational lease at the time that they assumed
12    the quarry in July?
13  A.    To the best of my knowledge, we did. We
14    assumed both leases that Hanson had, both with
15    the Youngs and the Gilmers, at closing.
16  Q.    Do you know whether there was a separate
17    document of assumption for those leases?
18  A.    I don't know for sure. I would guess there
19    was, because that's how you assume leases.
20  Q.    Did you-all produce to -- did Oldcastle produce
21    to us all of the closing documents except what
22    might have been redacted based on financial
23    information?

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

5caea106-2811-4007-baae-d22f203862c6

118

```
 1              know, there is more than --
 2         MR. VERCELLI: The federal one, yeah.
 3         MR. ADAMS: Well, yeah, but there are
 4              many different plaintiffs involved
 5              in the Opelika matter and I think
 6              maybe that's --
 7  Q.   Is that your understanding?
 8  A.   Yes.
 9  Q.   The lawsuits plural applied to --
10  A.   The situation -- the JDA was supposed to
11       address the situation we found regarding the
12       Opelika quarry.
13  Q.   So the JDA doesn't apply to any of the other
14       quarries other than Opelika?
15  A.   No.
16  Q.   All right. Look at B, I presume that's 8B,
17       "Notwithstanding Section 8A, Oldcastle will be
18       solely responsible for all such costs of
19       defense with respect to," dah, dah, dah, "two,
20       any new claims that are added to the lawsuits."
21       How are y'all going to interpret new claims?
22       What constitutes a new claim?
23  A.   I don't know that I understand the question.
```

119

```
 1  Q.   All right. Well, it's referencing any new
 2       claims that are added -- "Oldcastle will be
 3       solely responsible for all costs of defense
 4       with respect to, two, any new claims that are
 5       added to the lawsuits." What I'm wondering is,
 6       what exactly does that mean? What would you
 7       consider a new claim?
 8  A.   I would believe that to mean a claim other than
 9       the Davis lawsuit.
10  Q.   All right. For example, let's assume that new
11       sinkholes develop on one of the existing
12       plaintiffs' properties, as they have in the
13       last week, some more sinkholes have developed;
14       are those new claims or are those considered
15       not new climbs under this JDA?
16         MR. DAVIDSON: Object to the form.
17  A.   I don't know that any sinkholes have developed
18       over the last week, as you said.
19  Q.   Well, I want you to assume that fact, okay?
20       Assume that new sinkholes have developed within
21       the last week or so on Donnie Smith's property,
22       some of which you-all and us were not aware of
23       until today, really. Assuming that's true,
```

120

```
 1       does that constitute a new claim added to the
 2       lawsuit?
 3         MR. DAVIDSON: I think that's -- I
 4              mean, we're going to argue with
 5              each other about that, but he's
 6              not going to give you a legal
 7              answer about --
 8         MR. ADAMS: Chip, I can tell you what
 9              our legal advice is going to be if
10              the hypothetical -- I don't think
11              this witness knows. Our position
12              is, what caused it? And our
13              position is going to be, it's not
14              our client's fault.
15         MR. VERCELLI: Okay.
16  Q.   Let me ask a question like this; are you
17       certain that there's no interpretive document
18       somewhere, or a series of correspondence or
19       e-mails between either lawyers or parties, that
20       address some of the questions about how to
21       interpret this docuemnt?
22  A.   Yes.
23  Q.   There are such documents?
```

121

```
 1  A.   No. You asked me whether I'm sure that there
 2       isn't.
 3  Q.   Okay.
 4  A.   And the answer is yes, so that means there
 5       aren't.
 6  Q.   Now, those e-mails that you referenced earlier
 7       when you said there was a stack of e-mails or
 8       words to that effect?
 9  A.   Yeah.
10  Q.   What do those e-mails deal with?
11  A.   I sent all my e-mails that I had communicated
12       to and from Hanson in this entire acquisition
13       of the seven quarries that we talked about
14       earlier to our attorneys. It was all of the
15       e-mails that I had generated during that time.
16  Q.   Okay. And did any of those e-mails deal with
17       this Hanson lawsuit?
18  A.   I'm not entirely sure. I would say a few
19       probably did.
20  Q.   What is the sum that's deleted in paragraph 9C?
21         MR. ADAMS: We instruct you not to
22              answer that question.
23         MR. VERCELLI: Okay. And your basis
```

31 (Pages 118 to 121)

122

1    for that is?
2    MR. ADAMS: It's none of your business.
3    MR. VERCELLI: Okay. Do you have a
4        little more legally refined manner
5        of saying that?
6    MR. ADAMS: Well, I mean, what -- it's
7        not relevant. It's immaterial to
8        any of the issues in this case.
9        It has no probative value toward
10       anything. It's just completely
11       immaterial. It's not going to
12       lead you to any relevant
13       information.
14   MR. VERCELLI: Okay. What about the
15       fact that it affects the
16       credibility of the witness and the
17       parties, as it clearly does?
18   MR. ADAMS: Well, what difference would
19       it make if it was ten dollars or a
20       hundred million dollars?
21   MR. VERCELLI: I think it would make a
22       big difference on the credibility
23       of the witnesses.

123

1    MR. ADAMS: Why? Do you mean the lower
2        the better for you or the higher
3        the better for you?
4    MR. VERCELLI: I don't know, but I
5        would like to know one way or the
6        other.
7    MR. ADAMS: Well, we will just have to
8        take that up with the court.
9    MR. VERCELLI: Okay.
10       (Off-the-record discussion.)
11   Q.  Have you ever been sued before for any reason?
12       MR. WHITE: Are you talking about him
13           personally?
14   Q.  Personally?
15   A.  Me personally?
16   Q.  Yes.
17   A.  No.
18   Q.  Have you ever been involved in a lawsuit other
19       than in your official capacity as an attorney?
20   A.  No.
21   Q.  Okay. Have you ever been arrested for any
22       reason?
23   A.  No.

124

1    Q.  Do you personally belong to any type of an
2        organization or club in Lee County, Alabama?
3    A.  No.
4    Q.  Do you know whether Oldcastle, as a
5        corporation, belongs to any clubs or
6        organizations in Lee County?
7    A.  I don't know that.
8    Q.  Okay. Have you ever been treated for drug or
9        alcohol problems?
10   A.  No.
11   Q.  Before the lunch break we were talking about
12       the July 10th telephone conversation?
13   A.  Uh-huh. (Positive response.)
14   Q.  Tell me, please, the essence of the
15       conversation, as you recall it.
16       MR. WHITE: Let me object to the form.
17           Do you want to ask him what he
18           remembers of what was said?
19       MR. VERCELLI: Well, I want to start
20           out kind of generally, then I will
21           ask him everything he can remember
22           if necessary.
23       MR. WHITE: There might be -- go ahead,

125

1        I'm sorry.
2    A.  The essence of the conversation was that we had
3        just received a copy of the -- what we refer to
4        as the settlement letter, which is your letter
5        of -- I forgot the date, June 26th. And my
6        main purpose for the conference call was to
7        find out from Hanson, as much as I possibly
8        could, about the background of the lawsuit and
9        the serious allegations that were made in the
10       letter.
11   Q.  What did they tell you?
12   A.  I don't remember any specific details. What I
13       remember in general was that they told us about
14       the various plaintiffs and their claims and the
15       investigations that both plaintiffs and
16       defendants had conducted in connection with the
17       lawsuit.
18   Q.  Did they tell you the results of the
19       investigations?
20   A.  As far as I can remember now, they told us
21       about -- they told us about a dye test that had
22       occurred. I think that's probably all I
23       remember at this time.

32 (Pages 122 to 125)

**126**

1  Q.  What did they tell you about the dye test?
2  A.  At that phone call what was said about the dye
3      test was that the plaintiffs had conducted a
4      dye test that was basically flawed, yeah.
5  Q.  How was it flawed? Did they tell you?
6  A.  To the best of my recollection, they said that
7      the findings were inconclusive of the dye test
8      because of the way it was conducted and the
9      results were taken.
10 Q.  "Were taken," I'm sorry, what do you mean by
11     that?
12 A.  You know, I suggest you ask these details more
13     to Brian Fowler, who is our engineer in that
14     regard. My understanding at the time was that,
15     you know, different dye material was placed at
16     different locations, and one of it had shown up
17     after a certain time, and then time expired and
18     something else had shown up later. And I was
19     told, it was confirmed by our engineers, that
20     the way these tests were conducted and the
21     types of dye that were used were not conclusive
22     evidence of dewatering of the pit and causing
23     sinkholes, dewatering Little Uchee Creek, and

**127**

1      so forth.
2  Q.  And what engineer told you that?
3  A.  Brian Fowler.
4  Q.  Mr. Fowler, does he work -- is he an Oldcastle
5      employee or is he the fellow with North
6      American or whatever they call that?
7  A.  He's the principal of North American Reserves.
8      He's not an Oldcastle employee.
9  Q.  Does Oldcastle have a geologist on staff?
10 A.  There's no geologist that works out of our head
11     office in Washington, D.C.
12 Q.  What about for Oldcastle Materials Southeast?
13 A.  That I don't know. I don't know whether they
14     have a geologist on staff there.
15 Q.  Okay. The way you've answered that to me is a
16     hedge; we don't have one in D.C., okay?
17         MR. WHITE: Object to the form and move
18         to strike?
19         MR. DAVIDSON: Whatever this is going
20         to be.
21 Q.  That's fine. But I'm telling you that to
22     explain my next question, okay? My question
23     is, Oldcastle, whether it's Southeast or

**128**

1      Oldcastle, Inc., is a mining company that mines
2      rock. It's incredulous that Oldcastle wouldn't
3      have geologists employed by Oldcastle, to me,
4      okay? So I guess my question is, does
5      Oldcastle employ geologists?
6          MR. DAVIDSON: I move to strike all of
7          that. And if we can talk about
8          the question, I may have to object
9          to it, too. State your question,
10         Chip, so he can try to answer it.
11 Q.  Does Oldcastle employ geologists?
12 A.  Oldcastle Materials, Inc. is ultimately a
13     holding company for a variety of subsidiaries
14     operating in the mining business throughout the
15     United States. There's no geologist on staff
16     by Oldcastle Materials, Inc. in Washington,
17     D.C. What I'm not sure about is what the
18     situation is in the various subsidiaries in the
19     various regions and states where we have
20     operations and whether these individual
21     companies have any geologists on staff.
22 Q.  Okay. Is the only geologist then that you, on
23     behalf of Oldcastle, consulted, prior to

**129**

1      purchasing this Opelika quarry, Mr. Fowler?
2  A.  Yes.
3  Q.  And how many trips to Alabama to the Opelika
4      quarry did Mr. Fowler make prior to the
5      purchase?
6  A.  I don't know.
7  Q.  Do you believe he made more than two?
8  A.  I don't believe anything. I don't know.
9  Q.  Did he ever give you a written report of any
10     type about the Lee County quarry?
11 A.  Yes.
12 Q.  Was that document or documents produced to us?
13 A.  Isn't that what we discussed the last time?
14 Q.  I don't know. If we did, remind me, I'm sorry.
15     By last time, do you mean in Mr. Reynolds'
16     deposition?
17 A.  Yes.
18 Q.  Give me your answer, if you can, please.
19 A.  During Mr. Reynolds' deposition we talked about
20     it off the record, so I'm not sure what to do
21     now.
22 Q.  Tell me what you understand about whether or
23     not Fowler gave you a written report or

33 (Pages 126 to 129)

3/1/2004                                                        Frank Heisterkamp

---

138

1   A.   It would be Ted Reynolds or Brian Fowler.
2   Q.   As a result of your conversations, what did you
3        determine to do to address the noise
4        complaints?
5   A.   Again, that was similar to the other two
6        issues. We felt that we ought to be able to
7        change the operations around so much that there
8        wouldn't be any harmful noise emissions into
9        the neighborhood.
10  Q.   And the big change there is that you're putting
11       the plant in the pit instead of on the surface?
12  A.   I guess that's part of it, yes.
13  Q.   What's the other part of it?
14  A.   The type of the plant could be another part; I
15       don't know. I'm not an expert enough to know.
16  Q.   Who would know the answers to that?
17  A.   Ted Reynolds and Brian Fowler. And I believe
18       Ted already spoke to that.
19  Q.   All right. Currently, or at least since July
20       13th, there was a plant -- we've been calling
21       it a plant, a rock crusher and related
22       conveyors and such, that have been situated
23       exactly where they were when Hanson had the

139

1        quarry, right?
2   A.   It's the Hanson plant, yes.
3   Q.   And that's still in operation, unless within
4        the last few days they've turned it off and
5        made the other one operational?
6   A.   Correct.
7   Q.   Then you've got a plant that's inside the pit
8        now that's a newer plant?
9   A.   Correct.
10  Q.   Erected on site?
11  A.   Yes.
12  Q.   Is there a third plant or a second, depending
13       on how you want to look at it, an agricultural
14       lime plant?
15  A.   No.
16  Q.   Is there proposed to be another plant there?
17  A.   At some stage we considered putting an ag lime
18       or agricultural lime plant in there, but that
19       plant has not been set up at the quarry.
20  Q.   Is it going to be set up?
21  A.   I believe that SRM Aggregates still has the
22       plan to set up an agricultural lime plant at
23       the quarry.

140

1   Q.   Where is that ag lime plant going to be placed?
2   A.   I don't know.
3   Q.   According to this document at page 1554, the
4        North American Reserve document, "An
5        agricultural lime plant is scheduled to be
6        erected at the overburden storage area in the
7        near future." Does that help? Does that
8        refresh your memory?
9   A.   No.
10  Q.   Do you know where the overburden storage area
11       is?
12  A.   I do not know where the overburden storage area
13       is that this report refers to.
14  Q.   Okay. Is there something other than this
15       report that will -- in writing that will
16       identify where they intend to put this ag lime
17       plant?
18  A.   Not to my knowledge. I guess you will have to
19       ask Morris Bishop or Ted Reynolds.
20  Q.   Okay. Ag lime, that's used in road preparation
21       and you spread it on fields in order to affect
22       the pH of the land and all of that, isn't it?
23  A.   It's -- as far as I know, and, again, I'm not

141

1        an expert there, it's a more powdery product
2        used in the agricultural industry.
3   Q.   Okay. As a result of your internal telephone
4        conversations, what did you determine to do to
5        address the issue of sinkhole formation, I
6        think is the way you said it?
7   A.   I had asked Brian Fowler to investigate the
8        allegations regarding sinkholes, dewatering of
9        Little Uchee Creek and Spring Villa. And I was
10       told by Mr. Fowler that, based on his findings
11       and investigations that he had conducted, he
12       did not believe that the operation of the
13       quarry would cause the formation of sinkholes
14       or dewater the creek and the spring.
15  Q.   What did he base that opinion on?
16  A.   You would have to ask him.
17  Q.   Did he share with you any particular
18       information that he based that opinion on?
19  A.   I believe he had, to the best of my knowledge,
20       various conversations with Hanson, their
21       technical staff and maybe their experts, but
22       I'm not sure about that.
23  Q.   Do you know whether he reviewed any written

---

36 (Pages 138 to 141)

Ricky L. Tyler                          Montgomery Reporting Service
(334) 262-3331                               (877) 834-6048

5caea106-2811-4007-baae-d22f203862c6

146

1      MR. WHITE: Didn't we talk about this
2      this morning?
3      MR. VERCELLI: Indirectly.
4  A.  I don't understand.
5  Q.  All right. Let me ask you this -- let me
6    rephrase my question. If the quarry is
7    enjoined and is determined to be shut down by
8    the judge as a result of this litigation, --
9  A.  Yes.
10  Q.  -- what is -- tell me, please, what happens
11    between Oldcastle and Hanson about that?
12      MR. DAVIDSON: To the extent that is in
13      what is protected and we haven't
14      produced, I don't think he --
15      MR. WHITE: We produced that in the --
16      MR. VERCELLI: Well, I know. It's also
17      a wordy type of document. I want
18      his understanding of what happens.
19      MR. WHITE: Well, his understanding of
20      what is going to happen is
21      irrelevant, because the document
22      is what controls that.
23      MR. DAVIDSON: This is what's going to

147

1      happen right here.
2      MR. VERCELLI: Okay.
3  A.  It's my understanding, and it's the agreement
4    between the parties, that Oldcastle takes the
5    risk of injunctive relief, as we refer to it,
6    of the quarry. So if we operate the quarry in
7    a way that causes sinkhole, causes harm, and is
8    ultimately led to be shut down, that's going to
9    be our problem.
10  Q.  Hanson doesn't have to pay anything or no
11    repercussion to Hanson whatsoever?
12  A.  There is a financial repercussion to them.
13  Q.  Okay. What is that financial repercussion?
14      MR. WHITE: Object to the form.
15      MR. DAVIDSON: We're not going to
16      disclose that.
17  A.  I was instructed by my attorney, Phil Adams,
18    earlier not to answer that.
19  Q.  Okay. That financial repercussion, does it
20    take the form of a payment of some amount of
21    money?
22  A.  Yes.
23  Q.  The amount of money invested by Hanson in the

148

1    quarry to change its operational -- I said
2    Hanson, didn't I?
3      MR. DAVIDSON: Yes.
4  Q.  Let me start over. The amount of money that
5    Oldcastle has spent on the quarry to change the
6    manner of its operation, do you know
7    approximately how much that is?
8  A.  Yes.
9  Q.  What is that?
10  A.  I believe that we have spent to date, to the
11    best of my knowledge, almost five million
12    dollars. We're planning to spend another two.
13  Q.  Of that amount, how much is on the plant in the
14    pit?
15  A.  Well, it's kind of all on the plant and the
16    pit, I don't understand the -- it's all in the
17    plant and the pit.
18      MR. WHITE: Did you say the plant in
19      the pit?
20      MR. VERCELLI: The plant in the pit,
21      I'm sorry.
22  A.  Oh.
23  Q.  How much of that money relates to the plant

149

1    being constructed in the pit?
2  A.  The cost for the plant, my best recollection,
3    is 1.2 million dollars, which would be
4    excluding any cost for setting it up, which is
5    significant.
6  Q.  Okay. The amount that Hanson is going to pay
7    to Oldcastle, is that amount sufficient to
8    reimburse Oldcastle for the amount that
9    Oldcastle is spending on the operational
10    changes to the quarry?
11      MR. WHITE: Object to the form.
12  A.  That's the same as before, I was instructed not
13    to answer that.
14  Q.  I understand. I have to ask so that I will
15    have the record so the judge can determine
16    whether to make you answer the question.
17  A.  Okay.
18  Q.  Now, the July 11th and July 12th conversations
19    that you've told me about, the internal
20    conversations were between you and Mr. Bishop
21    and Mr. Fowler?
22  A.  (Witness nods head in the affirmative.)
23  Q.  Any other parties?

158

1  A.   I have no other information than Mr. Reynolds,
2       no.
3  Q.   Now, you mentioned also that you will certainly
4       monitor pumping and water levels and everything
5       that's required in that regard; what did you
6       mean by "required in that regard"?
7  A.   I guess what I meant to say was that we will
8       monitor all emissions that can possibly be
9       created as a result from the operation of the
10      quarry.
11 Q.   Okay.
12 A.   In particular the ones raised in the allegation
13      letter I referred to earlier, dust, noise,
14      vibration.
15 Q.   Okay. How are you monitoring for dust
16      emissions?
17 A.   Again, I refer to Mr. Reynolds' deposition.
18 Q.   Do you have any knowledge different than what
19      Mr. Reynolds testified about?
20 A.   No.
21 Q.   Would anyone with Oldcastle have any additional
22      or different knowledge than that which
23      Mr. Reynolds talked about?

159

1  A.   I doubt that, no.
2  Q.   He would be the best person in your opinion?
3  A.   Yes.
4  Q.   With respect to noise, would anybody have more
5       or better or different knowledge than
6       Mr. Reynolds? And I'm talking about
7       Oldcastle-related people.
8  A.   I wouldn't think so.
9  Q.   With respect to the discharge of water and the
10      monitoring of discharge of water from the
11      quarry pit, would anyone at Oldcastle have any
12      better or different information than
13      Mr. Reynolds testified about?
14 A.   I can't think of any, no.
15 Q.   Now, does Oldcastle Materials Southeast, Inc.,
16      or Oldcastle Materials, Inc., have a
17      department, a division, or a person whose job
18      it is to ensure that Oldcastle complies with
19      environmental rules and regulations?
20 A.   We all have to make sure that we comply with
21      environmental rules and regulations. So I
22      guess I don't know --
23 Q.   Well, do you have any particular person or any

160

1       particular department whose primary duties are
2       to ensure compliance with environmental rules
3       and regulations?
4  A.   You've asked me that with regard to Oldcastle
5       Materials Southeast and Oldcastle Materials,
6       Inc. With regard to Oldcastle Materials
7       Southeast, Inc., this responsibility, I
8       believe, falls within Ted Reynolds, I believe
9       Todd Wheeler, the professional engineer, and
10      probably also Morris Bishop, the ultimately
11      responsible President, to ensure that there's
12      full compliance with all environmental rules
13      and regulations.
14          With regard to Oldcastle Materials, Inc.,
15      there's no particular person who's charged with
16      environmental compliance in our D.C. office.
17      We all sign codes of conduct and have to -- and
18      are constantly held to high standards on
19      environmental compliance, but there is no
20      individual person who is in charge of that.
21 Q.   Since you've been with Oldcastle, are you aware
22      of whether Oldcastle has had any adverse
23      verdicts in the United States against it

161

1       related to alleged sinkhole problems?
2  A.   I'm not aware of any.
3  Q.   Who would know the answer to that?
4           MR. WHITE: Are we talking about
5       Oldcastle, Inc., Oldcastle
6       Materials?
7           MR. VERCELLI: I'm talking really about
8       any of the Oldcastles.
9           MR. DAVIDSON: There's only two --
10      well, go ahead.
11          MR. VERCELLI: No, I'm talking about in
12      the United States, so there is
13      more than two.
14          MR. DAVIDSON: Well, there is a lot of
15      subsidiaries, but it is not
16      necessarily Oldcastles.
17 Q.   Just to make sure, I think we're communicating,
18      but I'm talking about any of the Oldcastle
19      companies in the U.S.
20 A.   I understand that.
21          MR. WHITE: You're asking who might
22      know that information?
23          MR. VERCELLI: Yes.

166

1 better knowledge?
2 A.  Well, we are in the middle of investigating the
3 current status of the quarry and what is going
4 to be the best way in the future to operate the
5 quarry in an environmentally friendly way.  So
6 after all of these reports are finalized, it
7 may be that somebody else has knowledge about
8 this.  At the moment I would say Mr. Reynolds
9 is best informed about this.
10      (Off-the-record discussion.)
11 Q.  Okay.  I'm going to show you Oldcastle 751;
12 it's one of the documents y'all produced, y'all
13 being Oldcastle.  This is dated July the 3rd.
14 The second page of that document references the
15 Davis lawsuit, okay?
16      MR. BYRAM:  What is the document?
17      MR. VERCELLI:  It is Oldcastle
18          production document 751 and 752.
19      MR. DAVIDSON:  July 3rd letter to Jeff
20          Kochian at Gibson Dunn.
21 Q.  It states on the very top with respect to the
22 Hanson lawsuits, "Tort action and companion
23 federal declaratory judgment action at Opelika

167

1 previously discussed in depth with Oldcastle
2 principals."  And this is dated July the 3rd.
3 First of all, when was it discussed in depth
4 with Oldcastle principals on or before July the
5 3rd?
6 A.  I have no idea.
7 Q.  Do you know which principals they're speaking
8 of?
9 A.  Well, they must be speaking of either myself or
10 Tom Hill.
11 Q.  Do you recall any such conversations on or
12 before July the 3rd?
13 A.  As I said earlier, other than the conversation
14 at the end of May with Ward Nye when there was
15 a general reference to the lawsuit, there were
16 no other conversations about this.
17 Q.  This letter is signed by a Mr. Gillan, Division
18 Counsel for Hanson Aggregates, and it's being
19 sent to Jeffrey Kochian?
20 A.  Yes.
21 Q.  Who is Oldcastle's lawyer at Gibson Dunn,
22 right?
23 A.  He's a transaction lawyer at Gibson Dunn, yes.

168

1 Q.  Okay.  He references a discussion in depth.
2 The conversation you told me about in late May
3 with Mr. Nye you would not, and did not,
4 characterize as in-depth?
5 A.  And I would not.
6 Q.  Okay.  So do you have any idea what
7 conversation these people are talking about in
8 this letter?
9 A.  No.
10 Q.  Who would know that; Mr. Kochian, I guess?
11 A.  No.  I guess the sender of the letter, which is
12 Mr. Gillan.
13 Q.  Okay.  Did your lawyers at Gibson Dunn have
14 other or additional conversations with Hanson
15 or Hanson lawyers regarding this Davis lawsuit
16 about which they reported to you prior to the
17 closing?
18      MR. WHITE:  Objection.  That's
19          attorney/client privilege, what
20          his lawyers may have told him
21          about this lawsuit.
22      MR. VERCELLI:  I disagree for the
23          reason that this relates to the

169

1 due diligence efforts and the
2 purchase of the quarry.  But to
3 the extent you may or may not be
4 right, I'm not asking for the
5 communication, I'm asking for the
6 fact of whether there was a
7 communication.
8      MR. WHITE:  That's still protected.
9 A.  I'm confused.  I don't understand the question.
10      MR. WHITE:  Whether or not they
11          communicated about it and to what
12          extent is protected by the
13          attorney/client privilege, and we
14          instruct him not to answer.
15      MR. VERCELLI:  Okay.  Are you saying
16          that you're not going to let him
17          answer whether or not the lawyers
18          reported to the principals at
19          Oldcastle relating to this lawsuit
20          prior to the closing of the
21          transaction?
22      MR. WHITE:  That's exactly what -- any
23          communications that took place

43 (Pages 166 to 169)

---

170

1    between Oldcastle and their
2    attorneys regarding this lawsuit
3    is privileged communications.
4    MR. VERCELLI: And you're not going to
5    let him answer questions about it?
6    MR. WHITE: Yes.
7    MR. DAVIDSON: And the fact of it, too.
8    I mean, the fact that there was a
9    communication.
10   MR. WHITE: That's right.
11   MR. VERCELLI: I just want to make sure
12   we're clear when we go to the
13   judge on that.
14   MR. DAVIDSON: Certainly.
15   Q.   Okay. This document, Oldcastle 752, the same
16   letter, references item 7B, "A substantially
17   identical summary of the Mike Davis matter was
18   listed in the last audit letter." What summary
19   is this referring to, and what audit letter is
20   it referring to?
21   A.   I have no idea.
22   Q.   Have you seen any such audit letter or summary?
23   A.   No.

---

171

1    Q.   Okay.
2    A.   Can we take a break while you do that?
3    Q.   Sure.
4         (Recess.)
5    BY MR. VERCELLI:
6    Q.   Okay. Earlier you reported that -- in answer
7    to one of the questions earlier, we were
8    talking about Mr. Fowler, you said in essence
9    that Mr. Fowler's -- Mr. Fowler reported to you
10   that it was unlikely that all of these matters
11   were caused by the allegations -- let me start
12   over. That's just a bad question. I've got to
13   start that one all over.
14        As I understand it, Mr. Fowler reported to
15   you, and perhaps others at Oldcastle, that the
16   allegations of the Davis suit, as it relates to
17   the formation of sinkholes, drying up of the
18   Little Uchee, drying up of Spring Villa, were
19   not, in his opinion, correct?
20   A.   He didn't believe, based on his investigation
21   and findings, that the operation of the quarry
22   caused these allegations, sinkholes, Little
23   Uchee Creek and the spring.

---

172

1    Q.   Did he believe that any of them were caused by
2    the operation of the quarry? If not all of
3    them, were any of them caused by the operation
4    of the quarry in his opinion?
5    A.   As far as I remember, it was none of them.
6    Q.   Do you believe that the attorneys, Gibson Dunn,
7    that you had assisting you on the purchase of
8    the Opelika quarry had more or better
9    information relating to the allegations of the
10   Davis suit than you received?
11   A.   No.
12   Q.   We talked about the Skelly and Loy and the
13   aquaFUSION reports a little while ago; whose
14   responsibility was it to review or to analyze
15   those?
16   A.   Brian Fowler.
17   Q.   And Mr. Fowler was part of the team for this
18   acquisition, right?
19   A.   Absolutely.
20   Q.   Does Oldcastle, or any of the Oldcastle
21   companies that you're aware of, have a written
22   environmental policy of any type?
23   A.   I believe that our separate and individual

---

173

1    operations in the various regions that we
2    operate in have their own environmental
3    policies that they adhere to.
4    Q.   Do you know where we can get a copy of that
5    policy for Oldcastle Materials Southeast?
6    A.   I am not sure. I'm not exactly sure who
7    exactly would have that. I would ask
8    Mr. Bishop.
9    Q.   Okay.
10   A.   Or -- yeah, Mr. Bishop.
11   Q.   Does Oldcastle, or any subsidiary of Oldcastle
12   Materials, Inc., maintain a website?
13   A.   Yes, we have a website.
14   Q.   Okay. Who has the website? Does each company
15   have their own or is it one big website that's
16   intended to cover everybody?
17   A.   I'm not entirely sure. I'm not the expert on
18   the websites that we have. As far as I know,
19   there is an Oldcastle Materials website with
20   links to some of our individual subsidiaries.
21   Q.   What is that website address?
22   A.   My best guess is oldcastlematerials.com.
23   Q.   Does Oldcastle Materials, Inc., or any of the

---

44 (Pages 170 to 173)

**182**

1   made relative to the prior draft and this is
2   just a clean version of the second draft.
3   Q.   All right. That being 796. And is 796 the
4   final signed version? It does not have
5   signatures on it, but is that the final signed
6   version; do you know?
7   A.   I don't know.
8   Q.   Okay.
9   A.   I believe we produced a final signed version to
10   you.
11       MR. SPRAYBERRY: You were on a roll and
12       it should be right there.
13       MR. VERCELLI: 813.
14   A.   Here, is that what it says? 813 you're looking
15   for?
16   Q.   Yeah, but that's not a signed version.
17       MR. SPRAYBERRY: Well, it's in that
18       group, it's 813 through 835. It's
19       in there, I think.
20   Q.   All right. Let me get to that in just a
21   minute, but while we're on this one, let me ask
22   you a couple of questions. Version one lists
23   CRH Oldcastle Materials Group, Inc., who is

**183**

1   that?
2   A.   I have no idea. It's the wrong name.
3   Q.   Okay. None of the Oldcastle companies is
4   called CRH Oldcastle Materials Group, Inc.?
5   A.   There is no, no. I believe what they meant was
6   Oldcastle Materials, Inc. And they still got
7   it wrong, because the ultimate buyer was
8   Oldcastle Materials Southeast, Inc.
9   Q.   Right. Because it was wrong on the second
10   version as well, right?
11   A.   It could well be that there was another two
12   versions afterwards; I don't know.
13   Q.   Okay. I'm going to show you 817 and 818,
14   that's another version of the Asset Purchase
15   Agreement.
16       MR. SPRAYBERRY: What are we on, 817?
17   Q.   817 and 818. But that one is not signed
18   either. Do you know if that's the final
19   version?
20   A.   I don't know. Let me just have a quick look.
21   Q.   Sure. It's still got the wrong company?
22   A.   I hope it's wrong, because otherwise I was
23   wrong. I am not sure. All I can offer is that

**184**

1   I give you -- that I make sure I produce the
2   final signed version of it.
3       (Off-the-record discussion.)
4   Q.   All right. What I'm referring to now is
5   Oldcastle 1 and 2. On Oldcastle 2, that refers
6   to, number seven there, "copies of any water or
7   test well drilling logs;" did y'all, Oldcastle,
8   receive those prior to the purchase?
9   A.   Everything you see listed on List A in this
10   document, the recipient of that was Brian
11   Fowler.
12   Q.   Okay.
13   A.   So I guess Brian Fowler is the person who would
14   have received them, if he received them.
15   Q.   And you don't know whether he did or not?
16   A.   No.
17   Q.   Okay. And do you know whether he received
18   number eight or nine on here?
19   A.   I know nothing about List A.
20   Q.   Okay. 4, which is List C, these are requests
21   by the law firm, right?
22   A.   (Witness nods head in the affirmative.)
23   Q.   Do you know whether the law firm received these

**185**

1   documents requested, or, if so, when?
2   A.   I don't.
3   Q.   Who at that law firm would know?
4   A.   The transaction lawyer was Jeff Kochian, he
5   reports to Steve Shoemate, he would know.
6   Q.   Okay. Would the attorneys have reported the
7   information that they received -- no, let me
8   rephrase that. I'm going to presume that the
9   lawyers got at least some of the documents that
10   they requested on that list; that may be false,
11   but I want to presume they got at least some of
12   them. Did the lawyers summarize or report to
13   you or anyone else at Oldcastle that which they
14   did receive?
15       MR. WHITE: Object, instruct him not to
16       answer, attorney/client privilege.
17       MR. VERCELLI: Well, I'm not asking for
18       the actual communication, just the
19       fact of whether he reported it.
20       MR. WHITE: Instruct him not to answer.
21       I mean, you can do a motion to the
22       court. We're not going to answer
23       any questions about communications

47 (Pages 182 to 185)

238

1  A.  Why don't I do it when I give you the responses
2     so I'm probably more accurate than if I just do
3     it now?
4  Q.  Okay. And I will ask you to do the same thing
5     with respect to Oldcastle Materials Southeast,
6     Inc., could you do that?
7  A.  I can do that, but Oldcastle Materials
8     Southeast, Inc. doesn't have any other
9     subsidiaries. So I'm not quite sure what I
10    am --
11 Q.  And I apologize, I wasn't clear. I'm not
12    talking about subsidiaries of the corporation,
13    I'm talking about the structure, the people,
14    the flow chart of the personnel within
15    Oldcastle Materials, Inc. In other words,
16    you're the VP of Development?
17 A.  I understand. I will provide both.
18 Q.  You've got an Assistant VP of Development?
19 A.  I will provide both.
20 Q.  Someone is underneath him. And then there must
21    be another VP of something else at Oldcastle
22    Materials?
23 A.  Yes.

239

1  Q.  And what I want is all of the VPs and then
2     everybody that reports to those VPs down to the
3     individual quarry level?
4  A.  I'll do my best to provide those and I will
5     show them to you.
6         MR. VERCELLI: Okay. We can have that
7         understanding he will just do that
8         when he reads and signs?
9         MR. WHITE: Yeah. I mean, are we
10        talking about -- I don't know how
11        far out you want.
12        MR. VERCELLI: To the individual -- to
13        the Plant Manager level of the
14        individual quarries.
15        MR. WHITE: For how many quarries are
16        we talking about.
17        MR. VERCELLI: Just Oldcastle Southeast
18        and Oldcastle Materials, Inc.
19        itself. I don't want that for --
20        I don't want it for all of these
21        other states and all of these
22        other subsidiaries.
23        MR. WHITE: That's fine.

240

1  A.  I can give you a chart that describes that for
2     Oldcastle Materials Southeast, Inc., and I can
3     give you a chart for Oldcastle Materials, Inc.
4     in their Washington-based operation.
5  Q.  That's what I would love. That will be
6     perfectly.
7         MR. VERCELLI: And we just have an
8         understanding that he will do that
9         when he reads and signs, please?
10        MR. WHITE: That will be fine. Yeah,
11        he will do that.
12 Q.  Did Oldcastle obtain any aerial photographs of
13    the quarry, other than this photograph marked
14    1038 -- 1538, prior to acquisition?
15 A.  I don't believe we did.
16 Q.  How about since the acquisition, have you got
17    any photographs, aerial photographs, of the
18    quarry?
19        MR. WHITE: We've taken some in
20        anticipation of litigation.
21 A.  I believe we did at the request of our
22    attorneys and we're using this in this case.
23        MR. VERCELLI: Okay. Now, those would

241

1     be discoverable, wouldn't they?
2         MR. WHITE: At the appropriate time. I
3         don't know that they're
4         discoverable at this time.
5  Q.  Prior to assuming the quarry, did Oldcastle
6     exchange any information or obtain information
7     from Dyno Nobel?
8  A.  I'm not aware of any.
9  Q.  Do you know who they are?
10 A.  It sounds like a blasting company to me, but
11    I'm not aware of any.
12        MR. VERCELLI: I think we may be done.
13        If we can take a short break and
14        let Jim tell me what all I missed.
15        (Recess.)
16        MR. VERCELLI: We have no further
17        questions of the witness. Thank
18        you for answering our questions.
19        I do want to mention this
20        though; at several points during
21        the deposition we inquired about
22        information known to the attorneys
23        for Oldcastle, namely Gibson Dunn.

61 (Pages 238 to 241)

242

1　　We were not allowed to ask the
2　　questions, and answers were not
3　　given to those questions, which,
4　　of course, short-circuited or cut
5　　us off from asking follow-up
6　　questions relating to information
7　　known to the Gibson Dunn attorneys
8　　with respect to this litigation,
9　　allegations of the litigation,
10　　court documents, and then any
11　　communications they might have
12　　made with Oldcastle principals.
13　　　So I just want to make it
14　　clear that, therefore, since we're
15　　cut off from inquiring into that,
16　　I think it would be most
17　　inappropriate and unfair were
18　　Oldcastle to try to use some of
19　　that information at trial.  So I
20　　would expect Oldcastle is agreeing
21　　not to try to use that information
22　　at trial; is that true?
23　　MR. ADAMS:  I think what I would like

244

1　　answers.
2　　MR. ADAMS:  So I take it that you did
3　　ask all the questions that you
4　　wanted to ask.
5　　MR. VERCELLI:  No.  I asked questions
6　　which led to objection,
7　　attorney/client privileged,
8　　instruct not to answer, which then
9　　prevented me from being able to
10　　make any follow-up questions based
11　　on his answers.
12　　MR. ADAMS:  Well, you don't know what
13　　your questions would have been
14　　then since you don't know what the
15　　answers would have been?
16　　MR. VERCELLI:  I would agree.
17　　MR. ADAMS:  Is that right?
18　　MR. VERCELLI:  I would agree.
19　　MR. ADAMS:  I just want to make it
20　　clear that you haven't been
21　　prevented from asking any
22　　questions other than the follow-up
23　　questions that you don't know what

243

1　　for you to do -- I believe I heard
2　　you say that you were prevented
3　　from asking the questions that you
4　　thought were appropriate?
5　　MR. VERCELLI:  Uh-huh.
6　　MR. ADAMS:  I would like for you to go
7　　ahead and ask those questions now,
8　　pose those questions now, so we
9　　can get those on the record, so
10　　the court can determine whether or
11　　not they are appropriate.
12　　MR. VERCELLI:  Okay.  I think we did
13　　that earlier, but I will be happy
14　　to do that again.
15　　MR. ADAMS:  Well, then I misunderstood
16　　what you said.  I thought you said
17　　you were prevented from asking the
18　　questions.
19　　MR. VERCELLI:  We asked certain
20　　questions to which he was
21　　instructed not to answer, which,
22　　of course, then we couldn't do
23　　follow-up questions based on his

245

1　　they would be.
2　　MR. VERCELLI:  I tell you what let's
3　　do, let's do this; let me ask the
4　　witness some questions just to
5　　make sure we've got it abundantly
6　　clear.
7　　BY MR. VERCELLI:
8　　Q.  Prior to Oldcastle's assumption of the quarry,
9　　the Gibson Dunn law firm was consulted in order
10　　to assist you with the acquisition of this
11　　quarry; is that right?
12　　A.  Yes.
13　　Q.  And one of the documents produced, namely
14　　Oldcastle 1 through Oldcastle 6, includes
15　　documents that were requested and were to be
16　　provided to Mr. Shoemate at Gibson Dunn?
17　　A.  Correct.
18　　Q.  Now, one of my questions is, did Mr. Shoemate
19　　or anybody at Gibson Dunn report to you in any
20　　form about the documents that they received?
21　　　MR. WHITE:  And that's where we object
22　　and instruct him not to answer.
23　　MR. ADAMS:  What were the documents

62 (Pages 242 to 245)

3/1/2004                                                                                      Frank Heisterkamp

**246**

1        that --
2    MR. VERCELLI:  They're listed on --
3        what's that page number there?
4    MR. ADAMS:  Page four.  You are asking
5        him about these documents that
6        were listed on page four?
7    MR. VERCELLI:  Yes.  Or any other
8        documents that they might have
9        received, but yes.  And so my next
10       question will be, I wanted to go
11       down every one of those categories
12       and ask him about all of those
13       categories, whether Gibson Dunn
14       got them, what Gibson Dunn
15       reported to you about each of
16       these documents.  Will you allow
17       him to answer those questions?
18   MR. ADAMS:  I think you have framed the
19       issue properly, because we're not
20       going to allow you to go into
21       that.
22   MR. VERCELLI:  And the other -- in
23       addition to what might also be on

**247**

1        the record, the other big category
2        is, what information Gibson Dunn
3        learned about this lawsuit, and
4        then what information Gibson Dunn
5        might have provided to Oldcastle
6        about what it learned about this
7        lawsuit.
8    MR. WHITE:  We would have the same
9        objection.
10   MR. ADAMS:  You're asking him what
11       Gibson Dunn learned?
12   MR. VERCELLI:  Yes.  And what Gibson
13       Dunn told Oldcastle management
14       about this lawsuit.
15   MR. ADAMS:  All right.  Well, I'm going
16       to instruct him not to answer what
17       Gibson Dunn told him.  If he knows
18       what Gibson Dunn learned in some
19       other way, then I'll allow him to
20       answer that.
21   BY MR. VERCELLI:
22   Q.   Okay.  Do you know what Gibson Dunn -- what
23       documents Gibson --

**248**

1    MR. WHITE:  Well, let me say this; he
2        would have no way of knowing what
3        Gibson Dunn may have learned other
4        than by some communications from
5        Gibson Dunn.
6    MR. VERCELLI:  That's exactly right.
7    MR. VERCELLI:  Which you're not going
8        to let him talk about?
9    MR. WHITE:  That's right.
10   MR. VERCELLI:  So now I guess we're
11       back to, given that we are not
12       able to ask questions about
13       Oldcastle's knowledge learned from
14       Gibson Dunn, then it seems clear
15       to me, Oldcastle should not be
16       allowed to advance that
17       information at trial since we were
18       not allowed to discover it.
19   MR. ADAMS:  Well, of course, I would
20       assume that you're going to take
21       this matter up with the judge
22       between now and the trial.
23   MR. VERCELLI:  I don't know.

**249**

1    MR. ADAMS:  And what we're planning on
2        doing, and I'm going to tell you
3        now, the only thing that we are
4        objecting to are communications
5        between Oldcastle and Oldcastle's
6        attorneys as being privileged,
7        okay?
8    MR. VERCELLI:  Even though it relates
9        to their legal advice as part of
10       the acquisition of this quarry?
11   MR. ADAMS:  Yes.
12   MR. VERCELLI:  Okay.  I think that's
13       clear as mud, but I think it's
14       clear enough on the record for the
15       judge to be able to assist us
16       should we desire.
17   MR. ADAMS:  All right.  Is there
18       anything else that you want to put
19       on the record?
20   MR. VERCELLI:  No.  We'll just schedule
21       some more depos when we get a
22       chance.
23   MR. ADAMS:  All right.  For your

                                                63 (Pages 246 to 249)

*Davis v. Hansen*, Case No. CV 02-85
Privilege Log of Defendant, Oldcastle Materials Southeast, Inc.

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 10/28/2003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Attorney/Client; Joint Defense |
| 10/28/2003 | John Gillan | Frank Heisterkamp | Ward Nye; Tammy Butler; Wayne Phears | Email | Opelika | Attorney/Client; Joint Defense |
| 10/27/2003 | Frank Heisterkamp | Rowan Smith | Glenn Culpepper; Kara Morley | Email | Opelika Lawsuit | Attorney/Client; Work Product |
| 10/24/02003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Attorney/Client; Work Product |
| 10/24/2003 | John Gillan | Frank Heisterkamp | Wayne Phears; Ward Nye | Email | Opelika | Attorney/Client; Joint Defense |
| 10/24/2003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Joint Defense |
| 10/24/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client; Work Product |
| 10/24/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika | Attorney/Client |
| 10/23/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client; Work Product |
| 10/23/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika | Attorney/Client |
| 10/23/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams | | Email | Opelika | Attorney/Client; Work Product |
| 10/23/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams | | Email | Opelika | Attorney/Client; Work Product |
| 10/23/2003 | John Gillan | Frank Heisterkamp; John Gillan | | Email | Opelika | Joint Defense |
| 10/23/2003 | Brian Fowler | Frank Heisterkamp | | Email | Your Schedule? | Work Product |
| 10/22/2003 | Jeffrey Kochian | Deborah Fisher; Frank Heisterkamp; Olivia Cato | Brian Fowler | Email | Opelika | Attorney/Client; Work Product |
| 10/22/2003 | Deborah Fisher | Frank Heisterkamp; Jeffrey Kochian; Olivia Cato | Brian Fowler | Email | Opelika | Attorney/Client; Work Product |

2230

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| 10/22/2003 | Jack Weiss | Frank Heisterkamp | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill; Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/20/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 10/20/2003 | Frank Heisterkamp | Jeffrey Kochian | Olivia Cato; Deborah Fisher; Brian Fowler | Email | Opelika | Attorney/Client; Work Product |
| 10/20/2003 | Jeffrey Kochian | Deborah Fisher; Frank Heisterkamp; Brian Fowler | Olivia Cato | Email | Opelika | Attorney/Client; Work Product |
| 10/20/2003 | Deborah Fisher | Frank Heisterkamp; Jeffrey Kochian; Brian Fowler | Olivia Cato | Email | Opelika | Attorney/Client; Work Product |
| 10/20/2003 | Frank Heisterkamp | Kara Morley | | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/20/2003 | Kara Morley | Frank Heisterkamp | | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/17/2003 | Jack Weiss | Frank Heisterkamp | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| | | Olivia Cato | Brian Fowler | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |

2

2231

| Date | Author | Recipient | CC's | DocType | Subject/Re: | Privilege Type |
|------|--------|-----------|------|---------|-------------|----------------|
| 10/17/2003 | Olivia Cato | Frank Heisterkamp | Brian Fowler | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/17/2003 | Frank Heisterkamp | Brian Fowler | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Frank Heisterkamp | Glenn Culpepper; Mark Towe | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Frank Heisterkamp | Morris Bishop; Ted Reynolds | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles H. Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/14/2003 | Frank Heisterkamp | Morris Bishop; Ted Reynolds | | Email | FW: Opelika (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/14/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams | Email | Opelika (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/13/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/09/2003 | John Gillan | Gary Whitlock; Deborah Fisher; Frank Heisterkamp; Jeffrey Kochian | Leighton Yates; Ward Nye; Joseph Murphy | Email | FW: Opelika | Attorney/Client; Work Product |
| 10/09/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams | | Email | FW: Hanson/CRH Opelika | Attorney/Client; Work Product |
| 10/09/2003 | Craig Cyr | Frank Heisterkamp | | Email | Opelika Drawings | Work Product |
| 10/08/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika meeting – CONFIDENTIAL | Attorney/Client; Work Product |
| 10/07/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams; Brian Fowler | Charles Haake | Email | Davis v. Hanson et al (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |

3

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 10/03/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/01/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 09/28/2003 | Frank Heisterkamp | Mark Towe | | Email | Opelika – For your information | Attorney/Client |
| 09/23/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 09/23/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika | Attorney/Client |
| 09/21/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika 2 | Work Product |
| 09/21/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika | Work Product |
| 09/19/2003 | Frank Heisterkamp | Brian Fowler | | Email | Opelika | Work Product |
| 09/17/2003 | Jeffrey Kochian | Frank Heisterkamp | Steven Shoemate; Jack Weiss | Email | Opelika Liability | Attorney/Client; Work Product |
| 09/17/2003 | Frank Heisterkamp | Jeffrey Kochian | Steven Shoemate; Jack Weiss | Email | Opelika Liability | Attorney/Client; Work Product |
| 09/17/2003 | Frank Heisterkamp | Brian Fowler | | Email | Elam | Work Product |
| 09/16/2003 | Jack Weiss | Phil Adams; Charles Haake | Frank Heisterkamp | Email | FW: Opelika quarry | Attorney/Client; Work Product |
| 09/15/2003 | Jeffrey Kochian | Frank Heisterkamp | Steven Shoemate | Email | Opelika Liability | Attorney/Client; Work Product |
| 09/15/2003 | Brian Fowler | Morris Bishop | Frank Heisterkamp | Email | Opelika | Work Product |
| 09/10/2003 | Frank Heisterkamp | Jack Weiss | | Email | Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/10/2003 | Frank Heisterkamp | Morris Bishop | | Email | FW: Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/09/2003 | Frank Heisterkamp | Jack Weiss | | Email | Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/09/2003 | Jack Weiss | Frank Heisterkamp | Charles Haake; Phil Adams | Email | FW: Davis v. Hanson discovery – JOINT DEFENSE PRIVILEGE | Attorney/Client; Work Product |
| 09/04/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika – legal fees | Attorney/Client; Work Product |

4

| Date | Author | Recipient | CCs | Doc Type | Subject/Re | Privilege Type |
|------|--------|-----------|-----|----------|------------|----------------|
| 09/04/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams | Rowan Smith; Morris Bishop | Email | Opelika – legal fees | Attorney/Client; Work Product |
| 09/04/2003 | Rowan Smith | Frank Heisterkamp | | Email | Legal Fees – Opelika | Attorney/Client |
| 09/04/2003 | Frank Heisterkamp | Rowan Smith | | Email | Legal Fees – Opelika | Attorney/Client |
| 09/04/2003 | Frank Heisterkamp | Jack Weiss | | Email | Time line | Attorney/Client |
| 09/04/2003 | Jack Weiss | Frank Heisterkamp | Charles Haake | Email | FW: Opelika pretrial conf | Attorney/Client; Work Product |
| 09/03/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika/depo prep | Attorney/Client |
| 09/03/2003 | Frank Heisterkamp | Jack Weiss | | Email | Opelika/depo prep | Attorney/Client |
| 09/03/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika/depo prep | Attorney/Client |
| 09/03/2003 | Frank Heisterkamp | Brian Fowler | | Email | Opelika | Work Product |
| 09/03/2003 | Brian Fowler | Frank Heisterkamp | | Email | Opelika | Work Product |
| 09/02/2003 | Jack Weiss | Frank Heisterkamp | | Email | FW: hydrogeology issues | Attorney/Client; Work Product |
| 08/14/2003 | James Byram | Jack Weiss | | Email | Hydrogeology issues | Attorney/Client; Work Product; Joint Defense |
| 08/13/2003 | Jack Weiss | James Byram | Phil Adams | Email | Motion to continue | Attorney/Client; Work Product; Joint Defense |
| 08/13/2003 | James Byram | Phil Adams; Jack Weiss | | Email | FW: Motion to continue | Attorney/Client; Work Product; Joint Defense |
| 09/02/2003 | Jack Weiss | Frank Heisterkamp | | Email | Hydrogeology issues | Attorney/Client; Work Product |
| 09/01/2003 | Frank Heisterkamp | Jack Weiss | | Email | Hydrogeology issues | Attorney/Client; Work Product |
| 08/18/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 08/14/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams | Email | FW: hydrogeology issues | Attorney/Client |
| 08/14/2003 | Jack Weiss | Frank Heisterkamp; Phil Adams | | Email | Opelika case (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 08/13/2003 | Jack Weiss | Frank Heisterkamp | | Email | Opelika case | Attorney/Client; Work Product |

5

2234

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 08/13/2003 | Tomohisa Aiko | Frank Heisterkamp | | Email | Opelika settlement letter | Attorney/Client |
| 08/13/2003 | Frank Heisterkamp | Tomohisa Aiko | | Email | Opelika settlement letter | Attorney/Client |
| 08/13/2003 | Tomohisa Aiko | Frank Heisterkamp | | Email | Opelika settlement letter | Attorney/Client |
| 07/12/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Opelika APA | Attorney/Client |
| 07/12/2003 | Ward Nye | Frank Heisterkamp | Joseph Murphy | Email | FW: #784406 v1 – Opelika Joint Defense Agreement | Joint Defense |
| 07/12/2003 | Jeffrey Kochian | Troy Clough; Steven Shoemate; Frank Heisterkamp | | Email | FW: #784406 v1 – Opelika Joint Defense Agreement | Attorney/Client; Joint Defense |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp; Steven Shoemate; Brian Fowler | | Email | Opelika | Attorney/Client; Work Product |
| 07/11/2003 | Frank Heisterkamp | Jeffrey Kochian | | Email | [No Subject] | Attorney/Client |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | [No Subject] | Attorney/Client; Work Product |
| 07/11/2003 | Frank Heisterkamp | Jeffrey Kochian | | Email | [No Subject] | Attorney/Client |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp; Brian Fowler | | Email | [No Subject] | Attorney/Client; Work Product |
| 07/11/2003 | Brian Fowler | Frank Heisterkamp | | Email | [No Subject] | Work Product |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | [No Subject] | Attorney/Client; Work Product |
| 07/11/2003 | Frank Heisterkamp | Jeffrey Kochian | | Email | [No Subject] | Attorney/Client |
| 07/11/2003 | Frank Heisterkamp | Morris Bishop | Mark Towe | Email | Hanson closing | Attorney/Client; Joint Defense |
| 07/11/2003 | Jeffrey Kochian | Frank Heisterkamp | Brian Fowler | Email | [No Subject] | Attorney/Client; Work Product |
| 07/10/2003 | Frank Heisterkamp | Tom Hill | | Email | Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| 07/10/2003 | Brian Fowler | Jeffrey Kochian | Morris Bishop; Frank Heisterkamp | Email | Hanson – Opelika | Attorney/Client; Work Product |
| 08/13/2003 | Frank Heisterkamp | Phil Adams; Jack Weiss; Brian Fowler; Morris Bishop | | Email | Time Line Opelika matter | Attorney/Client; Work Product |

6

2235

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| 08/13/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Timeline | Attorney/Client; Work Product |
| 08/12/2003 | Frank Heisterkamp | Brian Fowler; Phil Adams; Jack Weiss; Morris Bishop | | Email | Hanson – Opelika law suit | Attorney/Client; Work Product |
| 08/11/2003 | Tomohisa Aiko | Frank Heisterkamp | Jack Weiss; Jeffrey Kochian | Email | Joint Defense Agreement | Attorney/Client; Work Product; Joint Defense |
| 08/10/2003 | Jack Weiss | Frank Heisterkamp | Steven Shoemate | Email | Jack Weiss | Attorney/Client; Work Product |
| 08/07/2003 | Tomohisa Aiko | Frank Heisterkamp | | Email | Opelika Asset Purchase Agreement | Attorney/Client; Work Product |
| 08/07/2003 | Frank Heisterkamp | Tomohisa Aiko | | Email | Opelika Asset Purchase Agreement | Attorney/Client; Work Product |
| 08/07/2003 | Tomohisa Aiko | Frank Heisterkamp | Jack Weiss | Email | Opelika Asset Purchase Agreement | Attorney/Client; Work Product |
| 08/07/2003 | Tomohisa Aiko | Frank Heisterkamp | Jack Weiss | Email | Opelika Schedules | Attorney/Client; Work Product |
| 08/07/2003 | Steven Shoemate | Frank Heisterkamp | | Email | Jack Weiss | Attorney/Client; Work Product |
| 08/07/2003 | Frank Heisterkamp | Steven Shoemate; Tomohisa Aiko | Jack Weiss | Email | Jack Weiss | Attorney/Client; Work Product |
| 08/01/2003 | Frank Heisterkamp | John Gillan | | Email | Opelika | Attorney/Client; Work Product; Joint Defense |
| 08/01/2003 | John Gillan | Frank Heisterkamp | | Email | Opelika | Attorney/Client; Work Product; Joint Defense |
| 07/18/2003 | Jeffrey Kochian | Frank Heisterkamp | | Email | Opelika | Attorney/Client |
| 07/15/2003 | John Gillan | Frank Heisterkamp | | Email | Opelika | Joint Defense |
| 07/15/2003 | Ward Nye | Frank Heisterkamp | John Gillan | Email | Opelika | Joint Defense |
| 07/15/2003 | Frank Heisterkamp | John Gillan | Ward Nye; Joseph Murphy | Email | Opelika | Joint Defense |

7

2236

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 07/14/2003 | Frank Heisterkamp | Morris Bishop | Rowan Smith; Mark Towe | Email | Opelika | Joint Defense |
| 07/14/2003 | John Gillan | Frank Heisterkamp | Ward Nye; Joseph Murphy | Email | Opelika | Joint Defense |
| 10/27/2003 | Frank Heisterkamp | Rowan Smith | Glenn Culpepper; Kara Morley | Email | Opelika Lawsuit | Attorney/Client; Work Product |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill, Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 10/16/2003 | Frank Heisterkamp | Glenn Culpepper; Mark Towe | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 07/11/2003 | Tom Hill | Glenn Culpepper | | Email | FW: Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill; Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |

8

2237

| Date | Author | Recipient | CCS | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 10/16/2003 | Frank Heisterkamp | Glenn Culpepper; Mark Towe | | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 09/28/2003 | Frank Heisterkamp | Mark Towe | | Email | Opelika – For your information | Attorney/Client; Work Product |
| 07/14/2003 | Frank Heisterkamp | Morris Bishop | Rowan Smith; Mark Towe | Email | FW: Opelika | Attorney/Client; Work Product; Joint Defense |
| 07/11/2003 | Frank Heisterkamp | Morris Bishop | Mark Towe | Email | Hanson closing | Attorney/Client; Joint Defense |
| 10/22/2003 | Frank Heisterkamp | Jack Weiss; Phil Adams; Morris Bishop; Mark Towe; Tom Hill; Glenn Culpepper; Brian Fowler | | Email | Ward Nye – Hanson | Attorney/Client; Work Product |
| 10/19/2003 | Frank Heisterkamp | Tom Hill; Mark Towe; Glenn Culpepper; Morris Bishop; Rowan Smith; Ted Reynolds | Angela Dziubek; Kara Morley; Olivia Cato | Email | FW: Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client; Work Product |
| 07/11/2003 | Tom Hill | Glenn Culpepper | | Email | FW: Hanson deal -- Ward Nye | Attorney/Client; Joint Defense |
| 07/11/2003 | Tom Hill | Frank Heisterkamp | | Email | Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| 07/10/2003 | Frank Heisterkamp | Tom Hill | | Email | Hanson deal – Ward Nye | Attorney/Client; Joint Defense |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Asset List | Proprietary/ Confidential Business Information |
| 08/15/2003 | Deborah Fisher | Tomohisa Aiko | Frank Heisterkamp; Brian Fowler | Letter | Hanson Quarries | Attorney/Client; Work Product |

9

2238

| Date | Author | Recipient | cc's | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| 08/29/2003 | Deborah Fisher | Tomohisa Aiko; Brian Fowler; Frank Heisterkamp | | Facsimile | Opelika Quarry | Attorney/Client; Work Product |
| 07/10/2003 | Deborah Fisher | Frank Heisterkamp; Jeff Kochian; Brian Fowler | | Memorandum | New Information on Southeastern Quarries | Attorney/Client; Work Product |
| 07/10/2003 | Deborah Fisher | Glen Wilking; Gary Whitlock | | Memorandum | New Information on Southeastern Quarries | Attorney/Client; Work Product |
| | Frank Heisterkamp | | | Spreadsheet | Asset Swaps | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| 06/18/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Capital Expenditures Three Years 2003-2005 | Proprietary/ Confidential Business Information |
| 06/17/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Stripping Cost by Site ($000) | Proprietary/ Confidential Business Information |
| 06/17/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Capital Expenditures Five Years 2003-2005 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |

10

2230

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| | Frank Heisterkamp | | | Spreadsheet | Hanson Deal Structure (revised) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Asset Swaps | Proprietary/ Confidential Business Information |
| 06/07/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Stripping Cost by Site ($000) | Proprietary/ Confidential Business Information |
| 06/07/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Capital Expenditures Five Years 2003-2005 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Leases | Proprietary/ Confidential Business Information |
| 04/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Southeast Region – Backlog – April 2003 | Proprietary/ Confidential Business Information |
| 04/30/2003 | Frank Heisterkamp | | | Spreadsheet | Plant Finished Goods Inventory Report | Proprietary/ Confidential Business Information |

11

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|---|---|---|---|---|---|---|
| | Frank Heisterkamp | | | Spreadsheet | Summary Profit & Loss by Cost Element 2000 (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Sales Analysis of Aggregates – Month & YTD (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Sales Analysis of Aggregates – Month & YTD (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Sales Analysis of Aggregates – Month & YTD (Various Quarries) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Summary Profit & Loss by Cost Element (Various Quarries) | Proprietary/ Confidential Business Information |
| 05/12/2003 | Frank Heisterkamp | Mark Towe | | Facsimile | Hanson Project Spreadsheets | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries – Consol 6 Asset | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries – Consol 5 Asset | Proprietary/ Confidential Business Information |

224

| Date | Author | Recipient | CCs | Doc Type | Subject/Re | Privilege Type |
|------|--------|-----------|-----|----------|------------|----------------|
| 05/02/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project Stripping Cost by Site ($000) | Proprietary/ Confidential Business Information |
| 05/02/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Project 2003 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries – Consol 6 Asset | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Swaps – Summary Comparison | Proprietary/ Confidential Business Information |
| 12/02/2003 | Joseph Murphy | Frank Heisterkamp | | Facsimile and Spreadsheets | Summary Profit & Loss by Cost Element (Various Quarries) | Proprietary/ Confidential Business Information |
| 12/03/2003 | Joseph Murphy | Frank Heisterkamp | | Facsimile | 12 month results; Summary Profit & Loss by Cost Element (Various Quarries) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 (Nov YTD) | Proprietary/ Confidential Business Information |
| 06/24/2003 | Craig Cyr | Frank Heisterkamp | | Email | Updated Hanson Lease Table | Proprietary/ Confidential Business Information |

13

| Date | Author | Recipient | CC: | Doc. Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|-----------|-------------|----------------|
| 07/01/2003 | Joseph Murphy | Frank Heisterkamp | | Facsimile | Spreadsheets Re: Hanson Aggregates Stock Status and Plant Finished Goods Inventory Reports | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarry Aggregate Valuation | Proprietary/ Confidential Business Information |
| 08/13/2003 | Frank Heisterkamp | | | Spreadsheet | SRM Aggregates Hanson Employee Unused Vacation as of 07/13/2003 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson – GAT Quarries | Proprietary/ Confidential Business Information |
| 03/29/2003 | Frank Heisterkamp | Tom Hill; Don Eshleman; Glenn Culpepper; Mark Towe; Michael Brady | | Memorandum | Hanson – Asset swaps | Proprietary/ Confidential Business Information |
| 04/04/2003 | Frank Heisterkamp | Joseph Murphy | | Letter | Business Valuation | Proprietary/ Confidential Business Information |
| 07/10/2003 | Frank Heisterkamp | | | Spreadsheet | Plant Finished Goods Inventory Report | Proprietary/ Confidential Business Information |
| 07/08/2003 | Deborah Fisher | Jeffrey Kochian; Jack Zouhary | Frank Heisterkamp; Glenn Perry | Email | Hanson like-kind exchange issue—leases | Attorney/Client |
| 07/08/2003 | Joseph Murphy | Frank Heisterkamp | | Email | FW: Leased Vehicles | Proprietary/ Confidential Business Information |

14

2243

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| | Frank Heisterkamp | | | Spreadsheet | FW Dodge Forecast | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Swaps – Summary Comparison | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Leases | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Alexander City Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 | Proprietary/ Confidential Business Information |
| 06/03/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson – GAT | Proprietary/ Confidential Business Information |

15

244

| Date | Author | Recipient | CC's | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|------|----------|-------------|----------------|
| | Frank Heisterkamp | | | Spreadsheet | Hanson – GAT Quarries | Proprietary/ Confidential Business Information |
| 05/30/2003 | Frank Heisterkamp | | | Spreadsheet | Plant Finished Goods Inventory Report – Alexander City | Proprietary/ Confidential Business Information |
| 09/19/2003 | Brian Fowler | Frank Heisterkamp | | Facsimile | Opelika Dye Test Opinion | Work Product |
| 09/17/2003 | Charles Haake | Phil Adams; Frank Heisterkamp | Jack Weiss | Email | Opposition to Plaintiffs' Motion to Continue | Attorney/Client; Work Product |
| 09/11/2003 | Jack Weiss | Frank Heisterkamp | Phil Adams; Charles Haake | Email | Davis v. Hanson (CONFIDENTIAL AND PRIVILEGED) | Attorney/Client |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element (Dec YTD) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element (Apr YTD) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element 2000 | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |

16

| Date | Author | Recipient | CCs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| 05/05/2003 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element 2000 | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Capital Expenditures – Select Sites | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Quarries for swap with OMG 2002 (Nov YTD) | Proprietary/ Confidential Business Information |
| 03/08/2003 | Frank Heisterkamp | | | Spreadsheet | Hanson Swaps – Summary Comparison | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson – Profit and Loss Models | Proprietary/ Confidential Business Information |

17

22?

| Date | Author | Recipient | CCs | Doc Type | Subject/Ref | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 09/25/2002 | Frank Heisterkamp | Joseph Murphy | | Facsimile | Alabama – Confidentiality Agreement | Proprietary/ Confidential Business Information |
| 09/23/2002 | Joseph Murphy | Frank Heisterkamp | | Letter | Confidentiality Agreement | Proprietary/ Confidential Business Information |
| 09/18/2002 | Frank Heisterkamp | Morris Bishop | | Facsimile | Hanson – Asset Swap | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Handwritten Note | Hanson – Asset Swap | Proprietary/ Confidential Business Information |
| 09/30/2002 | Joseph Murphy | Frank Heisterkamp | DLG; CHN & GJW | Letter | Confidentiality Business Information | Proprietary/ Confidential Business Information |
| 09/26/2002 | Frank Heisterkamp | | | Spreadsheet | Hanson Building Materials America, Inc. Reserve Bank Information as of April 2002 ('000 omitted) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Summary | Opelika Quarry – Lease Recording Summary | Proprietary/ Confidential Business Information |
| 01/18/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |

18

2247

| Date | Author | Recipient | Ccs | Doc Type | Subject/Re: | Privilege Type |
|------|--------|-----------|-----|----------|-------------|----------------|
| 01/15/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |
| 06/27/2001 | Frank Heisterkamp | | | Record Summary | Opelika Mineral Agreement and Lease | Proprietary/ Confidential Business Information |
| 03/30/2000 | Frank Heisterkamp | | | Record Summary | Opelika – Agreement and Easement | Proprietary/ Confidential Business Information |
| 09/25/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Summary Profit & Loss by Cost Element  (Aug YTD) | Proprietary/ Confidential Business Information |
| 09/25/2002 | Frank Heisterkamp | | | Spreadsheet | Opelika Sales Analysis of Aggregates – Month & YTD | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson Aggregates East – Southeast Region Opelika Quarry | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson – History (Alexander City & Opelika) | Proprietary/ Confidential Business Information |
| | Frank Heisterkamp | | | Spreadsheet | Hanson – History (Alexander City & Opelika) w.o. inventory adjustment | Proprietary/ Confidential Business Information |

19

2248

| Date | Author | Recipient | CC's | Doc Type | Subject/Re... | Privilege Type |
|------|--------|-----------|------|----------|---------------|----------------|
| 10/18/2002 | Joseph Murphy | Frank Heisterkamp | | Facsimile | Summary Profit & Loss by Cost Element | Proprietary/ Confidential Business Information |
| 10/24/2002 | Joseph Murphy | Frank Heisterkamp | | Email & Spreadsheets | Opelika & Alex City – Inventory | Proprietary/ Confidential Business Information |
| 10/22/2002 | Frank Heisterkamp | Morris Bishop | | Facsimile & Spreadsheets | Hanson – Hanson History | Proprietary/ Confidential Business Information |
| 10/24/2002 | Joseph Murphy | Frank Heisterkamp | | Facsimile & Spreadsheets | Fixed Asset Master List | Proprietary/ Confidential Business Information |

70278310_4.DOC

20

2249

# EXHIBIT "G"

## Selected Pages from Fowler Deposition

Page Number                                                          Heisterkamp

102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . No opinion on dye test -not enough data-

103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . He told Oldcastle no way to know categorically

187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Does not know if all marble connected

206 / 208 . . . . . . . . . . . . . . . . . . . No data, but does not believe spring water coming into quarry

230 . . . . . . . . . . . . . . . . . . . . . . . . . (No data) but believes spring dry for combination of reasons

250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . He "does not understand geology of spring area"

264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Aware of MSDS/silica sheet and testing

2250

3  A.  There may be a copy of a letter there in the
4      stack. I don't recall.
5  Q.  You don't remember who it was from or to?
6  A.  No.
7  Q.  I don't remember seeing one. Let me show you
8      the documents I think we got today, Mr. Fowler,
9      if you could flip through it?
10 A.  I think I'm recalling now that I believe what I
11     saw was a deposition by a Doctor Ewers or
12     Evers, I forget the name now. I believe he was
13     an expert for Hanson.
14 Q.  Ewers?
15 A.  I think it's Ewers. I think that's the --
16     that's the document that I have seen.
17 Q.  A report by Doctor Ewers, maybe?
18 A.  Well, I believe -- I'm pretty sure it was
19     either a deposition or a report.
20 Q.  Okay. Did you look at any of the other reports
21     or summaries of --
22 A.  I've seen all of the expert opinion at this
23     point.
0102
1  Q.  Okay.
2  A.  But I don't believe there's a letter. I think
3      what I'm recalling is that --
4  Q.  And you found all of that out in what month?
5  A.  Well, it was -- I think I finally got the
6      materials in early August of 2003.
7  Q.  Have you been asked to form any opinions on
8      that dye trace or dye study?
9  A.  Oh, several times.
10 Q.  You have been?
11 A.  Yes, I have.
12 Q.  Okay. And by whom were you asked?
13 A.  Oldcastle, various people.
14 Q.  Have you done any calculations or research on
15     it?
16 A.  I have formulated no opinion.
17 Q.  And why didn't you formulate an opinion?
18 A.  Don't have enough information yet.
19 Q.  What are you lacking?
20 A.  Well, we need to understand the structural
21     geology of the bedrock; we need to understand

251

22      the actual flow net that exists in the bedrock;
23      I have to understand the chemistry of these
0103
1       dyes better than I do.  Basically you need to
2       go through the type of investigation you and I
3       talked about an hour or so, hour and a half
4       ago.
5   Q.   Right.  The step-by-step from the geology down
6       to the samples?
7   A.   Right.  Otherwise in my view, and as I've said
8       to Oldcastle, there's no way to know what the
9       dye test means categorically.
10  Q.   Does it tell you anything about travel time?
11  A.   A dye test by itself?
12  Q.   Right.
13  A.   It can, if you know all of those parameters I
14      was describing to you.
15  Q.   Okay.  And since you were asked to formulate
16      opinions, have you looked at any other
17      documents or talked to anybody else?
18  A.   No.  We're formulating this investigation that
19      we want to undertake and we've been waiting for
20      that to start.
21  Q.   "We" being North American Reserve?
22  A.   North American Reserve on behalf of Oldcastle.
23  Q.   Okay.  And what are you going to do to -- you
0104
1       say you are formulating it, what are you going
2       to do?
3   A.   Well, we basically are going to drill a series
4       of holes around the quarry and in a line from
5       the quarry towards the northeast out into the
6       Young parcel, out to the furthest reaches of
7       the Young parcel that we can get to on that
8       property.  And then essentially pump the quarry
9       at a variety of different rates and actually
10      monitor the drawdowns, not model them, but
11      monitor them, so that we know about the
12      hydrology.  Then the drilling that's done will
13      all be rock cores, so we'll get what appears,
14      from the literature and the other expert
15      opinion, to be the first third dimensional
16      picture of what the bedrock geology is under

2282

8    surface that you're talking about. From the
9    high point on the Young parcel it would
10    probably be close to 280, 290, something, you
11    know, on the order of 300 feet, underneath the
12    highest part of the Young parcel. On the
13    average it's probably 250.
14  Q.   All right. Back on your report, down at the
15    bottom at 2.2, it talks about "All but one of
16    these reserves consists of nearly flat-lying
17    varieties of marble, limestone and dolomitic
18    limestone." I guess the one exception is some
19    other quarry that's got some type of granite?
20  A.   Right. It's Alexander City.
21  Q.   Okay. Now, the marble out at the Lee County
22    quarry is not flat-lying, is it?
23  A.   Well, at the time, based on what we knew at the
0186
1    time from that Steltenpohl geologic map, and
2    the fact that we hadn't yet acquired all of
3    these other field trip reports that I mentioned
4    earlier this morning, because we didn't
5    understand that this whole activity was
6    underway, the map that he did — the first map
7    that he did, the one I was referring to, shows
8    the Chewacla Marble, as it's called on the map,
9    to be flat-lying. And when we looked in the
10    quarry, we saw the jointing and the fracturing,
11    but the layering, the bedding, the relic
12    bedding in the limestone is close to
13    horizontal. So we made that assumption that it
14    was a flat-lying limestone.
15  Q.   It's actually pinnacled, isn't it, and domed?
16  A.   Do you mean the surface of it?
17  Q.   Right.
18  A.   Yes. Right. But the limestone formation is
19    flat-lying underneath.
20  Q.   Okay. And when you looked at the GSA map, the
21    geology map, did you notice that there were
22    several locations of the Chewacla Marble?
23  A.   Yes.
0187
1  Q.   Did you see that there was one location up at
2    Spring Villa?

253

3  A.  Well, I didn't know Spring Villa was important
4      at the time, but I did notice that there was
5      marble there.
6  Q.  Okay.
7  A.  And also over at -- over towards Chewacla State
8      Park.
9  Q.  Right.  Do you know if those units of Chewacla
10     Marble are connected?
11 A.  We don't.
12 Q.  Okay.  How do you know you don't?
13 A.  Well, I don't know because I haven't studied
14     it.
15 Q.  You haven't looked.  Okay.
16 A.  I'm going on the basis of all the published
17     information in the expert reports in this case,
18     there's great disagreement over whether they're
19     connected or not.  And we would like to find
20     that out in our investigation, which is one of
21     our goals.
22 Q.  On the next page, 1554, it specifically talks
23     about the quarry and the expansion.  I think
0188
1      you did some calculations on your sheet,
2      somebody has taken your calculations, but did
3      you calculate up how much overburden would have
4      to be removed?
5  A.  I think that's on the sheets there.
6          MR. ADAMS:  I think Mr. Vercelli had
7              that.
8  Q.  That would be on 1801 maybe or 1802?
9  A.  I don't know if it's on there or not.  Yeah,
10     here it is.  It's on 1804 on the left side,
11     lower left side, at three million cubic yards.
12     The actual calculated number was 2.595 million
13     yards and we rounded it up to three million.
14 Q.  Cubic yards?
15 A.  Yes.
16 Q.  And that's where you're going to strip it off
17     the 16 acres?
18 A.  Well, that would be the total stripping left to
19     go all the way out to the end of the quarry
20     development.
21 Q.  Okay.  And when you're removing that

2254

1    near?

2  A.  Well, near enough for it to be a problem.  I
3       mean, it was going to depend on the situation.
4       I mean, the point is we always look.  Whether
5       it's near or far, we're always looking for that
6       kind of problem, potential problem.

7  Q.  And how do you look near or far?

8  A.  Well, you look around the site, aerial photos,
9       maps, the state databases that tell you where
10      the parks are, where the protected wetland
11      areas are, wildlife habitats and that kind of
12      thing.

13 Q.  If you had known that Spring Villa was dry,
14      would that have raised a red flag with you?

15 A.  Well, just that fact alone I don't think would
16      have.

17 Q.  Okay.  Why not?

18 A.  Well, I mean what raised the spectra of it was
19      the implication that this quarry made it dry.
20      I mean, that takes it from a non-red flag to a
21      red flag.

22 Q.  All right.  Which is the last one down there,
23      environmental litigation?

0206

1  A.  Right.

2  Q.  I take it if you had known, when you did your
3       site visit, that there was a pending lawsuit,
4       it would have raised a red flag?

5  A.  Yes.

6  Q.  Okay.  And then I would assume that on July
7       10th when you found out, it raised the red
8       flag?

9  A.  It did.  And it's still up.

10 Q.  And it's still up?

11 A.  Yes.

12 Q.  Okay.  So I guess would it be fair to say on
13      July 10th you had some reservations about the
14      purchase of this property?

15      MR. ADAMS:  Object to the form.

16 A.  Well, no.  Because we -- we believed -- well,
17      what we understood of the allegations that day,
18      we thought they were pretty serious, if true.
19      And we still think that's the case, and we're

2255

20    approaching -- this investigation we're going
21    to do, we're approaching it with that attitude.
22    But we don't believe, based on our experience
23    in dealing with these kinds of problems and the
0207
1    basic geological and hydrogeological situation
2    that exists out there, that these problems
3    can't be controlled in a way that will be
4    satisfactory. So we wouldn't have -- I don't
5    think we would have backed off of the
6    acquisition; I'm certain we wouldn't have
7    actually.
8  Q.  I thought I had asked you earlier about the
9    cone of depression and whether you could
10    calculate it and so forth, but you said you
11    didn't have enough data. But now you're
12    telling me at the time you had enough data to
13    determine that, in your opinion, Oldcastle
14    could control or limit the impact?
15        MR. ADAMS:  Object to the form.
16  A.  Yeah. I think the -- we looked in the quarry
17    at the fractured limestone, and we looked at
18    the water situation that existed there, and
19    this is after we found out about the
20    litigation. There's basically no conduit or
21    system of conduits in the quarry walls which
22    would suggest that four or five or six million
23    gallons of water a day out of the water budget
0208
1    is coming straight over from Little Uchee Creek
2    drainage into the quarry. It goes to the
3    contributory cause business I was talking about
4    this morning.
5  Q.  Well, where is it coming from?
6  A.  Well, we don't know. As a matter of fact,
7    nobody does. Lots and lots of speculation, but
8    no scientific facts. Well, the investigation
9    we intend to do is going to determine that,
10    because that's where the rubber hits the road
11    in this whole thing. And if we find out --
12        MR. ADAMS:  Hold it, Brian.
13  A.  Okay. We need to establish the degree to which
14    these different -- the allegations, contentions

2256

15  and speculations are true or not true.
16  Q.  Right.
17  A.   And the qualitative judgment on my part was
18     that the -- given the fact these are usually
19     contributory problems, once we identify the
20     contributors, because we have identified them
21     as specifically as we're proposing to do it,
22     that we can mitigate those impacts
23     satisfactorily.
0209
1  Q.   But right now you're telling us that nobody
2     knows where the water is coming from?
3  A.   That's right.
4  Q.   So if Hanson's people told you they knew where
5     it was coming from or what was causing it,
6     you're saying that --
7  A.   I don't believe them.
8  Q.   You don't believe them?
9  A.   No.  And I don't believe your experts either.
10  Q.   And why don't you believe Hanson's experts?
11  A.   Because there is no scientific data used to
12     develop the opinions and speculations.  They're
13     speculations, and we need to --
14  Q.   And what scientific data is missing, in your
15     opinion?
16  A.   The actual measurements and studies of the sort
17     I described to you this morning; on site,
18     hands-on, give me the numbers, let's find out
19     what's really going on type study.
20  Q.   Okay.  Back on July 10th, if you didn't believe
21     Hanson's experts and you had no data of your
22     own, why was it Oldcastle thought they could
23     limit the impact?
0210
1          MR. ADAMS:  Well, wait a minute.
2             That's not what he testified
3             about, Jimmy.
4          MR. VERCELLI:  That's exactly what he
5             testified to.
6          MR. ADAMS:  No, it isn't, Chip.  And I
7             don't want to --
8          MR. VERCELLI:  That's exactly how I
9             understood it.

2257

8      there is just a whole range of things you can
9      do in between lots and little. I mean, it
10     depends on how much.
11 Q.  Low flow, you know, it's 300,000, 500,000
12     gallons a day?
13 A.  I mean, I think my trouble with the Little
14     Uchee Creek and Spring Villa right now is we
15     don't know anything about the structural
16     geology underneath Spring Villa or the Little
17     Uchee Creek. The 2001 map from Georgia Survey,
18     the Steltenpohl map I mentioned this morning,
19     and then the third one that Doctor Cook did in
20     his deposition, all show different geology at
21     Spring Villa. So there's three guys right
22     there and all disagree on what the bedrock is
23     at Spring Villa. One of them is -- hopefully
0229
1      one of them is right. Maybe they're all wrong,
2      we don't know. We would like to drill some
3      holes over there and find out what it is.
4  Q.  I thought they all agreed that it was Chewacla
5      Marble?
6  A.  The maps are all different in the third
7      dimension. So we need to resolve that or at
8      least I would need to resolve it before I could
9      start making some conclusions. But you've got
10     the karstic solubility of the limestone over
11     there is be same as it may be at the quarry.
12 Q.  Right. This is a karst area?
13 A.  Right. And the rate of karstic development
14     solution activity underneath Spring Villa is
15     conceivably faster than it is at the quarry or
16     slower. I mean, we just don't know which.
17     It's entirely possible that the problem at
18     Spring Villa and Little Uchee Creek is a
19     contributory problem.
20 Q.  Say that again.
21 A.  Well, there's karstic features forming -- there
22     were karstic features forming under Spring
23     Villa and under Little Uchee Creek a thousand
0230
1      years ago and that's been progressing up until
2      today. So the fact that the spring went dry

2258



3      and the creek went dry may not necessarily be
4      just because the quarry is there.  It could be,
5      and probably is, a combination of these
6      different things.  And there's also been
7      construction at the spring in the past in the
8      1950s, drilling, blasting and deepening and
9      whatever.
10  Q.    '20s, 1920s.
11  A.    Well, whenever.  But, you know, the point is
12      that over a thousand year time frame for
13      karstic features to be forming, it's not
14      unlikely, I don't know that it is, but it's not
15      unlikely that there could have been some
16      changes wrought by that work, which added
17      together with today's conditions, you know,
18      created the situation that we have today.  And
19      in order for me to tell you how much water is
20      good and how much water is bad relative to the
21      quarry, I need to know the answers to those
22      questions before I could really give you a
23      solid answer.
0231
1  Q.    When you say that the karst features have been
2      forming out in the spring area for thousands of
3      years, what are you basing that on?
4  A.    Well, it's karstic limestone, nobody disagrees
5      about that.  And the karstic development began
6      as soon as the ocean --
7  Q.    Receded?
8  A.    -- receded, which is roughly in the Pliocene,
9      what, five million years ago.
10  Q.    It was before my time, I don't know.
11  A.    Me, too.
12  Q.    So we've done -- I was asking you about some of
13      this stuff.  If there is a cone of depression
14      in this karst area, are sinkholes more likely
15      to form?
16  A.    I'm not sure.  If the quarry is creating the
17      cone?
18  Q.    Well, you've already said they are, haven't
19      you?
20  A.    I'm just confused about your question.
21  Q.    I mean, there is a cone of depression out

2259

20  A.   Right.
21  Q.   Okay.
22  A.   That's always a possibility.  In fact, the
23       famous stories in Florida where the parking
0250
1        lots collapse, and it eats cars and people and
2        everything else, I mean, oftentimes those
3        sinkholes are there for a long, long time, and
4        it's that one day when the extra
5        tractor-trailer truck drives over it that, you
6        know, it collapses or whatever it is.
7   Q.   I was going to ask you about that, too.  If
8        these sinkholes are forming and are continuing
9        to form, like you say the potential is there
10       and they haven't collapsed yet, could it be a
11       safety factor if you're driving your pickup
12       truck or your tractor over your pasture?
13  A.   Well, sure.  And I think that there's a
14       pattern.  If you look at the sinkholes that are
15       involved here, you will see that most of them
16       are concentrated around Spring Villa and Little
17       Uchee Creek.  And there's a set of geological
18       circumstances there that we don't — I
19       certainly don't understand and the experts that
20       y'all have had seem to conflict over it.  We
21       need to find out why that pattern is the way it
22       is, because that's important.  I don't know
23       why, but that's an important factor here.
0251
1   Q.   How did you know that there was a pattern to
2        the sinkholes?  Did you look at the GPS grid we
3        had given?
4   A.   Yeah.  We got a set of GPS readings from
5        somebody, I'm not quite sure, and then we
6        plotted them up.
7   Q.   Okay.
8             MR. BYRAM:  Do I have that?
9             MR. SPRAYBERRY:  Probably not.  We
10            don't give everything.
11            MR. BYRAM:  Whatever that is, I want a
12            copy of it.
13            MR. SPRAYBERRY:  Yes, you should have
14            it.

2260

```
 9      you write somebody a scheduling e-mail over the
10      weekend about calls next week or something, I
11      don't -- I do everything orally with Oldcastle.
12      I just don't have time and in the field there
13      are no computers around to e-mail.
14  Q.  Okay.  Number five, the same thing, e-mails and
15      so forth to Oldcastle, you don't have any of
16      those?
17  A.  No.
18  Q.  Number six is a laundry list of stuff of
19      computer printouts or documents; A is minable
20      reserves or the mining plan, you're working on
21      that, right?
22  A.  Well, I gave you our calculations earlier.
23  Q.  On the reserves, okay?
0263
 1  A.  Right.  And the mining plan -- operational plan
 2      is under development.
 3  Q.  All right.  B is depth of mining, you've given
 4      us that?
 5  A.  Yes.
 6  Q.  C is the pumping, the volumes, the
 7      calculations, you've given us your discharge
 8      reports?
 9  A.  Right.  What we had was what we had from
10      Hanson.  We haven't generated any of ours yet
11      because we haven't started the investigation.
12  Q.  Okay.  D, documents related to the changes in
13      operations or methods of operations; and you've
14      told us about some, but have there been any
15      memos or documents circulated beforehand saying
16      how you're going to change the operation?
17  A.  Not that I know of.  Or at least not that I
18      produced.
19  Q.  E is your due diligence efforts and documents,
20      which I think you've produced a large --
21  A.  Yes.
22  Q.  We've got all of that.  F was the request to
23      increase the pumping to ten million gallons a
0264
 1      day by Mr. LeBron, do you have any documents on
 2      that?
 3  A.  No.  No.
```

2261

4   Q.   G was the data sheet on silica or other hazards
5        at the Lee County quarry, do you have any of
6        that?
7   A.   No, I don't.
8   Q.   Okay.  Do you know anything about the
9        requirements for the safety sheet on the
10       silica?
11  A.   I know what they are.
12  Q.   Okay.  Are they required at the limestone
13       quarries?
14  A.   Yeah, I believe they are -- well, it depends on
15       State law, but there are supposed to be MSDS
16       sheets available for anything that represents a
17       hazard to a truck driver or an employee.
18  Q.   Right.  And silica is one of the by-products
19       from the crushing and limestone operation,
20       isn't it?
21  A.   Well, generally not from the limestone, it's
22       probably from the overburden in this case, but
23       there is a possibility you would have there.
0265
1   Q.   Okay.  Who would we get that from; do you know?
2   A.   Well, I would imagine that Ted Reynolds would
3        be the one.
4   Q.   H, any other documents on your list of red
5        flags; I think we've gone over that?
6   A.   Yes.
7   Q.   And I think you said on the government sites
8        you looked at, y'all just look at them, make a
9        small notation, and don't store it or print it
10       or anything?
11  A.   Right.  That's right.
12  Q.   All of the hydrology or engineering reports,
13       studies or documents?
14  A.   Well, everything that I've got that we had
15       beforehand, you have.  I don't have -- we
16       haven't generated any of our own yet.  And the
17       only other things I have are the expert reports
18       that the two sides, Hanson and you folks, have
19       produced, which were given to me after the
20       closing.
21  Q.   Do you have any documents on the dye traces or
22       the dye studies going on at the quarry?

2262

**EXHIBIT "H"**

**Selected Pages from Reynolds Deposition**

<u>Page Number</u>                                                                                                    <u>Heisterkamp</u>

45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Has read Oldcastle Environment policy

249 - 253 . . . . . . . . . . . . . . . . . . . . . Oldcastle can and does test employees for silica exposure

2265

3   A.   There may be a copy of a letter there in the
4        stack.  I don't recall.
5   Q.   You don't remember who it was from or to?
6   A.   No.
7   Q.   I don't remember seeing one.  Let me show you
8        the documents I think we got today, Mr. Fowler,
9        if you could flip through it?
10  A.   I think I'm recalling now that I believe what I
11       saw was a deposition by a Doctor Ewers or
12       Evers, I forget the name now.  I believe he was
13       an expert for Hanson.
14  Q.   Ewers?
15  A.   I think it's Ewers.  I think that's the --
16       that's the document that I have seen.
17  Q.   A report by Doctor Ewers, maybe?
18  A.   Well, I believe -- I'm pretty sure it was
19       either a deposition or a report.
20  Q.   Okay.  Did you look at any of the other reports
21       or summaries of --
22  A.   I've seen all of the expert opinion at this
23       point.
0102
1   Q.   Okay.
2   A.   But I don't believe there's a letter.  I think
3        what I'm recalling is that --
4   Q.   And you found all of that out in what month?
5   A.   Well, it was -- I think I finally got the
6        materials in early August of 2003.
7   Q.   Have you been asked to form any opinions on
8        that dye trace or dye study?
9   A.   Oh, several times.
10  Q.   You have been?
11  A.   Yes, I have.
12  Q.   Okay.  And by whom were you asked?
13  A.   Oldcastle, various people.
14  Q.   Have you done any calculations or research on
15       it?
16  A.   I have formulated no opinion.
17  Q.   And why didn't you formulate an opinion?
18  A.   Don't have enough information yet.
19  Q.   What are you lacking?
20  A.   Well, we need to understand the structural
21       geology of the bedrock; we need to understand

264

22      the actual flow net that exists in the bedrock;
23      I have to understand the chemistry of these
0103
1       dyes better than I do.  Basically you need to
2       go through the type of investigation you and I
3       talked about an hour or so, hour and a half
4       ago.
5   Q.   Right.  The step-by-step from the geology down
6       to the samples?
7   A.   Right.  Otherwise in my view, and as I've said
8       to Oldcastle, there's no way to know what the
9       dye test means categorically.
10  Q.   Does it tell you anything about travel time?
11  A.   A dye test by itself?
12  Q.   Right.
13  A.   It can, if you know all of those parameters I
14      was describing to you.
15  Q.   Okay.  And since you were asked to formulate
16      opinions, have you looked at any other
17      documents or talked to anybody else?
18  A.   No.  We're formulating this investigation that
19      we want to undertake and we've been waiting for
20      that to start.
21  Q.   "We" being North American Reserve?
22  A.   North American Reserve on behalf of Oldcastle.
23  Q.   Okay.  And what are you going to do to -- you
0104
1       say you are formulating it, what are you going
2       to do?
3   A.   Well, we basically are going to drill a series
4       of holes around the quarry and in a line from
5       the quarry towards the northeast out into the
6       Young parcel, out to the furthest reaches of
7       the Young parcel that we can get to on that
8       property.  And then essentially pump the quarry
9       at a variety of different rates and actually
10      monitor the drawdowns, not model them, but
11      monitor them, so that we know about the
12      hydrology.  Then the drilling that's done will
13      all be rock cores, so we'll get what appears,
14      from the literature and the other expert
15      opinion, to be the first third dimensional
16      picture of what the bedrock geology is under

2260

8    surface that you're talking about. From the
9    high point on the Young parcel it would
10    probably be close to 280, 290, something, you
11    know, on the order of 300 feet, underneath the
12    highest part of the Young parcel. On the
13    average it's probably 250.
14  Q.  All right. Back on your report, down at the
15    bottom at 2.2, it talks about "All but one of
16    these reserves consists of nearly flat-lying
17    varieties of marble, limestone and dolomitic
18    limestone." I guess the one exception is some
19    other quarry that's got some type of granite?
20  A.  Right. It's Alexander City.
21  Q.  Okay. Now, the marble out at the Lee County
22    quarry is not flat-lying, is it?
23  A.  Well, at the time, based on what we knew at the
0186
1    time from that Steltenpohl geologic map, and
2    the fact that we hadn't yet acquired all of
3    these other field trip reports that I mentioned
4    earlier this morning, because we didn't
5    understand that this whole activity was
6    underway, the map that he did -- the first map
7    that he did, the one I was referring to, shows
8    the Chewacla Marble, as it's called on the map,
9    to be flat-lying. And when we looked in the
10    quarry, we saw the jointing and the fracturing,
11    but the layering, the bedding, the relic
12    bedding in the limestone is close to
13    horizontal. So we made that assumption that it
14    was a flat-lying limestone.
15  Q.  It's actually pinnacled, isn't it, and domed?
16  A.  Do you mean the surface of it?
17  Q.  Right.
18  A.  Yes. Right. But the limestone formation is
19    flat-lying underneath.
20  Q.  Okay. And when you looked at the GSA map, the
21    geology map, did you notice that there were
22    several locations of the Chewacla Marble?
23  A.  Yes.
0187
1  Q.  Did you see that there was one location up at
2    Spring Villa?

2266

3  A.  Well, I didn't know Spring Villa was important
4      at the time, but I did notice that there was
5      marble there.
6  Q.  Okay.
7  A.  And also over at -- over towards Chewacla State
8      Park.
9  Q.  Right.  Do you know if those units of Chewacla
10     Marble are connected?
11 A.  We don't.
12 Q.  Okay.  How do you know you don't?
13 A.  Well, I don't know because I haven't studied
14     it.
15 Q.  You haven't looked.  Okay.
16 A.  I'm going on the basis of all the published
17     information in the expert reports in this case,
18     there's great disagreement over whether they're
19     connected or not.  And we would like to find
20     that out in our investigation, which is one of
21     our goals.
22 Q.  On the next page, 1554, it specifically talks
23     about the quarry and the expansion.  I think
0188
1      you did some calculations on your sheet,
2      somebody has taken your calculations, but did
3      you calculate up how much overburden would have
4      to be removed?
5  A.  I think that's on the sheets there.
6          MR. ADAMS:  I think Mr. Vercelli had
7              that.
8  Q.  That would be on 1801 maybe or 1802?
9  A.  I don't know if it's on there or not.  Yeah,
10     here it is.  It's on 1804 on the left side,
11     lower left side, at three million cubic yards.
12     The actual calculated number was 2.595 million
13     yards and we rounded it up to three million.
14 Q.  Cubic yards?
15 A.  Yes.
16 Q.  And that's where you're going to strip it off
17     the 16 acres?
18 A.  Well, that would be the total stripping left to
19     go all the way out to the end of the quarry
20     development.
21 Q.  Okay.  And when you're removing that

2267

```
 1     near?
 2  A.  Well, near enough for it to be a problem.  I
 3     mean, it was going to depend on the situation.
 4     I mean, the point is we always look.  Whether
 5     it's near or far, we're always looking for that
 6     kind of problem, potential problem.
 7  Q.  And how do you look near or far?
 8  A.  Well, you look around the site, aerial photos,
 9     maps, the state databases that tell you where
10     the parks are, where the protected wetland
11     areas are, wildlife habitats and that kind of
12     thing.
13  Q.  If you had known that Spring Villa was dry,
14     would that have raised a red flag with you?
15  A.  Well, just that fact alone I don't think would
16     have.
17  Q.  Okay.  Why not?
18  A.  Well, I mean what raised the spectra of it was
19     the implication that this quarry made it dry.
20     I mean, that takes it from a non-red flag to a
21     red flag.
22  Q.  All right.  Which is the last one down there,
23     environmental litigation?
0206
 1  A.  Right.
 2  Q.  I take it if you had known, when you did your
 3     site visit, that there was a pending lawsuit,
 4     it would have raised a red flag?
 5  A.  Yes.
 6  Q.  Okay.  And then I would assume that on July
 7     10th when you found out, it raised the red
 8     flag?
 9  A.  It did.  And it's still up.
10  Q.  And it's still up?
11  A.  Yes.
12  Q.  Okay.  So I guess would it be fair to say on
13     July 10th you had some reservations about the
14     purchase of this property?
15         MR. ADAMS:  Object to the form.
16  A.  Well, no.  Because we -- we believed -- well,
17     what we understood of the allegations that day,
18     we thought they were pretty serious, if true.
19     And we still think that's the case, and we're
```

2268

```
20      approaching -- this investigation we're going
21      to do, we're approaching it with that attitude.
22      But we don't believe, based on our experience
23      in dealing with these kinds of problems and the
0207
1       basic geological and hydrogeological situation
2       that exists out there, that these problems
3       can't be controlled in a way that will be
4       satisfactory.  So we wouldn't have -- I don't
5       think we would have backed off of the
6       acquisition; I'm certain we wouldn't have
7       actually.
8   Q.  I thought I had asked you earlier about the
9       cone of depression and whether you could
10      calculate it and so forth, but you said you
11      didn't have enough data.  But now you're
12      telling me at the time you had enough data to
13      determine that, in your opinion, Oldcastle
14      could control or limit the impact?
15          MR. ADAMS:  Object to the form.
16  A.  Yeah.  I think the -- we looked in the quarry
17      at the fractured limestone, and we looked at
18      the water situation that existed there, and
19      this is after we found out about the
20      litigation.  There's basically no conduit or
21      system of conduits in the quarry walls which
22      would suggest that four or five or six million
23      gallons of water a day out of the water budget
0208
1       is coming straight over from Little Uchee Creek
2       drainage into the quarry.  It goes to the
3       contributory cause business I was talking about
4       this morning.
5   Q.  Well, where is it coming from?
6   A.  Well, we don't know.  As a matter of fact,
7       nobody does.  Lots and lots of speculation, but
8       no scientific facts.  Well, the investigation
9       we intend to do is going to determine that,
10      because that's where the rubber hits the road
11      in this whole thing.  And if we find out --
12          MR. ADAMS:  Hold it, Brian.
13  A.  Okay.  We need to establish the degree to which
14      these different -- the allegations, contentions
```

2269

15    and speculations are true or not true.
16  Q.   Right.
17  A.   And the qualitative judgment on my part was
18       that the -- given the fact these are usually
19       contributory problems, once we identify the
20       contributors, because we have identified them
21       as specifically as we're proposing to do it,
22       that we can mitigate those impacts
23       satisfactorily.
0209
1   Q.   But right now you're telling us that nobody
2        knows where the water is coming from?
3   A.   That's right.
4   Q.   So if Hanson's people told you they knew where
5        it was coming from or what was causing it,
6        you're saying that --
7   A.   I don't believe them.
8   Q.   You don't believe them?
9   A.   No.  And I don't believe your experts either.
10  Q.   And why don't you believe Hanson's experts?
11  A.   Because there is no scientific data used to
12       develop the opinions and speculations.  They're
13       speculations, and we need to --
14  Q.   And what scientific data is missing, in your
15       opinion?
16  A.   The actual measurements and studies of the sort
17       I described to you this morning; on site,
18       hands-on, give me the numbers, let's find out
19       what's really going on type study.
20  Q.   Okay.  Back on July 10th, if you didn't believe
21       Hanson's experts and you had no data of your
22       own, why was it Oldcastle thought they could
23       limit the impact?
0210
1        MR. ADAMS:  Well, wait a minute.
2           That's not what he testified
3           about, Jimmy.
4        MR. VERCELLI:  That's exactly what he
5           testified to.
6        MR. ADAMS:  No, it isn't, Chip.  And I
7           don't want to --
8        MR. VERCELLI:  That's exactly how I
9           understood it.

8       there is just a whole range of things you can
9       do in between lots and little.  I mean, it
10      depends on how much.
11  Q.   Low flow, you know, it's 300,000, 500,000
12      gallons a day?
13  A.   I mean, I think my trouble with the Little
14      Uchee Creek and Spring Villa right now is we
15      don't know anything about the structural
16      geology underneath Spring Villa or the Little
17      Uchee Creek.  The 2001 map from Georgia Survey,
18      the Steltenpohl map I mentioned this morning,
19      and then the third one that Doctor Cook did in
20      his deposition, all show different geology at
21      Spring Villa.  So there's three guys right
22      there and all disagree on what the bedrock is
23      at Spring Villa.  One of them is -- hopefully
0229
1       one of them is right.  Maybe they're all wrong,
2       we don't know.  We would like to drill some
3       holes over there and find out what it is.
4   Q.   I thought they all agreed that it was Chewacla
5       Marble?
6   A.   The maps are all different in the third
7       dimension.  So we need to resolve that or at
8       least I would need to resolve it before I could
9       start making some conclusions.  But you've got
10      the karstic solubility of the limestone over
11      there is the same as it may be at the quarry.
12  Q.   Right.  This is a karst area?
13  A.   Right.  And the rate of karstic development
14      solution activity underneath Spring Villa is
15      conceivably faster than it is at the quarry or
16      slower.  I mean, we just don't know which.
17      It's entirely possible that the problem at
18      Spring Villa and Little Uchee Creek is a
19      contributory problem.
20  Q.   Say that again.
21  A.   Well, there's karstic features forming -- there
22      were karstic features forming under Spring
23      Villa and under Little Uchee Creek a thousand
0230
1       years ago and that's been progressing up until
2       today.  So the fact that the spring went dry

271



3    and the creek went dry may not necessarily be
4    just because the quarry is there.  It could be,
5    and probably is, a combination of these
6    different things.  And there's also been
7    construction at the spring in the past in the
8    1950s, drilling, blasting and deepening and
9    whatever.
10  Q.    '20s, 1920s.
11  A.    Well, whenever.  But, you know, the point is
12        that over a thousand year time frame for
13        karstic features to be forming, it's not
14        unlikely, I don't know that it is, but it's not
15        unlikely that there could have been some
16        changes wrought by that work, which added
17        together with today's conditions, you know,
18        created the situation that we have today.  And
19        in order for me to tell you how much water is
20        good and how much water is bad relative to the
21        quarry, I need to know the answers to those
22        questions before I could really give you a
23        solid answer.
0231
1   Q.    When you say that the karst features have been
2         forming out in the spring area for thousands of
3         years, what are you basing that on?
4   A.    Well, it's karstic limestone, nobody disagrees
5         about that.  And the karstic development began
6         as soon as the ocean --
7   Q.    Receded?
8   A.    -- receded, which is roughly in the Pliocene,
9         what, five million years ago.
10  Q.    It was before my time, I don't know.
11  A.    Me, too.
12  Q.    So we've done -- I was asking you about some of
13        this stuff.  If there is a cone of depression
14        in this karst area, are sinkholes more likely
15        to form?
16  A.    I'm not sure.  If the quarry is creating the
17        cone?
18  Q.    Well, you've already said they are, haven't
19        you?
20  A.    I'm just confused about your question.
21  Q.    I mean, there is a cone of depression out

20  A.   Right.
21  Q.   Okay.
22  A.   That's always a possibility.  In fact, the
23       famous stories in Florida where the parking
0250
1        lots collapse, and it eats cars and people and
2        everything else, I mean, oftentimes those
3        sinkholes are there for a long, long time, and
4        it's that one day when the extra
5        tractor-trailer truck drives over it that, you
6        know, it collapses or whatever it is.
7   Q.   I was going to ask you about that, too.  If
8        these sinkholes are forming and are continuing
9        to form, like you say the potential is there
10       and they haven't collapsed yet, could it be a
11       safety factor if you're driving your pickup
12       truck or your tractor over your pasture?
13  A.   Well, sure.  And I think that there's a
14       pattern.  If you look at the sinkholes that are
15       involved here, you will see that most of them
16       are concentrated around Spring Villa and Little
17       Uchee Creek.  And there's a set of geological
18       circumstances there that we don't — I
19       certainly don't understand and the experts that
20       y'all have had seem to conflict over it.  We
21       need to find out why that pattern is the way it
22       is, because that's important.  I don't know
23       why, but that's an important factor here.
0251
1   Q.   How did you know that there was a pattern to
2        the sinkholes?  Did you look at the GPS grid we
3        had given?
4   A.   Yeah.  We got a set of GPS readings from
5        somebody, I'm not quite sure, and then we
6        plotted them up.
7   Q.   Okay.
8            MR. BYRAM:  Do I have that?
9            MR. SPRAYBERRY:  Probably not.  We
10               don't give everything.
11           MR. BYRAM:  Whatever that is, I want a
12               copy of it.
13           MR. SPRAYBERRY:  Yes, you should have
14               it.

2273

```
 9      you write somebody a scheduling e-mail over the
10      weekend about calls next week or something, I
11      don't -- I do everything orally with Oldcastle.
12      I just don't have time and in the field there
13      are no computers around to e-mail.
14  Q.  Okay.  Number five, the same thing, e-mails and
15      so forth to Oldcastle, you don't have any of
16      those?
17  A.  No.
18  Q.  Number six is a laundry list of stuff of
19      computer printouts or documents; A is minable
20      reserves or the mining plan, you're working on
21      that, right?
22  A.  Well, I gave you our calculations earlier.
23  Q.  On the reserves, okay?
0263
 1  A.  Right.  And the mining plan -- operational plan
 2      is under development.
 3  Q.  All right.  B is depth of mining, you've given
 4      us that?
 5  A.  Yes.
 6  Q.  C is the pumping, the volumes, the
 7      calculations, you've given us your discharge
 8      reports?
 9  A.  Right.  What we had was what we had from
10      Hanson.  We haven't generated any of ours yet
11      because we haven't started the investigation.
12  Q.  Okay.  D, documents related to the changes in
13      operations or methods of operations; and you've
14      told us about some, but have there been any
15      memos or documents circulated beforehand saying
16      how you're going to change the operation?
17  A.  Not that I know of.  Or at least not that I
18      produced.
19  Q.  E is your due diligence efforts and documents,
20      which I think you've produced a large --
21  A.  Yes.
22  Q.  We've got all of that.  F was the request to
23      increase the pumping to ten million gallons a
0264
 1      day by Mr. LeBron, do you have any documents on
 2      that?
 3  A.  No.  No.
```

2274

4   Q.   G was the data sheet on silica or other hazards
5        at the Lee County quarry, do you have any of
6        that?
7   A.   No, I don't.
8   Q.   Okay.  Do you know anything about the
9        requirements for the safety sheet on the
10       silica?
11  A.   I know what they are.
12  Q.   Okay.  Are they required at the limestone
13       quarries?
14  A.   Yeah, I believe they are -- well, it depends on
15       State law, but there are supposed to be MSDS
16       sheets available for anything that represents a
17       hazard to a truck driver or an employee.
18  Q.   Right.  And silica is one of the by-products
19       from the crushing and limestone operation,
20       isn't it?
21  A.   Well, generally not from the limestone, it's
22       probably from the overburden in this case, but
23       there is a possibility you would have there.
0265
1   Q.   Okay.  Who would we get that from; do you know?
2   A.   Well, I would imagine that Ted Reynolds would
3        be the one.
4   Q.   H, any other documents on your list of red
5        flags; I think we've gone over that?
6   A.   Yes.
7   Q.   And I think you said on the government sites
8        you looked at, y'all just look at them, make a
9        small notation, and don't store it or print it
10       or anything?
11  A.   Right.  That's right.
12  Q.   All of the hydrology or engineering reports,
13       studies or documents?
14  A.   Well, everything that I've got that we had
15       beforehand, you have.  I don't have -- we
16       haven't generated any of our own yet.  And the
17       only other things I have are the expert reports
18       that the two sides, Hanson and you folks, have
19       produced, which were given to me after the
20       closing.
21  Q.   Do you have any documents on the dye traces or
22       the dye studies going on at the quarry?

42

1   Q.   Okay.  So if there is an environmental problem
2        out there, let's say that Oldcastle Materials'
3        quarry in Lee County violated its ADEM permit,
4        let's assume that happened -- that has happened
5        already, hasn't it?
6            MR. WHITE:  Object to form.
7   A.   I don't understand the question.
8   Q.   Oldcastle Materials' Lee County quarry has
9        already violated its ADEM permit, hasn't it?
10  A.   Which ADEM permit are you referring to?  Well,
11       I can't ask questions, I'm sorry.
12  Q.   You tell me which ones they violated.  They've
13       already violated their air permit, haven't
14       they?
15  A.   Not to my knowledge.
16  Q.   Oldcastle has been cited by ADEM for violating
17       the air permit, haven't they?
18  A.   Not to my knowledge.
19  Q.   Okay.  Oldcastle has been cited by ADEM for
20       violating its discharge permit, hasn't it?
21  A.   We're currently discussing that with ADEM right
22       now.
23  Q.   But they've cited you for violating the

43

1        discharge permit, haven't they?
2   A.   We received an NOV.
3   Q.   Notice of Violation?
4   A.   Yes.
5   Q.   And what did that relate to?
6   A.   They had five points on it that they felt were
7        noncompliance issues.
8   Q.   Do you have that document with you here today?
9   A.   No, I do not.
10  Q.   Is there some particular reason you didn't
11       bring that document with you?
12           MR. WHITE:  We've got that in the
13               documents that we're going to
14               produce to you.
15           MR. VERCELLI:  Okay.
16  Q.   Now, because Opelika violated its permit, is it
17       your fault that the quarry there violated the
18       permit or is it someone else's fault?
19           MR. ADAMS:  Object to the form.
20  A.   I'm listed as the responsible official.
21  Q.   What happened to you as a result of that
22       violation, if anything?
23  A.   I received a notice of violation.

44

1   Q.   From ADEM?
2   A.   Yes, sir.
3   Q.   What did the corporation do to you as a result
4        of that violation, if anything?
5   A.   Nothing at this time.
6   Q.   Do you expect the corporation to do anything to
7        you?
8   A.   No, sir.
9   Q.   Okay.  I didn't either.
10           MR. ADAMS:  I move to strike that as
11               being inappropriate.
12           MR. VERCELLI:  That's fine.
13  Q.   If there's a problem at the Opelika quarry and
14       you don't know the answer to it, who do you go
15       to other than Mr. Wheeler?  I'm talking about
16       environmental issues.
17  A.   Depending on what it might be, I mean, it's
18       speculation.  We would have to have a problem
19       that would come up that would require somebody
20       other's expertise than what we have.
21  Q.   Okay.  As far as you know, Mr. Wheeler is the
22       one who is ultimately responsible for
23       environmental issues for Oldcastle Materials

45

1        Southeast; is that right?
2   A.   No, I am listed as the responsible official.
3   Q.   At the plant, right?
4   A.   Yes.
5   Q.   I'm talking about at the Southeast, for all of
6        the plants?
7   A.   I'm probably listed as the responsible official
8        for those, too.
9   Q.   For all of the other plants?
10  A.   Yes.
11  Q.   Okay.  Tell me all of the training you've
12       received by Oldcastle relating to environmental
13       compliance issues for the State of Alabama.
14       What training have you actually received from
15       Oldcastle?
16  A.   We -- can we take a break?
17  Q.   I would rather you answer that question first,
18       but we can after the question is answered, if
19       you don't mind.
20  A.   I've read Oldcastle's environmental policies.
21  Q.   You have read Oldcastle's environmental
22       policies?
23  A.   Yes.

246

1    A.    You have a 250 foot blasting limit from the
2          pipeline and we're storing the overburden on
3          that 250 foot area. So, no, it will never be
4          mined.
5    Q.    Okay. And it's your testimony that you could
6          have put all of that 600,000 yards in that
7          area?
8    A.    You could have. But the reason the 600,000
9          yards came up here was to build this enormous
10         berm to cut down on the noise that was alleged
11         to be coming from the property.
12   Q.    And the other reason it was put there, it was
13         also convenient to do that, wasn't it?
14   A.    Well, it's much more easier to — it's a much
15         more shorter haul to haul to the new area than
16         it was to haul it all the way to the top of
17         that big berm. So, no, that's not correct.
18   Q.    Okay. Where are you going to put all of this
19         overburden as you enlarge the pit here?
20   A.    We will continue on this 250 foot blasting
21         limitation along the pipeline.
22   Q.    Both sides or just the north side?
23   A.    Just the north side.

247

1    Q.    Okay. We talked earlier about the
2          environmental assessment, did we resolve that
3          issue? We can go off the record.
4          (Off-the-record discussion.)
5    BY MR. VERCELLI:
6    Q.    The geologist who visited twice, what were the
7          reasons for his visits?
8    A.    Just to look at the quarry.
9    Q.    What was his purpose in looking at the quarry?
10   A.    So he would have firsthand knowledge of what it
11         looked like.
12   Q.    All right. Well, what was he going to do based
13         on that knowledge?
14   A.    I can't answer that.
15   Q.    Okay. Both visits were just so he would have
16         knowledge of the quarry and see the situation
17         there?
18   A.    To the best of my knowledge, yes.
19   Q.    Do you know when those visits were?
20   A.    I don't recall the dates at this time.
21   Q.    Were they months apart or days apart or what?
22   A.    I don't recall at this time.
23   Q.    Other than reporting to ADEM, does anybody else

248

1          have regulatory authority over the quarry,
2          other than MSHA and ADEM?
3    A.    Yes.
4    Q.    Who is that?
5    A.    It would be the Alabama Industrial Relations
6          Board, I believe.
7    Q.    Department of Industrial Relations?
8    A.    Yeah.
9    Q.    What do they require of you-all?
10   A.    They come in and do occasional site visits.
11   Q.    For what purpose?
12   A.    Looking at the pit for safety.
13   Q.    Okay. When you hire employees or other workers
14         for this Opelika quarry, what information do
15         you give them? I mean, we would have loved to
16         have had a personnel file, but we don't have
17         one, so we could have gone through a personnel
18         file. So, generally speaking, what information
19         do you give them?
20   A.    I don't understand what you're asking.
21   Q.    Okay. When you hire them, do you give them any
22         warnings about anything?
23   A.    I still don't understand what you're asking.

249

1    Q.    Do you have any MSDS's on site?
2    A.    Sure.
3    Q.    For what?
4    A.    Any chemicals used in the plant.
5    Q.    Okay. Anything other than chemicals used in
6          the plant?
7    A.    Not that I can recall at this time.
8    Q.    How about silica? Have you got an MSDS at the
9          plant for silica dust?
10   A.    I don't know. I don't recall at this time.
11   Q.    Whose job is it to ensure that appropriate
12         MSDS's are distributed to the employees?
13   A.    Our Safety Director.
14   Q.    Who is that?
15   A.    It would Dana Gortney.
16   Q.    Mr.?
17   A.    Ms.
18         MR. ADAMS:  You said Gortney?
19   A.    Gortney, G-O-R-T-N-E-Y.
20   Q.    Is she related to the other Gortney?
21   A.    Yes.
22   Q.    Husband and wife?
23   A.    Brother and sister.

63 (Pages 246 to 249)

Ted Reynolds

**250**

1  Q.  Brother and sister. So her office is at
2      Birmingham?
3  A.  Yes.
4  Q.  And it's not your job or someone at the local
5      quarry to make sure that the various quarry
6      employees are given the appropriate MSDS's?
7  A.  New hire employees are given training, safety
8      training, and which the MSDS is part of that
9      training.
10 Q.  Who gives that training?
11 A.  Dana Gortney or her -- whoever she appoints to
12     do that.
13 Q.  And is that on site training or do they go
14     somewhere else for it?
15 A.  It can be either.
16 Q.  How about for the employees at the Lee County
17     quarry, was it on site or did they have to go
18     off?
19 A.  They went off site. Part of them have went off
20     site; part of them have been done there.
21 Q.  Do the employees sign the MSDS's or acknowledge
22     receipt in some manner?
23 A.  I don't know about the MSDS in particular. I

**251**

1      know they sign off on their training
2      certificates and the MSDS is a part of that
3      training program.
4  Q.  Okay. Are you aware of the hazards of silica
5      dust?
6  A.  I have a basic knowledge.
7  Q.  Okay. What is your basic knowledge of the
8      hazards, if any, of silica dust?
9  A.  You know, you don't need to breathe too much of
10     it.
11 Q.  Why not?
12 A.  It can be harmful to you.
13 Q.  How can it be harmful to you?
14 A.  It can hurt your lungs or whatever.
15 Q.  And that's something that Oldcastle is aware of
16     and has an obligation under law to warn its
17     employees of, isn't it?
18     MR. ADAMS: Object to the form.
19 Q.  You can answer if you can.
20 A.  Yes.
21 Q.  Do you have a copy of the MSDS for silica
22     that's used at the Opelika quarry?
23 A.  I don't know --

**252**

1  Q.  Have you ever seen --
2  A.  -- at this time.
3  Q.  -- one down there?
4  A.  I do not recall seeing one at this time.
5  Q.  Is there a place at the plant, the Opelika
6      quarry, where notices and MSDS's are published
7      so that employees can go there to see them if
8      they choose to?
9  A.  Yes.
10 Q.  Where is that?
11 A.  It's in the employee room.
12 Q.  I'll make this statement in your presence, just
13     so you can get your heads-up on it; we would
14     like to get copies of all of the documents that
15     are available to the employees in the employee
16     room. And I would like that none of them be
17     destroyed pending the copying of all of those
18     documents. I'm sure your lawyers will send you
19     a letter at some point.
20     MR. ADAMS: If you will just write us
21         and let us know what you want.
22 Q.  What, if anything, does Oldcastle do to
23     determine whether its employees are exposed to

**253**

1      too much silica dust?
2  A.  The federal government does employee testing
3      and we have done -- or we have the ability to
4      do some testing ourselves.
5  Q.  Do you do the testing on the employees?
6  A.  We have not done it at Opelika.
7  Q.  Is there a particular reason you haven't done
8      it at Opelika?
9  A.  We haven't -- I don't know how to say it. We
10     just haven't got to it yet.
11 Q.  And silica dust is created how in a quarry like
12     this Lee County quarry?
13 A.  Through the crushing operation.
14 Q.  All right. Through blasting as well?
15 A.  I would think that would be minimal.
16 Q.  Okay. Why do you think it would be minimal?
17 A.  Because you don't blast every day.
18 Q.  Do you have any knowledge or does Oldcastle
19     attempt in any way to determine how much of the
20     dust from each blast is fugitive dust
21     emissions?
22 A.  No.
23 Q.  What does Oldcastle do to minimize the dust

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

8b6c5d17-17b1-4719-add5-a6cba011e668



F I L E D
APR 1 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | Civil Action No.:  CV-2002-85 |
| | § | |
| HANSON AGGREGATES | § | |
| SOUTHEAST, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

To:     Clerk
Lee County Circuit Court
Justice Center, Room 104
2311 Gateway Drive
Opelika, AL

Please take notice that the following discovery documents have been served on behalf of

defendant Hanson Aggregates Southeast, Inc.:

( X )     Fourth Re-Notice of Deposition (Utilities Board of the City of Opelika);

( X )     Fourth Re-Notice of Deposition (City of Opelika);

( X )     Fourth Re-Notice of Deposition (Beauregard Water Authority); and

( X )     Notice of Deposition (Mayor Barbra Patton, Bo Brown, Jerry Teel, Dan
Hilyer and Bill Harrelson)

Respectfully submitted this 9th day of April, 2004.

_Paul Clark_ lc
_____
One of the attorneys for Defendant
Hanson Aggregates Southeast, Inc.

143632.1

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
**BALCH & BINGHAM LLP**
P. O. Box 78
Montgomery, AL 36101-0078
(334) 834-6500

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116

### Certificate of Service

    I hereby certify that on this 9th day of April, 2004, a copy of the foregoing has been served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL 36803-2345

_Paul Clark_
Of Counsel

220u

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

FILED

APR 1 3 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

       Please take notice that the following documents were served on April 12, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Haward and Nora Jackson.

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 12th day of April, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY&
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
        Plaintiff,              *

v.                                     *       CASE NUMBER: CV-02-85
                            *
                            *

HANSON AGGREGATES SOUTHEAST,           *
INC., et al.                           *
        Defendants.             *

**F I L E D**

APR 1 3 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### MOTION FOR LEAVE TO ADD PLAINTIFFS

The Plaintiffs would show this Court that:

1.     The Plaintiffs move for leave to add Robert and Belinda Smith as Plaintiffs.

2.     They have damage to their home as well as claims for dust and noise. Mrs. Smith and their fourteen (14) year old son have asthma, which is greatly aggravated by the dust. Mr. Smith has recently begun having nose bleeds.

3.     They have no sinkholes open on their property.

4.     Their claims will not delay the remainder of the case.

**WHEREFORE,** the Plaintiffs move this Court for leave to add additional Plaintiffs.

OF COUNSEL:

**CHARLES VERCELLI, JR.,** (VER004)
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

**GUY GUNTER**
*Council for City of Opelika/ Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

2286

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                    John V. Denson
BALCH & BINGHAM, LLP                   SAMFORD, DENSON, HORSLEY, PETTEY
P.O. Box 78                              & BRIDGES
Montgomery, AL 36101                   P.O. Box 2345
                                       Opelika, AL 36803-2345


H. Wayne Phears                        Phillip E. Adams, Jr.
PHEARS & MOLDOVAN                      ADAMS, UMBACH, DAVIDSON & WHITE, LLP
Suite 375                              P. O. Box 2069
4725 Peachtree Corner Circle           Opelika, AL 36803-2069
Norcross, GA 30092-3000

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 13th day of _____April_____, 2004.

OF COUNSEL

2284

# IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | § |
| Plaintiff, | § |
| | § |
| v. | §     CASE NUMBER: CV-02-85 |
| | § |
| HANSON AGGREGATES SOUTHEAST, | § |
| INC., et al. | § |
| Defendants. | § |

FILED
APR 1 5 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
      Lee County Justice Center
      2311 Gateway Drive, Room 104
      Opelika, Alabama 36801.

Please take notice that the following documents were served on April ___14___, 2004 to all attorneys of record in the above styled and numbered cause;

      1.    Answers to Oldcastles' First Set of Interrogatories by Michele Wilkes.

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the _____ 14 _____ day of April, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY & BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

APR 1 5 2004

2286

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION TO COMPEL ALEY DEPOSITION

Plaintiffs move this Honorable Court to enter an order allowing Plaintiffs to depose their expert, Tom Aley. As grounds for this Motion, Plaintiffs say:

1. Tom Aley has been designated as Plaintiffs' expert.

2. Mr. Aley has given several reports in this case. Attached to this Motion to Compel are the most recent of Mr. Aley's reports, which detail his opinions regarding Oldcastle and the damages it is causing. These reports are Bates-stamped 2234-2268.

3. The Plaintiffs have repeatedly requested to depose Mr. Aley, for use at trial, mediation, or otherwise. Defendants have refused.

4. Tom Aley is a world-renowned expert who travels very frequently on business. He frequently travels out of the country for extended periods. His availability is difficult, therefore, and it is imperative to the Plaintiffs' case, that Mr. Aley's deposition be taken both for discovery and for use at trial, if necessary. The Plaintiffs want to depose Mr. Aley as if he were testifying live at trial.

5. The Plaintiffs wish to take Mr. Aley's deposition by videotape.

2287

6.     The Defendants have refused to take the deposition of Mr. Aley, and/or have refused to allow the Plaintiffs to depose Mr. Aley for use at trial.

7.     Alabama Rule of Civil Procedure 30 clearly sets forth that the Plaintiffs have the right to depose their expert. As their expert has produced all of his reports, and has previously been deposed by Defendant Hanson, it is appropriate and not unfair to the Defendants that the Plaintiffs be allowed to depose Mr. Aley as requested.

8.     Rule 32 also provides that the deposition of Mr. Aley may be taken and used for any purpose, including use at trial or any other hearing. Therefore, there is no basis for Defendants to refuse to cooperate in the deposition of Mr. Aley.

9.     Mr. Aley is available for deposition on May 18-19, and Plaintiffs have requested of the Defendants that they take the deposition at that time. Defendants have refused, even though Defendants' expert, Dr. Ewers, is available on those days.

10.     Plaintiffs hereby agree, and by prior stipulation with Defendant Hanson's attorneys, have agreed that each parties' experts may attend the depositions of the other experts. Accordingly, Plaintiffs agree that the Defendants' experts may attend the deposition of Mr. Aley (and Plaintiffs' other experts) provided that Mr. Aley or other Plaintiffs' experts may attend the depositions of the Defendants' experts.

**WHEREFORE,** for good cause shown, Plaintiffs move this Honorable Court to enter an order allowing the Plaintiffs to depose Mr. Aley on May 18-19, 2004, by videotape and by stenographic means.

2288

_____

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

2289

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

J.M. (Jack) Weiss
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 14th day of ___April___, 2004.

_____
OF COUNSEL

155-00\PsMot to Compel Aley Depo.2.wpd

4

Summary of the professional opinions of Thomas J. Aley relative to the Hanson (now Oldcastle) Quarry, which is located near Opelika, Alabama. Opinions revised on March 29, 2004.

1. My opinions are based upon site visits on December 5 and 17, 2002;, April 28, 2003; and September 4, 2003. My opinions are further based upon my professional education and training; over 37 years of professional experience in karst hydrology and sinkhole collapse issues; technical literature and previous experience dealing with sinkhole formation and the impacts of quarry pumping on sinkhole formation; previous experience where quarry pumping has resulted in springs ceasing to flow; and various documents, reports, and maps related to the Hanson Quarry (now known as the Oldcastle Opelika Quarry) and to wells and hydrologic conditions in the Opelika area.

2. The Hanson (now Oldcastle) Quarry, located near Opelika, Alabama, is excavating geologic units which consist primarily of the Chewacla Marble. The Chewacla Marble of the region has natural solutional features which include (but are not limited to) pinnacled bedrock, solutional openings, and springs such as Spring Villa.

3. A productive aquifer exists in the Chewacla Marble and in adjacent and nearby rock units which notably include the Hollis Quartzite. This aquifer yields groundwater supplies to local wells and formerly yielded water to a spring known as Spring Villa.

4. It is common for quarries located in soluble rocks such as marble, limestone, and dolomite to adversely impact adjacent lands if the operation of the quarries appreciably lowers natural groundwater elevations. These impacts on adjacent lands commonly include, but may not be limited to: A) land subsidence and/or the sudden formation of sinkholes in surrounding areas, B) decreases in groundwater supplies available to water supply wells, C) decreases in the flow rates of surface streams, and D) decreases in the flow rates of springs.

5. A new sinkhole formed immediately adjacent to Lee County Highway 166 after pumping of the Hanson (now Oldcastle) Quarry lowered groundwater elevations in the area. When observed on December 17, 2002, this sinkhole was about 15 feet in diameter and about 15 feet deep. Weathered marble was exposed on the hanging wall of the sinkhole. On December 17, 2002, five pounds of rhodamine WT dye solution consisting of approximately 20% dye and 80% diluent was introduced into this sinkhole accompanied by approximately 73,000 gallons of water. For a period of 3 hours and 21 minutes the water was introduced into this sinkhole at a rate of about 350 gallons per minute, and all water rapidly disappeared into the subsurface through the bottom of the sinkhole. The dye was subsequently detected in water discharged from the Hanson (now Oldcastle) Quarry at the point where the quarry discharge passes beneath Lee County Highway 166. This groundwater trace demonstrated that the sinkhole is hydrologically connected with the Hanson (now Oldcastle) Quarry. The breakthrough curve of dye concentrations is consistent with subsurface flow through a fractured rock groundwater system.

Plaintiff
000000000002234

6. It is my conclusion that the collapse of the sinkhole immediately adjacent to Lee County Highway 166 was a direct result of quarry pumping. Pumping by the quarry appreciably lowered natural groundwater elevations in and around the quarry and reduced buoyant support given to the overlying landscape by water. Loss of buoyant support is a common mechanism responsible for sinkhole collapses associated with de-watering of soluble rock aquifers by quarries.

7. A report by Paul B. Krebs and Associates entitled "Hydrology for the Spring Villa, Alabama, Area" indicates that Hanson Aggregates Inc. re-activated the quarry in question during the summer of 1999. The U.S. Geological Survey Parkers Crossroads 7.5 minute topographic quadrangle of 1971 (photorevised 1983) indicates that, prior to the re-activation of the quarry the elevation on the quarry floor was about 585 feet above msl. There was a small and undoubtedly shallow pool of water on the floor as shown on the topographic map. It is reasonable to conclude that the elevation of this pool was at or near the natural elevation of the water table in the quarry area prior to the re-activating of the quarry.

8. A large spring known as Spring Villa is located in the valley of Little Uchee Creek about 8,000 feet northeast of the Hanson (now Oldcastle) Quarry. The spring is located in the Chewacla Marble. Prior to the pumping by the quarry Spring Villa provided a perennial discharge of groundwater. This conclusion is based on flow records, past use of the spring, and wetland vegetation located downstream of the spring. The spring no longer has a perennial discharge. The Krebs report plus verbal information from Alan Lee (Opelika Water Works) and James Sprayberry (an attorney) indicate that the spring has discharged water for only a few hours since it first stopped flowing during late spring, 2000. This altered flow pattern is attributable to the quarry pumping which has diverted water from the spring into the quarry and then, after pumping, into a different topographic basin from the one in which the water would normally have flowed.

9. The elevation of the floor of the pool at Spring Valley is approximately 573 feet msl. Prior to re-activation of the quarry, the water table elevation in the vicinity of the quarry was at about 585 feet. As a result, the elevation difference between the two points under natural conditions was about 12 feet over a lateral distance of about 8,000 feet with the groundwater gradient being from the quarry toward the spring. The most reasonable assumption regarding the direction for groundwater movement under natural conditions was from the vicinity of the quarry area toward Spring Villa.

It is my conclusion that re-activation of the quarry has lowered the present water table elevation in the immediate vicinity of the quarry to about 500 feet. This has reversed the direction of the groundwater gradient between the quarry and Spring Villa. It is my further conclusion that the pumping of the quarry after its re-activation has been responsible for the ending of flow from Spring Villa.

Plaintiff
000000000002235

10. Based upon my experience, and the pattern of groundwater elevations in the area, it is my conclusion that Spring Villa will seldom (if ever) discharge groundwater unless quarry pumping is curtailed and water level elevations in the region are allowed to recover to more natural conditions. If the pumping of the quarry is terminated, it is my conclusion that the spring will again have perennial flow within a few months to a few years.

11. It is my understanding that the Hanson (now Oldcastle) Quarry plans to ultimately increase the depth of the quarry by about another 125 feet. If this were to occur it will result in even more sinkhole collapses in the region, more decreases and losses of groundwater supplies for properties around the quarry, and adverse impacts from the quarry pumping on lands in a much larger quarry zone of influence.

12. On December 17, 2002 I introduced 10 pounds of a fluorescein dye mixture containing approximately 75% dye and 25% diluent into a dissolved out hole in the Chewacla Marble from which spring water at Spring Villa had formerly discharged to the surface. The dye was flushed into the groundwater system with water from a fire hydrant; the flow rate was between 300 and 325 gallons per minute. Based upon meter readings, a total of 119,000 gallons of water was introduced into the spring between 0735 hours and 1437 hours on December 17. All water rapidly disappeared into the groundwater system.

As of sampling and analysis completed through March 23, 2004, no dye from this dye introduction has been detected in the discharge water from the Hanson Quarry or in water at any other sampling stations.

13. On December 17, 2002 I introduced 15 pounds of an eosine dye mixture containing approximately 75% dye and 25% diluent into a sinkhole formed within about the previous week in the channel of Little Uchee Creek. The sinkhole is located about 800 feet northwest of Spring Villa. At the time of the dye introduction the sinkhole into which the dye was introduced was the furthest upstream of a series of 7 recently formed sinkholes in the channel of Little Uchee Creek in the stream reach upstream of the Lee County Highway which passes north of Spring Villa. Subsequent to the time of my dye introduction more sinkholes have formed in the area including another sinkhole on Little Uchee Creek upstream of the one into which I introduced the tracer dye. At the time of my dye introduction Little Uchee Creek was flowing into the dye introduction sinkhole at a rate of approximately 100 gallons per minute. At this time no flow in the creek passed this sinkhole and continued down the surface stream channel.

Eosine dye from the sinkhole introduction on Little Uchee Creek was first detected in water discharged from the Hanson (now Oldcastle) Quarry in activated carbon samplers in place for the period from June 5 to June 12, 2003. This indicates that the first arrival of dye from this dye introduction in water from the quarry occurred between 170 and 177 days after dye introduction. Eosine dye from this dye introduction has continued to be detected in activated carbon samplers in place at the point where quarry water

Plaintiff
0000000000002236

3

discharges across Road 166. The most recently collected samplers were in place at this location for the period from May 8 to May 23, 2004.

14. Based upon field observations, groundwater gradients, technical literature, and my past experience it is my conclusion that the Hanson (now Oldcastle) Quarry pumping has caused the formation of sinkholes in the channel of Little Uchee Creek and the subsequent loss of perennial flow in this stream from the point of the most upstream sinkhole downstream for an appreciable distance. The quarry pumping has also resulted in the decrease of flow rates in Little Uchee Creek for the entire stream segment downstream of the sinkholes in the stream channel and Spring Villa.

15. The pumping of water from the Hanson (now Oldcastle) Quarry has caused new sinkhole development along Lee County Highway 166 and in the channel of Little Uchee Creek. In addition, a number of other sinkholes resulting from quarry activities have occurred in the region and more examples of sinkhole collapses and land subsidence due to quarry pumping must be expected in the future in areas underlain by the Chewacla Marble.

16. Rhodamine WT dye from the dye introduction in a sinkhole along Road 166 was detectable in activated carbon samplers placed in water discharged from the quarry at the point where this water crosses Road 166. This dye was first detected in activated carbon samplers in place at this sampling station for the period from December 18 to 19, 2003 (Days 1 and 2 after the date of dye introduction). Rhodamine WT was detectable in activated carbon samplers placed at this sampling station through the period July 2 to August 28, 2003 (Days 197 through 254 after the date of dye introduction).

Approximately 98% of all rhodamine WT dye detected at the point where quarry discharge waters cross Road 166 was detected in samples collected on or before March 27, 2003. During this period no eosine dye was detected at this sampling station and the analytical graphs showed no evidence that any rhodamine WT dye was degrading to a fluorescent compound which would create fluorescence peaks which might be confused with well shaped emission fluorescence peaks characteristic of eosine dye. Any suggestion that the eosine dye detected at this sampling station during the period from the period June 5 to June 12, 2003 through March 8 to 23, 2004 might in some way represent a fluorescent compound resulting from the breakdown of rhodamine WT dye is not supported by factual data and is not reasonable.

17. I have prepared a report entitled: "Summary Report on Groundwater Tracing Results Associated with the Hanson (now Oldcastle) Quarry at Opelika, Alabama." The report is dated April, 2004. This report reflects my professional opinions.

F:\shared\tom\opelika3.doc
Revised 4/6/04

Plaintiff
0000000000002237

2294

# Summary Report on Groundwater Tracing Results Associated with the Hanson (now Oldcastle) Quarry at Opelika, Alabama.

## April 2004.

Tom Aley, Alabama Professional Geologist #1089

## Dye Introductions

### Rhodamine WT Trace

A new sinkhole formed immediately adjacent to Lee County Highway 166 after pumping of the Hanson (now Oldcastle) Quarry lowered groundwater elevations in the area. When observed on December 17, 2002, this sinkhole was about 15 feet in diameter and about 15 feet deep. Weathered marble was exposed on the hanging wall of the sinkhole.

On December 17, 2002, five pounds of rhodamine WT dye solution consisting of approximately 20% dye and 80% diluent was introduced by Tom Aley into this sinkhole accompanied by approximately 73,000 gallons of water. For a period of 3 hours and 21 minutes the water was introduced into this sinkhole at a rate of about 350 gallons per minute, and all water rapidly disappeared into the subsurface through the bottom of the sinkhole.

### Eosine Trace

On December 17, 2002 Tom Aley introduced 15 pounds of an eosine dye mixture containing approximately 75% dye and 25% diluent into a sinkhole formed within about the previous week in the channel of Little Uchee Creek. The sinkhole is located about 800 feet northwest of Spring Villa. At the time of the dye introduction the sinkhole into which the dye was introduced was the furthest upstream of a series of 7 recently formed sinkholes in the channel of Little Uchee Creek in the stream reach upstream of the Lee County Highway which passes north of Spring Villa. Subsequent to the time of my dye introduction more sinkholes have formed in the area including another sinkhole on Little Uchee Creek upstream of the one into which I introduced the tracer dye. At the time of my dye introduction Little Uchee Creek was flowing into the dye introduction sinkhole at a rate of approximately 100 gallons per minute. At this time no flow in the creek passed this sinkhole and continued down the surface stream channel.

### Fluorescein Trace

On December 17, 2002 Tom Aley introduced 10 pounds of a fluorescein dye mixture containing approximately 75% dye and 25% diluent into a dissolved out hole in the Chewacla Marble from which spring water at Spring Villa had formerly discharged to the surface. The dye was flushed into the groundwater system with water from a fire

Plaintiff
00000000002238

hydrant; the flow rate was between 300 and 325 gallons per minute. Based upon meter readings, a total of 119,000 gallons of water was introduced into the spring between 0735 hours and 1437 hours on December 17. All water rapidly disappeared into the groundwater system.

## Dye Sampling Results

Sampling results from all activated carbon and water samples are included as Tables 5 and 6 at the back of this report.

## Tracer Dye Detections

### Rhodamine WT Trace

Dye from this trace was detected at the following sampling stations:

♦ Station 10. Test Well at 166. This station is very near the dye introduction point.
♦ Station 11. Quarry Discharge at 166.
♦ Station 12. Quarry Discharge at Parkers. This station is downstream of Station 11.
♦ Station 13. Creek at 146. This station is downstream of Stations 11 and 12.

Table 1 summarizes data from Station 11 (Quarry Discharge at 166) for rhodamine WT dye detections in elutants from activated carbon samplers.

Through September 24, 2003 the sum of mean rhodamine WT dye concentrations in activated carbon samplers was 6019.8 parts per billion. Mean values were used when two samplers were analyzed for dye concentrations. The activated carbon samplers were lost for the period from Day 77 to Day 84. For this period we used the daily mean of the previous and subsequent sample values; this was 5.0 ppb; for the seven day period it equaled 35.0 ppb. For the period from Day 98 to Day 168 there were no samples. For this 70 day period we used the mean daily value for the prior period and the subsequent period (0.85 ppb) for 70 days = 59.5 ppb. The sum of 6019.8 + 35.0 + 59.5 = 6114.3 ppb.

Plaintiff
000000000002239

2

Plaintiff 00000000022240

2288

**Table 1.** Rhodamine WT Dye Detections in Elutants from Activated Carbon Samplers, Quarry Discharge at Road 166.  Day Zero is 12/17/02, the date of dye introduction.

| From | Day # | To | Day # | Packet 1 conc. ppb | Packet 2 conc. ppb | Difference ppb | Mean ppb | RPD | Packet 1 WL nm | Packet 2 WL nm | Difference ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/5/02 | | 12/12 | | ND | ND | ND | ND | | | | |
| 12/12 | | 12/18 | 1 | ND | ND | | | | | | |
| 12/18 | 1 | 12/19 | 2 | 156 | 91.6 | 64.4 | 123.8 | 52.0 | 567.8 | 567.6 | .2 |
| 12/19 | 2 | 12/20 | 3 | 534 | 413 | 121 | 474 | 25.5 | 568.0 | 568.2 | .2 |
| 12/20 | 3 | 12/23 | 6 | 1990 | 2380 | 391 | 2185 | 17.9 | 568.0 | 568.0 | .0 |
| 12/23 | 6 | 12/26 | 9 | 811 | 742 | 69 | 777 | 8.9 | 568.0 | 567.9 | .1 |
| 12/26 | 9 | 12/30/02 | 13 | 764 | 612 | 152 | 688 | 22.1 | 567.9 | 568.3 | .4 |
| 12/30/02 | 13 | 1/2/03 | 16 | 408 | 607 | 199 | 508 | 39.2 | 567.4 | 567.8 | .4 |
| 1/2 | 16 | 1/9 | 23 | 570 | 475 | 95 | 523 | 18.2 | 567.7 | 567.4 | .3 |
| 1/9 | 23 | 1/16 | 30 | 266 | 216 | 50 | 241 | 20.7 | 567.6 | 567.4 | .2 |
| 1/16 | 30 | 1/23 | 37 | 144 | 142 | 2 | 143 | 1.4 | 567.7 | 567.7 | 0 |
| 1/23 | 37 | 1/30 | 44 | 95.5 | 81.7 | 13.8 | 88.6 | 15.6 | 567.8 | 567.7 | .1 |
| 1/30 | 44 | 2/6 | 51 | 64.7 | 33.9 | 30.8 | 49.3 | 62.5 | 567.6 | 567.6 | 0 |
| 2/6 | 51 | 2/13 | 58 | 35.6 | 26.1 | 9.5 | 30.9 | 30.7 | 567.9 | 567.7 | .2 |
| 2/13 | 58 | 2/20 | 65 | 46.9 | 44.1 | 2.8 | 45.5 | 6.2 | 567.7 | 567.9 | .2 |
| 2/20 | 65 | 2/26 | 71 | 40.3 | NS | -- | -- | | 567.9 | NS | -- |
| 2/26 | 71 | 3/6 | 79 | 51.1 | 52.7 | 1.6 | 51.9 | 3.1 | 568.1 | 568.1 | 0 |
| 3/6 | 79 | 3/13 | 86 | NS | | -- | -- | NS | | | |
| 3/13 | 86 | 3/19 | 92 | 23.1 | 17.9 | 5.2 | 20.5 | 25.4 | 568.0 | 568.3 | .3 |
| 3/19 | 92 | 3/27 | 100 | 6.81 | 8.68 | 1.87 | 7.75 | 24.1 | 568.9 | 568.3 | .6 |
| 3/27 | 100 | 6/5 | 170 | No Samples | | | | | | | |
| 6/5 | 170 | 6/12 | 177 | 3.88 | 5.38 | 1.50 | 4.63 | 32.4 | 568.4 | 566.8 | 1.6 |
| 6/12 | 177 | 7/2 | 197 | 7.35 | 11.2 | 3.8 | 9.3 | 40.9 | 567.6 | 566.8 | 0.8 |

(continued)

3

2297

Plaintiff
0000000000002241

Table 1 (continued). Rhodamine WT Dye Detections in Elutants from Activated Carbon Samplers, Quarry Discharge at Road 166. Day Zero is 12/17/02, the date of dye introduction.

| From | Day # | To | Day # | Packet 1 conc. ppb | Packet 2 conc. ppb | Difference ppb | Mean ppb | RPD | Packet 1 WL nm | Packet 2 WL nm | Difference ppb |
|------|-------|-----|-------|--------------------|--------------------|----------------|----------|-----|----------------|----------------|----------------|
| (continued) | | | | | | | | | | | |
| 7/2 | 197 | 8/28 | 254 | 11.9 | 9.78 | 2.1 | 10.9 | 19.3 | 568.3 | 566.8 | 1.5 |
| 8/28 | 254 | 9/4 | 261 | ND | ND | | | | ND | ND | |
| 9/4 | 261 | 9/9 | 266 | ND | ND | | | | ND | ND | |
| 9/9 | 266 | 9/16 | 273 | ND | ND | | | | ND | ND | |
| 9/16 | 273 | 9/24 | 281 | ND | ND | | | | ND | ND | |
| 9/24 | 281 | 10/1 | 288 | ND | ND | | | | ND | ND | |
| 10/1 | 288 | 10/8 | 295 | ND | ND | | | | ND | ND | |
| 10/8 | 295 | 10/15 | 302 | ND | ND | | | | ND | ND | |
| 10/15 | 302 | 10/22 | 309 | ND | ND | | | | ND | ND | |
| 10/22 | 309 | 10/29 | 316 | ND | ND | | | | ND | ND | |
| 10/29 | 316 | 11/12 | 3.30 | Water Sample Only | | | | | | | |
| 11/12 | 330 | 12/17 | 365 | ND | ND | | | | ND | ND | |
| 12/17 | 365 | 1/6/04 | 385 | ND | ND | | | | ND | ND | |
| 1/6/04 | 385 | 3/8 | 447 | ND | ND | | | | ND | ND | |
| 3/8 | 447 | 3/23 | 462 | ND | ND | | | | ND | ND | |

4

2298

Approximately 98% of all rhodamine WT dye detected at the point where quarry discharge waters cross Road 166 was detected in samples collected on or before March 27, 2003. During this period no eosine dye was detected at this sampling station and the analytical graphs showed no evidence that any rhodamine WT dye was degrading to a fluorescent compound which would create fluorescence peaks which might be confused with well shaped emission fluorescence peaks characteristic of eosine dye.

Table 2 provides mean daily rhodamine WT concentrations from Station 11. The peak daily rhodamine WT dye concentration at this sampling station occurred during the period from Day 3 to Day 6 after dye introduction (December 20 to 23, 2002). The mean daily rhodamine WT concentration during this period was 728.3 ppb. Order of magnitude dye concentration declines from this peak concentration period were as follows:

♦ Mean daily rhodamine WT dye concentration at Station 11 declined to approximately 10% of the peak daily dye concentration during the period from Day 16 to 23 after dye introduction (January 2 to January 9, 2003).

♦ The mean daily dye concentration at this station declined to approximately 1% of the peak daily dye concentration during the period from Day 44 to 51 after dye introduction (January 30 to February 6, 2003).

♦ The mean daily dye concentration declined to 0.1% of the peak daily dye concentration during the period from Day 170 to 177 (June 5 to June 12, 2003).

In summary, approximately 98% of the detected rhodamine WT dye had discharged from the quarry on or before March 27, 2003. The first detection of eosine dye at Station 11 occurred at the same time that the mean daily rhodamine WT concentration had declined to 0.1% of the peak daily dye concentration. Any suggestion that the eosine dye detected at this sampling station during the period from June 5 to June 12, 2003 through March 8 to 23, 2004 might in some way represent a fluorescent compound resulting from the breakdown of rhodamine WT dye is not supported by factual data and is neither logical nor reasonable. In fact, the data clearly demonstrate that the breakdown of rhodamine WT could not have produced the fluorescence peaks in the range of eosine dye detected in all activated carbon samplers collected from Station 11 during the period from Day 170 to 177 through at least Day 447 through Day 462. Eosine dye will probably continue to be present beyond Day 462 in the discharge water from the quarry as monitored with activated carbon samplers at Station 11.

Plaintiff
000000000002242

**Table 2. Mean Daily Rhodamine WT Concentrations from Activated Carbon Samplers, Quarry Discharge at Road 166. Day 0 is 12/17/02.**

| Period from Day | To Day | Daily Mean Conc. ppb |
|---|---|---|
| 0 | 1 | 0 |
| 1 | 2 | 123.8 |
| 2 | 3 | 474.0 |
| 3 | 6 | 728.3 |
| 6 | 9 | 259.0 |
| 9 | 13 | 172.0 |
| 13 | 16 | 169.3 |
| 16 | 23 | 74.7 |
| 23 | 30 | 34.4 |
| 30 | 37 | 20.4 |
| 37 | 44 | 12.7 |
| 44 | 51 | 7.0 |
| 51 | 58 | 4.4 |
| 58 | 65 | 6.5 |
| 65 | 71 | 6.7 |
| 71 | 79 | 6.5 |
| 79 | 86 | 5.0 - NS - Est. mean of prior and subsequent periods |
| 86 | 92 | 3.4 |
| 92 | 100 | 1.0 |
| 100 | 170 | 0.9 - NS - Est. mean of prior and subsequent periods |
| 170 | 177 | 0.7 |
| 177 | 197 | 0.5 |
| 197 | 254 | 0.2 |
| 254 | 261 | ND |
| 261 | 266 | ND |
| 266 | 273 | ND |
| 273 | 281 | ND |
| 281 | 288 | ND |
| 288 | 295 | ND |
| 295 | 302 | ND |
| 302 | 309 | ND |
| 309 | 316 | ND |
| 316 | 330 | ND - Water Sample Only |
| 365 | 385 | ND |
| 385 | 447 | ND |
| 447 | 462 | ND |

6

Plaintiff
000000000002243

Relative Percent Difference (RPD) values are routinely calculated in professional quality hydrologic studies. The RPD value for a pair of samples is the difference between the two analysis results divided by the mean of the two values. RPD values were calculated for dye concentrations in pairs of activated carbon samplers which contained rhodamine WT dye. There were 19 pairs of activated carbon samplers used in the calculations. The mean RPD value for rhodamine WT concentration was 24.5%. The maximum RPD value for any pair of samples was 62.5%, and the minimum RPD value for any pair of samples was 1.4%. There were no cases where rhodamine WT was detected in only one of the pair of samplers. The mean wavelength difference in fluorescence peaks was 0.4 nm. These values demonstrate that the analytical results are of adequate quality to support calculations made above relative to the amount of detectable rhodamine WT discharged from the quarry during particular periods and the concentrations eluted from activated carbon samplers.

### Eosine Trace

Dye from this trace was detected at the following sampling stations:

- Station 11. Quarry Discharge at 166.
- Station 12. Quarry Discharge at Parkers. This station is downstream of Station 11.

Table 3 summarizes data from Station 11 (Quarry Discharge at 166) for eosine dye detections in elutants from activated carbon samplers. Eosine dye was first detected at this sampling station in activated carbon samplers in place for the period June 5 to 12, 2003 (170 to 177 days after dye introduction). Eosine dye has been continuously detected in all activated carbon samplers collected from this sampling station through the most recent samplers which were in place from March 8 to 23, 2004 (447 to 462 days after dye introduction).

Table 4 presents mean daily eosine concentrations from activated carbon samplers in place at Station 11. The maximum mean daily concentration occurred in a sampler in place for the period from Day 261 to 266 (September 4 to 9, 2003).

Relative Percent Difference (RPD) values were calculated for activated carbon samplers which contained eosine dye. There were 16 pairs of activated carbon samplers used in the calculations. The mean RPD value for eosine concentrations was 30.0%. The maximum RPD value for any pair of samples was 87.0%, and the minimum RPD value for any pair of samples was 3.2%. There were no cases where eosine was detected in only one of a pair of samplers. The mean wavelength difference in fluorescence peaks in pairs of samplers was 0.2 nm.

Plaintiff
00000000000002244

2304

Plaintiff
0000000000002245

**Table 3. Eosine Dye Detections in Elutants from Activated Carbon Samplers, Quarry Discharge at Road 166. Day Zero is 12/17/02, the date of dye introduction.**

| From | Day # | To | Day # | Packet 1 conc. ppb | Packet 2 conc. ppb | Difference ppb | Mean ppb | RPD | Packet 1 WL nm | Packet 2 WL nm | Difference ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/5/03 | 170 | 6/12 | 177 | 3.23 | 5.62 | 2.39 | 4.43 | 54.0 | 539.1 | 539.2 | 0.1 |
| 6/12 | 177 | 7/2 | 197 | 9.09 | 16.2 | 7.1 | 12.7 | 55.9 | 539.1 | 539.2 | 0.1 |
| 7/2 | 197 | 8/28 | 254 | 8.24 | 7.80 | 0.44 | 8.02 | 5.5 | 539.4 | 539.7 | 0.3 |
| 8/28 | 254 | 9/4 | 261 | 5.13 | 5.48 | 0.35 | 5.31 | 6.6 | 538.8 | 539.0 | 0.2 |
| 9/4 | 261 | 9/9 | 266 | 12.4 | 7.93 | 4.5 | 10.2 | 44.1 | 539.3 | 539.1 | 0.2 |
| 9/9 | 266 | 9/16 | 273 | 11.0 | 4.27 | 6.7 | 7.7 | 87.0 | 538.9 | 539.1 | 0.2 |
| 9/16 | 273 | 9/24 | 281 | 7.05 | 6.83 | 0.22 | 6.94 | 3.2 | 539.2 | 539.1 | 0.1 |
| 9/24 | 281 | 10/1 | 288 | 5.43 | 8.45 | 3.02 | 6.94 | 43.5 | 539.5 | 539.1 | 0.4 |
| 10/1 | 288 | 10/8 | 295 | 8.57 | 11.6 | 3.0 | 10.1 | 29.7 | 539.1 | 539.0 | 0.1 |
| 10/8 | 295 | 10/15 | 302 | 4.32 | 5.27 | 0.95 | 4.80 | 19.8 | 539.0 | 539.1 | 0.1 |
| 10/15 | 302 | 10/22 | 309 | 3.12 | 1.63 | 1.49 | 2.38 | 62.6 | 539.6 | 539.5 | 0.1 |
| 10/22 | 309 | 10/29 | 316 | 6.99 | 8.10 | 1.11 | 7.55 | 14.7 | 539.0 | 539.1 | 0.1 |
| 10/29 | 316 | 11/12 | 330 | Water Sample Only | | -- | | | | | |
| 11/12 | 330 | 12/17 | 365 | 9.51 | 11.1 | 1.6 | 10.3 | 15.5 | 539.6 | 539.2 | 0.4 |
| 12/17 | 365 | 1/6/04 | 385 | 9.85 | 10.7 | 0.8 | 10.3 | 7.8 | 539.3 | 539.5 | 0.2 |
| 1/6 | 385 | 3/8 | 447 | 13.7 | 16.8 | 3.1 | 15.3 | 20.3 | 539.1 | 539.3 | 0.2 |
| 3/8 | 447 | 3/23 | 462 | 12.8 | 11.6 | 1.2 | 12.2 | 9.8 | 539.2 | 539.3 | 0.1 |

**Table 4. Mean Daily Eosine Concentrations from Activated Carbon Samplers, Quarry Discharge at Road 166. Day 0 is 12/17/02.**

| Period from Day | To Day | Daily Mean Conc. ppb |
|---|---|---|
| 170 | 177 | 0.63 |
| 177 | 197 | 0.64 |
| 197 | 254 | 0.14 |
| 254 | 261 | 0.76 |
| 261 | 266 | 2.04 |
| 266 | 273 | 1.10 |
| 273 | 281 | 0.87 |
| 281 | 288 | 0.99 |
| 288 | 295 | 1.44 |
| 295 | 302 | 0.69 |
| 302 | 309 | 0.34 |
| 309 | 316 | 1.08 |
| 316 | 330 | 0.69 - No Sample. Mean of prior and subsequent value. |
| 330 | 365 | 0.29 |
| 365 | 385 | 0.52 |
| 385 | 447 | 0.25 |
| 447 | 462 | 0.81 |

2302

Plaintiff
000000000002246

9

Dr. Ewers, in a letter of July 10, 2003 to Mr. Byram, suggested that my interpretation of an eosine dye detection in the June 5, 2003 sampling was premature and very possibly incorrect. Dr. Ewers asserted that the fluorescence peaks which I attributed to eosine dye (and which met our qualitative and quantitative criteria for positive eosine dye detections) were likely due to the breakdown of rhodamine WT dye. There are a number of reasons that Dr. Ewers' assertions are incorrect; the following identifies some of them:

♦ Rhodamine WT does not convert to eosine dye. Instead, some portions of a rhodamine WT dye mixture may degrade to a compound which has some fluorescence characteristics similar to eosine dye. Further degradation yields a compound with still different fluorescence characteristics.

♦ The fact that 98% of the detected rhodamine WT dye had discharged from the quarry on or before March 27, 2003 and that the first detection of eosine dye at Station 11 occurred at the same time that the mean daily rhodamine WT concentration had declined to 0.1% of the peak daily dye concentration. As a result, there was insufficient rhodamine WT available to convert to a compound which might have fluorescence characteristics similar to eosine dye.

♦ Dr. Ewers stated that my interpretation of a positive eosine detection in activated carbon samplers placed in waters derived from the quarry was premature. Dr. Ewers' opinion (one would expect) indicates that further positive detections of eosine dye would be able to confirm the conclusion which I had reached. As of March 23, 2004 we have collected and analyzed 32 activated carbon samplers which had been placed in the water pumped from the quarry and which contained detectable concentrations of eosine dye. The time period during which eosine dye has been detected in waters from the quarry has now exceeded 9 months. No sampler in place during any portion of this 9 month period was negative for the presence of eosine dye. I disagree with Dr. Ewers' statement that my interpretation was premature. However, the abundant data now available show that my interpretation (actually my conclusion) was in fact correct.

♦ Deterioration of rhodamine WT dye to a fluorescent compound which would be mistaken for eosine dye in activated carbon samplers (assuming an analytical approach of professional quality) is a highly unlikely event. When it occurs, the conversion takes on the order of years. It is reasonable to expect such a conversion to be especially slow in relatively clean groundwater (such as found in the Opelika area).

♦ We have conducted other analytical tests on elutant samples from charcoal packets placed in waters which have discharged from the quarry. These results have been compared with results from samples known to contain eosine dye. Results from these other analytical tests of samplers from the quarry discharge water have been consistent with the presence of eosine dye in the samplers. These tests have included: 1) dilution of elutant samples with water to determine the wavelength difference due to the modification of the liquid matrix, and 2) multiple analysis of samples with different wavelength separations between the excitation and emission slits.



Plaintiff
000000000002247

2304

♦ There are no data to reasonably suggest that the fluorescence peaks which we have identified as eosine dye are not in fact eosine dye derived from the dye which we introduced in Little Uchee Creek.

**Fluorescein Trace**

As of March 23, 2004 no fluorescein dye has been detected from the introduction at Spring Villa. Solution cavities exist at Spring Villa below the elevation at which the dye was introduced. The introduced dye and water could be detained in these cavities and be slowly "bleeding out" into adjacent rocks and/or alluvium. Of major importance is the fact that, unlike the eosine dye introduction upstream of Spring Villa on Little Uchee Creek, there is no continuing flow of water serving to flush the fluorescein dye into and through the regional aquifer. The magnitude of this difference in flushing water volume is indicated by the following values.

On December 17, 2002 a total of 119,000 gallons of water was introduced with the dye at Spring Villa. On the same date eosine dye was introduced at the sinkhole on Little Uchee Creek. The flow rate at the eosine dye introduction site was estimated at 100 gallons per minute; this equals 144,000 gallons per day. In a single day the eosine dye introduction had approximately 1.2 times more water to flush it into and through the aquifer than did the Spring Villa Trace.

Dr. Ewers also introduced fluorescein dye at Spring Villa. In a letter to Charles E. Vercelli, Jr. from James A. Byram, Jr. dated March 29, 2004, Mr. Byram reported that Dr. Ewers used in excess of 15,000 cubic feet of flush water; this equals 112,200 gallons. Since he reported that the volume was in excess of 15,000 cubic feet we will conclude, for calculation purposes, that Dr. Ewers introduced about 115,000 gallons of water in conjunction with his dye introduction at Spring Villa.

The amount of water I introduced at Spring Villa, plus the volume that Ewers introduced, equals about 234,000 gallons. We have now sampled for tracer dyes in the discharge waters from the quarry through March 23, 2004; this is 462 days after my dye introduction. 462 days multiplied by 144,000 gallons of water per day equals approximately 66.5 million gallons of water. This in turn equals 284 times more water introduced behind the eosine dye introduction than behind the fluorescein introductions made by Dr. Ewers and me. Other than trivial amounts of water yielded by precipitation into the spring basin there has been no other water introduced into Spring Villa.

Prior to the start of pumping by the quarry the mean flow of Spring Villa (based upon 16 measurements) was 3.78 cubic feet per second. The amount of water introduced into Spring Villa in conjunction with the Ozark Underground Laboratory (OUL) fluorescein dye introduction equaled the mean flow from this spring for a 70 minute period. The peak measured flow rate of Spring Villa was 11.01 cubic feet per second. At

Plaintiff
000000000002248

2305

this flow rate the amount of water introduced into Spring Villa in conjunction with our dye introduction equaled the peak measured flow from this spring for a period of 24 minutes. Spring Villa, before its water sources was pirated by quarry pumping, was a major regional spring. Historic flow rates from the spring and the nature of solution cavities make it reasonable to expect the existence of bedrock cavities capable of detaining many times the volume of water introduced during the OUL and Ewers dye traces.

As of March 23, 2004, no fluorescein dye from either of the two dye introductions made at Spring Villa has been detected in quarry discharge waters. Detainment of dyed waters in the vicinity of Spring Villa with slow release into alluvium or the fractured rock aquifer adjacent to the limestone deposits is the likely explanation for the non-detection of fluorescein in quarry discharge waters. This is supported by the results from the results from the nearby eosine dye introduction.

It is also noteworthy that, based upon Mr. Byram's letter of March 29, 2004, Dr. Ewers has not detected fluorescein dye at any of his other sampling stations. Dr. Ewers, in a July 10, 2003 letter to James A. Byram, Jr., concluded that the most likely reason that fluorescein had not been detected from my introduction at Spring Villa was due to my failure to have sufficient properly located dye sampling stations. Dr. Ewers' data is providing useful evidence that his suggestion (that dye from Spring Villa would appear at locations other than in the quarry) was neither reasonable nor correct.

F:\shared\tom\opelika8.doc

Plaintiff
000000000002249

Ozark Underground Laboratory, Inc.

Groundwater Investigation
Charcoal Results

Opelika, AL

**Table 5.** Results charcoal samplers analyzed for the presence of fluorescein, eosine, rhodamine WT (RWT) and sulforhodamine B (SRB) dyes. Peak wavelengths are reported in nanometers (nm); dye concentrations are reported in parts per billion (ppb).

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3409 | 1 | East Branch Uchee Creek at Road 148 | | 12/6 1205 | 12/12 1106 | | ND | | ND | | ND | | ND |
| M3765 | 1 | East Branch Uchee Creek at Road 148 | | 12/12 1106 | 12/18 0918 | | ND | | ND | | ND | | ND |
| M3782 | 1 | East Branch Uchee Creek at Road 148 | | 12/18 0918 | 12/19 0855 | | ND | | ND | | ND | | ND |
| M3939 | 1 | East Branch Uchee Creek at Road 148 | | 12/19 0855 | 12/20 0827 | | ND | | ND | | ND | | ND |
| M3958 | 1 | East Branch Uchee Creek at Road 148 | | 12/20 0827 | 12/23 0916 | | ND | | ND | | ND | | ND |
| M4012 | 1 | East Branch Uchee Creek at Road 148 | | 12/23 0916 | 12/26 0918 | | ND | | ND | | ND | | ND |
| M4030 | 1 | East Branch Uchee Creek at Road 148 | | 12/26 0918 | 12/30 0844 | | ND | | ND | | ND | | ND |
| M4127 | 1 | East Branch Uchee Creek at Road 148 | | 12/30 0844 | 1/2 0824 | | ND | | ND | | ND | | ND |
| M4406 | 1 | East Branch Uchee Creek at Road 148 | | 1/2 0824 | 1/9 0851 | | ND | | ND | | ND | | ND |
| M4545 | 1 | East Branch Uchee Creek at Road 148 | | 1/9 0851 | 1/16 0834 | | ND | | ND | | ND | | ND |
| M4796 | 1 | East Branch Uchee Creek at Road 148 | | 1/16 0834 | 1/23 0751 | | ND | | ND | | ND | | ND |
| M4865 | 1 | East Branch Uchee Creek at Road 148 | | 1/23 0751 | 1/30 0805 | | ND | | ND | | ND | | ND |
| M4943 | 1 | East Branch Uchee Creek at Road 148 | | 1/30 0805 | 2/6 0800 | | ND | | ND | | ND | | ND |
| M5033 | 1 | East Branch Uchee Creek at Road 148 | | 2/6 0800 | 2/13 0809 | | ND | | ND | | ND | | ND |
| M5110 | 1 | East Branch Uchee Creek at Road 148 | | 2/13 0809 | 2/20 0748 | | ND | | ND | | ND | | ND |
| M5135 | 1 | East Branch Uchee Creek at Road 148 | | 2/20 0748 | 2/26 0731 | | ND | | ND | | ND | | ND |
| M5264 | 1 | East Branch Uchee Creek at Road 148 | | 2/26 0731 | 3/6 0906 | | ND | | ND | | ND | | ND |
| M5369 | 1 | East Branch Uchee Creek at Road 148 | | 3/6 0906 | 3/13 0755 | | ND | | ND | | ND | | ND |
| M5466 | 1 | East Branch Uchee Creek at Road 148 | | 3/13 0755 | 3/19 0757 | | ND | | ND | | ND | | ND |
| M5617 | 1 | East Branch Uchee Creek at Road 148 | | 3/19 0757 | 3/27 0732 | | ND | | ND | | ND | | ND |
| M7266 | 1 | East Branch Uchee Creek at Road 148 | | 3/27 0732 | 6/5 1203 | | ns | | | | | | ND |
| M72266 | 1 | East Branch Uchee Creek at Road 148 | | 6/5 1203 | 6/12 1505 | | ND | | | | | | ND |
| | 1 | East Branch Uchee Creek at Road 148 | | 6/12 1505 | 7/2 1300 | | wso | | | | | | ND |
| M3407 | 2 | Little Uchee at 148 | | 12/6 1147 | 12/12 1059 | | ND | | ND | | ND | | ND |
| M3408 | 3 | Spring Villa below Weir | | 12/6 1157 | 12/12 1050 | | ND | | ND | | ND | | ND |
| M3946 | 3 | Spring Villa below Weir | | 12/12 1050 | 12/20 0847 | | ND | | ND | | ND | | ND |
| M3962 | 3 | Spring Villa below Weir | | 12/20 0847 | 12/23 0936 | | ND | | ND | | ND | | ND |
| M4015 | 3 | Spring Villa below Weir | | 12/23 0936 | 12/26 0943 | | ND | | ND | | ND | | ND |
| M4033 | 3 | Spring Villa below Weir | | 12/26 0943 | 12/30 0904 | | ND | | ND | | ND | | ND |
| M4130 | 3 | Spring Villa below Weir | | 12/30 0904 | 1/2 0842 | | ND | | ND | | ND | | ND |
| M4409 | 3 | Spring Villa below Weir | | 1/2 0842 | 1/9 0907 | | ND | | ND | | ND | | ND |
| M4548 | 3 | Spring Villa below Weir | | 1/9 0907 | 1/16 0851 | | ND | | ND | | ND | | ND |
| M4799 | 3 | Spring Villa below Weir | | 1/16 0851 | 1/23 0805 | | ND | | ND | | ND | | ND |
| M4867 | 3 | Spring Villa below Weir | | 1/23 0805 | 1/30 0825 | | ND | | ND | | ND | | ND |
| M4946 | 3 | Spring Villa below Weir | | 1/30 0825 | 2/6 0812 | | ND | | ND | | ND | | ND |
| M5036 | 3 | Spring Villa below Weir | | 2/6 0812 | 2/13 0831 | | ND | | ND | | ND | | ND |
| M5112 | 3 | Spring Villa below Weir | | 2/13 0831 | 2/20 0759 | | ND | | ND | | ND | | ND |
| M5137 | 3 | Spring Villa below Weir | | 2/20 0759 | 2/26 0740 | | ND | | ND | | ND | | ND |
| M5266 | 3 | Spring Villa below Weir | | 2/26 0740 | 3/6 0915 | | ND | | ND | | ND | | ND |
| M5371 | 3 | Spring Villa below Weir | | 3/6 0915 | 3/13 0806 | | ND | | ND | | ND | | ND |
| M5468 | 3 | Spring Villa below Weir | | 3/13 0806 | 3/19 0808 | | ND | | ND | | ND | | ND |

2306

Plaintiff
00000000000002250

2007

Ozark Underground Laboratory, Inc.

Opelika, AL

Groundwater Investigation
Charcoal Results



| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Fluorescein Results Conc ppb | Eosine Results Peak nm | Eosine Results Conc ppb | RWT Results Peak nm | RWT Results Conc ppb | SRB Results Peak nm | SRB Results Conc ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M5619 | 3 | Spring Villa below Weir | | 3/19 0808 | 3/27 0745 | ND | | ND | | ND | | ND | |
| M7269 | 3 | Spring Villa below Weir | | 3/27 0745 | 6/5 1150 | ns | | | | ND | | ND | |
| M7678 | 3 | Spring Villa below Weir | | 6/5 1150 | 6/12 1532 | ND | | ND | | ND | | ND | |
| M9208 | 3 | Spring Villa below Weir | | 6/12 1532 | 7/2 1236 | ND | | ND | | ND | | ND | |
| M9338 | 3 | Spring Villa below Weir | Ewers | NDT | 9/24 1023 | ND | | ND | | ND | | ND | |
| M9450 | 3 | Spring Villa below Weir | Ewers | 9/24 1023 | 10/1 0714 | ND d | | ND | | ND | | ND | |
| M9614 | 3 | Spring Villa below Weir | Ewers | 10/1 0714 | 10/8 1317 | ND | | ND | | ND | | ND | |
| M9728 | 3 | Spring Villa below Weir | Ewers | 10/8 1317 | 10/15 1332 | ND | | ND | | ND | | ND | |
| M9814 | 3 | Spring Villa below Weir | Ewers | 10/15 1332 | 10/22 1330 | ND | | ND | | ND | | ND | |
| N0115 | 3 | Spring Villa below Weir | Ewers | 10/22 1330 | 10/29 1031 | ND | | ND | | ND | | ND | |
| N0445 | 3 | Spring Villa below Weir | Ewers | 10/29 1031 | 11/12 1312 | ND | | ND | | ND | | ND | |
| N0619 | 3 | Spring Villa below Weir | Ewers | NDT | 11/26 1047 | ND | | ND | | ND | | ND | |
| N0990 | 3 | Spring Villa below Weir | Ewers | NDT | 12/17 1204 | ND | | ND | | ND | | ND | |
| N1738 | 3 | Spring Villa below Weir | Ewers | 12/17 1200 | 1/7 0646 | ND | | ND | | ND | | ND | |
| N1928 | 3 | Spring Villa below Weir | Ewers | 2/19 1320 | 3/8 1140 | ND | | ND | | ND | | ND | |
| N1928 | 3 | Spring Villa below Weir | Ewers | 3/8 1140 | 3/23 1345 | ND | | ND | | ND | | ND | |
| M3769 | 4 | Test Well #2 | | 12/17 1349 | 12/18 0944 | ND | | ND | | ND | | ND | |
| M3786 | 4 | Test Well #2 | | 12/18 0944 | 12/19 0912 | ND | | ND | | ND | | ND | |
| M3944 | 4 | Test Well #2 | | 12/19 0912 | 12/20 0848 | ND | | ND | | ND | | ND | |
| M3961 | 4 | Test Well #2 | | 12/20 0848 | 12/23 0934 | ND | | ND | | ND | | ND | |
| M4014 | 4 | Test Well #2 | | 12/23 0934 | 12/26 0940 | ND | | ND | | ND | | ND | |
| M4032 | 4 | Test Well #2 | | 12/26 0940 | 12/30 0913 | ND | | ND | | ND | | ND | |
| M4129 | 4 | Test Well #2 | | 12/30 0913 | 1/2 0846 | ND | | ND | | ND | | ND | |
| M4408 | 4 | Test Well #2 | | 1/2 0846 | 1/9 0909 | ND | | ND | | ND | | ND | |
| M4547 | 4 | Test Well #2 | | 1/9 0909 | 1/16 0853 | ND | | ND | | ND | | ND | |
| M4798 | 4 | Test Well #2 | | 1/16 0853 | 1/23 0810 | ND | | ND | | ND | | ND | |
| M4945 | 4 | Test Well #2 | | 1/23 0810 | 1/30 0824 | ns | | ND | | ND | | ND | |
| M5035 | 4 | Test Well #2 | | 1/30 0824 | 2/6 0814 | ND | | ND | | ND | | ND | |
| M5113 | 4 | Test Well #2 | | 2/6 0814 | 2/13 0832 | ND | | ND | | ND | | ND | |
| M5138 | 4 | Test Well #2 | | 2/13 0832 | 2/20 0802 | ND | | ND | | ND | | ND | |
| M5267 | 4 | Test Well #2 | | 2/20 0802 | 2/26 0745 | ND | | ND | | ND | | ND | |
| M5372 | 4 | Test Well #2 | | 2/26 0745 | 3/6 0918 | ND | | ND | | ND | | ND | |
| M5469 | 4 | Test Well #2 | | 3/6 0918 | 3/13 0806 | ND | | ND | | ND | | ND | |
| M5621 | 4 | Test Well #2 | | 3/13 0806 | 3/19 0810 | ND | | ND | | ND | | ND | |
| | 4 | Test Well #2 | | 3/19 0810 | 3/27 0747 | ND | | ND | | ND | | ND | |
| M7268 | 4 | Test Well #2 | | 3/27 0747 | 6/5 1145 | ns | | | | ND | | ND | |
| M7677 | 4 | Test Well #2 | | 6/5 1145 | 6/12 1530 | ND | | ND | | ND | | ND | |
| M8611 | 4 | Test Well #2 | | 6/12 1530 | 7/2 1234 | ND | | ND | | ND | | ND | |
| M8847 | 4 | Test Well #2 | Ewers | NDT | 8/27 1042 | ND | | ND | | ND | | ND | |
| M8923 | 4 | Test Well #2 | Ewers | 8/27 1042 | 9/3 0654 | ND | | ND | | ND | | ND | |
| M9127 | 4 | Test Well #2 | Ewers | 9/3 0654 | 9/10 0709 | ND | | ND | | ND | | ND | |
| M9202 | 4 | Test Well #2 | Ewers | 9/10 0709 | 9/16 0716 | ND | | ND | | ND | | ND | |
| | 4 | Test Well #2 | Ewers | 9/16 0716 | 9/24 1013 | ns | | ND | | ND | | ND | |

2

f:\docs\ico\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

**GroundWater Investigation**
**Charcoal Results**

Optika, AL

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 200z/2004 | Date/Time Recovered 200z/2004 | Fluorescein Results Peak nm | Fluorescein Results Conc. ppb | Eosine Results Peak nm | Eosine Results Conc. ppb | RWT Results Peak nm | RWT Results Conc. ppb | SRB Results Peak nm | SRB Results Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M9448 | 4 | Test Well #2 | Ewers | 9/24 1013 | 10/1 0704 | nsf | | | ND | | ND | | ND |
| M9612 | 4 | Test Well #2 | Ewers | 10/1 0704 | 10/8 1309 | ND | | | ND | | ND | | ND |
| M9726 | 4 | Test Well #2 | Ewers | 10/8 1309 | 10/15 1327 | ND | | | ND | | ND | | ND |
| M9812 | 4 | Test Well #2 | Ewers | 10/15 1327 | 10/22 1323 | ND | | | ND | | ND | | ND |
| N0113 | 4 | Test Well #2 | Ewers | 10/22 1323 | 10/29 1024 | ND | | | ND | | ND | | ND |
| N0443 | 4 | Test Well #2 | Ewers | 10/29 1024 | 11/12 1307 | ND | | | ND | | ND | | ND |
| N0617 | 4 | Test Well #2 | Ewers | NDT | 11/26 1037 | ND | | | ND | | ND | | ND |
| N0988 | 4 | Test Well #2 | Ewers | NDT | 12/17 1156 | ND | | | ND | | ND | | ND |
| N1736 | 4 | Test Well #2 | Ewers | NDT | 1/7 0640 | ND | | | ND | | ND | | ND |
| N1926 | 4 | Test Well #2 | Ewers | 2/19 1310 | 3/8 1130 | ND | | | ND | | ND | | ND |
| M3411 | 5 | Test Well Number 5 | | 12/10 1018 | 12/12 1033 | ND | | | ND | | ND | | ND |
| M3770 | 5 | Test Well Number 5 | | 12/12 1033 | 12/18 1002 | ND | | | ND | | ND | | ND |
| M3787 | 5 | Test Well Number 5 | | 12/18 1002 | 12/19 0837 | ND | | | ND | | ND | | ND |
| M3945 | 5 | Test Well Number 5 | | 12/19 0837 | 12/20 0811 | ND | | | ND | | ND | | ND |
| M3956 | 5 | Test Well Number 5 | | 12/20 0811 | 12/23 0858 | ND | | | ND | | ND | | ND |
| M4010 | 5 | Test Well Number 5 | | 12/23 0858 | 12/26 0858 | ND | | | ND | | ND | | ND |
| M4028 | 5 | Test Well Number 5 | | 12/26 0858 | 12/30 0827 | ND | | | ND | | ND | | ND |
| M4125 | 5 | Test Well Number 5 | | 12/30 0827 | 1/2 0804 | ND | | | ND | | ND | | ND |
| M4404 | 5 | Test Well Number 5 | | 1/2 0804 | 1/9 0832 | ND | | | ND | | ND | | ND |
| M4543 | 5 | Test Well Number 5 | | 1/9 0832 | 1/16 0819 | ND | | | ND | | ND | | ND |
| M4794 | 5 | Test Well Number 5 | | 1/16 0819 | 1/23 0736 | ND | | | ND | | ND | | ND |
| M4863 | 5 | Test Well Number 5 | | 1/23 0736 | 1/30 0745 | ND | | | ND | | ND | | ND |
| M4941 | 5 | Test Well Number 5 | | 1/30 0745 | 2/6 0746 | ND | | | ND | | ND | | ND |
| M5031 | 5 | Test Well Number 5 | | 2/6 0746 | 2/13 0755 | ND | | | ND | | ND | | ND |
| M5108 | 5 | Test Well Number 5 | | 2/13 0755 | 2/20 0733 | ND | | | ND | | ND | | ND |
| M5134 | 5 | Test Well Number 5 | | 2/20 0733 | 2/26 0712 | ND | | | ND | | ND | | ND |
| M5262 | 5 | Test Well Number 5 | | 2/26 0712 | 3/6 0852 | ND | | | ND | | ND | | ND |
| M5367 | 5 | Test Well Number 5 | | 3/6 0852 | 3/13 0740 | ND | | | ND | | ND | | ND |
| M5464 | 5 | Test Well Number 5 | | 3/13 0740 | 3/19 0741 | ND | | | ND | | ND | | ND |
| M5615 | 5 | Test Well Number 5 | | 3/19 0741 | 3/27 0719 | ND | | | ND | | ND | | ND |
| M7264 | 5 | Test Well Number 5 | | 6/5 1209 | 6/12 1445 | ns | | | ND | | ND | | ND |
| M7675 | 5 | Test Well Number 5 | | 6/12 1445 | 7/2 1212 | ND | | | ND | | ND | | ND |
| | 6 | Not assigned | | | | | | | | | | | |
| M3403 | 7 | Little Uchee Creek at 145 | | 12/6 1026 | 12/12 0830 | ND | | | ND | | ND | | ND |
| M3755 | 7 | Little Uchee Creek at 145 | | 12/12 0830 | 12/18 0711 | ND | | | ND | | ND | | ND |
| M3772 | 7 | Little Uchee Creek at 145 | | 12/18 0711 | 12/19 0725 | ND | | | ND | | ND | | ND |
| M3772D | 7 | Little Uchee Creek at 145 | | 12/18 0711 | 12/19 0725 | ND | | | ND | | ND | | ND |
| M3930 | 7 | Little Uchee Creek at 145 | | 12/19 0725 | 12/20 0657 | ND | | | ND | | ND | | ND |
| M3948 | 7 | Little Uchee Creek at 145 | | 12/20 0657 | 12/23 0741 | ND | | | ND | | ND | | ND |
| M4002 | 7 | Little Uchee Creek at 145 | | 12/23 0741 | 12/26 0733 | ND | | | ND | | ND | | ND |
| M4019 | 7 | Little Uchee Creek at 145 | | 12/26 0733 | 12/30 0705 | ND | | | ND | | ND | | ND |

f:\docs\ozxa\opelika.xls 3/29/04

Plaintiff
00000000002252

Oza...nderground Laboratory, Inc.

**Groundwater Investigation
Charcoal Results**

Opelika, AL

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4116 | 7 | Little Uchee Creek at 145 | | 12/30 0705 | 1/2 0653 | ND | | ND | | ND | | ND | |
| M4395 | 7 | Little Uchee Creek at 145 | | 1/2 0653 | 1/9 0726 | ND | | ND | | ND | | ND | |
| M4534 | 7 | Little Uchee Creek at 145 | | 1/9 0726 | 1/16 0720 | ND | | ND | | ND | | ND | |
| M4786 | 7 | Little Uchee Creek at 145 | | 1/16 0720 | 1/23 0640 | ND | | ND | | ND | | ND | |
| M4854 | 7 | Little Uchee Creek at 145 | | 1/23 0640 | 1/30 0639 | ND | | ND | | ND | | ND | |
| M4932 | 7 | Little Uchee Creek at 145 | | 1/30 0639 | 2/6 0648 | ND | | ND | | ND | | ND | |
| M5099 | 7 | Little Uchee Creek at 145 | | 2/6 0648 | 2/13 0658 | wso | | ND | | | | ND | |
| M5127 | 7 | Little Uchee Creek at 145 | | 2/13 0658 | 2/20 0637 | ND | | ND | | ND | | ND | |
| M5253 | 7 | Little Uchee Creek at 145 | | 2/20 0637 | 2/26 0612 | ND | | ND | | ND | | ND | |
| M5361 | 7 | Little Uchee Creek at 145 | | 2/26 0612 | 3/6 0729 | ND | | ND | | ND | | ND | |
| M5455 | 7 | Little Uchee Creek at 145 | | 3/6 0729 | 3/13 0620 | ND | | ND | | ND | | ND | |
| M5608 | 7 | Little Uchee Creek at 145 | | 3/13 0620 | 3/19 0638 | ND | | ND | | ND | | ND | |
| | 7 | Little Uchee Creek at 145 | | 3/19 0638 | 3/27 0629 | ND | | ND | | ND | | ND | |
| M7255 | 7 | Little Uchee Creek at 145 | | 3/27 0629 | 6/5 1250 | ns | | ND | | ND | | ND | |
| | 7 | Little Uchee Creek at 145 | | 6/5 1250 | 6/12 1353 | ND | | ND | | | | ND | |
| | 7 | Little Uchee Creek at 145 | | 6/12 1353 | 7/2 1058 | wso | | ND | | ND | | ND | |
| M3402 | 8 | Gates Road at Section Corner | | 12/6 1012 | 12/12 0953 | **ND** | | **ND** | | ND | | ND | |
| M1763 | 8 | Gates Road at Section Corner | | 12/12 1000 | 12/18 0850 | ND | | ND | | ND | | ND | |
| M3779 | 8 | Gates Road at Section Corner | | 12/18 0850 | 12/19 0829 | ND | | ND | | ND | | ND | |
| M3937 | 8 | Gates Road at Section Corner | | 12/19 0829 | 12/20 0801 | ND | | ND | | ND | | ND | |
| M3955 | 8 | Gates Road at Section Corner | | 12/20 0801 | 12/23 0846 | ND | | ND | | ND | | ND | |
| M4009 | 8 | Gates Road at Section Corner | | 12/23 0846 | 12/26 0848 | ND | | ND | | ND | | ND | |
| M4027 | 8 | Gates Road at Section Corner | | 12/26 0848 | 12/30 0815 | ND | | ND | | ND | | ND | |
| M4124 | 8 | Gates Road at Section Corner | | 12/30 0815 | 1/2 0756 | ND | | ND | | ND | | ND | |
| M4403 | 8 | Gates Road at Section Corner | | 1/2 0756 | 1/9 0825 | ND | | ND | | ND | | ND | |
| M4542 | 8 | Gates Road at Section Corner | | 1/9 0825 | 1/16 0812 | ND | | ND | | ND | | ND | |
| M4793 | 8 | Gates Road at Section Corner | | 1/16 0812 | 1/23 0728 | ND | | ND | | ND | | ND | |
| M4862 | 8 | Gates Road at Section Corner | | 1/23 0728 | 1/30 0736 | ND | | ND | | ND | | ND | |
| M4939 | 8 | Gates Road at Section Corner | | 1/30 0736 | 2/6 0738 | ND | | ND | | ND | | ND | |
| M5030 | 8 | Gates Road at Section Corner | | 2/6 0738 | 2/13 0747 | ND | | ND | | ND | | ND | |
| M5107 | 8 | Gates Road at Section Corner | | 2/13 0747 | 2/20 0724 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 2/20 0724 | 2/26 0703 | wso | | | | | | ND | |
| M5261 | 8 | Gates Road at Section Corner | | 2/26 0703 | 3/6 0819 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 3/6 0819 | 3/13 0731 | wso | | ND | | ND | | ND | |
| M5463 | 8 | Gates Road at Section Corner | | 3/13 0731 | 3/19 0733 | ND | | ND | | ND | | ND | |
| M5614 | 8 | Gates Road at Section Corner | | 3/19 0733 | 3/27 0712 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 3/27 0712 | 6/5 1215 | ns | | ND | | ND | | ND | |
| M7263 | 8 | Gates Road at Section Corner | | 6/5 1215 | 6/12 1440 | ND | | ND | | ND | | ND | |
| | 8 | Gates Road at Section Corner | | 6/12 1440 | 7/2 1206 | wso | | ND | | ND | | ND | |
| M3401 | 9 | Gates Road at West Stream | | 12/6 0946 | 12/12 0945 | **ND** | | **ND** | | ND | | ND | |
| M3401D | 9 | Gates Road at West Stream | | 12/6 0946 | 12/12 0945 | ND | | ND | | ND | | ND | |
| M3762 | 9 | Gates Road at West Stream | | 12/12 0945 | 12/18 0839 | ND | | ND | | ND | | ND | |
| M3778 | 9 | Gates Road at West Stream | | 12/18 0839 | 12/19 0821 | ND | | ND | | ND | | ND | |

Plaintiff
00000000002253

f:\docs\coa\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3936 | 9 | Gates Road at West Stream | | 12/19 0821 | 12/20 0754 | ND | | ND | | ND | | ND | |
| M3954 | 9 | Gates Road at West Stream | | 12/20 0754 | 12/23 0841 | ND | | ND | | ND | | ND | |
| M4008 | 9 | Gates Road at West Stream | | 12/23 0841 | 12/26 0841 | ND | | ND | | ND | | ND | |
| M4026 | 9 | Gates Road at West Stream | | 12/26 0841 | 12/30 0809 | ND | | ND | | ND | | ND | |
| M4123 | 9 | Gates Road at West Stream | | 12/30 0809 | 1/2 0750 | ND | | ND | | ND | | ND | |
| M4402 | 9 | Gates Road at West Stream | | 1/2 0750 | 1/9 0820 | ND | | ND | | ND | | ND | |
| M4541 | 9 | Gates Road at West Stream | | 1/9 0820 | 1/16 0807 | ND | | ND | | ND | | ND | |
| M4792 | 9 | Gates Road at West Stream | | 1/16 0807 | 1/23 0723 | ND | | ND | | ND | | ND | |
| M4861 | 9 | Gates Road at West Stream | | 1/23 0723 | 1/30 0731 | ND | | ND | | ND | | ND | |
| M4938 | 9 | Gates Road at West Stream | | 1/30 0731 | 2/6 0734 | ND | | ND | | ND | | ND | |
| M5029 | 9 | Gates Road at West Stream | | 2/6 0734 | 2/13 0742 | ND | | ND | | ND | | ND | |
| M5106 | 9 | Gates Road at West Stream | | 2/13 0742 | 2/20 0720 | ND | | ND | | ND | | ND | |
| M5133 | 9 | Gates Road at West Stream | | 2/20 0720 | 2/26 0659 | ND | | ND | | ND | | ND | |
| M5133D | 9 | Gates Road at West Stream | | 2/20 0720 | 2/26 0659 | ND | | ND | | ND | | ND | |
| M5259 | 9 | Gates Road at West Stream | | 2/26 0659 | 3/6 0815 | ND | | ND | | ND | | ND | |
| M5366 | 9 | Gates Road at West Stream | | 3/6 0815 | 3/13 0727 | ND | | ND | | ND | | ND | |
| M5462 | 9 | Gates Road at West Stream | | 3/13 0727 | 3/19 0729 | ND | | ND | | ND | | ND | |
| | 9 | Gates Road at West Stream | | 3/19 0729 | 3/27 0709 | wso | | | | | | ND | |
| | 9 | Gates Road at West Stream | | 3/27 0709 | 6/5 1219 | ns | | | | | | ND | |
| M7262 | 9 | Gates Road at West Stream | | 6/5 1219 | 6/12 1435 | wso | | ND | | ND | | ND | |
| | 9 | Gates Road at West Stream | | 6/12 1435 | 7/2 1200 | wso | | | | | | ND | |
| M3788 | 10 | Test Well at 166 | | 12/12 1018 | 12/17 1310 | ND | | ND | | ND | | ND | |
| M3761 | 10 | Test Well at 166 | | 12/17 1310 | 12/18 0828 | ND | | ND | | ND | | ND | |
| M3777 | 10 | Test Well at 166 | | 12/18 0828 | 12/19 0814 | ND | | ND | | ND | | ND | |
| M3935 | 10 | Test Well at 166 | | 12/19 0814 | 12/20 0748 | ND | | ND | | ND | | ND | |
| M3953 | 10 | Test Well at 166 | | 12/20 0748 | 12/23 0835 | ND | | ND | | 567.6 | 608 | ND | |
| M4007 | 10 | Test Well at 166 | | 12/23 0835 | 12/26 0834 | ND | | ND | | ND | | ND | |
| M4025 | 10 | Test Well at 166 | | 12/26 0834 | 12/30 0801 | ND | | ND | | ND | | ND | |
| M4122 | 10 | Test Well at 166 | | 12/30 0801 | 1/2 0743 | ND | | ND | | ND | | ND | |
| M4401 | 10 | Test Well at 166 | | 1/2 0743 | 1/9 0814 | ND | | ND | | ND | | ND | |
| M4539 | 10 | Test Well at 166 | | 1/9 0814 | 1/16 0801 | ND | | ND | | ND | | ND | |
| M4791 | 10 | Test Well at 166 | | 1/16 0801 | 1/23 0718 | ND | | ND | | ND | | ND | |
| M4859 | 10 | Test Well at 166 | | 1/23 0718 | 1/30 0725 | ND | | ND | | ND | | ND | |
| M4937 | 10 | Test Well at 166 | | 1/30 0725 | 2/6 0729 | ND | | ND | | ND | | ND | |
| M5028 | 10 | Test Well at 166 | | 2/6 0729 | 2/13 0736 | ND | | ND | | ND | | ND | |
| M5105 | 10 | Test Well at 166 | | 2/13 0736 | 2/20 0715 | ND | | ND | | ND | | ND | |
| M5132 | 10 | Test Well at 166 | | 2/20 0715 | 2/26 0651 | ND | | ND | | ND | | ND | |
| M5258 | 10 | Test Well at 166 | | 2/26 0651 | 3/6 0810 | ND | | ND | | ND | | ND | |
| M5365 | 10 | Test Well at 166 | | 3/6 0810 | 3/13 0721 | ND | | ND | | ND | | ND | |
| M5461 | 10 | Test Well at 166 | | 3/13 0721 | 3/19 0723 | ND | | ND | | ND | | ND | |
| M5613 | 10 | Test Well at 166 | | 3/19 0723 | 3/27 0703 | ND | | ND | | ND | | ND | |
| | 10 | Test Well at 166 | | 3/27 0703 | 6/5 1225 | ns | | | | | | ND | |
| M7261 | 10 | Test Well at 166 | | 6/5 1225 | 6/12 1428 | ND | | ND | | ND | | ND | |

5

f:\docs\coa\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.

Opelika, AL.

Ground... Investigation
Charcoal Results

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M7674 | 10 | Test Well at 166 | | 6/12 1428 | 7/2 1140 | ND | | ND | | ND | | ND | |
| M3399 | 11 | Quarry Discharge at 166 | | 12/5 0855 | 12/12 1004 | ND | | ND | | ND | | ND | |
| M3759 | 11 | Quarry Discharge at 166 | | 12/12 1004 | 12/18 0810 | ND | | ND | | ND | | ND | |
| M3759D | 11 | Quarry Discharge at 166 | | 12/12 1004 | 12/18 0810 | ND | | ND | | ND | | ND | |
| M3776 | 11 | Quarry Discharge at 166 | | 12/18 0810 | 12/19 0807 | ND | | ND | | 567.8 | 156 | ND | |
| M3776D | 11 | Quarry Discharge at 166 | | 12/18 0810 | 12/19 0807 | ND | | ND | | 567.6 | 91.6 | ND | |
| M3934 | 11 | Quarry Discharge at 166 | | 12/19 0807 | 12/20 0739 | ND | | ND | | 568.0 | 534 | ND | |
| M3934D | 11 | Quarry Discharge at 166 | | 12/19 0807 | 12/20 0739 | ND | | ND | | 568.2 | 413 | ND | |
| M3952 | 11 | Quarry Discharge at 166 | | 12/20 0739 | 12/23 0823 | ND | | ND | | 568.0 | 1,990 | ND | |
| M3952D | 11 | Quarry Discharge at 166 | | 12/20 0739 | 12/23 0823 | ND | | ND | | 568.0 | 2,380 | ND | |
| M4006 | 11 | Quarry Discharge at 166 | | 12/23 0823 | 12/26 0818 | ND | | ND | | 568.0 | 811 | ND | |
| M4006D | 11 | Quarry Discharge at 166 | | 12/23 0823 | 12/26 0818 | ND | | ND | | 567.9 | 742 | ND | |
| M4024 | 11 | Quarry Discharge at 166 | | 12/26 0818 | 12/30 0753 | ND | | ND | | 567.9 | 764 | ND | |
| M4024D | 11 | Quarry Discharge at 166 | | 12/26 0818 | 12/30 0753 | ND | | ND | | 568.3 | 612 | ND | |
| M4121 | 11 | Quarry Discharge at 166 | | 12/30 0753 | 1/2 0735 | ND | | ND | | 567.4 | 408 | ND | |
| M4121D | 11 | Quarry Discharge at 166 | | 12/30 0753 | 1/2 0735 | ND | | ND | | 567.8 | 607 | ND | |
| M4399 | 11 | Quarry Discharge at 166 | | 1/2 0735 | 1/9 0806 | ND | | ND | | 567.7 | 570 | ND | |
| M4399D | 11 | Quarry Discharge at 166 | | 1/2 0735 | 1/9 0806 | ND | | ND | | 567.4 | 475 | ND | |
| M4538 | 11 | Quarry Discharge at 166 | | 1/9 0806 | 1/16 0755 | ND | | ND | | 567.6 | 266 | ND | |
| M4538D | 11 | Quarry Discharge at 166 | | 1/9 0806 | 1/16 0755 | ND | | ND | | 567.4 | 216 | ND | |
| M4790 | 11 | Quarry Discharge at 166 | | 1/16 0755 | 1/23 0712 | ND | | ND | | 567.7 | 144 | ND | |
| M4790D | 11 | Quarry Discharge at 166 | | 1/16 0755 | 1/23 0712 | ND | | ND | | 567.7 | 142 | ND | |
| M4858 | 11 | Quarry Discharge at 166 | | 1/23 0712 | 1/30 0718 | ND | | ND | | 567.8 | 95.5 | ND | |
| M4858D | 11 | Quarry Discharge at 166 | | 1/23 0712 | 1/30 0718 | ND | | ND | | 567.7 | 81.7 | ND | |
| M4936 | 11 | Quarry Discharge at 166 | | 1/30 0718 | 2/6 0724 | ND | | ND | | 567.6 | 64.7 | ND | |
| M4936D | 11 | Quarry Discharge at 166 | | 1/30 0718 | 2/6 0724 | ND | | ND | | 567.6 | 33.9 | ND | |
| M5027 | 11 | Quarry Discharge at 166 | | 2/6 0724 | 2/13 0730 | ND | | ND | | 567.9 | 35.6 | ND | |
| M5027D | 11 | Quarry Discharge at 166 | | 2/6 0724 | 2/13 0730 | ND | | ND | | 567.7 | 26.1 | ND | |
| M5104 | 11 | Quarry Discharge at 166 | | 2/13 0730 | 2/20 0709 | ND | | ND | | 567.7 | 46.9 | ND | |
| M5104D | 11 | Quarry Discharge at 166 | | 2/13 0730 | 2/20 0709 | ND | | ND | | 567.9 | 44.1 | ND | |
| M5131 | 11 | Quarry Discharge at 166 | | 2/20 0709 | 2/26 0646 | ND | | ND | | 567.9 | 40.3 | ND | |
| M5257 | 11 | Quarry Discharge at 166 | | 2/26 0646 | 3/6 0804 | ND | | ND | | 568.1 | 51.1 | ND | |
| M5257D | 11 | Quarry Discharge at 166 | | 2/26 0646 | 3/6 0804 | ND | | ND | | 568.1 | 52.7 | ND | |
| | 11 | Quarry Discharge at 166 | | 3/6 0804 | 3/13 0709 | wso | | | | | | ND | |
| M5459 | 11 | Quarry Discharge at 166 | | 3/13 0709 | 3/19 0719 | ns | | ND | | 568.0 | 23.1 | ND | |
| M5459D | 11 | Quarry Discharge at 166 | | 3/13 0709 | 3/19 0719 | ND | | ND | | 568.3 | 17.9 | ND | |
| M5612 | 11 | Quarry Discharge at 166 | | 3/19 0719 | 3/27 0659 | ND | | ND | | 568.9 | 6.81 | ND | |
| M5612D | 11 | Quarry Discharge at 166 | | 3/19 0719 | 3/27 0659 | ND | | ND | | 568.3 | 8.68 | ND | |
| M7259 | 11 | Quarry Discharge at 166 | | 6/5 1230 | 6/12 1425 | ND | | 539.1 | 3.23 | 568.4 | 3.88 | ND | |
| M7259D | 11 | Quarry Discharge at 166 | | 6/5 1230 | 6/12 1425 | ND | | 539.2 | 5.62 | 568.8 | 5.38 | ND | |
| M7673 | 11 | Quarry Discharge at 166 | | 6/12 1425 | 7/2 1136 | ND | | 539.1 | 9.09 | 567.6 | 7.35 | ND | |
| M7673D | 11 | Quarry Discharge at 166 | | 6/12 1425 | 7/2 1136 | ND | | 539.2 | 16.2 | 566.8 | 11.2 | ND | |

6

f:\docs\cook\opelika.xls
3/29/04

Plaintiff
0000000000002255

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M8612 | I1 | Quarry Discharge at I66 | | 7/2 1136 | 8/28 0640 | ND | | 539.4 | 8.24 | 568.3 | 11.9 | ND | |
| M8612D | I1 | Quarry Discharge at I66 | | 7/2 1136 | 8/28 0640 | ND | | 539.7 | 7.80 | 566.8 | 9.78 | ND | |
| M8851 | I1 | Quarry Discharge at I66 | | 8/28 0640 | 9/4 0654 | ND | | 538.8 | 5.13 | ND | | ND | |
| M8851D | I1 | Quarry Discharge at I66 | | 8/28 0640 | 9/4 0654 | ND | | 539.0 | 5.48 | ND | | ND | |
| M8928 | I1 | Quarry Discharge at I66 | | 9/4 0654 | 9/9 0652 | ND | | 539.3 | 12.4 | ND | | ND | |
| M8928D | I1 | Quarry Discharge at I66 | | 9/4 0654 | 9/9 0652 | ND | | 539.1 | 7.93 | ND | | ND | |
| M9133 | I1 | Quarry Discharge at I66 | | 9/9 0652 | 9/16 0824 | ND | | 538.9 | 11.0 | ND | | ND | |
| M9133D | I1 | Quarry Discharge at I66 | | 9/9 0652 | 9/16 0824 | ND | | 539.1 | 4.27 | ND | | ND | |
| M9207 | I1 | Quarry Discharge at I66 | | 9/16 0824 | 9/24 1114 | ND | | 539.2 | 7.05 | ND | | ND | |
| M9207D | I1 | Quarry Discharge at I66 | | 9/16 0824 | 9/24 1114 | ND | | 539.1 | 6.83 | ND | | ND | |
| M9343 | I1 | Quarry Discharge at I66 | | 9/24 1114 | 10/1 0801 | ND | | 539.1 | 5.43 | ND | | ND | |
| M9343D | I1 | Quarry Discharge at I66 | | 9/24 1114 | 10/1 0801 | ND | | 539.1 | 8.45 | ND | | ND | |
| M9454 | I1 | Quarry Discharge at I66 | | 10/1 0801 | 10/8 1303 | ND | | 539.1 | 8.57 | ND | | ND | |
| M9454D | I1 | Quarry Discharge at I66 | | 10/1 0801 | 10/8 1303 | ND | | 539.0 | 11.6 | ND | | ND | |
| M9617 | I1 | Quarry Discharge at I66 | | 10/8 1303 | 10/15 1354 | ND | | 539.0 | 11.6 | ND | | ND | |
| M9617D | I1 | Quarry Discharge at I66 | | 10/8 1303 | 10/15 1354 | ND | | 539.1 | 4.32 | ND | | ND | |
| M9731 | I1 | Quarry Discharge at I66 | | 10/15 1354 | 10/22 1000 | ND | | 539.1 | 5.27 | ND | | ND | |
| M9731D | I1 | Quarry Discharge at I66 | | 10/15 1354 | 10/22 1000 | ND | | 539.6 | 3.12 | ND | | ND | |
| M9817 | I1 | Quarry Discharge at I66 | | 10/22 1000 | 10/29 0954 | ND | | 539.5 | 1.63 | ND | | ND | |
| M9817D | I1 | Quarry Discharge at I66 | | 10/22 1000 | 10/29 0954 | ND | | 539.0 | 16.99 | ND | | ND | |
| N0615 | I1 | Quarry Discharge at I66 | | 10/29 0954 | 11/12 1223 | wso | | 539.1 | 8.10 | ND | | ND | |
| N0615D | I1 | Quarry Discharge at I66 | | 11/12 1223 | 12/17 1120 | ND | | 539.6 | 9.51 | ND | | ND | |
| N0985 | I1 | Quarry Discharge at I66 | | 11/12 1223 | 12/17 1120 | ND | | 539.2 | 11.1 | ND | | ND | |
| N0985D | I1 | Quarry Discharge at I66 | | 12/17 1120 | 1/6 1404 | ND | | 539.3 | 9.85 | ND | | ND | |
| N1735 | I1 | Quarry Discharge at I66 | | 12/17 1120 | 1/6 1404 | ND | | 539.5 | 10.7 | ND | | ND | |
| N1735D | I1 | Quarry Discharge at I66 | | 1/6 1404 | 3/8 1119 | ND | | 539.1 | 13.7 | ND | | ND | |
| N1923 | I1 | Quarry Discharge at I66 | | 1/6 1404 | 3/8 1119 | ND | | 539.2 | 16.8 | ND | | ND | |
| N1923D | I1 | Quarry Discharge at I66 | | 3/8 1119 | 3/23 1408 | ND | | 539.2 | 12.8 | ND | | ND | |
| M3410 | 12 | Quarry Discharge at Parkers | | 3/23 1408 | 12/10 1001 | ND | | 539.3 | 11.6 | ND | | ND | |
| M3758 | 12 | Quarry Discharge at Parkers | | 12/10 1001 | 12/12 0921 | ND | | ND | | ND | | ND | |
| M3775 | 12 | Quarry Discharge at Parkers | | 12/12 0921 | 12/18 0759 | ND | | ND | | 567.9 | 46.6 | ND | |
| M3933 | 12 | Quarry Discharge at Parkers | | 12/18 0759 | 12/19 0759 | ND | | ND | | 568.0 | 338 | ND | |
| M3951 | 12 | Quarry Discharge at Parkers | | 12/19 0758 | 12/20 0732 | ND | | ND | | 568.2 | 1,020 | ND | |
| M4005 | 12 | Quarry Discharge at Parkers | | 12/20 0732 | 12/23 0815 | ND | | ND | | 568.0 | 304 | ND | |
| M4023 | 12 | Quarry Discharge at Parkers | | 12/23 0815 | 12/26 0810 | ND | | ND | | 567.9 | 385 | ND | |
| M4119 | 12 | Quarry Discharge at Parkers | | 12/26 0810 | 12/30 0746 | ND | | ND | | 567.9 | 171 | ND | |
| M4398 | 12 | Quarry Discharge at Parkers | | 12/30 0746 | 1/2 0728 | ND | | ND | | 567.9 | 179 | ND | |
| M4537 | 12 | Quarry Discharge at Parkers | | 1/2 0728 | 1/9 0759 | ND | | ND | | 567.6 | 98.4 | ND | |
| M4789 | 12 | Quarry Discharge at Parkers | | 1/9 0759 | 1/16 0749 | ND | | ND | | 567.5 | 59.7 | ND | |
| M4857 | 12 | Quarry Discharge at Parkers | | 1/16 0749 | 1/23 0707 | ND | | ND | | 567.7 | 46.5 | ND | |
| M4935 | 12 | Quarry Discharge at Parkers | | 1/23 0707 | 1/30 0712 | ND | | ND | | 567.5 | 28.1 | ND | |
| M5026 | 12 | Quarry Discharge at Parkers | | 1/30 0712 | 2/6 0719 | ND | | ND | | 568.1 | 10.7 | ND | |
| | | Quarry Discharge at Parkers | | 2/6 0719 | 2/13 0725 | ND | | ND | | | | ND | |

f:\docs\co\opelika.xls
3/29/04

7

Plaintiff
0000000000002256

Ozark Underground Laboratory, Inc.

Opelika, AL

2313

Groundwater Investigation
Charcoal Results

| OUL Lab # | OUL Station # | Station Name | Samples by Envers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M5103 | 12 | Quarry Discharge at Parkers | | 2/13 0725 | 2/20 0705 | ND | | ND | | 567.8 | 16.3 | ND | |
| M5130 | 12 | Quarry Discharge at Parkers | | 2/20 0705 | 2/26 0640 | ND | | ND | | 567.7 | 7.65 | ND | |
| M5256 | 12 | Quarry Discharge at Parkers | | 2/26 0640 | 3/6 0759 | ND | | ND | | 567.8 | 9.24 | ND | |
| M5364 | 12 | Quarry Discharge at Parkers | | 3/6 0759 | 3/13 0702 | ND | | ND | | 568.1 | 12.4 | ND | |
| M5364D | 12 | Quarry Discharge at Parkers | | 3/6 0759 | 3/13 0702 | ND | | ND | | 568.1 | 14.3 | ND | |
| M5458 | 12 | Quarry Discharge at Parkers | | 3/13 0702 | 3/19 0711 | ND | | ND | | 568.1 | 10.1 | ND | |
| M5611 | 12 | Quarry Discharge at Parkers | | 3/19 0711 | 3/27 0655 | ND | | ND | | 568.6 | 7.06 | ND | |
| M7258 | 12 | Quarry Discharge at Parkers | | 3/27 0655 | 6/5 1235 | ns | | ND | | 568.5 | | ND | |
| M7258 | 12 | Quarry Discharge at Parkers | | 6/5 1235 | 6/12 1418 | ND | | 538.6 | 4.82 | 566.6 | 7.71 | ND | |
| M7258D | 12 | Quarry Discharge at Parkers | | 6/5 1235 | 6/12 1418 | ND | | 537.6 | 2.78 | 568.4 | 4.15 | ND | |
| | 12 | Quarry Discharge at Parkers | | 6/12 1418 | 7/2 1126 | wso | | | | | | ND | |
| M8852 | 12 | Quarry Discharge at Parkers | | 7/2 1126 | 8/28 | ns | | | | | | ND | |
| M8929 | 12 | Quarry Discharge at Parkers | | NDT | 9/4 0839 | ND | | ND | | ND | | ND | |
| M8929D | 12 | Quarry Discharge at Parkers | | 9/4 0839 | 9/9 0647 | ND | | ND | | ND | | ND | |
| M9132 | 12 | Quarry Discharge at Parkers | | 9/4 0839 | 9/9 0647 | ND | | ND | | ND | | ND | |
| M9132D | 12 | Quarry Discharge at Parkers | | 9/9 0647 | 9/16 0819 | ND | | 539.4 | 3.87 | ND | | ND | |
| M9342 | 12 | Quarry Discharge at Parkers | | 9/9 0647 | 9/16 0819 | ND | | 539.1 | 4.01 | ND | | ND | |
| M9342D | 12 | Quarry Discharge at Parkers | | 9/16 0819 | 9/24 1109 | ND | | 539.6 | 1.89 | ND | | ND | |
| M9453 | 12 | Quarry Discharge at Parkers | | 9/24 1109 | 10/1 0756 | ND | | 539.1 | 1.95 | ND | | ND | |
| M9453D | 12 | Quarry Discharge at Parkers | | 9/24 1109 | 10/1 0756 | ND | | 539.1 | 3.21 | ND | | ND | |
| M9616 | 12 | Quarry Discharge at Parkers | | 10/1 0756 | 10/8 1358 | ND | | 539.1 | 3.26 | ND | | ND | |
| M9616D | 12 | Quarry Discharge at Parkers | | 10/1 0756 | 10/8 1358 | ND | | 538.3 | 1.67 | ND | | ND | |
| M9730 | 12 | Quarry Discharge at Parkers | | 10/8 1358 | 10/15 1348 | ND | | 538.3 | 2.56 | ND | | ND | |
| M9730D | 12 | Quarry Discharge at Parkers | | 10/8 1358 | 10/15 1348 | ND | | 538.5 | 1.14 | ND | | ND | |
| M9816 | 12 | Quarry Discharge at Parkers | | 10/15 1348 | 10/22 0953 | ND | | 538.5 | 1.14 | ND | | ND | |
| M9816D | 12 | Quarry Discharge at Parkers | | 10/15 1348 | 10/22 0953 | ND | | 538.3 | 1.14 | ND | | ND | |
| N0117 | 12 | Quarry Discharge at Parkers | | 10/22 0953 | 10/29 0951 | ND | | 538.2 | 1.38 | ND | | ND | |
| N0117D | 12 | Quarry Discharge at Parkers | | 10/22 0953 | 10/29 0951 | ND | | 538.4 | 2.97 | ND | | ND | |
| N0614 | 12 | Quarry Discharge at Parkers | | 10/29 0951 | 11/12 1216 | ND | | 538.4 | 4.42 | ND | | ND | |
| N0614D | 12 | Quarry Discharge at Parkers | | 10/29 0951 | 11/12 1216 | ND | | 539.3 | 4.27 | ND | | ND | |
| N0984 | 12 | Quarry Discharge at Parkers | | 11/12 1216 | 12/17 1113 | ND | | 539.1 | 4.62 | ND | | ND | |
| N0984D | 12 | Quarry Discharge at Parkers | | 11/12 1216 | 12/17 1113 | ND | | 539.0 | 5.90 | ND | | ND | |
| | 12 | Quarry Discharge at Parkers | | 12/17 1113 | 1/6 1400 | ND | | 539.3 | 3.40 | ND | | ND | |
| | 12 | Quarry Discharge at Parkers | | 1/6 1400 | 3/8 1116 | ND | | 539.0 | 3.76 | ND | | ND | |
| N1922 | 12 | Quarry Discharge at Parkers | | 3/8 1116 | 3/23 1400 | wso | | 539.1 | 6.60 | ND | | ND | |
| N1922D | 12 | Quarry Discharge at Parkers | | 3/8 1116 | 3/23 1400 | ND | | 539.3 | 7.53 | ND | | ND | |
| M3405 | 13 | Creek at 146 | | 12/6 1100 | 12/12 0857 | ND | | ND | | ND | | ND | |
| M3756 | 13 | Creek at 146 | | 12/12 0857 | 12/18 0729 | ND | | ND | | ND | | ND | |
| M3773 | 13 | Creek at 146 | | 12/18 0729 | 12/19 0738 | ND | | ND | | ND | | ND | |
| M3931 | 13 | Creek at 146 | | 12/19 0738 | 12/20 0711 | ND | | ND | | 568.8 | 5.72 | ND | |
| M3949 | 13 | Creek at 146 | | 12/20 0711 | 12/23 0756 | ND | | ND | | 567.9 | 60.0 | ND | |
| M4003 | 13 | Creek at 146 | | 12/23 0756 | 12/26 0747 | ND | | ND | | 568.0 | 13.8 | ND | |

f:/docs/coal/opelika.xls   3/29/04

Plaintiff
00000000002257

2314

Ozark Underground Laboratory, Inc.

Opelika, AL

**Groundwater Investigation**
**Charcoal Results**

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4021 | 13 | Creek at 146 | | 12/26 0747 | 12/30 0724 | ND | | ND | | 568.2 | 10.9 | ND | |
| M4117 | 13 | Creek at 146 | | 12/30 0724 | 1/2 0706 | ND | | ND | | ND | | ND | |
| M4117D | 13 | Creek at 146 | | 12/30 0724 | 1/2 0706 | ND | | ND | | 567.2 | 25.8 | ND | |
| M4117V | 13 | Creek at 146 | | 12/30 0724 | 1/2 0706 | ND | | ND | | ND | | ND | |
| M4396 | 13 | Creek at 146 | | 1/2 0706 | 1/9 0740 | ND | | ND | | 567.7 | 40.1 | ND | |
| M4535 | 13 | Creek at 146 | | 1/9 0740 | 1/16 0732 | ND | | ND | | 567.8 | 31.1 | ND | |
| M4787 | 13 | Creek at 146 | | 1/16 0732 | 1/23 0652 | ND | | ND | | 567.7 | 22.9 | ND | |
| M4855 | 13 | Creek at 146 | | 1/23 0652 | 1/30 0653 | ND | | ND | | 568.2 | 5.71 | ND | |
| M4933 | 13 | Creek at 146 | | 1/30 0653 | 2/6 0702 | ND | | ND | | ND | | ND | |
| M5024 | 13 | Creek at 146 | | 2/6 0702 | 2/13 0710 | ND | | ND | | ND | | ND | |
| M5101 | 13 | Creek at 146 | | 2/13 0710 | 2/20 0648 | ND | | ND | | 567.4 | 4.10 | ND | |
| M5128 | 13 | Creek at 146 | | 2/20 0648 | 2/26 0625 | ND | | ND | | 567.0 | 4.04 | ND | |
| M5234 | 13 | Creek at 146 | | 2/26 0625 | 3/6 0739 | ND | | ND | | ND | | ND | |
| M5362 | 13 | Creek at 146 | | 3/6 0739 | 3/13 0646 | ND | | ND | | 567.5 | 5.18 | ND | |
| M5456 | 13 | Creek at 146 | | 3/13 0646 | 3/19 0651 | ND | | ND | | ND | | ND | |
| M5609 | 13 | Creek at 146 | | 3/19 0651 | 3/27 0639 | ND | | ND | | ND | | ND | |
| | 13 | Creek at 146 | | 3/27 0639 | 6/5 1242 | ns | | ND | | | | ND | |
| M7256 | 13 | Creek at 146 | | 6/5 1242 | 6/12 1406 | ND | | ND | | ND | | ND | |
| M7672 | 13 | Creek at 146 | | 6/12 1406 | 7/2 1110 | ND | | ND | | ND | | ND | |
| | 14 | Beauregard Well Number 4 | | Only water samples collected at this site | | | | | | | | | |
| M3406 | 15 | Chewacala Creek near Pipeline | | 12/6 1124 | 12/12 0913 | ND | | ND | | ND | | ND | |
| M3757 | 15 | Chewacala Creek near Pipeline | | 12/12 0913 | 12/18 0748 | ND | | ND | | ND | | ND | |
| M3774 | 15 | Chewacala Creek near Pipeline | | 12/18 0748 | 12/19 0751 | ND | | ND | | ND | | ND | |
| M3932 | 15 | Chewacala Creek near Pipeline | | 12/19 0751 | 12/20 0724 | ND | | ND | | ND | | ND | |
| M3950 | 15 | Chewacala Creek near Pipeline | | 12/20 0724 | 12/23 0807 | ND | | ND | | ND | | ND | |
| M4004 | 15 | Chewacala Creek near Pipeline | | 12/23 0807 | 12/26 0801 | ND | | ND | | ND | | ND | |
| M4022 | 15 | Chewacala Creek near Pipeline | | 12/26 0801 | 12/30 0736 | ND | | ND | | ND | | ND | |
| M4118 | 15 | Chewacala Creek near Pipeline | | 12/30 0736 | 1/2 0719 | ND | | ND | | ND | | ND | |
| M4397 | 15 | Chewacala Creek near Pipeline | | 1/2 0719 | 1/9 0752 | ND | | ND | | ND | | ND | |
| M4536 | 15 | Chewacala Creek near Pipeline | | 1/9 0752 | 1/16 0742 | ND | | ND | | ND | | ND | |
| M4788 | 15 | Chewacala Creek near Pipeline | | 1/16 0742 | 1/23 0702 | ND | | ND | | ND | | ND | |
| M4856 | 15 | Chewacala Creek near Pipeline | | 1/23 0702 | 1/30 0706 | ND | | ND | | ND | | ND | |
| M4934 | 15 | Chewacala Creek near Pipeline | | 1/30 0706 | 2/6 0713 | ND | | ND | | ND | | ND | |
| M5025 | 15 | Chewacala Creek near Pipeline | | 2/6 0713 | 2/13 0719 | ND | | ND | | ND | | ND | |
| M5102 | 15 | Chewacala Creek near Pipeline | | 2/13 0719 | 2/20 0658 | ND | | ND | | ND | | ND | |
| M5129 | 15 | Chewacala Creek near Pipeline | | 2/20 0658 | 2/26 0635 | ND | | ND | | ND | | ND | |
| M5255 | 15 | Chewacala Creek near Pipeline | | 2/26 0635 | 3/6 0752 | ND | | ND | | ND | | ND | |
| M5363 | 15 | Chewacala Creek near Pipeline | | 3/6 0752 | 3/13 0656 | ND | | ND | | ND | | ND | |
| M5457 | 15 | Chewacala Creek near Pipeline | | 3/13 0656 | 3/19 0702 | ND | | ND | | ND | | ND | |
| M5610 | 15 | Chewacala Creek near Pipeline | | 3/19 0702 | 3/27 0649 | ND | | ND | | ND | | ND | |
| | 15 | Chewacala Creek near Pipeline | | 3/27 0649 | 6/5 1240 | ns | | ND | | | | ND | |
| M7257 | 15 | Chewacala Creek near Pipeline | | 6/5 1240 | 6/12 1413 | ND | | ND | | ND | | ND | |
| | 15 | Chewacala Creek near Pipeline | | 6/12 1413 | 7/2 1119 | wso | | ND | | | | ND | |

9

Plaintiff
00000/000000 2258

Ozark Underground Laboratory, Inc.

**Groundwater Investigation**
**Charcoal Results**

Opelika, AL

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers # | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3404 | 16 | Trib to Lee County Lake | | 12/6 1045 | 12/12 0842 | ND | | ND | | ND | | ND | |
| M3754 | 16 | Trib to Lee County Lake | | 12/12 0842 | 12/18 0653 | ND | | ND | | ND | | ND | |
| M3771 | 16 | Trib to Lee County Lake | | 12/18 0653 | 12/19 0715 | ND | | ND | | ND | | ND | |
| M3929 | 16 | Trib to Lee County Lake | | 12/19 0715 | 12/20 0646 | ND | | ND | | ND | | ND | |
| M3947 | 16 | Trib to Lee County Lake | | 12/20 0646 | 12/23 0731 | ND | | ND | | ND | | ND | |
| M4001 | 16 | Trib to Lee County Lake | | 12/23 0731 | 12/26 0722 | ND | | ND | | ND | | ND | |
| M4018 | 16 | Trib to Lee County Lake | | 12/26 0722 | 12/30 0653 | ND | | ND | | ND | | ND | |
| M4115 | 16 | Trib to Lee County Lake | | 12/30 0653 | 1/2 0643 | ND | | ND | | ND | | ND | |
| M4394 | 16 | Trib to Lee County Lake | | 1/2 0643 | 1/9 0711 | ND | | ND | | ND | | ND | |
| M4533 | 16 | Trib to Lee County Lake | | 1/9 0711 | 1/16 0707 | ND | | ND | | ND | | ND | |
| M4785 | 16 | Trib to Lee County Lake | | 1/16 0707 | 1/23 0630 | ND | | ND | | ND | | ND | |
| M4853 | 16 | Trib to Lee County Lake | | 1/23 0630 | 1/30 0629 | ND | | ND | | ND | | ND | |
| M4931 | 16 | Trib to Lee County Lake | | 1/30 0629 | 2/6 0638 | ND | | ND | | ND | | ND | |
| M5023 | 16 | Trib to Lee County Lake | | 2/6 0638 | 2/13 0648 | ND | | ND | | ND | | ND | |
| M5098 | 16 | Trib to Lee County Lake | | 2/13 0648 | 2/20 0629 | ND | | ND | | ND | | ND | |
| M5126 | 16 | Trib to Lee County Lake | | 2/20 0629 | 2/26 0604 | ND | | ND | | ND | | ND | |
| M5252 | 16 | Trib to Lee County Lake | | 2/26 0604 | 3/6 0718 | ND | | ND | | ND | | ND | |
| M5359 | 16 | Trib to Lee County Lake | | 3/6 0718 | 3/13 0620 | ND | | ND | | ND | | ND | |
| M5454 | 16 | Trib to Lee County Lake | | 3/13 0620 | 3/19 0629 | ND | | ND | | ND | | ND | |
| | 16 | Trib to Lee County Lake | | 3/19 0629 | 3/27 0621 | wso | | | | | | ND | |
| M7234 | 16 | Trib to Lee County Lake | | 6/5 1300 | 6/5 1300 | ns | | | | | | ND | |
| | 16 | Trib to Lee County Lake | | 6/12 1345 | 6/12 1345 | wso | | | | | | ND | |
| M3764 | 17 | Little Uchee Upstream from Sink | | 12/17 0819 | 12/18 0903 | ND | | ND | | ND | | ND | |
| M3781 | 17 | Little Uchee Upstream from Sink | | 12/18 0903 | 12/19 0843 | ND | | ND | | ND | | ND | |
| M3938 | 17 | Little Uchee Upstream from Sink | | 12/19 0843 | 12/20 0816 | ND | | ND | | ND | | ND | |
| M3957 | 17 | Little Uchee Upstream from Sink | | 12/20 0816 | 12/23 0904 | ND | | ND | | ND | | ND | |
| M4011 | 17 | Little Uchee Upstream from Sink | | 12/23 0904 | 12/26 0905 | ND | | ND | | ND | | ND | |
| M4029 | 17 | Little Uchee Upstream from Sink | | 12/26 0905 | 12/30 0832 | ND | | ND | | ND | | ND | |
| M4126 | 17 | Little Uchee Upstream from Sink | | 12/30 0832 | 1/2 0812 | ND | | ND | | ND | | ND | |
| M4405 | 17 | Little Uchee Upstream from Sink | | 1/2 0812 | 1/9 0840 | ND | | ND | | ND | | ND | |
| M4544 | 17 | Little Uchee Upstream from Sink | | 1/9 0840 | 1/16 0824 | ND | | ND | | ND | | ND | |
| M4795 | 17 | Little Uchee Upstream from Sink | | 1/16 0824 | 1/23 0741 | ND | | ND | | ND | | ND | |
| M4864 | 17 | Little Uchee Upstream from Sink | | 1/23 0741 | 1/30 0753 | ND | | ND | | ND | | ND | |
| M4942 | 17 | Little Uchee Upstream from Sink | | 1/30 0753 | 2/6 0751 | ND | | ND | | ND | | ND | |
| M5032 | 17 | Little Uchee Upstream from Sink | | 2/6 0751 | 2/13 0759 | ND | | ND | | ND | | ND | |
| M5109 | 17 | Little Uchee Upstream from Sink | | 2/13 0759 | 2/20 0738 | ND | | ND | | ND | | ND | |
| | 17 | Little Uchee Upstream from Sink | | 2/20 0738 | 2/26 0718 | wso | | ND | | | | ND | |
| M5263 | 17 | Little Uchee Upstream from Sink | | 2/26 0718 | 3/6 0900 | ND | | | | | | ND | |
| M5368 | 17 | Little Uchee Upstream from Sink | | 3/6 0900 | 3/13 0746 | ND | | ND | | ND | | ND | |
| M5465 | 17 | Little Uchee Upstream from Sink | | 3/13 0746 | 3/19 0747 | ND | | ND | | ND | | ND | |
| M5616 | 17 | Little Uchee Upstream from Sink | | 3/19 0747 | 3/27 0723 | ND | | ND | | ND | | ND | |
| | 17 | Little Uchee Upstream from Sink | | 3/27 0723 | 6/5 1130 | ns | | | | | | ND | |

f:\docs\coa\opelika.xls
3/29/04

Plaintiff
00000000002259

2316

Ozark Underground Laboratory, Inc.

**Groundwater Investigation**
**Charcoal Results**

Opelika, AL

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Peak nm | Fluorescein Conc. ppb | Eosine Peak nm | Eosine Conc. ppb | RWT Peak nm | RWT Conc. ppb | SRB Peak nm | SRB Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M7265 | 17 | Little Uchee Upstream from Sink | | 6/5 1130 | 6/12 1502 | ND | | | | | | ND | |
| | | | | 6/12 1502 | 7/2 1224 | wso | | | | | | ND | |
| M8613 | 17 | Little Uchee Upstream from Sink | Ewers | NDT | 8/27 1057 | ND | | ND | | ND | | ND | |
| M8849 | 17 | Little Uchee Upstream from Sink | Ewers | 8/27 1057 | 9/3 0710 | ND | | ND | | ND | | ND | |
| M8926 | 17 | Little Uchee Upstream from Sink | Ewers | 9/3 0710 | 9/10 0736 | ND | | ND | | ND | | ND | |
| M9130 | 17 | Little Uchee Upstream from Sink | Ewers | 9/10 0736 | 9/16 0748 | ND | | ND | | ND | | ND | |
| M9205 | 17 | Little Uchee Upstream from Sink | Ewers | 9/16 0748 | 9/24 1034 | ND | | ND | | ND | | ND | |
| M9339 | 17 | Little Uchee Upstream from Sink | Ewers | 9/24 1034 | 10/1 0727 | ND | | ND | | ND | | ND | |
| M9451 | 17 | Little Uchee Upstream from Sink | Ewers | 10/1 0727 | 10/8 1330 | ND | | ND | | ND | | ND | |
| M9611 | 17 | Little Uchee Upstream from Sink | Ewers | 10/8 1330 | 10/15 1316 | ND | | ND | | ND | | ND | |
| M9725 | 17 | Little Uchee Upstream from Sink | Ewers | 10/15 1316 | 10/22 1315 | ND | | ND | | ND | | ND | |
| M9811 | 17 | Little Uchee Upstream from Sink | Ewers | 10/22 1315 | 10/29 1017 | ND | | ND | | ND | | ND | |
| N0112 | 17 | Little Uchee Upstream from Sink | Ewers | 10/29 1017 | 11/12 1302 | ND | | ND | | ND | | ND | |
| | | | | 11/12 1302 | 12/17 NT | ns | | | | | | ND | |
| N0987 | 17 | Little Uchee Upstream from Sink | Ewers | 12/17 NT | 1/7 0623 | ND | | ND | | ND | | ND | |
| | | | | 1/7 0623 | 3/8 | ns | | | | | | ND | |
| N1925 | 17 | Little Uchee Upstream from Sink | Ewers | NDT | 3/23 1317 | ND | | ND | | ND | | ND | |
| M3766 | 18 | Test Well #1 at Spring | | 12/17 1345 | 12/18 0939 | ND | | ND | | ND | | ND | |
| M3783 | 18 | Test Well #1 at Spring | | 12/18 0939 | 12/19 0909 | ND | | ND | | ND | | ND | |
| M3941 | 18 | Test Well #1 at Spring | | 12/19 0909 | 12/20 0840 | ND | | ND | | ND | | ND | |
| M3959 | 18 | Test Well #1 at Spring | | 12/20 0840 | 12/23 0930 | ND | | ND | | ND | | ND | |
| M4013 | 18 | Test Well #1 at Spring | | 12/23 0930 | 12/26 0935 | ND | | ND | | ND | | ND | |
| M4031 | 18 | Test Well #1 at Spring | | 12/26 0935 | 12/30 0902 | ND | | ND | | ND | | ND | |
| M4128 | 18 | Test Well #1 at Spring | | 12/30 0902 | 1/2 0840 | ND | | ND | | ND | | ND | |
| M4407 | 18 | Test Well #1 at Spring | | 1/2 0840 | 1/9 0905 | ND | | ND | | ND | | ND | |
| M4546 | 18 | Test Well #1 at Spring | | 1/9 0905 | 1/16 0849 | ND | | ND | | ND | | ND | |
| M4797 | 18 | Test Well #1 at Spring | | 1/16 0849 | 1/23 0801 | ND | | ND | | ND | | ND | |
| M4866 | 18 | Test Well #1 at Spring | | 1/23 0801 | 1/30 0823 | ND | | ND | | ND | | ND | |
| M4944 | 18 | Test Well #1 at Spring | | 1/30 0823 | 2/6 0810 | ND | | ND | | ND | | ND | |
| M5034 | 18 | Test Well #1 at Spring | | 2/6 0810 | 2/13 0830 | ND | | ND | | ND | | ND | |
| M5111 | 18 | Test Well #1 at Spring | | 2/13 0830 | 2/20 0756 | ND | | ND | | ND | | ND | |
| M5136 | 18 | Test Well #1 at Spring | | 2/20 0756 | 2/26 0738 | ND | | ND | | ND | | ND | |
| M5265 | 18 | Test Well #1 at Spring | | 2/26 0738 | 3/6 0913 | ND | | ND | | ND | | ND | |
| M5370 | 18 | Test Well #1 at Spring | | 3/6 0913 | 3/13 0803 | ND | | ND | | ND | | ND | |
| M5467 | 18 | Test Well #1 at Spring | | 3/13 0803 | 3/19 0805 | ND | | ND | | ND | | ND | |
| M5618 | 18 | Test Well #1 at Spring | | 3/19 0805 | 3/27 0739 | ND | | ND | | ND | | ND | |
| | | | | 3/27 0739 | 6/5 1140 | ns | | | | | | ND | |
| M7267 | 18 | Test Well #1 at Spring | | 6/5 1140 | 6/12 1528 | ND | | ND | | ND | | ND | |
| M7676 | 18 | Test Well #1 at Spring | | 6/12 1528 | 7/2 1232 | ND | | ND | | ND | | ND | |
| M8610 | 18 | Test Well #1 at Spring | Ewers | NDT | 8/27 1046 | ND | | ND | | ND | | ND | |
| M8848 | 18 | Test Well #1 at Spring | Ewers | 8/27 1046 | 9/3 0658 | ND | | ND | | ND | | ND | |
| M8924 | 18 | Test Well #1 at Spring | Ewers | 9/3 0658 | 9/10 0725 | ND | | ND | | ND | | ND | |
| M9128 | 18 | Test Well #1 at Spring | Ewers | 9/10 0725 | 9/16 0724 | ND | | ND | | ND | | ND | |

11

Plaintiff
0000000000002260

Ozark Underground Laboratory, Inc.

Opelika, AL

2317

## Groundwater Investigation
### Charcoal Results

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M9203 | 18 | Test Well #1 at Spring | Ewers | 9/16 0724 | 9/24 1015 | ND | | ND | | ND | | | ND |
| M9336 | 18 | Test Well #1 at Spring | Ewers | 9/24 1015 | 10/1 0710 | ND | | ND | | ND | | | ND |
| M9949 | 18 | Test Well #1 at Spring | Ewers | 10/1 0710 | 10/8 1313 | ND | | ND | | ND | | | ND |
| M9613 | 18 | Test Well #1 at Spring | Ewers | 10/8 1313 | 10/15 1330 | ND | | ND | | ND | | | ND |
| M9727 | 18 | Test Well #1 at Spring | Ewers | 10/15 1330 | 10/22 1326 | ND | | ND | | ND | | | ND |
| M9813 | 18 | Test Well #1 at Spring | Ewers | 10/22 1326 | 10/29 1027 | ND | | ND | | ND | | | ND |
| N0114 | 18 | Test Well #1 at Spring | Ewers | 10/29 1027 | 11/12 1309 | ND | | ND | | ND | | | ND |
| N0444 | 18 | Test Well #1 at Spring | | NDT | 11/12 1309 | ND | | ND | | ND | | | ND |
| N0618 | 18 | Test Well #1 at Spring | | NDT | 11/26 1040 | ND | | ND | | ND | | | ND |
| N0989 | 18 | Test Well #1 at Spring | Ewers | NDT | 12/17 1200 | ND | | ND | | ND | | | ND |
| N1737 | 18 | Test Well #1 at Spring | | 12/17 1156 | 1/7 0643 | ns | | | | | | | ND |
| N1927 | 18 | Test Well #1 at Spring | Ewers | 1/7 0643 | 2/19 1315 | ND | | ND | | ND | | | ND |
| M3767 | 19 | Test Well #1 at Spring | Ewers | 2/19 1315 | 3/8 1135 | ND | | ND | | | | | ND |
| N3784 | 19 | 1st Hole past Spring | Ewers | 3/8 1135 | 3/23 1340 | ND | | ND | | | | | ND |
| M3942 | 19 | 1st Hole past Spring | | 12/17 0730 | 12/18 0949 | ND | | ND | | ND | | | ND |
| M3963 | 19 | 1st Hole past Spring | | 12/18 0949 | 12/19 0917 | ND | | ND | | ND | | | ND |
| M4016 | 19 | 1st Hole past Spring | | 12/19 0917 | 12/20 0852 | ND | | ND | | ND | | | ND |
| M4034 | 19 | 1st Hole past Spring | | 12/20 0852 | 12/23 0939 | ND | | ND | | ND | | | ND |
| M4131 | 19 | 1st Hole past Spring | | 12/23 0939 | 12/26 0947 | ND | | ND | | ND | | | ND |
| M4410 | 19 | 1st Hole past Spring | | 12/26 0947 | 12/30 0908 | ND | | ND | | ND | | | ND |
| M4549 | 19 | 1st Hole past Spring | | 12/30 0908 | 1/2 0849 | ND | | ND | | ND | | | ND |
| M4801 | 19 | 1st Hole past Spring | | 1/2 0849 | 1/9 0912 | ND | | ND | | ND | | | ND |
| M4868 | 19 | 1st Hole past Spring | | 1/9 0912 | 1/16 0855 | ND | | ND | | ND | | | ND |
| M4947 | 19 | 1st Hole past Spring | | 1/16 0855 | 1/23 0816 | ND | | ND | | ND | | | ND |
| M5037 | 19 | 1st Hole past Spring | | 1/23 0816 | 1/30 0830 | ND | | ND | | ND | | | ND |
| M5114 | 19 | 1st Hole past Spring | | 1/30 0830 | 2/6 0816 | ND | | ND | | ND | | | ND |
| | 19 | 1st Hole past Spring | | 2/6 0816 | 2/13 0839 | ND | | ND | | ND | | | ND |
| | 19 | 1st Hole past Spring | | 2/13 0839 | 2/20 0810 | ND | | ND | | ND | | | ND |
| | 19 | 1st Hole past Spring | | 2/20 0810 | 2/26 0748 | ns | | | | ND | | | ND |
| M5373 | 19 | 1st Hole past Spring | | 2/26 0748 | 3/6 0921 | ns | | | | | | | ND |
| M5470 | 19 | 1st Hole past Spring | | 3/6 0921 | 3/13 0810 | ND | | ND | | | | | ND |
| M5622 | 19 | 1st Hole past Spring | | 3/13 0810 | 3/19 0812 | ND | | ND | | | | | ND |
| M7270 | 19 | 1st Hole past Spring | | 3/19 0812 | 3/27 0750 | ND | | ND | | | | | ND |
| M7679 | 19 | 1st Hole past Spring | | 3/27 0750 | 6/5 1157 | ns | | | | | | | ND |
| M3768 | 20 | 2nd Hole past Spring | | 6/12 1535 | 7/2 1237 | ND | | ND | | | | | ND |
| M3785 | 20 | 2nd Hole past Spring | | 12/17 0730 | 12/18 0952 | ND | | ND | | ND | | | ND |
| M3943 | 20 | 2nd Hole past Spring | | 12/18 0952 | 12/19 0918 | ND | | ND | | ND | | | ND |
| M3964 | 20 | 2nd Hole past Spring | | 12/19 0918 | 12/20 0854 | ND | | ND | | ND | | | ND |
| M4017 | 20 | 2nd Hole past Spring | | 12/20 0854 | 12/23 0940 | ND | | ND | | ND | | | ND |
| M4035 | 20 | 2nd Hole past Spring | | 12/23 0940 | 12/26 0949 | ND | | ND | | ND | | | ND |
| M4132 | 20 | 2nd Hole past Spring | | 12/26 0949 | 12/30 0910 | ND | | ND | | ND | | | ND |
| M4411 | 20 | 2nd Hole past Spring | | 12/30 0910 | 1/2 0851 | ND | | ND | | ND | | | ND |
| | 20 | 2nd Hole past Spring | | 1/2 0851 | 1/9 0913 | ND | | ND | | ND | | | ND |

Plaintiff
0000000000002261

F:\docs\cra\opelika.xls
3/29/04

2318

Ozark Underground Laboratory, Inc.

Groundwater Investigation
Charcoal Results

Opelika, AL

| OUL Lab # | OUL Station # | Station Name | Samples by Ewers | Date/Time Placed 2002/2004 | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4550 | 20 | 2nd Hole past Spring | | I/9 0913 | 1/16 0856 | ND | | | | ND | | ND | |
| M4802 | 20 | 2nd Hole past Spring | | 1/16 0856 | 1/23 0817 | ND | | ND | | ND | | ND | |
| M4869 | 20 | 2nd Hole past Spring | | 1/23 0817 | 1/30 0831 | ND | | ND | | ND | | ND | |
| M5038 | 20 | 2nd Hole past Spring | | 1/30 0831 | 2/6 0817 | ns | | | | | | ND | |
| M5115 | 20 | 2nd Hole past Spring | | 2/6 0817 | 2/13 0842 | ND | | ND | | | | ND | |
| M5139 | 20 | 2nd Hole past Spring | | 2/13 0842 | 2/20 0812 | ND | | ND | | | | ND | |
| M5268 | 20 | 2nd Hole past Spring | | 2/20 0812 | 2/26 0750 | ND | | ND | | ND | | ND | |
| M5374 | 20 | 2nd Hole past Spring | | 2/26 0750 | 3/6 0922 | ND | | ND | | ND | | ND | |
| M5471 | 20 | 2nd Hole past Spring | | 3/6 0922 | 3/13 0812 | ND | | ND | | ND | | ND | |
| M5623 | 20 | 2nd Hole past Spring | | 3/13 0812 | 3/19 0814 | ND | | ND | | ND | | ND | |
| M7271 | 20 | 2nd Hole past Spring | | 3/19 0814 | 3/27 0752 | ND | | ND | | ND | | ND | |
| | 20 | 2nd Hole past Spring | | 3/27 0752 | 6/5 1159 | ns | | | | | | ND | |
| | 20 | 2nd Hole past Spring | | 6/5 1159 | 6/12 1536 | ND | | ND | | ND | | ND | |
| M8614 | 21 | Beauregard Well #1 | | 6/12 1536 | 7/2 1238 | ns | | | | | | ND | |
| M8850 | 21 | Beauregard Well #1 | Ewers | NDT | 8/27 1300 | ns | | | | | | ND | |
| M8927 | 21 | Beauregard Well #1 | Ewers | 8/27 1300 | 9/3 0726 | ND | | ND | | | | ND | |
| M9131 | 21 | Beauregard Well #1 | Ewers | 9/3 0726 | 9/10 0754 | ND | | ND | | ND | | ND | |
| M9206 | 21 | Beauregard Well #1 | Ewers | 9/10 0754 | 9/16 0803 | ND | | ND | | ND | | ND | |
| M9341 | 21 | Beauregard Well #1 | Ewers | 9/16 0803 | 9/24 1050 | ND | | ND | | ND | | ND | |
| M9452 | 21 | Beauregard Well #1 | Ewers | 9/24 1050 | 10/1 0741 | ND | | ND | | ND | | ND | |
| M9610 | 21 | Beauregard Well #1 | Ewers | 10/1 0741 | 10/8 1344 | ND | | ND | | ND | | ND | |
| M9724 | 21 | Beauregard Well #1 | Ewers | 10/8 1344 | 10/15 1300 | ND | | ND | | ND | | ND | |
| M9810 | 21 | Beauregard Well #1 | Ewers | 10/15 1300 | 10/22 1300 | ND | | ND | | ND | | ND | |
| N0111 | 21 | Beauregard Well #1 | Ewers | 10/22 1300 | 10/29 1002 | ND | | ND | | ND | | ND | |
| N0616 | 21 | Beauregard Well #1 | Ewers | 10/29 1002 | 11/12 1242 | ND | | ND | | ND | | ND | |
| N0986 | 21 | Beauregard Well #1 | Ewers | NDT | 11/26 | ns | | | | | | ND | |
| N1924 | 21 | Beauregard Well #1 | Ewers | 12/17 1135 | 12/17 1135 | ND | | ND | | ND | | ND | |
| | 21 | Beauregard Well #1 | Ewers | 1/7 0611 | 1/7 0611 | ND | | ND | | ND | | ND | |
| M8925 | 22 | Spring Villa at Suction Bay | Ewers | 3/8 1059 | 3/8 1059 | wso | | | | | | ND | |
| M9129 | 22 | Spring Villa at Suction Bay | Ewers | 3/8 1059 | 3/23 1255 | ND | | ND | | ND | | ND | |
| M9134 | 22 | Spring Villa at Suction Bay | Ewers | 9/3 0701 | 9/10 0729 | ND | | ND | | ND | | ND | |
| M9204 | 22 | Spring Villa at Suction Bay | Ewers | 9/10 0729 | 9/16 0733 | ND | | ND | | ND | | ND | |
| M9337 | 22 | Spring Villa at Suction Bay | Ewers | NDT (1) | 9/16 0735 | ND | | ND | | ND | | ND | |
| M9615 | 22 | Spring Villa at Suction Bay | Ewers | 9/16 0733 | 9/24 1026 | ND | | ND | | ND | | ND | |
| M9729 | 22 | Spring Villa at Suction Bay | Ewers | 9/24 1026 | 10/1 0718 | ND d | | ND | | ND | | ND | |
| M9815 | 22 | Spring Villa at Suction Bay | Ewers | 10/1 0718 | 10/15 1337 | ND | | ND | | ND | | ND | |
| N0116 | 22 | Spring Villa at Suction Bay | Ewers | 10/15 1337 | 10/22 1334 | ND | | ND | | ND | | ND | |
| | 22 | Spring Villa at Suction Bay | Ewers | 10/22 1334 | 10/29 1033 | ND | | ND | | ND | | ND | |
| | 22 | Spring Villa at Suction Bay | Ewers | 10/29 1033 | 11/12 1314 | ND | | ND | | ND | | ND | |
| | 22 | Spring Villa at Suction Bay | Ewers | 11/12 1314 | 3/8 | ns | | | | | | ND | |

13

Plaintiff
0000000000002262

Ozark Underground Laboratory, Inc.

Opelika, AL

Groundwater Investigation
Water Results

**Table 6.    Results water samples analyzed for the presence of fluorescein, eosine, rhodamine WT (RWT) and sulforhodamine B (SRB) dyes. Peak wavelengths are reported in nanometers (nm); dye concentrations are reported in parts per billion (ppb).**

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Conc. ppb | Eosine Results Peak nm | Conc. ppb | RWT Results Peak nm | Conc. ppb | SRB Results Peak nm | Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M3805 | 1 | East Branch Uchee Creek at Road 148 | | 12/18 0918 | ND | | ND | | ND | | ND | |
| M3818 | 1 | East Branch Uchee Creek at Road 148 | | 12/19 0855 | ND | | ND | | ND | | ND | |
| M7690 | 1 | East Branch Uchee Creek at Road 148 | | 7/2 1300 | ND | | ND | | ND | | ND | |
| M3349 | 5 | Test Well Number 5 | | 12/10 1018 | ND | | ND | | ND | | ND | |
| M3807 | 5 | Test Well Number 5 | | 12/18 1002 | ND | | ND | | ND | | ND | |
| M3821 | 5 | Test Well Number 5 | | 12/19 0837 | ND | | ND | | ND | | ND | |
| M3368 | 7 | Little Uchee Creek at 145 | | 12/5 1115 | ND | | ND | | ND | | ND | |
| M3354 | 7 | Little Uchee Creek at 145 | | 12/6 1026 | ND | | ND | | ND | | ND | |
| M3359 | 7 | Little Uchee Creek at 145 | | 12/10 0915 | ND | | ND | | ND | | ND | |
| M3795 | 7 | Little Uchee Creek at 145 | | 12/18 0711 | ND | | ND | | ND | | ND | |
| M3809 | 7 | Little Uchee Creek at 145 | | 12/19 0725 | ND | | ND | | ND | | ND | |
| M5054 | 7 | Little Uchee Creek at 145 | | 2/13 0658 | ND | | ND | | ND | | ND | |
| M7682 | 7 | Little Uchee Creek at 145 | | 7/2 1058 | ND | | ND | | ND | | ND | |
| M3353 | 8 | Gates Road at Section Corner | | 12/6 1012 | ND | | ND | | ND | | ND | |
| M3363 | 8 | Gates Road at Section Corner | | 12/10 1113 | ND | | ND | | ND | | ND | |
| M3816 | 8 | Gates Road at Section Corner | | 12/18 0830 | ND | | ND | | ND | | ND | |
| M5205 | 8 | Gates Road at Section Corner | | 12/19 0829 | ND | | ND | | ND | | ND | |
| M5431 | 8 | Gates Road at Section Corner | | 2/26 0703 | ND | | ND | | ND | | ND | |
| M7688 | 8 | Gates Road at Section Corner | | 3/13 0731 | ND | | ND | | ND | | ND | |
| M3352 | 8 | Gates Road at Section Corner | | 7/2 1206 | ND | | ND | | ND | | ND | |
| M3362 | 9 | Gates Road at West Stream | | 12/6 0946 | ND | | ND | | ND | | ND | |
| M3802 | 9 | Gates Road at West Stream | | 12/10 1116 | ND | | ND | | ND | | ND | |
| M3815 | 9 | Gates Road at West Stream | | 12/18 0839 | ND | | ND | | ND | | ND | |
| M5635 | 9 | Gates Road at West Stream | | 12/19 0821 | ND | | ND | | ND | | ND | |
| M7687 | 9 | Gates Road at West Stream | | 7/2 1200 | ND | | ND | | ND | | ND | |
| M3367 | 11 | Quarry Discharge at 166 | | 12/5 0855 | ND | | ND | | ND | | ND | |
| M3366 | 11 | Quarry Discharge at 166 | | 12/10 1011 | ND | | ND | | ND | | ND | |
| M3792 | 11 | Quarry Discharge at 166 | | 12/17 1300 | ND | | ND | | ND | | ND | |
| M3793 | 11 | Quarry Discharge at 166 | | 12/17 1449 | ND | | ND | | ND | | ND | |
| M3801 | 11 | Quarry Discharge at 166 | | 12/18 0810 | ND | | ND | | ND | | ND | |
| M3814 | 11 | Quarry Discharge at 166 | | 12/19 0807 | ND | | ND | | 574.3 | 1.73 | ND | |
| M3995 | 11 | Quarry Discharge at 166 | | 12/20 0739 | ND | | ND | | 574.4 | 7.73 | ND | |
| M3999 | 11 | Quarry Discharge at 166 | | 12/23 0823 | ND | | ND | | 574.1 | 1.93 | ND | |
| M4110 | 11 | Quarry Discharge at 166 | | 12/26 0818 | ND | | ND | | 574.3 | 1.06 | ND | |
| M4114 | 11 | Quarry Discharge at 166 | | 12/30 0753 | ND | | ND | | 574.4 | 0.238 | ND | |
| M4166 | 11 | Quarry Discharge at 166 | | 1/2 0735 | ND | | ND | | 575.2 | 0.266 | ND | |

1

f:\docs\cooalopelika.xls
3/29/04

Plaintiff
00000000002263

Ozark Underground Laboratory, Inc.                                    Opelika, AL

**Groundwater Investigation**
**Water Results**

2320

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M4515 | 11 | Quarry Discharge at 166 | | 1/9 0806 | ND | | ND | | | | ND | |
| M4618 | 11 | Quarry Discharge at 166 | | 1/16 0755 | ND | | ND | | 574.2 | 0.182 | ND | |
| M4806 | 11 | Quarry Discharge at 166 | | 1/23 0712 | ND | | ND | | 574.4 | 0.070 | ND | |
| M4898 | 11 | Quarry Discharge at 166 | | 1/30 0718 | ND | | ND | | ND | | ND | |
| M4965 | 11 | Quarry Discharge at 166 | | 2/6 0724 | ND | | ND | | ND | | ND | |
| M5058 | 11 | Quarry Discharge at 166 | | 2/13 0730 | ND | | ND | | ND | | ND | |
| M5125 | 11 | Quarry Discharge at 166 | | 2/20 0709 | ND | | ND | | ND | | ND | |
| M5204 | 11 | Quarry Discharge at 166 | | 2/26 0646 | ND | | ND | | ND | | ND | |
| M5319 | 11 | Quarry Discharge at 166 | | 3/6 0804 | ND | | ND | | ND | | ND | |
| M5430 | 11 | Quarry Discharge at 166 | | 3/13 0709 | ND | | ND | | 579.2 | 0.091 | ND | |
| M5491 | 11 | Quarry Discharge at 166 | | 3/19 0719 | ND | | ND | | ND | | ND | |
| M5634 | 11 | Quarry Discharge at 166 | | 3/27 0659 | ND | | ND | | ND | | ND | |
| M7315 | 11 | Quarry Discharge at 166 | | 6/12 1425 | ND | | ND | | ND | | ND | |
| M7686 | 11 | Quarry Discharge at 166 | | 7/2 1136 | ND | | ND | | ND | | ND | |
| M8799 | 11 | Quarry Discharge at 166 | | 8/28 0640 | ND | | ND | | ND | | ND | |
| M8932 | 11 | Quarry Discharge at 166 | | 9/9 0652 | ND | | ND | | ND | | ND | |
| M9152 | 11 | Quarry Discharge at 166 | | 9/16 0824 | ND | | ND | | ND | | ND | |
| M9233 | 11 | Quarry Discharge at 166 | | 9/24 1114 | ND | | ND | | ND | | ND | |
| M9512 | 11 | Quarry Discharge at 166 | | 10/1 0801 | ND | | ND | | ND | | ND | |
| M9552 | 11 | Quarry Discharge at 166 | | 10/8 1303 | ND | | ND | | ND | | ND | |
| M9737 | 11 | Quarry Discharge at 166 | | 10/15 1354 | v | | | | | | ND | |
| M9976 | 11 | Quarry Discharge at 166 | | 10/22 1000 | ND | | ND | | ND | | ND | |
| N0151 | 11 | Quarry Discharge at 166 | | 10/29 0954 | ND | | ND | | ND | | ND | |
| N0625 | 11 | Quarry Discharge at 166 | | 11/12 1223 | ND | | ND | | ND | | ND | |
| N1017 | 11 | Quarry Discharge at 166 | | 12/17 1120 | ND | | ND | | ND | | ND | |
| N1741 | 11 | Quarry Discharge at 166 | | 1/6 1404 | ND | | ND | | ND | | ND | |
| N1930 | 11 | Quarry Discharge at 166 | | 3/8 1119 | ND | | ND | | ND | | ND | |
| M3357 | 12 | Quarry Discharge at 166 | | 3/23 1408 | ND | | ND | | ND | | ND | |
| M3799 | 12 | **Quarry Discharge at Parkers** | | 12/10 1001 | ND | | ND | | ND | | ND | |
| M3813 | 12 | Quarry Discharge at Parkers | | 12/18 0759 | ND | | ND | | ND | | ND | |
| M3994 | 12 | Quarry Discharge at Parkers | | 12/19 0758 | ND | | ND | | 574.4 | 0.925 | ND | |
| M3998 | 12 | Quarry Discharge at Parkers | | 12/20 0732 | ND | | ND | | 574.1 | 0.537 | ND | |
| M4109 | 12 | Quarry Discharge at Parkers | | 12/23 0815 | ND | | ND | | 574.2 | 1.61 | ND | |
| M4113 | 12 | Quarry Discharge at Parkers | | 12/26 0810 | ND | | ND | | 574.3 | 1.23 | ND | |
| M4165 | 12 | Quarry Discharge at Parkers | | 12/30 0746 | ND | | ND | | 574.5 | 0.277 | ND | |
| M4514 | 12 | Quarry Discharge at Parkers | | 1/2 0728 | ND | | ND | | 574.8 | 0.288 | ND | |
| M4617 | 12 | Quarry Discharge at Parkers | | 1/9 0759 | ND | | ND | | 576.4 | 0.175 | ND | |
| M4805 | 12 | Quarry Discharge at Parkers | | 1/16 0749 | ND | | ND | | 574.8 | 0.092 | ND | |
| | 12 | Quarry Discharge at Parkers | | 1/23 0707 | ND | | ND | | ND | | ND | |

Plaintiff
00000000002264

f:\docs\coa\opelika.xls
3/29/04

2321

Ozark Underground Laboratory, Inc.

Opelika, AL

Groundwater Investigation
Water Results

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 20022004 | Fluorescein Results Peak nm | Fluorescein Results Conc. ppb | Eosine Results Peak nm | Eosine Results Conc. ppb | RWT Results Peak nm | RWT Results Conc. ppb | SRB Results Peak nm | SRB Results Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M4897 | 12 | Quarry Discharge at Parkers | | 1/30 0712 | ND | | ND | | ND | | ND | |
| M4964 | 12 | Quarry Discharge at Parkers | | 2/6 0719 | ND | | ND | | ND | | ND | |
| M5057 | 12 | Quarry Discharge at Parkers | | 2/13 0725 | ND | | ND | | ND | | ND | |
| M5124 | 12 | Quarry Discharge at Parkers | | 2/20 0705 | ND | | ND | | ND | | ND | |
| M5203 | 12 | Quarry Discharge at Parkers | | 2/26 0640 | ND | | ND | | ND | | ND | |
| M5318 | 12 | Quarry Discharge at Parkers | | 3/6 0759 | ND | | ND | | 575.2 | 0.059 | ND | |
| M5429 | 12 | Quarry Discharge at Parkers | | 3/13 0702 | ND | | ND | | ND | | ND | |
| M5490 | 12 | Quarry Discharge at Parkers | | 3/19 0711 | ND | | ND | | ND | | ND | |
| M5633 | 12 | Quarry Discharge at Parkers | | 3/27 0655 | ND | | ND | | ND | | ND | |
| M7314 | 12 | Quarry Discharge at Parkers | | 6/12 1418 | ND | | ND | | ND | | ND | |
| M7685 | 12 | Quarry Discharge at Parkers | | 7/2 1126 | ND | | ND | | ND | | ND | |
| M8954 | 12 | Quarry Discharge at Parkers | | 9/9 0647 | ND | | ND | | ND | | ND | |
| M9151 | 12 | Quarry Discharge at Parkers | | 9/16 0819 | ND | | ND | | ND | | ND | |
| M9232 | 12 | Quarry Discharge at Parkers | | 9/24 1109 | ND | | ND | | ND | | ND | |
| M9511 | 12 | Quarry Discharge at Parkers | | 10/1 0756 | ND | | ND | | ND | | ND | |
| M9551 | 12 | Quarry Discharge at Parkers | | 10/8 1358 | ND | | ND | | ND | | ND | |
| M9664 | 12 | Quarry Discharge at Parkers | | 10/15 1348 | ND | | ND | | ND | | ND | |
| M9736 | 12 | Quarry Discharge at Parkers | | 10/22 0953 | ND | | ND | | ND | | ND | |
| M9975 | 12 | Quarry Discharge at Parkers | | 10/29 0951 | ND | | ND | | ND | | ND | |
| N0150 | 12 | Quarry Discharge at Parkers | | 11/12 1216 | ND | | ND | | ND | | ND | |
| N0624 | 12 | Quarry Discharge at Parkers | | 12/17 1113 | ND | | ND | | ND | | ND | |
| N1016 | 12 | Quarry Discharge at Parkers | | 1/6 1400 | ND | | ND | | ND | | ND | |
| N1739 | 12 | Quarry Discharge at Parkers | | 3/8 1116 | ND | | ND | | ND | | ND | |
| N1929 | 12 | Quarry Discharge at Parkers | | 3/23 1400 | ND | | ND | | ND | | ND | |
| M3369 | 13 | Creek at 146 | | 12/5 1147 | ND | | ND | | ND | | ND | |
| M3355 | 13 | Creek at 146 | | 12/6 1100 | ND | | ND | | ND | | ND | |
| M3364 | 13 | Creek at 146 | | 12/10 0927 | ND | | ND | | ND | | ND | |
| M3796 | 13 | Creek at 146 | | 12/18 0729 | ND | | ND | | ND | | ND | |
| M3810 | 13 | Creek at 146 | | 12/19 0738 | ND | | ND | | ND | | ND | |
| M3992 | 13 | Creek at 146 | | 12/20 0711 | ND | | ND | | ND | | ND | |
| M3996 | 13 | Creek at 146 | | 12/23 0756 | ND | | ND | | 573.4 * | 0.259 | ND | |
| M4107 | 13 | Creek at 146 | | 12/26 0747 | ND | | ND | | 574.1 | 1.62 | ND | |
| M4111 | 13 | Creek at 146 | | 12/30 0724 | ND | | ND | | 574.2 | 0.717 | ND | |
| M4532 | 13 | Creek at 146 | | 1/2 0706 | ND | | ND | | 574.0 * | 0.242 | ND | |
| M4512 | 13 | Creek at 146 | | 1/9 0740 | ND | | ND | | 573.6 * | 0.211 | ND | |
| M4615 | 13 | Creek at 146 | | 1/16 0732 | ND | | ND | | 575.4 | 0.115 | ND | |
| M4803 | 13 | Creek at 146 | | 1/23 0652 | ND | | ND | | 574.2 | 0.103 | ND | |
| M4895 | 13 | Creek at 146 | | 1/30 0653 | ND | | ND | | 573.8 * | 0.053 | ND | |
| M4962 | 13 | Creek at 146 | | 2/6 0702 | ND | | ND | | ND | | ND | |

3

Plaintiff
0000000000002265

F:\docs\coa\opelika.xls
3/29/04

Ozark Underground Laboratory, Inc.                                    Opelika, AL

## Groundwater Investigation
## Water Results

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results Peak nm | Fluorescein Results Conc. ppb | Eosine Results Peak nm | Eosine Results Conc. ppb | RWT Results Peak nm | RWT Results Conc. ppb | SRB Results Peak nm | SRB Results Conc. ppb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M5055 | 13 | Creek at 146 | | 2/13 0710 | | | | | | | | |
| M5122 | 13 | Creek at 146 | | 2/20 0648 | ND | | ND | | ND | | ND | |
| M5201 | 13 | Creek at 146 | | 2/26 0625 | ND | | ND | | ND | | ND | |
| M5316 | 13 | Creek at 146 | | 3/6 0739 | ND | | ND | | 575.8 | 0.061 | ND | |
| M5427 | 13 | Creek at 146 | | 3/13 0646 | ND | | ND | | ND | | ND | |
| M5631 | 13 | Creek at 146 | | 3/27 0639 | ND | | ND | | ND | | ND | |
| M3350 | 14 | Beauregard Well Number 4 | | 12/6 1115 | ND | | ND | | ND | | ND | |
| M3361 | 14 | Beauregard Well Number 4 | | 12/10 0935 | ND | | ND | | ND | | ND | |
| M3797 | 14 | Beauregard Well Number 4 | | 12/18 0740 | ND | | ND | | ND | | ND | |
| M3811 | 14 | Beauregard Well Number 4 | | 12/19 0746 | ND | | ND | | ND | | ND | |
| M3993 | 14 | Beauregard Well Number 4 | | 12/20 0718 | ND | | ND | | ND | | ND | |
| M3997 | 14 | Beauregard Well Number 4 | | 12/23 0801 | ND | | ND | | ND | | ND | |
| M4108 | 14 | Beauregard Well Number 4 | | 12/26 0755 | ND | | ND | | ND | | ND | |
| M4112 | 14 | Beauregard Well Number 4 | | 12/30 0731 | ND | | ND | | ND | | ND | |
| M4164 | 14 | Beauregard Well Number 4 | | 1/2 0713 | ND | | ND | | ND | | ND | |
| M4513 | 14 | Beauregard Well Number 4 | | 1/9 0747 | ND | | ND | | ND | | ND | |
| M4616 | 14 | Beauregard Well Number 4 | | 1/16 0737 | ND | | ND | | ND | | ND | |
| M4804 | 14 | Beauregard Well Number 4 | | 1/23 0657 | ND | | ND | | ND | | ND | |
| M4896 | 14 | Beauregard Well Number 4 | | 1/30 0700 | ND | | ND | | ND | | ND | |
| M4963 | 14 | Beauregard Well Number 4 | | 2/6 0708 | ND | | ND | | ND | | ND | |
| M5056 | 14 | Beauregard Well Number 4 | | 2/13 0715 | ND | | ND | | ND | | ND | |
| M5123 | 14 | Beauregard Well Number 4 | | 2/20 0654 | ND | | ND | | ND | | ND | |
| M5202 | 14 | Beauregard Well Number 4 | | 2/26 0630 | ND | | ND | | ND | | ND | |
| M5317 | 14 | Beauregard Well Number 4 | | 3/6 0745 | ND | | ND | | ND | | ND | |
| M5428 | 14 | Beauregard Well Number 4 | | 3/13 0651 | ND | | ND | | ND | | ND | |
| M5489 | 14 | Beauregard Well Number 4 | | 3/19 0656 | ND | | ND | | ND | | ND | |
| M5632 | 14 | Beauregard Well Number 4 | | 3/27 0644 | ND | | ND | | ND | | ND | |
| M7313 | 14 | Beauregard Well Number 4 | | 6/12 1408 | ND | | ND | | ND | | ND | |
| M7683 | 14 | Beauregard Well Number 4 | | 7/2 1114 | ND | | ND | | ND | | ND | |
| M3351 | 15 | Chewacala Creek near Pipeline | | 12/6 1124 | ND | | ND | | ND | | ND | |
| M3365 | 15 | Chewacala Creek near Pipeline | | 12/10 0956 | ND | | ND | | ND | | ND | |
| M3798 | 15 | Chewacala Creek near Pipeline | | 12/18 0748 | ND | | ND | | ND | | ND | |
| M3812 | 15 | Chewacala Creek near Pipeline | | 12/19 0751 | ND | | ND | | ND | | ND | |
| M7684 | 15 | Chewacala Creek near Pipeline | | 7/2 1119 | ND | | ND | | ND | | ND | |
| M3356 | 16 | Trib to Lee County Lake | | 12/6 1045 | ND | | ND | | ND | | ND | |
| M3358 | 16 | Trib to Lee County Lake | | 12/10 0922 | ND | | ND | | ND | | ND | |
| M3794 | 16 | Trib to Lee County Lake | | 12/18 0653 | ND | | ND | | ND | | ND | |
| M3808 | 16 | Trib to Lee County Lake | | 12/19 0715 | ND | | ND | | ND | | ND | |
| M5630 | 16 | Trib to Lee County Lake | | 3/27 0621 | ND | | ND | | ND | | ND | |

4

Ozark Underground Laboratory, Inc.

Opelika, AL

Ground Water Investigation
Water Results

| OUL Lab # | OUL Station # | Station Name | Samples Collected By | Date/Time Recovered 2002/2004 | Fluorescein Results | | Eosine Results | | RWT Results | | SRB Results | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb | Peak nm | Conc. ppb |
| M7681 | 16 | Trib to Lee County Lake | | 7/2 1052 | ND | | ND | | ND | | | |
| M3791 | 17 | Little Uchee Upstream from Sink | | 12/17 0819 | ND | | ND | | ND | | ND | |
| M3804 | 17 | Little Uchee Upstream from Sink | | 12/18 0903 | ND | | ND | | ND | | ND | |
| M3817 | 17 | Little Uchee Upstream from Sink | | 12/19 0843 | ND | | ND | | ND | | ND | |
| M5206 | 17 | Little Uchee Upstream from Sink | | 2/26 0718 | ND | | ND | | ND | | ND | |
| M7689 | 17 | Little Uchee Upstream from Sink | | 7/2 1224 | ND | | ND | | ND | | ND | |
| M3790 | 18 | Test Well #1 at Spring | | 12/17 1026 | ND | | ND | | ND | | ND | |
| M3789 | 18 | Test Well #1 at Spring | | 12/17 1345 | ND | | ND | | ND | | ND | |
| M3806 | 18 | Test Well #1 at Spring | | 12/18 0939 | ND | | ND | | ND | | ND | |
| M3819 | 18 | Test Well #1 at Spring | | 12/19 0909 | ND | | ND | | ND | | ND | |
| N1742 | 21 | Beauregard Well #1 | Ewers | 3/8 1059 | ND | | ND | | ND | | ND | |

Plaintiff
0000000000002267

F:\docs\coal\opelika.xls
3/29/04

5

Ozark Underground Laboratory, Inc.

Groundwater Investigation
Footnotes

## FOOTNOTES

ND = No dye detected

ns = no charcoal sample for this sampling period.

wso = only a water sample was collected during this sampling period.

d = these charcoal packets were dry upon arrival at the OUL.

nsf = the sample for this sampling period was not found.

v = water vial empty upon arrival at OUL.

(1) = old bug

Plaintiff

00000000002268

f:\docs\coa\opelika.xls
3/29/04

1

Opelika, AL

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
         Plaintiffs,                 )
                                       )
vs.                                    )    Civil Action No. CV-20 02-0085
                                       )
HANSON AGGREGATES SOUTHEAST,           )
INC., et al.,                          )
                                       )
         Defendants.                 )

### CIVIL SUBPOENA FOR PRODUCTION OF
### DOCUMENTS, ETC., UNDER RULE 34(b)(2)

TO:    Dixie Pipeline Company
        1117 Perimeter Center West, Suite West 301
        Atlanta, Georgia 30338

      You are hereby commanded to do each of the following acts at the instance of the Plaintiffs within fifteen (15) days after service of this subpoena.

      That you produce the following documents and permit the above-named Plaintiffs to inspect and copy each of the following documents (all with respect to the Lee County Quarry only):

    1.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Oldcastle Materials Southeast, Inc. d/b/a SRM, from January 1, 2003, through the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

    2.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Hanson Aggregates Southeast, Inc. between July 1, 2002, and the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

    3.    Any documents (as defined on the attached sheet) regarding the affects on the Dixie Pipeline were a sinkhole to form under the Pipeline in Lee County, Alabama.

4.  Any documents that evidence any problems with the pipeline in the stretch between the Lee County Terminal on Highway 51 and the Georgia State line.

5.  All construction drawings, specifications, and contract specifications (as well as, as-built specifications) relating to the construction of the pipeline in the section of Lee County, Alabama from the Highway 51 Terminal to the Georgia state line.

6.  Documents detailing the use of the gravel purchased from Hanson and/or Oldcastle (SRM) by Dixie Pipeline.

7.  Any records related in any way to the walk-through inspections and/or reports related thereto (as noted at page 9 in the deposition of Ricky Chafin taken on December 10, 2002).

Such production and inspection is to take place at the place where the documents or things are regularly kept or at some other reasonable place designated by you.

You are further advised that other parties to the action in which this subpoena has been issued have the right to be present at that time of such production or inspection. You have the option to deliver or mail legible copies of documents or things to the party causing the issuance of this subpoena but you may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies. The Plaintiffs agree to pay all reasonable expenses incurred by you at the aforementioned time and place.

You have the right to object at any time prior to the date set forth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating, with respect to any item or category to which objection is made, you reasons for such objection.

Dated this the ⟨⟩th day of ⟨June⟩ _____, 2004.


_____
**CHARLES E. VERCELLI, JR.**
One of the Attorneys for Plaintiffs
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805


CLERK



By: _____
                    DEPUTY CLERK

2327

Law Offices of James B. Sprayberry
P. O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P. O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

155-00\Subpoena-Dixie1.3.wpd

## DEFINITIONS

"Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

2328

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,          )
                                )
           Plaintiffs,      )
                                )
vs.                        )    Civil·Action No. CV-20 02-85
                                )
HANSON AGGREGATES SOUTHEAST,   )
INC., et al.,                 )
                                )
           Defendants.     )

## PLAINTIFF'S OPPOSITION TO OLDCASTLE'S MOTION
## FOR DRILLING MONITORING WELLS

      Plaintiffs would show this Court that:

1.     This Defendant has been extremely slow in producing most of it's discovery.  For

example, their experts summaries were due at the end of January, 2004.  They are yet to be

produced even though requested several times.  The Plaintiff's have pointed out on several

occasions that our experts can not change or reformulate their opinions without data and

documentation from Oldcastle.

      In opposition to this motion copy of the deposition of Brian Fowler will be filed

simultaneously with this motion.  Fowler was a designated corporate rep, even though a contract

geologist.  At his deposition on March 11, 2004, Fowler testified under oath that:

     A.     He had no testing plan in this case (Pg.103 and 252 - 254) even though he has

            been involved since May, 2003;

     B.     He had no mine plan in this case (Pg. 54);

     C.     He and/or Oldcastle no longer monitored the daily discharge amounts as Hanson

            had done. (Pg. 108);

2329

D.    He and/or Oldcastle no longer monitored their own monitoring wells on their leased property. (Pg. 105 - 107 ) This was done even though Oldcastle had the drill records and pump test records from Aqua Fusion;

E.    He intended to reduce (in order to test) the pumping discharge in order to avoid damage being caused at the higher rates. (Pg. 214, 223 - 224 );

F.    The pumping of monitoring wells is for new quarries (Pg. 46), if an existing quarry the company monitors the water levels under <u>actual</u> conditions.  He also had no idea where monitor wells would be placed (Pg. 144 - 146);

G.    He agreed that discharge pumping causes dewatering, which lowers the water table and causes a cone of depression (Pg. 218) and that the "cone" does make sinkholes more likely. (Pg. 231);

H.    He <u>cannot</u> think of a way to tell how far the water comes from (Pg. 255) and since July, 2003, he has done <u>nothing</u> to test. (Pg. 252 - 254);

I.    He even admitted that testing now <u>cannot</u> tell water patterns of 2003 or earlier. (Pg. 247); and

J.    He admitted that the dye from the sinkhole on Lee Road 166 showed a hydro connection to the quarry (Pg. 226).  Also, he admitted that the dye from the Little Uchee sinkhole showed <u>either</u> a direct connection to the quarry <u>or</u> it was a chemical breakdown. (Pg. 227).

2.    The Defendant had requested permission which the City (by Vercelli letter dated 3/26/2004), declined to grant at this time unless a written plan was submitted showing a hydraulic or hydro geology need.  A copy of the letter is attached.

3.    Oldcastle has now unilaterally canceled the scheduled deposition of Tom Aley (Plaintiff's Expert) which has been set for several weeks. His deposition was set April 7 and 8, 2004 and this canceled verbally, on Friday afternoon at about 2:30 P.M. He may not be available now for several weeks or months, and they have waived the chanse to depose Mr. Aley.

4.    Earlier the Defendant Hanson had unilaterally canceled the depositions of three or four of the Opelika City witnesses including the Mayor, Dan Hilyer, Alan Lee and Bo Brown. These had been set for April 1 and 2.

It appears that Oldcastle have made a corporate decision to stonewall and delay this case as much as possible. They were aware of the pending litigation in May, 2003 prior to their purchase of the quarry on July 13, 2003. Now ten months later, Oldcastle, without a hydraulic plan, has decided they want new monitoring wells. The Plaintiffs are filing simultaneously with this motion other letters to show the correspondence with the Plaintiffs attempting to obtain documents, to attempt to avoid delay on the scheduled depositions. They are:

A.    Vercelli letter of March 12, 2004, (experts and Aley deposition);

B.    Vercelli letter of March 12, 2004, (Ewers work);

C.    Vercellie e-mail of January 7, 2004, (Ewers work);

D.    Vercelli letter of March 19, 2004, (depositions and expert information);

E.    Vercelli letter of March 3, 2004, (experts and silica);

F.    Vercelli letter of March 26, 2004, (no water plan/wells); and

G.    Vercelli memo of March 8, 2004, (Aley deposition).

5.    These documents are needed and necessary, and overdue by many months. Oldcastle was served in August, 2003 with a request for documents. These should be produced within ten

(10) days.

WHEREFORE, the Plaintiffs move this Court for an order that; (a) Denies their motion for monitoring wells, (b) Orders them to immediately produce their expert's summaries and Rule 26 disclosures, (c) provide other requested documents such as, hazard warning sheets for silica, seismograph result for the Griggs/Edwards the three and a half (3 ½ ) inch Skelly and Loy notebook reviewed by Mr. Fowler prior to the purchase on July 13, 2003 and the list of other documents that were intentionally withheld by Oldcastle's New York lawyers.


**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs


**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2332

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                    John V. Denson
Matt Parnell                           SAMFORD, DENSON, HORSLEY, PETTEY
BALCH & BINGHAM, LLP                     & BRIDGES
P.O. Box 78                            P.O. Box 2345
Montgomery, AL 36101                   Opelika, AL 36803-2345

H. Wayne Phears                        Phillip E. Adams, Jr.
PHEARS & MOLDOVAN                      ADAMS, UMBACH, DAVIDSON & WHITE, LLP
Suite 375                              P. O. Box 2069
4725 Peachtree Corner Circle          Opelika, AL 36803-2069
Norcross, GA 30092-3000                       *hand delivered*

by placing a copy of the same in the United States mail, properly addressed and postage prepaid,
this the _29_ day of _MARCH_, 2004.

_____
OF COUNSEL

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 12, 2004

Phillip E. Adams, Jr.                          **Via E-mail & Mail**
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

RE:    *Davis, et al v. Hanson/Oldcastle*

Dear Phil:

This follows our lengthy conversation during the deposition of Brian Fowler, one of your corporate representatives, yesterday, March 11. During the deposition, it was established clearly that some of Mr. Fowler's documents requested in the deposition notice and in the corporate representative deposition notice were not produced to us by the attorneys at Gibson, Dunn & Crutcher in New York. In addition, Oldcastle's responses to our 2nd Interrogatories did not identify what documents were being produced. All the document does is say that documents are produced, and then Oldcastle gave us a stack of documents. This has made it extremely difficult to determine what documents came from what source. Moreover, based on the review of the documents in the corporate representative's depositions, we believe but do not know for sure, that some of the documents were simply those which we had produced, produced back to us. As you know, if that is true, it is not appropriate under the Civil Discovery Rules.

In an effort to resolve this discovery dispute, we have asked that you promptly provide to us (in no more than two weeks) a detailed listing of exactly what documents were produced and from whom they were obtained. You are also to produce to us (as we had previously agreed) a detailed privilege log indicating what documents were withheld from us under a claim of privilege. We have no such information now, but it is clear that some documents were withheld from us.

If you are unable to respond in full to this request within two weeks, kindly let me know now so that we may file a motion to compel with the Court. I would rather not have to file such a motion.

✓ 1 - Aley
1 - Atty. Corresp.
1 - Vercelli.

2334

Phillip E. Adams, Jr.
March 12, 2004
Page 2

Additionally, with respect to experts, we disclosed to you our experts many months ago. Their opinions have not changed because we have never been given information from you that would change any of their opinions. Under the order of September 29, 2003, under "further comments", the Court stated: "The Plaintiffs shall have sixty (60) days from this Order to disclose any expert witnesses. **The Defendant shall have sixty (60) days thereafter to disclose any expert witness or in the alternative shall have one-hundred twenty (120) days from this Order.**" One-hundred twenty days from that Order was approximately January 26, 2004. We have repeatedly requested information from your experts. We have received none. Your delay in disclosing your expert information to us is hindering our ability to prosecute our case. We therefore ask that you provide your expert witness disclosures, which were due on January 26, not later than March 31, 2004. We can then give that information to Mr. Aley in time for him to consider it before his deposition on April 7. In that regard, let this confirm that we have tendered our expert, Tom Aley, for deposition at that time.

If these issues are not resolved satisfactorily, we expect to raise them with the Judge on March 29. Thank you.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry (via e-mail and mail)
       James A. Byram, Jr. (via e-mail and mail)
       John V. Denson (via e-mail and mail)
       Guy F. Gunter, III (via e-mail and mail)
       H. Wayne Phears (via e-mail and mail)
       Jack Weiss (via e-mail and mail)

155-00\Adams7.1.wpd

2335

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 12, 2004

James A. Byram, Jr.                                      **Via E-mail and Mail**
Balch & Bingham, LLP
P. O. Box 78
Montgomery, AL 36101-0078

  RE:  *Davis, et al. v. Hanson Aggregates, et al.*

Dear Jim:

  We need the following information with respect to Dr. Ewers' work:

  1.  The types and concentration of dyes injected into each site;

  2.  The quantity of dyes injected into each site;

  3.  The amount of water that flushed the dyes into each of the injection points;

  4.  Your dye test results since the date of injection; and

  5.  We need to know the manufacturer or seller of the particular dyes injected.

  Mr. Aley will need all of this information to factor the same into his opinions. As you know, we have tendered him for deposition on April 7, and we want to be sure that he will be able to have enough information to give his opinions at that time. If you cannot reply to this request within the next two weeks, please let us know, and please let us know why not.

  Thank you.

         Sincerely,

         Charles E. Vercelli, Jr.

CEVjr/ma

2336

James A. Byram, Jr.
March 12, 2004
Page 2

cc:      Tom Aley (via e-mail and mail)
         James B. Sprayberry (via e-mail and mail)
         John V. Denson (via e-mail and mail)
         Guy F. Gunter, III (via e-mail and mail)
         H. Wayne Phears (via e-mail and mail)
         Phillip E. Adams, Jr. (via e-mail and mail)
         J.M. (Jack) Weiss (via e-mail and mail)


P.S.     We have asked Mr. Aley to provide us with his test results.  We propose to give you Mr.
         Aley's test results at the same time we receive your test results.

155-00\Byram39.2.wpd

*2337*

## Cassie Holk

| | |
|---|---|
| **From:** | "Chip Vercelli" <cvercelli@vercelli-law.com> |
| **To:** | "Weiss, Jack M." <jmweiss@gibsondunn.com>; "Phears, Wayne" <wphears@pmlawfirm.com>; "Denson, John" <Denson@samfordlaw.com>; "Byram, Jim" <Jbyram@balch.com>; "Adams, Phil" <padams@audwlaw.com>; "Sprayberry, Jim - Cassie" <cholk@charterinternet.com> |
| **Sent:** | Friday, March 12, 2004 3:25 PM |
| **Attach:** | Byram39.2.wpd; Adams7.1.doc; Adams7.1.wpd; Byram39.2.doc |

Attached in Word and in WordPerfect formats are two letters -- one to Phil and one to Jim Byram.  Thank you.
CHIP

2338

**Cassie Holk**

| | |
|---|---|
| **From:** | "Chip Vercelli" <cvercelli@vercelli-law.com> |
| **To:** | "Weiss, Jack M." <jmweiss@gibsondunn.com>; "Phears, Wayne" <wphears@pmlawfirm.com>; "Denson, John" <Denson@samfordlaw.com>; "Byram, Jim" <Jbyram@balch.com>; "Adams, Phil" <padams@audwlaw.com>; "Sprayberry, Jim - Cassie" <cholk@CHARTERINTERNET.COM> |
| **Sent:** | Wednesday, January 07, 2004 3:01 PM |
| **Subject:** | Hanson |

Balch & Bingham, LLP

P. O. Box 78

Montgomery, AL 36101-0078

RE: *Davis, et al. v. Hanson Aggregates, et al.*

Dear Jim:

Without reviewing my notes carefully, I recall that when we agreed for Hanson's experts to inject dye, Hanson promised to send us the results of any dye sampling promptly. We have received no results. Can you please, therefore, immediately forward to us the results of all testing done to date? We would like this information at least in summary form at this time, followed later by the backup documentation.

If you recall our conversations and agreements differently, kindly let me know, and I will examine my notes more carefully. Otherwise, I hope that you will send us this information within a few days. Thank you.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma

cc: James B. Sprayberry (via e-mail only)

John V. Denson (via e-mail only)

Guy F. Gunter, III (via fax only)

H. Wayne Phears (via e-mail only)

Phillip E. Adams, Jr. (via e-mail only)

J.M. (Jack) Weiss (via e-mail only)

1/7/2004

2339

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

## FAX MESSAGE

TO:

| | |
|---|---|
| James B. Sprayberry | 334-821-7101 |
| Guy F. Gunter, III | 334-745-6288 |
| John V. Denson | 334-745-3506 |
| James A. Byram, Jr. | 866-736-3863 |
| Phillip E. Adams, Jr. | 334-749-3238 |
| H. Wayne Phears | 770-263-6715 |
| J.M. "Jack" Weiss | 212-351-5224 |

FROM:         Chip Vercelli

DATE:         March 19, 2004

RE:           *Davis, et al. v. Hanson, et al.*

FAX NO.:      Listed above

NO. OF PAGES:    ___3___
(Including Cover Sheet)

MESSAGE:

*********************************************************************
CONFIDENTIALITY NOTICE
The information contained in this facsimile message is privileged and confidential information intended for the use of the addressee listed above. If you are neither the intended recipient nor the employee nor agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this facsimile message is strictly prohibited. If you have received this document in error, please immediately notify us by telephone to arrange for the return of the original documents to us.

*********************************************************************

AB atty fax.2.wpd

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

2340

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 19, 2004

James A. Byram, Jr.
Balch & Bingham, LLP
P. O. Box 78
Montgomery, AL 36101-0078

**Via E-mail and Fax**

RE:    *Davis, et al. v. Hanson Aggregates, et al.*

Dear Jim:

This letter follows our sinkhole tour with Hanson and Oldcastle experts. I videotaped all of the sinkholes until I left. I left when they were looking at the last sinkhole on the Spring Villa property farthest downstream on the old drainage. They then went to sinkholes on Highway 166, the Clark property, and near the Uniroyal Tire Plant. I did not videotape those, therefore.

During the videotaping, occasionally Mr. Wood wanted me to make note of something and make statements on the video. I told him that I would be happy to provide a copy of the videotape to you. I am happy to do so. However, during the tour, Mr. Wood had maps and a list of sinkholes that very clearly included sinkholes unknown to the Plaintiffs. We have never received a complete list of sinkholes from you, and it is very clear that your expert knew of additional sinkholes, for example, but not limited to, farther north and west of Little Uchee Creek than we knew about. By this time, we would have thought you would have had a duty to provide all such known sinkholes to us. We have always provided all known sinkholes to you, as soon as we learn about them.

I am happy to provide you a copy of the videotape. However, I will do so only with your agreement to provide to me your GPS coordinates on every sinkhole known to you and your experts. If you are willing to do this, I will be happy to provide these videotapes to you within a week and a half. I would provide them sooner, but I am going out of town for a week.

By copy of this letter to Phil Adams, I am making the same video available to him, but I of course will not send it to him until I have heard from you. If you can possibly respond today, that would be appreciated.

Mr. James A. Byram, Jr.
March 19, 2004
Page 2

On another note, we understand that you want to change the depositions of the City representatives from April 1 and April 2 to April 14-16 or April 19-22. The City representatives' depositions are already scheduled for the 1st and 2nd. Is it not possible for you to simply send someone else? We do not desire to get into a position where you and/or Oldcastle can ask for another continuance because you or Oldcastle were unable to take depositions. We do not want to delay depositions, therefore. If you and Phil can assure us that you and Phil will not be asking for another continuance from the August trial setting, then I suppose we can agree to continue the depositions. Otherwise, we would prefer to keep them on April 1 and 2.

With respect to the dates you have proposed (April 14-16 and April 19-22), be advised that I will be in a capital murder trial the week of April 19-22, and preparing for it the prior week. Therefore, those days are not very convenient for me. I would like to be at my own clients' depositions, so it is much more convenient for these depositions to be taken on April 1 and 2 as scheduled. Please let me know your thoughts in this regard. By copy of this letter to Mr. Adams, I am asking him to give us his thoughts as well.

I would appreciate hearing from you today if possible. If not, please respond to Jim Sprayberry next week. Thank you.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry (via e-mail and fax)
       John V. Denson (via e-mail and fax)
       Guy F. Gunter, III (via e-mail and fax)
       H. Wayne Phears (via e-mail and fax)
       Phillip E. Adams, Jr. (via e-mail and fax)
       J.M. (Jack) Weiss (via e-mail and fax)

P.S.    We presume you are gathering Dr. Ewers' test results. When can we expect to exchange such results?

165-00\Byram41.3.wpd

2342

# VERCELLI & ASSOCIATES, P.C.

### Attorneys & Counselors at Law
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, *Of Counsel*

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 3, 2004

Phillip E. Adams, Jr.                                   **Via Fax & Mail**
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

RE:    *Davis, et al v. Hanson/Oldcastle*

Dear Phil:

As we discussed at the deposition of Mr. Heisterkamp, we do want to take the deposition of Brian Fowler. You were going to check whether he could give a deposition during the latter part of this week or next week. Inasmuch as he is in essence the corporate representative, we would ask that he be produced in Alabama for the deposition. If you disagree with this reasoning, please let me know. We would like to take his deposition as soon as possible in order to conclude our questions of the corporate representatives.

Also note that I have provided copies of the photograph that you gave me (Bates number 1538) to Jim Byram and to John Denson for their files.

We also need a copy of the MSDS on silica and other items (any MSDS's used by Oldcastle).

I understand, based on your statement read to us at the end of the deposition of Mr. Heisterkamp, that your expert witnesses are: Geotran of Sterling, Virginia; Trinity Consultants (place unknown); Resource Systems Group (place unknown); Sauls Engineering (seismographic); and Austin Powder (blasting). If you have any additional or different experts, we obviously need to know of those people at this time. Please send us their addresses.

Additionally, we have not received responses to our third interrogatories and requests for production. Can you please file responses?

Phillip E. Adams, Jr.
March 3, 2004
Page 2

Finally, based on the Heisterkamp deposition, it is clear that we need a copy of the Oldcastle "code of conduct". Could you please provide this to us as soon as possible? If not, just let me know.

I look forward to hearing from you soon.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry
159-09\Adams6.1.wpd

2344

# VERCELLI & ASSOCIATES, P.C.

### *Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

March 26, 2004

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

**Via E-mail & Fax only**

RE:    *Davis, et al v. Hanson/Oldcastle*

Dear Phil:

During Mr. Fowler's deposition, you told us, for the first time, that your experts had not yet completed—or even substantially begun— a water study plan for the area. You told us for the first time that your experts would like to drill new monitoring wells in or around the dry spring area at Spring Villa. You asked our permission to install such wells. We have discussed your request with Guy Gunter and with Mr. Tom Aley.

At this point we are not inclined to grant permission to allow any new wells on the City or Utility Board property. One reason we are not inclined to grant such permission is the fact that Oldcastle has abandoned the monitoring of their own monitoring wells. We believe they had six (6) monitoring wells on leased property. In addition, there are three monitoring wells already in place in the Spring Villa area. Two (2) are on the Utility board property and one (1) is on the Smith property. Data already exists on those three (3) wells through old reports and through Dr. Ewers' monitoring since September of 2003. Since Oldcastle and Hanson have a Joint Defense Agreement, it is clear that all that data is available to your experts. Consequently, we see no need, at this late date, to authorize additional wells to be drilled.

We might reconsider if a complete and detailed water study plan is provided that shows a hydrological need for new monitoring wells in the Spring Villa area. Oldcastle has had eight (8) months since the purchase to complete such a plan and provide it to us. If Oldcastle would like us to reconsider, please provide us with a detailed water study plan as soon as possible.

2345

Phillip E. Adams, Jr.
March 26, 2004
Page 2

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
cc:    James B. Sprayberry (via e-mail and fax)
       James A. Byram, Jr. (via e-mail and fax)
       John V. Denson (via e-mail and fax).
       Guy F. Gunter, III (via fax)
       H. Wayne Phears (via e-mail and fax)
       Jack Weiss (via e-mail and fax)
155-00\Adams8.1.wpd

2346

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

## FAX MESSAGE

**TO:**

| | |
|---|---|
| James B. Sprayberry | 334-821-7101 |
| Guy F. Gunter, III | 334-745-6288 |
| John V. Denson | 334-745-3506 |
| James A. Byram, Jr. | 866-736-3863 |
| Phillip E. Adams, Jr. | 334-749-3238 |
| H. Wayne Phears | 770-263-6715 |
| J.M. "Jack" Weiss | 212-351-5224 |

**FROM:**     Chip Vercelli

**DATE:**     March 8, 2004

**RE:**     *Davis, et al. v. Hanson, et al.*

**FAX NO.:**     Listed above

**NO. OF PAGES:**     ___2___
(Including Cover Sheet)

**MESSAGE:**

*********************************************************************************************
CONFIDENTIALITY NOTICE
    The information contained in this facsimile message is privileged and confidential information
intended for the use of the addressee listed above. If you are neither the intended recipient nor the employee
nor agent responsible for delivering this message to the intended recipient, you are hereby notified that any
disclosure, copying, distribution, or the taking of any action in reliance on the contents of this facsimile
message is strictly prohibited. If you have received this document in error, please immediately notify us by
telephone to arrange for the return of the original documents to us.

*********************************************************************************************

All atty fax.2.wpd

2347

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, *OF COUNSEL*

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

## MEMORANDUM

**TO:**      James A. Byram, Jr. (via Fax only)
James B. Sprayberry (via Fax only)
John V. Denson (via Fax only)
Guy F. Gunter, III (via Fax only)
H. Wayne Phears (via Fax only)
Jack Weiss (via Fax only)
Phillip E. Adams, Jr. (via Fax only)

**FROM:**   Charles E. Vercelli, Jr.

**DATE:**   March 8, 2004

**RE:**     *Davis, et al. v. Hanson Aggregates, et al.*

Dear Gentlemen:

Jim Sprayberry and I would like to take the deposition of Tom Aley by videotape on any of the following days: March 30-April 2 or April 5-7. We will offer him for a discovery deposition to be followed by the videotape deposition for use at trial or elsewhere. Please advise which dates are convenient. Please note that we have recently forwarded Oldcastle's discovery responses and Mr. Reynolds' deposition to Mr. Aley. We will forward to him Mr. Fowler's deposition immediately upon receipt, and we will ask Mr. Aley to send to us any changes to his opinions based on this information. We expect to provide that to you at least one week before his deposition.

Please have your response available during Thursday's deposition as we would like to schedule Mr. Aley's deposition at that time. Thank you.

CEVjr/ma
155-01\All.atty memos.1.wpd

*copy* 2348

```
0001
1              IN THE CIRCUIT COURT FOR
2              LEE COUNTY, ALABAMA
3
4
5   MIKE DAVIS, et al.,
6          Plaintiffs,
7   Vs.                    CIVIL ACTION NO.
8                          CV-2002-85
9   HANSON AGGREGATES SOUTHEAST,
10  INC., et al.,
11          Defendants.
12
13
14
15          DEPOSITION OF BRIAN K. FOWLER, taken
16  pursuant to notice and stipulation on behalf of the
17  Plaintiffs, in the conference room of Adams, Umbach,
18  Davidson & White, 205 South 9th Street, Opelika,
19  Alabama, before Ricky L. Tyler, Certified Shorthand
20  Reporter and Notary Public in and for the State of
21  Alabama at Large, on Thursday, March 11th, 2004,
22  commencing at 9:50 A.M.
23
0002
1                  APPEARANCES
2   FOR THE PLAINTIFFS:
3          CHARLES E. VERCELLI, JR., ESQ.
4          Vercelli & Associates
5          1019 South Perry Street
6          Montgomery, AL 36104-5049
7           and
8          JAMES B. SPRAYBERRY, ESQ.
9          Attorney at Law
10         P. O. Drawer 2429
11          Auburn, AL 36831-2429
12
13  FOR THE DEFENDANT, HANSON AGGREGATES SOUTHEAST:
14         JAMES A. BYRAM, JR., ESQ.
15         Balch & Bingham LLP
16         P. O. Box 78
17         Montgomery, AL 36101-0078
18  FOR OLDCASTLE MATERIALS SOUTHEAST:
```

2349

14      South Bethlehem, New York.
15  Q.   South Bethlehem?
16  A.   Yes.  And then we've done -- we've contributed
17        into some assessments for another daughter
18        called The Dolomite Group, D-O-L-O-M-I-T-E.
19        They're in the Rochester, New York area.
20  Q.   All right.  Do you remember which quarry that
21        was for?
22  A.   I don't honestly remember.
23  Q.   The Dolomite Group, do they work in limestone
0046
1        mainly?
2   A.   Yes.  All of these -- well, the quarry in
3        Vermont is in a -- like a schist, all of the
4        other ones are in limestones.
5   Q.   And when you do the cone of depression, what do
6        you have to locate for the regulatory agencies?
7   A.   Well, they want to -- well, in a new quarry
8        opening, generally you've gone out and drilled
9        a series of holes to try to determine exactly
10        where the rock is so you know how to plan the
11        quarry.  And the different states that require
12        this to be done will ask you to put observation
13        wells into the core holes so that you can
14        monitor the ground water after you've taken the
15        core out.  So they will ask us for all of that
16        data.  And in a new quarry setting, where there
17        is no pumping going on, we will often run a
18        pump test.
19  Q.   I was fixing to say, in a pre-quarry situation,
20        how can we determine what the pumping is going
21        to be if they're not in operation?  How do you
22        do that?
23  A.   Well, we will run a pump test.  And there are a
0047
1        variety of formulas, once again, that one can
2        use to scale a pump test so that you can -- you
3        estimate the cone of depression at the rate of
4        the pump test.  And then by using charts and
5        graphs, nomographs in particular, you can take
6        those results and estimate what the pumping
7        rate will be at higher volumes.
8   Q.   Of those cones of depression that you've worked

2350

18  Q.   And is that litigation or is that --
19  A.   It's -- what is it in?  It's in a -- I can't
20       think of the name of the process.  There's
21       litigation in place, but it's been kicked down
22       from litigation to --
23  Q.   Mediation or arbitration?
0053
1   A.   The court kicked it back to the environmental
2        regulatory board that serviced the appeal the
3        first time.  So it's in litigation, but the
4        part I'm in right now is not in court.
5   Q.   What town or county would that be in?
6   A.   See, the quarry is located in Cavendish,
7        Vermont, C-A-V-E-N-D-I-S-H.
8   Q.   Do you know what county?
9   A.   I think that's Windsor County, Vermont,
10       W-I-N-D-S-O-R.
11  Q.   Okay.  I think you said you had been involved
12       in a good bit of due diligence.  What about
13       mining plans, have you --
14  A.   Yes.
15  Q.   Do you do mining plans for companies?
16  A.   Yes, we do.
17  Q.   Do you do mining plans for Oldcastle or its
18       affiliated companies?
19  A.   Yes, we do.
20  Q.   Have you done any recently for them?
21  A.   Well, we're involved in one way or the other
22       with that most all the time for Oldcastle and
23       their companies.
0054
1   Q.   Are you involved in the one in Lee County,
2        Alabama?
3   A.   Yes,
4   Q.   And how are you involved in that one?
5   A.   I'm responsible for it.
6   Q.   All right.  What's the status of it?
7   A.   It's in progress at the moment.
8   Q.   Do we have anything in writing on it yet?
9   A.   No.
10  Q.   Tell us what you do when you're doing a mining
11       plan.  How do you go about that?
12  A.   Well, we're in the process of trying to

2351

13    determine a lot of those items we discussed
14    earlier; the bedrock structure, the locations
15    of the bedrock formations; we're taking a look
16    at what Hanson was doing operationally from the
17    point of view of blasting, orientation of
18    blasting faces, loading of blasting materials,
19    what kind of rock product they were generating
20    versus what kind we're going to try to
21    generate; what kind of hauling equipment we're
22    going to use in the quarry; what sort of
23    loading equipment we will be using in the
0055
1    quarry. It's a very dense matrix of questions
2    that need to get answered in order to put
3    together a mine plan.
4    Q.    Do you have an estimate on when that will be
5    finished?
6    A.    We're beginning or going to begin some
7    investigations, drilling and so on, here
8    hopefully in the next week or two. It will
9    probably take something on the order of a
10    month, month and a half; it depends a little
11    bit on the weather and then, of course, what we
12    find in the drilling.
13    Q.    Are you going to be drilling exploratory holes
14    to core it and see what's down there?
15    A.    Yes. And then we would take that data as I
16    sort of described to you earlier and that would
17    go into giving us the quantitative basis we
18    would need for the mine -- for the mine plan.
19    Q.    Have you reviewed -- I'm going to ask in a
20    minute what Hanson gave you, but have you seen
21    Hanson's old mining plans?
22    A.    No, we haven't.
23    Q.    Have you had -- I guess you've had experience
0056
1    in, when you do these due diligence and so
2    forth, looking for potential hazards or
3    liabilities that might be involved in a quarry?
4    A.    Yes.
5    Q.    And would that include both computer searches
6    and manual searches of records and site visits?
7    A.    Yes.

2352

3    A.   There may be a copy of a letter there in the
4         stack.  I don't recall.
5    Q.   You don't remember who it was from or to?
6    A.   No.
7    Q.   I don't remember seeing one.  Let me show you
8         the documents I think we got today, Mr. Fowler,
9         if you could flip through it?
10   A.   I think I'm recalling now that I believe what I
11        saw was a deposition by a Doctor Ewers or
12        Evers, I forget the name now.  I believe he was
13        an expert for Hanson.
14   Q.   Ewers?
15   A.   I think it's Ewers.  I think that's the --
16        that's the document that I have seen.
17   Q.   A report by Doctor Ewers, maybe?
18   A.   Well, I believe -- I'm pretty sure it was
19        either a deposition or a report.
20   Q.   Okay.  Did you look at any of the other reports
21        or summaries of --
22   A.   I've seen all of the expert opinion at this
23        point.
0102
1    Q.   Okay.
2    A.   But I don't believe there's a letter.  I think
3         what I'm recalling is that --
4    Q.   And you found all of that out in what month?
5    A.   Well, it was -- I think I finally got the
6         materials in early August of 2003.
7    Q.   Have you been asked to form any opinions on
8         that dye trace or dye study?
9    A.   Oh, several times.
10   Q.   You have been?
11   A.   Yes, I have.
12   Q.   Okay.  And by whom were you asked?
13   A.   Oldcastle, various people.
14   Q.   Have you done any calculations or research on
15        it?
16   A.   I have formulated no opinion.
17   Q.   And why didn't you formulate an opinion?
18   A.   Don't have enough information yet.
19   Q.   What are you lacking?
20   A.   Well, we need to understand the structural
21        geology of the bedrock; we need to understand

2353

22     the actual flow net that exists in the bedrock;
23     I have to understand the chemistry of these
0103
1     dyes better than I do.  Basically you need to
2     go through the type of investigation you and I
3     talked about an hour or so, hour and a half
4     ago.
5  Q.   Right.  The step-by-step from the geology down
6     to the samples?
7  A.   Right.  Otherwise in my view, and as I've said
8     to Oldcastle, there's no way to know what the
9     dye test means categorically.
10  Q.   Does it tell you anything about travel time?
11  A.   A dye test by itself?
12  Q.   Right.
13  A.   It can, if you know all of those parameters I
14     was describing to you.
15  Q.   Okay.  And since you were asked to formulate
16     opinions, have you looked at any other
17     documents or talked to anybody else?
18  A.   No.  We're formulating this investigation that
19     we want to undertake and we've been waiting for
20     that to start.
21  Q.   "We" being North American Reserve?
22  A.   North American Reserve on behalf of Oldcastle.
23  Q.   Okay.  And what are you going to do to -- you
0104
1     say you are formulating it, what are you going
2     to do?
3  A.   Well, we basically are going to drill a series
4     of holes around the quarry and in a line from
5     the quarry towards the northeast out into the
6     Young parcel, out to the furthest reaches of
7     the Young parcel that we can get to on that
8     property.  And then essentially pump the quarry
9     at a variety of different rates and actually
10     monitor the drawdowns, not model them, but
11     monitor them, so that we know about the
12     hydrology.  Then the drilling that's done will
13     all be rock cores, so we'll get what appears,
14     from the literature and the other expert
15     opinion, to be the first third dimensional
16     picture of what the bedrock geology is under

2354

17    this quarry and in the land areas between it
18    and the surrounding areas.
19  Q.  I know you got the Patterson reports, did you
20    look at the drill reports and the core studies
21    in those?
22  A.  Yes. Yes, we did. Yes, we did.
23  Q.  I noticed in there there was some voids and mud
0105
1    seams and so forth in the rock, did that tell
2    you anything about the geology in that area?
3  A.  Well, in the vicinity of the cores it shows
4    that there is mud seams and voids, which is
5    typical of limestone formations.
6  Q.  Right. And do those mud seams or voids carry
7    water, transmit water?
8  A.  I believe some of them were moist; I don't
9    remember any wet voids.
10  Q.  Okay. And did you review the pumping records
11    in the Buss report?
12  A.  There are no pumping records in the Buss
13    report.
14  Q.  I may be calling it the wrong thing.
15  A.  Not sounding controversial, but there just
16    aren't any and we can save some time. The Buss
17    report describes the installation of six
18    monitoring wells.
19  Q.  Right. And they pumped them?
20  A.  To develop them. There is no data there
21    relative to pumping of the quarry and
22    observations in the wells made later, which is
23    what we need.
0106
1  Q.  Okay. So you're saying that really has -- that
2    Buss report is of no value?
3  A.  In and of itself, right.
4  Q.  Okay. When I say he did a pump study, he
5    pumped the wells to see what the interrelation
6    between two of the wells were, one and three?
7  A.  Right. That's what is known as a development
8    study, to make sure that he's got
9    communication. He was installing the wells,
10    and that's an installation report, and what
11    he's doing is telling somebody like me that the

2889

```
12        wells were put in, that they communicated, so
13        we know the net -- the data that we're going to
14        get will be -- we will be able to relate each
15        well to the other one.  And then he leaves the
16        site and let's me, or whoever he did the work
17        for, take care of the monitoring after that.
18   Q.   Right.  And they were keeping up, I think, with
19        the daily pumping discharge?
20   A.   "They" being meaning?
21   Q.   Hanson.
22   A.   I believe that's true, yes.
23   Q.   And they were also monitoring the water levels
0107
1         in those monitoring wells daily or weekly?
2    A.   I don't remember, but those records are in the
3         stack you have here today.
4    Q.   Can you tell us why Oldcastle is not doing
5         that?
6    A.   We're trying to reinstall these observation
7         wells at points in the structural geology where
8         we will gain information that's directly
9         related to those calculations I described to
10        you before.
11   Q.   I guess my question was off.  Can you tell me
12        why Oldcastle is not doing daily pumping
13        records of discharge, keeping up with a chart?
14   A.   Well, I suspect they know how much they're
15        pumping every day.  Are you talking about
16        quarry pumping or hydrological study?
17   Q.   Quarry pumping, their discharge?
18   A.   Yeah, they know what that is.
19   Q.   Why aren't they logging it; do you know?
20   A.   On paper?
21   Q.   Right.
22   A.   I don't know.  I don't know that.
23   Q.   Did you recommend to them they either do do it
0108
1         or not to do it?
2    A.   No.  I haven't been asked one way or the other.
3    Q.   Well, wouldn't that help you to know what
4         they're pumping every day?
5    A.   Well, no.  Because the pumping they're doing
6         now is designed to keep the water in the quarry
```

7      at one level so that they can mine rock above
8      that level or keep roadways dry and that kind
9      of thing. The pumping they're doing is not
10     varied enough or quantitative enough in the
11     sense of the exact numbers to tell us anything
12     about the hydrology.
13  Q.   Do you remember what Hanson was pumping on a
14     daily average?
15  A.   I don't offhand.
16  Q.   If I told you three million, I mean, does that
17     ring a bell with you?
18  A.   Well, it seems a little high, I think, but it's
19     in the right range.
20  Q.   Do you know what Oldcastle is pumping now?
21  A.   I don't right now.
22  Q.   Well, when you looked at the pre-acquisition,
23     and prior to the site visit, didn't you review
0109
1      the Hanson pumping records to see how much they
2      were pumping on a daily basis?
3   A.   I don't believe we got the actual pumping
4      records until later on in this process. We
5      reviewed the NPDES permits that they had given
6      us, which have the pumping -- the permitted
7      pumping rates in them.
8   Q.   And what were the permitted pumping rates; do
9      you remember?
10  A.   I believe -- I believe they were in that one
11     and a half to three million gallon a day range,
12     although I -- I could go back and review it
13     again, I don't honestly remember what they were
14     at the time.
15  Q.   Sure. Did you review any rainfall records?
16  A.   Pre -- in the due diligence?
17  Q.   Right.
18  A.   No.
19  Q.   And what about since then, has Oldcastle been
20     keeping up with the rainfall records?
21  A.   I don't believe Oldcastle is, no.
22  Q.   Why aren't they doing that?
23  A.   I don't know. I don't know.
0110
1   Q.   Prior to the site visit did you look at any

2357

8      usually where you find those things, from the
9      gas line company. They will have requirements
10     you have to follow.
11  Q.   Did you talk to somebody to find that out?
12  A.   The Hanson people told us that Dixie Pipeline
13     knew what was going on and had provided them in
14     the past with approvals of their blasting
15     plans.
16  Q.   Did the people at Hanson tell you they had
17     seismographs out a lot of times when they
18     blasted?
19  A.   Yes. In fact, they said they had them out all
20     the time.
21  Q.   Did they tell you why they had them out?
22  A.   The reason we were given was that it's a
23     standard corporate procedure to have the
0143
1      seismographs out.
2   Q.   They didn't tell you it was because of the
3      claims of blasting damage and they had at least
4      one of them in the yard of one of the
5      plaintiffs?
6   A.   My understanding was they always had
7      seismographs out for every blast. We weren't
8      told there was any special reason in this case.
9   Q.   Did you check the monitoring wells when you
10     were there?
11  A.   We went to the heads of the wells to see where
12     they were.
13  Q.   The locations?
14  A.   Right. And we checked on the -- there was one
15     well in Doctor Buss's report that had a seal
16     problem.
17  Q.   Bentonite?
18  A.   Yeah. And we went to look at that.
19  Q.   And they freed it up, I think?
20  A.   I think the well has been decommissioned
21     because the seal problem couldn't be solved. I
22     think I learned that after the site visit, but
23     at the time we wanted to see, you know, what
0144
1      that all meant. And then we checked the other
2      wells to see if the seals -- if there had been

2358

3    any sealing problems there, and everything
4    seemed to be okay in the wells themselves.
5  Q.   And those wells, I guess, penetrated the
6    groundwater table?
7  A.   I believe they all did, yes.
8  Q.   Are those wells still there on site?
9  A.   Oh, yes.
10  Q.   Are they just going to be abandoned?
11  A.   No.  No.  We're going to use three of them in
12    our study.  One of them, I believe, has been
13    taken out by the stripping operation.  It was
14    located where the stripping operation
15    ultimately went through, so that's been taken
16    out by the stripping.
17  Q.   Which three are you going to use, do you know?
18  A.   I don't know the numbers, but it would be the
19    three on the west side.  I know there's two on
20    the west side and one in like the southwest
21    corner.  I don't remember the numbers.
22  Q.   Right.  Two on the west side or three on the
23    west side?
0145
1  A.   Well, I think there's two on the west side and
2    then the third one is down in the southwest
3    corner.  And we're going to add three of our
4    own.
5  Q.   And where are you going to add yours?
6  A.   Well, we're going to do one up in back of the
7    shop and office area on the north side of the
8    site.
9  Q.   North side, okay.
10  A.   Right.  To try to determine the northerly edge
11    of the marble and the adjacent rock formation.
12    And then another one over on -- effectively on
13    what's the tree line right now on the stripping
14    operation on the Young parcel, which would be
15    easterly.
16  Q.   East side?
17  A.   Yeah.
18       MR. ADAMS:  Did you say marble just a
19      minute ago?
20  A.   Yes.
21  Q.   It's a dolomitic marble, isn't that what that

14         asking him that?
15  Q.   I'm just asking.  Have you looked at --
16  A.   I don't remember those records exactly.  I
17       remember reading about those kind of things.
18  Q.   I think I was asking you, when you're pumping
19       from the quarry, you can call it whatever you
20       want, but you're dewatering the area, aren't
21       you?
22           MR. WHITE:  Object to the form.
23           MR. ADAMS:  It's asked and answered.
0218
1  A.   Well, no, we're not.  I mean, we're pumping at
2       different rates, which are substantially lower
3       than the pumping rate that's going on in the
4       quarry.  Half million gallons a day --
5  Q.   No, I'm talking about now; pumping four and a
6       half million gallons a day?
7  A.   Well, whatever water is coming in the quarry,
8       we're taking it out.  From wherever it's coming
9       from, we're taking it out.
10  Q.   And when you're taking it out and discharging
11       it, whatever you call that, you're dewatering,
12       aren't you?
13  A.   Right, but I don't know what I'm dewatering.
14           MR. ADAMS:  Object to that, asked and
15               answered.
16  Q.   And why are we dewatering?
17  A.   Why are we dewatering?
18  Q.   Is it to keep the quarry dry?
19  A.   Well, to keep the water level at a level
20       necessary to run the quarry.
21  Q.   Sure.  And when you pump and discharge, it
22       artificially lowers the water table?
23  A.   Yes.
0219
1  Q.   And when you artificially lower the water
2       table, I think we've already agreed, it causes
3       the cone of depression?
4  A.   It creates the cone, yes.
5  Q.   Right.  And we don't know the size of the cone
6       or the shape of the cone, right?
7  A.   That's right.
8  Q.   But when you're taking out -- I don't know what

360

```
 9       four and a half million gallons a day would be,
10       but 130 million gallons a month or something?
11   A.   Whatever that is.
12   Q.   And I think you said you could do calculations
13       on a water budget?
14   A.   We can, yes.
15   Q.   Okay.  But you haven't done any of those yet?
16   A.   No.
17   Q.   Okay.  In fact, to do a water budget, you don't
18       need geology or any of the other data, do you?
19   A.   Oh, absolutely.
20   Q.   You do?
21   A.   I don't know how you can get a water budget
22       without it.
23   Q.   Is that on the density and the permeability
0220
 1       factors that go in the formula?
 2   A.   Right.
 3   Q.   And I think you mentioned the formulas, where
 4       are they located?  Are they in some general --
 5   A.   Yeah, any basic hydrology textbook would have
 6       the formulas.
 7   Q.   All right.  And what are they called?  I know
 8       they don't have a particular --
 9   A.   I don't know that there's a particular name.
10       They are sort of aquifer dynamics formulae.
11   Q.   Okay.  Aquifer dynamics?
12   A.   There will be a set of them for sand and gravel
13       and a set of them for fractured rock and so
14       forth.
15   Q.   What are the other factors that go into the
16       formula; do you know?
17   A.   The formula?
18   Q.   Right.
19   A.   Which one?
20   Q.   Whichever one you would use to figure up the
21       water budget?
22   A.   Oh, well, I don't know that there is a formula
23       for a water budget.  I thought you were talking
0221
 1       about aquifer dynamics and the way water flows
 2       through an aquifer.  A water budget is
 3       basically an estimate of how much water is
```

288

23      less than what was being pumped at those times.

0223

1      And the reason you do that is so in the course
2      of running the pump test you don't cause damage
3      to the outside envelope of the pumping that's
4      been going on.  If the allegation is that two
5      million gallons a day is causing damage, it's
6      crazy to do a test at two million gallons a
7      day, because you may cause damage during the
8      test.  So you go down to half a million or a
9      million or 750,000 where it's pretty clear no
10     damage has occurred in the past.
11  Q.   Well, isn't it also dangerous -- if you're
12     going to fluctuate the pumping and fluctuate
13     the water table level, that it can even be more
14     dangerous because it will cause -- particularly
15     in karst terrain it will cause sinkhole
16     collapse?
17  A.   Was that a question?
18  Q.   Right.
19  A.   No.
20  Q.   That's not a problem?
21  A.   No, because the collapse dynamics of the
22     sinkholes were triggered by some pumping rate
23     in the past, which is going to be, given the

0224

1      records, likely substantially higher than what
2      we would be pumping during the pump test.  So
3      the water tables around the quarry should
4      actually be coming up during the time we're
5      running the test.
6  Q.   You're saying even the holes that are forming
7      recently in the last two weeks or so were
8      caused by pumping that was in the past?
9  A.   No, they may be being caused by the pumping
10     today, so you don't run the test at the pumping
11     that's going on today, because you might create
12     more sinkholes.
13  Q.   You reduce it down?
14  A.   That's exactly right.  That's what I've been
15     saying.  So you run the test at 500,000 or 250
16     or something like that so that you're below the
17     damage envelope that's been demonstrated to be

2362

18    true.

19  Q.  Okay.  Do you know how much leased land is out

20     there, Mr. Fowler?

21  A.  I think it's all leased.

22  Q.  Oh, I'm sorry.  How many acres are leased?

23       MR. ADAMS:  All of it.

0225

1       MR. SPRAYBERRY:  A good answer to a bad

2         question.

3  A.  I'm sorry, I misunderstood your question.  No,

4     I don't know the total acreage.

5  Q.  Assume it's 600 acres, and we're pumping out

6     1.6 billion gallons a year, or whatever it

7     would be, according to my math, do you think

8     that 1.6 billion gallons is all coming from

9     that leased property?

10  A.  Probably not.

11  Q.  We just don't know where it's coming from?

12  A.  Right.

13  Q.  Is there any way we can tell how far it's

14     coming at this point?

15  A.  How far the water that comes into the quarry

16     travels?  Not right now, I don't think, that I

17     can think of a way.

18  Q.  I guess you saw in the depositions about the

19     dye traces and I think I had asked you earlier.

20     From the -- on 166, which is on the west side

21     of the quarry, there's a sinkhole --

22  A.  Right.

23  Q.  -- and the Rhodamine dye was put in there and

0226

1     it showed up about three days later in the

2     quarry discharge; does that tell you anything

3     about that sinkhole?

4  A.  Well, probably there is a connection between

5     the sinkhole, hydrologic connection between the

6     sinkhole and the water in the quarry.

7  Q.  Oky.  And what about the Eosine that was put in

8     Uchee Creek and showed up in the discharge,

9     does that tell you anything?

10      MR. ADAMS:  Object to the form.

11  A.  Well, no, because of this problem with the

12     breakdown products, which, you know, I need to

13      investigate some more.

14  Q.   Well, I thought I asked that earlier and you

15      said Eosine does not break down; the

16      Fluorescein does, but Eosine doesn't?

17  A.   Right.  But the Eosine could have come from

18      whatever the other dye was that they put in

19      close to the quarry, as I understand it.

20  Q.   You're saying the Eosine could have come from

21      the Rhodamine dye?

22  A.   Right, as a breakdown product of the Rhodamine

23      dye or whatever it was.  I don't remember which

0227

1       dye is which here.  But Eosine is the one I

2       understand is the most stable of the three,

3       chemically stable.

4   Q.   Right.  And it's the one that's shown up from

5       Little Uchee Creek in the discharge?

6            MR. WHITE:  Object to the form.

7   A.   Is Eosine?

8   Q.   And does that tell you anything?

9   A.   Well, it could mean that there's a direct

10      connection between the spring and the quarry or

11      it could mean that it's breakdown product, and

12      we aim to try to resolve that.

13  Q.   One of the two?

14  A.   Right.  Which one it is, we don't know, but we

15      need to find out.

16  Q.   And it would have to travel about 7,000 feet,

17      that's an abnormally long distance, is it, for

18      water --

19  A.   That's a long way for a cone of depression.

20  Q.   Is it?

21  A.   Yeah.

22  Q.   What's the longest dye study you know of?

23  A.   Well, I don't know.  The longest one I know

0228

1       about is, I don't know, a few hundred feet, I

2       think, up until now.

3   Q.   Okay.  If the water from Little Uchee is going

4       into the quarry, what can we do about it?

5            MR. WHITE:  Object to the form.

6   A.   Well, I guess it would depend on how much water

7       is going in from Little Uchee Creek.  I mean,

3      and the creek went dry may not necessarily be
4      just because the quarry is there. It could be,
5      and probably is, a combination of these
6      different things. And there's also been
7      construction at the spring in the past in the
8      1950s, drilling, blasting and deepening and
9      whatever.
10  Q.    '20s, 1920s.
11  A.    Well, whenever. But, you know, the point is
12      that over a thousand year time frame for
13      karstic features to be forming, it's not
14      unlikely, I don't know that it is, but it's not
15      unlikely that there could have been some
16      changes wrought by that work, which added
17      together with today's conditions, you know,
18      created the situation that we have today. And
19      in order for me to tell you how much water is
20      good and how much water is bad relative to the
21      quarry, I need to know the answers to those
22      questions before I could really give you a
23      solid answer.
0231
1   Q.    When you say that the karst features have been
2      forming out in the spring area for thousands of
3      years, what are you basing that on?
4   A.    Well, it's karstic limestone, nobody disagrees
5      about that. And the karstic development began
6      as soon as the ocean --
7   Q.    Receded?
8   A.    -- receded, which is roughly in the Pliocene,
9      what, five million years ago.
10  Q.    It was before my time, I don't know.
11  A.    Me, too.
12  Q.    So we've done -- I was asking you about some of
13      this stuff. If there is a cone of depression
14      in this karst area, are sinkholes more likely
15      to form?
16  A.    I'm not sure. If the quarry is creating the
17      cone?
18  Q.    Well, you've already said they are, haven't
19      you?
20  A.    I'm just confused about your question.
21  Q.    I mean, there is a cone of depression out

2365

22    there?
23 A.   Because of the pumping, yes.
0232
1 Q.   Because of the pumping?
2 A.   Right.
3 Q.   And this is a karst area?
4 A.   Yes.
5 Q.   And because of that, isn't it true that it's
6       more likely that sinkholes will form?
7 A.   It increases the possibility, yes.
8 Q.   All right.  And if there is a sinkhole that
9       forms in a stream, it can swallow that stream,
10      can't it?
11 A.   Oh, sure.  Yeah.
12 Q.   I think you even made reference to the river
13      where the quarry was diverting some of the
14      water from the river 2,000 feet earlier in your
15      deposition?
16 A.   Oh, on one of the other quarries?
17 Q.   Yes.
18 A.   Yes.
19 Q.   Which quarry was that?
20 A.   That was the one in Pennyslvania.
21 Q.   What was the name of it?
22 A.   Well, it's called the Hummelstown quarry,
23      H-U-M-M-E-L-S-T-O-N -- S-T-O-W-N, I'm sorry.
0233
1 Q.   And I take it it did not swallow the entire
2       river, it was taking part of the water?
3 A.   Right.  But had we not stopped the process, the
4       hole would have gotten progressively bigger and
5       eventually the river would have run into the
6       quarry.
7 Q.   So you had no choice in that situation but to
8       try to do something?
9           MR. ADAMS:  Object to the form.
10 A.  Right.
11 Q.   And if there's a sinkhole out there in Little
12      Uchee Creek, you can just assume that it is
13      swallowing the entire creek --
14          MR. WHITE:  Object to the form.
15          MR. ADAMS:  Object to the form.
16 A.  Well, I don't know.  I mean, I haven't walked

2365

6  A.   I gave them back to Ted, yeah.
7  Q.   Okay.  Well, we will need to get those from
8       Mr. Reynolds.
9  A.   The better place to get them is from Dixie
10      Pipeline.
11 Q.   What you're saying is there's steel on either
12      side of the pipeline itself?
13 A.   Right.  The pipeline is constructed so that
14      it's not tremendously flexible in a vertical or
15      a horizontal sense.
16 Q.   Is it in a steel cage or is it welded to the
17      pipe?
18 A.   I believe the superstructure in this case is
19      welded to the side of the pipe, although, you
20      know, don't hold me right to that, but I think
21      that's what it is.
22 Q.   So if a 20 foot hole opens underneath it,
23      you're not — you think it will hold up?
0247
1  A.   Right, it would bridge the hole.  You need to
2       fix the hole obviously and reenforce the pipe,
3       but you wouldn't have an immediate impact.
4  Q.   Okay.  I think Lee County also did some sonar
5       on Lee Road 166 and on Spring Villa Road, did
6       you see those reports?
7  A.   I don't believe I did, no.
8  Q.   Okay.  There was a big void up under Spring
9       Villa Road according to the sonar reports, and
10      they were going to grout it; I don't know if
11      they've grouted it or not.
12 A.   I don't think I have seen — I'm pretty sure I
13      haven't.  I don't recall it, anyway.
14 Q.   I think you said earlier that the water
15      underground, the groundwater, can flow one
16      direction and then over time it can change and
17      go to a different direction?
18 A.   Yeah, in karstic limestone.  Yeah.
19 Q.   Sure.  So if we do monitoring wells in 2004
20      will it tell us what the water pattern was in
21      2003 or 2002, or could it change over time?
22 A.   Yeah, we wouldn't probably be able to determine
23      the previous patterns, except, I mean, if we
0248

2367

```
 1    were lucky enough to hit a void of a certain
 2    sort that had a certain diameter and we were
 3    able to look at the weathering rinds on the
 4    side of the sinkhole -- of the void in order to
 5    get an idea of how long it has been since water
 6    did flow through the crack and so forth, that's
 7    one way to get at it.
 8  Q.  Right.
 9  A.  It's not tremendously precise, but you can tell
10      if you are lucky enough to hit one of them.
11  Q.  Other than the monitoring wells that you're
12      talking about, is there anything else we can
13      use or do to determine where the water is
14      coming from that's going into the quarry?
15  A.  Well, use the sinkholes actually.
16  Q.  Do what now?
17  A.  Use the sinkholes.
18  Q.  How would we use those?
19  A.  If they're directly related to water flow
20      involving the quarry, then by studying them and
21      how long it's been since water was in them and
22      how they collapsed, we'll get a pretty good
23      feel for where the cone of depression is or has
```
0249
```
 1    been and how the quarry pumping might be
 2    affecting it.  In fact, in our investigation,
 3    one of the things we want to do is a
 4    hole-by-hole inspection and collapse mechanic
 5    analysis on each one.
 6  Q.  Why do you look to see when it had water in it?
 7  A.  Well, that will give us an idea of how long ago
 8      the water had been there.  If a sinkhole forms
 9      tomorrow and you go into it and you find out
10      the weathering rinds on the side of it indicate
11      no water has been there for 150 years or
12      something like that, then the collapse
13      mechanics are the results of something else.
14      You see, the sinkhole can form and water go
15      some place else, but that sinkhole never sunk,
16      it never was old enough or it had enough water
17      in it to actually --
18  Q.  The potential was there, but it had not yet
19      collapsed?
```

2000

15    MR. VERCELLI:  And over time we've
16        given all of the coordinates as
17        best we can on all of them over
18        time.
19    MR. BYRAM:  Yeah.  Well, it would be
20        nice to have one list.
21    MR. ADAMS:  Somebody gave them to me
22        very recently, within the last
23        month or so.
0252
1   A.   And maybe I got them from you then.
2        MR. ADAMS:  Yeah, you did.
3   Q.   Mr. Fowler, after -- in July of last year when
4        you learned of the litigation, I know y'all are
5        working on this plan, what else have y'all done
6        to determine the validity or the invalidity of
7        the allegations in the lawsuit?
8   A.   Well, we haven't really done anything specific
9        in a scientifically quantitative sense.  What
10       we've been trying to do is make sure we
11       understood all of the positions.  As I said
12       earlier, I think it's important not to be
13       cynical about this, and say, this is baloney,
14       and this is okay.
15       I mean, we're not a party to the original
16       lawsuit, we're in this other one.  And my
17       attitude was that let's see if one of these
18       people is right.  Let's assume the best and go
19       forward and see if we can use their data, use
20       their line of logic, and their evidence, and so
21       on, and come up with a reasonable scientific
22       certainty that their conclusion is accurate.
23       And we've spent most of the most of the
0253
1        months between our receipt of the boxes of the
2        stuff and, you know, the first -- you know, you
3        read things first to get a feel for where
4        you're going and sifting and sorting and
5        whatever.  We've spent most of the time trying
6        to figure out where those opinions are.
7        We've come up with these conflicts that
8        I've described earlier and decided that what we
9        needed to do was conduct this investigation of

10    our own to try to get enough data to decide
11    which ones are right or wrong, or what is -- if
12    they're all wrong, what's right.
13        I guess we don't have a big stake in the
14    results of the investigation. Because what we
15    intend to do is what we've already started to
16    do, and that is to begin to identify, you know,
17    dust, noise, blasting, down the list. Those
18    are problems. I've just taken --
19  Q.   One at a time?
20  A.   -- the complaint seriously, because, I mean,
21    people aren't complaining about them if they
22    weren't problems in the sense of their
23    lifestyle or their livelihood. And in an
0254
1    environmental management sense, it doesn't
2    matter how bad the problem is, the problem
3    exists. And as long as the problem exists,
4    even perceived to exist, we've got a problem.
5        And there are a variety of things we can
6    do to begin to mitigate those impacts, whatever
7    they may be. Now, some people may never be
8    satisfied, you know, but we'll do the best we
9    can. And that's the goal -- I mean, that's my
10    assignment from Oldcastle is to design an
11    investigation and the design of a mining plan
12    which has the maximum amount of abatement --
13    mitigation and abatement built into it for the
14    impacts that have been identified by the
15    complaints that you-all have transferred to us.
16  Q.   Have you made any recommendations to Oldcastle
17    that they've declined not to pursue?
18  A.   Oh, no. Everything we've suggested they've
19    done.
20  Q.   Okay. And that's the berms and the monitoring
21    wells to be put in; any other recommendations
22    you've made to them?
23  A.   Yeah. We suggested that they, for the time
0255
1    being, cut back on the loading rate and the
2    blasting and redesign the blasting patterns.
3    Based on information that I don't personally
4    have, but Ted Reynolds had, about the size of

5    the blasting shots that they were detonating --
6    that Hanson was detonating and the orientation
7    of the quarry and so forth, we've backed all of
8    that down to somewhere around 50 percent of
9    what they were doing.  The plant production
10    rate has been cut down to -- I'm not quite sure
11    of these percentages, so don't hold me to them,
12    but something like 50 or 60 percent of what
13    they were doing.  And we've moved the hauling
14    patterns in the stripping area and the quarry
15    around so we've cut down back-up movements, for
16    example, which have all of the back-up alarms.
17    So no trucks are backing up any more, they're
18    all --
19  Q.  Going forward?
20  A.  Right, they're always going forward.  There is
21    a variety of things like that that we have done
22    in an attempt to make sure insofar as we can,
23    without having the numbers, that, you know,
0256
1    we're not creating whatever impact people
2    perceived that there was before.  Now,
3    obviously that isn't a hundred percent
4    successful, but that's what we've been doing.
5  Q.  Would you agree with me that the water table in
6    the Spring Villa area has dropped, for whatever
7    reason?
8  A.  It appears as though it has, yeah.
9  Q.  And dropped fairly significantly?
10  A.  It dropped more than 30 feet.
11  Q.  Right.  For whatever reason.  And I believe
12    Hanson's expert said that whatever caused that
13    water table to drop was also causing the
14    sinkholes?
15  A.  In the Spring Villa area?
16  Q.  Right.
17  A.  Yeah.
18  Q.  Would you agree with that?
19  A.  I agree with that.  We don't know what the
20    mechanism is, but --
21  Q.  When you're talking about the mechanism of the
22    sinkhole, are you talking about the size of it
23    and the shape of it and how it collapsed in; is

2371

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

FILED

APR 15 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### DEEFNDANT OLDCASTLE MATERIALS' RESPONSE TO PLAINTIFFS' "MOTION FOR DEFENDANTS TO PAY COST OF SECOND MEDIATION"

COMES now Oldcastle Materials, Inc. and files herein its response and opposition to Plaintiffs' Motion seeking to compel this Defendant to pay a portion of the Plaintiffs' cost of mediation and shows unto the Court as follows:

1. The Plaintiffs in this case filed suit against this Defendant on August 1, 2003, less than thirty (30) days after this Defendant acquired the Opelika quarry from Hanson Materials and prior to this Defendant conducting any significant quarry operations on the property.

2. The Plaintiffs' Motion avers that the first mediation was held May 21, 2003, more than two months prior to the Defendant Oldcastle being made a party to this action and the mediation was held without Oldcastle's knowledge, consent or participation.

3. The Court has ordered all parties to mediation at this time and Oldcastle intends to enter into the mediation in good faith.

4. However, the attorney for Oldcastle has recently been advised by counsel for the Plaintiffs that he has spoken with the Court appointed mediator to discuss the method and means by which the

mediation might be conducted. Counsel for Oldcastle has reached the opinion after receiving and reviewing a memo from Plaintiffs' counsel dated April 12, 2004 that Plaintiffs may not be entering mediation in good faith with the idea of reaching a compromised settlement of claims in this matter (See Exhibit "A" attached hereto.)

WHEREFORE, the Defendant Oldcastle avers that this Court make and enter an order requiring that the cost of mediation be divided equally between the Plaintiffs and the Defendants herein.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant Oldcastle
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15th day of April, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

2375

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

_Phillip E Adams_
Of Counsel

2374

# VERCELLI & ASSOCIATES, P.C.

*Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
TODD E. HUGHES
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

FILE COPY

## MEMORANDUM

**TO:**     James A. Byram, Jr.
            James B. Sprayberry
            John V. Denson
            Guy F. Gunter, III
            H. Wayne Phears
            Jack Weiss
            Phillip E. Adams, Jr.

**FROM:**   Charles E. Vercelli, Jr.

**DATE:**   April 14, 2004

**RE:**     *Davis, et al. v. Hanson Aggregates, et al.*

Dear Gentlemen:

I have spoken with retired Circuit Judge William Gordon about mediating this case. During the last hearing, the Defendants apparently agreed to a subsequent mediation by Judge Gordon. In discussing the matter with Judge Gordon, I made him aware of the purchase of the quarry by Oldcastle and Mr. Adams' involvement. In further discussing the matter with Judge Gordon, we felt it might be appropriate for Judge Gordon to communicate with each of the parties separately, rather than have a joint mediation session attended by all parties and their representatives. He and I felt that it may be more conducive to settlement discussions if he were able to speak freely with each party without the time constraint of a formal mediation. The formal mediation did not work last time. Jim Sprayberry and I do not believe that it is particularly necessary to have everybody in one conference room together only to be broken up into separate rooms at this point in the game. I invite your thoughts in this regard.

If either Defendant would rather not participate, please let us know. We are certainly willing to listen, but please do not waste your time and our time if your client has no intention of offering a meaningful settlement proposal. Our original letter to Hanson (June 26, 2003) sets forth the issues that must be addressed in any settlement dialogue.

CEVjr/ma

cc:   Judge William Gordon

155-001\All atty memo\R2.wpd

# EXHIBIT A

2375

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
    Plaintiffs,                     )
                                       )
vs.                                    )       CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC. et al.,                )
                                       )
    Defendants.                     )

F I L E D

APR 1 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION FOR COURT TO ORDER PARTIES TO ATTEND MEDIATION

COMES NOW the Defendant, Oldcastle Materials and moves the Court to require the Plaintiffs and Defendants herein to have all Plaintiffs and representatives of corporate Plaintiffs and Defendants present at the mediation ordered by this Court and in support of this Motion says as follows:

1.  Less than thirty (30) days after acquiring the Opelika quarry and before any significant operations had begun on the premises Plaintiffs filed suit against Oldcastle in this matter.

2.  Defendant Oldcastle has never had an opportunity to participate in a mediation or other attempt to resolve the issues and claims being made by the Plaintiffs against the Defendant Oldcastle.  Consistent with the Civil Court mediation Rules applicable in this state Oldcastle intends to bring a representative prepared to discuss during mediation the issues submitted and someone who possesses authority to authorize settlement during the mediation session. Oldcastle is informed that not all Plaintiffs may attend the mediation session.

3. Oldcastle further avers that the claims being asserted by the parties are different and each Plaintiff should be present in order to hear and participate in the negotiations and the mediation process.

4. Oldcastle proposes that this Honorable Court require that the parties and their attorneys meet with the mediator to determine the appropriate method by which the mediation might be conducted, including the notion of conducting the mediation over several days by which all individual Plaintiffs could participate on one day and the representatives of the City of Opelika and Beauregard Water Authority participate on another day in order to allow all parties an opportunity to engage in the mediation process and to have an opportunity to settle each respective claim on their individual merits.

Respectfully submitted, this the 15th day of April, 2004.


ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant Oldcastle
P. O. Box 2069
Opelika, AL 36803-2069

2

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15th day of April, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

2378

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**F I L E D**

APR 16 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. CV-02-85 |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RESPONSE TO PLAINTIFFS' MOTION REGARDING THE COSTS OF SECOND MEDIATION

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") hereby requests the Court to deny Plaintiffs' "Motion for Defendants to Pay Cost of Second Mediation." In response to Plaintiff's Motion, Hanson avers as follows:

1.      Rule 2 of the *Alabama Civil Court Mediation Rules* states that "[i]n all instances except where the request for mediation is made by only one party, the court may allocate the costs of mediation, except attorney's fees, among the parties." The Comment to Rule 2, as amended, admonishes that "[i]t may be helpful for courts to consider the commitment to the mediation process that derives from each party having a financial stake in the process. Courts may find mediations are more successful if each party is required to pay a portion of the mediation costs."

2.      Rule 15 of the *Alabama Civil Court Mediation Rules* requires that "...expenses of the mediation, including necessary travel and expenses of the mediator...shall be borne equally by the parties unless the parties agree otherwise, or unless the court directs otherwise."

3.      In the instant case, the Court exercised its authority under *Ala.Civ.Ct.Med.R.* 2 and 15 to allocate the expenses of the second mediation in its Order dated February 12, 2004. In

143682.1

its Order, the Court specifically required the parties to "evenly split the costs of said mediation." The Court's Order is in harmony with the express language of Rules 2 and 15 and with the express purpose for the allocation of mediation expenses set forth in the Comment to Rule 2.

4.    Plaintiffs' request to alter the Court's previous allocation of expenses is wholly without merit.  Hanson entered into the first round of mediation "prepared to discuss during mediation sessions the issues submitted to mediation" and made "someone with authority to settle" "reasonably available" during the entire course of the initial mediation as required by Rule 6 of the mediation rules.  There is simply no basis for any contrary contention by plaintiffs' counsel.

WHEREFORE, premises considered, Hanson respectfully requests the Court to deny Plaintiffs' Motion for Defendants to Pay Cost of Second Mediation as the Court has previously ruled on this issue in a manner consistent with the express language and purpose of the *Alabama Civil Court Mediation Rules.*

Respectfully submitted this the 15th day of April 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

143682.1

2

2380

H. Wayne Phears, Esq.
Phears & Moldovan
4725 Peachtree Corner Circle
Suite 375
Norcross, Georgia  30092

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by

United States Mail, properly addressed and postage prepaid, on this the 15th day of April 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069


Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

Of Counsel

143682.1

**FILED**

**IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA** APR 1 9 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## DEFENDANT OLDCASTLE'S MOTION TO STRIKE EACH OF THE PLAINTIFF'S RESPONSES TO OLDCASTLES INTERROGATORIES AND MOTION TO COMPEL NEW RESPONSES AND MOTION FOR SANCTIONS

COMES NOW, the Defendant, Oldcastle Materials Southeast Inc., by and through counsel, and moves this Honorable Court to strike each of the individual Plaintiff's responses to Oldcastle's Interrogatories and to compel the Plaintiffs to file new responses which fully and completely respond to Oldcastle's discovery requests. As grounds for said motion, Defendant states as follows:

1.  On October 15, 2003, Oldcastle propounded Interrogatories and Request for Production directed to each of the Plaintiffs. (See exhibit A).

2.  Sometime thereafter, Oldcastle began receiving Interrogatory Responses signed by the Plaintiffs. However, upon reviewing the Interrogatory responses, it became apparent that each of the Plaintiff's interrogatory responses were virtually identical to each other, with the exception of only a few paragraphs scattered throughout the responses. (Examples of Plaintiffs' Interrogatory responses are attached as exhibits B, C, D, E, F, & G).

3.    As the Court can see, one can literally lay the responses side by side, and see the identical nature of the responses. The responses are verbatim for each Plaintiff, with very few exceptions.

4.    An example of one of the Plaintiffs Interrogatory responses are those completed by Plaintiffs, Naomi and Ken Schweiker, which is attached as Exhibit "B". Oldcastle's Interrogatory #1 requests information concerning the Plaintiffs' experts, their opinions, qualifications, and bases for their opinions. The Schweiker's response is that "at the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Request for Production. . . . . Summaries of the opinions, qualifications, and bases for opinions for these experts have been previously produced in Plaintiffs' response to Hanson's Interrogatories and Request for Production of Documents which are incorporated here by reference. These expert's opinions are expected to be the same - as appropriate - with respect to Defendant, Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Request for Production of Documents, then Plaintiffs expect to provide such information to each of the above experts." The Schweiker's response to this interrogatory is <u>identical</u> to the responses of <u>all</u> the Plaintiff's.

5.    On March 16, 2001, counsel for Oldcastle wrote to counsel for Plaintiffs requesting that the Plaintiffs meaningfully respond to Oldcastle's

discovery requests. (See exhibit H). Specifically, counsel stated, "we are entitled to specific responses regarding experts and expert opinions and we will expect to receive those prior to your clients' depositions." As of the date of the instant filing, counsel for Oldcastle has not received any supplemented discovery responses from any of the Plaintiffs.

6.    In addition, and perhaps more disturbing, is that each of the Plaintiffs' discovery responses contain information and alleged factual statements regarding the operation of the quarry, and its alleged effects, which the Plaintiffs themselves have no personal knowledge of, yet such statements are set forth in their Interrogatory responses as if the individual Plaintiffs do, in fact, have personal knowledge of the alleged facts.

7.    Take, for instance, the Interrogatory responses of Ken and Naomi Schwieker. In Interrogatory # 2(a) Oldcastle asks the Plaintiff to "set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in paragraph 111 of the complaint that Oldcastle 'is intending to and will continue the operations of the quarry the same or similar conditions' as Hanson operated the quarry." Ken and Naomi Schwieker responded in pertinent part as follows, " . . . *Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operations of their mobile equipment and their*

stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much or more noise and dust pollution . . . ." (Emphasis added).[1] At deposition, however, Mr. Schwieker admitted that he did *not* have any personal knowledge as to *how much water Oldcastle is pumping from the quarry;* he admitted that he did *not* have any personal knowledge has to *how much dust is being generated at the quarry, and further stated that dust is not one of his complaints in this lawsuit;* he further admitted that he did *not* have any personal knowledge regarding *the generation of "loud and irritating noise from early in the morning and into the night" -- Specifically, he admitted that he had no knowledge of whether Oldcastle operated the quarry earlier in the morning that Hanson or later in the evening than Hanson;* Mr. Schwieker also admitted that he has *no knowledge* as to *how much rock Oldcastle may be crushing and whether it has caused as much or more noise and dust pollution.* (See excerpts of depo. of Ken Schweiker attached as exhibit I.)

8.    Again, in Interrogatory # 3(a), Oldcastle requests that the Plaintiffs set forth every fact, transaction, occurrence, communication, or event upon

---

[1]Again, all of the Plaintiffs responses to this interrogatory in this regard were identical.

which Plaintiffs base the contention in paragraph 113 of the complaint that "Oldcastle continued operation of the quarry will be done in a negligent and a wanton manner and causing damages and continued damages to Plaintiffs."

9.    Ken and Naomi Schwieker in their response to said Interrogatory, state that, ". . . Oldcastle continued and continues its operations unabated - and in fact in a manner that is even worse than when Hanson operated the quarry, *as the noise is worse, the dust is worse,* the problems with land collapse is worse, and the spoil pile has been greatly increased in size."[2] Again, at deposition, Mr. Schwieker admitted that *he has no knowledge of noise or dust problems, and that dust and noise are not part of his complaints in this lawsuit.* Additionally, in his response to Interrogatory # 3(a) the Schweiker's state that, "moreover, on October 5th & 6th, 2003, there was a heavy mud and/or discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).[3] Again, at deposition, Mr. Schwieker admitted that he had no first hand knowledge

_____

[2] Once again, all of the Plaintiffs responses to this interrogatory in this regard were identical.

[3] Yet again, all of the Plaintiffs responses to this interrogatory in this regard were identical.

of this incident and gained this information via his attorney. (See exhibit I).

10.     These are but a few examples of the kinds of interrogatory responses each of the Plaintiffs gave. These types of interrogatory responses are scattered throughout the responses by Ken and Naomi Schwieker, and throughout all of the Plaintiffs responses to Oldcastle's Interrogatories. Time after time at deposition, many of the Plaintiffs have disavowed their interrogatory responses, or distanced themselves therefrom.

11.     The Plaintiffs' Interrogatories responses, in their current state do not aid the Defendants in ascertaining which claims are being made by which parties, or what the Plaintiffs' expert will say as to any alleged damages allegedly caused by Oldcastle. This is precisely the reason the Interrogatories and Request for Production were propounded to the Plaintiffs in the first place.

12.     The Plaintiffs' responses to Oldcastle's Discovery Requests in their current condition, are utterly meaningless. They simply compile a series of bare allegations and unsubstantiated contentions drafted by the Plaintiffs' attorneys and signed off by the Plaintiffs themselves. Each of the Plaintiffs have admitted over and over that they do not have personal knowledge of the allegations set forth in their discovery responses.

WHEREFORE, counsel for Defendant, Oldcastle moves this Honorable Court to strike each of the Plaintiffs' discovery responses and order that each of the Plaintiffs

again respond to Oldcastle's discovery requests, but this time in a more meaningful and forthright way, based upon each individual Plaintiff's personal knowledge. Additionally, Defendant also moves this Honorable Court to enter such appropriate attorneys fees, costs, and sanctions as it deems appropriate pursuant to Rule 37 due to the incomplete, evasive, inadequate and misleading nature of Plaintiffs' discovery responses.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
PHILLIP E. ADAMS, JR. (ADA025)

BY: _____
MATTHEW W. WHITE (WHI086)

BY: _____
PATRICK C. (RICK) DAVIDSON
(DAV111)

Attorneys for Defendant Oldcastle
Materials Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel. (334) 745-6466

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the above and foregoing upon:

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 South Perry Street
Montgomery, AL 36104

James B. Sprayberry, Esq.
P.O. Box 2429
Auburn, AL 36831-2429

Guy Gunter, Esq.
P.O. Box 409
Opelika, AL 36801

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

This the ___19___ day of ___April___, 2004.

_____
Of Counsel for Defendant

2388

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
        Plaintiffs,                )
                                   )
vs.                                )    CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                  )
SOUTHEAST, INC. et al.,            )
                                   )
        Defendants.                )

## OLDCASTLE'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Defendant Oldcastle, Inc., requests that Plaintiffs answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure.

## INSTRUCTIONS AND DEFINITIONS

1.    "Complaint" means the Fourth Amended and Restated Complaint in this matter.

2.    "Oldcastle" means Oldcastle, Inc., the entity named in the complaint, including any present or former officers, directors, employees, representatives, agents or attorneys thereof.

3.    "Hanson" means Hanson Aggregates Southeast, Inc., the entity named in the complaint, including any present or former officers, directors, employees, representatives, agents or attorneys thereof.

4.    The "Quarry" means to the limestone and marble quarry located in Lee County, Alabama, referred to in the complaint.

5.    "Relating to" and "relate(s) to" mean constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to the given subject matter.

6.    "Document" shall include, without limitation, all written, typed, or otherwise preserved communication, including any letter, correspondence, note, book, pamphlet, article,

DEFENDANT'S EXHIBIT

A

bulletin, directive, review, publication, memorandum, diary, log, test, analysis, study, appraisal, projection, check, invoice, receipt, bill, purchase order, shipping order, contract, lease, agreement, work paper, calendar, envelope, paper, telephone message, tape, computer tape, computer disk, computer card, recording, videotape, film, microfilm, microfiche, drawing, account, ledger, statement, financial data, and all other writings or communication in Plaintiffs' actual or constructive possession, custody or control or of which Plaintiffs have knowledge of the existence, and whether prepared, published, or released by Plaintiffs or by any other person or entity. The term "documents" is intended to include all drafts of documents and all documents in Plaintiffs' actual or constructive possession, custody or control, and whether prepared, published or released by Plaintiffs or by any other person or entity. Without limiting the foregoing, the term "document" shall include any copy that differs in any respect from the original or other versions of the document, such as, but not limited to, copies containing notations, insertions, corrections, marginal notes, emendations or any other variations.

7.     "Person" means any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

8.     Whenever in these interrogatories there is a request to identify a communication, state:

   a.     the date and place of such communication;

   b.     the identity of each person who was present at or who participated in such communication;

   c.     the type of communication (e.g., letter, telegram, conference, telephone conversation, memoranda, etc.);

   d.     the substance of such communication; and

    e.     the identity of each document reflecting, referring to, comprising, constituting, or summarizing such communication.

9.    Whenever in these interrogatories there is a request to identify a document, state:

    a.     the date;

    b.     the author and signatories;

    c.     the recipients and addresses;

    d.     the type of document (e.g., letter, memorandum, telegram, etc);

    e.     the substance of the document;

    f.     the identity and addresses of all other persons who received copies;

    g.     the custodian; and

    h.     the location.

10.    Whenever in these interrogatories there is a request to identify a person, state:

    a.     the full name;

    b.     residence address;

    c.     residence telephone number;

    d.     business address;

    e.     business telephone number; and

    f.     and relationship to Plaintiffs of that person.

## INTERROGATORIES

1.    Identify any and all experts Plaintiffs intend to offer testimony in the trial of this matter, and state the subject matter on which the expert is expected to testify, state the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each opinion.

2.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 111 of the Complaint that Oldcastle "is intending to and will continue the operations of the quarry under the same or similar conditions" as Hanson operated the quarry.

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

3.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 113 of the Complaint that "Oldcastle's continued operation [of the quarry] will be done in a negligent and wanton manner causing damages and continued damages to Plaintiffs."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

4.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 114 of the Complaint that "All damages and harms pleaded in this Complaint will continue if Defendant Oldcastle continues to operate the quarry."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

5.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 114 of the Complaint that

2396

"any blasting and discharging of water by Oldcastle will cause continuing damages to the Plaintiffs."

(b)     Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

6.     (a)     For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused any injury or damage to the Plaintiff's property.

(b)     For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)     the nature of each such item of injury or damage;

(2)     the date such injury or damage occurred;

(3)     whether such injury or damage is permanent; and

(4)     every fact, transaction, occurrence, communication, or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (3) of this interrogatory.

(c)     Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

7.     (a)     State whether Plaintiffs contend that Oldcastle's continued operation of the quarry gives rise to a substantial threat of irreparable injury to Plaintiffs.

2394

(b)     If the answer to subparagraph (a) of this interrogatory is yes, set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs bases that contention.

(c)     Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (b) above.

8.     (a)     For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused, aggravated or otherwise contributed to any personal injury or bodily harm.

(b)     For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)     the nature of each item of such personal injury or bodily harm;

(2)     the date such personal injury or bodily harm occurred; and

(3)     every fact, transaction, occurrence, communication, or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (2) of this interrogatory.

(c)     Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

9.     (a)     For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, constitutes a nuisance, as that term is used in Section 6-5-120 of the Code of Alabama.

2395

(b)     For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state each fact, transaction, occurrence, or event that support such contention.

(c)     Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

10.     (a)     For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused any trespass upon the Plaintiff's property.

(b)     For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state each fact, transaction, occurrence, or event that support such contention.

(c)     Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

11.     (a)     For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused such Plaintiff any special damage, as that term is used in Section 6-5-123 of the Code of Alabama.

(b)     For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)     the nature of such damage;

(2)     the amount of such damage; and

7

(3)    each fact, transaction, occurrence, communication or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (2) of this interrogatory.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

12.    (a)    State whether Oldcastle's operation of the quarry after July 13, 2003, has diverted any stream, as that term is used in Section 33-7-4 of the Code of Alabama, from its natural channel.

(b)    If the answer to subparagraph (a) of this interrogatory is yes, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

PHILLIP E. ADAMS, JR.

70262432_1.DOC

8

2397

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15TH day of October, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

2896

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                            *
                                               *
          Plaintiff,                           *
                                               *
v.                                             *        CASE NUMBER: CV-02-85
                                               *
HANSON AGGREGATES SOUTHEAST,                   *
INC., et al.                                   *
          Defendants.                          *


## ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY KEN AND NAOMI SCHWIEKER

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts
      previously disclosed in response to Hanson's Interrogatories and Requests for Production. In
      further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions
      have previously been taken by Hanson and whose reports and supplemental reports have
      previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr.
      Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions,
      qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs'
      responses to Hanson's Interrogatories and Requests for Production, which are incorporated here
      by reference. These experts' opinions are expected to be the same–as appropriate–with respect to
      Defendant Oldcastle.    However, if Oldcastle ever meaningfully responds to Plaintiffs'
      Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to
      each of the above experts.  At that time, if those experts deem it appropriate based on new
      information, the experts will supplement their opinions.  Plaintiffs further reserve the right to
      supplement the opinions of these experts based upon ongoing discovery.

      Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM
      employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is
      adopted here by reference.

2.    (a)    Plaintiffs have observed no significant change in the general process of the operation of the
             quarry after Oldcastle assumed the operation.  However, we and the some of the other
             plaintiffs have observed significant increases in sinkholes. Therefore, all the Plaintiffs'
             prior interrogatory responses, responses to requests for production, and answers to
             deposition questions are equally applicable to the problems caused by Oldcastle.  In this
             regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large
             quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues
             to generate large amounts of dust on the cleared areas and by the operation of their mobile
             equipment and their stationary equipment; Oldcastle continues to create loud and irritating
             noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and
             into the night (often later than Hanson); Oldcastle appears to be crushing as much or more



DEFENDANT'S
EXHIBIT
B

rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

Several holes formed in the branch, which runs east from the west; this branch disappears into these sinkholes and is swallowed. These holes are spaced twenty (20) feet apart.

A new hole (20 feet long by 15 feet wide by 6 feet deep) formed March 1, 2004 (A.M.) or February 29, 2004 (P.M.) in sudden collapse. It is south of the branch and west of these other holes. It is approximately five (5) feet from the branch and will soon connect with the branch and cause a huge hole. Also a very large sinkhole formed near by branch on the night of March 13 or the morning of March 14. It is approximately twenty (20) feet east of the hole that formed approximately two (2) weeks ago. When it formed it was approximately 10 ft. x 15 ft. with an unknown depth.

Also the deep water well at our farm has gone substantially dry as of March 14. We used it frequently but in small quantities. We have used it for forty (40) years or more and never had a problem with lack of water. Now it produces little or no water.

Ken has also observed a sinkhole south of the Uniroyal Plant next to Highway 169. It has grown in size. Ken has also heard and felt, for the first time, blasts from the quarry.

We now fear for our safety constantly and our fear is ten (10) times greater that when Hanson operated the quarry. Our property is substantially devalued. These holes could cause a potentially tragic accident. We are reluctant to operate our tractor or bushhog now because of the danger of hidden sinkholes

(b)     See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)     Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping

2400

records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

(b)    Please see our answer to 2(b) above, which is incorporated here by reference; also county workers. Spring Villa road is in terrible shape.

(c)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to the quarry we had no sinkholes and there was no problem with loss of surface water. Now holes are forming constantly, ponds are dry and streams diverted.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our farm house.

(b)    The sinkholes are getting worse and my property is not safe. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic,

dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Sinkholes are forming constantly with some forming as recently as February 29, 2004 or March 1, 2004. As long as the pumping continues, the problem will be permanent. My land is substantially devalued. Another hole formed March 13 (P.M.) Or March 14 (A.M.).

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.   (a)     Yes.

(b)     Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.   (a)     No

(b)     N/A

(c)     N/A

(d)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.   (a)     Yes.

(b)     The sinkholes have ruined my property and have made my property unsafe.

(c)  .  Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.  (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

2402

11.   (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.   (a)   Yes.

      (b)   It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground.  I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.  Some holes have formed as recently as February 29, 2004 or March 1, 2004 and March 13/14, 2004.

      (c)   Please see our answers to all of the above interrogatories, which are incorporated here by reference.

      I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 16th day of March , 2004.

      KEN SCHWIEKER

      NAOMI SCHWIEKER

2403

STATE OF ALABAMA     *
                                   *

COUNTY OF LEE         *

        BEFORE ME, a Notary Public in and for said State and County, came KEN SCHWIEKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

        GIVEN under my hand and official seal this ____ day of _March_ , 2004.

                                         _Cassandra A Holt_
                                         Notary Public

(SEAL)

My Commission Expires: MY COMMISSION EXPIRES DEC. 18, 2007 _____

STATE OF ALABAMA     *
                                   *

COUNTY OF LEE         *

        BEFORE ME, a Notary Public in and for said State and County, came NAOMI SCHWIEKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

        GIVEN under my hand and official seal this _17th_ day of _March_ , 2004.

                                         _Cassandra A Holt_
                                         Notary Public

(SEAL)

My Commission Expires: MY COMMISSION EXPIRES DEC. 18, 2007 _____

2404

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

_____

James B. Sprayberry

2405

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                          *

      Plaintiff,                         *    **ORIGINAL**

                         *

v.                                           *    CASE NUMBER: CV-02-85

                         *

HANSON AGGREGATES SOUTHEAST,                 *
INC., et al.                                 *
      Defendants.                        *

## ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY DONNIE SMITH

1.  At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

    Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.  (a)  Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as

**DEFENDANT'S EXHIBIT**

C

much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area. Three or more new holes have opened in February, 2004.

(b)   See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.   (a)   Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

(b)   Three or more new holes have opened and several are very large holes. Spring Villa road is in terrible shape.

(c)   Please see our answers above, which are incorporated here by reference.

4.   (a)   Please see our answers above, which are incorporated here by reference.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)   Please see our answers above, which are incorporated here by reference.

5.   (a)   All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to the quarry we had no sinkholes and there was no problem with loss of surface. Now holes are forming constantly.

(b)   Please see our answers above, which are incorporated here by reference.

6.   (a)   We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)   The sinkholes are getting worse and my property is not safe. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Sinkholes are forming constantly with some forming as recently as February 26, 2004. The sinkholes can be repaired but they re-appear bigger than before. As long as the pumping continues, the problem will be permanent. My land is substantially devalued. We understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.   (a)   Yes.

(b)   Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health,

our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)     No

(b)     N/A

(c)     N/A

(d)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.    (a)     Yes.

(b)     The sinkholes have ruined my property and have made my property unsafe.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.    (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.    (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)     Yes.

(b)     It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems. Some holes have formed as recently as February 26, 2004.

(c)     Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 27 day of February, 2004.

_Dennie Smith_
DONNIE SMITH

**STATE OF ALABAMA**   *

**COUNTY OF LEE**   *

BEFORE ME, a Notary Public in and for said State and County, came DONNIE SMITH, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 27 day of Feb, 2004.

Notary Public

(SEAL)

My Commission Expires: 9/18/04

2410

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

3/11/2004

James B. Sprayberry

*Circuit Court No.* CV02-85  *Supreme Court No.* 1040857

# APPEAL

TO

# Supreme Court of Alabama

FROM

MIKE & DONNA DAVIS ETAL.-OLDCASTLE MATERIALS SOUTHEAST, INC & HANSON AGGREGATES SOUTHEAST, INC.                              *Appellant*

vs.

HANSON AGGREGATES SOUTHEAST, INC ETAL. & CITY OF OPELIKA, CITY OF OPELIKA UTILITIES BOARD ETAL.                      *Appellee*

24??

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NUMBER: CV-02-85 |
| | * | |
| HANSON AGGREGATES SOUTHEAST, | * | |
| INC., et al. | * | |
| Defendants. | * | |

### ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY DAVID AND TONYA TANKERSLEY

1.   At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.   (a)   Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the some of the other plaintiffs have observed significant increases in sinkholes. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared

DEFENDANT'S EXHIBIT

D

2412

areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

We have twenty-six (26) new holes in the fenced portion of my pasture and they are approximately one (1) foot across and over five (5) foot deep. A third hole is in the very center of my horse pasture. It is a small depression with a hole that captures all of the water in the vicinity. Our well has gone dry and will remain dry if Oldcastle continues dewatering. Our home is approximately 1 1/4 miles from the quarry and we are experiencing sinkhole development almost constantly. We worry about the safety value of our home and property.

(b)     See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.     (a)     Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is

2413

worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down). Spring Villa road is in terrible shape.

(b)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to the quarry we had no sinkholes and there was no problem with loss of surface water. Now holes are forming constantly, ponds are dry and streams diverted.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that many are suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)    The sinkholes are getting worse and my property is not safe. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Sinkholes are forming constantly with some forming as recently as of January and February, 2004. The sinkholes can be repaired but they re-appear bigger than before. As long as the pumping continues, the problem will be permanent. My land is substantially devalued.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)    Yes.

(b)    Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)    No

(b)    N/A

(c)    N/A

9.    (a)    Yes.

(b)    The sinkholes have ruined my property and have made my property unsafe.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.    (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.    (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)    Yes.

(b)    It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems. Some holes have formed as recently as of January and February, 2004, and they continue to form.

(c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this _15_ day of ___March___, 2004.

_____
DAVID TANKERSLEY

_____
TONYA TANKERSLEY

**STATE OF ALABAMA**    *
                        *
**COUNTY OF LEE**       *

BEFORE ME, a Notary Public in and for said State and County, came DAVID TANKERSLEY, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this _15th_ day of _March_, 2004.

_____
Notary Public

(SEAL)

MY COMMISSION EXPIRES DEC. 18, 2007

My Commission Expires:_____

2418

**STATE OF ALABAMA**          *

                             *

**COUNTY OF LEE**             *

BEFORE ME, a Notary Public in and for said State and County, came TONYA TANKERSLEY, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 15th day of March , 2004.

_____
Notary Public

(SEAL)          MY COMMISSION EXPIRES DEC. 18, 2007

My Commission Expires:_____

Page 6 of 7

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 23-5
Opelika, AL 36803-2345

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4225 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

Philip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

3/5/__

James B. Sprayberry

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NUMBER: CV-02-85 |
| | * | |
| HANSON AGGREGATES SOUTHEAST, | * | |
| INC., et al. | * | |
| Defendants. | * | |

## ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY ANTHONY AND CAROL CLARK

1.  At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

    Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.  (a)  Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise

DEFENDANT'S EXHIBIT

E

from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

Noise, dust and blasting generally the same or worse with some blasts being really bad. Even our kids have called several times when they were home to tell us that the blast shook our home. They start operating at 5:30 A.M. and/or 6:00 A.M. every morning and you can not sleep past that time. You can hear the gravel or rock hitting the machinery. The cracks in our foundation are worse now than they were last year. And our home and property are substantially devalued. We do not believe we could sell our home now. Our home is our biggest investment and we worry about the damage and the devaluation.

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud

and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

As noted, the dust is a lot worse than it was, and our house is filling with dust, and the mountain of dirt is worse. Moreover, the noise pollution from the quarry is worse than ever, and we hear the noise inside our home even louder than ever. The blasting is worse, and the blasts are shaking our home more than before. A very large area has been clear cut with more heavy equipment operating from very early in the morning until late in the evening.

(b)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference. Additionally, the clear cut area is much larger than before, more equipment is now operating, the noise is the same or worse under Oldcastle, and the dust is the same or worse under Oldcastle. The trees have been cleared within a few feet of the property lines on the east side and on part of the South side of the property. There is now only a small buffer strip, if any, of trees around part of the Young property. We and many of the Plaintiffs can sit or stand in our own backyards and watch the equipment operate, whereas before it was much less visible. During the month of October, on many mornings, the equipment was cranking up at 5:00 - 5:30 a.m and ran well past dark. For example, on October 20, 2003, Oldcastle's equipment ran until approximately 9:00 p.m.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to when Hanson began blasting, our home had no damage. Since Hanson began blasting on such a regular basis, we have had cracks, cracked foundations and other problems caused by the repetitive blasts. As long as the blasting continues, we cannot have our home repaired as, more likely than not, the damage would return in just a short while. Since Oldcastle is blasting just as much as before, and will continue to blast, anyone with a little bit of common sense can tell that Oldcastle's operation is going to continue causing damage to us.

(b)    Please see our answers above, which are incorporated here by reference.

6.  (a)  We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

    (b)  We are bothered by the continued, and worse, dust in the air, by dust deposited onto our property and into our homes, [by aggravation of our existing medical problems such as asthma,] by repetitive shaking and rocking of our house from the blasting, by continuous daily noise from the equipment, and by continuous heavy truck traffic in the area. Most of this is daily, but the blasting is generally once a week or once every two (2) weeks. Some of the damage is not permanent such as noise and dust and will stop when the quarry is put out of business. Some of these problems, like the blasting damage, is not repairable at this time, if the blasting continues. If the blasting stops, then we can repair our house and we believe the continuing damage will stop. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

    Also, our breathing problems are just as bad as ever, and we understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

    (c)  Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.  (a)  Yes.

    (b)  Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

2422

Also, our health problems continue because of Oldcastle's continued operation of the quarry. These health problems are irreparable, as it is impossible to compensate us for our bad health and inability to breath in our own home.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.   (a)   Yes

(b)   (1)   Since July 13, 2003, the dust has been the same or worse than when Hanson ran the quarry. This is partly due to the fact that Oldcastle has cleared a very large area and has it exposed with no vegetation and in part because Oldcastle has raised the spoil pile by 25-50 feet or more–none of which is vegetated.

(2)   The increased dust since Oldcastle took over has made mine and my kids asthma worse and is causing more problems at night. We feel even worse than when Hanson was operating the quarry – not surprisingly since the dust is much, much worse. We cannot give you specific dates, as the problems are almost daily–worse on some days than others, but almost always there are some medical problems aggravated by the dust. Moreover, when the wind is blowing in our direction, we cannot even go outside. Finally, you can see the dust clouds coming from the Quarry and you can feel and breath the grit in the air.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.   (a)   Yes.

(b)   Please see our answers above, which apply here too. The dust and noise is almost daily. Except on Saturday and Sunday, the noise and dust are almost a daily nuisance beginning early in the morning and continuing until late at night. Even then, the dust stays on and lingers until Oldcastle starts operating again the next day. Sometimes on Sunday the dust is not so bad, unless the wind is blowing our way. The blasting is not as often but it rattles our home, and has caused cracks and our foundation problems get worse. If this isn't a nuisance–"anything that works hurt, inconvenience or damage to another" (to quote the law)–then nothing is.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.   (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

2423

11.    (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)     Yes.

       (b)     It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.

       (c)     Please see our answers to all of the above interrogatories, which are incorporated here by reference.

     I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 19th day of _____March_____, 2004.

ANTHONY CLARK

CAROL CLARK

2424

STATE OF ALABAMA     *
                             *

COUNTY OF LEE         *

BEFORE ME, a Notary Public in and for said State and County, came ANTHONY CLARK, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 19th day of March , 2004.

_____
Notary Public

(SEAL)

My Commission Expires:_____
                        MY COMMISSION EXPIRES DEC. 18, 2007

STATE OF ALABAMA     *
                             *

COUNTY OF LEE         *

BEFORE ME, a Notary Public in and for said State and County, came CAROL CLARK, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 19th day of March , 2004.

_____
Notary Public

(SEAL)

My Commission Expires:_____
                        MY COMMISSION EXPIRES DEC. 18, 2007

2425

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

3/19/2004

James B. Sprayberry

155-00\Clark, Anthony et ux.wpd

2426

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,       *

            *

     Plaintiff,      *

            *

v.             *    CASE NUMBER: CV-02-85

            *

HANSON AGGREGATES SOUTHEAST,  *

INC., et al.         *

     Defendants.    *

### ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY HAWARD AND NORA JACKSON

1. At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2. (a) Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise

DEFENDANT'S EXHIBIT

F

from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial.  In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference.  As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available.  By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area.  Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

As noted, the dust is a lot worse than it was, and our house is filling with dust, and the mountain of dirt is worse. Moreover, the noise pollution from the quarry is worse than ever, and we hear the noise inside our home even louder than ever.  The blasting is worse, and the blasts are shaking our home more than before.   A very large area has been clear cut with more heavy equipment operating from very early in the morning until late in the evening.

(b)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference. Additionally, the clear cut area is much larger than before, more equipment is now operating, the noise is the same or worse under Oldcastle, and the dust is the same

or worse under Oldcastle. The trees have been cleared within a few feet of the property lines on the east side and on part of the South side of the property. There is now only a small buffer strip, if any, of trees around part of the Young property. We and many of the Plaintiffs can sit or stand in our own backyards and watch the equipment operate, whereas before it was much less visible. During the month of October, on many mornings, the equipment was cranking up at 5:00 - 5:30 a.m and ran well past dark.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)    We are bothered by the continued, and worse, dust in the air, by dust deposited onto our property and into our homes, by aggravation of our existing medical problems such chronic respiratory issues, by continuous daily noise from the equipment, and by continuous heavy truck traffic in the area. Most of this is daily. Some of the damage is not permanent such as noise and dust and will stop when the quarry is put out of business. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, and water run off have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Also, Nora Jackson's respiratory problems are just as bad as ever, and we understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)    Yes.

(b)    Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, and water run off.

Also, our health problems continue because of Oldcastle's continued operation of the quarry. These health problems are irreparable, as it is impossible to compensate us for our bad health and inability to breath in our own home.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)    Yes

(b)    (1)    Since July 13, 2003, the dust has been the same or worse than when Hanson ran the quarry. This is partly due to the fact that Oldcastle has cleared a very large area and has it exposed with no vegetation and in part because Oldcastle has raised the spoil pile by 25-50 feet or more--none of which is vegetated.

(2)    The increased dust since Oldcastle took over has made Nora's respiratory problems are worse. Nora feels much worse now than when Hanson was operating the quarry – not surprisingly since the dust is much, much worse.

(3)    We cannot give you specific dates, as the problems are almost daily--worse on some days than others, but almost always there are some medical problems aggravated by the dust.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.    (a)    Yes.

(b)    Please see our answers above, which apply here too. Except on Saturday and Sunday, the noise and dust are almost a daily nuisance beginning early in the morning and continuing until late at night. Even then, the dust stays on and lingers until Oldcastle starts operating again the next day. Sometimes on Sunday the dust is not so bad, unless the wind is blowing our way. If this isn't a nuisance–"anything

that works hurt, inconvenience or damage to another" (to quote the law)–then nothing is.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)    Yes, to the best of our knowledge Oldcastle's operation of the quarry since July 13, 2003, has diverted several streams and tributaries, from their natural channels.

(b)    It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over.  Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground.  I do not know the exact dates these things happened.  I understand that other plaintiffs have videotape and photographs of these new problems.

(c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 12th day of ___April___, 2003.


_Haward Jackson_
HAWARD JACKSON


_Nora F. Jackson_
NORA JACKSON

Page 5 of 7

STATE OF ALABAMA          *
                          *
COUNTY OF LEE             *

BEFORE ME, a Notary Public in and for said State and County, came HAWARD JACKSON, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this __13th__ day of __April__, 2004.

_____
Notary Public

(SEAL)

My Commission Expires:__MY COMMISSION EXPIRES DEC. 18, 2007__

STATE OF ALABAMA          *
                          *
COUNTY OF LEE             *

BEFORE ME, a Notary Public in and for said State and County, came NORA JACKSON, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this __13th__ day of __April__, 2004.

_____
Notary Public

(SEAL)

My Commission Expires:__MY COMMISSION EXPIRES DEC. 18, 2007__

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served on the __12__ day of ___April___, 2004, upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

James B. Sprayberry

2488

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | * |
| | * |
|       Plaintiff, | * |
| | * |
| v. | *    CASE NUMBER: CV-02-85 |
| | * |
| HANSON AGGREGATES SOUTHEAST, | * |
| INC., et al. | * |
|       Defendants. | * |

## ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY MICHELE WILKES

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.    (a)    Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than

DEFENDANT'S EXHIBIT
G
Blumberg No. 5114

Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution.

The dust is worse under Oldcastle. The dust seeps into my home constantly. The noise, however, is twice as loud under Oldcastle as compared to Hanson. They start before daylight and work past dark. It often sounds as if they are working in my front yard. The blasting continues to shake my home. After blasts my pictures are crooked, soot has been shaken loose from the chimney and collects on the hearth, and items are knocked over on their shelves.

(b)  See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.  (a)  Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. .

As noted, the dust is a lot worse than it was, and our house is filling with dust, and the mountain of dirt is worse. Moreover, the noise pollution from the quarry is worse than ever, and we hear the noise inside our home even louder than ever. The blasting is worse, and the blasts are shaking our home more than before. A very large area has been clear cut with more heavy equipment operating from very early in the morning until late in the evening.

(b)  Please see our answers above, which are incorporated here by reference.

4.  (a)  Please see our answers above, which are incorporated here by reference. Additionally, the clear cut area is much larger than before, more equipment is now operating, the noise is the same or worse under Oldcastle, and the dust is the same or worse under Oldcastle. The trees have been cleared within a few feet of the property lines on the east side and on part of the South side of the property. There is now only a small buffer strip, if any, of trees around part of the Young property. We and many of the Plaintiffs can sit or stand in our own backyards and watch the equipment operate, whereas before it was much less visible. During the month of October, on many mornings, the equipment was cranking up at 5:00 - 5:30 a.m and ran well past dark. For example, on October 20, 2003, Oldcastle's equipment ran until approximately 9:00 p.m.

(b)  Please see our answers above, which are incorporated here by reference.

5.  (a)  All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)    We are bothered by the continued, and worse, dust in the air, by dust deposited onto our property and into our homes, by repetitive shaking and rocking of our house from the blasting, by continuous daily noise from the equipment, and by continuous heavy truck traffic in the area. Most of this is daily, but the blasting is generally once a week or once every two (2) weeks. Some of the damage is not permanent such as noise and dust and will stop when the quarry is put out of business. Some of these problems, like the blasting damage, is not repairable at this time, if the blasting continues. If the blasting stops, then we can repair our house and we believe the continuing damage will stop. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)    Yes.

(b)    Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, and blasting damage.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)    Yes

(b)    (1)    Since July 13, 2003, the dust has been the same or worse than when Hanson ran the quarry. This is partly due to the fact that Oldcastle has cleared a very large area and has it exposed with no vegetation and in part because

Oldcastle has raised the spoil pile by 25-50 feet or more–none of which is vegetated.

(2)   Please see our answer to 6(a)

(3)   Please refer to our answers above, which apply here too.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.   (a)   Yes.

(b)   Please see our answers above, which apply here too. The dust and noise is almost daily. Except on Saturday and Sunday, the noise and dust are almost a daily nuisance beginning early in the morning and continuing until late at night. Even then, the dust stays on and lingers until Oldcastle starts operating again the next day. Sometimes on Sunday the dust is not so bad, unless the wind is blowing our way. The blasting rattles our home, and may have caused cracks and may be causing foundation problems. If this isn't a nuisance–"anything that works hurt, inconvenience or damage to another" (to quote the law)–then nothing is.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.   (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.   (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.   (a)   Yes.

(b)   It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.

(c)   Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this *14* day of *April*, 2004.

_____
MICHELE WILKES

**STATE OF ALABAMA**  *

*

**COUNTY OF LEE**  *

BEFORE ME, a Notary Public in and for said State and County, came MICHELE WILKES, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this *14th* day of *April*, 2004.

_____
Notary Public

(SEAL)

MY COMMISSION EXPIRES DEC. 18, 2007

My Commission Expires:_____

2466

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing incumbent has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

E. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
475 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

Philip E. Adams Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

this the _____ day of _____, 2004.

_____
James B. Sprayberry

2439

### ADAMS, UMBACH, DAVIDSON & WHITE, LLP
*Law Offices and Mediation Center*
205 South 9ᵗʰ Street
Opelika, Alabama 36801

Phillip E. Adams, Jr.
Arnold W. Umbach, Jr.
Patrick C. Davidson
Matthew W. White
——————
Jacob A. Walker, Jr., Ret.

Email: padams@audwlaw.com
Direct Fax: (334) 749-3238

March 16, 2004

Mailing Address:
P. O. Box 2069
Opelika, AL 36803-2069

Tel. (334) 745-6466
Fax (334) 749-3238

VIA FACSIMILE ONLY

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry St.
Montgomery, AL 36104-5049

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

  RE:  ***Davis, et al. vs. Hanson Aggregates, et al.***

Dear Chip and Jimmy:

According to our records, the only plaintiffs who have responded to Oldcastle's Interrogatories and Request for Production have been the City of Opelika, Randall and Wanda Parker, Donnie Smith and Ronnie and Dorothy Griggs.  Please provide the remaining responses within the next 48 hours due to the fact that the depositions of these parties will be taken beginning Monday, March 22, 2004.

I realize that some of the documents that we have requested may have been previously produced, but we are entitled to each of these for each of the Plaintiffs so that we can determine what, if any, damages the Plaintiffs are claiming from our clients.  In that same light, the fact that you characterized Oldcastle's prior Interrogatories and Request for Production Responses as not being meaningful, is a matter you need to take up with the Court.  We are entitled to specific responses regarding experts and expert opinions and we will expect to receive those prior to your clients' depositions.

It is our position that we have and will continue to maintain a spirit of goodwill in working with the Plaintiffs and Plaintiffs' counsel regarding discovery in this case.  At every request during the recent depositions, we have made documents available

**DEFENDANT'S EXHIBIT**

*H*

Page Two
March 16, 2004

and/or have supplemented the discovery depositions with discovery responses and documents that were asked for during the depositions. This has been done in a meaningful and timely manner, and much of the work is still underway.

We look forward to receiving the requested information in order to properly prepare for the depositions.

Yours very truly,

*Phil*

PHILLIP E. ADAMS, JR.

rr

185

1  is your opinion based on?
2  A.  What someone -- if I was interested in selling
3      it and somebody was looking to buy, what the
4      minuses that now have occurred, the sinkholes,
5      and how they would affect how much interest
6      there was and how much they would be willing to
7      pay for it.  It decreases the -- it eliminates
8      the possibility of having livestock or horses
9      out there, unless they want to risk the
10     animals, you know, sticking them on the
11     pasture.  So that takes away that option, I
12     think.
13 Q.  Okay.  So, I mean, is that just -- I guess what
14     you're saying is that's your own personal --
15     going through your own personal thought process
16     of how this property would be devalued, that's
17     what you're basing your opinion on?
18 A.  If it was for sale, that's how I think it would
19     be.
20 Q.  Has anybody ever told you, have you received
21     any kind of -- other than through your lawyer,
22     has anybody ever communicated with you that
23     your property is now devalued 25 to 50 percent?

186

1      Is that some outside source that's told you
2      that?
3  A.  No.
4  Q.  Okay.  That's strictly your own thought
5      process?
6  A.  Correct.
7  Q.  Okay.  In your previous deposition you talked
8      about some near misses where you and your wife
9      had been on a bush-hog and you thought -- I
10     think you were driving once when your wheel
11     fell in a sinkhole and you described an
12     incident where your wife almost -- a near miss
13     incident with your wife?
14 A.  That's correct.
15 Q.  I'm not going to go back into those two, but
16     since that time, since your deposition, have
17     you had any other occurrences like that where
18     -- a near miss situation or somebody falling
19     into a sinkhole or getting hurt or anything of
20     that nature?
21 A.  No, nobody has fallen into a sinkhole yet.
22 Q.  When you talk about this mental anguish that
23     you're suffering from, the fear and what not,

187

1      have you had -- you haven't had to seek any
2      kind of professional help for that, have you?
3  A.  No, I haven't.
4  Q.  Okay.  Have you talked to your pastor about it?
5  A.  No, I haven't.
6  Q.  Do you feel like you lose sleep over it?
7  A.  Probably.
8  Q.  You think so?  When did you first begin
9      experiencing this fear that you describe?  When
10     did that first come on, so to speak?
11 A.  The main part of it would be since the last
12     large sinkholes appeared suddenly.
13 Q.  Okay.
14 A.  I mean, that's -- that's when it --
15 Q.  Okay.  You were -- in your deposition
16     previously in September you talked about having
17     fear and anxiety related to the sinkholes; is
18     that correct?
19 A.  Correct.
20 Q.  When did you first -- I'm not asking you when
21     it got worse, I'm just talking about when you
22     first started experiencing those symptoms, when
23     do you think that was?

188

1  A.  Probably after -- not knowing where the
2      sinkholes was coming from to start with, I
3      think possibly when my wife had the close call
4      on the large sinkhole.
5  Q.  Okay.  And when would that have been?
6  A.  It would have been in the spring of '03.
7  Q.  Spring of '03.  I'm going to ask you -- I'm
8      going to refer to your interrogatory responses
9      some more.  In your response, if you will look
10     on page one there on, your answer to 2(a), in
11     2(a) we asked, "Set forth every fact,
12     transaction, occurrence, communication, or
13     event upon which plaintiffs base the contention
14     in paragraph 111 of the complaint that
15     Oldcastle is intending to and will continue the
16     operations of the quarry under the same or
17     similiar conditions as Hanson operated the
18     quarry."  And in your response under paragraph
19     2(a), about halfway down that paragraph there,
20     it says, "In this regard, plaintiffs have
21     observed that Oldcastle continues to pump
22     discharge water in large quantities believed to
23     equal or exceed the amount pumped by Hanson."

24 (Pages 185 to 188)

Ricky L. Tyler                                    Montgomery Repo...
(334) 262-3331                                              (87
                                                    05f4f60...

DEFENDANT'S
EXHIBIT

I

189

1    Now, you don't have any knowledge of how much
2    water Oldcastle is pumping from their quarry,
3    do you?
4    A.    Just what I've heard from my lawyer.
5    Q.    Okay. Do you have any reason to believe, other
6    than what your lawyer has told you, that that's
7    a true statement?
8    A.    Other than the fact that I believe what he
9    says, no.
10   Q.    Okay. You don't have any personal knowledge,
11   so to speak?
12   A.    No, I do not.
13   Q.    "Oldcastle continues to generate large amounts
14   of dust on the cleared areas and by the
15   operation of their mobile equipment and their
16   stationary equipment." Again, you don't have
17   any personal knowledge of how much dust is
18   being generated out there, do you?
19   A.    No, I do not.
20   Q.    Okay. And that's not part of your complaints
21   in this lawsuit, is it?
22   A.    That's correct, it is not.
23   Q.    It goes on to say, "Oldcastle continues to

190

1    create loud and irritating noise from early in
2    the morning, earlier, in fact, than Hanson, and
3    throughout the day and into the night, often
4    later than Hanson." Again, you don't have any
5    personal knowledge as to how much noise is
6    created out there, do you?
7    A.    General noise or blasting noise?
8    Q.    Well, general noise, I believe, is what this is
9    referring to.
10   A.    No, I do not.
11   Q.    And you don't have any specific knowledge as to
12   whether that noise was created earlier than
13   Hanson or later than Hanson, do you?
14   A.    I do not.
15   Q.    Okay. It goes on to say, "Oldcastle appears to
16   be crushing as much or more rock, and has
17   caused as much or more noise and dust
18   pollution." Again, do you have any personal
19   knowledge as to how much rock Oldcastle is
20   crushing out there?
21   A.    I do not.
22   Q.    And then it goes on to say, the last sentence
23   there says, "And continues to endanger the

191

1    motoring public by virtue of the collapses in,
2    on, or under roadways in the area." Again, I
3    believe I asked you earlier, you don't know of
4    any sinkholes opening up in roadways, do you?
5    A.    Actually making a hole in the roadway, is that
6    the question?
7    Q.    Actually making a hole?
8    A.    No, I do not.
9    Q.    Okay. Is there any reason that you included
10   this information in your interrogatory
11   responses if you didn't -- if you didn't have
12   any knowledge of it?
13   A.    I have knowledge from what my lawyer has said.
14   Q.    Well, the responses here, I assume you didn't
15   write this information, did you?
16   A.    No, I didn't.
17   Q.    Okay.
18   A.    But I did read it.
19   Q.    You read it and agreed to it because your
20   lawyers told you that's what was going on and
21   you believe them?
22   A.    Well, like "observed no significant changes," I
23   haven't, you know.

192

1    Q.    Let me go down to paragraph 3(a). It says,
2    "Oldcastle had actual knowledge that litigation
3    was pending and that sinkholes had been caused
4    by the pumping even before Oldcastle purchased
5    the quarry." Again, you don't have any
6    personal knowledge of that, do you?
7    A.    No, I do not, not firsthand knowledge.
8    Q.    Okay. And it goes on about Oldcastle meeting
9    with the City of Opelika and with Hanson and
10   Krebs Engineering; again, all of this stuff,
11   you don't have personal knowledge of this
12   information, do you, in paragraph 3(a)?
13   A.    That is correct. I do not have firsthand
14   knowledge of that that you mentioned.
15   Q.    And you, if you flip on over to page three,
16   towards the bottom of that paragraph, if you go
17   up a little ways, it says, "As the noise is
18   worse, the dust is worse, the problems
19   associated with land collapse are worse, and
20   the spoil pile has been greatly increased in
21   size." Obviously you've testified about land
22   collapse being worse, but as to noise and dust
23   and spoil pile, again, you don't have any

25 (Pages 189 to 192)

193

1    personal knowledge of that information, do you?
2  A.  If the spoil pile is what you can see from Lime
3    Kiln Road, I know that's -- I have seen that.
4  Q.  You have seen that?
5  A.  I have seen that.
6  Q.  And you think that's enlarged or gotten bigger?
7  A.  From what I remember.
8  Q.  Okay. Is that a problem to you? Do you think
9    -- what's your opinion about the spoil pile
10    being greater?
11  A.  It's not a physical problem to me.
12  Q.  Okay. Do you understand the purpose of that
13    pile or what the plans are with that pile?
14  A.  No, I do not.
15  Q.  Okay. And, again, it goes on to talk about,
16    "Moreover, on October 5th or 6th, 2003, there
17    was a heavy mud and/or sediment discharge in
18    violation of ADEM regulations that resulted in
19    massive amounts of sediment being pumped out of
20    the holding ponds and into the drainage and
21    onto the Bobby Parker property, causing his
22    irrigation system to pump red mud all over his
23    property, until the mud clogged his system and

194

1    shut it down." Again, I don't want to be
2    repetitive, but you have don't have any
3    personal knowledge of that occurrence, do you?
4  A.  Correct, no firsthand information about that.
5  Q.  And throughout your interrogatory responses
6    there's information that is not based upon your
7    personal knowledge, but based upon things
8    coming from other sources, including your
9    lawyers?
10  A.  That's correct. I'm not sure all of it applies
11    -- that applies to all of it, because I haven't
12    looked at each individual one while we're
13    speaking.
14  Q.  Okay. And I'm about to wrap up here; I'm sorry
15    to keep you so long. Tell me how it was that
16    you first got involved in the lawsuit. I know
17    in your first deposition they asked you about
18    this and you said that you had called around;
19    do you remember who you called and spoke to?
20  A.  Actually after thinking about it, I talked to
21    Donnie Smith who was one -- one person that
22    sent me in the right direction.
23  Q.  Okay. You called and spoke with Donnie Smith?

195

1  A.  I called around, but I also spoke with him
2    personally.
3  Q.  Okay.
4  A.  It's a combination.
5  Q.  Do you remember anybody else you spoke with?
6  A.  No, I sure don't.
7  Q.  I mean, is it something -- when you called
8    around, did you know that you wanted to be a
9    plaintiff in the lawsuit, or were you just
10    trying to get information, or tell me about
11    that?
12  A.  I was trying to get information to see if I
13    wanted to be a plaintiff in the lawsuit.
14  Q.  Okay. Did you talk with anybody other than
15    Donnie?
16  A.  I'm sure I did, but I don't think I got any
17    useful information other than talking to
18    Donnie.
19  Q.  Okay. Do you remember any of the other people
20    you may have spoken to?
21  A.  I sure don't.
22  Q.  Do you remember when it might have been when
23    you first approached Donnie Smith about it?

196

1  A.  It wouldn't have been long before I got into
2    this lawsuit.
3  Q.  Which was when? Just to the best of your
4    recollection.
5  A.  I don't even recall. I don't want to hazard a
6    guess, because I don't remember when it was.
7  Q.  Okay. Whenever the lawyers filed an amended
8    complaint adding your name, it would have been
9    shortly before that is when you had contacted
10    him?
11  A.  I'm sure it would have been sometime before
12    that, right.
13  Q.  Okay. And is Donnie the one that put you in
14    touch with Mr. Sprayberry or was there somebody
15    in between that you talked to?
16  A.  I think he's the one that actually gave me some
17    useful information of who to contact to ask
18    about it.
19  Q.  Okay. Well, who else, other than
20    Mr. Sprayberry or Mr. Vercelli, who else would
21    you have contacted?
22  A.  Well, I didn't know who was handling something
23    like this, so I don't know. I mean, I didn't

26 (Pages 193 to 196)

2445

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

MIKE DAVIS, et al.,       )

          Plaintiffs,     )

      )

v.       )

      )

HANSON AGGREGATES SOUTHEAST,    )

INC., et al.,       )

      )

          Defendants.    )

      )

APR 1 9 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

CIVIL ACTION NO. CV-02-85

## HANSON'S OBJECTION TO PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION OF TOM ALEY

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") shows the Court as follows:

1.     Plaintiffs have filed a motion to compel ("Motion") the deposition of their own expert witness, Tom Aley ("Aley"), for the perpetuation of his trial testimony. Plaintiffs' counsel proposes the following schedule:

| | |
|---|---|
| Monday (5/17/04) | quarry tour and examination of all known sinkholes. |
| Tuesday (5/18/04) | Defendants depose Tom Aley. |
| Wednesday (5/19/04) | Plaintiffs depose Mr. Aley by videotape for use at trial or elsewhere. Defendants may cross-examine. |
| Wednesday (5/19/04) | Plaintiffs depose Dr. Ewers |

2.     Plaintiffs' Motion incorrectly asserts that Aley "has been previously deposed by Hanson." While Hanson properly noticed Aley's discovery deposition, and began taking his discovery deposition on April 29, 2003, Aley's deposition was never completed. (*See* Deposition of Tom Aley, excerpts attached as Exhibit "A," at p. 225-26.) Rather, it was suspended to accommodate Aley' travel schedule.

143873.1

2446

3.    Since the suspension of his deposition, Aley has issued four supplemental reports regarding the opinions he proposes to assert at trial on June 24, 2003, July 9, 2003, and April 13, 2004, and will undoubtedly have other opinions based on the proposed quarry tour and inspection to be held on May 17, 2004. Aley has not been deposed concerning any of those opinions.

4.    Plaintiffs' Motion also incorrectly asserts that "Defendants have refused" to allow Plaintiffs to take Aley's deposition. (*See* Motion at ¶ 3.) Hanson has never refused to allow Plaintiffs' to depose Aley "for use at trial, mediation, or otherwise." (*See* id.) Rather, Hanson has insisted that it be afforded the opportunity to complete Aley's discovery deposition before Plaintiffs attempt to take his deposition for trial purposes. (*See* March 30, 2004 letter from Jim Byram to Chip Vercelli, attached as Exhibit "B.") Hanson has also asked to be afforded a sufficient amount of time between the conclusion of Aley's discovery deposition and Aley's trial deposition to prepare a proper a cross-examination. (*Id.*) Further, Hanson has discussed its concerns directly with Plaintiffs' counsel. (*See* March 30, 2004 letter from Jim Byram to Plaintiffs' counsel of record, attached as Exhibit "C," at p. 2.) This is no more than Hanson would be entitled to if Plaintiffs intended to call Aley as a witness at trial.

5.    Plaintiffs' Motion incorrectly states that Defendants' have refused to schedule Aley's trial deposition on May 18-19, "even though Defendants' expert, Dr Ewers, is available on those days." Dr. Ewers, one of Hanson's expert witnesses, is in fact not available on May 18-19 because he is committed to testify as an expert witness in a trial in Canada on May 17-19. (See April 6, 2004 letter from Jim Byram to Chip Vercelli, attached as Exhibit "D.") Further, Plaintiffs were informed of Dr. Ewers' conflict with Plaintiffs' proposed schedule prior to the filing of this Motion.

143873.1

2

2448

6.    Hanson needs the assistance of its hydrogeology experts to prepare the cross-examination of Aley.

7.    Plaintiffs' motion is premature.  Aley's study is on-going.  Hanson's dye test expert, Dr. Ewers, has not completed his dye-test study, nor has he issued his report.  Oldcastle plans further hydrogeology studies, which have not been completed, and Oldcastle's experts have not issued reports.  Surely, Aley will offer opinions in rebuttal of the opinions of these other experts, which will require yet another deposition.

WHEREFORE, premises considered, Hanson respectfully requests the Court to deny Plaintiffs' Motion to compel the taking of Tom Aley's trial deposition until his discovery deposition is completed and the Defendants have had a reasonable opportunity thereafter to prepare to cross examine Aley during his trial deposition.

Respectfully submitted this the 19th day of April 2004.



One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.


**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115


143873.1

2447

H. Wayne Phears, Esq.
Phears & Moldovan
4725 Peachtree Corner Circle
Suite 375
Norcross, Georgia 30092

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by

United States Mail, properly addressed and postage prepaid, on this the 19th day of April 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

Of Counsel

143873.1

4

1

1              IN THE CIRCUIT COURT FOR

2                 LEE COUNTY, ALABAMA

3

4

5    MIKE DAVIS, et al.,

6              Plaintiffs,

7    Vs.                           CIVIL ACTION NO.

8                                  CV-2002-85

9    HANSON AGGREGATES SOUTHEAST,

10   INC., et al.,

11             Defendants.

12

13

14

15             DEPOSITION OF THOMAS ALEY, taken pursuant

16   to notice and stipulation on behalf of the

17   Defendants, in the conference room of the Law Office

18   of James B. Sprayberry, 225 North Gay Street, Auburn,

19   Alabama, before Ricky L. Tyler, Certified Shorthand

20   Reporter and Notary Public in and for the State of

21   Alabama at Large, on Tuesday, April 29th, 2003,

22   commencing at 9:12 A.M.

23

222

1    this, please?
2    A.   Okay.  From Spring Villa spring I looked at
3         where points were at an elevation of 500 feet,
4         saying that that was the current pumping level,
5         water level in the quarry.
6    Q.   All right.
7    A.   At the quarry the straight line distance to
8         that was 7,800 feet.
9    Q.   From the quarry to the spring?
10   A.   From Spring Villa to the quarry was 7,800 feet.
11        It was -- the other shortest distance was --
12        one was greater than 2,600, probably a lot
13        greater, but I ran off the topographic maps I
14        had.  Really the closest point -- next closest
15        point was toward the southeast on Little Uchee
16        Creek, which would be 21,800 feet.  What this
17        shows is the gradient is far steeper from
18        Spring Villa spring to the quarry than to any
19        other point.  And that's basically all it
20        shows.
21   Q.   Let me state it, and you just tell me if I'm
22        understanding what you're saying.  You're
23        making an assumption that the quarry sump is at

223

1    500 feet?
2    A.   That's right.
3    Q.   And what you're doing here is comparing the
4         distance from the spring to the quarry and
5         other places, which according to the topo map,
6         have an elevation of 500 feet?
7    A.   Correct.
8    Q.   Okay.  All right.  And then yesterday you bored
9         some trees, and what you were doing there was
10        looking at the diameter of the rings to see if
11        they were -- I guess in a year of low rainfall
12        the rings are closer together than a year of a
13        lot of rainfall?
14   A.   The thickness of the rings, that's correct.
15   Q.   All right.
16   A.   And I used three species.  White Oak and Red
17        Oak are both deep-rooted species.  From the
18        present back for 30 years and 39 years in the
19        two oaks, the rings were all of relatively
20        similar widths.  In a Loblolly Pine in a dryer
21        site most likely to encounter drought
22        conditions, for the period 1990 to 2002, the
23        growth -- we measured the growth.  The period

224

1    '81 to '89 was 0.46 inches in eight years.  So
2    taking the average during the period 1990 to
3    2002, the diameter growth of the tree was one
4    and a half times greater than the rate during
5    the period 19 -- during the period 1981 to
6    1989.
7        The opinion derived from that is no recent
8    drought.  The 1980s were worse than the present
9    conditions and the spring didn't go dry.  This
10   is -- in my view this is just confirming
11   evidence of the water budget and the other
12   observations.
13   Q.   Okay.  And then the next page?
14   A.   These are the flow measurements segregated by
15        the '80s and the '90s.
16   Q.   This is now measurements in the spring based
17        on --
18   A.   That's correct.  And the mean flow during the
19        '80s was 2.24 CFS, the median 1.83.  And for
20        the 1990 values, the mean was 5.03 and the
21        median was 3.43.  What this shows is spring
22        flow measurements, while limited, were greater
23        in 1990 to 1998 than they were '81 to '89, and

225

1    that is consistent with what we saw in the tree
2    ring growth.  Trees do most of their growing
3    early in the spring; that's when they're
4    putting on the new growth; that's when you get
5    the -- that's when you get the most growth from
6    the trees, and that is dependent upon soil
7    moisture being saturated.  If soil moisture is
8    saturated, then you've been having recharge to
9    the groundwater system.
10   Q.   Just to make sure I'm correct on this; on
11        Exhibit 263, the source of this data is from
12        the Geological Survey information?
13   A.   That's correct.
14        MR. BYRAM:  Okay.  Let me just say on
15        the record, apparently we're going
16        to agree to disagree, but we will
17        want to resume this deposition to
18        finish our questions.
19        MR. VERCELLI:  And we will just have to
20        discuss that.  I mean, an awful
21        lot of today was, frankly, not
22        pertinent to his opinions.
23        MR. BYRAM:  Well, I disagree with that.

57 (Pages 222 to 225)

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

36d8fffd-1f5a-4357-b365-82b2450e6561

**226**

1      A lot of today was pertinent to a
2   bunch of stuff that was given to
3   us today as opposed to when it
4   should have been given to us.
5   MR. VERCELLI: Maybe we can – if we do
6   resume it, it might be by phone;
7   that might be the easiest and
8   cheapest way to do it.
9   THE WITNESS: The telephone would be
10  fine with me.
11  (Deposition recessed at 4:45 P.M.)
12
13
14  WITNESS:
15
16  Subscribed and sworn to before me this
17  day of            , 2003.
18
19
20          NOTARY PUBLIC
21
22  My Commission expires:
23          * * * *

**228**

1   in any manner interested in the results thereof.
2   This 12th day of May, 2003.
3
4
5
            Ricky L. Tyler
6           Certified Shorthand Reporter
            and Notary Public
7           State of Alabama at Large
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**227**

1       REPORTER'S CERTIFICATE
2
3   STATE OF ALABAMA
4   COUNTY OF MONTGOMERY
5       I, Ricky L. Tyler, Certified Shorthand
6   Reporter and Notary Public in and for the State of
7   Alabama at Large, do hereby certify that on Tuesday,
8   April 29th, 2003, pursuant to notice and stipulation
9   on behalf of the Defendants, I reported the
10  deposition of THOMAS ALEY, who was first duly sworn
11  by me to speak the truth, the whole truth, and
12  nothing but the truth, in the matter of MIKE DAVIS,
13  et al., Plaintiff, vs. HANSON AGGREGATES SOUTHEAST,
14  INC., et al., Defendants, Civil Action Number
15  CV-2002-85, now pending in the Circuit Court for Lee
16  County, Alabama, that the foregoing 226
17  computer-printed pages contain a true and accurate
18  transcription of the examination of said witness by
19  counsel for the parties set out herein; that the
20  reading and signing of said deposition was not waived
21  by witness and counsel for the parties.
22      I further certify that I am neither of
23  kin nor of counsel to the parties to said cause, nor

58 (Pages 226 to 228)

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

36d8fffd-1f5a-4357-b365-82b2450

B

**BSB**

**BALCH & BINGHAM LLP**

Alabama • Mississippi • Washington, DC

Attorneys and Counselors
The Winter Building
2 Dexter Avenue
P.O. Box 78 (36101-0078)
Montgomery, Alabama 36104-3515
(334) 834-6500
(334) 269-3115 Fax
www.balch.com

March 30, 2004

*Via Facsimile*

Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, Alabama 36104-5049

James B. Sprayberry, Jr., Esq.
P. O. Drawer 2429
Auburn, Alabama 36831-2429

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

Re:    **Mike Davis, et al. v. Hanson Aggregates Southeast, Inc., et al.**
       **Lee County Circuit Court, Civil Action No. CV-02-85**

Gentlemen:

This letter is in response to Chip's letter of March 19, responding to my fax of March 17, and Jim Sprayberry's memo of March 15, all regarding scheduling for the City depositions. We would like to take all the City depositions at one time over a two-day period, if necessary, including Hanson, Patton, Hilyer, Brown, Harrelson, Teel, and the new Beauregard Water Authority witness. I would suggest April 27-28 or May 11-12, which are dates previously set aside by the parties for depositions in this case. It is my understanding that Phil Adams is available on those dates. Oldcastle may want to depose other City or Beauregard Water Authority representatives. Please let us know.

Also, after Paul Clark returned from the hearing on Monday, he gave me a copy of your opposition to Oldcastle's motion for drilling monitoring wells. Concerning the City deposition, that motion recites in paragraph 4 that Hanson "unilaterally cancelled the depositions." This is not accurate. Wayne Phears desired to attend those depositions on April 1-2 and was not available, and I was not available on April 2. There are more than enough days set aside for depositions in this case without having to take the City depositions piecemeal or without trial counsel being present. The dates we suggested, April 14-16, 19-22, were "unilaterally cancelled" -- using your terminology -- by Vercelli because of his schedule.

BALCH & BINGHAM LLP

Charles E. Vercelli, Jr., Esq.
James B. Sprayberry, Jr., Esq.
Guy F. Gunter, III, Esq.
March 30, 2004
Page 2

Further, the same pleading says in paragraph 3 that Oldcastle unilaterally cancelled the deposition of Tom Aley and that "they have waived the chanse [sic] to depose Mr. Aley." I am not sure who the "they" is you are referring to, but I am sure that Hanson has not waived the chance to depose Mr. Aley. Since his first deposition, which was not completed, he has issued two supplemental reports dated June 24, 2003 and July 9, 2003. The only way Mr. Aley's deposition was "set" was by Chip's memorandum of March 8, which was a "discovery deposition to be followed by the videotaped deposition for use at trial or elsewhere." As we discussed subsequently at Phil Adams' office, this procedure is not acceptable to us. We cannot prepare a cross-examination for trial without the benefit of deposition discovery and the advice of our experts, and I am confident that the Judge would not require us to do so. We will expect a full discovery deposition of Mr. Aley with ample time to complete the examination by Hanson's attorneys, as well as Oldcastle's attorneys. If you want to take the deposition of Mr. Aley for use at trial, that will need to be done at another time with ample notice to the parties.

Very truly yours,

James A. Byram, Jr.

JAB:cc

cc:     John V. Denson, Esq.
        H. Wayne Phears, Esq.
        Phillip E. Adams, Jr., Esq.

143234.1

C

# B&B

## BALCH & BINGHAM LLP

Alabama • Mississippi • Washington, DC

**James A. Byram, Jr.**
(334) 269-3159

Attorneys and Counselors
The Winter Building
2 Dexter Avenue
P.O. Box 78 (36101-0078)
Montgomery, Alabama 36104-3515
(334) 834-6500
(334) 269-3115 Fax
www.balch.com

(866) 736-3863 (direct fax)
jbyram@balch.com

March 30, 2004

*Via Facsimile*

Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, Alabama  36104-5049

> Re:   **Mike Davis, et al. v. Hanson Aggregates Southeast, Inc.**
> **Civil Action No. CV-02-85**
> **Lee County Circuit Court**

Dear Chip:

This will respond to your memorandum dated March 29 concerning your proposals for Mr. Aley's deposition. First, let me correct the misstatement in your memorandum. Hanson did not agree to depose Mr. Aley on April 7-8. Nevertheless, I have checked my calendar, and I have checked with Wayne Phears, Bob Wood and Ralph Ewers. All are available during the May 17-19 time period. The earlier dates, May 4-6, are not acceptable. As discussed in my earlier letter of today's date, Hanson does not agree to a discovery deposition followed by a trial deposition. Mr. Aley's original deposition was not finished, so he would not miss a plane flight he had scheduled. In addition, since his deposition, he has issued two supplemental reports and, I am sure he will have further opinions at his deposition. It is not reasonable to require the defendants to cross-examine Aley for trial without the opportunity to have his deposition completed and reviewed and additional research done if necessary. Also, I do not think it is practical to believe that you can complete a direct and cross-examination of Aley and depose Dr. Ewers in one day, as suggested by your proposed schedule.

Very truly yours,

James A. Byram, Jr.

JAB:cc
cc:   James B. Sprayberry, Esq.
John V. Denson, Esq.
Guy F. Gunter, III, Esq.
H. Wayne Phears, Esq.
Phil Adams, Esq.

143270 1

D

**B&B**

**▲LCH & BINGHAM** LLP

Alabama • Mississippi • Washington, DC

**James A. Byram, Jr.**
(334) 269-3159

Attorneys and Counselors
The Winter Building
2 Dexter Avenue
P.O. Box 78 (36101-0078)
Montgomery, Alabama 36104-3515
(334) 834-6500
(334) 269-3115 Fax
www.balch.com
(866) 736-3863 (direct fax)
jbyram@balch.com

April 6, 2004

*Via Facsimile*

Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, Alabama 36104-5049

> Re: **Mike Davis, et al. v. Hanson Aggregates Southeast, Inc.**
> **Civil Action No. CV-02-85**
> **Lee County Circuit Court**

Dear Chip:

Please refer to my letter of March 30 concerning Dr. Ewers' deposition. He is an expert witness in a trial in Canada, and has been asked to hold May 17-19 for his testimony in that case. The earliest dates he is available to come here for depositions are May 11-14. There is a chance that his Canadian testimony will be pushed back again, in which event he could come here during the May 17-19 time period. Let me know how you want to handle this as soon as possible. He will require advance payment from you for his deposition time.

Very truly yours,

James A. Byram, Jr.

JAB:cc

cc:    James B. Sprayberry, Esq.
John V. Denson, Esq.
Guy F. Gunter, III, Esq.
H. Wayne Phears, Esq.
Phil Adams, Esq.

143497.1

2455

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

APR 19 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al.,                          )
                                             )
                Plaintiffs,                  )
                                             )
v.                                           )
                                             )    CIVIL ACTION NO. CV-02-85
HANSON AGGREGATES SOUTHEAST,                 )
INC., et al.,                                )
                                             )
                Defendants.                  )
                                             )

## MOTION FOR COURT TO ORDER PARTIES TO ATTEND MEDIATION

Defendant Hanson Aggregates Southeast, Inc. hereby joins in the motion filed by
defendant Oldcastle on April 15, 2004, for the parties to attend mediation, and respectfully
requests the Court to grant the relief requested by said motion.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

H. Wayne Phears, Esq.
Phears & Moldovan
4725 Peachtree Corner Circle
Suite 375
Norcross, Georgia 30092

143894.1

1

2486

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by United States Mail, properly addressed and postage prepaid, on this the 19th day of April 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

Charles E. Vercelli, Jr., Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

Of Counsel

143894.1

2

F I L E D

APR 1 9 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK
CV-02-85

MIKE DAVIS, et al.,

_____,

Plaintiff

VS.

HANSON AGGREGATES, SOUTHEAST, INC. et al.,

_____,

Defendant

Case No.,

CIRCUIT COURT FOR LEE COUNTY

(Court or Administrative Agency)

## VERIFIED APPLICATION FOR ADMISSION
## TO PRACTICE UNDER RULE VII OF THE
## RULES GOVERNING ADMISSION TO THE ALABAMA STATE BAR

Comes now   Charles H. Haake _____, applicant

herein, and respectfully represents the following:

   1. Applicant resides at   20711 Corkwood Drive _____,

                                          Street Address

Potomac Falls _____, _____, Virginia _____

        City                        County                        State

20165 _____, (703) 948-6567 _____, 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 _____

   Zip Code                    Telephone                Social Security Number

   2. Applicant is an attorney and a member of the law firm of (or practices law

under the name of)  Gibson, Dunn & Crutcher, LLP _____, with

offices at 1050 Connecticut Ave. N.W. _____, Washington _____,

            Street Address                              City

_____, DC _____, 20036 ___, (202) 887-3581 _____,

   County              State          Zip Code          Telephone

3. Applicant has been retained personally or as a member of the above named law firm by Defendant, Oldcastle Material Southeast, Inc. _____ to provide legal representation in connection with the above-styled matter now pending before the above-named court or administrative agency of the State of Alabama.

4. Since November 26 _____ of 19 97 ____, applicant has been, and presently is, a member in good standing of the Bar of the highest court of the State of California _____, where applicant regularly practices law ATTACH A CERTIFICATE OF GOOD STANDING.

5. Applicant has been admitted to practice before the following courts: (List all of the following courts applicant has been admitted to practice before: United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and courts of other states.)

| Court: | Date Admitted: |
| --- | --- |
| Central District of California | November 1997 |
| California Supreme Court | November 1997 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

2

Applicant is presently a member in good standing of the Bars of those courts listed above, except as may be listed below: (Here list any court named in the preceding paragraph that applicant is no longer admitted to practice before.)

N/A

6.  Applicant presently is not subject to any disbarment proceedings, except as provided below (give particulars, e.g., jurisdiction, court, date):

N/A

7.  Applicant presently is not subject to any suspension proceedings, except as provided below (give particulars, e.g., jurisdiction, court, date):

N/A

8.  Applicant never has been subject to any disbarment proceedings, except as provided below (give particulars, e.g., jurisdiction, date of proceedings, court, date of reinstatement):

N/A

2460

9. Applicant never has been subject to any suspension proceedings, except as provided below (give particulars, e.g., jurisdiction, date of proceedings, court, date of reinstatement):

N/A

10. Applicant never has had any certificate or privilege to appear and practice before any administrative body suspended or revoked, except as provided below (give particulars, e.g., date, administrative body, date of suspension and reinstatement):

N/A

11. Applicant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate applicant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

12. Applicant or a member of applicant's firm has filed applications(s) to appear as counsel under Rule VII during the past three (3) years in the following matters:

| Date of Application | Name of Applicant | Case No. and Style of Case | Court or Admin. Body | Application Granted/Denied |
|---|---|---|---|---|
| 11/21/03 | Jack Weiss | LU-02-85 | Circuit Ct for Lee Co | Granted |
| | | | | |
| | | | | |
| | | | | |

(If necessary, please attach statement of additional applications.)

2466

13. Local counsel of record associated with applicant in this matter is

**Phil Adams of Adams, Umbach, Davidson & White, LLP** ,

who has offices at 205 South 9th Street ,

Opelika ,_____,Alabama,

City                                    County

36801_____,(334) 745-6466 ,

Zip Code                    Telephone

14. The following lists accurately state the name and address of each party in this matter, WHETHER OR NOT REPRESENTED BY COUNSEL, and the name and address of each counsel of record who has appeared for each party:

Name of Party                              Mailing Address

**See attached** _____    _____

_____    _____

_____    _____

_____    _____

Name of Counsel        Party Represented        Mailing Address

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

15.  Applicant agrees to comply with the provisions of the Alabama Rules of Professional Conduct, and applicant consents to the jurisdiction of the courts and the disciplinary boards of the State of Alabama.

16.  Applicant respectfully requests to be admitted to practice in the above named court or administrative agency for this cause only.

DATED this __13th__ of __April__ , 20 __04__ .

_____
APPLICANT

STATE OF __Washington__ )
COUNTY OF __District of Columbia__ )

I, __Charles H. Haake__ ,do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof, and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.

_____
APPLICANT/AFFIANT

Subscribed and Sworn to before me this
__13th__ day of __April__ , 20 __04__ .

_____
NOTARY PUBLIC

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rule VII of the Rules Governing Admission to the Alabama State Bar.

DATED this __16th__ day of __April__ ,20 __04__ .

_____
LOCAL COUNSEL OF RECORD

2468

| Name of Party | Mailing Address |
|---|---|
| 1. Mike & Donna Davis | 149 Lee Road 707 Opelika, AL 36804 |
| 2. Mike & Ann Broadwater | 610 Lee Road 166 Opelika, AL 36804 |
| 3. Mittie Broadwater | 574 Lee Road 166 Opelika, AL 36804 |
| 4. City of Opelika | 204 S. 7th St. Opelika, AL 36801 |
| 5. The Utilities Board of the City of Opelika | 502 Geneva St. Opelika, AL 36801 |
| 6. The Beauregard Water Authority | 7430 AL HWY 51 Opelika, AL 36804 |
| 7. Anthony & Carol Clark | 1740 Lee Road 147 Opelika, AL 36804 |
| 8. Courtney Clark | 1740 Lee Road 147 Opelika, AL 36804 |
| 9. Elaine Edwards | 3274 AL HWY 169 Opelika, AL 36804 |
| 10. Mary Sue Eiland | 2853 AL HWY 169 Opelika, AL 36804 |
| 11. Medena Frizzel | 3173 AL HWY 169 Opelika, AL 36804 |
| 12. Karla Frizzel | 3173 AL HWY 169 Opelika, AL 36804 |
| 13. Brianna Yougren | 3173 AL HWY 169 Opelika, AL 36804 |
| 14. Ronnie & Dorothy Griggs | 3256 AL HWY 169 Opelika, AL 36804 |
| 15. Mike & Stacy Hagans | 1668 Lee Road 147 Opelika, AL 36804 |
| 16. Howard & Lisa Harmon | 145 Lee Road 707 Opelika, AL 36804 |
| 17. Judson Harmon | 145 Lee Road 707 Opelika, AL 36804 |
| 18. Bria Harmon | 145 Lee Road 707 Opelika, AL 36804 |
| 19. Hayward & Nora Jackson | 1141 Lee Road Opelika, AL 36804 |
| 20. Mike & Sheila LaMacchia | 1355 Lee Road 147 Opelika, AL 36804 |
| 21. Russell LaMacchia | 1355 Lee Road 147 Opelika, AL 36804 |
| 22. Stanley & Jackie Ledbetter | 1330 Lee Road 166 Opelika, AL 36804 |
| 23. Terry & Carol Long | 3379 AL HWY 169 Opelika, AL 36804 |
| 24. Tim & Ada Manning | 3226 AL HWY 169 Opelika, AL 36804 |
| 25. David & Janette Baggett | 1198 Lee Road 147 Opelika, AL 36804 |
| 26. James & Shirley Parker | 3039 AL HWY 169 Opelika, AL 36804 |
| 27. Randall & Wanda Parker | 1229 Lee Road 166 Opelika, AL 36804 |
| 28. Ambur Parker | 1229 Lee Road 166 Opelika, AL 36804 |
| 29. Brandon Parker | 1229 Lee Road 166 Opelika, AL 36804 |
| 30. Maria & Jeff Richardson | 265 Lee Road 705 Opelika, AL 36804 |
| 31. Natasha Richardson | 265 Lee Road 705 Opelika, AL 36804 |
| 32. David & Amanda Sumner | 164 Lee Road 148 Opelika, AL 36804 |
| 33. Todd Sumner | 164 Lee Road 148 Opelika, AL 36804 |
| 34. Larry & Rita Sumner | 1100 Lee Road 147 Opelika, AL 36804 |
| 35. Martha Treadway | 3177 AL HWY 169 Opelika, AL 36804 |
| 36. Jasmine King | 3177 AL HWY 169 Opelika, AL 36804 |
| 37. Michael King | 3177 AL HWY 169 Opelika, AL 36804 |
| 38. Hazel King | 3177 AL HWY 169 Opelika, AL 36804 |
| 39. Joseph King | 3177 AL HWY 169 Opelika, AL 36804 |
| 40. Billy & Sherry Wallace | 1692 Lee Road 147 Opelika, AL 36804 |
| 41. Aaron Wallace | 1692 Lee Road 147 Opelika, AL 36804 |
| 42. Michele Wilkes | 1692 Lee Wilkes Opelika, AL 36804 |

2494

| | |
|---|---|
| 43. Shirley Wilson | 64 Lee Road 707 Opelika, AL 36804 |
| 44. Betty J. Pfingston | Hwy 166 Opelika, AL 36804 |
| 45. Jessica Pfingston | Hwy 166 Opelika, AL 36804 |
| 46. Wonda Bright | 245 Lee Road 166 Opelika, AL 36804 |
| 47. Hanson Aggregates Southeast, Inc. | 3085 HWY 169 Opelika, AL 36804 |
| 48. Louise Young O'Brien, Virginia Young Priest, Virginia Hart Young, & Claude John Young | 3085 HWY 169 Opelika, AL 36804 |
| 49. Charles W. Gilmer, Sr., Alice C. Gilmer, Charles W. Gilmer, Jr., Kammy Gilmer, Barbara Gilmer Smith, Gary Smith, Matthew Ruttledge Gilmer, Leila Wilder Gilmer, & Gilmer Properties, Ltd. | 3085 HWY 169 Opelika, AL 36804 |

| Name of Counsel | Party Represented | Mailing Address |
|---|---|---|
| James B. Sprayberry, Esq. | Co-Counsel for Property Owners | Post Office Drawer 2429 Auburn, AL 36831-2429 |
| Charles Vercelli, Jr., Esq. Vercelli & Associates, P.C. | Co-Counsel for Property Owners | 1019 S. Perry Street Montgomery, AL 36104-5049 |
| Guy F. Gunter, III, Esq. Melton, Gunter & Melton, LLP | City of Opelika, Opelika Utilities Board | P.O. Box 409 Opelika, AL 36803-0409 |
| John Denson, Esq. Samford, Denson, Horsley, Pettey, Bridges & Hughes | Defendants Gilmer and Young | P.O. Box 2345 Opelika, AL 36803-2345 |
| James A. Byram, Jr., Esq. Balch & Bingham, LLP | Hanson Aggregates Southeast, Inc. | Post Office Box 78 Montgomery, AL 36101 |
| Paul A. Clark, Esq. Balch & Bingham, LLP | Hanson Aggregates Southeast, Inc. | Post Office Box 78 Montgomery, AL 36101 |
| H. Wayne Phears, Esq. Phears & Moldovan | Hanson Aggregates Southeast, Inc. | Suite. 375 4725 Peachtree Corner Circle Norcross, GA 30092 |
| Phillip E. Adams, Jr., Esq. Adams, Umbach, Davidson &White, LLP | Oldcastle, Inc. | P.O. Box 2069 Opelika, AL 36803-2069 |
| Jack M. Weiss, Esq. Gibson, Dunn & Crutcher, LLP | Oldcastle, Inc. | 200 Park Ave., 48th Floor New York, NY 10016-0193 |
| Charles M. Haake, Esq. Gibson, Dunn & Crutcher, LLP | Oldcastle, Inc. | 1050 Connecticut Ave. NW Washington, D.C. 20036 |

Addresses for Davis v. Hanson.doc

2465

# THE
# STATE BAR
# OF CALIFORNIA

180 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105-1639
TELEPHONE (415) 538-2000

March 1, 2004

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, CHARLES HARRY
HAAKE was admitted to the practice of law in this state by the Supreme Court of
California on November 26, 1997; and has been since that date, and is at date hereof, an
ACTIVE member of the State Bar of California; and that no recommendation for discipline
for professional or other misconduct has ever been made by the Board of Governors or
a Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA

Waffa N. Salfiti
Senior Administrative Supervisor
Office of Certification

2466

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                      §
          Plaintiff,                  §
                              §
v.                                       §     **CASE NUMBER: CV-02-85**
                              §
HANSON AGGREGATES SOUTHEAST,             §
INC., et al.                             §
          Defendants.                §

### NOTICE OF SERVICE DISCOVERY DOCUMENTS



FILED

APR 22 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

    Please take notice that the following documents were served on April 22, 2004 to all attorneys of record in the above styled and numbered cause;

        1.      Answers to Oldcastles' First Set of Interrogatories by Mitte Broadwater

                      James B. Sprayberry (SPR008)
                     *One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry                      Charles E. Vercelli, Jr.
ATTORNEY AT LAW                          VERCELLI & ASSOCIATES, P.C.
P.O. Drawer 2429                         1019 S. Perry Street
Auburn, Alabama 36831-2429               Montgomery, Alabama 36104-5049
(334) 821-7100                           (334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

2457

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 22nd day of April, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY&
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801



James B. Sprayberry

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

ROBERT SMITH, BELINDA SMITH,          )
INDIVIDUALLY and as Next Friend for    )
Their Minor Child, JOSHUA SMITH, et al )
                                       )
    Plaintiffs,              )
                                       )   Civil Action No. CV-2002-85
vs.                                    )
                                       )
HANSON AGGREGATES SOUTHEAST, INC.; )
and OLDCASTLE MATERIALS SOUTHEAST, )
INC., et al                            )
                                       )
    Defendants.              )

**FILED**

APR 23 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## SIXTH AMENDED AND RESTATED COMPLAINT

129.    The Plaintiffs, Robert and Belinda Smith, re-allege Paragraphs 1 thru 128 in the previously filed complaints.

130.    These Plaintiffs own three (3) acres, more or less, at 3645 Alabama Highway 169; Opelika, Alabama. Their property is adjacent to and east of the quarry (Young) property.

131.    The noise, dust and blasting by Hanson and Oldcastle have damaged their home and have caused a nuisance, making them unable to enjoy their home and property.

132.    Mr. Smith has developed nose bleeds and Mrs. Smith and their child, Joshua Smith, have developed asthma, which is greatly aggravated by the dust.

133.    The blasting has damaged their home and cracked or shifted their concrete piers under their home.

The blasting, along with noise, makes it difficult or impossible for Mr. Smith to sleep. He works a rotating shift at Uniroyal and has to sleep many days.

Oldcastle purchased and operated the quarry knowing that it was a nuisance and that it was causing and will continue to cause damage. The actions have been and are negligent, willful and intentional. Despite numerous complaints, Oldcastle has continued to cause these damages.

**Wherefore** Plaintiffs demand judgement against Defendants Hanson and Oldcastle:(1) enjoining all of the Defendants, including Defendant Oldcastle, from operating this or any quarry on the Youngs' and Gilmer's lands, and for such other legal or equitable relief to which they are entitled; (2) for all compensatory damages to which they are entitled based upon Defendant Oldcastle's continuation of the nuisance and continued negligent and wanton operation of the quarry; (3) for such punitive damages as the jury deems appropriate to punish and deter Defendants Hanson and Oldcastle and others similarly situated; and (4) for costs of this action, attorneys' fees, interest and such other further relief as the jury finds reasonable.

**JAMES B. SPRAYBERRY  (SPR008)**

OF COUNSEL:
**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

**For Plaintiffs City of Opelika and Water Works Board of the City of Opelika Only:**
Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

2479

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 23rd day of April, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

# ALL PLAINTIFFS DEMAND TRIAL BY JURY IN
# LEE COUNTY, ALABAMA

155-00\6th-Amend-Complaint1.wpd

FILED

APR 2 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

MIKE DAVIS, *et al.*,                  §
                                       §
         Plaintiffs,                   §
                                       §
vs.                                    §        Civil Action No.:  CV-2002-85
                                       §
HANSON AGGREGATES                      §
SOUTHEAST, INC., *et al.*,             §
                                       §
         Defendants.                   §

## NOTICE OF SERVICE OF DISCOVERY DOCUMENT

To:    Clerk
       Lee County Circuit Court
       Justice Center, Room 104
       2311 Gateway Drive
       Opelika, AL

Please take notice that the following discovery document has been served on behalf of

defendant Hanson Aggregates Southeast, Inc.:

( X )    Notice to Take Deposition (Tom Aley)

Respectfully submitted this 27th day of April, 2004.

_____
One of the attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500

144236.1

2473

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

### CERTIFICATE OF SERVICE

This is to certify that on the 27th day of April, 2004, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

_____
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
                                       *
              Plaintiff,               *
                                       *
vs.                                    *        CIVIL ACTION NO. CV 02-085
                                       *
HANSON AGGREGATES                      *
SOUTHEAST, INC., et al,                *
                                       *
              Defendants.              *

## ORDER

A hearing was held on a variety of Motions in the above-styled case on April 21, 2004.
At the conclusion of the arguments of the parties, the Court enters the following Orders:

1.    The Defendant, Old Castle, will be allowed to drill up to six (6) wells. It is the
      understanding of the Court that the wells will be on the property belonging to the
      City of Opelika or the City of Opelika Recreation Board. The wells are to drilled
      within the next 14 to 21 days. The Plaintiffs are to provided notice of the dates
      and time of the drilling at least 72 hours in advance. Three representatives of the
      Plaintiffs may observe the drilling of the wells.

2.    Regarding the Plaintiffs' Motion to Compel, a variety of information is to be
      provided to the Court for an in camera inspection. In particular the items that are
      to be produced to the Court are those that are contained on Exhibit "C" of the
      Plaintiffs' Motion to Compel.

3.    After a recess that parties entered into a proposed Scheduling Order. A copy of
      this proposed Scheduling Order is attached and marked as Exhibit "A". The
      Court hereby adopts the schedule as provided by the Attorneys.

4.    The Court took under advisement as to whether or not the Defendants should be
      responsible for paying all the costs of mediation.

5.    The parties are ordered to attend the mediation, if Judge Gordon (the Mediator)
      believes they are necessary. Judge Gordon may order the parties to attend at his
      discretion.

6.    The next Status Conference is set in this case at the same time as the Pre-Trial

2474

Conference which is set for **JUNE 28, 2004, at 9:00 A.M.** in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.

7.     This case is set for trial on **AUGUST 16, 2004, at 8:30 A.M.** in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Jimmy Sprayberry
Post Office Box 2429
Auburn, AL 36831-2429

Hon. James Byram, Jr.
Hon. Dorman Walker
Hon. Matt Parnell
Post Office Box 78
Montgomery, AL 36101

Hon. Guy Gunter
Post Office Box 409
Opelika, AL 36803-0409

Hon. Charles Vercelli, Jr.
1019 S. Perry Street
Montgomery, AL 36104

Hon. John V. Denson
Post Office Box 2345
Opelika, AL 36803-2345

Hon. Phillip E. Adams, Jr.
Post Office Box 2069
Opelika, AL 36803-2069

DONE this the 28th day of April, 2004.

JACOB A. WALKER, III
Circuit Judge

**FILED**

APR 2 9 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

FILED

MAY 0 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF
## LEE COUNTY, ALABAMA

MIKE DAVIS, *et al.*,          §
                              §
      Plaintiffs,         §
                              §
vs.                           §          Civil Action No.: CV-2002-85
                              §
HANSON AGGREGATES             §
SOUTHEAST, INC., *et al.*,    §
                              §
      Defendants.        §

### NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

To:    Clerk
       Lee County Circuit Court
       Justice Center, Room 104
       2311 Gateway Drive
       Opelika, AL

      Please take notice that the following discovery documents have been served on one of the

attorneys for plaintiffs, Charles E. Vercelli, Jr., on behalf of defendant Hanson Aggregates

Southeast, Inc.:

      Documents Bates Stamped 5407-5424   (Dye recovery tables from Dr. Ewers)

      Documents Bates Stamped 5425-5954   (Dr. Ewers water samples from 9/1/03
                                  through 4/14/04)

      Documents Bates Stamped 5955-6647   (Dr. Ewers charcoal samples from 7/23/03
                                  through 4/14/04)

      Copies of these documents are available for inspection and copying at the offices of

Balch & Bingham LLP, 2 Dexter Avenue, Montgomery, Alabama 36104.

      Dated this __4__ day of May, 2004.

                           _____
                           One of the attorneys for Defendant
                           Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
**BALCH & BINGHAM LLP**
P. O. Box 78
Montgomery, AL 36101-0078
(334) 834-6500

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on the _4_ day of May, 2004, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL 36803-2345

Of Counsel

144434.1                                    2

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
VS.                                    )        CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        Defendants.                    )

**FILED**

MAY 0 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF HEARING

The Application of Charles H. Haake for admission to practice pro hac vice filed in the above-referenced matter are hereby set for hearing on the _9th_ day of _June_, 2004.

DONE this the _5th_ day of _May_, 2004.

_____
CIRCUIT JUDGE

### CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of _____, 2004, I have served a copy of the above and foregoing Verified Application for Admission to Practice Under Rule VII of the Rules Governing Admission to the Alabama State Bar via United States mail, postage prepaid, addressed as follows:

        Alabama State Bar
        Attention: PHV Admissions
        P. O. Box 671
        Montgomery, AL 36101

accompanied by payment of the $100.00 filing fee to the Alabama Sate Bar on this the _____ day of _____, 2004.

_____
PHILLIP E. ADAMS, JR.
Local Counsel of Record

2476

# IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
        Plaintiffs,                )
                                   )
VS.                                )        CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                  )
SOUTHEAST, INC., et al.,           )
                                   )
        Defendants.                )

FILED
MAY 0 5 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## ORDER GRANTING APPLICATION FOR ADMISSION TO PRACTICE UNDER RULE VII OF THE RULES GOVERNING ADMISSION TO THE ALABAMA STATE BAR

Upon consideration of the Verified Application for Admission to Practice filed herein by Charles H. Haake, the Court is of the opinion and ascertains and finds that said Motion is due to be granted. It is, therefore,

ORDERED, ADJUDGED AND DECREED by the Court as follows:

1. That the Application of Charles H. Haake for admission to practice under Rule VII in the above-styled case be and the same is hereby granted.

2. Charles H. Haake shall comply with the provisions of The Alabama Rules of Professional Conduct and all other requirements as set forth in Rule VII of the Rules Governing Admission to the Alabama State Bar in the above-styled case.

DONE this the ___ day of ___ May ___, 2004.

_____
CIRCUIT JUDGE

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

MAY 0 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS; DONNA DAVIS; , et al | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: CV-02-085 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC.; VIRGINIA | ) | |
| YOUNG PRIEST, GILMER | ) | |
| PROPERTIES, LTD. AND | ) | |
| OLDCASTLE MATERIALS | ) | |
| SOUTHEAST, INC., etc. | ) | |
| | ) | |
| Defendants. | ) | |

**PRELIMINARY
WITNESS AND EXHIBIT LISTS FILED ON BEHALF
YOUNG AND GILMER DEFENDANTS**

COME NOW the Defendants, Virginia Young Priest; John Claude Young, c/o Virginia

Young Priest; Virginia Hart Young; Louise Young O'Brien  (hereinafter **"Young Defendants"**)

and Gilmer Properties, Ltd. (hereinafter **"Gilmer Defendants"**) and list their witnesses and

exhibits as follows:

**WITNESS LIST:**

1.      All witnesses listed by Hanson Aggregates Southeast, Inc. (hereafter "Hanson

Defendant") and Oldcastle Materials Southeast, Inc. (hereafter "Oldcastle Defendant"), including

all expert witnesses listed by Hanson and Oldcastle

1

1.  Virginia Young Priest
    416 Charing Loop
    Auburn, Alabama 36830

2.  Louise Young O'Brien
    1416 Charing Loop
    Auburn, Alabama 36830

3.  Virginia Hart Young
    HC3 Box 40-C
    Port St. Joe, Florida  32456

4.  Charles W. Gilmer, Sr.
    575 Lee Road 166
    Opelika, Alabama 36801

5.  Alice C. Gilmer
    575 Lee Road 166
    Opelika, Alabama 36801

6.  Charles W. Gilmer, Jr.
    7800 Lee Road 175
    Salem, Alabama 36874

7.  Kammy Gilmer
    7800 Lee Road 175
    Salem, Alabama 36874

8.  Barbara  Gilmer Smith
    1401 Lee Road 47
    Opelika, Alabama 36804

9.  Gary Smith
    1401 Lee Road 47
    Opelika, Alabama 36804

10. Matthew Ruttledge Gilmer
    Lee Road 166
    Opelika, Alabama 36804

11  Lelia Wilder Gilmer
    Lee Road 166
    Opelika, Alabama 36804

12.   Any Plaintiff and any representative of any entity Plaintiff.

13.   Any witness identified by any other party to this action.

14.   Any witness whose identity is disclosed through further discovery.

15.   Any person deposed in this case.

16.   Rebuttal witnesses.

17.   This party reserves the right not to offer and/or to object to the testimony of any of these persons offered by any other party and to supplement and/or amend this witness list.


## EXHIBIT LIST:

1.   All exhibits listed by the Defendants Hanson and Oldcastle.

2.   The respective leases of the **Young and Gilmer Defendants** previously produced to the Plaintiffs' attorneys.

3.   All exhibits previously produced by the **Young and Gilmer Defendants** in response to Request for Production and including those exhibits produced at the deposition of Charles W. Gilmer, Sr.

4.   Any exhibit listed by any party to the case.

5.   This party reserves the right not to offer and/or to object to the exhibit offered by any other party and further reserves the right to supplement and/or amend this exhibit list subject to further discovery.

Respectfully submitted,

**OF COUNSEL FOR DEFENDANTS:**
**VIRGINIA YOUNG PRIEST, JOHN CLAUDE**
**YOUNG C/O VIRGINIA YOUNG PRIEST, LOUISE**
**YOUNG O'BRIEN, VIRGINIA HART**
**YOUNG  AND GILMER PROPERTIES, LTD.**
SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL  36803-2345
(334) 745-3504
FAX (334) 745-3506

JOHN V. DENSON
DEN007

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause, filed in open Court on this the 5th day of May , 2004, as follows:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Charles E. Vercelli, Jr.
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, Alabama 36104-5049

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Mr. Guy Gunter
Melton, Gunter & Melton
Post Office Box 409
Opelika, Alabama 36803-0409

Mr. Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

MAY 1 0 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' OBJECTION TO ALEY DEPOSITION NOTICE

Plaintiffs object to portions of the Aley Deposition Notice by Defendant Hanson, dated April 27, 2004, as follows:

1.    Tom Aley is Plaintiffs' hydrological expert.

2.    Defendant Hanson filed a Notice of Deposition that included an "Exhibit A" that listed 22 categories of documents and things for Mr. Aley to produce at his deposition. Plaintiffs object to the following numbered items upon the following grounds:

**Request #1:** "All time records, diaries, bills prepared or rendered in connection with the investigation and evaluation of the issues involved in the captioned suit."

**Objection:** Plaintiffs object to this request on the basis that it exceeds the scope of permissible discovery under Alabama Rule of Civil Procedure 26(b)(4). Plaintiffs are willing to waive this objection, however, if all Defendants stipulate that all of these same records for all expert witnesses will be produced by all parties at the depositions of said experts. Upon execution of such stipulation (a copy of which is being attached to this document for all attorneys to sign), Plaintiffs will waive this objection and ask Mr. Aley to produce such documents.

**Request #6:** "All publications authored by the witness within the preceding 10 years."

**Objection:** Plaintiffs object to this on the basis that the request exceeds the bounds of discovery under ARCP 26(b)(4). In addition, the request is burdensome and expensive for Mr. Aley to respond to. As before, Plaintiffs will waive this objection if all of the attorneys for all parties stipulate that the same documents will be produced with respect to every expert witness.

**Request #7:** "A listing of any other cases in which the witness has testified as an expert at trial or be deposition within the preceding 4 years."

**Objection:** Plaintiffs object to this on the basis that the request exceeds the bounds of discovery under ARCP 26(b)(4). In addition, the request is burdensome and expensive for Mr. Aley to respond to. As before, Plaintiffs will waive this objection if all of the attorneys for all parties stipulate that the same documents will be produced with respect to every expert witness.

**Request #13:** "All information about the Maryland case referred to at pages 50 to 51 of your deposition."

**Objection:** Plaintiffs object to this request on the grounds that it exceeds the scope of permissible discovery under ARCP 26(b)(4). Moreover, these documents are, in some respects, privileged and confidential as attorney-client and/or work product privileged documents between Mr. Aley and attorneys by whom he was employed. Additionally, to produce the documents is burdensome and oppressive, and the request seeks information that is not relevant to the facts, matters, or issues involved in this litigation.

**Request #14:** "All information about the Talladega case referred to at page 52 of your deposition."

2

2486

**Objection:** Plaintiffs object to this request on the grounds that it exceeds the scope of permissible discovery under ARCP 26(b)(4). Moreover, these documents are, in some respects, privileged and confidential as attorney-client and/or work product privileged documents between Mr. Aley and attorneys by whom he was employed. Additionally, to produce the documents is burdensome and oppressive, and the request seeks information that is not relevant to the facts, matters, or issues involved in this litigation.

**Request #15:** "All information about the Utah case referred to at pages 58-59 of your deposition."

**Objection:** Plaintiffs object to this request on the grounds that it exceeds the scope of permissible discovery under ARCP 26(b)(4). There is a confidentiality agreement with respect to these documents, the documents are more than 10 boxes, and Mr. Aley is not able to comply with this request as the attorneys with whom he consults object to producing that information (which is apparently in litigation). Moreover, these documents are, in some respects, privileged and confidential as attorney-client and/or work product privileged documents between Mr. Aley and attorneys by whom he was employed. Additionally, to produce the documents is burdensome and oppressive, and the request seeks information that is not relevant to the facts, matters, or issues involved in this litigation.

**Request #16:** "All information about the City of Florence/Key Cave case referred to at page 79 of your deposition."

**Objection:** Plaintiffs object to this request on the grounds that it exceeds the scope of permissible discovery under ARCP 26(b)(4). Moreover, these documents are, in

some respects, privileged and confidential as attorney-client and/or work product privileged documents between Mr. Aley and attorneys by whom he was employed. Additionally, to produce the documents is burdensome and oppressive, and the request seeks information that is not relevant to the facts, matters, or issues involved in this litigation.

**Request #19:** "Any hydro-geologic studies or reports by you involved in quarry dewatering."

**Objection:** Plaintiffs object to this on the basis that the request exceeds the bounds of discovery under ARCP 26(b)(4). In addition, the request is burdensome and expensive for Mr. Aley to respond to. As before, Plaintiffs will waive this objection if all of the attorneys for all parties stipulate that the same documents will be produced with respect to every expert witness.

**Request #20:** "Any expert witness testimony by you concerning quarry dewatering."

**Objection:** Plaintiffs object to this on the basis that the request exceeds the bounds of discovery under ARCP 26(b)(4). In addition, the request is burdensome and expensive for Mr. Aley to respond to. As before, Plaintiffs will waive this objection if all of the attorneys for all parties stipulate that the same documents will be produced with respect to every expert witness.

_____
**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

4

2486

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by faxing a copy of the same to each and by placing a copy of the same in the United States
mail, properly addressed and postage prepaid, this the _5th_ day of _May_, 2004.

_____
OF COUNSEL

155-00\Fs\ObjAleyDepoNotice.2.wpd

5

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

MAY 1 0 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

"Notice of Taking Deposition" of Ralph Ewers, dated May 5, 2004.

*C E Vercelli*

_____

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 6th day of _____May_____, 2004.

_____
OF COUNSEL

Not-Serv-Disc.2.wpd

2

2491

## IN THE CIRCUIT COURT OF
## LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, *et al.*, | § |
| | § |
| Plaintiffs, | § |
| vs. | §   Civil Action No.:  CV-2002-85 |
| | § |
| HANSON AGGREGATES | § |
| SOUTHEAST, INC., *et al.*, | § |
| | § |
| Defendants. | § |

### ORDER

This matter is before the court on the application of Brian E. Daughdrill for *pro hac vice* admission and the statement of the Alabama State Bar furnished in compliance with Rule VII of the Rule Governing Admission to the Alabama State Bar, which have been filed in this case. For good cause shown, it is ORDERED, ADJUDGED and DECREED that the application for *pro hac vice* admission is due to be and hereby is GRANTED.

DONE and ORDERED this ____ day of May, 2004.


_____
JACOB A. WALKER, IIII
Circuit Judge

cc:    James A. Byram, Jr.
       Paul A. Clark
       John V. Denson
       Phillip E. Adams, Jr.
       Charles E. Vercelli
       James B. Sprayberry
       Guy F. Gunter, III
       H. Wayne Phears
       Brian E. Daughdrill

**FILED**

MAY 1 0 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

144455.1





IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

FILED

MAY 1 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| vs. | § | Civil Action No.: CV-2002-85 |
| | § | |
| HANSON AGGREGATES | § | |
| SOUTHEAST, INC., *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

To:   Clerk
      Lee County Circuit Court
      Justice Center, Room 104
      2311 Gateway Drive
      Opelika, AL

Please take notice that the following discovery documents have been served on one of the attorneys for plaintiffs, Charles E. Vercelli, Jr., on behalf of defendant Hanson Aggregates Southeast, Inc.:

   (X)   Bob Wood's Subsidence Features Schedule (Document Bates Stamped 06670- 06673)

Copies of these documents are available for inspection and copying at the offices of Balch & Bingham LLP, 2 Dexter Avenue, Montgomery, Alabama 36104.

Dated this 10th day of May, 2004.

_____
One of the attorneys for Defendant
Hanson Aggregates Southeast, Inc.

144644.1

2498

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
**BALCH & BINGHAM LLP**
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on the 10th day of May, 2004, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

2494



IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

MAY 1 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, *et al.*,                     §
                                          §
                    Plaintiffs,           §
                                          §
vs.                                       §        Civil Action No.:  CV-2002-85
                                          §
HANSON AGGREGATES                         §
SOUTHEAST, INC., *et al.*,                §
                                          §
                    Defendants.           §

## NOTICE OF SERVICE OF DISCOVERY DOCUMENT

To:    Clerk
       Lee County Circuit Court
       Justice Center, Room 104
       2311 Gateway Drive
       Opelika, AL


Please take notice that the following discovery document has been served on behalf of

defendant Hanson Aggregates Southeast, Inc.:

    ( X )    Hanson's Supplemental Disclosure of Rebuttal Expert:  Dr. Ralph O.
             Ewers.

Respectfully submitted this 10th day of May, 2004.


                                          _____
                                          One of the attorneys for Defendant
                                          Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500


144236.1

2498

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on the 10th day of May, 2004, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
 & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
 & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

FILED

MAY 1 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| vs. | § | **Civil Action No.:  CV-2002-85** |
| | § | |
| HANSON AGGREGATES | § | |
| SOUTHEAST, INC., *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## OBJECTION TO NOTICE OF TAKING DEPOSITION

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") objects to the Plaintiffs' notice

to take the deposition of Ralph Ewers dated May 5, 2004, on the following grounds:

1.     Hanson objects to the notice and document production requests to the extent they

call for privileged information or documents protected by the attorney-client privilege and/or the

work-product doctrine.

2.     Hanson objects to the notice and document production requests to the extent they

seek to require deponent to comply with requests outside the scope of or contrary to the *Alabama

Rules of Civil Procedure*.

3.     Hanson objects to the notice and document production requests to the extent they

seek information or documents not relevant to the subject matter of this action or not reasonably

calculated to lead to the discovery of admissible evidence.

4.     Hanson objects the notice and document production requests to the extent the

document requests set forth therein are vague, overly broad, and/or unduly burdensome, or not

appropriately limited geographically, by subject matter, or by time, or to the extent they seek

information concerning trade secrets and/or private financial affairs.

144642.1

2497

Respectfully submitted this the 10th day of May, 2004.

_____
One of the attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL:**

James A. Byram, Jr. (BYR003)
PAUL A. CLARK (CLA076)
**BALCH & BINGHAM LLP**
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500

H. Wayne Phears, Esq.
**PHEARS & MOLDOVAN**
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

2496

## CERTIFICATE OF SERVICE

This is to certify that on the 10th day of May, 2004, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

2496

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | § |
|       Plaintiff, | § |
| | § |
| v. | §   CASE NUMBER: CV-02-85 |
| | § |
| HANSON AGGREGATES SOUTHEAST, | § |
| INC., et al. | § |
|       Defendants. | § |

FILED

MAY 14 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:    Clerk of the Lee County Circuit Court
        Lee County Justice Center
        2311 Gateway Drive, Room 104
        Opelika, Alabama 36801.

     Please take notice that the following documents were served on May 14, 2004 to all attorneys of record in the above styled and numbered cause;

        1.     Answers to Oldcastles' First Set of Interrogatories by James and Shirley Parker.

        2.     Answers to Oldcastles' First Set of Interrogatories by Mike and Donna Davis.

                                         James B. Sprayberry (SPR008)
                                    *One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

2509

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 13th day of May, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY&
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801


James B. Sprayberry

2503

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
      Plaintiffs,                   )
                                   )
vs.                                 )      CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                   )
SOUTHEAST, INC., et al.,            )
                                   )
      Defendants.                   )

### NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO:  Circuit Clerk of Lee County:

Please take notice that on the 18th day of May, 2004,

_____ 1.  A notice to take the deposition of:
_____ 2.  Interrogatories
_____ 3.  Request for Admissions
_____ 4.  Request for Production
_____ 5.  Answers to Second Interrogatories
_____ 6.  Response to Third Request for Admissions
_____ 7.  Response to Second Request for Production
_____ 8.  Notice of Intent to Serve a Subpoena on a Non-Party
         as follows:
__X__ 9.  Other: Documents listed in Oldcastle Privilege Log for in camera
         inspection by Judge Walker

was served on all parties to this cause by the Defendant Oldcastle Materials.

                    ADAMS, UMBACH, DAVIDSON & WHITE, LLP

                    BY: _Phillip E. Adams Jr._____
                    PHILLIP E. ADAMS, JR. (ADA025)
                    Attorney for Defendant
                    P. O. Box 2069
                    Opelika, AL 36803-2069



**FILED**
MAY 18 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 18th day of May, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_Phillip E. Adams Jr._
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

MAY 1 9 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-2002-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF INTENT TO SERVE SUBPOENA ON NON-PARTY

Take notice that upon the expiration of fifteen (15) days (or such other time as the

Court has allowed) from the date of service of this Notice, Respondent will apply to the

Clerk of this Court for issuance of the attached subpoenas directed to:

**Dixie Pipeline Company**
**1117 Perimeter Center West, Suite West 301**
**Atlanta, Georgia 30338**

to produce the documents or things at the time and place specified in the subpoenas.

_____
**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.                John V. Denson
Matt Parnell                      Samford, Denson, Horsley, Pettey
Balch & Bingham, LLP               & Bridges
P.O. Box 78                       P.O. Box 2345
Montgomery, AL 36101              Opelika, AL 36803-2345

H. Wayne Phears                   Phillip E. Adams, Jr.
Phears & Moldovan                 Adams, Umbach, Davidson & White, LLP
Suite 375                         P. O. Box 2069
4725 Peachtree Corner Circle      Opelika, AL 36803-2069
Norcross, GA 30092-3000

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _18th_ day of _MAY_, 2004.

_____
OF COUNSEL

155-00\Not-Intent-Dixie-Pipeline.1.wpd

2505

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                     )
                                        )
            Plaintiffs,                 )
                                        )
vs.                                     )     Civil Action No. CV-20 02-0085
                                        )
HANSON AGGREGATES SOUTHEAST,            )
INC., et al.,                           )
                                        )
            Defendants.                 )

### CIVIL SUBPOENA FOR PRODUCTION OF DOCUMENTS, ETC., UNDER RULE 34(b)(2)

TO:    Dixie Pipeline Company
       1117 Perimeter Center West, Suite West 301
       Atlanta, Georgia 30338

You are hereby commanded to do each of the following acts at the instance of the Plaintiffs within fifteen (15) days after service of this subpoena.

That you produce the following documents and permit the above-named Plaintiffs to inspect and copy each of the following documents (all with respect to the Lee County Quarry only):

1.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Oldcastle Materials Southeast, Inc. d/b/a SRM, from January 1, 2003, through the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

2.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Hanson Aggregates Southeast, Inc. between July 1, 2002, and the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

3.    Any documents (as defined on the attached sheet) regarding the affects on the Dixie Pipeline were a sinkhole to form under the Pipeline in Lee County, Alabama.

2506

4.     Any documents that evidence any problems with the pipeline in the stretch between the Lee County Terminal on Highway 51 and the Georgia State line.

5.     All construction drawings, specifications, and contract specifications (as well as, as-built specifications) relating to the construction of the pipeline in the section of Lee County, Alabama from the Highway 51 Terminal to the Georgia state line.

6.     Documents detailing the use of the gravel purchased from Hanson and/or Oldcastle (SRM) by Dixie Pipeline.

7.     Any records related in any way to the walk-through inspections and/or reports related thereto (as noted at page 9 in the deposition of Ricky Chafin taken on December 10, 2002).

Such production and inspection is to take place at the place where the documents or things are regularly kept or at some other reasonable place designated by you.

You are further advised that other parties to the action in which this subpoena has been issued have the right to be present at that time of such production or inspection. You have the option to deliver or mail legible copies of documents or things to the party causing the issuance of this subpoena but you may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies. The Plaintiffs agree to pay all reasonable expenses incurred by you at the aforementioned time and place.

You have the right to object at any time prior to the date set forth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating, with respect to any item or category to which objection is made, you reasons for such objection.

Dated this the _____ day of _____, 2004.


_____
**CHARLES E. VERCELLI, JR.**
One of the Attorneys for Plaintiffs
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

CLERK



By: _____
                 DEPUTY CLERK

Law Offices of James B. Sprayberry
P. O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P. O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

155-00\Subpoena-Dixie1.3.wpd

## DEFINITIONS

"Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

FILED

MAY 2 0 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )        Civil Action No. CV-02-0085
                                   )
HANSON AGGREGATES SOUTHEAST,       )
INC., et al.,                      )
                                   )
            Defendants.            )

## OBJECTION TO OLDCASTLES' SERVICE OF DISCOVERY DOCUMENTS

Plaintiffs would show this Court that:

1.      On May 18, 2004 Attorneys for the Plaintiffs received the "Notice of Service of Discovery Documents" from Oldcastle.

2.      Oldcastle is filing documents listed only in their Privilege Log for in camera inspection by Judge Walker.

3.      However, the Judge's last Order, based on the Plaintiff's Second Motion to Compel, ordered all documents on the Plaintiff's Exhibit "C" to the Second Motion to Compel to be produced. Exhibit "C" was a letter dated March 30, 2004 from James B. Sprayberry to Phil Adams, Jr., a copy of which is attached.

4.      By filing the documents from the Privilege Log only, Oldcastle has not complied with the Court Order.

5.      The Plaintiffs have repeatedly requested these documents in Motions to Produce, Deposition Notices, Depositions and the Second Motion to Compel. The Plaintiffs also contend that these documents are clearly discoverable, relate directly to the case, have not been objected to, and have been promised to the Plaintiffs by the Defendants.

WHEREFORE, the Plaintiffs request an Order requiring the Defendant, Oldcastle, to immediately produce the remainder of these documents.

James B. Sprayberry (SPR008)
One of the Attorney for the Plaintiffs

**OF COUNSEL:**
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

2519

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the ⏝20⏝ day of ⏝May⏝, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY,
PETTEY & BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON
& WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801

_____
James B. Sprayberry

Page 3 of 3

2511

# JAMES B. SPRAYBERRY
ATTORNEY AT LAW
P.O. DRAWER 2429
AUBURN, ALABAMA 36831-2429
(334) 821-7100
FAX (334) 821-7101

March 30, 2004

Phillip E. Adams, Jr
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

Re:    *Davis, et al vs. Hanson/Oldcastle*

Dear Phil:

We have discussed and/or requested the documents that I have listed below. They fall within the request for production and deposition notices that we have filed. The items we would like are:

1. The Oldcastle Code of Conduct referred to in the depositions;
2. The Silica MSDS sheets and testing results from Oldcastle;
3. Seismograph results/summaries for the Griggs and the Edwards property (I previously wrote and asked for those a short while ago);
4. 3 ½ inch binder from Skelly and Loy and related documents that Brian Fowler reviewed prior to the purchase;
5. The Fowler "notes" that he wrote while on his site visit to Opelika;
6. Fowler's billing for his project number 800-26;
7. The amount of money to be paid by Hanson to Oldcastle if restrictions are put on the operation. This is set out in the Joint Defense Agreement (JDA);
8. Documents from the "Privilege Log" of Oldcastle;
   Page 1 -    10/23/2003 e-mail from Fowler to Heisterkamp
   Page 2 -    None
   Page 3 -    10/9/2003 e-mail from Syr to Heisterkamp
               10/8/2003 e-mail from Fowler to Heisterkamp

**Exhibit "C" to Plaintiffs' Second Motion to Compel**
**Davis, et al vs. Hanson and Oldcastle, et al**
**Lee County, Alabama; Civil Action No. CV-02-85**

Phil Adams, Esq.
March 30, 2004
Page 2

| | |
|---|---|
| Page 4 - | 9/28/2003 e-mail from Heisterkamp to Towe |
| | 9/21/2003 e-mail from Fowler to Heisterkamp |
| | 9/19/2003 e-mail from Heisterkamp to Fowler |
| | 9/17/2003 e-mail from Heisterkamp to Fowler |
| | 9/15/2003 e-mail from Brian Fowler to Bishop |
| | 9/10/2003 e-mail from Heisterkamp to Bishop |
| Page 5 - | 9/3/2003 two e-mails, Heisterkamp to Fowler, Fowler to Heisterkamp |
| Page 6 - | 7/12/2003 e-mail from Ward Nye to Heisterkamp |
| | 7/11/2003 e-mail from Heisterkamp to Bishop & Towe, re: Hanson Closing |
| | 7/11/2003 e-mail from Brian Fowler to Heisterkamp |
| | 7/10/2003 e-mail from Heisterkamp to Hill, re: Hanson deal, Ward Nye |
| | 7/10/2003 e-mail from Fowler to Kochian and Morris Bishop |
| Page 7 - | 7/15/2003 e-mail from John Gillan to Heisterkamp |
| | 7/15/2003 e-mail from Ward Nye to Heisterkamp |
| | 7/15/2003 e-mail from Heisterkamp to Gillan |
| Page 8 - | 7/14/2003 e-mail from Heisterkamp to Bishop, re: Joint Defense |
| | 7/14/2003 e-mail from Gillan to Heisterkamp, re: Joint Defense |
| | 10/16/2003 e-mail from Heisterkamp to Glenn Culpepper and Towe |
| Page 9 - | 7/11/2003 e-mail from Heisterkamp to Bishop and Towe |
| | 7/11/2003 e-mail from Tom Hill to Glenn Culpepper, Fw: Hanson deal - Ward Nye |
| | 7/11/2003 e-mail from Hill to Heisterkamp, re: Hanson deal - Ward Nye |
| | 7/10/2003 e-mail from Heisterkamp to Hill |
| Page 10 - | Undated spreadsheet by Heisterkamp, re: Hanson quarries 2002 (two of these are listed on page 10) |
| Page 11 - | Three undated spreadsheets by Heisterkamp, Hanson deal structure, Hanson quarries 2002 and asset swaps |
| Page 12 - | None |
| Page 13 - | Undated spreadsheet by Heisterkamp on Hanson quarries 2002 |
| Page 14 - | Undated spreadsheet by Heisterkamp shown as Hanson-GAT quarries |
| Page 15 - | All spreadsheets except the first one called "Dodge Forecast" |
| Page 16 - | Undated spreadsheet by Heisterkamp called Hanson-GAT Quarries |
| | 9/19/2003 Fowler to Heisterkamp fax, re: Opelika Dye Test Opinion |
| Page 17 - | Undated spreadsheet by Heisterkamp shown as Hanson Quarries 2002 |

2518

Phil Adams, Esq.
March 30, 2004
Page 3

Page 18 -  9/18/2002 Heisterkamp to Bishop fax
            9/30/2002 Murphy to Heisterkamp letter
            9/26/2002 Heisterkamp spreadsheet, Hanson Building Materials
            reserve bank information
            1/18/2002 Heisterkamp spreadsheet Opelika Summary Profit &
            Loss

Page 19 -  The first five spreadsheets on that page dated 1/15/2002,
            6/27/2001, 3/30/2000, 9/25/2002, 9/25/2002

Page 20 -  10/22/2002 Heisterkamp facsimile to Bishop, re: Hanson History

Please have those documents to us by April 9, 2004.  If you decline to produce them, we will have no choice but to file a Motion to Compel which we would rather not file since these appear to be documents to which we are entitled.

Very truly yours,

James B. Sprayberry

JBS/ch

cc:    Chip Vercelli, Esq.
       Guy Gunter, Esq.
       Jim Byrum, Esq.
       John V. Denson, Esq.
       H. Wayne Phears, Esq.

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

**FILED**

MAY 2 4 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF SERVING DISCOVERY

Plaintiffs give notice of the filing of the following discovery in this case:

1.     Plaintiffs' Supplemental Expert Witness Disclosure: Hicks.

2.     Plaintiffs' Supplemental Expert Witness Disclosure: Cooper.

3.     Plaintiffs' Supplemental Expert Witness Disclosure: Getz.

4.     Plaintiffs' Expert Witness Disclosure: Barrentine.

5.     Plaintiff BWA's Supplemental Response to Defendants' Interrogatories and

Requests for Production.

_____
CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

**OF COUNSEL:**

Charles E. Vercelli, Jr.                    Guy F. Gunter, III
VERCELLI & ASSOCIATES, P.C.        MELTON, GUNTER & MELTON
1019 S. Perry Street                        P.O. Box 409
Montgomery, AL 36104-5049           Opelika, AL 36803-0409
(334) 834-8805                               (334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 21st day of MAY, 2004.

_____
OF COUNSEL

Not-Serv-Disc.2.wpd

2

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

MAY 2 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| vs. | )   CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
|     Defendants. | ) |

## MOTION TO STRIKE PLAINTIFFS' EXPERT WITNESS
## DISCLOSURE FOR DEREK BARRENTINE

Hanson Aggregates Southeast, Inc. ("Hanson") moves the Court to strike the Expert Witness Disclosure for Derek Barrentine ("Barrrentine") filed by Plaintiffs on May 18, 2004. In support of this Motion, Hanson avers as follows:

1.    Plaintiffs' expert disclosure designated Barrentine as "an expert witness to testify at the trial of this case." A copy of Plaintiffs' expert disclosure for Barrantine is attached at Tab A.

2.    The opinions to which Barrantine intends to testify are set forth in a letter attached to the expert disclosure. *See* Tab A. In summary, Barrentine intends to assert opinions regarding the alleged dangers created by the operation of a quarry near the Dixie Pipeline.

3.    On January 27, 2003, Hanson filed a motion for summary judgment as to the claims asserted by Plaintiffs in relation the Dixie Pipeline ("Hanson's motion").

4.    Hanson's motion was initially argued before the Court on June 20, 2003. *See* Transcript of Proceedings from June 20, 2003, excerpts of which are attached at Tab B, at page 5, line 8-page 19, line 25. In addition to arguing the merits of Hanson's motion, Hanson pointed out that Plaintiffs failed to file any response to Hanson's motion as required by *Ala. R. Civ. P.* 56 even though the motion had been pending for several months. *See* Tab B at page 19, lines 13-23.

Plaintiffs requested an opportunity to respond in writing to Hanson's motion, and the Court indicated that the matter would be re-heard on July 11, 2003. *See* Tab B at page 18, line 25-page 19, line 12.

5.    At the July 11 hearing, the Court correctly noted that Plaintiffs had again failed to file any response to Hanson's motion. *See* Transcript of Proceedings on July 11, 2003, excerpts of which are attached at Tab C, at page 23, lines 1-11. Based on Plaintiffs' failure to respond, the Court stated that Hanson's motion was due to be granted. *See* Tab C at page 24, lines 14-16; page 25, lines 9-13.

6.    Because Barrantine's opinions regarding the Dixie Pipeline are wholly irrelevant and inadmissible, Plaintiffs' expert disclosure for Barrentine is due to be struck and Barrentine should be prohibited from offering any opinion testimony at the trial of this matter.

WHEREFORE, premises considered, Hanson respectfully requests this Court to issue an Order striking Plaintiffs' Expert Witness Disclosure for Barrentine and precluding Barrentine from asserting at trial any testimony regarding the Dixie Pipeline or any other issue.

Respectfully submitted this the 24th day of May 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101
(334) 834-6500
(334) 269-3115 (fax)

2513

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 24th day of May, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL 36803-2345

_____
Of Counsel

A

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-0085 |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' EXPERT WITNESS DISCLOSURE: BARRENTINE

Plaintiffs disclose the following information with respect to expert witness Derek Barrentine:

1.     Derek Barrentine is hereby designated as an expert witness to testify at the trial of this case.

2.     Mr. Barrentine's qualifications are as stated on the resume attached hereto.

3.     The opinions to which Mr. Barrentine is expected to testify are summarized on the attached May 17, 2004, letter from Mr. Barrentine to the undersigned. This letter sets forth the bases for Mr. Barrentine's opinions as well as the opinions to which he is expected to testify.

_C E Vercelli_
_____
CHARLES E. VERCELLI, JR. (VER003)
One of the Attorneys for the Plaintiffs

2620

OF COUNSEL:
Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by hand delivering a copy of the same to each, this the _18th_ day of _May_, 2004.

_____
OF COUNSEL

1.55-00\ P-ExpDisc-Barrentine.1.wpd

2



## Curriculum Vitae
## M. Derek Barrentine, PE
Consulting Engineer

Engineer Response Consulting
Post Office Box 2308
Decatur, AL  35602
(256) 355-8070 ph.   (256) 355-8095 fax
www.ERC1.ws            Email@ERC1.ws

**_Profession_**   Derek Barrentine is a licensed Professional Engineer, specializing in transportation and land development since 1984. He has practiced successfully as a consultant, land developer, government official and expert witness. Areas of experience include contract administration, streets, traffic, railroads, buildings, recreational facilities, structures, foundations, public utilities, hydrology, storm systems, construction materials, environmental management, special products, grants, accident reconstruction, failure analysis and contract dispute resolution.

**_Registration_**   Professional Engineer since 1991, Alabama Registration No. 18177

**_Education_**   Mississippi State University, Bachelor of Science in Engineering, 1986

**_Primary Business_**   _ERC_ (Barrentine, P.C.), Decatur, AL
1996-Present, Principal Engineer
Providing failure analysis and corrective assistance in Civil Engineering, including Construction, Roadways, Public Systems and Industrial Sites.

## Disciplines and Scope

**Contract Administration:** Develop specifications and compile/revise contract agreements for construction and maintenance. Managed simultaneous projects at various stages of completion, involving estimating, bidding, contractor pay estimates, records management and inspection reports. Also managed annual labor and equipment bids for Decatur and Hartselle, AL.

**Foundation Design and Analysis:** Designed, inspected, evaluated and/or repaired building foundations for NASA facilities and test stands, multi-story hotel, commercial warehouse expansion, recreational facilities and roadway structures. Includes shallow and deep foundations involving pre-cast materials, cast-in-place concrete and post-tension cable. Such experience also involves work in the vicinity of sinkholes, uncontrolled fill sites, plastic and hydric clays, and blasting damage.

**Public Utilities:** Designed, constructed and/or inspected gravity sanitary sewer systems, gas distribution systems and water distribution systems; including co-design of gravity sanitary sewers for Mallard Fox Industrial Park (1000 acres). Continuous coordination with telephone, cable and electric companies regarding utility placement. Performed underground utility detection of water lines, steam, oxygen, nitrogen and natural gas lines using subsurface interface radar for NASA.

(page 1/5)





ERC Curriculum Vitae
M. Derek Barrentine, PE
Page 2/5

**Roadway Design:** Designed, reviewed construction plans and specs, and supervised construction for local, collector, arterial roads, highways and roadside clear zones. Also designed and upgraded test stand approaches for NASA. Practiced in all phases of construction and maintenance of public roadways in general accordance with AASHTO and DOT Standards.

**Railroad Design:** Designed rail yards for C&G Railway across North Mississippi. Co-designed railway system for Mallard Fox Industrial Park (1,000 acre development) in Decatur, AL.

**Traffic Management:** Assigned or authorized speed limits, striping, signage, signalization and construction zone safety activities in accordance with MUTCD for City of Hartselle, AL. Coordinated with DOT, railroad companies, mass transit, school boards, police departments, etc.

**Hydrology:** Designed, constructed and/or inspected underground storm systems, storm structures, improvements to major drainage channels, detention/retention facilities and coordinated maintenance of same. Extensive coordination with Army Corp of Engineers and TVA in obtaining 26A Permits. City Coordinator with FEMA for Hartselle & Decatur, AL; upgrading Flood Insurance Rate Maps and maintaining flood insurance rating systems.

**Environmental Compliance:** Performed wetland delineations, obtained NPDES industrial permits, designed erosion control plans, and installed mitigation facilities for municipal drainage channels. Designed City of Hartselle's E.A.R.T.H. Park/education facility for non-point source water pollution abatement, funded by a grant from Alabama Department of Environmental Management.

**Solid Waste Management:** Designed and supervised construction of municipal landfills in accordance with EPA Subtitle 'D' regulations. Consulted for Decatur/Morgan County Municipal Landfill, Hartselle Municipal Landfill, Cullman County Landfill, Cullman City Landfill, Hytch Inert Landfill, et al. to maintain environmental integrity (including post-closure monitoring). Wrote 10-Year Solid Waste Management Plans for Morgan County and Cullman County, AL in accordance with ADEM requirements, 1990. Also, chaired advisory boards in Morgan County and Cullman County, AL to establish recycling programs for citizens and industry.

**Site Selection and Land Use Planning:** Interim City Planner, City of Hartselle, AL. Advised City Council and Planning Commission members of Decatur and Hartselle, AL in zoning, annexation, condemnation and land development. Co-authored Comprehensive Plan, City of Hartselle, AL. Served on subdivision committees and chaired special committee to re-write subdivision regulations.



ERC Curriculum Vitae
M. Derek Barrentine, PE
Page 3/5

**Right-of-Way Acquisition:** Represented City of Decatur, AL in right-of-way/easement acquisitions according to DOT standards for roadway expansions and utility/drainage improvements, Decatur, AL.

**Project Management:** Coordinate construction scheduling, material purchases, logistics, inspections, contract administration, regulatory compliance, contractor payments and associated documentation for numerous construction projects.

**Special Products and Services:** Developed new processes for meeting special needs of clients, including *EZ-Surge,* an in-line cable shock absorber for use in maritime towing and mooring, and *E.A.R.T.H. Park,* a non-mechanical water treatment system used for non-point source storm water pollution abatement.

**Technical Research:** Research documents for design and forensic purposes, using internet and other resources, including environmental data, testing procedures/data, vehicle specifications, accident statistics and professional regulatory guidelines.

**Grant Acquisitions:** Prepared grant applications and obtained approval for multiple grants on behalf of the City of Hartselle, AL. Obtained numerous grants for infrastructure and transportation improvements through organizations such as Metro Planning Organization, ADECA, EPA, TN Valley RC&D, Flint Creek Watershed Project and numerous other organizations.

**Safety Management:** Acted in a general capacity, as an engineering consultant, developer and government official, to maintain job site safety through work site practices. Duties require understanding OSHA Standards, workman's compensation laws, corporate policies and other regulatory information regarding the general and specific safety of personnel and transportation ways.

**Forensic Analysis:** Consulted from discovery to testimony in accident reconstruction/failure analysis regarding roadways, railroad crossings, utilities, industrial sites, construction sites, construction materials, contract damages, building or foundation design/construction, log cabins, blasting damage, municipal storm systems, heavy equipment and environmental compliance.

**Personnel Management:** As a consulting engineer, land developer and Public Works Director, managed personnel, to work efficiently and diligently, often for long hours and in adverse conditions. Hired, trained and disciplined employees, maintained work time reports, enforced corporate policies and generally acted in an administrative and supervisory capacity.

2524



ERC Curriculum Vitae
M. Derek Barrentine, PE
Page 4/5

**Miscellaneous Projects:** Designed, acted in construction quality control capacity and/or Contract Administrator for various construction projects such as those shown below:

### Representative Construction Projects

**C&G Rail Yard Improvements and Expansions,** Columbus, MS

**Citadel Cement Barge Unloading and Storage Facility,** Decatur, AL

**Ridgeland Subdivision, Land Development,** Decatur, AL

**Oak Lea Subdivision, Add'n 6, Land Development,** Decatur, AL

**Chestnut Grove Elementary School Site,** Decatur, AL

**Cullman City/County Municipal Landfill Expansions,** Cullman, AL

**Mallard Fox Industrial Park Rail Facilities,** Decatur, AL

**Pointe Mallard Recreation Facilities Expansion,** Decatur, AL

**NASA Building & Test Stand Foundations,** Huntsville, AL

**Nanceford Rd. Bridge,** Hartselle, AL

**Barkley Bridge Elementary School Site,** Hartselle, AL

**Hampton Inn Foundation Assessment and Stabilization,** Cullman, AL

**Highway 55 Widening Project,** Morgan County, AL

**Budweiser Refrigerated Warehouse Expansion,** Decatur, AL

**EZsea-Surge,** Drew, MS

### Progressive Employment

*City of Hartselle*, Hartselle, AL
  1993-1996, City Engineer/Public Works Director

*AJT & Assoc., Inc.*, NASA-Marshall Space Flight Center, Huntsville, AL
  1992-1993, Civil Engineer, Facilities Division



ERC Curriculum Vitae
M. Derek Barrentine, PE
Page 5/5

*Pugh, Wright and Associates, Inc.*, Decatur, AL
  1989-1992, Consulting Engineer and Assistant City Engineer

*North Alabama Engineering Co., Inc.*, Decatur, AL
  1986-1989, Staff Engineering Intern

*Columbus & Greenville Railway Company, Inc.*, Columbus, MS
  1984-1986, Assistant to Chief Engineer

### Conferences, Seminars and Course Work Taken

- Advanced Accident Investigation/Reconstruction, Texas A&M University
- Traffic Engineering and Signalization, Auburn, AL
- Pavement Management Systems, Auburn, AL
- Subsurface Interface Radar Technology in Engineering and Geophysical Investigations, Geophysical Survey Systems, Inc.
- Construction Quality Control, Auburn University
- Construction Materials in Litigation, Construction Specifications Institute
- 8th Annual National Expert Witness & Litigation Seminar, SEAK, Inc.
- Americans with Disabilities Act, Construction Specifications Institute
- Human Resources Management in Local Government, Auburn University
- Stormwater Detention/Retention Facilities, Auburn University
- Effective Erosion & Sediment Control, Auburn University
- MicroStation I-32 2D Graphics in CADD Operation, Intergraph
- Grant Search & Proposal Development, Tennessee Valley RC&D
- Principles of Real Estate Sales, Calhoun Community College

2526

May 17, 2004

Chip Vercelli, Jr., Esquire
Vercilli & Associates, PC
1019 South Perry Street
Montgomery, AL  36104

**Re:     Davis, Opelika, et al. vs. Hanson Aggregate**
         **Statement of Findings**
         **ERC File No. 203.0815**

Dear Mr. Vercelli:

I am herein submitting a statement of findings from my preliminary investigation in the above matter. The statements and opinions herein were obtained by reviewing file material received from your office, and my professional experience in the analysis of blasting damage, sinkholes and gas migration. The opinions stated herein are subject to revision upon review of any new information. Additional information has been requested.

I am a licensed Professional Engineer in the State of Alabama since 1991, and have provided professional services as a Civil Engineer since 1984; as a government official, consultant, land developer and expert witness. A copy of my Curriculum Vitae is herein attached.

I was hired by your firm around August 15, 2003 to review documents and facts surrounding the above matter, and to opine those issues specific to sink holes in the vicinity of an LP-Gas pipeline. I have received a copy of the deposition transcripts of R. Chaffin and T. Williams, client photos, and correspondence between Hanson Aggregates and Dixie Pipeline Company.

**A.     Synopsis -**

According to the information received, including conversations with you and Mr. Sprayberry, Dixie Pipeline operates a 10-inch carbon steel Electric Resistance Welded (ERW) 1360 psi LP-Gas main, with Cathodic Protection, through Lee County, AL since 1960. Hanson Aggregates later began operating a rock quarry pit approximately 300 feet from Dixie Pipeline's 10-inch pressurized LP-Gas main. Evidence shows that sinkholes have developed in recent years at numerous locations in the area surrounding Hanson Aggregates' quarry, particularly Northeast of the Quarry, and in the vicinity of Dixie Pipeline's facilities. Therefore, there is concern that sinkholes may develop directly

beneath Dixie Pipeline's facilities, and likewise cause potential damage to the Pipeline, and subsequent loss of health, life and property in the nearby community.

**B.    Site Conditions -**

I have reviewed numerous maps and photographs of the above matter, and recognize that Hanson Aggregates' dewatering, blasting and rock quarry operations are in very close proximity to Dixie Pipeline's facilities. Photos also show numerous significant sinkholes; evident where surface soils have fallen into underground voids and leaving large openings at the ground surface.

A topographic map of the general vicinity was also reviewed, showing the marked locations of at least two (2) sinkholes, located within ½ mile of the Quarry. The two noted sinkholes were located on opposite sides of Dixie Pipeline's main line through Lee County, AL.

**C.    Technical Considerations -**

In my experience as a Civil Engineer, it is understood that the creation of sinkholes would be easiest by draining or pumping water (dewatering) from the strata below ground surface, combined with implementing ground vibrations. Sinkhole activity is therefore common where dewatering and periodic ground vibrations, such as from blasting operations, take place.

I understand that Hanson Aggregates has dewatered much of the area in its quarrying operations. While dewatering is common in quarrying and mining operations, dewatering creates subsurface voids in the adjoining land, where it was once filled with groundwater. It also serves to dry and loosen the natural compaction of subsurface soils.

Blasting surface waves cause soil movement. Even when peak particle velocity (ppv) is less than 2.0, blasting activity exacerbates soil consolidation, causes consolidation or movement of previously stable soils, which results in fissures and sinkholes.

When applied to a large area, such as in quarry operations, multiple sinkholes frequently appear, as found in the subject area. Frequent sinkhole activity in a given area, when visible at the surface, is powerful evidence that other sinkholes will develop as underground fissures and voids provide travel ways, yet to be realized at the surface.

In my work experience at NASA, Marshal Space Flight Center in Huntsville, AL, I have witnessed and worked around sinkholes, and recognize the instability of such soil conditions. Likewise, I recognize the potential for extensive damage to building foundations, roadways, storm systems, utility mains and other improvements.

Sinkhole activity behaves similarly to that of sand falling through an hour glass. "Plugging," in efforts to restrain or "choke off" a specific sinkhole is generally unsuccessful, as the surface soils remain unsupported over an underground void, whose subsurface opening may easily be larger than the visible surface opening. Once undermining begins by sinkhole activity, bridging is generally required to stabilize existing construction or facilities at the surface.

In accordance with ANSI B31.4, 24 feet is the maximum recommended unsupported, open-air span for similar gas lines; however, suspended utilities of any type must be anticipated and properly designed as such. Dixie Pipeline's 10-inch burried LP-Gas main was not designed to be suspended over an open span.

In the event that a sinkhole develops below Dixie Pipeline's LP-Gas main, the soil immediately beneath the Pipeline will fall into fissures/voids below, leaving the pipeline unsupported over the width of the [growing] sinkhole. Likewise, the overburden soil, specified at 30 inches minimum cover by Dixie Pipeline, will rest upon the unsupported pipe, imposing additional weight on top of the Pipeline. For a sinkhole 24 feet in diameter (ANSI B31.4, max. pipe span), this could easily add 113,000 lbs or more of soil load, transferred toward the center of the sinkhole opening, and possibly atop the pipeline. The overburden soil load is in addition to the normal weight of the carbon steel ERW pipeline and its pressurized LP-Gas product. Such conditions alone would easily exceed the structural design capacity of the Pipeline and cause catastrophic failure.

Additionally, where the pipeline would enter and exit the ground's opening, destructive shear forces would be applied to the suspended Pipeline, as soil falling into the sinkhole acts opposite the stable soil at the sides. Inadvertant movement of stone and other damaging material can easily come into contact with the pipeline; further damaging the structure or its appurtenances.

In my work experience as a City Engineer and Civil Engineering Consultant, I have monitored numerous landfills for detection of gas migration. I have studied gas migration; wherein, seepage from the gas source through underground fissures and voids acts as if in an uncontrolled distribution system that may lead to basements, buildings, sinkholes and other openings. Therein, explosion hazards can form when free product dilutes with air to within its Upper Explosive Limit, such as ignition by a water heater pilot light. Obviously, explosion hazards can result in extensive property damage, as well as causing harm or death to individuals. In the event of damage to the Pipeline and [undetected] product leakage, Dixie Pipeline's LP-Gas transmission main provides an exemplary source of explosive gas, and potentially significant explosion hazard.

Dixie Pipeline uses monitoring gages to determine pressure losses, in the event of measurable product loss. However, slow leaks, generally resulting from pipe fatigue or deformation, may not be detected before gas migrations begin to create explosion hazards.

**D.    Summary –**

Based upon the information reviewed and observations made, and due to ongoing dewatering and blasting activity in the nearby vicinity, the potential for sinkhole formation beneath the Dixie Pipeline LP-Gas main is much higher than normal. Likewise, due to the characteristics of sinkhole activity, the potential for damage to Dixie Pipeline is high. Due to the nature of product being transported by Dixie Pipeline, and the potential for gas migration in the event of a Pipeline failure, a subsequent explosion hazard is thereby created.

Under such conditions, it is my opinion that the residents and their properties are at a significant risk of harm by explosion hazard.

Very truly yours,

ENGINEER RESPONSE CONSULTING

M. Derek Barrentine, PE
Transportation & Development

MDB

attachment

B

21

1    On the Lee County,
2    are we going to get
3    into that or not;
4    the road issue?
5    What is it the
6    Plaintiffs are saying
7    -- what it is, the
8    Plaintiffs are saying
9    the County Road that
10    goes out to Spring
11    Villa Park is going
12    to fall in on account
13    of sinkholes, and
14    that is, of course, a
15    County road. It's
16    on the County right-
17    of-way.
18    And your response was:
19    Well, I mean, I
20    kind of think the
21    situation -- you
22    know, I wouldn't
23    let you bring in
24    Auburn Water
25    Authority and

22

1    everything else.
2    And the last line of that paragraph is:
3    I am not
4    inclined to expand
5    it to that.
6    THE COURT: So you have put in your
7    complaint -- I know about 166.
8    MR. VERCELLI: Your Honor, the Pretrial
9    Contentions -- which Your Honor had entered a
10    Pretrial Order, the Pretrial Contentions, which
11    was quite sometime ago, the bear -- the bottom
12    paragraph on page one of three of the
13    Plaintiff's Pretrial --
14    THE COURT: Uh-huh (affirmative response).
15    MR. VERCELLI: -- Contentions --
16    THE COURT: It has got it in there about
17    Spring Villa Road, so we will talk about that.
18    That will be all right.
19    What about Dixie Pipeline,
20    though?
21    MR. VERCELLI: That's been pled since --
22    if not the first complaint, --
23    THE COURT: Well, there --
24    MR. VERCELLI: -- the first amended
25    complaint.

23

1    THE COURT: Well, the problem there is
2    you never have filed -- have you filed a
3    response to their Motion for Summary Judgment
4    on that issue?
5    MR. VERCELLI: I think we did.
6    THE COURT: I have not found it. And I
7    have looked and looked.
8    MR. VERCELLI: Well, Your Honor, I know
9    one --
10    THE COURT: In this -- in all this, I may
11    have missed it, but I mean, I have looked.
12    MR. VERCELLI: Well, Your Honor, I know
13    one thing that you looked at which proves the
14    point -- when Your Honor looked at that
15    document that you then decided we could have
16    portions of, the Skelly and Lloyd document,
17    it's in the Skelly and Lloyd document that was
18    in their possession, that they knew that it was
19    concerned with sinkhole development on the
20    pipeline.
21    THE COURT: Well, the problem, though,
22    Mr. Vercelli, is, we were here on June 20th
23    and we got to talking about that particular
24    Motion in Limine. I am sorry. That particular
25    Motion for Summary Judgment. And -- and then

24

1    you said, well, I thought we were going to
2    argue that Motion for Summary Judgment on
3    July the 11th, and I said fine. And I have not
4    received any type of response.
5    MR. CLARK: Your Honor, we received a
6    response to our May Motion for Summary
7    Judgment.
8    THE COURT: Exactly. I got that.
9    MR. CLARK: We have not received any
10    response specifically to the Dixie Motion for
11    Summary Judgment.
12    MR. BYRAM: Which was filed in January of
13    2003.
14    THE COURT: I just haven't gotten a
15    response to it. I mean, since there is no
16    response, I think it's due to be granted.
17    MR. VERCELLI: Well, Your Honor, there
18    is in the record evidence proving the point,
19    which can be considered by Your Honor since
20    it's in the record proving the point. They
21    had knowledge of the problems with sinkholes
22    on the Dixie right-of-way by their own document
23    that Your Honor did review and has in your
24    possession.
25    MR. CLARK: Your Honor, by the Rules of --

**25**

1  Alabama Rules of Civil Procedure, Rule 56, they
2  have to respond by providing evidence and
3  affidavits. I would --
4    MR. VERCELLI: That's not true. If Your
5  Honor has the evidence, and you do, then we
6  have met our burden of opposing the motion.
7  And there is evidence in the Court file, Your
8  Honor, and we are relying on that.
9    THE COURT: Well, pull it out, then, Mr.
10  Vercelli. But, I mean, I expect you to file
11  a specific response and I haven't gotten it,
12  and I think it's just due to be granted because
13  there hasn't been a response.
14    MR. VERCELLI: Well -- but you have got
15  the document that shows the knowledge of the
16  problem on this Dixie pipeline and the sinkhole
17  development on the Dixie pipeline, and they
18  have had knowledge of this, Your Honor, for --
19  since 1999. They can't argue they haven't had
20  knowledge of that problem. There is evidence
21  in -- in Your Honor's files.
22    THE COURT: It's not their job to do your
23  job.
24    MR. VERCELLI: Well, what I am saying,
25  Your Honor, is, we have the evidence in the

**26**

1  file; therefore, we have met the burden under
2  Rule 56.
3    THE COURT: I don't think so.
4    MR. VERCELLI: The Skelly and Lloyd
5  report is evidence. I don't have to have an
6  affidavit. It's a document that's admitted
7  under the business record exception to the
8  hearsay rule. It came from their file. They
9  have got it. It's in the Court file.
10    THE COURT: Well, when -- and when has
11  the Skelly -- the only reason that document is
12  in the Court file is for the Court to review
13  it in-camera and to pass on as to what would
14  be discoverable -- possibly discoverable in
15  this case. That document has not been
16  introduced as evidence at all for any
17  particular purpose.
18    MR. VERCELLI: Except that I am relying on
19  it now and it's in the Court's file and Your
20  Honor reviewed it.
21    THE COURT: How can you rely on something
22  that's not in -- that's not in evidence. That
23  is not in evidence. That document was not
24  submitted for the purpose of being in response
25  to that Motion for Summary Judgment.

**27**

1    MR. VERCELLI: I don't think it has to
2  be submitted for that -- for that particular
3  purpose. If it's in the Court's file, --
4    THE COURT: I think there just has to be a
5  response.
6    MR. VERCELLI: -- we can rely on it.
7    THE COURT: I am not going to -- anyway,
8  this is -- I don't think we should could get
9  into that, anyway, on the first portion of the
10  case. Maybe you can get into it -- I may -- I
11  may let you get into it for the injunctive
12  relief if it becomes an issue.
13    MR. VERCELLI: All right. Now, to make
14  sure, Your Honor, if I understand your ruling,
15  as to Spring Villa Road, we can get into that
16  issue of the problems on Spring Villa Road?
17    THE COURT: Yes, sir. That's in the
18  Pretrial Contentions.
19    MR. VERCELLI: Okay.
20    THE COURT: I will let you get into it.
21    MR. BYRAM: May I respond to that?
22    THE COURT: Uh-huh (affirmative response).
23    MR. BYRAM: I know -- I think you have
24  already ruled, but just --
25    THE COURT: Uh-huh (affirmative response).

**28**

1    MR. BYRAM: -- I would like to make this
2  point: That the statute says -- 6 5 1 2 3 says
3  that:
4      A public nuisance
5      can only be subject
6      to a suit by an
7      individual if it
8      causes special damage
9      to that individual, --
10  -- to their property. There is no contention
11  that sinkholes on the right-of-way of Spring
12  Villa Road has damaged any of these six people.
13  Therefore, the -- under the express wording of
14  6 5 1 2 3, they simply don't have standing to
15  sue about it. Now --
16    THE COURT: Well, I don't -- I agree as
17  far as those six individuals. What they are
18  saying they want to get into it on is -- is the
19  public nuisance issue, and particularly what's
20  being brought by the Water Board or the -- just
21  showing evidence of dewatering in the area, is
22  the way I would understand it.
23    MR. VERCELLI: 6 5 122 that they don't
24  site to Your Honor states:
25      All municipalities

C

1
IN THE CIRCUIT COURT
2
FOR THE COUNTY OF LEE
3
STATE OF ALABAMA
4
THIRTY-SEVENTH JUDICIAL CIRCUIT
5
CIVIL
6
MIKE DAVIS, ET AL.,
7
Plaintiff,
8
VS.          CASE NO.: CV-02-085
9
HANSON AGGREGATES SOUTHEAST,
10
INC., ET AL.,
11
DEFENDANT.
12
_____/
13
PROCEEDINGS
14
BEFORE:
15
Jacob A. Walker, III, Circuit Court Judge,
Lee County Justice Center, Opelika,
16
Alabama.  June 20, 2003.

17
APPEARANCES:

18
For the Plaintiffs:

19
CHARLES E. VERCELLI, ESQ.
MONTGOMERY, ALABAMA
20
- and -
JAMES B. SPRAYBERRY, ESQ.
21
AUBURN, ALABAMA

22
For the Defendants:
JAMES A. BYRAM, JR., ESQ.
23
PAUL CLARK, ESQ.
MONTGOMERY, ALABAMA
24
- and -
JOHN V. DENSON, ESQ.   H. WAYNE PHEARS, ESQ.
25
OPELIKA, ALABAMA       NORCROSS, GEORGIA

---

1
PROCEEDINGS HAD IN OPEN COURT
2
JUNE 20, 2003
3
(Parties present and the following
4
proceedings were had.)
5
THE COURT:  Okay.  Y'all go back to Davis
6
v. Hanson.
7
MR. BYRAM:  Judge, we have the draft
8
Pretrial Order.
9
THE COURT:  Does everybody have a copy of
10
that?
11
(Mr. Clark indicating.)
12
THE COURT:  All right.
13
MR. BYRAM:  It's got the contentions as
14
Exhibits.
15
THE COURT:  Okay.
16
MR. DENSON:  Judge, there is one -- one
17
thing in there -- I just got this today -- in
18
looking at it, the -- on page two under
19
stipulations, --
20
THE COURT:  Uh-huh (affirmative response).
21
MR. DENSON:  -- I pointed this out
22
sometime ago, but the Young property is owned
23
by four members of the Young family.
24
THE COURT:  Uh-huh (affirmative response).
25
MR. DENSON:  Only one has been served, so

---

1
-- Paragraph Four B, --
2
THE COURT:  Okay.
3
MR. DENSON:  -- three of the parties have
4
not been served.  Virginia Young Priest is the
5
only member, and she has been appearing.
6
THE COURT:  Okay.  I will just make that
7
notation.
8
All right.  Any other issues
9
y'all want to take up?
10
MR. BYRAM:  Judge, we had some pending
11
Summary Judgment Motions as well as -- I think
12
we are prepared to discuss them further today,
13
if Your Honor wants to.  A Motion to Bifurcate
14
the legal and equitable issue.
15
THE COURT:  The Motion for Summary
16
Judgment was pretty -- pretty general.  I --
17
did -- did you file anything else in support of
18
it?
19
MR. BYRAM:  Yes, sir.  We -- well, we
20
filed -- we actually have three Summary
21
Judgment Motions pending.  There is one -- two
22
them have been filed a very long time.  One
23
of them is about the Parker and Haward Jackson
24
Plaintiffs based on release and res judicata.
25
Those are the two that had the prior case

---

1
against Opelika Materials, and --
2
THE COURT:  But they aren't -- they aren't
3
the two -- they aren't set up for this -- these
4
Plaintiffs, though.
5
MR. BYRAM:  That's right, Your Honor.
6
They are -- they are not in this group.
7
THE COURT:  Okay.
8
MR. BYRAM:  The second one is the Summary
9
Judgment on the Dixie Pipeline issue, and
10
that's been filed and briefed and the evidence
11
submitted for -- for some time.  The third
12
Summary Judgment is -- is -- as Your Honor
13
indicated, it is quite general.  It relates
14
to some of the legal issues that you are going
15
to have to decide; decide how to charge the
16
jury or whatever.  We filed the brief and
17
back-up materials on that --
18
MR. CLARK:  Yesterday.
19
MR. BYRAM:  -- yesterday; so it may be --
20
THE COURT:  Okay.
21
MR. BYRAM:  -- you know, it may be better
22
to hear that at the July 11th hearing.
23
THE COURT:  Well, we went and looked for
24
everything that had been filed.  I don't -- we
25
didn't find it.

5

1    MR. SPRAYBERRY: You couldn't miss this
2  one, Judge; it's a big thick --
3    THE COURT: Harold went down there this
4  morning. I figured y'all would file a bunch of
5  stuff.
6    MR. BYRAM: Here is -- here is the -- June
7  19th.
8    THE COURT: Okay. Well, what about the --
9  the pipeline, then, if you want to talk about
10  that?
11    MR. BYRAM: Okay. Judge, Paul is going
12  to argue that, but the bottom line is, the --
13  there is no -- the Dixie Pipeline people
14  were deposed. They don't have a problem with
15  it. Our expert says it's not a problem. None
16  of the Plaintiffs' experts have testified
17  about it, so -- but Paul will get into the
18  detail.
19    THE COURT: Okay.
20    MR. CLARK: Judge, the Plaintiffs' claims
21  regarding --
22    THE COURT: Uh-huh (affirmative response).
23    MR. CLARK: -- the Dixie Pipeline -- and
24  pipeline is a liquid petroleum transcontinental
25  pipeline that runs through part of the property

6

1  on which the quarry operates. In their
2  complaint, the Plaintiffs assert basically
3  two allegations regarding potential damage;
4  that is, that the quarry activity could damage
5  the pipeline, and, in turn, damage to the
6  pipeline could injure the Plaintiff. The
7  Plaintiffs have no evidence to support either
8  of those assertions. They have no expert
9  testimony. They have no lay opinion testimony.
10  They have no scientific evidence. They have
11  no factual evidence that the quarry has either
12  currently injured or damaged the pipeline or
13  that even if such damage did or could occur,
14  that any damage has damaged or could damage
15  the Plaintiffs.
16    Specifically, Judge, blasting at
17  the quarry and sinkholes in the vicinity
18  of the pipeline are the two issues; whether or
19  not either of these mechanisms could cause
20  damage to the pipeline. Blasting at the
21  pipeline, Your Honor, is measured by
22  seismographs, and every blast is measured.
23  It's measured in a unit called peak particle
24  velocity. The Dixie Pipeline has given us
25  information through deposition and guidelines

7

1  that say a peak particle velocity -- anything
2  less than two point 0 will not injure the
3  pipeline. The greatest peak particle velocity
4  recorded above the pipeline by the seismograph
5  sitting on top of it is point three four. We
6  haven't even gotten close to a blast that
7  could cause damage to the pipeline.
8    The second thing, Your Honor, is
9  sinkholes. The Plaintiffs say that a sinkhole
10  could form underneath the pipeline and could
11  give -- cause some damage by giving way to the
12  support of the pipeline. There is no evidence
13  that a sinkhole has formed. There is no
14  evidence regarding the possibility or a
15  probability of a sinkhole forming. And there
16  is no real evidence regarding the possible or
17  potential effects of a sinkhole forming
18  underneath the pipeline, on the pipeline.
19  There is nothing, Your Honor, short of the
20  Plaintiffs' bear allegation. And that is
21  insufficient, Your Honor, to constitute a
22  recoverable injury under any of the causes of
23  actions asserted in the Plaintiffs' complaint;
24  negligence, wantonness, nuisance, injunctive
25  relief. There is simply no basis upon which

8

1  the Plaintiffs can claim injury or a
2  recoverable interest in potential damage to the
3  Dixie Pipeline.
4    THE COURT: What -- what's y'all's
5  response?
6    MR. VERCELLI: Your Honor, I apologize
7  for being late. I was tied up in Judge
8  Hardwick's courtroom and was a little late. I
9  had understood that the Summary Judgment was
10  going to be heard not today but at another
11  time, so I am really not prepared, but I will
12  tell Your Honor this: 205 feet from the Dixie
13  Pipeline a twenty foot deep, twenty-five
14  foot diameter sinkhole developed beside Highway
15  166 a year or more ago. That was the second
16  development of that sinkhole. If a sinkhole
17  that size develops under the pipeline -- and
18  no one can say it won't. No one can say it
19  will. But if a sinkhole that size develops
20  under the pipeline, it could cause the
21  pipeline, particularly at a welded joint, to
22  crack and leak. The pipeline's people's
23  depositions were to the effect that if there
24  is a catastrophic leak in the pipeline, their
25  detection system shuts it down quickly, but if

9

1   it's a slow leak, it doesn't. And it could
2   leak for days. If it leaks for days, you
3   could have a massive explosion out there that
4   could literally incinerate an area of hundreds
5   of yards in diameter. For them to say that
6   there is no evidence of that is absurd. All of
7   the geologists --
8       THE COURT: Well --
9       MR. VERCELLI: -- agree that sinkholes can
10  occur anywhere out there, including in the
11  limestone terrain.
12      THE COURT: Well, who owns Dixie Pipeline?
13      MR. VERCELLI: Dixie Pipeline does.
14      THE COURT: Is that a publically traded
15  company or what?
16      MR. VERCELLI: I don't know if it's
17  publically traded, but it's a corporation.
18      THE COURT: Okay. Well, I mean, who is --
19  Well, I mean, why haven't they intervened if
20  it's so dangerous?
21      MR. VERCELLI: I don't know that they
22  know it's so dangerous. We asked them in
23  deposition if you are aware of what a sinkhole
24  could do, and they said, no, we never thought
25  about it.

10

1       THE COURT: Well, --
2       MR. VERCELLI: What they were saying --
3       THE COURT: -- when was that deposition?
4       MR. VERCELLI: Oh, it was a long time ago.
5   A year ago.
6       THE COURT: Well, I mean -- but they have
7   -- they are in the business of trying to
8   protect their assets, --
9       MR. VERCELLI: Right.
10      THE COURT: -- aren't they?
11      MR. VERCELLI: And what they were focused
12  on at that time in the deposition was whether
13  or not there was a peak particle velocity
14  sufficient to damage their pipeline, and that
15  wasn't, so they didn't have concern about it.
16  We took the deposition of the local guy who
17  had no clue whether or not a sinkhole could
18  hurt anything. We took the deposition of one
19  other corporate representative who had no
20  clue whether sinkholes could form, and if they
21  formed, what danger it could do to it. But
22  that's not the issue. The issue is -- we have
23  evidence and we have testimony from the
24  geologists who will say that sinkholes can form
25  under the pipeline, and if they form under the

11

1   pipeline, and the pipeline loses its support
2   under ground, it could crack, leak, and
3   explode.
4       THE COURT: Well, I guess where I am lost
5   is if the company is in business of making
6   profit and -- and you have a situation that's
7   -- that's dangerous and can impede their
8   ability to operate and then they are put on
9   notice of that problem, why don't they join in
10  the lawsuit?
11      MR. VERCELLI: Maybe they don't want to
12  be part of a lawsuit like this. I don't know.
13  Maybe they don't -- I mean, I can't speculate
14  as to why they don't join an existing lawsuit
15  seeking money -- you know, million in damages
16  against a company other than having stated
17  what I just said. Maybe they don't want to
18  be part of a lawsuit seeking millions in
19  damages.
20      THE COURT: Well, if the people from
21  Dixie don't think there is a problem, I --
22  don't you think you should go out on that --
23  that point?
24      MR. VERCELLI: I don't think we have any
25  evidence whatsoever that the people from Dixie

12

1   don't think there is a problem. I don't know
2   that Dixie and Hanson haven't had private
3   discussions and indemnity agreements between
4   them. We don't know that that sort of thing
5   isn't a problem.
6       THE COURT: Well, have you asked them?
7       MR. VERCELLI: Haven't asked Dixie. And
8   Hanson has produced frankly very little
9   documentation to us from Hanson -- I mean,
10  regarding the Dixie Pipeline. And the
11  documents they produced were quite some time
12  ago. There may or may not be further
13  correspondence that they haven't produced.
14      MR. BYRAM: Well, I will be happy to
15  stipulate that there is no such agreement, and
16  also that he has never asked for it, if there
17  were one, but there's not one.
18      MR. CLARK: That's right, Judge.
19      MR. VERCELLI: Well, we haven't asked for
20  an agreement. We have asked for all
21  correspondence with Dixie Pipeline. Your
22  Honor, we have asked for other documents they
23  haven't produced to us either.
24      MR. CLARK: Judge, we have given them
25  everything that we have regarding Dixie. Also

13

1 there is no other documents --
2 THE COURT: Well, --
3 MR. CLARK: -- that would tend to show a
4 conspiracy.
5 THE COURT: -- well, I am probably
6 inclined to grant it because I am just --
7 really you are -- it sounds like you are really
8 kind of carrying the flag for someone who
9 really doesn't want to be involved.
10 MR. VERCELLI: Well, I am carrying the
11 flag for people who live a hundred feet away
12 from a pipeline that might explode and
13 incinerate them. And I think that's part of
14 the public safety issue that's relevant for
15 nuisance in this case and whether Your Honor
16 ought to shut them down and do injunctive
17 relief.
18 MR. BYRAM: Judge, the -- the --
19 MR. VERCELLI: Just the --
20 MR. BYRAM: I am sorry. Did I interrupt
21 you, Chip?
22 MR. VERCELLI: No, not really.
23 MR. BYRAM: The -- the deposition of the
24 Dixie Pipeline fellow who has filed in support
25 of this said that the regulations that control

14

1 them are -- I think the Interstate Commerce
2 Commission: The pipeline regulations are
3 geared toward public safety. They testified
4 in their deposition that they were not
5 concerned; this was not a safety issue. They
6 monitor that pipeline on a very regular basis.
7 They fly it. They walk it. They come on
8 there when we blast. They make surprise
9 inspections. This is just -- there is no
10 evidence of what Chip said, that if a sinkhole
11 opened up under it, it would break. There is
12 no expert that said that. None. And the
13 pipeline people didn't say it. And there is
14 just -- there is no evidence --
15 THE COURT: Well, --
16 MR. BYRAM: -- to support that.
17 THE COURT: -- I will go back through
18 and -- and look back through it again, but if
19 -- if Dixie is not -- if the people at Dixie
20 don't really think there is a problem, then
21 I don't -- I don't see how you can get around
22 that.
23 MR. CLARK: Judge, if you will
24 specifically look -- look at the deposition
25 testimony we attached, at pages 82, 141, and

15

1 142, you will see testimony --
2 THE COURT: 141 and --
3 MR. CLARK: 142.
4 THE COURT: -- 142. Okay.
5 MR. CLARK: -- you will see deposition
6 testimony from Dixie saying that neither the
7 blasting nor the possibility of sinkholes was a
8 concern of theirs.
9 THE COURT: Okay.
10 MR. VERCELLI: And I think that's taken
11 out of context, because the concern was they
12 never thought about and they didn't know it
13 could happen. They weren't aware that
14 sinkholes were forming in the area.
15 THE COURT: Well, when --
16 MR. VERCELLI: And sinkholes have formed
17 in the area.
18 THE COURT: And when did you take the
19 deposition?
20 MR. VERCELLI: Quite sometime ago.
21 THE COURT: Well, they didn't join the
22 lawsuit.
23 MR. VERCELLI: I don't know that Your
24 Honor -- I don't know that they could have
25 joined the lawsuit, Your Honor.

16

1 THE COURT: They could -- they could have
2 filed a separate action.
3 MR. VERCELLI: I don't know.
4 MR. CLARK: Judge, we are making --
5 MR. VERCELLI: Your Honor, we are
6 speculating about some decision an entirely
7 different corporate entity might have taken.
8 MR. CLARK: And that's the key word,
9 Judge. The Plaintiffs are speculating.
10 Speculating on the possibility of an
11 occurrence that is simply not supported by
12 the evidence. They have no -- no evidence
13 that will show that a sinkhole will form.
14 And that is the standard for the least of the
15 recovery that they seek. They can get an
16 injunctive relief on an incomplete nuisance
17 if they can show that a -- that damage is
18 reasonably certain to occur, and they simply
19 haven't even gotten there. Otherwise, Judge,
20 they have to show that an injury has happened.
21 There is no recovery for fear of future injury.
22 The Supreme Court has made that clear in Nipp
23 versus Southern Bakeries just this year.
24 There is no recovery without a cognizable legal
25 injury, which the Plaintiffs simply don't

17

1  have.
2      MR. VERCELLI: I would like to respond
3  to that in two ways, Your Honor. If Your
4  Honor -- if Your Honor is going to take the
5  position -- if they are going to take the
6  position that we have got to have people
7  incinerated before we can stop a threat to the
8  people, I think that's an absurd proposition of
9  law not supported by the Supreme Court.
10  Secondly, he said that they have no evidence
11  that -- that sinkholes will form out there, and
12  that's the least they have to have. We have
13  got a sinkhole 200 feet from the pipeline that
14  formed. We have a sinkhole that formed about
15  200 feet -- possibly 200 yards south of the
16  pipeline. We have got sinkholes that have
17  formed somewhere in the vicinity of fifty or
18  sixty of them in an area of about 5,000 --
19  5,000 to 7,000 feet away from there. There is
20  plenty of evidence of formation of sinkholes.
21  Some of them as big as all the way across this
22  courtroom and -- and twenty feet deep. And
23  it doesn't take a rocket scientist to know --
24  and I think anybody can assume if a sinkhole
25  forms underneath of that pipeline, it could

18

1  affect the structural integrity of a pipeline
2  like that, and that danger to the public is
3  extreme. I mean, this is not a fanciful
4  danger to the public. If it blows, people
5  can die. And their experts can't tell -- and
6  their experts haven't said it won't happen
7  because they can't say it won't happen. There
8  is no evidence in the record that it won't
9  happen.
10      What they are trying to focus on
11  is that their isn't evidence in the record to
12  say that it will happen, and we can't say that
13  it will happen, but I can relate Your Honor to
14  a whole slew of explosions of pipelines
15  Worldwide where people have been incinerated.
16  And nobody sure expected those things to happen
17  either. So we would like an opportunity to
18  respond to the motion. We just got the Motion
19  the other day. I thought it was not going to
20  be heard today, so I didn't know we were going
21  to be arguing Summary Judgment.
22      THE COURT: Well, the Motion has been
23  filed for some time, and they just filed the
24  pleadings in support of it recently.
25      MR. VERCELLI: And it -- I thought Your

19

1  Honor -- Your Order was that it would not be
2  heard today.
3      THE COURT: Okay. Well, --
4      MR. VERCELLI: And am I --
5      THE COURT: -- I will just take it up --
6      MR. VERCELLI: -- am I mistaken?
7      THE COURT: -- I will take it up on the
8  11th then, Mr. Vercelli.
9      MR. VERCELLI: If we could have --
10      MR. CLARK: Judge --
11      MR. VERCELLI: -- an opportunity to
12  respond to it.
13      MR. CLARK: Judge, this -- this Motion
14  was filed on January 27th, 2003. The
15  Plaintiffs have not filed a response. They
16  have had since the middle of January to file
17  a response, and they -- they just simply
18  have not done; they have no -- provided no
19  evidence, in -- in reply to this, Judge. Here
20  is a copy of the -- our file stamped copy of
21  the Motion regarding Dixie Pipeline. And the
22  Plaintiffs simply haven't responded with any
23  evidence, period.
24      THE COURT: Well, let me go get the
25  file.

20

1      All right. What's the next
2  issue?
3      (Brief pause.)
4      MR. BYRAM: Your Honor, we filed -- as I
5  mentioned, --
6      THE COURT: Uh-huh (affirmative response).
7      MR. BYRAM: -- we filed -- John actually
8  filed a brief on that Motion to Severe, if Your
9  Honor wants to talk about that today.
10      MR. DENSON: Judge, the -- Hanson filed a
11  Motion for Bifurcation back on June 11th, and
12  in their Motion set out most of the law that's
13  involved, and what -- what I have done as of
14  today is filed a joinder with that and a
15  memorandum brief of law in support, and I am
16  prepared to argue that today if Your Honor
17  wants to hear it.
18      THE COURT: Well, we heard a little bit
19  about it last time, but go ahead.
20      MR. DENSON: Judge, as you know, the --
21  Hanson is the operating company, and my client
22  are the owners of the property. And it's been
23  stipulated through requests for admissions that
24  the Plaintiffs make no claims for damages
25  against the owners of the property.

2587

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

### <u>NOTICE OF SERVICE DISCOVERY DOCUMENTS</u>

To:    Clerk of the Lee County Circuit Court
       Lee County Justice Center
       2311 Gateway Drive, Room 104
       Opelika, Alabama 36801.

Please take notice that the following documents were served on May 25, 2004 to all attorneys of record in the above styled and numbered cause;

1.    Answers to Oldcastles' First Set of Interrogatories by Medena Frizzell.


_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244



FILED
MAY 2 5 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 25th day of May, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY&
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Stret
Montgomery, Alabama 36104

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Guy Gunter
*Council for City of Opelika/Opelika Water
Board*
P.O. Box 409
Opelika, Alabama 36801

James B. Sprayberry

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

FILED

MAY 25 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | )  CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANT OLDCASTLE'S FIRST WITNESS AND EXHIBIT LIST

COMES now the Defendant Oldcastle Materials, Inc. and files herein its First

Witness and Exhibit List as follows:

### Witness List

1. All witnesses listed by Hanson Aggregate Southeast, Inc. and Defendants Young and Gilmer including all expert witnesses listed by Hanson and Young and Gilmer.

2. Any person whose deposition has been taken by any party during the course of discovery in this case.

3. Any witness identified by any other party to this case.

4. All individually named Plaintiffs.

5. All representatives of the City of Opelika whose depositions have been taken.

6. All representatives of the Water Board of Opelika whose depositions have been taken.

7. All current members of the Opelika City Council.

8. Brian Fowler

9. Frank Heisterkamp

10. Ted Reynolds

## Exhibit List

1. All exhibits listed by the Defendants Hanson and Oldcastle.

2. The respective leases of the Young and Gilmer Defendants.

3. Any documents previously produced by Oldcastle to the Plaintiffs in response to Request for Production.

4. Any exhibit listed by any other party to the case.

5. The Defendant Oldcastle reserves the right not to offer and/or to object to the exhibit offered by any other party and further reserves the right to supplement and/or amend this Exhibit List subject to further discovery.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 25th day of May, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NUMBER: CV-02-85 |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

## <u>NOTICE OF SERVICE DISCOVERY DOCUMENTS</u>

To:    Clerk of the Lee County Circuit Court
Lee County Justice Center
2311 Gateway Drive, Room 104
Opelika, Alabama 36801.

Please take notice that the following documents were served on May 27, 2004 to all attorneys of record in the above styled and numbered cause:

       1.    Answers to Oldcastles' First Set of Interrogatories by Billy and Sherry Wallace.

_____
James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805



FILED
MAY 2 8 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the 25th day of May, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY & BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

this the 27th day of May, 2004.

James B. Sprayberry

2544

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS; DONNA DAVIS; , et al )<br><br>Plaintiffs, )<br><br>v. )<br><br>HANSON AGGREGATES<br> SOUTHEAST, INC.; VIRGINIA )<br>YOUNG PRIEST, GILMER )<br>PROPERTIES, LTD. AND )<br>OLDCASTLE MATERIALS )<br>SOUTHEAST, INC., etc. )<br><br>Defendants. ) | CIVIL ACTION NUMBER: CV-02-085 |

### WITNESS AND EXHIBIT LISTS FILED ON BEHALF
### YOUNG AND GILMER DEFENDANTS

COME NOW the Defendants, Virginia Young Priest; John Claude Young, c/o Virginia

Young Priest; Virginia Hart Young; Louise Young O'Brien  (hereinafter **"Young Defendants"**)

and Gilmer Properties, Ltd. (hereinafter **"Gilmer Defendants"**) and list their witnesses and

exhibits as follows:

### WITNESS LIST:

1.     All witnesses listed by Hanson Aggregates Southeast, Inc. (hereafter "Hanson

Defendant") and Oldcastle Materials Southeast, Inc. (hereafter "Oldcastle Defendant"), including

all expert witnesses listed by Hanson and Oldcastle

1.     Virginia Young Priest
       416 Charing Loop
       Auburn, Alabama 36830



FILED

MAY 2 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

1

2.      Louise Young O'Brien
         1416 Charing Loop
         Auburn, Alabama 36830

3.      Virginia Hart Young
         HC3 Box 40-C
         Port St. Joe, Florida  32456

4.      Charles W. Gilmer, Sr.
         575 Lee Road 166
         Opelika, Alabama 36801

5.      Alice C. Gilmer
         575 Lee Road 166
         Opelika, Alabama 36801

6.      Charles W. Gilmer, Jr.
         7800 Lee Road 175
         Salem, Alabama 36874

7.      Kammy Gilmer
         7800 Lee Road 175
         Salem, Alabama 36874

8.      Barbara  Gilmer Smith
         1401 Lee Road 47
         Opelika, Alabama 36804

9.      Gary Smith
         1401 Lee Road 47
         Opelika, Alabama 36804

10.     Matthew Ruttledge Gilmer
         Lee Road 166
         Opelika, Alabama 36804

11      Lelia Wilder Gilmer
         Lee Road 166
         Opelika, Alabama 36804

12.     Any Plaintiff and any representative of any entity Plaintiff.

13.     Any witness identified by any other party to this action.

14. Any witness whose identity is disclosed through further discovery.

15. Any person deposed in this case.

16. Rebuttal witnesses.

17. This party reserves the right not to offer and/or to object to the testimony of any of these persons offered by any other party and to supplement and/or amend this witness list.

## EXHIBIT LIST:

1. All exhibits listed by the Defendants Hanson and Oldcastle.

2. The respective leases of the **Young and Gilmer Defendants** previously produced to the Plaintiffs' attorneys.

3. All exhibits previously produced by the **Young and Gilmer Defendants** in response to Request for Production and including those exhibits produced at the deposition of Charles W. Gilmer, Sr.

4. Any exhibit listed by any party to the case.

5. This party reserves the right not to offer and/or to object to the exhibit offered by any other party and further reserves the right to supplement and/or amend this exhibit list subject to further discovery.

Respectfully submitted,

**OF COUNSEL FOR DEFENDANTS:**
**VIRGINIA YOUNG PRIEST, JOHN CLAUDE**
**YOUNG C/O VIRGINIA YOUNG PRIEST, LOUISE**
**YOUNG O'BRIEN, VIRGINIA HART**
**YOUNG  AND GILMER PROPERTIES, LTD.**
SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL  36803-2345
(334) 745-3504
FAX (334) 745-3506

JOHN V. DENSON
DEN007

2547

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause, filed in open Court on this the 28th day of  May  , 2004, as follows:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Charles E. Vercelli, Jr.
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, Alabama 36104-5049

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Mr. Guy Gunter
Melton, Gunter & Melton
Post Office Box 409
Opelika, Alabama  36803-0409

Mr. Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson

4



# ALABAMA STATE BAR

415 Dexter Avenue • Post Office Box 671 • Montgomery, Alabama 36101
Telephone: 334 / 269-1515 • Fax: 334 / 261-6310
www.alabar.org

## STATEMENT

The following information, in response to the application of petitioner, is furnished in compliance with Rule VII, Rules Governing Admission to the Alabama State Bar *(Pro HacVice):*

**PETITIONER:**   Mr. Charles H. Haake
Gibson, Dunn & Crutcher
1050 Connecticut Ave., NW
Washington, DC    20036-0000

**F I L E D**

**MAY 2 8 2004**

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**CURRENT APPLICATION:**

Date Application Received:    May 17, 2004
Case No.:    CV02-85
Style:    Mike Davis, et al. vs. Hanson
Aggregates Southeast, Inc., et al.
Court/Agency:    Circuit Court of Lee County
Date of Hearing:    June 09, 2004

**LOCAL COUNSEL:**  Mr. Phillip Exton Adams Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL    36803-2069

APPLICATIONS FOR RULE VII ADMISSION HAVE BEEN MADE BY ABOVE PETITIONER OR OTHER ATTORNEY MEMBERS OF PETITIONER'S FIRM IN THE PRECEDING 365 DAYS AS LISTED:

See Attached

*Emily Farrior*
PHV Admissions
May 27, 2004



**LAWYERS RENDER SERVICE**

# Gibson, Dunn & Crutcher

## Dates reported: May 28,2001 - May 27,2004

| Applicant | Date App Received | Case | Court | G/D/P/M |
|---|---|---|---|---|
| Meeke, Charles H. | | | | |
| | 05/17/2004 | CV02-85 | Circuit Court of Lee County | P |
| Weiss, Jack M. | | | | |
| | 11/21/2003 | CV02-85 | Circuit Court of Lee County | G |

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                      )
                                         )
    Plaintiffs,                      )
                                         )
vs.                                      )          CASE NO. CV-02-85
                                         )
HANSON AGGREGATES                        )
SOUTHEAST, INC. et al.,                  )
                                         )
    Defendants.                      )

## MOTION OF JACK M. WEISS TO WITHDRAW AS COUNSEL OF RECORD FOR OLDCASTLE MATERIALS SOUTHEAST, INC.

Jack M. Weiss hereby moves to withdraw as counsel of record for Oldcastle Materials

Southeast, Inc. ("Oldcastle").  Mr. Weiss was admitted *pro hac vice* in this matter on

November 21, 2003, and has served as counsel of record for Oldcastle.  Lead counsel, Phillip E.

Adams, and the law firm of Adams, Umbach, Davidson & White will continue to represent

Oldcastle in the matter.  Oldcastle consents to this withdrawal.

    Respectfully submitted this the 2nd day of June, 2004.

        JACK M. WEISS  (admitted *pro hac vice*)
        Gibson, Dunn & Crutcher, LLP
        200 Park Avenue
        New York, NY 10166-0193
        Attorney for Defendant, Oldcastle Materials
        Southeast, Inc.

70280430_1.DOC



FILED

JUN 0 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**CERTIFICATE OF SERVICE**

     This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 4th day of June, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                        )
                                           )
        Plaintiffs,                    )
                                           )
vs.                                        )    Civil Action No. CV-20 02-0085
                                           )
HANSON AGGREGATES SOUTHEAST,               )
INC., et al.,                              )
                                           )
        Defendants.                    )

### CIVIL SUBPOENA FOR PRODUCTION OF DOCUMENTS, ETC., UNDER RULE 34(b)(2)

TO:   **Dixie Pipeline Company**
       **1117 Perimeter Center West, Suite West 301**
       **Atlanta, Georgia 30338**

You are hereby commanded to do each of the following acts at the instance of the Plaintiffs within fifteen (15) days after service of this subpoena.

That you produce the following documents and permit the above-named Plaintiffs to inspect and copy each of the following documents (all with respect to the Lee County Quarry only):

1.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Oldcastle Materials Southeast, Inc. d/b/a SRM, from January 1, 2003, through the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

2.    Any and all documents (as defined on the attached sheet), communications (whether written or oral), memoranda, notes, reports, e-mails and any documents of any type whatsoever exchanged between Dixie Pipeline Company and Hanson Aggregates Southeast, Inc. between July 1, 2002, and the date that you respond to this subpoena, with respect to the Lee County, Alabama, quarry.

3.    Any documents (as defined on the attached sheet) regarding the affects on the Dixie Pipeline were a sinkhole to form under the Pipeline in Lee County, Alabama.

4.   Any documents that evidence any problems with the pipeline in the stretch between the Lee County Terminal on Highway 51 and the Georgia State line.

5.   All construction drawings, specifications, and contract specifications (as well as, as-built specifications) relating to the construction of the pipeline in the section of Lee County, Alabama from the Highway 51 Terminal to the Georgia state line.

6.   Documents detailing the use of the gravel purchased from Hanson and/or Oldcastle (SRM) by Dixie Pipeline.

7.   Any records related in any way to the walk-through inspections and/or reports related thereto (as noted at page 9 in the deposition of Ricky Chafin taken on December 10, 2002).

Such production and inspection is to take place at the place where the documents or things are regularly kept or at some other reasonable place designated by you.

You are further advised that other parties to the action in which this subpoena has been issued have the right to be present at that time of such production or inspection. You have the option to deliver or mail legible copies of documents or things to the party causing the issuance of this subpoena but you may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies. The Plaintiffs agree to pay all reasonable expenses incurred by you at the aforementioned time and place.

You have the right to object at any time prior to the date set forth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating, with respect to any item or category to which objection is made, you reasons for such objection.

Dated this the 7th day of _____ June _____, 2004.

_____
**CHARLES E. VERCELLI, JR.**
One of the Attorneys for Plaintiffs
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

_____
CLERK

By: _____
DEPUTY CLERK

Law Offices of James B. Sprayberry
P. O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P. O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

155-00\Subpoena-Dixie1.3.wpd

## DEFINITIONS

"Document" or "documents" shall mean every original and every non-identical copy (including blind copies) of each and every paper, writing, picture, photograph, slide, movie, film, visual or audio description, video tape, sound recording, microfilm, data stored or recorded by mechanical, electronic, electrical, or magnetic means (including, without limitation, data stored or recorded on or in punched cards, computer tapes, discs, reels, computer source codes, or other devices for business machines or any other means of storing and/or transmitting human intelligence), or any other printed or readable (by human or machine) materials. To be included, without limitation, in this definition of "document" are every invoice, statement, ledger sheet, recommendation, endorsement, order, direction, letter, telegram, teletype, report, memorandum (including, but without limitation, every intra-office memorandum, file memorandum, work memorandum, and memorandum of telephone conversations), interview, schedule, graph, chart, note (including, but without limitation, notes used to prepare any letter, memorandum, reports or other documents as herein defined) contract, agreement, form, worksheet, timesheet, expense ledger, check (canceled or otherwise), checkstub, voucher receipts, witness (including potential witness) statement, transcript, interview, sound recording or sound recording transcription, video tape, computer printout, book of account, payroll records, minutes, diaries (both office and personal), calendar, log, file card, raw data, notes and/or travel reports, data evidence, statement of expenses incurred, report of investigation, report of interview, record, brochure, book, exhibit, draft, certificate, table, price list, and any other tangible item or thing of readable or visual material of whatever nature and each and every file, folder, or other container in which the above items are stored, filed, or maintained.

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUN 15 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| LEE COUNTY, ALABAMA, et al | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. CV-2002-85 |
| vs. | ) | |
| | ) | |
| HANSON AGGREGATES SOUTHEAST, INC.; | ) | |
| and OLDCASTLE MATERIALS SOUTHEAST, | ) | |
| INC., et al | ) | |
| | ) | |
| Defendants. | ) | |

## LEE COUNTY'S SEVENTH AMENDED AND RESTATED COMPLAINT

134. The Plaintiff, Lee County, Alabama, re-alleges Paragraphs 1 thru 128 in the previously filed complaints.

135. The Plaintiff is a public governmental entity with numerous roads in the area of the Hanson/Oldcastle quarry.

136. The dewatering, sinkholes, and diversion of water have caused a nuisance making it where the public cannot enjoy public property. The public roads are subject to failure, collapse and sinkhole damage.

137. The sinkholes and dewatering damage the roads and asphalt and create a real and substantial threat to the motoring public not only on Spring Villa Road but also Lee Road 166 and other roads in the cone of depression or zone of influence.

138. Hanson and Oldcastle knew or should have known that the quarry was and is a nuisance and that it was causing and will continue to cause damage.

Oldcastle purchased and operated the quarry knowing that it was a nuisance and that it was causing and will continue to cause damage. The actions have been and are negligent, willful and intentional. Despite numerous complaints, Oldcastle has continued to cause these damages. The County has incurred approximately $250,000.00 in costs to repair Spring Villa Road (Lee Road #148) due to the dewatering and sinkhole damage. At least one repaired sinkhole on the right-of-way now shows sign of collapsing again.

**Wherefore** Plaintiffs demand judgement against Defendants Hanson and Oldcastle:(1) enjoining all of the Defendants, including Defendant Oldcastle, from operating this or any quarry on the Youngs' and Gilmer's lands, and for such other legal or equitable relief to which they are entitled; (2) for all compensatory damages to which they are entitled based upon Defendant Oldcastle's continuation of the nuisance and continued negligent and wanton operation of the quarry; (3) for such punitive damages as the jury deems appropriate to punish and deter Defendants Hanson and Oldcastle and others similarly situated; and (4) for costs of this action, attorneys' fees, interest and such other further relief as the jury finds reasonable.


JAMES B. SPRAYBERRY  (SPR008)


**OF COUNSEL:**
**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

2567

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 15th day of June, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

## ALL PLAINTIFFS DEMAND TRIAL BY JURY IN
## LEE COUNTY, ALABAMA

155-007th-Amend-Complaint1.wpd

2566

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| **MIKE DAVIS, et al.,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CASE NUMBER: CV-02-85** |
| | * | |
| | * | |
| **HANSON AGGREGATES SOUTHEAST,** | * | |
| **INC., et al.** | * | |
| **Defendants.** | * | |

### MOTION FOR LEAVE TO ADD PLAINTIFF

The Plaintiffs would show this Court that:

1.    The Plaintiffs move for leave to add Lee County, Alabama as a Plaintiff.

2.    The County has sustained damage to their roads and continue to suffer damage to their roads. They also have numerous sinkholes to form on their rights-of-way and voids to form under the asphalt on Spring Villa Road. The damages so far exceed $250,000.00 from the dewatering and sinkhole collapses.

3.    They have numerous sinkholes on their property, but the Defendants have seen them, photographed them, took GPS locations on them and have had access to the Lee County radar report.

4.    The claims of Lee County will not delay the remainder of the case. The case could be set August 16, 2004 as the County Engineer has already given a deposition, produced dockets, made available the County's ground penetrating radar report, and the figures on the $250,000.00 repair cost incurred by the County. County witnesses will testify at trial in August, 2004, whether the County's claims are set for trial then or not.

5.    In the alternative, the County could be set in 2005 for trial.

6.    A copy of the proposed Seventh Amended Complaint is attached.

**WHEREFORE**, the Plaintiffs move this Court for leave to add Lee County as an additional Plaintiff.

FILED

JUN 15 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

_____
**OF COUNSEL**

Page 1 of 2

**OF COUNSEL:**

**CHARLES VERCELLI, JR.,** (VER004)
*Co-Counsel for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Counsel for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

**GUY GUNTER**
*Counsel for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, Alabama 36801
(334) 745-6288

**STANLEY MARTIN**
*Counsel for Lee County, Alabama*
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
SAMFORD, DENSON, HORSLEY, PETTEY
 & BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the 15 day of June , 2004.

OF COUNSEL

2560

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                          )
                                             )
    Plaintiffs,                          )
                                             )
vs.                                          )          CASE NO. CV-02-85
                                             )
HANSON AGGREGATES                            )
SOUTHEAST, INC., et al.,                     )
                                             )
    Defendants.                          )

F I L E D

JUN 1 7 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### MOTION FOR SANCTIONS

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") moves the Court to enter appropriate sanctions under Rule 11, *Ala.R.Civ.P.* and/or *Ala. Code* §§ 12-19-270 *et seq.*, due to plaintiffs' counsel submitting false interrogatory answers, and shows the Court as follows:

1.    In December 2002 Hanson submitted interrogatories (Ex. 1) to Beauregard Water Authority ("BWA"), and on February 4, 2003 received the following response (Ex. 2):

11.    Q.    Identify by specific amount and category all monetary damages that you claim, and include in your response your calculations or other rationale for the amount that you claim.

    A.    We are more concerned about an injunction because we have a large number of families who depend on us for water.

(Ex. 2).

2.    BWA was deposed on April 16, 2003.[1]  Bobby Henderson was designated as the 30(b)(6) representative for BWA.  He testified at that time that Well No. 4 was not a productive well, that Well No. 5 was being developed, and that Well No. 5 would take the place of Well No. 4, because Well No. 5 produced at 1500 gallons per minute as opposed to 100 gallons per minute for Well No. 4, and because Well No. 4 was infected with an iron bacteria, which was discovered

---

[1]    Excerpts from BWA's April 16, 2003 deposition are attached as Ex. 3.

145211.1                                      1

in August 2002 after the well was placed in service in April 2002.  (Deposition at 6, 32-33, 35-36, 47-48).  He testified:

> Q.    Okay.  So you're not sure whether or not the quarry is affecting either well one or well four?
>
> . . . .
>
> A.    I'm not sure.
>
> Q.    Okay.  Has the Beauregard Water Authority commissioned any study to determine that?
>
> A.    No, sir.
>
> Q.    No, sir?
>
> A.    No, sir.
>
> Q.    Do you know of any experts in this case that are going to be testifying about Beauregard Water Authority?
>
> A.    No, sir.
>
> Q.    Have you talked to any of the experts?
>
> A.    No, sir.
>
> . . . .

(Ex. 3, p. 76.10 through p. 77.2) (objections omitted).

> Q.    Has Beauregard Water Authority suffered any damages caused by the quarry?
>
> . . . .
>
> A.    Not that I could say for sure, no, sir.

(Ex. 3, p. 79.2 through p. 79.6)  (objections omitted).

3.    Based on BWA's interrogatory responses and deposition testimony, Hanson filed a motion for summary judgment in June 2003 to dismiss the claims of the BWA because of the total lack of evidence of any damage caused to BWA by quarry operations. The Court has not yet ruled on this motion.

4.    After Oldcastle was added to the case, Oldcastle submitted interrogatories to BWA on November 12, 2003. (Ex. 4)    BWA's answer (Ex. 5), which was apparently not verified, but was signed by Mr. Vercelli, stated:

> . . . the special damages to Beauregard relates to dewatering and interference with the public water supplies of Beauregard well 4 and possibly its other wells. . . . If BWA loses its well number 4, its damages would be over $1 million dollars, though the exact amount has not been calculated for certain.

5.    Because this was a change from the prior testimony and because the former Rule 30(b)(6) representative for BWA was no longer employed by BWA, defendants requested a supplemental 30(b)(6) deposition for BWA.  The deposition was held on May 19, 2004.  The original 30(b)(6) representative and former employee Bobby Henderson, as well as another BWA employee, Richard Skinner, and BWA Board Chairman Harry Lazenby, were the designated witnesses.

6.    The day before the deposition, on May 18, Mr. Vercelli submitted supplemental responses to defendants' interrogatories and requests for production. (Ex. 6)  It included this statement:

> BWA Well No. 4 has historical pumping level of 116 feet below ground level. During the worst drought, the pumping level dropped to only 124 feet. However, because Well No. 4 pumping capacity has declined so markedly in the past year or so, BWA Well No. 4 was taken off line and capped effective May 17, 2004.  In its place, BWA developed Well No. 5 which is now in production.

In addition, these interrogatory answers stated, "Plaintiff BWA claims, therefore, from the Defendants, a total of $730,481.68 for the loss of Well No. 4."  This interrogatory answer also apparently claimed the total cost to place BWA Well No. 5 into production as additional damages.  Again, this interrogatory answer was not verified, but was signed by Mr. Vercelli as counsel for BWA.

7.    At the deposition on May 19, Mr. Henderson and Mr. Skinner both confirmed that

there were no damages caused by the quarry.  Mr. Henderson testified:[2]

Q.    . . . .  I noticed on page 79 of your deposition last year you testified that
the Beauregard Water Authority had not suffered any damages as a result
of the quarry; is that still your opinion?

. . . .

A.    There's none that I can say for sure.

(Henderson Deposition at pp. 119.12 – 120.6) (objection omitted).

Similarly, Mr. Skinner stated:[3]

Q.    Okay, Do you know of any adverse effect to the Beauregard Water system
as a result of the quarry that's being operated currently by Oldcastle?

A.    Not to my knowledge, no sir.

(Skinner Deposition at pp. 19.20 – 20.1)

Q.    Mr. Skinner, I think I understood what you were saying just then in those
questions and answers of Mr. Adams, but do you have any opinions or
claims or contentions that while Hanson operated the quarry from, say '99
to 2003, did it cause any problems to the Beauregard Water system?

A.    Not to my knowledge, no, sir.

(Skinner Deposition p. 21.20 – p. 22.4)

8.    Moreover, Mr. Skinner in his deposition testified that the interrogatory answer

quoted in paragraph 6 above was false.  He explained:

Q.    Okay.  Now, this sentence says, "However, because well number four
pumping capacity has declined so markedly in the past year or so, well
number four was taken off line."  What is that talking about?

A.    Well, well number four, when we drilled number five, number five was so
much better a well than number four, then we decided to take number four
off line because you're only getting a hundred gallons a minute out of that

---

[2]  Henderson's May 19, 2004 deposition excerpts are attached as Exhibit 7.

[3]  Skinner's May 19, 2004 deposition excerpts are attached as Exhibit 8.

well. Whereas, number five we're getting -- we can pump -- well, we're permitted to a thousand gallons a minute, but we could go more.

(Ex. 8, pp. 64.12 – 65.1).

Q.  So that statement in that answer is just not right, is it?

A.  No, sir.

Q.  Okay. No, sir, it's not correct?

A.  No, sir, it's not correct.

. . . .

MR. ADAMS: Why don't you just read what that ought to say?

A.  "Beauregard Water well number four has a historical pumping level of 124 feet below ground level during the worst of the drought. And then after the drought was over, the water table came up, the pumping level in well number four came up to 116 feet."

. . . . (comments of counsel deleted).

Q.  And what should the next sentence say?

A.  "Well number four pumping capacity has not declined markedly over the past year or so."

. . . .

Q.  So really the only connection between four and five is that five is a better well than four?

A.  Yes, sir.

Q.  It says, "However, because well number four has not declined, well number four was not taken off line -- was taken off line." That's not right, is it? I mean, it wasn't taken off line because it had not declined?

A.  No. It was taken off line because well number five was a better well.

Q.  Okay. Any other reason? Was the iron reason a reason that it was taken off?

A.  Well, there was a high content of iron and magnesium in the well, yes, sir.

Q.  Okay.

A.    That's why we added our filtration system to it.

Q.    You didn't have to have that on your other wells?

A.    No, sir.

(Ex. 8, pp. 65.20 – 69-14).

9.    Mr. Lazenby testified that the BWA was concerned about the future, and that

BWA was looking for "assurances" and "leverage," not damages[4]:

A.    Well, like I said, we are concerned of what our supply of water will be down through the years.

Q.    All right.  Worried about what your future supply of water might be?

A.    That's right.

. . . .

Q.    So you're here because you're concerned about the future for water availability for Beauregard?

A.    That's right.

. . . .

Q.    And then the other thing he told me you were going to tell me about is what do you want; what does the Beauregard Water Authority want?

A.    Well, we just would like to have some guarantee or leverage that we could not run out of water by some reason that could be prevented.

. . . .

Q.    Can you think of anything else that you want other than a guarantee or leverage that you won't run out of water on account of something you might prevent?

A.    That's right.

Q.    Anything else, other than that?

A.    I can't think of anything right now.

(Ex. 9, pp. 37.15 – 39.14)

---

[4]  Lazenby deposition excerpts attached as Exhibit 9.

2566

Q.    So is Beauregard asking for damages?

A.    I don't know. I will just have to ask what the lawyers say.

(Ex. 9, pp. 52.2 – 52.4)

10.    The amount of attorneys' fees and expenses associated with taking the BWA's deposition a second time was directly attributable to the false interrogatory answers, which attempted to change Mr. Henderson's prior sworn testimony. The representatives of BWA to their credit, would not swear falsely under oath at their deposition.[5] This additional discovery would not have been required if the interrogatory answers (Ex. 5, 6) prepared by the lawyers had been accurate.

11.    Rule 11, *Ala.R.Civ.P.,* provides: "The signature of an attorney constitutes a certificate by the attorney that the attorney has read the pleading, motion, or other paper; that to the best of the attorney's knowledge, information, and belief that there is good ground to support it; and that it is not interposed for delay." ". . . Rule 11 applies to motions and other papers as well as pleadings. The *specific* motivation for this expansion was the desire to make certain discovery devices such as . . . interrogatories subject to the provisions of Rule 11." *Committee Comments on 1973 Adoption of Rule 11.* (emphasis added.) Finally, "[i]t has frequently been held that both good faith and the spirit of the rule require the party answering interrogatories to see to it that his answers are truthful as of the time of the trial as well as of the time when the interrogatories are answered." *Id.*

12.    The Alabama Litigation Accountability Act also provides:

"The court shall assess attorneys' fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action or any part thereof, or asserted any claim or

---

[5]   Compare, however, the statement of Mr. Vercelli at Skinner's deposition, pp. 23-24:

. . . . We produced yesterday to you-all a supplemental response to interrogs and requests . . . . He could swear to the truth and accuracy of the answers as corrected, but he'll correct some figures.

defense therein, that is without substantial justification, or that the action or any part thereof, or any claim or defense therein, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including but not limited to abuses of discovery procedures available under the Alabama Rules of Civil Procedure . . ."

ALA. CODE § 12-19-272(c) (1975). *See, e.g., Fields v. Primerica Life Insurance Company,,* 2002

WL 31059371 (M.D. Ala. 2002):

[A]n officer of the court bears a responsibility to ensure the verity of the information offered before the court . . . .

. . . .

. . . Plaintiffs' counsel should be given some incentive to act more responsibly in the future. Indeed, hollow enforcement of the present statute would serve little deterrent impact upon lawyers who might otherwise negligently subject defendants to undue harassment.

WHEREFORE, the premises considered, Hanson respectfully requests the Court to award

attorney's fees and other sanctions as appropriate.

Dated this *16th* day of June, 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL**:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
(334) 834-6500
(334) 269-3115 (fax)

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the _16th_ day of June, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL 36803-2345

Of Counsel

145211.1                    9

1

IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                      )
                                         )
                    Plaintiffs,          )
                                         )
vs.                                      )        Civil Action No. CV-2002-85
                                         )
HANSON AGGREGATES                        )
SOUTHEAST, INC., et al.,                 )
                                         )
                    Defendants.          )

## DEFENDANT HANSON'S INTERROGATORIES
## AND REQUESTS FOR PRODUCTION

Pursuant to ALA. R. CIV. P. 33 and 34, Hanson Aggregates Southeast, Inc. (Hanson) requests

plaintiffs City of Opelika, the Utilities Board of the City of Opelika, and the Beauregard Water Authority

to answer the following interrogatories and to produce the documents herein requested within thirty

days after service at the office of Balch & Bingham LLP, 2 Dexter Avenue, Montgomery, Alabama

36104, and to permit Hanson and its attorneys to inspect them and to copy such of them as they may

desire.

### I.
### Definitions and Instructions

The following definitions and instructions are applicable to each interrogatory and request for
production unless negated by the context:

1.      The terms "you" and "your" shall mean the plaintiffs City of Opelika, the Utilities Board
of the City of Opelika, and the Beauregard Water Authority, individually and collectively, and any
person acting or purporting to act on behalf of any of them.

2.      Undefined terms shall have the same meaning as utilized in your complaint.

3.      The term "any" means "each and every" as well as "anyone".

126684.1

4. The conjunction "and/or" shall be interpreted in every instance both conjunctively and disjunctively so as to include any information within the scope of any of the items to which the conjunction "and/or" applies.

5. The term "relating", means constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, supporting, summarizing, mentioning, including, concerning, and/or referring to, directly or indirectly.

6. The term "document" shall have the same meaning as in Rule 34, *A.R.C.P.*, and shall include, without limitation, all tangible items, and all written or graphic matters of every kind and description, whether handwritten, typed or otherwise produced, reproduced, whether draft or final, original or reproduction, in your actual or constructive possession, custody or control, regardless of where located and however denominated by you including, but not limited to: reports, statements, letters, correspondence, memoranda, notes, summaries, films, transcripts, contracts, agreements, licenses, memoranda or notes of telephone conversations or personal conversations, or interviews, microfilms, telegrams, books, articles, bulletins, circulars, pamphlets, notices, rules, regulations, directives, teletype messages, communications, minutes of meetings, interoffice or interoffice communications, working papers, desk calendars, appointment books, diaries, time sheets, logs, visual, audio or video tapes, recordings, drawings, graphs, charts, photographs, telephone records, data processing results, printouts and computations (both in existence and stored in memory), and other data compilations from which information can be obtained and translated, if necessary, and a reasonably usable form.

7. The term "document" shall also include all copies of each document if the copies contain any omission or additional writing or other marking or are not identical to the original in any manner whatsoever.

8. The obligation to produce the documents requested herein is of a continuing nature. If at any time after compliance with this request you should acquire possession, custody or control of any additional document within the scope of the request, except to the extent such documents are obtained by discovery on the public record of this case you are required promptly to furnish such documents to plaintiffs' attorneys.

9. Where only a portion of a document relates to or refers to the subject indicated the entire document along with all attachments, appendices and/or exhibits must nevertheless be produced.

10. "Identify" means, when used in reference to:

(a) a natural <u>person</u>, to set forth such person's 1) full name, 2) present or last known business and residence address, 3) present or last known employer and position, and 4) employer and position at the time in question with respect to the particular interrogatory involved.

(b) a person who is a <u>business organization</u> or other entity not a natural person, to set forth, 1) the full name of such organization, 2) the address of such organization, and 3) the form of such organization. (For example, corporation, partnership, joint venture, etc.)

(c)     a <u>document</u>, to designate the production number, if previously produced, or to describe the document in sufficient particularity to withstand valid objections to such description appearing in a subpoena duces tecum or request or motion for production of such document, including, but not limited to, the type of document (i.e., "letter"), date, authority and address; and to state the name, address, and business and every person who has such document in his or her possession, custody of control and the location of such document.

(d)     a <u>transaction</u>, to state separately (i) its date and the place where it occurred, (ii) its substance, (iii) the identity of each person participating in the transaction, and (iv) the identity of all notes, memoranda or other documents memorializing, referring to or relating to the subject matter of the statement.

11.     As to any document with respect to which you assert a claim of privilege from discovery, identify the documents with a reasonable particularity, <u>i.e.</u>, by date, title and form (e.g., letter, memorandum) the name of the preparer, originator, and/or transmitter of the document, the name of the recipient of the document, the subject matter of the document, the number of pages, whether there were any attachments or appendices to such document, and the basis or ground of your assertion of such privilege.

## II.
## Interrogatories

1.     Identify any person whom you expect to call as an expert witness at trial; state the subject the subject matter upon which the expert is expected to testify; state the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

**Response:**

2.     State every fact, application of law to fact, and contention supporting the allegation in your complaint that the defendants' operation of a limestone quarry constitutes a nuisance.

**Response:**

2573

3.     State every fact, application of law to fact, and contention supporting the allegations in your complaint that the actions of defendants in pumping water from the quarry pit have caused such a substantial de-watering of the area that the spring at Spring Villa has been caused to go dry as a direct result of the pumping of water from the ground from the quarry.

**Response:**

4.     State every fact, application of law to fact, and contention supporting the allegations in your complaint that there is a substantial likelihood that the operations of the defendants in pumping out water from the quarry, in and around the quarry, will cause sinkholes in, near, and even far away from the quarry, and that this result is absolutely certain to occur in many places.

**Response:**

5.     State every fact, application of law to fact, and contention supporting the allegation in your complaint that operations of the quarry in causing sinkholes to form now and in the future will in fact endanger the viability of the Dixie Pipeline, and that it is foreseeable that if the ground beneath the Dixie Pipeline were to give way, particularly at a welded joint, the Dixie Pipeline would then rupture, and that a rupture of the pipeline could very well cause an explosion of devastating proportions that could incinerate an area of hundreds of yards in diameter.

**Response:**

126684.1                                                4

6.    State every fact, application of law to fact, and contention supporting the allegations in your complaint that actions of the defendants through blasting caused shaking of the earth, and throwing of rock, dirt, and dust onto and about the lands of plaintiffs.

**Response:**

7.    State every fact, application of law to fact, and contention supporting the allegations in your complaint that defendants actions have been willful, wanton, and aggravated, and in the complaint that defendants' actions were rude, wanton outrageous, and reckless.

**Response:**

8.    State every fact, application of law to fact, and contention supporting the allegations in your complaint that defendants have continued their challenged actions with full knowledge of the damaged being forced upon the individual plaintiffs as well as the public at large, and that defendants have taken no steps to abate any nuisance.

**Response:**

9.    State every fact, application of law to fact, and contention supporting the allegations in your complaint that plaintiffs made known to defendants by oral and written means  the damages

caused to plaintiffs and the general public by defendants' actions, and that plaintiffs protested defendants' actions.

**Response:**

     10.     Identify any person with knowledge of discoverable facts relating to the allegations of your complaint or your answers to these interrogatories.

**Response:**

     11.     Identify by specific amount and category all monetary damages that you claim, and include in your response your calculations or other rationale for the amount that you claim.

**Response:**

     12.     To the extent not previously stated, state every fact, application of law to fact, and contention supporting your claim that defendants are liable to you and/or that you or your property have been damaged by defendant.

Response:

      13.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 51 of the second amended and restated complaint.

Response:

      14.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 52 of the second amended and restated complaint.

Response:

      15.     State every fact, application of law to fact, and contention supporting the allegations of paragraph 53 of the second amended and restated complaint.

Response:

16.    State every fact, application of law to fact, and contention supporting the allegations of paragraph 54 of the second amended and restated complaint.

**Response:**

17.    State every fact, application of law to fact, and contention supporting the allegations of paragraph 82 of the second amended and restated complaint.

**Response:**

18.    State every fact, application of law to fact, and contention supporting the allegations of paragraph 97 of the second amended and restated complaint.

**Response:**

19.    State every fact, application of law to fact, and contention supporting the allegations of paragraph 108 of the second amended and restated complaint.

**Response:**

20.     Do you contend that the quarry is a public nuisance or a private nuisance, as defined by *Ala. Code* § 6-5-121, or both a public and a private nuisance?

**Response:**

21.     What specific aspects of the quarry operations do you contend constitute a private nuisance?

**Response:**

22.     What specific aspects of the quarry operations do you contend constitute a public nuisance?

**Response:**

23.     If you claim that any specific aspect of the quarry operations constitutes a public nuisance, then for each plaintiff making this claim, identify the special damage required by *Ala. Code* § 6-5-123 to give a right of action.

**Response:**

24.     Do you contend that the quarry is a permanent nuisance or an abatable nuisance -- *see, e.g., Reibert v. City of Mobile*, 776 So.2d 761, 764 (Ala. 2000) -- or both a permanent and an abatable nuisance?

**Response:**

25.     What specific aspects of the quarry do you contend constitute a permanent nuisance and when do you contend that such aspects of the quarry became a permanent nuisance?

**Response:**

26.     What specific aspects of the quarry operations do you contend constitute an abatable nuisance, when do you contend that such aspects of the quarry became an abatable nuisance and, for any such aspect of the quarry, how do you contend the alleged nuisance should be abated?

**Response:**

27.     How, specifically, do you contend that Hanson is operating the quarry negligently or improperly?

**Response:**

126684.1                                        10

28.     Do you contend that the damages plaintiffs allege can be avoided in the future if the quarry is operated non-negligently or properly?

Response:

29.     Do you contend that Hanson is liable for damage to any plaintiff caused by any act or omission relating to the quarry that occurred before Hanson acquired the quarry assets from Opelika Materials in June 1999?

Response:

30.     Assume that all blasting at the quarry is performed by an independent blasting contractor. Do you contend that Hanson is liable for damage to plaintiffs caused by blasting performed by the independent blasting contractor?

Response:

31.     If you contend that the quarry is an abatable nuisance, do you contend that plaintiffs are entitled to recover damages for the permanent devaluation of their property?

Response:

32.    Do you contend that operations at the quarry by Opelika Materials were a nuisance when they began?  If not, when do you contend operations at the quarry became a nuisance?

**Response:**

33.    Do you contend that operations at the quarry by Hanson were a nuisance when they began in 1999?  If not, when do you contend operations at the quarry became a nuisance?

**Response:**

34.    Do you contend that your use of groundwater has been interfered with by the quarry? Explain.

**Response:**

35.    If you contend that the alleged effect of the quarry on Spring Villa is a public nuisance, identify your special damage "in which the public does not participate" as required by *Ala. Code* § 6-5-123.

**Response:**

36.     Do you contend that the "comparative injury doctrine" -- *see Martin Bldg. Co. v. Imperial Laundry Co.*, 124 So. 82, 84 (Ala. 1929) -- does not apply to your claim for injunctive relief?

**Response:**

37.     Why do you contend that you are entitled to recover attorneys fees?

**Response:**

### III.
### Requests for Production

1.     Every document that is, or evidences, or materially relates to, any communication between (a) the plaintiffs or any agent of the plaintiffs and (b) Hanson, any agent or Hanson's, other defendant, or any agent of any other defendant.

2.     Every document that is, or evidences, or materially relates to, any communication between (a) the plaintiffs or any agent of the plaintiffs and (b) any other plaintiff, or agent for any other plaintiff, or any person or entity with whom deponent or deponent's agents have communicated concerning the facts or claims alleged by plaintiffs in this case.

3.     Every document or tangible item in the possession or control of plaintiffs or agents of the plaintiffs that materially relates to (a) the facts or claims asserted by plaintiffs, or (b) the defenses asserted by Hanson or any other defendant.

126684.1                                       13

4.    Every document or tangible item that evidences or materially relates to plaintiffs' allegations of damages or claims for damages.

5.    Every document that materially relates to the claims made by the plaintiffs against Hanson or any other defendant.

_____

One of the attorneys for defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Dorman Walker (WAL086)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, AL  36101-0078
(334) 834-6500
(334) 269-3115 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on the 31st day of December, 2002, a copy of the foregoing was served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

John Denson, Esq.
Samford, Denson, Horsley, Pettey & Bridges
P. O. Box 2345
Opelika, Alabama  36803-2345

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, Alabama 36803-0409

_____

Of Counsel

2

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                              *
            **Plaintiff,**                  *
v.                                               *          **CASE NUMBER: CV-02-85**
                              *
                              *
HANSON AGGREGATES SOUTHEAST,                     *
INC., et al.                                     *
            **Defendants.**                 *

## BEAUREGARD WATER AUTHORITY'S ANSWER TO DEFENDANT HANSON'S INTERROGATORIES AND REQUEST FOR PRODUCTION

1.      Please see list previously furnished.

2.      Hanson is dewatering the area around the quarry.  This is causing a cone of depression, sinkholes and artificial lowering of the water table and related problems.  Our water lines near the quarry regularly develop leaks.  Some are on the days of blasting.  We believe these problems will only get worse with time and that our #4 Well will be negatively impact, if not others also.

3.      See response to #2.  Also, by lowering the water table Hanson has reversed the flow at the spring.

4.      See responses to #2 to #3.  There has been a large sinkhole on Lee Road 166, which has re-opened.  We understand there are others on the Gilmer and Young property.  We believe they will increase in number and in location.

5.      We have no knowledge of this subject, but if holes open under our water lines, they will rupture as they are not designed for such stress.

6.      We have not seen or felt a blast at our office.

7.      We wrote the state and Hanson because of our concerns for our water supply.  Hanson has failed to supply us with information or to cooperate with us.  With this knowledge, they have continued to blast, get bigger and dig deeper.

8.      See response to #7.  They have taken no steps that we are aware of to stop, prevent or correct the damage.

9.      See responses to #7 and #8.

2684

10.   Bobby Henderson at Beauregard Water Authority
      Custodian of Records at ADEM
      Hanson Aggregates

11.   We are more concerned about an injunction because we have a large number of families who depend on us for water.

12.   See previous answers.

13.   Hanson is dewatering a large area and our Well #4 is approximately 1.5 miles Southwest of the quarry. We have another well off Society Hill Road, which is in limestone. We believe Well #4 has had some impact from the quarry and that it will get worse. This is based on the geology in the area, the pography, water flow on the surface, the dewatering of the Spring Villa area, the depth of the quarry, the amount of quarry discharge and the huge amount of overburden removed.

14.   See response to #13. We understand that the engineers, geologists and hydrologist believe it to be the same marble formation. The records and local witnesses indicate the Spring has never gone dry until Hanson began to pump a large amount of discharge from the quarry. Sinkholes have formed and re-appeared around the quarry. The last several years, we have not had a severe drought and the Spring has never gone dry in other droughts.

15.   See responses to #13 and #14. We are unsure of Opelika's position, but we know the Spring is dry.

16.   See responses to #13 and #14. We believe the water problems could be corrected if the overburden was replaced into the quarry. Any hole or depression would fill with water and the water table would return to its previous level. However, it the quarry continues and/ or gets deeper the damage may be irreversible.

17.   See responses to #13, #13 and #16. We have no recreational losses. However, our Well #4 is being impacted by the quarry and this impact will become greater as the hole gets bigger and deeper. Major environmental damage is being caused and it will only get worse if the quarry continues.

18.   See responses to #14, #14 and #17.

19.   See responses to #13, #14, #16, #17 and #18. We are unsure of the Parker's claim. The flow at the spring has been reversed and no longer surcharges.

20.   We believe it is both. As to us, we believe it is public.

21.   That would be up to the homeowners or citizens to determine.

22.   See responses to #2 and #5.

23.   We are not required to have a special damage as we are a public water system with thousands of customers.

24.   We believe it abatable with no permanent damage known at this time.

25.   See response to #24.  We believe it abatable.

26.   The blasting, the pumping of water, the lowering of the water table and the creation of sinkholes.

27.   By continuing to get bigger and deeper thus causing more problems.  This is being done after we complained, Opelika complained and numerous homeowner's complained.

28.   No, not as to us.

29.   If Hanson knew of problems and continued them, then they are responsible.

30.   Yes.

31.   If permanently damaged, yes.  If the damages are abatable, no. Remediation and repair may be required from Hanson.

32.   Yes.

33.   Yes.

34.   We believe that Well #4 will be negatively impacted in the future much more than now.  We have another well in Creek Nations that might be impacted.  Currently, the quarry is dewatering a large area which does impact us.

35.   See response to #23.

36.   We do not believe it is mandatory.  We do not believe it applies because we have thousands of people depending on us for water while Hanson mines for corporate profit.

37.   Under a public trust theory.


1.   None.

2.   This Plaintiff objects as we do not understand this question.

3.   Repair list and well head protection report and related documents.

4.   See response to #3.

5.   See response to #3.

**CHARLES VERCELLI, JR.,** (VER003)
*Co-Council for Property Owners*
300-B Water Street, Suite 214
Montgomery, AL 36104
(334)265-6529

*Bobby E. Henderson*

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, via hand-delivery, on this the 4 ᵀ day of January, 2003.
Feb

James A. Byram, Jr., Esq.
Dorman Walker, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Guy Gunter, Esq.
Melton, Gunter & Melton
P.O. Box 409
Opelika, Alabama 36801

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

James B. Sprayberry

2587

**STATE OF ALABAMA**       *
                          *
**COUNTY OF LEE**          *

    I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that Bobby Henderson, Manager of Beauregard Water Authority, whose names is signed to the foregoing instrument, and who is known to me, acknowledged before me on this date that being informed of the contents of said instrument he executed the same voluntarily on the day the same bears date.

    **GIVEN** under my hand and official seal this the _3_ day of February, 2003.

        (SEAL)

                                    NOTARY PUBLIC

My Commission Expires:

_9/18/04_

3

Bobby Henderson

1

1            IN THE CIRCUIT COURT FOR

2                LEE COUNTY, ALABAMA

3

4

5    MIKE DAVIS, et al.,

6              Plaintiffs

7    Vs.                          CIVIL ACTION NO.

8                                 CV-2002-85

9    HANSON AGGREGATES SOUTHEAST,

10   INC., et al.,

11             Defendants.

12

13

14

15           DEPOSITION OF BOBBY HENDERSON, taken

16   pursuant to notice and stipulation on behalf of the

17   Defendants, in the conference room of the Law Office

18   of James B. Sprayberry, 225 North Gay Street, Auburn,

19   Alabama, before Ricky L. Tyler, Certified Shorthand

20   Reporter and Notary Public in and for the State of

21   Alabama at Large, on Wednesday, April 16th, 2003,

22   commencing at 10:15 A.M.

23

6

1          for identification.)
2    Q.    Defendant's Exhibit 199 is a copy of the
3          deposition notice for this deposition; have you
4          seen that before, or an earlier version of
5          that?
6    A.    Yes, sir.
7    Q.    Okay. Are you the designated representative of
8          Beauregard Water authority for this 30(B)(6)
9          deposition?
10   A.    Yes, sir.
11   Q.    Okay. And is that -- would that be for all
12         areas of testimony requested?
13   A.    Probably so.
14   Q.    There's not any area that you know of that
15         you're not the official spokesman of the
16         Beauregard Water Authority?
17   A.    Yes, sir, that's correct.
18   Q.    Okay. What's your educational background,
19         please, sir?
20   A.    Well, I finished the 9th grade; I don't have a
21         high school education. I am certified as a
22         waterworks operator by ADEM. You know, that's
23         basically it.

7

1    Q.    Okay. How long have you been employed by
2          Beauregard?
3    A.    Since '87; March of '87.
4    Q.    And tell me the jobs you've had with
5          Beauregard.
6    A.    When I first started, I was a serviceman; I
7          read meters, put in services, anything that
8          needed to be done.
9    Q.    Okay. And just bring me up to the present.
10   A.    Then in '97 I moved up to Field Manager, and
11         that's my title now, I'm the Field Manager.
12   Q.    And what are your duties as the Field Manager?
13   A.    I'm responsible for everything on the outside;
14         water samples, new services, over the meter
15         readers, everything that needs to be done, I
16         assign the jobs and make sure that things get
17         done.
18   Q.    Okay. Have you been involved in the drilling
19         of water supply wells?
20   A.    I have watched them do it. I have never been
21         directly involved with it. We contract that
22         out and I have watched them and that's it.
23   Q.    Who is responsible for planning as far as, you

8

1          know, whether a new well is needed or whatever,
2          a new water source?
3    A.    The Board of Directors is the ones that decides
4          that.
5    Q.    Are there some particular consultants or
6          engineers that work with the Board on a regular
7          basis?
8    A.    Yes, sir.
9    Q.    Who is that?
10   A.    We have used Poly Engineering out of Dothan,
11         Alabama on all of the other wells. We have
12         another engineer now, but Poly Engineering is
13         the one that has --
14   Q.    P-O-L-Y?
15   A.    Uh-huh. (Positive response.)
16   Q.    Poly Engineering out of Dothan?
17   A.    Uh-huh. (Positive response.)
18   Q.    Please say "yes" or don't say "uh-huh," because
19         when he types it, it's real vague whether it's
20         uh-huh or huh-uh?
21   A.    Yes, sir.
22         MR. VERCELLI: No, when he types it, he
23            says positive or negative.

9

1          MR. BYRAM: Well, that's right. You
2             know, I'm sure he would prefer a
3             yes or a no as well.
4          MR. VERCELLI: We can go with that,
5             though.
6    A.    And James Brannon is the actual engineer.
7    Q.    James Brannon?
8    A.    B-R-A-N-N-O-N.
9    Q.    With Poly Engineering in Dothan?
10   A.    Right.
11   Q.    And you say now you have another engineering
12         firm?
13   A.    Yes, sir. But he has not did any work for us;
14         he is in the process of doing it. And it's
15         Hill Engineering out of Birmingham.
16   Q.    Is Hill going to be working on a particular
17         project?
18   A.    Yes, sir. We're in the process of putting in
19         another well and he has been working on it with
20         us.
21   Q.    Well four is the one I hear the most about in
22         this case. Did Poly Engineering select that
23         well site?

3 (Pages 6 to 9)

30

1  as far as the driller's logs, because they have
2  just finished it.
3  Q.  And this is Graves Well Drilling again?
4  A.  Yes, sir.
5  Q.  And this will be called well five?
6  A.  Yes, sir.
7  Q.  Is it called something now?
8  A.  When it is permitted by ADEM, then it would be
9  well five.
10 Q.  What do y'all call it now?
11 A.  We ain't calling it nothing now.  It's just
12 test well until -- once it is permitted, it
13 will be well five.
14 Q.  So if you call it the test well near well one,
15 that's an adequate description?
16 A.  It will be referenced as well number five once
17 we get all of the data back on it.
18 Q.  But if I wanted to ask Graves for the records

32

1  A.  Yes, sir.
2  Q.  Okay.  And you picked Pete Mitchell's property?
3  A.  Right.
4  Q.  Who picked the site near well one?
5  A.  I think that Mr. Graves also did that one, but
6  that was before my time and I'm not really 100
7  percent sure on that.
8  Q.  I'm talking about well five.
9  A.  Harry Lazenby, the Board of Directors, he
10 wanted to go deeper and see if we could get
11 more water.  On that particular area, we
12 already owned that property, so we just went
13 deeper to see if we could get more water.
14 Q.  Did you?
15 A.  Yes, sir.
16 Q.  Okay.
17 A.  It was pumped at 1,500 gallons a minute.  It
18 fell 67 foot pumping it at 1,500 gallons a

**30**

1  as far as the driller's logs, because they have
2  just finished it.
3  Q.  And this is Graves Well Drilling again?
4  A.  Yes, sir.
5  Q.  And this will be called well five?
6  A.  Yes, sir.
7  Q.  Is it called something now?
8  A.  When it is permitted by ADEM, then it would be
9  well five.
10  Q.  What do y'all call it now?
11  A.  We ain't calling it nothing now. It's just
12  test well until -- once it is permitted, it
13  will be well five.
14  Q.  So if you call it the test well near well one,
15  that's an adequate description?
16  A.  It will be referenced as well number five once
17  we get all of the data back on it.
18  Q.  But if I wanted to ask Graves for the records
19  on it, what should I ask for?
20  A.  Ask for well number five.
21  Q.  Okay. Do you know what sort of studies Graves
22  did to select the sites for the test wells or
23  production wells?

**31**

1  A.  I think, and I'm not 100 percent sure on this,
2  but he did a lineament analysis or fracture
3  analysis.
4  Q.  Have you ever seen a written report about that?
5  A.  No, sir.
6  Q.  You just think that's what he did?
7  A.  On the earlier wells -- the wells on Pete
8  Mitchell's property, the test wells, he did not
9  pick those sites.
10  Q.  Who picked those sites?
11  A.  I did, and they come up empty. They were in
12  line with some of the other wells and that's
13  one of the reasons. You know, we have a hard
14  time finding any water in this area. And we
15  had drilled several wells that come up dry, so
16  he had some property that he would let us put a
17  test well on it. So we got over there and
18  drilled and they come up empty, too.
19  Q.  Okay. But Graves would have picked sites for
20  test wells one and two?
21  A.  Yes, sir.
22  Q.  Or not one and two, but near the lime kiln and
23  Forestry property?

**32**

1  A.  Yes, sir.
2  Q.  Okay. And you picked Pete Mitchell's property?
3  A.  Right.
4  Q.  Who picked the site near well one?
5  A.  I think that Mr. Graves also did that one, but
6  that was before my time and I'm not really 100
7  percent sure on that.
8  Q.  I'm talking about well five.
9  A.  Harry Lazenby, the Board of Directors, he
10  wanted to go deeper and see if we could get
11  more water. On that particular area, we
12  already owned that property, so we just went
13  deeper to see if we could get more water.
14  Q.  Did you?
15  A.  Yes, sir.
16  Q.  Okay.
17  A.  It was pumped at 1,500 gallons a minute. It
18  fell 67 foot pumping it at 1,500 gallons a
19  minute.
20  Q.  Well, is it planned for well five to take the
21  place of well one, or to continue to use both
22  of them?
23  A.  It will take the place of well one. And it

**33**

1  will most likely have to take the place of well
2  four, too.
3  Q.  Why is that?
4  A.  It's -- the water level has gone down in it and
5  it's also got iron bacteria in the water.
6  Q.  The water level has gone down and it's got
7  what?
8  A.  Iron bacteria.
9  Q.  What's iron bacteria?
10  A.  It's a form of iron that actually grows in the
11  water and it will make water turn red.
12  Q.  Does ADEM require you not to use it if you have
13  iron bacteria?
14  A.  No, sir. They will not -- iron bacteria,
15  you'll have to have a treatment technique for
16  it. Iron bacteria is not a harmful bacteria;
17  it will just turn everything red. If you wash
18  clothes in it, it will turn them red.
19  Q.  So not using it is a consumer issue then?
20  A.  Well, you have to -- you can kill the bacteria
21  with chlorine if you pump a heavy dose of
22  chlorine in the well, but it will come back,
23  and then you have to do that once or twice a

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048
b6f5c224-dfe5-4122-9ff6-e942db658a6b

4/16/2003

34

1    year to keep it under control.
2    Q.   Well, was this not something that was tested
3         for when the decision was made to develop this
4         well?
5    A.   It had iron in it, but it did not have the iron
6         bacteria. And we put a pressure filter in to
7         remove the iron. But the bacteria is something
8         that was -- came up later on.
9    Q.   Okay. Does Beauregard contend that the
10        presence of iron bacteria in the well has
11        anything to do with the quarry?
12   A.   I don't know. You know, I don't have an
13        opinion on that.
14   Q.   Well, you're the man; so you don't have an
15        opinion about it?
16   A.   I'm not a geologist. I don't know where the
17        bacteria come from.
18   Q.   Okay. Do you have water level measurements
19        from well four?
20   A.   Yes, sir.
21   Q.   Where are they?
22   A.   I think they're on the back of the driller's
23        log. The driller's log also had -- on each

35

1    well also had the pumping report when they were
2    put in.
3    Q.   Did you bring that with you?
4    A.   You've got it when it was first put in and this
5         is a -- and well four is over in the far
6         column.
7              (Defendant's Exhibit 204 marked
8              for identification.)
9    Q.   All right. Tell me what Exhibit 204 shows.
10   A.   It's the water levels of the wells beginning
11        the 6th month, 31st day of 2000. Well number
12        four was put on line the 1st day of April,
13        2002.
14   Q.   The 1st day of April, 2002?
15   A.   I think so. You can run across there and find
16        it.
17   Q.   That's when you started using it?
18   A.   Yes, sir.
19   Q.   And when did the bacteria problem surface?
20   A.   August of 2002.
21   Q.   Okay. And you're saying this shows a drop in
22        the well level?
23   A.   Yes, sir.

36

1    Q.   What shows that?
2    A.   Well, if you look at the actual pumping test
3         when the test well was put in, it was pumped at
4         150 gallons a minute and it pulled it down to
5         113 foot. And right now we're only pumping it
6         at a hundred gallons a minute and it pulled it
7         down to 124 foot.
8    Q.   And you're referring to -- comparing
9         Defendant's Exhibit 200 and Defendant's Exhibit
10        204?
11   A.   Yes, sir.
12   Q.   So that's a difference of ten feet?
13   A.   Yes, sir. And 50 gallons per minute less
14        water. Here it was pumped at 150, and now
15        we're only pumping it at 100 gallons a minute.
16   Q.   Why?
17   A.   Because if it's pumped at 150, it will pull the
18        level down too far.
19   Q.   How deep is the well?
20   A.   The well is 397 foot deep. And I'm not sure
21        where the pump setting is at. The pump setting
22        would be in the wellhead protection.
23   Q.   The 124 feet, is that the depth to water, or is

37

1    that depth of water?
2    A.   No, sir. That's the depth from the top of the
3         ground to the water level, it's that far down.
4         And the measurement is from 40 foot above -- 40
5         inches above the top of the ground. In other
6         words, from the top of the well -- the cement
7         platform there at the top of the well, it's 124
8         foot down to the water.
9    Q.   To water?
10   A.   Uh-huh. (Positive response.)
11   Q.   And then the well goes 397 feet deep?
12   A.   Yes, sir. But the pump is not set that deep.
13   Q.   How deep is the pump?
14   A.   It's on the wellhead protection that you've
15        got, and I'm not sure what the setting is right
16        off.
17   Q.   Okay. Has the well ever been operated at 150
18        gallons per minute?
19   A.   No, sir.
20   Q.   So to start with you were operating it at a
21        hundred gallons per minute?
22   A.   Yes, sir.
23   Q.   Okay. So well four was drilled in April of

10 (Pages 34 to 37)

**46**

1    near two and three?
2  A.    Well two, the property -- that well doesn't
3       belong to us, and the property -- we have to
4       pay for that water. Yes, sir, we have
5       considered it, but when we put one in on the
6       property we own, you know, we've got a real
7       good well.
8  Q.    Does Beauregard have any sort of agreement with
9       either Auburn or Opelika to buy finished water?
10  A.    We have a mutual agreement with Opelika.
11  Q.    Okay. Tell me about that.
12  A.    Well, when we need the water, we call them and
13       let them know that we're going to turn it on.
14       So we go turn it on. Then when our tank fills
15       up, we call them and tell them we're going to
16       turn it off. They read the meter once a month
17       and bill us for it.
18  Q.    How long have you had that arrangement with
19       Opelika?
20  A.    Ever since I've been here. So I guess ever
21       since the system was first put in.
22  Q.    Okay. So you've got a pipe that runs from
23       Opelika out to your place somewhere?

**47**

1  A.    Well, we meet Opelika. And Opelika has laid a
2       new transmission line into our area and they
3       moved our meter out there and we're tied on out
4       there now.
5  Q.    Where is that?
6  A.    At the intersection of Highway 51, Alabama
7       Highway 51 and Lee Road 146.
8  Q.    Does that transmission line run by the quarry?
9  A.    Yes, sir.
10  Q.    How long has that been there?
11  A.    It was put in there last year.
12  Q.    2002?
13  A.    2002, yes, sir.
14  Q.    What size pipe is that?
15  A.    I believe it's a 24 inch, but I'm not 100
16       percent sure on that. That's Opelika's and I
17       think that that's what they put in.
18  Q.    Did well number four have as high a yield as
19       the other wells that you operate?
20  A.    Well number four?
21  Q.    Yes.
22  A.    No, sir.
23  Q.    Never did from the git-go?

**48**

1  A.    No, sir.
2  Q.    Does Opelika -- does your agreement with
3       Opelika have a limit on how much water you can
4       take?
5  A.    No, sir.
6  Q.    Can you buy the water from Opelika and sell it
7       to your customers and still make a profit?
8  A.    No, sir.
9  Q.    Is it a loss?
10  A.    Yes, sir. Now, let me rephrase that. Opelika
11       charges us more for the water than we sell it
12       to our customers for when our customer uses a
13       large amount of water. In other words, the
14       more you use, the lower our rates are per
15       thousand, and Opelika charges us more per
16       thousand. And I'm not sure what that is, but
17       if a customer uses, say, 20,000 gallons, then
18       he's paying less than --
19  Q.    On a per unit basis?
20  A.    Right. You know, on the top end we make money
21       off of it, but if he uses a whole lot, then
22       we're actually losing money on it.
23  Q.    Do you have records about how often you take

**49**

1       water from Opelika?
2  A.    Yes, sir.
3  Q.    Do you know, without looking at the record, how
4       often you have to do that?
5  A.    I've got a -- each day on the computer. For
6       the last year we haven't pulled a whole lot. I
7       would say for the last six months we haven't
8       pulled any. The onliest time we have to pull
9       from Opelika is during the summertime when
10       people starts irrigating their yards and
11       gardens and things of that nature.
12  Q.    So you use, I guess, Opelika for peak demand?
13  A.    Yes, sir.
14  Q.    And that's in the summer?
15  A.    Yes, sir.
16  Q.    And you attribute that to watering yards and
17       gardens and things that people don't do in the
18       wintertime?
19  A.    Yes, sir.
20  Q.    Okay. Are you taking water level measurements
21       in any wells that aren't being pumped?
22  A.    No, sir.
23  Q.    Could the drop in the well levels on one be

13 (Pages 46 to 49)

4/16/2003                                                      Bobby Henderson

---

**74**

1   Q.   You saw it filled before?
2   A.   Yes, sir.
3   Q.   Okay. Tell me about that.
4   A.   Well, I didn't actually see it being filled. I
5        saw it when it was open before and I saw it
6        after it was filled, but I didn't actually see
7        it being filled.
8   Q.   When you saw it before, was it the same size as
9        it is now, or smaller, or larger, or do you
10       know?
11  A.   It's pretty close to the same thing. It could
12       be a little bit bigger, but I didn't measure
13       it.
14  Q.   Did you watch them fill it?
15  A.   No, sir.
16  Q.   Do you know what it was filled with or how it
17       was filled?
18  A.   No, sir.
19  Q.   Do you know who filled it?
20  A.   No, sir.
21  Q.   Are there any -- does Beauregard have any wells
22       that you contend are being affected by the
23       quarry operations?

---

**75**

1   A.   I couldn't answer that for sure.
2   Q.   Okay. Who can?
3   A.   The two wells we have got that are closest to
4        the quarry are the two wells that has had the
5        most drop down.
6   Q.   And that's one and four?
7   A.   Yes, sir.
8   Q.   And four is how far away? A mile and a half?
9   A.   I'm not sure. Through the woods, maybe a mile
10       to a mile and a half.
11  Q.   How far is well one?
12  A.   Probably maybe two miles.
13  Q.   Is well one in Hollis Quartzite?
14  A.   Yes, sir.
15  Q.   Is well four in Hollis Quartzite?
16  A.   Yes, sir.
17  Q.   Does Chewacla Creek run by well four?
18  A.   Yes, sir. It's a -- that is a tributary of --
19       I'm not sure which one is Chewacla Creek. Yes,
20       sir, that is Chewacla Creek that runs right
21       beside it.
22  Q.   Okay. Is that feeding water to the well?
23  A.   No, sir.

---

**76**

1   Q.   Why not?
2   A.   Our wells are semi-confined and there should
3        not be influence by surface water.
4   Q.   I thought surface water fed the groundwater?
5        MR. VERCELLI: Objection.
6   A.   You'll have to talk to a geologist about that.
7   Q.   Okay.
8   A.   It probably does, but over a long period of
9        time maybe.
10  Q.   Okay. So you're not sure whether or not the
11       quarry is affecting either well one or well
12       four?
13       MR. VERCELLI: Objection.
14  A.   I'm not sure.
15  Q.   Okay. Has the Beauregard Water Authority
16       commissioned any study to determine that?
17  A.   No, sir.
18  Q.   No, sir?
19  A.   No, sir.
20  Q.   Do you know of any experts in this case that
21       are going to be testifying about Beauregard
22       Water Authority?
23  A.   No, sir.

---

**77**

1   Q.   Have you talked to any of the experts?
2   A.   No, sir.
3   Q.   There are no static measurements of well one,
4        right?
5   A.   Not on that list, no, sir.
6   Q.   And not any in recent history, are there?
7   A.   I'm not sure when the last static pressure was
8        took. Well one runs continuously, it very
9        seldom shuts off, so we have not shut it down
10       to --
11  Q.   You would have to shut it down for more than a
12       day to do a static well test, wouldn't you?
13  A.   No, sir. We do have a static test on it, and
14       it was done probably three weeks ago when this
15       other well was put in, and I don't have it on
16       that list because I didn't --
17  Q.   When you say "static," what do you mean by
18       that? Do you mean when it's not pumping or
19       when it's been sitting there for a period of
20       time or what?
21  A.   Yes, sir. We had to shut it off while they was
22       putting the test well in and we did a static
23       test on it then.

---

20 (Pages 74 to 77)

Ricky L. Tyler                        Montgomery Reporting Service
(334) 262-3331                               (877) 834-6048

b6f5c224-dfe5-4122-9ff6-e942db658a6b

78

1   Q.   How long did it recover before you measured it?
2   A.   How long did it recover?
3   Q.   Yes.
4   A.   Several days. I'm not sure of the exact number
5        of days, but it sat there several days.
6   Q.   Do you have that data?
7   A.   I don't have it with me, but it was 26 point
8        something foot was the static level of well
9        one.
10  Q.   Okay. But if I wanted to ask for this
11       information on that, what would I ask for?
12  A.   The last static level for well one. The last
13       available static level for well one.
14  Q.   Okay. Were there measurements taken as it
15       recovered?
16  A.   No, sir.
17  Q.   Just one measurement?
18  A.   Yes, sir.
19  Q.   Who was doing those measurements?
20  A.   Who did what now?
21  Q.   Who did those measurements?
22  A.   Richard Skinner.
23  Q.   Is he somebody that works for Beauregard?

79

1   A.   Yes, sir.
2   Q.   Has Beauregard Water Authority suffered any
3        damages caused by the quarry?
4            MR. VERCELLI: Objection. You can
5            answer if you can.
6   A.   Not that I could say for sure, no, sir.
7   Q.   Okay. Do you know of any attempts to -- by
8        Beauregard to -- any complaints made by
9        Beauregard to Hanson?
10  A.   I'm not sure if it was a complaint, but we --
11       and I'm not sure exactly how it was worded, but
12       we requested several years ago that they put in
13       a test well to help us monitor the water
14       levels. And I'm not sure exactly -- this was
15       before I got to be Field Manager, and I'm not
16       sure exactly how it was worded.
17  Q.   Okay. Did Beauregard put in any monitoring
18       wells to monitor well levels?
19  A.   No, sir.
20  Q.   Why not?
21  A.   We didn't have the funds available to do it
22       with.
23  Q.   You had the funds available to drill a bunch of

80

1        dry holes, didn't you?
2   A.   No, sir, we borrowed the money to do that.
3   Q.   Borrowed the money?
4   A.   Yes, sir.
5   Q.   And that's through a government program?
6   A.   No, sir. It was with bond money.
7   Q.   Okay. And that test well that was on Mitchell
8        Parker's property near the quarry, that was --
9        did that have water?
10  A.   Yes, sir, it had water.
11  Q.   Okay.
12  A.   But I don't know the quality or the quantity.
13  Q.   All right. So you never did enter into an
14       agreement -- you decided not to develop that
15       well, is that what happened there?
16  A.   Yes, sir.
17  Q.   So you don't own that well site anymore?
18  A.   No, sir.
19  Q.   Okay. Have you done any monitoring on the
20       Plant World well?
21  A.   No, sir. I went over there and took a water
22       level reading for him one time and I don't
23       remember exactly where it was at.

81

1   Q.   That's the one you've told me about, right?
2   A.   Yes, sir. But as far as monitoring it, no,
3        sir.
4   Q.   Well, that's a well between your well four and
5        the quarry, isn't it?
6   A.   Yes, sir.
7   Q.   Okay. But you haven't monitored that?
8   A.   No, sir.
9   Q.   Okay. Is this a map of your service territory,
10       is that what this is?
11  A.   Yes, sir.
12  Q.   Okay. This would show where your waterlines
13       are?
14  A.   This one here doesn't have our waterlines
15       actually drawed out on it, I don't think.
16  Q.   They don't show up on this copy, is that it?
17  A.   No, they're showing up on here. But, yes, sir,
18       this is where it originally come from, but
19       they're not showing up on this copy.
20  Q.   Is there any way to get a color copy or
21       something that will show it?
22           MR. VERCELLI: Can you print one of
23           those in color very easily?

21 (Pages 78 to 81)

4

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OLDCASTLE'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Defendant Oldcastle, Inc., requests that Plaintiffs answer the following Interrogatories in writing and under oath pursuant to Rule 33 of the Alabama Rules of Civil Procedure.

### INSTRUCTIONS AND DEFINITIONS

1. "Complaint" means the Fourth Amended and Restated Complaint in this matter.

2. "Oldcastle" means Oldcastle, Inc., the entity named in the complaint, including any present or former officers, directors, employees, representatives, agents or attorneys thereof.

3. "Hanson" means Hanson Aggregates Southeast, Inc., the entity named in the complaint, including any present or former officers, directors, employees, representatives, agents or attorneys thereof.

4. The "Quarry" means to the limestone and marble quarry located in Lee County, Alabama, referred to in the complaint.

5. "Relating to" and "relate(s) to" mean constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to the given subject matter.

6. "Document" shall include, without limitation, all written, typed, or otherwise preserved communication, including any letter, correspondence, note, book, pamphlet, article,

bulletin, directive, review, publication, memorandum, diary, log, test, analysis, study, appraisal, projection, check, invoice, receipt, bill, purchase order, shipping order, contract, lease, agreement, work paper, calendar, envelope, paper, telephone message, tape, computer tape, computer disk, computer card, recording, videotape, film, microfilm, microfiche, drawing, account, ledger, statement, financial data, and all other writings or communication in Plaintiffs' actual or constructive possession, custody or control or of which Plaintiffs have knowledge of the existence, and whether prepared, published, or released by Plaintiffs or by any other person or entity. The term "documents" is intended to include all drafts of documents and all documents in Plaintiffs' actual or constructive possession, custody or control, and whether prepared, published or released by Plaintiffs or by any other person or entity. Without limiting the foregoing, the term "document" shall include any copy that differs in any respect from the original or other versions of the document, such as, but not limited to, copies containing notations, insertions, corrections, marginal notes, emendations or any other variations.

7.    "Person" means any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

8.    Whenever in these interrogatories there is a request to identify a communication, state:

a.    the date and place of such communication;

b.    the identity of each person who was present at or who participated in such communication;

c.    the type of communication (e.g., letter, telegram, conference, telephone conversation, memoranda, etc.);

d.    the substance of such communication; and

e.  the identity of each document reflecting, referring to, comprising, constituting, or summarizing such communication.

9.  Whenever in these interrogatories there is a request to identify a document, state:

a.  the date;

b.  the author and signatories;

c.  the recipients and addresses;

d.  the type of document (e.g., letter, memorandum, telegram, etc);

e.  the substance of the document;

f.  the identity and addresses of all other persons who received copies;

g.  the custodian; and

h.  the location.

10.  Whenever in these interrogatories there is a request to identify a person, state:

a.  the full name;

b.  residence address;

c.  residence telephone number;

d.  business address;

e.  business telephone number; and

f.  and relationship to Plaintiffs of that person.

## INTERROGATORIES

1.  Identify any and all experts Plaintiffs intend to offer testimony in the trial of this matter, and state the subject matter on which the expert is expected to testify, state the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each opinion.

2.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 111 of the Complaint that Oldcastle "is intending to and will continue the operations of the quarry under the same or similar conditions" as Hanson operated the quarry.

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

3.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 113 of the Complaint that "Oldcastle's continued operation [of the quarry] will be done in a negligent and wanton manner causing damages and continued damages to Plaintiffs."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

4.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 114 of the Complaint that "All damages and harms pleaded in this Complaint will continue if Defendant Oldcastle continues to operate the quarry."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

5.    (a)    Set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs base the contention in Paragraph 114 of the Complaint that

"any blasting and discharging of water by Oldcastle will cause continuing damages to the Plaintiffs."

(b)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (a) of this interrogatory.

6.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused any injury or damage to the Plaintiff's property.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)    the nature of each such item of injury or damage;

(2)    the date such injury or damage occurred;

(3)    whether such injury or damage is permanent; and

(4)    every fact, transaction, occurrence, communication, or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (3) of this interrogatory.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

7.    (a)    State whether Plaintiffs contend that Oldcastle's continued operation of the quarry gives rise to a substantial threat of irreparable injury to Plaintiffs.

2600

(b)    If the answer to subparagraph (a) of this interrogatory is yes, set forth every fact, transaction, occurrence, communication, or event upon which Plaintiffs bases that contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, communications, or events set forth in response to subparagraph (b) above.

8.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused, aggravated or otherwise contributed to any personal injury or bodily harm.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)    the nature of each item of such personal injury or bodily harm;

(2)    the date such personal injury or bodily harm occurred; and

(3)    every fact, transaction, occurrence, communication, or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (2) of this interrogatory.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

9.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, constitutes a nuisance, as that term is used in Section 6-5-120 of the Code of Alabama.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

10.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused any trespass upon the Plaintiff's property.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

11.    (a)    For each Plaintiff named in the Complaint, state whether Oldcastle's operation of the quarry after July 13, 2003, has caused such Plaintiff any special damage, as that term is used in Section 6-5-123 of the Code of Alabama.

(b)    For each Plaintiff who answered subparagraph (a) of this interrogatory in the affirmative, state:

(1)    the nature of such damage;

(2)    the amount of such damage; and

2602

(3)    each fact, transaction, occurrence, communication or event upon which Plaintiff bases the contentions set forth in subparagraphs (a) and (b)(1) through (2) of this interrogatory.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

12.    (a)    State whether Oldcastle's operation of the quarry after July 13, 2003, has diverted any stream, as that term is used in Section 33-7-4 of the Code of Alabama, from its natural channel.

(b)    If the answer to subparagraph (a) of this interrogatory is yes, state each fact, transaction, occurrence, or event that support such contention.

(c)    Identify each person known to Plaintiffs to have knowledge of the facts, transactions, occurrences, or events set forth in response to subparagraph (b) above.

_____

**PHILLIP E. ADAMS, JR.**

70262432_1.DOC

2608

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15TH day of October, 2003:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

5

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                           *
                                              *
              Plaintiff,                      *
                                              *
v.                                            *        CASE NUMBER: CV-02-85
                                              *
HANSON AGGREGATES SOUTHEAST,                  *
INC., et al.                                  *
                                              *
              Defendants.                     *

## ANSWERS TO OLDCASTLES' INTERROGATORIES BY
## CITY OF OPELIKA, OPELIKA UTILITY BOARD
## AND BEAUREGUARD WATER AUTHORITY

1.    At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken and whose reports and supplemental reports have been produced and are incorporated here by reference:   Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders.  Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle.  However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts.  At that time, if those experts deem it appropriate based on new information, Plaintiffs' experts will timely supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.    (a)    Although our representatives do not spend as much time near the quarry as other Plaintiffs, to our knowledge, we have not observed any significant change in the manner of operation of the quarry since Oldcastle took over.  Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle.  In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson, and this pumping is continuing to dewater the area and cause

the formation of new sinkholes on property belonging to the City of Opelika and the Opelika Utilities Board, as well as on the lands of Mr. Ken Schieker. We understand that Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); and Oldcastle continues to crush just as much rock, causing just as much noise and dust pollution. Also, Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to these and other Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a) Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle's purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of their due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is operating the quarry in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for us and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems (according to the other plaintiffs), Oldcastle continued and continues its operations unabated – and in fact in a manner that is even more objectionable than when Hanson operated the quarry.

(b)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference. Additionally, the discharge of groundwater continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

    (b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    Not Applicable. We do not claim blasting damage from Oldcastle at this time.

    (b)    Not Applicable. We do not claim blasting damage from Oldcastle at this time.

6.    (a)    Yes.

    (b)    The continued dewatering caused by Oldcastle's unstopped pumping of water from the ground has continued to cause the diversion of the Little Uchee Creek on City/Utility Board property and on their property dowstream from the diversion, has diverted water from an unnamed tributary just upstream from their property, has continued the drying up of the spring at Spring Villa, and has continued to cause sinkholes to form on their lands.

        As for Beauregard, the problem is that the dewatering has caused and/or will cause our number 4 and possibly no. 1 well to lose capacity, and the danger exists, if pumping is not stopped, that Beauregard will have to spend large sums to find water for its customers elsewhere.

    (c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)    Yes.

    (b)    Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops dewatering the area, then sinkhole development will eventually stop or almost stop. We do not know whether, if Oldcastle stops dewatering, the spring will return, but our experts advise there is a reasonable possibility that with time, it might start discharging again, although it might not. Therefore, we do contend that Oldcastle's continued operation gives rise to a substantial threat of irreparable injury to our property. Moreover, because Oldcastle is continuing the dewatering, and the dewatering has in fact caused sinkholes on our property, there is a reasonable possibility that one or more sinkholes could form on other parts of our land, including the park, and that structures in the park could be damaged or destroyed. Thus, we believe the damage is irreparable if Oldcastle is not enjoined.

    (c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)    None of which we are currently aware, though we understand that other Plaintiffs have suffered personal injuries and/or bodily harm.

    (b)    Not applicable to us.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.     (a)     Yes.

(b)     Please see our answers above, which apply here too. We believe that what we have said above about dewatering and sinkhole development [plus our concerns (based upon expert evidence) that sinkholes may well cause collapses of public roads and/or the Dixie Pipeline], shows that the quarry is a nuisance.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.     (a) - (c).     Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.     (a) - (c).     Please see our answers to all of the above interrogatories, which are incorporated here by reference, as well as our answers to Hanson's discovery and our agents' deposition responses. In general, the nuisance is damaging the public, and these Plaintiffs have the right to bring an action for the public nuisance. The special damages to the City and Utilities Board relates to sinkholes and dewatering, and the special damages to Beauregard relates to dewatering and interference with the public water supplies of Beauregard well 4 and possibly its other wells.

Beaureguard Water Authority: If BWA loses its well number 4, its damages would be over $1 million dollars, though the exact amount has not been calculated for certain.

City of Opelika: The city's damages past and future, will be approximately $4-5 million dollars, with approximately $1 million in past damages and $3-4 million in future damages.

Opelika Utilities Board: The Spring and land would be virtually worthless. Loss from the potential sale of "spring water" would be approximately thirty six thousand ($36,000.00) dollars per year. Value to the land before all of the collapse and dewatering was approximately two thousand ($2,000.00) per acre, while the land now is worthless, dangerous, and not suitable for the intended uses as outlined in our prior discovery responses and deposition responses. The Utilities Board owns approximately eighty (80) acres of land.

12.     (a)     Yes.

(b)     It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after

Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. We do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.

(c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this ____ day of _____, 2003.

BY:_____

For the City of Opelika, Alabama

STATE OF ALABAMA        *

COUNTY OF LEE            *

BEFORE ME, a Notary Public in and for said State and County, came _____, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this _____ day of _____, 2003.

_____

Notary Public

(SEAL)

My Commission Expires:_____

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this ____ day of _____, 2003.

BY:_____

For the Opelika Utilities Board

STATE OF ALABAMA        *

COUNTY OF LEE            *

BEFORE ME, a Notary Public in and for said State and County, came _____, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this _____ day of _____, 2003.


_____
Notary Public


(SEAL)

My Commission Expires:_____

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this ____ day of _____, 2003.


BY:_____
For Beauregard Water Authority


STATE OF ALABAMA      *
COUNTY OF LEE          *

BEFORE ME, a Notary Public in and for said State and County, came _____, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this _____ day of _____, 2003.


_____
Notary Public


(SEAL)

My Commission Expires:_____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by faxing a copy of the same to each and by  placing a copy of the same in the United States
mail, properly addressed and postage prepaid, this the *12th* day of ___*November*___, 2003.

_____
OF COUNSEL

155-00\Ans Old Int City-BWA.5.wpd

*Circuit Court No.* CV02-85 *Supreme Court No.* 1040857

# APPEAL

TO

# Supreme Court of Alabama

FROM

MIKE & DONNA DAVIS ETAL.-OLDCASTLE MATERIALS SOUTHEAST, INC & HANSON
AGGREGATES SOUTHEAST, INC.                                *Appellant*

*vs.*

HANSON AGGREGATES SOUTHEAST, INC ETAL., & CITY OF OPELIKA, CITY OF
OPELIKA UTILITIES BOARD ETAL.                              *Appellee*

6

2863

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,       )
              )
    Plaintiffs,     )
              )
vs.            )  Civil Action No. CV-02-0085
              )
HANSON AGGREGATES SOUTHEAST, )
INC., et al.,          )
              )
    Defendants.    )

### PLAINTIFF BWA's SUPPLEMENTAL RESPONSE TO DEFENDANTS' INTERROGATORIES AND REQUESTS FOR PRODUCTION

Plaintiff Beauregard Water Authority supplements its prior responses to Defendant or Defendants' Interrogatories and Requests for Production of Documents as follows:

1. The life expectancy of a well used by BWA for servicing its customers' needs is indefinite. That is, BWA expects a producing well to last for many, many years.

2. BWA Well No. 1 has a historical pumping level of 76-78 feet below ground level. During the worst drought, the pumping level dropped to only 81 feet.

3. BWA Well No. 2 has a historical pumping level of 68 feet below ground level. During the worst drought, the pumping level did not drop.

4. BWA Well No. 3 has a historical pumping level of 30-33 feet below ground level. During the worst drought, the pumping level dropped to only 33 feet.

5. BWA Well No. 4 has a historical pumping level of 116 feet below ground level. During the worst drought, the pumping level dropped to only 124 feet. However, because Well No. 4 pumping capacity has declined so markedly in the past year or so,

BWA Well No. 4 was taken off line and capped effective May 17, 2004. In its place, BWA developed Well No. 5 which is now in production.

6.     The total cost to place BWA Well No. 4 into production was $736,951.34. These costs are reflected, in part, on the documents attached hereto as Bates-stamped documents Plaintiff 2315 through 2331. Of this amount, $114,297.25 represented the cost of installing approximately 5,300 feet of water lines from Well No. 4 to the BWA water distribution system. Approximately 5,000 feet of those lines are still usable. Therefore, approximately $6,496.66 of the $114,297.25 if unusable and now unnecessary. Plaintiff BWA claims, therefore, from the Defendants, a total of $730,481.68 for the loss of Well No. 4.

7.     The total cost to place BWA Well No. 5 into production has yet to be precisely determined, but the cost is currently not less than the following amounts:

(1)     Wilhite (laying pipe, vaults, hooking Well into the pumping station, etc., 2,300 feet of main from Highway 146 to Well No. 5): $47,000 so far;

(2)     Graves (drilling/developing of the Well/Well casing/testing and grouting): $215,794;

(3)     The Hill Engineering Group (engineering services and blueprint): not less than $6,000;

(4)     Tom Caudle Electronics (electrical work): $15,500 paid so far, and a total commitment expected of approximately $100,000; and

(5)     Additional costs not yet finalized and which are currently unknown.

8.     BWA customer base was as follows (September each year):

2

| 1998 | 2832 customers |
| 1999 | 2535 customers |
| 2000 | 2634 customers |
| 2001 | 2686 customers |
| 2002 | 2746 customers |
| 2003 | 2832 customers |

9.      Attached hereto as Bates-stamped documents Plaintiff 2332 through 2339 are BWA Well No. 5 March, 2003 pumping level records.

10.     Attached hereto as Bates-stamped documents Plaintiff 2340 through 2348 are the April 26, 1999 pumping level records for BWA Well No. 4 (known as Test Well 3-99).

11.     Attached hereto as Bates-stamped documents Plaintiff 2349 through 2365 are copies of the BWA pumping reports from January 1, 2003, through May 1, 2004.

12.     Attached hereto as Bates-stamped documents Plaintiff 2366 through 2371 are BWA operations reports for October, 2000 through September, 2002.

13.     Attached hereto as Bates-stamped documents Plaintiff 2372 through 2375 are BWA operations reports for October, 2002 through March, 2004.

_____

**CHARLES E. VERCELLI, JR. (VER003)**
One of the Attorneys for the Plaintiffs

3

**OF COUNSEL:**

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334) 745-6244

Law Offices of James B. Sprayberry
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
  & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by hand delivering a copy of the same to each, this the ___18th___ day of ___MAY___, 2004.

_____
OF COUNSEL

155-00\BWA Supp resp IRPD.2.wpd

4

7

5/19/2004                                                          Bobby Henderson

99

1                    IN THE CIRCUIT COURT FOR

2                       LEE COUNTY, ALABAMA

3

4

5     MIKE DAVIS, et al.,

6              Plaintiffs,

7     Vs.                              CIVIL ACTION NO.

8                                      CV-2002-85

9     HANSON AGGREGATES SOUTHEAST,

10    INC., et al.,

11              Defendants.

12

13                       VOLUME II

14

15         CONTINUATION OF THE DEPOSITION OF BOBBY

16    HENDERSON, taken pursuant to notice and stipulation

17    on behalf of the Defendants, in the conference room

18    of Adams, Umbach, Davidson & White, 205 South 9th

19    Street, Opelika, Alabama, before Ricky L. Tyler,

20    Certified Shorthand Reporter and Notary Public in and

21    for the State of Alabama at Large, on Wednesday, May

22    19th, 2004, commencing at 1:15 P.M.

23

116

1   Q.   And this well number five is 150 feet from well
2        number one?
3   A.   Correct.
4   Q.   And when was the test well done for well number
5        five?
6   A.   I think the first original test well was -- I'm
7        not sure, 2001.
8   Q.   Okay.
9   A.   We have -- we drilled four or five test wells
10       in a short period of time, so I'm not sure what
11       -- if it was 2001. I think it was 2001 when
12       the first test well was drilled.
13  Q.   Okay. And is the production well for well
14       number five, has it been also -- the contract
15       for it been done, to your knowledge?
16  A.   Yes, sir, it's been done.
17  Q.   So it's been completed?
18  A.   The well itself has been completed, yes, sir.
19  Q.   And do you know when it's supposed to go on
20       line?
21  A.   Probably within a couple of weeks.
22  Q.   Okay. And who drilled that well?
23  A.   Graves Well Drilling.

117

1   Q.   Out of where?
2   A.   Harpersville, Alabama.
3   Q.   Yes, sir. Do you know what the capacity of
4        that well is, the daily capacity of that well
5        is?
6   A.   It was permitted for a thousand gallons per
7        minute.
8   Q.   What is the capacity per minute for well number
9        one?
10  A.   I think it's 180 gallons a minute. I'm not
11       positive, but I believe.
12  Q.   180 gallons a minute?
13  A.   Yes, sir.
14  Q.   And well number five is a thousand gallons a
15       minute?
16  A.   Yes, sir.
17  Q.   Do you need some water?
18  A.   I've got bronchitis.
19            (Off-the-record discussion.)
20  Q.   Is well number five deeper than well number
21       one?
22  A.   Well number five, I believe it's 189 foot deep.
23  Q.   And how deep is well number one?

118

1   A.   I believe it's around 140. Now, I may be off a
2        few feet on this.
3   Q.   I understand.
4   A.   But, you know, it's not very much.
5            MR. DENSON: Did you say 189?
6   A.   Yes, sir, 189 foot.
7   Q.   For well number five. And about 140 for well
8        number one?
9   A.   Yes, sir.
10  Q.   Okay.
11           MR. BYRAM: That's the depth of the
12       well?
13           MR. ADAMS: That's what he said.
14           MR. BYRAM: 140 and 189?
15  Q.   Do you know what it costs the Beauregard Water
16       Authority to deliver a thousand gallons of
17       water from its wells?
18           MR. VERCELLI: Objection.
19  A.   Probably around 75 cents per thousand.
20  Q.   And do you know what the Beauregard Water
21       Authority charges its customers per thousand?
22  A.   It starts out at three dollars per thousand and
23       then it goes down from there. And I'm not sure

119

1        exactly where the breakdown is.
2   Q.   Do you mean after a thousand gallons it gets
3        cheaper per thousand?
4   A.   Yes, sir.
5   Q.   Okay.
6   A.   Not after a thousand. It's four or 5,000, and
7        then they will have a quarter per thousand
8        drop, and at 10,000 another quarter.
9   Q.   I've got you.
10  A.   And I'm not sure where the breakdown is on
11       that.
12  Q.   Thank you. I noticed on page 79 of your
13       deposition last year you testified that the
14       Beauregard Water Authority had not suffered any
15       damages as a result of the quarry; is that
16       still your opinion?
17           MR. VERCELLI: Objection. Let me
18       mention one thing; we're happy to
19       put him up, he's not currently an
20       employee, so he won't be the
21       corporate representative to answer
22       that question. Mr. Skinner will
23       better answer that question, but

6 (Pages 116 to 119)

120

1    I'm sure he can answer if he has
2    an opinion.  But it's not a
3    corporate representative
4    statement.
5        MR. ADAMS:  Thank you.  Go ahead.
6    A.  There's none that I can say for sure.
7    Q.  Okay.  And that's based on how many years of
8    association you've had with the Beauregard
9    Water Authority?
10    A.  17 years.
11        MR. ADAMS:  Okay.  That's all I have.
12        Thank you very much.
13
14        CROSS-EXAMINATION
15    BY MR. BYRAM:
16    Q.  Mr. Henderson, I just wanted to -- I think I
17    understood what you're saying, but you have had
18    an opportunity to review your deposition that
19    you gave before?
20    A.  Yes, sir.
21    Q.  Okay.  And you didn't note anything in there
22    that you wanted to change having read it?
23        MR. VERCELLI:  Objection.

121

1    A.  No, sir.
2    Q.  Is that right?
3    A.  I think so, yes, sir.
4    Q.  And you were telling the truth when you gave
5    that deposition?
6    A.  Yes.
7    Q.  Okay.  You had an opportunity to review all of
8    the records and everything before you gave that
9    deposition before, didn't you?
10    A.  I didn't understand the question.
11    Q.  Before you gave your deposition before, did you
12    have an opportunity to review the records of
13    Beauregard Water Authority?
14    A.  I had the opportunity to do it, yes, sir.
15    Q.  And had you done that before you gave your
16    deposition?
17    A.  I don't know particularly what records you
18    would be talking about.  You know, I may not
19    have looked at all of them, so I don't know.
20    Q.  Do you remember that we talked about a lot of
21    records in your deposition?
22    A.  Yes, sir.
23    Q.  And you brought some to the deposition with

122

1    you?
2    A.  Yes, sir.
3    Q.  Okay.  And as I recall, as soon as test well
4    four was put in -- well, test well three became
5    well four, right, production well four?
6    A.  Yes, sir.
7    Q.  Okay.  And as soon as test well three, which
8    became well four, was put in in '99, right?
9    A.  Yes, sir.
10    Q.  And then it had to be enlarged to be a
11    production well; is that right?
12    A.  Correct.
13    Q.  That means made bigger around?
14    A.  Yes, sir.
15    Q.  And that happened in 2001?
16    A.  I believe so.
17    Q.  Okay.  And you didn't actually start using it
18    for water supply until 2002?
19    A.  I'm not really sure on the exact dates.  It
20    might have been early 2002 when it was started.
21    Q.  Well, in your last deposition you said April
22    2002, would that have been right?
23    A.  It could have been.

123

1    Q.  Okay.  And I think you told me that from the
2    outset when that was drilled as a test well in
3    1999, the Water Authority kept looking for
4    other well sites; is that right?
5    A.  Yes, sir.  They're still looking for other well
6    sites now, yes, sir.
7    Q.  And so y'all knew that well three wasn't going
8    to be a productive enough well to provide your
9    needs, didn't you?
10    A.  We knew we had to have water and we was looking
11    for more water than what it was putting out.
12    Q.  And you actually, after that, had three more
13    test wells put in at Mr. Mitchell's property;
14    is that right?
15    A.  Yes, sir.
16    Q.  Okay.  And none of them worked, right?
17    A.  No, sir.
18    Q.  Okay.  And then --
19    A.  I'm not sure -- I'm not sure at what point --
20    we had wells put in on Pete Mitchell's
21    property, and I'm not for sure at what point
22    they were put in, whether the wells at the
23    Forestry was drilled first or --

8

1

1          IN THE CIRCUIT COURT FOR

2             LEE COUNTY, ALABAMA

3

4

5   MIKE DAVIS, et al.,

6          Plaintiffs,

7   Vs.                        CIVIL ACTION NO.

8                              CV-2002-85

9   HANSON AGGREGATES SOUTHEAST,

10  INC., et al.,

11         Defendants.

12

13

14

15          DEPOSITION OF RICHARD G. SKINNER, taken

16  pursuant to notice and stipulation on behalf of the

17  Defendants, in the conference room of Adams, Umbach,

18  Davidson & White, 205 South 9th Street, Opelika,

19  Alabama, before Ricky L. Tyler, Certified Shorthand

20  Reporter and Notary Public in and for the State of

21  Alabama at Large, on Wednesday, May 19th, 2004,

22  commencing at 2:30 P.M.

23

---

**18**

1  Q.  Okay. And did you hire somebody when
2      Mr. Henderson retired to take his place?
3  A.  Yes, sir, we did.
4  Q.  Who was that?
5  A.  Mr. Tim Williams.
6  Q.  And where did Mr. Williams work before he came
7      on board?
8  A.  I want to say Superior Electric.
9  Q.  All right. Just tell me, if you will, the
10     names of all of the people that work for the
11     Beauregard Water Authority.
12  A.  Right now?
13  Q.  Yes, sir.
14  A.  Right now there's myself, Richard Skinner,
15     Thomas Danny Peoples, Dexter Frazier, Jeff
16     Peters and Damon Corhan.
17  Q.  Corbin?
18  A.  Corhan.
19  Q.  C-O-R-E-N or C-O-R-A-N?
20  A.  C-O-R-H-A-N.
21  Q.  Okay. And then you would have -- that's one,
22     two, three, four -- that's six. And you've got
23     Beverly Bishop and who else?

---

**19**

1  A.  Beverly Bishop, Lisa Crenshaw and Jean Hamby.
2  Q.  Okay. Is the Beauregard Water Authority having
3     any problems with its water supply system now?
4         MR. VERCELLI: Objection.
5  A.  Any problems?
6  Q.  Yes, sir.
7  A.  In what regard, sir?
8  Q.  In the supply of the quantity of water that's
9     available to it through its wells?
10  A.  Not -- not now.
11  Q.  Have they ever had any problems with them since
12     you've been employed there?
13  A.  Well, just in peak months we had to buy water
14     from Opelika.
15  Q.  Just because of demand?
16  A.  Just because of the demand.
17  Q.  Okay. Any other reason other than because of
18     increased demand?
19  A.  Not to my knowledge.
20  Q.  Okay. Do you know of any adverse effect to the
21     Beauregard Water system as a result of the
22     quarry that's being operated currently by
23     Oldcastle?

---

**20**

1  A.  Not to my knowledge, no, sir.
2  Q.  Have you ever talked with anybody from
3     Oldcastle?
4  A.  No, sir.
5  Q.  Are you here today to offer any complaints
6     about the method and manner that Oldcastle is
7     operating the quarry?
8         MR. VERCELLI: Objection. You can go
9     ahead and answer.
10  A.  I have a personal opinion that over time
11     they're going to -- they're drawing so much
12     water out of the ground that it's going to
13     affect our water table, our water.
14  Q.  Tell me when you think that will occur.
15  A.  Well, I have no idea when that will occur.
16  Q.  Are you talking about sometime between now and
17     the end of time, or are you talking about
18     sometime between now and 20 years, 50 years, or
19     do you have any opinion about that?
20  A.  I don't -- I don't have an opinion on when it's
21     going to happen, but I do think that over a
22     period of time it will happen.
23  Q.  So you have -- I guess it would be correct to

---

**21**

1     say you have two opinions. One is that at some
2     point in time it will be a problem for
3     Beauregard, correct?
4  A.  Yes, sir.
5  Q.  And the other opinion that you've given me is
6     as of the present time and in the past there
7     hasn't been any problem?
8  A.  Yes, sir.
9  Q.  Okay. Do you have any other opinions, other
10     than those two, about anything that's pending
11     in this lawsuit between Beauregard and Hanson
12     Quarries or Oldcastle Materials?
13  A.  No, sir.
14         MR. ADAMS: That's all I have. Thank
15     you very much.
16  A.  Yes, sir.
17
18         CROSS-EXAMINATION
19  BY MR. BYRAM:
20  Q.  Mr. Skinner, I think I understood what you were
21     saying just then in those questions and answers
22     of Mr. Adams, but do you have any opinions or
23     claims or contentions that while Hanson

---

6 (Pages 18 to 21)

5/19/2004                                                          Richard Skinner

22

1    operated the quarry from, say, '99 to 2003, did
2    it cause any problems to the Beauregard Water
3    system?
4    A.   Not to my knowledge, no, sir.
5    Q.   All right. We've got some documents that were
6         produced here late yesterday afternoon,
7         operations report, pumping reports, things of
8         that nature, can you explain these to me?
9    A.   Yes, sir.
10   Q.   You can?
11   A.   Which ones are they, the monthly pumping
12        report?
13            MR. VERCELLI: Let me say this; he's
14            the one who gave them to me to
15            produce to you.
16            MR. BYRAM: I guess he can then.
17            MR. ADAMS: So he is the man then.
18            MR. VERCELLI: But you weren't showing
19            him anything, so he wouldn't
20            necessarily have known what you
21            meant. And what he's talking
22            about, Mr. Skinner, is the
23            documents that we produced, and

23

1            you haven't seen until today what
2            we've label as Plaintiffs'
3            Supplemental Response.
4    A.   Oh, okay.
5            MR. VERCELLI: But that's what we're
6            talking about.
7            MR. BYRAM: Can we take a break?
8            MR. VERCELLI: Sure.
9            (Recess.)
10           (Defendant's Exhibit 371 marked
11           for identification.)
12           MR. VERCELLI: Let's go on the record
13           real quick. We produced yesterday
14           to you-all a supplemental response
15           to interrogs and requests. This
16           was based on two conversations I
17           had with Mr. Skinner, who produced
18           the documents for me, and I
19           thought that I had gotten all of
20           the facts and figures correct, but
21           when I showed it to him a little
22           while ago, there were some of the
23           figures that are a little bit

24

1         incorrect, and he can correct
2         those, but generally the answers
3         are good. He could swear to the
4         truth and accuracy of the answers
5         as corrected, but he'll correct
6         some figures.
7            MR. BYRAM: Okay. Well, let's get our
8            corrections down first.
9    Q.   First of all, just for the record, Mr. Skinner,
10        I'm Jim Byram; I represent Hanson, and I'm
11        going to be asking you some questions.
12        Defendant's Exhibit 371 is a copy of what I
13        received late yesterday afternoon from
14        Mr. Vercelli, supplemental interrogatory
15        response and some documents. And Chip has
16        informed us that there were some errors in here
17        and you've got them corrected on this copy?
18   A.   Not on that copy, no, sir.
19   Q.   All right. Well, why don't you just go ahead
20        and write on there what the right answers are?
21   A.   Do you want it in pen or pencil?
22   Q.   I want it in black pen, if you've got one,
23        something that will show up good, because it's

25

1    going to be copied.
2    A.   (Witness complies.)
3            MR. VERCELLI: On paragraph six, the
4            736,000 dollar figure should be
5            655,840.54.
6            MR. ADAMS: Read that out again.
7            MR. VERCELLI: 655,840.54. On
8            paragraph seven, paren, two, page
9            two, --
10   A.   Yeah, right here.
11           MR. VERCELLI: -- that one, I think,
12           you had corrected also. Instead
13           of 215,000, it should be --
14   A.   173,405.
15           MR. VERCELLI: Point 00. On seven,
16           paren, three, instead of 6,000 to
17           Hill Engineering Group --
18   A.   It was 22,500.
19           MR. VERCELLI: And we would note that
20           that's paid in full now; is that
21           correct?
22   A.   Yes, sir. And Tommy Caudle Electric, I gave
23           them a figure of a hundred thousand, and then I

7 (Pages 22 to 25)

5/19/2004

Richard Skinner

62

1  A.   Yes, sir.
2  Q.   -- this would correspond to the well number?
3  A.   The pumping station number four is the well
4       number, and I put the well depth, pumping depth
5       in the pumping station.
6  Q.   And that would be the depth to water?
7  A.   It was when we were pumping.
8  Q.   All right.  In your interrogatory answers it
9       says well number four has a historical pumping
10      level of 116 feet below ground level?
11 A.   No.  It came up to 116 after last year.  Prior
12      to that it was 124, 126, 125.  Last year it
13      came -- or this year it came back up to 116.
14 Q.   Well, now, on this pump test that's included in
15      here, Bates-number 2344, it shows it going down
16      to 212 feet?
17 A.   Yes, sir.  But it goes down there at different
18      pumping -- a different amount of water pumped
19      out of it.  You see, this is 150 gallons a
20      minute.
21 Q.   What were you pumping -- what was your
22      production level?
23 A.   We never pumped more than a hundred gallons a

63

1       minute out of it.
2  Q.   All right.  I see.  So what was the --
3  A.   That was a pump test report to see how much it
4       drew down over -- according to what they were
5       pumping out of it.
6  Q.   Okay.  But, anyway, these records that are in
7       375 are going to show what the pumping level
8       was for this well?
9  A.   Yes, sir.
10 Q.   All right.  And so what did it go down to?
11 A.   124.
12 Q.   That's as low as it got?
13 A.   Yes, sir.
14 Q.   And it stayed there for a long time?
15 A.   Yes, sir.
16 Q.   So let me ask you this question now; it says
17      well number four has a historical pumping level
18      of 116 feet below ground level?
19 A.   Uh-huh.  (Positive response.)
20 Q.   Now, you told me that's what it went to --
21 A.   It came back up to.
22 Q.   Up to.  Okay.  I see.
23 A.   It was 124 foot.  It dropped during the drought

64

1       to 124 foot, then when we -- the water table
2       level came back up, it came up to 116 feet
3       pumping level at a hundred gallons a minute.
4  Q.   So when you shut it down it was at 116?
5  A.   Yes, sir.
6  Q.   Okay.  But most of the time it was being
7       operated it was pumping at 124?
8  A.   124, yes, sir.
9  Q.   And your pump had to have been at least at 260
10      deep?
11 A.   Yes, sir.
12 Q.   Okay.  Now, this sentence says, "However,
13      because well number four pumping capacity has
14      declined so markedly in the past year or so,
15      well number four was taken off line."  What is
16      that talking about?
17 A.   Well, well number four, when we drilled number
18      five, number five was so much better a well
19      than number four, then we decided to take
20      number four off line because you're only
21      getting a hundred gallons a minute out of that
22      well.  Whereas, number five we're getting -- we
23      can pump -- well, we're permitted to a thousand

65

1       gallons a minute, but we could go more.
2  Q.   Right.  That's just because well five is a lot
3       better well?
4  A.   Right.
5  Q.   Okay.  But I'm talking about well four.  It
6       says you're operating it at 124 feet and then
7       when we had more rain it went up to 116 feet
8       when we shut it down, so it was higher water
9       when you shut it down than most of the time it
10      was operating, but this says "pumping
11      capacity."  What does that mean, pumping
12      capacity has declined?  What is pumping
13      capacity?
14 A.   Pumping capacity is how much water you can pump
15      out of that well.
16 Q.   Well, I thought we said that the amount of
17      water pumped out of the well didn't really vary
18      over the whole time?
19 A.   It didn't.  It didn't.
20 Q.   So that statement in that answer is just not
21      right, is it?
22 A.   No, sir.
23 Q.   Okay.  No, sir, it's not correct?

Ricky L. Tyler
(334) 262-3331

17 (Pages 62 to 65)



66

1    A.    No, sir, it's not correct.
2    Q.    Okay. Well, do you want to edit that on your
3          exhibit?
4              MR. ADAMS: Why don't you just have him
5                  read out loud what a correct
6                  statement for number five ought to
7                  be into the record?
8          MR. BYRAM: Okay.
9              MR. ADAMS: Because I heard him say
10                 that it wasn't correct for it to
11                 say it had a historical pumping
12                 level of 116 feet either.
13         MR. BYRAM: That's right.
14   A.    It didn't.
15             MR. ADAMS: Why don't you just read
16                 what that ought to say?
17   A.    "Beauregard Water well number four has a
18         historical pumping level of 124 feet below
19         ground level during the worst of the drought.
20         And then after the drought was over, the water
21         table came up, the pumping level in well number
22         four came up to 116 feet."
23             MR. VERCELLI: That is what it says.

67

1              What it says in writing is correct
2                  then.
3          MR. ADAMS: No, it's not what it says.
4          MR. VERCELLI: It's not said exactly
5                  the same way he said it, but
6                  that's the same information.
7          MR. BYRAM: No.
8          MR. ADAMS: No, it starts off by saying
9                  that well four has a historical
10                 pumping level of 116 feet, which
11                 he says that's not true.
12         MR. VERCELLI: Below ground level. 116
13                 feet below ground level is higher
14                 than 124 feet.
15   A.    Right. It never pumped at 116 feet. It was
16         always at 124, 125, but it never was at 116
17         feet until after the drought.
18             MR. VERCELLI: Okay. And before the
19                 drought what was it?
20   A.    124 feet.
21             MR. VERCELLI: Okay.
22   A.    So it was lower in the well.
23   Q.    And what should the next sentence say?

68

1    A.    "Well number four pumping capacity has not
2          declined markedly over the past year or so."
3              MR. ADAMS: Thank you.
4    Q.    All right.
5              MR. ADAMS: Have him read the -- finish
6                  reading number five and ask him if
7                  that's a correct statement.
8    Q.    All right.
9    A.    "Beauregard well number four was taken off line
10         and capped effectively --" Monday was the --
11             MR. VERCELLI: 17th.
12   A.    The 17th of May, yes. "In its place,
13         Beauregard Water developed well number five
14         which will be in production."
15             MR. VERCELLI: When will it be in
16                 production?
17   A.    Hopefully by the end of the month.
18   Q.    So really the only connection between four and
19         five is that five is a better well than four?
20   A.    Yes, sir.
21   Q.    It says, "However, because well number four has
22         not declined, well number four was not taken
23         off line -- was taken off line." That's not

69

1          right, is it? I mean, it wasn't taken off line
2          because it had not declined?
3    A.    No. It was taken off line because well number
4          five was a better well.
5    Q.    Okay. Any other reason? Was the iron a reason a
6          reason that it was taken off?
7    A.    Well, there was a high content of iron and
8          magnesium in the well, yes, sir.
9    Q.    Okay.
10   A.    That's why we added our filtration system to
11         it.
12   Q.    You didn't have to have that on your other
13         wells?
14   A.    No, sir.
15   Q.    Okay. Now, I think we went over the pump
16         reports. Then you've got something called an
17         operations report on here --
18   A.    Yes, sir.
19   Q.    -- beginning at about 2366. What is that
20         document?
21   A.    This is a document that Ms. Crenshaw types up
22         and gives to the Board members every month so
23         they know what is happening within the system.

18 (Pages 66 to 69)

9

1

1              IN THE CIRCUIT COURT FOR

2                 LEE COUNTY, ALABAMA

3

4

5    MIKE DAVIS, et al.,

6              Plaintiffs,

7    Vs.                          CIVIL ACTION NO.

8                                 CV-2002-85

9    HANSON AGGREGATES SOUTHEAST,

10   INC., et al.,

11             Defendants.

12

13

14

15             DEPOSITION OF HARRY LAZENBY, taken

16   pursuant to notice and stipulation on behalf of the

17   Defendants, in the conference room of Adams, Umbach,

18   Davidson & White, 205 South 9th Street, Opelika,

19   Alabama, before Ricky L. Tyler, Certified Shorthand

20   Reporter and Notary Public in and for the State of

21   Alabama at Large, on Wednesday, May 19th, 2004,

22   commencing at 4:40 P.M.

23

**34**

1  A.   No.
2  Q.   Is that right?
3  A.   That is right.
4  Q.   And you've made a big addition --
5  A.   Right.
6  Q.   -- within the last five years?
7  A.   Yeah.  We have tried to cover the whole area if
8       possible.
9  Q.   Do you know what your pumping -- daily pumping
10      capacity is?
11 A.   I do not.
12 Q.   Do you know what your annual revenue is?
13 A.   Well, basically.
14 Q.   What is it?
15 A.   Probably about -- are you talking about before
16      expenses or just --
17 Q.   I'm talking about revenue, total receipts.
18 A.   Total receipts.  No, I couldn't give you that
19      figure; I sure couldn't.
20 Q.   Do you know what your annual profit is?
21 A.   Well, it varies from year-to-year.
22 Q.   What's the average?
23 A.   Around about 50 to 60,000 dollars.

**35**

1  Q.   50 to 60,000 dollars a year?
2  A.   Right.
3  Q.   Okay.  Where do y'all have your bank accounts?
4  A.   I believe it's Bancorp.
5  Q.   At Bancorp South?
6  A.   I believe that's right.
7  Q.   All right.  Any other banks?
8  A.   No.
9  Q.   Who is authorized to sign on your bank
10      accounts?
11 A.   Myself and Beverly Bishop.
12 Q.   Do you have to have two people sign all of the
13      checks?
14 A.   Uh-huh.  (Positive response.)
15 Q.   That would be yes?
16 A.   Yes.
17 Q.   Okay.  It's easier for him if you say yes.  To
18      your knowledge, has Beauregard Water Authority
19      ever run out of water to service its customers?
20 A.   We haven't run out, other than we have a demand
21      like -- we only have so much pumping capacity,
22      but we have not run out of water.
23 Q.   Do you treat your water?

**36**

1  A.   Sure.
2  Q.   How many gallons a day can you treat at your
3       treatment facility?
4  A.   That I don't keep up with.
5  Q.   All right.  Have you ever known what they could
6       treat a day?
7  A.   I don't.
8  Q.   Do you know, when you buy the water from
9       Opelika, do you have to treat it --
10 A.   No.
11 Q.   -- or is it already treated?
12 A.   It's already treated.  We try to buy as little
13      as we can.
14 Q.   Before your lawyer got a phone call and left,
15      Mr. Vercelli, Mr. Sprayberry is, of course,
16      here, he told me that you were going to tell us
17      about what the history of the Beauregard Water
18      Authority was.  Have you and I talked about
19      everything you can think of as far as --
20 A.   Well, that's basically the history.  We just
21      started roughly in 1974.  And we started with
22      about 500 customers and we've gone to about --
23      between 28 and 2,900.

**37**

1  Q.   Okay.  And you haven't left anything out in
2       terms of what the history is that you can think
3       of that's significant?
4  A.   I don't -- I can't think of anything really.
5  Q.   Okay.
6  A.   We've always had a good system, a good bunch of
7       folks, and we hope we've done a favor for this
8       community.  We set out to try to have some
9       service available that we didn't have when we
10      grew up.
11 Q.   Okay.  And then Mr. Vercelli said the other
12      thing you were going to tell me is why you are
13      here, why the Beauregard Water Authority is
14      here; why are you here?
15 A.   Well, like I said, we are concerned of what our
16      supply of water will be down through the years.
17 Q.   All right.  Worried about what your future
18      supply of water might be?
19 A.   That's right.
20 Q.   Okay.
21 A.   We don't have any magic wand or anything to
22      tell us that it's going to stay.
23 Q.   Right.  What is it that they say about the only

10 (Pages 34 to 37)

**38**

1  thing that's certain in life is what?
2  A.  Is death and taxes, I've heard that.
3  Q.  I've heard that.  And none of us have --
4  A.  That's right.
5  Q.  So you're here because you're concerned about
6      the future for water availability for
7      Beauregard?
8  A.  That's right.
9  Q.  Anything else, reason that you're here, other
10     than that?
11 A.  That would be my main reason.
12 Q.  Any other secondary reasons?
13 A.  I don't think there would be any secondary.
14 Q.  And then the other thing he told me you were
15     going to tell me about is what do you want;
16     what does the Beauregard Water Authority want?
17 A.  Well, we just would like to have some guarantee
18     or leverage that we could not run out of water
19     by some reason that could be prevented.
20 Q.  A guarantee or leverage that you won't run out
21     of water on account of something that could be
22     prevented?
23 A.  That's right.

**39**

1  Q.  Anything else that you want?
2  A.  That would be the main reason.
3  Q.  Sir?
4  A.  That would be the main reason.
5  Q.  Okay.  Any other secondary reasons other than
6      that?
7  A.  I don't think so.
8  Q.  Can you think of anything else that you want
9      other than a guarantee or leverage that you
10     won't run out of water on account of something
11     you might prevent?
12 A.  That's right.
13 Q.  Anything else other than that?
14 A.  I can't think of anything right now.
15 Q.  Okay.  That's fine.
16         MR. ADAMS:  That's all I have.  Thank
17     you very much, Mr. Lazenby.
18
19         CROSS-EXAMINATION
20 BY MR. BYRAM:
21 Q.  Mr. Lazenby, I'm Jim Byram; I represent Hanson;
22     I'm from Montgomery.  Let me ask you a few
23     questions.  What business are you in

**40**

1  personally?
2  A.  I grow cotton.
3  Q.  Cotton farmer?
4  A.  Just call me a farmer.
5         MR. SPRAYBERRY:  Self-employed
6      agriculturally.
7  A.  Self-employed and I have a retail business.
8  Q.  Okay.  And what's your retail business?
9  A.  It's a convenience center.
10 Q.  You said the financing for the original system
11     was FHA?
12 A.  Right.
13 Q.  How did that work?  Was that bonds or what was
14     that?  Did they just give a loan?
15 A.  We just made loans through the local bank.
16 Q.  And FHA guarantees the loan; is that it?
17 A.  That's right.  We have since paid off FHA.
18 Q.  And now it's self-sustaining, so to speak?
19 A.  No.  No.  We borrowed money from Joe Jolly in
20     Birmingham, so we just changed the people we
21     borrow it from.
22 Q.  Okay.  And is that bonds?
23 A.  It's just a loan; the same way as through the

**41**

1  bank.  We got a better interest rate and ten
2  years closer payoff.
3  Q.  Is that guaranteed?
4  A.  Yeah.
5  Q.  Who guarantees that?
6  A.  Joe Jolly.
7         MR. VERCELLI:  I think what he's asking
8      is does some organization
9      guarantee the payment of the loan?
10 A.  No.  We guarantee the payment, the water
11     system, Beauregard.
12 Q.  The system, not individually?
13 A.  Right.
14         MR. ADAMS:  But it's not guaranteed by
15     Farmers Home Administration or the
16     Small Business Administration or
17     any individual as far as --
18 A.  No.  We've got a loan with Joe Jolly.  And, of
19     course, I think the local banks made the loan,
20     but we're the ones to pay it off.
21 Q.  And it's, I guess, tax-free to Joe Jolly?
22 A.  That's right.  That's right.
23 Q.  But you sell the water for enough to pay all of

11 (Pages 38 to 41)

50

1    their daily operations.
2  Q.  Okay.
3  A.  When they've got a problem or got something
4      good to present to us, we go from there.
5  Q.  So Mr. Henderson was authorized to make those
6      decisions?
7  A.  That's right.
8  Q.  Okay. And now that Mr. Skinner is --
9  A.  In conjunction with the driller.
10 Q.  With the well driller?
11 A.  We rely a lot on Graves as to being the
12     authority because they have so many years of
13     experience in it.
14 Q.  Who are the consultants? You've got Poly
15     Engineering and now Derrick Hill?
16 A.  Hill.
17 Q.  And then you've got Graves is the drilling
18     company?
19 A.  Right.
20 Q.  Who else do y'all work with?
21 A.  That would be basically it.
22 Q.  Those would be the two?
23 A.  The three.

51

1        MR. ADAMS: Who was the engineering
2        company that they've mentioned
3        that was up in --
4        MR. BYRAM: Derrick Hill.
5  A.  Poly Engineering is in Abbeville.
6        MR. ADAMS: I thought he said he had
7        one that they were talking about
8        with regard to the wellhead
9        protection.
10       MR. SPRAYBERRY: Poly Engineering got a
11       guy out of South Alabama to do
12       that.
13       MR. ADAMS: Okay. That wasn't the
14       fellow from Hartsell?
15       MR. SPRAYBERRY: No.
16 Q.  Do you know the contact information for
17     Mr. Hill?
18 A.  I do not.
19       MR. SKINNER: I have his phone number
20       at the office.
21 A.  Dick might.
22 Q.  I heard your answers to Mr. Adams' questions
23     about why Beauregard is in the lawsuit.

52

1  A.  Uh-huh. (Positive response.)
2  Q.  So is Beauregard asking for damages?
3  A.  I don't know. I will just have to ask what the
4      lawyers say.
5  Q.  Okay. You're leaving that up to the lawyers?
6  A.  Yeah.
7  Q.  Is that right?
8  A.  Yeah.
9  Q.  You need to say yes or no or whatever.
10 A.  Yes.
11 Q.  Okay. But from the Board's standpoint, what
12     you're looking for is just -- you're concerned
13     about what might happen in the future?
14 A.  That's right.
15 Q.  And this engineer or whatever he was that told
16     you that the quarry and your wells were in the
17     same aquifer, you don't know who that was?
18 A.  I would have to go back through the Board and
19     see -- talk with Beverly Bishop, because she
20     has the name and all. I can't remember his
21     name.
22 Q.  Was it a live person who came to the Board and
23     talked to y'all?

53

1  A.  Oh, sure. I think we did have on two
2      occasions, the best I can remember. This has
3      been two to three years ago.
4        MR. ADAMS: Maybe we need to take
5        Ms. Bishop's deposition and maybe
6        just have her bring that.
7  A.  Beverly is day-to-day operations, she can
8      remember the names, I can't. I have umpteen
9      other things that I remember.
10 Q.  Okay. And was that -- was the issue there, did
11     it relate to the quarry? I mean, was your
12     question, is the quarry and our wells in the
13     same aquifer?
14 A.  I think I could say that.
15 Q.  Okay. And you think Ms. Bishop would know
16     that?
17 A.  Right. To my recollection, I've never heard of
18     but one aquifer and that's the one that we're
19     in. Of course, when we started the system, we
20     was the only boy on the block, you know. And
21     so we didn't have any qualms that I remember
22     anything about. So we were the only ones
23     pumping out of that aquifer. So it's just that

14 (Pages 50 to 53)

2687

**IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA**

MIKE DAVIS, et al.,                    )
                                       )
    Plaintiffs,                 )
                                       )
vs.                                    )          CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
    Defendants.                 )

**FILED**

**JUN 1 7 2004**

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION FOR HEARING

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") requests that the following dispositive motions be heard before the Court at the next scheduled status conference:

    1.    Hanson's motion for summary judgment, filed 5/19/03 (Memorandum Brief in Support, filed 6/19/03);

    2.    Hanson's motion to strike portions of plaintiffs' submissions in response to Hanson's motion for summary judgment, filed 9/22/03;

    3.    Hanson's motion to dismiss or motion for summary judgment regarding plaintiffs' claim for injunctive relief, filed 8/25/03.

Respectfully submitted this the 15 day of June, 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
(334) 834-6500
(334) 269-3115 (fax)

145772.1                                                    1

2625

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 15 day of June, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL 36803-2345

_____
Of Counsel

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED JUN 1 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al.,                    )
                                       )
         PLAINTIFFS,                   )
                                       )
vs.                                    )        CIVIL ACTION NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
         DEFENDANTS.                   )

## NOTICE OF FILING EXPERT DISCLOSURES

COMES NOW the Defendant, Oldcastle Matarials, by and through undersigned

counsel, and hereby gives notice of filing the following:

1.    Oldcastle's Disclosure of Rebuttal Expert, Maria Zufall and/or Andy Hixson
      of Trinity Consultants.

2.    Oldcastle's Disclosure of Rebuttal Expert, Kenneth Kaliski of Resource
      Systems Group, Inc.

3.    Oldcastle's Disclosure of Rebuttal Expert, Charles R. Faust of Geotrans, Inc.

4.    Oldcastle's Disclosure of Rebuttal Expert, McRoy Sauls of Saul Seismic, Inc.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

MATTHEW W. WHITE (WHI086)
Attorneys for Defendant
Post Office Box 2069
Opelika, AL 36801
(334) 745-6466

2650

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the above and foregoing upon:

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 South Perry Street
Montgomery, AL 36104

James B. Sprayberry, Esq.
P.O. Box 2429
Auburn, AL 36831-2429

Guy Gunter, Esq.
P.O. Box 409
Opelika, AL 36801

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

This the __18__ day of __June__, 2004.

_____
Of Counsel for Defendant

.2691

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
                                       *
            Plaintiff,                 *
                                       *
vs.                                    *        CIVIL ACTION NO. CV 02-085
                                       *
HANSON AGGREGATES                      *
SOUTHEAST, INC., et al,                *
                                       *
            Defendants.                *

## ORDER

A Status Conference was held in the above-styled case on June 9, 2004. The Court was informed that the parties desire to continue the Pre-Trial Conference until after the mediation of the case is completed. Therefore, the Pre-Trial Conference in this case is continued to either July 6 or July 7, 2004. The parties are to inform the Court as to which date is the most convenient.

On other issues it appears to the Court that there are several discovery matters that may possibly need the Court's attention. In particular, the matter regarding the "privilege log" submitted to the Court for in camera inspection should be addressed. Therefore, the parties are to contact the Court and set up a hearing regarding this matter as well as any other discovery matters prior to the Pre-Trial Conference.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Jimmy Sprayberry                  Hon. Charles Vercelli, Jr.
Post Office Box 2429                    1019 S. Perry Street
Auburn, AL 36831-2429                  Montgomery, AL 36104

Hon. James Byram, Jr.                  Hon. John V. Denson
Hon. Dorman Walker                     Post Office Box 2345
Hon. Matt Parnell                      Opelika, AL 36803-2345
Post Office Box 78
Montgomery, AL 36101                   Hon. Phillip E. Adams, Jr.
                                       Post Office Box 2069
Hon. Guy Gunter                        Opelika, AL 36803-2069
Post Office Box 409
Opelika, AL 36803-0409

DONE this the 18th day of June, 2004.

JACOB A. WALKER, III
Circuit Judge

FILED

JUN 2 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA**

FILED

JUN 21 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CASE NUMBER: CV-02-85** |
| | § | |
| HANSON AGGREGATES SOUTHEAST, | § | |
| INC., et al. | § | |
| Defendants. | § | |

## NOTICE OF SERVICE DISCOVERY DOCUMENTS

To:  Clerk of the Lee County Circuit Court
     Lee County Justice Center
     2311 Gateway Drive, Room 104
     Opelika, Alabama 36801.

     Please take notice that the following documents were served on June 21, 2004 to all attorneys of record in the above styled and numbered cause;

     1.  Answers to Oldcastles' First Set of Interrogatories by Terry and Carol Long.

James B. Sprayberry (SPR008)
*One of the Attorneys for Plaintiffs*

OF COUNSEL:
James B. Sprayberry
ATTORNEY AT LAW
P.O. Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049
(334) 834-8805

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, Alabama 36803-0409
(334) 745-6244

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been provided to the following, by first class mail, on this the ~~25~~th day of ~~May~~, 2004.
21    June

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY &
BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE,
LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

this the 21st day of June, 2004.

James B. Sprayberry

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUN 2 1 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## OLDCASTLE'S OBJECTION TO PLAINTIFFS' MOTION TO ADD LEE COUNTY AS A PARTY PLAINTIFF

COMES NOW the Defendant, Oldcastle Materials Southeast, Inc., by and through counsel, and objects to Plaintiffs' Motion to add Lee County as a Party Plaintiff.  As grounds for said motion, Defendant states as follows:

1.  Plaintiffs filed their motion to add Lee County as a party plaintiff on or about June 15, 2004.

2.  This matter is set for trial beginning August 16, 2004.   The Court has set aside three (3) week to try this case.

3.  To allow Plaintiffs to add Lee County as a party plaintiff at this late date, would unduly prejudice this Defendant, as  this Defendant would have inadequate time to prepare a defense for Lee County's allegations.

4.  The Plaintiffs have known throughout the pendency of this litigation that Lee County had potential claims.  Yet, Plaintiffs have waited until just two (2) months prior to the scheduled trial date, and after many significant discovery deadlines have expired, to attempt to add Lee County.

5.  Prior to Oldcastle being named a party defendant in this case, a deposition of a representative of Lee County was taken as part of discovery in this case. However, to date, Oldcastle has not had an opportunity to engage in

discovery regarding Lee County.

6.    If Lee County is allowed to be added as a party plaintiff, Oldcastle will need additional time to engage in further written discovery, take further depositions, and engage further expert testimony regarding Lee County's allegations in this case.  At the very least, this will necessitate a continuance of the current trial setting of August 16, 2004.

7.    Further, if this Court allows Lee County to be added as a party plaintiff, but schedules Lee County's aspect of the case for 2005, Oldcastle would object to any representative of Lee  County being called as a witness in the 2004 litigation, as such would unduly prejudice the defendant, as Oldcastle would not have had the opportunity to engage in discovery as to Lee County's claims.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

MATTHEW W. WHITE (WHI086)
Attorneys for Defendant
Post Office Box 2069
Opelika, AL 36801
(334) 745-6466

2036

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the above and foregoing upon:

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 South Perry Street
Montgomery, AL 36104

James B. Sprayberry, Esq.
P.O. Box 2429
Auburn, AL 36831-2429

Guy Gunter, Esq.
P.O. Box 409
Opelika, AL 36801

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

This the 21 day of June, 2004.

_____
Of Counsel for Defendant

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

FILED
JUN 21 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK
2687

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC. et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION FOR SANCTIONS

COMES NOW, Defendant Oldcastle Materials Southeast, Inc. d/b/a SRM Aggregates ("Oldcastle"), by and through the undersigned counsel, and hereby files this Motion for Sanctions and sets forth and says as follows:

1. On or about the 16th day of June, 2004, Defendant Hanson Aggregates filed a Motion for Sanctions based on the testimony of the Beauregard Water Authority.

2. Defendant Oldcastle hereby joins the Motion for Sanctions as set forth by Hanson, and in further support of this Motion, would cite the Court to the testimony and authorities set forth in the Hanson motion as if the same were set forth herein full.

**WHEREFORE,** Defendant Oldcastle respectfully requests this Court enter sanctions against Defendant Beauregard Water Authority, and its counsel, and whatever other remedies the Court deems just and fair.

Respectfully submitted this the 21 day of June, 2004.

MATTHEW W. WHITE (WHI086)
Attorney for Defendant, Oldcastle Materials
Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel.  (334) 745-6466

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the ____21____ day of ____June____, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Of Counsel

2

2658

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS,  et al ) 
                            ) 
          **Plaintiffs,** ) 
                            )     **Civil Action No. CV-2002-85** 
**vs.** ) 
                            ) 
HANSON AGGREGATES SOUTHEAST, INC.; ) 
and OLDCASTLE MATERIALS SOUTHEAST, ) 
INC., et al ) 
                            ) 
          **Defendants.** )

## PLAINTIFFS' RESPONSE TO OLDCASTLE'S MOTION TO EXCLUDE LEE COUNTY

The Plaintiffs would show this Court that:

1.    Since the 2003 Witness Lists, Neal Hall, the Lee County Engineer, has been listed as a witness. Mr. Hall has previously produced to the defendants his complete file on Spring Villa and Spring Villa Road.

2.    Mr. Hall has given a deposition in this case relative to sinkholes, road repair and future problems.

3.    In addition, Mr. Hall has made Lee County's ground penetrating radar report available to the defendants.  The report included estimates on different types of repair for Spring Villa Road (Lee Road 148).   In early 2004, Lee County repaired Spring Villa Road by drilling holes approximately every ten (10) feet over a one thousand (1,000) foot stretch, and injecting pressurized concrete into caves and caverns underneath Spring Villa Road.  The total cost for the radar report and road repair was Two Hundred Fifty Thousand and 00/100 DOLLARS ($250,000.00).



FILED
JUN 2 2 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

4.    In addition to Neal Hall's deposition, Spring Villa Road has been physically inspected and photographed by the experts for both Hanson and Oldcastle.   These inspections included not only the right-of-way but the property of Donnie Smith (which is South and adjacent to Spring Villa Road) and the Schwiekers (which is North and adjacent to Spring Villa Road).  The experts for the quarry companies that have inspected the area include: Mr. Todd Wheeler, engineer for Oldcastle; Dr. Ralph Ewers, water expert for Hanson; Mr. Bob Wood, geologist/expert for Hanson; Dr. Bob Cook, geologist/expert for Hanson; Mr. Brian Fowler, geologist/expert/corporate representative for Oldcastle; Mr. Ward Nye, Vice-president for Hanson; and presumably Mr. Charles Faust, hydrologist/expert for Oldcastle.

5.    Ward Nye, vice-president for Hanson, toured the Spring Villa Road area in December, 2003 and actually saw a sinkhole collapse under the asphalt on Spring Villa Road.  While Mr. Nye was present, Lee County highway repair crew arrived to dig the sinkhole area out with a backhoe, re-pack the dirt and repair the hole.

6.    Not only is Lee County out of pocket $250,000.00, but Spring Villa Road and Lee Road 166 are subject again to failure and collapse at any time.  Both plaintiff and defense experts agree that one cannot predict the size, the number or the location of sinkholes; however, they also agreed that they usually form over limestone deposits or over the line where limestone meets another geologic formation.  Both Spring Villa Road and Lee Road 166 fall into that category.

WHEREFORE, there is no legitimate reason to deny Lee County the opportunity to join this lawsuit as a Plaintiff since it will not slow down or delay this trial or this case, Oldcastle's motion should be denied.

JAMES B. SPRAYBERRY  (SPR008)

**OF COUNSEL:**
**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the _22_ day of June, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

Page 3 of 3

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                     )
                                        )
          Plaintiffs,                   )
                                        )
vs.                                     )     CIVIL ACTION NO.: CV-02-085
                                        )
HANSON AGGREGATES                       )
SOUTHEAST, INC., et al.                 )
                                        )
          Defendants.                   )

## JOINDER OF YOUNG AND GILMER DEFENDANTS TO MOTION FOR SANCTIONS

COME NOW Defendants Virginia Young Priest, John Claude Young, c/o Virginia Young Priest, Louise Young O'Brien and Virginia Hart Young (hereinafter "Young Defendants") and Gilmer Properties, Ltd. (hereinafter "Gilmer Defendants") and join in the Motion for Sanctions filed by Defendant Hanson Aggregates Southeast, Inc. ("Hanson") on or about June 17, 2004, a copy of which is attached hereto and marked as Exhibit "A." For the foregoing reasons, the Motion for Sanctions filed by Hanson is due to be granted:

1.    The Young and Gilmer Defendants hereby adopt and incorporate the facts and law pertaining to the false interrogatory responses and the subsequent admission and revelation of said false interrogatory responses by Beauregard Water Authority (BWA) representatives, as set forth in Hanson's Motion for Sanctions.

2.    Rule 11, ALA. R. CIV. P. and Section 12-19-270 *et seq.* ALA. CODE provide the necessary and proper means for this Court to award attorneys' fees and costs to the Young and Gilmer Defendants due to the claims made in BWA's interrogatory responses which BWA representatives subsequently admitted to be false and without substantial justification. See ALA. CODE § 12-19-272(a). The Young and Gilmer Defendants note, as did Hanson, that the BWA

FILED

JUN 22 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

representatives apparently had no knowledge of the falsehood of their interrogatory responses, and indeed, to their credit, gave sworn deposition testimony that the interrogatory responses (which were not verified) were false. This Court should impose sanctions in order to deter and prevent further misrepresentations in this case and others.

WHEREFORE, for the above-stated reasons, and for the reasons as more fully explained in Hanson's Motion for Sanctions, Defendants Virginia Young Priest, John Claude Young, c/o Virginia Young Priest, Louise Young O'Brien and Virginia Hart Young and Gilmer Properties, Ltd. hereby join in the Motion of Hanson Aggregates, Southeast, Inc., for Sanctions, and request such other relief as the Court deems just.

Respectfully submitted,

John V. Denson (DEN007)
Joshua J. Jackson (JAC072)
Attorneys for Defendants Virginia Young Priest,
John Claude Young c/o Virginia Young Priest,
Louise Young O'Brien, Virginia Hart Young and
Gilmer Properties, Ltd.

OF COUNSEL:
SAMFORD, DENSON, HORSLEY,
PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL 36803-2345
Telephone (334) 745-3504
Facsimile (334) 745-3506

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all of the Parties and Attorneys of record in the above-styled cause by First Class United States Mail, postage prepaid, on this the _22__ day of June, 2004.

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 South Perry Street
Montgomery, Alabama 36104-5049

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Phillip E. Adams
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

Guy F. Gunter, III
GUNTER & MELTON
228 South 9th Street
Opelika, Alabama 36801

Stanley A. Martin
Post Office Box 2526
Opelika, Alabama 36803

OF COUNSEL

Exhibit A

RECYCLED PAPER
RECYCLABLE

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,    )
           )
  Plaintiffs,    )
           )
vs.         )  CASE NO. CV-02-85
           )
HANSON AGGREGATES   )
SOUTHEAST, INC., et al.,  )
           )
  Defendants.   )

## MOTION FOR SANCTIONS

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") moves the Court to enter appropriate sanctions under Rule 11, *Ala.R.Civ.P.* and/or *Ala. Code* §§ 12-19-270 *et seq.*, due to plaintiffs' counsel submitting false interrogatory answers, and shows the Court as follows:

1. In December 2002 Hanson submitted interrogatories (Ex. 1) to Beauregard Water Authority ("BWA"), and on February 4, 2003 received the following response (Ex. 2):

 11. Q. Identify by specific amount and category all monetary damages that you claim, and include in your response your calculations or other rationale for the amount that you claim.

   A. We are more concerned about an injunction because we have a large number of families who depend on us for water.

(Ex. 2).

2. BWA was deposed on April 16, 2003.[1] Bobby Henderson was designated as the 30(b)(6) representative for BWA. He testified at that time that Well No. 4 was not a productive well, that Well No. 5 was being developed, and that Well No. 5 would take the place of Well No. 4, because Well No. 5 produced at 1500 gallons per minute as opposed to 100 gallons per minute for Well No. 4, and because Well No. 4 was infected with an iron bacteria, which was discovered

---

[1] Excerpts from BWA's April 16, 2003 deposition are attached as Ex. 3.

in August 2002 after the well was placed in service in April 2002. (Deposition at 6, 32-33, 35-36, 47-48). He testified:

> Q.   Okay. So you're not sure whether or not the quarry is affecting either well one or well four?
>
> . . . .
>
> A.   I'm not sure.
>
> Q.   Okay. Has the Beauregard Water Authority commissioned any study to determine that?
>
> A.   No, sir.
>
> Q.   No, sir?
>
> A.   No, sir.
>
> Q.   Do you know of any experts in this case that are going to be testifying about Beauregard Water Authority?
>
> A.   No, sir.
>
> Q.   Have you talked to any of the experts?
>
> A.   No, sir.
>
> . . . .

(Ex. 3, p. 76.10 through p. 77.2) (objections omitted).

> Q.   Has Beauregard Water Authority suffered any damages caused by the quarry?
>
> . . . .
>
> A.   Not that I could say for sure, no, sir.

(Ex. 3, p. 79.2 through p. 79.6) (objections omitted).

    3.   Based on BWA's interrogatory responses and deposition testimony, Hanson filed a motion for summary judgment in June 2003 to dismiss the claims of the BWA because of the total lack of evidence of any damage caused to BWA by quarry operations. The Court has not yet ruled on this motion.

4.    After Oldcastle was added to the case, Oldcastle submitted interrogatories to BWA on November 12, 2003. (Ex. 4)    BWA's answer (Ex. 5), which was apparently not verified, but was signed by Mr. Vercelli, stated:

> . . . the special damages to Beauregard relates to dewatering and interference with the public water supplies of Beauregard well 4 and possibly its other wells. . . . If BWA loses its well number 4, its damages would be over $1 million dollars, though the exact amount has not been calculated for certain.

5.    Because this was a change from the prior testimony and because the former Rule 30(b)(6) representative for BWA was no longer employed by BWA, defendants requested a supplemental 30(b)(6) deposition for BWA.  The deposition was held on May 19, 2004.  The original 30(b)(6) representative and former employee Bobby Henderson, as well as another BWA employee, Richard Skinner, and BWA Board Chairman Harry Lazenby, were the designated witnesses.

6.    The day before the deposition, on May 18, Mr. Vercelli submitted supplemental responses to defendants' interrogatories and requests for production. (Ex. 6)  It included this statement:

> BWA Well No. 4 has historical pumping level of 116 feet below ground level. During the worst drought, the pumping level dropped to only 124 feet.  However, because Well No. 4 pumping capacity has declined so markedly in the past year or so, BWA Well No. 4 was taken off line and capped effective May 17, 2004.  In its place, BWA developed Well No. 5 which is now in production.

In addition, these interrogatory answers stated, "Plaintiff BWA claims, therefore, from the Defendants, a total of $730,481.68 for the loss of Well No. 4."  This interrogatory answer also apparently claimed the total cost to place BWA Well No. 5 into production as additional damages.  Again, this interrogatory answer was not verified, but was signed by Mr. Vercelli as counsel for BWA.

7.    At the deposition on May 19, Mr. Henderson and Mr. Skinner both confirmed that

there were no damages caused by the quarry.  Mr. Henderson testified:[2]

> Q.    . . . . I noticed on page 79 of your deposition last year you testified that
> the Beauregard Water Authority had not suffered any damages as a result
> of the quarry; is that still your opinion?
>
> . . . .
>
> A.    There's none that I can say for sure.

(Henderson Deposition at pp. 119.12 – 120.6) (objection omitted).

Similarly, Mr. Skinner stated:[3]

> Q.    Okay, Do you know of any adverse effect to the Beauregard Water system
> as a result of the quarry that's being operated currently by Oldcastle?
>
> A.    Not to my knowledge, no sir.

(Skinner Deposition at pp. 19.20 – 20.1)

> Q.    Mr. Skinner, I think I understood what you were saying just then in those
> questions and answers of Mr. Adams, but do you have any opinions or
> claims or contentions that while Hanson operated the quarry from, say '99
> to 2003, did it cause any problems to the Beauregard Water system?
>
> A.    Not to my knowledge, no, sir.

(Skinner Deposition p. 21.20 – p. 22.4)

8.    Moreover, Mr. Skinner in his deposition testified that the interrogatory answer

quoted in paragraph 6 above was false.  He explained:

> Q.    Okay.  Now, this sentence says, "However, because well number four
> pumping capacity has declined so markedly in the past year or so, well
> number four was taken off line."  What is that talking about?
>
> A.    Well, well number four, when we drilled number five, number five was so
> much better a well than number four, then we decided to take number four
> off line because you're only getting a hundred gallons a minute out of that

---

[2]  Henderson's May 19, 2004 deposition excerpts are attached as Exhibit 7.

[3]  Skinner's May 19, 2004 deposition excerpts are attached as Exhibit 8.

well. Whereas, number five we're getting -- we can pump -- well, we're permitted to a thousand gallons a minute, but we could go more.

(Ex. 8, pp. 64.12 -- 65.1).

Q.    So that statement in that answer is just not right, is it?

A.    No, sir.

Q.    Okay. No, sir, it's not correct?

A.    No, sir, it's not correct.

. . . .

MR. ADAMS: Why don't you just read what that ought to say?

A.    "Beauregard Water well number four has a historical pumping level of 124 feet below ground level during the worst of the drought. And then after the drought was over, the water table came up, the pumping level in well number four came up to 116 feet."

. . . . (comments of counsel deleted).

Q.    And what should the next sentence say?

A.    "Well number four pumping capacity has not declined markedly over the past year or so."

. . . .

Q.    So really the only connection between four and five is that five is a better well than four?

A.    Yes, sir.

Q.    It says, "However, because well number four has not declined, well number four was not taken off line -- was taken off line." That's not right, is it? I mean, it wasn't taken off line because it had not declined?

A.    No. It was taken off line because well number five was a better well.

Q.    Okay. Any other reason? Was the iron reason a reason that it was taken off?

A.    Well, there was a high content of iron and magnesium in the well, yes, sir.

Q.    Okay.

A. That's why we added our filtration system to it.

Q. You didn't have to have that on your other wells?

A. No, sir.

(Ex. 8, pp. 65.20 – 69-14).

9. Mr. Lazenby testified that the BWA was concerned about the future, and that

BWA was looking for "assurances" and "leverage," not damages[4]:

A. Well, like I said, we are concerned of what our supply of water will be down through the years.

Q. All right. Worried about what your future supply of water might be?

A. That's right.

. . . .

Q. So you're here because you're concerned about the future for water availability for Beauregard?

A. That's right.

. . . .

Q. And then the other thing he told me you were going to tell me about is what do you want; what does the Beauregard Water Authority want?

A. Well, we just would like to have some guarantee or leverage that we could not run out of water by some reason that could be prevented.

. . . .

Q. Can you think of anything else that you want other than a guarantee or leverage that you won't run out of water on account of something you might prevent?

A. That's right.

Q. Anything else, other than that?

A. I can't think of anything right now.

(Ex. 9, pp. 37.15 – 39.14)

---

[4] Lazenby deposition excerpts attached as Exhibit 9.

Q.    So is Beauregard asking for damages?

A.    I don't know. I will just have to ask what the lawyers say.

(Ex. 9, pp. 52.2 – 52.4)

10.    The amount of attorneys' fees and expenses associated with taking the BWA's deposition a second time was directly attributable to the false interrogatory answers, which attempted to change Mr. Henderson's prior sworn testimony. The representatives of BWA to their credit, would not swear falsely under oath at their deposition.[5] This additional discovery would not have been required if the interrogatory answers (Ex. 5, 6) prepared by the lawyers had been accurate.

11.    Rule 11, *Ala.R.Civ.P.*, provides: "The signature of an attorney constitutes a certificate by the attorney that the attorney has read the pleading, motion, or other paper; that to the best of the attorney's knowledge, information, and belief that there is good ground to support it; and that it is not interposed for delay." ". . . Rule 11 applies to motions and other papers as well as pleadings. The *specific* motivation for this expansion was the desire to make certain discovery devices such as . . . interrogatories subject to the provisions of Rule 11." *Committee Comments on 1973 Adoption of Rule 11.* (emphasis added.) Finally, "[i]t has frequently been held that both good faith and the spirit of the rule require the party answering interrogatories to see to it that his answers are truthful as of the time of the trial as well as of the time when the interrogatories are answered." *Id.*

12.    The Alabama Litigation Accountability Act also provides:

"The court shall assess attorneys' fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action or any part thereof, or asserted any claim or

---

[5]  Compare, however, the statement of Mr. Vercelli at Skinner's deposition, pp. 23-24:

. . . . We produced yesterday to you-all a supplemental response to interrogs and requests . . . . He could swear to the truth and accuracy of the answers as corrected, but he'll correct some figures.

2682

defense therein, that is without substantial justification, or that the action or any part thereof, or any claim or defense therein, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including but not limited to abuses of discovery procedures available under the Alabama Rules of Civil Procedure . . ."

ALA. CODE § 12-19-272(c) (1975). *See, e.g., Fields v. Primerica Life Insurance Company,,* 2002 WL 31059371 (M.D. Ala. 2002):

> [A]n officer of the court bears a responsibility to ensure the verity of the information offered before the court . . . .

> . . . .

> . . . Plaintiffs' counsel should be given some incentive to act more responsibly in the future. Indeed, hollow enforcement of the present statute would serve little deterrent impact upon lawyers who might otherwise negligently subject defendants to undue harassment.

WHEREFORE, the premises considered, Hanson respectfully requests the Court to award attorney's fees and other sanctions as appropriate.

Dated this *16th* day of June, 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL**:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
(334) 834-6500
(334) 269-3115 (fax)

2086

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the _16th_ day of June, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

2654

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS; DONNA DAVIS; , et al  )
)
Plaintiffs,  )
)
v.  )          CIVIL ACTION NUMBER: CV-02-085
)
HANSON AGGREGATES  )
 SOUTHEAST, INC.; VIRGINIA  )
YOUNG PRIEST, GILMER  )
PROPERTIES, LTD. AND  )
OLDCASTLE MATERIALS  )
SOUTHEAST, INC., etc.  )
)
Defendants.  )

### JOINDER OF YOUNG AND GILMER DEFENDANTS
### TO MOTION OF OLDCASTLE OBJECTING TO MAKING
### LEE COUNTY A NEW PARTY PLAINTIFF

COME NOW the Defendants, Virginia Young Priest; John Claude Young, c/o Virginia

Young Priest; Virginia Hart Young; Louise Young O'Brien (hereinafter **"Young Defendants"**)

and Gilmer Properties, Ltd. (hereinafter **"Gilmer Defendants"**) join in the Motion filed by the

Defendant, Oldcastle Materials Southeast, Inc. (hereinafter **"Oldcastle"**) objecting to the

Plaintiffs' Motion to Add Lee County as a party Plaintiff.  A copy of Oldcastle's said Objection

is attached hereto as Exhibit "A."  As grounds for said Motion, the Young and Gilmer

Defendants adopt the same grounds as stated by Oldcastle in their Objection.



FILED
JUN 22 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

1

Respectfully submitted,

**OF COUNSEL FOR DEFENDANTS:**
**VIRGINIA YOUNG PRIEST, JOHN CLAUDE**
**YOUNG C/O VIRGINIA YOUNG PRIEST, LOUISE**
**YOUNG O'BRIEN, VIRGINIA HART**
**YOUNG AND GILMER PROPERTIES, LTD.**
SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL  36803-2345
(334) 745-3504
FAX (334) 745-3506

JOHN V. DENSON
DEN007

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause by First Class United States Mail, postage prepaid, on this the 22nd  day of    June  , 2004, as follows:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

Charles E. Vercelli, Jr.
Vercelli & Associates, P.C.
1019 South Perry Street
Montgomery, Alabama 36104-5049

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Mr. Guy Gunter
Melton, Gunter & Melton
Post Office Box 409
Opelika, Alabama  36803-0409

Mr. Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White
Post Office Box 2069
Opelika, Alabama 36803-2069

Mr. Stanley Martin
Post Office Box 2526
Opelika, Alabama 36803-2526

John V. Denson

2637

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        PLAINTIFFS,                    )
                                       )
vs.                                    )     CIVIL ACTION NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        DEFENDANTS.                    )

## OLDCASTLE'S OBJECTION TO PLAINTIFFS' MOTION
## TO ADD LEE COUNTY AS A PARTY PLAINTIFF

COMES NOW the Defendant, Oldcastle Materials Southeast, Inc., by and through

counsel, and objects to Plaintiffs' Motion to add Lee County as a Party Plaintiff.  As

grounds for said motion, Defendant states as follows:

1.    Plaintiffs filed their motion to add Lee County as a party plaintiff on or
      about June 15, 2004.

2.    This matter is set for trial beginning August 16, 2004.   The Court has set
      aside three (3) week to try this case.

3.    To allow Plaintiffs to add Lee County as a party plaintiff at this late date,
      would unduly prejudice this Defendant, as  this Defendant would have
      inadequate time to prepare a defense for Lee County's allegations.

4.    The Plaintiffs have known throughout the pendency of this litigation that
      Lee County had potential claims.  Yet, Plaintiffs have waited until just two
      (2) months prior to the scheduled trial date, and after many significant
      discovery deadlines have expired, to attempt to add Lee County.

5.    Prior to Oldcastle being named a party defendant in this case, a deposition
      of a representative of Lee County was taken as part of discovery in this case.
      However, to date, Oldcastle has not had an opportunity to engage in

discovery regarding Lee County.

6.  If Lee County is allowed to be added as a party plaintiff, Oldcastle will need additional time to engage in further written discovery, take further depositions, and engage further expert testimony regarding Lee County's allegations in this case. At the very least, this will necessitate a continuance of the current trial setting of August 16, 2004.

7.  Further, if this Court allows Lee County to be added as a party plaintiff, but schedules Lee County's aspect of the case for 2005, Oldcastle would object to any representative of Lee County being called as a witness in the 2004 litigation, as such would unduly prejudice the defendant, as Oldcastle would not have had the opportunity to engage in discovery as to Lee County's claims.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

MATTHEW W. WHITE (WHI086)
Attorneys for Defendant
Post Office Box 2069
Opelika, AL 36801
(334) 745-6466

2050

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the above and foregoing upon:

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 South Perry Street
Montgomery, AL 36104

James B. Sprayberry, Esq.
P.O. Box 2429
Auburn, AL 36831-2429

Guy Gunter, Esq.
P.O. Box 409
Opelika, AL 36801

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

This the 21 day of June, 2004.

Of Counsel for Defendant

2009

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al                    )
                                     )
          Plaintiffs,                )
                                     )    Civil Action No. CV-2002-85
vs.                                  )
                                     )
HANSON AGGREGATES SOUTHEAST, INC.;   )
and OLDCASTLE MATERIALS SOUTHEAST,   )
INC., et al                          )
                                     )
          Defendants.                )

## PLAINTIFFS' OBJECTION TO AND MOTION TO STRIKE OLDCASTLE'S EXPERTS

The Plaintiffs' would show this Court that:

1.    The defendant, Oldcastle was required to produce expert disclosures on Friday, June 18, 2004.

2.    Attached as Exhibit "A" is a copy of the purported disclosure for Dr. Charles Faust, which is similar to the other disclosures by Oldcastle.

3.    Rule 26 of the Alabama Rules of Civil Procedure clearly requires the disclosure to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

4.    Oldcastle flagrantly violated this rule by; (a) failing to list any real opinions and (b) failing to give a summary of the grounds for each opinion.

5.    The experts for the Plaintiffs', in their disclosures, have provided a written list of their opinions, a summary of the grounds for each opinion and the basis for these opinions whether by inspection, test or field work.

FILED

JUN 22 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2681

6.    Disclosure for Dr. Charles Faust, for example, says that "he may or may not testify about groundwater flow...". Such an incomplete disclosure violates both the spirit and the letter of Rule 26.

7.    In addition, the Plaintiffs' expert, Tom Aley, has already been deposed on two (2) different occasions for approximately fifteen (15) or sixteen (16) hours. Now the defendants wish to depose him a third time and he is tentatively set to come to Alabama on July 8, 2004. Mr. Faust is set for deposition on July 7, 2004 but the Plaintiffs have no opinions and no reports. This is one-sided discovery.

WHEREFORE, the Plaintiffs move to strike all of Oldcastle's purported experts and move to prohibit them from testifying at trial.

JAMES B. SPRAYBERRY  (SPR008)

**OF COUNSEL:**
**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

2662

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the 22 day of June, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

IN THE CIRCUIT COURT FOR
LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                )
                                   )
         Plaintiffs,               )
                                   )
vs.                                )          CASE NO. CV-02-85
                                   )
HANSON AGGREGATES                  )
SOUTHEAST, INC. et al.,            )
                                   )
         Defendants.               )

## OLDCASTLE'S DISCLOSURE OF REBUTTAL EXPERT, CHARLES R. FAUST OF GEOTRANS, INC.

Pursuant to Rule 26(b)(4)(a)(i), Alabama Rules of Civil Procedure, Defendant Oldcastle Materials Southeast, Inc. ("Oldcastle"), by and through the undersigned counsel, respectfully discloses the following information regarding Geotrans, Inc. and Charles R. Faust:

1.      Oldcastle may use as an expert witness at trial Charles R. Faust of Geotrans, Inc., 46050 Manikin Plaza, Sterling, VA 20166.

2.      The subject matter on which the expert is expected to testify is hydrogeology.

3.      Dr. Faust is expected to testify concerning the geology between the quarry and Spring Villa and the impacts that it may or may not have on groundwater flow between the quarry and Spring Villa.

4.      Dr. Faust is expected to testify concerning the elevation data collected at the wells near the quarry, and wells installed for the City of Opelika at Spring Villa.

5.    Dr. Faust is expected to testify concerning flaws in Plaintiffs' expert, Aley's, source analysis. Furthermore, Faust is expected to testify concerning the incorrect estimates of groundwater elevations and the flawed discussion of hydraulic gradients set forth by Plaintiffs' expert, Aley.

6.    Dr. Faust is expected to testify concerning the pumping volume at the quarry, and the pumping volume's effect on the pool elevation at the quarry.

7.    Dr. Faust is expected to testify about the incorrect, impossible and contradictory conditions presented by Dr. Aley concerning the groundwater flow in the vicinity of Spring Villa.

8.    Dr. Faust is also expected to testify about the cause of the sinkholes in the channel of Little Uchee Creek.

9.    Dr. Faust's opinions are based on his education, training, experience and research in the field as well as the various tests, opinions offered by Mr. Aley, geological survey information relied upon by their experts in this case and in the field, and, also, other matters reasonably and customarily relied up by experts in this field.

10.    A copy of Dr. Faust's curriculum vitae has previously been provided to Plaintiffs' counsel.

11.    A copy of Dr. Faust's initial report shall be produced by Oldcastle prior to Dr. Faust's deposition.

2.

Respectfully submitted this the 18 day of June, 2004.

_(signature)_

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant Oldcastle Materials
Southeast, Inc.
P.O. Box 2069
Opelika, AL 36803-2069
Tel.: (334) 745-6466

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 18 day of June, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_(signature)_

Of Counsel

3

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2686

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Civil Action No. CV-20 02-0085 |
| | ) |
| HANSON AGGREGATES SOUTHEAST, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

## MOTION FOR HEARING

The Plaintiffs would show this Court that:

1. The "privileged" documents were requested and then Ordered produced only after a Motion to Compel.

2. This Court has agreed that numerous e-mails should be produced, after reviewing them <u>in camera</u>.

3. The Plaintiffs contend that <u>all</u> documents and e-mails prior to the July 13, 2003 acquisition date are clearly discoverable as they relate to the purchase of the quarry.

4. The Plaintiffs are at a disadvantage if they cannot see the documents or the Defendants objection. A hearing is needed so the Plaintiffs can present their side.

5. In addition, the Defendants were Ordered by this Court to produce <u>all</u> other documents listed in the Motion to Compel. The Defendants have now flatly refused to do so. Attached is a defense letter of May 19, 2004 and Plaintiffs' letter of May 25, 2004.

For example, Oldcastle was ordered to produce the dollar amount they might receive from Hanson under the joint defense agreement ("JDA"), if restrictions were imposed. Oldcastle filed no objection to the Motion to Compel, but verbally objected at the hearing to the "privileged"

FILED

JUN 22 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

documents. Oldcastle has also failed to produce, after being ordered to produce; (a) the Oldcastle Code of Conduct; (b) testing results for silica exposure to employees; (c) seismograph results for Griggs/Edwards homes; (d) billing by Brian Fowler; and (e) the dollar amount to be paid by Hanson to Oldcastle if restrictions are imposed on the quarry operation.

Accordingly, the Plaintiffs are entitled to all other documents that the Defendants have withheld in violation of this Court's Order.

_____
JAMES B. SPRAYBERRY (SPR008)

**OF COUNSEL:**

**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, by first class mail, on this the ⟶22⟵ day of June, 2004.

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

James B. Sprayberry

2069

# ADAMS, UMBACH, DAVIDSON & WHITE, LLP
### *Law Offices and Mediation Center*
205 South 9th Street
Opelika, Alabama 36801

Phillip E. Adams, Jr.
Arnold W. Umbach, Jr.
Patrick C. Davidson
Matthew W. White
_____
Jacob A. Walker, Jr., Ret.

Email: padams@audwlaw.com
Direct Fax: (334) 749-3238

Mailing Address:
P.O. Box 2069
Opelika, AL 36803-2069

Tel. (334) 745-6466
Fax (334) 749-3238

May 19, 2004

VIA FACSIMILE ONLY

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, Alabama  36831-2429

    RE:  *Davis v. Hanson, et al.*

Dear Jimmy:

I am reviewing the document list that you forwarded to me by fax on May 18, 2004. The request contained in Items 1 through 8 have a number of objectionable documents that we will not produce at this time.  First, everything in Item 8 related to privilege log has been objected to and the same has been produced to Judge Walker. We will not produce any of those documents until ordered to do so.  With regard to Item 7 and the Joint Defense Agreement we are not going to produce any information concerning the contents of that agreement or the terms between Hanson and Oldcastle concerning restricted operations.

I am in the process of gathering documents identified in Items No. 1 through 6.  There may be some further objection to producing documents in those categories but at this time I am going to request all of them and will make a determination as to whether or not we object to the same.  These requests have never been sent to us in a formal interrogatory or request for production of documents and further I would suggest that we have never had the opportunity to respond pursuant to the Alabama Rules of Civil Procedure.  We will endeavor to do so according to this request.

Sincerely,

RICK DAVIDSON

rr
cc:    James Byram, Esq.
       Wayne Phears, Esq.
       John Denson, Esq.

# JAMES B. SPRAYBERRY
ATTORNEY AT LAW
P.O. DRAWER 2429
AUBURN, ALABAMA 36831-2429
(334) 821-7100
FAX (334) 821-7101

2670

May 25, 2004

Patrick C. (Rick) Davidson
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
205 South 9th Street
P.O. Box 2069
Opelika, AL 36803

Re:    *Davis, et al vs. Hanson/Oldcastle*

Dear Rick:

Thank you for your letter of May 19, 2004, in which you decline to produce certain documents. However, we had a hearing on April 20 on the Plaintiffs' Second Motion to Compel. Judge Walker, by Order of April 28th, directed all requested items (1 thru 8 inclusive) be produced to him for his in camera review.

His Order referred to Exhibit "C" which is my letter of March 30, 2004. These were items requested in Interrogatories, re-requested in Deposition Notices and requested a third time by letter.

Also, we need the drill logs and water levels for Oldcastle's two monitoring wells (NAR-10 and NAR-11). The auto-logger was downloaded on Friday, May 14, 2004. We also would like access to take water samples.

Very truly yours,

James B. Sprayberry

JBS/ch

cc:    Chip Vercelli, Esq.
Guy Gunter, Esq.
Jim Byram, Esq.
John Denson, Esq.
Phil Adams, Esq.
Wayne Phears, Esq.

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUN 2 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| MIKE DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-02-85 |
| | ) | |
| HANSON AGGREGATES | ) | |
| SOUTHEAST, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO STRIKE PLAINTIFFS' ALLEGATIONS REGARDING DIXIE PIPELINE

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") moves this Court to strike the allegations contained in Plaintiffs' Complaint, as amended, which reference and/or relate to the Dixie Pipeline. In support of this motion, Hanson avers as follows:

1.      On January 27, 2003, Hanson filed a motion for summary judgment ("Hanson's motion") as to the claims asserted by Plaintiffs in relation the Dixie Pipeline. In summary, Hanson asserted that Plaintiffs failed to show any specific harm or injury from quarry operations to the Dixie Pipeline and that Plaintiffs' allegations of potential future harm to the pipeline are purely speculative, thus entitling Hanson to summary judgment on the Plaintiffs' claims regarding the pipeline.

2.      Hanson's motion was argued at two separate hearings (June 20, 2003 and July 11, 2003). Based on Plaintiffs' failure to respond to Hanson's motion as of the July 11 hearing, the Court stated that Hanson's motion was due to be granted. *See* Transcript of Proceedings from July 11, 2003, at page 23, lines 1-11; page 24, lines 14-16; page 25, lines 9-13.

3.      On May 18, 2004, Plaintiffs filed an Expert Witness Disclosure for Derek Barrentine ("Barrentine") which disclosed the opinions to which Barrentine intends to testify. In

146056.1

1



summary, Barrentine intends to assert opinions regarding the alleged dangers created by the operation of a quarry near the Dixie Pipeline.

4.      On May 25, 2004, Hanson filed its Motion to Strike Plaintiffs' Expert Witness Disclosure for Barrentine ("Hanson's Motion to Strike") on the grounds that his opinions regarding the Dixie Pipeline are wholly irrelevant and inadmissible in light of the Court's ruling on Hanson's motion. The Court has not ruled on Hanson's Motion to Strike.

5.      On June 4, 2004, Hanson took Barrentine's deposition. *See* Depo. of Derek Barrentine, excerpts attached as Exhibit A. At his deposition, Barrentine testified that he was retained solely to "assess the structural integrity of the pipeline if there is a sinkhole that opens up under the pipeline" which is based on "the assumption that one might open up...." Ex. A at p. 43, lines 4-7; p. 44, lines 1-5. Barrentine was unable to offer any evidence that the Dixie Pipeline has suffered any damage as a result of the quarry. *See* Ex. A at p. 40 – 42. Barrentine testified that he was unable to say with a reasonable degree of certainty that damage to the Dixie Pipeline would occur in the future as a result of the quarry. *See* Ex. A at p. 109, lines 16-20; p. 111, lines 12-16. Finally, Barrentine testified that he was unable to point out any property owner that is at immediate risk of harm from a pipeline explosion. *See* Ex. A at p. 111, lines 17-23; p. 112, lines 1-2.

6.      Barrentine has not offered any new or different testimony establishing that Dixie Pipeline has been damaged by the quarry or that the possibility of future damage to the pipeline is anything more than mere speculation. He has also failed to demonstrate that any property owner was in immediate risk of harm from a pipeline explosion. Thus, Plaintiffs have failed to overcome any of the prior arguments in Hanson's motion which covered and addressed these claims, and therefore, should not be permitted to revive their allegations relating to the Dixie

146056.1

2

Pipeline based on Barrentine's testimony. Therefore, Plaintiffs' allegations regarding the pipeline are due to be stricken from the Complaint, as amended, and Plaintiffs should be precluded from asserting said allegations in future pleadings or at trial.

WHEREFORE, premises considered, Hanson respectfully requests this Court to issue an Order striking the allegations contained in Plaintiffs' Complaint, as amended, which reference and/or relate to the Dixie Pipeline and precluding Plaintiffs from asserting said allegations in future pleadings or at trial.

Respectfully submitted this the 23rd day of June, 2004.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101
(334) 834-6500
(334) 269-3115 (fax)

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

146056.1

3

2674

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 23rd day of June, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL  36803-2345


Of Counsel

146056.1

4

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

2675

| | |
|---|---|
| MIKE DAVIS; DONNA DAVIS; , et al | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC.; et al. | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NUMBER: CV-02-085

## DEFENDANTS, VIRGINIA YOUNG PRIEST AND GILMER PROPERTIES, LTD.'S MOTION ADOPTING MOTION TO STRIKE PLAINTIFFS' ALLEGATIONS REGARDING DIXIE PIPELINE FILED BY DEFENDANT, HANSON AGGREGATES SOUTHEAST, INC.

COME NOW, the Defendants, Virginia Young Priest;  John Claude Young, c/o Virginia Young Priest; Louise Young O'Brien; Virginia Hart Young (hereinafter **"Young"**) and Gilmer Properties, Ltd. (hereinafter **"Gilmer"**) and adopt the Motion to Strike Plaintiffs' Allegations regarding Dixie Pipeline filed on behalf of Defendant, Hanson Aggregates Southeast, Inc., (hereinafter **"Hanson"**), a copy of which is attached hereto as Exhibit "1."

Respectfully submitted,

OF COUNSEL FOR DEFENDANTS:
VIRGINIA YOUNG PRIEST; JOHN CLAUDE
YOUNG, C/O VIRGINIA YOUNG PRIEST;
LOUISE YOUNG O'BRIEN; VIRGINIA HART
YOUNG; GILMER PROPERTIES, LTD.

SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P.O. Box 2345
Opelika, AL  36803-2345 ·
(334) 745-3504
FAX (334) 745-3506

FILED

JUN 2 5 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

JOHN V. DENSON
DEN007

1

2675

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served on all Attorneys of Record in the above-styled cause, by mailing the same in U.S. Mail, postage prepaid, on this the ___25th___ day of ___June___, 2004, as follows:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101-0078

M. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092-3000

Guy F. Gunter, III
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0409

Mr. Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

Charles E. Vercelli, Jr.
Suite 214, Union Station
300-B Water Street
Montgomery, Alabama 36104

James B. Sprayberry
Post Office Drawer 2429
Auburn, Alabama 36831-2429

FILED
JUN 2 5 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

John V. Denson

2

Exhibit 1

RECYCLED PAPER
RECYCLABLE

2677

## IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
              Plaintiffs,              )
                                       )
VS.                                    )        CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
              Defendants.              )

FILED

JUN 2 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## DEFENDANT OLDCASTLE'S FIRST WITNESS AND EXHIBIT LIST

COMES now the Defendant Oldcastle Materials, Inc. and files herein its First

Witness and Exhibit List as follows:

### Witness List

1. All witnesses listed by Hanson Aggregate Southeast, Inc. and Defendants Young and Gilmer including all expert witnesses listed by Hanson and Young and Gilmer.

2. Any person whose deposition has been taken by any party during the course of discovery in this case.

3. Any witness identified by any other party to this case.

4. All individually named Plaintiffs.

5. All representatives of the City of Opelika.

6. All representatives of the Utilities Board of Opelika.

7. All members of the Opelika City Council.

8. Brian Fowler

9. Frank Heisterkamp

10. Ted Reynolds

11.  All experts previously identified by Oldcastle.

12.  A representative of the City of Auburn Water Authority.

13.  Representative of the Lee County Revenue Commissioner's office.

14.  All members of the Board and employees of the Beauregard Water Authority.

15.  A representative of Forbus Concrete Products, 194 Green Lane, Dadeville, Alabama 36853; tel. 256-825-6213.

16.  Representatives, members of the Board and employees of the Opelika Parks and Recreation Department.

17.  Representatives of Dixie Pipeline.

## Exhibit List

1.  All exhibits listed by the Defendants Hanson, Gilmer and Young.

2.  All exhibits listed by Plaintiffs in this case.

3.  The respective leases to the quarry premises of the Young and Gilmer Defendants.

4.  Any documents, including but not limited to photographs, video tapes and logs, previously produced by any Defendant to the Plaintiffs in response to a Request for Production.

5.  Any exhibit listed by any other party to the case.

6.  Any document previously made an exhibit to any deposition.

7.  Any exhibit produced or created by any expert witness in this case.

8.  The Defendant Oldcastle reserves the right not to offer and/or to object to the exhibit offered by any other party and further reserves the right to supplement and/or amend this Exhibit List subject to further discovery.

FILED
JUN 2 8 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2069

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: *Phillip E. Adams*

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 28th day of June 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama 36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL 36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama 36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

*Phillip E. Adams Jr.*

Of Counsel

FILED

JUN 2 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )    CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        Defendants.                    )

## HANSON'S PRELIMINARY WITNESS LIST

Defendant Hanson Aggregates Southeast, Inc. ("Hanson"), hereby submits the following

preliminary witness list for the trial set for August 16, 2004:

1.    Nigel Wills
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

2.    Steve Edgerton
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

3.    Tom Bugenhagen
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

4.    Brent Ward
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

5.    Randy Watkins
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

6.    David Turner
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

7.    Phil Welter
      c/o Hanson Aggregates Southeast, Inc.
      Tucker, Georgia

137455.1

8.     Matt Schwent
   c/o Hanson Aggregates Southeast, Inc.
   Tucker, Georgia

9.     Jim Zadarozny
   c/o Hanson Aggregates Southeast, Inc.
   Tucker, Georgia

10.     David Dukes
    Area Manager
    c/o Hanson Aggregates Southeast, Inc.
    Tucker, Georgia

11.     Richard Price (or other worker safety representative)
    c/o Hanson Aggregates Southeast, Inc.
    Charlotte, North Carolina

12.     Pat Cooley
    Opelika, Alabama

13.     Kelly Young
    Opelika, Alabama

14.     Irena White
    Phenix City, Alabama

15.     Christina Morrison
    Smiths, Alabama

16.     Shawn Greenway
    Cartersville, Georgia

17.     Tony Williams
    Dixie Pipeline Company
    1117 Perimeter Center West, Suite West 301
    Atlanta, Georgia 30338

18.     McRoy Sauls
    Sauls Seismic, Inc.
    3710 4th Avenue South
    Birmingham, Alabama 35222

19.     Robert Wood
    Tom Joiner & Associates
    P. O. Box 1490
    Tuscaloosa, Alabama 35403

20.     Robert B. Cook, Ph.D.

2682

Auburn University
Department of Geology
210 Petrie Hall
Auburn University, AL  36849

21. Harold L. Merck
Merck & Hill Consultants, Inc.
Suite 200
1995 North Park Place
Atlanta, GA  30339-2004

22. Rex Griffin
Auburn Water Board
Auburn, Alabama

23. David R. Thrasher, M.D.
Montgomery Pulmonary Consultants
1440 Narrow Lane Parkway
Montgomery, Alabama 36107

24. Gaeton Don Lorino, M.D.
Montgomery Pulmonary Consultants
1440 Narrow Lane Parkway
Montgomery, Alabama 36107

25. William P. Saliski, Jr., D.O.
Montgomery Pulmonary Consultants
1440 Narrow Lane Parkway
Montgomery, Alabama 36107

26. Joel Wehrman
JADE Engineering
210 Lorna Square, Suite 207
Hoover, Alabama  35216

27. Mark E. Barrs
Barrs Appraisal Services, Inc.
P. O. Box 1507
Montgomery, Alabama  36102-1507

28. Ralph O. Ewers, Ph.D
Ewers Water Consultants, Inc.
160 Redwood Drive
Richmond, Kentucky  40475

29. Dr. John Richards, Ph.D., P.E.
Air Control Techniques, P.C

2683

30. Jim Hiestand
Dyno Nobel
110 McLarty Road
Whitesburg, Georgia 30185

31. Danny Olive
Dyno Nobel
110 McLarty Road
Whitesburg, Georgia 30185

32. David Nooney
R. E. Grills Construction Company, Inc.
P. O. Box 90
Shannon, Alabama 35142

33. Glen Rickard
R. E. Grills Construction Company, Inc.
P. O. Box 90
Shannon, Alabama 35142

34. Malcolm LeBron, P.E.
Rt. 2, Box 29
Rockford, Alabama

35. Charles Gilmer

36. Any Gilmer defendant.

37. Any Young defendant.

38. Corporate representative of Oldcastle Materials Southeast, Inc.

39. Ron Gore (or other ADEM representative)
Alabama Department of Environmental Management
1400 Coliseum Boulevard
Montgomery, Alabama

39. Richard Hulcher (or other ADEM representative)
Alabama Department of Environmental Management
1400 Coliseum Boulevard
Montgomery, Alabama

40. Any plaintiff and any representative of any entity plaintiff.

41. Any witness identified by any other party to this action.

42. Any witness whose identity is disclosed through further discovery.

43.    Any person deposed in this case.

44.    Any person needed to authenticate any document or other exhibits.

45.    Any witness necessary for rebuttal.

Hanson reserves the right not to offer and/or to object to the testimony of any of these persons offered by any other party, and to supplement and/or amend this witness list.

Respectfully submitted this the 25th day of June 2004.

One of the attorneys for Defendant
Hanson Aggregates Southeast, Inc.

**OF COUNSEL**:
James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
P. O. Box 78
Montgomery, AL  36101-0078
Telephone:    (334) 834-6500

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

**Certificate of Service**

2685

I hereby certify that on this 25th day of June 2004, a copy of the foregoing has been served by first-class United States Mail, postage prepaid and properly addressed, upon the following:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL  36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
 & White, LLP
Post Office Box 2069
Opelika, Alabama  36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
 & Bridges
P. O. Box 2345
Opelika, AL  36803-2345

Of Counsel

2685

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )     CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

FILED

JUN 2 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## HANSON'S RESPONSE TO PLAINTIFFS' MOTION TO ADD LEE COUNTY AND RENEWED MOTION FOR SEPARATE TRIALS

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") hereby joins in the objections of the Oldcastle, Young and Gilmer defendants to plaintiffs' motion to add Lee County as a plaintiff.

Hanson further moves the Court, if Lee County is added as a plaintiff, to order a separate trial of the hydrogeology claims of Lee County, the City of Opelika, the Opelika Utilities Board, and Beauregard Water Authority, and individual plaintiffs Schwieker, Tankersley and Smith, and to continue that trial for the parties to complete Lee County and expert discovery on the hydrogeology issues, and to proceed on August 16 with trial of the quarry noise, dust, and blasting claims of the individual plaintiffs Mike Broadwater, R. Parker, Ledbetter, Clark, Griggs, and D. Sumner.

Respectfully submitted this the _24th_ day of June, 2004.

One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

146180.1              1

2087

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
(334) 834-6500
(334) 269-3115 (fax)

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 24th day of June, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
 & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
 & Bridges
P. O. Box 2345
Opelika, AL 36803-2345

Of Counsel

2680

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUN 2 8 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

MIKE DAVIS, et al., )
)
    Plaintiffs, )
)
vs. )    CASE NO. CV-02-85
)
HANSON AGGREGATES )
SOUTHEAST, INC., et al., )
)
    Defendants. )

## MOTION FOR HEARING

Defendant Hanson Aggregates Southeast, Inc. ("Hanson") requests that the following motions be heard before the Court at the hearing scheduled for June 30, 2004:

1.    Hanson's motion to strike plaintiffs' expert disclosure for Derek Barrentine, filed May 25, 2004;

2.    Hanson's motion for discovery sanctions against Plaintiffs, filed June 16, 2004;

3.    Hanson's motion to strike plaintiffs' claims regarding Dixie Pipeline, filed June 23, 2004.

Respectfully submitted this the 24th day of June, 2004.

_____
One of the Attorneys for Defendant
Hanson Aggregates Southeast, Inc.

OF COUNSEL:

James A. Byram, Jr. (BYR003)
Paul A. Clark (CLA076)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101
(334) 834-6500
(334) 269-3115 (fax)

146075.1                                      1

H. Wayne Phears, Esq.
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092
(770) 446-2116
(770) 263-6715 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 24th day of June, 2004:

James B. Sprayberry, Esq.
P. O. Drawer 2429
Auburn, AL 36830

Charles E. Vercelli, Jr., Esq.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, Alabama 36104-5049

Guy F. Gunter, III, Esq.
MELTON, GUNTER & MELTON
Post Office Box 409
Opelika, Alabama 36803-0404

Phillip E. Adams, Jr., Esq.
Adams, Umbach, Davidson,
  & White, LLP
Post Office Box 2069
Opelika, Alabama 36803-2069

John V. Denson, Esq.
Samford, Denson, Horsley, Pettey
  & Bridges
P. O. Box 2345
Opelika, AL 36803-2345


Of Counsel

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )    CASE NO. CV-02-85
                                       )
HANSON AGGREGATES                      )
SOUTHEAST, INC., et al.,               )
                                       )
        Defendants.                    )

## MOTION TO STRIKE PLAINTIFFS'
## ALLEGATIONS REGARDING DIXIE PIPELINE

COMES NOW the Defendant, Oldcastle Materials Southeast, Inc. ("Oldcastle"), by and

through the undersigned counsel, and moves this Court to strike the allegations contained in the

Plaintiffs' Complaint as amended and as grounds therefor adopts and incorporates herein each

and every ground set forth in the Motion filed by the Defendant Hanson on June 23, 2004.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY: _____
        PHILLIP E. ADAMS, JR.
        Attorney for Defendant Oldcastle
        P. O. Box 2069
        Opelika, AL 36803-2069
        Tel. (334) 745-6466
        Fax (3340 749-3238

FILED
JUN 29 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY THAT I HAVE THIS DAY SERVED A COPY OF THE FOREGOING BY PLACING A COPY OF SAME IN THE UNITED STATES MAIL, FIRST CLASS POSTAGE PREPAID, AND PROPERLY ADDRESSED TO THE FOLLOWING, THIS THE 29TH DAY OF JUNE, 2005:

JAMES B. SPRAYBERRY, ESQ.
POST OFFICE DRAWER 2429
AUBURN, ALABAMA 36831-2429

CHIP VERCELLI, ESQ.
VERCELLI & ASSOCIATES, P.C.
1019 S. PERRY STREET
MONTGOMERY, ALABAMA 36104-5049

GUY F. GUNTER, III, ESQ.
MELTON, GUNTER & MELTON
P. O. BOX 409
OPELIKA, AL 36803-0409

JOHN DENSON, ESQ.
SAMFORD, DENSON, HORSLEY,
 PETTEY, BRIDGES & HUGHES
P. O. BOX 2345
OPELIKA, ALABAMA 36803-2345

JAMES A. BYRAM, JR., ESQ.
PAUL A. CLARK, ESQ.
BALCH & BINGHAM LLP
POST OFFICE BOX 78
MONTGOMERY, ALABAMA 36101

H. WAYNE PHEARS, ESQ.
PHEARS & MOLDOVAN
SUITE 375
4725 PEACHTREE CORNER CIRCLE
NORCROSS, GEORGIA 30092

OF COUNSEL

2092

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    )
                                       )
        Plaintiffs,         )
                                       )
vs.                                    )    Civil Action No. CV-20 02-0085
                                       )
HANSON AGGREGATES SOUTHEAST,           )
INC., et al.,                          )
                                       )
        Defendants.         )

### PLAINTIFFS' MOTION TO COMPEL HANSON TO PRODUCE DOCUMENTS

    Plaintiffs move this Honorable Court to compel Hanson to respond to Plaintiffs' Request for Production of Documents as follows:

1.    Attached is a July 5, 2003 letter to Hanson's attorneys. The letter requests various documents that became relevant during Hanson's corporate representatives' depositions.

2.    The parties have routinely requested documents by letter, and generally, the parties have responded within a reasonable time. Hanson did not object to this letter or to producing these documents and during the depositions agreed to produce these documents.

3.    Hanson has not produced the documents requested in paragraphs 1 through 4 on page 1.

    WHEREFORE for good cause shown Plaintiffs move this Honorable Court to require Hanson to produce the documents requested in paragraphs 1 through 4 on page 1 within ten (10) days.

                                                                 _____

                                       **CHARLES E. VERCELLI, JR. (VER003)**
                                       One of the Attorneys for the Plaintiffs

**FILED**

JUN 30 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

2055

**OF COUNSEL:**
**For All Plaintiffs:**

LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by facsimile transmittal on 29th day of June, 2004 and by hand delivery of the same the 30th day of June, 2004.

_____
OF COUNSEL

# VERCELLI & ASSOCIATES, P.C.

### *Attorneys & Counselors at Law*
(334) 834-8805
Fax (334) 834-8807

CHARLES E. VERCELLI, JR.
THERESE FORD
RAY VAUGHAN, OF COUNSEL

1019 S. Perry Street
Montgomery, Alabama 36104-5049
cvercelli@vercelli-law.com

July 5, 2003
**Via Fax & Mail**

James A. Byram, Jr.
Dorman Walker
Balch & Bingham, LLP
P. O. Box 78
Montgomery, AL 36101-0078

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

RE:    *Davis, et al. v. Hanson Aggregates, et al.*

Dear Gentlemen:

This follows our discussions during the corporate representatives' depositions. Please provide the following information:

1.    Industry studies (NSSGA and others if any) on silica or silicosis or other breathing difficulties in homeowners surrounding quarries. Both witnesses said there were such studies. Please provide copies.

2.    We discussed in Mr. Wills' deposition that within the last 3 months Hanson has installed a "drain" on the western end of the spoil pile. Mr. Wills gave us the name of the contractor they hired. Please provide the documents relating to (1) payment to that contractor, and (2) any contract or document evidencing the scope of the work to be performed.

3.    The rainfall data collected at the quarry. Mr. Wills told us about this for the first time during his deposition on July 2, 2003.

4.    Dr. Cook's invoices with Hanson. These have been previously requested. We would like his invoices with respect to this particular matter, as well as a summary of the payments he has received over the many years he has assisted Hanson. Recall that Mr. Wills knew he had consulted at several quarries, including, at a minimum: Lee County; Athens, GA; Gainesville, GA; Sparta, SC; Monroe, GA(?); Alex City; Cartersville, GA.

2095

Messrs. Byram & Phears
July 5, 2003
Page 2

If you will not voluntarily produce these items by July 16th, please advise so we can seek relief from the Court. I hope filing a motion to compel will not be necessary.

Additionally, a few points remain outstanding:

1. You have not given us a date for the quarry tour. We anticipate videotaping and photographing during the tour and intend to use portions of the videotape at trial. Please give us some dates. You have previously objected to using audiotape, so we will discuss that issue with the Judge on July 11th, but we need to agree on a date that next week.

2. We would like to depose Dr. Thrasher and any other doctor you expect to call live at trial. Please schedule that deposition for the a few days after point 3.

3. Somewhere, we broke down getting the remaining plaintiffs to see Dr. Thrasher. We think you still want him to see Ambur Parker, Carol Clark and Courtney Clark. Please advise when they are to go to Dr. Thrasher (as soon as possible so we can depose Dr. Thrasher).

4. If you want to take additional depositions, please advise asap so we can schedule them. We would like to depose your testifying corporate personnel, unless you provide a statement of their anticipated testimony much as we did for our several witnesses.

5. We are to have an exhibit exchange on Monday. How shall we accomplish this? Please call so we can discuss this point.

I will be in the office all day Monday. Thank you.

Sincerely,

Charles E. Vercelli, Jr.

CEVjr/ma
Enclosure
cc:    James Sprayberry
       Guy Gunter
       John Denson
155-00\Byram-Phears3.2.wpd

F I L E D
JUL 0 2 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| Plaintiff, | * | |
| v. | * | CASE NUMBER: CV-02-85 |
| | * | |
| | * | |
| HANSON AGGREGATES SOUTHEAST, | * | |
| INC., et al. | * | |
| Defendants. | * | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO HANSON'S MOTION FOR SUMMARY JUDGMENT

As the Plaintiffs' understand the few limited areas left in the Motion for Summary Judgment they are:

1.    Hanson claims plaintiffs have no standing to bring a public nuisance;

2.    Hanson claims a statute of limitation argument;

3.    Hanson claims some question about damages, and whether the nuisance is abatable or permanent;

4.    Hanson claims the quarry is not diverting Little Uchee Creek since it flows into a sinkhole and disappears into the earth;

5.    Hanson disputes that the Plaintiffs' attorneys are entitled to be awarded attorney fees in addition to a judgment under the "common benefit doctrine".

## ARGUMENT

1.    Hanson's argument that a public nuisance claim cannot be brought in this litigation was incorrect to begin with but is now totally dead and moot.  There is no doubt and there has been no doubt for over eighty years in Alabama that a City may abate any public nuisance that is injuring the City or any portion thereof. (Sec. 6-5-122 *Code of Alabama, 1975*).  Even if the City of Opelika

F I L E D
JUL 0 2 2004
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Page 1 of 7

and the Opelika Utilities Board were not Plaintiffs, Alabama law allows individuals to bring an action for public nuisance if there are special damages. (Sec. 6-5-123 *Code of Alabama 1975*). Individuals have been allowed to sue under the public nuisance statute for the obstruction of public roads. (*Barnes v. Kent* 292 Ala. 508, 296 So. 2d, 881 (1974).

There is no dispute of the fact that Spring Villa Road (Lee Road 148) had voids and caves underneath the asphalt and was repaired at a cost of approximately $250,000.00 in order to avoid collapse. Hanson's defense is: (1) the quarries did not cause it; and (2) if the quarry did cause it, it was done by Oldcastle.

Those defenses are irrelevant as to the rights of individuals or cities to sue in order to protect public roadways. Public safety is paramount to corporate profit.

2.    Hanson next argues that there was a two year statute of limitations beginning from their purchase in 1999. This issue again is totally incorrect and totally moot. As a public nuisance there is no statute of limitations. Sec. 6-5-125 *Code of Alabama 1975*; *Reed v. Mayor* 9 So., 161 (1891); *Mayor v. Land* 137 Ala. 538, 34 So., 613 (1903); *Weiss v. Taylor* 144 Ala. 440, 39 So. 519 (1905). Therefore the limitations is not a defense to a complaint to abate a public nuisance.

If Hanson's argument claims some type of prescriptive easement, that argument is also invalid. Even very old cases make this clear. The degradation of a water course must continue for ten (10) years, and the nuisance must be continuous and uniform in results produced. The quarry has operated since 1996, it has not been continuous (since Oldcastle shut it down for four or five months) and obviously the damage done has not been uniform for these few years. This defense fails.

The lack of uniformity is evident in the variation in the blasts (Dr. Cooper's deposition

previously filed) from the variation in dramatic increase in the pumping and discharge from the quarry. Under Opelika Materials, the quarry generally discharged less than one million gallons per day. In 2001, Hanson dramatically increased the pumping to 1.2 million gallons per day. Since then Oldcastle has even more dramatically increased the pumping to 4.5 million gallons per day and has asked the State for clearance to discharge ten million gallons per day.

Private citizens have been allowed to bring a public nuisance suit against a polluter of a creek. Since degradation to a water way was an encroachment on a public right, no presumption could be made from the lapse of time and there was no statute of limitations. *Stone Container Corp. v. Stapler*, 263 Ala. 524, 83 So. 2d 283 (1955).

3.    Hanson then argues whether the nuisance is abatable or permanent. Obviously the nuisance is abatable. Oldcastle shut down their operation for several months and brought in new portable equipment. This equipment was put in the bottom of the pit in order to make more room for storage at ground level (see page 193 - 195 Fowler Deposition).

If stopped today, virtually all of the nuisance would stop. The blasting, the noise, the dust, the dewatering, and the truck traffic would literally be eliminated over night. The sinkhole collapses and the road failures would slow over time and the water table and the spring should return in a few years. (See page 471 - 476 Aley Deposition).

Thus some of the basis for damages, such as the noise, dust and traffic, would be eliminated immediately. However, some damages, as opposed to the nuisance, would be permanent. Homes that suffer blast damage and lands that have sinkhole damage would first have to be repaired. Then if the homeowners elected to sale their property, they would need to disclose to any potential buyer that their home or land had suffered blast damage and sinkhole damage. Accordingly the damages

would be the fair market value of the property before the nuisance and the fair market value of the property after the nuisance. See *Alabama Pattern and Jury Instructions*, 11.26; *Tyson Foods, Inc. v. Burnett*, 783 So. 2d 804 (Ala. 2000).

The granting of injunctive relief is not a bar to the grant of damages actually sustained. In fact, if such were true, intentional and willful damage payment could be avoided simply by agreeing to an injunction. If the nuisance causes permanent damage, generally damages have been awarded in leu of injunctive relief on the theory that an injunction will not afford proper relief for damage already done. (*Machem v. James*, 266 Ala. 454, 97 So. 2d 542 (1957).

However, in this case, a clear and present danger to the motoring public and to homeowners, coupled with the severe damage done to the local area, justifies shutting down the quarry, entering a permanent injunction and having the jury award damages and attorney fees.

4.    Hanson argues that the stream diversion statute (Sec. 33-7-4 *Code of Alabama 1975*) does not apply since Little Uchee Creek flows down into a sinkhole and disappears into the earth. This is the "Bill Clinton defense". Hanson claims that Little Uchee has not been "diverted" but has been "swallowed".

Websters New Riverside Dictionary defines "divert" as to turn aside from a direction or course; deflect. The root word means "to turn". I concluded, from reading Hanson's argument, that the "Clinton defense" holds that the diversion would only apply if the stream were diverted to the East or West; and since it was forced into the ground it does not apply. The Little Uchee was flowing South, it has been turned and now flows "down". The creek is now dry for roughly a mile and has impacted, for miles downstream all the way to the Randall Parker farm on Lee Road 145, the entire drainage basin.

Also, it should be noted that Hanson's motion was filed prior to the Schwieker's joining as plaintiffs. Not only is Little Uchee on their property, but numerous sinkholes have diverted an unnamed tributary down into the ground. Accordingly, the Randall Parkers, the Schwiekers, the City and the Opelika Utility Board would all have standing to bring an action under 33-7-4.

Opelika, the Utility Board and the Parkers also clearly have standing to sue under 33-7-4 for diverting the stream that previously flowed from the Spring into Little Uchee Creek. (See Schwieker Answer to Interrogatories; and Parker Answer to Interrogatories)

5.   Hanson argues that the Plaintiffs' attorneys are not entitled to an attorney fee in addition to damages ordered by the jury. The homeowners, the Cities and all of the citizens of Lee County would derive a "common benefit" from the plaintiffs' action and the efforts of the plaintiffs' attorneys. In addition the plaintiffs' have alleged that the defendants actions have been knowingly done, willful, intentional and egregious. For example when Hanson learned that the spring had suffered significantly reduced flow, Hanson significantly increased it's pumping and dried the spring up completely. When Oldcastle learned that sinkholes were forming and that the Spring Villa road was subject to collapse, they continued the significantly larger amount of pumping of 4.5 million gallons per day.

## CONCLUSION

For the clear reasons set forth above, Hanson's few remaining issues on Summary Judgment are due to be denied. This denial should also prohibit Oldcastle from re-filing the same Summary Judgment issues as they were verbally adopted in Court on June30, 2004.

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

**OF COUNSEL**
**For All Plaintiffs:**
LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by facsimile transmittal on 2nd day of July, 2004 and by First Class U.S. Mail, postage pre-paid on the 2nd day of July, 2004.

OF COUNSEL

FILED

JUL 0 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
                    Plaintiff,          *
v.                                     *        CASE NUMBER: CV-02-85
                                       *
                                       *
HANSON AGGREGATES SOUTHEAST,           *
INC., et al.                           *
                    Defendants.        *

### PLAINTIFFS' OPPOSITION TO DEFENDANT HANSON'S
### MOTION FOR SUMMARY JUDGMENT

The Plaintiffs would show this Court that:

1.    The Defendants are not entitled to summary judgment based on the pleadings,

documents produced, depositions and the Plaintiffs' Brief in Opposition to Defendant Hanson's

Motion for Summary Judgment.  The Plaintiffs have attached:

      a)      Tom Aley's second deposition (dated Tuesday, May 11, 2004) pages 314, 324 thru 325, 340 thru 341, 342 thru 343, 388 thru 389, 390, 411 thru 412, 416 thru 417, 457, 470 thru 473, and 476 thru 477

      b)      Schwieker Answer to Oldcastle Interrogatories.

      c)      Bill Harrelson deposition dated May 20, 2004 (the entire deposition).

      d)      Answers by the City and Utility Board to Hanson Interrogatories filed March 3, 2003.

      e)      Randall Parker Answer to Oldcastle Interrogatories.

      f)      Deposition of Brian Fowler (dated March 11, 2004) pages 98, 100, 102, 103, 125, 127, 193, 195, 206, 207, 209, 218, 225, 226, 227, 232, 244, 255 and 256.

FILED

JUL 0 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**JAMES B. SPRAYBERRY (SPR008)**
One of the Attorneys for the Plaintiffs

2705

**OF COUNSEL:**
**For All Plaintiffs:**

LAW OFFICES OF JAMES B. SPRAYBERRY
P.O. Drawer 2429
Auburn, AL 36831-2429
(334) 821-7100
Fax (334) 821-7101

Guy F. Gunter, III
MELTON, GUNTER & MELTON
P.O. Box 409
Opelika, AL 36803-0409
(334)745-6244
Fax (334) 745-6288

Charles E. Vercelli, Jr.
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104-5049
(334) 834-8805
Fax (33) 834-8807

Stanley Martin
ATTORNEY AT LAW
400 Second Avenue
P.O. Box 2526
Opelika, Alabama 36803
(334) 749-4142

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Phillip E. Adams, Jr.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P. O. Box 2069
Opelika, AL 36803-2069

John Denson
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, Alabama 36803-2345

H. Wayne Phears
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

by placing a copy of the same in the U.S. Mail, postage pre-paid on the 2nd day of July, 2004.

OF COUNSEL

```
0001
 1              IN THE CIRCUIT COURT FOR
 2              LEE COUNTY, ALABAMA
 3
 4
 5  MIKE DAVIS, et al.,
 6          Plaintiffs,
 7  Vs.                    CIVIL ACTION NO.
 8                         CV-2002-85
 9  HANSON AGGREGATES SOUTHEAST,
10  INC., et al.,
11          Defendants.
12
13
14
15          DEPOSITION OF BRIAN K. FOWLER, taken
16  pursuant to notice and stipulation on behalf of the
17  Plaintiffs, in the conference room of Adams, Umbach,
18  Davidson & White, 205 South 9th Street, Opelika,
19  Alabama, before Ricky L. Tyler, Certified Shorthand
20  Reporter and Notary Public in and for the State of
21  Alabama at Large, on Thursday, March 11th, 2004,
22  commencing at 9:50 A.M.
23
0002
 1                  APPEARANCES
 2  FOR THE PLAINTIFFS:
 3          CHARLES E. VERCELLI, JR., ESQ.
 4          Vercelli & Associates
 5          1019 South Perry Street
 6          Montgomery, AL 36104-5049
 7           and
 8          JAMES B. SPRAYBERRY, ESQ.
 9          Attorney at Law
10          P. O. Drawer 2429
11          Auburn, AL 36831-2429
12
13  FOR THE DEFENDANT, HANSON AGGREGATES SOUTHEAST:
14          JAMES A. BYRAM, JR., ESQ.
15          Balch & Bingham LLP
16          P. O. Box 78
17          Montgomery, AL 36101-0078
18  FOR OLDCASTLE MATERIALS SOUTHEAST:
```

13    A.    Yeah.
14    Q.    What did you learn about the dye trace after
15          the closing?
16    A.    Well, that there had been a -- well, by that
17          point we knew there was litigation going on and
18          that the dye test was set up to establish the
19          flow, the groundwater flow in the vicinity.  We
20          really didn't know anything about -- I mean, we
21          knew a dye test had been done, but we didn't
22          know anything about its circumstances.
23    Q.    Do you remember who you talked to at Oldcastle
0098
1          about the dye trace?
2     A.    I don't recall.  No, I don't.
3     Q.    Would it have been either Frank Heisterkamp or
4          or Mr. Reynolds?
5     A.    Well, it certainly could have been Frank.  It
6          could have been Frank.
7     Q.    You just don't remember?
8     A.    I just don't recall.
9     Q.    Did they tell you anything about what dyes were
10          used or how they were put in or whether they
11          were recovered?
12    A.    Not at that time, no.
13    Q.    Have you found it out since?
14    A.    Since, yes.
15    Q.    What did you find out since then?
16    A.    Well, this would be things we've learned since
17          the closing.
18    Q.    Okay.  Well, don't tell me what the lawyers
19          have talked to you about.
20    A.    Well, what I found out was that the dye had
21          been introduced in a couple of different or
22          several different locations around the quarry
23          with the idea of hopefully finding — I think
0099
1          the intent of the study was to find the dye in
2          the quarry water.
3     Q.    Okay.
4     A.    And then that would allow those running the
5          test to conclude that water had moved from
6          point A to the quarry.
7     Q.    Do you know if any of the dye has shown up?

2707

```
 8  A.   I believe dye did show up from the sinkholes,
 9       so-called sinkholes, that are the closest to
10       the quarry, I believe, on the west side.  And
11       then there was some dye that showed up later.
12       After the formal test was done another
13       measurement was made, I guess, and some dye --
14       a trace of this eocene dye had shown up.  And
15       subsequently there was some controversy over
16       whether that was a breakdown product from the
17       original dye or the original dye --
18  Q.   Itself?
19  A.   -- itself.
20  Q.   Do you know anything about eocene?
21  A.   Do I know anything about it?
22  Q.   Right.
23  A.   I mean, I know what it is.
0100
 1  Q.   I mean, do you know whether it can change its
 2       chemical composition or decompose?
 3  A.   I don't believe eocene can.
 4  Q.   Are there any of the other dyes that can change
 5       its chemical composition?
 6  A.   The other two dyes that I saw mentioned in the
 7       letter are subject to breakdown.
 8  Q.   One is a Fluorescein, I think?
 9  A.   I don't remember.
10  Q.   And one is Rhodamine WT, maybe?
11  A.   It could be.  Those sound familiar.
12  Q.   Okay.
13  A.   I don't remember though.
14  Q.   Was there any discussion on whether the dye
15       trace was valid or invalid?
16  A.   Well, there seemed to be controversy over
17       whether it was valid or invalid in the
18       materials I saw.
19  Q.   The materials you saw, was this a letter or a
20       memo?
21  A.   I think letters, memos.  It was documents.
22  Q.   Do you remember what documents you were looking
23       at?
0101
 1  A.   I don't honestly right off the top of my head.
 2  Q.   Are they here in the stack?
```

3  A.   There may be a copy of a letter there in the
4       stack.  I don't recall.
5  Q.   You don't remember who it was from or to?
6  A.   No.
7  Q.   I don't remember seeing one.  Let me show you
8       the documents I think we got today, Mr. Fowler,
9       if you could flip through it?
10  A.   I think I'm recalling now that I believe what I
11      saw was a deposition by a Doctor Ewers or
12      Evers, I forget the name now.  I believe he was
13      an expert for Hanson.
14  Q.   Ewers?
15  A.   I think it's Ewers.  I think that's the --
16      that's the document that I have seen.
17  Q.   A report by Doctor Ewers, maybe?
18  A.   Well, I believe -- I'm pretty sure it was
19      either a deposition or a report.
20  Q.   Okay.  Did you look at any of the other reports
21      or summaries of --
22  A.   I've seen all of the expert opinion at this
23      point.
0102
1  Q.   Okay.
2  A.   But I don't believe there's a letter.  I think
3      what I'm recalling is that --
4  Q.   And you found all of that out in what month?
5  A.   Well, it was -- I think I finally got the
6      materials in early August of 2003.
7  Q.   Have you been asked to form any opinions on
8      that dye trace or dye study?
9  A.   Oh, several times.
10  Q.   You have been?
11  A.   Yes, I have.
12  Q.   Okay.  And by whom were you asked?
13  A.   Oldcastle, various people.
14  Q.   Have you done any calculations or research on
15      it?
16  A.   I have formulated no opinion.
17  Q.   And why didn't you formulate an opinion?
18  A.   Don't have enough information yet.
19  Q.   What are you lacking?
20  A.   Well, we need to understand the structural
21      geology of the bedrock; we need to understand

22    the actual flow net that exists in the bedrock;
23    I have to understand the chemistry of these
0103
1     dyes better than I do. Basically you need to
2.    go through the type of investigation you and I
3     talked about an hour or so, hour and a half
4     ago.
5  Q.   Right. The step-by-step from the geology down
6      to the samples?
7  A.   Right. Otherwise in my view, and as I've said
8      to Oldcastle, there's no way to know what the
9      dye test means categorically.
10  Q.   Does it tell you anything about travel time?
11  A.   A dye test by itself?
12  Q.   Right.
13  A.   It can, if you know all of those parameters I
14     was describing to you.
15  Q.   Okay. And since you were asked to formulate
16     opinions, have you looked at any other
17     documents or talked to anybody else?
18  A.   No. We're formulating this investigation that
19     we want to undertake and we've been waiting for
20     that to start.
21  Q.   "We" being North American Reserve?
22  A.   North American Reserve on behalf of Oldcastle.
23  Q.   Okay. And what are you going to do to — you
0104
1     say you are formulating it, what are you going
2     to do?
3  A.   Well, we basically are going to drill a series
4      of holes around the quarry and in a line from
5      the quarry towards the northeast out into the
6      Young parcel, out to the furthest reaches of
7      the Young parcel that we can get to on that
8      property. And then essentially pump the quarry
9      at a variety of different rates and actually
10     monitor the drawdowns, not model them, but
11     monitor them, so that we know about the
12     hydrology. Then the drilling that's done will
13     all be rock cores, so we'll get what appears,
14     from the literature and the other expert
15     opinion, to be the first third dimensional
16     picture of what the bedrock geology is under

10  A.   Well, he told us about them, brought it up.
11      And we asked him, you know, where were they,
12      you know, and how big were they, when did they
13      form, and that kind of thing.
14  Q.   Do you remember what he said as to when they
15      formed?
16  A.   I don't off the top of my head.  I do recall
17      them walking away saying they were recent,
18      fairly recent.
19  Q.   Recent being?
20  A.   Well, recent not in the geological time sense;
21      they weren't a thousand years old or something.
22  Q.   Months or years?
23  A.   No, they weren't thousands of years old; they
0125
1      were --
2  Q.   Months or years old?
3  A.   Well, I don't remember, but, I mean, in a
4      geological sense they weren't sinkholes that
5      had been there for a long time.
6  Q.   Did you also talk to him about any dewatering
7      problems?
8  A.   Well, in the sense of the NPDES permit and the
9      pumping and so forth, yes.
10  Q.   Well, I mean, when you are pumping in the
11      limestone and you're dewatering, you're going
12      to have that cone of depression, aren't you?
13  A.   Yes.
14  Q.   I mean, that's a given, isn't it?
15  A.   Yes.
16  Q.   Because once you take water out of that system,
17      it's got to form a cone of depression, right?
18  A.   Right.
19  Q.   And the only question is how big is the cone of
20      depression going to be?
21  A.   Or what shape.
22  Q.   What shape?
23  A.   Right.
0126
1  Q.   We call it a cone, but it actually may be
2      elliptical or egg-shaped?
3  A.   Right.
4  Q.   Did you ask him any questions about that?



2711

5   A.   I don't recall asking him anything that
6        technical, you know, what shape is the cone of
7        depression, that kind of thing.  We talked
8        about the observation wells that Doctor Buss
9        had put in, and he mentioned they were
10       monitoring those on whatever schedule it was.
11  Q.   Did you ask him why they put them in?
12  A.   No, I don't think I did ask him.  Because it's
13       very typical to have monitoring wells around a
14       quarry.
15  Q.   Oh, it is?
16  A.   Yeah.
17  Q.   Why?
18  A.   Well, you need to know -- you need to know what
19       the water is doing.  That's the only way you
20       can tell.
21  Q.   Is through the monitoring wells?
22  A.   Right.
23  Q.   Okay.
0127
1   A.   You can't measure a cone of depression without
2        monitoring wells.
3   Q.   Did anybody ever tell you that the City of
4        Opelika and Hanson had talked about each
5        getting a study done and that Hanson was going
6        to put in monitoring wells?
7   A.   I don't believe I knew about that until after
8        the closing.
9   Q.   When you knew there was a cone of depression
10       and you knew there were some sinkholes, did you
11       ask him if they had tried to determine what
12       caused the sinkholes?
13  A.   I don't think I asked him that question per se.
14       The monitoring wells and the sinkholes were all
15       discussed together.  And my recollection is
16       that they were hoping to get data from the
17       monitoring wells that Buss had put in that
18       would have helped resolve all of that.
19  Q.   Resolve all of what?
20  A.   All of those questions, whatever they were at
21       the time.
22  Q.   Okay.
23  A.   I'm having a little trouble, because I know a



17    weeks.
18  Q.  Oh, can you?
19  A.  I mean, it's --
20  Q.  Well, have you done any calculations -- you say
21    you may not have enough dirt.  How far will
22    three million cubic yards go if you pile it 35
23    feet?  You're going to slope it, I guess?
0193
1    You're going to put a two-to-one slope on it or
2    something?
3  A.  Right.  That's the reason why it is such a
4    number.  That's why the red line on the bottom
5    of 1538 doesn't go all the way to the edge of
6    the Young parcel, because that's the part we're
7    not sure yet that we can actually construct.
8  Q.  Okay.
9  A.  But as you can see from the orientation of the
10    quarry, it may not ultimately be necessary to
11    build that part, which may help it all work out
12    pretty close to right.
13  Q.  You go on to say the crushing plant will be
14    moved in the future to the northernmost section
15    to allow access to the reserves underneath.
16    Why were you going to move the crushing plant
17    to the north part of the property?
18  A.  Well, what we were referring to at that point
19    was that the -- and this is not the best
20    photograph to -- I'm trying to think what is.
21    At the time that we were there, there was a
22    bench -- a bench of rock that Hanson had
23    created on the north side of the quarry hole.
0194
1  Q.  Right.
2  A.  Okay.  And we had thought the fastest way to
3    liberate the reserves underneath the part of
4    the quarry where the water pit was at the time
5    would be to move the plant over to the north
6    side, to move it from the surface down.  We

10  Q.   Okay.

11  A.   And the plant -- Hanson's plant, located where
12       it was, was using up stockpile area.

13  Q.   You were cramped for space?

14  A.   Right.  So the idea would be to dismantle the
15       plant, and put it down in the quarry hole, so
16       we would have all of that stockpile area, and
17       then for sales or whatever up on the higher
18       elevation.

19  Q.   I've got you.

20  A.   So at the time there was a flat area that we
21       thought we could do a little bit of blasting
22       around the edges and expand its size in the
23       hole and then put the plant down there, which



2716

0195
1        would then allow the quarry operation to move
2        south.

3   Q.   You were going to put -- what you're talking
4        about here when you say the northernmost
5        section, you were going to put it in the pit,
6        but against the north wall of the pit?

7   A.   Right, a good way to put it.

8   Q.   Okay.  And then you would have expanded the
9        quarry more to the south and the southeast?

10  A.   Yeah.  We had to come south slightly enough to
11       get that squared up so it was operationally
12       functional and then we would begin to go to the
13       east.

14  Q.   Okay.  Are you still going to do that or has
15       that changed?

16  A.   Well, putting the plant in the hole is still
17       going to happen now for other reasons, in
18       addition to the efficiency we talked about.
19       But I think now the indications we're getting
20       from the quality of the rock is rather than
21       coming to the south, we may go easterly first.

22  Q.   With the expansion of the pit?

23  A.   Right.

0196
1   Q.   Toward the east?

274

```
 1    near?
 2  A.   Well, near enough for it to be a problem.  I
 3       mean, it was going to depend on the situation.
 4       I mean, the point is we always look.  Whether
 5       it's near or far, we're always looking for that
 6       kind of problem, potential problem.
 7  Q.   And how do you look near or far?
 8  A.   Well, you look around the site, aerial photos,
 9       maps, the state databases that tell you where
10       the parks are, where the protected wetland
11       areas are, wildlife habitats and that kind of
12       thing.
13  Q.   If you had known that Spring Villa was dry,
14       would that have raised a red flag with you?
15  A.   Well, just that fact alone I don't think would
16       have.
17  Q.   Okay.  Why not?
18  A.   Well, I mean what raised the spectra of it was
19       the implication that this quarry made it dry.
20       I mean, that takes it from a non-red flag to a
21       red flag.
22  Q.   All right.  Which is the last one down there,
23       environmental litigation?
0206
 1  A.   Right.
 2  Q.   I take it if you had known, when you did your
 3       site visit, that there was a pending lawsuit,
 4       it would have raised a red flag?
 5  A.   Yes.
 6  Q.   Okay.  And then I would assume that on July
 7       10th when you found out, it raised the red
 8       flag?
 9  A.   It did.  And it's still up.
10  Q.   And it's still up?
11  A.   Yes.
12  Q.   Okay.  So I guess would it be fair to say on
13       July 10th you had some reservations about the
14       purchase of this property?
15           MR. ADAMS:  Object to the form.
16  A.   Well, no.  Because we -- we believed -- well,
17       what we understood of the allegations that day,
18       we thought they were pretty serious, if true.
19       And we still think that's the case, and we're
```



20     approaching -- this investigation we're going
21     to do, we're approaching it with that attitude.
22     But we don't believe, based on our experience
23     in dealing with these kinds of problems and the
0207
1     basic geological and hydrogeological situation
2     that exists out there, that these problems
3     can't be controlled in a way that will be
4     satisfactory. So we wouldn't have -- I don't
5     think we would have backed off of the
6     acquisition; I'm certain we wouldn't have
7     actually.
8 Q.  I thought I had asked you earlier about the
9     cone of depression and whether you could
10    calculate it and so forth, but you said you
11    didn't have enough data. But now you're
12    telling me at the time you had enough data to
13    determine that, in your opinion, Oldcastle
14    could control or limit the impact?
15       MR. ADAMS: Object to the form.
16 A.  Yeah. I think the -- we looked in the quarry
17    at the fractured limestone, and we looked at
18    the water situation that existed there, and
19    this is after we found out about the
20    litigation. There's basically no conduit or
21    system of conduits in the quarry walls which
22    would suggest that four or five or six million
23    gallons of water a day out of the water budget
0208
1     is coming straight over from Little Uchee Creek
2     drainage into the quarry. It goes to the
3     contributory cause business I was talking about
4     this morning.
5 Q.  Well, where is it coming from?
6 A.  Well, we don't know. As a matter of fact,
7     nobody does. Lots and lots of speculation, but
8     no scientific facts. Well, the investigation
9     we intend to do is going to determine that,
10    because that's where the rubber hits the road
11    in this whole thing. And if we find out --
12       MR. ADAMS: Hold it, Brian.
13 A.  Okay. We need to establish the degree to which
14    these different -- the allegations, contentions

2716

15      and speculations are true or not true.
16  Q.    Right.
17  A.    And the qualitative judgment on my part was
18      that the -- given the fact these are usually
19      contributory problems, once we identify the
20      contributors, because we have identified them
21      as specifically as we're proposing to do it,
22      that we can mitigate those impacts
23      satisfactorily.
0209
1  Q.    But right now you're telling us that nobody
2      knows where the water is coming from?
3  A.    That's right.
4  Q.    So if Hanson's people told you they knew where
5      it was coming from or what was causing it,
6      you're saying that --
7  A.    I don't believe them.
8  Q.    You don't believe them?
9  A.    No.  And I don't believe your experts either.
10  Q.    And why don't you believe Hanson's experts?
11  A.    Because there is no scientific data used to
12      develop the opinions and speculations.  They're
13      speculations, and we need to --
14  Q.    And what scientific data is missing, in your
15      opinion?
16  A.    The actual measurements and studies of the sort
17      I described to you this morning; on site,
18      hands-on, give me the numbers, let's find out
19      what's really going on type study.
20  Q.    Okay.  Back on July 10th, if you didn't believe
21      Hanson's experts and you had no data of your
22      own, why was it Oldcastle thought they could
23      limit the impact?
0210
1          MR. ADAMS:  Well, wait a minute.
2              That's not what he testified
3              about, Jimmy.
4          MR. VERCELLI:  That's exactly what he
5              testified to.
6          MR. ADAMS:  No, it isn't, Chip.  And I
7              don't want to --
8          MR. VERCELLI:  That's exactly how I
9              understood it.

14          asking him that?

15  Q.   I'm just asking.  Have you looked at --

16  A.   I don't remember those records exactly.  I

17       remember reading about those kind of things.

18  Q.   I think I was asking you, when you're pumping

19       from the quarry, you can call it whatever you

20       want, but you're dewatering the area, aren't

21       you?

22          MR. WHITE:  Object to the form.

23          MR. ADAMS:  It's asked and answered.

0218

1   A.   Well, no, we're not.  I mean, we're pumping at

2        different rates, which are substantially lower

3        than the pumping rate that's going on in the

4        quarry.  Half million gallons a day --

5   Q.   No, I'm talking about now; pumping four and a

6        half million gallons a day?

7   A.   Well, whatever water is coming in the quarry,

8        we're taking it out.  From wherever it's coming

9        from, we're taking it out.

10  Q.   And when you're taking it out and discharging

11       it, whatever you call that, you're dewatering,

12       aren't you?

13  A.   Right, but I don't know what I'm dewatering.

14          MR. ADAMS:  Object to that, asked and

15             answered.

16  Q.   And why are we dewatering?

17  A.   Why are we dewatering?

18  Q.   Is it to keep the quarry dry?

19  A.   Well, to keep the water level at a level

20       necessary to run the quarry.

21  Q.   Sure.  And when you pump and discharge, it

22       artificially lowers the water table?

23  A.   Yes.

0219

1   Q.   And when you artificially lower the water

2        table, I think we've already agreed, it causes

3        the cone of depression?

4   A.   It creates the cone, yes.

5   Q.   Right.  And we don't know the size of the cone

6        or the shape of the cone, right?

7   A.   That's right.

8   Q.   But when you're taking out -- I don't know what

2716

18    true.
19  Q.  Okay.  Do you know how much leased land is out
20      there, Mr. Fowler?
21  A.  I think it's all leased.
22  Q.  Oh, I'm sorry.  How many acres are leased?
23      MR. ADAMS:  All of it.
0225
1      MR. SPRAYBERRY:  A good answer to a bad
2          question.
3  A.  I'm sorry, I misunderstood your question.  No,
4      I don't know the total acreage.
5  Q.  Assume it's 600 acres, and we're pumping out
6      1.6 billion gallons a year, or whatever it
7      would be, according to my math, do you think
8      that 1.6 billion gallons is all coming from
9      that leased property?
10.  A.  Probably not.
11  Q.  We just don't know where it's coming from?
12  A.  Right.
13  Q.  Is there any way we can tell how far it's
14      coming at this point?
15  A.  How far the water that comes into the quarry
16      travels?  Not right now, I don't think, that I
17      can think of a way. 
18  Q.  I guess you saw in the depositions about the
19      dye traces and I think I had asked you earlier.
20      From the — on 166, which is on the west side
21      of the quarry, there's a sinkhole —
22  A.  Right.
23  Q.  — and the Rhodamine dye was put in there and
0226
1      it showed up about three days later in the
2      quarry discharge; does that tell you anything
3      about that sinkhole?
4  A.  Well, probably there is a connection between
5      the sinkhole, hydrologic connection between the
6      sinkhole and the water in the quarry. 
7  Q.  Oky.  And what about the Eosine that was put in
8      Uchee Creek and showed up in the discharge,
9      does that tell you anything?
10      MR. ADAMS:  Object to the form.
11  A.  Well, no, because of this problem with the
12      breakdown products, which, you know, I need to

13      investigate some more.

14  Q.    Well, I thought I asked that earlier and you

15      said Eosine does not break down; the

16      Fluorescein does, but Eosine doesn't?

17  A.    Right.  But the Eosine could have come from

18      whatever the other dye was that they put in

19      close to the quarry, as I understand it.

20  Q.    You're saying the Eosine could have come from

21      the Rhodamine dye?

22  A.    Right, as a breakdown product of the Rhodamine

23      dye or whatever it was.  I don't remember which

0227

1      dye is which here.  But Eosine is the one I

2      understand is the most stable of the three,

3      chemically stable.

4  Q.    Right.  And it's the one that's shown up from

5      Little Uchee Creek in the discharge?

6          MR. WHITE:  Object to the form.

7  A.    Is Eosine?

8  Q.    And does that tell you anything?

9  A.    Well, it could mean that there's a direct

10      connection between the spring and the quarry or

11      it could mean that it's breakdown product, and

12      we aim to try to resolve that.

13  Q.    One of the two?

14  A.    Right.  Which one it is, we don't know, but we

15      need to find out.

16  Q.    And it would have to travel about 7,000 feet,

17      that's an abnormally long distance, is it, for

18      water --

19  A.    That's a long way for a cone of depression.

20  Q.    Is it?

21  A.    Yeah.

22  Q.    What's the longest dye study you know of?

23  A.    Well, I don't know.  The longest one I know

0228

1      about is, I don't know, a few hundred feet, I

2      think, up until now.

3  Q.    Okay.  If the water from Little Uchee is going

4      into the quarry, what can we do about it?

5          MR. WHITE:  Object to the form.

6  A.    Well, I guess it would depend on how much water

7      is going in from Little Uchee Creek.  I mean,





2720

3    and the creek went dry may not necessarily be
4    just because the quarry is there.  It could be,
5    and probably is, a combination of these
6    different things.  And there's also been
7    construction at the spring in the past in the
8    1950s, drilling, blasting and deepening and
9    whatever.
10  Q.   '20s, 1920s.
11  A.   Well, whenever.  But, you know, the point is
12    that over a thousand year time frame for
13    karstic features to be forming, it's not
14    unlikely, I don't know that it is, but it's not
15    unlikely that there could have been some
16    changes wrought by that work, which added
17    together with today's conditions, you know,
18    created the situation that we have today.  And
19    in order for me to tell you how much water is
20    good and how much water is bad relative to the
21    quarry, I need to know the answers to those
22    questions before I could really give you a
23    solid answer.
0231
1  Q.   When you say that the karst features have been
2    forming out in the spring area for thousands of
3    years, what are you basing that on?
4  A.   Well, it's karstic limestone, nobody disagrees
5    about that.  And the karstic development began
6    as soon as the ocean --
7  Q.   Receded?
8  A.   -- receded, which is roughly in the Pliocene,
9    what, five million years ago.
10  Q.   It was before my time, I don't know.
11  A.   Me, too.
12  Q.   So we've done -- I was asking you about some of
13    this stuff.  If there is a cone of depression
14    in this karst area, are sinkholes more likely
15    to form?
16  A.   I'm not sure.  If the quarry is creating the
17    cone?
18  Q.   Well, you've already said they are, haven't
19    you?
20  A.   I'm just confused about your question.
21  Q.   I mean, there is a cone of depression out

2723

```
22      there?
23  A.   Because of the pumping, yes.
0232
 1  Q.   Because of the pumping?
 2  A.   Right.
 3  Q.   And this is a karst area?
 4  A.   Yes.
 5  Q.   And because of that, isn't it true that it's
 6       more likely that sinkholes will form?
 7  A.   It increases the possibility, yes.
 8  Q.   All right.  And if there is a sinkhole that
 9       forms in a stream, it can swallow that stream,
10       can't it?
11  A.   Oh, sure.  Yeah.
12  Q.   I think you even made reference to the river
13       where the quarry was diverting some of the
14       water from the river 2,000 feet earlier in your
15       deposition?
16  A.   Oh, on one of the other quarries?
17  Q.   Yes.
18  A.   Yes.
19  Q.   Which quarry was that?
20  A.   That was the one in Pennyslvania.
21  Q.   What was the name of it?
22  A.   Well, it's called the Hummelstown quarry,
23       H-U-M-M-E-L-S-T-O-N — S-T-O-W-N, I'm sorry.
0233
 1  Q.   And I take it it did not swallow the entire
 2       river, it was taking part of the water?
 3  A.   Right.  But had we not stopped the process, the
 4       hole would have gotten progressively bigger and
 5       eventually the river would have run into the
 6       quarry.
 7  Q.   So you had no choice in that situation but to
 8       try to do something?
 9           MR. ADAMS:  Object to the form.
10  A.   Right.
11  Q.   And if there's a sinkhole out there in Little
12       Uchee Creek, you can just assume that it is
13       swallowing the entire creek --
14           MR. WHITE:  Object to the form.
15           MR. ADAMS:  Object to the form.
16  A.   Well, I don't know.  I mean, I haven't walked
```



16    flows again, problem solved.

17  Q.   Okay.

18  A.   Because the water that's going down the hole is

19       irrelevant to the creek anymore.  And the

20       quarry can't be robbing water from Little Uchee

21       Creek, surface water from Little Uchee Creek.

22  Q.   Because you're saying it's surface water and

23       we're pumping out groundwater?

0243

1  A.   Well, the Little Uchee Creek is on the surface.

2  Q.   Right.

3  A.   You see, that's the kind of logic about this

4       that's bothering me.

5  Q.   Okay.  I think I had asked you about some

6       sinkholes, and you have seen some sinkholes in

7       your experience?

8  A.   Yes.

9  Q.   All right.  Have you ever seen one that's

10      formed under a pond or in the bottom of a pond?

11  A.   Yeah.  I've seen a lot of ponds that are in

12      sinkholes actually, yeah.

13  Q.   Well, I'm asking the other way around.  Have

14      you ever seen any ponds that have gone dry

15      because of sinkholes?

16  A.   Yes.  Well, I've heard about them.  I haven't

17      seen any, but I have heard of that happening.

18  Q.   Have you ever seen a road collapse or a parking

19      lot collapse because of sinkholes?

20  A.   I have never seen it, but have heard about it.

21  Q.   Okay.  Seen it on TV or anything?

22  A.   Reports, geological publications, and so on.

23  Q.   Have you read any of the GSA reports on the

0244

1       sinkholes collapse in Alabama?

2  A.   I'm not sure about a particular one that I've

3       seen.

4  Q.   The one on the Roberts Industrial Park sinkhole

5       collapse up in Birmingham by the interstate?

6  A.   Oh, maybe I have seen it about the interstate.

7       Maybe there is a pamphlet about it?

8  Q.   Right.

9  A.   I think I might have seen that one, yes.

10  Q.   Okay.  Would you agree with me that if a

2726

11    sinkhole forms under a roadway that it could be
12    dangerous to the public?
13  A.   Oh, sure.
14  Q.   Have you ever seen a hole where it formed under
15    somebody's building or house or something?
16  A.   I've seen pictures of that kind of thing.
17  Q.   And that would be dangerous, too?
18  A.   Sure.
19  Q.   Okay.  What about if it formed – if a sinkhole
20    formed under the gas pipeline?
21  A.   Well, in that case I'm not as concerned,
22    because the pipeline is designed -- the
23    engineering supports around the pipeline are



0245
1    designed to survive that kind of earth
2    subsidence, change in earth grade, where the
3    pipeline exists.
4  Q.   What engineering supports?
5  A.   Well, if you get to talk to Dixie Pipeline,
6    they have a sand bed around that pipeline,
7    which is a cushion basically, which allows for
8    minor adjustments up and down in the soil in
9    which the pipe is embedded to compensate so
10    that the pipeline isn't placed under stress.
11    You know, you wouldn't have a big S curve in
12    it.  And then along the sides of the pipeline
13    are steel bracing and reinforcing.  You know, a
14    pipeline is more like a bridge than it is just
15    a pipe.  There is a superstructure around the
16    pipeline that keeps it rigid.  This is why
17    pipelines in California don't burst every time
18    they have an earthquake.
19  Q.   Have you talked to Dixie about their's?
20  A.   I have not, but Ted Reynolds did talk to them
21    about it and he sent me, which I subsequently
22    gave back to him, Dixie Pipeline's
23    specifications, construction specifications.
0246
1  Q.   Okay.
2  A.   And we wanted those to redesign the blasting
3    that we were talking about this morning.
4  Q.   Okay.  So you looked at those, but don't have
5    them any more?

5   the blasting shots that they were detonating --
6   that Hanson was detonating and the orientation
7   of the quarry and so forth, we've backed all of
8   that down to somewhere around 50 percent of
9   what they were doing. The plant production
10   rate has been cut down to -- I'm not quite sure
11   of these percentages, so don't hold me to them,
12   but something like 50 or 60 percent of what
13   they were doing. And we've moved the hauling
14   patterns in the stripping area and the quarry
15   around so we've cut down back-up movements, for
16   example, which have all of the back-up alarms.
17   So no trucks are backing up any more, they're
18   all --
19  Q.  Going forward?
20  A.  Right, they're always going forward. There is
21   a variety of things like that that we have done
22   in an attempt to make sure insofar as we can,
23   without having the numbers, that, you know,
0256
1   we're not creating whatever impact people
2   perceived that there was before. Now,
3   obviously that isn't a hundred percent
4   successful, but that's what we've been doing.
5  Q.  Would you agree with me that the water table in
6   the Spring Villa area has dropped, for whatever
7   reason?
8  A.  It appears as though it has, yeah.
9  Q.  And dropped fairly significantly?
10  A.  It dropped more than 30 feet.
11  Q.  Right. For whatever reason. And I believe
12   Hanson's expert said that whatever caused that
13   water table to drop was also causing the
14   sinkholes?
15  A.  In the Spring Villa area?
16  Q.  Right.
17  A.  Yeah.
18  Q.  Would you agree with that?
19  A.  I agree with that. We don't know what the
20   mechanism is, but --
21  Q.  When you're talking about the mechanism of the
22   sinkhole, are you talking about the size of it
23   and the shape of it and how it collapsed in; is



13    I guess we don't have a big stake in the

14    results of the investigation. Because what we

15    intend to do is what we've already started to

16    do, and that is to begin to identify, you know,

17    dust, noise, blasting, down the list. Those

18    are problems. I've just taken --

19 Q.   One at a time?

20 A.   -- the complaint seriously, because, I mean,

21    people aren't complaining about them if they

22    weren't problems in the sense of their

23    lifestyle or their livelihood. And in an

0254

1    environmental management sense, it doesn't

2    matter how bad the problem is, the problem

3    exists. And as long as the problem exists,

4    even perceived to exist, we've got a problem.

5       And there are a variety of things we can

6    do to begin to mitigate those impacts, whatever

7    they may be. Now, some people may never be

8    satisfied, you know, but we'll do the best we

9    can. And that's the goal -- I mean, that's my

10    assignment from Oldcastle is to design an

11    investigation and the design of a mining plan

12    which has the maximum amount of abatement --

13    mitigation and abatement built into it for the

14    impacts that have been identified by the

15    complaints that you-all have transferred to us.

16 Q.   Have you made any recommendations to Oldcastle

17    that they've declined not to pursue?

18 A.   Oh, no. Everything we've suggested they've

19    done.

20 Q.   Okay. And that's the berms and the monitoring

21    wells to be put in; any other recommendations

22    you've made to them?

23 A.   Yeah. We suggested that they, for the time

0255

1    being, cut back on the loading rate and the

2    blasting and redesign the blasting patterns.

3    Based on information that I don't personally

4    have, but Ted Reynolds had, about the size of

2728



5   the blasting shots that they were detonating --
6   that Hanson was detonating and the orientation
7   of the quarry and so forth, we've backed all of
8   that down to somewhere around 50 percent of
9   what they were doing.  The plant production
10  rate has been cut down to -- I'm not quite sure
11  of these percentages, so don't hold me to them,
12  but something like 50 or 60 percent of what
13  they were doing.  And we've moved the hauling
14  patterns in the stripping area and the quarry
15  around so we've cut down back-up movements, for
16  example, which have all of the back-up alarms.
17  So no trucks are backing up any more, they're
18  all --
19 Q.   Going forward?
20 A.   Right, they're always going forward.  There is
21  a variety of things like that that we have done
22  in an attempt to make sure insofar as we can,
23  without having the numbers, that, you know,
0256
1   we're not creating whatever impact people
2   perceived that there was before.  Now,
3   obviously that isn't a hundred percent
4   successful, but that's what we've been doing.
5 Q.   Would you agree with me that the water table in
6   the Spring Villa area has dropped, for whatever
7   reason?
8 A.   It appears as though it has, yeah.
9 Q.   And dropped fairly significantly?
10 A.   It dropped more than 30 feet.
11 Q.   Right.  For whatever reason.  And I believe
12  Hanson's expert said that whatever caused that
13  water table to drop was also causing the
14  sinkholes?
15 A.   In the Spring Villa area?
16 Q.   Right.
17 A.   Yeah.
18 Q.   Would you agree with that?
19 A.   I agree with that.  We don't know what the
20  mechanism is, but --
21 Q.   When you're talking about the mechanism of the
22  sinkhole, are you talking about the size of it
23  and the shape of it and how it collapsed in; is

Page 229

1                    IN THE CIRCUIT COURT FOR

2                      LEE COUNTY, ALABAMA

3

4

5      MIKE DAVIS, et al.,

6                    Plaintiffs,

7      Vs.                                  CIVIL ACTION NO.

8                                           CV-2002-85

9      HANSON AGGREGATES SOUTHEAST,

10     INC., et al.,

11                   Defendants.

12

13                         VOLUME II

14

15             CONTINUATION OF THE DEPOSITION OF THOMAS

16     ALEY, taken pursuant to notice and stipulation on

17     behalf of the Defendants, in the conference room of

18     Adams, Umbach, Davidson & White, 205 South 9th

19     Street, Opelika, Alabama, before Ricky L. Tyler,

20     Certified Shorthand Reporter and Notary Public in and

21     for the State of Alabama at Large, on Tuesday, May

22     11th, 2004, commencing at 9:25 A.M.

23

5/11/2004

Thomas Aley

Page 314

1   250 dollars; I think that would be
2   irresponsible.
3   Q.   But you thought it was enough water, right?
4   A.   I thought it would be enough water for the
5   purpose of that trace, but I would point out, I
6   did two introductions really very close to one
7   another.  The eosine introduction on up the
8   creek valley is in the same unit of marble and
9   it had the advantage of lots of water behind
10  it.  So it was there in case I didn't have
11  enough water.  It would be a trace that had a
12  sinking stream pushing behind it.
13      And because that is one unit of marble,
14  they are so close together, the dye
15  introduction of the eosine was in effect my
16  second trace that would demonstrate -- would
17  determine if there was a hydrologic connection
18  between the Spring Villa area and the quarry.
19  And in fact that eosine dye introduction did
20  demonstrate that.  That's why we had two dye
21  introductions there, because water was limited
22  for Spring Villa; it was not limited at the
23  sinking stream.

Page 315

1   Q.   When you say the water was limited, it was only
2   limited by you based on how much you asked to
3   be put into the dye test, right?
4   A.   I do not believe that I would have been
5   provided a flow of a hundred gallons per minute
6   for months if needed.
7   Q.   But you didn't ask, right?
8   A.   I did not ask, no.
9   Q.   And you thought that the amount of water that
10  you did use was the proper amount for that dye
11  test?
12  A.   I hoped that it would be, but I had, if you
13  will, the fall-back of the other dye trace in
14  close proximity where I did have a very
15  adequate supply of water.
16  Q.   Was this dye test design issue discussed with
17  the City or is it documented in any way?
18  A.   It was discussed with -- it was discussed with
19  the City.  I don't believe it is documented
20  that this is a fall-back position or this --
21  how the two traces interact, but it was
22  certainly part of my thinking.
23  Q.   My question is, was it something that you

Page 316

1   discussed with your client?
2   A.   I believe I did.
3   Q.   Okay.  And who would that have been?
4   A.   I know I discussed it with Mr. Sprayberry and
5   Mr. Vercelli, because before arriving they told
6   me that a new sink had formed upstream of the
7   Spring Villa Road and was taking the entire
8   flow of the stream.  And I said, great, that
9   will be very helpful, I will want to introduce
10  dye there, because I have a -- I'll have a
11  great water supply for it.  I do recall that
12  discussion with them.
13  Q.   For the dye to be sitting there at Spring Villa
14  in these caverns, there has to be -- that
15  system must be such that it is not receiving
16  any input of water; is that true?
17  A.   It would be receiving some small amount from
18  precipitation, but it's not receiving large
19  amounts of water.
20  Q.   Okay.  And it would have to be such that
21  there's not any way for the water to flow out
22  of the caverns, right?
23  A.   That's right.  Now, I am not saying that it is

Page 317

1   just sitting there.  I talked about bleeding
2   out into either the rock matrix or through the
3   rock matrix and into the alluvium in Little
4   Uchee Creek.  And you can lose the dye in the
5   alluvium pretty readily.  Especially if it's
6   bleeding out at a few gallons a minute.
7   Q.   And where is this alluvium you're talking
8   about?
9   A.   Throughout the Little Uchee valley.
10  Q.   Okay.  And when you say "alluvium," what do you
11  mean by that?
12  A.   It's the sands, the gravels, the finer textured
13  materials that are filling the valley.
14  Q.   So --
15  A.   The soils.
16  Q.   -- you're talking about seeping from the
17  bedrock into the soils?
18  A.   Yeah.  Yes.
19  Q.   At a lower elevation obviously?
20  A.   Yes.  Yes.
21  Q.   Okay.  So that would be down the creek
22  somewhere?
23  A.   That would be a very likely area.

23 (Pages 314 to 317)

Page 322

1  sampling period. But I did not guarantee it
2  and I did not tell the client that I had
3  tremendous confidence that it was going to
4  appear in that period of time. I thought there
5  was a good chance that it would.
6  Q. Okay.
7  A. But we were going to learn something about the
8  system regardless of what happened.
9  Q. Okay.
10 A. And I hoped that would be beneficial to them.
11 Q. We learned there is not a conduit between the
12 spring and the quarry, right?
13        MR. VERCELLI: Objection.
14 A. We certainly did.
15 Q. We learned there's not a conduit between --
16 A. Excuse me, a single conduit. Yes, there may be
17 conduit pieces that exist in there, but, no,
18 there's not a big pipeline, as it were, that
19 runs from the spring or from the sinkhole there
20 on Little Uchee Creek that goes straight to the
21 quarry.
22 Q. There is not even a little pipeline? There's
23 not a pipeline, period, right?

Page 323

1  A. No, there is a pipeline, because we have
2  detected the eosine dye there. With the travel
3  rates, that's still very rapid flow. The more
4  you go through fractured rock, the slower in
5  general the flow rates are, unless it's just
6  moving along an open fault. You can get very
7  rapid movement along open faults.
8  Q. It's not an open fault then?
9  A. Don't seem to -- the data did not support an
10 open fault. Now, you may have some portions of
11 flow system where it's along an open fault, but
12 certainly not major portions of it.
13 Q. Let me be sure I understand what you're saying.
14 There is not a continuous conduit flow between
15 Spring Villa and the quarry shown by your dye
16 tests; is that true or false?
17 A. That is true based on the way I define conduit.
18 So we better understand what a conduit is. I
19 would visualize a conduit as the equivalent of
20 a pipe, it's of some appreciable dimensions,
21 let's say at least inches wide --
22 Q. Okay.
23 A. -- that would be continuous.

Page 324

1  Q. All right.
2  A. So a conduit at least inches wide does not
3  exist between Spring Villa and the Spring Villa
4  area and the quarry.
5  Q. All right. And that would also be true for the
6  sinkhole or swallet at Little Uchee Creek and
7  the quarry?
8  A. That is right. Because that's part of the
9  Spring Villa area.
10 Q. Okay.
11 A. Now, if you have flow routes through open
   fractures, they are smaller than conduits;
   those do exist that are integrated in a fashion
   capable of moving water from the Spring Villa
   area to the quarry. Those do exist.
16 Q. Based on the eosine trace in the creek?
17 A. That's correct.
18 Q. Okay.
19 A. And the fact that the quarry started operation
   and you started getting all of the sinkholes.
   Those are classic problems associated with loss
   of buoyant support when you have heavy
   groundwater extraction in the area. It's just

Page 325

1  classic stuff, even without the dye traces.
2  Q. Well, I understand.
3  A. It was clear -- let me finish answering the
4  question, please. Even without the dye traces,
5  it was clear to me that you had some major
6  change in groundwater levels in the area; when
7  you have that, you go in search of where is all
8  of the water being pumped. And where all of
9  the water or where lots of water is being
10 pumped in the area is the quarry.
11 Q. Okay. So your opinion was that the quarry was
12 the problem at the spring regardless of even
13 whether you did a dye test, is that it?
14 A. That was my opinion, yes.
15 Q. And the dye test was designed to prove your
16 point, right?
17 A. The dye test was designed to assess the area
18 and hopefully demonstrate that -- demonstrate a
19 hydrologic connection.
20 Q. Okay.
21 A. But it was not designed to be the proof or
22 disproof of the theory, because if it was to be
23 either proof or disproof of it, I only had a

25 (Pages 322 to 325)

11/2004

Thomas Aley

Page 338

1    -- that great quantity of water you testified
2    that's going into the creek travel into the
3    spring conduit system?
4    A.   No, not necessarily.  And the way I tried to
5    explain it was with like a tributary stream
6    system.  You could look at the tributary stream
7    on the left, and let's say it had an elevation
8    at some point on it of a thousand feet, and on
9    the right fork there was a point with an
10   elevation of 900 feet.  That doesn't mean the
11   water flows from the left fork to the right
12   fork just because there's the elevation
13   difference, but they are all part of the same
14   flow system.  I hope I made that clear to you.
15   Q.   Well, I guess I'm having trouble understanding
16   it.  What's the evidence that they're connected
17   then?  They're not connected in that area, but
18   they may be connected somewhere else, is that
19   it?
20   A.   You're in -- all three of those points that
21   we're talking about, the introduction point for
22   the eosine, Spring Villa spring or the former
23   location of Spring Villa spring, and that test

Page 339

1    well, all of them are in the marble.  All of
2    that marble is being drained and -- so that
3    makes it all part of the same flow system.  I
4    don't see it as different flow systems, even
5    though one point in that flow system may not be
6    directly tributary to another point in that
7    flow system.
8    Q.   Okay.  I just want to be sure I understand
9    here.  In this system you can have unconnected
10   fracture systems, right?
11   A.   That's correct.
12   Q.   Okay.  And you can have fracture systems in the
13   marble that aren't connected to one another?
14   A.   Yes.
15   Q.   Okay.  And you believe that the fracture system
16   into which the stream, Little Uchee, is going
17   is connected with the quarry; you believe that,
18   right?
19   A.   Yes.
20   Q.   Okay.  Now, what's your evidence that the
21   fracture system at the spring is connected with
22   the quarry?
23   A.   The best evidence is the fact that the spring

Page 340

1    went dry, and since the quarry has been pumping
2    flow has not returned to the spring.
3    Q.   Okay.  What is your evidence that the fracture
4    system for the spring and the fracture system
5    for the sinking creek are connected?
6    A.   Their close proximity; the fact that the
7    swallow hole for the stream exists because of a
8    loss of buoyant support, in other words,
9    groundwater withdrawal.  What we're seeing in
10   all of the sinkholes that we visited yesterday,
11   for example, including those in the creek and
12   essentially right next to where we introduced
13   the dye, all of those are due to a sudden
14   lowering of the water table.  Sudden lowering
15   of the water table is the reason that Spring
16   Villa spring has quit flowing.  The two
17   occurred in effect -- change that.  The two
18   occurred because both experienced drastic
19   lowering of the water table, and what has
20   caused that lowering of the water table has
21   been the quarry.
22   Q.   Do you have any data that shows that the quarry
23   has lowered the water table at the spring?

Page 341

1    A.   Yes.  The dye trace from the eosine shows that
2    that's what's caused the problem whatever the
3    distance is, 600, 800 feet away.  Due to their
4    proximity, being in the same marble, there is
5    no question that the two are hydrologically
6    associated and that the quarry is responsible
7    for the formation of the sinkholes and that the
8    quarry pumping is responsible for the cessation
9    of flow at Spring Villa.
10   Q.   Do you have any way of identifying the eosine
11   that you believe you have detected in the
12   quarry discharge as being the eosine that you
13   injected in the creek?
14        MR. VERCELLI:  I apologize, would you
15        please restate that?  I missed
16        part of it and I'm sorry.
17   Q.   Can you connect up the eosine that you put into
18   the swallet in the creek with the eosine
19   detected in the quarry discharge?
20   A.   Is there any way I can tell it is my eosine
21   versus somebody else's eosine, is that
22   basically the question?
23   Q.   Yes, sir.

29 (Pages 338 to 341)

3/11/2004

Thomas Aley

Page 342

1  A.   First, it is eosine. That, in my view, is
2       beyond question. Secondly, eosine is not
3       something that most other people have access
4       to. And as our records from the activated
5       carbon samplers would indicate, I want to point
6       out the duration period that we have detected
7       it. We have detected it since the first sample
8       that contained it was in place from June 5 to
9       June 12 of '03. And, let's see -- no, wait a
10      minute, I'm sorry. I got in the wrong column.
11      And the last sample we pulled was collected on
12      April 14, '04. We may have subsequent samples,
13      but eosine has been present in every single
14      sample for that entire period. So that's from
15      June of '03 to the middle of April of '04,
16      that's, round numbers, ten months.
17          It takes an appreciable amount of eosine
18      dye to be there for that long of period. It's
19      not something that you could attribute to
20      somebody carrying some of it down the road and
21      spilling it or something like that. It's
22      eosine dye. We had a number of samples before
23      we had any detections and then we've gotten it

Page 343

1       in all of these samples; it's a clear-cut
2       positive trace.
3  Q.   Well, whether it's a clear-cut positive trace
4       doesn't answer the question of whether it's
5       your eosine, and that's what I was -- that was
6       my point or what I was trying to ask you about.
7       So the fact that it was found from June to
8       April you believe shows it's a continuous
9       source of eosine in the system; is that it?
10 A.   It's a continuous discharge of the eosine,
11      which, in my opinion, is the eosine which I
12      introduced in the sinkhole in Little Uchee
13      Creek.
14 Q.   What was the reason that the dye was not
15      monitored between March and June of 2003?
16 A.   As I recall, we were going to court and -- or
17      thought we were going to court and Alan Lee
18      dropped the sampling. He had other things that
19      he was doing, so we just did not sample during
20      that period.
21 Q.   You didn't sample because you were going to
22      court?
23 A.   And in the discussions we had had we thought we

Page 344

1       were going to court, and thus had all of the
2       data that we would be able to use, so stopped
3       the sampling.
4  Q.   Okay.
5          MR. VERCELLI: In technical terms,
6            boo-boo.
7  A.   Not particularly.
8          MR. BYRAM: Well, let's let the witness
9            deal with that, Chip.
10 Q.   Are you aware that Doctor Ewers has injected
11      sulphorhodamine in the same sink where you put
12      the eosine?
13 A.   Yes, I am. Excuse me, no, it was not the same
14      sink.
15 Q.   Wasn't it?
16 A.   No. It's a sink in very close proximity, but I
17      believe it's a sink -- I believe he introduced
18      in the sinks that we saw in the field yesterday
19      when we took our field trip. And just
20      downstream of there 30 feet or so is the
21      sinkhole that I used. Since Doctor Ewers is
22      here, was it the sink that we saw in the field
23      trip yesterday?

Page 345

1  Q.   No, we don't do that. Do you have a -- you
2       agree, don't you, that a scientific test to be
3       valid must be repeatable? Do you agree with
4       that?
5  A.   It depends on what the test is.
6  Q.   A dye test?
7  A.   You know, if you want to know that you can kill
8       a hog by shooting it, and you shoot it, you
9       can't very well repeat that scientific test,
10      because you killed it.
11         MR. PHEARS: You can do it with another
12           hog. We barbecue them all the
13           time.
14 A.   Yeah, but it would be a different hog.
15 Q.   Well, let me ask it this way --
16 A.   But repeatability is important in many tests.
17      I would point out that we have many repeat
18      samples of the eosine being there. This test
19      has been repeated numerous times.
20 Q.   Repeated dye sampling for the eosine?
21 A.   That's right.
22 Q.   That's what you're talking about. You were at
23      the creek yesterday?

30 (Pages 342 to 345)

9/11/2004                                                          Thomas Aley

Page 386

1   A.   Under natural conditions, the solution cavities
2        were down-gradient of the supplying recharge
3        area.
4   Q.   Okay. So at the present time it has to be your
5        interpretation or assumption that the amount of
6        water going into these cavities is not enough
7        to flush out the dye and water that's detained
8        there?
9   A.   That's right. Because in effect what you are
10       trying to do is run water the opposite
11       direction from which it ran in the natural
12       drainage system feeding that spring. And it
13       can be very difficult to run water backwards in
14       your flow system.
15  Q.   And one of your assumptions or interpretations
16       also then is that the cavities can't be --
17       can't allow this water that's detained there to
18       escape at anything other than a slow leak?
19  A.   Once again, I object to the question that has
20       assumptions and interpretations both in the
21       question. I believe that attorneys should
22       interpret the law, not assume what it is.
23  Q.   Okay.

Page 387

1   A.   I see a difference between interpretation and
2        assumption. So if you want to make that two
3        questions, with assumptions being the first one
4        and interpretations, then we can do it.
5        Otherwise, if you want to allow me to properly
6        answer it, then let's use the term
7        "interpretation."
8   Q.   Well, I said "or" not "and." All you have to
9        say is "yes" for interpretation and "no" for
10       assumption.
11           MR. VERCELLI: Let me object.
12  A.   I will try and answer them that way for you.
13           MR. VERCELLI: Can you restate the
14           question, please, because I lost
15           it? I'm sorry.
16           (Question read by the Reporter.)
17  A.   That is my interpretation, correct. That is
18       not an assumption.
19  Q.   It's an interpretation based on the fact that
20       the dye has not been detected?
21  A.   The interpretation based on all of the items
22       that I've already identified several times.
23  Q.   Okay. Now, one of your interpretations is that

Page 388

1        the groundwater is flowing toward the quarry
2        from the spring area?
3   A.   The general flow direction is, --
4   Q.   The general flow?
5   A.   -- that is correct.
6   Q.   But your assumption here is that the --
7        although in your opinion the general flow
8        direction is from the spring to the quarry, in
9        the case of this fluorescein, that's not where
10       it's going; is that right?
11  A.   There has not been sufficient water behind the
12       fluorescein to flush it through that system.
13       But we know what the flow direction is from the
14       eosine dye introduction that is in the same
15       chunk of marble and in close proximity to it.
16       That's what tells us the flow direction.
17       All right. And that opinion that the eosine
18       proves the connection is based on the
19       interpretation or assumption that the fracture
20       system that's connected with the swallet at the
21       creek is also connected to the fracture system
22       that connects with the spring at the spring
23       site?

Page 389

1            MR. VERCELLI: Objection.
2   A.   Yes, as proven by the dye trace.
3   Q.   Okay. Well, the dye trace does not prove the
4        connection between that fracture system and the
5        spring fracture system or conduit system?
6   A.   I believe it does.
7   Q.   Why is that?
8   A.   It shows that the water that went down the
9        sinkhole in Little Uchee Creek came out of the
10       quarry. If it's to come out of the quarry,
11       it's got to move through some marble and it's
12       got to move through some other rocks that are
13       not marble, presuming the geologic mapping is
14       reasonably correct, and I think that's a
15       reasonable interpretation. It's got to go
16       through them, because that's the nature of the
17       geologic setting that you're dealing with.
18  Q.   So one of your interpretations or assumptions
19       is that the creek fracture system and the
20       spring fracture system aren't connected where
21       they're close together there, but they are
22       connected a mile and a half away; is that it?
23           MR. VERCELLI: Objection.

41 (Pages 386 to 389)

Thomas Aley

Page 390

1  A.   The spring -- the spring system and the
2  sinkhole -- I think I've explained this several
3  times, I'm sorry I'm having difficulty getting
4  it across to you in an understandable fashion.
5  Let me try it again.
6       The spring and the sinkhole are located
7  very close together. They -- the spring is in
8  a sinkhole that formed catastrophically. There
9  are numerous sinkholes in that area that have
10  formed suddenly; we call those catastrophic
11  sinks. All of those are classic examples of
12  water table lowering and loss of buoyant
13  support because of water extraction. You could
14  get that from a quarry; you could get it from
15  big production wells. Spring Villa spring, the
16  same general time frame as all of these sinks,
17  went dry.
18       All of these things show the same pattern.
19  All of them are bits of information that we put
20  together into the total interpretation of
21  what's going on in the area. And then we have
22  the dye trace that demonstrates that that area
23  is connected to the quarry.

Page 391

1  Q.   Okay. Now let's go to your July report,
2  please, sir, Supplement to the Opinions of Tom
3  Aley.
4       MR. VERCELLI: Which one, July?
5       MR. BYRAM: '03.
6  A.   I may need a copy of that. Wait, I may have
7  one up here. Let's see. Yes, I --
8  Q.   Do you have a copy of that?
9  A.   I believe I have a copy of it. It's five pages
10  long. I don't see a date on it.
11  Q.   Well, here is what was given to us. There's a
12  five page document and then there is a fax from
13  you to Mr. Vercelli dated July 6 that's 20
14  pages long and it looks like another one that
15  is 32 pages long. It's all of this stuff right
16  here, do you have a copy of that?
17  A.   May I see it a minute. I believe I have the
18  first part of this.
19       MR. VERCELLI: He probably doesn't have
20       the document that we produced; he
21       probably has just what he sent us.
22       MR. ADAMS: Off the record.
23       (Off-the-record discussion.)

Page 392

1  Q.   Any opinions you have are going to be -- some
2  sort of documentation will be in that book
3  right there?
4  A.   That's right.
5  Q.   So if I don't ask him about this, and I ask him
6  about that, I'm going to get everything he has
7  opinions about; is that right?
8  A.   Yes. And they will be updated opinions as of
9  now, because we have more data.
10       MR. VERCELLI: And "that book" meaning
11       Defendant's Exhibit 363.
12  A.   Excuse me a minute, when you hit a good
13  stopping place --
14       MR. BYRAM: Yeah, let's stop.
15       (Recess.)
16  BY MR. BYRAM:
17  Q.   I was looking at your most recent report and
18  you've attached two things, Summary of the
19  Professional Opinions of Aley and then a
20  Summary Report on Groundwater Tracing Results.
21  They seem to deal with much of the same issues,
22  I'm trying to figure out what the difference
23  is. Do they overlap?

Page 393

1  A.   I'm not -- may I see that so I can see what you
2  have, please? Where do you find dates on these
3  things?
4  Q.   On the certificate of service.
5  A.   Okay. The two -- I have copies of them
6  independently here in my notebook.
7  Q.   Well, while she's working on this other copy,
8  let me just ask you some things about this,
9  okay? So the first document, which has been
10  Bates-stamped for us 2234, Summary of
11  Professional Opinions of Aley, Opinions Revised
12  on March 29, 2004, do you have that document?
13  A.   Yes, I do.
14  Q.   Okay. It refers here to a site visit on
15  September the 4th, 2003. What was the purpose
16  of that site visit?
17  A.   That was probably while I was here in
18  conjunction with the last deposition. We could
19  see what the deposition date was.
20  Q.   That was in April.
21  A.   Oh, in April. Oh, I recall now. We had had a
22  deposition scheduled, and then it got canceled,
23  in August, I believe. I was in the region and

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

Page 410

1   the Hanson operation, often had discharges of
2   appreciable amounts of total suspended solids,
3   those total suspended solids plug up the
4   gravels in the stream channel, and in
5   consideration of that I believe the two inches
6   per day of infiltration was a good estimate to
7   use in this water budget.
8   Q.   Okay. Now, when you say that the -- for either
9   the spring or the quarry, what the recharge
10  area is, and you used the same water budget
11  methodology on both of those computations,
12  right?  7.72 square miles versus 9.15 square
13  miles?
14  A.   Basically the same, but I, of course, am
15  accounting for some of these other water
16  sources and direct precipitation on the quarry
17  and things like that.
18  Q.   When you say that's the recharge area, what
19  exactly do you mean by that?
20  A.   That is the amount of land area that is
21  required to account for the flow of water that
22  the quarry is pumping.
23  Q.   Okay.

Page 411

1   A.   That's the amount of land area required.
2   Q.   Okay. Or the amount of land area to account
3   for the spring flow?
4   A.   When I'm speaking of the recharge area for
5   Spring Villa spring, that's correct.
6   Q.   Okay. So on the Spring Villa spring you're
7   saying that to produce the flow of water, which
8   I think you said was 2.4 million gallons a day,
9   you would have to have a recharge area of at
10  least 7.72 square miles; is that it?
11  A.   If that's the number I used, yes, that's
12  correct.
13  Q.   Okay. And is there any way that this tells you
14  which 7.72 square miles?
15  A.   It tells you a lot about it, because Spring
16  Villa quit flowing. And that says that most,
17  if not all, of its recharge area was captured
18  by the quarry, because in effect the quarry is
19  now the replacement. It has hydrologically
20  replaced Spring Villa as the drainage point for
21  the groundwater system.
22  Q.   Okay. I understand your point there, but let's
23  just assume that the quarry didn't exist and

Page 412

1   you were just, for whatever reason, wanting to
2   compute a recharge area for this spring --
3   A.   Okay.
4   Q.   -- and you came up with 7.72 square miles?
5   A.   Yes, sir.
6   Q.   Does this address what 7.72 square miles?
7   A.   No.
8       MR. VERCELLI: Objection.
9   Q.   Okay.
10  A.   No, except that it needs to be over rocks where
11  you have adequate recharge, that would be over
12  the marbles, over -- or over the Hollis
13  Quartzite. If we had it over the schist, I
14  don't think you're going to move water in
15  nearly as rapidly. So that seven point -- was
16  it 72?
17  Q.   7.72 is what I wrote down.
18  A.   That 7.72 square miles for Spring Villa would
19  have been land that was underlain by either the
20  Chewacla Marble or the Hollis Quartzite.
21  Q.   What if it had been Coastal Plain sediment?
22  A.   You get some recharge through the Coastal Plain
23  sediment and some of it is overlain by Coastal

Page 413

1   Plain sediment. I'm taking that into
2   consideration. My estimate of 30 percent is
3   based in part on the textural classes of the
4   overburden materials from the boring logs taken
5   at the quarry.
6   Q.   Is the 30 percent some published number?
7   A.   Well, there are many values that are estimated
8   in water budgets for various materials, but
9   there is no standard published number that
10  tells you what the value should be. It is the
11  estimate based on my professional experience.
12  It is a number that I believe in that setting
13  is a reasonable number.
14  Q.   And that's based on an assumption that this
15  7.72 square mile area is a fractured rock
16  terrain that has storage capacity?
17  A.   Fractured rock and to some extent soluble rock
18  terrain, yes.
19  Q.   Okay. And let's go back to the Coastal
20  sediments or unconsolidated material or
21  whatever you call it. I mean, is its storage
22  capacity less or greater or about the same?
23  A.   This volume would need to move through those

47 (Pages 410 to 413)

Page 414

1    sediments where they overlie the fractured or
2    soluble rocks. If you didn't have the Coastal
3    Plain sediments there and it was just stripped
4    off to basically bare rock, then we would have
5    a much bigger number than 30 percent.
6  Q.  I guess my question was, if you were down in
7    Baldwin County, Alabama or some place where
8    you're a long way to bedrock and it's sandy
9    soil or whatever, would you use the 30 percent
10   infiltration rate?
11 A.  I've never worked in that county; I don't have
12   any data from that county.
13 Q.  Okay.
14 A.  I would want to get the data before I made
15   estimates.
16 Q.  Okay. Would you use 30 percent on your work in
17   Talladega?
18 A.  No.
19 Q.  What did you use up there?
20 A.  In Talladega there are sinkholes all over;
21   there is very little surface runoff. I would
22   have to look at my report to see if I made such
23   estimates. There is -- there's one little

Page 415

1    stream channel that disappears, but certainly
2    in Talladega it would have been a bigger
3    number.
4  Q.  The recharge number would be more than 30
5    percent?
6  A.  The recharge percent of total annual yield
7    would have been a larger number.
8  Q.  The 7.72 square mile number, does that -- is
9    what you're saying is that based on the
10   assumption that 30 percent of the rainfall
11   makes it into the groundwater system, it would
12   take an area that big and that much rainfall at
13   30 percent to produce a spring flow of 2.4
14   million gallons a day? Is that it?
15 A.  No.
16 Q.  No, it's not it?
17 A.  The amount -- it's based on -- it's based on 30
18   percent of the annual estimated water yield
19   from the water budget. You get -- let's say in
20   round numbers you get 55 inches of rain a year.
21   A lot of that rainfall is incorporated in
22   evaporation and water use by plants called
23   transpiration. So in the water budget you are

Page 416

1    deducting that and an appropriate amount based
2    on precipitation each month, temperature
3    number, the kind of factors that are in the
4    Thornthwaite tables. From that you calculate
5    how much total runoff you should have in a
6    year, or total runoff per month in a year.
7    Those are the numbers I used. And then I
8    assumed 30 percent of that total runoff became
9    the amount of recharge to groundwater.
10 Q.  Does this relate in any way to the -- now
11   moving from the spring to the quarry and the
12   similar computation coming up with 9.15 square
13   miles, does that have anything to do, in your
14   opinion, with the zone of influence?
15 A.  Yes.
16 Q.  Okay. Is that the zone of influence?
17 A.  That is the area of influence. The zone of
18   influence would have to locate where it is.
19 Q.  Okay.
20 A.  But this tells you its size under the pumping
21   levels and the depth of the quarry that existed
22   at that time. The quarry has now gone deeper.
23   The deeper you go, the larger the area that's

Page 417

1    contributing water because the more water
2    you're pumping. And, for example, I've seen in
3    the record, I think it was, an application for
4    an increase in pumping rate up to ten million
5    gallons a day. The deeper you go, the more
6    water you're pumping, because you're impacting
7    a larger area. But that number is my estimate
8    under these particular conditions.
9  Q.  Okay.
10 A.  And to some extent as the quarry moves
11   laterally, you're going to capture a bit more
12   water, too.
13 Q.  Okay. So the 9.15 square miles that you've
14   computed would be an area of influence, meaning
15   the total land area, but wouldn't identify
16   which particular land area --
17 A.  Right, it would not.
18 Q.  -- would be impacted by quarry pumping; is that
19   right?
20 A.  That's correct.
21 Q.  Okay.
22 A.  But if we were not in litigation here and we
23   had these values, we had the observations at

48 (Pages 414 to 417)

Page 454

1  was varies depending on how far away you are
2  from the pumping source?
3  A.  Yes, it will.
4  Q.  Okay.  So if you're saying that you're
5  dewatering 9.15 square miles, that doesn't mean
6  that there's -- you're taking all of the water
7  out of 9.15 square miles?
8  A.  No, but you are lowering water levels which
9  have impacts on property owners.  It makes it
10  further to groundwater if you have a well;
11  depending how far away you are, it may result
12  in lowering water levels below the depth of
13  existing wells.  Where you have underlying
14  carbonate rocks, you may be inducing sinkholes.
15  Q.  It may have an effect; it doesn't necessarily
16  have an effect?
17  A.  No.
18  Q.  No what?
19  A.  No, the --
20  Q.  Do you agree with me or not?
21  A.  It may have an effect.  Yes, I agree with you.
22  Q.  All right.
23  A.  It may have an effect.  And the effect is going

Page 455

1  to vary from property-to-property.
2        (Off-the-record discussion.)
3  Q.  On the water budget, I mean you're assuming,
4  right?  You took total quarry pumping of 3.356,
5  that was sort of your beginning point, right,
6  on your water budget?
7  A.  Okay.  I believe that was the number.
8  Q.  Yeah.  3.356 million gallons a day.  And you
9  assumed that -- you figured the average flow at
10  Spring Villa was 2.44 million gallons a day?
11  A.  All right.
12  Q.  And you assumed that all of the Spring Villa
13  flow was in the quarry discharge?
14  A.  That's right.
15  Q.  Okay.
16  A.  So that number would be the same.  The point
17  that I was trying to have made in this
18  supplemental opinion is simply that using
19  numbers that were prepared for the Hanson
20  quarry, it indicated that with a mining depth
21  to 250 feet, which is deeper than we have
22  now, --
23  Q.  Right.

Page 456

1  A.  They were anticipating an extraction of 5.76
2  million gallons per day.  If you use that and
3  the other figures I had, it would require a
4  recharge area of 15.7 square miles.
5  Q.  What's that?
6  A.  That is the amount of area in which -- that's
7  the amount of area required to give you enough
8  groundwater recharge to account for the quarry
9  pumping.  The point I was trying to make in
10  this was that the Skelly and Loy report was
11  providing notice to the Hanson quarry that they
12  were going to be having hydrologic impacts on a
13  very large area, much larger than the land they
14  owned or had under lease.  Under lease they
15  had, I believe it was, 437 acres, some number
16  like that.
17  Q.  Yeah.  I've seen your computation on that, you
18  don't need to do it now.  The Skelly and Loy
19  was a groundwater -- I mean, it's modeling,
20  right?
21  A.  It was a -- what did they call the report?
22  Q.  Well, the fact is the quarry wasn't 250 feet
23  deep in 1999?

Page 457

1  A.  That's right.
2  Q.  And it's not 250 deep now?
3  A.  That's right.  It was a projection that they
4  made as to what the pumping would be.
5  Q.  Okay.
6  A.  And I was simply making the point that with
7  their number, that was notification to their
8  client that they would be dewatering a very
9  large area.  Then you should look at that and
10  see what is in the area that you're going to
11  impact.  The fact that you dried up Spring
12  Villa spring and caused sinkholes was totally
13  predictable based on that kind of number.
14      Now, the fact is it may have occurred a
15  little more rapidly than Skelly and Loy might
16  have anticipated, but if you were planning a
17  quarry that's going 250 feet deep or
18  potentially 250 feet deep, I believe it's
19  prudent hydrology to look at how much of an
20  area are you affecting and what land-use
21  activities are in there that may be impacted by
22  what you're doing with the quarry.
23  Q.  Are you familiar with the Skelly and Loy model?

58 (Pages 454 to 457)

Thomas Aley

Page 458

1  A.   I've read through their report, to that extent
2       I am familiar with it.
3  Q.   I said, are you familiar with their model, the
4       computer model?
5  A.   No. I don't recall what they were using.
6  Q.   Okay.
7  A.   They might have used mode flow or one of those.
8       I'm familiar with many of them. But that was
9       the value they put in their report. Whether
10      it's accurate or not, I'm not prepared to say.
11      The point is simply they came up with a number
12      that I think a prudent quarry operator would
13      have expected that you were going to have
14      serious impacts on Spring Villa just because of
15      its close proximity.
16  Q.   And you're basing that on the Skelly and Loy
17      report?
18  A.   And the proximity of Spring Villa. If you're
19      going to be draining 15.7 square miles and
20      Spring Villa is only 8,000 feet away or
21      whatever the distance was or 6,600 feet, what
22      has happened to Spring Villa was predictable.
23  Q.   The 250 feet hasn't happened yet and there's 15

Page 459

1       square miles that you computed, not Skelly and
2       Loy?
3  A.   That's right.
4  Q.   Okay. Is there a principle in quarry
5       permitting that prohibits off-site impacts on
6       water tables?
7  A.   I don't know what the laws are in Alabama.
8  Q.   Any place?
9  A.   Water rates go state-by-state. There are some
10      of the western states that certainly you would
11      want to have control over where it goes or
12      you're wasting water.
13  Q.   It would not be uncommon -- you've been around
14      a lot of quarries, haven't you?
15  A.   (Witness nods head in the affirmative.)
16  Q.   It wouldn't be uncommon for a quarry to, using
17      your terminology, dewater off-site property?
18      MR. VERCELLI: Objection.
19  A.   In my opinion, no, it would not be. But such
20      dewatering is often a reason for non-issuance
21      of permits.
22  Q.   And oftentimes permits are issued without
23      quarries having 15 square miles of land under

Page 460

1       lease, aren't they?
2       MR. VERCELLI: Objection.
3  A.   Yes, they are.
4  Q.   Do you know of any quarries that have 15 square
5       miles of area?
6  A.   There are probably some in the belt around
7       Miami where there's a large amount of land
8       owned by quarries. The issues there are quarry
9       operations and their impacts on municipal water
10      supplies. Beyond that I cannot speak to it
11      because of a confidentiality agreement with
12      clients there.
13  Q.   But the fact that under your water budget, in
14      your opinion, if you're pumping three and a
15      half million gallons a day, you're going to be
16      impacting an area of some nine and a half
17      square miles or whatever it is, that means that
18      some of the water is going to come from an area
19      that far away, but it doesn't mean you're going
20      to cause damage that far away, right?
21  A.   There is a potential for causing damage in
22      areas that far away. And in reality much of
23      this water is moving through, it doesn't stop

Page 461

1       at a particular line out there. So some of the
2       lowering of the groundwater table would extend
3       further out than that. That number says you
4       need that much land just to give you
5       groundwater recharge equal to the volume that
6       you're extracting.
7  Q.   Doesn't the storage capacity of the subsurface
8       conditions enter into this?
9  A.   The storage -- this is the amount of land it
10      takes to replenish, on an annual basis, the
11      storage capacity that is -- from which you've
12      made extractions for the quarry pumping. It's
13      like a bank account. You've got to put in
14      enough water for that number of square miles to
15      equal the amount of water that is taken out by
16      the quarry pumping.
17  Q.   This computation doesn't tell you by what
18      amount the water table is lowered in any
19      particular area?
20  A.   No, it does not.
21  Q.   Do you have a client in Miami that you're
22      consulting or the City of Miami? Who are you
23      consulting?

Ricky L. Tyler
(334) 262-3331

Page 470

1  Q.  Are you aware of any other plaintiffs that
2      you're going to be testifying about their
3      property and to anything about the quarry in
4      relation to their property?
5  A.  I don't know who they are, but -- I don't know
6      who they are.
7  Q.  Okay.  You're not an expert on noise or dust or
8      blasting, are you?
9  A.  No, fortunately.
10         MR. BYRAM:  Good.  Okay.  I'm glad.
11         MR. ADAMS:  I have just one question.
12
13         CROSS-EXAMINATION
14  BY MR. ADAMS:
15  Q.  I represent Oldcastle.  Oldcastle is the
16      current operator of the quarry.  It acquired
17      the quarry around July the 11th or 12th of last
18      year and began operating the quarry.  Do you
19      know of any damages, any sinkholes, or any
20      dewatering of an area that has occurred since
21      July of last year that relates to any claim by
22      any plaintiff in this case?
23         MR. VERCELLI:  Objection.

Page 471

1  A.  Sinkhole collapses often occur at times after
2      the dewatering has occurred.  They don't occur
3      instantly.  So in that regard, the sinkhole
4      that forms today may have been a result of what
5      occurred months or even some years ago.
6          The continued operation of the quarry and
7      its dewatering is continuing to enhance the
8      risk of sinkhole collapse and land subsidence.
9      It's not that the problem existed only when it
10     was owned by the previous owner and that they
11     did all the damage and had all of the impacts.
12     The longer the pumping continues, the greater
13     the impacts will be.
14  Q.  Well, I appreciate your telling me that, but
15     let me see if I can get you to answer my
16     question.  My question is, do you know --
17         MR. VERCELLI:  Object to the form.
18  Q.  -- of any sinkhole, any sinkhole that has
19     occurred since July of last year that you would
20     attribute to the operation of Oldcastle of the
21     quarry that's the subject matter of this case?
22  A.  Yes.  I believe some of those that we saw on
23     the field trip yesterday have occurred since

Page 472

1      the date you gave me.
2  Q.  All right.  Do you attribute that collapse to
3      Oldcastle's operation?
4  A.  I think it is a result of both the operations
5      by Hanson and the continued operation by
6      Oldcastle.
7  Q.  All right.  Tell me what you base that opinion
8      on.
9  A.  The lowering of buoyant support induces
10     sinkhole collapse.  The Hanson operations
11     lowered buoyant support and caused -- induced
12     the collapse of sinkholes.  The operations of
13     Oldcastle have continued that dewatering and
14     thus they and Hanson are both implicated in the
15     sinkhole collapses that have occurred since
16     Oldcastle took over operation of the quarry.
17  Q.  So I take it it's your testimony, Mr. Aley,
18     that had the quarry closed in July of last year
19     that the sinkholes that you examined yesterday
20     that have occurred since July would not have
21     occurred?
22  A.  No, that would not be correct.  Because, as I
23     indicated, some of these impacts can occur

Page 473

1      substantially over a long period of time.  So
2      some of them would have occurred into the
3      future.  However, had the Hanson quarry closed
4      at the time Oldcastle purchased it, groundwater
5      levels would have increased and the risk of
6      sinkhole collapses would have lessened.
7  Q.  And I appreciate your telling me that.  My
8      question, however, is do you relate or have the
9      expertise or the knowledge to be able to tell
10     the jury in this case that the sinkholes that
11     have occurred since July of last year are
12     attributable to the activities of Oldcastle or
13     were the approximate result of the activities
14     of Oldcastle in July of 2003 up to the present
15     time?
16         MR. SPRAYBERRY:  Object to the form.
17  A.  It would be a combination of the activities of
18     Oldcastle and the previous activities of
19     Hanson.  And I cannot give you a percent of
20     responsibility for one party or the other.
21  Q.  How do you make that determination?  How do you
22     go out and look at a sinkhole and determine
23     when the condition arose that has led to the

2004

Thomas Aley

**Page 474**

1  collapse of it? Tell me what you look at.
2  A.   Okay. The sinkholes you have there are in an
3      area where sinkholes were very rare under
4      natural conditions, under pre-quarry
5      conditions.
6  Q.   So are you telling me that there were no
7      sinkholes out there prior to 1999?
8  A.   There were very few.
9  Q.   In that area?
10  A.   In that area.
11  Q.   Okay. Go ahead.
12  A.   The sinkholes that have been occurring in the
13      last few years and the present years -- and at
14      present are, in my opinion, due to the loss of
15      buoyant support because of the lessening of
16      groundwater levels. That's the information I
17      use. The time at which the collapse occurs may
18      be a substantial amount of time after that
19      water level decline first stopped.
20  Q.   I think that's my question. How do you -- how
21      do you know that? How do you go and look at a
22      sinkhole and determine when that sinkhole had
23      the loss of buoyancy that led to this collapse?

**Page 475**

1  A.   I think the best line of evidence in the Spring
2      Valley area --
3  Q.   Spring Villa?
4  A.   Spring Villa area would be when the spring quit
5      flowing. That's a great demonstration -- or
6      when the flow was substantially reduced.
7  Q.   So that would be in 1999 or 2000?
8  A.   Whatever the date was. Yes, I would say that
9      is very good evidence of when the water levels
10      in that area dropped appreciably. Whatever
11      formed, you know, at that time or subsequent to
12      that would be attributable to the loss of
13      buoyant support.
14  Q.   Other than the sinkholes that you've testified
15      about, do you know of any other condition that
16      exists at Spring Villa that you attribute to
17      the activities of Oldcastle Materials?
18  A.   The continued absence of discharge from Spring
19      Villa spring.
20  Q.   Let me ask you; I heard you and Mr. Byram talk
21      for an hour and a half or two hours about the
22      basic principle of logic that you could not
23      prove a negative. Tell me, please, sir, how

**Page 476**

1  can you prove that if the quarry closes that
2  the problem at Spring Villa is going to
3  remediate itself?
4          MR. VERCELLI: Objection.
5  A.   The flow of Spring Villa ceased because of the
6      heavy groundwater extraction at the quarry. If
7      you turn off the problem, it is very likely
8      that the spring will return to its flow. As
9      long as you continue to extract groundwater
10      from the quarry, the spring is not going to
11      return to its flow.
12  Q.   Do you have any data that supports that
13      conclusion that you just expressed?
14  A.   The dye tracing study that we have done, the
15      water balance study, all -- fundamentally the
16      inclusiveness of the data that are in this
17      notebook and that I have testified about today.
18  Q.   What you're talking about is that the data that
19      you and Mr. Byram have already talked about
20      today is all of the data that you have to
21      support the opinion that if the quarry closes
22      the problem at Spring Villa will remediate
23      itself; is that correct?

**Page 477**

1  A.   That's correct.
2          MR. ADAMS: Okay. That's all I have
3      right now. Thank you, sir.
4  A.   Thank you.
5          MR. SPRAYBERRY: We would like copies
6      and he will have -- I don't know
7      if he will have opinions about it,
8      but he wants to review the core
9      pictures and the drill logs for
10      the monitoring wells.
11      MR. ADAMS: What our plan was on that
12      is as soon as they are completed
13      and as soon as I get my set, I'm
14      going to send you your set. I
15      don't have anything right now.
16      MR. VERCELLI: We want to have that
17      well in advance of June 7th; well
18      in advance of that.
19
20          *   *   *
21
22
23

63 (Pages 474 to 477)

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

MIKE DAVIS, et al.,                    *
                                       *
      Plaintiff,            *
                                       *
v.                                     *          CASE NUMBER: CV-02-85
                                       *
HANSON AGGREGATES SOUTHEAST,           *
INC., et al.                           *
      Defendants.           *


## ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY KEN AND NAOMI SCHWIEKER

1.  At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same–as appropriate–with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

    Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.  (a)  Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the some of the other plaintiffs have observed significant increases in sinkholes. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more



rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

Several holes formed in the branch, which runs east from the west; this branch disappears into these sinkholes and is swallowed. These holes are spaced twenty (20) feet apart.

A new hole (20 feet long by 15 feet wide by 6 feet deep) formed March 1, 2004 (A.M.) or February 29, 2004 (P.M.) in sudden collapse. It is south of the branch and west of these other holes. It is approximately five (5) feet from the branch and will soon connect with the branch and cause a huge hole. Also a very large sinkhole formed near by branch on the night of March 13 or the morning of March 14. It is approximately twenty (20) feet east of the hole that formed approximately two (2) weeks ago. When it formed it was approximately 10 ft. x 15 ft. with an unknown depth.

Also the deep water well at our farm has gone substantially dry as of March 14. We used it frequently but in small quantities. We have used it for forty (40) years or more and never had a problem with lack of water. Now it produces little or no water.

Ken has also observed a sinkhole south of the Uniroyal Plant next to Highway 169. It has grown in size. Ken has also heard and felt, for the first time, blasts from the quarry.

We now fear for our safety constantly and our fear is ten (10) times greater that when Hanson operated the quarry. Our property is substantially devalued. These holes could cause a potentially tragic accident. We are reluctant to operate our tractor or bushhog now because of the danger of hidden sinkholes

    (b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping

records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

(b)    Please see our answer to 2(b) above, which is incorporated here by reference; also county workers. Spring Villa road is in terrible shape.

(c)    Please see our answers above, which are incorporated here by reference.

4.    (a)    Please see our answers above, which are incorporated here by reference.

The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)    Please see our answers above, which are incorporated here by reference.

5.    (a)    All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to the quarry we had no sinkholes and there was no problem with loss of surface water. Now holes are forming constantly, ponds are dry and streams diverted.

(b)    Please see our answers above, which are incorporated here by reference.

6.    (a)    We can't answer for everyone, except for what we have been told. Otherwise, please see our prior answers, which are incorporated here by reference. The combination of all of these problems makes it impossible to enjoy our property or our farm house.

(b)    The sinkholes are getting worse and my property is not safe. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic,

dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Sinkholes are forming constantly with some forming as recently as February 29, 2004 or March 1, 2004. As long as the pumping continues, the problem will be permanent. My land is substantially devalued. Another hole formed March 13 (P.M.) Or March 14 (A.M.).

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)     Yes.

(b)     Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)     No

(b)     N/A

(c)     N/A

(d)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.    (a)     Yes.

(b)     The sinkholes have ruined my property and have made my property unsafe.

(c)     Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.    (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.    (a) - (c).  Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.    (a)    Yes.

       (b)    It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground.  I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.  Some holes have formed as recently as February 29, 2004 or March 1, 2004 and March 13/14, 2004.

       (c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

       I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 1st day of _____March_____, 2004.

                                                    _____
                                                    KEN SCHWIEKER

                                                    _____
                                                    NAOMI SCHWIEKER

STATE OF ALABAMA    \*

                           \*

COUNTY OF LEE       \*

        BEFORE ME, a Notary Public in and for said State and County, came KEN SCHWIEKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

        GIVEN under my hand and official seal this ___ day of _March_ , 2004.

                                         Notary Public

(SEAL)

My Commission Expires: MY COMMISSION EXPIRES DEC. 18, 2007

STATE OF ALABAMA    \*

                           \*

COUNTY OF LEE       \*

        BEFORE ME, a Notary Public in and for said State and County, came NAOMI SCHWIEKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

        GIVEN under my hand and official seal this _17th_ day of _March_ , 2004.

                                         Notary Public

(SEAL)

My Commission Expires: MY COMMISSION EXPIRES DEC. 18, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

Charles Vercelli, Jr.
*Co-Council for Property Owners*
1019 South Perry Street
Montgomery, AL 36104
(334) 834-8807

Guy Gunter
*Council for City of Opelika/*
*Opelika Water Board*
P.O. Box 409
Opelika, AL 36801

James A. Byram, Jr., Esq.
BALCH & BINGHAM, LLP
P.O. Box 78
Montgomery, AL 36101-0078

John Denson, Esq.
SAMFORD, DENSON, HORSLEY, PETTEY
& BRIDGES
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears, Esq.
PHEARS & MOLDOVAN
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092

Phillip E. Adams, Jr., Esq.
ADAMS, UMBACH, DAVIDSON & WHITE, LLP
P.O. Box 2069
Opelika, AL 36803-2069

_____
James B. Sprayberry



Schnieker Sinkhole
Formed Feb 29 or March 1, 2004

```
 1                    IN THE CIRCUIT COURT FOR

 2                     LEE COUNTY, ALABAMA

 3

 4

 5     MIKE DAVIS, et al.,

 6              Plaintiffs,

 7     Vs.                              CIVIL ACTION NO.

 8                                      CV-2002-85

 9     HANSON AGGREGATES SOUTHEAST,

10     INC., et al.,

11              Defendants.

12

13                      VOLUME II

14

15              CONTINUATION OF THE DEPOSITION OF BILL

16     HARRELSON, taken pursuant to notice and stipulation

17     on behalf of the Defendants, in the conference room

18     of Adams, Umbach, Davidson & White, 205 South 9th

19     Street, Opelika, Alabama, before Ricky L. Tyler,

20     Certified Shorthand Reporter and Notary Public in and

21     for the State of Alabama at Large, on Thursday, May

22     20th, 2004, commencing at 1:40 P.M.

23
```

Page 126

APPEARANCES

FOR THE PLAINTIFFS:

JAMES B. SPRAYBERRY, ESQ.

Attorney at Law

P. O. Drawer 2429

Auburn, AL 36831-2429

and

CHARLES E. VERCELLI, JR., ESQ.

Vercelli & Associates

1019 South Perry Street

Montgomery, AL 36104-5049

FOR THE PLAINTIFF, CITY OF OPELIKA:

GUY F. GUNTER, III, ESQ.

Melton, Gunter & Melton

P. O. Box 409

Opelika, AL 36803-0409

FOR THE DEFENDANT, HANSON AGGREGATES SOUTHEAST:

H. WAYNE PHEARS, ESQ.

Phears & Moldovan

Suite 375

4725 Peachtree Corner Circle

Norcross, GA 30092

Page 127

FOR THE DEFENDANT, OLDCASTLE MATERIALS SOUTHEAST:

PHILLIP E. ADAMS, JR., ESQ.

Adams, Umbach, Davidson & White

P. O. Box 2069

Opelika, AL 36803-2069

FOR THE DEFENDANTS, GILMER and YOUNG:

JOHN V. DENSON, ESQ.

Samford, Denson, Horsley,

Pettey, Bridges & Hughes

P. O. Box 2345

Opelika, AL 36803-2345

INDEX

Page

Direct Examination by MR. ADAMS:        130
Cross-Examination by MR. PHEARS:        232
Cross-Examination by MR. DENSON:        297
Redirect Examination by MR. ADAMS:      302
Recross-Examination by MR. DENSON:      307

Page 128

INDEX (CONTD)
Page

EXHIBITS
For Defendant:
377A  Drawing
        For Identification              189

377B  Drawing
        For Identification              189
378  Drawing
        For Identification              189

379  Reservation Form
        For Identification              199
380  Pool Revenue
        For Identification              200

381  Opelika Pool Expenses
        For Identification              209
382  Reservations 5/04 Forward
        For Identification              210

383  '04 Reservations Prior to 5/04
        For Identification              214
384  2000 Spring Villa Pool Records
        For Identification              217

385  1999 Spring Villa Pool Records
        For Identification              220
386  Bo Brown's Job Description
        For Identification              222

387  2003-2004 Budget
        For Identification              223
388  2003 Opelika Pool Records
        For Identification              223

Page 129

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the continuation of the deposition of BILL HARRELSON is taken pursuant to notice and stipulation on behalf of the Defendants; that all formalities with respect to procedural requirements are waived; that said deposition may be taken before Ricky L. Tyler, Certified Shorthand Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Civil Rules of Procedure for the State of Alabama.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of the deposition of BILL HARRELSON is hereby waived and that said deposition may be introduced at the trial of this case or used

2 (Pages 126 to 129)

Page 130

1   in any other manner by either party hereto provided
2   for by the Statute, regardless of the waiving of the
3   filing of same.
4           It is further stipulated and agreed by
5   and between the parties hereto and the witness that
6   the signature of the witness to this deposition is
7   hereby not waived.
8
9                       * * * *
10
11          P R O C E E D I N G S
12
13          BILL HARRELSON, of lawful age, having first
14  been duly sworn, testified as follows:
15
16          DIRECT EXAMINATION
17  BY MR. ADAMS:
18  Q.   Would you state your name for the record,
19       please?
20  A.   Bill Harrelson.
21  Q.   Bill, you and I have been friends for a long
22       time.  For the record, I'm Phil Adams; I'm
23       representing Oldcastle in this lawsuit.  I

Page 131

1   wasn't here; my client hadn't been sued last
2   May the 6th when your deposition was taken the
3   first time in this case.
4   A.   Right.
5   Q.   So I wanted to take your deposition again to
6        ask you questions with regard to what you would
7        have to say about my client, Oldcastle, since
8        we have been in the case, essentially since
9        around the middle of July of last year, okay?
10  A.   Okay.
11  Q.   If I ask you some question that you don't
12       understand, that doesn't make any sense to you,
13       tell me that it doesn't, and I'll ask it in a
14       way that you and I do understand each other?
15  A.   Okay.
16  Q.   And unless you tell me you don't understand the
17       question, I'm going to assume that you do
18       understand it, all right?
19  A.   That's fine.
20  Q.   Have you read your deposition of May 6th, 2003?
21  A.   No, I have not.
22  Q.   Have you been given a copy of it?
23  A.   I don't recall ever receiving it.  I was asked

Page 132

1   that question.  Now, it could have been sent to
2   City Hall and I never got it.  I don't recall
3   ever seeing it; I really don't.
4   Q.   Okay.  Well, I was going to ask you, if you had
5        read it, did you notice anything in it that was
6        wrong, or that you disagreed with, or that you
7        had changed your opinion on, but since you
8        haven't read it, I don't guess you can answer
9        that question?
10  A.   I have not read it.
11  Q.   All right.  Tell me what your title is.
12  A.   I'm Director of Parks and Recreation.
13  Q.   For the City of Opelika?
14  A.   City of Opelika.
15  Q.   And how long have you held that position?
16  A.   I've been the Director of Parks and Recreation
17       since May of 1981.
18  Q.   And what did you do prior to that time?
19  A.   I have been with the Recreation Department in
20       several capacities since January the 1st, 1973.
21       And prior to that I coached football for a
22       year.  That's the only jobs I've ever had.
23  Q.   For the City of Opelika?

Page 133

1   A.   No, no, no.  I coached football at a private
2        school and then came to work in Opelika January
3        1st, 1973.
4   Q.   So you've been an employee of the City of
5        Opelika 31 plus years?
6   A.   In my 32nd year, that's correct.
7   Q.   As Director of Parks and Recreation, what are
8        your general duties?
9   A.   Of course, I'm in charge of all personnel.  I
10       work for a Park Board that does the hiring and
11       firing of those personnel.  I'm in charge of
12       all facilities, maintenance-wise, program-wise,
13       security, whatever, of course, through many
14       good and dedicated employees, but that's
15       basically it.
16  Q.   How many -- you say you work for the Park
17       Board?
18  A.   Yes, directly answer to the Park Board.
19  Q.   All right.  And who is the Park Board?
20  A.   The Park Board -- the Park Board, of course, is
21       appointed by the City Council.
22  Q.   How many people are on it?
23  A.   There's five.  The Chairman is Rusty Melnick,

3 (Pages 130 to 133)

Page 134

1       the Co-chairman is Larry Spratling, Rod Herring
2       is on that board.
3   Q.  Rod or Ron?
4   A.  Rod.
5   Q.  All right.
6   A.  Vickie Keith is on that board, and a new member
7       of that board is Clay Humphries.
8   Q.  And did you say Rusty Melnick is Chairman?
9   A.  Yes.
10  Q.  Okay. So you are -- your paycheck comes from
11      the City of Opelika?
12  A.  That's correct.
13  Q.  But in terms of who you report to, is you
14      report to this appointed, by the City Council,
15      Board?
16  A.  That's right. And I also answer to the Mayor.
17  Q.  Okay.
18  A.  It's a little bit different than a lot of City
19      employees, but I actually have two bosses;
20      although the mayors we've had in the City of
21      Opelika since 1988 have pretty much let the
22      Park Board run the Park Board business.
23  Q.  Okay.

Page 135

1   A.  But theoretically I do answer to the Mayor
2       also.
3   Q.  Okay. And how long has Rusty Melnick been
4       Chairman of the Parks and Rec Board?
5   A.  Rusty has been Chairman for several years, but,
6       you know, I don't know. I can't remember that,
7       but it's probably been at least five.
8   Q.  And who was the chairman before Rusty?
9   A.  Miles Thomas has been a chairman. Gosh, I
10      think Mike Thomas was a chairman at one time,
11      I'm not real sure about that. That's hard to
12      remember. And there was another one.
13  Q.  Miles Thomas and Mike Thomas?
14  A.  Mike was later. Of course, Miles was chairman
15      until he ran for City Commission. There was
16      another one in between. I think at one time
17      even Walter Parrent was chairman of the Park
18      Board, but that was, I think, before I --
19      Walter was on the Park Board when I was hired.
20      He might have been chairman then. And Bill
21      Lett had been chairman of the Park Board.
22  Q.  All right. What I was trying to find out is
23      who would have been chairman of the Parks Board

Page 136

1       in 1995 and '96?
2   A.  It could have still been Rusty; it's really
3       hard for me remember. Rusty has been chairman
4       for a good number of years, and I really can't
5       remember. We could go back and look it up.
6   Q.  Okay. How long are the terms?
7   A.  They are five year staggered terms.
8   Q.  So we have one roll off every year?
9   A.  That's the way it was supposed to have been.
10      That rotation sort of got messed up and that
11      hasn't been the way it's been, but they're
12      trying to get it back like it's supposed to be.
13      That's the way it's theoretically set up, yes.
14  Q.  Okay. How many people work for the Park Board
15      full-time?
16  A.  We have -- I believe it's 28 full-time people.
17  Q.  And I take it that the personnel at the Park
18      Board is seasonal; in the summertime it might
19      be more than it would be in the wintertime?
20  A.  Yes. In the summertime we have probably about
21      a hundred seasonal and part-time and some
22      temporary work service people.
23  Q.  Tell me the names of the facilities in Opelika

Page 137

1       that are under your responsibilities?
2   A.  Okay. The Opelika Recreation Center and the
3       Covington Recreation Center.
4   Q.  I'm going to call that the Denson Drive Rec
5       Center and the Covington Rec Center?
6   A.  Right.
7   Q.  All right.
8   A.  Municipal Park.
9   Q.  The Municipal Park.
10  A.  The Miles Thomas Field.
11  Q.  The Miles Thomas Field. Would you call it
12      adjacent to Municipal Park?
13  A.  It's across the road, yeah. It's adjacent to
14      it, yeah.
15  Q.  All right. Miles Thomas Field?
16  A.  We have Moore Stadium.
17  Q.  Okay.
18  A.  We have the old Dallas B. Smith Armory that's
19      now called the Arts Center.
20  Q.  Which is across the street from Moore Stadium?
21  A.  Yes.
22  Q.  Dallas B. Smith Armory?
23  A.  Yeah, but it's -- I mean, our official name for

4 (Pages 134 to 137)

Page 138

1  it is the Arts Center, but people still call it
2  Dallas B. Smith.
3  Q.  But you call it the Arts Center?
4  A.  That's correct.
5  Q.  Okay.  What else?
6  A.  Okay.  Let me think, did I leave anything out
7  here?  The Tennis Center.
8  Q.  Opelika Tennis Center?
9  A.  Uh-huh.  (Positive response.)  Floral Park.
10  Q.  All right.
11  A.  Which is softball fields.
12  Q.  Do they still play soccer up there at Floral
13  Park?
14  A.  Very little.  We play mostly at Miles Thomas
15  Field now and on the Middle School track.  I
16  might as well go ahead and say, we jointly own
17  the Middle School track area in a joint deal we
18  went in with the School Board.  We have kind of
19  joint responsibilities up there.
20  Q.  All right.
21  A.  Sort of the same thing with Opelika High School
22  baseball field, although the last few years,
23  with American Legion, we haven't played any

Page 139

1  older baseball out there, but we still have a
2  joint facility out there.
3  Q.  All right.  You didn't mention West Ridge?
4  A.  Okay.  You've got West Ridge Park, which is a
5  tremendous facility; 12 fields, four buildings,
6  playground, walking trail; that's a tremendous
7  facility.
8  Q.  All right.  What about the one out there past
9  West Point Pepperell?
10  A.  Are you talking about Smallwood.
11  Q.  Smallwood?
12  A.  Of course, Smallwood we still sort of maintain
13  somewhat.  We have teams practice out there.
14  That belongs to and always has belonged to West
15  Point Pepperell.  That never has been City
16  property.
17  Q.  All right.  So do you do anything with that?
18  A.  We clean it up and some teams practice out
19  there.
20  Q.  All right.  And how about this place over here
21  down here by the -- what used to be the
22  alternative school, it was --
23  A.  Oh, Southside Park.

Page 140

1  Q.  Right.
2  A.  That still belongs to us; it's basically
3  abandoned.  We really don't have anything
4  there.  It's really not used.
5  Q.  All right.
6  A.  And then, of course, with the Covington Center
7  there's a Covington Park and a Covington Ball
8  Field.
9  Q.  All right.  Covington Ball Field and a
10  Covington Park?
11  A.  Uh-huh.  (Positive response.)
12  Q.  Okay.
13  A.  And then you've got -- let's see, what did I
14  leave out?  Jeter Street Park and Jeter Street
15  Ball Field.
16  Q.  That are next to the school?
17  A.  Next to the Jeter School that's now the
18  alternative school.
19  Q.  All right.  But that's your responsibility as
20  opposed to the School Board's?
21  A.  Yes, that's our responsibility.
22  Q.  Okay.
23  A.  They use it for PE and that sort of thing, but

Page 141

1  it's our facility.
2  Q.  Okay.
3  A.  And Southside Park -- I mean, excuse me, Ray
4  Ward Park.  We already said Southside.
5  Q.  All right.  Now, where is Ray Ward Park?
6  A.  Over in the old Ray Ward subdivision across the
7  road from the cemetery.
8  Q.  All right.  And what is over there?
9  A.  Some playground equipment and a little small
10  ball field, basically a play field; no games
11  would be played there, just a play field for
12  kids to -- sandlot.
13  Q.  Okay.  Where else?
14  A.  Spring Villa Park.
15  Q.  Spring Villa.
16  A.  I don't think I left anything out; I think
17  that's it.
18  Q.  Have you heard about the new proposed
19  recreation center with the soccer fields and
20  the indoor swimming pool and the walking paths
21  and the tennis courts and all of that?
22  A.  That's what I just did a Kiwanis program about,
23  yeah.

5 (Pages 138 to 141)

Page 142

1 Q.  I'm sorry I missed it; you might could have
2     saved some time here.
3 A.  Yeah.
4 Q.  Is that supposed to be -- if that comes on
5     line, will that be your responsibility as
6     well --
7 A.  Yes.
8 Q.  -- or will that be somebody else in the City?
9 A.  No.  As you know, there is an Envision Opelika
10    that was a citizen-driven committee.  And my
11    involvement at this point is I'm simply a
12    citizen on the committee.  And, of course, you
13    know, I feel like realistically if it ever gets
14    built, it will be a joint effort between
15    Envision and the City and bond issues and
16    whatever, but, yes, that would be a City
17    facility at that point.
18 Q.  Just like all of these other places you've been
19    talking about?
20 A.  That's correct.
21 Q.  And for the benefit of the record, tell me what
22    is -- well, what is it that's supposed to be
23    out there?  First of all, how big a park is it?

Page 143

1     What's the acreage of it?
2 A.  It's 80 acres.
3 Q.  Okay.
4 A.  Do you mean what is proposed?
5 Q.  Yeah.
6 A.  Okay.  What's proposed is a 64,000 square foot
7     state-of-the-art recreation center.
8 Q.  Which will house what?
9 A.  The recreation center.  It would house an
10    indoor pool; there would be two basketball
11    courts; there would be racquet ball courts;
12    weight rooms; aerobics rooms; indoor walking
13    track; meeting rooms; lobby area; office space;
14    a senior citizen center; a two floor facility.
15 Q.  Is that where your office -- would that be
16    where the Director would be?
17 A.  That has not been decided.
18 Q.  Okay.  So that's not in the plan at this point?
19 A.  It could be or may not be, that's not been
20    planned.  Like I say, this is just a vision.
21    Envision Opelika is what this is.
22 Q.  I understand.  That's right.
23 A.  You know, it's got in the paper and everybody

Page 144

1     thinks we're fixing to break ground.  As I tell
2     people, we're 15 million dollars away.
3 Q.  The only thing standing between us and the
4     facility is 15 million dollars?
5 A.  15 million dollars, that's correct.
6 Q.  Okay.
7 A.  So I don't know if or when that will be built.
8     There may none of us in this room live long
9     enough to see it.  I seriously hope we do,
10    because I think it's something the City needs.
11 Q.  Now, we do have the land already, don't we?
12 A.  No.  It's a proposed site, but the land does
13    not belong to the City.
14 Q.  It hasn't been given or pledged?
15 A.  No.  No, not at this point.
16 Q.  Okay.  I didn't know that.
17 A.  That's just speculative.
18 Q.  All right.  What else is supposed to be out
19    there other than what is inside the --
20 A.  Soccer fields, you know, we had talked about.
21    Of course, we really don't have any soccer
22    fields.  We have areas we make soccer fields
23    out of, so this would be at least one soccer

Page 145

1     field and then some smaller ones.  Normal
2     things you would have in a park; picnic
3     shelters; there's even an amphitheater being
4     proposed or talked about; and a five field
5     softball complex.
6 Q.  Okay.  And how large is this pool supposed to
7     be, the indoor pool?
8 A.  I don't know square footage.  We went and
9     visited a lot -- when I say "we," I'm talking
10    about Envision Opelika.  We visited some
11    facilities.  We especially liked the pool in
12    the Valley.  I would say about the size of the
13    Opelika swimming pool, although it would only
14    have an eight foot depth and wouldn't have
15    diving boards, that's sort of a thing of the
16    past, and it would be zero depth pool.
17 Q.  What does that mean?
18 A.  Where you walk in just like you're walking in
19    from the beach; walking into the shallow water
20    and walk on out to a certain depth.  And that's
21    done for handicapped and children and that sort
22    of thing.  That's what's proposed.
23 Q.  Okay.  Have we talked about everything that you

Page 146

1    can think of right now that's proposed?
2    A.   Out there?
3    Q.   Think back through your speech and see if you
4         left anything out.
5    A.   I think I mentioned aerobic room, weight room,
6         cardiovascular areas, walking track.  You know,
7         these new recreation centers are
8         family-oriented and are intended for the whole
9         family.
10   Q.   And have you looked into that facility to see
11        about how many people you would have to have to
12        staff that facility, assuming it were built?
13   A.   I was asked to do that.  And it's really hard
14        to do because recreation is a different field
15        than maybe your profession, because in every
16        city it's done a different way.  Just because
17        there's X number of employees at the new Valley
18        Recreation Center, that doesn't necessarily
19        mean those employees run that center.  Because
20        that is their headquarters, there are athletics
21        people there.
22             So what I did, I contacted a company
23        called Barge, Wagner, Sumner and Cannon who did

Page 147

1    the prospectus for this facility.  They're out
2    of Nashville and they're the largest recreation
3    planning company in the Southeast.  And I got
4    them to do a survey of centers they had built
5    throughout the Southeast.  And they took their
6    operations costs and divided it by square
7    footage, on a square footage basis, and the
8    operations for that facility, which would be
9    staff, utilities, operating supplies,
10   everything, came out to 480,000 dollars a year.
11   Q.   What is your current total budget?
12   A.   Operations budget is a little over two million.
13   Q.   So it would be about, what is that, 25 percent
14        increase over your current budget?
15   A.   That's correct.  Now, that's assuming that you
16        continue to run the same facilities you're
17        running now.  And that decision has not been
18        made either.  It could be that one or both of
19        the recreation centers would be closed and put
20        all of the eggs in one basket.  That decision
21        hasn't been made.  And that decision would be
22        made by someone other than Envision Opelika.
23   Q.   It would be made by somebody on a City level

Page 148

1    probably?
2    A.   That's correct.
3    Q.   Is there any sort of timetable for that that
4         you've heard of in terms of that new facility?
5         I mean, is it just -- like you said, just a
6         dream at this point?
7    A.   That's all it is.
8    Q.   Has somebody said it's five years out or ten
9         years out?
10   A.   There's no time period; it's strictly a vision.
11   Q.   Okay.  Now, I want to talk to you a little bit
12        about the Spring Villa Park.  Tell me about it.
13        How many acres are involved with the Spring
14        Villa Park, of land?
15   A.   It's around 300.  Of course, not all of that is
16        usable.  And I've been asked that question a
17        hundred times.  Usable property, I would
18        estimate we probably use a hundred acres of it.
19   Q.   Now, I don't know whether you even know this;
20        you know, some of that property -- if you do,
21        that's fine; it's not a trick question.  Some
22        of that property is owned by the Utility Board
23        of Opelika?

Page 149

1    A.   That's correct.
2    Q.   And some of it is owned by the City?
3    A.   That's correct.
4    Q.   In terms of the Spring Villa operation, which
5         part of it is used by the Park and Rec, both
6         parts or just one or the other?
7    A.   We use everything except the old spring and
8         spring house.  I really don't know where the
9         line is, although I've been told.  But even
10        before that was turned over to the City, which
11        has not been that many years ago --
12   Q.   1986, wasn't it?
13   A.   That's about right.  Even when it totally
14        belonged to the Water Board, we still operated
15        it just as we do now.  Because the Water Board
16        never had any interest in it from a recreation
17        standpoint, it was simply a resource.
18   Q.   I'm just trying to see, since that dichotomy of
19        ownership does exist, whether you're aware of
20        that in terms of your operation, and what
21        you're telling me is no?
22   A.   No.  I mean, it hasn't made any difference in
23        our operation.  I am aware of it.

Page 150

1  Q.   But there aren't any lines for you to say,
2       well, we can't go over there because --
3  A.   No.
4  Q.   -- that's not City property?
5  A.   As a matter of fact, in some of our early day
6       camps, when the spring was still flowing and
7       there was still swamp area out there, part of
8       our day camp used to be the Swamp Stomp. So we
9       walked all the way down there. And we had a
10      guy named Frank Ware that was a biology teacher
11      at Beuregard that ran our day camp. So we
12      would take the kids all the way to the spring.
13      And we always, back when the water was boiling
14      up out of the ground like you wouldn't believe,
15      and was one of those things a lot of kids
16      hadn't seen, we've always taken children down
17      there. We had a trail going down there at one
18      time. So we've always used all of that
19      property even before any of it was turned over.
20      So it's never been a problem.
21  Q.   Okay. There aren't any agreements between --
22      that you know of between the Utility Board and
23      the City with regard to use of that property --

Page 151

1  A.   No.
2  Q.   -- by the Parks and Rec?
3  A.   They have never restricted our use in any way.
4  Q.   And it's never been defined, written, as far as
5       you know?
6  A.   As far as I know, it hasn't.
7  Q.   Okay. Since 1990 -- I'm sorry, since 2000,
8       have there been any changes or improvements
9       made at Spring Villa?
10  A.  Yes.
11  Q.  Tell me what those have been.
12  A.  And I can't give you a timetable. I could have
13      brought a diskette off my computer and gotten
14      it. We went into a project out there several
15      years ago when they started the distribution
16      center, that Wal-Mart Distribution Center, and
17      there were some houses out there that they were
18      going to burn or destroy, and I saw some value
19      in them. So we moved a caretaker's home out
20      there that our caretaker lives in.
21  Q.  That was after the City acquired the land to
22      build the Wal-Mart Distribution Center?
23  A.  That's correct. The distribution center was

Page 152

1       under construction and they were, of course,
2       burning these houses or moving these houses
3       that were in the way. So there was a very nice
4       home out there, it was about -- now it's about
5       2,500 square feet, we've got it set up. It's
6       where our caretaker lives. And then also --
7  Q.   You moved that?
8  A.   We moved it out there.
9  Q.   Okay.
10  A.  The Industrial Development Board was good to us
11      and gave us another house. And we swapped out
12      some things and actually got the house moved
13      for practically nothing. We moved another
14      house out there across the road in an area that
15      had previously not even been used at Spring
16      Villa for very much and made a lodge. And it
17      will accommodate a hundred, 150 people. We've
18      totally gutted the house, except for some
19      bathrooms, and put heating and cooling in it
20      and our men worked on it. So we have a very
21      active facility out there that's used widely.
22          There's a huge parking lot out there
23      that's been built since then. It was actually

Page 153

1       built because the Arts Festival went out there
2       for a couple of years, and that's really what
3       -- but it's used for everything now.
4           We also built a new picnic shelter out
5       there beside the lodge. So when you rent the
6       lodge, you rent the whole area. It's also got
7       restrooms in the back; a very nice shelter.
8           Up on the hill behind this area we built a
9       shelter, nice pavilion, that's used by the day
10      camps' it's used by Boy Scout troops; it's used
11      by the Opelika Police Department Dare Program.
12      We've since put restrooms up there for this
13      facility. And we've just recently built an
14      archery trail out there.
15          So all of those things have been done
16      since '90. And -- oh, excuse me, I forgot.
17      Down in the campgrounds -- that, incidentally,
18      are going to be renovated fairly soon, down in
19      the campgrounds we moved a double-wide trailer,
20      a very nice double-wide trailer, and added a
21      big porch to it that's like a campers'
22      clubhouse for the campers to use when they are
23      down there. So we added that and that came

Page 154

1    from Industrial Development property, all of
2    this stuff did.
3    Q.    That was out here at the Wal-Mart Distribution
4    Center?
5    A.    Uh-huh. (Positive response.) All of these
6    houses.
7    Q.    Buildings that we're talking about?
8    A.    They were all given to us.
9    Q.    All right. Now, when I asked you that question
10   to begin with I said "1990," and then I changed
11   it and said "since 2000."
12   A.    It was started before 2000.
13   Q.    Some of this was started prior to 2000?
14   A.    Yes. It wasn't finished in 2000. As a matter
15   of fact, some of it was just finished as late
16   as probably 2003.
17   Q.    Okay. What was the last thing that was
18   completed out there?
19   A.    The picnic shelter. We just put the restrooms
20   in this year up on the hill.
21   Q.    Okay.
22   A.    The picnic shelter, the day camp shelter, or
23   the pavilion up in the woods, the restrooms,

Page 155

1    and then the archery trail would be the last
2    three things done. And I could get those
3    dates, but I don't know them off the top of my
4    head.
5    Q.    Well, that's okay. I'm just trying to get a
6    general idea of when we are talking about.
7    Could we say that most of that stuff has been
8    done or all of that stuff has been done since
9    1995 or would that be pushing it?
10   A.    Oh, yeah, it's all been done since '95.
11   Q.    All right. Now, we took Bo Brown's deposition
12   yesterday, and he told us that he is the
13   manager of Spring Villa, and had been since he
14   retired from the Fire Department back in 1990
15   or '91; as I recall?
16   A.    Uh-huh. (Positive response.)
17   Q.    And we went through with him some of the stuff
18   about Spring Villa operationally, but I want to
19   make sure that you agree with some of the stuff
20   that Bo told us. The only thing -- and see if
21   you agree with this statement, the only thing
22   that is not at Spring Villa right now that was
23   there in 1995 is the swimming pool and the

Page 156

1    related facilities; I'm talking about at Spring
2    Villa Park?
3    A.    They're still there; it's not used.
4    Q.    Well, that's what I meant. It's still on the
5    premises, but you can't use it?
6    A.    That's correct. And the spring itself.
7    Q.    All right. Did you use the spring itself?
8    A.    For the things that I told you about.
9    Q.    About taking kids --
10   A.    We had a trail down there and we had part of
11   the day camp. And, of course, the lake that
12   was there that was basically a swamp, you know,
13   the swamp, the wetlands.
14   Q.    Tell me where that lake was. If I'm standing
15   at the swimming pool --
16   A.    Now, do you want to talk about where the
17   natural lake was or where the lake was in the
18   1800s?
19   Q.    I'm talking about the lake that you're talking
20   about.
21   A.    Okay. As the water ran out of the reservoir --
22   in other words, the water came up under the
23   spring house, the water boiled up under the

Page 157

1    spring house, and it built up to the top of the
2    reservoir. The reservoir had two eight inch
3    overflow pipes. In other words, when the
4    spring -- which it stayed full. The water ran
5    out of those two eight inch pipes into a big
6    box that we had put there -- not me, that had
7    been put there years and years ago to pump the
8    water to the pool.
9    Q.    What was the box made out of?
10   A.    It's concrete with wood batten boards in the
11   front.
12   Q.    Okay. Go ahead.
13   A.    And then that ran off and made a swamp and
14   basically a lake that spread way out in that
15   area. And I would guess that was probably two
16   to three acres. Now, that was the same
17   location that the lake was in the 1800s that's
18   talked about with the glass-bottom boats and
19   all of that.
20        And the reason I know that is because one
21   of Mr. Calhoun's pet projects was to get that
22   lake built back. And he had the county
23   engineers go in there and engineer all of that.

9 (Pages 154 to 157)

Page 158

1    And the dikes are still there. There was dikes
2    around the lake to keep Uchee Creek out of the
3    spring lake.
4    Q.   Do you have a copy of those engineering plans
5    of Mr. Calhoun?
6    A.   No. I have no idea what happened to that
7    stuff.
8    Q.   But you've seen them?
9    A.   Yeah. Mr. Calhoun was a funny fellow, and he
10   took a lot of that stuff with him when he
11   retired, because that was his pet thing. And
12   I've never seen that again.
13   Q.   When did he retire?
14   A.   He retired in '81 when I became Director.
15   Q.   Okay.
16   A.   I even asked his daughter and son, if they
17   found any of that stuff, to give it back to me,
18   but they didn't. Now, the County Engineer at
19   that time was Mr. Hilyer. I think Mr. Hilyer
20   is -- I think his name was Hilyer. Anyway, the
21   county had engineered the lake.
22   Q.   The County Engineer wasn't Harry Ennis?
23   A.   Yeah, maybe that's who it was. An older

Page 159

1    fellow?
2    Q.   Well, older fellows are getting younger and
3    younger to me.
4    A.   He was Mark Ennis' daddy, so that's right.
5    That's right, that's who it was. But anyway,
6    they had engineered it and so that's where the
7    five acre lake at one time was.
8    Q.   Harry Ennis is now on the County Commission, as
9    I recall; isn't that right, Mr. Sprayberry?
10       MR. SPRAYBERRY: I think so.
11       MR. DENSON: That's right. He's
12       running for reelection.
13       (Off-the-record discussion.)
14   A.   But anyway, Phil, in answer to your
15   question, --
16   Q.   Moving along.
17   A.   -- what formed what we call the lake, which was
18   a swamp, was the runoff from the reservoir from
19   the spring.
20   Q.   Okay. And you're saying that's in the same
21   general location, --
22   A.   As the old lake.
23   Q.   -- as best you can tell, from the old lake?

Page 160

1    A.   Right.
2    Q.   And you base that on stuff that Bill Calhoun
3    told you or perhaps stuff that you even saw
4    while he --
5    A.   You can see the dikes out there now, you know,
6    where the old lake was that kept Uchee Creek
7    out of the lake, because he wanted a spring
8    lake, you know, instead of the creek running in
9    it.
10       So the water runs out of the overflow. It
11   goes on down and it used to form the swamp and
12   then it ran into Little Uchee Creek. Of
13   course, Little Uchee Creek ran around the
14   perimeter of the park or down in the right-hand
15   side of the park, and you could hear that water
16   running. Of course, Uchee Creek doesn't even
17   run anymore. Uchee Creek is also dry. In
18   other words, the spring mixed with the creek on
19   down there.
20   Q.   On past the spring house?
21   A.   That's right, on past the spring house. Of
22   course, the creek nor the spring run anymore.
23   Q.   Okay. When did that happen?

Page 161

1    A.   Phil, all I can do is tell you to the best of
2    my recollection.
3    Q.   That's all I'm interested in.
4    A.   Are you asking me now when we started
5    experiencing problems and when the spring
6    started dropping?
7    Q.   I am.
8    A.   Okay. I'm not going to give you a date, but
9    I'm sure y'all --
10   Q.   Can you give me a year?
11   A.   No, I can't even give you that. But I'm sure
12   y'all know the year, because when it started
13   dropping was when the first rock company came
14   in there, but it was not Hanson. I want to say
15   it was called Opelika Materials.
16   Q.   Okay.
17   A.   We started seeing a loss in water, and Bo
18   started telling me about it, and we would go
19   out there and look at it. And basically
20   instead of the water boiling up out of this box
21   that at one time was chest high, it was just
22   barely keeping this box full. And I called
23   Steve Young, who worked with the Water Board,

10 (Pages 158 to 161)

Page 162

1  and Steve had always been a person that studied
2  the spring and stayed out there a lot. And
3  actually Steve was the last person who ran the
4  pumps at Spring Villa pumping water to the
5  City, and I want to say it was in 1991 when he
6  did that. There was two droughts, '88 and '91.
7  And they had pumped water to the City, I think
8  about 1.5 million gallons a day. So Steve knew
9  a lot about the spring.
10      So I called Steve. And Steve said, well,
11  if you'll get in my truck, I will show you
12  where your water is going. So we got in the
13  truck, and we went over to Lime Kiln Road. And
14  there's a pipe laying out there that looked
15  something like a four inch pipe. And I didn't
16  even know there was a quarry operation over
17  there, really; I didn't even know anything
18  about it. And all of the water was running
19  across Lime Kiln Road or under the road or
20  whatever. And that's when we started watching
21  the spring go down.
22      So that was Steve's answer. He said, you
23  don't have any head pressure over here. And

Page 163

1  which I knew that to be true, because in the
2  years I had walked out past the old lime kilns
3  and out to the quarry, you could see the water,
4  it wasn't that far down, and, of course, now it
5  was way down in there before you could see the
6  water.
7      So then that company actually went out of
8  business and there was several months before
9  Hanson came in there. I don't know if they had
10  actually bought it, but let me put it this way,
11  there was several months before it was put in
12  operation.
13  Q.  Okay.
14  A.  During those months the water popped right back
15  up just like it was, no difference.
16  Q.  Okay. And how often were you going out there
17  and monitoring it?
18  A.  I don't know. I can't say.
19  Q.  Weekly or monthly?
20  A.  Probably weekly. And when I say monitor it, I
21  wasn't going out there to monitor the water.
22  You know, I was out -- when I would go out
23  there and monitor the water was when Bo started

Page 164

1  telling me about the problem. And I don't
2  know, the year was either '97 or '98, but it's
3  whenever the first company came in, whatever
4  that date was, and I'm sure y'all have those
5  dates. But then the water came right back up.
6  But then when Hanson went back into the quarry
7  business, they started pumping. And initially
8  they didn't pump much more water than I had
9  seen from the other company, but as that year
10  went on, they pumped way more.
11  Q.  That would be, in your recollection, either '97
12  or '98?
13  A.  That would have been '98, I'm pretty sure, when
14  we started really struggling with the water out
15  there in '98. And we went in there and put new
16  boards in the box that I was talking about and
17  we chinked them up with concrete trying to keep
18  the water from running out through the cracks.
19      And then in '99 it had gotten to be a
20  serious problem. And in the spring of '99 the
21  reservoir really wasn't even filling up anymore
22  and the water in the reservoir was now green.
23  I had never seen that, because the water had

Page 165

1  always been crystal clear. Auburn University
2  used to keep fish in there and different
3  things. So in that summer of '99, I showed you
4  on those sheets where we actually opened the
5  pool two weeks late that year. We opened June
6  the 7th.
7  Q.  I haven't gotten those back from being copied
8  yet.
9  A.  The reason we opened June the 7th in '99 was we
10  still had enough water to pump, but the
11  condition of the water had gotten really bad
12  and it was green. It already had algae in it
13  when it came in the pool. Prior to that
14  basically what we did with Spring Villa pool
15  was we chlorinated the pool at night. And that
16  was only to kill the algae, because the pool
17  turned over every two days. In other words,
18  you pumped enough water in and the valve was
19  open enough to let enough water out that you
20  maintained. And it took about two days to fill
21  it up.
22      But that summer of '99 we decided, because
23  of the condition of the water coming out of the

Page 166

1   spring, that we would put in a chlorinator. So
2   we put a chlorinator on that line coming from
3   the spring. And we also hired Sun Laboratories
4   to test our water to be sure we weren't going
5   to have kids with staph infections and this
6   sort of thing. So that's the way we operated
7   in '99. Now, we made it through the year. As
8   the summer went on, the water diminished more
9   and more.
10      At times we would have to actually cut the
11  pump off or the pump would suck dry and lose
12  its prime. And we would have to let the water
13  build back up in the reservoir and run City
14  water in the pool, which is a bad thing to do,
15  because City water does not have the clarity of
16  that spring water. I mean, you can watch the
17  City water as it comes in the pool.
18      So then in 2000, the problem was real
19  serious. We had no water to start that year;
20  had no water at all.
21  Q.  Now, tell me about that. When you say you had
22  no water, do you mean --
23  A.  There was no runoff.

Page 167

1   Q.  There was no water in the spring?
2   A.  There was water in the reservoir, but there was
3       not enough water filling up the reservoir to
4       even overflow. So we went inside the pump
5       house and knocked a hole in the floor --
6   Q.  Of the pump house?
7   A.  -- of the pump house and put a 30 foot pipe
8       down into the water under the reservoir. In
9       other words, there was still water in the big
10      cave.
11  Q.  Who did that?
12  A.  Us and the Water Board.
13  Q.  I mean, did you hire a well person?
14  A.  No. All of us and the Water Board did it.
15  Q.  In other words, City employees --
16  A.  Yeah.
17  Q.  -- and the Parks and Rec?
18  A.  I'll show you a picture of it.
19  Q.  All right. Show me.
20  A.  Now, this is not a good picture. I had some
21      really good pictures. There was a big EPA
22      meeting over in Auburn several years after all
23      of this happened, and I had a really nice

Page 168

1   layout with all kind of pictures. And I gave
2   them to Governor Siegelman's wife and asked her
3   to give them back to me and she never did. So
4   what you've got is a photocopy of a picture.
5       There's our pump. These are the whole
6   huge pumps that pumped the water to the City of
7   Opelika, there's three of them. We sat our
8   pump here and ran a foot valve through the
9   floor, that's the floor, and went down into the
10  cave. There was no reservoir in the water --
11  no water in the reservoir in 2000.
12  Q.  All right. And who was it that designed this
13      remedial measure? Was it the Water Board or
14      you?
15  A.  I think it was Bill Harrelson, water engineer.
16      We were just trying to pump some water, you
17      know.
18  Q.  So you put a 30 foot pipe --
19  A.  Down here.
20  Q.  -- running down into the ground?
21  A.  Into the cave. There is a cave under that
22      spring house, a huge cave. I've been told like
23      a hundred feet big.

Page 169

1   Q.  There's a cave under there?
2   A.  Yes, that's where the water came up. The water
3       boils up under the spring house. There's a
4       hole you can get down through. There's a hole
5       under that spring house down to the -- down to
6       the underground aquifer that's probably as big
7       as this table right here that probably two men
8       could go down in.
9   Q.  Do you mean from here to down there?
10  A.  No, no, no.
11  Q.  You mean just as far as you can reach there,
12      four feet or five feet?
13  A.  Uh-huh. (Positive response.) And I've been
14      told -- now, I have not been down in there, nor
15      am I going. I've been told by the Water Board
16      guys that dove down in there, which would be
17      Bill Barry and Steve Young, that once you get
18      down in there, they call it a room, there's a
19      room like a hundred feet across down there.
20  Q.  Did it have water in it?
21  A.  Full of water, of course. It all boiled up out
22      of that hole.
23  Q.  All right. Full of water?

12 (Pages 166 to 169)

Page 170

1  A.   So we dropped this down into the cave.  There
2       was no water in the reservoir in 2000.
3  Q.   With the idea that you're going to pump out of
4       that -- out of that reservoir, out of that cave
5       or that hole down there?
6  A.   Out of that cave, that's right.  Because the
7       water level had dropped to where there was no
8       water in the reservoir.
9  Q.   Because there wasn't enough pressure to push it
10      up through the spring out into the reservoir?
11 A.   Well, that would be my opinion.
12 Q.   That would be mine, too.
13 A.   I don't know that, but that was my opinion,
14      that the water level had dropped to the point
15      that no more water could come out.  So then we
16      ran that way until July the 7th.
17 Q.   All right.  So how did that do when you started
18      pumping that water out of that cave down there?
19 A.   It wasn't very pretty water, but we, again, had
20      Sun Laboratories test the water and we were
21      able to chlorinate it enough to get the clarity
22      that we had to have.  Nothing like we used to
23      have.  So we operated until July the 7th.

Page 171

1       After July the 7th, the water level had dropped
2       below that 30 foot foot valve.
3  Q.   So between -- in that roughly month you had
4       basically pumped that cave dry?
5  A.   That's correct.  Phil, in the spring there was
6       enough water in the reservoir where you could
7       walk in it; by the time we opened the pool,
8       there was no water in the reservoir, we had to
9       pump down in the cave.  And then by July the
10      7th there was no water in the cave, or at least
11      it was down below that 30 foot foot valve.
12 Q.   Did anybody go back down into the cave on July
13      the 7th or prior to July the 7th to determine
14      what else there was down in there in that cave
15      or how far down it went?
16 A.   You couldn't have, unless you were to dive in
17      there.  Because, I mean, you couldn't -- you
18      see, you could get in the reservoir and go down
19      through the hole and go down in the cave, but
20      at that point it was at least 30 feet to the
21      water.
22 Q.   Yeah.  But nobody got on a cable or something
23      and got lowered down in there?

Page 172

1  A.   Not to my knowledge.
2  Q.   Okay.
3  A.   But the water was then below the 30 foot foot
4       valve.  And I say 30 feet, it's still out
5       there, I don't know that it was 30 feet.  I
6       don't know what it was.  It was about a joint
7       and a half of pipe, and a joint of pipe is 21
8       feet long, so I'm guessing around 30 feet.
9       Because we bought two pieces of pipe and that
10      was one piece and the rest of it went down.
11 Q.   Is that PVC pipe?
12 A.   PVC pipe.  It's got a foot valve on the end of
13      it.  It's still there as far as I know.
14 Q.   How much would it pump a day?
15 A.   Like I say, it filled the pool up every two
16      days.  That pump right there filled the pool up
17      every two days.
18 Q.   All right.  And how long did this operate, a
19      month?
20 A.   From Memorial Day till July the 7th.
21 Q.   So four or five weeks?
22 A.   Uh-huh.  (Positive response.)
23 Q.   And you would have filled the pool up with

Page 173

1       water every two days?
2  A.   We had, at that time, cut the flow down to make
3       it every four days.
4  Q.   Okay.
5  A.   When we were pumping at full capacity it was
6       every two days.
7  Q.   And do you know how many gallons that pool
8       would hold?
9  A.   I don't know, but I would guess probably
10      150,000.  Because that's about what the
11      Covington pool holds and I think that would be
12      about the same size.
13 Q.   By the way, what are the dimensions of that
14      pool at Spring Villa?
15 A.   I don't know.  And they're not anything.  I
16      mean, that pool was built in '33.  You know,
17      pools now are 25 yards or 25 meters; that one
18      is neither.  It's somewhere around -- I don't
19      know.
20 Q.   You've never stepped it off?
21 A.   No.
22 Q.   Okay.
23 A.   I would think it's probably 30 yards long and

13 (Pages 170 to 173)

Page 174

1   maybe 20 yards wide, that would be my guess.
2        MR. ADAMS: Off the record.
3        (Off-the-record discussion.)
4   Q.   I believe he also said it was something like
5        four feet deep on the shallow end and eight
6        feet deep on the deep end --
7   A.   That's right.
8   Q.   -- and about halfway down it would be about six
9        feet deep, it was just kind of gradually
10       sloping from --
11  A.   That's right.
12  Q.   You would agree with that as well?
13  A.   (Witness nods head in the affirmative.) And,
14       like I say, it's about the size of the
15       Covington pool, probably a little bit bigger,
16       so I say 150, 180,000 gallons, something of
17       that nature.
18  Q.   Okay. And every four days it would empty and
19       refill the pool?
20  A.   Phil, that's just a guess.
21  Q.   I understand.
22  A.   When that pump ran full capacity all that year,
23       that pump or the new pump that replaced it, we

Page 175

1   had several, we wanted to turn the water over
2   every two days. And we knew that because when
3   you drained the pool and filled it back up, it
4   would take it two days. So we knew what it
5   was. We cut the flow about in half trying to
6   conserve water, trying to keep the pool open
7   that one more year.
8   Q.   Okay. And since -- did you tell me July the
9        7th?
10  A.   July the 7th, 2000.
11  Q.   -- July the 7th, 2000 the pool has not
12       reopened?
13  A.   No.
14  Q.   And have you been out to look -- let me ask you
15       this question before I ask the other. It is
16       true, is it not, that in 2000 we had
17       substantially lowered rainfall than we
18       typically have here in Opelika?
19  A.   I think that was '99.
20  Q.   It was not 2000 also?
21  A.   I don't know. In my mind I was thinking that
22       was '99.
23  Q.   Maybe it was '99 and the first part of 2000?

Page 176

1   A.   It could have been.
2   Q.   But I was going to lead up to the point, since
3        then, however, including last year, we have had
4        more normal rainfall?
5   A.   Well, last year it was above normal.
6   Q.   Okay. How much above normal was it last year?
7   A.   Oh, it brought our water table up statewide
8        like 26 inches or something over what it was
9        last year, last spring and last summer.
10  Q.   Do you know what it brought it up here in
11       Opelika?
12  A.   I have no idea. I just remember that statewide
13       we were like 26 inches down and it brought it
14       up to normal or something of that nature. I
15       know Lake Martin filled up and stayed full all
16       summer.
17  Q.   Since that time have you been out to Spring
18       Villa to see what, if anything, has occurred
19       with the spring?
20  A.   Yes, many times.
21  Q.   How often would you say you went out during --
22  A.   Well, I went out a good bit when they were
23       drilling those wells and doing all of that

Page 177

1   stuff. I couldn't give you an answer. I
2   probably was out there once every two or three
3   weeks.
4   Q.   And when was the last time you went out there?
5   A.   Oh, I've been out there a lot. To the spring?
6   Q.   Yeah.
7   A.   Probably this spring.
8   Q.   Within the last 30 or 45 days?
9   A.   Probably March. I went out there -- let me
10       see, what were they doing? It was late spring
11       -- I mean, early spring probably, the last time
12       I've been out there. And then, of course, when
13       all of those people were coming through here
14       going down that old runoff and, of course,
15       checking that big huge cave that was down the
16       runoff down there, I went out there with them.
17  Q.   Are you talking about the cave in the creek?
18  A.   Uh-huh. (Positive response.) Well, in the
19       runoff from the spring.
20  Q.   Tell me what you mean when you say "the runoff
21       from the spring."
22  A.   Like I say, your reservoir -- the water boiled
23       up under the spring house, filled the

14 (Pages 174 to 177)

Page 178

1   reservoir, and then there was two eight inch
2   pipes that water ran full force out of into
3   that box where we drew our water, over the box,
4   form its lake, its stream on down and ran into
5   Little Uchee.
6        About halfway down there there is a big
7   cave now that I guess was another place water
8   came out; I don't know. And I can't tell you
9   if it's been there all these years, because
10  it's always been under water down there until
11  now. But I've walked down there recently, yes,
12  and it's a scary thing because Lord knows where
13  it goes to. You can throw a rock in it and you
14  can't hear it hit the bottom. If somebody fell
15  in it, they would be gone.
16  Q.  All right.
17  A.  It's about the same size as the one that comes
18      under the spring house.
19  Q.  And how far is that from the spring house and
20      the reservoir in terms of feet or yards?
21  A.  50 yards.
22  Q.  And then how far is it from where that cavern
23      is, or hole or cave or whatever you want to

Page 179

1   call it, on down to where the water would have
2   gone back into the creek?
3   A.  Probably between 50 and a hundred yards on down
4       there.
5   Q.  Okay. And all of that is on property that's
6       owned either by the City of Opelika or the
7       Utility Board?
8   A.  That's right.
9   Q.  Not by anybody else?
10  A.  No, no private property in there.
11  Q.  Okay. Is it all dry in there now?
12  A.  Totally dry. You can walk on all of it.
13  Q.  Okay.
14  A.  And it was dry last year.
15  Q.  Okay. And there is no increased moisture that
16      you know of?
17  A.  None.
18  Q.  Okay.
19  A.  And, Phil, I didn't finish my story about the
20      water. Later in the year 2000, when there was
21      still water down in that cave, although it was
22      too low for us to get to, later on that year
23      the creek started running backwards. In other

Page 180

1   words, the creek -- the Little Uchee Creek was
2   still running, but it began to run back toward
3   the spring and down in the hole.
4   Q.  All right. Let me see if I can make myself
5       understand what you just told me. Can we agree
6       that normally Little Uchee Creek ran generally
7       from east to west?
8   A.  I'm directionally dyslectic. If you were
9       standing at the pump house looking toward the
10      park, Spring Villa ran from -- Little Uchee
11      Creek ran from left to right.
12  Q.  Okay. If you were standing out there on the
13      road going to Spring Villa looking at the pump
14      house, Little Uchee Creek would be running from
15      your left hand toward your right hand?
16  A.  That's right. Under the road and all down
17      through there.
18  Q.  And what you're telling me is -- at what point
19      did it start running from right to left?
20  A.  Well, not the creek now. Not the creek.
21  Q.  Okay.
22  A.  You see, Little Uchee came like this; the
23      spring water came and connected and went on

Page 181

1   down.
2   Q.  Wait a minute. Let me get you to draw that for
3       me.
4   A.  Okay. This is the reservoir -- this is the
5       reservoir right here. The spring house sits --
6       the house itself sits on top, because all of
7       this is full of water. Two eight inch pipes
8       ran out from wherever they had the water level,
9       which was over your head, I don't know how deep
10      it was, into this box that was right here.
11      These two eight inch pipes would run out and
12      this water would boil up. It formed a stream
13      and/or a lake all out in here both ways. And
14      then it would come on down here. And my
15      drawing is not too good; give me another piece
16      of paper. And it would run into the creek down
17      in this area. It would come on into the creek
18      down in that area.
19          Well, after all of this dried up, all of
20      this out here was dry, although in 2000 it was
21      still marshy, but it was dry and there was no
22      water coming out of the resevoir, when we would
23      get an exceptionally big rain, especially a

Page 182

1  fast rain, the creek would build up and the
2  water would run this way and run into the hole.
3        MR. VERCELLI:  Put an arrow that way on
4           that map.  And in the middle of
5           that line, too, a couple of times.
6  A.  (Witness complies.)  But, I mean, that just
7        happened when there would be a real --
8        MR. ADAMS:  Since this is my
9           examination, shouldn't I be the
10          one telling what to put on there?
11       MR. VERCELLI:  You could, but that will
12          explain what the witness was
13          saying to make it more
14          understandable.
15       MR. ADAMS:  But wouldn't I get to ask
16          those questions?
17       MR. VERCELLI:  You certainly can.
18       (Off-the-record discussion.)
19  Q.  How about doing me a favor; how about on the
20      first piece of paper that you used where you
21      drew the spring house, make a one?
22  A.  Right here?
23  Q.  Well, no, down at the bottom of it.

Page 183

1  A.  Okay.
2  Q.  And on the second one that you made for me,
3      make a two?
4  A.  Down here?
5  Q.  On page two.
6  A.  Okay.  I see what you're talking about, you're
7      talking about the pages.
8  Q.  Yeah, page numbers.  All right.  And for mine
9      and your benefit, and for those people in the
10     future wanting to identify it, page one, if you
11     laid it out, would be closer to your left hand
12     and page two would be closer to your right
13     hand?
14  A.  Okay.
15  Q.  So what you're telling me is that normally the
16     water would flow under normal conditions from
17     page one toward page two?
18  A.  Right.
19  Q.  But beginning in what year, 2000?
20  A.  No, not beginning in; later in that summer,
21     which that's the only time it ever happened.
22  Q.  The summer of 2000?
23  A.  That's right.

Page 184

1  Q.  The summer of 2000, when you would get a rain,
2      it would come in and it would flow from page
3      two back toward page one up into the spring
4      house?
5  A.  Right.  It would fill up all of this again from
6      Uchee Creek.
7  Q.  How deep would it get?
8  A.  Oh, just -- not very deep, just swampy.
9  Q.  Ankle deep?
10  A.  Yeah.  And what I say happened, I know it
11     happened one time, because Bo said, you need to
12     come out here and see this, this is a
13     phenomenon.  And I went out there and saw it
14     and it was running back into this box here.
15     Now, it never got high enough to get back in
16     the reservoir, but it was running backwards and
17     getting in this box and spreading out right
18     there.
19  Q.  Where is that cave or cavern that you -- no,
20     I'm not talking about the one in the spring
21     house, I'm talking about the one you said --
22  A.  Oh, it's right about -- right along right
23     there.

Page 185

1  Q.  Write "cave" or "cavern" underneath that?
2  A.  (Witness complies.)  One of the learned guys
3      that Bo used to call waterologists that came
4      out there, geologist, hydrologist, whatever, he
5      crawled around in that dadgum thing and about
6      scared me to death.
7  Q.  I think that was Mr. Vercelli.  Did he have a
8      coalminer's hat on with a light on it?
9  A.  No, that wasn't him.
10  Q.  It was not?  Okay.
11  A.  It was a guy from somewhere out west that had a
12     name I couldn't pronounce.  But he crawled
13     around in that thing and threw rocks in it and
14     everything else.  And as far as I know, it's
15     still there.  I have not walked down there and
16     don't want to.
17  Q.  Do you mean this hole we're talking about?
18  A.  No, I'm not going to walk down there.  If that
19     thing caved in, you would never be seen again.
20     I'm not walking down there.
21  Q.  Now, Bo was telling us yesterday, and I want to
22     see if you saw it, did you see that
23     two-by-four?

16 (Pages 182 to 185)

Page 186

1    A.    Yes, I took a picture of it, but I don't know
2          what I did it with it.  It might have been in
3          the pictures I gave to the Governor's wife.
4    Q.    He told us that you took a picture.
5    A.    I did.
6    Q.    And I was going to ask you did you still have
7          it, but you don't have it either?
8    A.    I don't know, Phil.  I may could go back and
9          look through some boxes of negatives and find
10         it.
11   Q.    That's all right.  Where was that two-by-four?
12   A.    Okay.  Give me another piece of paper and let
13         me explain to you how it worked first so you
14         can understand.  Okay.  I'm going to draw an
15         elevation.  And let me tell you something, I'm
16         not an artist.
17              MR. VERCELLI:  Excuse me one second.
18         Since this is your deposition, if
19         you wouldn't mind marking these as
20         exhibits, I would appreciate it.
21              MR. ADAMS:  I'll see if I can get
22         around to it in a little while.
23              MR. VERCELLI:  Okay.  I would

Page 187

1          appreciate that.  And if you
2          don't, I guess I'll do it at the
3          end.
4              MR. ADAMS:  That would be what we would
5          call cross-examination.
6              MR. VERCELLI:  Okay.
7    A.    Okay.  I'm going to do an elevation.  This is a
8          reservoir.  Of course, the ground level -- the
9          ground level is going to come up like this to
10         the ground, and this is a reservoir, which is a
11         concrete -- like a big swimming pool.  On top
12         of this reservoir is the spring house; it sits
13         up here with the pumps and all that in it.
14         Down here under the spring house is where the
15         big hole is.
16              Right over in this corner there is another
17         hole that's very small; a man couldn't get down
18         in it.  As a matter of fact, years ago the
19         Water Board rolled a huge rock over it because
20         they were afraid some kid would get in there
21         fooling around and somehow get down in that
22         hole.  I don't know, it wasn't that big, but
23         there was a little bit of water came out right

Page 188

1          there.  But this is where the main water came
2          out.
3              Now, around this building -- around this
4          building, all the way around, were these -- or
5          are these big steel screens to keep the fish
6          and debris and whatever out of that.
7    Q.    Are they screens?
8    A.    They are big steel metal screens, yes.
9    Q.    How big is the hole on them?
10   A.    I would say half inch square.  It's made out of
11         what people call expansion steel.
12   Q.    Half the size of a dime?
13   A.    Yeah, something like that.
14   Q.    Okay.
15   A.    And, of course, the water could flow in and
16         out, but the fish that was put out here
17         couldn't get down in there.  So anyway, there's
18         no way to get under this house unless you take
19         these big screens down, which would take two
20         men getting down in the reservoir and taking
21         the clamps aloose and taking it off.
22              So anyway, in this runoff right here that
23         runs right here down to this box I was telling

Page 189

1          you about --
2    Q.    Now, show me -- I tell you what let's do for
3          Mr. Vercelli's sake, before he explodes, let's
4          go ahead and put a 377 Defendant's Exhibit on
5          the first drawing that you did.
6    A.    All right.
7    Q.    And what I want you to do is to put -- under
8          that first 377 I want you to put an "A,"
9          capital A?
10   A.    Okay.
11   Q.    Now, the second one I want you to write 377 and
12         put a "B"?
13   A.    Okay.  (Witness complies.)
14              (Defendant's Exhibits 377A and 377B
15         marked for identification.)
16   Q.    Okay.  Now, on the second -- I guess
17         technically it would be third piece of paper
18         that he's used, but the second exhibit, I'm
19         going to have him put Defendant's Exhibit 378.
20              (Defendant's Exhibit 378 marked
21         for identification.)
22   Q.    Now, show me on Exhibit --
23   A.    First of all, this floor would come all the way

17 (Pages 186 to 189)

Page 190

1   to the ground over here.
2   Q.   All right. Well, go ahead and finish it up
3        like you think it ought to be.
4   A.   Okay. And here's where the water, of course,
5        comes up into the spring house.
6   Q.   All right. Now, show me on 377 where this
7        grate is that you've located on 378?
8   A.   Around the outsides of this building. Of
9        course, we're looking down on this building
10       here. They're around the outside on three
11       sides.
12  Q.   What you've done is made kind of heavy markings
13       to illustrate where the heavy screens are?
14  A.   That's right. Yeah, they're around three
15       sides. The back of this building backs up to
16       the back.
17            (Off-the-record discussion.)
18  Q.   Now, where is this hole right here on 378 on
19       377?
20  A.   Right about right here (Indicating).
21  Q.   Okay.
22  A.   Probably about in the center.
23  Q.   All right. Now, go ahead. I just wanted to

Page 191

1   get oriented.
2   A.   Okay. So, of course, this comes all the way to
3        the ground. And the only exit or entrance from
4        here is through these screens.
5   Q.   Okay. Now, is this the sky?
6   A.   This is the sky.
7   Q.   Okay.
8   A.   This is the top of that flat top building that
9        comes all the way to the ground. There's water
10       around -- and I hope I'm telling you the truth,
11       gosh, you go out there so much, I think -- I'm
12       sure the water comes around three sides of that
13       building. I think it does.
14  Q.   All right. Go ahead.
15  A.   So anyway, the back side is backed up. So all
16       of this is reservoir. The two-by-four got in
17       here under this building.
18  Q.   The two-by-four came in, it is your theory,
19       through this hole here on 378?
20  A.   It either came through that hole or two men got
21       in there and took one of these screens down and
22       put it under the building. Because it got up
23       in here and went down one of these eight inch

Page 192

1   pipes and lodged on the far side of this box.
2   Q.   So it would have come in through the floor and
3        come up -- is this water in here?
4   A.   It's full of water.
5   Q.   Come up here to the top, floated up to the top?
6   A.   Uh-huh. (Positive response.)
7   Q.   Got turned and got sucked down --
8   A.   Into that pipe.
9   Q.   -- into one of those pipes?
10  A.   Right.
11  Q.   And then came out the other pipe and butted up
12       against --
13  A.   That's right.
14  Q.   And what are we calling this little mark right
15       there?
16  A.   That is the box that we actually drew from.
17       Three sides of this box are concrete; this side
18       over here was boarded up.
19  Q.   And is that where you were getting the water
20       for the pool?
21  A.   We pumped -- we had our pump all of those
22       years, as far as I know since the 1930s, set
23       right out here, right here, the foot valve went

Page 193

1   right here and went down into that box. That's
2   where it pumped from until the year 2000.
3   Q.   All right. And what we're talking about --
4   A.   We pumped the runoff of the spring is what we
5        pumped.
6   Q.   Not the spring?
7   A.   Not the spring; we pumped the runoff.
8   Q.   And what you're talking about on 377 then would
9        be this area out here --
10  A.   That's correct.
11  Q.   -- where I'm pointing?
12  A.   That's correct. The two-by-four went right
13       down through here, continued right on, and hit
14       the far side right there.
15  Q.   Okay. And what's the distance from here to
16       here?
17  A.   Of this little box?
18  Q.   Yeah.
19  A.   Probably about three feet, maybe four.
20  Q.   Okay. So you went out there and you saw this
21       two-by-four?
22  A.   Bo called me and said, you need to see this.
23       And I went out there and looked at it. And, of

Page 194

1  course, there was no -- you had two ways to get
2  it out. You could take these boards out of
3  this box, which would have been a real job, and
4  had to put them back and torn that up, but I
5  told him just to get down in this box and cut
6  the two-by-four. And he did it -- cut it with
7  a handsaw, cut it in three pieces.
8  Q.  That's what he told us yesterday, it took him
9      three cuts, and he estimates it to be -- the
10     board to be eight to ten feet long?
11  A.  That's about right. Maybe 12; I don't know.
12  Q.  Okay --
13  A.  Because, like I say, it's probably three to
14      four feet right there. And it took three cuts
15      to get it out.
16  Q.  And how big around did you tell me -- now, is
17      this spot that we're looking at here, where is
18      that in relation to this spot here that I'm
19      pointing at on 378?
20  A.  Directly over it. That pump came straight down
21      into this cave and on down into the cave down
22      here under the -- there was a foot valve right
23      down here.

Page 195

1  Q.  All right.
2  A.  And the pump sat right over here.
3  Q.  All right. Now, let me get this record
4      straight on this, too. What we're looking at
5      here is a folder that is marked "Parks and
6      Recreation Board," addressed to the Alabama
7      Commission on Environmental Initiatives, from
8      Bill Harrelson. And there's a page in here
9      styled Interior of Spring Villa Pump House?
10  A.  That's right.
11  Q.  Am I right about all of that?
12  A.  I had prepared that for the meeting that they
13      had in Auburn that Govenor Siegelman's wife
14      headed up.
15  Q.  This is the one that had all of the color
16      photographs?
17  A.  I gave her the booklet, just like a notebook
18      here, with all of the color photos, and even
19      wrote a note in it, "Please send this back to
20      me," but I never got it back.
21      MR. ADAMS: Okay. Is this an exhibit
22          in this case?
23      MR. SPRAYBERRY: Yes.

Page 196

1      MR. ADAMS: Does anybody know the
2          number of it right offhand?
3      MR. VERCELLI: It's probably to his --
4          did we talk about that last time
5          in your deposition?
6  A.  I bet we did. I know we talked about the
7      two-by-four. Now, whether I showed you this or
8      not, I don't know.
9      MR. VERCELLI: Phil, I'm fairly certain
10         that --
11     MR. ADAMS: I'm sitting here looking at
12         it, it's been marked as
13         Defendant's Exhibit 271. And it
14         has a Bates-stamp on it and the
15         number of the Bates-stamp on that
16         exhibit is --
17  A.  Phil, here are the screens.
18     MR. ADAMS: Bates-number 5.
19  A.  I wish we had a real picture. And I told you
20     wrong, the screens are on two sides, not three
21     sides. This pump house sits further over this
22     way. So actually the screens are on this side
23     and the far side. There are no screens on the

Page 197

1  front side. I told you wrong. This building
2  actually sits in here like this (Indicating).
3  So you've got water on two sides, not three.
4  Q.  Okay.
5  A.  See how it comes right there? This is the
6      reservoir and there are those big screens. As
7      a matter of fact, in this picture I think that
8      one is down. This was when the reservoir was
9      totally empty. The best I can remember, they
10     took that screen down to go down in there and
11     catch the pipe from the top and take it on down
12     in the cave.
13  Q.  All right.
14  A.  I wish I had the real picture. Of course, I
15     didn't know any of this was coming up. I just
16     took those pictures just -- and, like I say, I
17     didn't make any copies, and that was before the
18     day of digital pictures or I would still have
19     them.
20  Q.  When the spring went dry in 2000 and you closed
21     the pool, it hasn't been open since then?
22  A.  No.
23  Q.  Has the use at Spring Villa diminished?

Page 198

1  A.   Of course, the pool use has.
2  Q.   Well, no, I'm not talking about the pool. I'm
3       talking about the overall use?
4  A.   Yes. And probably the people who just come out
5       there when the kids are going to swim, and mom
6       and dad are going to sit on a picnic table, and
7       picnic and sit around the park, maybe walk the
8       trail, yes, that's diminished. But what's
9       happened, those other facilities have been
10      added, which have increased the number.
11      Because like that lodge across the road is the
12      only such facility in this area that you can
13      rent for a reasonable price.
14 Q.   What does it rent for?
15 A.   Oh, it depends on the number of people. It
16      tells you in there. It's as cheap as a hundred
17      dollars or the most it would be about -- much,
18      much, cheaper than you can rent. So we have a
19      lot of lodge business. We didn't let but
20      groups of 25 in the old antebellum home.
21 Q.   All right. What I'm going to try to do is to
22      get my stuff off of your stuff and hand it back
23      over here to you.

Page 199

1  A.   Okay. I think on that long sheet, the long
2       sheet, you'll see -- I told you you could keep
3       that, so I don't know if she made copies of it
4       or not. That's it right there.
5  Q.   Are you talking about this sheet right here?
6  A.   That will show you the prices right there.
7  Q.   All right. Let me mark this as Defendant's
8       Exhibit 379 and get you to look at it.
9            (Defendant's Exhibit 379 marked
10           for identification.)
11 A.   I think not having a pool has hurt the
12      walk-through traffic. I think it has hurt the
13      church groups coming out there, you know. I
14      think it has hurt -- I think it has probably
15      had effect on the number of campers coming out
16      there.
17 Q.   Have you looked to see whether or not the
18      revenue to the Parks and Rec is down from 2000?
19 A.   If you will give me that sheet, I will show you
20      what it's done.
21 Q.   What sheet are you talking about?
22 A.   I've got it right here. Maybe you didn't copy
23      this. Okay. Spring Villa revenue --.

Page 200

1  Q.   Hold it just a minute.
2            (Off-the-record discussion.)
3  Q.   Are you looking at something that says "Pool
4       Revenue"? Show me what you're looking at.
5  A.   Pool revenue.
6  Q.   Show me the piece of paper that you're looking
7       at, Bill?
8  A.   (Witness complies.)
9  Q.   That's a piece of paper that starts off "Pool
10      Revenue"?
11 A.   That's '99, 2000, 2001, 2002 and 2003.
12 Q.   All right. Wait a minute. I'm going to find a
13      copy here for the reporter.
14      MR. VERCELLI: Three or four pages in
15           from the top in what you just
16           handed me.
17      MR. ADAMS: I see it. I'm going to
18           mark it as Defendant's Exhibit
19           380.
20           (Defendant's Exhibit 380 marked
21           for identification.)
22 A.   I've got something here; I don't want to tell
23      you wrong. I wish I had my phone; I would call

Page 201

1       Ms. Strozier; she prepared this for me. I'm
2       not sure -- of course, the Spring Villa
3       receipts, we never separated the pool from the
4       other receipts, it just goes into Spring Villa
5       receipts.
6  Q.   So what you've shown me -- is this your
7       handwriting?
8  A.   That's Ms. Strozier's, Ellen Strozier.
9  Q.   Ellen Strozier?
10 A.   She got this off the computer from past
11      revenue, revenue sheets.
12 Q.   All right. And it's got basically three
13      different sites; it's got Opelika Pool,
14      Covington Pool and Spring Villa. And it's got
15      from 3/5 -- I don't know what that means. What
16      does that mean right above Opelika Pool?
17 A.   That is just the number, the account number.
18 Q.   Oh, that's the account number. And then you've
19      got from '99 to 2003?
20 A.   That's right.
21 Q.   So if we look in 1999, the Opelika Pool's
22      revenue was 11,364.11?
23 A.   That's right.

Page 202

1   Q.   Covington 882?
2   A.   That's right.
3   Q.   And Spring Villa 10,750.13?
4   A.   Of course, that's total receipts. And what I'm
5        not understanding from what she did for me is
6        which one is the 10,000 and the 7,000; it was
7        all added together. I don't know how she did
8        that. I should have asked her.
9   Q.   Well, in order to get a total for Spring Villa,
10       would I add -- now, what relationship is the
11       10,750.13 to the 7,578? I mean, would I add
12       them together?
13  A.   That's what I'm telling you, I'm going to have
14       to ask her, because she did it and I didn't
15       even notice that until just a minute ago. I
16       just got this this morning and I've had a busy
17       morning. She just did it for me this morning.
18  Q.   Okay.
19  A.   I don't know, except that I can tell you this
20       was the pool receipts included. And you can
21       see in 2000 where that dropped. And then, of
22       course, in 2001 it dropped tremendously without
23       the pool. And then you start seeing a gradual

Page 203

1        rise because of those other facilities. So I'm
2        thinking, yes, you add them together, which
3        would give you have the total receipts.
4   Q.   So what we would be talking about, if you do
5        add them together, and I --
6   A.   I'll get that clarified for you, I'm sorry.
7   Q.   At a break we can call and you can find out.
8   A.   Right.
9   Q.   You would have about 18,100 dollars, roughly,
10       total for 1999?
11  A.   Well, yes, that's right.
12  Q.   And you're going to have about 17,500 dollars
13       total, roughly, for 2003?
14  A.   Correct. And I can tell you the difference is
15       those new facilities that you just got the
16       rental sheet on that are full pretty much the
17       year-round now. The rentals of that new lodge
18       and all of that has brought that back up. You
19       see the drop in 2000 and then there's a drop in
20       2001 and 2002.
21  Q.   Right. 2001 was the first full year without
22       the pool?
23  A.   Without a pool, that's right.

Page 204

1   Q.   And it was also probably the first full year
2        without the lodge --
3   A.   Probably 2002 was the first full year of the
4        lodge.
5   Q.   Well, I'm saying 2001 was the first year
6        without the pool and without the lodge?
7   A.   That's correct. And then, of course, it took a
8        while for the lodge to catch on, and now it's
9        pretty much rented year-round. So that's the
10       reason you see the big increase in 2003.
11  Q.   And another question I had, down here under
12       "pool chemicals," what happened in 2001 to
13       cause that spike in pool chemicals? You used
14       10,000 dollars more in pool chemicals for two
15       pools than you used for three pools in 1999.
16  A.   Well, Spring Villa is almost a non-factor now.
17       I told you how little we used, although we did
18       chlorinate --
19  Q.   I thought you said chlorinated it at night?
20  A.   We did, but very little, compared to a filtered
21       pool which you chlorinate 24/7. The difference
22       was we put in a new pool filter system that
23       went to stick chlorine that's much, much safer

Page 205

1        than what we were using, which was gas --
2   Q.   And that was --
3   A.   -- or liquid. We used gas, then we used
4        liquid, then we had our filter systems and our
5        feeders redone. And this chlorine is much more
6        expensive, but much, much safer.
7   Q.   So this is just for the chemicals, this isn't
8        for the feeder system itself?
9   A.   No, this is the chemicals for those years. And
10       I think probably the reason it's 19,000 is that
11       first year we possibly used too much; I don't
12       know. Because you see it's come down to 15 and
13       down 12.
14  Q.   It's back down in 2003 to what it was in 2000?
15  A.   Let me tell you why. Summer is now eight weeks
16       long; summer used to be 12 weeks long.
17  Q.   You know, that's something Bo and I were
18       talking about the other day. And let's see if
19       we agree with this; he told me that the pool at
20       Spring Villa when he went out there generally
21       was open from around Memorial Day --
22  A.   Uh-huh. (Positive response.)
23  Q.   -- until around Labor Day?

21 (Pages 202 to 205)

Bill Harrelson

Page 206

1  A.  That's correct.  Closed on Monday of Labor Day.
2  Q.  And it was open from 1:00 to 5:00 seven days a
3      week?
4  A.  That's right.
5  Q.  And then he said that when school started
6      gradually moving back into August to open, that
7      what they would do is close the pool during the
8      week when school started, but leave it open --
9      continue to leave it open on the weekends until
10     Labor Day weekend --
11 A.  That's correct.
12 Q.  -- and then they would close it back up?
13 A.  Still do that.
14 Q.  That's still what they do?
15 A.  Opelika and the Covington pool, we go by the
16     Opelika school calendar.  Spring Villa pool, we
17     generally went by the Beauregard school
18     calendar, which are about the same thing, not
19     much difference.  And we only open on weekends.
20     And like I say, summer used to be 12 weeks.
21     Not only did you have 12 full weeks of
22     swimming, you also had two more seasons of
23     swimming lessons.  We've gone from six sessions

Page 207

1      to four sessions of swimming lessons, because
2      summer is eight weeks long now.
3  Q.  Right.  Summer is one-third shorter now than it
4      was ten years ago?
5  A.  And even on weekends you don't have a lot.
6      Once school starts, people get out of that
7      mode.  So that's the reason for the difference
8      in the figures.
9  Q.  Okay.
10         MR. PHEARS:  It's so confusing to me,
11     summer is shorter and Spring Villa
12     is --
13         MR. SPRAYBERRY:  Is it summer or summer
14     break shorter?
15         MR. PHEARS:  But Spring Villa has moved
16     closer to the quarry.
17         MR. ADAMS:  That's suction.
18         MR. PHEARS:  Oh, it did it to summer,
19     too.
20         MR. SPRAYBERRY:  Ozone.
21 A.  Moved closer to the quarry; how is that?  I
22     don't understand when you mean.
23         MR. PHEARS:  It's a long story.  The

Page 208

1      distance from the quarry to Spring
2      Villa gets less?
3  A.  Well, that would be very easy to measure.
4  Q.  Well, it would be, but we've had some
5      confusion.  When we started in this case there
6      were depositions that said the distance from
7      the quarry to Spring Villa was 8,000 feet.  We
8      took some depositions last week when some
9      people testified the distance was 6,600.
10         MR. VERCELLI:  6,800.
11 A.  Well, if you ask me, I'm going to tell you I
12     don't know.  If you give me 30 minutes, I will
13     run out there and clock it for you, but I don't
14     know and I'm not going to give you -- I don't
15     know how far it is.
16         MR. PHEARS:  If you're going to clock
17     it, you better be able to fly.
18 A.  Yeah, as the crow flies, I can't tell you.  But
19     it runs pretty much parallel to that road.  It
20     would have to, because once you come out on
21     169, it's not very far down to your left.
22 Q.  All right.  Bill, we were talking -- let me
23     mark this as Defendant's Exhibit 381.

Page 209

1         (Defendant's Exhibit 381 marked
2      for identification.)
3  Q.  Is this the rental -- or let me show it to you
4      and you tell me what it is.
5  A.  This is the expenses at the Opelika Pool and
6      the Covington Pool.
7  Q.  What do you mean the expenses?
8  A.  Staff, personnel, just strictly personnel.  No
9      chemicals, no nothing.  That's personnel at the
10     two pools.  That's what it costs us to operate
11     those two pools for the summer, just personnel.
12 Q.  And that is beginning -- this is for what year?
13 A.  That's for this coming year.
14 Q.  That's for '04?
15 A.  That's proposed for this coming year.  And it
16     will come pretty close to that.  Of course,
17     Spring Villa is not included in that anymore.
18 Q.  All right.
19 A.  Now, somebody told me y'all wanted that.  I
20     never did know why, but I had heard you wanted
21     it, so that's the reason I brought it.
22 Q.  Where was the list that you brought for me that
23     had all of the rental numbers on it?

22 (Pages 206 to 209)

Page 210

1  A.  Are you talking about the amounts?
2  Q.  Yeah.  The charges?
3  A.  That one right there.  That's the amounts.
4  Q.  That is 379.
5  A.  Right.  And then, of course, you have copied
6      what's already been rented this year, and
7      what's going to be rented the rest of the year
8      or most of what's going to be rented.
9  Q.  How about looking through what I've got and
10     show that to me?
11 A.  Now, I don't know which one of these are which,
12     because now they're not yellow and pink.
13 Q.  Do you want to look through yours?
14 A.  No, I can tell you, because I can look at the
15     dates.  These are the ones that are coming up,
16     because it starts with that Police Department
17     camp.  Now, there will be many more than that
18     as we go on.
19 Q.  I'm going to mark this Defendant's Exhibit 382.
20         (Defendant's Exhibit 382 marked
21          for identification.)
22 Q.  Now, these are the ones that have not yet
23     occurred?

Page 211

1  A.  That's correct, but are already reserved.
2  Q.  I understand.  These are ones for '04; they are
3      reservations made but have not yet happened?
4  A.  That's right.  And that will probably double by
5      the time we get to October, because there will
6      be many more made as we go on.
7  Q.  Okay.  So this sheet has on it -- it has who it
8      is, it has the Opelika Police Department Youth
9      Camp, Charlie Childs, with his telephone
10     number, the reservation date, 80 people in the
11     group, to get there at 8:00 in the morning and
12     leave at 2:00, and they're renting the shelter;
13     is that right?
14 A.  (Witness nods head in the affirmative.)
15 Q.  Now, it says 50 or less 25 dollars and he's got
16     80 people, how much is this going to cost?
17 A.  Well, you're looking at something that doesn't
18     apply, because that's not going to cost him
19     anything.
20 Q.  Why, because that's the City?
21 A.  It's a part of the City and that's their Dare
22     Program and all of that.
23 Q.  Let's find one that --

Page 212

1  A.  The very next one will show you what it's going
2      to cost that group.
3          MR. SPRAYBERRY:  What exhibit number is
4          that?
5          MR. ADAMS:  382.
6  A.  These are the ones that have already taken
7      place.
8  Q.  All right.  This is one here from a lady named
9      -- the Payne Reunion that's coming up on
10     Saturday the 29th that are renting the lodge
11     for 51 to a hundred people, and it's going to
12     cost 150 dollars, right?
13 A.  That's correct.
14 Q.  She paid a hundred dollar deposit down and she
15     would owe 50 dollars balance?
16 A.  Right.
17 Q.  Well, no.  Then she -- tell me what that means.
18     Has she now paid it all?
19 A.  Due by May 24th, she's now paid it all.
20 Q.  Okay.  And this has --
21 A.  Well, it's not May 24th, I can't tell you for
22     sure, but I think she has.
23 Q.  The reason I said, do you see where it says

Page 213

1      "total paid 150"?
2  A.  She's already paid it all then.  Most people
3      do.  A few wait until that day.  Most people
4      pay it all.  We require them to pay a portion.
5  Q.  All right.
6  A.  And you asked about numbers, it just so happens
7      the last one in this list, which is the ones
8      that have already taken place, this one had 300
9      people in it.
10 Q.  Well, this one that we're looking at here had a
11     hundred.
12 A.  Yeah, this is 300 and it cost them 500 dollars.
13 Q.  Is that the one that is going to occur or has
14     already occurred?
15 A.  You've got the one, I think, that's going to
16     occur; this one already has.
17 Q.  All right.  Well, let me mark it as an exhibit,
18     and why don't you look at yours so I can mark
19     this for the reporter?
20 A.  You see, this one -- when is May 23rd?  That's
21     this coming Sunday, isn't it?
22 Q.  Yes.
23 A.  Okay.  This one actually has not occurred, but,

23 (Pages 210 to 213)

Page 214

1    see, what she does, she pulls the sheets out
2    and gives them to Bo on Monday for the whole
3    week.
4  Q.    That's right.
5  A.    So that sheet has already been pulled out,
6    although that event has not taken place. That
7    event is this coming Sunday.
8  Q.    Bo testified that he goes by there on Mondays
9    and she hands him what's coming up for that
10    week?
11  A.    The whole week.
12  Q.    All right. I marked that as Defendant's
13    Exhibit 383.
14        (Defendant's Exhibit 383 marked
15        for identification.)
16  Q.    And these are the ones that have occurred, I
17    believe you and I looked at this before we
18    started, --
19  A.    October.
20  Q.    -- from last October 1, which would be the
21    beginning of your fiscal year, --
22  A.    Uh-huh. (Positive response.)
23  Q.    -- until September 30?

Page 215

1  A.    That's right.
2  Q.    Okay. And this has everything that has been
3    charged and paid for at Spring Villa during
4    this fiscal year?
5  A.    That has everything that's been reserved and
6    paid for. That certainly does not tell you how
7    many people have been out there.
8  Q.    All right. What would I need to look at?
9  A.    Well, there is nothing you can look at. Like I
10    say, it's a public park, just like Municipal
11    Park is. You can go out there right now; we
12    can all go out there and sit down at a picnic
13    table and eat us a hamburger. The only thing
14    we can't do is drink beer. And there's no
15    reservation, there's nothing. If a group --
16    if a large group wanted to go out there and
17    take potluck, there's nothing that says they
18    can't. They reserve it so it's theirs and
19    nobody else will be in it. So there's a lot
20    more people that go there than what this says.
21    These are the reservations that are made.
22  Q.    Do you have a judgment as to what percentage
23    that would be in comparison to the people that

Page 216

1    do make reservations? I mean, is it 20 percent
2    more or --
3  A.    I guess 50/50.
4  Q.    So the people who make reservations represent
5    about half of the total number?
6  A.    About half of the people that go out there.
7    There's a lot of people that go out there
8    picnicking in the afternoon or whatever; they
9    don't make a reservation, because there's going
10    to be something open. And then we have like --
11  Q.    And would they pay anything?
12  A.    No, not a penny. Now, we don't open the
13    building, but if that picnic shelter is not
14    reserved, you are welcome to use it free of
15    charge. The reservation is saying it's yours
16    from 2:30 to 4:30 on Sunday afternoon.
17  Q.    Okay.
18  A.    When you get out of there, somebody else can go
19    in there, and we don't charge them a penny.
20    Now, we encourage large groups not to do that,
21    because it would be hard for us to accommodate
22    them if they just show up. But a lot of people
23    come to the park just to come to the park.

Page 217

1    And then also like we've been meeting with
2    Mental Health about some -- basically some
3    problems we've had. Mental Health goes out
4    there just about every day with different
5    groups. There's rarely a day they don't come
6    out there. You know, it's just all kind of
7    people that come out there all the time.
8        (Defendant's Exhibit 384 marked
9        for identification.)
10  Q.    All right. Let me show you what somebody has
11    marked with a 2000 on the front of it and get
12    you to look at that and tell me what that is.
13  A.    This is the -- this is the pool receipts.
14  Q.    For?
15  A.    For the year 2000, which we closed July the
16    7th.
17  Q.    That's the Spring Villa pool?
18  A.    That's correct. This is the Spring Villa pool
19    2000, the last day is July the 7th right there.
20    Now, this is no official document, I want you
21    to understand that. There is places that it
22    overlaps. Bo starts on different days
23    different weeks. Days that it rains he will

24 (Pages 214 to 217)

Page 218

1   just leave blank. This is basically our checks
2   and balances system for this is how many people
3   came to swim and this is how much money you
4   turned in that week. Now, this will include
5   the people who paid to come to the pool and the
6   people who have family passes. It does not
7   include the day camps that come to the pool,
8   the Dare Program, the people who made
9   reservations and it included the pool back in
10   those days; it doesn't include all of those.
11 Q. But if I looked at the -- if I had this
12   Defendant's Exhibit -- what is made up in
13   Defendant's Exhibit 383 and 382, I would have
14   those people, wouldn't I?
15 A. Yes, except these have nothing to do with the
16   pool because there is no pool now.
17 Q. Well, I know. But if I had it for the year
18   2000?
19 A. If you did, but we don't.
20 Q. I understand. All I'm trying to get at is a
21   concept to be able to know that in -- for
22   example, 1999, if you were interested, you
23   could have -- to see who was using the Spring

Page 219

1   Villa pool, you could take Exhibit 384 and
2   Exhibit 383 and 382 and look at it and make a
3   reasonably close calculation --
4 A. That's correct.
5 Q. -- of how many people were in the pool?
6 A. By adding the day camp to it --
7 Q. Right.
8 A. -- and by adding certain other groups to it,
9   you could do that.
10 Q. Okay.
11 A. And, like I say, that's the year we closed,
12   July the 7th. Do you want '99, too?
13 Q. Well, that's what I was just getting ready to
14   -- is this '99?
15 A. This is '99, Spring Villa pool.
16 Q. All right.
17 A. Now, if you notice on '99, the pool did not
18   open until the 7th of June. This is the year I
19   was telling you we delayed it two weeks when we
20   didn't have the quality water we needed and we
21   put the chlorinator in. So we closed the pool
22   for two weeks to get all of that done. We
23   actually opened up the 7th, but we operated all

Page 220

1   the way through Labor Day that year. Now, if
2   you get on into September, you'll see what
3   we've been talking about, you're only open on
4   weekends.
5 Q. Now, what I want to -- I've marked that as
6   Defendant's Exhibit 385.
7       (Defendant's Exhibit 385 marked
8       for identification.)
9 Q. And I want to get you to turn and look at page
10   one so I can get this in the record.
11 A. Okay.
12 Q. Do you see down at the bottom of that top sheet
13   there's a number on there that says 324 paid
14   and 86 pass?
15 A. Uh-huh. (Positive response.)
16 Q. Tell me what that is.
17 A. That week, which only amounted to the 7th and
18   the 8th, because obviously we're not open, for
19   whatever reason, the rest of that week. I
20   don't really know why; I don't remember. It
21   could have been rain, it could have been
22   whatever. But on the 7th and the 8th we had
23   324 swimmers and 86 passes.

Page 221

1 Q. Right.
2 A. Which add 324 paid and 86, that will tell you
3   how many swimmers we had those two days. And
4   then we turned in 349 dollars.
5 Q. And then if you look through each sheet in that
6   Exhibit 385, it's going to have that in it,
7   isn't it?
8 A. Yeah. I had Ms. Strozier do that. She went
9   through and added them up.
10 Q. Okay. She didn't do that at the time?
11 A. No. No.
12 Q. She has just done that?
13 A. Did it yesterday.
14 Q. All right.
15 A. So, see, the week that actually went a whole
16   week, you had 463 paid, 219 passes, that comes
17   to somewhere around 700. And then the money
18   you turned in was 463 dollars that week.
19 Q. You keep on looking --
20 A. And, again, that does not include day camps and
21   groups and that sort of thing.
22 Q. I understand. Okay. I understand that. I'm
23   marking my copies, so hand me those back and

Page 222

1    they'll be mine.
2    A.    Okay.
3    Q.    Now, I'm going to show you -- all right.  This
4          is Bo Brown's contract; I don't care about
5          that.  Does anybody care about Bo Brown's
6          contract?
7              MR. SPRAYBERRY:  I think Mr. Brown
8                  might care about it, but not us.
9    A.    That's his basic job description.
10   Q.    This is his job description?
11   A.    Which is turned in -- you see, that contract
12         has to be bid.
13   Q.    Bo's contract is bid?
14   A.    Yes.
15   Q.    I'm going to mark as Defendant's Exhibit 386 --
16         what about Mr. Gunter, does he bid his
17         contract?
18             MR. GUNTER:  Professional services is
19                 excepted from the bid law.
20             (Off-the-record discussion.)
21             (Defendant's Exhibit 386 marked
22                 for identification.)
23   Q.    Defendant's Exhibit 386 is Bo Brown's job

Page 223

1          description?
2    A.    Yes.
3              (Defendant's Exhibits 387 and 388
4                  marked for identification.)
5    Q.    Okay.  Let me show you what I've marked as
6          Defendant's Exhibit 387 and get you to identify
7          that for me?
8    A.    I think that's our basic operations budget.
9          That was what was turned in last year.  And I
10         did not give you the computer sheet because it
11         would be so hard to understand, because once
12         this gets passed, it gets included with a lot
13         of other things in the City.  This is the
14         request I turned in.  This is strictly
15         operations, it doesn't have anything to do with
16         capital outlay or whatever, although in the
17         last few years there hasn't been any capital
18         outlay.  So anyway, this is our operations
19         budget.  And you could probably say two million
20         dollars, because it was cut two or three
21         different times by small amounts, but that's a
22         ballpark figure of our entire operations.
23   Q.    Thank you.

Page 224

1    A.    And, Phil, some questions were asked about
2          Spring Villa.  You see, the only thing you're
3          going to see in the Spring Villa portion of
4          that budget is 2,000 dollars for a supply
5          account and 1,000 dollars for water, which is
6          City water, and Bo's contract.  But we don't
7          charge maintenance items; we don't charge work
8          that we go out there and do.  And the two
9          people who work out there are charged against
10         general administration, not Spring Villa.
11   Q.    Okay.
12   A.    So that really does not reflect Spring Villa's
13         operations at all.
14   Q.    That's what I was going to ask you.  In other
15         words, you don't allocate the cost to a
16         specific facility?
17   A.    Not Spring Villa.
18   Q.    Well, what about Denson Drive?
19   A.    Well, if you look down the budget here you'll
20         see the first budget there, which is -- the
21         first one is general administration, which is
22         your biggest portion.  That is all of the
23         salaries and wages for every part-time person

Page 225

1          in the City.  The only reason Bo's is in Spring
2          Villa is because he's contractual.  These are
3          all of the employees, which comes to 849,000
4          dollars.
5              And then in the second category you've got
6          centers and general operations.  This is the
7          operations of the two recreation centers.  Not
8          salaries now.  There are some part-time
9          salaries in there, but not any full-time
10         salaries.
11   Q.    So these salaries and wages of roughly 103,000
12         dollars is part-time salaries and wages?
13   A.    In what?
14   Q.    Centers and general recreation?
15   A.    That's correct.  That would be day camp workers
16         and just all kind of different things.
17   Q.    Okay.
18   A.    Opelika Pools, which now is the two pools, it
19         used to be three.
20   Q.    Did Spring Villa used to be under the Opelika
21         Pools category?
22   A.    Pools, yes.  And then special programs, that's
23         all the special things we do, aerobics, what

26 (Pages 222 to 225)

Bill Harrelson

Page 226

1    have you. General maintenance is the entire
2    maintenance budget. A good bit of this
3    maintenance budget would go to Spring Villa,
4    but it's not charged to Spring Villa. Tennis
5    and Activities Center, that's the tennis center
6    in the old Armory. And then Spring Villa.
7        But, like I say, the 2,000 dollars in
8    operating supplies, that's simply because there
9    are certain things used at Spring Villa that
10   are used nowhere else. One of them is propane
11   gas; one of them might be cooking supplies. So
12   that's the only reason that's there. He picks
13   up toilet paper, soap, cleaning utensils,
14   whatever; that comes out of general
15   maintenance.
16   Q.   Okay. And do you have a judgment or an opinion
17       about what you spend out of your budget on an
18       annual basis for Spring Villa?
19   A.   Phil, I don't.
20   Q.   Okay.
21   A.   I think it would be probably pretty hard to try
22       to figure it out, you know.
23   Q.   Okay.

Page 227

1    A.   You could go through a year and keep up with
2        it, about the only way I would know to figure
3        it out.
4    Q.   Right. But that has not been done?
5    A.   It has never been done.
6    Q.   Okay. Have you had an occasion to meet anybody
7        from Oldcastle since they've been here?
8    A.   No.
9    Q.   To your knowledge, have you talked with anybody
10       from Oldcastle?
11   A.   No.
12   Q.   To your knowledge, is anything -- any condition
13       that exists out at Spring Villa any worse since
14       Oldcastle acquired the quarry in July of 2003
15       than it was before that time?
16   A.   We started seeing sinkholes, but I don't know
17       that that has anything to do with Newcastle. I
18       think --
19   Q.   Oldcastle.
20   A.   I mean, Oldcastle. It may just be a matter of
21       time. But, yes, we've seen sinkholes.
22   Q.   Where have you seen the sinkholes?
23   A.   The worst has been in the highway up there

Page 228

1    right by the spring house. And the county has
2    been out there several times and pumped
3    concrete down in it and a little bit of
4    everything because it's gotten to a dangerous
5    point.
6    Q.   Have you seen any sinkholes other than the one
7        you just described?
8    A.   Yeah. There's some right around the pump house
9        there, you know, and down toward that pasture,
10       which is not our property, on back down in
11       there. I have not walked down there and seen
12       them; Bo has told me about it. Then there's --
13       he told me there's one back around the trail
14       somewhere, but I have not seen it. He's told
15       me about it.
16   Q.   Other than Bo telling you about them, the only
17       one you've seen is the one up there on the
18       road?
19   A.   The road and there's been a couple around the
20       spring house itself, back in there where the
21       wells were drilled and all of that in that
22       area. There's some in there; I've seen those.
23   Q.   Okay. And other than what you've told me about

Page 229

1    the sinkholes, that's the only physical changes
2    you've seen to the Spring Villa Park? When I
3    say Spring Villa Park, I'm talking about the
4    whole Utility Board property and the City
5    property.
6    A.   Since Oldcastle took over?
7    Q.   Since last July, the middle of July of last
8        year?
9    A.   The sinkholes would be the only thing, would be
10       the only difference I know of.
11       MR. VERCELLI: Can we take a short --
12       just give me one second to ask the
13       witness a question.
14       (Witness conferring with counsel.)
15       MR. VERCELLI: I asked the witness
16       whether or not he had seen or
17       heard anything about new sinkholes
18       near the Penn Young house or by
19       the pool. And I think that
20       refreshed his memory. So if you
21       want to ask him or let him
22       testify, he can tell you about a
23       couple more.

27 (Pages 226 to 229)

**Page 230**

1  Q.  After Mr. Vercelli interrupted the deposition
2      and whispered in your ear, have you thought of
3      anything else in regard to sinkholes?
4          MR. VERCELLI:  Let me object to the
5              question.  What I said on the
6              record, is that what occurred, the
7              exchange between the two of us?
8  A.  Yes.
9          MR. VERCELLI:  Okay.  Go ahead and
10             answer his question.
11 Q.  Let me ask my question again.  After
12     Mr. Vercelli interrupted the deposition and
13     whispered in your ear, have you thought of
14     anything else that you want to tell me with
15     regard to sinkholes?
16 A.  Yes.  I have seen the sinkhole down around the
17     pool.
18 Q.  How big is it?
19 A.  Maybe six feet across.
20 Q.  A diameter of six feet?
21 A.  Diameter.
22 Q.  How deep is it?
23 A.  I don't know; a foot, 18 inches.

**Page 231**

1  Q.  Is it caved-in or is it just sort of sagging?
2  A.  When I saw it, it was in the fall and we were
3      out there working on the trail.
4  Q.  That was my next question.  When did you see
5      it?
6  A.  It was in the fall when we were out there
7      working on the trail, the fall of 2003.
8  Q.  Do you remember whether it was in September or
9      October?
10 A.  I would say October.
11 Q.  Okay.
12 A.  One of the two.  And he's told me about the one
13     around the house, but I have not seen it.
14 Q.  Okay.
15 A.  That's relatively new.  And I've been out
16     there, I just haven't thought about looking or
17     asking him to show it to me.
18 Q.  Okay.
19         MR. VERCELLI:  May I interrupt you?
20             The reason I was telling him about
21             that, to let you know, is we have
22             not previously disclosed that to
23             you; it just came to our

**Page 232**

1      attention.  So that's the reason
2      I'm asking him to tell you about
3      it now so that you will have
4      knowledge of it.
5          MR. ADAMS:  Well, that and you wanted
6              to make sure that he didn't forget
7              it.
8          MR. VERCELLI:  Well, I wanted to make
9              sure you know about it.
10         MR. ADAMS:  And that he --
11         MR. VERCELLI:  Well, I wasn't sure
12             whether he had seen it or not and
13             apparently he hadn't.  He had only
14             heard about it.
15         MR. ADAMS:  Thank you.  I think that's
16             all I have, Bill.  Thank you.
17         (Recess.)
18
19         CROSS-EXAMINATION
20 BY MR. PHEARS:
21 Q.  Mr. Harrelson, my name is Wayne Phears; I
22     represent Hanson.  I have a few questions to
23     ask you.  Let me ask you first; do you have any

**Page 233**

1      areas of expertise that are relevant to this
2      case?
3  A.  My only expertise is in recreation.
4  Q.  And tell me what that encompasses.
5  A.  How I got to the point where I am?
6  Q.  No.  What would be the components of that
7      expertise?
8  A.  I really don't understand your question.
9  Q.  Let me try do it more specifically then.  Do
10     you have any expertise in swimming pool
11     plumbing?
12 A.  Yes.
13 Q.  And what would that be?
14 A.  Well, I've, of course, dealt with the pools
15     since 1973, and our city pools have been
16     renovated two different times since then.  So I
17     know what it requires to put in that plumbing,
18     yes.
19 Q.  Have you ever built one from scratch?
20 A.  With my own two hands?
21 Q.  Let's try that.
22 A.  No.
23 Q.  Okay.  Have you ever had one built from scratch

Page 234

1    under your supervision?
2  A.  No.  Renovated twice since I've been in
3    Opelika.  There has not been a new pool built
4    since I've been here, no.
5  Q.  Are you capable yourself of sitting down and
6    costing out what a new pool would cost?
7  A.  No, sir.
8  Q.  And my recollection is you got pool figures
9    from Barge, Wagner here?
10 A.  That's correct.
11 Q.  Because that's not an area of expertise for
12    you?
13 A.  That's correct.
14 Q.  Now, you testified today, I think, that after
15    Opelika Materials stopped pumping, the spring
16    came right back, was that your testimony today?
17 A.  Yes, sir.
18 Q.  I don't recall you saying that the last time
19    around.  Do you remember saying that the last
20    time around?
21 A.  I do not.  Like I say, I didn't even read that.
22    I don't know if that question was asked.
23 Q.  What year did Opelika stop pumping?

Page 235

1  A.  I don't know.  I told you before I didn't know.
2    I'm sure y'all know, because I'm sure you know
3    when they started and when Hanson started.  But
4    there was a period of time that they did not
5    mine the quarry.
6  Q.  Well, when Opelika was mining it, the water
7    never stopped flowing in any event?
8  A.  No.  It slowed down; did not stop.
9  Q.  In fact, I've seen some flow charts for that
10    time period, that, who was it, GSA did flow
11    charts on it?
12 A.  I guess; I don't know.
13 Q.  Have you seen them?
14 A.  They used to send us a flow chart and I never
15    knew how they got them.  I never knew what they
16    did to get them, but I had seen them, yes.
17 Q.  And the flow at least in the '96/'98 range was
18    fairly consistent with historical rates, wasn't
19    it?
20 A.  I don't know.
21 Q.  You don't know?
22 A.  No.
23 Q.  Do you know whether the flow in '97 was more or

Page 236

1    less than it had been historically?
2  A.  Well, like I said, I don't remember the years.
3    Whenever Opelika Materials started, we saw a
4    decrease in the water.  Although we still were
5    able to pump, but we did see a decrease in the
6    water.  Whatever that date was, that's when it
7    was.
8  Q.  Earlier when you testified in response to
9    Mr. Adams' questions, I thought you had
10    indicated that there was some certainty about
11    the flow returning to normal in '98?
12 A.  No, sir.  I said between the time that Opelika
13    Materials moved out -- and I don't know when
14    that was, I'm sure y'all do, between the time
15    that Opelika Materials moved out and prior to
16    the time that Hanson started to mine, the flow
17    came back visibly.  You could visibly see the
18    spring come back up.
19 Q.  And do you know whether there was any change in
20    rainfall during that time period?
21 A.  No, sir, I don't remember that.
22 Q.  So you can't say for certain that it wouldn't
23    be connected to something other than the

Page 237

1    quarry?
2  A.  I have no idea.  I cannot remember how much it
3    rained in '97/'98.  No, sir, I can't.
4  Q.  In your history with Spring Villa, did it react
5    to rainfall?
6  A.  Very little.
7  Q.  Did it react to droughts?
8  A.  No.
9  Q.  I noticed, at least on that Geological Survey
10    document, there were years when the flow went
11    below, I guess, one CFS, do you recall seeing
12    any of that?
13 A.  No, sir.  But the only thing I can say about a
14    drought is I know that -- and here again, I
15    can't swear that my years are correct.  I think
16    we're talking about '88 and '91 maybe were the
17    years that the City pumped from that location.
18    And the spring flowed during the drought, the
19    City pumped, the figure I was told by Steve
20    Young was 1.5 million gallons, back to the City
21    water supply, but the area where we pumped our
22    runoff water still stayed full.
23    But what you've got to understand is, it

29 (Pages 234 to 237)

Page 238

```
 1      didn't matter how much or how little, all we
 2      were concerned with was that little reservoir
 3      down below the big reservoir stayed full.  And
 4      it never, ever got empty during any of those
 5      drought years.  There were times you could
 6      hardly see that area where we drew from, it was
 7      way under water; then there were times when you
 8      could see the top of it.  So it varied, but
 9      still it stayed full.
10          MR. PHEARS:  Does anybody remember
11              whether that chart of the flow was
12              marked at the last deposition?
13          MR. SPRAYBERRY:  It would have been in
14              Aley's.  Are you talking about the
15              GSA reports?
16          MR. PHEARS:  Right.  The chart that has
17              about eight or ten years of flow
18              on it.
19          MR. SPRAYBERRY:  It was in Aley's.
20          MR. PHEARS:  I thought I saw it getting
21              ready for this.
22  A.   I think actually they sent those reports to the
23       Water Board, but I have seen them.
```

Page 239

```
 1  Q.   Now, when we were having some discussions with
 2       the City previously, the City provided us with
 3       an estimate that the old pool was 42 feet by
 4       102 feet; does that sound about right to you?
 5  A.   Like I said before, I don't know.  I guessed 30
 6       yards by 20 yards.  Bo said 90 something feet.
 7       I don't know.  I've never measured that pool.
 8  Q.   Okay.  Let me ask you to assume for purposes of
 9       these questions that the pool actually -- the
10       old pool actually measured 42 feet by 102 feet,
11       which made it 4,284 square feet, okay?
12  A.   Okay.
13  Q.   We'll round it off to 4,300 square feet, fair
14       enough?
15  A.   Okay.
16          MR. VERCELLI:  Off the record.
17              (Off-the-record discussion.)
18          MR. VERCELLI:  I'll just object on the
19              form, but go ahead.
20          MR. PHEARS:  I may have a letter in
21              here, but it's information that
22              Guy got us previously.
23          MR. GUNTER:  Somebody had to ask me to
```

Page 240

```
 1      have it measured; it wasn't just
 2      information I received.
 3          MR. VERCELLI:  You were saying assume
 4          the old pool is 42 by 102.
 5          MR. PHEARS:  Right.
 6  Q.   It's my understanding that the estimate that
 7       you've obtained for a new pool are for a 7,000
 8       square foot pool, correct?
 9  A.   That's correct.
10  Q.   Now, why is Hanson or Oldcastle supposed to pay
11       for a 7,000 square foot pool to replace a 4,300
12       square foot pool?
13  A.   Well, first of all, of course, the pool was
14       built in 1930 -- in the 1930s.  Of course, the
15       attraction for that pool was that it was a
16       spring-fed pool, which is something very unique
17       this day and time.  Of course, I can remember
18       as a small boy swimming in spring-fed pools
19       different places.  It was very unique and I
20       think it's probably one of the few spring-fed
21       pools left.  It was a major attraction; people
22       wanted to come out there to swim in the spring
23       water.  It was different; it was an attraction.
```

Page 241

```
 1      That's gone.
 2          My feeling was to replace that with a
 3      conventional pool, filled by City water, and
 4      chemically treated and filtered and circulated,
 5      that you needed a pool that would bring in an
 6      attraction.  I think to go out there and build
 7      a pool of the same size that had no mystique
 8      and no spring water, no anything, I don't think
 9      that would be any attraction at all.
10  Q.   So you picked the 7,000 square foot size?
11  A.   I picked a pool basically the same size as the
12       Opelika Pool, because the swimmer load was
13       actually greater on the Spring Villa pool when
14       we closed than the Opelika Pool.
15  Q.   So you had more swimmers in a smaller pool at
16       Spring Villa?
17  A.   That is correct.  The last few years it sort of
18       evolved that way.  Spring Villa pool tended to
19       get more popular as years went on, truthfully.
20  Q.   Did you consult with anybody in deciding that
21       the replacement pool ought to be 7,000 square
22       feet?
23  A.   Only Barge, Wagner, Sumner and Cannon.
```

30 (Pages 238 to 241)

Page 242

1  Q.  Well, did they suggest the size to you or just
2      provide you cost numbers?
3  A.  They provided me cost numbers based on -- they
4      sent me plans on pools they had built
5      throughout. And we decided on a zero depth
6      entry pool, maximum eight foot depth, no diving
7      boards. We decided on that based on the
8      information they gave me on liabilities and the
9      way pools are going now and what you need to
10     do. So that's how all of that was come up
11     with.
12 Q.  Did anybody ever tell you that you just
13     couldn't build a 4,300 square foot pool?
14 A.  Did anybody tell me that you couldn't?
15 Q.  Right.
16 A.  No. I never asked anybody what size pool you
17     could build. I guess you could build any size.
18 Q.  Okay. You don't know of any reason that you
19     couldn't replace -- you don't know of any
20     reason physically that you couldn't replace a
21     4,300 square foot pool with a 4,300 square foot
22     pool?
23 A.  Yes, sir, I think there are several reasons why

Page 243

1      you wouldn't want to do that. I've already
2      mentioned one, that you need something that
3      would really be an attraction, something that
4      people would want to come to. We talked about
5      the zero depth entry; we talked about the spray
6      animals that you put in the shallow end, which
7      would be an attraction for the children,
8      something we don't have, to replace the
9      attraction that we had with the spring water.
10        Secondly, when you build a new pool, you
11     have to meet all requirements. Now, with an
12     old pool that's grandfathered, much like an old
13     building, your ADA, EPA, I don't know what all,
14     but you have to meet all of those requirements
15     when you build a new pool.
16 Q.  Right. Does any of that keep the pool from
17     being 4,300 square feet?
18 A.  I don't know. And I don't know if there's a
19     maximum number you can put in a pool; I really
20     don't know.
21 Q.  None of that -- none of -- there wasn't any ADA
22     reason or maximum number in a pool reason that
23     you picked a 7,000 square foot pool, was there?

Page 244

1  A.  No. I think that ADA and that sort of thing
2      had to do with your shower facilities, your
3      dressing facility, your pool deck space. Now,
4      there is a requirement that your deck space be
5      three times as large as your area, which the
6      old pool was nothing close to that.
7  Q.  So every time you make the pool bigger, you
8      have to make the deck space three times --
9  A.  That's correct. It has to be three times
10     larger than the pool surface.
11 Q.  So every square foot --
12 A.  No, I'm not going to tell you that's a law; I'm
13     telling you that's the way you build a pool.
14 Q.  Okay. Not a rule necessarily?
15 A.  I don't know that. It may be; I don't know.
16 Q.  Now, why did you pick 7,000 square feet instead
17     of six?
18 A.  Because I looked at some pools that I thought
19     would fit our needs out there, and that's what
20     -- that's what I was asked to do. I looked at
21     pools that I thought would fit our needs and be
22     an attraction and that sort of thing and that's
23     the pool I picked.

Page 245

1  Q.  Who asked you to do that?
2  A.  Who asked me to do it? Nobody asked me to do
3      it.
4  Q.  You said that's what you were asked to do?
5  A.  Oh, I was asked by the City to do it when we
6      started talking about this.
7  Q.  Was it the Mayor?
8  A.  Mayor and/or City Council.
9  Q.  And they said to you, tell me what size pool
10     would fit our needs out there?
11 A.  Yes, basically. Now, the way that all
12     happened, there was some kind of settlement
13     offered. And it was 200 or 250,000 dollars.
14     And I don't think the City Council or the Mayor
15     knew that you can't build a public pool for
16     that. You can't build -- what square footage
17     did you say Spring Villa pool is? 43,000?
18 Q.  4,300.
19 A.  You can't build 4,300 for anywhere close to
20     that, because you can't build a pool that
21     doesn't have filter systems. My gosh, filter
22     systems alone would cost you 75 or 80,000
23     dollars. You can't build a pool for 200,000

31 (Pages 242 to 245)

Page 246

1    dollars. That's how all of this started.
2        And then they said, well, get us some
3    figures on what it would cost to build a pool
4    and to build a pool that would serve our needs
5    for years to come. So that's what I did.
6  Q.  And why did you pick 7,000 square feet instead
7    of 8,000 square feet?
8  A.  Because I looked at some pools that Barge,
9    Wagner, Sumner and Cannon had built. One pool
10    I looked at was the pool in Jacksonville,
11    Alabama that they had built. And I thought the
12    design of the pool, the size of the pool, the
13    way the pool was constructed, was what what we
14    needed. I didn't particularly pick a square
15    footage; I used a plan.
16  Q.  Well, at the end of the day it was driven by
17    what you thought the City's needs were?
18  A.  That's correct. And I think that may be close
19    to what the Opelika Pool is. I'm really not
20    sure, but I think it's probably close.
21  Q.  Did you ever do any evaluation of any kind,
22    formal or informal, about rehabbing the old
23    pool?

Page 248

1    built a pool, and, no, I haven't. It is my
2    opinion that you cannot rebuild a pool of that
3    age that's built the way that one is. I don't
4    know how you would ever do that. And the pool
5    -- to me it would probably crumble all to
6    pieces if you got in there with a jackhammer.
7    That would be my opinion.
8  Q.  What kind of surface do you plan for the new
9    pool; not decking but surface of the pool?
10  A.  Well, there's different type surfaces. There's
11    one called gunite. There is still poured
12    pools, but they're all poured in one piece,
13    they're not poured in sections like this one
14    is, and they have different type surfaces. One
15    of them is called marcite.
16  Q.  Pebble Tec?
17  A.  That's one.
18  Q.  Is Pebble Tec planned for this?
19  A.  No.
20  Q.  Did you investigate refinishing the other one
21    in Pebble Tec?
22  A.  No.
23  Q.  Do you know --

Page 247

1  A.  Which pool?
2  Q.  Spring Villa.
3  A.  Through the years I had asked people. When you
4    say "rehabbing," there is no way to rehab that
5    pool.
6  Q.  Why not?
7  A.  Because it's basically a big concrete bathtub.
8    And to put in filter systems, you have to get
9    under the pool, you have to get down to the
10    side of the pool; you have influent and
11    effluent flows; and you cannot rebuild a pool
12    that old. You would have to put a metal liner
13    in it or something and you can't.
14  Q.  My pool was built in the 1920's, it's 11 inch
15    concrete, and we rehabbed it completely, put a
16    whole new system on it. Why couldn't you do
17    that?
18        MR. VERCELLI: Objection.
19  A.  I just explained why you couldn't.
20  Q.  Don't you just excavate out and put some lines
21    in it and put the pumping and the filtration
22    off to the side somewhere?
23  A.  Well, you've already asked me if I've ever

Page 249

1  A.  We did the Opelika pool and Covington pool in
2    marcite several years ago.
3  Q.  Is that similar to Pebble Tec?
4  A.  I don't know.
5  Q.  Do you have a City water supply available out
6    there?
7  A.  There is a City water line coming out there.
8    It would not be big enough to feed a pool. It
9    could probably be enlarged, but there is City
10    water at Spring Villa, yes. But it's strictly
11    just a water line coming out there.
12  Q.  I know that somebody had done a calculation in
13    one of these letters about getting water to
14    Spring Villa Estates, did you have anything to
15    do with that?
16  A.  No, sir.
17  Q.  Do you know why anybody would be doing a
18    calculation about getting water to Spring Villa
19    Estates?
20  A.  Unless it were the Water Board, I wouldn't have
21    any idea.
22  Q.  You're the wrong guy to ask that, aren't you?
23  A.  Sure am.

Page 250

1  Q.  Let me hand you what's marked as Defendant's
2      Exhibit 271, which was previously discussed
3      with you, the memo to the Alabama Commission on
4      Environmental Initiatives, and ask you if you
5      recall seeing the discharge measurements that
6      you apparently attached to your memo?
7  A.  Yes.  Like I said, I don't remember where I got
8      them, but yes.
9  Q.  They were originally a part of that memo?
10 A.  I think they probably came -- they probably
11     came to the Water Board, I don't know where
12     they came from, but yeah.
13 Q.  Now, the estimate --
14 A.  I wrote this -- this was by no means anything
15     official.  They had a meeting in Auburn that
16     had to do with ADEM and that sort of thing and
17     I wrote this to take to my meeting.  Nobody
18     asked me to write it.  As a matter of fact, I
19     didn't even date it.  And I gave it to, like I
20     say, the group and the Governor's wife was
21     there.
22 Q.  And she lost it?
23 A.  Well, I don't know whether she lost it.  I'm

Page 251

1      not saying she got it.  I'm saying she was
2      there, and she headed up the meeting, and I
3      gave them a notebook like this one with a
4      pretty picture on the front and all of those
5      original pictures were in it.  And that's what
6      I did it for.  I didn't do it for any official
7      reason.
8  Q.  Help me work through the Barge, Wagner estimate
9      a little bit here.  It includes changing -- a
10     structure of some kind for changing rooms,
11     right?
12 A.  Dressing rooms.
13 Q.  Right.
14 A.  Correct.
15 Q.  How big is that structure?
16 A.  I don't know.  I don't know off the top of my
17     head.  It's based on the size of the pool and
18     their specifications.
19 Q.  Did you have one before at Spring Villa?
20 A.  Yes, we have dressing rooms out there that are
21     wooden structures.  They're nothing like what
22     you would have to have now.
23 Q.  They're still there?

Page 252

1  A.  They're still intact, yes.  They're still out
2      there by the pool.
3  Q.  And is there some law that requires you to have
4      a different structure now?
5  A.  I have no idea, except your ADA laws.  You have
6      to have any pool ADA-accessible.
7  Q.  But when you asked them to estimate a pool with
8      brand-new modern state-of-the-art changing
9      rooms, that was because you thought that was
10     something the City needed?
11 A.  Well, I don't think you would build a pool in
12     2004 and put wooden drop-siding dressing rooms
13     up there.  I don't think you would do that.
14     And that's what those are, they are wood
15     structures.  What people used to call
16     drop-siding.  I don't think you would do that
17     at a new pool.
18 Q.  Why should Hanson have to pay for new dressing
19     rooms for the City?
20 A.  Well, I think the reason Hanson should have to
21     pay is because the mystique and the attraction
22     of the spring water is gone.  And I don't know
23     if it will ever come back, and I have no way of

Page 253

1      knowing if it will.  Even if the quarry were to
2      stop operation today, I have no way of knowing
3      if it will come back, and you don't know, and
4      none of the rest of us know.  As Bo Brown
5      called them, the waterologists don't know.
6      Nobody knows if the water will ever come back.
7      So I think that we need an attraction out there
8      and I think Hanson should pay for it.
9          Now, as far as the environment and the
10     wetlands and the spring that everyone enjoyed,
11     I can't put a price on that; that's priceless.
12 Q.  No way to figure it out?
13 A.  No way.  But I think the pool is a small thing
14     to ask, that's my opinion, and strictly my
15     opinion.
16 Q.  Well, that's what you're here for.
17 A.  I think it's a small thing for what has
18     happened at the park.  I mean, it's historic;
19     it's something that people in this whole
20     community in this part of the state have talked
21     about for years and years.  I went out there as
22     a high school kid and watched that water come
23     up out of that spring and was mesmerized by it

Ricky L. Tyler                          Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

Page 254

```
1       and now it's gone.  And these kids are never
2       going to see it again.  So I think to build a
3       modern new pool that would meet modern new
4       standards is the least the City could ask for.
5   Q.  Well, I guess my question is, what's the
6       cutoff?  If you want a 7,000 square foot pool,
7       why shouldn't Hanson have to build you a 10,000
8       square foot one?  What's the cutoff?
9   A.  They asked me to check on the prices and design
10      of a pool that would meet our needs.  And, in
11      my words, it needs to be an attraction.
12  Q.  All right.  And if you thought, that is if Bill
13      Harrelson thought that Opelika needed a 10,000
14      square foot pool, then Hanson ought to pay for
15      a 10,000 square foot one, right?
16  A.  I don't think Opelika needs a 10,000 square
17      foot pool.
18  Q.  But if you thought it did, then what you think
19      would be fair would be for Hanson to pay for a
20      10,000 square foot one, right?
21  A.  No, it's not what I think.
22  Q.  But so far what we've got in terms of the
23      replacement pool is what you think the City
```

Page 255

```
1       needs, correct?
2   A.  That is correct.
3   Q.  Okay.
4   A.  After 32 years of experience I think I'm
5       qualified to make that estimation.
6   Q.  Now, did the old pool have a concession stand?
7   A.  Yes.  It was a portable building, but it was a
8       concession stand, yes.
9   Q.  And the new one has what kind of concession
10      stand?
11  A.  Built-in concession stand.
12  Q.  Brick, what is it?
13  A.  Of course it would be a masonry structure.  You
14      wouldn't build a new pool and put a wood
15      structure up, just like I just said before.
16      Nobody would do that.
17  Q.  And why should Hanson have to pay for a new
18      concession stand?
19  A.  Well, here again, they're paying for the entire
20      facility.  That is all part of the facility.
21      You don't build a swimming pool without
22      dressing rooms and shower rooms.  The Health
23      Department requires you to take a shower in a
```

Page 256

```
1       filtered pool.
2   Q.  What kind of decking do you have in there?
3   A.  Decking?
4   Q.  Yes.
5   A.  Concrete.  Are you talking about inside the
6       building?
7   Q.  No, I'm sorry.  Around the pool?
8   A.  Concrete.
9   Q.  Just plain old concrete?
10  A.  Well, you can do the washed pebbles, you can do
11      a lot of different things.  That's not been
12      designed.
13  Q.  What does the estimate have in it?
14  A.  Of what?
15  Q.  What does the estimate assume will be the
16      decking?
17  A.  I don't know.
18  Q.  No idea?
19  A.  I don't have any idea.  I have not looked at
20      any that weren't concrete; I don't know.
21      Barge, Wagner, Sumner and Cannon sent me
22      several different designs; they sent me some
23      square footage costs and this sort of thing.  I
```

Page 257

```
1       don't know specifics; hadn't gotten that far.
2   Q.  I presume it's fenced?
3   A.  It would have to be fenced, yes.
4   Q.  It takes a bigger fence for a bigger pool and a
5       bigger deck, right?
6   A.  Sure.
7   Q.  And Hanson ought to pay for that, right?
8   A.  Sure.
9   Q.  Are you going to pave the parking lot?
10  A.  That's not been discussed.
11  Q.  Why not?
12  A.  It hasn't gotten that far yet.
13  Q.  Don't you think Hanson ought to have to pay to
14      pave the parking lot, too?
15  A.  I would think if it was included in the entire
16      facility, yes.
17  Q.  What else does the estimate include that wasn't
18      part of the old structure?
19  A.  Well, I don't see any part of the old structure
20      being used in the new structure.
21  Q.  I'm sorry.  What other facilities or
22      construction are included in the new estimate
23      that weren't facilities that were a part of the
```

Page 258

```
 1      old pool?
 2   A.   The filtration system.
 3   Q.   But you've got to have that because you don't
 4      have spring water, right?
 5   A.   That's correct.  Dressing rooms, concession
 6      stand, filter room, because now there's
 7      filters, chemical room, because now there's
 8      chemicals.  I guess that's it.  The fencing, of
 9      course, fencing and decking.
10   Q.   Have you consulted with anybody about the
11      possibility of rehabbing the old pool?
12   A.   Yes.  We've talked to some pool companies about
13      it in the past.  Not in connection with what
14      we're talking about today.
15   Q.   Right.  I'm talking about after you lost the
16      spring water, have you talked to anybody about
17      rehabbing it?
18   A.   No, I have not.
19   Q.   Is it fair to say that you don't have the
20      expertise to know whether it can be rehabbed or
21      not?
22   A.   No, I don't.
23   Q.   Okay.  I got real confused on 380.
```

Page 259

```
 1   A.   You know, let me go back to this.  And I guess
 2      it's like when you talk about old buildings and
 3      old structures, for the right amount of money I
 4      guess anything can be done.
 5   Q.   And you haven't investigated what the cost
 6      would be, right?
 7   A.   I haven't even -- I haven't even checked on the
 8      feasibility of doing it.  I'm just telling you
 9      what I've been told in the past that it could
10      not be done.
11   Q.   This is a rehabbed building we're in, for
12      example?
13   A.   That's correct.  And there are people that say
14      you can build this square footage cheaper than
15      you can rehab this building.
16   Q.   Depending on the state you build it to?
17   A.   That's correct.  You can rehab anything for the
18      right amount of money.  I do not think
19      rehabbing that pool is feasible or
20      cost-effective.  That's my opinion.
21   Q.   Or meets the needs of Opelika?
22   A.   That's right.  That pool doesn't even have a
23      children's area; it's just got a concrete ramp
```

Page 260

```
 1      that sets up inside the pool with railings
 2      around it.  It doesn't even have a separate
 3      area for toddlers and babies, which you would
 4      never do that now.
 5   Q.   Do you consider it safe?
 6   A.   No.  You could never do that now.
 7   Q.   So at the end of the day, if Opelika got a new
 8      pool like Barge, Wagner has specked skeletally,
 9      it would be getting a lot more than it had in
10      the old pool?
11   A.   No, it would be getting less.
12   Q.   Because of the absence of spring water?
13   A.   That's correct.
14   Q.   Okay.
15   A.   And when you asked me the questions about
16      rehabbing the pool, I would have loved to many
17      years ago -- and I know you didn't ask me all
18      of this, but this is my dime.  I went to Disney
19      World one year and went over to River Country.
20      And they had this pool with this great
21      waterfall that you slid down, a big rock wall.
22      And I'm thinking to myself, man, if we had that
23      pool at Spring Villa being fed by that 67
```

Page 261

```
 1      degree spring water, crystal clear water,
 2      wouldn't that be wonderful?  And that's when I
 3      talked to a couple of pool companies, at the
 4      time that they were doing the renovation on the
 5      Opelika and Covington pool, about that, and
 6      they said it was totally unfeasible to do
 7      anything but start all over.  But I have not
 8      talked to those companies, those same companies
 9      or any new companies, since the year 2000, no.
10   Q.   I'm confused on 380.  Do you have 380 handy?
11   A.   Yes.
12   Q.   Help me understand.  What is the top column?
13   A.   The years 1999, 2000, 2001, 2002, 2003.
14   Q.   But right under it is says "Opelika Pool," what
15      do those numbers represent?
16   A.   That is the money we took in at -- that was the
17      revenue from the Opelika Pool those years?
18         MR. GUNTER:  Off the record.
19         (Off-the-record discussion.)
20   Q.   Okay.  I've got you.  And down on Spring Villa
21      you have two breakouts, and one of those is --
22      can you break the pool revenue out separately
23      at Spring Villa?
```

35 (Pages 258 to 261)

5/20/2004

Bill Harrelson

Page 262

1   A.   You know, that's what I told him a while ago, I
2        can tomorrow. I cannot, because that all goes
3        in the same thing, and Mrs. Ellen Strozier, my
4        administrative assistant, did this, and I
5        really don't know where she drew these figures
6        from -- I mean, I know where she got them from,
7        this was our revenue, but I cannot break the
8        pool out of that, no.
9             MR. VERCELLI: Let's go off the record.
10            (Off-the-record discussion.)
11  Q.   Do you have a file labeled Spring Villa?
12  A.   A file? I imagine we've got several.
13  Q.   Parks does?
14  A.   I don't know what you want. I mean, I don't
15       know.
16  Q.   Do you have files labeled Spring Villa?
17  A.   In the filing cabinet in the office, do we have
18       -- yeah, I imagine we've got several. I
19       couldn't tell you what's in them.
20  Q.   No, no, no. Don't anticipate my questions here
21       and this will go quicker.
22  A.   Okay.
23  Q.   Have you turned those files over to your

Page 263

1        lawyers for review and production in this case?
2   A.   I don't remember if any of them has been turned
3        over or not; I really don't.
4             MR. PHEARS: Mr. Vercelli, would you
5             see if they have been?
6             MR. VERCELLI: I have no idea if they
7             have or haven't.
8             MR. PHEARS: Okay. Would you check and
9             see if they have been?
10            MR. VERCELLI: I will be happy to.
11            But, again, if you will remind me,
12            I will be happy to.
13            MR. PHEARS: Well, consider yourself
14            reminded.
15            MR. VERCELLI: The difficulty with that
16            is I will forget. So if I don't
17            get it to you in a reasonable
18            time, just remind me and we will
19            be happy to work with you. I
20            think you're entitled to see it;
21            it's just a matter of we've got to
22            remember to get it to you.
23  A.   Well, I don't recall giving any files to any

Page 264

1        lawyers.
2             MR. SPRAYBERRY: It's never been
3             requested, I don't think.
4             MR. PHEARS: Well, you try and I'll
5             try, okay? Fair enough?
6             MR. VERCELLI: We can do that.
7   BY MR. PHEARS:
8   Q.   Am I correct that the cost of operating Spring
9        Villa pool exceeded the receipts?
10  A.   That would be hard to say. Spring Villa pool
11       probably came closer to breaking even than any
12       of the other pools, simply because not many
13       chemicals, a good number of swimmers. If you
14       look at the Covington pool, you will see how
15       few swimmers there are over there.
16  Q.   Not very many, are there?
17  A.   No, there's not.
18  A.   Why is that?
19  A.   Well, I can't explain that.
20  Q.   Do you have any idea?
21  A.   Personal choice. It's open, it's open to the
22       public, but we can't tell people where to swim.
23  Q.   Well, can you think of any reason that nobody

Page 265

1        -- not many people go to it?
2   A.   None that I wish to discuss.
3   Q.   Do you have an opinion?
4   A.   No, sir.
5   Q.   Do you have an opinion you don't want to
6        discuss?
7   A.   I'm not going to give you an opinion at all
8        about that. That doesn't have anything to do
9        with the water at Spring Villa.
10  Q.   Okay. On Defendant's 381, the concession cost
11       at -- well, help me out. Is there anywhere in
12       here that you -- in 381 at the bottom you've
13       got "Total Opelika Pools, 54,000 dollars;" do
14       you see that?
15  A.   That's correct. That's personnel.
16  Q.   That's personnel only?
17  A.   Correct.
18  Q.   And that's two pools?
19  A.   That's correct.
20  Q.   So those pools are costing 27,000 dollars per
21       pool --
22  A.   No, that's not correct.
23  Q.   -- just in personnel?

36 (Pages 262 to 265)

Page 266

1   A.   The Opelika Pool -- you'll see there's a
2      breakdown between Opelika and Covington. If
3      you look at that Opelika pool, it costs more.
4   Q.   Okay. Now, do you have any idea whether Spring
5      Villa pool generated 20,000 dollars per season?
6   A.   No, it never generated that much.
7   Q.   Did it take less personnel to operate it?
8   A.   It took less personnel in that there were not
9      regular swimming lessons out there, although we
10     did have some lessons. But as far as
11     lifeguards, no, it didn't; it took the same
12     number.
13   Q.   Do you intend to make any calculation for
14     purposes of your testimony at trial as to
15     whether Spring Villa made or lost money?
16   A.   (Witness shakes head in the negative.)
17   Q.   That's not your point, is it?
18   A.   No, sir, it's not my point at all. I've never
19     heard of a pool that makes money. If it did,
20     we would build ten of them here.
21   Q.   It would be like golf courses then, wouldn't
22     they?
23   A.   We would build that 10,000 footer you're

Page 267

1      talking about if it made money.
2   Q.   Okay. Now, I think you also said earlier that
3      you could not break out the cost of operating
4      the Spring Villa pool separately for the years
5      it was operational?
6   A.   No, sir, I can't.
7   Q.   Okay.
8   A.   Now, you can take those sheets for '99 and 2000
9      and you can -- and that will tell you how much
10     money was turned in for public swimming.
11   Q.   Right. But I'm asking you now if you can break
12     out the cost of operating the Spring Villa pool
13     separately?
14   A.   I could go back to some of my old budgets where
15     Spring Villa was included in what you have
16     there and tell what it was costing at that time
17     to operate it personnel-wise.
18   Q.   Right. But its total overall cost, I think you
19     said earlier you couldn't do that?
20   A.   The only thing I could tell you that was
21     separate during those years would be the
22     personnel at Spring Villa would be separate.
23   Q.   Okay.

Page 268

1   A.   The lifeguards and the workers. That's the
2      only thing that would be separate.
3   Q.   Have you done any calculation of how much more
4      it would cost to operate a new 7,000 square
5      foot pool there versus the old Opelika pool?
6   A.   I think it would probably cost about the same
7      as the Opelika pool.
8   Q.   I'm sorry, that was a bad question. Have you
9      done any comparsion between the new 7,000
10     square foot pool that you would build at Spring
11     Villa and the old Spring Villa pool as far as
12     operating costs?
13   A.   The only operating costs would be chemicals.
14   Q.   And personnel?
15   A.   Personnel would be the same.
16   Q.   Okay. So the chemical costs would be
17     different?
18   A.   Yes.
19   Q.   And I remember you testified, however, that
20     your chemical cost at Opelika was going up
21     because of a change in the state regs?
22   A.   Yes -- no, not regulations. We went to a
23     different type chlorine because it was safer.

Page 269

1   Q.   I think you also testified that you were going
2      to have to go to a 3.0 residual instead of a
3      1.5 residual?
4   A.   Well, that's sort of been a new standard;
5      that's correct. They used to say 1.6 to 2.0;
6      now they've raised it up to 3.0. I don't know
7      that that's a law. And I've been here 32 years
8      and I have never had anybody come and inspect
9      any pool in Opelika, but we try to go by the
10     standards. And certainly we don't want
11     children with ear infections and staph
12     infections. Yes, that's been a new technology
13     that you do raise that.
14   Q.   Did you ever calculate how much more that was
15     going to cost in chemical treatment?
16   A.   Well, I think it would be a third more. You've
17     got the same amount of water, you go to a 2.0,
18     you increase it 30 percent to go to a 3.0, I
19     would think.
20   Q.   Your earlier testimony was you were going from
21     a 1.5 to a 3.0 and --
22   A.   That's about right.
23   Q.   -- in that case it would be a doubling?

Ricky L. Tyler              Montgomery Reporting Service
(334) 262-3331                (877) 834-6048

Page 270

1  A.  I don't know why I said 1.5. That's not
2  correct. It actually used to be 1.6 to 2.0. I
3  might have said 1.5, but it actually was 1.6 to
4  2.0 was the school of thumb -- I mean, the rule
5  of thumb when I first started in this business.
6  And now it is 3.0.
7  Q.  So if it went from 1.5 to three, it would be a
8  doubling of the cost; if it went from two to
9  three, it would be 50 percent more cost?
10  A.  I guess so, yeah.
11  Q.  Three being 1.5 times two?
12  A.  Well, I think one reason that you did that is
13  because the chlorine now is much more
14  environmental-friendly; it doesn't burn your
15  eyes and change the color of your hair the way
16  the old gas used to. So I think that's one
17  reason that the standards have been raised,
18  because you can raise it to that without having
19  the bad effects.
20  Q.  You testified previously that a major problem
21  with the old pool was that it leaked?
22  A.  The Spring Villa pool?
23  Q.  Right.

Page 271

1  A.  It's always leaked, yeah.
2  Q.  I mean, was the concrete cracked? Concrete is
3  naturally porous, isn't it?
4  A.  Well, of course, the pool was built when you, I
5  guess, what I would assume -- I wasn't around
6  in 1933, but I would assume they poured the
7  floor, then they poured the walls, and around
8  the edges we would always fill in with tar or
9  silicone or whatever. Of course, the pool
10  leaking was not really a factor, because we
11  were maintaining a level of incoming and
12  outgoing anyway. So it really didn't make any
13  difference.
14  Q.  Did the old pool have any type of interior
15  finish on it like gunite or something --
16  plaster or anything?
17  A.  Paint.
18  Q.  Paint?
19  A.  It was painted every year.
20  Q.  And then did you seal it or caulk it every
21  year?
22  A.  Sealed it, caulked it, and then painted it.
23  Q.  To slow down the leaks?

Page 272

1  A.  That's right.
2  Q.  Did you ever investigate whether putting an
3  interior finish on it would stop the leaking?
4  A.  Like I say, back when the two pools were being
5  renovated, and I don't know what the year was,
6  Bobby Freeman was in office, if that will tell
7  you anything, when they were renovated by
8  Paddock Pools; I had Paddock Pools out of South
9  Carolina go out there and look at it, and they
10  told me it was unfeasible and not
11  cost-efficient to do anything to it. That's
12  the only time I've ever had a contractor go
13  look at it.
14  Q.  Now, have you read any of the expert reports
15  about what happened to the water at Spring
16  Villa?
17  A.  Expert reports from who?
18  Q.  From your experts?
19  A.  No, sir.
20  Q.  The Krebs report, for example, have you read
21  that?
22  A.  No, sir.
23  Q.  Do you have an understanding as to what -- just

Page 273

1  a general understanding as to how the water
2  allegedly got from Spring Villa to the quarry?
3  A.  Do I have an understanding?
4  Q.  Right.
5  A.  The only thing I can tell you is cause and
6  effect.
7  Q.  Is there some -- is there some underground
8  formation there through which the water is
9  flowing?
10  A.  That's what's always been told to me and that's
11  what the general knowledge of this entire
12  county would tell you. I have not swam through
13  that opening, no.
14  Q.  Nor me. But that general knowledge is that
15  there is some type of connection, like a
16  natural pipe, between the quarry and the
17  spring?
18  A.  I've been told about what you're talking about,
19  and I can't remember specifically if I've read
20  the Krebs report, that there is an underground
21  aquifer that connects those two.
22  Q.  Like some type of a natural conduit?
23  A.  Natural underground river, which is what a

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048

Page 274

1    spring is.
2  Q.   Okay.
3  A.   They call them underground aquifers, I think is
4    the word.
5  Q.   And was that your belief as to how the
6    two-by-four got there?
7  A.   Yes, sir. I don't know of any other way it
8    could have gotten there, unless somebody took
9    those doors down and put it under there.
10 Q.   It had to get there through some type of
11   conduit big enough to carry a two-by-four?
12        MR. VERCELLI: Objection.
13 A.   That's correct.
14 Q.   That's your belief?
15 A.   That's my belief.
16 Q.   If there isn't a conduit between Spring Villa
17   and the quarry big enough to carry a
18   two-by-four, where did the two-by-four come
19   from?
20        MR. VERCELLI: Objection.
21 A.   Someone went out there one night, climbed the
22   fence, took those steel doors down, put the
23   two-by-four under there, and then put the steel

Page 275

1    doors back up.
2  Q.   Couldn't it also be that there is a conduit
3    between Spring Villa and someplace else other
4    than the quarry?
5        MR. VERCELLI: Objection.
6  A.   I have no way of knowing that.
7  Q.   No way of knowing?
8  A.   I have no way of knowing that.
9  Q.   Do you think somebody climbed in there and
10   picked those steel doors up and put a
11   two-by-four in there?
12 A.   No, sir.
13 Q.   You think it floated up, don't you?
14 A.   Yes, sir.
15 Q.   Which would mean it came from somewhere
16   underground?
17 A.   No, I think it originated on top of the ground.
18 Q.   It went underground and then popped up in the
19   spring?
20 A.   That's correct.
21 Q.   A better way to say it would be it flowed
22   underground and then popped up in the spring?
23 A.   Right.

Page 276

1  Q.   How big was this two-by-four?
2  A.   I would say 10 to 12 feet. It had to be cut
3    three times to get it out of there. Which I
4    think that box is maybe three feet, maybe four.
5  Q.   Well, how would you get it in from the outside?
6    If you had to cut it three times to get it out,
7    how would you get it in from the outside?
8  A.   I don't understand what you mean.
9  Q.   Wouldn't you have to cut it into three pieces
10   to get it in?
11 A.   No, sir. The overflow pipes that run from the
12   reservoir down to the box, when the two-by-four
13   got in line with one of those, it went down it
14   in a straight direction.
15 Q.   The question is, could somebody have taken the
16   screens off on the outside and squeezed it in
17   from the outside at that length or would they
18   have to cut it?
19 A.   Oh, no, sir, they wouldn't have had to cut it.
20   That building is probably -- I would guess
21   offhand that building is maybe 20 by 20; I
22   don't know.
23 Q.   But it could have gone down into the inlet

Page 277

1    without being cut?
2  A.   Sure. If it got straight with the inlet.
3  Q.   Okay.
4  A.   But it couldn't come out unless it was pushed
5    back up through the water. So the easiest way
6    to get it out was cut it into three times, cut
7    it into three pieces.
8  Q.   Bear with me one second here. I'm done, but I
9    just want to check -- I'm going to do a Vercelli here
10   and say, just give me a minute.
11        MR. VERCELLI: Have all the time you
12        need.
13        (Off-the-record discussion.)
14 A.   Do y'all want to me to call someone with an
15   explanation of this?
16        MR. PHEARS: Yeah. Why don't we take a
17        break here and let's see if we can
18        get an explanation of that.
19        (Recess.)
20 A.   A very simple explanation. I'm the one that
21   asked her to do it and why I didn't remember
22   it; I don't know. The top column there under
23   Spring Villa, which the first figure is

39 (Pages 274 to 277)

Page 278

1   $10,750.13, '99, 2000, goes across, the top
2   figures are our total receipts for that year,
3   12 months, October to October. The bottom
4   figure is June, July and August.
5  Q.  Oh, I've got you.
6  A.  Which would include pool and other things that
7   happened during the summer. And I'm the one
8   that asked her to do it that way and didn't
9   even remember it.
10      MR. SPRAYBERRY:  Top numbers --
11  A.  The top number is the total for the year, total
12   receipts at Spring Villa for the year, all
13   rentals, pool, everything. The bottom number
14   is June, July and August, which is inclusive of
15   the top figure. So if you look at the summers,
16   you go from 7,500 in '99, which was a full year
17   except we did not operate the first two weeks;
18   then you go 6,713, which actually we stopped
19   pool operation on July the 7th; then you go to
20   2001 with no pool operation and you see where
21   it drops; 2002 it stays pretty much steady;
22   2003 is the addition of the lodge which jumped
23   it back up to 5,000.

Page 279

1  Q.  So just in round numbers it looks like your
2   pool receipts during the summer might have been
3   three or 4,000 dollars?
4  A.  Well, if you add those things up, it will tell
5   you exactly what they are. The '99 and the
6   2000, it will tell you what the pool receipts
7   were.
8  Q.  Well, tell me what you think it is then.
9  A.  Well, I don't know. I would have to look and
10   add them up. You've got them.
11  Q.  Just tell me what you would add.
12  A.  Okay. Look back in this one right here that's
13   '99. On each page --
14  Q.  Oh, I'm sorry. You can't do it off this?
15  A.  No.
16  Q.  Oh, that's fine.
17  A.  On each page there's a figure.
18  Q.  Yeah, I've got that. That's okay.
19  A.  There is a weekly amount that was turned in
20   from that pool.
21  Q.  But looking at -- for example, looking at
22   receipts for 1999, during the summer you've got
23   7,578 dollars there, do you see that?

Page 280

1  A.  Uh-huh. (Positive response.)
2  Q.  And we know that's not all pool receipts,
3   right?
4  A.  That's correct.
5  Q.  Okay. Over in 2001 when you have no pool
6   receipts, you still have 3,200 dollars in
7   receipts, correct?
8  A.  That's correct.
9  Q.  And the next year you have 3,600 dollars in
10   receipts, correct?
11  A.  That's correct.
12  Q.  So it looks like your pool receipts are
13   probably what, three or 4,000 dollars?
14  A.  That's about right.
15  Q.  Okay.
16  A.  I think that in 2001 and 2002 they're going to
17   maintain. Let me tell you something else about
18   the Opelika Pool receipts that I don't think I
19   explained. That's not all public swimming. We
20   have a tremendous swimming lesson program. And
21   when you see a drop in our pool revenue in
22   2000, 2001, 2002 and 2003, it's because that's
23   when summers became eight weeks long. Not only

Page 281

1   do we lose public swimming for almost a month,
2   we always lose two full two-week sessions of
3   swimming lessons. That's the reason you see a
4   tremendous drop there. That is public swimming
5   plus swimming lessons in the Opelika Pool
6   receipts.
7  Q.  I've got Plaintiff's Supplemental Response to
8   Defendant's Interrogatories here, and it says
9   that you prepared something on pool expenses.
10   Have you seen that before?
11  A.  Yes.
12  Q.  Okay.
13  A.  Now, I could not find this. We had a computer
14   crash a while back and evidently this is one of
15   the things that got lost, because everything on
16   my hard drive was gone. The stuff I had on the
17   network was still there.
18      MR. PHEARS:  Do you mind if I stand
19   over here, Chip?
20      MR. VERCELLI:  No.
21      MR. PHEARS:  Unless you have an extra
22   copy.
23      MR. VERCELLI:  I don't have one with

40 (Pages 278 to 281)

Page 282

1      me, no, I'm sorry.
2 Q.  It looks like you did include the cost of a
3     parking lot in there as a part of your
4     estimate, correct?
5 A.  I may have have; I don't know.
6 Q.  How big?
7 A.  Whatever the standards call for on the pools
8     that I looked at.
9 Q.  Paved?
10 A.  Sure. If we put one in here, it was paved, I'm
11     sure.
12 Q.  And you've landscaping in there, right?
13 A.  Sure.
14 Q.  Was the old pool landscaped?
15 A.  Not you could speak of, no. It had grass
16     around it.
17 Q.  And you've got a storage building of some kind
18     in there, right?
19 A.  Correct.
20 Q.  Did the old pool have a storage building?
21 A.  The old pool didn't need a storage building.
22 Q.  And you've got a cover in there, right?
23 A.  Right.

Page 283

1 Q.  Did the old pool have a cover?
2 A.  The old pool didn't need a cover; it was
3     drained in the winter.
4 Q.  It didn't have one, did it?
5 A.  No.
6 Q.  Okay. I've got a letter here from Mr. Gunter
7     in June of 2002 which says that, according to
8     Mr. Harrelson, approximately 300 swimmers use
9     the pool each day. I looked at that list you
10     gave me pretty quickly and it looked to me like
11     less than a hundred used Spring Villa every
12     day?
13 A.  I think the number is 200. If I told him 300,
14     I was mistaken. The number I've always used is
15     200. I think if you look at these letters I
16     wrote to the Mayor it will say 200. This one
17     right here says 200 per day. What I based that
18     on, just like I told Phil Adams, if you look at
19     the numbers in the pool, of course, it
20     fluctuates, but you -- you know, mostly on peak
21     days, and several days, you will have a
22     hundred, and then you've got 35 day campers
23     each day. We had at that time a lot of groups

Page 284

1     that used the pool. It would be real hard to
2     put a number on it. That was my estimate, that
3     about 200 swimmers per day swam in the Spring
4     Villa pool.
5 Q.  Well, take a look at 1999, I can't tell you
6     what exhibit it was marked as; do you have
7     that?
8 A.  Yes. We have had days where we closed it down
9     at 250. Now, I can't tell you if it was during
10     '99 or 2000, I'm telling you in my past we have
11     closed it at 250.
12 Q.  The first full week in there says 463 paid, do
13     you see that?
14 A.  Uh-huh. (Positive response.) 219 passes.
15 Q.  That would be about --
16 A.  Well, actually the 219 is paid, too. That's
17     season passes.
18 Q.  Are they part of the paid?
19 A.  That's correct.
20     MR. VERCELLI: You add the two.
21 A.  That doesn't reflect in this 463 dollars. You
22     could buy a season ticket and swim for the
23     whole year.

Page 285

1 Q.  That's my question, does the 463 include the
2     219?
3 A.  No, sir.
4 Q.  Okay.
5 A.  The money does not. The 463 swimmers --
6 Q.  Does?
7 A.  -- does. And the 219 is people who have paid,
8     but they've paid on a season ticket.
9 Q.  So taking out the people who had a pass, how
10     many people swam that week?
11 A.  You can't take the people out that had a pass.
12     They swam, too.
13 Q.  I understand that. I was trying to get some
14     numbers here.
15     MR. VERCELLI: Why don't you ask him
16     how many people swam that week
17     including passes.
18 Q.  All inclusive, passes and everybody, how many
19     people swam that week?
20 A.  Add 463 and 219.
21 Q.  Okay. This is Georgia math, but that would be
22     less than a hundred a day, wouldn't it?
23 A.  Okay. Now, add 35 plus four instructors, let's

41 (Pages 282 to 285)

Page 286

1    just say 40 a day, for day camp that swam every
2    day. I can't tell you during that week how
3    many other groups swam; I don't know.
4  Q.  Looking at the next page.
5        MR. VERCELLI:  I'm sorry, can I ask him
6           one question?  He was saying about
7           other groups, other groups are not
8           counted in those numbers?
9  A.  No, we didn't count the group swimmers. No, we
10   didn't even count the day camps.
11 Q.  Well, how would you know whether there were or
12   were not group swimmers?
13 A.  Because the day campers swam every day.
14 Q.  Right. But other than that, did the group
15   swimmers not pay?
16 A.  They paid sometimes; sometimes it was inclusive
17   on the deal they had for the facility they
18   rented and this sort of thing. The day
19   campers, no, they didn't pay. The Dare Program
20   that the Police Department runs, no, they
21   didn't pay. The Boy Scouts, no, they didn't
22   pay. The Girl Scouts, no, they didn't pay.
23 Q.  Other than the day campers, how do you know

Page 287

1    whether you've got any group on any given day?
2  A.  We don't.
3  Q.  Okay.
4  A.  Except I just told you we did. But I can't
5    tell you what day and how many.
6  Q.  Okay. Going on to the next page --
7  A.  What does the number of swimmers have to do
8    with where the water went? I don't understand.
9  Q.  You understand this case is also about what you
10   want from Hanson and Oldcastle?
11 A.  Right.
12 Q.  Okay.
13       MR. VERCELLI:  Can we take a short
14          break? This is a client; it won't
15          take but about one minute.
16          (Off-the-record discussion.)
17 Q.  The next page, where it says 365 paid and 160
18   passes?
19 A.  Yeah, I see that, that's on the third page.
20   Well, you see, there's one, two, three days
21   that the pool was not open. More than likely
22   rain would be my guess.
23 Q.  The next page, 164 paid , 109 passes?

Page 288

1  A.  Right. Here again, the pool was open three, I
2    think, days that week -- well, no, I don't
3    know. The report doesn't go through the full
4    week.
5  Q.  The bottom line is I could add these up and
6    figure it out?
7  A.  Sure.
8  Q.  And you're telling me I would have to add the
9    day campers and the counselors?
10 A.  And other groups, but I can't give you a number
11   of those other groups.
12 Q.  But the number should have been, by your
13   testimony, 200 instead of 300?
14 A.  I don't know. I don't recall ever giving
15   anybody 300, because we would not let 300 in.
16   That had to be a misunderstanding, a misprint
17   or something of that nature, because 200 is the
18   number I've always used. That's in this
19   document you've already looked at and that is
20   already in evidence that I wrote in this thing.
21   I said it was one of our area's most popular
22   recreation facilities with an average of over
23   200 swimmers per day. I've never used the

Page 289

1    number 300. I don't know where that came from.
2    I'm not going to say I didn't say it wrong. If
3    I did, I made a mistake. We wouldn't allow 300
4    swimmers in that pool; it would be standing
5    room only. You could walk across without
6    getting wet.
7  Q.  You could walk on water then, couldn't you?
8  A.  Sure could.
9  Q.  What is the date of this -- oh, I'm sorry, I
10   couldn't see it at first. The memo dated July
11   19, 2000 in which you blamed Hanson for the
12   loss of water at the pool, at that point in
13   time what study, if any, did you have as to
14   whose fault it was?
15 A.  As I've said before, the only thing I had was
16   cause and effect. And when I wrote that to the
17   Mayor, I was telling the Mayor what I thought
18   by cause and effect. I had no inclination or
19   no knowledge that we were going to get into a
20   lawsuit or anything else. That was simply my
21   explanation to the Mayor of why we were having
22   to close the facility. Because I can assure
23   you, her phone rang off the hook once we did

Page 290

1    it.
2    Q.    Now, at this -- well, you might, but that's not
3    what the Mayor says.
4            MR. SPRAYBERRY:  269?
5    Q.    Yeah, 269.  This memo literally was done by you
6    a few days after you closed the pool?
7    A.    That's correct.
8    Q.    Okay.
9    A.    And I guess I was frustrated and a little bit
10   angry.
11   Q.    I was going to say, were you angry?
12   A.    Of course, I was.
13   Q.    Is that what the last sentence reflects?
14   A.    Why do you think I do what I do?  It's not for
15   the lucrative salary I make.  My salary and
16   what I've gotten out of 32 years of this is
17   improving the quality of life of people and
18   watching people enjoy themselves in recreation
19   outings and making those wholesome and fun.
20   And, of course, it bothered me when a place
21   that had been that popular was now gone.
22   Q.    Why were you so quick to conclude that it was
23   Hanson's fault?  At this point you --

Page 291

1    A.    I don't quick -- from '98, '99 and 2000, I
2    don't call that quick.  I watched cause and
3    effect.  And I watched the water go down as the
4    pumping went up.
5    Q.    Well, how did you know what the pumping was?
6    A.    Because you can ride down the Lime Kiln Road
7    and watch the volume of water coming under the
8    road, which increased.
9    Q.    At any given point in time, correct?
10   A.    Yes.  Which increased as the years went on.
11   Q.    But do you know whether that's a 24 hour rate
12   or not?
13   A.    I have no idea.
14   Q.    Do you know whether the pumps even run all day?
15   A.    No.
16   Q.    You just assumed they were?
17   A.    I do know that Sun Laboratories did a reading
18   of that.  And I don't know if it was '99 or
19   2000, but they did a reading of 3,000 gallons a
20   day going under Lime Kiln Road -- three million
21   gallons a day going under Lime Kiln Road.
22   Q.    How much did Opelika Materials pump?
23   A.    I have no -- they pumped it all.

Page 292

1    Q.    How much?
2    A.    I don't understand your question.
3    Q.    You know, if you're going to sit there and
4    you're going to tell me, well, I know this and
5    I know that, then I'm going to ask you what you
6    know.  How many million gallons a day did
7    Opelika Materials pump?
8    A.    Whatever went under Lime Kiln Road, they pumped
9    it all.
10   Q.    Well, how much was it?
11   A.    Sun Laboratories said it was three million
12   dollars -- three million gallons a day.
13   Q.    Okay.  Now, how much did Hanson pump?
14   A.    Three million gallons a day.
15   Q.    So they pumped the same as Opelika Materials?
16   A.    Oh, I'm sorry.  I'm sorry.  Start all over.  I
17   do not know how much Opelika Materials pumped.
18   Q.    Okay.
19   A.    But a much, much smaller amount than Hanson
20   visibly, but it was never measured.
21   Q.    Wouldn't you have to know how much was pumped
22   in a 24 hour period, seven days a week, 12
23   months a year, to know how much the total

Page 293

1    pumping was?
2    A.    I do not know what the total pumping of Opelika
3    Materials was.  I do know what I was told by
4    Sun Laboratories that the pumping was under
5    Hanson.  I do not know whether it was '99 or
6    2000, I don't remember, but I'm sure Sun
7    Laboratories has that information.
8    Q.    Was Opelika Materials doing two million and
9    Hanson did three million?
10   A.    I would guess that Opelika Materials was doing
11   probably a third of what Hanson was doing in
12   '99 and 2000.
13   Q.    But that would just be a guess?
14   A.    That's my guess by looking at it.
15   Q.    Are you qualified to guess flows in the
16   millions of gallons per day?
17   A.    I did not guess flows in millions of gallons.
18   I didn't guess any flow.  I told you Sun
19   Laboratories measured the flow.
20   Q.    You're not qualified?
21   A.    No, sir.
22   Q.    Okay.
23   A.    Did not do it.  I think I'm qualified to look

43 (Pages 290 to 293)

Page 294

1  at a stream of water and look at another stream
2  of water and tell you that one is two-thirds
3  larger than the other. Yes, sir, I think I am.
4  Visually I can tell you one is --
5  Q. Two-thirds?
6  A. Yes, sir.
7  Q. Not one-half or three-quarters or one-third,
8  but two-thirds?
9  A. Yes, sir. I think I would know what would be
10  one-half, because obviously the stream would be
11  twice as big. This stream was more than twice
12  as big as what Opelika Materials pumped. So I
13  think it was probably twice.
14  Q. At the time you wrote this memo and blamed
15  Hanson, you didn't have the first professional
16  study of the situation, did you?
17  A. No, sir. No one except Opelika Water Board,
18  the workers at Opelika Water Board.
19  Q. But you had at that point blamed Hanson
20  already?
21  A. Yes, sir. I didn't file a lawsuit, but I
22  blamed them, yes.
23  Q. And you were mad at them?

Page 295

1  A. Sure. I was not mad at Hanson, no, sir, that's
2  wrong. I wasn't mad at Hanson. I wasn't mad
3  at Opelika Materials. I guess if I had to be
4  mad at someone, I'm mad at the State of
5  Alabama. Because ADEM said they did an
6  environmental study. That's not true. They
7  never did any environmental study. They
8  couldn't have. That's who I was mad at.
9  I don't know why we pay all of those
10  learned people in the Alabama Department of
11  Economic -- whatever it is, and they basically
12  are rubber-stamping these applications. I know
13  no investigation was done, because they never
14  came down there. To investigate that creek and
15  that spring and that swamp, you would have had
16  to climb a ten foot chain link fence with
17  barbed wire on top, and they didn't do that,
18  and we never let them in. That's who I was mad
19  with.
20  Q. But the truth is, you're angry at Hanson --
21  A. No, sir.
22  Q. -- for, as you see it at least, running the
23  spring dry?

Page 296

1  A. No, sir. I am mad at our State for allowing it
2  to happen. And especially once they knew it
3  was happening.
4  Q. Let me ask you to look at the last sentence of
5  Defendant's Exhibit 269, please, the one you
6  have there in bold print?
7  A. Uh-huh. (Positive response.) Yes, sir.
8  Q. Why would it have been a mistake to build a
9  smaller pool?
10  A. I don't understand your question.
11  Q. You say, "to build a pool any smaller than the
12  Opelika pool, or to build a pool that does not
13  meet all current standards and regulations
14  would be a mistake"?
15  A. Yes, sir.
16  Q. Now, the first part of that says, "to build a
17  pool any smaller than the Opelika Pool would be
18  a mistake." Why?
19  A. Based on swimmer load.
20  Q. Couldn't you have just as many folks that used
21  to be in the Spring Villa pool in a pool the
22  same size as Spring Villa?
23  A. That would not be advisable.

Page 297

1  Q. Were you overloading the Spring Villa pool?
2  A. Yes, sir. I've told you that.
3  Q. At a hundred, 150 a day?
4  A. Yes, sir. That's a lot of swimmers in a pool.
5  Q. Okay.
6  A. I think you could draw a correlation to that.
7  In 1930 you bought a Model A that had a 42
8  horse engine, are you going to buy one now?
9  Q. Well, but I think what you want us to give you
10  is a Duesenberg when you owned a Model A; is
11  that right?
12  A. That's correct.
13  Q. Okay.
14  A. And I've already answered the reasons for that.
15  Q. I understand. We're through.
16      MR. DENSON: Let me ask you something.
17
18      CROSS-EXAMINATION
19  BY MR. DENSON:
20  Q. I represent the Gilmer and Young families that
21  own the land.
22  A. Yes, sir.
23  Q. Don't operate the quarry.

44 (Pages 294 to 297)

Page 298

1   A.   Right.
2   Q.   You mentioned a Steve Young, my notes say, on
3        two occasions, and I want to know who he is,
4        but you mentioned, I think, that he pointed out
5        that the quarry discharge was taking water from
6        Spring Villa, is what I wrote, by going down
7        and looking at Highway 166.  Who is that?
8   A.   Is that Lime Kiln Road?  166?
9   Q.   Yes.
10  A.   Who is Steve?  Steve worked for the Water Board
11       years and years; he's now retired.  He was a
12       Water Board worker.
13  Q.   And where does he live now?
14  A.   In Opelika.  He lives out on -- I don't
15       remember.  What's the road in Opelika that ends
16       and starts back again?  North Gate?  He lives
17       out on the Saugahatchee end of North Gate; I
18       think he still lives out there.
19           MR. ADAMS:  Yeah, that's North Gate.
20  A.   I think he still lives out there.
21  Q.   And he was an employee of the Utility Board or
22       the Water Board at that time?
23  A.   Yes, sir.  Yes, sir.  For many, many years.

Page 299

1   Q.   And then did he dive in the cave?
2   A.   He told me he did.
3   Q.   Oh, he told you he did?
4   A.   Oh, do you mean with a scuba tank on?
5   Q.   Well, I just wrote down "Steve Young dove down
6        there after July 7 into the cave"?
7   A.   No, sir.
8   Q.   Not in the cave, but in the hole underneath the
9        spring?
10  A.   No, sir, I didn't say that.  I said, to my
11       knowledge nobody went down there after that
12       point.  That spring Steve went down in there
13       and helped us put that pipe down in there.
14       Now, how deep he went down in there, I couldn't
15       say.
16  Q.   What did he go in?  What was the cavity he went
17       in?  Where was it located?
18  A.   Under the spring house.
19  Q.   Okay.
20  A.   The opening.  That spring -- that spring when
21       we went out there trying to get some water that
22       spring when we put the foot valve through the
23       floor, Steve took his pants off and swam in his

Page 300

1        underwear, if you want to know the truth about
2        it.  He and Bill Barry, I think, took those
3        doors down, and Steve went in there, and went
4        down in there deep enough to be sure we could
5        put the pipe down in there the depth we were
6        putting it.  And we put it down in there.
7   Q.   Was that after July 7, 2000?
8   A.   No, sir, that was in the spring of 2000.
9   Q.   The spring of 2000?
10  A.   We were trying to get started.  It was cold; I
11       couldn't believe he got in it.
12  Q.   Okay.  Do you know any of the Gilmer family
13       that owns -- do you know Mr. Charles Gilmer,
14       Senior?
15  A.   I know who Mr. Charles Gilmer is and I know
16       Matt and Chuck.
17  Q.   Did you ever talk with any of them about the
18       quarry and how it operates and whether or not
19       it caused any loss of water?
20  A.   No, sir, I've never talked to any of them.  I
21       haven't even seen Matt and Chuck in a number of
22       years.
23  Q.   Have you ever heard anything that they've said

Page 301

1        about it?
2   A.   I've heard through Spring Villa Grocery talk
3        that Charles Gilmer has said that when he was a
4        little boy you could throw a stump in the
5        reservoir and it would come up in the creek.
6        Of course, you're talking about before the
7        spring house was put there.  And, of course,
8        that same old wives' tale was told by Bubba
9        Johnson, that a boat came up in Uchee Creek.
10       But, no, sir, I wasn't around then.
11  Q.   All right.  That a stump could be thrown in the
12       quarry and come up in the spring?
13  A.   Yes, sir.  Now, don't get this wrong; Charles
14       Gilmer didn't tell me that.  I was told Charles
15       Gilmer said that.
16  Q.   Okay.  And who told you that he said that?
17  A.   I do not know; scuttlebutt.
18  Q.   That was Spring Villa Grocery talk?
19  A.   Talk, yeah.  This one said this and this one
20       said that, you know, he said, she said.
21  Q.   And the story about the boat, is that
22       supposedly attributed to something he said?
23  A.   No, sir, that came from Bubba Johnson, who used

45 (Pages 298 to 301)

Page 302

1     to be head of Public Works. He said his father
2     always told that story.
3 Q.  Who was his father?
4 A.  I do not know. Mr. Johnson. They used to run
5     Johnson's Jewelers in downtown Opelika. I
6     don't know his name.
7        (Off-the-record discussion.)
8        MR. DENSON: That's all I have.
9
10        REDIRECT EXAMINATION
11 BY MR. ADAMS:
12 Q.  Let me just ask this; Bill, have y'all talked
13     about Defendant's Exhibit 272?
14 A.  That's what you were talking about. You were
15     talking about the size of the lake. There was
16     a sketch done by the County Engineers and Tim
17     Gore drew that. He drew it as a picture that
18     Mr. Calhoun wanted to go to civic clubs and
19     talk about. Tim took the sketch that the
20     county had done and drew -- you know, Tim was
21     artistic, and Tim Gore drew that picture of
22     where the lake would be if it were rebuilt.
23 Q.  Now, this is not the lake that you were talking

Page 303

1     about. The spring house is down here and the
2     lake you were talking about was on the other
3     side of the spring?
4 A.  No, that is the lake.
5 Q.  This is the lake that you were talking about?
6 A.  Yes. Here is your spring house. The overflow
7     from the spring ran right on down through here
8     and would form the lake.
9 Q.  Oh, okay. When I was --
10 A.  Now it comes on down here and runs into the
11     creek.
12 Q.  When I was looking at it and I was thinking
13     about it --
14 A.  Just like this. Just like this is the way you
15     would orient it.
16 Q.  Okay.
17 A.  Just like that.
18 Q.  I'm with you.
19        MR. VERCELLI: He's off eight degrees.
20 A.  Yeah, it's the same way. There's your spring
21     house.
22        MR. ADAMS: Well, I didn't know we had
23        Ferdinand Magellan here was going

Page 304

1     to --
2        MR. VERCELLI: He was only off by about
3        eight or ten degrees.
4        MR. ADAMS: Is that right?
5 A.  And I'm not very artistic.
6        MR. ADAMS: Leeward or starboard?
7        MR. VERCELLI: Starboard.
8 A.  And here again, this is nothing official. Tim
9     did this drawing from a sketch because
10     Mr. Calhoun was talking at a civic club. And I
11     just happened to have this and somebody made a
12     copy of it, I don't know who.
13 Q.  What was this creek right here that's shown on
14     here?
15 A.  That's a creek that goes under the road up
16     there, but the creek is dry now. And the dikes
17     were right along here to keep the creek water
18     out of the lake water.
19 Q.  All right. And so this creek goes all the way
20     around?
21 A.  I guess it would or did or whatever. I guess
22     that's your spillway.
23 Q.  And then there was another creek that came on

Page 305

1     down?
2 A.  This is the creek right here that the spring
3     water now runs into -- that did run into.
4        MR. VERCELLI: You said the creek runs
5        all the way -- I don't think
6        that's a creek. I think that's a
7        dike.
8 A.  That's a dike.
9 Q.  Oh, this is a dike here?
10 A.  This is the creek. It comes under the road and
11     comes on down through here and comes on back in
12     here. And that trail that we do every year
13     comes on down through here. And sort of on
14     back over here it runs right by that creek,
15     which the creek bed is totally dry now and has
16     been for several years. But this is the dike
17     that keeps all of this, you know.
18 Q.  And so this cavern that you were telling me
19     about would be somewhere between the spring
20     house and where this lake would be?
21 A.  About right in there (Indicating).
22 Q.  Okay.
23 A.  I had forgotten about that.

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048



Page 306

1  Q.  Now, when was this done?
2  A.  Oh, gosh, before Mr. Calhoun retired.  I would
3      say '79, '80.
4  Q.  This drawing?
5  A.  Uh-huh.  (Positive response.)  And it was drawn
6      from what the county had done, but Tim just
7      drew it to make it a picture.  It was big.  It
8      was on a piece of poster board.  Now, what
9      happened to the county maps, I don't know.
10         MR. VERCELLI:  What exhibit number was
11         that, I'm sorry?
12         MR. ADAMS:  272.
13 A.  Tim drew that and made it the same size -- as
14     you see the scale on it, made it the same size
15     as the County Engineer's, and all of that sort
16     of thing, and it was just made into a picture.
17     What happened to the county's map, I don't
18     know.
19 Q.  Okay.
20 A.  I may still have that picture; I don't know.
21         MR. VERCELLI:  See if you can find the
22         original.  If you can find the
23         original, let me know.

Page 307

1         RECROSS-EXAMINATION
2  BY MR. DENSON:
3  Q.  Bill, is that the same lake that was the 1880s
4      and it was five acres and now, before the water
5      went away, it was about a two-acre lake?
6  A.  Yes, sir.  Of course, it was much, much deeper.
7      The two acres was basically a swamp.  Yes, sir,
8      that was the five-acre lake that, according to
9      the County Engineers, would have put it right
10     back where it was based on the dikes, that some
11     of them still exist; that was their conception
12     of exactly what it was.  And Mr. Calhoun's
13     vendetta was to build that lake back.
14         MR. PHEARS:  To where it was in the
15         1880s?
16 A.  That's correct.  Have a totally spring-fed
17     lake.  He had visions of sand and glass bottom
18     boats and picnic shelters and all of that sort
19     of thing.  And he wanted the county to do it,
20     but it just never got done.
21         MR. ADAMS:  I don't have any other
22         questions.  Thank you.  I'm going
23         to offer of all these exhibits.

Page 308

1  FURTHER DEPONETH SAITH NOT
2         *   *   *   *
3
4
5  DEPONENT:
6
7  Subscribed and sworn to before me this
8  day of           , 2004.
9
10
11
              NOTARY PUBLIC
12
13 My Commission expires:
14
15            *  *  *  *
16
17      REPORTER'S CERTIFICATE
18
19 STATE OF ALABAMA
20 COUNTY OF MONTGOMERY
21     I, Ricky L. Tyler, Certified Shorthand
22 Reporter and Notary Public in and for the State of
23 Alabama at Large, do hereby certify that on Thursday,

Page 309

1  May 20th, 2004, pursuant to notice and stipulation on
2  behalf of the Defendants, I reported the continuation
3  of the deposition of BILL HARRELSON, who was first
4  duly sworn by me to speak the truth, the whole truth,
5  and nothing but the truth, in the matter of MIKE
6  DAVIS, et al., Plaintiff, vs. HANSON AGGREGATES
7  SOUTHEAST, INC., et al., Defendants, Civil Action
8  Number CV-2002-85, now pending in the Circuit Court
9  for Lee County, Alabama, that the foregoing 184
10 computer-printed pages contain a true and accurate
11 transcription of the examination of said witness by
12 counsel for the parties set out herein; that the
13 reading and signing of said deposition was not waived
14 by witness and counsel for the parties.
15     I further certify that I am neither of
16 kin nor of counsel to the parties to said cause, nor
17 in any manner interested in the results thereof.
18     This 26th day of May, 2004.
19
20
21
              Ricky L. Tyler
22            Certified Shorthand Reporter
              and Notary Public
23            State of Alabama at Large
24

Ricky L. Tyler                     Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NUMBER: CV-02-85 |
| | * | |
| | * | |
| HANSON AGGREGATES SOUTHEAST, | * | |
| INC., et al. | * | |
| Defendants. | * | |

## CITY OF OPELIKA AND OPELIKA UTILITIES BOARD'S ANSWER TO DEFENDANT HANSON'S INTERROGATORIES AND REQUEST FOR PRODUCTION

1.    Please see list previously furnished.

2.    Hanson is dewatering the area around the quarry. This is causing a cone of depression, sinkholes and artificial lowering of the water table and related problems. Spring Villa and Little Uchee Creek have both gone dry and we believe that these problems will only get worse with time.

3.    See response to #2. Also, by lowering the water table Hanson has reversed the flow at the spring. Our hydrologist indicates that if the quarry is filled with the overburden that has been removed, the flow to the Spring would be restored.

4.    See responses to #2 and to #3. There has been a large sinkhole on Lee Road 166, which has re-opened. We understand there are others on the Gilmer and Young property. There are now numerous sinkholes in and around Spring Villa and Little Uchee Creek. Some have formed as recently as December, 2002. We believe they will increase in number and in location.

5.    Neither the City of Opelika nor the Utilities Board has information on the pipeline.

6.    We have not seen or felt a blast at our offices. Employees may have heard or felt them at Spring Villa Park.

7.    We wrote the state and Hanson because of our concerns for our water supply. Hanson has failed to supply us with information or to cooperate with us. With this knowledge, they have continued to blast, get bigger and dig deeper. They promised to provide their study to the City if the City would provide the Krebs Report to them. The City provided the Krebs Report, but Hanson breached its promised by failing to provide us with their study.

FILED

COPY

MAR 0 3 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

8.    See response to #7.  They have taken no steps that we are aware of to stop, prevent or correct the damage.

9.    See responses to #7 and #8.

10.    Mayor Patton, City of Opelika
Dan Hillyer, Opelika Water Board
Bill Harrelson, Opelika Parks & Recreation
Darren Brown (who has sinkholes)
Robert Smith (who has dry ponds)
Our Experts and other Water Board Employees who helped pump water down the large sinkhole on Lee Road 166 including Alan Lee and Woody Hicks, who prepared the Krebs reports

11.    We are more concerned about an injunction because we have a large number of families who depend on us for water and/or recreation.   The City has made a previous demand and a break down of their damages.  If the damage caused by Hanson is permanent, even though the nuisance is abatable, we believe that the damages would be based on the permanent devaluation of the Water Board and City of Opelika property. The rental value would be $12,000 per month for the City and $3,000 per month for the Utility Board, not counting remediation.  The $15,000.00 per month would have begun, at a minimum, two (2) years prior to filing suit up to trial.

12.    See previous answers.

13.    Hanson is dewatering a large area, which is partially in limestone. We believe that it will get worse.  This is based on the geology in the area, the topography, water flow on the surface, the dewatering of the Spring Villa area, the depth of the quarry, the amount of quarry discharge and the huge amount of overburden removed.

14.    See response to #13.  We understand that the engineers, geologists and hydrologist believe it to be the same marble formation.  The records and local witnesses indicate the Spring has never gone dry until Hanson began to pump a large amount of discharge from the quarry.  Sinkholes have formed and re-appeared around the quarry. The last several years, we have not had a severe drought and the Spring has never gone dry in other droughts.

15.    See responses to #13 and #14.  We know the Spring is dry, Little Uchee is dry and the situation is getting worse.

16.    See responses to #13 and #14.  We believe the water problems could be corrected if the overburden was replaced into the quarry.  Any hole or depression would fill with water and the water table would return to its previous level.  However, it the quarry continues and/ or gets deeper the damage may be irreversible.

17.    See responses to #13, #14. #15 and #16.  We do have recreational losses.

We have been unable to fill the Spring Villa pool and we do not have the Spring as an emergency, back-up water source. Major environmental damage is being caused and will only get worse if the quarry continues.

18. See responses to #14, #15, #16 and #17.

19. See responses to #13, #14, #15, #16, #17 and #18. We are unsure of the Parker's claim. The flow at the spring has been reversed and no longer surcharges.

20. We believe it is both. As to us, we believe it is public.

21. That would be up to the homeowners or citizens to determine.

22. See responses to #2, #5, #13, #14, #15, #16, #17, #18, and #19.

23. We are not required to have a special damage as we are a public water system with thousands of customers. However, we do have special damages due to the dewatering and sinkhole problem.

24. We believe it abatable with no permanent damage known at this time; however, major repairs would be needed around Little Uchee and the Spring.

25. See response to #24. We believe it abatable.

26. The blasting, the pumping of water, the lowering of the water table and the creation of sinkholes.

27. By continuing to get bigger and deeper thus causing more problems. This is being done after we complained, Opelika complained and numerous homeowner's complained.

28. No, not as to us.

29. If Hanson knew of problems and continued them, then they are responsible.

30. Yes.

31. If permanently damaged, yes. If the damages are abatable, no. Remediation and repair may be required from Hanson.

32. Yes.

33. Yes.

34. We believe that Well #4 will be negatively impacted in the future much more than now. Beauregard has another well in Creek Nations that might be impacted. Currently, the quarry is dewatering a large area which does impact us, Little Uchee Creek and Spring Villa. Also, see above responses.

35. See response to #23.

36.      We do not believe it is mandatory. We do not believe it applies because we have thousands of people depending on us for water while Hanson mines for corporate profit.

37.      Under a public trust theory.


1.      Hanson should have copies of all previous communications, including the Krebs Report.

2.      This Plaintiff objects as we do not understand this question; however, we have not communicated, to our knowledge, with any of the home owners or with Beauregard Water Authority. We have communicated between ourselves, but is a work product generated because of this litigation and we object to any such production.

3.      You have our Krebs Report. We will be producing reports from the meteorologist, hydrologist and the other experts that directly relate to our claims and some or all of your defenses.

4.      See response to #3. In addition, we have a video and photographs made of the sinkholes, the dewatered Spring and the dewatered Little Uchee Creek.

5.      See response to #3.


**CITY OF OPELIKA**

By: _____

Its: ___MAYOR___


**OPELIKA UTILITIES BOARD**

By: _____

Its: ___Chairman___

**OF COUNSEL:**

**CHARLES VERCELLI, JR.,** (VER003)
*Co-Council for Property Owners*
300-B Water Street, Suite 214
Montgomery, AL 36104
(334)265-6529

**JAMES B. SPRAYBERRY** (SPR008)
*Co-Council for Property Owners*
Post Office Drawer 2429
Auburn, Alabama 36831-2429
(334) 821-7100

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the following, via hand-delivery, on this the _29_ day of February, 2003.

James A. Byram, Jr., Esq.
Dorman Walker, Esq.
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

Guy Gunter, Esq.
Melton, Gunter & Melton
P.O. Box 409
Opelika, Alabama 36801

John Denson, Esq.
Samford, Denson, Horsley, Pettey
& Bridges
P.O. Box 2345
Opelika, Alabama 36803-2345

James B. Sprayberry

**STATE OF ALABAMA**    *
                               *

**COUNTY OF LEE**        *

    I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that _Barbara Patton_, _____ Mayor _____ of City of Opelika, whose names is signed to the foregoing instrument, and who is known to me, acknowledged before me on this date that being informed of the contents of said instrument executed the same voluntarily on the day the same bears date.

    **GIVEN** under my hand and official seal this the _28_ day of February, 2003.

        (SEAL)                                       _____
                                                NOTARY PUBLIC

My Commission Expires:

_9|18|04_____

**STATE OF ALABAMA**    *
                               *

**COUNTY OF LEE**        *

    I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that _Homer Williams_, _Chairman_ of Opelika Utilities Board, whose names is signed to the foregoing instrument, and who is known to me, acknowledged before me on this date that being informed of the contents of said instrument executed the same voluntarily on the day the same bears date.

    **GIVEN** under my hand and official seal this the _28_ day of February, 2003.

        (SEAL)                                        _____
                                                NOTARY PUBLIC

My Commission Expires:

_9|18|04_____

2603

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| MIKE DAVIS, et al., | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **CASE NUMBER: CV-02-85** |
| | * | |
| HANSON AGGREGATES SOUTHEAST, | * | |
| INC., et al. | * | |
| **Defendants.** | * | |

## ANSWERS TO OLDCASTLES' FIRST SET OF INTERROGATORIES BY RANDALL, WANDA, and AMBUR PARKER

1.  At the present time, Plaintiffs have retained and expect to testify at trial the same experts previously disclosed in response to Hanson's Interrogatories and Requests for Production. In further answer to this Interrogatory, Plaintiffs identify the following persons, whose depositions have previously been taken by Hanson and whose reports and supplemental reports have previously been provided to Hanson: Tom Aley, David Hicks, Dr. Tom Cooper, Roger Getz, Dr. Warren Styles, Dr. Katherine Nichols, and/or Dr. James Saunders. Summaries of the opinions, qualifications, and bases for opinions of these experts have been previously produced in Plaintiffs' responses to Hanson's Interrogatories and Requests for Production, which are incorporated here by reference. These experts' opinions are expected to be the same—as appropriate—with respect to Defendant Oldcastle. However, if Oldcastle ever meaningfully responds to Plaintiffs' Interrogatories and Requests for Production, then Plaintiffs expect to provide such information to each of the above experts. At that time, if those experts deem it appropriate based on new information, the experts will supplement their opinions. Plaintiffs further reserve the right to supplement the opinions of these experts based upon ongoing discovery.

    Plaintiffs have not retained, but expect to call as expert witnesses, those GSA and ADEM employees identified on their Preliminary Witness List for the January 26, 2004, trial, which is adopted here by reference.

2.  (a)  Plaintiffs have observed no significant change in the general process of the operation of the quarry after Oldcastle assumed the operation. However, we and the vast majority of the other plaintiffs have observed significant increases in dust and noise levels. Therefore, all the Plaintiffs' prior interrogatory responses, responses to requests for production, and answers to deposition questions are equally applicable to the problems caused by Oldcastle. In this regard, Plaintiffs have observed that Oldcastle continues to pump discharge water in large quantities believed to equal or exceed the amount pumped by Hanson; Oldcastle continues to generate large amounts of dust on the cleared areas and by the



operation of their mobile equipment and their stationary equipment; Oldcastle continues to create loud and irritating noise from early in the morning (earlier, in fact, than Hanson) and throughout the day and into the night (often later than Hanson); Oldcastle appears to be crushing as much or more rock, and has caused as much and more noise and dust pollution; Oldcastle's pumping of groundwater from the underground aquifers has caused additional sinkholes to form, has caused or will cause additional collapses of land belonging to many of the Plaintiffs, and continues to endanger the motoring public by virtue of the collapses in, on, and under roadways in the area.

(b)    See every person whose deposition has already been taken in this case, as well as every person who was identified on Plaintiffs' Preliminary Witness List for the January 26, 2004, trial. In general, the residents in the area would have such knowledge, Plaintiffs' and Hanson's experts would have knowledge or information, the Plaintiffs and their family members would have such knowledge and the employees of Hanson and Oldcastle would have such knowledge.

3.    (a)    Please see the response to Interrogatory number 2(a) above, which is incorporated here by reference. Oldcastle knew or should have known that a huge area of land was being dewatered by the Quarry pumping. Oldcastle had actual knowledge that litigation was pending and that sinkholes had been caused by the pumping even before Oldcastle purchased the Quarry. Oldcastle knew or should have known that the City of Opelika met with Hanson and commissioned Krebs Engineering to do a study to determine why the spring at Spring Villa had dried up, and Oldcastle also should have known that two (2) of the three (3) dyes injected into the ground by Plaintiff's experts had been detected in the discharge water from the Quarry, proving that the quarry dewatering was damaging us and others in the area. As part of its due diligence, Oldcastle should have reviewed pumping records, pending litigation, geology records, boring data, and other information that was readily available. By knowingly continuing the nuisance with evidence that the nuisance was hurting other people, Oldcastle is acting in a negligent and wanton manner. In general, even though Oldcastle knew, or should have known, that the dewatering is causing a huge problem for many of the plaintiffs and the motoring public, and even though Oldcastle knew or should have known that the noise, dust and blasting are causing problems, Oldcastle continued and continues its operations unabated – and in fact in a manner that is even worse than when Hanson operated the quarry, as the noise is worse, the dust is worse, the problems associated with land collapse are worse, and the spoil pile has been greatly increased in size and is a worse problem for us and others in the area. Moreover, on October 5th or 6th, 2003, there was heavy mud and/or sediment discharge in violation of ADEM regulations that resulted in massive amounts of sediment being pumped out of the holding ponds and into the drainage and onto the Bobby Parker property, causing his irrigation system to pump red mud all over his property (until the mud clogged his system and shut it down).

As noted, the dust is a lot worse than it was, and our house is filling with dust, and the mountain of dirt is worse. Moreover, the noise pollution from the quarry is



worse than ever, and we hear the noise inside our home even louder than ever. The blasting is worse, and the blasts are shaking our home more than before. A very large area has been clear cut with more heavy equipment operating from very early in the morning until late in the evening. Oldcastle continues to flood our pasture because of the dirt, and our farm on Little Uchee Creek has little or no flow in the creek due to the dewatering.

(b)   Please see our answers above, which are incorporated here by reference.

4.   (a)   Please see our answers above, which are incorporated here by reference. Additionally, the clear cut area is much larger than before, more equipment is now operating, the noise is the same or worse under Oldcastle, and the dust is the same or worse under Oldcastle. The trees have been cleared within a few feet of the property lines on the east side and on part of the South side of the property. There is now only a small buffer strip, if any, of trees around part of the Young property. We and many of the Plaintiffs can sit or stand in our own backyards and watch the equipment operate, whereas before it was much less visible. During the month of October, on many mornings, the equipment was cranking up at 5:00 - 5:30 a.m and ran well past dark. For example, on October 20, 2003, Oldcastle's equipment ran until approximately 9:00 p.m.



The pumping of discharged water continues, which in turns continues dewatering of the area. Sinkholes continue to form in the Spring Villa area and now an unnamed tributary of Little Uchee Creek disappears into the ground. Little Uchee Creek, north of Spring Villa Road, disappears into a sinkhole, and all of these problems will continue and will get worse until Oldcastle stops pumping and wasting all the groundwater in the area.

(b)   Please see our answers above, which are incorporated here by reference.

5.   (a)   All of our experts' prior opinions answer this question, as well as our answers and the answers of our co-Plaintiffs to Hanson's discovery responses, all of which are incorporated here by reference. Prior to when Hanson began blasting, our home had no damage. Since Hanson began blasting on such a regular basis, we have had cracks, cracked foundations and other problems caused by the repetitive blasts. As long as the blasting continues, we cannot have our home repaired as, more likely than not, the damage would return in just a short while. Since Oldcastle is blasting just as much as before, and will continue to blast, anyone with a little bit of common sense can tell that Oldcastle's operation is going to continue causing damage to us.

(b)   Please see our answers above, which are incorporated here by reference.

6.   (a)   We can't answer for everyone, except for what we have been told. We understand from discussions with many of the other Plaintiffs that everyone is suffering from continued house shaking, dust problems, noise problems, and traffic problems. Otherwise, please see our prior answers, which are incorporated here by

Page 3 of 7

reference. The combination of all of these problems makes it impossible to enjoy our property or our home.

(b)    We are bothered by the continued, and worse, dust in the air, by dust deposited onto our property and into our homes, by aggravation of our existing medical problems such as asthma, by repetitive shaking and rocking of our house from the blasting, by continuous daily noise from the equipment, and by continuous heavy truck traffic in the area. Most of this is daily, but the blasting is generally once a week or once every two (2) weeks. Some of the damage is not permanent such as noise and dust and will stop when the quarry is put out of business. Some of these problems, like the blasting damage, is not repairable at this time, if the blasting continues. If the blasting stops, then we can repair our house and we believe the continuing damage will stop. Otherwise, what we said in response to Hanson's interrogatories and in response to Hanson's deposition questions, applies to Oldcastle's continued operation. Obviously, what we said about a particular event may not apply, but we have already explained in detail how the noise, dust, traffic, dewatering, and blasting have hurt us, and there is no difference between the way it used to hurt us and the way it hurts us now, except it seems worse and Oldcastle's operation is actually creating more and worse noise, dust, traffic, etc.

Also, our breathing problems are just as bad as ever, and we understand that other Plaintiffs are experiencing medical problems just as bad as, or worse than, when Hanson operated the quarry.

(c)    Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

7.    (a)    Yes.

(b)    Please see our answers to Hanson's discovery and our deposition answers, which are incorporated here by reference. In general, we know that if Oldcastle stops operating, all or almost all of our problems will eventually go away. We contend that Oldcastle's continued operation will give rise to a substantial threat of irreparable injury to our health, our property and our home. This is because of a combination of noise, dust, blasting damage and/or dewatering. The dewatering is continuing to cause sinkholes and if they form on our property or under our home, we believe the damage would be irreparable. Also, Little Uchee Creek and Spring Villa are gone because of the dewatering from the quarry, and Oldcastle is pumping just as much water as Hanson did. When that stops, we hope that the Creek and the Spring will come back, but there is no way to know for sure until someone finally stops Oldcastle.

Also, our health problems continue because of Oldcastle's continued operation of the quarry. These health problems are irreparable, as it is impossible to compensate us for our bad health and inability to breath in our own home.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

8.    (a)   Yes

(b)   Since July 13, 2003, the dust has been the same or worse than when Hanson ran the quarry. This is partly due to the fact that Oldcastle has cleared a very large area and has it exposed with no vegetation and in part because Oldcastle has raised the spoil pile by 25-50 feet or more–none of which is vegetated.

(c)   The increased dust since Oldcastle took over has made Wanda's and Ambur's asthma worse and is causing more problems at night. Wanda's and Ambers' medicine has changed to a stronger medicine and stronger dosages. Wanda and Ambur feel even worse than when Hanson was operating the quarry – not surprisingly since the dust is much, much worse. We cannot give you specific dates, as the problems are almost daily–worse on some days than others, but almost always there are some medical problems aggravated by the dust. Moreover, when the wind is blowing in our direction, we cannot even go outside. Finally, you can see the dust clouds coming from the Quarry and you can feel and breath the grit in the air.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

9.    (a)   Yes.

(b)   Please see our answers above, which apply here too. The dust and noise is almost daily. Except on Saturday and Sunday, the noise and dust are almost a daily nuisance beginning early in the morning and continuing until late at night. Even then, the dust stays on and lingers until Oldcastle starts operating again the next day. Sometimes on Sunday the dust is not so bad, unless the wind is blowing our way. The blasting is not as often but it rattles our home, and has caused cracks and our foundation problems get worse. If this isn't a nuisance–"anything that works hurt, inconvenience or damage to another" (to quote the law)–then nothing is.

(c)   Please see our answers above, which are incorporated here by reference (especially our Preliminary Witness List).

10.   (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

11.   (a) - (c). Please see our answers to all of the above interrogatories, which are incorporated here by reference.

12.   (a)   Yes.

(b)    It is our understanding that both the Little Uchee Creek and an unnamed branch (a tributary to Little Uchee) have been diverted by the dewatering into sinkholes. Little Uchee was first diverted in the fall of 2002, and the tributary on Ken Schwieker's property was diverted in the late summer or early fall of 2003, after Oldcastle took over. Since Oldcastle began operations, new sinkholes have formed in Little Uchee upstream of the old sinkholes, and the new sinkhole(s) have diverted the surface water into the ground. I do not know the exact dates these things happened. I understand that other plaintiffs have videotape and photographs of these new problems.

(c)    Please see our answers to all of the above interrogatories, which are incorporated here by reference.

I swear or affirm that the answers to the above interrogatories are true and correct and are based on my personal knowledge, information and belief, except as stated otherwise, on this 9 day of Dec                , 2003.

                                          _Randall Parker_____
                                          RANDALL PARKER, individually and as Father
                                          and Next Friend of Ambur Parker

                                          _Wanda Parker_____
                                          WANDA PARKER, individually and as Father
                                          and Next Friend of Ambur Parker

STATE OF ALABAMA        *
COUNTY OF LEE            *

BEFORE ME, a Notary Public in and for said State and County, came RANDALL PARKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this 9th day of December, 2003.

                                          _Sophia S. Benson_____
                                          Notary Public

(SEAL)

My Commission Expires: 4-11-06

Page 6 of 7

STATE OF ALABAMA    *
COUNTY OF LEE    *

BEFORE ME, a Notary Public in and for said State and County, came WANDA PARKER, whose name is signed to the foregoing Answer and who is known to me, and acknowledged before me on this date that being informed of the contents of said instrument, she executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this _9th_ day of _December_, 2003.

_Sophie S. Benson_
Notary Public

(SEAL)

My Commission Expires: _4-11-06_

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served upon:

James A. Byram, Jr.
Matt Parnell
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

John V. Denson
Samford, Denson, Horsley, Pettey
 & Bridges
P.O. Box 2345
Opelika, AL 36803-2345

H. Wayne Phears
Phears & Moldovan
Suite 375
4725 Peachtree Corner Circle
Norcross, GA 30092-3000

Phillip E. Adams, Jr.
Adams, Umbach, Davidson & White, LLP
P. O. Box 2069
Opelika, AL 36803-2069

by faxing a copy of the same to each and by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this the _12th_ day of _November_, 2003.

_C E Vercelli_
OF COUNSEL

155-00\Ans Oldcastle Inl.randall parker.5.wpd

Page 7 of 7

FILED

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

JUL 0 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )     CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

TO:  Circuit Clerk of Lee County:

Please take notice that on the 2nd day of July, 2004,

_____ 1. A notice to take the deposition of:
_____ 2. Interrogatories
_____ 3. Request for Admissions
_____ 4. Request for Production
_____ 5. Answers to Second Interrogatories
_____ 6. Response to Third Request for Admissions
_____ 7. Response to Second Request for Production
_____ 8. Notice of Intent to Serve a Subpoena on a Non-Party
          as follows:
__X__ 9. Other:   Reports of Trinity Consultants and Charles R. Faust, Ph.D.

was served on all parties to this cause by the Defendant Oldcastle Materials.

ADAMS, UMBACH, DAVIDSON & WHITE, LLP

BY:_____

PHILLIP E. ADAMS, JR. (ADA025)
Attorney for Defendant
P. O. Box 2069
Opelika, AL 36803-2069

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing by placing a copy of same in the United States Mail, first class postage prepaid, and properly addressed to the following, this the 2nd day of July, 2004:

James B. Sprayberry, Esq.
Post Office Drawer 2429
Auburn, Alabama  36831-2429

Chip Vercelli, Esq.
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, Alabama  36104-5049

Guy F. Gunter, III, Esq.
Melton, Gunter & Melton
P. O. Box 409
Opelika, AL  36803-0409

John Denson, Esq.
Samford, Denson, Horsley,
Pettey, Bridges & Hughes
P. O. Box 2345
Opelika, Alabama  36803-2345

James A. Byram, Jr., Esq.
Paul A. Clark, Esq.
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama  36101

H. Wayne Phears, Esq.
Phears & Moldovan, Ste. 375
4725 Peachtree Corner Circle
Norcross, Georgia 30092

_____
Of Counsel

IN THE CIRCUIT COURT FOR LEE COUNTY, ALABAMA

FILED

| | |
|---|---|
| MIKE DAVIS, et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) CASE NO. CV-02-85 |
| | ) |
| HANSON AGGREGATES | ) |
| SOUTHEAST, INC., et al., | ) |
| | ) |
| **Defendants.** | ) |

JUL 0 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## ANSWER OF OLDCASTLE MATERIALS, INC.
## TO FOURTH AMENDED COMPLAINT

COMES now Oldcastle Materials Southeast, Inc., by and through the undersigned counsel, and in answer to Plaintiff's Fourth Amended Complaint hereby states as follows:

1. Defendant Oldcastle specifically denies the material allegations contained in Paragraphs 1 through 94 of Plaintiffs' Fourth Amended and Restated Complaint and demands strict proof thereof.

2. Defendant adopts the answers previously set forth as if the same were set forth herein.

3. Defendant denies the allegations in paragraph 96 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

4. The allegations of paragraph 97 of Plaintiffs' Fourth Amended Complaint do not require a response from Defendant Oldcastle; however, to the extent Oldcastle has knowledge of the facts made the basis of paragraph 97, Defendant Oldcastle denies the allegations and demands strict proof thereof.

5. Defendant Oldcastle denies the allegations in paragraph 98 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

6. Defendant Oldcastle denies the allegations in paragraph 99 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

7. Defendant Oldcastle denies the allegations in paragraph 100 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

8. Defendant Oldcastle denies the allegations in paragraph 101 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

9. Defendant Oldcastle denies the allegations in paragraph 102 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

10. Defendant Oldcastle denies the allegations in paragraph 103 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

11. Defendant Oldcastle denies the allegations in paragraph 104 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

12. Defendant Oldcastle denies the allegations in paragraph 105 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

13. Defendant Oldcastle denies the allegations in paragraph 106 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.

Defendant denies that Plaintiffs are entitled to an injunction prohibiting the operation of the quarry and any other legal or equitable relief and demands strict proof thereof.

14. Defendant restates and re-adopts the responses to the previous paragraphs of Plaintiffs Fourth Amended Complaint as if set forth in full herein.

15. Defendant denies the allegations of paragraph 108 of Plaintiffs' Fourth Amended Complaint and demand strict proof thereof.

16. Defendants deny that Plaintiffs are entitled to a prohibition of pumping operations associated with the quarry and demand strict proof thereof.

17. Defendant Oldcastle admits the allegations of paragraph 109 of Plaintiffs Fourth Amended Complaint.

18. Defendant denies the allegations of paragraph 110 of Plaintiffs' Fourth Amended Complaint and demands strict proof thereof.